# Exhibit A

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FT. WORTH DIVISION

| | | |
|---|---|---|
| **ROBERT "BOB" ROSS**<br>**Plaintiff/Counterclaim Defendant** | § <br> § <br> § <br> § <br> § | |
| **V.** | § <br> § <br> § <br> § | **Case No. 4:22-CV-00343-Y** |
| **ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, MCGAUGHEY, REBER AND ASSOCIATES, INC., JULIE HEDRICK, ERIK HARRIS**<br>**Defendants/Counterclaim Plaintiff.** | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF AND BRIEF IN SUPPORT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW Plaintiff, ROBERT "BOB" ROSS, and files this, his Response to Defendants', ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS (hereinafter "APFA"), JULIE HEDRICK, AND ERIK HARRIS 12(b)(6) and 12(b)(1) Motion to Dismiss, and as grounds for support herein would show this Honorable Court the following:

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief, brought pursuant to Federal Rules Civil Procedure §§ 12(b)(1) and 12(b)(6).

---

# I. <u>INTRODUCTION</u>

Robert "Bob" Ross (hereinafter referred to as "Plaintiff" or "Ross"), is a member in good standing of the Association of Professional Flight Attendants union (hereinafter "APFA") and the Former National Treasurer. Plaintiff was charged with violations of the APFA policy after enduring three days of arbitration hearings, and an award being issued against him declaring he breached his fiduciary duty to the union. Plaintiff filed his complaint against McGaughey Reber and Associates dba Diversified Credit Systems, APFA, the National President, Julie Hedrick, and National Treasurer, Erik Harris, to vacate the arbitration award after discovering APFA and the National Officers withheld documents and pertinent facts from Plaintiff, the APFA Board of Directors, the APFA Executive Committee members, and Arbitrator Ruben Armendariz in order to acquire an unfavorable arbitration award. Ross contends this violated his rights under the "Member's Bill of Rights" afforded by the Labor Management Reporting and Disclosure Act, as well as breached the APFA Constitution, and breached the two officer's common-law fiduciary duties to the Plaintiff. Plaintiff asserts Defendants' motivation was Plaintiff's opposition to a proposed merger of APFA with the Association of Flight Attendants-CWA, AFL-CIO (hereinafter "AFA").

On or about July 21, 2022, Defendants filed a Motion to Dismiss Plaintiff's Claims for Relief and Brief in Support (hereinafter "Motion to Dismiss"). (*See generally, Ex. A, Defs' Motion to Dismiss Pl's Claims for Relief and Brief in Support*). Defendants assert the following arguments in their Motion to Dismiss:

(1) Plaintiff's claims fail to meet subject matter jurisdiction,

(2) LMRDA provisions no longer govern any internal union matters, and

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

2

     (3) all remaining claims asserted by Plaintiff are unfounded either

        (a)   due to lack of jurisdictional basis,

        (b)    due to lack of meeting Plaintiff's legal obligation "to exhaust the mandatory internal union remedies 'prior to taking any legal action'",

        (c)    Plaintiff failed to meet the statutory pre-requisite to filing a claim under §501(a) of the Labor Management Reporting and Disclosure Act, and

        (d)    all other claims are preempted by the Arbitration Award. (*see generally, Ex. A, Defs' Motion to Dismiss Pl's Claims for Relief, 5-10*).

Defendants' Motion to Dismiss provides misleading interpretations of the law, as well as inconsistent interpretations of Plaintiff's claims asserted in this case before the court. A clear understanding of both the law and Plaintiff's position clearly show that Defendant's motion to dismiss should be denied.

## II. <u>STATEMENT OF THE CASE</u>

Plaintiff, Robert "Bob" Ross ("Plaintiff") seeks damages alleging unlawful violations of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, et seq. ("LMRDA"), the Association of Professional Flight Attendants Union Constitution, and Breach of Fiduciary Duty as provided for under Texas Common Law by Defendants APFA, JULIE HEDRICK, AND ERIK HARRIS ("hereinafter Defendants"). APFA is a labor organization covered under the LMRDA, 29 U.S.C. §401 et seq, and 29 U.S.C. § 158, et seq. Plaintiff is a member in good standing of APFA as defined under the LMRDA and 29 U.S.C. § 158. On or about January of 2016, the Plaintiff ran for office within the APFA local union elections. For clarification, Robert "Bob" Ross ran for

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

3

National President Nena Martin ran for National Vice-President, and Eugenio Vargas ran for National Treasurer.

Plaintiff won the election, with Robert "Bob" Ross being elected President, Nena Martin elected Vice-President, and Eugenio Vargas Treasurer ("Ross Administration"). The Ross Administration opposed a merger of the union with AFA—another multi-airline flight attendants' union. This created two political factions within APFA competing for power: Pro-APFA/AFA and Anti-APFA/AFA. The individuals comprising the Pro-APFA/AFA faction undertook a course of conduct of retaliation and suppression to thwart the efforts of Plaintiff, as well as others within the local union, to silence the opposition, supplement leadership, and effectuate a merger of the two unions. Ross voluntarily stepped down from his position as National President on March 9, 2018 after negotiating and signing a transition agreement with the APFA Board of Directors ("Transition Agreement"). In 2020, the Hedrick Administration (a Pro-APFA/AFA Administration) was elected to National Office.

Plaintiff was subjected to retaliatory and oppressive actions by their union opponents and were subjected to deliberate attempts to suppress their dissent within in the union. Specifically, but not limited to, Plaintiff, Ross was investigated, charged, harassed, and disparaged through online media sources intended for work purposes, his confidential Transition Agreement made public, without his consent, unlawfully collected and credit-reported on in violation of federal law, and forced to defend himself in an sham arbitration in which documents were withheld, and the national officers informed the Executive Committee and the Board of Directors that an independent accounting firm reviewed and determined that the payments made to Ross under the Transition Agreement were miscalculated. The APFA National Officers demanded Ross pay back several

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

4

thousand they claimed he owed to APFA for these alleged overpayments.  Thereafter, Ross was charged with various violations of the APFA policy, including credit card violations, rental car violations, reimbursement violations, payout for his sick and vacation pay, and his payments under the Transition Agreement.  The arbitration hearing was held—much of it conducted in a way that denied Ross a fair opportunity to be heard—and an arbitration award was issued.  The arbitration award went well beyond the charges asserted against Plaintiff by framing the issue as "Did Bob Ross, the Defendent [sic] herein violate the APFA Policy Manual and the APFA Constitution by engaging in malfeasance, fraud, misappropriation of funds while he was in office during the term of April 1, 2016 to March 2, 2018. If so, what shall be the appropriate remedy?"

The arbitration award further states that "[t]he arbitrator finds that throughout this proceeding, Defendant Ross *intentionally and willfully* ignored the provisions of the APFA Policy Manual and thus, has violated and abused his fiduciary duty entrusted to him by the APFA membership ." (*Ex. D, Ross Arbitration Award, Issued March 19, 2022, p. 21-24*).

The award goes beyond the initial charges asserted against Plaintiff and determines criminal or civil violations against Plaintiff where no such violations were ever initially asserted.  ." (*Ex. D, Ross Arbitration Award, Issued March 19, 2022, p. 21-24*).  The award seeks to ameliorate grievances for a family trip never taken, furniture purchases for which Ross previously reimbursed the Union—a fact that Chinery and Lee did not dispute—and necessary items for an APFA apartment Ross resided in while away from his CA-based residence prior to his relocation once his children finished school.  Furthermore, the award goes beyond the scope of remedies sought in the initial charges and issues fines for charges made for various violations.  The award even cites "the independent accounting firm" that reviewed Ross's payments under the Transition Agreement as

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

5

the basis for issuing a fine in the amount owed for the repayment of his over-payment. (*Ex. D, Ross Arbitration Award, Issued March 19, 2022, 21-23*).

Plaintiff discovered that APFA officers had presented false statements to the Executive Committee and the Board of Directors and withheld pertinent documentation during the arbitration hearings. Attached hereto, incorporated herein and marked as <u>Exhibit C</u> is the Original Petition filed by Diversified Credit against Ross in Tarrant County Justice Court, Precinct Three (*Ex. C, Pl.'s Original Petition, Tarrant County Justice Court, Precinct Three, JP03-22-DC00017757, 9*). Attached hereto, incorporated herein and marked as <u>Exhibit B</u> is the Affidavit of Nena Martin, a former Board member who attests to the statements made by the officers at the Board of Directors meetings, the Executive Committee meetings, and the emails received that clearly assert the misrepresentation that the accounting firm's review determined the incorrect per diem was used to calculate Ross's payments (*Ex. B. Affidavit of Nena Martin and Email from Erik Harris to Board of Directors and Executive Committee*). Upon being served on a debt lawsuit filed by Defendant, McGaughey, Reber and Associates—the successor-in-interest to the Transition Agreement, Ross discovered a letter from the APFA accounting firm that reviewed his payments under the Transition Agreement ("Confidential Memorandum"). (*Ex. C, Pl.'s Original Petition, Tarrant County Justice Court, Precinct Three, JP03-22-DC00017757, 9*). The Confidential Memorandum clearly states that the payments made to Ross "appear appropriate and in compliance with the transition agreement" which conflicts with the National Officer's statements to the APFA Board of Directors and the Executive Committee, as well as statements relied on by the arbitrator to issue the award. (*Ex. B, Pl.'s Original Petition, Tarrant County Justice Court, Precinct Three, JP03-22-DC00017757, 9; Ex. B, Affidavit of Nena Martin and attached Ex. B-1, Email from Erik Harris to*

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

6

*Board of Directors and Executive Committee).* Plaintiff's union representative appealed to the arbitrator upon discovering the Confidential Memorandum, however, Plaintiff was denied the opportunity to introduce the evidence or reopen the case.

Plaintiff was not provided the safeguards against improper disciplinary action guaranteed under the LMRDA. Withholding documentation and misrepresenting the facts is an unconscionable violation to Plaintiff's right to a fair hearing and goes beyond any rational explanation that could meet a reasonableness standard. The result of this conduct is that Plaintiff has been unfairly fined and disciplined by APFA's conduct. Further, Plaintiff's reputation has been damaged, he has been fined, his credit report has been damaged, removed from his position on the Board of Directors as Base President, and suspended from holding any official APFA position for the remainder of his life. He has suffered for the past six years from on onslaught of public humiliation tactics designed, coordinated, and executed by the Defendants. He has suffered financially and emotionally as he has watched his wife and children suffer from the pain this has brought on their family. Plaintiff seeks to have the arbitration award vacated, as this hearing and the resulting arbitration award are clearly based on fraudulent conduct.

## III. ARGUMENTS AND AUTHORITIES

### A. Standards For Dismissal

An FRCP 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction seeks the dismissal of the lawsuit because the court lacks the authority to hear the dispute. *See generally U.S. v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773 (1984). A claim must be dismissed, pursuant to Rule 12(b)(1), "when the Court lacks the statutory or constitutional power to adjudicate

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

7

the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.

1998). 29 U.S.C. § 412 clearly states:

> "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

If a FRCP 12(b)(1) motion simply challenges the Court's subject-matter jurisdiction based

on the sufficiency of the pleading's allegations, then the motion is a facial attack. *U.S. v. Ritchie*,

15 F.3d 592, 598 (6th Cir. 1994). In a facial attack, the District Court will accept all material

allegations of the complaint as true and construe them in the light most favorable to the non-

moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Ritchie*, 15

F.3d at 598; *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

In resolving the question of subject-matter jurisdiction, the District Court can refer to

evidence outside the pleadings. *Luckett v. Bure*, 290 F.3d, 496-97 (2d Cir. 2002); *Gonzalez v. U.S.*,

284 F.3d 281, 288 (1st Cir. 2002).

A motion to dismiss for failure to state a claim upon which relief can be granted tests the

formal sufficiency of the statement of claim for relief in the Plaintiff's complaint. *Doe v. Hillsboro*

*ISD*, 81 F.3d 1395, 1401 (5th Cir. 1996). The motion cannot be used to resolve factual issues or the

merits of the case and is not appropriate unless the Plaintiff's pleadings on their face show, beyond

a doubt, that the Plaintiff cannot prove any set of facts that would entitle it to relief. *Medina-Claudio*

*v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002); *Hickey v. Obannon*, 287 F.3d 656, 657 (7th

Cir. 2002).

Rule 12(b)(6) motions are disfavored in the law, and a Court will rarely encounter

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

8

circumstances that justify granting them. *Mahone v. Addicks Utility District of Harris County,* 836 F.2d 921, 926 (5th Cir. 1998). A Court may dismiss a claim only when it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations found in the complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A motion to dismiss should not be granted unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him or her to relief. *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

The claimant is not required to set out in detail the facts upon which the claim is based, rather the rules require that the claim simply give the Defendant "fair notice." *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168 (1993). Further, a Court may not look beyond the pleadings. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). The Court must accept as true the allegations in the complaint and must view the allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the claim need only give the Defendant fair notice of the nature of the claim and the grounds on which it rests. *See Mahone*, 836 F.2d at 926. The rules also dictate that the pleadings be liberally construed "as to substantial justice." *Id.*

**B.** **Plaintiffs Have Stated Claims Upon Which Relief May Be Granted**.

    (1).   Plaintiff properly brought his causes of action pursuant to the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*, and provided Defendants "fair notice" therein pursuant to Federal Rule of Civil Procedure § 8(a).

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Manguno v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720,

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

9

725 (5th Cir. 2002). The complaint must be liberally construed in favor of the Plaintiff, and all facts pleaded in the complaint must be taken as true. *Id.* Recent decisions by the Supreme Court have elaborated on the pleading standards for civil litigation *See Ashcroft v Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Supreme Court noted two "working principles" in the *Iqbal* and *Twombly* decisions. First, while a Court must accept all factual allegations in the complaint as true, the court need not accept a complaint's legal conclusions as true; and second, a complaint must state a "plausible claim for relief" to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1949-50. "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id,* at 1949. The court presumes factual allegations to be true, even if doubtful in fact. *Twombly*, 550 U.S. at 555; *Lindquist v. City of Pasedena*, 525 F.3d 383, 386 (5th Cir. 2008).

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. *Fed. R. Civ. P.* 8(a). As the Supreme Court has emphasized, this rule does not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570, or "detailed factual allegations," *Iqbal*, 129 S. Ct. at 1949.

Defendants allege that Plaintiff has not stated a claim upon which relief can be granted under the LMRDA. (*Ex. A, Defs' Motion to Dismiss Pl's Claims for Relief, 6*). However, Defendants have wholly failed to provide any legal or factual basis supporting their allegations that Plaintiff cannot state a claim upon which relief can be granted under the LMRDA. Defendants argue that LMRDA does not govern disputes between members as these disputes do not classify as a disciplinary measure by the union. Plaintiff would note that the APFA Const. Art. VII—

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

10

entitled "Hearings and Disciplinary Procedures"—spells out that members are subject to fine, suspension or expulsion, or suspension from or removal from office for an enumerated list of violations. (*Ex. E* APFA Const. Art. VII, Sec. 1 *et. seq.).* Furthermore, Art. VII, Sec. 2 creates the right for any member in good standing to file charges against another member—however neither the Constitution nor Policy grants APFA the right to file charges against an individual member in pursuit of disciplinary measures. (*Id.* at Sec. 2 *et. seq.).* Once charges are filed, the National Secretary then presents the charges to the APFA Executive Committee, who vote on whether the charges are timely, valid and specific. The accused is then referred to an arbitrator for an arbitration hearing, which ultimately results an award. If the award stipulates the accused member must pay fines, those damages are collected by the union.

In the present case, the charges were brought by two members, the Executive Committee found the charges to be timely, valid, and specific after the National Officers misrepresented that an accounting firm's review of Ross's payments under his Transition Agreement found the payments were incorrect. (*Ex. B. Affidavit of Nena Martin and Email from Erik Harris to Board of Directors and Executive Committee).* Following issuance of the arbitration award, the APFA National President issued a public announcement to all membership on March 24, 2022 announcing the arbitrations as a result of the unions publications of financial documentation; furthermore, the arbitration awards were adopted by resolution by the APFA Board of Directors on March 8, 2022. (*Ex. F Resolution by Board of Directors March 8, 2022; Ex. G, Presidential Hotline to Membership, March 24, 2022*).

## C.     <u>Subject Matter Jurisdiction</u>

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

11

    (1)   <u>Subject Matter Jurisdiction is Conferred based on Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411, *et. seq.*</u>

Subject matter jurisdiction exists when a federal question exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." (28 U.S.C. § 1331). "The 'vast majority' of cases that come within this grant of jurisdiction are covered by Justice Holmes' statement that a 'suit arises under the law that creates the cause of action.'" (*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 807 (1986) quoting *Franchise Tax Board* v. *Construction Laborers Vacation Trust,* 463 U. S. 1, 8-9 (1983)). An action "arises under" federal law if: (1) "federal law creates the cause of action[,]" or (2) "the vindication of a right under state law necessarily turn[s] on some construction of federal law." (*Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 808-09 (1986) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.,* 463 U.S. 1, 9 (1983)); *see also, Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308, 312 (2005)).

In the matter before this Court, the cause of action at the heart of the case are those claims falling under the LMRDA § 411, *et seq.* Grounds for a cause of action are created by the federal legislation under LMRDA, 29 U.S.C. § 412 which grants:

> "[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United State for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located." (29 U.S.C. § 412).

The cause of action for the unfair hearing and violation of Plaintiff's rights arise from the federal Labor Management Reporting and Disclosure Act, thus subject matter jurisdiction is clearly established.

**D.**      <u>**Arbitrator's Decision is Subject to Review**</u>

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support
      12

(1) <u>The Arbitrator's Decision Is Subject to Judicial Review</u>

Defendants contend that Plaintiff's basis for setting aside the arbitration award is grounded in LMRDA § 411. (*Ex. A, Def's Motion to Dismiss Pl's Claims for Relief, p. 6*). Plaintiff filed the motion to vacate the arbitration award based on the well-established law that arbitration awards where fraud, corruption, misconduct, or where arbitrators exceeded their authority shall be vacated by the court. (9 U.S.C. § 10). The cause of action under LMRDA §411, *et seq.* is rooted in the Plaintiff's cause of action for damages as a result of the violation of his rights as a union member granted thereunder. Defendants seem to confuse the two laws—one is a means to vacate an invalid award, the other is a means to recover for damages suffered.

Plaintiff's claim under LMRDA are valid and properly asserted claims. The *Supreme* Court coined LMRDA "the product of congressional concern with widespread abuses of power by union leadership." *(Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 1870, (1982)). The *Breininger* Court reviews a steel worker's claim brought against his union denial of referrals at the hiring halls. The question before the Supreme Court was whether the union's actions were considered disciplinary actions that required notice and a fair hearing under LMRDA 101(a)(5). (*Breininger v. Sheet Metal Workers*, 493 U.S. 67 (1989)) [*Attachment 1]*. The *Breininger* Court found that "[t]he fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide 'safeguards against improper disciplinary action,' indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members." (*Id.* at 92). The case addresses the term "otherwise discipline" in the language of LMRDA § 411 for purposes of when a union must give notice and a hearing and when it should not. (*Id).* The Supreme Court holds that

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

13

"otherwise discipline" indicates "'Congress did not intend to include  all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules."   (*Id.* at 91).  The statute highlights the types of punishment as fines, expulsion, and suspension, which the *Breininger* Court found required a disciplinary process rather than an *ad hoc* retaliation by union officials.  *Id.* At no point does the *Breininger*  Court address subject matter jurisdiction.  Nor does the *Breininger* Court ever hold that subject matter jurisdiction did not extend to union disciplinary arbitrations.

The *Guidry* Court also did not address subject matter jurisdiction issues, nor did it  address arbitration awards regarding union procedures. (*Guidry v. Int'l Union Of Operating Eng.*, *406*, 882 F. 2d 929 (5th Cir. 1989)) [*Attachment 2*].  This Court, instead, addressed a union members complaint regarding hiring hall procedures between a union and an employer that allowed the union to hire within and outside the union at its discretion.  (*Id at* 933-934).  Hiring procedures of one of the Business Agent illustrated that he was exploiting and disregarding the hiring hall procedures to enrich those union members loyal to him—detrimentally to his opponents to silence and compel obedience. (*Id).* Here the Court held that under 101(a)(5) you cannot define depriving job referrals as "discipline" in which notice, and a fair hearing is required.  However, when it is done as an imposition on a union member's free speech, it can be prohibitive in its effective under 101(a)(1 and 101(a)(2).  (*Guidry v. Int'l Union Of Operating Eng.*, 907 F. 2d 1491, 1493 (5th Cir. Ct App. 1990)) [*Attachment 3*].  Furthermore, the *Guidry* Court held that the discipline requirement does not have to be done in the union's name, but if done on behalf of the union, rather than ad hoc retaliation committed by one union leader, would still fall within the scope of 101(a)(5).  (*Id.* at 1492-93).

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                14

The discipline complained of by the Plaintiff includes damage to his reputation, fines, expulsion from his position as Base President, and suspension from his ability to serve as an elected official. Furthermore, the charges were brought on behalf of and for the benefit of the union, not for the benefit of the members that brought the charges. Considering this discipline is outlined as regular disciplinary measures in the APFA Constitution, and proceedings were held through an arbitration—the Plaintiff's claim clearly meets the standards laid out by the *Breininger* Court. Plaintiff can only assume that Defendants' counsel intended to argue that the arbitration between two members, as provided for under APFA's disciplinary procedures, is not considered an internal union-conducted disciplinary proceedings regulated by LMRDA. (*Ex. A, Defs' Motion to Dismiss Plaintiff's Claims for Relief and Brief in Support, 5*). If *this* is Defendants' argument, then this notion disregards the procedures spelled out in the APFA Constitution, which provides that the National Secretary "shall administer Article VII procedures." (*Ex. E, APFA Const Art. III Sec. 6D(8), pg. 22*). The National Treasurer oversees all financial records, production of all financial documents, maintain computerization of financial documents, oversee all daily activities of the APFA headquarters office and staff, and assist the National Secretary in the discharge of his duties. (*Ex. E, APFA Const Art. III Sec. 6E et seq., pg. 23-24*). The National President acts as the chairperson for the Board of Directors, and the Executive Committee, appoints the members on the Executive Committee, and has the authority to retain and hire legal counsel for the union. (*Ex. E, APFA Const Art. III Sec. 6 et seq., pg. 20-21*). The Vice-President is empowered to hire counsel for members in arbitrations and grievances and assist the National President in the discharge of all duties. (*Ex. E, APFA Const Art. III Sec. 6 et seq., pg. 21-22*). The Executive Committee, comprised of all four national officers and appointees made by the National President, review and vote on

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

15

whether charges are timely, specific, and valid prior to any referral of charges to arbitration (*Ex. E, APFA Const Art. VII Sec. 3 et seq., pg. 42-43*). The Board of Directors, which includes all four national officers, appoint an arbitrator to preside over the arbitration. (*Ex. E, APFA Const Art. VII Sec. 5 et seq., pg. 44-45*).

The APFA Constitution illustrates that the only means to bring about a disciplinary action is to file charges by an individual member against another individual member through the arbitration process, which is overseen and conducted by the National Officers. There are no provisions outlined in Art. VII of the APFA Constitution or APFA Policy that provide for APFA to bring charges against a member on behalf of the union—the drafters of the APFA Constitution sought to empower all members to implement discipline against one another for violations. Furthermore, there is no provisions or measure for a member to file charges and bring an action against an officer as an officer. The only means to file charges outlined in Art. VII of the APFA Constitution provides for only one member to file charges against another member. Therefore, the only possible interpretation of the Article VII Arbitration Procedures of the APFA Constitution as anything other than a disciplinary proceeding falling within the scope of LMRDA would undermine the statute and frustrate its purpose—to protect members from unfair treatment and intimidation tactics.

(2) <u>Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order</u> <u>Comports with Well-Settled Federal Labor Law Principles.</u>

Defendants argue that the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is final and not subject for review by the judiciary, therefore the arbitrator's award in the case at issue should stand as final and binding. The review of arbitration

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

16

awards in labor cases was described by the *Misco* Court as "[t]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." (*United Paper Workers International Union v. Misco, Inc.,* 484 U.S. 29, 36-37 108 S.Ct. 364, 371, (1987)) [*Attachment 4*]. Application of these ordinary contract principles falls squarely within an arbitrator's wide discretion to interpret and apply a collective bargaining agreement. Relying on this interpretation for this case at issue poses three problems: (1) there is not a Collective Bargaining Agreement at issue between Plaintiff and Defendants, (2) this interpretation frustrates the policy and purpose behind the LMRDA and the Member's Bill of Rights as forged by Congress, and (3) labor law principles regarding arbitration still favor vacating arbitration awards in certain circumstances.

The first problem with extending the arbitrator's authority within the case-at-issue is that no Collective Bargaining Agreement is at issue in the current case between Plaintiff and Defendants. "A union constitution is considered a contract between the union and its members, and a member or members may sue the union under section 301 (a) for breach of that contract." (*Wooddell v. International Bhd. of Elec. Workers,* 112 S.Ct. 494, 499, 116 L.Ed.2d 419 (1991); *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 619-27, 101 S.Ct. 2546, 2549-53, 69 L.Ed.2d 280 (1981); *Kinney v. International Bhd. of* 1477*1477 *Elec. Workers,* 669 F.2d 1222, 1229 (9th Cir.1981)). A Collective Bargaining Agreement is one typically defined by "contracts between an employer and a labor organization representing employees. . . ." (29 U. S.C. § 185(a)).

In the case before the court, the employer, American Airlines, Inc., is not a party to the Union Constitution, nor a party to the charges filed nor the union's disciplinary procedures, nor

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

17

the arbitration hearing.  The Plaintiff has not filed a claim for breach of duty of fair representation.  This is governed solely by the union constitution—which is a contract between the members and APFA.  Therefore, application of the labor law principle that an arbitrator's interpretation of a collective bargaining agreement is not appropriate here.

The second problem with Defendants' argument is that this approach frustrates the policy interest behind enacting LMRDA.  The LMRDA policy interest was clear upon Congress's enactment of the legislation: "[t]he legislative history and the extensive hearings which preceded the  enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from" abusing their disciplinary powers. (*Local Union No. 38 v. Pelella*, 350 F.3d 73, 83-84 (2nd Cir. 2003) (citing *Salzhandler v. Caputo,* 316 F.2d 445, 449 (2d Cir.1963))). The Second Circuit Court spells out the policy behind the Union Member's "Bill of Rights" in saying that "Section 101 of Title I of the LMRDA represents '[o]ne of the most significant remedial provisions of the LMRDA.' (*Pelella*, 350 F. 3d 73, 84 (citing *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation,* 590 F.2d 1139, 1149 (D.C.Cir.1978))).  The Union Member's "Bill of Rights," protects members from the abusive or coercive practices of the union's leadership.  (*Franza v. International Brotherhood of Teamsters, Local 671,* 869 F.2d 41, 44 (2d Cir.1989)).

In the case before the court, expansion of an arbitrator's interpretations from a Collective Bargaining Agreement to union disciplinary arbitrations would simply stifle protections afforded to members from abuse of power by union officials and leadership under LMRDA.  The case law, let alone Congress's intent in creating and implementing the law simply does not support such a

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

18

broad scope of interpretation of this axiom.

The third problem with Defendants' arguments in support of non-judicial review of the arbitrator's award within a Union's disciplinary proceeding is that it ignores those instances in which the courts have vacated arbitration awards even interpreting a collective bargaining agreement. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." (*Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 507-509 (2001) (quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960)) [*Attachment 5*]. The Supreme Court in *Garvey,* goes on to state that "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award." Here, the court makes clear that when dishonesty has occurred, vacating the arbitration award is the proper recourse. Those "decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced." *Misco*, 484 U.S. 29 at 38-39.  Again, these cases apply to those where the arbitration occurs as a result of a collective bargaining agreement.  In the case before the court, dishonesty *has* been asserted, if not clearly established by the documents attached to Plaintiff's Original Complaint. (*Ex. H, Pl's Original Compl.).* Therefore, even if a heightened standard to vacate the union's disciplinary action were applied, the arbitrator's award at issue should still be vacated per the labor law principles due to the Defendants' fraud—however, at the very least, Plaintiff's motion to dismiss should be denied.


### E.     Plaintiff's Remaining Claims Have Merit

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

19

(1)  Jurisdictional Basis for Remaining Claims rests in *Gibbs* Supplement Jurisdiction

As previously discussed, the Supreme Court has held that "[a] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." (*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). Furthermore, 28 U.S.C. §1331 requirements are met when a case generally arises under federal law when that federal law creates the cause of action.  (*Grable & Sons*, 545 U.S. 308, 312).

State law claims asserted between the same parties, based on the same nucleus of facts that gave rise to the cause of action which forms the basis of subject matter jurisdiction, may be heard based on supplemental or pendent jurisdiction. In *Finley,* the Supreme Court reaffirmed what it previously held in *Gibbs* finding that "in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [which] comprises but one constitutional 'case.'" (*Finley* v. *United States,* 490 U. S. 545, 548 (1989) quoting *Mine Workers* v. *Gibbs,* 383 U. S. 715 (1966)) [*Attachment 6].*

In the case before the court, subject matter jurisdiction is conferred based on federal question because the cause of action *arises out of* the LMRDA, 29 U.S.C. § 412.  Supplemental jurisdiction over state law claims can be founded on the *Gibbs* case and its progeny of broadly interpreting jurisdictional authority over state law claims within an action properly embedded in federal question jurisdiction.

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support                                    20

(2) <u>Exhaustion of Internal Remedies was not Required Prior to Filing Suit</u>.

Plaintiff is not required to exhaust internal remedies as a pre-requisite to filing suit against the Defendants. Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts the discretion to hear a union member claim or require a union member to exhaust his internal remedies before filing suit. (*See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982). *Guidry v. Operating Engineers Local 406*, 882 F. 2d 1491, (5th Cir. 1990)). Exhaustion, however, is not required "when internal union remedies are inadequate or illusory, or when the union has taken a consistent position in opposition to that of a plaintiff, and exhaustion would therefore be futile . . . ." *Verville v. Int'l Ass'n of Machinists & Aerospace Workers*, 520 F.2d 615, 620 (6th Cir. 1975).

Despite the futility of meeting a pre-exhaustion requirement, Plaintiff *did* exhaust his internal remedies prior to filing suit, as Plaintiff pursued arbitration and achieved an award. Plaintiff called witnesses that were not required to appear or that were intimidated and discouraged from testifying on behalf of the Plaintiff during the Arbitration. Plaintiff subpoenaed documents pertaining to the charges and put on his defense. Plaintiff only brought this lawsuit after discovering that the Union and the National Officers conspired to withhold documents and mis-informed APFA officials to achieve a guilty result.

(3) <u>Common Law Breach of Fiduciary Duty Claims require compliance with LMRDA § 501(b).</u>

The Breach of Fiduciary Duty claims brought against the officers were asserted under

---

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

21

Texas Common Law, similar to the counterclaim asserted by Defendant. LMRDA § 501(a) clearly asserts a cause of action against an officer that spends union funds or for purposes of pecuniary or personal gain. Plaintiff's Complaint never asserted any facts regarding the officers' conduct pertaining to their spending of union funds, rather Plaintiff's complaints clearly focus on the withholding of documents, the presentation of false facts, defamation of his character, and conspiring to defame his character. Consequently, any pre-requisite needed to comply with LMRDA § 501(b) is moot, as no claim under LMRDA § 501(a) have been asserted.

(4) <u>Preemption of the Breach of Union Constitution and Breach of Fiduciary Duty claims cannot exist based on the Fraudulent Arbitration Award.</u>

Preemption of the remaining claim cannot be based on an Arbitration that were not based on any claims brought by the Plaintiff and did not address any of the grievances or damages Defendants imposed on the Plaintiff. The Supreme Court finds preemption of state law claims only when the claim is dependent on interpretation of a Collective Bargaining Agreement. (*Hawaiian Airlines v. Norris*, 512 U.S. 246 (1994); *Martin v. American Airlines, Inc.*, 390 F.3d 601 (8th Cir. 2004)). Consequently, since no Collective Bargaining Agreement is at issue in the case before the Court, then there is no preemption of the state law claims brought against the Defendants.

**F.     Plaintiff Has Satisfied the "Fair Notice" Pleading Requirements Pursuant to Federal Rule of Civil Procedure 8(a).**

Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim" showing that the pleader is entitled to relief. (Fed. R. Civ. P. 8(a)). As the Supreme Court has emphasized, Rule 8 does not require "heightened fact pleading of specifics," or "detailed

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

22

factual allegations," (*Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949). Plaintiff has provided

an extremely detailed pleading outlining specific violations of the LMRDA by Defendants. (*Ex.

H, Pl's Original Compl.*).

The law clearly states that the Claimant is not required to set out in detail the facts upon

which the claim is based, rather the Rules require that the claim simply give the Defendants "fair

notice." (*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination*, 507 U.S. 163, 168

(1993)). Further, the Court must accept as true the allegations in the complaint and must view the

allegations in the light most favorable to the Plaintiff. *Blackburn*, at 931. The allegations in the

claim need only give the Defendant fair notice of the nature of the claim and the grounds on which

it rests. (*See Mahone*, 836 F.2d at 926). The rules also dictate that the pleadings be liberally

construed "as to substantial justice." (*Id*).    Plaintiff has met his burden of providing a detailed

factual basis and specific statutory protections along with specific relief. (*Ex. H, Pl's Original

Compl.*).

## IV. CONCLUSION AND PRAYER

In conclusion, Plaintiff clearly plead, and sought protection and relief, pursuant to his rights

as a member of a labor organization under the LMRDA. Plaintiff alleged and asserted a detailed

factual background demonstrating how Defendants violated his rights. Plaintiff has provided

Defendant with fair notice of the allegations and facts of his claims pursuant to Federal Rule of

Civil Procedure 8(a) and the local rules of this Court. Plaintiff cited specific clauses under the

LMRDA under which their rights are protected, and relief is available. Further, Plaintiff has also

demonstrated that Plaintiff has only plead relief sought from this Court in its official capacity,

and that sound case law exists to protect his rights. For the reasons state herein, Plaintiff requests

Plaintiff's Response to Defendants'                                    23
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

that the Court deny Defendants' Motion to Dismiss Plaintiff's Claims for Relief.

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

24

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC

By: /s/ Heather Abreu
     Heather Abreu
     Texas Bar No. 24122577
     Phone: (972) 327-5800
     Email: heather@KDphillipslaw.com

By: /s/ Kerri Phillips
     Kerri Phillips
     Texas Bar No. 24065906
     Phone: (972) 327-5800
     Email: kerri@KDphillipslaw.com

     5700 Tennyson Parkway, Suite 300
     Plano, Texas 75024
     Fax: (940) 400-0089
     For Service of Filings:
     notice@KDphillipslaw.com

     **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

     I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing **on this the** 11th **Day of August, 2022.**

William Osborne
Margot Nikitas
Sanford Denison
Michael Rake

                       /s/
                       Heather Abreu

Plaintiff's Response to Defendants'
Motion to Dismiss Plaintiff's Claims for
Relief and Brief in Support

25

**493 U.S. 67 (1989)**

# BREININGER

### v.

## SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL UNION NO. 6

<u>No. 88-124.</u>

**Supreme Court of United States.**

Argued October 10, 1989

Decided December 5, 1989

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

70     *70 *Francis J. Landry* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Acting Solicitor General Bryson, Stephen L. Nightingale, Joseph E. DeSio, Robert E. Allen, Norton J. Come, Linda Sher, Jerry G. Thorn, Allen H. Feldman, Steven J. Mandel,* and *Anne P. Fugett.*

*Laurence Gold* argued the cause for respondent. With him on the brief were *Jeffrey I. Julius* and *Marsha Berzon.*[*]

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents two questions under the federal labor laws: first, whether the National Labor Relations Board (NLRB or Board) has exclusive jurisdiction over a union member's claims that his union both breached its duty of fair representation and violated the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 519, 29 U. S. C. § 401 *et seq.* (1982 ed.), by discriminating against him in job referrals made by the union hiring hall; and second, whether the union's alleged refusal to refer him to employment through the hiring hall as a result of his political opposition to the union's leadership gives rise to a claim under §§ 101(a)(5) and 609 of the LMRDA, 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.). The Court of Appeals for the Sixth Circuit held that petitioner's suit fell within the exclusive jurisdiction of the Board and that

71     petitioner had failed to state a claim *71 under the LMRDA. 849 F. 2d 997 (1988) *(per curiam).* We reverse the Court of Appeals' decision as to jurisdiction, but we affirm its holding that petitioner did not state a claim under LMRDA §§ 101(a)(5) and 609.

# I

Petitioner Lynn L. Breininger was at all relevant times a member of respondent, Local Union No. 6 of the Sheet Metal Workers International Association. Pursuant to a multiemployer collective-bargaining agreement, respondent operates a hiring hall through which it refers both members and nonmembers of the union for construction work. Respondent maintains an out-of-work list of individuals who wish to be referred to jobs. When an employer contacts respondent for workers, he may request certain persons by name. If he does not, the union begins at the top of the list and attempts to telephone in order each worker listed until it has satisfied the employer's request. The hiring hall is not the exclusive source of employment for sheet metal workers; they are free to seek employment through other mechanisms, and employers are not restricted to hiring only those persons recommended by the union.[1] Respondent also maintains a job referral list under the Specialty Agreement, a separate collective-bargaining agreement negotiated to cover work on siding, decking, and metal buildings.

72     Petitioner alleges that respondent refused to honor specific employer requests for his services and passed him over in making job referrals. He also contends that respondent refused to process his internal union grievances regarding *72 these matters. Petitioner's first amended complaint contained two counts. First, he asserted a violation of the duty of fair representation, contending that respondent, "in its representation of [petitioner], has acted arbitrarily, discriminatorily, and/or in bad faith and/or without reason or cause." First Amended Complaint ¶ 13. Second, petitioner alleged that his union, "in making job referrals, . . . has favored a faction of members . . . who have been known to support . . . the present business manager," as "part of widespread, improper discipline for political opposition in violation of 29 U. S. C. [§ 411(a)(5)] and 29

U. S. C. § 529." *Id.,* ¶ 17. Respondent, in other words, "acting by and through its present business manager . . . and its present business agent [has] `otherwise disciplined' " petitioner within the meaning of LMRDA §§ 101(a)(5) and 609. *Id.,* ¶ 16.

The District Court held that it lacked jurisdiction to entertain petitioner's suit because "discrimination in hiring hall referrals constitutes an unfair labor practice," and "[t]he NLRB has exclusive jurisdiction over discrimination in hiring hall referrals." No. C 83-1126 (ND Ohio, Feb. 20, 1987), p. 6, reprinted in App. to Pet. for Cert. A9. The District Court determined that adjudicating petitioner's claims "would involve interfe[r]ing with the NLRB's exclusive jurisdiction." *Id.,* at 7, App. to Pet. for Cert. A10.

The Court of Appeals affirmed in a brief *per curiam* opinion. With respect to the fair representation claim, the court noted that "[c]ircuit courts have consistently held that . . . fair representation claims must be brought before the Board" and that "if the employee fails to affirmatively allege that his *employer* breached the collective bargaining agreement, which [petitioner] failed to do in the case at bar, he cannot prevail." 849 F. 2d, at 999 (emphasis in original). In regard to the LMRDA count, the Court of Appeals found that "[d]iscrimination in the referral system, because it does not breach the employee's union

73    membership rights, does not constitute `discipline' within the meaning of LMRDA" and *73 that "[h]iring hall referrals are not a function of union membership since referrals are available to nonmembers as well as members." *Ibid.* We granted certiorari. 489 U. S. 1009 (1989).

## II

### A

We have long recognized that a labor organization has a statutory duty of fair representation under the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* (1982 ed.), "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* v. *Sipes,* 386 U. S. 171, 177 (1967); see also *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 203 (1944). In *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), the NLRB determined that violations of the duty of fair representation might also be unfair labor practices under § 8(b) of the NLRA, as amended, 29 U. S. C. § 158(b) (1982 ed.).[2] The Board held that the right of employees under § 7 of the NLRA, as amended, 29 U. S. C. § 157, to form, join, or assist labor organizations, or to refrain from such activities, "is a statutory

74    limitation on statutory bargaining representatives, and . . . that Section 8(b)(1)(A) of the Act *74 accordingly prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious, or unfair." 140 N. L. R. B., at 185. In addition, the Board reasoned that "a statutory bargaining representative and an employer also respectively violate Section 8(b)(2) and 8(a)(3) when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an employer to derogate the employment status of an employee." *Id.,* at 186. While petitioner alleged a breach of the duty of fair representation, his claim might relate to conduct that under *Miranda Fuel* also constitutes an unfair labor practice. And, as a general matter, neither state nor federal courts possess jurisdiction over claims based on activity that is "arguably" subject to §§ 7 or 8 of the NLRA. See *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245 (1959).

Nevertheless, the District Court was not deprived of jurisdiction. In *Vaca* v. *Sipes, supra,* we held that *Garmon*'s pre-emption rule does not extend to suits alleging a breach of the duty of fair representation. Our decision in *Vaca* was premised on several factors. First, we noted that courts developed and elaborated the duty of fair representation before the Board even acquired statutory jurisdiction over union activities. Indeed, fair representation claims often involve matters "not normally within the Board's unfair labor practice jurisdiction," 386 U. S., at 181, which is typically aimed at "effectuating the policies of the federal labor laws, not [redressing] the wrong done the individual employee," *id.,* at 182, n. 8. We therefore doubted whether "the Board brings substantially greater expertise to bear on these problems than do the courts." *Id.,* at 181. Another consideration in *Vaca* for finding the fair representation claim judicially cognizable was the NLRB General Counsel's unreviewable discretion to refuse to institute unfair labor practice proceedings. "[T]he General Counsel will refuse to bring

75    complaints on behalf *75 of injured employees when the injury complained of is `insubstantial.' " *Id.,* at 183, n. 8. The right of the individual employee to be made whole is "[o]f paramount importance," *Bowen* v. *United States Postal Service,* 459 U. S. 212, 222 (1983), and "[t]he existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine,"

_Vaca, supra,_ at 182-183. Consequently, we were unwilling to assume that Congress intended to deny employees their traditional fair representation remedies when it enacted § 8(b) as part of the Labor Management Relations Act, 1947 (LMRA). As JUSTICE WHITE described _Vaca_ v. _Sipes_ last Term in _Karahalios v. Federal Employees,_ 489 U. S. 527, 535 (1989):

> "As we understood our inquiry, it was whether Congress, in enacting § 8(b) in 1947, had intended to oust the courts of their role enforcing the duty of fair representation implied under the NLRA. We held that the `tardy assumption' of jurisdiction by the NLRB was insufficient reason to abandon our prior cases, such as _Syres_ [v. _Oil Workers,_ 350 U. S. 892 (1955)]."

That a breach of the duty of fair representation might also be an unfair labor practice is thus not enough to deprive a federal court of jurisdiction over the fair representation claim. See _Communications Workers_ v. _Beck,_ 487 U. S. 735, 743 (1988).

We decline to create an exception to the _Vaca_ rule for fair representation complaints arising out of the operation of union
76 hiring halls. Although the Board has had numerous opportunities to apply the NLRA to hiring hall policies,[3] we *76 reject the notion that the NLRB ought to possess exclusive jurisdiction over fair representation complaints in the hiring hall context because it has had experience with hiring halls in the past.[4] As an initial matter, we have never suggested that the _Vaca_ rule contains exceptions based on the subject matter of the fair representation claim presented, the relative expertise of the NLRB in the particular area of labor law involved, or any other factor. We are unwilling to begin the process of carving out
77 exceptions now, especially since we *77 see no limiting principle to such an approach. Most fair representation cases require great sensitivity to the tradeoffs between the interests of the bargaining unit as a whole and the rights of individuals.
[5] Furthermore, we have never indicated that NLRB "experience" or "expertise" deprives a court of jurisdiction over a fair representation claim. The Board has developed an unfair labor practice jurisprudence in many areas traditionally encompassed by the duty of fair representation. The Board, for example, repeatedly has applied the _Miranda Fuel_ doctrine in cases involving racial discrimination. See _International Brotherhood of Painters, Local 1066 (W. J. Siebenoller, Jr., Paint Co.),_ 205 N. L. R. B. 651, 652 (1973); _Houston Maritime Assn., Inc. (Longshoremen Local 1351),_ 168 N. L. R. B. 615, 616-617 (1967), enf. denied, 426 F. 2d 584 (CA5 1970); _Cargo Handlers, Inc. (Longshoremen Local 1191),_ 159 N. L. R. B. 321, 322-327 (1966); _United Rubber Workers, Local No. 12 (Business League of Gadsden),_ 150 N. L. R. B. 312, 314-315 (1964), enf'd, _368 F. 2d 12_ (CA5 1966), cert. denied, _389 U. S. 837 (1967);_ _Automobile Workers, Local 453 (Maremont Corp.),_ 149 N. L. R. B. 482, 483-484 (1964); _Longshoremen, Local 1367 (Galveston Maritime Assn., Inc.),_ 148 N. L. R. B. 897, 897-900 (1964), enf'd, _368 F. 2d 1010 (CA5 1966),_ cert. denied, _389 U. S. 837 (1967);_ _Independent Metal Workers, Local No. 1 (Hughes Tool Co.),_ 147 N. L. R. B. 1573, 1574 (1964); see also _Handy Andy, Inc.,_ 228 N. L. R. B. 447, 455-456 (1977). In addition, the Board has found gender discrimination by unions to be an unfair labor practice. See _Wolf Trap Foundation for the Performing Arts,_ 287 N. L. R. B. 1040 (1988), 127 LRRM 1129, 1130 (1988); _Olympic S. S. Co.,_ 233 N. L. R. B. 1178,
78 1189 (1977); _Glass Bottle Blowers Assn.,_ *78 _Local 106 (Owens-Illinois, Inc.),_ 210 N. L. R. B. 943, 943-944 (1974), enf'd, _520 F. 2d 693_ (CA6 1975); _Pacific Maritime Assn. (Longshoremen and Warehousemen, Local 52),_ 209 N. L. R. B. 519, 519-520 (1974) (Member Jenkins, concurring). In short, "[a] cursory review of Board volumes following _Miranda Fuel_ discloses numerous cases in which the Board has found the duty of fair representation breached where the union's conduct was motivated by an employee's lack of union membership, strifes resulting from intraunion politics, and racial or gender considerations." _United States Postal Service,_ 272 N. L. R. B. 93, 104(1984). Adopting a rule that NLRB expertise bars federal jurisdiction would remove an unacceptably large number of fair representation claims from federal courts.

Respondent calls to our attention language in some of our decisions recognizing that "[t]he problems inherent in the operation of union hiring halls are difficult and complex, and point up the importance of limiting initial competence to adjudicate such matters to a single expert federal agency." _Journeymen and Apprentices_ v. _Borden,_ 373 U. S. 690, 695 (1963) (citation omitted). For this reason, respondent contends that "[w]hether a hiring hall practice is discriminatory and therefore violative of federal law is a determination Congress has entrusted to the Board." _Farmer_ v. _Carpenters,_ 430 U. S. 290, 303, n. 12 (1977). The cases cited by respondent, however, focus not on whether unions have administered properly out-of-work lists as required by their duty of fair representation, but rather on whether exclusive hiring halls have encouraged union membership impermissibly as forbidden by § 8(b). Such exclusive arrangements are not illegal _per se_ under federal labor law, but rather are illegal only if they in fact result in discrimination prohibited by the NLRA. See _Teamsters_ v. _NLRB,_ 365 U. S. 667, 673-677 (1961); see also _Woelke & Romero Framing, Inc._ v. _NLRB,_ 456 U. S. 645, 664-
79 665 (1982). We have found _state law_ pre-empted on the ground that "Board approval *79 of various hiring hall practices would be meaningless if state courts could declare those procedures violative of the contractual rights implicit between a member and his union." _Farmer, supra,_ at 300, n. 9. These state-law claims frequently involve tort, contract, and other

substantive areas of law that have developed quite independently of labor law." Cf. *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U. S. 399, 403-406 (1988); *Electrical Workers v. Hechler,* 481 U. S. 851, 855-859 (1987); *Allis-Chalmers Corp. v. Lueck,* 471 U. S. 202, 211 (1985); *Teamsters v. Lucas Flour Co.,* 369 U. S. 95, 103-104 (1962).

The duty of fair representation is different. It has "judicially evolved," *Motor Coach Employees v. Lockridge,* 403 U. S. 274, 301 (1971), as part of federal labor law — predating the prohibition against unfair labor practices by unions in the 1947 LMRA. It is an essential means of enforcing fully the important principle that "no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers." *Ibid.;* see also *United Parcel Service, Inc. v. Mitchell,* 451 U. S. 56, 63 (1981) ("[T]he unfair representation claim made by an employee against his union . . . is more a creature of `labor law' as it has developed . . . than it is of general contract law"). The duty of fair representation, unlike state tort and contract law, is part of federal labor policy. Our "refusal to limit judicial competence to rectify a breach of the duty of fair representation rests upon our judgment that such actions cannot, in the vast majority of situations where they occur, give rise to actual conflict with the operative realities of federal labor policy." *Lockridge, supra,* at 301; see also *Vaca,* 386 U. S., at 180-181 ("A primary justification for the pre-emption doctrine — the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose — is not applicable to cases involving alleged \*80 breaches of the union's duty of fair representation"). We therefore decline to interpret the state-law pre-emption cases as establishing a principle that hiring halls are somehow so different from other union activities that fair representation claims are not cognizable outside of the NLRB.

The Court of Appeals below also held that if an employee fails to allege that his *employer* breached the collective-bargaining agreement, then he cannot prevail in a fair representation suit against his *union.* See 849 F. 2d, at 999. This is a misstatement of existing law. In *Vaca,* we identified an "intensely practical consideratio[n]," 386 U. S., at 183, of having the same entity adjudicate a joint claim against both the employer and the union when a wrongfully discharged employee who has not obtained relief through any exclusive grievance and arbitration procedures provided in the collective-bargaining agreement brings a breach-of-contract action against the employer pursuant to § 301(a) of the LMRA, 61 Stat. 156, 29 U. S. C. § 185(a) (1982 ed.). We noted that where the union has control of the grievance and arbitration system, the employee-plaintiff's failure to exhaust his contractual remedies may be excused if the union has wrongfully refused to process his claim and thus breached its duty of fair representation. See *Vaca,* 386 U. S., at 185-186. "[T]he wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as a bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Id.,* at 186.

Our reasoning in *Vaca* in no way implies, however, that a fair representation action *requires* a concomitant claim against an employer for breach of contract. Indeed, the earliest fair representation suits involved claims against unions for breach of the duty in *negotiating* a collective-bargaining agreement, a context in which no breach-of-contract action against an employer is possible. See *Ford Motor Co. v.* \*81 *Huffman,* 345 U. S. 330 (1953); *Steele v. Louisville & Nashville R. Co.,* 323 U. S. 192 (1944). Even after a collective-bargaining agreement has been signed, we have never required a fair representation plaintiff to allege that his *employer* breached the agreement in order to prevail. See, *e. g., Communications Workers v. Beck,* 487 U. S., at 743; *Czosek v. O'Mara,* 397 U. S. 25, 29 (1970). "[A]n action seeking damages for injury inflicted by a breach of a union's duty of fair representation [is] judicially cognizable in any event, that is, even if the conduct complained of [is] arguably protected or prohibited by the National Labor Relations Act *and whether or not the lawsuit [is] bottomed on a collective agreement." Motor Coach Employees v. Lockridge, supra,* at 299 (emphasis added).

Respondent argues that the concern in *Vaca* that suits against the employer and union be heard together in the same forum is applicable to the hiring hall situation, because any action by petitioner against an employer would be premised not on § 301 but rather on the contention that the employer had knowledge of the union conduct violating § 8(b)(1)(A) and acted on that knowledge in making an employment decision.[6] The employer would thereby violate \*82 NLRA § 8(a)(3), 29 U. S. C. § 158(a)(3), see *Wallace Corp. v. NLRB,* 323 U. S. 248, 255-256 (1944), and be held jointly and severally liable with the union, *but only in a suit before the Board.*[7] In the hiring hall environment, permitting courts to hear fair representation claims against the union would create the danger of bifurcated proceedings before a court and the NLRB. The absence of a § 301 claim, according to respondent, requires that we hold that the NLRB possesses exclusive jurisdiction over petitioner's fair representation suit.

This argument misinterprets our reasoning in *Vaca*. Because a plaintiff must as a matter of logic prevail on his unfair representation allegation against the union in order to excuse his failure to exhaust contractual remedies before he can litigate the merits of his § 301 claim against his employer, we found it "obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions." 386 U. S., at 187. Moreover, because the union's breach may have enhanced or contributed to the employee's injury, permitting fair representation suits to be heard in court facilitates the fashioning of a remedy. *Ibid.* We concluded that it made little sense to prevent courts from adjudicating fair representation claims.

The situation in the instant case is entirely different. In the hiring hall context, the Board may bring a claim alleging a violation of § 8(b)(1)(A) against the union, and a parallel suit against the employer under § 8(a)(3), without implicating the duty of fair representation at all. Or, as in the instant case, an employee may bring a claim solely against the union based on its wrongful refusal to refer him for work. While in *Vaca* *83 an allegation that the union had breached its duty of fair representation was a necessary component of the § 301 claim against the employer, the converse is not true here: a suit against the union need not be accompanied by an allegation that an employer breached the contract, since whatever the employer's liability, the employee would still retain a legal claim against the union. The fact that an employee *may* bring his fair representation claim in federal court in order to join it with a § 301 claim does not mean that he *must* bring the fair representation claim before the Board in order to "join" it with a hypothetical unfair labor practice case against the employer that was never actually filed.

Federal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against employers. We have always assumed that independent federal jurisdiction exists over fair representation claims because the duty is implied from the grant of exclusive representation status, and the claims therefore "arise under" the NLRA. See, *e. g.*, Tunstall v. Locomotive Firemen & Enginemen, 323 U. S. 210, 213 (1944). Lower courts that have addressed the issue have uniformly found that 28 U. S. C. § 1337(a), which provides federal jurisdiction for, *inter alia*, "any civil action or proceeding arising under any Act of Congress regulating commerce," creates federal jurisdiction over fair representation claims, because we held in Capital Service, Inc. v. NLRB, 347 U. S. 501, 504 (1954), that the NLRA is an "Act of Congress regulating commerce." See Chavez v. United Food & Commercial Workers Int'l Union, 779 F. 2d 1353, 1355, 1356 (CA8 1985); Anderson v. United Paper-workers Int'l Union, 641 F. 2d 574, 576 (CA8 1981); Buchholtz v. Swift & Co., 609 F. 2d 317, 332 (CA8 1979), cert. denied, 444 U. S. 1018 (1980); Mumford v. Glover, 503 F. 2d 878, 882-883 (CA5 1974); Retana v. Apartment, Motel, Hotel & Elevator Operators Local 14, 453 F. 2d 1018, 1021-1022 (CA9 1972); De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F. 2d 281, 283, n. 1 (CA1), cert. denied, 400 *84 U. S. 877 (1970); Nedd v. United Mine Workers of America, 400 F. 2d 103, 106 (CA3 1968); see also Bautista v. Pan American World Airlines, Inc., 828 F. 2d 546, 549 (CA9 1987). We agree with this reasoning. Because federal-court jurisdiction exists over a fair representation claim regardless of whether it is accompanied by a breach-of-contract claim against an employer under § 301,[8] and because a fair representation claim is a separate cause of action from any possible suit against the employer, we decline to adopt a rule that exclusive jurisdiction lies in the NLRB over any fair representation suit whose hypothetical accompanying claim against the employer might be raised before the Board.

The concerns that animated our decision in *Vaca* are equally present in the instant case. The Court of Appeals erred in holding that the District Court was without jurisdiction to hear petitioner's fair representation claim.

## B

Respondent contends that even if jurisdiction in federal court is proper, petitioner has failed to allege a fair representation claim for two reasons.

*85 **1**

First, respondent notes that we have interpreted NLRA § 8(a)(3) to forbid employer discrimination in hiring only when it is intended to discriminate on a union-related basis. See, *e. g.*, NLRB v. Brown, 380 U. S. 278, 286 (1965). Respondent maintains that symmetry requires us to interpret § 8(b) (2) as forbidding only discrimination based on union-related criteria and not any other form of maladministration of a union job referral system.[9] Respondent contends that under this standard it committed no unfair labor practice in this case. The LMRA, according to respondent, reflects a purposeful *86 congressional decision to limit the scope of § 8(b)(2) to instances where a union discriminates solely on the basis of union

membership or lack thereof. This decision would be negated if the duty of fair representation were construed as extending further than the unfair labor practice provisions of the NLRA.

We need not decide the appropriate scope of §§ 8(b)(1)(A) and 8(b)(2) because we reject the proposition that the duty of fair representation should be defined in terms of what is an unfair labor practice. Respondent's argument rests on a false syllogism: (a) because _Miranda Fuel Co._, 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), establishes that a breach of the duty of fair representation is also an unfair labor practice, and (b) the conduct in this case was not an unfair labor practice, therefore (c) it must not have been a breach of the duty of fair representation either. The flaw in the syllogism is that there is no reason to equate breaches of the duty of fair representation with unfair labor practices, especially in an effort to _narrow_ the former category. The NLRB's rationale in _Miranda Fuel_ was precisely the opposite; the Board determined that breaches of the duty of fair representation were also unfair labor practices in an effort to _broaden,_ not _restrict,_ the remedies available to union members. See 140 N. L. R. B. at 184-186.[10] Pegging the duty of fair representation to the Board's definition of unfair labor practices would make the two redundant, despite their different purposes, and would eliminate some of the prime virtues of the duty of fair representation — flexibility and adaptability. See _Vaca_, 386 U. S., at 182-183.

87    The duty of fair representation is not intended to mirror the contours of § 8(b); rather, it arises independently from *87 the grant under § 9(a) of the NLRA, 29 U. S. C. § 159(a) (1982 ed.), of the union's exclusive power to represent all employees in a particular bargaining unit. It serves as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." _Vaca, supra,_ at 182; see also _NLRB_ v. _Allis-Chalmers Mfg. Co._, 388 U. S. 175, 181 (1967) ("It was because the national labor policy vested unions with power to order the relations of employees with their employer that this Court found it necessary to fashion the duty of fair representation"). Respondent's argument assumes that enactment of the LMRA in 1947 somehow limited a union's duty of fair representation according to the unfair labor practices specified in § 8(b). We have never adopted such a view, and we decline to do so today.

## 2

Second, respondent insists that petitioner has failed to state a claim because in the hiring hall setting a union is acting essentially as an employer in matching up job requests with available personnel. Because a union does not "represent" the employees as a bargaining agent in such a situation, respondent argues that it should be relieved entirely of its duty of fair representation.[11]

88    We cannot accept this proposed analogy. Only because of its status as a Board-certified bargaining representative *88 and by virtue of the power granted to it by the collective-bargaining agreement does a union gain the ability to refer workers for employment through a hiring hall. Together with this authority comes the responsibility to exercise it in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unit have entrusted the union with the task of representing them. That the particular function of job referral resembles a task that an employer might perform is of no consequence. The key is that the union is administering a provision of the contract, something that we have always held is subject to the duty of fair representation. "The undoubted broad authority of the union as exclusive bargaining agent in the negotiation _and administration_ of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." _Humphrey_ v. _Moore_, 375 U. S. 335, 342 (1964) (emphasis added). See _Communications Workers_ v. _Beck_, 487 U. S., at 739; _Hines_ v. _Anchor Motor Freight, Inc._, 424 U. S., 554, 564 (1976); see also _Electrical Workers_ v. _Hechler_, 481 U. S., at 861-862; _id.,_ at 865 (STEVENS, J., concurring in part and dissenting in part).

In _Vaca_ v. _Sipes, supra,_ for example, we held that a union has a duty of fair representation in grievance arbitration, despite the fact that NLRA § 9(a) expressly reserves the right of "any individual employee or group of employees . . . to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect." The union in _Vaca_ exercised power over grievances because the contract so provided, not because the NLRA required such an arrangement. Hence, the observation that a contract might provide for the operation of a hiring hall directly by a consortium of interested employers rather than a union is irrelevant; the same might have been said about the system for processing grievances in _Vaca._ In *89 short, a union does not shed its duty of fair representation merely because

89

it is allocating job openings among competing applicants, something that might be seen as similar to what an employer does.

The union's assumption in the hiring hall of what respondent believes is an "employer's" role in no way renders the duty of fair representation inapplicable. When management administers job rights outside the hiring hall setting, arbitrary or discriminatory acts are apt to provoke a strong reaction through the grievance mechanism. In the union hiring hall, however, there is no balance of power. If respondent is correct that in a hiring hall the union has assumed the mantle of employer, then the individual employee stands alone against a single entity: the joint union/employer. An improperly functioning hiring hall thus resembles a closed shop, " `with all of the abuses possible under such an arrangement, including discrimination against employees, prospective employees, members of union minority groups, and operation of a closed union.' " _Teamsters_ v. _NLRB_, 365 U. S., at 674 (quoting S. Rep. No. 1827, 81st Cong., 2d Sess., 14 (1947)); see also Note, Unilateral Union Control of Hiring Halls: The Wrong and the Remedy, 70 Yale L. J. 661, 674 (1961). In sum, if a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly _increases_ rather than _decreases._ That has been the logic of our duty of fair representation cases since _Steele_ v. _Louisville & Nashville R. Co.,_ 323 U. S., at 200.[12]

90    *90 We reject respondent's contention that petitioner's complaint fails to state a fair representation claim.

## III

The Court of Appeals rejected petitioner's LMRDA claim on the ground that petitioner had failed to show that he was "otherwise disciplined" within the meaning of LMRDA §§ 101(a)(5) and 609, 29 U. S. C. §§ 411(a)(5) and 529 (1982 ed.). These provisions make it unlawful for a union to "fin[e], suspen[d], expe[l], or otherwise disciplin[e]" any of its members for exercising rights secured under the LMRDA.[13] The Court of Appeals reasoned that because "[h]iring hall referrals . . . are available to nonmembers as well as to members," 849 F. 2d, at 999, and the hiring hall was not an exclusive source of employment for sheet metal workers, petitioner did not suffer discrimination on the basis of rights he held by virtue of his _membership_ in the union. We affirm the Court of Appeals' conclusion, although we do not adopt its reasoning.[14]

In _Finnegan_ v. _Leu,_ 456 U. S. 431 (1982), we held that removal from appointive union employment is not within the scope of § 609's prohibitions, because that section was "meant to refer only to punitive actions diminishing membership rights, and
91    not to termination of a member's status as an appointed union employee." _Id.,_ at 438 (footnote omitted). *91 Petitioner, joined by the United States as _amicus curiae,_ argues that the Court of Appeals misapplied our reasoning in _Finnegan,_ because Congress could not have intended to prohibit a union from expelling a member of the rank-and-file from a members-only hall for his political opposition to the union leadership, but to permit the leadership to impose the same sanction if the hiring hall included a few token nonmembers as well. Either way, the purpose of the Act would hardly be served if a union were able to coerce its members into obedience by threatening them with a loss of job referrals. Under the reading urged by the United States, _Finnegan_ held only that the LMRDA does not protect the positions and perquisites enjoyed exclusively by union leaders; it did not narrow the protections available to "nonpolicymaking employees, that is, rank-and-file member-employees." _Finnegan, supra,_ at 443 (BLACKMUN, J., concurring).

We need not decide the precise import of the language and reasoning of _Finnegan,_ however, because we find that by using the phrase "otherwise discipline," Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules. "Discipline is the criminal law of union government." Summers, The Law of Union Discipline, 70 Yale L. J. 175, 178 (1960). The term refers only to actions "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." _Miller_ v. _Holden,_ 535 F. 2d 912, 915 (CA5 1976).

Our construction of the statute is buttressed by its structure. First, the specifically enumerated types of discipline — fine,
92    expulsion, and suspension — imply some sort of established disciplinary process rather than ad hoc retaliation *92 by individual union officers.[15] See 2A C. Sands, Sutherland on Statutory Construction § 47.17, p. 166 (4th ed. 1984) _(ejusdem generis)._ Second, § 101(a)(5) includes procedural protections — "written specific charges" served before discipline is imposed, "a reasonable time" in which to prepare a defense, and a "full and fair hearing" — that would not apply to instances of unofficial, _sub rosa_ discrimination. These protections contemplate imposition of discipline through the type of procedure we encountered in _Boilermakers_ v. _Hardeman,_ 401 U. S. 233, 236-237 (1971) (expulsion after trial before union

committee, with subsequent internal review). The fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide "safeguards against improper disciplinary action," indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members. A hiring hall could hardly be expected to provide a hearing before every decision *not* to refer an individual to a job.

The legislative history supports this interpretation of "discipline." Early drafts of § 101(a)(5), for example, contained elaborate lists of "due process protections," such as the presumption of innocence, venue restrictions, the right to counsel, the right to confront and cross-examine witnesses, and *93 other guarantees typically found in the criminal context.[16] Congress envisioned that "discipline" would entail the imposition of punishment by a union acting in its official capacity. See 105 Cong. Rec. 5812 (1959) (remarks of Sen. McClellan) (referring to "safeguards . . . against improper disciplinary action" as procedures that must be followed before a union member can be "expelled or punished," "tried," or "suspend[ed]" by the union); *id.,* at 6023 (remarks of Sen. Kuchel) (noting that discipline may be imposed only on "the usual reasonable constitutional basis upon which [criminal] charges might be brought").

A forerunner of § 101(a)(5) in the Senate provided criminal penalties for *both* improper "discipline" by "any *labor organization,* its officers, agents, representatives, or employees" *and* the use by "*any person* . . . of force or violence, or . . . economic reprisal or threat thereof, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercising by such member of any right to which he is entitled under the provisions of this Act." S. 1555, as reported, 86th Cong., 1st Sess., 53 (1959) (emphasis added); see also S. Rep. No. 187, 86th Cong., 1st Sess., 53-54, 94 (1959); 105 Cong. Rec. 15120 (1959) (comments of Sen. Goldwater). Although S. 1555 was not passed in this form by the Senate,[17] the fact that even in an earlier bill improper *discipline by a labor organization* was listed separately from *economic coercion by any person* shows that the *94 Senate believed that the two were distinct, and that it did not intend to include the type of unauthorized "economic reprisals" suffered by petitioner in the instant case in its definition of "discipline." The bipartisan compromise bill introduced by Representatives Landrum and Griffin, which amended S. 1555 after its passage by the Senate, substituted civil remedies for the criminal penalties. Representative Griffin explained that the bill covered only the "denial of . . . rights through *union discipline,*" 105 Cong. Rec. 13091 (1959) (emphasis added), an apparent reference to penalties imposed by the union in its official capacity as a labor organization. Discipline "must be done in the name of or on behalf of the union as an organizational entity." Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969).

In the instant case, petitioner alleged only that the union business manager and business agent failed to refer him for employment because he supported one of their political rivals. He did not allege acts by the union amounting to "discipline" within the meaning of the statute. According to his complaint, he was the victim of the personal vendettas of two union officers. The opprobrium of the union *as an entity,* however, was not visited upon petitioner. He was not punished by any tribunal, nor was he the subject of any proceedings convened by respondent. In sum, petitioner has not alleged a violation of §§ 101(a)(5) and 609, and the Court of Appeals correctly dismissed his claim under the LMRDA.[18]

*95 **IV**

We express no view regarding the merits of petitioner's claim. We hold only that the Court of Appeals erred when it determined that the District Court lacked jurisdiction over the suit, but that the Court of Appeals correctly found that petitioner failed to state a claim under §§ 101(a)(5) and 609 of the LMRDA. We remand the cause for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

When school officials inflict corporal punishment on a schoolchild, we speak of the child being "disciplined."[1] A prison inmate who is summarily deprived of "good time" credits is also subjected to "discipline."[2] So too is the soldier who as a result of misconduct is required by a superior to perform additional duties.[3] In none of these cases is the discipline imposed by a "tribunal" or as a result of a "proceeding convened by" the disciplinary official. *Ante,* at 94. Rather, what distinguishes the punishment as "discipline" is that it is imposed by one in control with a view to correcting behavior that is considered to be deviant. The Court today holds, however, that a union member who is deprived of work referrals as a

Case 4:22-cv-00034-Y    Document 352-11    Filed 08/23/22    Page 35 of 50    PageID 2683

96    result of his intraunion political activities, conduct deemed by the union to be deviant, is nonetheless not being    96
subjected to discipline. Although I join the Court's analysis and disposition of petitioner's duty of fair representation claim in
Parts I and II of its opinion, I cannot join this restrictive interpretation of the LMRDA.

Title I of the LMRDA, the "Bill of Rights" of labor organizations, "was the product of congressional concern with widespread
abuses of power by union leadership." _Finnegan_ v. _Leu_, 456 U. S. 431, 435 (1982). These took at least two forms. First,
many unions were run autocratically and did not accord their members the right of self-governance. See _Sheet Metal_
_Workers_ v. _Lynn_, 488 U. S. 347, 356, n. 8 (1989); _Steelworkers_ v. _Sadlowski_, 457 U. S. 102, 112 (1982). Accordingly,
Congress decreed that union members would have equal voting rights and the freedom of speech and assembly and
provided in § 102, 29 U. S. C. § 412 (1982 ed.), a means of enforcing these rights through a civil cause of action in federal
court. Second, there was evidence that unions imposed discipline on their members in violation of their members' civil rights
or without adequate procedural safeguards.[4] See _Finnegan_, 456 U. S., at 442 (Congress was concerned with "protecting
the rights of union members from arbitrary action by the union or its officers") (emphasis deleted); _Boilermakers_ v.

97    _Hardeman_, 401 U. S. 233, 243-245 (1971). The provisions which address these concerns, *97 LRMDA §§ 101(a)(5)[5] and
609,[6] 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.), are written in expansive language. They respectively prohibit the imposition
of discipline by any labor "organization or any officer thereof," § 411(a)(5), and "any labor organization, or any officer, agent,
shop steward, or other representative of a labor organization, or any employee thereof." § 529. And they refer not only to
fines, suspension, and expulsion, the usual sanctions imposed by a union, but also to unspecified means by which the
union "otherwise disciplin[es]" its members.

As a matter of plain language, "discipline" constitutes "punishment by one in authority . . . with a view to correction or
training." Webster's Third New International Dictionary 644 (1976); see also Random House Dictionary of the English
Language 562 (2d ed. 1987) ("punishment inflicted by way of correction and training"); 4 Oxford English Dictionary 735 (2d
ed. 1989) (same). Union discipline is thus punishment imposed by the union or its officers "to control the member's conduct
in order to protect the interests of the union or its membership." _Miller_ v. _Holden_, 535 F. 2d 912, 915 (CA5 1976). It easily
includes the use of a hiring hall system by one who is charged with administering it to punish a member for his political

98    opposition. Indeed, the express *98 reference in the Act to "fines," a form of discipline that traditionally was not imposed
after a trial, suggests that Congress intended the Act to reach discipline that is both informal and affects only a member's
economic rights.

Moreover, as a matter of the statute's purpose and policy, it would make little sense to exclude the abuse of a hiring hall to
deprive a member of job referrals from the type of discipline against which the union member is protected. Congress
intended the LMRDA to prevent unions from exercising control over their membership through measures that did not
provide adequate procedural protection. "[I]nterference with employment rights constitute[s] a powerful tool by which union
leaders [can] control union affairs, often in violation of workers' membership rights." _Vandeventer_ v. _Local Union No. 513,_
_Int'l Union of Operating Engineers,_ 579 F. 2d 1373, 1378 (CA8 1978); see also Etelson & Smith, Union Discipline Under the
Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969) ("Since the prime motivation to join a union is concern about one's
interests as an employee, it seems manifest that a very effective method of disciplining a union member would be to cause
injury to those interests"). It is inconceivable that a statute written so broadly would not include such sanctions within its
compass.

The Court nonetheless concludes that the denial of hiring hall referrals is not properly attributable to the union and does not
constitute discipline within the meaning of the LMRDA. The Court errs in its construction of petitioner's complaint and in its
interpretation of the LMRDA. At this pleading stage, petitioner's allegations must be accepted as true and his complaint may
be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the
allegations." _Hishon_ v. _King & Spaulding_, 467 U. S. 69, 73 (1984); _Conley_ v. _Gibson_, 355 U. S. 41, 45-46 (1957). Petitioner
alleges "that in failing to refer him for employment . . . the defendant, acting by and through its present business manager,

99    David Williams, *99 and its present business agent, Michael Duffy, have `otherwise disciplined' plaintiff." The union's abuse
of the hiring hall system is further said to have "been part of widespread, improper discipline for political opposition." App. to
Pet. for Cert. A-21. The Court elsewhere acknowledges that "the ability to refer workers for employment through a hiring
hall" is a power of the _union_ granted it by the collective-bargaining agreement, _ante,_ at 88, and it properly concludes that
petitioner's allegations are sufficient to support the imposition of liability upon the union for breaching its duty of fair
representation. Petitioner's allegation that the union's officers used their union-granted authority over the hiring hall to
punish him for his union activities should also be sufficient to support the claim that punishment was imposed "under color

or the union's right to control its membership and that the "opprobrium of the union *as an entity*" was "visited upon petitioner." *Ante,* at 94.

The Court states that the discriminatory use of the hiring hall to punish petitioner does not constitute discipline because it is not an "established disciplinary process" or imposed by "any tribunal" or as the result of "any proceeding." *Ante,* at 91, 94. But, as Congress was well aware,[7] discipline can be imposed informally as well as formally and pursuant to unwritten practices similar to those petitioner has alleged as well as to a formal established policy. The language and structure of the Act do not evince any intention to restrict its coverage to sanctions that are imposed by tribunals *100 or as the result of proceedings. That Congress specified detailed procedures to be followed in disciplinary proceedings does not mean that no procedures need be followed when discipline is imposed without any proceeding whatsoever. Nor does the legislative history, which reflects Congress' intention to prevent a wide range of arbitrary union action, support such a crabbed reading. [8] By holding that the informally imposed sanctions alleged here are not covered by the LMRDA, the Court ironically deprives union members of the protection of the Act's procedural safeguards at a time when they are most needed — when the union or its officers act so secretly and so informally that the member receives no advance notice, no opportunity to be heard, and no explanation for the union's action. This construction of the labor organization's "Bill of Rights" is perverse and cannot have been intended by Congress.

Finally, this case is not controlled, as the Court of Appeals concluded, by our decision in *Finnegan* v. *Leu,* 456 U. S. 431 (1982). In that case, we held that removal from appointive union employment did not constitute discipline within the meaning of § 609. *Id.,* at 437; see also *Sheet Metal Workers* v. *Lynn,* 488 U. S., at 353, n. 5. We stated that "it was rank-and-file union members — not union officers or employees, as such — whom Congress sought to protect," 456 U. S., at 437, and that "Congress [did not] inten[d] to establish a system of job security or tenure for appointed union employees," *id.,* at 438. In his brief for the United States as *101 *Amicus Curiae,* the Solicitor General has cogently explained why *Finnegan* is not controlling:

> "The question presented by this case is far different. Here, participation in the Union's job referral program is a benefit enjoyed by all members of the Union within the bargaining unit, and the issue is whether withdrawal of the benefit can be deemed `discipline' even though that benefit may also be extended to non-members of the Union. *Finnegan*'s emphasis on the distinction between union members and union leaders does not apply to this situation. In fact, the court of appeals' reliance on language in *Finnegan* that drew that distinction turns the Court's approach on its head. *Finnegan*'s conclusion that the Act did not protect the positions and perquisites enjoyed only by union leaders was surely not intended to narrow the class of benefits, enjoyed by the rank-and-file, that cannot be withdrawn in retaliation for the exercise of protected rights.

> "The court of appeals implicitly acknowledged (see Pet. App. A3) that participation in a job referral system limited to union members would be a part of `a union member's rights or status *as a member of the union*' (456 U. S. at 437). The fact that non-members may be included within the system should not alter that characterization. In either case, when a union member's removal from or demotion on an out-of-work list is based upon a violation of a union rule or policy, or political opposition to the union's leadership, the removal or demotion can fairly be characterized as a punitive action taken against the member *as a member* that sets him apart from other members of the rank-and-file. See *id.* at 437-438. Moreover, such an action bears enough similarity to the specific disciplinary actions referred to in Section 609 to fall within the residual category of *102 sanctions — encompassed by the phrase `otherwise disciplined' — that are subject to that provision."[9]

Today the Court correctly refuses to adopt the Court of Appeals' reasoning, but its rationale is just as flawed as that of the Court of Appeals. Retaliation effected through a union job referral system is a form of discipline even if the system is used by nonmembers as well as members and even if the sanction is the result of an *ex parte,* ad hoc, unrecorded decision by the union.

I respectfully dissent from the Court's disposition of petitioner's claim under the Labor-Management Reporting and Disclosure Act of 1959.

[*] Briefs of *amici curiae* urging reversal were filed for the Association for Union Democracy et al. by *Paul Alan Levy, Alan B. Morrison,* and *Arthur L. Fox II;* and for the National Right to Work Legal Defense Foundation by *Rossie D. Alston, Jr.,* and *Glenn M. Taubman.*

[1] The word "exclusive" when used with respect to job referral systems is a term of art denoting the degree to which hiring is reserved to the union hiring hall. Hiring is deemed to be "exclusive," for example, if the union retains sole authority to supply workers to the employer up to a designated percentage of the work force or for some specified period of time, such as 24 or 48 hours, before the employer can hire on his own. See *Carpenters, Local 608 (Various Employers),* 279 N. L. R. B. 747, 754 (1986), enf'd, 811 F. 2d 149 (CA2), cert. denied, 484 U. S. 817 (1987).

[2] Section 8(b)(1)(A) provides that it is an unfair labor practice for a labor organization or its agents to restrain or coerce "employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the NLRA]: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U. S. C. § 158(b)(1)(A) (1982 ed.). Section 8(b)(2) makes it an unfair labor practice for a labor organization or its agents "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." § 158(b)(2).

[3] The Board has determined that a labor organization that is the statutory collective-bargaining representative of employees utilizing its exclusive hiring hall is barred from using unfair, irrelevant, or invidious considerations in making referrals of such employees. See *Journeymen Pipe Fitters, Local No. 392,* 252 N. L. R. B. 417, 421 (1980), enf. denied, 712 F. 2d 225 (CA6 1983) *(per curiam).* The Board has held that "any departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant falls within that class of discrimination which inherently encourages union membership, breaches the duty of fair representation owed to all hiring hall users, and violates Section 8(b)(1)(A) and (2), unless the union demonstrates that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function." *Operating Engineers, Local 406,* 262 N. L. R. B. 50, 51 (1982), enf'd, 701 F. 2d 504 (CA5 1983) *(per curiam); see also Teamsters, Local No. 174 (Totem Beverages, Inc.),* 226 N. L. R. B. 690, 698-700 (1976); *Boilermakers, Local Lodge 169 (Riley Stoker Corp.),* 209 N. L. R. B. 140, 144-145 (1974). Deviation from clear and unambiguous standards in refusing to refer an employee for work establishes a prima facie violation of §§ 8(b)(1) (A) and 8(b)(2), irrespective of whether the deviation is related to discrimination based on union membership. See *NLRB v. International Association of Bridge, Structural and Ornamental Iron Workers,* 600 F. 2d 770, 776-777 (CA9 1979), cert. denied, 445 U. S. 915 (1980); *International Association of Heat and Frost Insulation, Local 22 (Rosendahl, Inc.),* 212 N. L. R. B. 913 (1974). The Board in some cases has found unfair labor practices based on discriminatory referrals by nonexclusive hiring halls. See *Iron Workers, Local 577 (Tri-State Steel Erectors),* 199 N. L. R. B. 37 (1972); *Hoisting and Portable Engineers, Local No. 4 (Carlson Corp.),* 189 N. L. R. B. 366 (1971), enf'd, 456 F. 2d 242 (CA1 1972); *Chauffeurs' Union, Local 923, Teamsters (Yellow Cab Co.),* 172 N. L. R. B. 2137, 2138 (1968); cf. *Teamsters, Local 17,* 251 N. L. R. B. 1248, 1256-1259 (1980). We intimate no views on the merits of any of the Board's decisions.

[4] That the Board has joined an *amicus* brief supporting petitioner shows that it does not share respondent's concern that its jurisdiction is being invaded in this case. See *Motor Coach Employees v. Lockridge,* 403 U. S. 274, 298, n. 8 (1971).

[5] "Complexity," for example, has never prevented us from holding that unions must arbitrate grievances fairly, see *Vaca v. Sipes,* 386 U. S. 171 (1967); *Conley v. Gibson,* 355 U. S. 41 (1957), despite the difficult tradeoffs in grievance processing between individual rights and collective welfare.

[6] We accept respondent's characterization of the employer's liability only for the purpose of argument. We note that the Board traditionally had imposed strict liability on an employer party to an exclusive hiring hall, solely on the basis of its being a party to the arrangement and even in the absence of proof that it had knowledge of the union's discriminatory practices. See *Frank Mascali Construction Co. G. P. Co.,* 251 N. L. R. B. 219, 222 (1980), enf'd, 697 F. 2d 294 (CA2), cert. denied, 459 U. S. 988 (1982); *Longshoremen, Local 1351 (Galveston Marine Assn., Inc.),* 122 N. L. R. B. 692, 696 (1958); *Operating Engineers Local 12 (Associated General Contractors),* 113 N. L. R. B. 655, 661, n. 5 (1955), modified on other grounds, 237 F. 2d 670 (CA9 1956), cert. denied, 353 U. S. 910 (1957). The Board has recently abandoned the strict liability principle, holding instead that "no liability should be imposed when an employer does not have actual notice, or may not reasonably be charged with notice of a union's discriminatory operation of a referral system." *Wolf Trap Foundation for the Performing Arts,* 287 N. L. R. B. 1040, 1041 (1988), 127 LRRM 1129, 1130 (1988). We express no view regarding the standard for liability of any of the employers in the instant case.

[7] We need not determine whether plaintiffs in petitioner's position *could* make out a § 301 claim. We simply note that petitioner in his first amended complaint did not allege a breach of contract by any employer.

[8] The development of the law in the § 301 context is not to the contrary. We have recognized that although a § 301 suit against the employer and a fair representation claim against the union are "inextricably interdependent," *United Parcel Service, Inc. v. Mitchell,* 451 U. S. 56, 66-67 (1981) (Stewart, J., concurring in judgment), breach of the duty of fair representation is a cause of action separate from the claim against the employer. See *DelCostello v. Teamsters,* 462 U. S. 151, 164, 165 (1983) (noting that a hybrid fair representation/§ 301 suit "comprises two causes of action" and that "[t]he employee may, if he chooses, sue one defendant and not the other"); *United Parcel Service,* 451 U. S., at 66 (Stewart, J., concurring in judgment) (§ 301 and fair representation claim each has "its own discrete jurisdictional base"); *id.,* at 73, n. 2 (STEVENS, J., concurring in part and dissenting in part) ("[D]espite this close relationship, the two claims are not inseparable. Indeed, although the employee in this case chose to sue both the employer and the union, he was not required to do so; he was free to institute suit against either one as the sole defendant").

[9] Respondent contends that § 8(b)(1)(A) should be construed *in pari materia* with § 8(b)(2), as requiring a showing of union-related discrimination. See *Teamsters* v. *NLRB*, 365 U. S. 667, 676 (1961) (§ 8(b)(1) condemns a hiring hall "which in fact is used to encourage and discourage union membership by discrimination in regard to hire or tenure, term or condition of employment"); *Local 271, Int'l Brotherhood of Painters* v. *NLRB*, 717 F. 2d 805, 808-809 (CA3 1983); *NLRB* v. *Local Union 633, United Assn. of Journeymen and Plumbers*, 668 F. 2d 921, 922-923 (CA6 1982) *(per curiam)*; *NLRB* v. *Local 143, Moving Picture and Projection Machine Operators Union*, 649 F. 2d 610, 612 (CA8 1981). The NLRB, however, has construed §§ 8(b)(1)(A) and 8(b)(2) more expansively to bar the use of unfair, irrelevant, or invidious considerations in employee referrals of employees, and to prohibit, absent sufficient justification by the union, any departure from established procedures. See n. 3, *supra*. We need not pass on the wisdom of the Board's interpretation, because we hold that whatever the proper reading of § 8(b), petitioner has stated a claim for breach of the duty of fair representation. We note, however, that respondent's arguments are inconsistent. On the one hand, respondent contends that courts should not entertain fair representation suits because to do so would disturb NLRB efforts to create a uniform unfair labor practice body of law governing hiring halls. On the other hand, respondent maintains that NLRB rules with respect to hiring hall unfair labor practices are actually in excess of what the statute authorizes. If that is so, the NLRB does not seem particularly "expert" in this area. Moreover, if the NLRB's hiring hall rules are void because they are beyond what the statute permits, then there is no overlap between the duty of fair representation and the unfair labor practices developed by the Board, and there is in fact *less* reason to hold that courts lack jurisdiction over hiring hall fair representation claims.

[10] Similarly, in deciding not to enforce *Miranda Fuel*, the Second Circuit explicitly rejected a crabbed view of the duty of fair representation and juxtaposed a statement of the narrowness of § 8 with an acknowledgment that the duty of fair representation is a broader concept. See 326 F. 2d, at 176. No decision of this Court held otherwise.

[11] Respondent's argument would require us to find that there is no duty of fair representation at all in the hiring hall context; this is a position which cannot be reconciled with numerous decisions of the Courts of Appeals and the NLRB. See, *e. g.*, *Lewis* v. *Local 100, Laborers' Int'l Union*, 750 F. 2d 1368, 1376 (CA7 1984); *Beriault* v. *Local 40, Super Cargoes & Checkers of Int'l Longshoremen's Union*, 501 F. 2d 258, 264-266 (CA9 1974); *Smith* v. *Local No. 25, Sheet Metal Workers Int'l Assn.*, 500 F. 2d 741, 748-749 (CA5 1974); *Operating Engineers, Local 406*, 262 N. L. R. B., at 51, 57; *Carpenters, Local 608 (Various Employers)*, 279 N. L. R. B., at 754-755; *Journeymen Pipe Fitters, Local No. 392*, 252 N. L. R. B., at 421-422; *Bricklayers' and Stonemasons' Int'l Union, Local No. 8*, 235 N. L. R. B. 1001, 1006-1008 (1978).

[12] It was for this reason that the Board sought in its decision in *Mountain Pacific Chapter, Associated General Contractors*, 119 N. L. R. B. 883, enf. denied, 270 F. 2d 425 (CA9 1959), to require an exclusive hiring hall to incorporate certain procedural safeguards in the agreement establishing the exclusive arrangement. Although we held in *Teamsters* v. *NLRB*, 365 U. S. 667 (1961), that the Board's approach in *Mountain Pacific* exceeded the mandate of the NLRA, our decision in that case was confined to the unfair labor practice context and did not purport to determine the proper scope of the duty of fair representation. In addition, we were careful to note that the Board retained authority "to determin[e] whether discrimination has in fact been practiced" and to "eliminat[e] discrimination" in the operation of hiring halls. 365 U. S., at 677. *Teamsters* held invalid only the Board's attempt to impose prophylactic safeguards on hiring halls in the absence of any particularized findings of discrimination. It has no bearing on the instant case — a suit by an individual member of the union alleging specific acts in violation of the duty of fair representation.

[13] The phrase "otherwise disciplin[e]" appears in both §§ 101(a)(5) and 609, and we have already determined that it has the same meaning in both sections. See *Finnegan* v. *Leu*, 456 U. S. 431, 439, n. 9 (1982).

[14] The Court of Appeals clearly had jurisdiction over the LMRDA claim. See *Boilermakers* v. *Hardeman*, 401 U. S. 233, 238 (1971). To the extent the Court of Appeals held otherwise, it was in error.

[15] We do not imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101 (a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions. Even respondent acknowledges that a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules. Contrary to JUSTICE STEVENS' suggestion, *post*, at 99-100, and nn. 7, 8, we do not hold that discipline can result only from "formal" proceedings, as opposed to "informal" or "summary" ones. We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures indicates that Congress meant "discipline" to signify penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers.

[16] See, *e. g.*, H. R. 4473, 86th Cong., 1st Sess., 12-16 (1959); H. R. 7265, 86th Cong., 1st Sess., 19-20 (1959); S. 1137, 86th Cong., 1st Sess., 11 (1959).

[17] We traced the legislative history of §§ 101(a)(5) and 609 in *Hardeman*, 401 U. S., at 242-245, and *Finnegan*, 456 U. S., at 435-441. The relevant portion of S. 1555 as passed became LMRDA § 610, 29 U. S. C. § 530 (1982 ed.), which criminalizes the threat or use of force or violence to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of rights granted under the LMRDA. Section 610 does not by its terms extend to economic reprisals.

[18] We do not pass on petitioner's claim that certain of his rights secured by the LMRDA were "infringed" by respondent's conduct, in violation of § 102, 29 U. S. C. § 412 (1982 ed.), because the claim was neither presented to nor decided by the Court of Appeals below, and thus is not properly before us. See *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981). In addition, the § 102 issue is not

included within the relevant question on which we granted certiorari ("Whether a union's discriminatory refusal to refer its members to jobs constitutes `discipline' within the meaning of the [LMRDA]?").

[1] See, *e.g.*, Ingraham v. Wright, 430 U. S. 651 (1977) (use of corporal punishment, without predeprivation hearing, as means of disciplining schoolchildren); Goss v. Lopez, 419 U. S. 565, 580 (1975) (suspension from school without hearing as form of discipline).

[2] See, *e. g.*, Preiser v. Rodriguez, 411 U. S. 475, 478-481 (1973) (unauthorized deprivation of prison good time credits as form of discipline).

[3] See Manual for Courts-Martial, United States, 1968, Ch. 26 (detailing forms of nonjudicial disciplinary punishment for minor offenses).

[4] The Court is mistaken in suggesting that the predecessor to § 101 (a)(5), which distinguished between improper discipline imposed by a union and the use of economic reprisal by any person to interfere with the exercise of protected rights, signifies congressional intent that discipline not include economic reprisal. *Ante*, at 93-94. That provision, which was later embodied in § 610 of the Act, is addressed to attempts to interfere with rights protected by the substantive provisions of Title I and not to the arbitrary imposition of discipline at which the procedural provisions are aimed. It does not follow, as the Court seems to assume, that because Congress did not prohibit "all acts that deterred the exercise of rights protected under the LMRDA," *ante*, at 91, that it also intended to permit unions to employ this particularly powerful sanction without any procedural safeguards.

[5] Section 101(a)(5), as set forth in 29 U. S. C. § 411(a)(5) (1982 ed.), provides:

"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

[6] Section 609, as set forth in 29 U. S. C. § 529 (1982 ed.), provides:

"It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section."

[7] Contemporaneous sources are replete with examples of discipline imposed informally and through summary procedures. See, *e. g.*, National Industrial Conference Board, Studies in Personnel Policy, No. 150, Handbook of Union Government Structure and Procedures 71-72 (1955) ("A few unions make specific statements in their constitutions that members are to be disciplined without trial for certain offenses. . . . These unions have a membership of 569,857"); Note, The Power of Trade Unions to Discipline Their Members, 96 U. Pa. L. Rev. 537, 541 (1948) ("[H]earings indicate the existence of physical violence and `goon squad' activity as a less formal means of disciplining opposing factions").

[8] Indeed, even union officials testified before Congress that union disciplinary methods were informal and discipline was imposed by workers. See, *e. g.*, Hearings on H. R. 3540, H. R. 3302, H. R. 4473, and H. R. 4474 before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess., pt. 4, p. 1483 (1959) (testimony of George Meany, President of American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)); see also 105 Cong. Rec. App. 3294 (1959) (AFL-CIO Legislative Department Analysis of Provisions in Senator McClellan's Amendment) ("Often disciplinary proceedings are usually wholly informal").

[9] Brief for United States as *Amicus Curiae* 19-20 (footnote omitted). Most of the Courts of Appeals that have considered the issue have properly concluded that depriving a member of job referrals and other forms of economic reprisals can constitute discipline under the LMRDA. See Guidry v. International Union of Operating Engineers, Local 406, 882 F. 2d 929, 940-941 (CA5 1989); Murphy v. International Union of Operating Engineers, Local 18, 774 F. 2d 114, 122-123 (CA6 1985), cert. denied, 475 U. S. 1017 (1986); Keene v. International Union of Operating Engineers, 569 F. 2d 1375 (CA5 1978); see also Moore v. Local 569, Int'l Brotherhood of Electrical Workers, 653 F. Supp. 767 (SD Cal. 1987); T. Kheel, Labor Law § 43.06[4], 43-105 (1986); Beaird & Player, Union Discipline of its Membership Under Section 101(a)(5) of Landrum-Griffin: What is "Discipline" and How Much Process is Due?, 9 Ga. L. Rev. 383, 392 (1975); Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 733 (1969). But see Comment, Applicability of LMRDA Section 101 (a)(5) to Union Interference with Employment Opportunities, 114 U. Pa. L. Rev. 700 (1966). Two Courts of Appeals have held that suspension of a member from a nonexclusive job referral system did not constitute discipline when such suspension was required by the terms of the collective-bargaining agreement. See Turner v. Local Lodge No. 455, Int'l Brotherhood of Boilermakers, 755 F. 2d 866, 869-870 (CA11 1985); Hackenburg v. International Brotherhood of Boilermakers, 694 F. 2d 1237, 1239 (CA10 1982); see also Figueroa v. National Maritime Union of America, 342 F. 2d 400 (CA2 1965) (although interference with employment opportunities is covered by Act, union's compliance with collective-bargaining agreement in refusing to refer seaman does not constitute discipline).

**882 F.2d 929 (1989)**

## Robert GUIDRY, Plaintiff-Appellee, Cross-Appellant,

v.

## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants-Appellants, Cross-Appellees.

<u>No. 87-4733.</u>

### United States Court of Appeals, Fifth Circuit.

August 29, 1989.
Rehearing and Rehearing Denied September 28, 1989.

931    *930 *931 Robert H. Urann, Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants cross-appellees.

Maurice L. Tynes, Lake Charles, La., for plaintiff-appellee cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

Rehearing and Rehearing En Banc Denied September 28, 1989.

932    *932 KING, Circuit Judge:

The plaintiff-appellee, Robert Guidry, sued the defendants-appellants, the International Union of Operating Engineers, Local 406 and former and current Union leaders, alleging denial of rights guaranteed by 29 U.S.C. § 411(a) (1985), unlawful discipline in violation of 29 U.S.C. § 529 (1985), and breach of the duty of fair representation. The United States District Court for the Western District of Louisiana found in favor of the plaintiff.[1] The court awarded damages for lost wages, emotional distress, punitive damages and attorneys' fees and ordered that Guidry be reinstated to Union membership. We affirm the judgment of liability, but we remand the award of damages for further findings.

# I. FACTS

The facts, as found by the district court, are summarized as follows:

# A. Background and Players

Plaintiff-appellee Robert Guidry ("Guidry") became a member of the International Union of Operating Engineers, Local 406 (the "Union") in 1949. The Union is a constituent division of the International Union of Operating Engineers and is an unincorporated labor organization with six districts in the state of Louisiana. There is an office within each district, and the statewide central office is in New Orleans.

The Union elects a statewide Business Manager and Financial Secretary who works out of the central New Orleans Office. Defendant Peter Babin III ("Babin") has served in this position since 1976. The Business Manager negotiates collective bargaining agreements in Louisiana, serves on a committee that negotiates the National Pipe Line Agreement, acts as a trustee of the Union's Health and Welfare Fund, and appoints and supervises assistant business managers in the various districts who oversee the day-to-day functioning of the Union. These assistant business managers are also known as "business agents" ("BAs") and they represent the Union at pre-job conferences, administer the hiring hall procedures, and appoint union stewards and master mechanics to act as representatives for the Union on the job.

Babin's predecessor as Business Manager appointed defendant Willard Carlock, Sr. ("Carlock") as BA for the Union's Lake Charles District. After he took office, Babin retained Carlock as BA until Carlock and his administration of the district came under criminal investigation. Babin fired Carlock on March 10, 1984. _Taliaferro v. Schiro_, 669 F.Supp. 763, 766 (W.D.La.1987).

Babin appointed defendant Columbus J. Laird ("Laird") as BA for the Lake Charles District in 1976. Laird technically had as much authority as Carlock, but he considered Carlock his boss and followed Carlock's instructions. Laird was in office until January 15, 1985 when he resigned after an indictment was brought against him, Carlock, and others. *Id.*

Babin appointed Don Schiro ("Schiro") to be statewide Pipe Line Business Agent in March 1980. Schiro represented the Union in pipeline construction jobs controlled by the National Pipe Line Agreement and was responsible for attending pre-job conferences and appointing stewards and referring workers to pipeline jobs. However, Schiro generally left these details to BAs such as Carlock and Laird. *Id.*

The district court found that Babin's supervision of the BAs was "totally inadequate." Id. at 775-76. Upon appointing a BA, Babin instructed him to run the hiring hall on a non-discriminatory basis, but otherwise did very little to supervise him. He met with each BA semi-annually to discuss local problems. He had no formal evaluation procedure, but instead relied on his own re-election as evidence that Union members were satisfied with the performances of the BAs from their districts. *Id.* at 765.

933

*933 **B. The Lake Charles District Hiring Hall**

## 1) *Generally*

The Union, as the exclusive collective bargaining agent for operating engineers in its jurisdiction, signed two major collective bargaining agreements. The first agreement is between the Union and the Lake Charles District, Associated General Contractors of Louisiana, Inc. and governs the building and construction industry (the "Building Trades Agreement"). The National Pipe Line Agreement covers all transportation mainline pipeline and underground cable work. Both agreements specify that the Union will provide labor through an exclusive hiring hall. The method for registering applicants for referral is set out in the agreements and involves placing individuals in four groups according to their work experience. The Union has always disregarded this rule and it has, instead, grouped workers together, keeping only a separate group for oilers. The hiring hall maintains two separate lists for building trades projects and pipeline projects, and, since March 1984, a worker can keep his or her name on only one list at a time. Both lists contain names in the order in which the applicant notifies the Union that he or she is available for work.

## 2) *Departures from the Hiring Hall Procedure*

Both Agreements allow the contractor to hire some of its employees on any given job outside the structure of the hiring hall. The Building Trades Agreement allows the contractor to hire key personnel directly and to recall any worker who has been employed by that contractor for at least six of the previous twelve months. The National Pipe Line Agreement allows the contractor to hire half its workforce from a group of "regular employees." Regular employees have either been employed by the contractor in the prior six months or are customarily employed by that contractor whenever it has work. *Id.* at 767.

Additionally, the Union has developed informal departures from the regular hiring hall procedure of offering a referral to the first applicant on the list. The first of these exceptions is based on the fact that the Union can, according to the agreements, name stewards to pipeline projects and master mechanics to building trades jobs to act as Union representatives. The procedure for such appointment under the agreements is to name an individual from among the Union members already referred to the job. Carlock, Laird, and Schiro departed from this rule by naming stewards and master mechanics to jobs, regardless of their positions on the list. Schiro sometimes appointed individuals who were not yet even on the list to steward positions when the job they were working on at the time was nearing completion. *Id.* at 768.

Short-term jobs, which are expected to last one to three days, also were treated as exceptions to the hiring hall procedure. Referrals for these jobs are simply given to those applicants who were present at the Union hall at the time the referral was received, irrespective of the applicants' places on the list. Union leadership made a similar exception for temporary replacements of workers who were incapacitated or could not otherwise perform their jobs. *Id.* at 768.

Finally, the Union's collective bargaining agreement with Dolphin Construction Company required that the Union refer residents of Allen Parish to its construction project there. Allen Parish residents, therefore, received referrals to those jobs before non-residents whose names were higher on the list.

Case 4:22-cv-00034-Y    Document 363-12    Filed 08/23/22    Page 42 of 50    PageID 2560

### 3) Manipulation of the Hiring Hall Procedures and the Exceptions

The district court found that Carlock "exploited[ed] and, at times, disregard [ed] entirely the hiring hall procedures to enrich his confederates to the detriment of the plaintiff and others." *Id.* at 769. The district court went on to explain specifically the various ways in which Carlock accomplished this: (1) appointing his confederates as stewards or master mechanics irrespective of their skills or their places on the list; (2) abusing the short-term referral exception to designate some jobs as short-term that he knew to be substantially longer *934 than three days; (3) allowing contractors to employ as "regular employees" workers who did not meet the requirements of that group as outlined in the National Pipe Line Agreement; (4) designating a referral as a recall under the Building Trades Agreement regardless of the individual's eligibility for recall. *Id.* at 769.

The district court found that Carlock quelled opposition by means of "intimidation and threats of retaliation in the form of economic discrimination and physical injury." *Id.* Also, the court found that Union members feared voting against Carlock because the balloting was not secret and they feared retaliation. *Id.* Finally, the court noted that Carlock made it difficult for disgruntled or suspicious workers to check their positions on the out-of-work list by keeping possession of, or control over, that list. *Id.* at 769-70.

## II. PROCEDURAL BACKGROUND

After a bench trial, the district court held in favor of the plaintiffs. The court awarded Guidry — who is the only plaintiff against whom this appeal is brought — lost wages totalling $5,310.50, $20,000 for emotional distress, $10,000 in punitive damages. The court also awarded attorneys' fees in an amount to be agreed to by the parties, or in default of that, to be set by the court. All of the above awarded damages were to be paid by the Union. The court also ordered the reinstatement of Guidry as a Union member. Additionally, the court awarded Guidry $1000 in punitive damages to be paid by Babin. The defendants timely appealed the judgment of the district court, asserting that Guidry failed to prove liability and that the damage awards are improper or excessive. Guidry cross-appeals the amount of damages awarded for emotional distress, lost wages, and punitive damages — arguing that they are inadequate.

## III. THE QUESTIONS OF LIABILITY

The Union, Carlock, Babin, Schiro, and Laird (collectively the "defendants") argue on appeal that the district court erred in holding them liable under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 401-531 (1985 and Supp.1986) ("LMRDA"). The defendants also challenge the district court's conclusion that Union hiring hall procedures violated the duty of fair representation under the Labor Management Relations Act section 9(a), 29 U.S.C. § 159(a) (1973) ("LMRA"). Further, the defendants argue that Guidry failed to exhaust his internal union remedies, and therefore, his case should have been dismissed.

## A. The LMRDA Claim

Guidry argued below, and the district court found, that his rights under sections 101(a)(1), (2) of the LMRDA had been abridged, 29 U.S.C. §§ 411(a)(1), (2), and that he had been wrongfully disciplined under sections 101(a)(5) and 609, 29 U.S.C. §§ 411(a)(5)[2] and 529.[3] The court concluded *935 that the defendants' manipulation of the hiring hall procedures to the detriment of Guidry and the other plaintiffs constituted violations of these provisions. It also concluded that Guidry's expulsion from the Union was violative of the LMRDA. The defendants assert that the evidence presented at trial does not support this portion of the verdict and that, therefore, the district court's factfinding is clearly erroneous for two reasons: (1) that there was no evidence to support the conclusion that Guidry exercised rights guaranteed him by the LMRDA, and (2) that there was no evidence to support the conclusion that the Union acted to retaliate against Guidry for having exercised those rights. Additionally, the defendants argue that even if the evidence supports the district court's underlying fact findings, its legal conclusion that the manipulation of hiring hall procedures constitutes "discipline" within the meaning of the statutes is erroneous. We address these arguments in order.

## 1) Did Guidry Oppose Union Leadership?

Case 4:22-cv-00394-Y   Document 35-12   Filed 08/23/22   Page 43 of 50   PageID 2561

The district court found that "Guidry [had] a long history of opposing incumbent Union officers." 669 F.Supp. at 772. The defendants challenge this finding as clearly erroneous and unsupported by the evidence and assert that Guidry failed to show either that he actually opposed Union leadership or that his opposition of that leadership was known. They characterize the evidence as demonstrating that Guidry opposed the Union leadership only until 1972,[4] and as failing to show — aside from Guidry's own testimony that he had opposed every administration since 1956 — that his opposition continued beyond 1972. The defendants cite _Chapa v. Local 18_, 737 F.2d 929, 932 (11th Cir.1984), for the proposition that a plaintiff's "bald assertion" that he opposed union leadership and that the union retaliated is insufficient to support a verdict for the plaintiff on an LMRDA wrongful discipline claim.

We begin by noting that the defendants are urging us to review the district court's factfinding. Our review is limited by Federal Rule of Civil Procedure 52(a), which provides that we may not set aside such findings unless "clearly erroneous." This standard of review has been interpreted to mean:

> [that] [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the
> court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would
> have weighed the evidence differently. Where there are two permissible views of the evidence, the
> factfinder's choice between them cannot be clearly erroneous.

_Anderson v. Bessemer City_, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Applying this standard, we conclude that the district court's factfinding is not clearly erroneous. The defendants' characterization of the record is incomplete. Far from simply containing Guidry's conclusory assertions that he generally opposed Union management, the record contains Guidry's specific testimony of particular instances of his opposition to the Union.

Guidry described in detail the circumstances of his decision in 1979 to go to the Federal Bureau of Investigation ("FBI") with evidence of Union corruption. Guidry made that decision after discussing his position with fellow Union members. Guidry testified that when Carlock and Laird discovered that he had gone to the FBI, they came on the job site at which Guidry was 936 *936 employed as master mechanic and sought to force his employer to discharge him. Guidry ultimately filed charges against Carlock with the Union's executive board. Although these events occurred outside the one-year prescriptive period applicable to Guidry's LMRDA claim, _see infra_ at section IV.A, they are not too remote in time to have been found by the district court to have triggered Union retaliation.

Guidry's testimony is replete with examples of challenges he levelled against the Union leadership's operation of the hiring hall. These include a challenge to the hiring methods on a job for which he was asked to steward — Guidry openly complained that men who had never worked for the company before were hired as "regular employees." Guidry also challenged the hiring hall when he discovered that his name had been left off the out-of-work list as a result of a new rule that required him to choose between the building trades and the pipeline lists.

According to Guidry's testimony, as well as that of Union members, Guidry's opposition to the Union leadership was hardly a secret. Charles Lovett, a member of the Union who was called to testify for the plaintiffs, noted that Guidry had been "bucking the system" at the Union for twenty-five years and had gained nothing.

The Union challenges this testimony as inadequate because it fails to show that Guidry either sought a Union office after 1972 or openly campaigned against the Union leadership in an election after 1972. The defendants argue that all of Guidry's political activity in the Union is too remote in time to support a claim of retaliation occurring in 1980-83. The flaw in the defendants' argument is their assumption that in order to assert a violation of section 101(a)(2) of the LMRDA, a plaintiff must show that he or she spoke out in opposition to Union leadership in the context of an election. We read the statute to contain a much broader protection of speech.

The statute itself speaks of the right of every union member to "express any views, arguments or opinions," 29 U.S.C. § 411(a)(2), _supra_ n. 2, and does not limit such expression to one occurring in the context of a union election. In fact, the statute refers separately to a union member's right to express his views upon candidates running for union office. _Id._

The Supreme Court has characterized the LMRDA as "the product of congressional concern with widespread abuses of power by union leadership." _Finnegan v. Leu_, 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). The "Bill of Rights" portion of that legislation was "aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." _Id._ at 435, 102 S.Ct. at 1870. Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." _Sheet_

Case 4:22-cv-00388-Y   Document 35-12   Filed 08/23/22   Page 44 of 50   PageID 2562

*Metal Workers' Intern. Ass'n v. Lynn,* 488 U.S. 347, ___, 109 S.Ct. 639, 645, 102 L.Ed.2d 700 (1989) (quoting *United Steelworkers of Am. v. Sadlowski,* 457 U.S. 102, 112, 102 S.Ct. 2339, 2346, 72 L.Ed.2d 707 (1982)).

The defendants do not cite, nor have we found, any cases that limit the free speech rights protected by the LMRDA's Bill of Rights to speech relating directly to an election within the union. While we agree with the defendants' position that the evidence adduced at trial does not support the conclusion that Guidry formally opposed Union leadership after 1972 in the context of a Union election, we conclude that the district court was not clearly erroneous in its finding that Guidry openly opposed Union leadership at least up to the time that he filed this suit.

## 2) *Did the Union Act to Retaliate Against Guidry for Exercising Free Speech Rights?*

937     The district court found generally that hiring hall procedures were abused and threats of retaliation in the form of economic and physical injury were used to control Union members and to enrich those members who supported the leadership. 669 F.Supp. at 769. The court also enumerated the instances of such reprisals *937 that specifically related to Guidry. In addition to discrimination in the hiring hall, the district court found that the Union retaliated against Guidry for his opposition to leadership by denying him a gold Union membership card recognizing his thirty years of service. Also, the district court found that Union economic pressure forced Guidry to violate Union rules and cross a picket line. The court found that when Guidry faced charges for having crossed the picket line, Laird telephoned supporters of the leadership to ensure that they would attend the meeting at which the membership was to vote on Guidry's fate — thus, making his expulsion almost certain.

The defendants challenge these factfindings as clearly erroneous. They argue that even if Guidry did show that he had been discriminated against in hiring hall referrals, he failed to show that such discrimination was connected to his exercise of rights protected under the LMRDA. They argue that the other union acts found by the district court to have been discriminatory were justified by long-standing Union rules.

The record contains abundant evidence, both in the form of testimony and documentation, of the procedures followed by Union leadership in referring applicants to jobs through the hiring hall. The court found twenty-one specific instances in which Union leadership manipulated the hiring hall procedure by employing one of the means outlined above. This resulted in direct harm to Guidry. *See Taliaferro,* 669 F.Supp. at 781-86 (Appendix). The district court concluded that each improper referral had been used to penalize Guidry (and the other plaintiffs) for their refusal to support the defendants. *Id.* at 776.[5] We do not find clear error in this conclusion.

The defendants argue that Guidry failed to show in each case of hiring hall discrimination that the intent of Union leadership was discriminatory. We disagree. Guidry (and the other plaintiffs) provided substantial evidence, particularly in the testimony of Laird, of the attitude of Carlock toward those members who had "voted wrong" in prior elections, and of the control Carlock exercised over the out-of-work list. This evidence, coupled with the clear evidence of Guidry's dissent from Union leadership, is sufficient to support a conclusion that the discrimination was intentional. Even though the evidence is largely circumstantial, it is sufficient to support the verdict. *See Vandeventer v. Local 513 of Int'l Union of Op. Eng.,* 579 F.2d 1373, 1380 (8th Cir.) (holding that primarily circumstantial evidence was sufficient to support verdict that union had taken retaliatory action), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

Additionally, the plaintiffs introduced testimony and exhibits regarding the specifics of each wrongful referral found by the district court. After reviewing the evidence supporting each of the twenty-one wrongful referrals, which involved jumping over Guidry's name on the out-of-work list, this court is convinced that the district court's factfinding is correct and supported by substantial evidence. We, therefore, do not disturb the district court's conclusion that discrimination in the hiring hall referrals took place and was used in retaliation for Guidry's failure to support Union leadership.

## 3) *Does the Manipulation of Hiring Hall Procedures Constitute Discipline within the Meaning of Sections 101(a)(5) and 609 of the LMRDA?*

Case 4:22-cv-00318-Y    Document 363-12    Filed 08/23/22    Page 45 of 50    PageID 2568

938    The defendants challenge the district court's holding that the wrongful hiring hall referrals constitute "discipline" within the meaning of sections 101(a)(5) *938 and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5) and 529. They argue that according to _Finnegan v. Leu, supra,_ the term "discipline" in section 609 refers to actions taken by the union that diminish the membership rights of a union member. Hiring hall discrimination does not qualify, according to the defendants, because hiring hall referrals must be made available to non-union members. _United Ass'n of Journeymen, Local 198 v. NLRB, 747 F.2d 326 (5th Cir.1984)_; National Labor Relations Act, § 8(b)(1)(A), (b)(2), 29 U.S.C. § 158(b)(1)(A), (b)(2).

The issue presented here — whether proof that a union has retaliated against one of its members for his exercise of a right protected under section 101 of the LMRDA constitutes "discipline" within the meaning of section 609 of that act — has been addressed by a number of courts with apparently contradictory results. We conclude, however, that the cases can be harmonized, and we hold that under the facts presented here, Guidry has made out a proper claim for wrongful discipline in violation of the LMRDA.

In _Miller v. Holden,_ we held:

> Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

535 F.2d 912, 915 (5th Cir.1976). We decided that the claim brought in _Miller_ — that the plaintiff's discharge from his employment by a trust established by, but separate from, his union — did not state a cause of action under the LMRDA because the discharge did not constitute "discipline" under the statute. In determining the meaning of discipline we looked first to the statute and its legislative history, _id._ at 914 n. 5 (citing 1 Legislative History of LMRDA of 1959, 338, 516, 619, 687, 858 (NLRB ed. 1959)), but concluded that neither was enlightening on the issue. We, therefore, applied the principal of statutory construction of _ejusdem generis_ and construed the general term discipline to conform to the essential character of the three specific types of discipline listed in the statute: fine, expulsion, and suspension. _Id._ at 914-15. Our result required, as quoted above, that the union action separate the plaintiff from other union members in good standing to constitute discipline.

We followed the holding in _Miller_ to find that manipulation of hiring hall referrals to the detriment of the plaintiff constituted discipline within the meaning of LMRDA in _Keene v. International Union of Op. Eng., Local 624, 569 F.2d 1375 (5th Cir.1978)_. In that case, the plaintiff had unsuccessfully run for union office. He showed that after his loss in the election he received virtually no referrals through the union's hiring hall and that over two hundred people with less priority on the out-of-work list received referrals in preference to him. We held that a jury could reasonably conclude that such discrimination in referrals constituted discipline for exercising rights protected under the LMRDA.

The question, however, is not so easily resolved. The Supreme Court addressed the issue of what constitutes "discipline" under section 609 of the LMRDA in a different, but related, context in _Finnegan v. Leu, supra_. In that case, the plaintiffs sued under the LMRDA after they were discharged from their employment as union business agents following the election of Leu as president of the union. The plaintiffs had openly supported Leu's rival, the incumbent president, in the campaign. At trial, Leu explained that he had discharged the plaintiffs because he felt that they were loyal to the incumbent and would be unable to implement his policies. The Court held that the term discipline in section 609 "refers only to retaliatory actions that affect a union member's rights or status _as a member_ of the union." 456 U.S. at 437, 102 S.Ct. at 1871 (emphasis added). It concluded that the discharge of the plaintiffs from their appointive union positions was not within the scope of

939    "other discipline" contemplated by section 609. _Id._ at *939 439, 102 S.Ct. at 1872.[6] The Court reasoned that the LMRDA was intended to protect rank-and-file union members, rather than union officers or employees. Therefore, while the plaintiffs' right to campaign against a candidate for union president was protected, such campaigning did not immunize them from discharge at the pleasure of the new president from their jobs as union employees.

In cases not involving the loss of employment within the union itself, an apparent conflict in interpreting _Finnegan_ has arisen. In _Hackenburg v. International Bhd. of Boilermakers, Local 101, 694 F.2d 1237 (10th Cir.1982)_, the court followed _Finnegan_ to hold that union members who were "benched" — that is they received no referrals — following a wildcat strike had not been "otherwise disciplined" within the meaning of the LMRDA.

In *Hackenburg,* the union, following the terms of its collective bargaining agreement with an employer, deprived the plaintiffs of any job assignments for ninety days as a result of their involvement in a wildcat strike. The plaintiffs sued, arguing that they had been "otherwise disciplined" within section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), without the procedural protections afforded by that section. The court determined that the "sanctions imposed were employment related rather than internal union related," 694 F.2d at 1240, and, relying on *Finnegan,* held that the procedural safeguards of section 101(a)(5) were not available because the punishment was not related to the union members' rights or status as members. *Id.* at 1239.

*Turner v. Local Lodge # 455 of the Int'l Bhd. of Boilermakers,* 755 F.2d 866 (11th Cir.1985), involves circumstances very similar to those in *Hackenburg.* The plaintiffs in *Turner* also suffered a ninety-day benching pursuant to the terms of a collective bargaining agreement as a result of their refusal to cross an illegal picket line. The court first noted that the plaintiffs' contention that the benching had actually occurred in retaliation for their exercise of rights protected by sections 101(a)(1) and (2) of the LMRDA had been properly taken away from the jury because of the lack of evidentiary support. It then addressed the plaintiffs' contention — which was identical to that in *Hackenburg* — that the benching had violated section 101(a)(5) because proper procedures had not been followed before the union imposed the sanction.

The court considered the broad language in section 101(a)(5) and stated that "the sweeping language ... cannot be read out of context, but must be taken as backing and support for union members exercising their `Bill of Rights' and that any union disciplinary measure unrelated to the `Bill of Rights' is not covered." *Turner,* 755 F.2d at 869. Therefore, the absence of any claim of retaliation by the union was fatal to the plaintiffs' LMRDA claim. The court then went on to state that under the interpretation *940 of "discipline" found in *Finnegan,* the benching in the case before it did not constitute discipline, because it did not affect the plaintiffs' rights as members of the union in as much as union membership is not a requirement in order for one to be carried on the out-of-work list and receive employment referrals. *Id.* In concluding, however, the court noted that "the case might be different" if there had been evidence of, for example, "retaliation for exercise of a protected right." *Id.* at 870.

Such a different result was reached by the Sixth Circuit in *Murphy v. International Union of Op. Eng., Local 18,* 774 F.2d 114 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986), in which the court found that a denial of work assignments through a hiring hall to a union member in retaliation for his opposition of union leadership could be considered "discipline" within the meaning of section 101(a)(5). *Murphy,* 774 F.2d at 122. The court went on to uphold the district court's conclusion that although the union's actions were not "discipline," they were nevertheless actionable as violative of sections 101(a)(1) and (2). The court distinguished *Finnegan* on the ground that the *Finnegan* court had been concerned with union employees and the right of a union leader to choose people to help him run the union. *Id.* at 123. The court stated: "Plainly, the Supreme Court in *Finnegan* did not intend to rule out [29 U.S.C.] section 411 as a protection against manipulative discrimination on behalf of an ordinary union member seeking to exercise his right of expression at union meetings." *Id.* The court also distinguished *Turner* and *Hackenburg* simply by noting that the unions involved in both had acted pursuant to collective bargaining agreements. Id. at 122 n. 5. The court did not address the question of whether the language in *Turner,* which states that a refusal to refer a member to employment does not affect his rights as a member, 755 F.2d at 869, precluded a determination that such a refusal could constitute discipline in any circumstances.

In *Moore v. Local 569 of the Int'l Bhd. of Elec. Workers,* 653 F.Supp. 767 (S.D.Cal.1987), the court directly addressed the problem avoided in *Murphy* — that *Turner* appears to preclude a holding that discriminatory referral procedures affect union members' *rights* as a member of the union. The court began by analyzing the reasoning in the problematic dicta from *Turner* that because non-members could take advantage of a union hiring hall, membership rights are not affected by a discriminatory hiring hall. *Moore,* 653 F.Supp. at 770. The *Moore* court decided that this language did not preclude a determination that membership rights were ever affected by such discrimination for two reasons. First, the court inferred that in *Turner,* the plaintiffs no longer had a right to be referred to work because of their involvement in wildcat strikes prohibited under the collective bargaining agreement. *Id.* Second, and more importantly, the court reasoned that one of the rights of a union member was to receive nondiscriminatory referrals from the union hiring hall. The court concluded that the ability of non-members to place their names on the out-of-work list did not diminish and, in fact, had no relationship to that right. The court, therefore, rejected the union's contention in the case before it that the dicta in *Turner* regarding the issue of whether benching could constitute discipline should control. It found instead that the plaintiffs' allegations stated a cause of action under section 609 of the LMRDA. *Id.* at 770-71.

We agree with the *Moore* court's rejection of this dicta from *Turner* in circumstances such as those before us. It is apparent from the evidence that Guidry's name was repeatedly skipped over on the out-of-work list in retaliation for his outspoken opposition to Union leadership. Here, as in *Murphy,* and as distinguished from *Turner* and *Hackenburg,* there was evidence

Case 4:22-cv-00343-Y   Document 35-12   Filed 08/23/22   Page 47 of 50   PageID 2365

of a reprisal for exercise of rights protected under the LMRDA. The *Turner* court itself noted that if there is evidence of union retaliation the case might be different. We also point out that here, as distinguished from *Finnegan,* the question involves the right to fair treatment of a union member by his union. In *Finnegan,* *941 the plaintiffs were seeking to retain their employment by the union, not something to which every union member is entitled. Here, on the other hand, the plaintiff simply seeks not to be singled out for unfair treatment by his union. We simply cannot agree with the defendants' contention that the discriminatory administration of the hiring hall does not represent the kind of discipline covered by the LMRDA.

941

## B. Exhaustion of Union Remedies

The defendants challenge the district court's ruling on the ground that Guidry failed to exhaust his internal union remedies, and, as a result, they argue that his suit should have been dismissed. In his complaint, as well as on brief to this court, Guidry asserts that pursuit of his internal union remedies would have been futile, and therefore, he is not required to exhaust that avenue before filing this suit. The district court did not directly address this question, although it clearly did not find that Guidry's failure to exhaust internal union remedies precluded this suit.

Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), allows courts in their discretion to require that a union member exhaust his internal remedies before filing suit. *See* 29 U.S.C. § 411(a)(4); *Hammons v. Adams,* 783 F.2d 597, 603 (5th Cir.1986); *Chadwick v. International Bhd. of Elec. Workers, Local 175,* 674 F.2d 939 (D.C.Cir.1982).

Before a union member may bring suit against his union for breach of the duty of fair representation under section 301 of the LMRA, 29 U.S.C. § 185, the member must either exhaust union remedies or show an adequate reason for not doing so. *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). Here too, courts have discretion to decide whether to require such exhaustion. *Id.* at 689, 101 S.Ct. at 2095. Factors relevant to the inquiry of whether to require exhaustion are: (1) whether union officials are so hostile to the member that he cannot hope to obtain a fair hearing; (2) whether the union procedures are adequate; and (3) whether requiring exhaustion would unreasonably delay the member in pursuing his rights. *Id.* Guidry asserts that the first of these exceptions is applicable here.

The Union Constitution and Bylaws, admitted into evidence in the court below, provide simply that the local union's determination of any grievance shall be final and binding. Neither provides specific grievance procedures for the type of complaint Guidry asserts. In such absence of procedural requirements, an employee may proceed to file suit after pursuing his contractual remedies. *Hammons,* 783 F.2d at 602. Additionally, where it is clear, as here, that because the complaint is directed at those officials who would hear Guidry's complaint, the member should be excused for his failure to exhaust internal remedies. *Hayes v. Brotherhood of Ry. and Airline Clerks/Allied Servs. Div.,* 734 F.2d 219 (5th Cir.), *cert. denied,* 469 U.S. 935, 105 S.Ct. 336, 83 L.Ed.2d 272 (1984).

## IV. THE DAMAGE AWARDS

## A. The Statute of Limitations

The district court, following *Local 1397, United Steelworkers of Am. v. United Steelworkers of Am.,* 748 F.2d 180 (3d Cir.1984), applied a six-month statute of limitations to the plaintiffs' LMRDA claims. It therefore looked back six months prior to the date of filing of the suit to determine the amount of damages. After the district court rendered its decision, and after oral argument on this case, the Supreme Court overruled *Local 1397. Reed v. United Transp. Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). The Court held in *Reed* that, unlike claims brought under section 301 of the LMRA, *see DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), claims brought under section 101(a)(2) of the LMRDA are more akin to civil rights claims than to unfair labor practice charges. Therefore, the Court reasoned under the rule established in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the state general or residual personal injury statute of *942 limitation should apply to actions brought under section 101(a)(2). Therefore, we look to Louisiana state law to determine the appropriate statute of limitations for the LMRDA claims. The claims under section 301 of the LMRA are, however, still subject to the six-month limitation.

942

Article 3492 of the Louisiana Civil Code provides a one-year limitations period for delictual actions, which include personal injury actions. La.Civ.Code Ann. art. 3492 (West Supp.1989). Therefore, the limitations period that should be applied to Guidry's claims under the LMRDA is one year.[7] Because the damages amount must be based in part on facts not found by

the district court, we must remand the damages portion of this cause for a redetermination of the amount of damages to be awarded. However, we can and will address the legal issues raised by the parties regarding the types of damages awarded.

# 1) *Punitive Damages*

The district court awarded punitive damages to be paid both by the Union and Babin, relying on _International Bhd. of Boilermakers v. Braswell_, 388 F.2d 193, 199 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968), and *Parker v. Local Union No. 1466, United Steelworkers of Am.*, 642 F.2d 104, 106 (5th Cir.1981), for the proposition that punitive damages may be awarded under the LMRDA where the union acted with "actual malice or reckless or wanton indifference to the rights of the plaintiff." _Braswell_, 388 F.2d at 199.

On appeal, the defendants urge us to overrule this Circuit's precedent and rule that punitive damages are unavailable in LMRDA cases. Alternatively, they argue that the evidence does not support the finding of malice on which the punitive damage award depends. We find neither argument convincing.

As to the first argument, we simply point out that as a panel of this court, we are not free to overrule the precedent of prior Fifth Circuit cases. Only the *en banc* court has the necessary power to do so. _National Bank of Commerce of Dallas v. All American Assurance Co._, 583 F.2d 1295, 1301 (5th Cir.1978). As to the defendants' second argument, we point to our discussion *supra* at parts III A. 1 and 2 of the sufficiency of the evidence. We conclude that the evidence adduced at trial supports the district court's finding of malice, and therefore we uphold the court's decision to award punitive damages,

943   although, *943 for the reason noted below, we vacate the amount of the award.

On cross-appeal, Guidry argues that the amount of punitive damages awarded was insufficient and he seeks enhancement of the amount to $250,000. The only argument Guidry advances for this position asserts essentially that because the Union can afford more, this award is not sufficiently punitive. Because we remand this case for a redetermination of the damage award, we decline to address this issue. Because the district court may have been influenced in its decision on punitive damages by the amount of actual damages, we vacate the punitive damage award and leave it to the district court, in its discretion, to fix once again the amount of punitive damages when the amount of actual damages has been recomputed.

# 2) *Emotional Distress*

The defendants also contest the award of damages for emotional distress, arguing that because the plaintiffs failed to present evidence of any physical manifestations of that distress, such an award is unavailable under the LMRDA. We agree that emotional distress "standing alone does not constitute a sufficient basis for the awarding of damages under the [LMRDA]." _Bise v. International Bhd. of Elec. Workers, Local 1969_, 618 F.2d 1299 (9th Cir.1979) (quoting _International Bhd. of Boilermakers v. Rafferty_, 348 F.2d 307, 315 (9th Cir.1965)), *cert. denied*, 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980). In order to protect against spurious claims for emotional distress that might drain union coffers and thereby deprive other members of effective representation, some courts have required LMRDA claimants who seek damages for emotional distress also to adduce some evidence of actual injury. *See id.* Other courts do not impose an actual injury requirement. *Compare Bise, supra* with _Bradford v. Textile Workers of Am._, 563 F.2d 1138, 1144 (4th Cir.1977). Whether to impose an actual injury requirement, as well as what such a requirement entails, are issues of first impression for this Circuit.

We conclude, as the district court did, that LMRDA claimants who seek damages for emotional distress must adduce some evidence of actual injury. The environment in which LMRDA claims arise — discipline and termination by both unions and employers — is emotionally charged at the outset and, thus, one in which claims for emotional distress are likely to be the rule rather than the exception. Moreover, the subjective nature of these claims makes it particularly difficult to dismiss meritless actions at early stages in the litigation — before the union has gone to considerable expense in defending the action. Hence, we agree with the Ninth Circuit that an actual injury requirement should be imposed in order to protect unions in their representative capacities from malice from within.

A further issue to be resolved, however, is what type of evidence will suffice to establish "actual injury." Despite professed agreement, the two circuit courts that have addressed this problem construe "actual injury" in different ways. In _Rodonich v. House Wrecker's Union Local 95_, 817 F.2d 967, 977 (2d Cir.1987), the Second Circuit upheld the following jury instruction: "[y]ou must find such mental or emotional distress based upon the particular plaintiff's physical condition or medical evidence." *Id.* The Second Circuit then declared that "[t]he qualification that claims of emotional distress be supported by a

Case 4:22-cv-00343-Y   Document 38-2   Filed 08/23/22   Page 49 of 50   PageID 867

physical manifestation of injury is an appropriate safeguard against the award of excessive and speculative damages." *Id.; see also* Petramale v. Local 17, Laborers' Int'l Union of North Am., 847 F.2d 1009, 1012 (2d Cir.1988). The Ninth Circuit, however, construes "actual injury" more broadly. In *Bise* and its progeny,[8] lost wages, as well as physical manifestations of emotional distress, served as sufficient indication of actual injury. In the case before us, the district court awarded damages for emotional distress to those plaintiffs who could *944 demonstrate actual injury through lost wages.

944

We adopt the Ninth Circuit's approach. We fail to see why physical manifestations of injury should be the sole guarantor of genuineness; financial distress may well be the most reliable and frequent cause of mental distress. Moreover, whatever the indicia of actual injury used, plaintiffs who seek damages for emotional distress must present credible evidence of that distress. District courts should not be hidebound to antiquated notions about the nature of mental injury and suffering in order to determine whether an LMRDA claim is genuine. We therefore affirm the district court's interpretation of the actual injury requirement. We vacate the award, however, for reconsideration along with the other components of damages to be awarded.

## 3) *Attorneys' Fees*

The district court awarded to Guidry and the other plaintiffs "reasonable" attorneys' fees. The court looked to Hall v. Cole, 412 U.S. 1, 4-5, 93 S.Ct. 1943, 1945-46, 36 L.Ed.2d 702 (1973) to determine the standards for an award of reasonable attorneys' fees. *Hall* allows an award of attorneys' fees to a successful party even in the absence of statutory or contractual authority when his opponent has acted in bad faith or when his success in the litigation confers a benefit on members of an ascertainable class, and where the court's award of attorneys' fees will make it possible to spread the cost of litigation over the class of beneficiaries of the suit. The court below held that, in this case, attorneys' fees were available under both theories.

On appeal, the defendants argue that the district court's application of these two theories was an error of law. We agree.

The bad faith exception to the general rule — that absent contractual or statutory authority, attorneys' fees are not recoverable — is set out in detail in Shimman v. International Union of Op. Eng., Local 18, 744 F.2d 1226, 1228-34 (6th Cir.1984) (en banc), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). *Shimman* makes clear that the focus of the bad faith inquiry is not the actions that precipitated the law suit, but rather the manner in which the litigation itself is carried out. That is, the rule is intended to penalize the litigant who brings to court a frivolous suit or defense, or abuses the process so as to create an inquiry separate from the underlying claim. *Id.* at 1231. This court has adopted the same reasoning. *See, e.g.,* Batson v. Neal Spelce Assoc., 805 F.2d 546, 550 (5th Cir.1986).

There is no evidence that the defendants in this case have either brought a frivolous defense or pursued the litigation in a vexatious manner. For that reason, we disagree with the district court's holding that the bad faith exception is applicable here.

The common benefit theory is also unavailable to Guidry. The *Shimman* court discussed this theory as well. In *Shimman,* as in the instant case, the underlying litigation resulted in a damage award benefitting only the plaintiffs personally. The plaintiffs contended in *Shimman,* as they do here, that although the money awards do not benefit the union membership as a whole, an incidental benefit of the awards — dispelling the chill on free speech created by union leadership — does inure to the benefit of all union members.

The court in *Shimman* explicitly rejected this theory. 744 F.2d at 1235. The court reasoned that the idea of the common benefit theory is to shift the costs of litigation to those who would have had to pay if they had brought the suit. *Id.* In *Shimman,* as here, other members of the union could not have brought suit to redress the injuries of an individual union member. Further, an award of attorneys' fees here would not spread the costs of litigation proportionate to the common benefit. Guidry would have to pay no more for the cost of litigation than any fellow union member, but he would receive substantially greater benefits in the form of cash awards.

We therefore hold that on remand, the district court should not include an award of attorneys' fees in its damages award.

945

*945 ## 4) *Lost Wages*

Case 4:22-cv-00343-Y Document 36-2 Filed 08/23/22 Page 50 of 50 PageID 868

Guidry argues in his cross-appeal that the amount of lost wages awarded was inadequate to compensate him. Once again, we are not in a position to review the district court's damage determination because we are remanding that portion of the holding. We note, however, that the district court's method of determining the lost wages due — comparing Guidry's actual wages to the average amount earned by union members during the limitations period — is a sound and fair method of making that determination.

# V.

For all the foregoing reasons, we AFFIRM the judgment as to the defendants' liability, and we VACATE the award of damages and REMAND for redetermination of the proper amount. Costs shall be borne by the defendants.

[1] The district court held trial on five related cases simultaneously and found for the plaintiff in each of the cases. _Taliaferro v. Schiro_, 669 F.Supp. 763 (W.D.La.1987). The defendants appeal the judgment in this case only.

[2] Sections 411(a)(1), (2), and (5) read as follows:

(1) Equal Rights

Every member of a labor organization shall have equal rights and privileges within such an organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of Speech and Assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(5) Safeguards Against Improper Disciplinary Action

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Section 101, 29 U.S.C. Sec. 411, is often referred to as the union members'"Bill of Rights."

[3] Section 529 ("Prohibition on certain discipline by labor organization") reads as follows:

It shall be unlawful for any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

[4] It is clear from the evidence that the last time Guidry ran for Union office was in 1972.

[5] The district court also concluded that each improper refusal constituted a breach of the duty of fair representation under 29 U.S.C. § 159(a). 669 F.Supp. at 775-76. The defendants dispute this conclusion, solely on the ground that the evidence is insufficient to support the factfinding that intentional discrimination in hiring hall referrals had occurred. We therefore conflate their arguments under the LMRDA and the duty of fair representation to the extent they concern the sufficiency of the evidence. That is, we address only once the issue of whether the finding that the operation of the hiring hall was intentionally discriminatory was clearly erroneous.

[6] The Court went on to address the question of whether section 102 of the LMRDA, 29 U.S.C. § 412, provided independent authority for the suit. Section 102 provides that:

Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

The Court noted that the intended relationship between this provision and section 609 was "not entirely clear," 456 U.S. at 439, 102 S.Ct. at 1872, but indicated that a litigant could maintain an action under section 102 without necessarily stating a violation of section 609. However, it concluded that in the circumstances before it no "rights secured" by the subchapter had been infringed, holding that whatever limits the subchapter placed on the union's authority to use dismissal to suppress dissent, it did not restrict union leaders from choosing a staff with views compatible with their own. _Id._ at 440-41, 102 S.Ct. at 1872-73. In _Sheet Metal Workers' Inter. Ass'n v. Lynn_, 488 U.S. 347, 109 S.Ct.