699, 102 L.Ed.2d 700 (1989), the Court recently limited this portion of the holding in *Finnegan* to cases in which the union employment was appointive, rather than elective. The Court reasoned in *Lynn* that when an elective official is removed from his post, the union members are denied their chosen representative, and the chilling effect on free speech is more widespread. *Id.* 109 S.Ct. at 645.

Because we find that a violation of section 609 has occurred here, it is clear that this suit could also be maintained under section 102. That does not, however, affect the result here.

[7] A subsidiary issue is whether *Reed* should be afforded retroactive effect in this case. We believe that it should.

The general rule is that federal cases should be decided according to the law existing at the time of the decision. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 105-09, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), however, the Supreme Court declined to apply retroactively a limitations period that would have time barred a litigant's lawsuit. The Court refined a three-part nonretroactivity test: (1) the supervening decision must establish an unforeseen and unforeshadowed principle of law, as where the Court has overruled clear circuit precedent on which the litigants may have relied; (2) the purposes of the substantive law upon which the limitations period operates would not be served by retroactivity; and (3) retroactive application would produce inequitable results. *Id.* at 106-07, 92 S.Ct. at 355-56. These factors provide no basis for refusing retroactive application of *Reed* to this case.

Prior to *DelCostello,* the established precedent in the Fifth Circuit specified application of an appropriate state statute of limitations in section 101(a)(2) cases. *Sewell v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 445 F.2d 545, 548-50 (5th Cir.1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972) (applying a one-year Alabama statute of limitations for tort actions). No post-*DelCostello* Fifth Circuit decision definitively altered this rule until the district court below adopted the Third Circuit's *Local 1397* interpretation of a six-month limitations period. Thus, *Chevron* `s first factor clearly is not satisfied: Fifth Circuit precedent was not overruled by, but in fact supported, the *Reed* decision; at most, the limitations issue was unsettled after *DelCostello.* Likewise, the remaining two *Chevron* factors cannot be met. Applying Louisiana's one-year limitations period to determine damages in this case would further the remedial goals of section 101(a)(2) of the LMRDA without substantially frustrating any federal policy of repose, and would not be inequitable, as litigants in this Circuit could not have justifiably relied on a six-month limitations period prior to *Reed. See Goodman,* 482 U.S. at 662-64, 107 S.Ct. at 2621-22.

[8] *See, e.g., Bloom v. International Bhd. of Teamsters,* 752 F.2d 1312, 1315 (9th Cir.1984).

**907 F.2d 1491 (1990)**

## Robert GUIDRY, Plaintiff-Appellee Cross-Appellant,

v.

## INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 406, et al., Defendants-Appellants Cross-Appellees.

No. 87-4733.

**United States Court of Appeals, Fifth Circuit.**

May 22, 1990.

As Modified on Petition for Rehearing July 25, 1990.[*]

1492    *1492 Robert H. Urann and Jerry L. Gardner, Jr., Metairie, La., for defendants-appellants, cross-appellees.

Maurice L. Tynes, Lake Charles, La. and Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for plaintiff-appellee, cross-appellant.

Before RUBIN, GARZA and KING, Circuit Judges.

# ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

PER CURIAM:

On March 19, 1990, the Supreme Court ___ U.S. ___, 110 S.Ct. 1465, 108 L.Ed.2d 603, vacated our judgment in _Guidry v. International Union of Operating Engineers_, 882 F.2d 929 (5th Cir.1989), and remanded for further proceedings in light of _Breininger v. Sheet Metal Workers International Association_, ___ U.S. ___, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). We, in turn, remand to the district court.

1493    In _Breininger_, the Court held that the phrase "otherwise discipline" under sections 101(a)(5) and 609 of the Labor Management Reporting and Disclosures *1493 Act of 1959 (LMRDA) denotes only that punishment "authorized by the union as a collective entity to enforce its rules." _Id._ 110 S.Ct. at 439. In other words, an action must be "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." _Id._ (_quoting Miller v. Holden_, 535 F.2d 912, 915 (5th Cir.1976)). The union need not, however, invoke formal proceedings, and discipline can entail informal or summary penalties as long as adverse action against a union member is not purely "ad hoc retaliation by individual union officers." _Id._, 110 S.Ct. at 439 n. 15. "Discipline `must be done in the name of or on behalf of the union as an organizational entity.'" _Id._ The petitioner in _Breininger_ "alleged only that [certain union officers] failed to refer him to employment because he supported one of their political rivals." _Id._ at 440. Thus, the petitioner failed to allege acts constituting discipline by the union as a collective entity.

The Supreme Court's interpretation of the phrase "otherwise discipline" in determining whether hiring hall discrimination gives rise to a claim under sections 101(a)(5) and 609 of the LMRDA does not affect that portion of our panel opinion affirming liability and damages based on Guidry's claim that the Union breached its duty of fair representation under the Labor Management Relations Act, 29 U.S.C. § 159(a). _See Guidry_, 882 F.2d at 937 & n. 5. Therefore, this portion of our prior opinion is reinstated.

On the issue of LMRDA liability, we need remand only with respect to those claims potentially impacted by the Supreme Court's decision in _Breininger,_ that is, Guidry's unlawful discipline claims based on sections 101(a)(5) and 609 of the Act.[1] _Breininger_ does not alter the district court's judgment regarding the defendants' violations of Guidry's equal rights under section 101(a)(1) and right to free speech under section 101(a)(2). A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights even if no unlawful "discipline" is shown. _Finnegan v. Leu_, 456 U.S. 431, 439, 102 S.Ct. 1867, 1872, 72 L.Ed.2d 239 (1982); _Murphy v. International Union of Operating Engineers, Local 18_, 774 F.2d 114, 122 (6th Cir.1985), _cert. denied_, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986).

Case 4:22-cv-00838-Y Document 35-23 Filed 08/23/22 Page 3 of 50 PageID 786

If Guidry wishes to pursue his unlawful discipline claims on remand, the district court must determine, in view of *Breininger,* whether the Union as a collective entity was responsible for hiring hall discrimination against him. The court should make new findings, taking additional evidence if needed, and render its judgment accordingly.

In our previous opinion in this case, we vacated the district court's award of LMRDA damages, holding that, due to an intervening Supreme Court case, *Reed v. United Transportation Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), the district court erred in applying a six-month statute of limitations to Guidry's LMRDA claims. *See Guidry,* 882 F.2d at 941-42. We remanded for a redetermination of damages based on violations occurring within one year of filing suit, applying Louisiana's one-year limitations period for delictual actions. *Id.* at 941-45. This holding is unaffected by *Breininger,* and we therefore remand for a reassessment of damages consistent with the discussion contained in our previous opinion. *Id.*

REMANDED.

# ON PETITION FOR REHEARING

PER CURIAM:

In our opinion dated August 29, 1989, this court affirmed a district court judgment in favor of plaintiff Robert Guidry (Guidry) as to the liability of the International Union of Operating Engineers, Local 406 and former and current Union leaders (the 1494 defendants) for violations of the Labor *1494 Management Relations Act (LMRA), 29 U.S.C. § 159(a), and the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411(a)(1), (2), (5), and 529. *Guidry v. International Union of Operating Engineers, Local 406,* 882 F.2d 929 (5th Cir.1989), *vacated,* ___ U.S. ___, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990). We remanded, however, for a reassessment of damages. *Id.* at 941-45. The Supreme Court subsequently vacated our judgment and remanded for further consideration in light of its decision in *Breininger v. Sheet Metal Workers International Association Local Union No. 6,* ___ U.S. ___, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), a case that addressed the issue of whether hiring hall discrimination constituted "discipline" within the meaning of sections 101(a)(5) and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5), 529. We, in turn, remanded to the district court for further proceedings in light of *Breininger,* to the extent that *Breininger* affected our panel's prior opinion. *Guidry,* 902 F.2d 335 (1990). Of course, for the reasons explained in our prior opinion, a remand to the district court was necessary, in any event, to reassess Guidry's damages. *See Guidry,* 882 F.2d at 941-45 (holding that actual and punitive damages based on Guidry's LMRDA claims should be reassessed under a one-year limitations period).

Guidry now petitions this court for panel rehearing and for rehearing en banc. Guidry argues that a remand on the liability issue is required only as to those claims potentially affected by the *Breininger* decision — i.e., those claims based on sections 101(a)(5) and 609 of the LMRDA[2] — and that our mandate erroneously instructs the district court to make new determinations of liability on all of his claims. He contends that *Breininger* in no way impacts the district court's finding of liability based on the defendants' breach of the duty of fair representation under the LMRA, 29 U.S.C. § 159(a). He also argues that the district court's finding of liability under the LMRDA may be affirmed on the alternative grounds of Guidry's LMRDA equal rights and free speech claims, 29 U.S.C. §§ 411(a)(1), (2) — theories of recovery that were not addressed by the Supreme Court in *Breininger,* and that are not affected by the Court's decision in that case.

Having considered Guidry's motion for rehearing, we conclude that his complaint is well taken. Although it was not our intention to require the district court to reevaluate the defendants' liability for breach of the duty of fair representation, 29 U.S.C. § 159(a), or for violation of Guidry's rights to equal union member rights and free speech, 29 U.S.C. §§ 411(a)(5), 529, we admit that our mandate is not completely clear on this point. We therefore modify our prior order, by deleting the last full paragraph and substituting in its place the following four paragraphs.[**]

[*] Editor's Note: This opinion was originally published at 902 F.2d 335 and is republished here incorporating the ordered modifications.

[1] Guidry's expulsion and the district court's reinstatement of Guidry to the Union are not at issue as expulsion is explicitly set out in the LMRDA as a form of discipline. *See* 29 U.S.C. §§ 411(a)(5), 529.

[2] Guidry correctly notes that the Supreme Court's holding regarding a plaintiff's burden of pleading and proof under the LMRDA looks only to sections 101(a)(5) and 609 of the Act, 29 U.S.C. §§ 411(a)(5), 529, and is based on its construction of the term "discipline" contained in those sections.

[*] Editor's Note: These paragraphs have been incorporated at the end of the opinion at 1495.

**484 U.S. 29 (1987)**

## UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, ET AL.

### v.

## MISCO, INC.

<u>No. 86-651.</u>

**Supreme Court of United States.**

Argued October 13, 1987

Decided December 1, 1987

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

31   *31 *David Silberman* argued the cause for petitioners. With him on the briefs were *Lynn Agee, Michael Gottesman,* and *Laurence Gold.*

*A. Richard Gear* argued the cause and filed a brief for respondent.[*]

JUSTICE WHITE delivered the opinion of the Court.

The issue for decision involves several aspects of when a federal court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement.

## I

Misco, Inc. (Misco, or the Company), operates a paper converting plant in Monroe, Louisiana. The Company is a party to a collective-bargaining agreement with the United Paperworkers International Union, AFL-CIO, and its union local (the Union);

32   the agreement covers the production and maintenance *32 employees at the plant. Under the agreement, the Company or the Union may submit to arbitration any grievance that arises from the interpretation or application of its terms, and the arbitrator's decision is final and binding upon the parties. The arbitrator's authority is limited to interpretation and application of the terms contained in the agreement itself. The agreement reserves to management the right to establish, amend, and enforce "rules and regulations regulating the discipline or discharge of employees" and the procedures for imposing discipline. Such rules were to be posted and were to be in effect "until ruled on by grievance and arbitration procedures as to fairness and necessity."[1] For about a decade, the Company's rules had listed as causes for discharge the bringing of intoxicants, narcotics, or controlled substances on to plant property or consuming any of them there, as well as reporting for work under the influence of such substances.[2] At the time of the events involved in this case, the Company was very concerned about the use of drugs at the plant, especially among employees on the night shift.

Isiah Cooper, who worked on the night shift for Misco, was one of the employees covered by the collective-bargaining agreement. He operated a slitter-rewinder machine, which uses sharp blades to cut rolling coils of paper. The arbitrator found that this machine is hazardous and had caused numerous injuries in recent years. Cooper had been reprimanded

33   twice in a few months for deficient performance. *33 On January 21, 1983, one day after the second reprimand, the police searched Cooper's house pursuant to a warrant, and a substantial amount of marijuana was found. Contemporaneously, a police officer was detailed to keep Cooper's car under observation at the Company's parking lot. At about 6:30 p.m., Cooper was seen walking in the parking lot during work hours with two other men. The three men entered Cooper's car momentarily, then walked to another car, a white Cutlass, and entered it. After the other two men later returned to the plant, Cooper was apprehended by police in the backseat of this car with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray. The police also searched Cooper's car and found a plastic scales case and marijuana gleanings. Cooper was arrested and charged with marijuana possession.[3]

On January 24, Cooper told the Company that he had been arrested for possession of marijuana at his home; the Company did not learn of the marijuana cigarette in the white Cutlass until January 27. It then investigated and on February 7 discharged Cooper, asserting that in the circumstances, his presence in the Cutlass violated the rule against having drugs

Case 4:22-cv-00343-Y    Document 363-21    Filed 08/23/22    Page 6 of 50    PageID 25794

on the plant premises.[4] Cooper filed a grievance protesting his discharge the same day, and the matter proceeded to arbitration. The Company was not aware until September 21, five days before the arbitration hearing was scheduled, that marijuana had been found in Cooper's car. That fact did not become known to the Union until the hearing began. At the hearing it was stipulated that the issue was whether the Company had "just cause to discharge *34 the Grievant under Rule II.1" and, "[i]f not, what if any should be the remedy." App. to Pet. for Cert. 26a.

34

The arbitrator upheld the grievance and ordered the Company to reinstate Cooper with backpay and full seniority. The arbitrator based his finding that there was not just cause for the discharge on his consideration of seven criteria.[5] In particular, the arbitrator found that the Company failed to prove that the employee had possessed or used marijuana on company property: finding Cooper in the backseat of a car and a burning cigarette in the frontseat ashtray was insufficient proof that Cooper was using or possessed marijuana on company property. Id., at 49a-50a. The arbitrator refused to accept into evidence the fact that marijuana had been found in Cooper's car on company premises because the Company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge.[6]

The Company filed suit in District Court, seeking to vacate the arbitration award on several grounds, one of which was that ordering reinstatement of Cooper, who had allegedly possessed marijuana on the plant premises, was contrary to public policy. The District Court agreed that the award must be set aside as contrary to public policy because it ran *35 counter to general safety concerns that arise from the operation of dangerous machinery while under the influence of drugs, as well as to state criminal laws against drug possession. The Court of Appeals affirmed, with one judge dissenting. The court ruled that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The arbitrator had found that Cooper was apprehended on company premises in an atmosphere of marijuana smoke in another's car and that marijuana was found in his own car on the company lot. These facts established that Cooper had violated the Company's rules and gave the Company just cause to discharge him. The arbitrator did not reach this conclusion because of a "narrow focus on Cooper's procedural rights" that led him to ignore what he "knew was in fact true: that Cooper did bring marijuana onto his employer's premises." Ibid. Even if the arbitrator had not known of this fact at the time he entered his award, "it is doubtful that the award should be enforced today in light of what is now known." Ibid.

35

Because the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy,[7] we granted the Union's petition for a writ of certiorari, 479 U. S. 1029 (1987), and now reverse the judgment of the Court of Appeals.

36

*36 **II**

The Union asserts that an arbitral award may not be set aside on public policy grounds unless the award orders conduct that violates the positive law, which is not the case here. But in the alternative, it submits that even if it is wrong in this regard, the Court of Appeals otherwise exceeded the limited authority that it had to review an arbitrator's award entered pursuant to a collective-bargaining agreement. Respondent, on the other hand, defends the public policy decision of the Court of Appeals but alternatively argues that the judgment below should be affirmed because of erroneous findings by the arbitrator. We deal first with the opposing alternative arguments.

## A

Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, and this is such a case, the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." Steelworkers v. Enterprise Wheel & Car Corp., 363 U. S. 593, 596 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. Id., at 597.

37

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation *37 to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." _Steelworkers_ v. _American Mfg. Co._, 363 U. S. 564, 567-568 (1960) (emphasis added; footnote omitted).

See also _AT&T Technologies, Inc._ v. _Communications Workers_, 475 U. S. 643, 649-650 (1986).

The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 61 Stat. 154, 29 U. S. C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." See also _AT&T Technologies, supra_, at 650. The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute. Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the

38

facts and of the meaning *38 of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. _Enterprise Wheel, supra_, at 599. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined. Furthermore, it must be remembered that grievance and arbitration procedures are part and parcel of the ongoing process of collective bargaining. It is through these processes that the supplementary rules of the plant are established. As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. Of course, decisions procured by the parties through fraud or through the arbitrator's dishonesty need not be enforced. But there is nothing of that sort involved in this case.

39

*39 **B**

The Company's position, simply put, is that the arbitrator committed grievous error in finding that the evidence was insufficient to prove that Cooper had possessed or used marijuana on company property. But the Court of Appeals, although it took a distinctly jaundiced view of the arbitrator's decision in this regard, was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances, to be ample proof that Rule II.1 was violated. No dishonesty is alleged; only improvident, even silly factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.

Nor was it open to the Court of Appeals to refuse to enforce the award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time Cooper was fired. The parties bargained for arbitration to settle disputes and were free to set the procedural rules for arbitrators to follow if they chose. Article VI of the agreement, entitled "Arbitration Procedure," did set some ground rules for the arbitration process. It forbade the arbitrator to consider hearsay evidence, for example, but evidentiary matters were otherwise left to the arbitrator. App.

19. Here the arbitrator ruled that in determining whether Cooper had violated Rule II.1, he should not consider evidence not relied on by the employer in ordering the discharge, particularly in a case like this where there was no notice to the employee or the Union prior to the hearing that the Company would attempt to rely on after-discovered evidence. This, in effect, was a construction of what the contract required when deciding discharge cases: an arbitrator was to look only at the evidence before the employer at the time of discharge. As the arbitrator noted, this approach was consistent with the practice *40 followed by other arbitrators.[8] And it was consistent with our observation in _John Wiley & Sons, Inc._ v. _Livingston,_ 376 U. S. 543, 557 (1964), that when the subject matter of a dispute is arbitrable, "procedural" questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.

Under the Arbitration Act, the federal courts are empowered to set aside arbitration awards on such grounds only when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U. S. C. § 10(c). See _Commonwealth Coatings Corp._ v. _Continental Casualty Co._, 393 U. S. 145 (1968).[9] If we apply that same standard here and assume that the arbitrator erred in refusing to consider the disputed evidence, his error was not in bad faith or so gross as to amount to affirmative misconduct.[10] Finally, it is worth noting that putting *41 aside the evidence about the marijuana found in Cooper's car during this arbitration did not forever foreclose the Company from using that evidence as the basis for a discharge.

Even if it were open to the Court of Appeals to have found a violation of Rule II.1 because of the marijuana found in Cooper's car, the question remains whether the court could properly set aside the award because in its view discharge was the correct remedy. Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In _Enterprise Wheel,_ for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he "is to bring his informed judgment to bear in order to reach a fair solution of a problem. _This is especially true when it comes to formulating remedies._" 363 U. S., at 597 (emphasis added). The parties, of course, may limit the discretion of the arbitrator in this respect; and it may be, as the Company argues, that under the contract involved here, it was within the unreviewable discretion of management to discharge an employee once a violation of Rule II.1 was found. But the parties stipulated that the issue before the arbitrator was whether there was "just" cause for the discharge, and the arbitrator, in the course of his opinion, cryptically observed that Rule II.1 *42 merely listed causes for discharge and did not expressly provide for immediate discharge. Before disposing of the case on the ground that Rule II.1 had been violated and discharge was therefore proper, the proper course would have been remand to the arbitrator for a definitive construction of the contract in this respect.

# C

The Court of Appeals did not purport to take this course in any event. Rather, it held that the evidence of marijuana in Cooper's car required that the award be set aside because to reinstate a person who had brought drugs onto the property was contrary to the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. We cannot affirm that judgment.

A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. _W. R. Grace & Co._ v. _Rubber Workers,_ 461 U. S. 757, 766 (1983); _Hurd_ v. _Hodge,_ 334 U. S. 24, 34-35 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements. _E. g., McMullen_ v. _Hoffman,_ 174 U. S. 639, 654-655 (1899); _Twin City Pipe Line Co._ v. _Harding Glass Co._, 283 U. S. 353, 356-358 (1931). In the common law of contracts, this doctrine has served as the foundation for occasional exercises of judicial power to abrogate private agreements.

*43 In _W. R. Grace,_ we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." 461 U. S., at 766. We cautioned, however, that a court's refusal to enforce an arbitrator's _interpretation_ of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public

interests." *Ibid.* (quoting *Muschany v. United States,* 324 U. S. 49, 66 (1945)). In *W. R. Grace,* we identified two important public polices that were potentially jeopardized by the arbitrator's interpretation of the contract: obedience to judicial orders and voluntary compliance with Title VII of the Civil Rights Act of 1964. We went on to hold that enforcement of the arbitration award in that case did not compromise either of the two public policies allegedly threatened by the award. Two points follow from our decision in *W. R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." 461 U. S., at 766. At the very least, an alleged public policy must be properly framed under the approach set out in *W. R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced.

44    *44 As we see it, the formulation of public policy set out by the Court of Appeals did not comply with the statement that such a policy must be "ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Ibid.* (quoting *Muschany v. United States, supra,* at 66). The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a "well-defined and dominant" policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in *W. R. Grace* that a formulation of public policy based only on "general considerations of supposed public interests" is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.

Even if the Court of Appeals' formulation of public policy is to be accepted, no violation of that policy was clearly shown in this case. In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the work-place is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d, at 743. A refusal to enforce an award must rest on more than speculation or assumption.

In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana
45    while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of *45 drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort the Company might have made to discharge Cooper for having had marijuana in his car on company premises. Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened.[11] In this connection it should also be noted that the award ordered Cooper to be reinstated in his old job or in an equivalent one for which he was qualified. It is by no means clear from the record that Cooper would pose a serious threat to the asserted public policy in every job for which he was qualified.[12]

The judgment of the Court of Appeals is reversed.

*So ordered.*

46    *46 JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, concurring.

I join the Court's opinion, but write separately to underscore the narrow grounds on which its decision rests and to emphasize what it is *not* holding today. In particular, the Court does not reach the issue upon which certiorari was granted: whether a court may refuse to enforce an arbitration award rendered under a collective-bargaining agreement on public policy grounds only when the award itself violates positive law or requires unlawful conduct by the employer. The opinion takes no position on this issue. See *ante,* at 45, n. 12. Nor do I understand the Court to decide, more generally, in what way,

Case 1:22-cv-00343-Y Document 86-24 Filed 08/31/22 Page 10 of 50 PageID 2938

if any, a court's authority to set aside an arbitration award on public policy grounds differs from its authority, outside the collective-bargaining context, to refuse to enforce a contract on public policy grounds. Those issues are left for another day.

I agree with the Court that the judgment of the Court of Appeals must be reversed, and I summarize what I understand to be the three alternative rationales for the Court's decision:

1. The Court of Appeals exceeded its authority in concluding that the company's discharge of Cooper was proper under the collective-bargaining agreement. The Court of Appeals erred in considering evidence that the arbitrator legitimately had excluded from the grievance process, in second-guessing the arbitrator's factual finding that Cooper had not violated Rule II.1, and in assessing the appropriate sanction under the agreement. See _Steelworkers_ v. _American Mfg. Co._, 363 U. S. 564, 567-568 (1960); _Steelworkers_ v. _Enterprise Wheel & Car Corp._, 363 U. S. 593, 596-597, 599 (1960). Absent its overreaching, the Court of Appeals lacked any basis for disagreeing with the arbitrator's conclusion that there was not "just cause" for discharging Cooper. See _ante,_ at 39-42.

47   *47 2. Even if the Court of Appeals properly considered evidence of marijuana found in Cooper's car and legitimately found a Rule II.1 violation, the public policy advanced by the Court of Appeals does not support its decision to set aside the award. The reinstatement of Cooper would not contravene the alleged public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F. 2d 739, 743 (CA5 1985). The fact that an employee's car contains marijuana gleanings does not indicate that the employee uses marijuana on the job or that he operates his machine while under the influence of drugs, let alone that he will report to work in an impaired state in the future. See _ante,_ at 44. Moreover, nothing in the record suggests that the arbitrator's award, which gives the company the option of placing Cooper in a job equivalent to his old one, would require Cooper to operate hazardous machinery. See _ante,_ at 44-45.

3. The public policy formulated by the Court of Appeals may not properly support a court's refusal to enforce an otherwise valid arbitration award. In _W. R. Grace & Co._ v. _Rubber Workers_, 461 U. S. 757 (1983), we stated that the public policy must be founded on " `laws and legal precedents.' " _Id._, at 766, quoting _Muschany_ v. _United States_, 324 U. S. 49, 66 (1945). The Court of Appeals identified no law or legal precedent that demonstrated an "explicit public policy," 461 U. S., at 766, against the operation of dangerous machinery by persons under the influence of drugs. Far from being "well defined and dominant," as _W. R. Grace_ prescribed, the Court of Appeals' public policy was ascertained merely "from general considerations of supposed public interests." _Ibid._ See _ante,_ at 43. I do not understand the Court, by criticizing the company's public policy formulation, to suggest that proper framing of an alleged public policy under the approach set out in _W. R. Grace_ would be

48   sufficient to justify a court's refusal to enforce an arbitration award on public policy grounds. Rather, I understand the *48 Court to hold that such compliance is merely a necessary step if an award is not to be enforced. See _ante,_ at 44.

It is on this understanding that I join the opinion of the Court.

[*] _David E. Feller_ and _William P. Murphy_ filed a brief for the National Academy of Arbitrators as _amicus curiae_ urging reversal.

_Philip A. Lacovara_ and _William R. Stein_ filed a brief for Northwest Airlines, Inc., et al. as _amici curiae_ urging affirmance.

[1] App. 20-21. The language quoted is from Article XI of the agreement, which concerns maintenance of discipline. Article VI of the agreement sets out the arbitration procedure. _Id.,_ at 18-20. The reserved rights of management are specified in Article IV of the agreement. _Id.,_ at 13-15.

[2] Rule II.1 lists the following as causes for discharge: "Bringing intoxicants, narcotics, or controlled substances into, or consuming intoxicants, narcotics, or controlled substances in the plant, or on plant premises. Reporting for duty under the influence of intoxicants, narcotics, or controlled substances." App. to Pet. for Cert. 31a.

[3] Cooper later pleaded guilty to that charge, which was not related to his being in a car with a lighted marijuana cigarette in it. The authorities chose not to prosecute for the latter incident.

[4] The Company asserted that being in a car with a lit marijuana cigarette was a direct violation of the company rule against having an illegal substance on company property. App. 23.

[5] These considerations were the reasonableness of the employer's position, the notice given to the employee, the timing of the investigation undertaken, the fairness of the investigation, the evidence against the employee, the possibility of discrimination, and the relation of the degree of discipline to the nature of the offense and the employee's past record.

[6] The arbitrator stated: "One of the rules in arbitration is that the Company must have its proof in hand before it takes disciplinary action against an employee. The Company does not take the disciplinary action and then spend eight months digging up supporting evidence to justify its actions. In addition, the use of the gleanings evidence prevented the Grievant from knowing the full extent of the charge against

Case 4:23-cv-00823-Y Document 88-34 Filed 08/31/22 Page 11 of 50 PageID 2979

him. Who knows what action the Chevron of the Union would have taken if the gleanings evidence had been made known from the outset of the Company's investigation." App. to Pet. for Cert. 47a.

[7] The decision below accords with the broader view of the courts' power taken by the First and Seventh Circuits. See, *e. g.,* *United States Postal Service* v. *American Postal Workers Union, AFL-CIO,* 736 F. 2d 822 (CA1 1984); *E. I. DuPont de Nemours and Co.* v. *Grasselli Employees Independent Assn. of East Chicago, Inc.,* 790 F. 2d 611 (CA7),* cert. denied, 479 U. S. 853 (1986). A narrower view has been taken by the Ninth and District of Columbia Circuits. See, *e. g.,* *Bevles Co.* v. *Teamsters Local 986,* 791 F. 2d 1391 (CA9 1986); *Northwest Airlines, Inc.* v. *Air Line Pilots Assn. International,* 257 U. S. App. D. C. 181, 808 F. 2d 76 (1987); *American Postal Workers Union* v. *United States Postal Service,* 252 U. S. App. D. C. 169, 789 F. 2d 1 (1986).

[8] Labor arbitrators have stated that the correctness of a discharge "must stand or fall upon the reason given at the time of discharge," see, *e. g., West Va. Pulp & Paper Co.,* 10 Lab. Arb. 117, 118 (1947), and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge. O. Fairweather, Practice and Procedure in Labor Arbitration 303-306 (2d ed. 1983); F. Elkouri & E. Elkouri, How Arbitration Works 634-635 (3d ed. 1973).

[9] The Arbitration Act does not apply to "contracts of employment of . . . workers engaged in foreign or interstate commerce," 9 U. S. C. § 1, but the federal courts have often looked to the Act for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, empowers the federal courts to fashion rules of federal common law to govern "[s]uits for violation of contracts between an employer and a labor organization" under the federal labor laws. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957) (construing 29 U. S. C. § 185). See, *e. g., Ludwig Honold Mfg. Co.* v. *Fletcher,* 405 F. 2d 1123 (CA3 1969); *Pietro Scalzitti Co.* v. *International Union of Operating Engineers, Local No. 150,* 351 F. 2d 576 (CA7 1965).

[10] Even in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate. See, *e. g., Amalgamated Food & Allied Workers Union, Local 56* v. *Great A&P Tea Co.,* 415 F. 2d 185 (CA3 1969) (vacating and remanding to the arbitrators for decision after finding that the arbitrators declined to arbitrate the issues submitted). See also 9 U. S. C. § 10(e) ("Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators").

[11] The issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases, and it was a matter for the arbitrator in the first instance to decide whether Cooper's alleged use of drugs on the job would actually pose a danger. That is not a problem here, for the arbitrator recognized that being under the influence of marijuana while operating slitter-rewinder machinery was indeed dangerous, and no one disputed this point.

[12] We need not address the Union's position that a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law.

**532 U.S. 504 (2001)**

# MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION

v.

# GARVEY

No. 00-1210.

**United States Supreme Court.**

Decided May 14, 2001.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

506    *506 Per Curiam.

The Court of Appeals for the Ninth Circuit here rejected an arbitrator's factual findings and then resolved the merits of the parties' dispute instead of remanding the case for further arbitration proceedings. Because the court's determination conflicts with our cases limiting review of an arbitrator's award entered pursuant to an agreement between an employer and a labor organization and prescribing the appropriate remedy where vacation of the award is warranted, we grant the petition for a writ of certiorari and reverse. The motions for leave to file briefs *amicus curiae* of the National Academy of Arbitrators and the Office of the Commissioner of Baseball are granted.

In the late 1980's, petitioner Major League Baseball Players Association (Association) filed grievances against the Major League Baseball Clubs (Clubs), claiming the Clubs had colluded in the market for free-agent services after the 1985, 1986, and 1987 baseball seasons, in violation of the industry's collective-bargaining agreement. A free agent is a player who may
506    contract with any Club, rather than one whose right to contract is restricted to a particular Club. In a *506 series of decisions, arbitrators found collusion by the Clubs and damage to the players. The Association and Clubs subsequently entered into a Global Settlement Agreement (Agreement), pursuant to which the Clubs established a $280 million fund to be distributed to injured players. The Association also designed a "Framework" to evaluate the individual player's claims, and, applying that Framework, recommended distribution plans for claims relating to a particular season or seasons.

The Framework provided that players could seek an arbitrator's review of the distribution plan. The arbitrator would determine "'only whether the approved Framework and the criteria set forth therein have been properly applied in the proposed Distribution Plan.' " *Garvey v. Roberts*, 203 F. 3d 580, 583 (CA9 2000) *(Garvey I)*. The Framework set forth factors to be considered in evaluating players' claims, as well as specific requirements for lost contract-extension claims. Such claims were cognizable "'only in those cases where evidence exists that a specific offer of an extension was made by a club prior to collusion only to thereafter be withdrawn when the collusion scheme was initiated.' " *Id.*, at 584.

Respondent Steve Garvey, a retired, highly regarded first baseman, submitted a claim for damages of approximately $3 million. He alleged that his contract with the San Diego Padres was not extended to the 1988 and 1989 seasons due to collusion. The Association rejected Garvey's claim in February 1996, because he presented no evidence that the Padres actually offered to extend his contract. Garvey objected, and an arbitration hearing was held. He testified that the Padres offered to extend his contract for the 1988 and 1989 seasons and then withdrew the offer after they began colluding with other teams. He presented a June 1996 letter from Ballard Smith, Padres' President and CEO from 1979 to 1987, stating
507    that, before the end of the 1985 season, Smith offered to extend Garvey's contract through *507 the 1989 season, but that the Padres refused to negotiate with Garvey thereafter due to collusion.

The arbitrator denied Garvey's claim, after seeking additional documentation from the parties. In his award, he explained that "'[t]here exists . . . substantial doubt as to the credibility of the statements in the Smith letter.' " *Id.*, at 586. He noted the "stark contradictions" between the 1996 letter and Smith's testimony in the earlier arbitration proceedings regarding collusion, where Smith, like other owners, denied collusion and stated that the Padres simply were not interested in extending Garvey's contract. *Ibid.* The arbitrator determined that, due to these contradictions, he "'must reject [Smith's] more recent assertion that Garvey did not receive [a contract] extension' " due to collusion, and found that Garvey had not shown a specific offer of extension. *Ibid.* He concluded:

The shadow cast over the credibility of the Smith testimony coupled with the absence of any other corroboration of the claim submitted by Garvey compels a finding that the Padres declined to extend his contract not because of the constraints of the collusion effort of the clubs but rather as a baseball judgment founded upon [Garvey's] age and recent injury history.' " *Ibid.*

Garvey moved in Federal District Court to vacate the arbitrator's award, alleging that the arbitrator violated the Framework by denying his claim. The District Court denied the motion. The Court of Appeals for the Ninth Circuit reversed by a divided vote. The court acknowledged that judicial review of an arbitrator's decision in a labor dispute is extremely limited. But it held that review of the merits of the arbitrator's award was warranted in this case, because the arbitrator "'dispensed his own brand of industrial justice.' " *Id.,* at 589. The court recognized that Smith's prior testimony with respect to collusion conflicted with the statements in his 1996 letter. But in the court's view, the arbitrator's *508 refusal to credit Smith's letter was "inexplicable" and "border[ed] on the irrational," because a panel of arbitrators, chaired by the arbitrator involved here, had previously concluded that the owners' prior testimony was false. *Id.,* at 590. The court rejected the arbitrator's reliance on the absence of other corroborating evidence, attributing that fact to Smith and Garvey's direct negotiations. The court also found that the record provided "strong support" for the truthfulness of Smith's 1996 letter. *Id.,* at 591-592. The Court of Appeals reversed and remanded with directions to vacate the award.

The District Court then remanded the case to the arbitration panel for further hearings, and Garvey appealed. The Court of Appeals, again by a divided vote, explained that *Garvey I* established that "the conclusion that Smith made Garvey an offer and subsequently withdrew it because of the collusion scheme was the only conclusion that the arbitrator could draw from the record in the proceedings." No. 00-56080, 2000 WL 1801383, *1 (CA9, Dec. 7, 2000) (unpublished), judgt. order reported at 243 F. 3d 547 *(Garvey II).* Noting that its prior instructions might have been unclear, the court clarified that *Garvey I* "left only one possible result—the result our holding contemplated—an award in Garvey's favor." 2000 WL 1801383, *1. The Court of Appeals reversed the District Court and directed that it remand the case to the arbitration panel with instructions to enter an award for Garvey in the amount he claimed.[1]

*509 The parties do not dispute that this case arises under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185(a), as the controversy involves an assertion of rights under an agreement between an employer and a labor organization. Although Garvey's specific allegation is that the arbitrator violated the Framework for resolving players' claims for damages, that Framework was designed to facilitate payments to remedy the Clubs' breach of the collective-bargaining agreement. Garvey's right to be made whole is founded on that agreement.

Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Paperworkers* v. *Misco, Inc.,* 484 U. S. 29, 36 (1987). We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that `a court is convinced he committed serious error does not suffice to overturn his decision.' " *Eastern Associated Coal Corp.* v. *Mine Workers,* 531 U. S. 57, 62 (2000) (quoting *Misco, supra,* at 38). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable. *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 597 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, fact finding" does not provide a basis for a reviewing court to refuse to enforce the award. *Misco,* 484 U. S., at 39.

In discussing the courts' limited role in reviewing the merits of arbitration awards, we have stated that "'courts . . . have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.' " *510 Id.,* at 37 (quoting *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 568 (1960)). When the judiciary does so, "it usurps a function which . . . is entrusted to the arbitration tribunal." *Id.,* at 569; see also *Enterprise Wheel & Car Corp., supra,* at 599 ("It is the arbitrator's construction [of the agreement] which was bargained for . . ."). Consistent with this limited role, we said in *Misco* that "[e]ven in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result." 484 U. S., at 40-41, n. 10. That step, we explained, "would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for" in their agreement. *Ibid.* Instead, the court should "simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement." *Ibid.*

Case 4:23-cv-00332-Y Document 88-25 Filed 08/31/22 Page 14 of 50 PageID 2982

To be sure, the Court of Appeals here recited these principles, but its application of them is nothing short of baffling. The substance of the court's discussion reveals that it overturned the arbitrator's decision because it disagreed with the arbitrator's factual findings, particularly those with respect to credibility. The Court of Appeals, it appears, would have credited Smith's 1996 letter, and found the arbitrator's refusal to do so at worst "irrational" and at best "bizarre." _Garvey I_, 203 F. 3d, at 590-591. But even "serious error" on the arbitrator's part does not justify overturning his decision, where, as here, he is construing a contract and acting within the scope of his authority. _Misco, supra_, at 38.

In _Garvey II,_ the court clarified that _Garvey I_ both rejected the arbitrator's findings and went further, resolving the merits of the parties' dispute based on the court's assessment of the record before the arbitrator. For that reason, the court found

511 further arbitration proceedings inappropriate. *511 But again, established law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision. _Misco, supra_, at 40, n. 10; see also _American Mfg. Co., supra_, at 568. Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings. _Misco, supra_, at 40, n. 10. The dissent suggests that the remedy described in _Misco_ is limited to cases where the arbitrator's errors are procedural. _Post,_ at 512 (opinion of Stevens, J.). _Misco_ did involve procedural issues, but our discussion regarding the appropriate remedy was not so limited. If a remand is appropriate _even_ when the arbitrator's award has been set aside for "procedural aberrations" that constitute "affirmative misconduct," it follows that a remand ordinarily will be appropriate when the arbitrator simply made factual findings that the reviewing court perceives as "irrational." The Court of Appeals usurped the arbitrator's role by resolving the dispute and barring further proceedings, a result at odds with this governing law.[2]

For the foregoing reasons, the Court of Appeals erred in reversing the order of the District Court denying the motion to vacate the arbitrator's award, and it erred further in directing that judgment be entered in Garvey's favor. The petition for a

512 writ of certiorari is granted, the judgment of *512 the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

_It is so ordered._

Justice Ginsburg, concurring in part and concurring in the judgment.

I agree with the Court that in _Garvey_ v. _Roberts_, 203 F. 3d 580 (CA9 2000), the Ninth Circuit should not have disturbed the arbitrator's award. Correction of that error sets this case straight. I see no need to say more.

Justice Stevens, dissenting.

It is well settled that an arbitrator "does not sit to dispense his own brand of industrial justice." _Steelworkers_ v. _Enterprise Wheel & Car Corp._, 363 U. S. 593, 597 (1960). We have also said fairly definitively, albeit in dicta, that a court should remedy an arbitrator's "procedural aberrations" by vacating the award and remanding for further proceedings. _Paperworkers_ v. _Misco, Inc._, 484 U. S. 29, 40-41, n. 10 (1987). Our cases, however, do not provide significant guidance as to what standards a federal court should use in assessing whether an arbitrator's behavior is so untethered to either the agreement of the parties or the factual record so as to constitute an attempt to "dispense his own brand of industrial justice." Nor, more importantly, do they tell us how, having made such a finding, courts should deal with "the extraordinary circumstance in which the arbitrator's own rulings make clear that, more than being simply erroneous, his finding is completely inexplicable and borders on the irrational." _Garvey_ v. _Roberts_, 203 F. 3d 580, 590 (CA9 2000) (case below). Because our case law is not sufficiently clear to allow me to conclude that the case below was wrongly decided—let alone to conclude that the decision

513 was so wrong as to require the extraordinary remedy of a summary *513 reversal—I dissent from the Court's disposition of this petition.

Without the benefit of briefing or argument, today the Court resolves two difficult questions. First, it decides that even if the Court of Appeals' appraisal of the merits is correct—that is to say, even if the arbitrator did dispense his own brand of justice untethered to the agreement of the parties, and even if the correct disposition of the matter is perfectly clear—the only course open to a reviewing court is to remand the matter for another arbitration. That conclusion is not compelled by any of our cases, nor by any analysis offered by the Court. As the issue is subject to serious arguments on both sides, the Court should have set this case for argument if it wanted to answer this remedial question.

Second, without reviewing the record or soliciting briefing, the Court concludes that, in any event, "no serious error on the arbitrator's part is apparent in this case." _Ante,_ at 511, n. 2. At this stage in the proceedings, I simply cannot endorse that conclusion. After examining the record, obtaining briefing, and hearing oral argument, the Court of Appeals offered a

Case 4:22-cv-00933-Y   Document 86-25   Filed 08/31/22   Page 15 of 50 PageID 2983

reasoned explanation of its conclusion. See 203 F. 3d, at 589-592; see also *Id.,* at 589-594 (Hawkins, J., concurring). Whether or not I would ultimately agree with the Ninth Circuit's analysis, I find the Court's willingness to reverse a fact bound determination of the Court of Appeals without engaging that court's reasoning a troubling departure from our normal practice.[*]

Accordingly, I respectfully dissent.

[1] Garvey contends that, because the Association's petition was filed more than 90 days after *Garvey I,* we cannot consider a challenge raising issues resolved in that decision. But there is no question that the Association's petition was filed in sufficient time for us to review *Garvey II,* and we have authority to consider questions determined in earlier stages of the litigation where certiorari is sought from the most recent of the judgments of the Court of Appeals. *Mercer v. Theriot,* 377 U. S. 152 (1964) *(per curiam); Hamilton-Brown Shoe Co. v. Wolf Brothers & Co.,* 240 U. S. 251, 258 (1916).

[2] In any event, no serious error on the arbitrator's part is apparent in this case. The fact that an earlier panel of arbitrators rejected the owners' testimony as a whole does not compel the conclusion that the panel found Smith's specific statements with respect to Garvey to be false. The arbitrator's explanation for his decision indicates that he simply found Smith an unreliable witness and that, in the absence of corroborating evidence, he could only conclude that Garvey failed to show that the Padres had offered to extend his contract. The arbitrator's analysis may have been unpersuasive to the Court of Appeals, but his decision hardly qualifies as serious error, let alone irrational or inexplicable error. And, as we have said, any such error would not justify the actions taken by the court.

[*] The Court's opinion is somewhat ambiguous as to its reasons for overturning the portion of the Court of Appeals' decision setting aside the arbitration. It is unclear whether the majority is saying that a court may never set aside an arbitration because of a factual error, no matter how perverse, or whether the Court merely holds that the error in this case was not sufficiently severe to allow a court to take that step. If it is the latter, the Court offers no explanation of what standards it is using or of its reasons for reaching that conclusion.

### 383 U.S. 715 (1966)

# UNITED MINE WORKERS OF AMERICA

## v.

# GIBBS.

No. 243.

### Supreme Court of United States.

Argued January 20, 1966.

Decided March 28, 1966.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

717    *717 *Willard P. Owens* argued the cause for petitioner. With him on the brief were *E. H. Rayson* and *R. R. Kramer.*

*Clarence Walker* argued the cause for respondent. With him on the brief was *William Ables, Jr.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondent Paul Gibbs was awarded compensatory and punitive damages in this action against petitioner United Mine Workers of America (UMW) for alleged violations of § 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, as

718    amended,[1] and of the common law of *718 Tennessee. The case grew out of the rivalry between the United Mine Workers and the Southern Labor Union over representation of workers in the southern Appalachian coal fields. Tennessee Consolidated Coal Company, not a party here, laid off 100 miners of the UMW's Local 5881 when it closed one of its mines in southern Tennessee during the spring of 1960. Late that summer, Grundy Company, a wholly owned subsidiary of Consolidated, hired respondent as mine superintendent to attempt to open a new mine on Consolidated's property at nearby Gray's Creek through use of members of the Southern Labor Union. As part of the arrangement, Grundy also gave respondent a contract to haul the mine's coal to the nearest railroad loading point.

719    On August 15 and 16, 1960, armed members of Local 5881 forcibly prevented the opening of the mine, threatening respondent and beating an organizer for the rival union.[2] The members of the local believed Consolidated *719 had promised them the jobs at the new mine; they insisted that if anyone would do the work, they would. At this time, no representative of the UMW, their international union, was present. George Gilbert, the UMW's field representative for the area including Local 5881, was away at Middlesboro, Kentucky, attending an Executive Board meeting when the members of the local discovered Grundy's plan;[3] he did not return to the area until late in the day of August 16. There was uncontradicted testimony that he first learned of the violence while at the meeting, and returned with explicit instructions from his international union superiors to establish a limited picket line, to prevent any further violence, and to see to it that the strike did not spread to neighboring mines. There was no further violence at the mine site; a picket line was maintained there for nine months; and no further attempts were made to open the mine during that period.[4]

720    *720 Respondent lost his job as superintendent, and never entered into performance of his haulage contract. He testified that he soon began to lose other trucking contracts and mine leases he held in nearby areas. Claiming these effects to be the result of a concerted union plan against him, he sought recovery not against Local 5881 or its members, but only against petitioner, the international union. The suit was brought in the United States District Court for the Eastern District of Tennessee, and jurisdiction was premised on allegations of secondary boycotts under § 303. The state law claim, for which jurisdiction was based upon the doctrine of pendent jurisdiction, asserted "an unlawful conspiracy and an unlawful boycott aimed at him and [Grundy] to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage."[5]

The trial judge refused to submit to the jury the claims of pressure intended to cause mining firms other than Grundy to cease doing business with Gibbs; he found those claims unsupported by the evidence. The jury's verdict was that the UMW had violated both § 303 and state law. Gibbs was awarded $60,000 as damages under the employment contract and $14,500 under the haulage contract; he was also awarded $100,000 punitive damages. On motion, the trial court set aside the award of damages with respect to the haulage contract on the ground that damage was unproved. It also held that union

Case 4:22-cv-00343-Y    Document 36-25    Filed 08/23/22    Page 17 of 50    PageID 3985

721    pressure on Grundy to discharge respondent as supervisor would constitute only a primary dispute with Grundy, as respondent's employer, and hence was not cognizable as a claim under § 303. Interference with the *721 employment relationship was cognizable as a state claim, however, and a remitted award was sustained on the state law claim.[6] 220 F. Supp. 871. The Court of Appeals for the Sixth Circuit affirmed. 343 F. 2d 609. We granted certiorari. 382 U. S. 809. We reverse.

# I.

A threshold question is whether the District Court properly entertained jurisdiction of the claim based on Tennessee law. There was no need to decide a like question in _Teamsters Union_ v. _Morton_, 377 U. S. 252, since the pertinent state claim there was based on peaceful secondary activities and we held that state law based on such activities had been pre-empted by § 303. But here respondent's claim is based in part on proofs of violence and intimidation. "[W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. _United Automobile Workers_ v. _Russell_, 356 U. S. 634; _United Construction Workers_ v. _Laburnum Corp._, 347 U. S. 656. . . . State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." _San Diego Building Trades Council_ v. _Garmon_, 359 U. S. 236, 247.

722    *722 The fact that state remedies were not entirely pre-empted does not, however, answer the question whether the state claim was properly adjudicated in the District Court absent diversity jurisdiction. The Court held in _Hurn_ v. _Oursler_, 289 U. S. 238, that state law claims are appropriate for federal court determination if they form a separate but parallel ground for relief also sought in a substantial claim based on federal law. The Court distinguished permissible from nonpermissible exercises of federal judicial power over state law claims by contrasting "a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the non-federal _ground; in_ the latter it may not do so upon the non-federal _cause of action._" 289 U. S., at 246. The question is into which category the present action fell.

_Hurn_ was decided in 1933, before the unification of law and equity by the Federal Rules of Civil Procedure. At the time, the meaning of "cause of action" was a subject of serious dispute;[7] the phrase might "mean one thing for one purpose and
723    something different for another." *723 _United States_ v. _Memphis Cotton Oil Co._, 288 U. S. 62, 67-68.[8] The Court in _Hurn_ identified what it meant by the term by citation of _Baltimore S. S. Co._ v. _Phillips_, 274 U. S. 316, a case in which "cause of action" had been used to identify the operative scope of the doctrine of _res judicata._ In that case the Court had noted that "`the whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time.' " 274 U. S., at 320. It stated its holding in the following language, quoted in part in the _Hurn_ opinion:

> "Upon principle, it is perfectly plain that the respondent [a seaman suing for an injury sustained while working aboard ship] suffered but one actionable wrong and was entitled to but one recovery, whether his injury was due to one or the other of several distinct acts of alleged negligence or to a combination of some or all of them. In either view, there would be but a single wrongful invasion of a single primary right of the plaintiff, namely, the right of bodily safety, whether the acts constituting such invasion were one or many, simple or complex.

> "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action. `The facts are merely the means, *724 and not the end. They do
724    not constitute the cause of action, but they show its existence by making the wrong appear.' " _Id.,_ at 321.

Had the Court found a jurisdictional bar to reaching the state claim in _Hurn,_ we assume that the doctrine of _res judicata_ would not have been applicable in any subsequent state suit. But the citation of _Baltimore S. S. Co._ shows that the Court found that the weighty policies of judicial economy and fairness to parties reflected in _res judicata_ doctrine were in

themselves strong counsel for the adoption of a rule which would permit federal courts to dispose of the state as well as the federal claims.

With the adoption of the Federal Rules of Civil Procedure and the unified form of action, Fed. Rule Civ. Proc. 2, much of the controversy over "cause of action" abated. The phrase remained as the keystone of the *Hurn* test, however, and, as commentators have noted,[9] has been the source of considerable confusion. Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.[10] Yet because the *Hurn* question involves issues of jurisdiction as well as convenience, there has been some tendency to limit its application to cases in which the state and federal claims are, as in *Hurn,* "little more than the equivalent of different epithets to characterize the same group of circumstances." 289 U. S., at 246.[11]

725   *725 This limited approach is unnecessarily grudging Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," U. S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."[12] The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.[13]

726   *726 That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.[14] Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.[15] Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.[16] Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and *727 left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. In the present case, for example, the allowable scope of the state claim implicates the federal doctrine of pre-emption; while this interrelationship does not create statutory federal question jurisdiction, *Louisville & N. R. Co.* v. *Mottley,* 211 U. S. 149, its existence is relevant to the exercise of discretion. Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed. Rule Civ. Proc. 42 (b). If so, jurisdiction should ordinarily be refused.

The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited. For example, it may appear that the plaintiff was well aware of the nature of his proofs and the relative importance of his claims; recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case. Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.

728   *728 We are not prepared to say that in the present case the District Court exceeded its discretion in proceeding to judgment on the state claim. We may assume for purposes of decision that the District Court was correct in its holding that the claim of pressure on Grundy to terminate the employment contract was outside the purview of § 303. Even so, the § 303 claims based on secondary pressures on Grundy relative to the haulage contract and on other coal operators generally were substantial. Although § 303 limited recovery to compensatory damages based on secondary pressures, *Teamsters Union* v. *Morton, supra,* and state law allowed both compensatory and punitive damages, and allowed such damages as to both secondary and primary activity, the state and federal claims arose from the same nucleus of operative fact and

Case 4:22-cv-00343-Y    Document 36-25    Filed 08/23/22    Page 19 of 50    PageID 3027

reflected alternative remedies. Indeed, the verdict sheet sent in to the jury authorized only one award of damages, so that recovery could not be given separately on the federal and state claims.

It is true that the § 303 claims ultimately failed and that the only recovery allowed respondent was on the state claim. We cannot confidently say, however, that the federal issues were so remote or played such a minor role at the trial that in effect the state claim only was tried. Although the District Court dismissed as unproved the § 303 claims that petitioner's secondary activities included attempts to induce coal operators other than Grundy to cease doing business with respondent, the court submitted the § 303 claims relating to Grundy to the jury. The jury returned verdicts against petitioner on those § 303 claims, and it was only on petitioner's motion for a directed verdict and a judgment *n. o. v.* that the verdicts on those claims were set aside. The District Judge considered the claim as to the haulage *729 contract proved as to liability, and held it failed only for lack of proof of damages. Although there was some risk of confusing the jury in joining the state and federal claims—especially since, as will be developed, differing standards of proof of UMW involvement applied— the possibility of confusion could be lessened by employing a special verdict form, as the District Court did. Moreover, the question whether the permissible scope of the state claim was limited by the doctrine of pre-emption afforded a special reason for the exercise of pendent jurisdiction; the federal courts are particularly appropriate bodies for the application of pre-emption principles. We thus conclude that although it may be that the District Court might, in its sound discretion, have dismissed the state claim, the circumstances show no error in refusing to do so.

## II.

This Court has consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes, sustaining a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation. *Allen-Bradley Local* v. *Wisconsin Board*, 315 U. S. 740; *United Construction Workers* v. *Laburnum Construction Corp.*, 347 U. S. 656; *United Automobile Workers* v. *Wisconsin Board*, 351 U. S. 266; *Youngdahl* v. *Rainfair, Inc.*, 355 U. S. 131; *United Automobile Workers* v. *Russell*, 356 U. S. 634. Petitioner concedes the principle, but argues that the permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity. We agree.

Our opinions on this subject, frequently announced over weighty arguments in dissent that state remedies *730 were being given too broad scope, have approved only remedies carefully limited to the protection of the compelling state interest in the maintenance of domestic peace. Thus, in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, we read our prior decisions as only allowing "the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order," *id.*, at 247, and noted that in *Laburnum*

> "damages were restricted to the `damages directly and proximately caused by wrongful conduct chargeable to the defendants . . .' as defined by the traditional law of torts. . . . Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct." *Id.*, 248, n. 6. at 249.

In *Russell*, we specifically observed that the jury had been charged that to award damages it must find a proximate relation between the violence and threats of force and violence complained of, on the one hand, and the loss of wages allegedly suffered, on the other. 356 U. S., at 638, n. 3. In the two *Wisconsin Board* cases it was noted that the State's administrative-injunctive relief was limited to prohibition against continuation of the unlawful picketing, not all picketing. 315 U. S., at 748; 351 U. S., at 269-270, n. 3. And in *Youngdahl*, the Court held that a state court injunction which would have prohibited all picketing must be modified to permit peaceful picketing of the premises. We said, "[t]hough the state court was within its discretionary power in enjoining future acts of violence, intimidation and threats of violence by the strikers and the union, yet it is equally clear that such court entered the pre-empted domain *731 of the National Labor Relations Board insofar as it enjoined peaceful picketing . . . ." 355 U. S., at 139.[17]

It is true that in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies*, 312 U. S. 287, the Court approved sweeping state injunctive relief barring any future picketing in a labor dispute, whether peaceful or not. That case, however, was decided only on a constitutional claim of freedom of speech. We did not consider the impact of federal labor policy on state regulatory power. Moreover, as we recognized in *Youngdahl, supra*, at 139, the case was decided in the context of a strike marked by extreme and repeated acts of violence—"a pattern of violence . . . which would inevitably reappear in the event picketing were later resumed." The Court in *Meadowmoor* had stated the question presented as "whether a state can

choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed," 312 U. S., at 292, and had reasoned that

> "acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." Id., at 294.

732   Such special facts, if they appeared in an action for damages after picketing marred by violence had occurred, *732 might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered.[18] Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter.

In the present case, petitioner concedes that violence which would justify application of state tort law within these narrow bounds occurred during the first two days of the strike. It is a separate issue, however, whether the pleadings, the arguments of counsel to the jury, or the instructions to the jury adequately defined the compass within which damages could be awarded under state law. The tort claimed was, in essence, a "conspiracy" to interfere with Gibbs' contractual relations. The tort of "conspiracy" is poorly defined, and highly susceptible to judicial expansion; its relatively brief history is colored by use as a weapon against the developing labor movement.[19] Indeed, a reading of the record in this case gives the

733   impression that the notion of "conspiracy" was employed here to expand the application of state law substantially *733 beyond the limits to be observed in showing direct union involvement in violence.

Thus, respondent's complaint alleged "an unlawful conspiracy and an unlawful boycott . . . to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." No limitation to interference by violence appears. Similarly, in arguing to the jury asserted, not that the conspiracy in which the union had allegedly participated and from which its liability could be inferred was a conspiracy of violence but that it was a conspiracy to impose the UMW and the UMW's standard contract on the coal fields of Tennessee.[20] Under the state law, it would not have been relevant that the union had not actually authorized, participated in or ratified the particular violence involved or even the general use of violence. It would only be necessary to show a conspiracy in which the union had a part, and to show also that those who engaged in the violence were members of the conspiracy and their acts were related to the conspiracy's purpose.[21]

The instructions to the jury also appear not to have kept the conspiracy concept within any proper bounds. The charge instructed the jury separately on the § 303 and conspiracy claims, characterizing each as predicated on an assertion that there had been "unlawful" picketing action, and distinguishing one from the other on the basis that in the conspiracy claim

734   "the lawfulness of the means rather than the lawfulness of the object or the purpose *734 of the picketing . . . is controlling." But in charging the conspiracy claim, the court stressed that the "unlawfulness" of the picketing, rather than violence as such, would be controlling. Thus, in characterizing respondent's claim of a conspiracy intentionally to interfere with his contractual relations with Grundy, the trial judge said respondent asserted the interference to be "wrongful in that it was accomplished by unlawful means, including violence and threats of violence." Turning to the question of the international union's responsibility, he said this depended on a showing that it "was a party to a conspiracy pursuant to which the interference was committed." He defined conspiracy as

> "an agreement between two or more . . . to do an unlawful thing, or to do a lawful thing by unlawful means. . . . It is not essential to the existence of a conspiracy that the agreement between the conspirators be formally made between the parties at any one time, if, for example, two persons agreed to pursue an unlawful purpose or pursue a lawful purpose by unlawful means, then later a third person with knowledge of the existence of the conspiracy assents to it either impliedly or expressly and participates in it, then all three are conspirators in the same conspiracy. . . . [A]ll that is required is that each party to the conspiracy know of the existence of the conspiracy and that each agrees to assist in some manner in the furtherance of the unlawful purpose . . . or any unlawful means of accomplishing an unlawful purpose."

The trial judge then charged, in accordance with the Tennessee common law on conspiracy,[22] that the union, if a member

735   of a conspiracy, would be liable for all acts "done in concert . . . with the common purpose, and to effect *735 a common design," whether or not it had authorized, participated in, or ratified the particular acts. The jury was told it might award "only

Case 4:22-cv-00343-Y    Document 362-25    Filed 08/23/22    Page 21 of 50    PageID 5089

such damages as . . . he has sustained as a proximate and direct result of the action of the defendant," and that "[n]o award of damages can be made . . . on the basis of losses sustained . . . as a result of lawful activity upon the part of the defendant or its agents." Such instructions do not focus the jury's attention upon violence or threats of violence as the essential predicate of any recovery it might award.

## III.

Even assuming the conspiracy concept could be and was kept within limits proper to the application of state tort law under the pre-emption doctrine, reversal is nevertheless required here for failure to meet the special proof requirements imposed by § 6 of the Norris-LaGuardia Act:[23]

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

Petitioner vigorously contends that § 6 applied to the state claims in this case; that, on this record, it cannot be charged with having participated in or authorized the violence of August 15-16; and that its acts once it learned of the violence fell short of what would be necessary to show either ratification of the violence or any intent to build its picketing campaign upon the fears the violence engendered. We agree.

736    *736 We held in _Brotherhood of Carpenters_ v. _United States_, 330 U. S. 395, 403, that

> "whether § 6 should be called a rule of evidence or one that changes the substantive law of agency . . . its purpose and effect was to relieve organizations. . . and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

Shortly thereafter, Congress passed the Labor Management Relations Act, which expressly provides that for the purposes of that statute, including § 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of § 6.[24] Yet although the legislative history indicates that Congress was well aware of the _Carpenters_ decision,[25] it did not repeal § 6 outright, but left it applicable to cases not arising under the new Act. This selectivity is not surprising, for on state claims, though not on § 303 claims, punitive damages may be recovered. The driving force behind § 6[26] and the opposition to § 303, even in its limited

737    form,[27] was the fear that unions might be destroyed *737 if they could be held liable for damage done by acts beyond their practical control. Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which the section does not apply.[28]

Although the statute does not define "clear proof," its history and rationale suggest that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as "clear, unequivocal, and convincing proof." Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with "more than a bare preponderance of the evidence to prevail." _Schneiderman_ v. _United States_, 320 U. S. 118, 125. In our view, that burden was not met.[29]

738    *738 At the outset, it is clear that the requisite showing was not made as to possible union authorization of or participation in the violence of August 15 and 16. Although it is undoubtedly true that the officers and members of Local 5881 were present in force at the mine site on those days, neither the Local nor they are parties to this suit. Mr. Gilbert, the UMW representative, had left the area for a business meeting before the series of events culminating in the violence, and immediately upon his return, the violence subsided. The Sixth Circuit conceded that "[t]he proofs were sketchy as to defendant's responsibility for the [first two days' violence]." This view accurately reflects the state of the record. Petitioner was not even aware of Grundy's plan to open the Gray's Creek mine until after the violence had occurred.

The remaining issue is whether there was clear proof that the union ratified the violence which had occurred. Preliminarily, we note that it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that petitioner involved itself in the dispute after the violence had occurred, or from the fact that it carried on some normal union functions, such as provision of strike relief. A union would ordinarily *739 undertake these tasks during the course of a lawful strike. National labor policy requires that national unions be encouraged to exercise a restraining influence on explosive strike situations; and when they seek to do so, they should not for these activities be made to risk liability for such harm as may already have been done. The fact that ripples of the earlier violence may still be felt should not be permitted, and under § 6 is not permitted, to impose such liability. Because the dispute which sparked the violence will often continue, the union will feel a responsibility to take up the dispute as well as to curb its excesses. There can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred. Cf. *ILGWU* v. *Labor Board,* 237 F. 2d 545. What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

The record here is persuasive that the petitioner did what it could to stop or curtail the violence. There was repeated and uncontradicted testimony that when news of the violence reached the meeting that Gilbert was attending, he was given firm instructions to return to the scene, to assume control of the strike, to suppress violence, to limit the size of the picket line, and to assure that no other area mines were affected.[30] He *740 succeeded. Although the day after his return two Consolidated officers were harassed by a large and unruly mob in a nearby town, this incident was unrelated to respondent, and was not repeated. There was no further violence at the mine site, and the number of pickets was reduced to a very few. Other mines in the immediate area, including two worked on lease by Gibbs, continued to operate, although strenuous effort was required to accomplish this; one union official testified, "I thought I was going to get whipped two or three times [by members of the Local who opposed this policy]."[31]

To be sure, there was testimony that Gilbert and, through him, the international union were not pleased with respondent's role in the abortive venture to open the Gray's Creek mines with members of the Southern Labor Union. A company officer testified that when the mines finally opened respondent was not hired, because "Had I hired Mr. Paul Gibbs none of these mines would be open today." Respondent testified that Gilbert had told him, shortly after assuming control of the strike, "I want you to keep your damn hands off of that Gray's Creek area over there, and tell that Southern Labor Union that we don't intend for you to work that mine." To another, Gilbert is alleged to have said, "Hell, we can't let that *741 go on . . . Paul was trying to bring this other union in there, and [Gilbert said] he ain't going to get by with it." A third witness reported remarks of a similar tenor. Respondent testified that fear for his own safety caused him not to visit his mine leases after the events of August 15 and 16. His foreman testified to minor acts of violence at the mine site, never connected to any person or persons.

The relevant question, however, is whether Gilbert or other UMW representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute. The Sixth Circuit's answer was that they had. Its view of the record gave it

> "the impression that the threat of violence remained throughout the succeeding days and months. The night and day picketing that followed this spectacular beginning was but a guaranty and warning that like treatment would be accorded further attempts to open the Gray's Creek area. The aura of violence remained to enhance the effectiveness of the picketing. Certainly there is a threat of violence when the man who has just knocked me down my front steps continues to stand guard at my front door." 343 F. 2d, at 616.

An "impression" is too ephemeral a product to be the result of "clear proof." As we have said, the mere fact of continued picketing at the mine site is not properly relied upon to show ratification. But even accepting the passage as a holding that "clear proof" of UMW involvement is present, we do not so read the record.

If there was a remaining threat of violence here, it was a threat which arose from the context of the dispute, and not from the manner in which the international union was shown to have handled it. This dispute began when unemployed miners in the Appalachian hills discovered *742 that jobs they believed had been promised to them were being given to others behind their backs. In considering the *vicarious* liability of the international union, accommodation must be made for that fact. The record here clearly bears the construction that the international union exerted pressure to assure that respondent would lose his present jobs and obtain no more. But the record fails to rebut petitioner's contention that it had been unwilling to see its ends accomplished through violence, and indeed had sought to control the excesses which had occurred. Since the

record establishes only peaceful activities in this regard on the part of petitioner, respondent was limited to his § 303 remedy. *Teamsters Union v. Morton, supra.* Although our result would undoubtedly be firmer if the petitioner had assured respondent that, having assumed control of the strike, it would prevent further violence, in the circumstances of this case the crucial fact of petitioner's participation in or ratification of the violence that occurred was not proved to the degree of certainty required by § 6.

*Reversed*

THE CHIEF JUSTICE took no part in the decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, concurring.

I agree with and join in Part I of the Court's opinion relating to pendent jurisdiction. As to Part II, I refrain from joining the Court's speculations about the uses to which it may put the pre-emption doctrine in similar future cases. The holding in Part III that the Norris-LaGuardia Act requires reversal here seems to me correct, but my interpretation of the statute is different and somewhat narrower than that of the Court.

743 The statutory requirement for union liability in this case is "clear proof of actual participation in, or actual *743 authorization of . . . [the unlawful acts], or of ratification of such acts after actual knowledge thereof."[1] The Court construes this provision as fixing a new test of the quantum of proof, somewhere between ordinary civil and criminal standards. I do not think the admittedly vague legislative history imports this reading, and I believe it introduces a revealing inconsistency since the new test could not be applied to criminal cases, concededly governed by the same statutory language, without standing the statute on its head by having it *reduce* present quantum-of-proof requirements in criminal cases, that is, proof "beyond a reasonable doubt." The best reading I can give the statute, absent more light than has been shed upon it in this case, is one directing it against a particular type of inferential proof of authority or ratification unacceptable to those who framed the law. For me, the gist of the statute is that in the usual instance a union's carrying on of its normal strike functions and its failure to take affirmative action to dispel misconduct are not in themselves proof of authorization or ratification of the wrongdoing.[2]

744 *744 In the present case, apart from a few quite ambiguous episodes, there was nothing to bring the violence home to the union except, as the Sixth Circuit stressed (see p. 741, *ante*), that the union continued through its picketing the threat that the earlier violence would be renewed and did not repudiate the violence or promise to oppose its renewal. Whatever arguments could be made for imposing liability in such a situation, I think it approximates what the statute was designed to forbid. On this basis, I concur in the reversal.

[1] Section 303 of the Labor Management Relations Act, 1947 provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b) (4) of this title.

"(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 29 U. S. C. § 187 (1964 ed.).

Section 158 (b) (4) of Title 29 U. S. C. (1964 ed.), § 8 (b) (4) of the National Labor Relations Act, as amended, 73 Stat. 542, provides, in relevant part, that:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

.....

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.....

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as

the representative of such employees under the provisions of section 159 of this title. *Provided,* that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ."

[2] These events were also the subject of two proceedings before the National Labor Relations Board. In one, the Board found that Consolidated had unlawfully assisted the Southern Labor Union in violation of § 8 (a) (2) of the National Labor Relations Act, as amended, 49 Stat. 452, 29 U. S. C. § 158 (a) (2) (1964 ed.), *Tennessee Consolidated Coal Co.,* 131 N. L. R. B. 536, enforcement denied *sub nom. Labor Board* v. *Tennessee Consolidated Coal Co.,* 307 F. 2d 374 (C. A. 6th Cir. 1962). In the other, it found that Local 5881 had engaged in coercive picketing in violation of § 8 (b) (1) (A), 61 Stat. 141, 29 U. S. C. § 158 (b) (1) (A) (1964 ed.), *Local 5881, UMWA,* 130 N. L. R. B. 1181. The International itself was not charged in this proceeding, and the Board's consideration focused entirely on the events of August 16.

[3] The only testimony suggesting that Gilbert might have been at the mine site on August 15-16 was Gibbs' statement that "Well, everything happened so fast there, I'm thinking that I seen Mr. Gilbert drive up there, but where he went, I don't know." Whether such testimony could ever be sufficient to establish presence we need not decide, since respondent effectively conceded in the Sixth Circuit and here that Gilbert was in Middlesboro when the violence occurred.

[4] Immediately after the Board's order in the proceedings against it, note 2, *supra,* Consolidated reopened the mine it had closed during the spring of 1960, and hired the men of Local 5881. Later, and while this litigation was awaiting trial, that mine was closed as the result of an accident. At this point, the fall of 1962, the Gray's Creek mine was opened using members of Local 5881.

[5] See *Dukes* v. *Brotherhood of Painters, Local No. 437,* 191 Tenn. 495, 235 S. W. 2d 7 (1950); *Brumley* v. *Chattanooga Speedway & Motordrome Co.,* 138 Tenn. 534, 198 S. W. 775 (1917); *Dale* v. *Temple Co.,* 186 Tenn. 69, 208 S. W. 2d 344 (1948).

[6] The questions had been submitted to the jury on a special verdict form. The suggested remittitur from $60,000 to $30,000 for damages on the employment contract and from $100,000 to $45,000 punitive damages was accepted by respondent. In view of our disposition, we do not reach petitioner's contentions that the verdict must be set aside in toto for prejudicial summation by respondent's counsel, or because the actual damages awarded substantially exceeded the proof, and the punitive damage award may have rested in part on the award of actual damages for interference with the haulage contract, which was vacated as unproved.

[7] See Clark on Code Pleading 75 *et seq.* (1928); Clark, The Code Cause of Action, 33 Yale L. J. 817 (1924); McCaskill, Actions and Causes of Actions, 34 Yale L. J. 614 (1925); McCaskill, One Form of Civil Action, But What Procedure, for the Federal Courts, 30 Ill. L. Rev. 415 (1935); Gavit, A "Pragmatic Definition" of the "Cause of Action"? 82 U. Pa. L. Rev. 129 (1933); Clark, The Cause of Action, *id.,* at 354 (1934); Gavit, The Cause of Action—a Reply, *id.,* at 695 (1934).

[8] See also *American Fire & Cas. Co.* v. *Finn,* 341 U. S. 6, 12; *Musher Foundation, Inc.* v. *Alba Trading Co.,* 127 F. 2d 9, 12 (C. A. 2d Cir. 1942) (dissenting opinion of Clark, J.).

[9] Shulman & Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 397-410 (1936); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 232 (1948); Barron & Holtzoff, Federal Practice and Procedure § 23 (1965 Supp.).

[10] See, *e. g.,* Fed. Rules Civ. Proc. 2, 18-20, 42.

[11] *E. g., Musher Foundation* v. *Alba Trading Co., supra;* Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Col. L. Rev. 1018, 1029-1030 (1962).

[12] The question whether joined state and federal claims constitute one "case" for jurisdictional purposes is to be distinguished from the often equally difficult inquiry whether any "case" at all is presented, *Gully* v. *First National Bank,* 299 U. S. 109, although the issue whether a claim for relief qualifies as a case "arising under . . . the Laws of the United States" and the issue whether federal and state claims constitute one "case" for pendent jurisdiction purposes may often appear together, see *Dann* v. *Studebaker-Packard Corp.,* 288 F. 2d 201, 211-215 (C. A. 6th Cir. 1961); *Borak* v. *J. I. Case Co.,* 317 F. 2d 838, 847-848 (C. A. 7th Cir. 1963), aff'd on other grounds, 377 U. S. 426.

[13] Cf. *Armstrong Co.* v. *Nu-Enamel Corp.,* 305 U. S. 315, 325. Note, Problems of Parallel State and Federal Remedies, 71 Harv. L. Rev. 513, 514 (1958). While it is commonplace that the Federal Rules of Civil Procedure do not expand the jurisdiction of federal courts, they do embody "the whole tendency of our decisions. . . to require a plaintiff to try his . . . whole case at one time," *Baltimore S. S. Co.* v. *Phillips, supra,* and to that extent emphasize the basis of pendent jurisdiction.

[14] *Massachusetts Universalist Convention* v. *Hildreth & Rogers Co.,* 183 F. 2d 497 (C. A. 1st Cir. 1950); *Moynahan* v. *Pari-Mutuel Employees Guild,* 317 F. 2d 209, 211-212 (C. A. 9th Cir. 1963); *op. cit. supra,* notes 9 and 11.

[15] Some have seen this consideration as the principal argument against exercise of pendent jurisdiction. Thus, before *Erie,* it was remarked that "the limitations [on pendent jurisdiction] are in the wise discretion of the courts to be fixed in individual cases by the exercise of that statesmanship which is required of any arbiter of the relations of states to nation in a federal system." Shulman & Jaegerman, *supra,* note 9, at 408. In his oft-cited concurrence in *Strachman* v. *Palmer,* 177 F. 2d 427, 431 (C. A. 1st Cir. 1949), Judge Magruder counseled that "[f]ederal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in

state-court litigation, at 493. See also Wechsler, *supra,* note 9, at 252-253; Note, 74 Harv. L. Rev. 1000, 1001 (1961); Note, *supra,* note 11, at 1043-1044.

[16] Note, *supra,* note 11, at 1025-1026; *Wham-O-Mfg. Co. v. Paradise Mfg. Co.,* 327 F. 2d 748, 752-754 (C. A. 9th Cir. 1964).

[17] In *Teamsters Union v. Morton, supra,* a similar analysis was applied to permit recovery under § 303 of damages suffered during a strike characterized by proscribed secondary activity only to the extent that the damages claimed were the proximate result of such activity; damages for associated primary strike activity could not be recovered.

[18] It would of course be relevant if the Board had already intervened and as here, note 2, *supra,* issued an order which permitted the continuance of peaceful picketing activity.

[19] On the flexibility of "conspiracy" as a tort, see *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F. 2d 187, 189 (C. A. 2d Cir. 1943); *Riley v. Dun & Bradstreet, Inc.,* 195 F. 2d 812 (C. A. 6th Cir. 1952); Charlesworth, Conspiracy as a Ground of Liability in Tort, 36 L. Q. Rev. 38 (1920); Burdick, Conspiracy as a Crime, and as a Tort, 7 Col. L. Rev. 229 (1907); Burdick, The Tort of Conspiracy, 8 Col. L. Rev. 117 (1908). The anti-labor uses of the doctrine are well illustrated in Sayre, Labor and the Courts, 39 Yale L. J. 682, 684-687 (1930). Similar dangers are presented by the tort of malicious interference with contract, *id.,* at 691-695, a doctrine equally young which in its origins required a showing of interference by force, threats, or fraud, but does so no more, Sayre, Inducing Breach of Contract, 36 Harv. L. Rev. 663 (1923); Comment, 56 Nw. U. L. Rev. 391 (1961).

[20] Respondent's attorney argued in summation:

". . . and here is the conspiracy. Mr. Pass [an official of petitioner's] testified, we want that contract all over this nation. That contract or better. I don't guess at that, there is his testimony. There is no deviation from that contract, Mr. Turnblazer so says, unless it is approved in Washington. They impose a nationwide contract all over this nation, all over. I don't care whether it is in Canada or West Virginia or California or Tennessee."

[21] Note 5, *supra.*

[22] *Ibid.*

[23] 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.).

[24] National Labor Relations Act, as amended, § 2 (13), 61 Stat. 139, 29 U. S. C. § 152 (13) (1964 ed.); Labor Management Relations Act, 1947, §§ 301 (e), 303 (b), 61 Stat. 157, 159, 29 U. S. C. §§ 185 (e), 187 (b) (1964 ed.).

[25] See, *e. g.,* S. Rep. No. 105, 80th Cong., 1st Sess., p. 21.

[26] The fullest statement of the basis for § 6 appears in S. Rep. No. 163, 72d Cong., 1st Sess., pp. 19-21.

[27] The present § 303 was introduced on the floor of the Senate by Senator Taft, in response to a more severe proposal which would have permitted injunctive relief as well as damages against secondary activity. 93 Cong. Rec. 4769-4770, 4833-4847, 4858-4875 (1947). The tenor of the opposition may be seen in those pages, and also at 93 Cong. Rec. 4765-4766 (remarks of Senator Thomas); 93 Cong. Rec. 6451-6452 (remarks of Senator Morse); 93 Cong. Rec. 6520-6521 (remarks of Senator Pepper).

[28] The argument might be made that if there were "clear proof" that the local union was responsible, the responsibility of the international union *vis-a-vis* its local would be governed by a less demanding standard than that applicable for determining the responsibility of a labor organization or its officers on the basis of the acts of "individual officers, members, or agents" of the organization. Since the local was not a party here, we have no occasion to assess this issue. Liability of the international union is premised on the acts of Gilbert and the UMW's other agents, or not at all.

[29] In charging the jury, the trial judge first instructed the jury at length that the plaintiff's burden was to prove his case by a preponderance of the evidence, and that "if the plaintiff carries the burden of proof by a preponderance of the evidence, however slight that preponderance might be, he has done all that is required of him and is entitled to a verdict." In connection with substantive discussion of the state claim, he then remarked:

"Before the defendant may be held responsible for the acts of its agents in entering into a conspiracy during the course of a labor dispute, there must be clear proof that the particular conspiracy charged or the act generally of that nature had been expressly authorized or necessarily followed from a granted authority by the defendant, or that such conspiracy was subsequently ratified by the defendant after actual knowledge thereof."

The phrase "clear proof," referred to just this once, was never explained. The possibility is strong that the jury either did not understand the phrase or completely overlooked it in the context of the lengthy charge given. No challenge is directly made to the charge, however, and it does not appear whether an objection was entered. Accordingly, we do not rest judgment on this point.

[30] Other international union personnel were also later sent, perhaps in part because the union wanted to put its best foot forward in the NLRB proceedings, note 2, *supra,* which ensued. One such person testified,

". . . I explained to them that the labor board was there investigating and that certainly any mass picketing would only cause them a great deal of trouble, and instructed them that they should limit the number of their pickets and under no circumstances have any violence or any threats of violence to any person coming into or near that area."

[31] About six days after the violence, an earthmoving equipment salesman driving by the entrance to the mine site stopped to ask how he might get to another mine. Gilbert was present among the picketers, and gave him instructions. Gilbert told the salesman that he "couldn't get through" the road chosen, and should approach by another route; he said the salesman should tell any union men he met that he had spoken to Gilbert. A sinister cast can be put on this incident, but it shows clearly only that Gilbert was in control of the strike and that operations unrelated to Gray's Creek were not being interfered with. It is significant that the salesman did not claim to have been stopped by force or threatened in any way; it appears he did no more than seek directions, and received no more in return.

[1] Norris-LaGuardia Act, § 6, 47 Stat. 71, 29 U. S. C. § 106 (1964 ed.). The section is quoted in full at p. 735, *ante.*

[2] The principal legislative document, S. Rep. No. 163, 72 Cong., 1st Sess., pp. 19-21, is not very illuminating but it does at the end of its discussion of the section make reference to Frankfurter & Greene, The Labor Injunction 74-75 (1930). At these pages, to illustrate rulings on union responsibility that are deemed improper, that book states: " `Authorization' has been found as a fact where the unlawful acts `have been on such a large scale, and in point of time and place so connected with the admitted conduct of the strike, that it is impossible on the record here to view them in any other light than as done in furtherance of a common purpose and as part of a common plan'; where the union has failed to discipline the wrong-doer; where the union has granted strike benefits." (Footnotes omitted.) See also *id.,* at 220-221, n. 42; *United Brotherhood of Carpenters v. United States,* 330 U. S. 395, 418-419 and n. 2 (Frankfurter, J., dissenting).

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ROBERT (BOB) ROSS,** | § | |
| | § | |
| **Plaintiff/Counterclaim Defendant,** | § | |
| | § | |
| **V.** | § | **Civil Action No. 4:22-cv-00343-Y** |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, et al.,** | § | |
| | § | |
| **Defendants/Counterclaim Plaintiffs.** | § | |

<u>**UNION DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR RELIEF
AND BRIEF IN SUPPORT**</u>

SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX 75214

MARGOT A. NIKITAS*
Illinois Bar No. 6309782
General Counsel
Association of Professional
 Flight Attendants
1004 W. Euless Boulevard
Euless, TX 76040

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015

*Admitted *Pro Hac Vice*

*Counsel for Defendant Counterclaim Plaintiff
Association of Professional Flight Attendants, and
Defendants Julie Hedrick and Erik Harris*

Dated: July 21, 2022

Exhibit A

## I.     <u>INTRODUCTION</u>

Defendants Julie Hedrick, Erik Harris and Defendant/Counterclaim Plaintiff Association of Professional Flight Attendants ("APFA") (collectively, "Union Defendants") by their undersigned counsel, respectfully submit this Motion to Dismiss the claims for relief by Plaintiff Robert (Bob) Ross ("Ross") against them for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, as a matter of law, pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure ("FRCP").[1]  In support of their Motion, the Union Defendants submit this Memorandum of Law.

## II.    <u>STATEMENT OF THE CASE</u>

Plaintiff Ross, a member and former National President of APFA, has brought this lawsuit against APFA and two of its current officers, National President Julie Hedrick and National Treasurer Erik Harris, in an attempt to vacate and annul the arbitration decision and order[2], issued against him by Arbitrator Ruben Armendariz ("Arbitrator's Decision and Order"). The facts of the case are plain from Ross's Complaint and attached Arbitrator's Decision and Order:

Based upon internal union charges against Ross filed by two APFA members, Melissa Chinery-Burns and Sandra Lee ("Charging Parties"), under Article VII of the APFA Constitution, reviewed by the APFA Executive Committee and then referred for resolution to Arbitrator Armendariz, pursuant to Article VII of the APFA Constitution, a three-day hearing

---

[1] This motion seeks dismissal of all of Plaintiff Ross's claims against all Defendants herein as asserted in his Complaint (doc.1), leaving pending APFA's Counterclaim against Ross asserted in the Union Defendants' Answer and Counterclaim (doc. 8, at pgs.32-43, PAGE ID 32-43). As individual defendants Julie Hedrick and Erik Harris are not parties to APFA's counterclaim against Ross, upon dismissal of Ross's claims against the Defendants, Hedrick and Harris should be dismissed as parties to this action.

[2] Attached as Exhibit C to the Complaint (doc.1-3, PAGE ID 35-51).

was held on the record on June 16 and November 17-18, 2021. The issues as presented to the

Arbitrator were whether Ross, when acting as the APFA National President, violated the APFA

Constitution[3] and Policy Manual by engaging "in malfeasance, fraud [and] misappropriation of

funds" during his term of office as President" and whether any violations of the APFA

Constitution and Policy Manual were "willful." Arbitrator's Decision and Order at 2.

During the three-day hearing, the Charging Parties called five (5) witnesses to testify in

support of their charges against Ross and Ross called three (3) witnesses in his defense.

Arbitrator's Decision and Order at 2. Following the close of the hearing and the filing of briefs

by the parties, the Arbitrator issued his decision on March 19, 2022. *Id.*

The Arbitrator concluded that Ross had "*intentionally* and *willfully* ignored the APFA

Policy Manual and thus has violated his fiduciary duty as entrusted by the APFA membership."

Arbitrator's Decision and Order at 22 (emphasis in original). He further observed that "Ross's

testimony was inconsistent and not forthright," that Ross "should be prohibited from serving in

any official position for life within the APFA organization," and that he be required to resign

from any positions within APFA that he currently held. Arbitrator's Decision and Order at 23-24.

As further remedies, the Arbitrator ordered that APFA assign an auditor to review Ross's

expenses as submitted to APFA including credit card, rental car, and mileage; that Ross repay

APFA for any inappropriate expenses he had submitted as determined by the auditor; that Ross

repay APFA for additional specific amounts for erroneous vacation and apartment leasing; and

that he repay APFA for both the auditor's fees and the Arbitrator's fee. Arbitrator's Decision and

Order at 24. The Arbitrator has retained jurisdiction over compliance with the remedial issues in

the case. *Id.*

---

[3] The relevant provisions of the APFA Constitution and Policy Manual are restated in the
Arbitrator's Decision and Order at 4-7.

Plaintiff Ross then filed this lawsuit against APFA and its National President and National Treasurer—*none* of whom were parties to the Ross arbitration proceeding. The Complaint asserts federal subject matter jurisdiction to support Ross's claims: diversity of citizenship, Section 102 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §402, and the Fair Credit and Reporting Act, 15 U.S.C. §1681. Complaint, paras. 1-2, 8-10.

Plaintiff Ross's specific claims for relief against the Union Defendants are:

1. To vacate the Arbitrator's Decision and Order as purportedly violative of the Federal Arbitration Act, Complaint paras. 39-42;
2. To vacate the Arbitrator's Decision and Order as purportedly violative of LMRDA Section 101(a)(5), Complaint paras. 57-50;
3. Alleged violations of the APFA Constitution, Complaint, paras. 60-66;
4. Alleged breach of Ross's employment contract, Complaint, paras. 69-77; and
5. Other allegations: alleged violation of the Fair Credit Reporting Act, Complaint, paras. 67-69; defamation, intentional infliction of emotional harm, breach of fiduciary duty. Complaint, paras. 85-89.

In its answer to the Complaint, APFA filed a Counterclaim[4] against Ross for enforcement of the Arbitrator's Decision and Order and for breach of Ross's fiduciary duties as APFA National President as determined by the Arbitrator in his Decision and Order.[5]

As we now show, Ross's claims for relief should all be dismissed. Under well settled precedent, there is *no* subject matter jurisdiction for Ross's claims under either the Section 101(a)(5) of the LMRDA or the Fair Credit Reporting Act. Moreover, *none* of the allegations in the Complaint asserts a claim upon which relief can be granted again as a matter of law. Dismissal of Ross's baseless claims against the Union Defendants will leave APFA's Counterclaim against Ross for enforcement of the Arbitrator's Decision and Order and breach of

---

[4] Doc. 8, at pgs.32-43, PAGE ID 32-43.

[5] See Exhibit C to the Complaint (doc.1-3, PAGE ID 35-51).

fiduciary duty to be resolved by the Court.

## III.    STANDARD OF REVIEW

FRCP 12(b)(1) requires dismissal of any claim over which federal courts lack subject matter jurisdiction. If the court determines that it lacks subject matter jurisdiction, it must dismiss the action. FRCP 12(h)(3). A court may find subject matter jurisdiction is lacking from "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (*per curiam*).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161 (citation omitted). When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Id.* (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977) (*per curiam*)).

With regard to dismissal under Rule 12)b)(6), this Court recently summarized the relevant precedents in *Oliver v. Univ. of Texas Sw. Med. Sch.*, 2019 U.S. Dist. LEXIS 21289, 2019 WL 536276 at *16-17 (2019) (J. Boyle):

> In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve **[*17]** this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks and alterations omitted).

In addition, the court may consider documents attached to the complaint in considering a motion under Rule 12(b)(6) if they are referred to in the plaintiffs' complaint and are central to the plaintiff's claims. *Scanlan v. Tex. A&M Univ.*, 343 F3d 553, 536, (5th Cir. 2003).

## IV.   ARGUMENT

### A.  The Arbitrator's Decision Is Not Subject to Judicial Review Under LMRDA Section 101(a)(5)

The entire jurisdictional basis for Ross's allegation that the Arbitrator's Decision and Order should be vacated is LMRDA Section 101(a)(5) (Complaint, paras. 57-59) an allegation that is baseless as a matter of law.  To the contrary, it is well settled that LMRDA Section 101(a)(5) provides subject matter jurisdiction for judicial review of internal, *union-conducted* disciplinary proceedings but *not* subject matter jurisdiction for judicial review of other union-related administrative or legal matters such as the third-party arbitration award in this case. *Breininger v. Sheet Metal Workers Local 6*, 493 U.S. 67, 92-94 (1989); *Guidry v. ;Operating Engineers Local 406*, 907 F.2d 1491, 1492 (5th Cir. 1990); *Webster v. United Auto Workers Local 5*, 394 F. 3d 436, 441 (6th Cir. 2005); *Hackenburg v. Boilermakers*, 694 F. 2d 1237, 1239 (10th Cir. 1982); *Bass v. Int'l Bro. of Boilermakers*, 630 F. 2d 1058, 1066 (6th Cir. 1980); *Kirk v. Transport Workers Union*, 934 F. Supp. 775, 785 (S.D. Tex. 1995); *Ryals v. ILA Local 1771*, 33 F. Supp. 3d 634, 639-40 (D.S.C. 2014).

In other words, because there is no subject matter jurisdiction under or LMRDA Section 101(a)(5), the only jurisdictional bases cited in the Complaint as support for a challenge to the

Arbitrator's Decision and Order, any and all claims in the Complaint for vacation of the Arbitrator's Decision and Order must be dismissed for lack of jurisdiction. *See* FRCP 12(b)(1).[6]

### B. Plaintiff's Asserted Basis for Judicial Review of the Arbitrator's Decision and Order Violates Settled Federal Labor Law Principles

Even assuming, for purposes of argument *only*, that Ross has asserted a viable jurisdictional basis in the Complaint to support his challenge to the Arbitrator's Decision and Order, the Complaint fails to state a claim for which relief can be granted because, on its face, that claim *violates* the federal labor law axiom requiring judicial deferral to final and binding labor arbitration decisions. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597-99 (1960); *Delek Ref. Ltd. v. Local 202 Steelworkers,* 891 F. 3d 566, 570 (5th Cir. 2018); *Weber Aircraft v . IBT  Local 767*, 253 F.3d 821, 824 (5th Cir. 2001); *Refresco Bevs.v. Teamsters Local 997*, 2021 U.S. Dist. LEXIS 238421, 2021 WL 5908988 at *7-8 (N.D. Tex. 2021) (J. O'Connor); *Teamsters Gen. Drivers Warehousemen v. Greif Packaging, LLC*, 2010 WL 1417889, at *7 (S.D. Tex. Apr. 7, 2010) (J. Atlas); *Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 (N.D. Tex. 2007) (J. Means).

The Fifth Circuit recently summarized the restrictive standard of judicial review of labor arbitration decisions in its unpublished decision in *Ball Metal Container Corp. v. United Auto Workers Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022):

> "Judicial review of arbitration awards is severely limited." "The standard for this review is 'among the narrowest known to the law.'" When an arbitration award

---

[6] Although Ross *does not* assert the Federal Arbitration Act ("FAA") as a basis for subject matter jurisdiction for judicial review and vacation of the Arbitrator's Decision and Order (Complaint, Paragraph 2-3, 7-8), the Complaint does allege that the Decision and Order violates the FAA. Complaint, paras. 39-42. Any assertion of subject matter jurisdiction under the FAA would be erroneous as a matter of law. Precedent is well settled to the contrary: the FAA does not provide subject matter jurisdiction to review arbitration awards.  *Smith v. Rush Retail Ctr., Inc.,* 291 F. Supp. 2d 479, 487 (W.D. Tex 2003) (citing authorities), *aff'd* 360 F. 3d 504, 505 (5th Cir. 2004); *Mellado v. MBNA Am. Bank,* 2004 U.S. Dist. LEXIS 25471, 2004 WL 2937224 at *3-4 (N.D. Tex. 2004) (J. Lynn); *Judd v. Texakoma Fin., Inc.,* No. 3:96-CV-26 04-P, 1996 WL 734940, at *4 (N.D. Tex. Dec. 11, 1996) (J. Solis).

settles a labor dispute, judicial review is "particularly constrained." "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."

Under this unusually deferential standard of review, "courts are not authorized to reconsider the merits of an award." "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits. Instead of assessing how well the arbitrator interpreted the contract, [*8] we ask if the arbitrator acted within the contract's bounds. "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."

To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'" "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end." In these situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award. "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority,'" however, "'that ambiguity must be resolved in favor of the arbitrator.'" (Footnotes and citations omitted).

*See also Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 at *19-21 (N.D. Tex. 2007) (J. Means) (awarding attorneys fees as remedy for baseless attempt to vacate arbitration award).[7]

Nowhere in the Complaint does Ross allege, much less assert any specific citation for any contention, that the Arbitrator exceeded his authority or violated the express terms of his jurisdiction under the governing provisions of Article VII of the APFA Constitution. Indeed, his objections are entirely limited to the merits of the charges and to the procedural conduct of the hearing. Complaint, paras. 39-42. Nor did Ross make any such jurisdictional argument to the

---

[7] The same "exceedingly deferential" standard of review of arbitration awards governs cases which, unlike the instant case, are subject to judicial review under the FAA. *Lalo LLC v. Hawk Apparel, Inc.*, 2022 U.S. Dist. LEXIS 72218, 2022 WL 1173801 at *5-7 (N.D. Tex. 2022) (J. Lindsay).

Arbitrator during or after the hearing. Arbitrator's Decision and Order at 8-13. Ross's attempt to persuade the Court to vacate the Arbitrator's Decision and Order thus fails on this independent legal basis.

As the Tenth Circuit Court of Appeals put it well, "[b]ecause arbitration presents such a `narrow standard of review,' [28 U.S.C.] Section 1927 sanctions are warranted if the arguments presented are `completely meritless'" [citation omitted] [and] to underscore the point that unjustified, protracted attempts to vacate arbitration awards . . . will not be tolerated [one] does so at the risk of being sanctioned." *DMA Inter., Inc. v. Qwest Comm. Inter., Inc.*, 585 F3d 1341,1345-46 (10th Cir. 2009). [8]

### C.     Plaintiff's Claims for Violation of the APFA Constitution and Breach of Fiduciary Duty Are Without Merit

The breach of the APFA Constitution and breach of fiduciary duty allegations (which the Union Defendants assume refers to an alleged violation of LMRDA Section 501, 29 U.S.C. §501) are likewise subject to dismissal again as a matter of law.

First, Ross has neglected to assert *any* specific jurisdictional basis for either claim.

Second, relief is precluded, again as a matter of law, because, under the APFA Constitution and settled precedent, Ross was legally *obligated* to exhaust the mandatory internal union remedies "prior to taking any legal action," *Clayton* v. *International Union*, 451 U.S. 679, 692 (1981); *Hayes* v. *Brotherhood of Ry. & Airline Clerks*, 727 F.2d 1383, 1385-86 (5th Cir.), *cert. denied* 469 U.S. 953 (1984). In other words, if he had any valid claims against National President Hedrick or National Treasurer Harris, he could have brought them internally under

---

[8] Ross's attempt to vacate the Arbitrator's Decision and Order likewise violates the settled doctrine of judicial noninterference in internal union governance. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953); *Carr v. ALPA*, 866 F.3d 597, 602-03 and n.16 (5th Cir. 2017); *O'Neill v. Air Line Pilots Ass'n*, 939 F.2d 1199, 1206 (5th Cir. 1991); *Newell v. IBEW,* 789 F.2d 1186, 1189 (5th Cir. 1986).

Article VII of the APFA Constitution, but he did no such thing and his failure to do so is grounds for dismissal of his claims under FRCP12(b)(6).[9]

Third, before filing a breach of fiduciary duty claim (which we assume is intended as an LMRDA Section 501(a) claim), Ross was required by Section 501(b) to make a demand for remedial action by the APFA. *Adams-Lundy v. Ass'n of Prof. Flight Attendants*, 844 F. 2d 245, 248-49 (5th Cir. 1988); *Van Elder v. Amalgamated Transit Union Local 1338*, 2014 U.S. Dist. Lexis 63202, 2014 WL 1808079 at *10-11 (N.D. Tex. 2014) (J. Horan).  Once again, Ross did not even attempt to comply with this mandatory statutory prerequisite and his breach of fiduciary duty claim fails to state a claim for relief on its face.

### D.  Ross's Remaining Claims Are All Preempted

Finally, the remaining allegations in Ross's Complaint fail, again as a matter of law, on preemption grounds: the underlying allegations are all "inextricably intertwined" with Ross's challenge to the merits of the Arbitrator's Decision and Order and are therefore preempted. *Woodcock v. Marathon Petroleum*, 2019 U.S. Dist. LEXIS 66447, 2019 WL167618187 at *5-6 (S.D. Tex. 2019) ("Preemption occurs when a decision on the [nonlabor] claim is inextricably intertwined with consideration of the terms of the labor contract or when the application of state law to a dispute requires interpretation of the collective-bargaining agreement." *Thomas v. LTV Corp.,* 39 F. 3d 611, 615-16 (5th Cir. 1994). *See also Blanks v UAW,* 837 F. Supp. 2d 609, 616 (N.D, Tex. 2011), (J. Means), *aff'd* 464 Fed. Appx. 284 (5th Cir. 2012).[10]

---

[9] Likewise, as a matter of law, any and all claims by Ross against National President Hedrick and National Treasurer Harris are void on their face. As union officers they are not proper Defendants in any case. *Atkinson v. Sinclair Refining Co*., 370 U.S. 238, 247-49 (1962); *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 406-07 (1981); *Universal Communications Corp. v. Burns*, 499 F.2d 691, 693-94 (5th Cir. 1971).

[10] Ross's additional claims are "inextricably intertwined" with the arbitration proceedings in this case: his claim against APFA for alleged violation of the Fair Credit Reporting Act (Complaint,

Here, the governing "labor contract" under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. §185(a), is the APFA Constitution, not a collective bargaining agreement. *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 622 (1981); *Wooddell v. Int'l Bhd. of Elec. Workers*, 502 U.S. 93, 99, 101 (1991); *Hampton v. Int'l Longshoreman's Ass'n,* 2017 U.S. Dist. LEXIS 218154 at *5-6 (S.D. Tex. 2007). But the legal principle of federal preemption and the outcome are the same.

## V.  CONCLUSION

For the reasons stated, the Union Defendants respectfully submit that all of Ross's claims for relief in the Complaint must be dismissed for lack of subject matter jurisdiction under FRCP 12(b)(1) and also for their failure to state a claim for relief as a matter of law under FRCP 12(b)(6), leaving APFA's Counterclaim for enforcement of the Arbitrator's Decision and Order and for Ross's breach of fiduciary duty as an APFA officer to be resolved by the Court. Individual defendants Julie Hedrick and Erik Harris, upon dismissal of all claims against them by Plaintiff Ross, should also be dismissed as parties to this action as they are not parties to the remaining counterclaim by APFA against Ross.

---

paras. 67-69) relates directly to, and seeks to challenge and interfere with APFA's efforts to collect moneys owed by Ross under the Arbitrator's Decision and Order and invades the Arbitrator's continuing jurisdiction over the remedial issues in this case. Arbitrator's Decision and Order at 23. His claim of intentional infliction of emotional distress (Complaint, paras. 81-84) is expressly based on presentations made to the Arbitrator during the arbitration hearing and seeks to collaterally attack the Arbitrator's rulings. His defamation and interference with contract allegations (Complaint, paras 85-89) likewise directly relate to, and implicitly attempt to relitigate the merits of the Arbitrator's Decision and Order. *Id.* Finally, although Ross's allegations against Defendant Diversified Credit Systems ("Diversified") (Complaint, paras. 4, 78-80) are not addressed to the Union Defendants, they are also directed to interfere with efforts to enforce the Arbitrator's remedy and violate with the Arbitrator's continuing remedial jurisdiction, and are therefore also preempted.

.

Date: July 21, 2022

Respectfully Submitted

 /s/ Sanford R. Denison

SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX  75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

MARGOT A. NIKITAS*
Illinois Bar No. 6309782
General Counsel
Association of Professional
 Flight Attendants
1004 W. Euless Boulevard
Euless, TX 76040
Tel. (817) 540-0108 ext. 8108
Fax. (817) 355-1919
Email: MNikitas@apfa.org

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015
Tel.: (202) 243-3200
Fax: (202) 686-2977
Email: b.osborne@osbornelaw.com

*Counsel for Defendant Counterclaim Plaintiff
Association of Professional Flight Attendants, and
Defendants Julie Hedrick and Erik Harris*

*Admitted *Pro Hac Vice*

11

## **CERTIFICATE OF SERVICE**

I certify that on this _21st day of July 2022 a true and correct copy of the foregoing document was served on the below listed counsel of record for Plaintiff/Counterclaim Defendant Ross by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

KERRI PHILLIPS
HEATHER ABREU
K.D. Phillips Law Firm, PLLC
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com
Email: Heather@KDphillipslaw.com

Date: July 21, 2022                     _/s/ Sanford R. Denison_____
                                        SANFORD R. DENISON

13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT.WORTH DIVISION

| | | |
|---|---|---|
| ROBERT (BOB) ROSS<br>Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| V. | § | |
| | § | |
| MCGAUGHEY, REBER AND | § | |
| ASSOCIATES, INC., ASSOCIATION | § | |
| OF PROFESSIONAL FLIGHT | § | Case No. |
| ATTENDANTS, JULIE HEDRICK, | § | |
| AND ERIK HARRIS | § | |
| Defendants. | § | |

## AFFIDAVIT OF NENA MARTIN IN SUPPORT OF PLAINTIFF'S ORIGINAL COMPLAINT AND MOTION TO VACATE

BEFORE ME, the undersigned authority, on this day personally appeared Nena Martin, who being

by me first duly sworn, did state:

1.  "I am employed as a Flight Attendant working with American Airlines, Inc. and I

    served on the Board of Directors for the Association of Professional Flight

    Attendants, between April 2011 to January 2021. I am of sound mind and body to

    make this affidavit and have personal knowledge of the following facts:

    a.  I attended the Board of Director's meetings on October 27, 2020, and October

        28, 2020, in which evidence from an accounting firm hired by APFA was

        presented off the record. Erik Harris presented spreadsheets he stated were the

        results of an accounting review that showed Robert "Bob" Ross owed for an

        overpayment made under his Transition Agreement in the amount of $5,436.47.

**Exhibit B**

1

I was present at this meeting and reviewed all documents submitted and can attest to the true and correct findings of the Board of Directors at this time.

b. I have not seen the Confidential Memorandum dated October 22, 2020, from Wood, Stephens & O'Neil, L.L.P ("Confidential Memorandum") and the Board of Directors were not presented this Confidential Memorandum at any formal APFA Board of Directors meeting or discussion with which I participated.

c. I received an email from Erik Harris on November 25, 2020, with a letter attached. A true and correct copy of that letter is attached hereto and marked Exhibit B-1. This information was presented to me on or about October 27, 2020, with the other Board of Directors while discussing it off the record. No formal vote was ever made, no formal record ever taken. It was decided that APFA General Counsel, Margo Nikitas, would call and discuss the accounts with Mr. Ross to review the spreadsheet.

d. I also attended the APFA Executive Committee meeting on December 1, 2020, where the Executive Committee reviewed the charges filed by Melissa Chinery-Burns and Sandra Lee against Robert "Bob" Ross. At this Executive Committee meeting, I had the opportunity to hear all arguments made against Robert Ross prior to the Executive Committed voting on whether the charges were timely, specific, and valid. The Confidential Memorandum dated October 22, 2020, from Wood, Stephens & O'Neil, L.L.P was never presented to the Executive Committee for review and consideration prior to voting on the charges."

**Exhibit B**

FURTHER AFFIANT SAYETH NOT.

**Nena Martin**

SWORN AND SUBSCRIBED TO before me on this 18 day of April 2022.

Notary Public, State of Missouri

**Exhibit B**

3

**From:** Erik Harris <eharris ██████████>
**Sent:** Wednesday, November 25, 2020 9:58 AM
**To:** Base Presidents <BasePresidents ████████>; Executive Committee <ExecutiveCommittee █████ g>
**Cc:** Margot Nikitas <MNikitas ████████>
**Subject:** Bob Ross' Overpayment

Hi all-

The attached letter was sent to Bob Ross yesterday in regards to the Overpayment of wages. I gave him a deadline of January 1, 2021 to cure the debt owed to APFA or to make payment arrangements.

As always, I will keep you all posted on the progress of collecting these funds.

Thanks,

Erik

--

# Erik Harris *Pronouns: he, him, his*
National Treasurer
Association of Professional Flight Attendants
█████████████

*The content of this email is intended solely for the recipient(s).*
*It is not to be shared, forwarded or posted without the author's written consent.*

# Exhibit B-1



**Association of Professional
Flight Attendants**
Representing the **Flight Attendants** of American Airlines

November 24, 2020

**Via Email and Return Receipt Certified Mail #7019 1120 0000 0179 3144**

Mr. Bob Ross
4701 Hayloft Ct
El Dorado Hills, CA 95762

**RE:   Overpayment of Wages**

Dear Mr. Ross:

I am sending this letter to follow-up on our telephone conversation on November 10, 2020.
During our call, we discussed the finding of the APFA Board of Directors that you were
overpaid in the amount of $5,436.47 in 2018. The Board's finding was based on the results of a
review from an independent accounting firm which determined that the formula used to
determine the daily rate for your sick and vacation payout was incorrect. (See Schedule C,
enclosed).

On or before January 1, 2021, please remit payment (via check, money order, cashier's check, or
credit card) to APFA in full or contact me to discuss payment arrangements.

Please contact me at 817.540.0108 or eharris@apfa.org with any questions or concerns. Thank
you for your prompt cooperation.

Sincerely,

Erik Harris
National Treasurer

Enclosure

CC:   APFA Board of Directors
      APFA Executive Committee
      Margot Nikitas, General Counsel

**Exhibit B-1**

A

**Bob Ross - National President Pay**

116 hours paid monthly at the highest purser pay including international overide, per the policy manual.

| | | | | |
|---|---|---|---|---|
| * Maximum flight attendant pay | 60.13 | | | |
| Purser Pay | 7.50 | | | |
| International pay | 3.75 | | | |
| | 71.38 | 116 hours | 8,280.08 | |

| Bi-monthly pay 4/1/16 - 12/31/16 | 4,140.04 |
|---|---|

| | | | | |
|---|---|---|---|---|
| ** Maximum flight attendant pay | 61.33 | | | |
| Purser Pay | 7.50 | | | |
| International pay | 3.75 | | | |
| | 72.58 | 116 hours | 8,419.28 | |

| Bi-monthly pay - 1/1/17 - 5/1/17 | | 4,209.64 |
|---|---|---|
| 101,031.36 | Annual salary | |
| 276.80 | Daily rate for sick and vacation | |

| | | | | |
|---|---|---|---|---|
| *** Maximum flight attendant pay | 64.96 | | | |
| Purser Pay | 7.50 | | | |
| International pay | 3.75 | | | |
| | 76.21 | 116 hours | 8,840.36 | |

| Bi-monthly pay - 5/2/17 - 12/31/17 | | 4,420.18 |
|---|---|---|
| 106,084.32 | Annual salary | |
| 290.64 | Daily rate for sick and vacation | |

| | | | | |
|---|---|---|---|---|
| **** Maximum flight attendant pay | 66.26 | | | |
| Purser Pay | 7.50 | | | |
| International pay | 3.75 | | | |
| | 77.51 | 116 hours | 8,991.16 | |

| Bi-monthly pay - 1/1/18 - 7/31/18 | | 4,495.58 |
|---|---|---|
| 107,893.92 | Annual salary | |
| 295.60 | Daily rate for sick and vacation | |

* Pay rates effective 4/1/16
** Pay rates effective 1/1/17 - 5/1/17
*** Pay rates effective 5/2/17 - 12/31/17 (1.6% increase)
**** Pay rates effective 1/1/18 - 7/31/18

# Exhibit B-1

**National Officer: Bob Ross**

|  | B | | | | |
|---|---|---|---|---|---|
|  | Annual Salary | Daily amount (divide by 365) | Eligible Days to pay | Payment | |
| Profit Sharing - 2016 | | | | 2,652.22 | (paid 3/10/17) |
| Vacation Pay - 2017 | $ 101,031.36 | 276.80 | 14 | 3,875.20 | (paid 3/31/17) |
| Sick Pay - 2017 | $ 101,031.36 | 276.80 | 12 | 3,321.60 | (paid 3/31/17) |
| Retro - Wage Arbitration Award 1.6% | | | | 918.72 | (paid 6/1/17) |
| Triple Play Grand Slam | | | | 300.00 | (paid 7/6/17) |
| Grand slam | | | | 150.00 | (paid 1/25/18) |
| (Additional $50 grand slam paid on 2/15/18 salary check) | | | | | |
| 2071 Profit Sharing | | | | 2,458.19 | (paid 3/9/18) |
| Vacation & Sick Pay - 2017 - (adjustment paid in 2018) | | | | 968.76 | (paid 3/29/2018) |
| Vacation Pay - 2017 (remaining unused days per agreement) | $ 114,632.67 | 314.06 | 17 | 5,339.02 | (paid 3/29/2018) |
| Vacation Pay - 2018 (remaining unused days per agreement) | $ 122,121.70 | 334.58 | 29 | 9,702.82 | (paid 3/29/2018) |
| (Paid in two checks in the amount of $4,851.41 each) | | | | | |
| Sick Pay - 2018 | $ 122,121.69 | 334.58 | 12 | 4,014.96 | (paid 3/29/2018) |
| End of Term Payout - 2017 (January 1 - December 31, 2017) | $ 118,046.02 | 334.58 | 35 | 11,710.30 | (paid 3/29/2018) |
| (Paid in two checks in the amount of $5,903.43 each and one for $5,903.44) | | | | | |
| End of Term Payout - 2018 (January 1 - July 31, 2018) | $ 118,046.02 | 334.58 | 20.44 | 6,838.82 | (paid 3/29/2018) |
| (Paid in two checks in the amount of $3,419.41 each) | | | | | |
| Profit sharing 2018 | | | | 1,403.59 | (paid 3/9/19) |

**Exhibit B-1**

**Exhibit B-1**

| National Officer: | Bob Ross | | | Overpayment Calculation | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Annual Salary | Daily amount (divide by 365) | Eligible Days to pay | | Payment | |
| **Vacation Pay - 2017** | | | | | | | | |
| Original amount | | $ | 101,031.36 | 276.80 | | 14 | $ 3,875.20 | *OK (paid 3/31/17)* |
| | | | | | Overpayment | | $ - | $ - |
| **Sick Pay - 2017** | | | | | | | | |
| Original amount | | $ | 101,031.36 | 276.80 | | 12 | $ 3,321.60 | *OK (paid 3/31/17)* |
| | | | | | Overpayment | | $ - | $ - |
| **Vacation & Sick Pay - 2017 - (adjustment paid in 2018....all paid in error)** | | | | | Overpayment | | $ 968.76 | $ 968.76 |
| **Vacation Pay - 2017 (remaining unused days per agreement)** | | | | | | | | |
| Original amount - paid in error (a) | | $ | 114,632.67 | 314.06 | | 17 | $ 5,339.02 | *(paid 3/29/2018)* |
| Correct calculation amount | | $ | 101,031.36 | 276.80 | | 17 | $ 4,705.60 | |
| | | | | | Overpayment | | $ 633.42 | $ 633.42 |
| **Vacation Pay - 2018 (remaining unused days per agreement)** | | | | | | | | |
| Original amount - paid in error (a) | | $ | 122,121.70 | 334.58 | | 29 | $ 9,702.82 | *(paid 3/29/2018)* |
| Correct calculation amount | | $ | 107,893.92 | 295.60 | | 29 | $ 8,572.40 | |
| | | | | | Overpayment | | $ 1,130.42 | $ 1,130.42 |
| **Sick Pay - 2018** | | | | | | | | |
| Original amount - paid in error (a) | | $ | 122,121.69 | 334.58 | | 12 | $ 4,014.96 | *(paid 3/29/2018)* |
| Correct calculation amount | | $ | 107,893.92 | 295.60 | | 12 | $ 3,547.20 | |
| | | | | | Overpayment | | $ 467.76 | $ 467.76 |
| **End of term payout - 2017 (January 1 - December 31, 2017)** | | | | | | | | |
| Original amount - paid in error (a) | | $ | 118,046.02 | 334.58 | | 35 | $ 11,710.30 | *(paid 3/29/2018)* |
| Correct calculation amount | | $ | 107,893.92 | 295.60 | | 35 | $ 10,346.00 | |
| | | | | | Overpayment | | $ 1,364.30 | $ 1,364.30 |

JP03-22-DC00017757

NO. _____

| | | |
|---|---|---|
| **DIVERSIFIED CREDIT SYSTEMS,** | § | **IN THE JUSTICE OF THE PEACE** |
| **ASSIGNEE FOR THE "ASSOCIATION** | § | **COURT** |
| **OF PROFESSIONAL FLIGHT** | § | |
| **ATTENDANTS"** | § | |
| Plaintiff, | § | |
| | § | |
| **V.** | § | **NO. 3** |
| | § | |
| **ROBERT (BOB) ROSS** | § | |
| Defendant. | § | **TARRANT COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Diversified Credit Systems, Assignee of a contract (Agreement) from the Association of Professional Flight Attendants, hereinafter called Plaintiff, complaining of and about Robert (Bob) Ross, hereinafter called Defendant, and for cause of action shows unto the Court the following:

### DISCOVERY CONTROL PLAN LEVEL

1.      Plaintiff intends that discovery be conducted under Discovery Level 3.

### PARTIES AND SERVICE

2.      Plaintiff, Diversified Credit Systems (a D/B/A of McGaughey, Reber and Associates, Inc.), Assignee for the "Association of Professional Flight Attendants", is a business entity operating in the State of Texas and whose address is P.O. Box 3424, Longview, TX 75606.

3.      Diversified Credit Systems, Assignee of the Association of Professional Flight

Exhibit C