C. The composition of the Negotiating Committee for any Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL, shall be as follows:

   (1)  Three (3) or more permanent members consisting of:

     a.  The National President or his/her designee;

     b.  One (1) elected representative from each airline covered or to be covered by the applicable Collective Bargaining Agreement, who shall be elected by the membership of that airline at large; and

     c.  One (1) representative from each airline covered or to be covered by the applicable Collective Bargaining Agreement. This representative shall be appointed by the National President.

## Section 6.   VACANCY:

A vacancy in the position of a Negotiating Committee member shall be filled using the same procedures described in Article X, Section 5.A(1)(b) of this Constitution. If the vacancy is for an elected negotiator, an election for that position shall be held in accordance with Article VI of this Constitution. The National President shall appoint an interim negotiator to serve until the election is completed.

## Section 7.   REMOVAL:

A. An appointed member of a Negotiating Committee may be removed from his/her position by the appointing person or body. A removal by the Board of Directors shall be by an affirmative two-thirds (2/3) vote of the Voting Board of Directors.

B. An elected member of a Negotiating Committee may be removed from his/her position by the membership as provided in Article VIII, Section 3 of this Constitution, or following the completion of the procedures provided for in Article VII of this Constitution.

# ARTICLE XI
## CONTRACT RATIFICATION
## AND STRIKE PROCEDURES

**Section 1.**    RATIFICATION PROCESS:

A. A proposed Collective Bargaining Agreement will be submitted to the affected membership for approval only after it has been accepted by a majority vote of the Negotiating Committee and presented to the Executive Committee.

  (1) Should the Executive Committee reject a proposed agreement, the Negotiating Committee shall present the proposed agreement to the Board of Directors.

  (2) The Board of Directors may decide to submit the proposed agreement to the membership for approval

B. A decision by the Executive Committee, or the Board of Directors of the APFA, to submit a proposed agreement to the membership for approval should not necessarily be construed to be an endorsement of the merits of the proposed agreement.

C. The affected membership shall be given the complete changes to a Collective Bargaining Agreement prior to or at the start of the balloting period.

D. A proposed Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those active members in good standing covered by the applicable Agreement who cast valid ballots. Members may vote only on those agreements which apply to their respective airline(s), unless covered under a master agreement.

E. Balloting:

  (1) The sole issue to appear on the secret ballot shall be the ratification of the Collective Bargaining Agreement.

  (2) The time limit for the return of ratification ballots (the Ballot Date) shall be not less than thirty (30) days after the sending of the ballots to the respective membership.

F. Any letters of agreement or side letters entered into between an employer and the APFA during or outside of the Collective Bargaining negotiations which alter the rates of pay, rules, or working conditions for covered Flight Attendant employees shall be subject to ratification by the Executive Committee. If the Executive Committee

determines that the alteration is substantial, such letter of agreement or side letter shall be submitted for ratification to the membership covered by the applicable Agreement pursuant to the procedures outlined in this Article XI.

G. Upon ratification by the membership, a Collective Bargaining Agreement and/or letters of agreement shall be deemed binding.

## Section 2.   STRIKE PROCEDURES:

A. The Executive Committee or Negotiating Committee may recommend a balloting of the membership to authorize a strike.   Any such balloting must be approved by the Board of Directors.

B. A strike shall be authorized only by an affirmative vote by a majority of those active members in good standing covered by the applicable Collective Bargaining Agreement who cast valid ballots.

C. Such strike authorization shall empower the Board of Directors to authorize the National President to call a strike in accordance with the Railway Labor Act.

D. Once a strike has commenced, it may be called off by the Board of Directors.

E. During a strike, the procedures for voting on a proposed Collective Bargaining Agreement shall be as follows:

(1) The National President shall call system-wide membership meetings for the purpose of voting on a proposed Collective Bargaining Agreement.

(2) The affected membership shall be presented with the complete changes to a Collective Bargaining Agreement prior to the balloting.

(3) The Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those members in good standing covered by the Agreement present at the membership meetings who cast valid ballots.

(4) The vote shall be accomplished by secret ballot.

(5) Upon ratification of the Collective Bargaining Agreement, the National President shall notify the membership of the conclusion of the strike, and the complete language of the new Agreement shall be provided to the membership.

# ARTICLE XII
## AFFILIATIONS, MERGERS,
## FEDERATIONS OR CHARTERS

## Section 1.

Any action to affiliate, merge or federate the APFA with any other labor organization; or to issue a charter; or to organize an employee group (except as provided in Section 2 of this Article XII) to provide representation to that employee group for the purposes of the Railway Labor Act shall be subject to prior approval by:

A. a two-thirds (2/3) majority of the Executive Committee, and

B. a two-thirds (2/3) majority of the Voting Board of Directors, and

C. an affirmative vote by a majority of those active members in good standing who return valid ballots.

## Section 2.

Any action to organize a Flight Attendant employee group that is employed by a subsidiary or affiliated airline owned and/or operated by American Airlines Group, or that is employed by an independently-owned airline that performs flying for or on behalf of American Airlines or American Airlines Group, to provide representation to that employee group for the purposes of the Railway Labor Act shall be subject to prior approval by:

A. a two-thirds (2/3) majority of the Executive Committee, and

B. a two-thirds (2/3) majority of the Voting Board of Directors.

## Section 3.

Any agreement to affiliate, merge, federate, issue a charter, or to represent another employee group shall protect and preserve the APFA's right to autonomy in all of its actions; and shall protect and preserve the collective bargaining relationship between American Airlines and the Flight Attendant employees of American Airlines represented by the APFA.

# ARTICLE XIII
## *SAVINGS CLAUSE*

### Section 1.

Should any part, section, provision or Article of this Constitution be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any final decree of a court of competent jurisdiction, such invalidation of such part, section, provision or Article of this Constitution shall not invalidate any remaining portions, which shall continue in full force and effect.

### Section 2.

If any part, section, provision or Article of this Constitution is invalidated as described above, the Executive Committee is empowered, subject to the approval of the Board of Directors, to promptly amend the invalidated part, section, provision or Article to the limited extent necessary to conform to the enacted legislation or final judicial decree which resulted in the invalidation. Any such amendment shall preserve, as nearly as possible consistent with the law, the invalidated part, section, provision or Article.

A. Such amendment shall become effective when adopted by the Executive Committee and shall remain in effect until the Board of Directors acts as described in B. below.

B. At the next Annual Convention or at an earlier special meeting of the Board of Directors if one is convened, the Board of Directors shall consider the amendment and shall either:

   (1) decide that the amendment or an alternative amendment be submitted to the APFA membership for approval, or

   (2) determine that there should be no amendment and that the Constitution shall remain as is, minus the invalidated part, section, provision or Article.

C. In the event an amendment is sent to the APFA membership for approval, the proposed amendment shall be in effect until the membership approves or rejects it unless the Board of Directors expressly provides otherwise.



# APFA

## ANNUAL BOARD OF DIRECTORS CONVENTION

## March 8-10, 2022

*Westin Irving Convention Center at Las Colinas*

| Resolution Information | | BOS Milenkovic | CLT Hazlewood | DCA Pennel | DFW De Roxtra | LAX Nikides | LGA Santana | MIA Trautman | ORD Wroble | PHL Kaswinkel | PHX Agee | SFO Ross | Pres Hedrick |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Resolution #:** 10 | | | | | | | | | | | | | |
| **Resolution Name:** Chinery-Lee v Vargas Arbitration Remedy | | | | | | | | | | | | | |
| **Status:** Pass | | | | | | | | | | | | | |
| **Maker:** Hedrick | **YES** | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☐ | | ☐ |
| **Second:** Nikides | **NO** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| **Date:** 03/10/2022 | **ABS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Time:** 2:55 p.m. | **N/A** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Affects PM:** ☐ | | | | | | | | | | | | | |
| **Comments:** | | **Yes:** 10 **No:** 1 **Abstain:** 0 **Absent:** 0 **Show of Hands:** ☐ | | | | | | | | | | | |

**WHEREAS**, APFA Constitution, Article VII provides APFA members a mechanism to hold their representatives accountable through internal hearing procedures facilitated by a neutral third-party arbitrator; and

**WHEREAS**, two such members, Melissa Chinery & Sandra Lee, filed Article VII Charges against previous APFA National Treasurer, Eugenio Vargas, on November 24, 2020; and

**WHEREAS**, these Article VII charges were referred to the designated Article VII Arbitrator, Ruben Armendariz, in accordance with APFA Constitution Article VII, Section 3; and

**WHEREAS**, the Chinery-Lee v Vargas charges were heard on September 14-16, 2021 in Irving, Texas; and

**WHEREAS**, Arbitrator Armendariz rendered a decision in the matter of Chinery-Lee v Vargas on February 18, 2022; and

**WHEREAS**, the remedy states:

"Vargas is to repay APFA for the following:

1. If after the Independent Auditors audit is completed and he/she determines that Vargas had used the APFA credit card for his own personal use on meals during his

tenure as National Treasurer, Vargas is hereby Ordered to repay APFA for all meals he charged to the APFA credit card.

2. Vargas is prohibited from serving in any APFA National Officer position or Regional Officer position for life.

3. Vargas is hereby fined and ordered to repay the APFA for half of the Arbitrator's Fee for this arbitration.

4. The arbitrator shall retain jurisdiction for 90-days over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Vargas, that will be the amount to be assessed or due and the BOD or EC shall Order said repayment from Vargas."

; and

**WHEREAS**, the APFA Board of Directors is authorized and empowered to take any and all lawful action consistent with the Constitution to safeguard and protect the APFA, and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA.

**BE IT THEREFORE RESOLVED**, the APFA affirms the APFA Article VII Arbitrator's decision and remedy and hereby sanctions the following actions:

1. The APFA Board of Directors hereby orders APFA National Treasurer, Erik Harris, to retain an independent auditor to investigate if Vargas had used the APFA credit card for his own personal use on meals during his tenure as National Treasurer. Within 30 days of completion, the results of this investigation shall be remitted to the Board of Directors for review. After this review, the APFA Board of Directors shall order Eugenio Vargas to repay APFA for any monies deemed owed by the independent auditor.

2. The APFA Board of Directors hereby orders the NBC to maintain a record of the Chinery-Lee v Vargas Article VII award to ensure Eugenio Vargas name is removed from any Willingness-to-Serve that he may submit for life.

3. The APFA Board of Directors hereby orders Eugenio Vargas to repay APFA $8,623.17 for the Article VII Arbitrator's fees. The National Treasurer shall be charged with collecting from Vargas consistent with the APFA Constitution, Policy Manual, and any applicable Federal, State, and local laws.

4. Notwithstanding, should any further fees be incurred by the Article VII Arbitrator as it relates to the issuance and implementation of the remedy, fifty percent (50%) of such fees shall be remitted to Eugenio Vargas for repayment.

(https://www.apfa.org/)

Account (/my-account/)  |  Log In (/account/login/)

Search here...



# 3.24.22 – APFA Receives Article VII Arbitration Awards



**Thursday, March 24, 2022**

On March 19th, Arbitrator Ruben R. Armendariz issued a decision in Article VII charges brought under the APFA Constitution and Policy Manual against former APFA National President Bob Ross. Arbitrator Armendariz barred Ross from serving in any APFA position for life, ordered Ross to resign as San Francisco Base President, ordered Ross to repay APFA a substantial sum of money, and ordered an independent audit of certain expenses.

This decision follows a February 18th, 2022 decision that barred former APFA National Treasurer Eugenio Vargas from holding any APFA position for life and fined him half the cost of the arbitration, among other remedies.

Arbitrator Armendariz also ordered sweeping changes in the APFA financial policy, which requires training on allowable expenses, and instructed APFA to create a separate body of trained forensic accountants. This ruling demonstrates that this organization has spent years operating

EXHIBIT G                                              APPENDIX 132

without proper financial controls. We have attached the decisions below and encourage all members to educate themselves on these issues.

These charges were brought by APFA members Melissa Chinery and Sandra Lee under Article VII of the APFA Constitution. We thank them for bringing these issues forward. The fact that we are in this place illustrates the need for more reform. You deserve to have your dues money spent according to the strictest financial standards. The dues dollars that allow our union to operate and provide our paychecks are your dollars, and we have a fiduciary responsibility to safeguard union finances.

When our administration took office, we supported financial transparency and committed to upholding the language that members have the right to review the financial information of the union under Article III of the APFA Constitution and federal labor law. Previously, this union has prevented members from reviewing all financial documents. Following prior legal advice, members were only allowed to view monthly financial reports and the LM-2 reports (our annual Department of Labor filing). We believe our past outside attorneys and advisors guided us improperly. We will continue to ensure members are not kept in the dark about dues spending.

To view the Chinery-Lee v Ross Arbitration Award, please click **here** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/7488c141-524c-97d2-1cd8-53b497ea5173/22_Corrected_Decision_Robert_Ross_1.pdf).

To view the Chinery-Lee v Vargas Arbitration Award, please click **here** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/2eb32bb3-8897-24c5-50a7-e8be520735c0/22_Decision_Eugenio_Vargas.pdf).

**Next Steps: Ensuring Financial Transparency and Accountability at APFA**

These decisions are a wake-up call for our entire union. As an independent union, we have no parent body to scrutinize our actions and must hold ourselves to the strictest standards. In the coming months, we will be reviewing the APFA Policy Manual to further reform APFA's financial policies. We will fully cooperate with Arbitrator Armendariz's decisions and will draw on the expertise of legal and financial experts.

Financial accountability and transparency have been a priority for our administration. We have taken several steps to ensure that APFA is handling your dues dollars responsibly, including:

- Increasing membership visibility into our financial reports, including audits, LM-2 filings, monthly financial reports, expense and mileage reports, credit card statements, signed contr  acts and agreements, and payroll registers.

EXHIBIT G                                                          APPENDIX 133

- PA/AR removals (flat rate of 5 hours per day) used for all known meetings (such as Board of Director's Meetings and Executive Committee Meetings). PA/AR days are pre-planned absences placed onto a union Representative's schedule before PBS processes and count towards the Representative's PBS award max (**Policy Manual 5.C.1.g** (https://www.apfa.org/members/)).

- Enforcement of the Financial Reform Initiative resolutions passed at the March 2021 APFA Annual Convention, which included the following updates to the APFA Policy Manual:

  - **Resolution #8- APFA Issued Credit Cards** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/33410129-1e48-4d7f-9286-9085e19b3a86/2021_Conv_08_APFA_Issued_Credit_Cards.01.pdf) creates a new section 5.L in the Policy Manual and limits APFA credit card usage to National Officers. It also requires accountability by ensuring that another National Officer has to sign off on charges, requires strict documentation of all charges, and implements twice-yearly reviews of credit card activity by the Budget Committee. At least one (1) random audit will be performed by the Budget Committee every six (6) months to ensure proper spending, and training on the policy will be required by all incoming National Officers.

  - **Resolution #9- APFA Apartments** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/c4308b62-2a91-4601-ad04-cfb5a33d7e1a/2021_Conv_09_APFA_Apartments.01.pdf) puts more stringent guidelines on spending and inventory for APFA provided apartments. The Budget Committee shall maintain a table of the approved costs for purchasing new or replacement items. It adds a new inventory system to track all items belonging to APFA.

  - **Resolution #10- Business Related Meals** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/ce5361e7-6fd8-4da8-8b5c-17d7420fab2d/2021_Conv_10_Business_Related_Meals.01.pdf) adds policy for group meals to ensure compliance with the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) regarding meals purchased using an APFA credit card. All meal charges must be accompanied by a written explanation of the specific union business conducted during the meal and the full names and titles of all attendees.

  - **Resolution #11- Rental Car Policy & APFA Provided Transportation** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/3f9e49a6-7fe8-421b-aaed-2a21da0f9494/2021_Conv_11_Rental_Car_Polilcy_APFA_Provided_Transportion.01.pdf) adds language that any APFA Representative on union business in DFW should make every effort to utilize APFA-owned vehicles before using a taxi, rental cars, or other paid forms of transportation. This resolution also revises, further defines, and olicy Manual Section 5.H.4 by limiting rental car usage by incoming

EXHIBIT G                      **APPENDIX 134**

National Officers to thirty (30) days, except in extenuating circumstances and only upon approval from the APFA Executive Committee.

- Resolution #12- National Officer Relocation (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/f2c34cd8-f670-44fd-b288-741a6b9fac5f/2021_Conv_12_National_Officer_Relocation.01.pdf) updates the amount allowed for a National Officer to move to DFW. Instead of offering $10,000 round trip for a move to DFW, the Budget Committee shall maintain a table of approved relocation costs. Relocation reimbursement may be provided in accordance with the table.This resolution also limits the time in which a National Officer must decide to move to DFW or take an APFA provided apartment. This change allows the National Officer three (3) months from the election date to make their decision. This resolution also limits the amount of time a National Officer may reside in a hotel while deciding to move to DFW or take an APFA apartment. If a National Officer elects to live in an APFA apartment while in DFW, they will not be paid moving expenses if they suddenly change their mind and decide to relocate to DFW.

- Resolution #13- Collection of Non-Dues Related Monies Owed by APFA Representatives (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/82664914-049c-4ad0-92a7-580d909aa465/2021_Conv_13_Collection_of_Funds_from_APFA_Representatives.01.pdf) adds a new section to the APFA Policy Manual, Section 7.J. It states that Representatives owing non-dues related monies to APFA will receive written notification from the National Treasurer and ensures payment or a payment plan within thirty (30) days of receipt of such notification. If no payment is received, the monies will be sent to a collection agency.

- Resolution #14- Resignation or Recall of a National Officer (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/901dadb6-fdd1-4990-bd05-b639a67cb8d1/2021_Conv_14_Resignation_or_Recall_of_a_National_Officer.01.pdf) adds new language. Before this resolution, APFA had no written policy or procedure outlining pay and benefits for a resigning or recalled National Officer. This resolution adds a new Section 6.E to the APFA Policy Manual outlining the pay and benefits for a resigning or recalled National Officer and will remove the possibility of any future National Officer exit agreements.

Case 4:22-cy-00343-Y    Document 36-10    Filed 08/23/22    Page 12 of 50    PageID 954

We will continue to review policies that have been in place for many years and make the changes necessary to ensure APFA is compliant with the Office of Labor-Management Standards (OLMS), the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), and the Internal Revenue Service (IRS) standards for labor unions.

In Solidarity,

*Julie*

**Julie Hedrick**
*APFA National President*

---

*Posted in Hotlines - 2022 (https://www.apfa.org/category/hotline-archives/hotlines-2022/) and tagged National President (https://www.apfa.org/tag/national-president/)*

1004 West Euless Boulevard
Euless, Texas 76040

Phone: (817) 540-0108 (tel:817-540-0108)
Fax: (817) 540-2077 (tel:817-540-2077)

**Headquarters**
M-F: 9:00AM - 5:00PM (CT)

**APFA Phone Reps**
M-F: 7:00AM - 7:00PM (CT)

**After-Hours Live Chat**
M-F: 3:00PM - 11:00 PM (CT)
Sat-Sun: 9:00AM - 5:00PM (CT)

## APFA Events

**2022 Fall Board of Directors Meeting
(https://www.apfa.org/event/2022-fall-board-of-directors-meeting/)**

EXHIBIT G                                      APPENDIX 136

**October 25 @ 9:00 am - October 27 @ 5:00 pm**

## Employee Number

95108

## Password

••••••••

Log In

Register (https://www.apfa.org/account/register-
reset-password/)

(https://www.facebook.com/APFAunity 

(https://twitter.com/APFAunity) 

(http://www.linkedin.com/company/associatio 
n-for-professional-flight-attendants)

(http://www.youtube.com/user/AAflightattend 
ants)

(https://www.instagram.com/apfaunity)

Site Map (/sitemap)
Privacy Policy (https://www.apfa.org/privacy-
policy/)
Terms of Use (/terms-of-use/)
Jobs (/jobs/)

Wings Foundation
(http://www.wingsfoundation.com/)
Airline Ambassadors (http://www.airlineamb.org/)
UNICEF/Change for Good
(http://www.unicefusa.org/campaigns/changeforg
ood/)
APA (http://www.alliedpilots.org/)

TWU (http://www.twu.org/)/IAM
(https://www.goiam.org/)

CWA (https://www.cwa-union.org/)-IBT
(https://teamster.org/)

---

© 2022 APFA | Powered by Beaver Builder (http://www.wpbeaverbuilder.com/?utm_medium=bb-pro&utm_source=bb-
theme&utm_campaign=theme-footer)



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FT. WORTH DIVISION**

| | |
|---|---|
| **ROBERT (BOB) ROSS**<br>**Plaintiff,**<br><br><br><br><br><br><br>**V.**<br><br>**ASSOCIATION OF PROFESSIONAL**<br>**FLIGHT ATTENDANTS,**<br>**MCGAUGHEY, REBER AND**<br>**ASSOCIATES, INC., JULIE**<br>**HEDRICK, AND ERIK HARRIS**<br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§   **Case No. 4:22-CV-00343**<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**PLAINTIFF'S ORIGINAL COMPLAINT AND**
**MOTION TO VACATE ARBITRATION AWARD**

**NOW COMES** ROBERT (BOB) ROSS, Plaintiff, in the above-entitled and numbered

cause, and files this Plaintiff's Original Complaint, and shows the Court:

**I.**

**INTRODUCTION**

1.      This action seeks redress for unlawful debt collection practices of the Fair Debt

Collection Practices Act 15 U.S.C. §§1692 d, e, and f et seq {hereinafter "FDCPA"), violations for

the Fair Credit Reporting Act 15 U.S.C. 1681s-2 (a)(1)(A) and (B) (hereinafter "FCRA"), and the

Labor Management Records and Disclosure Act, 29 U.S.C. 412,

"LMRDA"), and damages resulting from various torts brought under state law including intentional interference with a contract, defamation, intentional infliction of emotional distress,

2.    In 2016, Plaintiff was elected APFA National President shortly after American Airlines and US Airways merged.  The merger created a division between the labor unions with the Association of Flight Attendants ("AFA") on one side—the union that represented US Airways flight attendants among others—and the Association of Professional Flight Attendants on the other side—a labor union that *exclusively* represents American Airlines flight attendants.  A power struggle ensued between AFA and APFA, in which AFA has now infiltrated APFA with the intent to take over via a merger of the two unions.  The result has been the use of APFA's Disciplinary Procedures to victimize any union member outspoken against a merger between AFA and APFA.  Violations of APFA members' rights have ensued in pursuit of the AFA agenda under federal and Texas state law as well as intentional tortious violations that resulted in damages to the Plaintiff and his family.

## II.

## PARTIES

3.    Plaintiff, Bob Ross ("Ross") was employed with APFA in the state of Texas and a citizen of Texas during his employment.  His current primary residence is in the State of California; however, all events pertinent to the claims contained herein occurred within the state of Texas.  His primary residence is 4701 Hayloft Ct., El Dorado Hills, CA 95762.

4.    Defendant, McGaughey, Reber and Associates, Inc d/b/a Diversified Credit Systems ("Diversified"), is the assignee of a termination contract between Ross and the Association of Professional Flight Attendants—its registered agent for service of process is M S. McGaughey located at 2200 Jahan Trail, Longview, Texas 75604.

This company is engaged in the collection of debts using the mail and the telephone. Diversified is an entity whose principal purpose is the collection of any debts. The Defendant regularly attempt to collect consumer debt alleged to be due to another and are "debt collectors' as defined by FDCPA, 15 U.S.C. § 1692(a)(6).

5.   Defendant, Association of Professional Flight Attendants ("APFA") is the original party to the Transition Agreement which formed the basis of the original claim. That claim gave rise to this lawsuit and may be served by and through its current National President, Julie Hedrick at APFA headquarters at 1004 W. Euless Blvd, Euless, Texas 76040.

6.   Defendant, Julie Hedrick, ("Hedrick") is the National President of APFA and can be served at his place of employment at APFA headquarters 1004 W. Euless Blvd, Euless, Texas 76040 or at her place of residence 3231 Del Monte Court, Fairfield, CA 94534.

7.   Defendant, Erik Harris ("Harris") is the National Treasurer of APFA and can be served at his place of employment at APFA headquarters 1004 W. Euless Blvd, Euless, Texas 76040 or at his place of residence 2100 Heritage Ave, Apartment 7104 Euless, Texas 76039.

## III.

## JURISDICTION AND VENUE

8.   Plaintiff files with this Complaint in the Northern District Federal Court - Fort Worth Division based on Federal Question and Diversity between the Parties in this suit.

9.   Plaintiff brings claim under jurisdiction of this action is conferred on this court by virtue of the Fair Credit Reporting Act 15 U.S.C. 1681s-2 (a)(1)(A) and (B), Fair

EXHIBIT H                                                          APPENDIX 141

Debt Collection Practices Act 15 U.S.C. §§1692 d, e, and f, and the Labor Management Records and Disclosure Act, 29 U.S.C. 412, Section 102.

10.     The amount in controversy exceeds $75,000 the Defendants conduct business in Texas, while the Plaintiff is a citizen is a former citizen of Texas at the time, he signed the Contract and all facts that gave rise to the claims contained herein, occurred in the State of Texas.

## IV.

## CONDITIONS PRECEDENT

11.     All conditions precedent to Plaintiff's recovery against Defendants have been fully performed, have occurred, or have been waived or excused.

## V.

## FACTUAL BACKGROUND

**A.     Bob Ross was elected by the Membership in April of 2016 to serve as President of the Association of Professional Flight Attendants Union.**

12.     Ross was elected shortly after American Airlines and US Airways merged.  This created a power struggle between the labor unions for the Flight Attendants. A power struggle ensued between the AFA and APFA in which AFA ended up infiltrating APFA with their eye on a merger of the two unions.  The result has been the use of APFA's Disciplinary Procedures as a method of victimizing those within APFA's union that stand against a merger between AFA and APFA.

13.     Ross was elected to a four-year term, took office in April of 2016, and found himself faced with a conflict surrounding proposals of a merger between AFA and APFA.  Many APFA members had reservations about a union that represented interests from multiple airlines with competing interests to those of American Airline flight attendants or that those competing interest weaken bargaining power of APFA's labor union.  Ross prioritized unifying the AA flight attendants

under the APFA umbrella and opposed a merger between the unions.  Unbeknownst to Ross, this political opinion against a merger marked him as an enemy to anyone with something to gain from a merger—specifically, AFA leadership and their loyalists.  AFA lost many members due to the AA buy-out of US Airways, and a merger or takeover of APFA would bring in an additional 18,000 members, and their union dues.

14.    Since the day after Ross was elected APFA National President, his administration and supporters were met with stonewalling tactics, disparaging remarks, and conflict from those APFA members who remain loyal to the AFA agenda seeking a merger and ultimate takeover of APFA ("AFA/APFA").  Melissa Chinery-Burns, a former US Airways Flight Attendant, and vocal advocate of AFA/APFA union merger, stated publicly to Ross that she would "work tirelessly to make sure [Ross] [is] out of office." She began a petition to remove Ross and his administration after learning he opposed an AFA/APFA merger.

15.    Plaintiff, Ross, is an honest and outspoken leader of the APFA union, and as President his voice and support strengthened.  However, the APFA Annual Conference on February 28, 2018 - March 3, 2018 was the culmination of this campaign to harass and dismantle his administration.  The APFA BOD encouraged Ross to step down from his role as many endured a lot of questions from AFA/APFA members about the Chinery-Burns's petition and campaign for Ross's resignation. Fear that any of these Board members would be the next led many to support Ross's resignation.

**B.  Ross negotiated, signed a transition agreement, and reluctantly surrendered his Presidential position, but was subsequently voted back on by the APFA BOD in April of 2021.**

16.    Ross conceded his position as President of APFA after insisting on the following conditions:

EXHIBIT H                                                                              APPENDIX 143

- Ross would be paid outside of APFA policy—which provides that unused Sick and Vacation days may be paid to officers according to a Per Diem Calculation of Annual Salary divided by 365.
- Ross would be paid *all* accrued unused vacation time—rather than be limited to only the 14 days provided for under APFA policy;
- Ross would be paid *all* unused accrued sick time—rather than be limited to only the 12 days provided for under the APFA policy;
- Ross would no longer be a target for undue harassment and open hostility by any of the APFA/AFA members through a binding non-disparagement clause;
- Ross would be entitled to his privacy under the terms of the Transition Agreement with a Confidentiality clause; and
- Ross would be entitled to moving expenses back to California in the amount of $10,000.

Ross's transition agreement, encapsulating these conditions, was drafted by Mark Richard, APFA outside legal counsel, and signed on March 1, 2018 ("Transition Agreement").

17.     After Ross acquiesced to the AFA/APFA agenda, he resigned as APFA National President, packed his family up and moved back to California.  A year passed, and in 2020 many championed Ross's campaign for APFA BOD position.  In 2021, Ross was duly elected to APFA's BOD where he, again, stood as a voice against the AFA/APFA merger.  However, Ross's popularity and re-election threatened AFA/APFA supporters.  Meanwhile, AFA members crept deeper into key roles within APFA's organizational structure—eventually leading to the election of APFA's National officers: National President, Julie Hedrick; National Vice-President, Larry Salas, National Treasurer, Erik Harris, as the National Secretary and Josh Black.

18.     On or about March of 2019, AFA/APFA members Chinery-Burns and Sandra Lee ("Lee") launched an investigation into Ross, the officers that served with him, and his supporters. With the assistance of Harris, the APFA National Treasurer, Chinery-Burns and Lee began to scour all financial records from his presidency in search of any impropriety.  The APFA National Officers granted Chinery-Burns and Lee access to Ross's confidential Transition Agreement, despite the confidentiality clause contained therein. Thereafter, additional charges against those APFA leadership that supported Ross and his administration were filed.  Again, these APFA elected officials could

EXHIBIT H                                                                    APPENDIX 144

either fight the charges in arbitration or retire their career from American Airlines as flight attendants—a bold and blatant attempt to take over key APFA leadership positions.

**C.  In November of 2020, Erik Harris, APFA's National Treasurer, sent a demand for an alleged debt Ross owed for $5,436.37.**

19.     On November 24, 2020, Harris wrote a letter to Ross demanding payment for a debt he allegedly owed to APFA ("Overpayment-of-Wages Letter").   A true and correct copy of the Overpayment-of-Wages Letter is attached hereto as Exhibit A.     The following factual assertions were made in the Overpayment-of-Wages Letter by Mr. Harris:

    i.   The APFA BOD had met and declared in a finding that Ross was overpaid in the amount of $5,436.47 under his Transition Agreement in 2018 (See Ex. A).

    ii.   The APFA BOD's findings were based on a review from an independent accounting firm (*See* Ex. A).

    iii.   This independent accounting firm "determined that the formula used to determine the daily rate for [Ross's] sick and vacation payout was incorrect" (*See* Ex. A).

**Every single factual assertion outlined above is false.**

20.     Harris included and referenced scheduled attachments to the Overpayment-of-Wages Letter marked as A, B and C (*See* Ex. A) ("Schedules").   The attached Schedules outline the following:

    i.   Schedule A: the calculation of Ross's Per Diem calculation per the APFA Policy—annual salary divided by 365;

    ii.   Schedule B: an outline of payments made in 2018 for unused Vacation and Sick Days in accordance with the Transition Agreement; and

    iii.   Schedule C: a final spreadsheet asserted that the amount Ross was paid and then subtracted the APFA-Policy Per Diem multiplied by the correct APFA-Policy capped twelve (12) Sick Days per year and the maximum amount of his unused Vacation Days.

21.     The per diem calculation used for Ross's original 2018 payout included his normal monthly stipends paid to all APFA officers for their Meal Expense Allowance ("MEA") and Special Assignment Fee ("SAF") and Maintaining an Office Outside Residence—a stipend often included when one takes vacation and sick leave.  The difference between the two per diem calculations resulted in an alleged overpayment of $5,436.37 (*See* Ex. A).  There is no explanation as to why no payment was made for the additional Sick Days as he was entitled to those paid days as well.

22.     Nothing in the Overpayment-of-Wages Letter indicates these Schedules were the product of an audit or a formal review by an independent accounting firm (Ex. A).  Ross was never given any independent accounting firm's name or information to verify these calculations or any other information to validate these schedules, despite asking for a copy of the full report in the conversation Ross and Harris had, as referenced in this letter.  Harris gave Ross until January 1, 2021 to make payment in full or, alternatively, to contact his office to make payment arrangements.  By the middle of February 2021, he discovered the debt had been sold to Diversified, after which Diversified filed suit against Ross to collect the debt.

**D.  On January 14, 2022, Diversified Credit Systems filed suit against Ross for the same debt Lee and Chinery-Burns already filed Article VII charges to collect on—except Diversified's Petition included a letter from the APFA's accounting firm stating its opinion that Ross was paid correctly and does not owe this debt.**

23.     After the APFA Article VII Arbitration concluded, Diversified Credit Systems, LLC filed suit against Ross for breach of contract to collect the same $5,436.47 debt Chinery-Burns and Lee pursued in arbitration.  Upon review of the petition, Ross realized that Julie Hedrick, Erik Harris, and others in the current APFA Administration withheld documents prior to and during the APFA Article VII Arbitration that would have exonerated him.  Simply put, by filing the lawsuit, Diversified unknowingly filed evidence that disproved the validity of the very debt it attempted to collected, credit reported on, and filed suit on Plaintiff.

PLAINTIFF'S ORIGINAL PETITION - Page 8 of 27

24.     More specifically, Diversified Credit Systems included as Exhibit B to its original petition a letter from Wood, Stephens & O'Neil, L.L.P., an accounting firm.  This letter describes that a request for an informal review of Bob Ross's confidential Transition Agreement was made of the accounting firm—a true and correct copy of this letter is attached hereto, marked as <u>Exhibit B</u>, and incorporated herein for all purposes ("Confidential Memorandum"). The Confidential Memorandum from the APFA Accounting Firm outlines the following pertinent facts:

    i. That APFA officers, the APFA staff attorney, and APFA's outside counsel requested an informal review of Bob Ross's confidential Transition Agreement.

    ii. That these Officers and attorneys requested the preparation of an overpayment schedule of accrued and unused Sick and Vacation Day payments made to Bob Ross in 2018—similar to the overpayment schedules previously prepared for three other officers.  These overpayment schedules used the APFA Policy to calculate the per diem rate of pay for each officer and capped payout for Vacation and Sick Days according to APFA Policy.

    iii. The *most* important aspect of the letter states "**Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick, and accrued and unused vacation time.  This agreement doesn't [sic] specify that the payments be made in accordance with the policy manual guidelines. Consequently, these payments appear appropriate and in compliance with the transition agreement**."

    iv. Ross was granted moving expenses up to $10,000 for which he did not use all of these funds."

25.     This Confidential Memorandum directly contradicts the facts laid out by Harris in the Overpayment-of-Wages Letter to Ross—**the accounting firm did not determine that the formula used to pay Ross's sick and vacation days was incorrect.**  In fact, the Confidential Memorandum confirms that Ross was paid *correctly* under the Transition Agreement since he was to be paid outside of APFA policy. This Confidential Memorandum names those that made the request and those that received notice of this letter: the APFA officers, and in-house and outside.

26.     Furthermore, Diversified sent Ross a verification-of-debt letter that included the Overpayment-of-Wages Letter ("VOD letter").  This VOD letter is directly contradicted by the Confidential Memorandum, thereby proving that APFA and Diversified held documentation from an accounting firm that Ross never owed this debt and should not have been collecting, credit reporting, pursing Article VII charges, or filing suit on this debt (*See* Ex. A).

27.     A request for Schedules that misrepresent the characterization of payments made to Ross is an attempt to acquire seemingly valid documents that the union could otherwise use to implicate Ross in over-payments to himself before he left office—a clear plot to fraudulently implicate Ross in wrongdoing from the outset.  The intent behind this "informal review" seemed to raise suspicions by the accounting firm as well, as it drove the accountant to draft the Confidential Memorandum clarifying that Ross was not responsible for these "overpayments" outlined in the Schedules it prepared.  The Confidential Memorandum even points to Ross's conservative use of his moving expenses under the Transition Agreement—a fact highlighting Ross's integrity, rather than his culpability.  APFA officers and their attorneys however, concealed this letter and used only the Schedules, cited the accounting firm's "review" as though it were an audit, and misrepresented that the accounting firm found that Ross was overpaid.  As a direct result of these misrepresentations the APFA officers disparaged, harassed, and charged Ross under the APFA Article VII Constitution and pursue damages.  The APFA officers and attorneys, in particular Hedrick and Harris, submitted the Schedules to the APFA BOD, and the APFA EC to convince APFA leadership of his unwillingness to pay his debts, claiming he stole from union members just before he left office.  The APFA General Counsel, Margot Nikitas, (copied on both of these letters) was present at the December 1, 2020 EC meeting where Ross's Article VII charges were reviewed, as well as every day of Ross's Arbitration

EXHIBIT H                                                    APPENDIX 148

proceedings—yet she never raised the accounting firm's true findings to the Arbitrator, the APFA BOD, or the APFA EC.

28.     The Overpayment-of-Wages Letter further misrepresented that the APFA BOD found that Ross was overpaid by $5,436.47 in 2018—a fact later relied on by the Arbitrator to rule against Ross and fine him $27,631.60 in damages (Ex. C). Nena Martin ("Martin"), an APFA Board member during 2011 and 2021, was present at both the APFA BOD meeting on October 27 and 28 of 2020, which addressed many of the issues related to Ross's charges, and the APFA EC meeting on December 1, 2020.  Martin attests that she never participated in or knew of any finding from the BOD that Ross owed the $5,436.47 debt or that his per diem rate was miscalculated based on these Schedules.  Moreover, a thorough scrub of all meeting minutes, resolutions, and actions by the AFPA BOD during the Fall of 2020 resulted in no evidence that the APFA BOD ever discussed this account, reviewed this Confidential Memorandum from the accounting firm, nor did the APFA BOD ever find that Ross was overpaid, that his per diem calculation was incorrect, or that he even owed money to APFA.  No formal vote was ever held, and no formal action by the APFA BOD was ever taken as far as the record shows.  If the BOD reviewed this matter there would have been some sort of record of it in which each director voted, as the directors must maintain transparency with their continuants. The lack of any formality in writing by the Board of Directors indicates no formal action was ever taken; thus, citing this finding is a clear misrepresentation of the facts and abuse of power.

29.     Nena Martin also attended the EC meeting on December 1, 2020 where Ross's Article VII charges were found timely, valid, and specific—she attests that neither the Confidential Memorandum nor its contents were ever presented or disclosed to the EC prior to voting.  Martin only attests that the BOD and the EC were presented with spreadsheets, similar to those attached to the Overpayment-of-Wages Letter, and told that an accounting firm prepared them as a result of a formal

review.  It can only be presumed that the APFA Officers and their counsel deliberately withheld the information and misrepresented the facts to ensure that Ross and his supporters were removed from the APFA BODs.

**E.  APFA BOD and the APFA EC held that the charges brought against Ross for fraud and misappropriations were valid and referred the case to APFA's internal Arbitration Proceedings per the APFA's Constitution.**

30.     Once an Article VII charge is filed by a member, at the first regularly scheduled meeting of the APFA Executive Committee ("APFA EC"), the EC reviews the charges for its timeliness, specificity, and validity.  If the charges are found to be timely, valid, and specific, the charged party is then served notice and the matter proceeds to arbitration.  The charged party escapes a judgment by either winning at arbitration or if the charged member retires from American Airlines while the charges are pending, the charges are dismissed.  It is not difficult to see how abuse of APFA's Constitutional Article VII Disciplinary Procedures could thwart the democratic process of an election and victimize the very members the union seeks to protect.

31.     These Disciplinary Procedures are the means AFA loyalists have used to stack the APFA BOD and take over the APFA leadership roles—AFA now poised for the hostile take-over of APFA's union.  Most AA Flight Attendants are left without a voice, as they are unaware of the power struggles and financial motivations behind many of these key AFA/APFA leaders.  Consequently, APFA's Constitutional Article VII Disciplinary Procedures are launched to institute a culture of silence and obedience among those that dare to have a voice.

32.     Unbeknownst to Plaintiff, Chinery-Burns and Lee filed Article VII charges against Ross on November 18, 2020 for violations of misuse of his credit card, and overpayment under the Transition Agreement among other complaints.  These charges were based, in part, on payments made under the Transition Agreement.  The APFA EC held a meeting on December 1, 2020 and voted that

the charges were valid and timely before Ross ever received notice of the Article VII charges. Arbitration Proceedings were initiated per Article VII charges without Ross ever receiving proper notice, an opportunity to review any evidence, or an opportunity to be heard by the APFA BOD or the APFA EC.  Ross was left with only one of two choices: he could resign from AA under a cloud of suspicion or proceed to arbitration in the hope he would win and restore his reputation.

33.     Discipline procedures conducted by the APFA, from start to finish, were fraught with due process violations that ran the spectrum—from lack of proper notice that charges were filed to unequal time for presentation of arguments to the exclusion of relevant and exculpatory evidence. This arbitrator allowed APFA's conspiracy to play out despite the lack of authority to hear these charges as they were well beyond the 60-day limitations period required by the APFA Constitution. Ross also served subpoenas on the APFA President, Julie Hendrick and the National Secretary, Josh Black—both refused to appear, testify, or produce any documents.  Ross requested all documentation related to this alleged overpayment-of-wages debt be produced including all financial documentation related to the Ross Account in Collections with Diversified Credit.  Lee, Chinery-Burns, and Harris served a large amount of documentation to Ross the day of trial in a disorganized mess, and yet no sanctions or exclusion of those documents were ordered by the Arbitrator, as would be standard in any other official judicial proceeding.  Most notably, Harris, the APFA National Treasurer, failed to produce any documents related to the debt demanded in the Overpayment-of-Wages Letter or any documentation from the accounting firm cited in this letter.

34.     The Arbitrator disallowed Ross from questioning Harris about his Transition Agreement and payments made thereunder.  Many of the charges brought against Ross pertained to expenses charged to the union for a rental vehicle, meals and expenses related to union business, furniture he purchased for an APFA apartment he used while splitting his time between Dallas-Fort

Worth and California.  Yet the arbitrator failed to consider the evidence showing Ross reimbursed APFA for this furniture upon moving it to his home.  Speculation persisted about credit card receipts for small gift cards he bought as a "thank you" to give the flight attendants that worked those flights, or charges for in-flight internet use on business-related flights.   These were the types of charges brought into question three to five years after the charges were incurred when the APFA Constitution limits the time to bring charges to 60 days from the time "after the accuser becomes aware, or reasonably should have become aware, of the alleged offense." (APFA Const. Art. 7 Sec. 2 (D)(1). The procedure during 2016-2018 was to submit expenses to the APFA Treasurer who reviewed and approved expenses as valid.  The Treasurer during Ross's administration was Eugenio Vargus, who reviewed and approved all of Ross's charges and expenses during his term and never knew Ross to conduct any illegal or illicit charges to the union.

35.     The Arbitrator prevented Ross from admitting any evidence relating to Vargus's review and verification of his charges, payments and expenses that were paid per procedure.  Ross was also not allowed to question Harris over the calculations for his payout nor the review by the accounting firm, nor discuss the assignment of the Transition Agreement assigned to Diversified Credit and the rights of APFA to continue to collect on an account now assigned to a third party as the Arbitrator began to take over questioning the witness without regard as to whether the witness. The Arbitrator even allowed Harris to testify as an accountant and Harris did nothing to correct the record and clarify that he does not, in fact, hold any certification as a public accountant.  Chinery-Burns was given more than eight hours over two days to present her case to the Arbitrator; Ross had less than three hours to present his defense and witnesses—most ignored his subpoenas.

36.     An arbitration award was issued on March 19, 2022A true and correct copy of the final Arbitration Award is attached hereto an incorporated herein and marked as <u>Exhibit C</u>

("Arbitration Award"). The Arbitrator relied on evidence presented by Chinery-Burns and Lee that Ross was guilty of breach of fiduciary duty, misappropriation of funds, and fraud citing the same misrepresentations reflected in Harris's Overpayment-of-Wages Letter:

> "With respect to sick and vacation payout, ***the APFA Board of Directors has determined that Defendant Ross was overpaid in the amount of $5,436.47 in 2018* [and]. . . .** *[t]he Board's finding was based on the results of a review from an independent accounting firm which\*/ determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect*. . . .[i]t is therefore arbitrator's Opinion, Defendant Ross has failed and abused his Fiduciary Duty. The non-payment of these monies reveals Defendant Ross is not accepting this responsibility" (Arbitration Award, March 19, 2022, 21-24).

These are misrepresentations, and yet because Harris testified to them as factual, the Arbitrator found it to be truthful without giving Ross the opportunity to show evidence to the contrary.

**F.   APFA's internal Arbitration resulted in a windfall result against Ross and held Ross liable for all charges Chinery-Burns brought against him, and Ross is now charged with over $27,631.60 in charges and fees by APFA for the cost of an unfair arbitration.**

37.   Upon discovering the Confidential Memorandum, Ross's union representative appealed to the Arbitrator to reopen the arbitration and submit this evidence.  The Arbitrator denied this request—despite the document's exculpatory nature, Harris' concealment of it from the APFA BOD and EC—who voted and deemed the Article VII charges valid—and APFA's lack of disclosure of it during the Arbitration. The Arbitrator did not find the evidence pertinent to any of the charges brought against Ross, then proceeded to find him guilty for fraud, misappropriation of funds, and breach of a fiduciary duty, and rendered an arbitration award in favor of Chinery-Burns and Lee for at least $27,631.60.

38.   When the arbitrator rendered the award, the result was a windfall against Ross, for which an entire day passed before he was ever served with the verdict.  The arbitrator ignored any evidence that Ross previously paid for the furniture charged on the company card upon it being delivered to his home.  The arbitrator ignored any evidence that all of the charges were filed outside

of the 60-day window required by the Art. 7, Sec. 2(D)(1) of the APFA Constitution.  This would mean that the charges were not timely filed with the union, and thus Chinery-Burns and Lee were prohibited from filing their claims before ever being heard by the Executive Committee.  Thus, the Arbitrator did not have the authority to issue the ruling under the APFA Constitution.

## V.

## MOTION TO VACATE ARBITRATION AWARD

**G. Plaintiff moves to vacate the award for Arbitration issued on March 19, 2022 based on fraud, misconduct, evidence partiality and refusal by the Arbitrator to hear evidence material and pertinent to the controversy.**

39.     Plaintiff incorporates all preceding paragraphs above.

40.     Under the Federal Arbitration Act §10 (a) an award of arbitration may be set aside or vacated upon any one of the following grounds: (1) where the award was procured by corruption, fraud, or undue means, (2) where there was evidence partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights to any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

41.     The award was procured with the use of fraudulent documents and testimony that directly contradicts the Confidential Memorandum (*See* Ex B).  The Arbitrator relied on fraudulent misrepresentations by APFA leadership including statements that the APFA BOD had found Ross owed this debt and that an independent

account firm found he was paid at the incorrect rate—both statements are shown false by the evidence attached hereto (*See* Ex. B).   Furthermore, this award is based on information that was withheld by multiple APFA leadership and counsel that had a duty to disclose the information it otherwise concealed and withheld during this process.  Thus, through misrepresentations and concealment of these documents to the BOD, the EC and the Arbitrator by multiple individuals within the APFA leadership—all of which have a duty to disclose—grounds to vacate the arbitration award based on fraud are clearly met.

42.   The Arbitrator was partial against Ross, and guilty of misconduct in rendering the arbitration award because he excluded evidence that should have been considered in these proceedings.  This evidence includes:

- Evidence of the Transition Agreement;

- Evidence pertaining to Eugenio Vargus and his review of all of Ross's financial transactions;

- Evidence and testimony of APFA payments made under the Transition Agreement and the Accounting Firm's review of Plaintiff's payments by Harris;

- Evidence and testimony of the amount of debt that was owed by Ross to APFA and the calculations of that debt;

- Evidence and testimony about any APFA BOD meetings relating to any findings of Ross that he owed a debt to APFA;

- Evidence that was concealed from the accounting firm's review of any alleged debt owed by Ross.

Finally, the Arbitrator rushed Ross through his evidence and his witness testimony as he had preserved less than three hours for his defense to be presented, as compared to the Complainants having more than eight hours over two days to

EXHIBIT H                                                          APPENDIX 155

present their case. Exculpatory evidence was not considered despite the bad faith

of it being withheld by the union itself—this shows bad faith actions and unclean

hands by the union in conducting the arbitration.

### IX.

### CLAIM:  LABOR MANAGEMENT RECORDS DISCLOSURE ACT VIOLATIONS

57.     Plaintiff incorporates all preceding paragraphs above.

58.     Under 29 U.S.C. 412, Section 102 states that "[a]ny person whose rights secured

by the provisions of this title have been infringed by any violation of this title may

bring a civil action in a district court of the United States for such relief (including

injunctions) as may be appropriate. Any such action against a labor organization

shall be brought in the district court of the United States for the district where the

alleged violation occurred, or where the principal office of such labor organization

is located."  This act provides that no member of any labor organization may be

fined in any way except for nonpayment of dues, unless notice, an opportunity to

prepare a defense and a full and fair hearing is given to the person (29 U.S.C. 411,

§101(a)(5)).

59.     Defendant, APFA, claimed that the found that Plaintiff, Ross, owed $5,436.37, in

the Overpayment-of-Wages Letter, which is a violation of this section of the Labor

Management Records Disclosure Act §101(a)(5) ("LMRDA"), as Plaintiff never

received proper notice, due process or a full and fair hearing before being assessed

with a fine or fee.  There is no requirement for anyone not living within 150 miles

of the arbitration site to comply with subpoenas, however most of the flight

attendants live outside the state.   Furthermore, restriction of documents and

document discovery cannot be compelled by the charged-party, and thus restricting financial documents can become a basis for APFA to deny request for documents subject to Arbitration proceedings.  It is a violation of LMRDA to not offer a full and fair hearing on the matter, and yet a charged party is not entitled to compel the evidence needed to absolve oneself.  Further, it is a violation of LMRDA to conceal the full financial documents associated with the accounting firm's review of Ross's debt and conceal the letter from the accounting firm finding Plaintiff was paid correctly under the terms of his Transition Agreement by Defendant, APFA.

## X.

## CLAIM: BREACH OF UNION CONSITUTION

60.    Plaintiff incorporates all preceding paragraphs above.

61.    The APFA Constitution provides in Art. II §3 (C)-(D) provides that all members shall have the right to individual privacy, due process and equal representation.

62.    Defendants, APFA, Hedrick and Harris, violated Plaintiff's, Ross's, rights to privacy by publicizing and disparaging him regarding debts that he owed to the union and its members.  Harris, the APFA National Treasurer, emailed APFA leadership, directors, and committee members about Plaintiff's debt.  These emails harassed him publicly over a debt in dispute.  Further, social media posts to APFA membership were posted by various members as well as a hotline announcement that marred Plaintiff after the announcement of the arbitration award.

63.    Defendants violated Plaintiff's due process and equal representation rights intentionally when it withheld evidence from the accounting firm that its opinion was that he did not owe the debt under his Transition Agreement.  APFA further

violated due process by misrepresenting the facts to Plaintiff and the union BOD and EC to charge and collect monies and disparage Plaintiff.

64.   Defendants violated Plaintiff's due process rights in denying him access to documentation he requested in a subpoena as it never gave him a copy of the Confidential Memorandum.

65.   Defendants denied Plaintiff proper notice as required prior to charging him with Article VII charges.

66.   The APFA Constitution Art. VII, Sec. 2 provides that charges must be brought within 60-days after a member knows or should have known of the charges that are filed.  APFA denied Ross his due process rights by allowing his charges to move forward and finding them timely-filed despite evidence and testimony in the opening statement that these two members began investigations into Ross in 2019, well over 12 months prior to filing Article VII charges against him.

## XI.

## CLAIM: VIOLATIONS OF FAIR CREDIT REPORTING ACT

67.   Plaintiff incorporates all preceding paragraphs above.

68.   Defendants, Diversified Credit and APFA, published to credit reporting agencies that Plaintiff was in collections on $5,436.47.   Ross discovered this when he was refinancing his home and attempting to get a lower interest rate as well as taking out a loan to assist in funding his children's college education.  Ross disputed this credit reporting in writing.  After researching the debt, Diversified Credit responded with a verification of the debt, which included the demand letter from APFA National Treasurer, Harris.  However, the Plaintiff's original petition proves that Diversified Credit had a copy of the Confidential Memo in its possession at the

time and clearly did not conduct a thorough investigation of the debt as it continued to collect the debt. APFA was the original creditor of the debt and knowingly furnished inaccurate and false information to Diversified Credit that Ross owed a debt under the Transition Agreement despite having been informed by the accounting firm that he did not owe this debt. APFA and Erik Harris acting intentionally and knowingly when it gave Diversified the incorrect address to prevent any initial contact letter from reaching Ross and giving him the opportunity to dispute the debt to prevent any credit reporting. Harris was aware that this would mar his credit report at a time when his two children were applying for college and subsequent financial aid. Therefore, APFA, and its officers owe Ross for furnishing this information to Diversified Credit for violations under the Fair Credit Reporting Act.

69.     The Fair Credit Reporting Act 15 U.S.C. 1681s-2 (a)(1)(A) and (B) creates a duty for all furnishers of information, like Diversified Credit to Ross, that *"A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."* Clearly Diversified Credit breached this duty in reporting even after receiving a dispute in writing from Ross. The failure to investigate after his complaint and therefore, reporting information it should have known was inaccurate resulted in substantial refinance damages of $400,000, plus the associated costs and attorney's fees.

## XII.

## CLAIM:  BREACH OF CONTRACT/EMPLOYMENT CONTRACT

69.    Plaintiff incorporates all preceding paragraphs above.

70.    Plaintiff, Ross, provided valuable services to Defendant, APFA, by working as a National President for Defendant.  A Transition Agreement was drafted by APFA counsel and signed by all APFA BOD as well as Defendant, Ross on March 1, 2018 creating a valid and binding contract ("Transition Agreement").

71.    Plaintiff provided these services as a National President for Defendant.

72.    Defendant accepted these services.

73.    Defendant failed to maintain its obligations of confidentiality under the Transition Agreement when it revealed the terms of the transition agreement to Chinery-Burns and Lee, as well as others in the APFA membership.

74.    Defendant failed to maintain its obligation of non-disparagement under the Transition Agreement when it allowed Hedrick, Harris, and Chinery-Burns continually publish false or disparaging comments about Plaintiff, causing reputational and emotional damages to him and his family.

75.    Defendant failed to pay the full amount due and owing under the Transition Agreement as the calculations per the Confidential Memo provided to the APFA BOD clearly exhibits the opinion of APFA's own accountant that the calculation of the per diem rate and payments were accurate.

76.     Defendant suffered damages to his career and future income based on the reputational harm suffered in violation of the nondisparagement clause under his Transition Agreement.

77.     Defendant failed to pay Plaintiff for all of his sick pay under the Transition Agreement, at the per diem rate including MEA/SAF stipends as intended in the Transition Agreement, the costs and expenses he incurred for arbitration proceedings, his reimbursable expenses APFA failed to pay him for prior to his termination which amount to a total $45,037.40.

**XIII.**

**CLAIM: FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS**

78.     Plaintiff incorporates all preceding paragraphs above.

79.     Defendant, Diversified, violated 15 U.S.C. §§1692 d, e, and f of the Fair Debt Collection Practices Act ("FDCPA"), including misrepresentations on the amount, the nature, and harassing and/or disparaging comments to the debtor for the purposes of abuse.

80.     Defendant, Diversified, never sent and Initial Contact Letter to Ross and violated the FDCPA in his rights to dispute the validity of the debt and prevent credit reporting.  The damages resulted from unauthorized credit reporting and negative credit reporting and collections of the wrong amount at a time when Ross was refinancing his home and applying for loans for his children's college education.  Consequently, he has suffered extensive damages as a result including the additional interest for the loans on his children's college, the denial of his home loan, which is over $500,000 loan, and he has now had to bring his children home

from college do to the inability to continue paying for their college education due to the Arbitration Award and litigation.  His family has suffered extensively as a result.

## XIV.

### CLAIM:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.    Plaintiff incorporates all preceding paragraphs above.

82.    The Defendants, APFA, Julie Hedrick and Erik Harris acted intentionally or recklessly when both failed to correct the record, turn over the Confidential Memorandum and misrepresented to the Arbitrator, the BOD and EC that Ross owed a debt under the Transition Agreement, that Ross refused to pay this debt, and that the accounting firm found in its review that Ross was paid properly under the Transition Agreement.

83.    Defendants' actions were extreme and outrageous in concealing the Confidential Memorandum or failing to correct the record when the facts reflected inaccuracies regarding the BOD findings.

84.    Defendants' action caused the Plaintiff extreme emotion distress for himself and his family.  Ross has had multiple hospital stays, medical issues, family and marital issues, financial issues, and extreme emotional distress because of the on-going hardship on him and his family.  His wife, and children have suffered as well, particularly because his wife also works for American Airlines as a flight attendant, thus she too has suffered extreme emotional distress, panic attacks, the children have come home from college due to the cost of their education has become unbearable.  All of which has been created by the circumstances created by APFA.

EXHIBIT H                                                    APPENDIX 162

## XV.

## CLAIM:  DEFAMATION, INTENTIONAL INTERFERENCE WITH A CONTRACT, AND BREACH OF FIDUCIARY DUTY

85.    Plaintiff incorporates all preceding paragraphs above.

86.    Defendants, APFA, Julie Hedrick, and Erik Harris made false statements to a third-party regarding debt that Plaintiff, Ross, owed under the Transition Agreement, regarding the APFA BOD's findings and regarding the accounting firm's conclusions about -Plaintiff's payments under the Transition Agreement that were defamatory and false.  Based on the elected positions of APFA National President and APFA National Treasurer, both Julie Hedrick and Erik Harris had a duty to disclose this document and explain the results of the review, and that it was not the same as an audit as it did not carry the weight of the accounting firm's binding opinion about overpayment of Ross's wages.

87.    Defendants acted with the intent to defame Plaintiff, injure his reputation, and remove him from his position within APFA leadership.  Furthermore, Defendants intentionally and knowingly interfered with Ross' payment under a contract since he hasn't received full payment for his Sick Days under the contract.

88.    In so acting, Julie Hedrick and Erik Harris have breached their fiduciary duty to the APFA Board of Directors, the Executive Committee, and the APFA membership—but most importantly to Ross, a member of APFA in good standing.

89.    Defendants did, in fact, defame, intentionally interfere with a contract and breach of Plaintiff's fiduciary duty to Ross as a member in good standing by causing damages, injuring his reputation, causing him to terminate his position from APFA leadership and causing great emotional distress to Plaintiff as a result.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant hereby prays as follows:

1.     For injunctive relief for unlawful collection activity, labor practices and defamation, and violations of the non-disparagement clause in Plaintiff's Transition Agreement.

2.     For a judgment of vacatur of the Arbitration Award of the basis of fraud, lack of authority to issue this award and misconduct,

3.     That Defendant recover a judgment against Plaintiff, and Defendants, jointly and severally for monetary damages for $1,800,000 for violations plus additional court costs and all attorney's fees incurred in this cause, and reasonable attorney's fees.

4.     That Plaintiff recover a judgment against Plaintiff and Defendants jointly and severally for punitive damages; and

5.     Such other and further relief, at law or in equity, to which Defendant may be justly entitled to receive.

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC


By:  /s/ Kerri Phillips
Kerri Phillips
Texas Bar No. 24065906
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com

EXHIBIT H                                                          APPENDIX 164

**ATTORNEY FOR DEFENDANT**

EXHIBIT H                                                    APPENDIX 165



**Association of Professional Flight Attendants**

Representing the Flight Attendants of American Airlines

November 24, 2020

**Via Email and Return Receipt Certified Mail #7019 1120 0000 0179 3144**

Mr. Bob Ross

███████████████████

**RE:   Overpayment of Wages**

Dear Mr. Ross:

I am sending this letter to follow-up on our telephone conversation on November 10, 2020. During our call, we discussed the finding of the APFA Board of Directors that you were overpaid in the amount of $5,436.47 in 2018. The Board's finding was based on the results of a review from an independent accounting firm which determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect.  (See Schedule C, enclosed).

On or before January 1, 2021, please remit payment (via check, money order, cashier's check, or credit card) to APFA in full or contact me to discuss payment arrangements.

Please contact me at ███████ or eharris(███████ with any questions or concerns.  Thank you for your prompt cooperation.

Sincerely,

Erik Harris
National Treasurer

Enclosure

CC:   APFA Board of Directors
       APFA Executive Committee
       Margot Nikitas, General Counsel

**Exhibit A**          ███████████████████

EXHIBIT H     ███████████████     www.apfa.org     APPENDIX 166

A

**Bob Ross - National President Pay**

116 hours paid monthly at the highest purser pay including international overide, per the policy manual.

| | | | | |
|---|---|---|---|---|
| * | Maximum flight attendant pay | 60.13 | | |
| | Purser Pay | 7.50 | | |
| | International pay | 3.75 | | |
| | | 71.38 | 116 hours | 8,280.08 |

| Bi-monthly pay 4/1/16 - 12/31/16 | | | 4,140.04 |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| ** | Maximum flight attendant pay | 61.33 | | |
| | Purser Pay | 7.50 | | |
| | International pay | 3.75 | | |
| | | 72.58 | 116 hours | 8,419.28 |

| Bi-monthly pay - 1/1/17 - 5/1/17 | | | 4,209.64 |
|---|---|---|---|

| 101,031.36 | Annual salary |
|---|---|
| 276.80 | Daily rate for sick and vacation |

| | | | | |
|---|---|---|---|---|
| *** | Maximum flight attendant pay | 64.96 | | |
| | Purser Pay | 7.50 | | |
| | International pay | 3.75 | | |
| | | 76.21 | 116 hours | 8,840.36 |

| Bi-monthly pay - 5/2/17 - 12/31/17 | | | 4,420.18 |
|---|---|---|---|

| 106,084.32 | Annual salary |
|---|---|
| 290.64 | Daily rate for sick and vacation |

| | | | | |
|---|---|---|---|---|
| **** | Maximum flight attendant pay | 66.26 | | |
| | Purser Pay | 7.50 | | |
| | International pay | 3.75 | | |
| | | 77.51 | 116 hours | 8,991.16 |

| Bi-monthl ypay - 1/1/18 - 7/31/18 | | | 4,495.58 |
|---|---|---|---|

| 107,893.92 | Annual salary |
|---|---|
| 295.60 | Daily rate for sick and vacation |

* Pay rates effective 4/1/16
** Pay rates effective 1/1/17 - 5/1/17
*** Pay rates effective 5/2/17 - 12/31/17 (1.6% increase)
**** Pay rates effective 1/1/18 - 7/31/18

# Exhibit A

**Exhibit A**

| National Officer: | **Bob Ross** | | | | | |
|---|---|---|---|---|---|---|
| | | | Annual | Daily amount | Eligible | |
| | | | Salary | (divide by 365) | Days to pay | Payment |
| Profit Sharing - 2016 | | | | | | 2,652.22 | (paid 3/10/17) |
| Vacation Pay - 2017 | | | | | | | |
| | | | $ 101,031.36 | 276.80 | 14 | 3,875.20 | (paid 3/31/17) |
| Sick Pay - 2017 | | | | | | | |
| | | | $ 101,031.36 | 276.80 | 12 | 3,321.60 | (paid 3/31/17) |
| Retro - Wage Arbitration Award 1.6% | | | | | | 918.72 | (paid 6/1/17) |
| Triple Play Grand Slam | | | | | | 300.00 | (paid 7/6/17) |
| Grand slam | | | | | | 150.00 | (paid 1/25/18) |
| (Additional $50 grand slam paid on 2/15/18 salary check) | | | | | | | |
| 2071 Profit Sharing | | | | | | 2,458.19 | (paid 3/9/18) |
| Vacation & Sick Pay - 2017 - (adjustment paid in 2018) | | | | | | 968.76 | (paid 3/29/2018) |
| Vacation Pay - 2017 (remaining unused days per agreement) | | | | | | | |
| | | | $ 114,632.67 | 314.06 | 17 | 5,339.02 | (paid 3/29/2018) |
| Vacation Pay - 2018 (remaining unused days per agreement) | | | | | | | |
| | | | $ 122,121.70 | 334.58 | 29 | 9,702.82 | (paid 3/29/2018) |
| | | | (Paid in two checks in the amount of $4,851.41 each) | | | | |
| Sick Pay - 2018 | | | | | | | |
| | | | $ 122,121.69 | 334.58 | 12 | 4,014.96 | (paid 3/29/2018) |
| End of Term Payout - 2017 (January 1 - December 31, 2017) | | | | | | | |
| | | | $ 118,046.02 | 334.58 | 35 | 11,710.30 | (paid 3/29/2018) |
| | | | (Paid in two checks in the amount of $3,903.43 each and one for $3,903.44) | | | | |
| End of Term Payout - 2018 (January 1 - July 31, 2018) | | | | | | | |
| | | | $ 118,046.02 | 334.58 | 20.44 | 6,838.82 | (paid 3/29/2018) |
| | | | (Paid in two checks in the amount of $3,419.41 each) | | | | |
| Profit sharing 2018 | | | | | | 1,403.99 | (paid 3/8/19) |

**Exhibit A**

| National Officer: | Bob Ross | | | **Overpayment Calculation** | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Annual | Daily amount | Eligible | | | |
| | | | Salary | (divide by 365) | Days to pay | | Payment | |
| **Vacation Pay – 2017** | | | | | | | | |
| | Original amount | $ | 101,031.36 | 276.80 | 14 | $ | 3,875.20 | OK (paid 3/31/ |
| | | | | | Overpayment | $ | - | $ |
| | | | | | | | | |
| **Sick Pay – 2017** | | | | | | | | |
| | Original amount | $ | 101,031.36 | 276.80 | 12 | $ | 3,321.60 | OK (paid 3/31 |
| | | | | | Overpayment | $ | - | $ |
| | | | | | | | | |
| **Vacation & Sick Pay – 2017 – (adjustment paid in 2018....all paid in error)** | | | | | Overpayment | $ | 968.76 | $ |
| | | | | | | | | |
| **Vacation Pay – 2017 (remaining unused days per agreement)** | | | | | | | | |
| | Original amount – paid in error (a) | $ | 114,632.67 | 314.06 | 17 | $ | 5,339.02 | (paid 3/29/20 |
| | Correct calculation amount | $ | 101,031.36 | 276.80 | 17 | $ | 4,705.60 | |
| | | | | | Overpayment | $ | 633.42 | $ |
| | | | | | | | | |
| **Vacation Pay – 2018 (remaining unused days per agreement)** | | | | | | | | |
| | Original amount – paid in error (a) | $ | 122,121.70 | 334.58 | 29 | $ | 9,702.82 | (paid 3/29/20 |
| | Correct calculation amount | $ | 107,893.92 | 295.60 | 29 | $ | 8,572.40 | |
| | | | | | Overpayment | $ | 1,130.42 | $ 1, |
| | | | | | | | | |
| **Sick Pay – 2018** | | | | | | | | |
| | Original amount – paid in error (a) | $ | 122,121.69 | 334.58 | 12 | $ | 4,014.96 | (paid 3/29/20 |
| | Correct calculation amount | $ | 107,893.92 | 295.60 | 12 | $ | 3,547.20 | |
| | | | | | Overpayment | $ | 467.76 | $ |
| | | | | | | | | |
| **End of term payout – 2017 (January 1 – December 31, 2017)** | | | | | | | | |
| | Original amount – paid in error (a) | $ | 118,046.02 | 334.58 | 35 | $ | 11,710.30 | (paid 3/29/20 |
| | Correct calculation amount | $ | 107,893.92 | 295.60 | 35 | $ | 10,346.00 | |
| | | | | | Overpayment | $ | 1,364.30 | $ 1, |

EXHIBIT H                                                          APPENDIX 169

**End of term payout - 2018 (January 1 - July 31, 2018)**

| | | | | | |
|---|---|---|---|---|---|
| Original amount - paid in error (a) | $ | 118,046.02 | 334.58 | 20.44 | $ 6,838.82 (paid 3/29/2018) |
| Correct calculation amount | $ | 107,893.92 | 295.60 | 20.44 | $ 6,042.06 |
| | | | Overpayment | $ 796.75 | $ 796.75 |
| | | | Overpayment subtotal | | $ 5,361.41 ** |
| Add 2018 profit-sharing contribution paid (3/8/2019) on excess amount above ** | | | | | $ 75.06 (based on 1.4%) |
| | | Total overpayment - due to APFA | | | $ 5,436.47 |

(a) - included union pay (MEA/SAF)

EXHIBIT A

# Wood, Stephens & O'Neil, L.L.P.
## Certified Public Accountants

6300 Ridglea Place, Suite 318
Fort Worth, TX 76116
Tele. 817-377-1700
Fax 817-377-1870

## CONFIDENTIAL MEMORANDUM

MEMO TO:      APFA Board of Directors and the Executive Committee

FROM:         Hal O'Neil, CPA, Pam Bush
SUBJECT:      Review of officer disbursements and the Bob Ross transition agreement
DATE:         October 22, 2020

The current APFA officers, in consultation with the APFA staff attorney and outside counsel, requested that our firm review specific former officer expense reimbursements and payroll disbursements, as well as the payments arising from the Bob Ross confidential transition agreement. This informal engagement is substantially less in scope than an audit engagement, the objective of which would be the expression of an opinion regarding these specific disbursements. Accordingly, we do not express an opinion or any form of assurance regarding these disbursements. Our task under this informal engagement, was as follows:

1. To review the backup for the former officers' salary disbursement amounts from 2016 - 2018 and to determine these base salaries were calculated correctly and in compliance with the guidelines and pay rates stipulated in the APFA policy manual. Please see the enclosed schedule A for each officer.

2. To prepare an overpayment schedule of the accrued and unused sick, and accrued and unused vacation time payments made to Bob Ross in 2018, similar to the overpayment schedules we prepared previously for the other three officers. Please see the enclosed schedules B and C for each officer. These overpayment schedules for the other officers were previously provided to the Board of Directors. Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick, and accrued and unused vacation time. This agreement doesn't specify that the payments be made in accordance with the policy manual guidelines. Consequently, these payments appear appropriate and in compliance with the transition agreement. This agreement also specifies reimbursement payments to him of up to $10,000 in actual moving expenses. His moving expense reimbursement payments did not exceed this amount.

3. To assist the APFA accounting department staff in reviewing and organizing the various requested documents, as set forth in the flight attendants Chinery and Lee financial document request.

Please contact us should the Board of Directors or the Executive Committee have questions regarding our limited engagement.

Sincerely,

*Hal O'Neil, CPA*

EXHIBIT
"*B*"

**Exhibit B**
EXHIBIT H                                                            APPENDIX 171

|  | | | C | | | | | |
|---|---|---|---|---|---|---|---|---|
| National Officer: | Bob Ross | | | Overpayment Calculation | | | | |
|  | | | Annual Salary | Daily amount (divide by 365) | Eligible Days to pay | Payment | | |
| Vacation Pay – 2017 | | | | | | | | |
|  | Original amount | | $  101,031.36 | 276.80 | 14 | $  3,875.20 | OK (paid 3/31/17) | |
|  | | | | | Overpayment | $  - | $  - | |
| Sick Pay – 2017 | | | | | | | | |
|  | Original amount | | $  101,031.36 | 276.80 | 12 | $  3,321.60 | OK (paid 3/21/17) | |
|  | | | | | Overpayment | $  - | $  - | |
| Vacation & Sick Pay – 2017 – (adjustment paid in 2018….all paid in error) | | | | | Overpayment | $  969.76 | $  969.76 | |
| Vacation Pay – 2017 (remaining unused days per agreement) | | | | | | | | |
|  | Original amount – paid in error (a) | $  114,632.67 | 314.06 | 17 | $  5,339.02 | (paid 3/29/2018) | |
|  | Correct calculation amount | $  101,031.36 | 276.80 | 17 | $  4,705.60 | | |
|  | | | | | Overpayment | $  633.42 | $  633.42 | |
| Vacation Pay – 2018 (remaining unused days per agreement) | | | | | | | | |
|  | Original amount – paid in error (a) | $  122,121.70 | 334.58 | 29 | $  9,702.82 | (paid 3/29/2018) | |
|  | Correct calculation amount | $  107,893.92 | 295.60 | 29 | $  8,572.40 | | |
|  | | | | | Overpayment | $  1,130.42 | $  1,130.42 | |
| Sick Pay – 2018 | | | | | | | | |
|  | Original amount – paid in error (a) | $  122,121.69 | 334.58 | 12 | $  4,014.96 | (paid 3/29/2018) | |
|  | Correct calculation amount | $  107,893.92 | 295.60 | 12 | $  3,547.20 | | |
|  | | | | | Overpayment | $  467.76 | $  467.76 | |
| End of term payout – 2017 (January 1 – December 31, 2017) | | | | | | | | |
|  | Original amount – paid in error (a) | $  118,046.02 | 334.58 | 35 | $  11,710.30 | (paid 3/29/2018) | |
|  | Correct calculation amount | $  107,893.92 | 295.60 | 35 | $  10,346.00 | | |
|  | | | | | Overpayment | $  1,364.30 | $  1,364.30 | |
| End of Term Payout – 2018 (January 1 – July 31, 2018) | | | | | | | | |
|  | Original amount – paid in error (a) | $  118,046.02 | 334.58 | 20.44 | $  6,838.82 | (paid 3/29/2018) | |
|  | Correct calculation amount | $  107,893.92 | 295.60 | 20.44 | $  6,042.06 | | |
|  | | | | | Overpayment | $  796.75 | $  796.75 | |
|  | | | | | Overpayment subtotal | | $  5,361.41 | ** |
|  | Add 2018 profit-sharing contribution paid (3/8/2019) on excess amount above ** | | | | | | $  75.06 | (based on 1.4%) |
|  | | | Total overpayment – due to APFA | | | | $  5,436.47 | |

**Exhibit B**

EXHIBIT H                                                    APPENDIX 172

**In the Matter of Arbitration Between**

|  |  |  |
|---|---|---|
| | ) | |
| **Melissa Chinery** | ) | |
| **Sandra Lee** | ) | **RE: Article VII Charges** |
| | ) | **Violations of APFA Constitution** |
| **APFA Charging Party Members** | ) | **and APFA Policy Manual** |
| **(Plaintiff)** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **Robert Ross, Former APFA National** | ) | |
| **President** | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |

**Before:**                    **Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:**        **The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

**June 16, 2021, continued to November 17 and 18, 2021**

**Appearances:**

**For Charging Party Members:**        **Melissa Chinery, Representative**
**(Plaintiff's)**                **Sandra Lee, Representative**

**For Charged Party Member:**        **Kit Gomez Alba, Esq.**
**(Defendant)**                **Gina Guidry, Representative**
**Robert Ross, Representative**

EXHIBIT H                                    APPENDIX 173

## INTRODUCTION

This is an Article VII Hearing that was heard at the Westin Irving Convention Center at Las Colinas, Irving, Texas on June 16, 2021 and continued to November 17 and 18, 2021. The arbitration hearing was transcribed by Carson Reporting & Associates.

Charging Party Melissa Chinery and Sandra Lee, will be hereinafter referred to as the "Plaintiff." Charged Party Robert Ross, will be hereinafter referred to as the "Defendant."

Plaintiff presented for testimony Cathy Lukensmeyer, Erik Harris, Michael Trapp, John Nikides and Melissa Chinery.

Defendant presented for testimony Casey Veloso, Anthony Thuriault and Robert Ross.

All of these witnesses were afforded full opportunity to be heard, to be examined, and to be cross-examined.  The parties were allowed to introduce evidence on the issues. Based on the entire record, my observation of the witnesses, examination of the evidence, exhibits presented, post-hearing briefs[1] submitted, and arguments presented therein, this arbitrator makes the following findings and renders the following Discussion, Opinion, and Award.

## THE ISSUES

Plaintiff submits the issue to be addressed by the Alternate Article VII Arbitrator is stated as follows:

Did Bob Ross, the Defendent herein violate the APFA Policy Manual and the APFA Constitution by engaging in malfeasance, fraud, misappropriation of funds while he was in office during the term of April 1, 2016 to March 2, 2018. If so, what shall be the appropriate remedy?

Defendant submits the issue to be addressed by the Alternate Article VII Arbitrator is stated as follows:

Whether the Plaintiff's allegations raised against him are true or false? Did former National President Ross knowingly or "willfully" violate any express Article of the APFA Constitution or Policy Manual? If so, what is the appropriate remedy?

## FACTS

The facts in this matter center on Defendant Ross assuming office as the APFA National President and moving to Dallas, TX during the months of April 2016 through October 2016.

---

[1] The parties agreed to submit post-hearing briefs by e-mail to arbruben@gmail.com on January 31, 2021 and extended to February 18, 2021.  The post-hearing briefs were timely emailed and received. Thus, the arbitrator finds the record in this matter closed on February 18, 2021.



**Exhibit C**
EXHIBIT H

2

APPENDIX 174