**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ROBERT (BOB) ROSS,** | § | |
| | § | |
| **Plaintiff/Counterclaim Defendant,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-CV-00343-Y** |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS,** | § | |
| **MCGAUGHEY, REBER AND** | § | |
| **ASSOCIATES, INC.,  JULIE** | § | |
| **HEDRICK, AND ERIK HARRIS,** | § | |
| | § | |
| **Defendants/Counterclaim Plaintiffs** | § | |

**APPENDIX TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT
COUNTERCLAIM PLAINTIFF APFA FOR ENFORCEMENT
OF THE ARBITRATOR'S DECISIONS IN THIS CASE**

Defendant Counterclaim Plaintiff Association of Professional Flight Attendants

("APFA"), by its undersigned counsel, pursuant to Local Rules 7.1(i) and 56.3((a)(2), 56.5(c)

and 56.6, submits the following appendix to its motion and brief in support for summary

judgment in its favor  (Docs. ___ and ___) on its counterclaim (Doc. 8 at PageID 107-117) to

confirm and enforce the decisions of the arbitrator against Plaintiff Counterclaim Defendant

Robert Ross ("Ross") at issue in this case. Pursuant to this Court's requirements, the portion of

each page of this appendix on which APFA relies in its brief in support of its motion have been

either underlined or bracketed in the margin.

| TAB | DESCRIPTON | APFA APP. PAGES |
|---|---|---|
| A | Constitution and Policy Manual of the Association of Professional Flight Attendants (Excerpts) | 001 – 019 |
| B | Arbitrator's Decision issued on March 19, 2022 | 020 – 043 |
| C | Arbitrator's Supplemental Decision issued on August 24, 2022 | 044 – 046 |

| D | Ross's Post-Hearing Brief to the Arbitrator | 047 - 048 |
|---|---|---|
| E | Ross's Resignation as San Francisco (SFO) Base President | 049 |
| F | Non-Published Cases (Lexis or WestLaw) | |
| | *Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 at *11-13, 19-21 (N.D. Tex. 2007) (J. Means) | 050 – 057 |
| | *Ball Metal Container Corp. v. UAW Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022) (unpublished). | 058 – 070 |
| | *Bldg. Materials Mfg. Co. v. Steelworkers,* 2020 U.S. Dist. LEXIS 37075, 2020 WL 1047895 at *7-8 (N.D. Tex. 2020) | 071 – 077 |
| | *Hampton v. Int'l Longshoreman's Ass'n*, 2017 U.S. Dist. LEXIS 218154 at *5-6 (S.D. Tex. 2007). | 078 - 083 |

Date: September 20, 2022

Respectfully Submitted,

   */s/ Sanford R. Denison*
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 550
Dallas, TX  75214
Tel.: (214) 637-0750
Fax.: (214) 637-0730
Email: denison@baabdenison.com

WILLIAM W. OSBORNE JR.*
D.C. Bar No. 912089
Osborne Law Offices P.C.
5335 Wisconsin Avenue N.W., Suite 440
Washington, D.C. 20015
Tel.: (202) 243-3200
Fax: (202) 686-2977
Email: b.osborne@osbornelaw.com

*Counsel for Defendant Counterclaim Plaintiff Association of Professional Flight Attendants, and Defendants Julie Hedrick and Erik Harris*

*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 20th day of September 2022 a true and correct copy of the foregoing document was served on the below listed counsel of record by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

KERRI PHILLIPS
HEATHER ABREU
K.D. Phillips Law Firm, PLLC
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com
Email: Heather@KDphillipslaw.com

MICHAEL R RAKE
Michael R. Rake, Attorney at Law
PO Box 1556
Lake Dallas, TX 75065
Tel.: (940) 498-2103
Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com

   */s/ Sanford R. Denison*
SANFORD R. DENISON

# Exhibit A

Constitution and Policy Manual of the APFA (Excerpts)



# THE
# CONSTITUTION
## OF THE
# ASSOCIATION
## OF
# PROFESSIONAL
# FLIGHT
# ATTENDANTS

*As amended by the APFA Membership*
JUNE 18, 2014

# Exhibit A

(9) The National Treasurer shall submit a quarterly financial review to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4.D of this Constitution.

(10) The National Treasurer shall submit with his/her signature all Federal and State Reports required by law.

(11) The National Treasurer shall oversee and coordinate ongoing computerization of the APFA headquarters files, records and systems.

(12) The National Treasurer shall oversee the daily activities of the APFA headquarters office staff.

(13) The National Treasurer shall coordinate the headquarters office staff to ensure assistance is provided to administrative, committee and support personnel.

(14) The National Treasurer shall assist the National Secretary in the discharge of all duties. Should there be a temporary absence in the office of the National Secretary; the National Treasurer may perform the duties of the National Secretary.

## Section 7. BASE COUNCILS / BASE REPRESENTATIVES:

A. Organization: The Base Council shall consist of the Base President, Vice President, and Base Council Representatives (BCRs). When a base contains both an American Airlines Operation and one or more OAL Operations (as defined in Article I, Section 7,K,2 of this Constitution), the Base Council shall also include an OAL Operation Advisory Panel Representative (APR). The members of a Base Council hold positions with the APFA as Base Representatives.

B. Base Representatives shall hold such positions only at the base where they are stationed.

C. The Base President and Vice President shall be elected by the membership of the base at large.

D. Base Council Representatives (BCRs) shall be elected by the membership of the American Airlines base at which they are stationed. BCRs shall hold such positions only at the base at which they are stationed.

(1) Each base shall be entitled to one BCR for each one hundred (100) members or fraction thereof who are stationed at the base.

E. The Advisory Panel Representative (APR) shall be elected by the membership of the OAL Operation base at which he/she is stationed. The APR shall hold such position only from the OAL Operation base at which he/she is stationed.

APFA App. 002

F. A Base President may appoint an active member in good standing to fill a vacancy on the Base Council to complete the balance of an unexpired term, pursuant to the provisions of Article VI, Section 8 of this Constitution.

G. A Base President may appoint additional individuals to assist the Base Council to meet the needs of the membership, however such individuals may not exercise a vote on matters brought before the Base Council.

H. Duties of the Base President shall include but not be limited to the following:

  (1) The President shall represent the membership of the base at any convention of the APFA, and if elected by secret ballot vote of the base membership, or if duly elected by virtue of running unopposed, shall be empowered to elect and remove Ad Hoc Members of the Executive Committee.

  (2) The President shall represent the membership of the base at any other meeting of the Board of Directors.

  (3) The President shall have the right to investigate all grievances and to take such action at the base as may be necessary for the operation of the APFA.

  (4) The President shall maintain the base office in order to represent the members at the base and to supervise the activities of the APFA at the base.

  (5) The President shall have the responsibility for calling, posting notice of and conducting all base meetings, and shall keep the respective members informed of the actions of the APFA.

  (6) The President shall maintain the APFA bulletin board(s) at the base.

  (7) The President may establish all local base committees not otherwise established by the Board of Directors, the Executive Committee and/or the National Officers.

  (8) The President shall provide the Board of Directors and/or the Executive Committee with any information which may be requested and shall carry out all resolutions and/or policy decisions of the Board of Directors and/or Executive Committee.

  (9) The President should provide a quarterly report to the Executive Committee.

I. Duties of the Vice President shall include but not be limited to the following:

  (1) The Vice President shall assist the President, the Base Council Representatives and the Advisory

APFA App. 003

Panel Representative in the discharge of their duties and responsibilities.

    (2) In the absence of the Base President, or should a vacancy occur in the position of Base President, the Vice President shall perform the duties of the President.

    (3) In the absence of the Base President, the Vice President shall represent the membership of the base at any convention of the APFA, and if elected by secret ballot vote of the base membership, or if duly elected by virtue of running unopposed, shall be empowered to elect and remove Ad Hoc Members of the Executive Committee.

J. Duties of the Advisory Panel Representative (APR) shall include but not be limited to the following:

    (1) The APR shall assist the Base President, Vice President and Base Council Representatives in the discharge of their duties and responsibilities.

    (2) The APR shall assist the Base President with those aspects of base representation unique to the OAL Operation of the base.

    (3) The APR shall represent the OAL Operation of a base at all meetings of the OAL Operation Advisory Panel.

K. Duties of the Base Council Representative (BCR) shall include but not be limited to the following:

    (1) The BCR shall assist the Base President, Vice President and Advisory Panel Representative in the discharge of their duties and responsibilities.

    (2) The BCR shall coordinate with the Base President in the investigation and filing of grievances.

    (3) The BCR shall endeavor to provide expertise in any or all areas of grievance, safety, health, scheduling, contract language and interpretation, professional standards, uniforms, hotel, membership records or other areas deemed appropriate by the Base President and/or the Board of Directors and/or Executive Committee.

    (4) The BCR shall coordinate activities with appropriate APFA administrative and committee personnel and departments.

## Section 8.  OAL OPERATION ADVISORY PANEL:

A. Organization:  The OAL Operation Advisory Panel shall consist of the Advisory Panel Representatives from the OAL Operation(s) at each base.

B. The Advisory Panel shall meet at least once a year with the National Officers of the APFA to evaluate those

# ARTICLE VII
## *HEARINGS AND DISCIPLINARY PROCEDURES*

**Section 1.** GROUNDS FOR CHARGES:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

A. Failure to pay dues, assessments or penalties levied by the Association;

B. Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

C. Willfully acting as a strike breaker during any work stoppage duly authorized by the Association;

    (1) Notwithstanding Section 1.C, above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

D. Willful violation of a Flight Attendant's Collective Bargaining Agreement;

E. Theft or embezzlement of Association monies or property;

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

G. Willfully acting in a manner that causes the Association to violate its legal obligations; or

H. Willfully bringing charges without reasonable basis against another member, officer or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

**Section 2.** FILING OF CHARGES:

A. A charge may be filed by any member in good standing. All charges shall be filed with the National Secretary and shall be proffered in writing and shall be specific as to the alleged act(s) and/or the Article(s) of this Constitution

APFA App. 005

allegedly violated which constitute the basis of the charge(s).

B. The National Secretary shall cause a copy of the charges to be served upon the accused and the accuser within seven (7) days following receipt of the charges. Such notification shall be by registered mail, return receipt requested to their last known addresses, and shall furnish the accused and the accuser a description of all relevant procedures.

C. The National Secretary shall send a copy of all charges to the Executive Committee and to the Board of Directors within seven (7) days following his/her receipt of the charges.

D. Time Limits:

(1) Charges based on Section 1.A through Section 1.F of this Article VII must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the alleged offense.

(2) Charges based on Section 1.G of this Article VII may not be filed unless and until it has been determined, in a separate legal proceeding (such as a lawsuit), that the Association has violated its legal obligations, or unless and until the Association settles a legal proceeding brought against it by furnishing substantial relief to an opposing party. Charges based on Section 1.G above must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the completion or settlement of the legal proceeding.

(3) Charges based on Section 1.H of this Article VII must be filed within sixty (60) days following the Article VII Arbitrator's decision which gives rise to such charge(s).

E. The accused and accuser may be represented during Article VII proceedings by any individual; however, the APFA will not compensate either party for attorney's fees.

**Section 3.**   REVIEW OF CHARGES:

At the first regularly scheduled meeting of the Executive Committee following receipt of charges by the National Secretary, the Executive Committee shall review the charges for timeliness, specificity and validity.

A. Should the charges be determined to be timely, specific and valid, such charges shall then be forwarded by the National Secretary via registered mail, return receipt requested to the Article VII Arbitrator designated herein

APFA App. 006

within seven (7) days following such Executive Committee meeting.

B. Charges deemed untimely by the Executive Committee will be dismissed without appeal.

C. Charges deemed non-specific by the Executive Committee shall be referred back to the accuser. The accuser may resubmit, one time only, such charges to the National Secretary for review by the Executive Committee at its next regularly scheduled meeting without affecting the time limits of Section 2.D of this Article VII.

D. Charges may be deemed invalid and dismissed if the Executive Committee determines that the charges address conduct protected by this Constitution and/or by law (including the LMRDA Bill of Rights). Charges may also be deemed invalid and dismissed if they fail to state a proper claim under Section 1 of this Article VII. Should such charges be dismissed as invalid, the accuser may, within seven (7) days following receipt of notification of dismissal by the Executive Committee, appeal to the Article VII Arbitrator designated herein. If the Article VII Arbitrator determines that the charges are valid, s/he shall so advise the National Secretary, the accused and the accuser, and the charges will be processed in accordance with this Article VII.

## Section 4.  SUSPENSION FROM OFFICE:

A. If charges are filed against a national officer or elected representative based on Section 1.B, Section 1.C or Section 1.E of this Article VII, the Board of Directors may determine at any time during the pendency of the charges that the alleged conduct giving rise to the charges threatens the APFA's vital interests. The Voting Board of Directors may then, by two-thirds (2/3) vote, suspend the accused's authority as national officer or elected representative until the threat is removed or the Article VII Arbitrator designated herein resolves the charges, whichever occurs sooner.

B. A national officer or elected representative suspended pursuant to this section shall be entitled, upon demand, to an expedited resolution of the charges, with a decision rendered within thirty (30) days following the Board of Directors Meeting where the officer or elected representative was suspended.

C. If the charges are filed by or against a member of the Executive Committee or the Board of Directors, such member must appoint an alternate member of the Association to participate in the review of the charges as

APFA App. 007

provided in Section 3 of this Article VII and, when necessary, to participate in the vote regarding the suspension of the member of the Executive Committee or Board of Directors as provided in this Section 4.

**Section 5.**   APPOINTMENT OF THE ARTICLE VII ARBITRATOR:

A.  The Board of Directors shall appoint an arbitrator to resolve all charges filed under this Article VII.   The Article VII Arbitrator, once appointed, shall serve until s/he resigns or until the Board of Directors determines to appoint a new Article VII Arbitrator.

B.  The Board of Directors may also appoint one or more alternate Article VII Arbitrators who shall have the authority to hear and decide particular charges when the Article VII Arbitrator is not available.

C.  C. The Article VII Arbitrator and any alternate Article VII Arbitrator(s) shall be a person expert in labor law who is a neutral (such as an academic or professional labor arbitrator), who has experience as a neutral in adjudicating internal labor organization disputes, and who has no other prior or current involvement with the APFA.

**Section 6.**   JURISDICTION AND AUTHORITY OF THE ARTICLE VII ARBITRATOR:

A.  The Article VII Arbitrator shall have power to resolve all charges referred to him/her during his/her tenure.

B.  The administrative procedures for handling Article VII charges shall be included in the APFA Policy Manual. The Article VII Arbitrator may from time to time propose changes in these administrative procedures, and such changes shall become effective and included in the Policy Manual if they are approved by the Board of Directors.   The administrative procedures to be adopted shall be in general compliance with American Arbitration Association rules where practicable, but may not conflict in any respect with the provisions of this Constitution.

C.  The Article VII Arbitrator may, on his/her own motion or upon motion filed by the accused, declare that charges are untimely or do not allege a violation cognizable as charges under this Article VII and thus are dismissed without the need for hearing.

D.  The Article VII Arbitrator may, on his/her own motion, or upon motion filed by the accused, determine that charges are not sufficiently specific and that they will be dismissed unless the accuser amends them to provide sufficient specificity.

E. The accused may move for summary dismissal of the charges on the ground that the accuser does not have evidence sufficient to sustain the charges and thus there is no need for a full hearing.  On receipt of such a motion, the Article VII Arbitrator shall afford the accuser an opportunity to identify evidence that would sustain the charges.  If the Article VII Arbitrator concludes, following that opportunity, that the accuser does not have evidence sufficient to sustain the charges, the Article VII Arbitrator may grant summary dismissal of the charges.

F. If at any time during the pendency of the charges, the Article VII Arbitrator determines (whether on his/her own motion or the motion of the accused) that the conduct furnishing the basis for the charges is protected by this Constitution and/or by law (including the LMRDA Bill of Rights), the Article VII Arbitrator shall have the authority to dismiss the charges addressed to such protected conduct.

G. No ex-parte communication may be had with the Article VII Arbitrator either by the accused, the accuser or by the APFA, or any member of the APFA except with respect to scheduling, location and like administrative matters.

H. The decision of the Article VII Arbitrator shall be final and binding upon the accused and the accuser.

## Section 7.   COSTS:

A. Initial costs of the Article VII proceedings shall be borne by the APFA in accordance with the provisions of Article V of this Constitution.

B. In the event a charge is dismissed by the Article VII Arbitrator, or in the event the Article VII Arbitrator does not sustain a charge, up to one-half (1/2) of the fees and expenses of the Article VII Arbitrator and all administrative costs to the APFA relative to that charge may be levied against the accuser by the APFA upon completion of charge proceedings brought under Section 1.H of this Article VII.

C. In the event the Article VII Arbitrator sustains a charge, costs of the proceedings shall be paid by the APFA and may be offset by a fine levied against the accused in an amount determined by the Arbitrator, if a fine was requested by the accuser.

D. In the event that it becomes necessary to enforce an Article VII Arbitration award through judicial proceedings, attorney's fees for those judicial proceedings may be paid or reimbursed by the APFA to the appropriate party seeking such enforcement.

**Section 8.**   INTERNAL REMEDIES:

Members, officers and representatives shall exhaust internal remedies under this Article VII for a period not to exceed four months prior to taking any legal action against members, officers or representatives of the APFA with respect to matters cognizable as charges under this Article VII.

APFA App. 010

APFA App. 011

# The APFA Policy Manual

*Established in accordance with*
*Article III of*

## THE APFA CONSTITUTION

*by*

## THE APFA BOARD OF DIRECTORS

MARCH 14, 1992

APFA App. 012

# SECTION 17
## ARTICLE VII ADMINISTRATIVE POLICIES AND PROCEDURES

**POLICY STATEMENT:** In furtherance of the objectives of the APFA, the Board of Directors hereby adopts the following policy for the governance of administrative procedures for hearings conducted under Article VII of the APFA Constitution.

**A.   FILING OF CHARGES**

1.   When charges have been filed in accordance with Article VII, Section 2. of the APFA Constitution, the parties must be notified by registered mail, return receipt requested. If the letter is not claimed by the addressee, this, nevertheless, shall be deemed sufficient notice of the proceedings.

**B.   EXECUTIVE COMMITTEE REVIEW OF CHARGES**

1.   Refer to the APFA Constitution, Article VII, Section 3.

**C.   APPEAL WHEN CHARGES DISMISSED BY EXECUTIVE COMMITTEE**

1.   The dismissal of charges deemed invalid by the Executive Committee, pursuant to Article VII, Section 3.D., because they address conduct protected by the APFA Bill of Rights and / or law, or fail to state a proper claim, may be appealed to the Arbitrator within seven (7) calendar days from the time that the accuser receives notice of the Executive Committee's dismissal.

2.   The appeal shall be made in writing and sent to the National Secretary who shall forward it to the Arbitrator and send a copy to the accused.

3.   The accused shall have fourteen (14) calendar days to respond to the appeal in writing.

4.   The response shall be sent to the National Secretary, who shall forward it to the Arbitrator and send a copy to the accuser.

**D.   RETIREMENT OF ONE OF THE PARTIES**

1.   If a charged member retires while the charge is pending, the charge will be administratively dismissed.

2.   If the member who filed the charge retires while the charge is pending, the charge will be administratively be dismissed.

**E.   SETTING THE DATE, TIME AND LOCATION OF THE HEARING**

1.   After the Executive Committee determines that the charges are timely and specific and the Executive Committee or the Arbitrator determines that the charges are valid, the National Secretary shall set the date, time and place of the hearing so that the hearing is held within 90 days of the decision from the Executive Committee or Arbitrator.

2.   All Article VII hearings are to take place in person in the DFW area.

APFA App. 013

3.    At least thirty (30) days in advance of the hearing, the National Secretary shall mail the accused, the accuser and the appropriate Arbitrator notice of the date, time and place of the hearing along with a copy of the charges.

4.    When the Article VII Arbitrator is not available, the National Secretary shall set the date, time and place of the hearing with an Alternate Article VII Arbitrator in accordance with the APFA Constitution Article VII, Section 5.B and Section 17.W of this Policy Manual.

## F.    MOTIONS

1.    Motions may be based on untimeliness, lack of specificity, failure to state a violation, or claiming that the conduct that is furnishing the basis for the charges is protected.

2.    Motions to dismiss

a.    Motions to dismiss, which are filed pursuant to Article VII, Section 6.C., D. and / or F. of the APFA Constitution, wherein the accused makes the claim that the charges were untimely, do not allege a violation cognizable as charges, are not sufficiently specific, and / or that the conduct furnishing the basis for the charges are protected by the APFA Bill of Rights and / or law, shall be submitted in writing to the National Secretary within fourteen (14) calendar days following the Executive Committee's determination that the charges are timely, specific and valid.

b.    The National Secretary shall forward such motion or motions to the Arbitrator and send a copy to the accuser.

(1)    The accuser shall have fourteen (14) calendar days to respond in writing to such motion or motions.

(2)    The response shall be sent to the National Secretary who shall forward it to the Arbitrator and send a copy to the accuser.

3.    Motions for Summary Dismissal

a.    Motions for summary dismissal filed under Article VII, Section 6.E. of the APFA Constitution by either party to the charges must be filed in writing with the National Secretary no later than fourteen (14) calendar days before the date of the hearing.

b.    Upon receipt, the National Secretary shall, immediately, forward the motion to the Arbitrator and the other party(ies).

(1)    A response may be filed with the National Secretary no later than seven (7) calendar days before the hearing.

(2)    The response shall be sent to the National Secretary who shall forward it to the Arbitrator and send a copy to the moving party.

4.    Other Motions

a.    The time limit requirements for motions, not specifically detailed herein, shall be left to the discretion of the Article VII Arbitrator.

5.   Timeliness of Motions

    a.   Nothing herein shall restrict the Article VII Arbitrator's authority to extend the time limit requirements of any motion, so long as all parties are promptly advised of such extension.

## G.   EXCHANGE OF DOCUMENTS AND WITNESS LISTS

1.   Not later than thirty (30) calendar days prior to the scheduled date set for the hearing, the representatives designated by the accused and the accuser shall exchange all documents they intend to enter in support of their respective positions and make available, in writing, the names of all witnesses they intend to summon whom they deem necessary to the dispute.

2.   The parties have a duty to exchange any changes, alterations and / or additions to the document and witness lists promptly throughout the thirty (30) days preceding the hearing.

3.   Nothing, herein, shall require the representative of either party to present the aforementioned documents or to summon the aforementioned witnesses during the course of the hearing.

4.   The exchange of documents and witness lists shall be coordinated through the Office of the National Secretary.

## H.   STENOGRAPHIC RECORD

1.   The National Secretary shall make arrangements for a stenographer to be present at the hearing.

2.   The transcript shall be the official record of the proceeding and shall be made available to the Arbitrator.

3.   Parties who request a copy of the transcript are responsible for paying their share of the costs of such record.

## I.   ATTENDANCE AT HEARINGS

1.   Active members in good standing of the APFA are entitled to attend hearings.

2.   The Arbitrator may exclude any witness or witnesses, other than a party or other essential person during the testimony of other witnesses.

3.   The Arbitrator shall determine whether any other person may attend the hearing.

## J.   ADJOURNMENTS

1.   The Arbitrator, when there is good cause, may adjourn or postpone the hearing upon the request of a party or on the Arbitrator's own initiative.

## K.   ORDER OF PROCEEDINGS

1.   The Arbitrator shall determine how the case can best be presented so that all parties have a fair opportunity to contest the issues.

2.     The Arbitrator shall afford each party a full opportunity for the presentation of relevant proof.

**L.    OATHS**

1.     All witnesses are required to testify under oath.

**M.    HEARING IN THE ABSENCE OF A PARTY**

1.     The hearing may proceed in the absence of any party, who, after due notice, fails to be present or fails to obtain an adjournment.

2.     The Arbitrator may not issue a decision based solely on the default of a party.

3.     The Arbitrator shall require the other party to submit such evidence as may be required to make an award.

**N.    EVIDENCE**

1.     The parties may offer such evidence as they desire and shall produce such additional evidence as the Arbitrator may deem necessary to an understanding and determination of the dispute.

2.     The Arbitrator may subpoena witnesses and documents independently or upon the request of any party.

3.     The Arbitrator shall be the judge of the relevancy and materiality of the evidence offered and conformity to the legal rules of evidence shall not be necessary.

4.     Where possible the parties should stipulate to facts and circumstances which are not in dispute.

**O.    INITIAL COSTS OF PROCEEDINGS**

1.     The Board of Directors interprets Article VII, Section 7.A. of the APFA Constitution to include the following costs and expenses:

    a.     Reasonable and ordinary costs associated with administering the proceedings, i.e. telephone, postage, copying, etc.;

    b.     The costs associated with obtaining the official transcript of the proceedings,

    c.     The fees and expenses of the Article VII Arbitrator;

    d.     The costs associated with providing the hearing room; and

    e.     Trip removal costs and expenses associated with the attendance of the accused, his / her representative, the accuser and his / her representative.

2.     The payment of attorney fees and expenses, and expenses associated with the attendance of any witnesses, are specifically excluded.

**P.    FINAL ARGUMENTS**

1.    The parties may submit oral arguments at the conclusion of the evidentiary hearing or written arguments at a time specified by the Arbitrator.

**Q.   REOPENING THE HEARING**

1.    At any time prior to the issuance of the Arbitrator's decision, a hearing may be reopened.

a.    A hearing may be reopened only upon the showing of good cause.

**R.   RELEASE OF DOCUMENTS FOR JUDICIAL PROCEEDINGS**

1.    At the time the Arbitrator issues a decision, the Arbitrator shall forward all documentary evidence offered at the hearing and the official transcript to the National Secretary.

2.    The National Secretary shall, upon the written request of a party, furnish the party with copies of any documentary evidence that may be required in judicial proceedings related to the hearing.

3.    The party making this request shall bear the costs of copying the documents.

**S.   COMMUNICATION WITH THE ARBITRATOR**

1.    There shall be no ex parte communications between the parties and the Arbitrator.

2.    All communications shall be directed to the National Secretary for distribution to the opposing party and the Arbitrator, unless there is an advance agreement to allow direct mailing.

3.    If the parties agree to use direct mailing, they shall mail to all parties and to the National Secretary copies of all correspondence sent to the Arbitrator.

4.    The mailing of copies shall be indicated by a "cc" notation under the signature in the letter or the cover letter for another document sent to the Arbitrator.

**T.   SUSPENSION OF AN OFFICER OR ELECTED REPRESENTATIVE DURING THE PENDENCY OF CHARGES**

1.    When an officer or elected representative who is suspended by the Board of Directors demands an expedited resolution of the charges, pursuant to Article VII, Section 4.B. of the APFA Constitution, the National Secretary shall notify the Arbitrator and the accuser by telephone of the demand and subsequently send a confirming letter.

2.    All parties shall cooperate in doing whatever is necessary to expedite the resolution of the charges.

**U.   INTERPRETATION AND APPLICATION OF RULES**

1.    The Arbitrator shall interpret and apply these rules.

**V.   PROCEDURES FOR FILING OF COMMENTS BY INTERESTED PARTIES**

APFA App. 017

1.    Interested parties may file written comments on motions to dismiss, motions for summary dismissal and at the conclusion of the evidentiary hearing.

2.    Unless other arrangements have been agreed to in advance, interested party comments should be submitted to the National Secretary for distribution to the parties during the time for response to a motion or within the time specified by the Arbitrator for his / her written argument.

## W.    ALTERNATE ARBITRATORS

1.    Should the primary Article VII Arbitrator be unavailable to hear charges in accordance with APFA Constitution Article VII Section 5.B., the following procedures shall apply:

    a.    If there are charges pending hearing while the primary Article VII Arbitrator is unavailable, the National Secretary shall obtain available dates from the available Alternate Article VII Arbitrators.  The charges shall be scheduled for hearing in the order they were filed, starting with the earliest filed charge.  The Alternate Article VII Arbitrator with the earliest availability will be assigned the earliest filed charge.  The next earliest charge will be assigned to an Alternate Article VII Arbitrator with the earliest availability for hearing.  This process shall continue until all charges pending hearing have been assigned to an Alternate Article VII Arbitrator for hearing.

        (1)    Once an Alternate Arbitrator is assigned a charge, the National Secretary shall forward a file with a copy of the charges and all communications between the parties to that Alternate Article VII Arbitrator.

    b.    Any charges found to be timely, specific and valid by the Executive Committee while the primary Article VII Arbitrator is unavailable shall be forwarded to an Alternate Article VII Arbitrator.  The National Secretary shall determine a rotation for forwarding such charges to the available Alternate Article VII Arbitrators.

        (1)    Any charges determined invalid by the Executive Committee that are appealed in accordance with APFA Policy Manual Section 17.C will be forwarded to the next Alternate Article VII Arbitrator in the rotation.

    c.    Once an Alternate Article VII Arbitrator has been assigned a charge, all communications with that Arbitrator shall be in accordance with APFA Policy Manual Section 17.S.

    d.    It is understood that Alternate Article VII Arbitrators have the jurisdiction and authorities granted in Article VII of the APFA Constitution and Section 17 of the APFA Policy Manual.

    e.    Once a charge has been forwarded to an Alternate Article VII Arbitrator, that arbitrator shall maintain jurisdiction until the matter is settled.  The primary Arbitrator will no longer hold any jurisdiction over the forwarded charge.

# Section 17 Revisions

| Revision Date | Resolution Number | Reference Number | Nature of Revision |
|---|---|---|---|
| 2021 Fall BOD | Res. 4 | 17.I.1 | Add the word Active |
| 2021 Conv. | Res. 4 | 17.E.1-4 | Adds language regarding date, time and location of Article VII hearings |
| 2021 Conv. | Res. 4 | 17.W | Adds new section regarding Alternate Arbitrators |
| 2013 Conv. | Res. 4 | 17.F.2.b.(2) | Adds "accuser" |
| 2013 Conv. | Res. 4 | 17.F.5.a | Amends language that nothing herein shall restrict Art VII Arbitrator's authority to extend time limit requirements of any motion, so long as all parties are promptly advised of such extension |
| 2011 Conv. | Res. 12 | 17.D | New section D that if a charged member retires while the charge is pending, the charge will be administratively dismissed; if the member who filed the charges retires, the charge will be administratively dismissed |
| | | | |
| | | | |
| | | | |
| | | | |

# Exhibit B

Arbitrator's Decision issued on March 19, 2022

**In the Matter of Arbitration Between**

|  |  |
|---|---|
| **Melissa Chinery** | ) |
| **Sandra Lee** | )   **RE: Article VII Charges** |
|  | )   **Violations of APFA Constitution** |
|     **APFA Charging Party Members** | )   **and APFA Policy Manual** |
|         **(Plaintiff)** | ) |
|  | ) |
| **And** | ) |
|  | ) |
| **Robert Ross, Former APFA National** | ) |
| **President** | ) |
|  | ) |
|     **APFA Charged Party Member** | ) |
|         **(Defendant)** | ) |
|  | ) |
|  | ) |

**Before:**                       **Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:**      **The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

                                    **June 16, 2021, continued to November 17 and 18, 2021**

**Appearances:**

    **For Charging Party Members:**    **Melissa Chinery, Representative**
        **(Plaintiff's)**                **Sandra Lee, Representative**

    **For Charged Party Member:**     **Kit Gomez Alba, Esq.**
        **(Defendant)**                 **Gina Guidry, Representative**
                                         **Robert Ross, Representative**

**Exhibit B**

## INTRODUCTION

This is an Article VII Hearing that was heard at the Westin Irving Convention Center at Las Colinas, Irving, Texas on June 16, 2021 and continued to November 17 and 18, 2021. The arbitration hearing was transcribed by Carson Reporting & Associates.

Charging Party Melissa Chinery and Sandra Lee, will be hereinafter referred to as the "Plaintiff." Charged Party Robert Ross, will be hereinafter referred to as the "Defendant."

Plaintiff presented for testimony Cathy Lukensmeyer, Erik Harris, Michael Trapp, John Nikides and Melissa Chinery.

Defendant presented for testimony Casey Veloso, Anthony Thuriault and Robert Ross.

All of these witnesses were afforded full opportunity to be heard, to be examined, and to be cross-examined. The parties were allowed to introduce evidence on the issues. Based on the entire record, my observation of the witnesses, examination of the evidence, exhibits presented, post-hearing briefs[1] submitted, and arguments presented therein, this arbitrator makes the following findings and renders the following Discussion, Opinion, and Award.

## THE ISSUES

Plaintiff submits the issue to be addressed by the Alternate Article VII Arbitrator is stated as follows:

Did Bob Ross, the Defendent herein violate the APFA Policy Manual and the APFA Constitution by engaging in malfeasance, fraud, misappropriation of funds while he was in office during the term of April 1, 2016 to March 2, 2018. If so, what shall be the appropriate remedy?

Defendant submits the issue to be addressed by the Alternate Article VII Arbitrator is stated as follows:

Whether the Plaintiff's allegations raised against him are true or false? Did former National President Ross knowingly or "willfully" violate any express Article of the APFA Constitution or Policy Manual? If so, what is the appropriate remedy?

## FACTS

The facts in this matter center on Defendant Ross assuming office as the APFA National President and moving to Dallas, TX during the months of April 2016 through October 2016.

---

[1] The parties agreed to submit post-hearing briefs by e-mail to arbruben@gmail.com on January 31, 2021 and extended to February 18, 2021. The post-hearing briefs were timely emailed and received. Thus, the arbitrator finds the record in this matter closed on February 18, 2021.

2

Defendant Ross is alleged to have misused the APFA credit card on several matters during his term in office.

Plaintiff alleged in the Article VII grievance and heard are described as follows:

Defendant is charged with eight **(8)** specific violations of the Policy Manual and the APFA Constitution.

**(1) Misuse of Credit Card:**

As APFA National President, Plaintiff Ross was provided an APFA credit card.
  a. Defendant Ross spent thousands on purchasing sheets, blankets, pillows, mattresses, furniture as well as smaller items such as toilet paper and candy.
  b. Defendant Ross purchased over $3600 in furniture on his APFA credit card and had it delivered to his personal residence in South Lake, Texas.
  c. Defendant Ross charged an APFA rental truck in August 2016.

**(2) Rental Car:**
Defendant Ross is charged with billing APFA for a rental car for six months at a cost of over $6200.00 Ross was considered living in the DFW area and was not entitled to a rental car.

**(3) Reimbursement:**
Defendant Ross claimed mileage that he was not entitled to, including the period when he had a rental car.

**(4) SAF/MEA and meal expenses--Change of formula to include Meal Expense Allowance (MEA) and Special Assignment Fee (SAF):**
Defendant Ross and his fellow officers changed the longstanding formula for Vacation reimbursement. Defendant Ross also violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card.

**(5) Payout of Vacation**-Change of Formula to include MEA and SAF and an office stipend in with wages when considering the reimbursement of sick and vacation time. This was discovered when the pay for the Vice President, Secretary and Treasurer was looked at more closely by the next administration long after the Ross Administration had left office.

**(6) Maintaining an Office:**
Defendant Ross claimed thousands for maintaining an office he was not entitled to.

**(7) Payout of Vacation Days:**
Defendant Ross received compensation for expense payments beyond his term in office.

**(8) Buyout:** Defendant Ross collected compensation in two forms. (1) MEA and SAF (2) Maintaining an office outside Residence.

Defendant argued at the hearing that these Article VII charges were filed by the Charging Party (Plaintiff) as a weapon against Ross and the Officers of the Ross Administration.

This matter was submitted to this Alternate Article VII Arbitrator to make a decision on the charges cited herein.

## THE RELEVANT PORTIONS OF THE APFA CONSTITUTION AND POLICY MANUAL

**THE APFA CONSTITUTION**

**Article I. Section 7.   DEFINITIONS:**

As used in this Constitution, the following words or terms shall mean:

E.   **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary  capacity with or as a member of the APFA.

**M.**   **"Privilege"** means a benefit or advantage enjoyed by a person in any position or    fiduciary capacity with or as a member of the APFA.

**O.**   **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

Q   **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as  a  member  of  the APFA.

**Article II. Section 2. OBLIGATIONS OF MEMBERS:**

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from, or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties, and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties, and responsibilities.

**Section 3. BILL OF RIGHTS OF MEMBERS**

**B.**   All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

**Article III, GOVERNMENT OF THE APFA**
**Section 3 Board of Directors**

A.  The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights and privileges, duties and responsibilities of the officers, representatives and members of the APFA.  The Board of Directors is authorized to interpret this constitution and to establish, prescribe and adopt such other policies which may be consistent with this constitution as required for the direction and management of the affairs of the APFA.

4

**L.**   Jurisdiction and Duties: The Board of Directors shall have the following rights, privileges, duties and responsibilities;

1. Set policy for the APFA;
2. Modify the APFA Policy Manual as it deems appropriate;
3. Approve the annual budget;
4. Set annual goals for the APFA as it deems appropriate;
5. Assign to each Ad Hoc Member of the Executive Committee those Presidents with whom s/he shall maintain regular contact and communication;
6. Determine the number of administrative, committee, and support positions as may be required under Article IX of this Constitution to meet the needs of the membership;
7. Nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;
8. Review the base assignment of any OAL Operation or satellite and, when necessary alter operation or satellite assignments.
   While not limited to the following, the Board of Directors may:
9. Review the dues structure of the Association;
10. Override the Executive Committee rejection of a proposed Collective Bargaining Agreement;
11. Establish the Regions and the National Vice President will assign the Regional Representatives;
12. Establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;
13. Direct special mailings to the membership;
14. Recognize the accomplishments and achievements of members of the APFA;
15. Give annual awards;
16. Confer Honorary membership;
17. Approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;
18. Appoint special committees;
19. Appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);
20. Approve Article VII administrative changes;
21. Suspend officers or representatives pursuany to Article VII;
22. Take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.Bof this Constitution.

## Article VII. Section 1. Grounds For Charges:

5

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

**A.** Failure to pay dues, assessments or penalties levied by the Association.

**B.** Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

**C.** Willfully acting as a strike breaker during any work stoppage duly authorized by the Association; (1) Notwithstanding Section 1.C., above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

**D.** Willful violation of a Flight Attendant's Collective Bargaining Agreement

**E.** Theft or embezzlement of Association monies or property

**F.** Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee

**G.** Willfully acting in a manner that causes the Association to violate its legal obligations; or

**H.** Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

*APFA POLICY MANUAL*

**Section 5.G.1. Trip Removal and Expense Policy – Other Expenses**

**1.** Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

**Section 5.F.5.a. Trip Removal and Expense Policy–Meal Expense/Allowance**

APFA App. 025

**a.** Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

**(1)** Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

**(2)** The reimbursement of a Business-Related Expense shall not count against a representative's MEA.

## Section 5.H. Relocation

1. Upon assuming office/appointment, National Officer(s)/Chairs shall be expected and, for the purpose of this policy, shall be considered to reside in the DFW area. The DFW area, for purposes of this policy, shall not exceed a seventy-five (75) mile radius from APFA Headquarters.

2. If, on the date of his/her election, a National Officer does not reside in the DFW area, s/he shall be reimbursed for actual moving expenses for relocation from/to his/her place of permanent primary residence by a certified mover as a condition of employment with the APFA, to a maximum of ten thousand ($10,000) per round trip move.

   a. The provisions of H.2 above must be exercised within six (6) months following the end of the last term of office of the National Officer and must be substantiated by invoice or bill.

3. A National Officer may choose not to relocate to the DFW area but may, instead, choose to accept suitable furnished accommodations paid for by the APFA as provided in H.7. below. If a National Officer accepts such accommodations in lieu of relocation expenses as provided in H.2. above, the following will apply:

....

7. Incoming National Officers incoming and other Representatives shall normally be able to use outgoing National Officers or Representatives furniture and furnishings rather than replace these items with each change of National Officer or Representative, subject to the right to reasonably refuse furniture and furnishings.

**PLAINTIFF'S ARGUMENT**

7

APFA App. 026

Plaintiff argued the violations center on Defendant Ross assuming office as the APFA National President and moving to Dallas, TX during the months of April 2016 through October 2016. Defendant Ross misused the APFA credit card on several matters during his term in office. The APFA Policy Manual provides that National Officers will be provided up to $10,000 in moving expenses or, provided they can demonstrate a permanent residence outside of DFW, the officer can get a corporate apartment furnished by APFA. Defendant Ross leased an apartment at the Bear Creek complex on June 1, 2016, thus he chose both options for relocation when he is only to choose one option. Defendant Ross purchased $3600 of furniture from Ashley Furniture to be delivered to his home in South Lake, Texas. Defendant Ross had a rental car for six months at a cost of $6,200.00. He was living in the DFW area and was not entitled to a rental car. Defendant Ross claimed mileage when he was not entitled to claim mileage. Defendant Ross and his fellow officers changed the longstanding formula for Vacation reimbursement. Defendant Ross violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. The change of formula to include MEA and SAF with an office stipend in wages when considering the reimbursement of sick and vacation time. This was discovered when the pay for the Vice President, Secretary and Treasurer was looked at more closely by the next administration long after the Ross Administration had left office. Defendant Ross claimed for maintaining an office he was not entitled to. Defendant Ross received compensation for expense payments beyond his term in office. Defendant Ross collected compensation in two forms. (1) MEA and SAF (2) and maintaining an office outside Residence when he was not working.

## DEFENDANT'S ARGUMENT

Defendant Ross argued the alleged violations were the direct result of the "Ross Transition Agreement." Defendant argued that charged violation No. 5: Payout of Vacation, Charged Violation, No. 6: Maintaining an Office, Charged Violation No. 7: Payout of Vacation Days and Charged Violation No. 8: Buyout are a part of the Transition Agreement (TA).

Defendant Ross argued the "Ross Transition Agreement" was deemed to be a legally authorized by Arbitrator Valverde in the Arbitration case, Moyer vs BOD (2018) dated September 21, 2021. Arbitrator Valverde ruled the dispute that Ross received a benefit was "without merit." The charges in that case were dismissed. Defendant argued that it stands to reason the accusers (Plaintiff) would have no claim that Defendant Ross received a benefit from the "Ross Transition Agreement" that he was not entitled to and any alleged violation stemming from his acceptance of the agreement, should be dismissed.

Defendant Ross argued the arbitrator, designated in these Article VII proceedings, has the jurisdiction and authority to rule on the validity of charges and the remedy sought by the Plaintiff to the allegation. Did former National President Ross knowingly or "willfully" violate an express Article of the APFA Constitution or Policy Manual, and did Ross "willfully" violate any express Article of the Constitution and/or Policy Manual when he accepted the terms of the "Ross Transition Agreement"? The arbitrator also has the jurisdiction and authority to dismiss the Article VII Charges against the Defendant.

Defendant Ross argued with respect to the *misuse of the APFA credit card* that multiple alleged purchases violated Policy Manual 5.G – Business Related Expenses. Defendant argued Business Related Expenses are actually defined in Policy Manual *Section 5.F.5. Section 5.G, "Other Expenses" where it states,*

> *5.G Other Expenses – Actual out-of-pocket expenses incurred by a member conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for personal profit of the APFA member, but to compensate him/her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.*

Defendant Ross argued the Plaintiff cited the wrong policy in their support of these charges, evidence of their lack of understanding the process and policy. No purchases were made on the APFA union credit card were submitted for reimbursement on the weekly/monthly expenses. Receipts were submitted for each credit card charge and reviewed per policy by the appropriate accounting and legal departments. Plaintiff admitted they did not review any other administrations union credit card charges for similar purchases or past practice or for expenses when said officers relocated to DFW.

Defendant Ross argued with respect to the *misuse of a Rental Car* was billed to the National President's department during the timeframe according to the Plaintiff allegation, is coincidental to the timeframe of the Ross relocation, but was not as a condition of the relocation. 2016 APFA Policy Manual Section 5.H – Rental – was silent on the use of rental cars in connection with or during the timeframe of a relocation. This issue was previously reviewed by the APFA BOD at the time the email was sent to the National Treasurer in March 2019. The APFA BOD and Budget Committee members tasked with this review took no action on this matter and the issue was closed. Defendant argued that several rental cars were rented through the President's office for numerous representatives during this time frame and not specifically to Bob Ross for personal use. Department representatives having access to rental cars during this timeframe included, but is not limited to, uniform committee members, toxic fume events and other committee representatives. At no time did the Plaintiff cite evidence that a rental car was provided for Ross' sole personal use.

Defendant Ross argued with respect to *mileage* the following that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.G. – Other Expenses / Mileage.
5.G.1.b. (1).(a) Mileage:
[2]. Mileage shall not be reimbursed for travel between the representatives' residence and an APFA office that has been provided for the primary use of the representative for a period in excess of 31 days.

Defendant Ross states that the Plaintiff have formed their own theory and alleged that former APFA National President, Bob Ross is in violation for claiming mileage for attending meetings with the Company or claiming mileage for any event outside of APFA headquarters while conducting APFA business while using a rental car. At no time did Ross file for reimbursement for mileage from his residence to the APFA headquarters. The Plaintiff did not

present evidence that Ross claimed a mileage reimbursement while using a rental car and not his own vehicle. Defendant Ross submits Section 5.G.b.1.a.1., is silent on a specific vehicle to be used in the reimbursement of mileage. At any given time, an APFA Representative could be subject to using their personal vehicle or a "Rental Car" for conducting APFA business.

Defendant Ross argued with respect *to SAF/MEA and meal expenses* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.F: Business Related Expenses. He states that the APFA had no policy on how to differentiate or separate any amounts from the guaranteed MEA/SAF totals when National Officers, Regional Representatives, National Chairs, or other Representatives, who are authorized a full month trip removal pay and are receiving guaranteed stipends of MEA/SAF and are considered a host of an authorized APFA meeting. APFA also had no policy in place until 2021, for a National Officer in relation to one's union credit card practice.

Special Assignment Fee (SAF) Policy:
The intent of the SAF is explained in Section 5.E.1

5.E.1.a. – The intent of the Special Assignment Fee (SAF) is to offer payment to the representatives for the days that they conduct APFA business in excess of their normal scheduled bid line. Amounts paid under this arrangement are reportable as wages on the representative's W-2 and are subject to withholding and payment of employment taxes.

5.E.4.a.(1) – If a Representative performs work for the APFA, and is not otherwise paid for that day's work by means of an APFA Paid Trip Removal.......such representative shall receive the Daily SAF for work performed in accordance with the following schedule.

Calculation for the National Officers' SAF is specifically delineated in Section 5.E.4.c – SAF Rates – Monthly –

(c)National Officers and Regional Representatives: $400 minimum, but not to exceed $500 maximum.

Meal Expense/Meal Expense Allowance (MEA)

Defendant Ross argued with respect to the *payout of vacation* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of 5.E.4 Special Assignment Fee (SAF) above and 5.F.1 Meal Expense Allowance (MEA) rates.

Guaranteed MEA at Residence is explained in Section 5.F.3.a

5.F.3.a – On days a representative is both trip removed and performing work for the APFA at his/her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2.

5.F.3.d – National Officers, Regional Representatives, National Chairs and other representatives who are authorized full month trip removal or the equivalent shall receive a "Guaranteed MEA at Residence" of Three Hundred dollars ($300) per month.

Section 5.F.4.a – Calculation of MEA
National Officers, Regional Representatives, National Chairs and other representatives who are authorized full month trip removal or the equivalent (e.g. "Payback as provided in D above) shall receive a minimum MEA of Three Hundred dollars ($300) per month

Maintaining an Office Outside of Residence (MOOR)

Maintaining an Office outside of residence is required of APFA President, as the office is located and maintained at APFA Headquarters and is paid in addition to SAF.

5.E.4.c.(3).(a) – A National Officer, Regional Representative, National Chair, Base President and/or Base Vice-President who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.

5.F.1.a.(1) – Per Diem Rate (Accountable Plan)
(1) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA. Also required for the purposes of calculating how much Special Assignment Fee (SAF) an officer receives, it is imperative that the officer fill out the required weekly paperwork that would ascertain how many hours were worked for the APFA.

   Defendant Ross argued that all payouts and formula used to calculate the payout for vacation, sick and end of term buyout of accrued and unused Sick and Vacation days occurred after former APFA President Ross had left office and was the product of a Transition Agreement and not specific to APFA Policy. Through sworn testimony, former APFA National Treasurer, Eugenio Vargas, used full salary vs basic salary in these calculations, which include MEA and SAF in compliance with the terms of the controlling document, the Ross TA.

   Defendant Ross argued that a National Officer or Regional Representative on a full month trip removal shall receive per policy a $500 maximum of SAF payment. National Officers, Regional Representatives, National Chairs and other APFA Representatives on a full month trip removal shall receive a minimum Guaranteed MEA of $300 per month. Each National Officer, per policy, each month received the guaranteed amount of $1050 ($500 SAF, $300 MEA and $250 MOOR) in addition to basic salary. This amount was determined by the APFA Accounting Department. and was the combined stipend included as Salary and Benefits per the Ross TA used by the former APFA Treasurer, after Ross left office, to calculate the daily rate of unused Sick and Vacation Days that Ross was not allowed to use during his final 5 months as National President to "make him whole." These amounts were paid after Ross left office and as a condition of the Ross TA. It is irrational for the Plaintiff to request that weekly timesheets were required to receive these payments for the months after Ross left office.

Defendant Ross argued that on January 14, 2022, an APFA document surfaced that was withheld from document retrieval that corroborates the Policy Manual was not the controlling document to the Ross TA and therefore Ross was paid in compliance with the TA. This document would have been exculpatory to the defense of Mr. Ross on this and other matters pertaining to the Ross TA had it been provided.

Defendant Ross with respect to "*maintain an office outside of residence*" that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.E.3 Maintaining an Office Outside of Residence. The maintaining an office outside of residence is required of APFA President, as the office is located and maintained at APFA Headquarters and is paid in addition to SAF.

5.E.4.c.(3).(a) – A National Officer, Regional Representative, National Chair, Base President and/or Base Vice-President who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.

Defendant Ross argued that each National Officer, per policy, each month received the guaranteed amount of $1050. This amount included $500 for SAF, $300 for MEA and $250 for office outside of residence. This amount was determined by the APFA Accounting Department and provided to all National Officers as part of their salary. This charge also should be dismissed as Ross did not pay himself the payments under the terms of the Ross TA.

Defendant Ross argued with respect to the *payout of vacation days* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 6.B.1: National Officer Salary and Benefits. Defendant Ross states that any change to the formula used to calculate the payout for vacation, sick and end of term buyout occurred after former APFA President Ross had left office. Through sworn testimony, former APFA National Treasurer, Eugenio Vargas, used full salary vs basic salary in these calculations, in compliance with the Ross TA.

Defendant Ross argued the Ross Transition Agreement stated Ross would be paid any and all accrued and unused sick and vacation from April 1, 2016 – July 31, 2018. The calculation of the unused days was to be paid as though Ross was able to use any of those days while in office as President for his remaining 5 months had he not resigned. There was no agreement that these days were to be paid per Policy as the Plaintiff insists. An investigation into the payout of the Sick and Vacation days paid, brought about by Plaintiff's allegations that it was discovered Ross was not properly paid "All" of his accrued and unused Sick days from April 1, 2016 – July 31, 2018. Ross earned and did not use 18 Sick days in each of the fiscal years April 2016-March 2017 and April 2017-March 2018. Ross was only paid Per Policy 6.B.3.d Offset/Loss of Sick Time, of 12 days for each fiscal year. The additional 12 days, (6) days Apr. 2016-2017 and (6) days Apr. 2017-2018 have still not been acknowledged or paid to Ross in accordance with the Ross TA. The value of these lost Sick days, depending on the calculation used, is in excess of $3400 still owed to Ross.

Defendant Ross argued that he received a *buyout but it is cited as the Ross Transition Agreement*. The charging party submits that Ross collected more money than if he had remained in office for the four (4) months left in his term. However, once Ross left office, he asked for and collected from the APFA compensation in two forms he was not entitled to per the "agreement." One form of compensation which he received every month was MEA and SAF and Maintaining an Office Outside Residence. Mr. Ross continued to collect one thousand and fifty dollars ($1050) a month."

"He collected these payments for the months of: March, April, May, June and July of 2018. This stipend is clearly hinged on reimbursement related to work and not part of the National Officer salary. To accept this money is in clear violation of the intent of the Policies written that allows a representative extra compensation for working hours above and beyond their scheduled workload. By taking this money this is another violation of the Section 5 policies outlined above."

Defendant Ross argued in Item no. 3 of the Ross Transition Agreement states "APFA agrees that Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018. Full Salary for a National Officer, per the APFA Policy Manual, Section 5 entitles the officer to receive guaranteed MEA, SAF, and Office Outside of Residence payment. This guaranteed payment is $1050, which is considered gross wages and recorded in "Box 1" of the National Officers W-2 tax form.

Defendant Ross argued that former APFA National Treasurer Vargas has stated in sworn testimony he used full salary vs basic salary for all calculations in compliance with the Ross Transition Agreement. This full salary calculation would include the benefits of MEA, SAF and any accrued and unused sick and vacation that he would have coming to him as President for those 5 months (4/1/16-7/31/18), as if he remained in office.

### DISCUSSION AND OPINION

Defendant Ross assumed office on April 1, 2016 as National President of the APFA. In that position he is entrusted with a Fiduciary duty to the APFA for cost and expenditures. This report revealed that Defendant Ross abused his fiduciary duty to the members of the APFA. The arbitrator has consolidated certain violations in this report.

1. **Misuse of the APFA Credit Card and**
2. **SAF/MEA and Meal Expense Policy**

Plaintiff argued in these allegations that Defendant Ross moved into the South Lake home during the week of August 11, 2016. Defendant Ross used the APFA credit card for his personal use and was not for any Union related business activities and abused his fiduciary duty to the APFA. He charged the renting of a moving truck on August 20, 2016 to move furniture after being reimbursed for moving his belongings from Sacramento. He has purchased tools, sheets, blankets, pillows, mattresses, furniture and even smaller items such as toilet paper and candy. None of the larger items were ever inventoried or returned to the APFA upon cessation of his term of office. Defendant Ross elected to relocate to the DFW area and was afforded a moving expense reimbursement, he was not entitled to buy any furnishings using APFA funds. Plaintiff argued Defendant Ross violated Section 5.G. **Other Expenses** of the Policy Manual. Kim Ross, wife of

13

the Defendant packed up the California house in August 2016. Defendant Ross's wife and kids stayed in 5 different hotels as they drove across the country, including vacation stops at the Grand Canyon and Flagstaff. They used the union credit card for these hotels, except for one hotel stay on August 2nd that Ross expensed in his weekly report to the APFA.  It also appears in the documentation that APFA paid for all of Ross's family meal expenses. (CLX-17, CLX-37, and CLX-42) All of these expenses were billed to APFA as part of the cost of moving the Ross family from California to Texas. Defendant Ross was not present for any of these hotel stays.

The arbitrator finds that if his family was driving directly from California to Dallas, Texas, the APFA would not have incurred additional costs for hotels, meals and mileage. It appears APFA paid for Ross's family vacation in the Grand Canyon with Defendant Ross' APFA credit card. The cost of this vacation to include meals and hotels should be borne by Defendant Ross.  This is an abuse of Ross's fiduciary duty to the APFA membership. This is a per se violation of the Policy Manual.

On August 9, 2016 Defendant Ross bought tools at Home Depot on the APFA credit card. On this same date, the APFA handyman delivers APFA furniture to the South Lake home. (CLX-4). On August 12, 2016 the moving pods that Ross had rented arrived to the South Lake house. On this same date, Defendant Ross charges $64.30 for gas at Shell Oil in South Lake on the union credit card and bills it to the move but he also claimed mileage and was paid. On August 13, 2016 Defendant Ross *purchased $3,637 in furniture on the APFA credit card from Ashley Furniture (CLX-40)* and had it delivered to his personal residence at the South Lake home.  The furniture was delivered to Kim Ross at the South Lake home in two installments – on August 18, 2016 and August 25, 2016.  Defendant Ross claimed the family did not move until September 2016 but the record evidence clearly revealed they actually moved in August, 2016. A couple of bed frames and small items were returned costing $331.28 to Ashley Furniture on August 24, 2016 (CLX-40). John Nikides testified that Defendant Ross was ordered by APFA to repay $3600.00 to APFA for this furniture and he did so through payroll deduction. Here, Defendant Ross abused his fiduciary duty to the members of the APFA.

Plaintiff argues Defendant Ross used the APFA credit card for his own personal use. Several meals were charged on the credit card and the participants were National Officers, the Officers and their Regional Representatives as well as himself eating alone. This violates Section 5.F. **Meal Expenses/Meal Expense Allowance (MEA)**, 5. **Business Related Expenses**, a.1.2. Plaintiff argues this violates the following:

**Section 5 Business Related Expenses:**
    a. *Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions with a representative would reasonably be considered the host of an authorized APFA function or meeting.*
  1. *Discretion and good judgment should be used when exercising this privilege and when incurring such a legitimate and necessary business-related expense. Abuse, as determined by the executive committee, may lead to the limitation of revocation of this privilege.*

APFA App. 033

2. *In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.*

**Section 5.G of the Policy Manual provides the following:**

*Actual out-of- pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him /her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.*

Additionally, the items Defendant Ross purchased were for his personal benefit such as dry cleaning, trips to the gas station, 7-eleven, and a monthly GOGO internet subscription.

Plaintiff argued Defendant Ross violated the Meal Expense provisions of the APFA Policy Manual during his term in office. Ross claimed per diem and actual meals. He used the APFA credit card for meals at fast food restaurants by himself. As a National Officer Defendant Ross received a guarantee MEA ($300.00 per month). The APFA Policy Manual does not permit National Officers to charge actual meals in their city of residence. National Officers are provided Guaranteed MEA instead of actual meal expense. There are no provisions for National Officers to receive actual meals. Actual meals are covered in F.2 of the Policy Manual and do not include the National Officers or other full-time representatives nor is there a working lunch exception. The only time an APFA National Officer can purchase actual meals is the hosting exception.

Defendant Ross argued with respect *to SAF/MEA and meal expenses* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.F: Business Related Expenses. He states that the APFA had no policy on how to differentiate or separate any amounts from the guaranteed MEA/SAF totals when National Officers, Regional Representatives, National Chairs, or other Representatives, who are authorized a full month trip removal pay and are receiving guaranteed stipends of MEA/SAF and are considered a host of an authorized APFA meeting. APFA also had no policy in place until 2021, for a National Officer in relation to one's union credit card practice.

Defendant Ross additionally argued the parties cited the wrong policy in support of these charges, evidence of their lack of understanding of the process and policy. No purchases were made on the APFA union credit card were submitted for reimbursement on the weekly/monthly expenses. Receipts were submitted for each credit card charge and reviewed per policy by the appropriate accounting and legal departments.

The arbitrator finds the Plaintiff provided sufficient evidence to establish merit and a violation of the Policy Manual to reveal Defendant Ross abused his fiduciary duty to the membership of the APFA. Under these circumstances, the APFA will hire an Independent Auditor to perform the task of auditing Defendant Ross purchase of meals and other items on the APFA credit card from April 1, 2016 through July 31, 2018. Record evidence revealed that he had purchased meals and used the APFA credit card for a personal vacation for his family at the Grand

APFA App. 034

Canyon and other items that are not business related. The Independent Auditor will have to determine if such meal(s) or other purchases were for conducting union business or not. Defendant Ross as the National President was required to submit documentation to support all credit card expenses for meals as well as other expenses. If no documentation was provided to support the expenses were for union related business, then Defendant Ross will be required to repay APFA for all of those expenses not substantiated. Moreover, the audit must comply with federal income tax guidelines which distinguish between personal and nonpersonal expenses. Additionally, Defendant Ross is hereby Ordered to repay all of the Independent Auditor's fee to the APFA.

**3. Rental Car**

Plaintiff argued Defendant Ross violated the APFA Policy Manual by having a rental car in DFW for six months. The Policy Manual in Section 5.G.1 does not allow a National Officer to have a rental car in base. Defendant Ross upon assuming office is considered for all expenses to be living in Dallas. The only way a rental car would be approved is if the APFA Representative was renting it away from their city of residence per 5.G.1.b. If it is used for personal reasons, it is considered income. Moreover Section 8.D governs the use of APFA provided vans and cars, "Automobiles owned or leased by the APFA are to be used primarily to conduct APFA business during normal business hours. After hours, they may be reserved on a first-come, first served basis for the use of representatives who reside outside of the DFW metropolitan area," Section 8.D.1. in Section 8.D.2 a Regional Representative whose residence is outside of DFW may get a rental car when leased cars are not available. Cathy Lukensmeyer testified that National Officers should not be getting a rental car in Dallas for their personal use. Defendant Ross received a rental car from March 2016 until October 16, 2016. He booked a rental on March 28, 2016 for 24 days. On May 5, 2016, Defendant Ross upgraded the car to a luxury car. The car rentals were updated several times into October 2016. At hearing, Defendant Ross denied having a rental car but when confronted with rental car receipts, he then claimed it was for his department and not for him. Several emails (June 16, 2016 extended the rental to July 29, 2016, July 18, 2018, September 30, 2016 extended to October 3, 2016) from APFA secretaries disclosed it was for Bob's rental car (CLX-45). Additionally, ross did not have a personal car in DFW to commute to APFA headquarters. Here, the arbitrator finds Defendant Ross abused his Fiduciary duty to the membership of the APFA by renting cars for his personal use to commute to work.

Defendant Ross did not move his wife's car to Dallas until August, 2016 so Ross was using APFA rental cars exclusively during that period. He charged APFA for the mileage, hotels, gas and meals. Ross admitted he did not have a vehicle to get to work so he used the rental car. Plaintiff argued that if an Employer provides an automobile to an employee, including for commuting to and from work, that is considered a fringe benefit and is considered taxable income by the IRS. (26 CFR § 1.61-21(a)(1) - Taxation of fringe benefits.) Under the LMRDA the governing body is the APFA Board of Directors and they have an obligation to recover the money. (29 U.S.C. 501) So Defendant Ross saying the Board looked into the matter in 2019 does not resolve the matter. If it is determined Defendant Ross received over $6200 in unlawful compensation in the form of a rental car he was not entitled to under federal labor law, the money must be paid back to the APFA.

Defendant Ross argued with respect to the *misuse of a Rental Car* was billed to the National President's department during the timeframe according to the Charging party's allegation, is

APFA App. 035

coincidental to the timeframe of the Ross relocation, but was not as a condition of the relocation. 2016 APFA Policy Manual Section 5.H – Relocation – was silent on the use of rental cars in connection with or during the timeframe of a relocation.

The arbitrator finds the Plaintiff has supported their charge to establish merit and a violation of the Policy Manual over the use of rental cars, thus, Defendant Ross abused his Fiduciary duty to the membership of the APFA. the Independent Auditor will audit Defendant Ross' use of a rental car from April 2016 through October 2016 and determine the cost of the rental from April 2016 through October 16, 2016. If Defendant Ross did not support the use of a rental car with documentation for Union related business matters, Defendant Ross will be required to repay APFA for the use of the rental cars. Whatever the amount of dollars the Independent Auditor has determined Defendant Ross owes for using a rental car for his personal use in lieu of a union business, he shall be Ordered to repay that amount to the APFA.

**4.Mileage**

Plaintiff argued Defendant Ross claimed mileage that he was not entitled to, including the period he had a rental car. The AFPA Policy Manual has detailed language to a National Officer assuming office.

> **Relevant Provisions**
> Upon assuming office/appointment, National Officer(s) / Chair(s) shall be expected and, for the purposes of this policy, shall be considered to reside in the DFW area per 5.H.1.
>
> *5.G.1.b. Ground Transportation*
> "[1] A representative shall be reimbursed for mileage at the IRS standard mileage rate for travel to conduct APFA business, not to exceed a monthly maximum of one thousand (1000) miles. All mileage must be recorded on an "APFA Mileage Log" and submitted per Section 5.I.5. of this Policy Manual," per Section 5G.1.b.1.
>
> " S/he is not authorized to claim any other expenses as provided in this policy for the purpose of personal travel between DFW and his/her permanent residence," per Section H.5.c.

The mileage logs are included in CLX-13-19 and specify that Ross drove the following mileage:

| | |
|---|---|
| March 2016 | 336 miles |
| April 2016 | 294 miles |
| May 2016 | 294 miles |
| June 2016 | 336 miles |
| July 2016 | 294 miles |

17

APFA App. 036

Plaintiff argued Defendant Ross violated the APFA Policy Manual by claiming mileage to and from his permanent residence in Sacramento and the Sacramento airport. He claimed mileage between his Sacramento permanent residence and the Sacramento Airport at 42 miles each way. The APFA Policy Manual states that a National Officer may not claim expenses for his commute home. All commuting back to your home city is on your own money. But Defendant Ross charged mileage, parking and meals at the airport. Defendant Ross also charged APFA $105 a month for parking his vehicle at the Sacramento Airport. This is not an authorized expense as no additional expenses for commuting home were authorized. All of this occurred at the same time Defendant Ross had a rental car.

Defendant Ross states Plaintiff's have formed their own theory and alleged that former APFA National President, Bob Ross is in violation for claiming mileage for attending meetings with the Company or claiming mileage for any event outside of APFA headquarters while conducting APFA business while using a rental car. At no time did Ross file for reimbursement for mileage from his residence to the APFA headquarters. The Charging Party did not present evidence that Ross claimed a mileage reimbursement while using a rental car and not his own vehicle. Defendant Ross submits Section 5.G.b.1.a.1., is silent on a specific vehicle to be used in the reimbursement of mileage. At any given time, an APFA Representative could be subject to using their personal vehicle or a "Rental Car" for conducting APFA business.

The arbitrator finds the plaintiff has supported their charge to establish merit and a violation of the Policy Manual. Thus, Defendant Ross abused his Fiduciary duty to the membership of the APFA by claiming mileage to and from his residence and parking his personal vehicle in the Sacramento Airport. The arbitrator requests the Independent Auditor to look at the mileage logs or statements from April 1, 2016 through October, 2016 and determine the amount of money Defendant Ross was paid for claiming mileage from the Sacramento airport and return. Defendant Ross' claimed 42 miles from the Sacramento airport to his residence and 42 miles to return to the airport on weekends. Additionally, Defendant Ross charged $105.00 a month for parking his car at the Sacramento airport and claimed this cost to APFA for payment. The Independent Auditor shall investigate the claims for parking his car and determine how much he claimed and received payment from the APFA Whatever dollar amount the Independent Auditor has determined for mileage and parking, Defendant Ross is hereby Ordered to repay the APFA.

**5.   Maintaining an Office**

Plaintiff withdrew this charge in their post-hearing brief.

**6.   Charges related to Ross Leaving Office as National President (Buyout)**
**7.   Sick and Vacation Payouts**
**8.   Receiving MEA and SAF when Performing no work.**

Defendant Ross left office on March 1, 2018 in the face of a DOL ordered rerun election. He was elected to a four-year term but he voluntarily resigned and negotiated a Transition Agreement to leave. The economic terms of the Transition Agreement are as follows:

3.   APFA agrees that ROSS will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018.

APFA App. 037

4. APFA agrees to pay ROSS all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018.
5. APFA agrees to pay ROSS, upon his request, a one-time lump sum in the total amount of ten thousand dollars ($10,000), which represents ROSS's moving expenses. ROSS shall present the moving expenses to a APFA for payment through 2019.

Plaintiff argued that nowhere in the exit package language does it specify that Defendant Ross should get paid MEA and SAF expense payments for the months he is not working in March, April, May, June and July 2016. Yet, Defendant Ross received $1050 a month in these payments for five months for a total of $5250. MEA and SAF are considered expenses. Salary is included in Section 6-National Officer Salary and benefits. In Section 5-Trip Removal and Expense Policy is where SAF and MEA are located and discussed. The APFA Constitution defines salary in Section 6.A which provides, "The salary of the National President shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for a flight attendant based on 116 hours monthly."

## Section 6: National Officer Pay and Benefits
## B.1: Vacation

a. National officers shall be entitled to thirty-five (35) days of paid vacation to be taken in each fiscal year while in office or the seniority respective vacation allowance s/he is contractually entitled to as a Flight Attendant, whichever is greater. This calculation will not be based on the Article 6.H of the Collective Bargaining Agreement referring to "trips missed." This vacation allowance may be taken at the discretion of the National Officer, however, not more than fourteen (14) consecutive days taken at any one time.

b. National Officers should schedule their vacations so as to avoid the simultaneous absence of more than two (2) National Officers. In no case shall the National President and the National Vice President be on vacation simultaneously.

c. At the end of a fiscal year, up to fourteen (14) days of any unused APFA vacation allowance, as provided in B.1.a above, will be paid to the National Officer at a rate prorated on the National Officers' annual salary for the period of APFA vacation allowance owed, less applicable state and federal taxes. If the National Officer is entitled to more than thirty-five days vacation, up to twenty-one (21) days will be paid as stated above.

d. At the beginning of a term, the National Officer should be paid by the Company for any vacation allowance accrued as a flight attendant.

e. At the end of the term, the APFA will ensure that the departing National Officer is provided with the vacation time to which s/he would ordinarily be entitled as if the National Officer had been an active Flight Attendant for the previous and current calendar years. If the company does not provide the out-going officer with the appropriate vacation allowance accrued for the previous and current calendar year the APFA will:

19

1. Provide payback of accrued vacation allowance to be taken in corresponding consecutive vacation days in a block(s) that is seniority respective at his/her domicile per Article 6.1 of the AA/APFA Collective Bargaining Agreement, within 13 months following the end of the applicable term; or

2. The APFA will provide the departing National Officer with the appropriate Flight Attendant vacation by means of cash reimbursement at a rate prorated on the National Officers annual salary for the period of APFA vacation allowance owed less applicable state and federal taxes.

Plaintiff argued that Defendant Ross was paid 14 days of vacation for fiscal year 2017 which ran from April 2016 and through March 2017. Ross used four vacation days and was entitled to be paid out 14 of the remaining 31 days. Ross was paid that amount in 2017. In fiscal year 2018 Ross was entitled to be paid out an additional 14 vacation days as he used 6 days and should have received the maximum 14 days. Ross was also entitled to his end of term vacation which provides that he can receive vacation he would have accrued during present and previous year. For bidding purposes as a Flight Attendant, he should have received 35 days of vacation. So, the total amount Ross should have received in 2018 was 49 days which would have been 35 days for the end of term and 14 days maximum payout for fiscal year 2018. This is on top of the 14 days Ross already received for fiscal year 2018.

Plaintiff additionally argued that Ross received 101.44 days paid out in the amount of $38,574.68. Part of this payment includes the inflated pay which is the subject of a separate violation. Ross was overpaid 52.44 hours of vacation.

Defendant Ross argued the Ross TA is controlling. Defendant Ross would be paid any and all accrued and unused sick and vacation from April 1, 2016 – July 31, 2018. The calculation of the unused days was to be paid as though Ross was able to use any of those days while in office as President for his remaining 5 months had he not resigned. There was no agreement that these days were not to be paid per Policy as the Charging Party insists. An investigation into the payout of the Sick and Vacation days paid, brought about by the Charging Party's allegations, revealed Ross was not properly paid all of his accrued and unused Sick days from April 1, 2016 – July 31, 2018. Ross earned and did not use 18 Sick days in each of the fiscal years April 2016-March 2017 and April 2017-March 2018. Ross was only paid Per Policy 6.B.3.d Offset/Loss of Sick Time, of 12 days for each fiscal year. The additional 12 days, (6) days Apr. 2016-2017 and (6) days Apr. 2017-2018 have still not been acknowledged or paid to Ross in accordance with the Ross TA. The value of these lost Sick days, depending on the calculation used, is in excess of $3400 is still owed to Ross.

The arbitrator finds that MEA and SAF is guaranteed to the National Officers to compensate them for not working as a Flight Attendant. The TA provides for "Full Salary" including benefits. While one can argue that MEA and SAF is a guaranteed benefit, the Policy Manual states it is not wages or benefits but rather are expenses as stated in Section 5 of the Policy Manual. The TA does not mention MEA and SAF as a benefit but the purpose of providing a guaranteed MEA and SAF to the National Officers so they would not suffer monetarily. MEA and

20

SAF is a guaranteed expense to be paid monthly to the National Officers. If Defendant Ross did not receive the MEA and SAF that he was guaranteed as a National Officer, it would then be reasonable to assume that he would suffer monetarily. The TA states he will continue to receive his current full salary and benefits. The language regarding benefits in Section 6 of the Policy Manual and expenses in Section 5 of the Policy Manual is clear and unambiguous. However, if the BOD enters into a TA with an employee to pay his full salary for an additional 5 months without working then the TA language would be in conflict with the language over expenses (guaranteed MEA and SAF for National Officers) in Section 5 of the Policy Manual. During these five months of the TA that Defendant Ross was paid his full salary, no evidence was introduced that Defendant Ross worked as a Flight Attendant while receiving guaranteed MEA and SAF. Under normal circumstances, expenses are listed in box 1 of a W-2 but they are not considered wages or salary. It is therefore, the Opinion of this arbitrator the intent of the TA reached between Attorney Mark Richards, Robert Ross and the 2018 BOD was for the purpose of maintaining the "status quo ante" for Defendant Ross. Thus, it would be reasonable to conclude Defendant Ross received MEA and SAF for the months of March through July 2018 as a guaranteed expense benefit. However, it should be noted that MEA and SAF are expenses and are not to be included in or considered with his full salary for use in the payout determination of accrued sick and vacation leave. For these reasons, the arbitrator is of the Opinion this charge over MEA and SAF should be dismissed.

With respect to sick and vacation payout, the APFA Board of Directors has determined that Defendant Ross was overpaid in the amount of $5,436.47 in 2018. "The Board's finding was based on the results of a review from an independent accounting firm which determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect." Record evidence revealed National Treasurer Vasquez admitted he had changed the formula without the approval of the BOD or the EC.

Moreover, it is the arbitrator's understanding that Defendant Ross has refused to repay $5,436.47 to APFA and is presently in litigation to recoup the money owed to APFA. The arbitrator finds this is very troublesome in view of the fact that he is a standing Board member and the other National Officers have acknowledged the computation of their debt and has either paid their debt in full or have arranged to pay off their debt. As National President, Defendant Ross was elected to a position of trust with the responsibility of protecting APFA assets. Ross has a Fiduciary duty to the membership of the APFA and this arbitrator finds that he has abused this trust.

It is therefore arbitrator's Opinion, Defendant Ross has failed and abused his Fiduciary Duty. The non-payment of these monies reveals Defendant Ross is not accepting this responsibility. Thus, it is this arbitrator's Opinion that Defendant Ross should be and is hereby Ordered to immediately repay the APFA $5,436.47.

**Leasing an Apartment at the Bear Creek Complex**

The APFA provides National Officers two choices for relocating to the Dallas metroplex. They can either accept a corporate apartment or they can accept the relocation moving expense entitling them up to $10,000 in moving expenses. But they are required to select their choice before they move. Here, the record evidence revealed Defendant Ross accepted both choices. Plaintiff argued that Defendant Ross leased an apartment at the Bear Creek Complex on June 1, 2016.

Defendant Ross testified and denied leasing an apartment at the Bear Creek Complex but after Plaintiff showed him documentation, Defendant Ross then admitted that he had leased the apartment at the Bear Creek Complex for one year to be paid by APFA.

On Defendant Ross's weekly report, he claimed that he was house hunting on June 7 and 8, 2016. Defendant Ross explained that his children's school in California ended in June 2016. Kim Ross, packed household items into pods without furniture because their furniture was too large for the South Lake home and was delivered in August 2016. Defendant Ross decided to order furniture from Ashley furniture and ordered $3,637.00 worth of furniture on August 13, 2016 with the APFA credit card. Defendant Ross denied that he had ordered the furniture for his residence, that it was ordered for the corporate apartment because it had no furniture. Documentation was presented to Defendant Ross revealing he had the furniture delivered to the South Lake residence on August 18 and 25, 2016. Thus, Defendant Ross chose both options for his own personal benefit and was not looking out for APFA's benefit. He also acquired APFA furniture to be moved to his his residence per Mike Trapp's testimony when he was not entitled to do so. As a result of his actions, the corporate apartment he leased for his own personal benefit at the Bear Creek Complex cost APFA $8,106.13 which is an unnecessary expense for the APFA.

Thus, it is the arbitrator's Opinion, that Defendant Ross abused his Fiduciary duty to the membership of the APFA and should be assessed the cost of leasing that apartment in the amount of $8,106.13.

## Conclusion:

The arbitrator finds that throughout this proceeding, Defendant Ross *intentionally and willfully* ignored the provisions of the APFA Policy Manual and thus, has violated and abused his fiduciary duty entrusted to him by the APFA membership. Ross's testimony was inconsistent and not forthright. Because Ross abused his position of trust as well as his fiduciary duty to the membership of the APFA, he can no longer hold a position of trust with the APFA. Moreover, Article VII, Section 1 of the APFA Constitution provides that:

1. Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

……

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

Here, Defendant Ross has overwhelmingly violated the APFA Policy Manual and APFA Constitution. Ross has refused to repay APFA for an inappropriate overpayment in the amount of $5,436.47. The Union has been forced to put the matter in collections after Ross refused and is now forced to commence a lawsuit against Ross. The policy manual has a procedure for APFA representatives to follow if they disagree with the determination on any expenses which is to appeal to the APFA Executive Board and Board of Directors per Section 5.B. Ignoring the Board of Directors is not an option, especially *for a sitting Board member*. John Nikides testified that Ross's refusal to repay APFA as a sitting Board member undermines the Union, and the memberships faith in its officers.

APFA App. 041

Plaintiff argued that Defendant Ross should be expelled from membership. It is the Opinion of this arbitrator that Defendant Ross should be prohibited from serving in any official position for life within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. Additionally, if Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.

## REMEDY

1. The APFA will hire an Independent Forensic Auditor to audit Robert Ross' weekly reports, monthly reports and APFA credit card charges from April 1, 2016 through July, 2018 and perform the following tasks:

Specifically:

   a. The Auditor shall inspect the receipts for the Ross family vacation taken in the Grand Canyon in August 2016. Ross claimed all of hotel stays, meals and mileage charges as relocation moving expenses when some are for a personal vacation. Please determine what costs should not have been claimed as relocation moving expenses. Ross is liable for the excess cost and is hereby Ordered to repay APFA for all inappropriate charges!

   b. The Auditor shall inspect Ross' APFA credit card usage for personal and group meals and purchases for personal items such as tools, toiletries, bath towels, and candy from April 1, 2016 through July 2018 and determine the cost of all inappropriate charges. If no documentation was provided to support each purchase was a union related business cost, then Ross is liable for all inappropriate charges and is hereby Ordered to repay the APFA for all inappropriate charges!

   c. The Auditor shall inspect all of Ross' rental car usage from April 1, 2016 through October 16, 2016 and determine if these rentals were for union related business. APFA paid for the rental cars but there should be documentation to show if it was for union related business. If not, Ross is to be assessed the cost of the rental cars during the above period and is hereby Ordered to repay APFA for inappropriate rental car usage!

   d. The Auditor shall inspect all of Ross' claimed mileage from the Sacramento Airport to his residence (42 miles) and return (42 miles) as well as all monthly parking of his personal car. He claimed $105.00 per month from April 1, 2016 through July 2016 to park his car at the Sacramento airport. Ross is to be assessed the mileage and monthly parking he claimed and Ross is hereby Ordered to repay APFA for all of these inappropriate charges!

2. Ross is hereby Ordered to immediately repay the APFA $5,436.47 per the finding of the APFA Board of Directors. An independent accounting firm determined the formula used to determine the daily rate assessed for sick and vacation payout was incorrect.

3. Ross is hereby Ordered to repay the APFA $8,106.13 for leasing an apartment at the Bear Creek Complex where he had no intention of occupying.

4. Ross is hereby fined and Ordered to repay the APFA for all of the Arbitrator's Fee for this arbitration.

5. Ross is hereby ordered to repay the APFA the full cost of hiring the Independent Forensic Auditor.

6. Ross is hereby Ordered to repay $3,637.00 to the APFA for all of the furniture he had purchased and delivered to his residence located in South Lake, Texas.

7. Ross is prohibited from serving in any official  position within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. If Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.

8. The APFA if it hasn't done so, must create a separate body of trained forensic accountants to oversee the annual audit and to create procedures and recommendations to preclude fraud for the BOD's review and action to be included within the Policy Manual. National Officers or Officers who have the authority to extend APFA to credit or use of an APFA credit card must be held economically responsible. The language created must be very clear and unambiguous. Training over the LMRDA must be a requirement for all National Officers or any person who can extend APFA to credit and whom is given an APFA credit card. These individuals must sign a document declaring and attesting that they have read and understand their responsibilities in using an APFA credit card or extending credit to the APFA for rental cars, apartments, etc., and that negligence will not be tolerated and will be dealt with severe penalties.

9. The arbitrator shall retain jurisdiction over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Ross, that will be the amount to be assessed or due for repayment to the APFA. The APFA shall either Order said repayment from Ross or submit the Independent Auditors findings to have this arbitrator issue a Supplemental Decision and Remedy.

**AWARD**

The grievance is sustained in part and denied in part.

**Issued in San Antonio, Texas the 19th day of March, 2022.**

Ruben R. Armendáriz, Arbitrator

APFA App. 043

# Exhibit C

Arbitrator's Supplemental Decision issued on August 24, 2022

<u>In the Matter of Arbitration Between</u>

|  |  |  |
|---|---|---|
| | ) | |
| **Melissa Chinery** | ) | |
| **Sandra Lee** | ) | **RE: Article VII Charges** |
| | ) | **Violations of APFA Constitution** |
| **APFA Charging Party Members** | ) | **and APFA Policy Manual** |
| **(Plaintiff)** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **Robert Ross, Former APFA National** | ) | |
| **President** | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |
| _____ | ) | |

## SUPPLEMENTAL DECISION AND REMEDY MODIFICATION

**Before:** **Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:** **The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

**June 16, 2021, continued to November 17 and 18, 2021**

**Appearances:**

**For Charging Party Members:** **Melissa Chinery, Representative**
**(Plaintiff's)** **Sandra Lee, Representative**

**For Charged Party Member:** **Kit Gomez Alba, Representative**
**(Defendant)** **Gina Guidry, Representative**
**Robert Ross, Representative**

<span style="color:red">**Exhibit C**</span>

RE: Supplemental Decision and Remedy Modification
Article VII Charges

On the 19th day of March 2022, the undersigned arbitrator issued a Decision in the above matter. In the original Remedy, the undersigned arbitrator requested APFA to hire a forensic auditor to audit certain items of this case to identify all inappropriate charges listed in item 1., 1(a.), 1(b)., 1(c.), and 1(d.) concerning Defendant Ross.

In accordance with the original remedy, the APFA hired Cornwell Jackson, Certified Public Accountants to conduct the requested audits. On August 5, 2022, the Independent Accountant's Audit Report was completed and submitted to the APFA. This report was subsequently transmitted to this arbitrator to review and to issue a "Supplemental Decision and Remedy Modification."

The arbitrator has reviewed the Independent Accountant's Audit Report and finds Defendant Ross has violated certain identified items. Thus, the March 19, 2022 Original Remedy is hereby modified to reflect the Auditors' identified items. Accordingly, the arbitrator finds those monetary amounts found inappropriate are now subject for repayment to APFA. Additionally, the Auditors invoices for services rendered shall be included for repayment.

## REMEDY MODIFICATION

It is hereby Ordered that Defendant Ross shall repay the APFA the following amounts the auditors identified as inappropriate. The accountant's Audit Report is a thorough explanation of the auditor's findings and those amounts found inappropriate.[1]

| | |
|---|---|
| 1(a): Inappropriate costs claimed as moving expenses. | $.    775.05 |
| 1(b): Inappropriate credit card charges for meals and personal items. | 12, 274.00 |
| 1(c): Inappropriate costs related to rental cars. | 6, 454.38 |
| 1(d): Inappropriate costs related to mileage to Sacramento airport. | 725.76 |
| 1(d): Inappropriate costs related to airport parking. | 107.00 |
| | **$   20,336.19** |

**Auditors Invoices:**

| | |
|---|---|
| 05/31/2022 | $       150.00 |
| 06/30/2022 | 3,325.00 |
| 07/31/2022 | 11,000.00 |
| 08/05/2022 | 350.00 |
| **Total** | **$   14,825.00** |

2. Ross is hereby Ordered to immediately repay the APFA **$5,436.47** per the finding of the APFA Board of Directors. An independent accounting firm determined the formula used to determine the daily rate assessed for sick and vacation payout was incorrect.

3. Ross is hereby Ordered to repay the APFA **$8,106.13** for leasing an apartment at the Bear Creek Complex where he had no intention of occupying.

4. Ross is hereby fined and Ordered to repay the APFA for all of the Arbitrator's Fee of **$10, 217.96** for this arbitration.

5. Ross is hereby Ordered to repay **$3,637.00** to the APFA for all of the furniture he had purchased and delivered to his residence located in South Lake, Texas.

---

[1] Mr. Ross can request a copy of the auditor's report from the APFA if he has not already received a copy of it.

APFA App. 045

RE: Supplemental Decision and Remedy Modification
Article VII Charges

6. Ross is prohibited from serving in any official position within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. If Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.

7. The APFA if it hasn't done so, must create a separate body of trained forensic accountants to oversee the annual audit and to create procedures and recommendations to preclude fraud for the BOD's review and action to be included within the Policy Manual. National Officers or Officers who have the authority to extend APFA to credit or use of an APFA credit card must be held economically responsible. The language created must be very clear and unambiguous. Training over the LMRDA must be a requirement for all National Officers or any person who can extend APFA to credit and whom is given an APFA credit card. These individuals must sign a document declaring and attesting that they have read and understand their responsibilities in using an APFA credit card or extending credit to the APFA for rental cars, apartments, etc., and that negligence will not be tolerated and will be dealt with severe penalties.

8. The arbitrator shall retain jurisdiction over any issue involving this remedy for only 90 days from the date of this Supplemental Decision and Remedy Modification.

**Issued the 24th day of August, 2022, in San Antonio, Texas.**

Ruben R. Armendáriz, Arbitrator

3

# Exhibit D

Ross's Post-Hearing Brief to the Arbitrator (Excerpt)

Association of Professional Flight Attendants
Article VII Charges
Before Arbitrator Ruben R. Armendariz

Robert Ross
Former APFA National President
Charged Party

and

Melissa Chinery
Sandra Lee
Members
Charging Parties

# ARTICLE VII CHARGES – ROSS – POST HEARING BRIEF
## Closing Brief

By:   Robert Ross                Gina Guidry              Kit Gomez Alba
        1Rross@comcast.net        Guidrygina@yahoo.com     Sable227@gmail.com
        (916) 284-2402               (817) 793-8828             (360) 270-9552

**<span style="color:red">Exhibit D</span>**

APFA App. 047

the "Ross Transition Agreement" that he was not entitled to and any alleged violation stemming from his acceptance of the agreement, should be dismissed.

Whereas the Arbitrator, designated in these Chinery/Lee v Ross Article VII proceedings, has the jurisdiction and authority to rule on the validity of charges and the remedy sought by the Charging Party to the allegation. Did former National President Ross knowingly or **"willfully"** violate an express Article of the APFA Constitution or Policy Manual, and did Ross **"willfully"** violate any express article of the Constitution and/or Policy Manual when he accepted the terms of the "Ross Transition Agreement"? [Ex. R6]. The Arbitrator also has the jurisdiction and authority to dismiss the Article VII Charges against the Accused.

The Article VII Arbitrator also has the jurisdiction and authority to rule, if Melissa Chinery and Sandra Lee did **"willfully"** bring charges against former National President, Bob Ross, as well as against the other Officers of the Ross Administration without having just cause and/or sufficient evidence to sustain the charges.

> **Article VII Section 1.G**
> *"Willfully acting in a manner that causes the Association to violate its legal obligations."*

Whereas it is within the right of the APFA BOD and Leadership to do all necessary to safeguard and protect APFA, They do not have the authority to unilaterally violate written agreements that harm a party to the agreement while aiding a non-involved member to the agreement in their quest to use that information against Ross.

> **Article III Section 3.A. – Board of Directors**
> A. **"The Board of Directors is authorized empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this Constitution and to establish, prescribe and adopt such other policies which may be consistent with this Constitution as requires for the direction and management of the affairs of the APFA.**

# Exhibit E

Ross's Resignation as San Francisco (SFO) Base President

**From:** 1rross@comcast.net <1rross@comcast.net>
**Sent:** Monday, March 21, 2022 1:34 PM
**To:** Tim Schwartz <tschwartz@apfa.org>
**Cc:** 'anthony cataldo' <anthcat@yahoo.com>
**Subject:** SFO BP

Please consider this my Resignation as SFO Base President.


Bob Ross
916-284-2402 Mobile/Text
1RRoss@comcast.net


*This e-mail, including attachments, is intended for the exclusive use of the addressee. If you are not the intended recipient, any dissemination, use, distribution or copying is prohibited.*

**Exhibit E**

# Exhibit F

Non-Published Cases Cited in the Brief

*Allied Waste Systems Inc. v. Teamsters Local 767*, 2007 U.S. Dist. LEXIS 43035, 2007 WL 1703634 at *11-13, 19-21 (N.D. Tex. 2007) (J. Means)

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)
**(Cite as: 2007 WL 1703634 (N.D.Tex.))**

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Fort Worth Division.
ALLIED WASTE SYSTEMS, INC.
v.
INTERNATIONAL BROTHERHOOD OF TEAM-
STERS, LOCAL 767.
**Civil Action No. 4:06-CV-328-Y.**

June 13, 2007.
Celeste Yeager Winford, Michele C. Spillman,
Gardere Wynne Sewell, Dallas, TX, for Allied
Waste Systems, Inc.

G. William Baab, Baab & Denison, Dallas, TX, for
International Brotherhood of Teamsters, Local 767.

*ORDER DENYING PLAINTIFF'S MOTION FOR*
*SUMMARY JUDGMENT AND GRANTING DE-*
*FENDANT'S*
*CROSS-MOTION FOR SUMMARY JUDGMENT*
TERRY R. MEANS, United States District Judge.

*1 This case involves the final and binding decision
of an arbitrator concluding that plaintiff Allied
Waste Systems, Incorporated ("Allied Waste"), vi-
olated the collective-bargaining agreement ("CBA")
when it terminated the employment of David Esco-
bar because he had not performed his regular job
duties for a period of six months. Allied Waste has
refused to abide by the arbitrator's decision and has
brought suit in this Court under section 301 of the
Labor Management Relations Act of 1947
("LMRA"), as amended, 29 U.S.C. § 151 *et seq.,*
requesting that the Court vacate the arbitrator's de-
cision and award. Defendant International Brother-
hood of Teamsters, Local 767 ("Local 767"), filed a
counterclaim requesting that the Court confirm the
arbitrator's decision and order the enforcement of
his award. Local 767 also counters that Allied
Waste's refusal to abide by the binding decision of

the arbitrator is without justification and requests
that the Court award it reasonable attorney's fees.

The Court has before it the parties' cross-motions
for summary judgment that call upon the Court to
decide: (1) whether it should vacate the arbitrator's
decision and award in favor of Local 767 or con-
firm it and order its enforcement; and, (2) whether
Allied Waste's refusal to abide by the arbitrator's
decision is unjustified and thus entitles Local 767 to
reasonable attorney's fees.

After review, the Court concludes that the arbitrator
acted within the scope of his authority and that his
decision and award in favor of Local 767 is ration-
ally inferable from the terms of the CBA and
should be enforced. Further, the Court concludes
that Allied Waste's refusal to abide by the arbitrat-
or's decision is without justification and in violation
of its obligation to honor federal labor policy favor-
ing the voluntary arbitration of labor disputes.

I. Factual Background

The material facts in this case are not in dispute.
Allied Waste and Local 767 are parties to a valid
CBA that includes a final and binding arbitration
procedure for settling grievances. It is undisputed
that the CBA covers the grievance at issue here.

Allied Waste provides a variety of trash-hauling
services in the greater Dallas-Fort Worth, Texas,
area. As part of its services, Allied Waste picks up
trash and garbage containers on regularly estab-
lished routes using "roll-off" trucks. Escobar
worked for Allied Waste as a driver of these roll-
off trucks at its Fort Worth, Texas, facility from
1982 until his termination on July 23, 2003.

Escobar's position involved heavy-duty work. He
worked alone and was required to lift amounts in
excess of twenty-five pounds, push and pull heavy
doors, and install and remove heavy tarpaulins. He
routinely worked ten-hour shifts on as many days a
week as was required by the volume of work to be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

APFA App. 051

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)
(Cite as: 2007 WL 1703634 (N.D.Tex.))

completed.

On January 23, 2003, Escobar suffered an on-the-job injury. The next day, Escobar saw a physician selected by Allied Waste. The physician determined that Escobar had injured his right arm but that he could return to work with certain restrictions. The physician ordered that Escobar be restricted from lifting anything that weighed more than twenty-five pounds and from working longer than eight hours per day.

*2 On February 3, Allied Waste sent Escobar a letter informing him that it had reviewed the medical report concerning his injury. Allied Waste indicated that it had identified an appropriate modified duty position for him based on the physician's assessment and stated that it was extending to Escobar "a bona fide offer of employment pursuant to [Rule § 129.6 of the Texas Administrative Code]." (App. in Supp. of Pl.'s Mot. Summ. J. at 36.) The letter, however, did not specify the position Allied Waste had identified for Escobar's modified duty.

The letter instructed Escobar to return to work on February 3. It informed him that his work schedule would be Monday through Friday from 5:00 a.m. until he completed his route and that he would be paid at the same rate as roll-off truck drivers. The letter then went on to state,

This position will entail these specific physical and time requirements: No lifting objects/carrying objects more than 25lbs for more than 8 hours per day .... Please be assured that [Allied] Waste will only assign you task [sic] consistent with your physical abilities, knowledge, and skills and will provide you training if necessary.

(Id.) Finally, the letter advised Escobar that he could contact Ruby Silva, Allied Waste's safety manager, if he had any questions. Escobar signed the letter indicating that he accepted Allied Waste's offer and returned to work on February 3.

When he returned to work, Escobar resumed his duties operating a roll-off truck. Allied Waste, however, did not immediately provide Escobar with

any accommodations consistent with the physician's restrictions. Thus, for approximately one week Escobar performed all of the regular duties including the heavy work despite his restrictions. About a week later, Allied Waste assigned Escobar an assistant, but the assistant failed to provide any help. He merely observed Escobar perform all of his duties.

Escobar complained to his supervisors but nothing happened. Then, in late February, Escobar and two of his union representatives met with his supervisors and again informed them that Escobar's assistant was not providing any help. Still, the situation remained unchanged. On March 4, 2003, Escobar's assistant failed to show up at work and was not seen again. Escobar never contacted Silva to inform her of the situation.

The next day, Escobar saw another physician approved by Allied Waste. He concluded that Escobar was physically incapable of performing his duties and removed Escobar from his job. The physician did not clear Escobar to return to work without any restrictions until August 22. Escobar never returned to work after March 5.

Under Article 16, Section 5 of the CBA,

An employee shall lose his seniority rights and the employment relationship shall cease under the following conditions .... Failing to perform duties of any regular position or classification for any reason for longer than six (6) months. Performing modified duties pursuant to Article 14, Section 4 of this agreement does not constitute "performing duties of any regular position or classification" under this provision.

*3 (App. in Supp. of Pl.'s Mot. Summ. J. at 27.) In accordance with its interpretation of this article, Allied Waste determined that Escobar had not been performing the regular duties of a roll-off driver since January 23, 2003, the day the first physician placed Escobar on modified duty. On July 23, six months later, Allied Waste sent a letter to Escobar informing him that it was terminating his employment because he had not performed his regular du-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)
(Cite as: 2007 WL 1703634 (N.D.Tex.))

Page 3

ties during the past six months.

Escobar timely filed a grievance under the CBA. In accordance with the CBA, the grievance was submitted to binding arbitration and the parties agreed on Bernard Marcus to serve as the arbitrator. According to the CBA,

The arbitrator will be jointly contacted and asked to hold a hearing at which both parties may present evidence. The arbitrator shall decide only the grievance submitted by applying the express language of this agreement and shall have no authority to add to, subtract from, modify or amend this agreement, but shall be limited to determining whether or not a violation of the terms have been committed.

The arbitrator's duly rendered decision shall be final and binding on the employer concerned, the union, and the employee(s) involved.

(App. in Supp. of Pl.'s Mot. Summ. J. at 22.)

The parties asked Marcus to answer the question,

Did [Allied Waste] have just cause to terminate the employment of [Escobar] on the grounds that [Escobar] failed to perform the duties of any regular position or classification in the bargaining unit for a period longer than six months, as required in Article 16, Section 5, of the labor agreement?

(App. in Supp. of Pl.'s Mot. Summ. J. at 2.) In accordance with the CBA, Marcus held a hearing and received evidence. After the hearing, Marcus invited the parties to submit post-hearing briefs arguing their positions.

After review of the evidence and the parties' briefs, Marcus concluded that Allied Waste had breached the CBA. Marcus began his opinion discussing Article 16(5) of the CBA. He found that article to be "clear and unambiguous." (App. in Supp. of Pl.'s Mot. Summ. J. at 8.) The clear meaning, according to Marcus, was that Article 16(5) gave Allied Waste the right to terminate any employee who failed to perform the duties of any regular position or classification for any reason, including injury, for longer than six months. He stated that Allied

Waste had "the contractual obligation to establish that Escobar did not perform the regular duties of any bargaining unit job classification after January 23, 2003." (Id. at 9.) In other words, Marcus placed the burden on Allied Waste to prove that Escobar performed only modified duties between February 3 and March 5.

Based on the evidence, Marcus found that Escobar had performed his regular duties as a roll-off driver between February 3 and March 5, despite being placed on modified duty. Marcus rejected Allied Waste's argument that Escobar was obligated to inform its safety manager that his assistant failed to offer any help. Nevertheless, Marcus found that Escobar had, on two occasions, notified his supervisors that his assistant was not providing any help and that because no corrective action occurred, Escobar continued to perform his regular duties until March 5. Marcus also noted that Allied Waste had not produced any evidence to counter Escobar's assertion that he continued to perform his regular duties between February 3 and March 5 without modification. Marcus particularly noted that Allied Waste never called the assistant it assigned to Escobar to testify at the hearing.

*4 Because he found that Escobar did in fact perform the regular duties of a roll-off driver, Marcus concluded that the six-month clock under Article 16(5) did not begin to run until March 5, the day Escobar stopped performing his regular duties altogether due to his on-the-job injury. Marcus interpreted the plain language of Article 16(5) to mean that the question is whether in fact the employee is actually performing his regular duties or was performing modified duties--not whether that employee was technically placed on a modified duty by a physician. Since it wasn't until March 5 that Escobar ceased performing his regular duties, the six-month clock did not expire until September 5. And because Escobar was cleared to work without any restrictions on August 22, which was before the six-month period had expired, Allied Waste violated the CBA when it terminated his employment on Ju-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ly 23, which was also before the six-month period had expired.

As a result, Marcus directed Allied Waste to offer Escobar reinstatement to his former or equivalent position with no interruption in benefits or seniority. Further, Marcus directed Allied Waste to make Escobar whole for any loss of wages and other benefits between August 23, 2003, and the date he is reinstated or advises Allied Waste that he does not desire to return to work. Marcus allowed for an offset of any interim earnings, unemployment compensation, or state or federal assistance Escobar received after August 23.

II. Analysis

A. Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As mentioned above, the material facts in this case are not in dispute. What the parties dispute is the conclusion of the arbitrator that Allied Waste violated the CBA when it terminated Escobar's employment because he had not performed his regular duties for longer than six months.

Judicial review of an arbitration decision arising from the terms of a CBA is narrowly limited, and the Court is required to afford great deference to the arbitral award. *See Beaird Industries, Inc. v. Local 2297,* 404 F.3d 942, 944 (5th Cir.2005). The Supreme Court has emphasized that

the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for, and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different than his.

*United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598-99, 80 S.Ct.

1358, 4 L.Ed.2d 1424 (1960). Of course, the arbitrator is not free to disregard the terms of the CBA and impose "his own brand of industrial justice." *Beaird,* 404 F.3d at 944. Accordingly, the Court will affirm an arbitral award " 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority ...." *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). If the arbitrator's decision "draw[s] its essence from the [CBA] ... the fact a court is convinced he committed serious error does not suffice to overturn his decision." *Eastern Associated Coal corp. v. United Mine Workers of America, District* 17, et al., 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (internal quotations and citations omitted).

*5 The Court has characterized the "essence test" as "rather metaphysical." *Kergosien v. Ocean Energy, Inc.,* 390 F.3d 346, 353 (5th Cir.2004) (internal quotations and citations omitted). Thus, to draw its essence from the CBA, the award must in some logical way be derived from the wording or purpose of the contract, and "the single question is whether the award, however arrived at, is rationally inferable from the contract." *Id.* at 353-54.

B. Discussion

Allied Waste begins its attack by arguing that Marcus "fashioned his own brand of industrial justice and rendered an award that does not draw its essence from the contract." (Pl.'s Mot. for Summ. J. at 5.) It contends that Marcus "completely ignored [the] plain language of the CBA." (*Id.*) Although characterized in that fashion, as will be discussed below, in reality Allied Waste's arguments invite the Court to second-guess Marcus's interpretation of Article 16(5) and his application of that article to the facts of this case.

Allied Waste asseverates that,

The language of the CBA is clear--if a doctor releases an employee to work with restrictions, the employee is on modified duty and is not perform-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing the functions of his regular position.

(Pl.'s Mot. for Summ. J. at 6.) Allied Waste argues that Marcus's construction of Article 16(5) is erroneous because it makes it impossible for Allied Waste to place any of its employees on modified duty under the CBA or to terminate any of its employees for failing to perform their regular duties for six months. (Pl.'s Mot. for Summ. J. at 6.) Allied Waste contends that his interpretation allows its employees to simply claim that they performed some of their regular duties while they were on modified duty, and that any employee can just reset the six-month clock by performing his regular duties while placed on modified duty.

Allied Waste argues that the correct interpretation of Article 16(5) is that any work an employee performs while placed on modified duty by a physician does not qualify as performing regular duties. It is not until a physician removes the restrictions and clears the employee to perform his regular duties does the six-month clock end--according to Allied Waste's interpretation. Thus, "the fact that Escobar claims to have performed his regular duties for approximately one month ... is beside the point." (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 2.)

Further, Allied Waste argues that Marcus's interpretation is erroneous because it allows for its employees to merely disregard the orders of physicians placing them on modified duty. Allied Waste contends that its termination of Escobar was justified nonetheless because he violated the CBA and its rules when he continued to perform his regular duties despite a physician order to the contrary. Allied Waste argues, "Escobar should not be able to unilaterally avoid the plain language of the CBA by blatantly disregarding his doctor's orders and performing work beyond his restrictions without notifying the safety manager, Ruby Silva." (Pl.'s Mot. for Summ. J. at 6.)

*6 Finally, Allied Waste contends that Marcus erred when he concluded that Escobar was not required to report his situation to Silva. According to Allied Waste, the February 3 letter to Escobar

clearly advised him to direct any questions or concerns he had regarding his modified duty to Silva. Under the CBA, Allied Waste contends that Escobar had no authority to continue to perform his regular duties without informing Silva.

Marcus considered these arguments and rejected them. He observed that Article 16(5) clearly and unambiguously gave Allied Waste the right to terminate the employment of any employee who was not **performing** his regular duties, for whatever reason, for longer than six months. He concluded, however, that Article 16(5) speaks in terms of an employee's actual performance and not in terms of a physician's order placing an employee on modified duty. Thus, for Marcus, whether Escobar continued to perform his regular duties despite a physician order to the contrary was not "besides the point," but was the critical question.

Based on the evidence, Marcus found, as fact, that Escobar had been performing his regular duties from February 3 until March 5 despite the physician order. Applying his interpretation of the CBA, Marcus concluded that the six-month clock under Article 16(5) did not begin to run until March 5, the day Escobar actually stopped performing his regular duties.

Furthermore, Allied Waste did not discharge Escobar because he continued to perform his regular duties despite a physician order otherwise. And the parties did not submit that issue to Marcus for arbitration. According to the CBA, Marcus was strictly confined to adjudicating the issue the parties submitted to him, and that issue concerned Allied Waste's decision to terminate Escobar's employment because he had not performed his regular duties for more than six months under Article 16(5). Thus, Marcus would have acted outside of his authority if he determined that, because Allied Waste could have terminated Escobar for alternative reasons, it did not violate the CBA.

Moreover, Allied Waste fails to point to any provision in the CBA that required Escobar to report to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

its safety manager, Silva, that the conditions of his position required him to perform his regular duties beyond the physician-ordered restrictions. At best, Allied Waste points to the letter it sent Escobar on February 3. The CBA, however, provides that, "Employees shall immediately, or at the end of their shift, report all injuries to their immediate supervisor ...." (App. in Supp. of Pl.'s Mot. Summ. J. at 25.) Escobar twice reported to his immediate supervisors that his assistant failed to help him in any way and as a result, he was required to continue to perform his regular duties despite being injured.

The record shows that Marcus discharged his duties in accordance with the CBA and that he acted well within the scope of his authority. Following the terms of the CBA, Marcus held a hearing and gave both sides the opportunity to submit evidence. Additionally, a review of the language in Article 16(5) and in the CBA establishes that Marcus's interpretation and decision can be rationally inferred from it. Article 16(5) uses the words "perform" and "performing." Thus it is rational to infer that Article 16(5)'s primary concern is the actual work the employee is performing and not whether the employee was placed on modified duty by a physician. And the CBA provides that employees are to report their injuries to their immediate supervisors, not the safety manager. Thus, Marcus's conclusion that Escobar was not required to report his situation to Silva and that he fulfilled any obligations he had by reporting his situation to his immediate supervisors is also rationally based on the CBA.

\*7 It is beyond the purview of this Court to review Marcus's findings of fact or to second-guess his interpretation and application of the CBA. As long as Marcus acted within the scope of his authority and his decision can be rationally inferred from the text and purpose of the CBA, this Court must confirm his decision and award. The Court's review is very narrow, and to the extent Allied Waste's arguments invite the Court to do otherwise, the Court must decline the invitation.

C. Attorney's Fees

Local 767 contends that Allied Waste's refusal to abide by and comply with the arbitrator's decision is without justification. Thus, Local 767 argues that it is entitled to reasonable attorney's fees.

As a starting point, the Supreme Court has repeatedly reaffirmed the "American Rule" holding that each party in a lawsuit ordinarily shall bear its own attorney's fees--"the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. & Care Home, Inc., et al. v. West Virginia Dep't of Health & Human Res., et al.,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Hensley, et al. v. Eckerhart, et al.,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Under this practice, a court will not award attorney's fees to a prevailing party "absent explicit statutory authority." *Buckhannon,* 532 U.S. at 602.

Section 301 of LMRA does not explicitly provide for attorney's fees in a suit brought to vacate an arbitrator's award or to order its enforcement. Nevertheless, under the law of this Circuit, "when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may properly be awarded." *Bell Production Engineers Association v. Bell Helicopter Textron,* 688 F.2d 997, 999 (5th Cir.1982). Of course, it is not enough simply to say that because the judicial challenge to the arbitration decision was unsuccessful, the refusal to abide by it, *a fortiori,* was without justification. *International Association of Machinists & Aerospace Workers, District 766 v. Texas Steel Company,* 639 F.2d 279, 283 (5th Cir.1981). On the other hand, merely asserting, as grounds for refusing to accept the binding arbitration decision, that the arbitrator exceeded his authority, ignored the express terms of the CBA, and fashioned his own brand of industrial justice, does not mean that the refusal was justified. *See Id.* "Rather, the Court must look to the realities of the situation." *Id.*

The reality of the situation here is that Allied

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Waste's objections to Marcus's decision go to his construction of Article 16(5) and its application to the facts of this case. Nothing in Allied Waste's arguments, although couched in that fashion, address whether Marcus acted outside the scope of his authority or that his decision cannot be rationally inferred from the text and purpose of the CBA. Just because there may be room to disagree with Marcus's interpretation and application of Article 16(5) does not mean that his interpretation and application cannot be rationally inferred from it. Allied Waste's objections to Marcus's decision, properly characterized, involve the intrinsic merits of the dispute.

\*8 The Court has a duty to sanction

**frivolous and wasteful judicial challenges to conscientious and fair arbitration decisions .... The federal labor policy favoring voluntary arbitration dictates that when a refusal to abide by an arbitration decision is without justification, and judicial enforcement is necessary, the court should award the party seeking enforcement reasonable costs and attorney's fees incurred in that effort. This sanction is necessary lest federal labor policy be frustrated by judicial condonation of dilatory tactics that lead to wasteful and unnecessary litigation.**

*Texas Steel Company,* **639 F.2d at 284** (holding district court abused discretion by not awarding attorney's fees).

III. Conclusion

For the foregoing reasons, Allied Waste's summary-judgment motion is DENIED (doc. # 12), and Local 767's summary-judgment motion is GRANTED (doc. # 15). The arbitration decision and award entered on March 27, 2006, by Bernard Marcus and attached as Exhibit A to Allied Waste's original complaint is HEREBY CONFIRMED. Local 767 is entitled to judicial enforcement of the arbitrator's decision and award. Further, Local 767 is entitled to costs and reasonable attorney's fees incurred in defending this action and seeking enforcement. Local 767 shall have fourteen days from the date of

this order to submit affidavits in support of such costs and fees, after which time Allied Waste shall have seven days to file any objections to the reasonableness of the costs and fees claimed.

Not Reported in F.Supp.2d, 2007 WL 1703634 (N.D.Tex.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

APFA App. 057

*Ball Metal Container Corp. v. UAW Local 129*, 2022 U.S. App. LEXIS 33214, 2022 WL 340573 at *7-8 (5th Cir. 2022) (unpublished).

 Neutral
As of: September 18, 2022 12:08 AM Z

# *Ball Metal Bev. Container Corp. v. Local 129, UAW*

United States Court of Appeals for the Fifth Circuit

February 4, 2022, Filed

No. 21-10755

**Reporter**
2022 U.S. App. LEXIS 3214 *; 2022 WL 340573

BALL METAL BEVERAGE CONTAINER CORPORATION, Plaintiff-Appellee, versus LOCAL 129, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Defendant-Appellant.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [\*1]** Appeal from the United States District Court for the Northern District of Texas. USDC 4:20-CV-797.

*Ball Metal Bev. Container Corp. v. United Auto., Aero. & Agric. Implement Workers, Local 129, 547 F. Supp. 3d 568, 2021 U.S. Dist. LEXIS 145414, 2021 WL 3277270 (N.D. Tex., July 6, 2021)*

## Core Terms

arbitrator, termination, just cause, harassment, Grievant, discipline, violations, arbitration award, suspension, parties, arbitral decision, employees, proper cause, attorney's fees, ambiguity, benefits, modified, terms, backpay, bargaining, seniority, exceeded, plant, disciplinary action, summary judgment, noncompliance, reasons, suspend, vacatur, rights

## Case Summary

**Overview**
HOLDINGS: [1]-The employee's harassment violation warranted appropriate disciplinary action, up to and including termination, and the flexibility in this disciplinary approach permitted the arbitrator to opt for a penalty short of termination; [2]-Because the arbitrator's opinion did not unambiguously reflect that the arbitrator exceeded his authority, the appellate court must enforce his award; [3]-Because the company's challenge was jurisdictional, the district court did not abuse its discretion in denying a fee award; [4]-When an arbitrator's decision did not specify the award during a period of noncompliance, the court was authorized to remand to the arbitrator for clarification.

**Outcome**
Judgment reversed and remanded.

## LexisNexis® Headnotes

Business & Corporate Compliance > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN1*[ ] **Arbitration, Arbitrability**

When the parties submit a dispute for arbitration, the arbitrator's decision shall be final and binding on all parties. The arbitrator's authority, however, is constrained.

Governments > Courts > Rule Application & Interpretation

2022 U.S. App. LEXIS 3214, *1

**HN2**[⬇] **Courts, Rule Application & Interpretation**

More generally, for violations of plant rules and company policies, progressive discipline is to be followed except that steps for discipline may be accelerated depending upon the severity of the infraction and if there is a pattern of violation of any of the rules.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Summary Judgment Review > Standards of Review

**HN3**[⬇] **Alternative Dispute Resolution, Judicial Review**

The appellate court reviews a district court's grant of summary judgment in a suit to vacate an arbitration award de novo. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

**HN4**[⬇]   **Alternative Dispute Resolution, Judicial**

Review

Judicial review of arbitration awards is severely limited. The standard for this review is among the narrowest known to the law. When an arbitration award settles a labor dispute, judicial review is particularly constrained. The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations, which reflect a decided preference for private settlement of labor disputes without the intervention of government.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Essence of Agreements

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

Labor & Employment Law > ... > Labor Arbitration > Arbitrators > Authority

**HN5**[⬇]   **Alternative Dispute Resolution, Judicial Review**

Under this unusually deferential standard of review, courts are not authorized to reconsider the merits of an award. Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits. Instead of assessing how well the arbitrator interpreted the contract, we ask if the arbitrator acted within the contract's bounds. An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > ... > Labor Arbitration > Arbitrators > Authority

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Essence of Agreements

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

*HN6*[🔽] **Alternative Dispute Resolution, Judicial Review**

To determine whether arbitrators have overstepped their authority, courts apply the essence test, evaluating whether the arbitration award has a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. Where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end. In these situations, an arbitrator is no longer applying or interpreting the agreement but rewriting it, and the appellate court will vacate the award. Where there is ambiguity as to whether an arbitrator is acting within the scope of his authority, however, that ambiguity must be resolved in favor of the arbitrator.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Wrongful Termination > Breach of Contract > For Cause Standard

*HN7*[🔽] **Labor Arbitration, Discipline, Layoffs & Terminations**

Explicating broad CBA terms like cause, when left undefined by contract, is the arbitrator's charge. In addition to assessing the nature of the violations, an arbitrator may under the precedents take account of employee tenure in determining whether just cause for discipline exists rather than for dismissal.

Business & Corporate Compliance > ... > Pretrial

Matters > Alternative Dispute Resolution > Judicial Review

*HN8*[🔽] **Alternative Dispute Resolution, Judicial Review**

The correctness of the arbitrator's interpretation is irrelevant so long as it was an interpretation.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Awards

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Essence of Agreements

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Scope of Authority

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

*HN9*[🔽] **Alternative Dispute Resolution, Judicial Review**

When there are two alternative constructions of an arbitrator's reasoning, one of which would uphold the decision, the appellate court must enforce the award. As the Supreme Court has explained, a mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Unless the arbitral decision does not draw its essence from the collective bargaining agreement, a court is bound to enforce the award even when the basis for the arbitrator's decision may be ambiguous.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN10*[🔽] **Alternative Dispute Resolution, Judicial Review**

Business & Corporate Compliance > ... > Pretrial

Given that arbitrators need not explain their reasoning at all, an ambiguity in reasoning generally will not disturb their awards. It has long been settled that arbitrators are not required to disclose or explain the reasons underlying an award. Although explanations of arbitration awards are not mandatory, they are desirable. To encourage justification, the Supreme Court has advised against overturning awards based on ambiguities that can be identified in the explanations arbitrators choose to give, since that would discourage them from providing those reasons in the first place. So long as the appellate court can discern a possible rationale from the arbitrator's actions, his decision must stand.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN11*[🔽]   **Alternative Dispute Resolution, Judicial Review**

Before the court rejects an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based his decision on noncontractual grounds.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > Second Level Review

Civil Rights Law > ... > Procedural Matters > Costs & Attorney Fees > Appellate Review

*HN12*[🔽]   **Alternative Dispute Resolution, Judicial Review**

The appellate court reviews the district court's denial of attorneys' fees for abuse of discretion. For the same reason that judicial review of arbitration awards is limited, a party may be awarded attorneys' fees if it has to fight back a court challenge to the award it obtained in the parties' chosen forum.

Business & Corporate Compliance > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN13*[🔽]   **Arbitration, Arbitrability**

Courts award fees when the challenge to the arbitrator's decision is without justification. Without justification refers not to the strength of the challenge but to the type. Challenges to an arbitrator's jurisdiction or authority do not result in fee awards, whereas challenges to the intrinsic merits of a dispute justify fee awards even if the challenges are not frivolous. When parties have agreed to arbitrate a dispute, a subsequent court challenge to the merits is not justified even when that question is close because going to court is at odds with the parties' agreement to be bound by the arbitrator's decision.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN14*[🔽]   **Alternative Dispute Resolution, Judicial Review**

When an arbitrator's decision does not specify the award during a period of noncompliance, the court is authorized to remand to the arbitrator for clarification.

**Counsel:** For Ball Metal Beverage Container Corporation, Plaintiff - Appellee: onathan Gary Rector, Esq., Barbi McClennen Lorenz, Littler Mendelson, P.C., Dallas, TX.

For Local 129, United Automobile, Aerospace, and Agricultural Implement Workers of America, Defendant - Appellant: James Roddy Tanner, Esq., Jamie King Harrison, Tanner & Associates, P.C., Fort Worth, TX.

**Judges:** Before OWEN, Chief Judge, and CLEMENT and ENGELHARDT, Circuit Judges.

# Opinion

PER CURIAM:*

This labor dispute concerns an arbitrator's decision. We uphold the award and reverse the contrary judgment of the district court. The parties may present their arguments regarding back pay and benefits from the date that the employee was prepared to return to work for arbitration.

I

Ball Metal Beverage Container Corporation (Ball Metal) operates a beverage can plant in Fort Worth, Texas. Local 129, United Automobile, Aerospace, and Agricultural Implement Workers of America (Local 129) is a labor union that serves as the exclusive bargaining representative for some Ball Metal employees.

Ball Metal and Local 129 are parties to a collective bargaining agreement **[*2]** (CBA) that governs the terms of employment for employees represented by the union. The version of the CBA pertinent to this dispute contains a management rights provision that includes this provision:

> Except as otherwise expressly limited by this Agreement, all functions of management not otherwise relinquished or limited shall remain vested exclusively in the Company, including, but not limited to . . . hire, discipline, or discharge employees for just cause; . . . provided that these rights shall not be exercised in any manner which would constitute a breach of any other Article of this Agreement.

Another article of the agreement, titled "Disciplinary Actions and Discharge," provides: "The right of the Company to discipline or discharge employees for good cause including violations of this Agreement or Company rules is hereby acknowledged." Aside from these provisions, the CBA does not describe what constitutes just or good cause.

The CBA also outlines procedures for addressing grievances, including arbitration procedures. _HN1_[↑] When the parties submit a dispute for arbitration, the arbitrator's decision "shall be final and binding on all parties." The arbitrator's authority, however, is **[*3]**

constrained. The agreement states that "[t]he jurisdiction of the arbitrator shall be limited to interpreting or determining compliance with the terms of this Agreement. The arbitrator shall have no power to add to or subtract from, to disregard or modify any part or all of the terms of this Agreement."

Ball Metal has rules and policies that govern misconduct. There is a plant rule against harassment as well as a company policy that prohibits discrimination, harassment, and retaliation. The plant rule defines harassment as activity "of a sexual nature, racial nature, a religious nature or any activity that can be construed as harassment." Employee training materials describe harassment as including "behavior towards another person which is unwelcome and personally offensive to [the] recipient and . . . creates an intimidating, offensive or hostile work environment."

Ball Metal does not prescribe any particular sanction for a harassment violation. The harassment policy provides only that violations "will subject th[e] employee to appropriate disciplinary action, up to and including termination." _HN2_[↑] More generally, for violations of plant rules and company policies, "progressive discipline **[*4]** is to be followed except that steps for discipline 'may be accelerated depending upon the severity of the infraction and if there is a pattern of violation of any of the rules.'" The procedure is different for selected rules not at issue here whose violation "will result in automatic suspension for purpose of discharge."

Shawn Allen, a Ball Metal employee, was a member and an elected shop chairman of the union. He had worked at Ball Metal since 2006. In 2019, Allen was accused of harassing a coworker. Specifically, he was accused of yelling at the coworker and calling him a "f-------g scab" after learning that the coworker had left the union. Allen had been accused of similar conduct in the past. He had not otherwise been disciplined for behavioral or productivity issues.

After an investigation, Ball Metal terminated Allen in late June 2019. Local 129 filed a grievance contesting the termination decision, which proceeded to arbitration. The parties presented these questions to the arbitrator: "Whether or not the Grievant, Shawn Allen, was terminated for proper cause and, if not, what is the appropriate remedy?"[1]

---

* Pursuant to _5TH CIRCUIT RULE 47.5_, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in _5TH CIRCUIT RULE 47.5.4_.

---

[1] As noted, the CBA uses the terms "just cause" and "good cause," and the parties framed the issue for the arbitrator

On July 6, 2020, the arbitrator issued an opinion and award. In the "DISCUSSION **[*5]** AND FINDINGS" section of the decision, the arbitrator determined that, "[u]nder the parties['] CBA, . . . the Company had proper cause to discipline the Grievant for violation of" Ball Metal's harassment policy and plant rule. The arbitrator also determined that, "[b]esides the CBA and Company Policy, the Grievant's conduct violated the Preamble of the CBA," which urged "promot[ing] a cooperative and progressive industrial and economic relationship between the Company and its employees." The arbitrator further explained that "while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service." He concluded that "based upon all the previous discussion the termination decision is modified in the following AWARD."

On the following page, under the heading "AWARD," the arbitrator wrote: "The Grievant, Shawn Allen was not terminated for proper cause, as the Company failed to give proper consideration to the Grievant's seniority." The award provided that, instead of termination, Allen would be suspended from the date of his discharge to the date of his return to work; he would be offered immediate reinstatement **[*6]** without back pay or benefits; and he would retain his seniority. In essence, the arbitrator reduced the sanction to a roughly yearlong unpaid suspension.

The day after the arbitrator issued the decision, Local 129 informed Ball Metal that Allen wanted to return to work and was prepared to do so immediately. The company declined to reinstate him. Instead, on July 30, 2020, Ball Metal filed suit under *§ 301 of the Labor Management Relations Act* seeking vacatur of the arbitrator's award. Local 129 counterclaimed seeking enforcement of the arbitrator's award, attorneys' fees, and back pay and benefits for the period of noncompliance since the award. The parties filed cross motions for summary judgment.

The district court granted summary judgment in favor of

---

using a third term, "proper cause." The record shows no distinction in the meaning of the terms, and neither party argues for one. For ease of reading, we use the terms interchangeably. *Cf. Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 604 (5th Cir. 1989)* (observing that the phrases "proper cause" and "just cause" "carr[y] no talismanic significance in labor jurisprudence" but rather are merely "term[s] of art that define[] the many unrelated, independent acts that serve as grounds for employee discipline").

Ball Metal and vacated the arbitrator's award. The court held that the arbitrator exceeded his authority under the CBA by modifying Allen's sanction after stating that there was just cause for termination. The court did not discuss the portion of the award in which the arbitrator stated that Allen "was not terminated for proper cause." The court also denied attorneys' fees. On appeal, Local 129 challenges the vacatur and attorneys' fees rulings.

**II**

**A**

We begin with the challenge **[*7]** to the vacatur ruling. **_HN3_**[↑] "We review a district court's grant of summary judgment in a suit to vacate an arbitration award *de novo*."[2] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

**_HN4_**[↑] "Judicial review of arbitration awards is severely limited."[4] "The standard for this review is 'among the narrowest known to the law.'"[5] When an arbitration award settles a labor dispute, judicial review is "particularly constrained."[6] "The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations," which "reflect a decided preference for private settlement of labor disputes without the intervention of government."[7]

**_HN5_**[↑] Under this unusually deferential standard of

---

[2] *Beaird Indus. v. Local 2297, Int'l Union, UAW, 404 F.3d 942, 944 (5th Cir. 2005)*.

[3] *Fed. R. Civ. P. 56(a)*.

[4] *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union, 831 F.2d 72, 74 (5th Cir. 1987)*.

[5] *Cont'l Airlines v. Air Line Pilots Ass'n, Int'l, 555 F.3d 399, 405 (5th Cir. 2009)* (quoting *E. Air Lines, Inc. v. Transp. Workers Union, Local 533, 580 F.2d 169, 172 (5th Cir. 1978)*).

[6] *Teamsters Local No. 5 v. Formosa Plastics Corp., 363 F.3d 368, 371 (5th Cir. 2004)*.

[7] *United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 37, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)*.

review, "courts are not authorized to reconsider the merits of an award."[8] "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."[9] Instead of assessing how well the arbitrator interpreted the contract, **[*8]** we ask if the arbitrator acted within the contract's bounds.[10] "[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."[11]

HN6[↑] To determine whether arbitrators have overstepped their authority, "courts apply the 'essence test,' evaluating whether the arbitration award 'ha[s] a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement.'"[12] "[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end."[13] In these situations, "an arbitrator is no longer applying or interpreting the agreement but rewriting it," and we will vacate the award.[14] "Where 'there is ambiguity as to whether an arbitrator is acting within the scope of his authority,'" however, "'that ambiguity must be resolved in favor of the arbitrator.'"[15]

**B**

Our decisions in *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103*[16] and *Weber Aircraft Inc. v. General Warehouseman and Helpers Union Local 767*[17] are instructive, if not dispositive. In *Albemarle*, an arbitration award ordered suspension **[*9]** instead of termination for employees who had violated safety rules. We reversed the district court's vacatur of that award.[18] The management rights clause in the CBA provided that "the suspending, disciplining and discharging employees for cause . . . are all rights solely of the COMPANY."[19] We understood the clause to "contemplate[] situations in which a finding of 'cause' could support lesser sanctions than termination."[20] We drew a distinction between this clause and clauses in other CBAs that provided only for discharge, from which "authority to impose a lesser alternative sanction cannot be arguably inferred."[21]

Because the CBA in *Albemarle* did not "make clear that any violation of safety rules is an offense requiring discharge," we accepted the interpretation of the arbitrator, who determined that the employees' violations were cause only for discipline, not termination.[22] We acknowledged that "an arbitrator could quite naturally read the CBA to specify that Albemarle employees' jobs are contingent on strict adherence to safety rules," but we concluded that was

---

[8] *Id.* at 36.

[9] *Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013)* (quoting *Eastern Associated Coal Corp. v. UMW, Dist. 17, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)*).

[10] *United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)*; *see also* **Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989)** ("We have interpreted Supreme Court jurisprudence as requiring vacation of arbitral decisions that reinstate discharged employees when such arbitral action is deemed to be an ultra vires act.").

[11] *Id.*

[12] *Communs. Workers of Am., AFL-CIO v. Southwestern Bell Tel. Co., 953 F.3d 822, 826-27 (5th Cir. 2020)* (quoting *Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1325 (5th Cir. 1994)*).

[13] **Delta Queen, 889 F.2d at 602**.

[14] *Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 570 (5th Cir. 2018)*.

[15] *Quezada v. Bechtel OG & C Constr. Servs., 946 F.3d 837, 844 (5th Cir. 2020)*.

[16] *703 F.3d 821 (5th Cir. 2013)*.

[17] *253 F.3d 821 (5th Cir. 2001)*.

[18] *Albemarle, 703 F.3d at 824, 828*.

[19] *Id. at 823*.

[20] *Id. at 825*.

[21] *Id.* (quoting *Weber, 253 F.3d at 825*) (first citing *E.I. DuPont de Nemours & Co. v. Local 900 of Intern. Chem. Workers Union, 968 F.2d 456, 459 (5th Cir. 1992)*; then citing **Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 601, 603-04 (5th Cir. 1989)**).

[22] *Id.*

"not the only arguable reading."[23] It was also permissible to read the CBA as the arbitrator had done and "infer degrees of punishment **[*10]** for infractions based on the egregiousness of employee conduct," rather than "assume[] that all safety violations mandate the same, harsh penalty of termination."[24]

Similarly, in *Weber*, we reversed the district court's vacatur of an arbitration award that ordered suspension instead of termination for an employee who had committed sexual harassment.[25] The employee had worked at the company for over twenty-five years.[26] The CBA reserved for the employer "the right to . . . suspend, and/or discharge for just cause."[27] For the harassment rule specifically, the CBA categorized violations as grounds for "Immediate Suspension for investigation/Possible Discharge."[28] Although the arbitrator determined that the employee had engaged in sexual harassment, he decided that termination was "excessive, given the facts of the case and [the employee's] prior record of service."[29]

We held that the arbitrator was within "the ambit of his authority under the CBA by determining that, while there was not just cause to fire [the employee], there was just cause to suspend him without backpay for some eleven months."[30] We accepted the arbitrator's interpretation of the CBA as "authorizing a range of punishment" **[*11]** for harassment violations.[31] We deemed this reading "plausible because the CBA provides that [the] . . . violation calls for suspension and possible, not certain, discharge; and because the CBA does not establish a fixed definition of 'just cause,' plainly indicating that the standard varies with the level of punishment."[32] Given

the flexibility within the provisions, "to find in favor of Weber's suspension or discharge of an employee, the arbitrator has to find that Weber had just cause *for the particular disciplinary action taken*."[33]

Like the CBAs in *Albermarle* and *Weber*, the CBA here "contemplates situations in which a finding of 'cause' could support lesser sanctions than termination."[34] The management rights clause provides that Ball Metal could "hire, discipline, or discharge employees for just cause." As in *Weber*, this provision suggests that "just cause" means "just cause for the particular disciplinary action taken."[35] Indeed, when the parties framed the issue for the arbitrator, they did so in terms of the sanction and asked whether Allen "was terminated for proper cause."

[ **HN7**[↑] ] We have determined "that explicating broad CBA terms like 'cause,' when left undefined by contract, is the **[*12]** arbitrator's charge."[36] In addition to assessing the nature of the violations, an arbitrator may under our precedents take account of employee tenure in determining whether just cause for discipline exists rather than for dismissal.[37] Had Ball Metal wished to remove consideration of any mitigating factors, it could have required termination for all harassment violations in the CBA or in company rules.[38] In fact, Ball Metal did

---

[23] *Id. at 826*.

[24] *Id.*

[25] *Weber, 253 F.3d at 823-24*.

[26] *Id. at 823*.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id. at 824*.

[31] *Id.*

[32] *Id.*

---

[33] *Id. at 823* (emphasis added).

[34] *Albemarle Corp. v. United Steel Workers ex rel. AOWU Local 103, 703 F.3d 821, 825 (5th Cir. 2013)*.

[35] *Weber, 253 F.3d at 823*.

[36] *Albemarle, 703 F.3d at 826* (citing *Amalgamated Meat Cutters & Butcher Workmen, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc., 481 F.2d 817, 820 (5th Cir. 1973)*); *see also Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 571 (5th Cir. 2018)* (the amount of discretion involved makes it difficult to see how an arbitrator's assessment of judgment-laden terms like "extreme" and "excessive" can amount to the direct conflict with the CBA that is necessary for judicial override).

[37] *Weber, 253 F.3d at 823*; *see also Gulf States Tel. Co. v. International Brotherhood of Electrical Workers, 416 F.2d 198, 200-202 (5th Cir. 1969)* (affirming the enforcement of an arbitration award in which the arbitrator determined that the employee's "previous record and seniority count for something in arguing against the extreme penalty in industrial relations").

[38] *Albemarle, 703 F.3d at 826* ("Had the Company wished to remove doubt as to whether safety violations like the

designate violations of other rules as mandating "automatic suspension for purpose of discharge." The company did not place harassment violations like Allen's within that category, providing instead that they warranted "appropriate disciplinary action, up to and including termination." The flexibility in this disciplinary approach permitted the arbitrator to opt for a penalty short of termination. The penalty selected—unpaid suspension for over a year—was well within the arbitrator's discretion.[39]

In light of our precedents, we conclude that the arbitrator could construe the CBA to mean that Allen's violations were just cause for discipline, rather than just cause for termination, given the character of the violations and his tenure. We hold only **[*13]** that this interpretation is an "arguable reading" of the CBA, not that it is the best or even a good one.[40] *HN8*[⬆] "The correctness of the arbitrator's interpretation is irrelevant so long as it was an *interpretation.*"[41]

## C

The arbitrator stated both that there was just cause for termination and that there was not. Given our especially deferential standard of review, we are bound to resolve the ambiguity in the arbitrator's favor.[42]

---

Grievants' met the criteria for cause to terminate, it had only 'to bargain for a specific list of violations that will be considered sufficient grounds for discharge' in the CBA.") (quoting *Amalgamated Meat Cutters & Butcher Workmen, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc., 481 F.2d 817, 820 (5th Cir. 1973)*).

[39] *See United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)* ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations."); *Gulf States, 416 F.2d at 202 n.10* ("Arbitral determination not only of the existence of misconduct but of the fitness of the punishment is routinely grist for the arbitral mill.").

[40] *Albemarle, 703 F.3d at 826*.

[41] *Sun Coast Res., Inc. v. Conrad, 956 F.3d 335, 337 (5th Cir. 2020)*.

[42] *Quezada v. Bechtel OG & C Constr. Servs., 946 F.3d 837, 844 (5th Cir. 2020)*.

In declining to terminate Allen, the arbitrator explained his reasoning as follows:

> Under the parties['] CBA, the Arbitrator concludes that the Company had proper cause to discipline the Grievant for violation of the Company's Discrimination, Harassment, and Retaliation Policy (CX-4) and Plant Rules No. 21 . . . . The Grievant's conduct created the violations and he alone must bear the repercussions. Besides the CBA and Company Policy, the Grievant's conduct violated the Preamble of the CBA . . . .
>
> The Arbitrator is of the opinion, however, that while the Company's decision to terminate the Grievant was for just cause, the Arbitrator must give some recognition to his thirteen (13) years of service. Accordingly, based upon all the previous discussion the termination decision **[*14]** is modified in the following award.

On the following page, labeled "AWARD," the arbitrator continued: "The Grievant, Shawn Allen was not terminated for proper cause, as the Company failed to give proper consideration to the Grievant's seniority." The award then set forth the terms of Allen's modified suspension sanction.

Ball Metal argues that the arbitrator exceeded his jurisdiction under the CBA because he impermissibly altered the sanction after he determined that there was just cause for termination. In Ball Metal's view, the arbitrator recognized that there was just cause to terminate Allen but then went on to factor in tenure, which he had no authority to consider at that point. Local 129 takes another view, emphasizing the arbitrator's later conclusion that there was not just cause for termination. The union reads the arbitrator's earlier reasoning to mean that Ball Metal had just cause to discipline, and could have had just cause for termination, but in the last analysis did not, because of Allen's seniority.

The arbitrator plainly stated that "the Company's decision to terminate the Grievant was for just cause," and then just as plainly stated that "the Grievant, Shawn Allen **[*15]** was not terminated for proper cause." Neither party has persuaded us that its interpretation stressing one rather than the other of these statements is the only possible reading. *HN9*[⬆] When there are two alternative constructions of an arbitrator's reasoning, one of which would uphold the decision, we must enforce the award. As the Supreme Court has explained, "[a] mere ambiguity in the opinion

accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award."[43] "Unless the arbitral decision does not 'dra[w] its essence from the collective bargaining agreement,' a court is bound to enforce the award . . . even when the basis for the arbitrator's decision may be ambiguous."[44]

**HN10**[⬆] Given that arbitrators need not explain their reasoning at all, an ambiguity in reasoning generally will not disturb their awards. "It has long been settled that arbitrators are not required to disclose or explain the reasons underlying an award."[45] Although explanations of arbitration awards are not mandatory, they are desirable.[46] To encourage justification, the Supreme Court has advised against "overturning [*16] awards based on ambiguities that can be identified in the explanations arbitrators choose to give," since that "would discourage them from providing those reasons in the first place."[47] So long as "[w]e can discern a possible rationale from the arbitrator's actions, . . . his decision 'must stand.'"[48]

We deem possible the rationale that the union suggests: the arbitrator could have determined that the offense was not in fact just cause for termination in light of

---

[43] _Enter. Wheel, 363 U.S. at 598_; _see also_ _Wireglass Metal Trades Council v. Shaw Env't & Infrastructure Inc., 837 F.3d 1083, 1091-92 (11th Cir. 2016)_ ("The rule of Enterprise Wheel is that, when it is 'not apparent' from the arbitrator's stated reasoning (or lack thereof) whether she permissibly interpreted a collective bargaining agreement or impermissibly modified it, and one can plausibly read the award either way, the court must resolve the ambiguity by finding that the award is an interpretation of the contract and enforcing it.").

[44] _W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum, & Plastic Workers, 461 U.S. 757, 764, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983)_ (internal citation omitted) (quoting _Enter. Wheel, 363 U.S. at 597 (1960)_).

[45] _See_ _Antwine v. Prudential Bache Sec., Inc., 899 F.2d 410, 412 (5th Cir. 1990)_.

[46] _Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 572 (5th Cir. 2018)_.

[47] _Id. at 572-73_.

[48] _Commc'ns Workers of Am. v. Sw. Bell Tel. Co., 953 F.3d 822, 828 (5th Cir. 2020)_ (quoting _Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013)_).

---

Allen's tenure. A Seventh Circuit case involving similar facts supports our conclusion. In _Arch of Illinois, Division of Apogee Coal Corp. v. District 12, United Mine Workers_,[49] the Seventh Circuit affirmed an arbitration award that ordered suspension instead of termination for an employee who had violated a rule against sleeping at work.[50] Similar to the Ball Metal CBA, the Arch of Illinois CBA provided that covered employees could not be "disciplined or discharged except for just cause."[51] Early in the opinion, the arbitrator observed that "sleeping is sufficient just cause to trigger a discharge" and described other concerns with the employee's conduct, concluding that, "[f]or all of those reasons therefore the grievant should [*17] be terminated."[52] Later in the opinion, however, the arbitrator decided that the employee should be suspended rather than terminated, reasoning that "the senior person's length of service must be recognized when that individual is dealt with by way of termination."[53]

The company argued that the arbitrator had exceeded his authority by modifying the penalty after already determining that there was just cause for termination.[54] The Seventh Circuit considered the company's interpretation reasonable but not inevitable.[55] That was insufficient because the company "must do more than merely show that its interpretation of the opinion is reasonable; it must demonstrate that the opinion cannot reasonably be interpreted in any other way."[56] The company did not make that showing.[57] The alternative interpretation that the company "lacked just cause to discharge [the employee] because of its failure to

---

[49] _85 F.3d 1289 (7th Cir. 1996)_.

[50] _Id. at 1291, 1294_.

[51] _Id. at 1291_.

[52] _Id._

[53] _Id._

[54] _Id. at 1293_.

[55] _Id._

[56] _Id._ (citing _United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597-98, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960)_).

[57] _Id._

consider his seniority is not so far-fetched as to lead us to deduce that the arbitrator relied on a noncontractual basis for the award."[58] _HN11_[⬆] The court explained that, "before we reject an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based **[*18]** his decision on noncontractual grounds."[59]

For similar reasons, we uphold the arbitrator's award in Allen's case. Because the opinion does not unambiguously reflect that the arbitrator exceeded his authority, we must enforce his award.

### III

We next address the union's challenge to the attorneys' fees ruling. _HN12_[⬆] We review the district court's denial of attorneys' fees for abuse of discretion.[60] "For the same reason that judicial review of arbitration awards is limited, a party may be awarded attorneys' fees if it has to fight back a court challenge to the award it obtained in the parties' chosen forum."[61] "This sanction is necessary lest federal labor policy be frustrated by judicial condonation of dilatory tactics that lead to wasteful and unnecessary litigation."[62]

_HN13_[⬆] Courts award fees when the challenge to the arbitrator's decision is "without justification."[63] "'Without justification' refers not to the strength of the challenge but to the type."[64] Challenges to an arbitrator's jurisdiction or authority do not result in fee awards, whereas challenges to the "intrinsic merits" of a dispute justify fee awards even if the challenges are not

frivolous.[65] "[W]hen parties have agreed to arbitrate a dispute, **[*19]** a subsequent court challenge to the merits is not justified even when that question is close because going to court is at odds with the parties' agreement to be bound by the arbitrator's decision."[66]

Ball Metal challenged the arbitrator's authority, so a fee award is unwarranted. Throughout its brief, Ball Metal framed its challenge in jurisdictional terms. The company consistently characterized the arbitrator's modified sanction as an action "exceeding his authority," rather than as a misreading of the contract's terms.[67] Ball Metal did not contest the arbitrator's interpretation of "just cause for termination."[68] Instead, Ball Metal assumed that the arbitrator had recognized just cause for termination and argued that he defied the limits on his authority that determination imposed.[69] Because Ball Metal's challenge was jurisdictional, the district court did not abuse its discretion in denying a fee award.

### IV

Finally, we address the parties' joint request for clarification about the award during the period of the company's noncompliance. Specifically, the parties request a remand to the arbitrator to determine whether to award back pay and benefits for this period.

The arbitrator's **[*20]** decision does not make clear what the award would be in the event of noncompliance. The award states that "[t]he Grievant will be offered immediate reinstatement without back pay and benefits," but it does not address whether back pay or

---

[58] _Id. at 1294_.

[59] _Id. at 1293_.

[60] _Tercero v. Tex. Southmost Coll. Dist., 989 F.3d 291, 301 (5th Cir. 2021)_.

[61] _Delek Refin., Ltd. v. Local 202, United Steel, 891 F.3d 566, 573 (5th Cir. 2018)_.

[62] _Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tex. Steel Co., 639 F.2d 279, 283 (5th Cir. 1981)_.

[63] _Bruce Hardwood Floors v. UBC, S. Council of Indus. Workers, Local Union No. 2713, 103 F.3d 449, 453 (5th Cir. 1997)_.

[64] _Delek, 891 F.3d at 573_.

[65] _Id._

[66] _Id. at 573-74_.

[67] See _id. at 574_ ("[A] party cannot avoid paying attorneys' fees by making only a conclusory assertion that it is challenging the arbitrator's 'power to make the award.'") (quoting _Tex. Steel Co., 639 F.2d at 283_).

[68] See _id._ (holding that a challenge to an arbitrator's interpretation of a contract is a merits inquiry and awarding attorneys' fees); _Tex. Steel Co., 639 F.2d at 283-84_ (holding that a challenge to an arbitrator's interpretation of a contract warranted attorneys' fees).

[69] See _Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1331 (5th Cir. 1994)_ (holding that a challenge to an award "upon a matter not submitted" to the arbitrator is a jurisdictional inquiry and denying attorneys' fees).

2022 U.S. App. LEXIS 3214, *20

benefits would be warranted if Allen was not offered immediate reinstatement. *HN14*[↑] When, as here, an arbitrator's decision does not specify the award during a period of noncompliance, "the court is authorized to remand to the arbitrator" for clarification.[70] Since both parties have requested a remand for this purpose, we will order one.

* * *

We REVERSE the award of summary judgment in favor of Ball Metal and RENDER judgment in favor of Local 129. We AFFIRM the denial of attorneys' fees. We REMAND to determine whether to award backpay and benefits during Ball Metal's period of noncompliance.

---

**End of Document**

---

[70] *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union v. Excelsior Foundry Co., 56 F.3d 844, 849 (7th Cir. 1995)*; *see also* *United Steelworkers, Dist. 36, Local 8249 v. Adbill Mgmt. Corp., 754 F.2d 138, 141-42 (3d Cir. 1985)*; **Marshall Durbin Cos., Inc. v. United Food & Comm. Workers Union, Local 1991, 254 F.3d 1081**, [published in full-text format at *2001 U.S. App. LEXIS 31738], 2001 WL 563907, at *1 (5th Cir. 2001)* (unpublished) (per curiam).

*Bldg. Materials Mfg. Co. v. Steelworkers,* 2020 U.S. Dist. LEXIS 37075, 2020 WL 1047895 at *7-8 (N.D. Tex. 2020)


Cited
As of: September 18, 2022 4:20 PM Z

## *Bldg. Materials Mfg. Corp. v. USW Int'l Union*

United States District Court for the Northern District of Texas, Dallas Division

March 3, 2020, Decided; March 3, 2020, Filed

Civil Action No. 3:18-cv-02606-X

**Reporter**
2020 U.S. Dist. LEXIS 37075 *; 2020 WL 1047895

BUILDING MATERIALS MANUFACTURING CORPORATION, Plaintiff, v. UNITED STEELWORKERS INTERNATIONAL UNION on behalf of its local 00759, Defendant.

## Core Terms

arbitrator, arbitrator's interpretation, summary judgment motion, attorney's fees, collective bargaining agreement, costs, contradicting, arbitration award, employees, merits, arbitral decision, express provision, argues, matter of law, express language, seniority, terminate, draws, summary judgment, Challenges, intrinsic

**Counsel:** [*1] For Building Materials Manufacturing Corporation, Plaintiff: Gavin S Martinson, LEAD ATTORNEY, Ogletree Deakins Nash Smoak & Stewart PC, Dallas, TX; Christopher Murray, PRO HAC VICE, Ogletree Deakins Nash Smoak & Stewart PC, Indianapolis, IN.

For United Steelworkers International Union on Behalf of its Local 00759, Defendant, Counter Claimant: Joseph H Gillespie, LEAD ATTORNEY, Gillespie Sanford LLP, Dallas, TX; Bruce Fickman, United Steelworkers Legal Department, Pittsburgh, PA; Sasha Shapiro, PRO HAC VICE, United Steelworkers Legal Department, Pittsburgh, PA.

For Building Materials Manufacturing Corporation, Counter Defendant: Gavin S Martinson, LEAD ATTORNEY, Ogletree Deakins Nash Smoak & Stewart PC, Dallas, TX; Christopher Murray, Ogletree Deakins Nash Smoak & Stewart PC, Indianapolis, IN.

**Judges:** BRANTLEY STARR, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BRANTLEY STARR

## Opinion

### MEMORANDUM OPINION AND ORDER

Building Materials Manufacturing Corporation ("Building Materials") alleges an arbitrator wrongly granted an arbitration award to one of defendant United Steelworkers International Union's ("United Steelworkers") members, Theresa Truesdell. Building Materials brings this action under *29 U.S.C. § 185*, which allows suits for a [*2] violation of a contract "between an employer and a labor organization representing employees in an industry affecting commerce" in a federal district court. Building Materials moves for summary judgment seeking to vacate the arbitration award [Doc. No. 21] while United Steelworkers moves for summary judgment seeking to enforce the award, along with requesting attorneys' fees and costs [Doc. No. 18]. The Court concludes that United Steelworkers has shown it is entitled to judgment as a matter of law.

Therefore, the Court **GRANTS** United Steelworkers's motion for summary judgment and request for attorneys' fees and costs and **DENIES** Building Materials's motion for summary judgment.

I.

Truesdell was hired by Building Materials, a roofing manufacturer, on October 14, 1992 to work at its Dallas facility. On October 21, 2016, Truesdell notified Building Materials that she would be out of work for several days. After informing Building Materials she would not be able to return because she needed to be in a less dusty environment, Truesdell was instructed to contact the administrator of leave under the *Family and Medical Leave Act ("FMLA")*, Liberty Mutual. Truesdell informed Liberty Mutual that [*3] her condition was caused by the working environment at the Dallas facility. Liberty Mutual subsequently approved Truesdell's claim for short-term benefits, which gave Truesdell a maximum of 26 weeks of income replacement benefits, applied retroactively as

of October 21, 2016.

On April 24, 2017, Building Materials contacted Truesdell asking about her return to work intentions and ability. Truesdell responded that she needed to be placed in a less dusty work area. After some back and forth, Building Materials concluded that all jobs at the Dallas plant Truesdell was working at, including those outside the manufacturing environment, involved some exposure to dust. Building Materials alleges that, given such circumstances, they had no choice but to terminate Truesdell and so they did on June 7, 2017.

In response, Truesdell filed a grievance under the parties' collective bargaining agreement (hereinafter "Agreement") on June 8, 2017. After completing the various grievance steps, the matter proceeded to arbitration. The parties stipulated the following question be put before the arbitrator: was Truesdell terminated for just cause? After reviewing the Agreement, the arbitrator concluded the **[*4]** answer was no. In coming to its decision, the arbitrator focused on section 4-11 of the Agreement, which states:

> Discharge for cause, voluntary resignation, lost time due to layoff exceeding twenty four (24) consecutive months, lost time due to reasons other than layoff exceeding twelve (12) months for employees with less than fifteen (15) years continuous service and eighteen (18) consecutive months for employees with more than fifteen (15) years continuous service, or absence without leave for more than four (4) consecutive days, shall terminate an Employee's continuous service record and seniority and if reemployed thereafter shall be considered a new Employee.[1]

The arbitrator interpreted the seniority termination deadlines in this provision as also setting tolling periods for when Building Materials could start discharging its employees. The arbitrator also interpreted "discharge for cause" to mean "other than for lost time covered hereinafter."[2] As a result of these moves, the arbitrator interpreted section 4-11 to mean that Building Materials could not discharge Truesdell, who had 15 years continuous service, until 18 months from presumably the date Truesdell notified Building Materials she would be out **[*5]** of work, October 21, 2016. As 18 months

had not passed (Truesdell was discharged on June 7, 2017), the arbitrator concluded Truesdell was not discharged for cause.

The arbitrator then fashioned a remedy that extended Truesdell's seniority for 30 days and sought to give Truesdell an opportunity to be reinstated in a way that would accommodate her health condition:

> 1. Truesdell's seniority will continue for 30 days from the date hereof.
> 2. Truesdell will promptly notify the Company in writing if she desires to be activated, any accommodation she will need, and will provide medical evidence in support of that request.
> 3. The Company will take prompt action on her request including seeking opportunities in areas other than Millwright work as Lienau testified he did prior to her 2016 termination. The Company may seek professional evaluation of Truesdell's current medical and physical condition and ability, and Truesdell will cooperate in that effort.
> 4. The Committee's [sic] mentioned in Article VIII-14 are encouraged to act if the Company's paragraph 3 actions do not result in Truesdell's activation.[3]

On September 28, 2018, Building Materials filed a complaint [Doc. No. 1] contending the arbitration **[*6]** award should be vacated because the arbitrator ignored the plain text of the Agreement. It makes this same argument in its motion for summary judgment filed on April 24, 2019. United Steelworkers filed its motion for summary judgment on the same day, alleging the arbitration award draws its essence from the Agreement and so should be enforced as written.

II.

Before the Court is Building Materials and United Steelworkers's motions for summary judgment. Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] "A fact is material if it 'might affect the outcome of the suit'" and "[a] factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[1] Exhibit B to Building Materials's Complaint at p.22 [Doc. No. 1, Ex. B].

[2] Exhibit A to Building Materials's Complaint at p.17 [Doc. No. 1, Ex. A].

---

[3] Exhibit A to Building Materials's Complaint at p.17-18 [Doc. No. 1, Ex. A].

[4] *Fed. R. Civ. P. 56(a)*.

party.'"[5]

The Court notes that the dispute between the parties in their motions for summary judgment concerns the arbitrator's interpretation, or lack thereof, of the Agreement and not the arbitrator's fact-finding. As such, the issue before the Court is which movant is entitled to judgment as a matter of **[*7]** law rather than whether there is a genuine dispute of material fact.

III.

Building Materials argues in its motion for summary judgment that the arbitrator exceeded his authority in ignoring the plain language of the Agreement by issuing his award and so, as a matter of law, Building Materials is entitled to have the arbitration award vacated. In contrast, United Steelworkers argues in its motion for summary judgment that the arbitrator's award draws its essence from the Agreement and so, as a matter of law, is entitled to have the award enforced. United Steelworkers also contends it is entitled to attorneys' fees and costs because Building Materials brought its challenge to the arbitration award without justification.

The Court agrees with United Steelworkers. In showing how the arbitrator's award draws its essence from the Agreement, United Steelworkers has shown how it is entitled to summary judgment as a matter of law under the _Rule of Civil Procedure 56(a)_ summary judgment standard. The Court further agrees that Building Materials brought its challenge without justification and so United Steelworkers is entitled to attorneys' fees and costs.

In actions brought under _29 U.S.C. § 185_ questioning an **[*8]** arbitrator's decision on a contract dispute, the Court may only look at whether the arbitrator's decision "draws its essence from the [collective bargaining agreement]."[6] This standard is interpreted "expansively."[7] Even if the arbitrator "seriously erred in his fact finding or contract interpretation," the Court must uphold a decision that draws from the essence of the collective bargaining agreement.[8] "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable."[9] An arbitrator dispenses "industrial justice" by acting contrary to the express provisions of the collective bargaining agreement or otherwise ignoring its plain language.[10] In such circumstances, the arbitrator is "no longer applying or interpreting the agreement but rewriting it."[11] An example of an arbitrator contradicting the express language of a collective bargaining agreement is _Southwest Airlines Co. v. Local 555, Transportation Workers Union of America AFL-CIO_, where the Fifth Circuit held an arbitrator's interpretation that the collective bargaining agreement's effective date was the signing **[*9]** date was contradicted by express language in the collective bargaining agreement stating the collective bargaining agreement shall "remain in full force and effect as of the date of ratification."[12] Lastly, in formulating any remedy, the arbitrator must be flexible "in meeting a wide variety of situations," as the "draftsman may never have thought of what specific remedy should be awarded to meet a particular contingency."[13] Even so, the arbitrator's award must ultimately draw its essence from the collective bargaining agreement.[14]

If the party fighting back the challenge to the arbitration decision in district court prevails, a subsequent question is whether that party is entitled to attorneys' fees and costs. The Fifth Circuit has made it clear that the party facing the challenge to the arbitration is entitled to attorneys' fees and costs if the challenge was brought "without justification."[15] "Without justification" refers to

---

[5] _Thomas v. Tregre, 913 F.3d 458, 462 (5th Cir. 2019)_ (alteration in original) (citing _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))_.

[6] _Delek Ref., Ltd. v. Local 202, United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFLCIO, 891 F.3d 566, 570 (5th Cir. 2018)_.

[7] _Id._

[8] _Id._

[9] _Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509, 121 S. Ct. 1724, 149 L. Ed. 2d 740 (2001)_ (quoting _United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960))_.

[10] _Delek Ref., Ltd. at 570_ (citations omitted).

[11] _Id._

[12] _912 F.3d 838, 845-6 (5th Cir. 2019)_.

[13] _United Steelworkers of Am., 363 U.S. at 597_.

[14] _Id._

[15] _Delek Ref., Ltd. at 573_ (citation omitted); _Int'l_

2020 U.S. Dist. LEXIS 37075, *9

the type of challenge and not to the strength of a challenge.[16] Challenges to an arbitrator's jurisdiction or authority are "justified" and so will not result in a fee award even if the challenge to the arbitration decision fails in court.[17] However, challenges **[*10]** that go to the intrinsic merits of a dispute are "without justification" and will result in fees even if not brought frivolously.[18] Challenges that go to the intrinsic merits of a dispute include challenges to an arbitrator's interpretation and application of a collective bargaining agreement and its discretion in fashioning a remedy.[19] Courts must also be wary of a challenging party attempting "to transform [a merits] claim into an excess-of-powers claim."[20] In other words, a party cannot in one breath argue "that the arbitrator transcended his authority" while in another assert that he "exercised his contractual authority . . . inconsistent with applicable principles of contractual construction, which 'necessarily touch[es] upon the 'intrinsic merits' of the case.'"[21]

Here, the arbitrator's decision and award draw from the essence of the Agreement. Regardless of the accuracy of the arbitrator's interpretation of section 4-11 of the Agreement, the arbitrator did not stray from "interpretation and application of the agreement" into dispensing "his own brand of industrial justice."[22] The arbitrator's interpretation of section 4-11 does not contradict any other express provisions of the Agreement or any express **[*11]** language in section 4-11 itself. In interpreting section 4-11, the arbitrator thought that an interpretation where an employee had seniority but was no longer employed did not make

---

Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Texas Steel Co., 639 F.2d 279, 284 (5th Cir. 1981) (noting how the party seeking arbitration enforcement is entitled to attorneys' fees and costs if a challenge is brought without justification).

[16] Delek Ref., Ltd., 891 F.3d at 573.

[17] Id.

[18] Id. (citations omitted).

[19] Delek Ref., Ltd., 891 F.3d at 573; Int'l Ass'n of Machinists, 639 F.2d at 284.

[20] Delek Ref., Ltd., 891 F.3d at 574 (quoting Hous. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., 765 F.3d 396, 412 (5th Cir. 2014)).

[21] Delek Ref., Ltd., 891 F.3d at 574.

[22] United Steelworkers of Am., 363 U.S. at 597.

sense and so understood section 4-11 as tying seniority and employment together. At bottom, the arbitrator focused on the text and what would constitute a reasonable interpretation in making his decision.

Regarding the award itself, it must draw from the essence of the Agreement but the arbitrator has flexibility to meet "a wide variety of situations."[23] Here, the arbitrator is seeking to balance the traditional remedy of reinstatement with the arbitrator's finding that Truesdell's fitness to work is at issue. To that end, the arbitrator includes provisions requiring Building Materials to accommodate her health condition and requiring Truesdell to cooperate with Building Materials to provide any requested health information. Insofar as the central issue of this dispute is whether Truesdell was properly discharged under the Agreement, this remedy, a tailored reinstatement, draws from the essence of the Agreement.[24]

In response, Building Materials raises several objections to the arbitrator's interpretation of the Agreement and to the remedy he issued. **[*12]** First, Building Materials argues that Article 8-1 of the Agreement expressly allows, without qualification, Building Materials to discharge employees for cause:

8-1 The management of the Company's Dallas Plant, and all of its subdivisions and departments, the direction of the working forces and the affairs of the Company including the right to hire, suspend, discharge, or discipline Employees for cause, the right to transfer or lay off Employees due to lack of work or curtailed production, the right to establish rules of conduct and penalties for violation of said rules, the right to establish, determine, maintain and enforce standards of production, the right to determine and control the number and the qualifications of Employees performing each operation at all times, the right to determine what shall be done and all methods and processes by which the work will be carried on, and the right to determine the number of shifts it shall work and the starting and stopping time of each shift are all

---

[23] United Steelworkers of Am., 363 U.S. at 597.

[24] This explanation of how the arbitrator's remedy draws its essence from the CBA disposes of Building Materials's argument that, assuming the arbitrator's interpretation of the CBA is correct, the awarded remedy still has no basis in the CBA because Truesdell's reinstatement would occur over 5 months after the prescribed 18-month leave period.

vested solely and exclusively in the Company provided that in the exercise of any of said rights or any or all other not enumerated rights or powers or authority customarily exercised by Management, **[*13]** the Company shall not violate the express provisions of this Agreement.[25]

Building Materials contends that the arbitrator's interpretation of section 4-11, specifically its interpretation of "discharge for cause" to mean discharge for reasons other than lost time covered in section 4-11, contradicts this unqualified right. This objection misses the mark. Article 8-1 expressly gives Building Materials the "sole and exclusive right" to discharge an employee for cause but it does not define what "cause" means. The arbitrator is interpreting what "cause" means and is not contesting Building Materials's "sole and exclusive right" to discharge an employee for cause. Moreover, Article 8-1 expressly limits such "sole and exclusive right" when it states that exercising this right "shall not violate the express provisions of this Agreement." For these reasons, Building Materials has failed to show how the arbitrator's interpretation of Article 4-11 contradicts the express language of Article 8-11.

Second, Building Materials argues that the arbitrator ignored the plain language of the Agreement when it interpreted Article 4-11 to create a right for Truesdell to an 18-month leave of absence before she could be terminated. This objection **[*14]** begs the question. It assumes that the arbitrator's interpretation of Article 4-11, which this Court must defer to, is incorrect. Indeed, Building Materials discusses at length in its motion for summary judgment how Article 4-11 should not be interpreted to mandate leave but, when all is said and done, does not point to any express provisions in Article 4-11 or elsewhere that contradict the arbitrator's interpretation on 18-month leave. This is a far cry from *Southwest Airlines Co.*, where the arbitrator's decision that the effective date of the collective bargaining agreement was the signing date was contradicted by express language in the collective bargaining agreement stating the agreement shall "remain in full force and effect as of *the date of ratification . . . .*"[26] Thus, Building Materials has failed to show the arbitrator's interpretation of the 18-month language contradicts the express language of the Article 4-11 or

any other Agreement provision.

For the reasons stated above, the Court holds that the arbitrator was not dispensing his own brand of industrial justice and that his award and decision draw from the essence of the Agreement. Given this holding, the Court must now **[*15]** decide whether United Steelworkers is entitled to attorneys' fees and costs.

United Steelworkers is entitled to attorneys' fees and costs because Building Materials brought this challenge without justification. As noted above, "without justification" means that the challenge goes to the merits of the dispute, which includes an arbitrator's interpretation of a contract.[27] Here, Building Materials at several points in its briefing on these motions for summary judgment contests the arbitrator's interpretation of the Agreement. For example, in its motion for summary judgment, Building Materials argues that the arbitrator's interpretation of Article 4-11 mandating 18-months of leave for employees is wrong because Article 4-11, properly interpreted, does not mandate leave. Additionally, in the same motion, Building Materials argues the arbitrator's interpretation of Article 4-11 makes no sense and would lead to absurd consequences. In another example, Building Materials, in its reply to United Steelworkers's motion for summary judgment, argues that the arbitrator's interpretation of "discharge for cause" in Article 4-11 is incorrect because it is inconsistent with the proper interpretation **[*16]** of Article 8-1, which gives Building Materials an unqualified right to discharge an employee for cause. As Building Materials's briefing illustrates that it is bringing this challenge on the merits, it must pay United Steelworkers's attorneys' fees and costs.

In response, Building Materials argues it is challenging the arbitrator's authority and not the intrinsic merits of the dispute. Building Materials contends that, in alleging that the arbitrator is ignoring the plain meaning of the Agreement and contradicting its express provisions, Building Materials is in fact arguing that the arbitrator is exceeding its authority and essentially rewriting the agreement. If this were true, then Building Materials would be correct. But it is not true. Although Building Materials is careful to cloak its arguments as being about the arbitrator ignoring the plain meaning of the Agreement and its express provisions, the substance of its arguments speaks for itself. As noted above, Building Materials's arguments focus on disputing the arbitrator's

---

[25] Exhibit B to Building Materials's Complaint at p.42-43 [Doc. No. 1, Ex. B].

[26] *912 F.3d 838, 845-46* (emphasis added).

[27] *Delek Ref., Ltd., 891 F.3d at 573*.

APFA App. 076

interpretation of the Agreement and do not cite to any express provision contradicting the arbitrator's decision. Indeed, this is a clear case of Building [*17] Materials attempting to "transform [a merits] claim into an excess-of-powers-claim.[28]" As its briefing makes clear, Building Materials is in one breath arguing "that the arbitrator transcended his authority while in another it asserts" that he wrongly interpreted the contract which, "necessarily touch[es] upon the 'intrinsic merits' of the case."[29] Thus, Building Materials is bringing this challenge on the merits.

IV.

Because this Court has found, as a matter of law, that the arbitrator's decision and award flow from the essence of the Agreement and that Building Materials brought this challenge on the merits of the dispute, the Court hereby **GRANTS** United Steelworkers's motion for summary judgment and request for attorneys' fees and costs and **DENIES** Building Materials's motion for summary judgment.[30]

---

[28] *Delek Ref., Ltd., 891 F.3d at 574* (quoting *Houston Ref., L.P., 765 F.3d at 412*).

[29] *Delek Ref., Ltd., 891 F.3d at 574*.

[30] The Court notes Building Materials in its complaint also argues the award should be vacated under the *Texas Arbitration Act* and the Federal Arbitration Act. However, Building Materials does not raise these arguments in its motion for summary judgment or in any of its other briefing related to the motions for summary judgment filings. As such, the Court deems these arguments waived. Even if the Court were to consider these arguments, they both fall flat. The Texas Arbitration Act specifically excludes "a collective bargaining agreement between an employer and a labor union." *Tex. Civ. Prac. & Rem. § 171.002(a)(1)*. Regarding the *Federal Arbitration Act*, assuming it applies, "the Supreme Court has made clear that district courts' review of arbitrators' awards under [the Federal Arbitration Act] is limited to the 'sole question . . . [of] whether the arbitrator (even arguably) interpreted the parties' contract." *BNSF R. Co. v. Alstom Transp., Inc., 777 F.3d 785, 788 (5th Cir. 2015)* (quoting *Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013))* (alteration added). In answering this question, the district court must look to the arbitration award and consider at least three factors: "(1) whether the arbitrator identifies her task as interpreting the contract; (2) whether she cites and analyzes the text of the contract; and (3) whether her conclusions are framed in terms of the contract's meaning." *Id.* (citation omitted). This question is disposed of in Section III of this order, which makes clear that the arbitrator in his award was interpreting the Agreement.

United Steelworkers, if it seeks to recover attorneys' fees, must submit a motion pursuant to *Federal Rule of Civil Procedure 54(d)* within 14 days after the entry of judgment, which is being entered alongside this order. If United Steelworkers chooses to file this motion, the Court further requires United Steelworkers to submit evidence supporting its request for attorneys' fees and costs. For attorneys' fees, [*18] United Steelworkers must itemize the hours spent with sufficient descriptive detail of the work conducted as to this particular case, as well as submit a proffered reasonable hourly rate based on the relevant experience of the attorney conducting the work. Upon the filing of the motion, Building Materials will have 5 days to file a response should it choose to do so. Upon the filing of the response, United Steelworkers will have 5 days to file a reply.[31]

**IT IS SO ORDERED** this 3rd day of March, 2020.

/s/ Brantley Starr

BRANTLEY STARR

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[31] Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

*Hampton v. Int'l Longshoreman's Ass'n*, 2017 U.S. Dist.
LEXIS 218154 at *5-6 (S.D. Tex. 2007).

 Neutral

As of: July 11, 2022 5:59 PM Z

# *Hampton v. Int'l Longshoreman's Ass'n, Local 24*

United States District Court for the Southern District of Texas, Houston Division

October 27, 2017, Decided; October 27, 2017, Filed, Entered

Civil Action No. H-16-2103

**Reporter**

2017 U.S. Dist. LEXIS 218154 *

ANTHONY C. HAMPTON, EDWARD J. RICHARDS, and RICKY HENDERSON, Plaintiffs, v. INTERNATIONAL LONGSHOREMAN'S ASSOCIATION, LOCAL 24, Defendant.

**Prior History:** *Hampton v. Mar. Ass'n Int'l Longshoreman Ass'n Pension Ret. Welfare & Vacation Funds, 2017 U.S. Dist. LEXIS 62726 (S.D. Tex., Apr. 25, 2017)*

## Core Terms

fee agreement, summary judgment, nonmovant, genuine, abide, declaratory judgment, contractual, funds, allegations, hire

**Counsel:** [*1] For Anthony C. Hampton, Edward J. Richards, Ricky Henderson, Plaintiffs: Reginald E McKamie, Sr, LEAD ATTORNEY, Attorney at Law, Houston, TX.

For ILA Local 24, Defendant: Eric H Nelson, Attorney at Law, Houston, TX; Billy Bruce Johnson, Jr, Berg Feldman Johnson Bell, LLP, Houston, TX.

**Judges:** DAVID HITTNER, United States District Judge.

**Opinion by:** DAVID HITTNER

## Opinion

ORDER

Pending before the Court is Defendant's Motion for Summary Judgment (Document No. 20). Having considered the motion, submissions, and applicable law, the Court determines the motion should be granted.

I. BACKGROUND

This is a suit for declaratory judgment. Plaintiffs Anthony C. Hampton ("Hampton"), Edward J. Richards ("Richards"), and Ricky Henderson ("Henderson") (collectively, "Plaintiffs") are members of Defendant International Longshoreman's Association, Local 24 ("Local 24"). Local 24 is a labor union for maritime workers, located in Houston, Texas. The parties are bound by the International Longshoremen's Constitution (the "Constitution"). This dispute arises from a Local 24 general union meeting, held on November 6, 2013 (the "Meeting"). At the Meeting, a motion was passed by a vote of union members to hire a lawyer to investigate a longshoremen's [*2] fund called the CR5[1] (the "Vote"). In connection with the Vote, Henderson located Reginald McKamie, Sr.

---

[1] The nature and details regarding the CR5 fund are not relevant in this dispute.

Page 2 of 6
Case 4:22-cv-00343-Y   Document 44   Filed 09/20/22   Page 89 of 92   PageID 1180
Hampton v. Int'l Longshoreman's Ass'n, Local 24

("McKamie"), an attorney. McKamie provided Henderson a fee agreement for Local 24 to hire McKamie as Local 24's attorney (the "Fee Agreement"). Henderson provided a copy of the Fee Agreement to Local 24's President, T.L. Simon ("Simon"), to sign on behalf of Local 24. Simon did not sign the Fee Agreement. Despite Simon's failure to sign the Fee Agreement, McKamie represented Plaintiffs in an action, connected with the CRS fund, in Galveston, Texas, in the United States District Court for the Southern District of Texas (the "Underlying Suit"). Final Judgment in the Underlying Suit was entered against Plaintiffs on July 14, 2017. Plaintiffs contend Local 24 breached its contractual obligation under the Constitution to abide by the Vote because Simon did not sign the Fee Agreement or discuss the Fee Agreement with McKamie or Local 24 members.

Based on the foregoing, on July 15, 2016, Plaintiffs filed suit seeking a declaratory judgment that the Vote requires Local 24 to pay the legal fees incurred in bringing the Underlying Suit. On August 31, 2017, Local 24 moved for summary judgment. **[*3]**

## II. STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The court must view the evidence in a light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997)*. Initially, the movant bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the nonmovant will be unable to establish a genuine dispute of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden then shifts to the nonmovant to come forward with

specific facts showing there is a genuine dispute for trial. *See Fed. R. Civ. P. 56(c)*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 956 (5th Cir. 1993)* (citation omitted).

But the nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Moreover, conclusory allegations unsupported by specific facts will not prevent an award of summary judgment; the plaintiff cannot rest on his allegations to get to a jury without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, 40 F.3d 698, 713 (5th Cir. 1994)*. If a reasonable jury could not return a **[*4]** verdict for the nonmoving party, then summary judgment is appropriate. *Liberty Lobby, Inc., 477 U.S. at 248*. The nonmovant's burden cannot be satisfied by "conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007)* (quoting *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994))*. Furthermore, it is not the function of the court to search the record on the nonmovant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992)*. Therefore, "[a]lthough we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for

Case 4:22-cv-00343-Y  Document 44  Filed 09/20/22  Page 90 of 92  PageID 1181
Page 4 of 6
Hampton v. Int'l Longshoreman's Ass'n, Local 24

trial." *Goodson v. City of Corpus Christi, 202 F.3d 730, 735 (5th Cir. 2000)*.

## III. LAW & ANALYSIS

Plaintiffs seek a declaratory judgment that the Vote requires Local 24 to pay the legal fees incurred in the Underlying Suit. A declaratory action does not create a cause of action. *Collin Cty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, 915 F.2d 167, 171-72 (5th Cir. 1990)*. Thus, Plaintiffs must raise a genuine dispute of material fact on a cognizable breach of contract claim in order to sustain their request for declaratory judgment. *Id.* Local 24 contends there is no contractual basis for requiring Local 24 to pay the legal fees incurred in the Underlying Suit and moves for summary **[*5]** judgment on Plaintiffs' suit for declaratory judgment.

In support of Plaintiffs' request for declaratory relief, Plaintiffs contend Local 24 breached its contractual duty under the Constitution because Local 24 failed to abide by the Vote when Simon did not sign the Fee Agreement and did not discuss the Fee Agreement with McKamie and Local 24 members. Local 24 contends it did not breach a contractual duty because the Constitution does not require Local 24 to abide by a union meeting vote to hire a lawyer. An international union's constitution is a binding contract between a local union and its members. *United Ass'n of Journeyman v. Local 334, United Ass'n of Journeyman, 452 U.S. 615, 622, 101 S. Ct. 2546, 69 L. Ed. 2d 280 (1981)*. Contract interpretation is a matter of law. *United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252, 1256 (5th Cir. 1990)*. Traditional rules of contract interpretation are applied when interpreting a union constitution, as long as their application is consistent with federal labor policies. *Id.* If a contract is susceptible to two reasonable interpretations, there is a genuine issue of fact as to the

parties' intent and summary judgment is inappropriate. *Id.* However, a contract is not ambiguous "merely because the parties to an agreement proffer conflicting interpretations of a term." *Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004)*. Thus, the Court must determine whether the Constitution could reasonably **[*6]** be interpreted to bind Local 24 to the Vote.

The only provision at issue is provision five of Part I of the Code of Ethics in the Constitution ("Provision Five"), which reads:

> The [International Longshoremen's Association] and local unions shall ensure that their operations are conducted in a democratic and fair manner. Regularly scheduled local union elections shall be conducted by secret ballot. Corruption, discrimination or anti-democratic practices shall not be tolerated.[2]

The parties' contentions turn on the meaning and applicability of the phrase "democratic and fair manner" in Provision Five. "Democratic and fair manner" is not defined in the Constitution. Plaintiffs contend that because the Vote was passed by a member vote at a general union meeting, and Provision Five requires Local 24 to conduct its operations in a democratic and fair manner, Provision Five requires Local 24 to abide by the Vote and thus Simon's failure to sign the Fee Agreement breached Local 24's obligation. Local 24 contends Provision Five cannot reasonably require Local 24 to abide by the Vote because other provisions in the Constitution govern Local 24's financial practices, including requiring Local 24 **[*7]** officers to act within their fiduciary roles when making decisions to expend Local 24 funds.[3]

---

[2] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 2.

[3] Local 24 also contends (1) Local 24 was not authorized to sign the Fee Agreement because it concerned individual

Page 5 of 6
Case 4:22-cv-00343-Y   Document 44   Filed 09/20/22   Page 91 of 92   PageID 1182
Hampton v. Int'l Longshoreman's Ass'n, Local 24

When interpreting a contractual provision, "courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." *Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004).* Thus, the Court must look at the entire Constitution to determine whether Provision Five could reasonably be interpreted to require Local 24 to abide by the Vote. The Constitution expressly states that Provision Five is meant to "supplement the obligations already imposed on [Local 24].["4] Part III of the Code of Ethics in the Constitution ("Part III"), entitled "Financial Practices," instructs in relevant part that Local 24 "should not permit any of its funds be invested or expended in a manner which results in the personal profit or advantage of any officer or representative of the union."[5] Part III also states that union members are to be reasonably informed on how Local 24's funds are used. Further, Part V of the Code of Ethics in the Constitution ("Part V"), entitled "Business and Financial Activities of Union Officials," specifically addresses that service providers for Local 24 **[*8]** are to be "selected solely on the basis of cost, quality, timeliness, location, convenience and whether the [provider] is unionized. Knowingly paying excessive amounts for goods or services is a breach of fiduciary duty."[6] Part III and Part V instruct Local 24 officers how and when Local 24 funds may be expended and impose duties on Local 24 officers when making decisions

regarding hiring a service provider, such as a lawyer. Thus, when making a decision to expend Local 24 funds, Simon is required to ensure Local 24 funds will not be used for the personal advantage of any union officer or representative. Specifically, when Simon was presented with the Fee Agreement, Simon had a duty to ensure that the Fee Agreement was in compliance with Local 24's financial practices and that McKamie was properly selected based solely on cost, quality, timeliness, location, and convenience.

Plaintiffs' interpretation that Provision Five requires Local 24 to abide by the Vote solely because the Vote was held at a union meeting would render Part III and Part V meaningless because such an **[*9]** interpretation would not allow Local 24 to make the financial decision to hire a lawyer based on the duties imposed in Part III and Part V. The Court thus finds that Provision Five cannot reasonably be interpreted to bind Local 24 to the Vote. Therefore, the Court finds, as a matter of law, Local 24 did not breach its contractual obligation under the Constitution.[7] Accordingly, Local 24's motion for summary judgment on Plaintiffs' suit for declaratory judgment is granted.

IV. CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Defendant's Motion for Summary Judgment (Document No. 20) is **GRANTED**.

---

members' financial interests; (2) that Plaintiffs' declaratory relief is wasteful and futile; and (3) that Local 24 is not obligated to pay the litigation costs in the Underlying Suit because the litigation costs were incurred voluntarily by Plaintiffs. In light of the Court's holding, however, the Court need not address these contentions.

[4] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 1.

[5] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 2.

[6] *Defendant's Motion for Summary Judgment*, Document No. 20, Exhibit 7 at 3.

[7] The Court notes it is undisputed that Local 24's standard procedure requires an expenditure of Local 24 funds to be approved by both Local 24's Executive Board and members. It is also undisputed that neither the Fee Agreement nor the litigation costs in the Underlying Suit was approved by Local 24's Executive Board or members. Thus, even if Provision Five could reasonably be interpreted to bind Local 24 to the Vote, the Vote does not require Local 24 to pay the litigation costs in the Underlying Suit because the expenditure was not approved pursuant to Local 24's standard procedure.

Page 6 of 6
Case 4:22-cv-00343-Y   Document 44   Filed 09/20/22   Page 92 of 92   PageID 1183
Hampton v. Int'l Longshoreman's Ass'n, Local 24

The Court will issue a separate Final Judgment.

SIGNED at Houston, Texas, on this 27 day of October, 2017.

/s/ David Hittner

DAVID HITTNER

United States District Judge

FINAL JUDGMENT

Because the Court has granted summary judgment for Defendant International Longshoreman's Association, Local 24 on all claims asserted in this lawsuit by Plaintiffs Anthony C. Hampton, Edward J. Richards, and Ricky Henderson (collectively, "Plaintiffs"), the Court hereby

**ORDERS** that Plaintiffs' case is **DISMISSED**.

**THIS IS A FINAL JUDGMENT**.

SIGNED at Houston, Texas, on this 27 day of October, 2017.

/s/ David Hittner **[*10]**

DAVID HITTNER

United States District Judge

---

End of Document