IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF TEXAS FORT WORTH DIVISION



|  |  |
|---|---|
| ROBERT (BOB) ROSS, | § |
| | § |
| | §   Civil Action No. 4:22-cv-343-Y |
| Plaintiff/Counterclaim | § |
| Defendant, | §   Judge Terry R. Means |
| | § |
| v. | § |
| | § |
| ASSOCIATION OF PROFESSIONAL | §   (Relates to Motion Referred to |
| FLIGHT ATTENDANTS, *et al.*, | §   Magistrate Judge Cureton) |
| | § |
| Defendants/Counterclaim | |
| Plaintiff. | |

---

**APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION TO QUASH DEFENDANTS'
SECOND NOTICE TO TAKE DEPOSITION AND MOTION FOR TEMPORARY
PROTECTIVE ORDER AND BRIEF IN SUPPORT**

---

Plaintiff Robert "Bob" Ross, pursuant to Local Rules 7.1(i) and § C of this Court's Case

Management Requirements, submits this appendix of supporting documents and of non-

published cases cited in, and in support of "PLAINTIFF'S MOTION TO QUASH

DEFENDANTS' SECOND NOTICE TO TAKE DEPOSTION AND MOTION FOR

TEMPORARY PROTECTIVE ORDER AND BRIEF IN SUPPORT:"

| Item | Description | Pgs. |
|:---:|:---|:---:|
| 1 | Supporting Documents Referenced in Brief | 1-8 |
|  | **NON-PUBLISHED CASES** |  |
| 2 | Blanchard & Co., Inc. v. Barrick Gold Corp., No. 02-3721, slip op. (E.D. 37 La. Apr. 5, 2004)) | 9-40 |
| 3 | Martin v. Local 556, Transp. Workers Union of Am., Civil Action No. 3:14-CV-00500-D , slip op. (N.D. Tex. Sep 03, 2014) | 41-67 |

Respectfully submitted,
K.D. PHILLIPS LAW FIRM, PLLC

By:  /s/  Kerri  Phillips
      Kerri Phillips
      Texas  Bar  No.  24065906
      Phone: (972) 327-5800
      Email: kerri@KDphillipslaw.com

      6010 W. Spring Creek Parkway
      Plano, Texas 75024
      Fax: (940) 400-0089
      For Service of Filings:
      notice@KDphillipslaw.com

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

      I certify that the true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing **on this the 7th  day of December 2023.**

                                         /s/  Kerri Phillips
                                         Kerri Phillips, Esq.

Jeffrey Bartos
Guerrieri, Bartos, & Roma, P.C.
1900 M Street, NW, Suite 700
Washington, DC 20036
Tel: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com

Charlette Matts
In-House Counsel for APFA
1004 West Euless Blvd
Euless, TX 76040
Tel: (682) 301-8454
Cmatts@apfa.org

James Sanford
4803 Gaston Avenue
Dallas, TX 75249-1020
Tel: (214) 800-5111; Fax: (214) 838-0001
Email jim@gillespiesanford.com
Email: joe@gillespiesanford.com


Michael Rake
PO Box 1556
Lake Dallas, TX 75065-1556
Tel: (940) 498-2103 Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com

| | |
|---|---|
| **From:** | Kerri Phillips |
| **To:** | Jeff Bartos |
| **Cc:** | Charlette Matts; James Sanford; John Grunert |
| **Subject:** | RE: Ross / Vargas - Depositions |
| **Date:** | Wednesday, December 6, 2023 12:51:00 PM |
| **Attachments:** | image001.png |

I won't agree to January.  This is during the voting period for the union, and as I've said I do not believe as officers of the court we should interfere in the internal union democratic process whatsoever.  It is in a delicate state and it is our responsibility to bolster the union membership's opportunity to function without the burden of this legal matter.

I'm open to depositions in February for all parties, but otherwise I'm not agreeable to any interference into the union election.

Thank you,



**Kerri Phillips**
KD Phillips Law Firm, PLLC
**Phone:** 972-327-5800 ext. 1001
**Fax:** 940-400-0089
**Email:** Kerri@KDphillipslaw.com

6010 W. Spring Creek Parkway
Plano, TX 75024
**www.KDphillipslaw.com**

IMPORTANT/CONFIDENTIAL:

IMPORTANT \ CONFIDENTIAL:  This message contains information from the law firm of KD Phillips Law Firm, PLLC that may be subject to the attorney-client privilege or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law.  Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means.  DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS.  If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq.  If you have received this communication in error, please notify us immediately at our telephone number:  (972) 327-5800

IRS Circular 230 Notice:  Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

**From:** Jeff Bartos <jbartos@geclaw.com>
**Sent:** Wednesday, December 6, 2023 8:51 AM
**To:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Cc:** Charlette Matts <cmatts@apfa.org>; James Sanford <jim@gillespiesanford.com>; John Grunert <jgrunert@geclaw.com>
**Subject:** Re: Ross / Vargas - Depositions

Thank you, Kerri. I don't agree to waiting until the very close of discovery (and just a month before the dispositive motion deadline) for these key depositions. Can you let me know what dates in January will work, even if not on consecutive days.

Jeff

**APPENDIX 1**

**From:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Sent:** Tuesday, December 5, 2023 2:52 PM
**To:** Jeff Bartos <jbartos@geclaw.com>
**Cc:** Charlette Matts <cmatts@apfa.org>; James Sanford <jim@gillespiesanford.com>; John Grunert <jgrunert@geclaw.com>
**Subject:** RE: Ross / Vargas - Depositions

Jeff,

You're correct, my mistake, I was thinking of the dispositive motions deadline.  I'll offer my clients for deposition on Feb. 26 and 27 if you'll offer your clients for a deposition on Feb. 15 and 16th.

Please advise if you agree before tomorrow.

Thank you,



**Kerri Phillips**
KD Phillips Law Firm, PLLC
**Phone:** 972-327-5800 ext. 1001
**Fax:** 940-400-0089
**Email:** Kerri@KDphillipslaw.com

6010 W. Spring Creek Parkway
Plano, TX 75024
**www.KDphillipslaw.com**

IMPORTANT/CONFIDENTIAL:

IMPORTANT \ CONFIDENTIAL:  This message contains information from the law firm of KD Phillips Law Firm, PLLC that may be subject to the attorney-client privilege or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law.  Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means.  DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS.  If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, et seq.  If you have received this communication in error, please notify us immediately at our telephone number:  (972) 327-5800

IRS Circular 230 Notice:  Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

**From:** Jeff Bartos <jbartos@geclaw.com>
**Sent:** Tuesday, December 5, 2023 12:24 PM
**To:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Cc:** Charlette Matts <cmatts@apfa.org>; James Sanford <jim@gillespiesanford.com>; John Grunert <jgrunert@geclaw.com>
**Subject:** Re: Ross / Vargas - Depositions

Kerri,

We will oppose such a motion.   The Court has already denied your earlier request to postpone the discovery that long, and since both Mr. Ross and Mr. Vargas are disqualified

**APPENDIX 2**

from holding union office as a result of the binding arbitration decisions, there is no reason to link the depositions to the election schedule.

Jeff

---

**From:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Sent:** Monday, December 4, 2023 2:26 PM
**To:** Jeff Bartos <jbartos@geclaw.com>
**Cc:** Charlette Matts <cmatts@apfa.org>; James Sanford <jim@gillespiesanford.com>; John Grunert <jgrunert@geclaw.com>
**Subject:** Re: Ross / Vargas - Depositions

Jeff,

I will be filing another motion to quash and a motion for a protective order.  I will request the court allow depositions of my clients in March so as not to interfere with the internal union election process.  I will also not schedule depositions of your clients until March.  Please advise if you agree or oppose.

Thank you,
Kerri Phillips

Sent from my iPhone

> On Dec 4, 2023, at 8:48 AM, Jeff Bartos <jbartos@geclaw.com> wrote:
>
> Kerri,
>
> Attached please find Amended Notices of Deposition for Mr. Ross and Mr. Vargas.  If you have any questions or wish to discuss scheduling, please let me know.
>
> Jeff
>
> *Jeffrey A Bartos*
>
> *Guerrieri Bartos & Roma PC*
>
> *1900 M Street, NW*
>
> *Suite 700*
>
> *Washington, DC  20036*

**APPENDIX 3**

*202-624-7400*


*www.geclaw.com*


<Amended Notice of Deposition- Ross.pdf>
<Amended Notice of Deposition - Vargas.pdf>

**APPENDIX 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| ROBERT (BOB) ROSS, | § | |
| | § | |
| | § | |
| Plaintiff/Counterclaim Defendant, | § | Civil Action No. 4:22-cv-343-Y |
| | § | |
| v. | § | Judge Terry R. Means |
| | § | |
| ASSOCIATION OF PROFESSIONAL | § | |
| FLIGIIT ATTENDANTS, *et al.*, | § | |
| | § | |
| Defendants/Counterclaim Plaintiff. | § | |

AMENDED NOTICE OF DEPOSITION - BOB ROSS

PLEASE TAKE NOTICE that counsel for Defendants Association of Professional

Flight Attendants, Julie Hedrick and Erik Harris will take the deposition of Plaintiff

Robert ("Bob") Ross upon oral examination, under oath before a notary public duly

licensed in the State of Texas on Wednesday, January 10, 2024 beginning at 10:00 a.m. at

the following location:

Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX  75246

The deposition will be conducted pursuant to Rule 30 of the Federal Rules of Civil

Procedure, for all purposes permissible under those Rules. Testimony will be recorded by

stenographic and videographic means.

Dated: December 4, 2023

1

**APPENDIX 5**

/s/ Jeffrey A. Bartos
JEFFREY A. BARTOS (*pro hac vice*)
D.C. Bar No. 435832
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
Tel.: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com


JAMES D. SANFORD
Tex. Bar No. 24051289
Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX  75246
Tel.: (214) 800-5111; Fax.: (214) 838-0001
Email: jim@gillespiesanford.com


*Counsel for Defendant and Counterclaim Plaintiff*
*Association of Professional Flight Attendants, and*
*Defendants Julie Hedrick and Erik Harris*

CHARLETTE L. MATTS (*pro hac vice*)
Tex. Bar No. 24133870
Association of Professional Flight Attendants
1004 W. Euless Blvd.
Euless, TX 76040
Tel.: (682) 301-8454
Email: Cmatts@apfa.org


*Counsel for Defendant and Counterclaim Plaintiff*
*Association of Professional Flight Attendants*

**APPENDIX 6**

**From:** ███████@aol.com <███████@aol.com>
**Sent:** Thursday, December 7, 2023 2:22 PM
**To:** Kerri Phillips <Kerri@KDphillipslaw.com>
**Subject:** Fw: Willingness-to-Serve: Nomination Ineligible


Sent from the all new AOL app for iOS

Begin forwarded message:

On Thursday, December 7, 2023, 12:55 PM, Ballot Committee <ballot@apfa.org> wrote:



December 7, 2023

Hello,

The National Ballot Committee (NBC) has received your Willingness-to-Serve form nominating Robert "Bob" Ross as a candidate for an APFA National Officer position. This is to advise you that Mr. Ross is not eligible to hold such office.

On March 19, 2022, Arbitrator Ruben Armendariz issued a binding Opinion and Award under Article VII of the APFA Constitution prohibiting Bob Ross from "serving in any official position within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified." In accordance with that decision, on May 23, 2022, the APFA Board of Directors adopted the Chinery-Lee v Ross Arbitration Remedy Resolution, which, among other things, directed the NBC to "maintain a record of the Chinery-Lee v. Ross Article VII award to ensure any Willingness-to-Serve Bob Ross may submit for any election APFA holds during his lifetime is removed from consideration."

In accordance with the Article VII ruling and the Board of Directors' implementing resolution, the National Ballot Committee (NBC) has therefore removed from consideration all Willingness-to-Serves nominating Bob Ross as a candidate for any APFA elected position.

**APPENDIX 7**

Accordingly, the NBC will take no further action related to the self-nomination or nomination of Bob Ross for any position within the APFA for which he is prohibited from being a candidate. The NBC has also concluded that Art. VI, Section 6 of the APFA Constitution is not applicable to this action.

In Solidarity,

**Adam Brooks** _Pronouns_: _he, him, they, them_

**National Ballot Committee Chair**
Association of Professional Flight Attendants

Office: 817.540.0108 | Email: ballot@apfa.org



**#WeAreReady #27kStrong #SolidaridtySeason #Strike #ContractNow**

_The content of this email is intended solely for the recipient(s). It is not to be shared, forwarded or posted without the authors written consent._

**APPENDIX 8**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 APR -5 AM 7: 33

LORETTA G. WHYTE
CLERK

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

BLANCHARD AND COMPANY, INC., ET AL                    CIVIL ACTION

**VERSUS**                                            NO. 02-3721

BARRICK GOLD CORPORATION, J.P. MORGAN                 SECTION "C" (3)
CHASE & CO. AND ABC COMPANIES

## ORDER AND REASONS

On March 26, 2004, the matter of defendants' Motion for a Protective Order came on for

hearing before the undersigned Magistrate Judge.

Present were: Stephen H Kupperman on behalf the plaintiffs, Blanchard and Company, Inc.,
Herbert Davies and James F. Holmes;
Edward Schwartz and David Radlauer on behalf of defendant Barrick Gold
Corporation; and
Paul Spagnoletti and Amelia Koch on behalf of J. P. Morgan Chase & Co.

For the following reasons, the defendants' motion is GRANTED IN PART and DENIED IN

PART as more specifically discussed below.

### I. BACKGROUND
### A. The Parties

The plaintiffs in this action are: (1) Blanchard and Co, Inc. ("Blanchard"), a retailer dealer

in rare coins and precious metals; (2) Herbert Davies ("Davies"), an individual investor in gold;

and (3) James F. Holmes ("Holmes"), a partner in a gold mining enterprise. Intervenors' claims

were dismissed [1]

DATE OF ENTRY
APR - 5 2004

---

[1]*See* Order and Reasons dated September 3, 2003 [Rec. Doc. No. 85].

Fee_____
Process_____
X /Dktd_____
✓ CtRmDep_____
___ Doc. No. _____

1

The defendants are: (1) Barrick Gold Corporation ("Barrick"), one of the largest gold mining companies in the world; (2) J.P. Morgan Chase & Co. ("JP Morgan"), one of the largest banking companies in the United States; and (3) ABC companies - unnamed gold bullion banks.

## B. Procedural Background

Plaintiffs' antitrust claim is generally that the defendants unlawfully combined and conspired to actively artificially manipulate the price of gold, monopolize the market in gold and cause antitrust injury to Davies as an investor, to Blanchard as a retailer and competitor, and to Holmes as a partner in a gold mining enterprise, all in violation of 15 U.S.C. §§ 1 & 2. More particularly, plaintiffs allege that Barrick's "Premium Gold Sales Program," unlike ordinary hedging programs, is a purposeful and unlawful mechanism to manipulate the price of gold both upwards and downwards. The mechanics of such program entails (1) JP Morgan and other bullion banks, acting on Barrick's behalf and at Barrick's direction, borrow contractually specified amounts of gold from a central bank and physically sell the gold into the spot market: (2) money from the spot market is then invested by JP Morgan; (3) JP Morgan pays the central bank a gold lease rate (a percentage lower than that earned by capital generated from the spot sale, with the interest premium being profit for Barrick); (4) at some future date, Barrick delivers gold to JP Morgan; and (5) JP Morgan returns the gold to the central bank.

Plaintiffs claim that the extraordinary favorable terms of the "spot-deferred sales contract" are only available to Barrick and to none of its competitors. Essentially, the plaintiffs claim is that Barrick's Premium Sales Program is unique, no other gold producer has the combination of margin-free hedging and flexible delivery dates available, and that in combination with bullion banks such as JP Morgan, Barrick, alone among gold mining companies, is in a position to

2

manipulate the price of gold at will.

Under the "spot-deferred sales contract," JP Morgan allegedly permits Barrick to defer repayment of the borrowed gold and waives the requirement for margin. Plaintiff further claims that, as a result, while other short sellers have to cover or add additional margin when the price of gold goes up, Barrick's prearranged derivative contracts give it the ability to add to its short positions at the higher prices.

Barrick allegedly artificially manipulates the price of gold upward by reducing its short positions, adding demand or reducing supply, by bolstering the market with negligent or deliberately false bullish prognoses regarding its intent with respect to short positions and knowingly sponsoring false statistical data with respect to the gold market and its own trading activities. Plaintiffs allege that Barrick manipulates the price of gold downward by injecting massive amounts of additional supply through its short sales.

Plaintiff further alleges that, for its part, JP Morgan profits as the largest holder of gold derivatives in the United States. A "derivative" is a bilateral contract whose value is derived from the value of the underlying asset, reference rate or index. In the case of "gold derivative" that includes any predominantly paper product whose value is directly or indirectly dependent on the price of gold. The allegations include that Barrick's ability to influence the price of physical gold can produce phenomenal profits for JP Morgan.

Although an atypical case, the district judge noted that gold is an atypical product and that investors in gold are not typical consumers. Assuming the allegations were true, the district judge found both antitrust injury and standing. The Court further determined that plaintiffs' complaint sufficiently alleges an anti-competitive scheme (*i.e.*, Barrick's attempted acquisition of

3

**APPENDIX 11**

monopoly power in the gold mining market and Morgan's attempted acquisition of monopoly power in the gold derivatives market). The district judge further observed that the fact that the corporate entities operate in differentiated markets makes their combination no less actionable and that, as alleged, the Premium Gold Sales Program is nothing but a specific agreement to fix prices involving an extraordinary commodity and atypical consumers, whose interests are not advanced by falling prices.

In addition to the plaintiffs' claims pursuant to The Clayton Act, plaintiffs also allege that the defendants have engaged in unfair trade practices in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUPTA"), La.Rev.Stat. 51:1401, et seq. Only the LUPTA claim against Barrick survived the defendants' motions to dismiss. The Court dismissed plaintiffs' LUPTA claims as against the defendant, J.P. Morgan, having found that J.P. Morgan, as a financial institution regulated by other authority, is expressly exempt for the Act. *See* Order and Reasons, dated September 3, 2003 at p. 28.

Plaintiffs' defamation, libel and slander claims, as well as Intervenors' analogous claims against Barrick, were dismissed. *Id.* at pp. 34-35.

## II. CONTENTIONS OF PARTIES GENERALLY

Defendants highlight that the plaintiffs seek in discovery the defendants' most sensitive, confidential and proprietary business information, claiming that it is relevant to their antitrust claim. As examples of highly sensitive and propriety information and documents sought, defendants listed the following, to wit: confidential terms of gold trades, confidential/proprietary commercial and highly competitive contractual arrangements (*i.e.*, credit agreements with non-party banks), confidential strategic planning information set forth in the Minutes of Barrick's

4

**APPENDIX 12**

Board of Directors and Finance Committee Meetings and customer lists.

Defendants' protection concerns are fueled, in part, by the fact that, at the outset of the litigation, Blanchard engaged in a widespread marketing and public relations campaign built around this litigation. Defendants contend that one of Blanchard's motivations is clear – *i.e.*, to use the litigation and facts it learns to sell more gold. In this vein, defendants refer to a press release, a website set up to provide ongoing information, direct mail campaigns and nationwide radio advertisements on the Rush Limbaugh show on Friday, May 9, 2003. Defendants find Blanchard's proclaimed intent to publicize facts it learns from this litigation particularly distressing. One website posts the headline, "Blanchard Moves into Discovery," and instructs, "Sign Up to be Notified of New Information Via E-MAIL." Defendants note that Blanchard's account representatives wrote directly to prospective customers about the litigation.

Defendants seek to ensure that their most highly confidential and proprietary information produced in discovery does not make its way into the public domain and into the hands of their competitors. A key concern that figures prominently in the protective order sought by Barrick is the fact that disclosure will be made to two self-proclaimed competitors of Barrick and JP Morgan. Defendants submit that the disclosure of this highly sensitive information to the public or to employees of the plaintiffs would result in undue harm and extreme prejudice to the defendants.

For all of the above reasons, Defendant seek protection under terms and conditions which they contend will permit the requisite disclosure and conduct of the litigation and also provide the defendants all reasonable assurances that such information will only be used for the conduct of the litigation. Barrick has submitted a proposed order attached hereto as Court Exhibit "A".

5

**APPENDIX 13**

The plaintiffs have submitted a proposed Protective Order of their own (attached hereto as Court Exhibit "B") and contend that defendants' proposed order stretches far beyond what is appropriate and necessary to protect material deemed confidential in this matter. Plaintiffs submit that the disputed provisions, which are addressed below, are a blatant attempt to control and unfairly monitor nearly every aspect of the plaintiffs' prosecution of this case and that such unprecedented control over their prosecution of this antitrust case should not be sanctioned by this Court.

Plaintiffs note that they have no objection to blanket protection of confidential material and have similarly proposed such an order to expedite the discovery in this case; however, they object to certain allegedly onerous terms as the need for such terms has not been demonstrated, noting that it is the defendants' burden under the controlling jurisprudence to prove "good cause." *See, e. g., Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786-87 (3rd Cir. 1994); *Holland v. Summit Technology, Inc.,* 2001 WL 1132030 (E. D. La. 2001).

As to public disclosure, plaintiffs point out that their proposed protective order limits the use of confidential material to "litigation purposes only" and specifically states that it "shall not be used for ... publicity [or] marketing." As a matter of free speech, Blanchard contends that it should remain free to publicize its involvement in this case and all *public* events in the litigation. Blanchard further highlights that, according to its own proposed order, plaintiffs will be unable to and will not disclose information obtained in discovery that has been designated "confidential."

Plaintiffs submit that their previous publicity of non-confidential public material is insufficient to justify any conclusion that Blanchard will violate a court-sanctioned protective order. Blanchard observes that Barrick has engaged in publicity of its own, issuing press releases

6

**APPENDIX 14**

and statements about this controversy and about Blanchard. Nevertheless, plaintiffs point out that they do not similarly presume, without evidence of any wrong-doing and, even before discovery has commenced in earnest, that Barrick will violate the protective order executed by the Court.

As to the existence or absence of "good cause," Blanchard highlights that Barrick has already publicly disclosed the material terms of its gold trades with counter parties, including JP Morgan. Considering the foregoing disclosure, plaintiffs argue that any "heightened protection" for these now public material terms of its gold trades is inappropriate. Blanchard notes that Barrick has made repeated disclosures in public filings, reports, including annual reports, and its submissions to the Securities and Exchange Commission. Copies of public pronouncements by Barrick were attached to plaintiffs' opposition memorandum as plaintiffs' Exhibit "B." Blanchard further argues that because Barrick publicly announced plans to liquidate its hedge book and engage in no more hedging transactions, the defendants cannot now establish any good reason for affording information relating to its hedge book transactions (or any other arguably confidential materials) "heightened protection" and concomitant restricted access sought by the defendants and that the ordinary "confidential" designation should serve the purpose of non-disclosure for all protected information.

In summary, plaintiffs contend that, absent a foundation for the defendants' proposed onerous provisions, the defendants' proposed order constitutes an attempt to control and monitor every aspect of the plaintiffs' strategy and prosecution of the case. Therefore, plaintiffs submit that the Court should adopt plaintiffs' proposed protective order.

7

**APPENDIX 15**

## III. ANALYSIS

### A. The Applicable Law Generally

A prerequisite to the issuance of a protective order governing discovery is a showing of "good cause." Fed. R. Civ. P. 26(c); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 778 (3rd Cir. 1994). Under Rule 26(c)(7) of the Federal Rules of Civil Procedure, a court may, upon a showing of good cause, issue an order protecting a trade secret or other confidential or commercially sensitive information from disclosure. The court may "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed. R. Civ. P. 26(c)(7).

"Good cause" exists when disclosure will result in a clearly defined and serious injury to the party seeking the protective order. *Pansy*, 23 F.3d at 786. The litigant seeking a protective order must articulate the injury with specificity. "Broad allegations of harm, unsubstantiated by specific examples," do not support a showing of good cause. The burden of justifying a protective order remains on the litigant seeking the order. In determining good cause, the court must balance the risk of injury without the protective order and the requesting party's need for information. The court has wide discretion in determining the scope of a protective order.

Both the plaintiffs and the defendants seek the entry of a protective order in this case, but disagree as to specific provisions necessary to preserve legitimate business/competitive interests of the respective parties. The order proposed by each allows each party to designate in good faith that information the designating party believes constitutes trade secrets, developmental

8

**APPENDIX 16**

information, or other proprietary data of commercial value as subject to protection. However, the plaintiffs suggest a singular "confidential" designation and the defendants propose a two-tier designation (*i.e.*, "confidential" and a "highly confidential" outside attorney's/expert's eyes only designation). Additionally, under the plaintiffs' proposed order, information or discovery materials not designated "confidential" are not subject to the protective decree, whereas, the defendants' proposed order, on its face, imposes various restrictions regarding the use of *all* discovery materials produced in this litigation and requires the return or destruction of *all* discovery materials upon completion of the case.

As to the appropriate scope of protection, the court in *Bayer AG and Miles, Inc. v. Barr Laboratories, Inc.,* 162 F.R.D. 456 (S. D. N. Y. 1995) said it best:

> There are essentially three types of protective orders in terms of the amount of information covered. The narrowest is a protective order covering specific, identified information. *See, e.g., Pelligrino v. United States,* 1992 WL 84475 at *3 (protective order covering a single, specified audiotape). With a narrow protective order the court usually reviews the protected material, so it is clear that "good cause" existed for the protective order.
>
> At the other extreme is an "umbrella" protective order that designates all discovery as protected, without any review or determination of "good cause" by parties or the court. "Umbrella" protective orders are disfavored, and on a motion for modification the burden generally will be on the party seeking protection to show good cause. *See Hayden,* 106 F.R. D. at 554 (burden of establishing need for continued protection is on person opposing the modification in "decisions involving 'umbrella' type orders that indiscriminately restrict access to all discovered documents."); *In re Agent Orange*, 104 F.R.D. at 570-571 (no "good cause" for original protective order that covered all discovery material).
>
> Between those two extremes is a "blanket" protective order that permits the parties to protect documents that they believe in good faith contain trade secrets and other confidential commercial information.[2] Such protective orders

---

[2]"While the terminology is not uniform throughout the case law, the Court follows *Hayden* in using the term "umbrella" to refer to the disfavored protective order that covers all

9

*are routinely agreed to by the parties and approved by the courts in commercial litigation, especially in cases between direct competitors. "Blanket" protective orders are essential to the functioning of civil discovery.*

*Bayer AG,* 162 F.R.D. at 465 (emphasis added).

Bearing the above-discussed applicable law in mind, the Court now turns to the plaintiffs' and defendants' specific areas of disagreement..

## B. Disputed Provisions of the Parties' Respective Proposed Orders

### (1) Limiting the Use of All Discovery to this Litigation
### Court Exhibit "A" Δ's ¶ 3/ Court Exhibit "B" P's ¶ 10(a)

Defendants' paragraph 3 addresses the concern limiting use of information gleaned during discovery to this particular case and no other. Defendants submit that this is a standard term of virtually every protective order. Plaintiffs comparable provision is set forth at paragraph 10(a) of their proposed order. Plaintiffs counter that it is apparent from their corresponding paragraph 10(a) that it is not their intention to use confidential information other than for the purpose of litigation and not for publicity or marketing. Plaintiffs point out that the real difference between the parties' proposals is that the defendants intend to restrict use of all discovery material to this particular case, while the plaintiffs seek the ability to use the information in related litigation involving the same parties (*i.e.*, a libel suit pending in a Canadian court involving Blanchard and Barrick). Plaintiff's submit that the libel suit will entail much of the same discovery and little purpose is served by forcing the parties to conduct voluminous discovery twice.

---

discovery information and the "blanket" to refer to a protective order that allows the parties to designate material they in good faith believe is commercially-sensitive for confidentiality protection." *Bayer AG,* 162 F.R.D. at 465 n. 14.

10

Moreover, the plaintiffs point out that what the defendant proposes is not an acceptable "blanket type" protective order, but rather the disfavored "umbrella type" covering all discovery materials. The defendants' proposal seeks to limit use and prevent public disclosure of "*all* material" not just discovery bearing a confidential designation. Defendants protective order reads in pertinent part, to wit: "All documents and discovery produced in this case shall be used solely for the purposes of this litigation." *See* Defendants' Order at para. 3 (emphasis added).

The Court finds that the defendants' position has merit regarding limiting disclosure to this particular litigation, but only insofar as it seeks to shield confidential documents and information. However, insofar as the defendants' proposed order addresses *all* discovery, shielding it from public disclosure or restricting its use to this litigation, the defendants' position is without merit and not supported by either the applicable rules or the prevailing jurisprudence. Indeed, the objective should be to protect only material for which there is a clear and significant need for confidentiality. *See Manual for Complex Litigation (Third)*, at p. 69 § 21.432. The protective order should "provide that all assertedly confidential material disclosed (and appropriately identified, usually by a stamp) is presumptively protected unless challenged." *Id.* at p. 67. By covering *all* discovery materials within the umbrella of protection, the defendants' provision, as presently confected, robs public documents of their public character. Suffice it to say, the Court is not persuaded by the defendants' argument that *all* discovery should come within the umbrella of protection; rather only documents bearing a confidentiality designation should be covered by the protective order. As to restricting the use of *confidential* material to *this* particular litigation, that issue is addressed below in the Court's resolution of the

11

disagreement regarding defendants' proposed paragraph 15(i).

## (2) Categories of Confidential Documents – Two Tiers
## Court Exhibit "A" Δ's ¶¶ 6, 7 and 18

Defendants' paragraphs 6, 7 and 18 address two categories of protected documents – *i.e.*, a CONFIDENTIAL classification and a HIGHLY CONFIDENTIAL classification; highly confidential documents are accorded restricted access, *i.e.*, to outside counsel and designated experts. There is no comparable provision in the plaintiffs' proposed protective order and the plaintiffs object strenuously to any such "eyes only" designation for highly confidential, proprietary documents.

Defendants submit that, in antitrust, patent, trademark infringement and other such litigation, such a dual tier designation is a standard component of protective orders and necessary to address concerns about disclosure of highly confidential, proprietary information to competitors. It submits that such a dual tier designation in no way inhibits plaintiffs' ability to litigate their claims. They further argue, as to the necessity of client competitors' review of highly sensitive proprietary information, that it is inconceivable that plaintiffs' would prosecute this action without retaining an outside expert to assist in their prosecution of the instant antitrust suit.

As aforestated, plaintiffs object to the dual tier designation and submit that there is no valid reason to restrict a class of documents so as to curtail competitor clients' review of confidential documents. Whether proprietary or commercially sensitive, plaintiff submits that the singular confidential designation, without restricting access by the clients employees together with the parties agreement not to disclose same and to utilize the information for any purpose

12

**APPENDIX 20**

other than litigation, adequately addresses the defendants' concerns. In this regard, plaintiffs'
remind the Court that the defendants bear the burden of proof of "good cause" with respect to the
necessity of the measure of protection meted out by the proposed "highly confidential"
designation. Plaintiffs argue that such a dual tier designation is not "the standard" and that the
defendants real goal in prohibiting certain documents from plaintiffs' view is to inhibit
prosecution of this case by unfairly restricting their ability to confer with counsel and to
synthesize crucial complex financial data, financial agreements or arrangements and their
consequences.

Plaintiffs' counsel points out that it is essential to the prosecution of this case that he rely
on his clients' superior understanding of the intricacies of the gold market and argues that his
clients' input is essential to the prosecution of this particular antitrust claim. Plaintiffs' counsel
explained: "[I]t was a plaintiff [the client] that carefully analyzed the gold market and Barrick's
governmental filings and public statements and, through detailed study, was able to piece
together the truth about defendants' manipulation of the gold industry, while others were not."
*See* Plaintiffs' Opposition Memorandum.

As mentioned at the outset, plaintiffs' contention is that Barrick has now ceased engaging
in hedging and there remains little or no "highly confidential" information to be shielded from
the clients' eyes. Considering the foregoing, the plaintiffs submit that the defendants have failed
to demonstrate "good cause" for the "highly confidential" designation, and have failed to show
any competitive disadvantage by disclosure of hedge book materials, *inter alia*, to the plaintiffs.

13

**APPENDIX 21**

Defendants reply that courts have explicitly recognized that competitive disadvantage is a type of harm cognizable under the Rule and that there is sufficient jurisprudential authority for restricting disclosure of "competitors" sales and marketing plans, financial forecasts, margin, pricing, strategies, and customer identities to only outside attorneys and experts.

In this case, defendants submit that the two-tiered classification system is necessary to protect defendants, including JP Morgan, from clearly defined and serious injuries, which would ensue if required to disclose to plaintiffs (their competitors) vital strategic business information, customer lists, customer agreements, etc., and provide competitors an opportunity to interfere with ongoing business operation. Defendants dispute plaintiffs' assertion that Barrick has already disclosed the terms of its hedging contracts to the public and submits that it has only identified the broad features of its hedging arrangements. Defendants further explain that many of the details and identities of its counter parties have not been made public and remain very confidential. Barrick argues that the announcement of a change in its hedge policy does not automatically erase the highly confidential nature of certain business records detailing business strategies and relationships, which are ongoing. It submits that Barrick's board minutes reflecting company strategy are no less confidential on account of the changed hedge policy. JP Morgan argues that it continues to have ongoing business relationships with many parties, including gold producers and central banks, and the terms of those agreements (and many of its other business records) sought by the plaintiffs are not only confidential, but proprietary information.

The Court observes that, while such dual tier designation may not be commonplace in ordinary litigation, such restrictions are commonplace where parties are competitors as is the case

14

**APPENDIX 22**

here. The Manual for Complex Litigation specifically notes that "disclosure to clients may be prohibited where, for example, the information has commercial value and the parties are competitors; alternatively, the order may (1) limit disclosure to named individuals not involved in the relevant corporate activity, (2) *create a special class of highly confidential documents that only attorneys and non-client experts may view,* (3) require particularized record keeping of disclosures to client personnel, and (4) require individual undertakings by those receiving such information not to use it." *Manual for Complex Litigation, Third* § 21.432 n. 146 (italicized emphasis added).

In *In re Motorsports Merchandise Antitrust Litigation*, 1998 WL 128424 * 4 (N. D. Ga. March 20, 1998), an antitrust case filed pursuant to the Clayton Act, involving an alleged conspiracy to fix prices of souvenirs and merchandise sold at professional stock car races sanctioned by NASCAR, the court addressed the matter of a highly confidential designation. *The In re Motorsports* court found that the defendants had the better argument, finding that the potential hardship to the plaintiffs was outweighed by the potential prejudice to the defendants and ordered entry of a protective order that included a "Highly Confidential" designation applicable to certain financial information.

In yet another antitrust case, *United States v. Dentsply International, Inc.*, 187 F.R.D. 152, 161-162. ( D. De. June 11, 1999), the court addressed the issue of access to confidential information by Dentsply's employees and its general counsel. The plaintiffs argued against disclosure of competitors' sales and marketing plans, financial forecasts, margin, pricing, cost and customer information to Dentsply employees and in-house counsel. Plaintiffs successfully

15

**APPENDIX 23**

argued that, even if such information is correctly designated as confidential, the information is so sensitive that its disclosure or further disclosure would work a clearly defined and serious injury. Dentsply argued that it would be prejudiced if its general counsel cannot have access to such confidential information and maintained that barring access to confidential information is unfair because Dentsply's outside counsel relies on general counsel to direct the litigation, devise legal strategy and provide assistance. The Government countered that, as an officer of Dentsply, general counsel was involved in the company's business decisions, he could base future business decisions on information learned during discovery. Moreover, giving Dentsply employees access to highly sensitive commercial information would increase the risk of its inadvertent disclosure. The court barred in house counsel from viewing sensitive proprietary documents, since he had a very real involvement in competitive decision making. In so doing, the court determined that the Government had carried its burden of demonstrating that the risk of injury outweighed the need for disclosure to General Counsel, observing that there was an unacceptably high risk of either utilization or inadvertent disclosure. *See Dentsply*, 187 F.R.D. at 161-62; *see also Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc.,* 200 F.R.D. 255 (M. D. N. C. April 18, 2001) (supplier lists disclosure limited to outside attorney's eyes only).

In *C. A. Muer Corp. v. Big River Fish Co.,* 1998 WL 4888007 * 3 (E. D. Pa. August 10, 1998), a trade mark infringement case, the court restricted access to confidential and proprietary information to attorneys and qualified experts only because providing the documents to Muer's competitors would provide it with vital information (marketing and financial ) and an opportunity to engage in underbidding goods and services, anticipatory expansion and to interfere

16

**APPENDIX 24**

with business operations). *See also Safeflight Instrument Corporation v. Sundstrand Data Control, Inc.,* 682 F.Supp. 20, 21 (D. De. March 24, 1998). In *Safeflight, supra,* a patent case, the court found that the weight of judicial precedent did not favor Safeflight's argument against heightened protection and further recognized that proper safeguards should attend the disclosure of trade secrets. The *Safeflight* court sanctioned the utilization of an "attorney's eyes only" designation. As to the plaintiff's inability to view the documents, the Court suggested that the plaintiff might, at a future time, nominate a non-technical officer to make business choices regarding the economic merits of this litigation, rather than an officer who is also a working scientist of the corporation.

In summary, "[a]mple precedent exists for limiting disclosure of highly sensitive, confidential or proprietary information to outside attorneys and experts, particularly when there is some risk that a party might use the information or disseminate it to others who might employ it to gain a competitive advantage over the producing party." *Asch/Grossbardt, Inc. v. Asher Jewelry Co., Inc.,* 2003 WL 660883 * 2 (S. D. N. Y. February 28, 2003) (*citing Westside-Marrero Jeep Eagle, Inc. v. Chrysler Inc.,* 1998 WL 186728 *2 (E. D. La. April 17, 1998)). "In most cases, 'the key issue often is not whether the information will be disclosed, but under what conditions it should be disclosed.'" *Id.* (*quoting Drexel Heritage Furnishings Inc. v. Furniture USA, Inc.,* 200 F.R.D. 255, 260 (M. D. N. C. 2001)). In order to protect against any "predatory" practices, while still recognizing the broad scope of discovery in a federal action, the court required entry of a protective order that (1) limited access to customer lists to plaintiff's counsel on an "Attorney's Eyes Only" basis, (2) limited the number of copies of said information that

17

**APPENDIX 25**

may be circulated among plaintiff's counsel, and (3) limited the use of said information for purposes of *the present litigation only. See id.* at ** 2-3 n. 2 (noting that the procedure was used in *Drexel Heritage, supra,* and *Liberty Folder v. Curtiss Anthony Corp.,* 90 F.R.D. 80, 82-83 (S. D. Oh. 1981)).

The Court is persuaded by the defendants' argument, written submissions and the controlling jurisprudence discussed above, that the defendants' interest in the confidentiality of its most highly commercially sensitive business and/or proprietary information outweighs any interest competitor plaintiffs have in securing its employees' ability to review this highly sensitive information. Moreover, whether designated "Confidential" or "Highly Confidential," all protected designation is subject to challenge.

This Court recognizes, as stated at the oral hearing of this matter that, it is simply postponing, rather than eliminating the need for close scrutiny of particular discovery materials to determine whether any classification is justified under the circumstances. The Court further observes that it is equally clear from the parties' submissions that even the "Confidential" designation as to certain discovery documents will be the subject of dispute. *See* Plaintiffs' Memorandum in Opposition at p. 5 n. 2. Nevertheless, the Court *trusts* that the parties and their able counsel will undertake the duty to designate only the material which they believe in *good faith* merits the level of protection assigned, thereby reducing the burden of a *voluminous* document-by-document adjudication and minimizing delay in the prosecution of this case. As to the dual-tier designation, the order shall specify, with as much particularity as possible, the categories of information subject to the respective designations.

18

**APPENDIX 26**

### (3) Limiting Disclosure of Confidential Documents to this Litigation
### Court Exhibit "A" Δ's ¶ 15(i)/ Court Exhibit "B" P's ¶ 13(i),(ii), (v)

Defendants' paragraph 15(i) limits access to current attorneys who have made an

appearance in this case. Plaintiff's corresponding provision paragraph 13, allows access by any

attorneys employed by law firms who are attorneys for the parties, in-house counsel employed by

a party who are involved in litigation management, clerical/paralegal personnel employed by

counsel or the parties and any consulting or testifying expert, provided that the expert has signed

an agreement to be bound by the protective order, such executed agreement to be maintained by

counsel.

Defendants submit that plaintiffs aim is to share confidential information with its counsel

in other matters (*i.e.*, the Canadian libel lawsuit involving the same parties). Defendants contend

that this discovery "sharing" loophole is unreasonable and that the restriction of the utilization of

confidential material to this litigation is a common feature designed to protect confidential,

sensitive and proprietary material from disclosure to competitors and non-parties outside of the

litigation. *See e. g., U. S. ex rel Stewart v. Louisiana Clinic,* 2002 U. Dist. LEXIS 24062 \*\* 19-

20 (E. D. La. December 12, 2002) (disclosure limited to specific individuals including parties'

counsel of record); *Cmedia, LLC v. Lifekey Healthcare, LLC*, 216 F.R.D. 387, 391 ( N. D.

Texas)(disclosure restricted to attorneys involved in the litigation and independent experts).


Plaintiffs argue that counsel in the Canadian proceeding should be afforded access to

confidential information to prevent the necessity of duplicate discovery. Plaintiffs direct the

Court's attention to the following cases: (1) *United States v. International Business Machines*

19

**APPENDIX 27**

*Corporation (IBMC)*, 70 F.3d 700 (S. D. N. Y. 1976) (an antitrust case) in which the court held that the movant failed to demonstrate good cause why the protective order should limit the parties' use of documents to the specific litigation at hand; and (2) *Johnson Foils, Inc. v. Huyck Corporation*, 61 F.R.D. 405, 410 (N. D. N. Y.) in which the court held that the defendant's order unacceptably limited the use of information in foreign litigation of a closely related nature involving essentially the same parties.    In their oral presentation, plaintiffs' counsel noted that his clients may stipulate that the protective order entered by this Court will govern utilization of the confidential materials in the ongoing Canadian libel action.

Defendants counter that Judge Berrigan dismissed Barrick's libel claim and contend that, *vis a vis* the Canadian libel suit and this litigation, the nature of the two suits are far from identical.

As to the plaintiffs' citation of *IBMC*, *supra*, the Court notes that the *IBMC* decision was driven by the preliminary findings that (1) movant CIA's motion was tardy, lack of procedural compliance being crucial in a case involving hundreds of nonparty deponents, and that, (2) in any event, movant failed to demonstrate that the specific documents at issue were of a confidential nature and failed to satisfactorily explain its failure to identify the documents that were worthy of protection, thus failing to demonstrate good cause for the blanket protection sought. *See United States v. IBMC*, 70 F.R.D. at 701-702. The court observed:

> It is difficult to discern from CIA's papers the precise basis for its claim that a
> protective order should issue. The court is forced to assume that CIA is
> contending either that: (1) although there may be nothing contained in the
> documents of a confidential nature, IBM may engage in commercial or legal
> activity directed to inflicting harm on CIA and should not be allowed to use
> discovered documents in support of that activity; or (2) although only some of the

20

**APPENDIX 28**

documents are of a confidential nature all of the documents should be protected since "to sort and designate 'confidential' information would be time consuming, hazardous, and an open invitation to continuous controversy." Under either theory, however, CIA has failed to show good cause for the issuance of the order requested.

*Id.* at 702.

In *Wilk v. American Medical Association*, 635 F.2d 1295 (7th Cir. 1980) (Wisdom, J.), the

Court noted that there was no suggestion that New York was anything but a bona fide litigant,

who needs access for bona fide litigation purposes, and that comparison of the Wilk and New

York complaints shows that much, if not most, of the Wilk discovery must be eventually

discoverable in the New York action. The *Wilk* court observed that the "two complaints are

founded on virtually identical allegations of nationwide conspiracy." *Wilk*, 635 F.2d at 1300.

The one major difference between the two suits is that one included a claim for damages. *Id.* at

1301 n. 12. Most notably, at the outset, the *Wilk* court observed the following, to wit:

> A collateral litigant should not be permitted to exploit another's discovery in the since of instituting the collateral litigation simply as a device to obtain access to sealed information. *United States v. United Fruit,* 410 F.2d 553, 597 (5th Cir.) (*citing Johnson Foils, Inc. v. Huyck Corporation*, 61 F.R.D. 405 (N. D. N. Y 1973)); *Williams v. Johnson & Johnson*, 50 F.R.D. 31 (S. D. N. Y. 1970). This a corrollary of the principle that federal discovery may not be used merely to subvert limitations on discovery in another proceeding. *Campbell v. Eastland,* 307 F.2d 478 (5th Cir.), *cert. denied,* 371 U.S. 955 (1962). *See generally*, 8 Wright & Miller § 2040, at 291-95. From that principle, it also follows that a collateral litigant has no right to obtain discovery materials that are privileged or otherwise immune from eventual involuntary discovery in the collateral litigation. *Grady*, 597 F.2d at 597.

*Wilk*, 635 at 1300.

This Court has previously recognized that only confidential material may be properly

accorded protected status under the Court-sanctioned protective decree. Thus, in that regard, the

21

**APPENDIX 29**

Court finds plaintiffs' position has merit, *i.e.*, ordinary discovery may be utilized in other litigation. However, as to discovery materials bearing the "confidential" and/or "highly confidential" designation, the Court finds the defendants' argument more persuasive under the circumstances presented in this case. Although the Canadian litigation was in fact spawned by the instant litigation, the two lawsuits are not of sufficiently similar *nature* to allow use of protected materials to-be-marshaled beyond the confines of this antitrust litigation in the Canadian proceeding. Sharing of bonafide protected information disclosed in this proceeding with attorney's involved in the Canadian libel action, who are not attorneys of record in this case, will not be permitted. This Court cannot conceive of any good reason to complicate the task of the soon-to-be challenged confidentiality designations by superimposing challenges driven by attorneys not involved this case, who are not subject to this Court's jurisdiction.

The Court recognizes that, even as amended herein, there are powerful incentives inherent in the attorney-crafted protective order (1) for the plaintiffs' to dispute literally every confidentiality classification (so that confidential material may be utilized in the foreign jurisdiction and elswhere) and (2) for the defendants to accord some level of protected status to most, if not all, of the discovery material produced and to err on the side of the "highly confidential" designation. One court noted that "[j]udges sign off on protective orders obligingly, both as a convenience to the party litigants and to assure administrative control of the case." *Dentsply,* 187 F.R.D. at 154. Considering the "daunting potential for disputes built into the [competing] protective orders proffered" in the *Dentsply* case, the court included a "back-up" private-sector mechanism to issue binding resolution of confidentiality classification disputes, the

22

**APPENDIX 30**

expense of which was to be taxed as costs to the parties. That having been said, the Court expects

that the parties and their respective counsel will exercise their "good faith" judgment in such a

fashion as to permit little or *no margin of error* in both classifying discovery documents as

protected information and in challenging the producing parties' classifications. For that reason,

no such fall back mechanism has been suggested by the undersigned *at this juncture of the*

*proceedings.*

### (4) Employees' Access to Confidential Documents
### Court Exhibit "A" Δ's ¶ 15(iv)/ Court Exhibit "B" P's ¶ 13(iv)

Defendants' paragraph 15(iv) limits access to information designated "Confidential" to

four employees of a party and requires that the employees given access sign an acknowledgment

and transmit it to the producing party, prior to viewing the protected discovery. The

corresponding provision in plaintiffs' proposed order is set forth in paragraph 13(iv) and permits

employees or representatives of the parties access to protected information to the extent necessary

to assist in the litigation. Plaintiffs' proposed order does not contemplate execution of any

agreement to abide by the protective order by employees or representatives of the parties.

Plaintiffs object to the arbitrary four employee limit, to forwarding the acknowledgment to

the producing party and to doing so in advance of the disclosure. Defendants cite *In re*

*Application of Time, Inc.* 1999 U.S. Dist. LEXIS 18394 at * 11 (E. D. La. November 22, 1999)

(requiring individuals to whom confidential information is disclosed to sign an affidavit and file it

in the record and serve same on all other parties).

Plaintiffs contends that limiting disclosure to four employees, approved in advance by the

defendants, is an unprecedented, unwarranted and blatant attempt to impair plaintiffs' prosecution

23

**APPENDIX 31**

of its case and that access by more than four employees is required. Plaintiffs note that employees
are needed to assist in indexing, organizing and preparing the case for trial. Plaintiffs point out
that there is no authority for restricting access by plaintiffs' employees, nor have they proved that
any such restriction is necessary in this case. As to the defendants' requirement of preapproval of
those employees who will have access, in that defendants' paragraph 15(iv) requires transmission
of the Agreement to opposing counsel *before reviewing the Confidential Information,* plaintiff
submits that such provision essentially gives the defendants' veto power over who the plaintiff's
can consult for litigation purposes within their own companies and provides a roadmap of the
plaintiffs' investigation of the case. Plaintiffs contend that providing the identity of its employees
engaged in the investigation and prosecution of the case enables defendants to hire private
investigation firms to depose and harass those employees and that the defendants have done so in
the past.

Plaintiffs urge the Court to adopt its proposed language because it is less restrictive and
more reasonably limits access to the number of employees necessary to assist in litigation.
Additionally, without pre-approval and without the necessity of executing an Agreement, the
parties can conduct their respective investigations with the requisite independence and employees
are spared potential investigation and harassment. In sum, plaintiffs' submit that its proposed
language is all that is necessary to assure confidentiality and yet it preserves the parties' respective
rights to strategize and litigate their cases as they, and not their opponents, see fit.

The Court agrees with the plaintiffs' argument that veto power and an arbitrary limit
appear to be extreme and unwarranted. One party should not have veto power over the others

24

**APPENDIX 32**

personnel assigned to assist in the litigation nor should it be able to restrict their ability to prepare by restricting access to a certain number of employees. This is particularly true in light of the implementation of the dual-tier designation adopted at the defendants' behest. However, the defendants' position has merit in that employees, who view confidential information, should have to execute the agreement as do others, including experts, who view the confidential documents. As to serving opposing counsel with the aforesaid executed agreements, filing same *in camera* will sufficiently protect the parties' respective interests. With the adoption of the "Highly Confidential" restriction, any restriction on client participation, other than as previously set forth above, is not warranted.

### (5) Disclosure of Confidential Information Limited to Deponents
### Court Exhibit "A" Δ's ¶ 15 and 18/ Court Exhibit "B" P's ¶ 13(iv)

Defendants' paragraphs 15 and 18 limit access to "Confidential Information" to deponents *during the course of a deposition*, instead of permitting *ex parte* disclosure to any "potential witnesses." Defendants contend that this prevents disclosure to a broad undefined spectrum of possible witnesses. Defendants submit that removal of these provisions from its order eliminates the protections afforded and that, what plaintiff has proposed, is essentially a sieve.

Plaintiff's counter with their need to show confidential information to all potential witnesses, including third parties, so as to determine whether such persons need be deposed. Plaintiffs reiterate the need to conduct their investigation outside of the defendants' glare and submit that they need to inquire about confidential information not merely from deponents during depositions, but also of potential witnesses without the defendant knowing their every move. Plaintiffs highlight the salutary effect of their proposed language, as it may serve to reduce the

25

**APPENDIX 33**

number of depositions necessary and thus minimize the cost of their antitrust litigation.

Defendants position has merit with regard to potential witnesses. The protections afforded by this order would be elusive if counsel were permitted to discuss "confidential" and "highly confidential" documents and information with unsworn *possible* witnesses. There exists good cause to impose the restriction sought by the defendants relative to the discussion of confidential documents with deponents. Here, both the plaintiffs and the defendants have recognized the need to protect the bonafide sensitive nature of certain discovery materials. Permitting the disclosure of confidential and in some cases proprietary documents to possible witnesses, who may be competitors of one or more of the parties, works at cross-purposes with the effort expended to date in crafting the necessary protections. Nothing stated herein should be construed so as curtail the respective parties' investigation addressing all discovery materials, which are not accorded protection as contemplated by the protective order to be entered by the Court.

## (6) Document Storage
### Court Exhibit "A" Δ's ¶ 17/ Court Exhibit "B" P ¶ 15

Defendants' paragraph 17 addresses their need to protect highly confidential information from disclosure to their competitors. Defendants suggest that the Court order the parties to maintain protected documents in the offices of counsel or in storage facilities and not at the clients' offices. Plaintiffs' proposed order contains no comparable storage restriction, but provides at paragraph 15 that confidential information shall be maintained in the strictest confidence by all parties and their counsel, which assumes that the documents will be maintained in secure offices and not available to persons not entitled to disclosure pursuant to the order.

Plaintiffs object to the defendants' storage restriction and explain that counsel may need to

26

**APPENDIX 34**

retain some data in *protected* offices of his client. Defendants counter that, given the proximity of the offices of Blanchard and its counsel (they occupy the same building), allowing the plaintiffs to retain defendants' confidential documents in its offices is unnecessary and creates the risk of disclosure beyond the *employee limit* chosen to have access.

Preliminarily, the Court notes that it has not adopted the arbitrary employee limit suggested by the defendants. The Court has been given no reason to doubt that the parties will, in keeping with the spirit and intent of the protections accorded to sensitive documents, utilize their employees only as necessary to review, study, chronicle, store and marshal exhibits during the course of this litigation and store confidential information so as to ensure protection from inadvertent disclosure

The Court finds that the plaintiff's proposal will adequately protect information and documents stamped "Confidential." However, as to documents which are stamped "Highly Confidential" (*i.e.*, outside experts and attorney's eyes only), such information shall either be maintained in a secure location outside counsel's offices or some other secure storage facility, but not at the clients' offices.

### (7) Deposition Attendance
### Court Exhibit "A" Δ's ¶ 23

Defendants paragraph 23 proposes to limit attendance at depositions utilizing Confidential Information to those who would otherwise have access to the information, whereas the plaintiffs' proposed order contains no such deposition attendance restriction. Defendants submit that clients' unrestricted attendance at depositions would defeat the purpose of the protective order. *See In re Shell Oil Refinery*, 136 F.RD. 615 (E. D. La. 1991).

27

**APPENDIX 35**

Plaintiffs' would have no objection to the defendant's proposal if the order adopted by the Court contains only one tier of confidentiality, *i.e.*, the confidential category and no "highly confidential." Nevertheless, the Court has previously determined that the two-tier structure is necessary to protect highly sensitive documents. As to the plaintiffs suggestion that the defendants proposal would result in their being excluded from most depositions, the Court is not persuaded.

Certainly, counsel will know in advance if "highly confidential" information will be discussed at a particular deposition. Obviously, the parties' clients cannot attend portions of the depositions wherein "highly confidential" documents are discussed. Even recognizing that this may generate a fair number of expedited telephone hearings, during the pendency of ongoing depositions, the Court cannot conclude that this is more trouble than its worth. There is a lot at stake in terms of potential competitive injury. Accordingly, the Court finds the defendants' proposed language to be the better approach. It is, however, expected that the parties will prepare for the depositions in advance and marshal "highly confidential" deposition exhibits and discussion thereof in such a manner as to cause as little disruption of the discovery depositions as possible. At the appropriate juncture of the deposition involving review and/or discussion of "highly confidential" documents, the clients can step out the room. Needless to say, the plaintiffs themselves may be required to produce some documents, which they believe in good faith fall into the "highly confidential" category; if any such documents are the subject of deposition testimony, the defendants will similarly be required to step out of the room at the appropriate juncture.

28

### (8) Attorney Communication of Confidential Communication
### Court Exhibit "A" Δ's ¶ 27

Defendants' paragraph 27 states that, in rendering advice and in otherwise communicating

with the client, the attorney shall not disclose Confidential Information to anyone not

appropriately specified in Paragraphs 15 and 18. Plaintiffs' objection is only applicable in the

context of a two-tier designation of confidentiality.

The Court finds that the language discussed above in paragraph 27 is appropriate in light

of the adoption of the two-tier designation. This simply reiterates that "highly confidential"

discovery is not to be disclosed to clients at all. If counsel were allowed to discuss such

information in rendering advice to the client, any protection of proprietary and/or highly sensitive

information would be illusory. Paragraph 27 merely addresses the potential risk of leaking highly

confidential information in discussions with the client and any concomitant competitive injury.

### (9) Destruction of Return of Discovery Documents
### Court Exhibit "A" Δ's ¶ 37/ Court Exhibit "B" P's ¶ 31

Defendants' paragraph 37 requires destruction and/or return of *all* discovery. Plaintiffs

point out that there is no good reason for the plaintiffs or the defendants to return all discovery

and certainly not publicly available materials such as SEC filings. They do not contest returning

confidential materials, which are rightfully subject to the protective order. Plaintiffs highlight that,

in both cases cited by defendants,[3] the protective orders issued subjected only confidential

documents to destruction or return.

---

[3]*Cmedia,* 216 F.R.D. at 391; *Videon Chevrolet, Inc. v. General Motors Corporation,* 1995
WL 395925 (E. D. Pa.).

**APPENDIX 37**

The Court, having previously determined that the provisions of the protective order only properly governs the utilization and disposition of confidential information, finds the plaintiffs proposed language at paragraph 31 appropriate.

### (10) Designation of Depositions as Confidential
### Court Exhibit "A" Δ's ¶ 9/ Court Exhibit "B" P's ¶ 10

Defendants' paragraph 9 permits 30 days within which to designate depositions transcripts confidential, whereas the plaintiffs' at paragraph 7 allows only 10 days. The Court finds that twenty (20) days is sufficient.

### (11) "Confidential" Information Obtained from Another Source
### Court Exhibit "B" P's ¶¶ 18, 19

Plaintiffs' paragraphs 18 and 19 allow "confidential" information to be used *if obtained other than through formal discovery* and *that confidential information may be disclosed to those who already had a copy of it.* The defendants' proposed order contains no corresponding provisions.

The court finds this language particularly troublesome, if not a virtual "Pandora's box." Either documentary discovery materials merit the confidential designation or they do not. If the information is available from another source, then perhaps the non-producing parties have an argument that the confidentiality designation is misplaced. Both proposed protective orders provide a mechanism for challenge of the producing party's designation. Plaintiffs' proposed paragraphs 18 and 19 are, in effect, an alternative mechanism, which would serve to *de facto* declassify confidential documents without the necessity of a challenge, if the document is available from another source.

30

**APPENDIX 38**

As previously mentioned, both plaintiffs and defendants have incorporated the generally sanctioned provisions regulating challenge of the producing party's designations. The approach embodied in plaintiffs' paragraphs 18 and 19 is unwieldy and unworkable. There shall be one route to take in order to invoke the Court's review and that is *via* challenge/objection, which method is uniformly approved by the courts and endorsed by the Manual for Complex Litigation. The Court is convinced that elevating "the cats out the bag" argument to mechanism for *de facto* declassification without review is unsound. The fact that the document is available from another source should be relegated to argument and factored into the analysis of any particular challenged designation.

## CONCLUSION

The parties have advised the Court both in written and oral argument that, other than the provisions discussed above, they are in substantial agreement with respect to provisions in the competing protective orders proffered. Perhaps this order and reasons will enable the plaintiffs and the defendants to submit a proposed protective order agreed to both in form and substance and consistent with this Court's rulings set forth above.

Accordingly,

**IT IS ORDERED** that the defendants' motion for protective order is GRANTED IN PART and DENIED IN PART, all as more specifically set forth above.

**IT IS FURTHER ORDERED** that, within fifteen (15) days of the entry of this order, the parties shall propose a joint protective order consistent with the Court's decision.

31

**APPENDIX 39**

## OBJECTIONS

Any objections to the foregoing must be: (1) specific, (2) in writing, and (3) served within ten days after being served with a copy of this order and reasons. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b).

New Orleans, Louisiana, this  2nd  day April, 2004.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

32

**APPENDIX 40**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STACY K. MARTIN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:14-CV-0500-D |
| VS. | § | |
| | § | |
| LOCAL 556, TRANSPORTATION | § | |
| WORKERS UNION OF AMERICA, | § | |
| AFL-CIO, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this labor dispute arising from disciplinary actions taken against officers of a union local, the court must decide whether it has subject matter jurisdiction over one claim and whether plaintiffs have stated a claim on which relief can be granted. For the reasons that follow, the court grants defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(1), grants in part and denies in part defendant's motion to dismiss under Rule 12(b)(6), and grants plaintiffs leave to amend as to all claims that are curable by amendment.

I

This is an action by plaintiffs Stacy K. Martin ("Martin"), Chris Click ("Click"), and Jerry Lindemann ("Lindemann") against defendant Local 556, Transportation Workers Union of America, AFL-CIO ("TWU Local"), seeking relief under the Norris LaGuardia Act, 29 U.S.C. §§ 101-15 ("NLA"), the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-97 ("LMRA"), and the Labor-Management Reporting and Disclosure Act of 1959,

**APPENDIX 41**

29 U.S.C. §§ 401-531 ("LMRDA"). Plaintiffs are flight attendants employed by Southwest Airlines. They are also members of TWU Local, the local of the labor union that represents Southwest Airlines' flight attendants.[1] Each plaintiff ran for and was elected to a union local office in 2012. Martin was elected President, Click First Vice President, and Lindemann Treasurer.

Following the elections, the President of the international union ("TWU International") requested that the TWU Local Executive Board grant leave to Thom McDaniel ("McDaniel"), the Immediate Past President of the TWU Local, so that he could accept a position with TWU International. McDaniel allegedly opposed plaintiffs during the 2012 elections. Plaintiffs contend that, as union President, Martin opposed TWU International's request because TWU International did not follow proper protocol in submitting it. The Executive Board denied the request. TWU International's President then

_____

[1]In deciding TWU Local's Rule 12(b)(6) motion, the court construes the amended complaint in the light most favorable to plaintiffs, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor. *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See Hunter v. Branch Banking & Trust Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* (citation omitted) (citing *Paterson*, 644 F.2d at 523).

-

allegedly threatened to charge Martin with violations of union rules if he continued to oppose the request.  Ultimately, the dispute was submitted to arbitration, and the arbitrator ruled in McDaniel's favor.

In the spring of 2013, a member of the TWU Local Executive Board charged Click and Lindemann jointly with violations of union rules, and another member[2] separately charged Click with other union rules violations.  Click's individual trial was scheduled for May 14, 2013, and Click and Lindemann's joint trial was scheduled for May 15, 2013.  On May 13 the Executive Board attempted to delay the trial dates to May 22 and May 23, 2013, respectively, by insisting that Martin reschedule the trials.  Martin allegedly refused to assist the Executive Board in its attempt to delay the trials on the basis that doing so would constitute a violation of union rules.  Click and Lindemann attended their trials on May 14 and 15, 2013 and were acquitted of all charges.  On May 16, 2013 Lindemann went on formally approved, extended medical leave.  On the same day, the Executive Board notified Click and Lindemann that it was nullifying the results of the May 14 and 15 trials and scheduling their retrials for May 23 and 24, 2013, respectively.  On May 23 a retrial committee found Click guilty and removed him from office.  On May 24 a retrial committee found Click and Lindemann guilty, removed them from office, and banned them from holding union office for three years.  Plaintiffs allege that neither Click nor Lindemann was present for the retrials on May 23 and 24.  On May 16, 2013 the Executive Board also

---

[2]Plaintiffs' amended complaint does not specify whether this person was a member of the Executive Board or a member of the union.  *See* Am. Compl. ¶ 20.

charged Martin with violating union rules.  The Executive Board conducted Martin's trial on May 29 and 30, found him guilty, removed him from office, and banned him from holding union office for three years.

Plaintiffs then brought the instant lawsuit against TWU Local, alleging that it had violated their rights under the LMRDA.  TWU Local filed a motion to dismiss and an amended motion to dismiss.  Plaintiffs then filed an amended complaint, and TWU Local filed the instant motion to dismiss the amended complaint.  In its present motion, TWU Local incorporates by reference the arguments and authorities asserted in its first motion to dismiss.[3]  TWU Local moves to dismiss count II of plaintiffs' amended complaint under Rule 12(b)(1) for failure to establish federal question jurisdiction, and to dismiss count I under Rule 12(b)(6) for failure to plead a plausible claim for relief under the LMRDA.

II

The court considers first TWU Local's Rule 12(b)(1) motion to dismiss.[4]

---

[3]TWU Local's first motion to dismiss predates plaintiffs' amended complaint.  "The court may nevertheless treat defendant's motion as directed to the amended complaint because the defects in plaintiff[s'] complaint reappear in the amended complaint." *Moore v. Dall. Indep. Sch. Dist.*, 557 F.Supp.2d 755, 760 (N.D. Tex. 2008) (Fitzwater, C.J.) (internal quotation marks and brackets omitted), *aff'd*, 370 Fed. Appx. 455 (5th Cir. 2010).  Because TWU Local asserts that the amended complaint is subject to dismissal on the same grounds as is the complaint, and the parties have fully briefed the sufficiency of the amended complaint, the court will consider TWU Local's arguments in its first motion to dismiss in assessing whether the amended complaint is subject to dismissal under Rules 12(b)(1) and 12(b)(6).

[4]*See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the

- 4 -

A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

B

Plaintiffs predicate subject matter jurisdiction over count II on the jurisdictional grant found in 29 U.S.C. § 185(a) of the LMRA,[5] which provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Section 185(a) imposes a jurisdictional requirement. *See, e.g., Tex. Indus., Inc. v. Radcliff*

---

merits.").

[5]Plaintiffs cite identical provisions of the NLA and LMRDA in counts I and II as the basis for their claims. *Compare* Am. Compl. ¶ 71, *with* ¶ 83 (citing 29 U.S.C. §§ 102, 401, 411, 412, 413, 431, 481, 482, 501, 529, and 530). The primary difference between each count is that, in count I, plaintiffs seek relief for "violation of the LM[RD]A," Am. Compl. at 10 (bold font and upper case text omitted), while in count II, they seek relief for "breach of the TWU [International] Constitution & violation of the LM[RD]A," *id.* (bold font and some upper case text omitted).

- 5 -

**APPENDIX 45**

*Materials, Inc.*, 451 U.S. 630, 642-43 (1981) ("In this vein, this Court has read § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), . . . as granting jurisdiction over defined areas of labor law[.]"); *Hou. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indust. & Serv. Workers Int'l Union*, ___ F.3d ___, 2014 WL 4197057, at *3 (5th Cir. Aug. 25, 2014) ("We have in the past read section 301(a) as a jurisdictional requirement."). "[A]n allegation of a labor contract violation is both necessary *and* sufficient to support subject-matter jurisdiction under section 301(a). If the court later finds the allegedly violated contract to be non-existent or invalid, it must dismiss for failure to state a claim, not for lack of jurisdiction." *Hou. Ref. L.P.*, 2014 WL 4197057, at *5 (footnote omitted); *see also id.* at *6 ("[T]he alleged violation of a labor contract is both necessary and sufficient to invoke federal subject-matter jurisdiction under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).").

The amended complaint does not allege that count II pertains to a violation of a contract between an employer and a labor organization or between labor organizations. The only conceivable contract mentioned in count II is the TWU International Constitution. *See* Am. Compl. ¶¶ 73-76. But the amended complaint does not allege that the TWU International Constitution is a contract between an employer and a labor organization or between labor organizations. Plaintiffs allege that the TWU International Constitution "is a contract between [TWU] Local and its members." *Id.* at ¶ 76. They assert that the TWU Local Executive Board violated its duties and responsibilities under the TWU International Constitution. *Id.* at ¶¶ 77-80.

- 6 -

**APPENDIX 46**

Accordingly, because an allegation of a labor contract violation is necessary to support subject matter jurisdiction under § 301(a), 29 U.S.C. § 185(a), and plaintiffs have not alleged such a violation, the court grants TWU Local's motion to dismiss count II of the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction.

III

TWU Local moves under Rule 12(b)(6) to dismiss count I of plaintiffs' amended complaint.

A

In deciding defendant's Rule 12(b)(6) motion, the court evaluates the sufficiency of plaintiffs' amended complaint "by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted)). To survive defendant's motion to dismiss under Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a

- 7 -

right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678. Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "labels and conclusions."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

### B

"The Labor-Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982).  Although the LMRDA as originally enacted focused on disclosure requirements and regulating union elections, over time various amendments have shifted the focus toward "protection for members of unions paralleling certain rights guaranteed by the Federal Constitution[.]"  *Id.*  In count I of the amended complaint, plaintiffs allege violations of the LMRDA, citing sections that deal with a host of topics, including reporting and disclosure requirements, the bill of rights for members of labor organizations, and provisions governing criminal violations of the Act.  Plaintiffs request

- 8 -

relief under § 102 of the NLA and §§ 401, 411, 412, 413, 431, 481, 482, 501, 529, and 530 of the LMRDA.

IV

A

Count I must be dismissed to the extent based on § 102 of the NLA and §§ 401, 413, and 530 of the LMRDA because these provisions do not expressly authorize a private cause of action. Section 102 is an introductory provision of the NLA that merely sets out the public policy underlying the Act. 29 U.S.C. § 102 ("It is necessary that [the individual unorganized worker] have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment"). Similarly, § 401 of the LMRDA declares the public policy that underlies the LMRDA. 29 U.S.C. § 401 (declaring that LRMDA is intended to protect members of labor unions from various "improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies" of the LMRA and the Railway Labor Act).

Section 413 of the LMRDA provides that nothing in §§ 411-15 should be interpreted to limit the rights and remedies that members of labor organizations have under other provisions of state or federal law, or under the constitution and bylaws of their respective labor organizations. *See* 29 U.S.C. § 413. It does not create a private right of action.

Section 530 is a statute that imposes criminal penalties on labor organizations that use "force or violence, or threat of the use of force or violence, to restrain, coerce, or

- 9 -

intimidate . . . any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled" under the LMRDA.  29 U.S.C. § 530.  Section 530 does not create a private cause of action.  The Supreme Court "rarely implie[s] a private right of action under a criminal statute[,]" and where the Court has, "'there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.'"  *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) (quoting *Cort v. Ash*, 422 U.S. 66, 79 (1975)).  Section 530 does not contain any language suggesting that Congress intended to authorize a private cause of action.  Thus plaintiffs do not plausibly state a claim for relief under § 530.

## B

Count I must be dismissed to the extent based on §§ 431 and 501 of the LMRDA because, although these sections do confer a private cause of action, plaintiffs have not pleaded *any* factual allegations to state a claim for relief under either section.  Section 431 pertains to certain disclosure and reporting requirements.  *See* 29 U.S.C. § 431.  For example, it provides that every labor organization must submit to the Secretary of Labor certain reports about the organization and annual reports that detail the organization's use of funds.  *See id.* (a)-(b).  Section 431 also requires that labor organizations make the information in these reports available to its members.  *See id.* § 431(c).  But plaintiffs have neither pleaded any factual allegations that mention the reports covered by § 431 nor alleged any failure by TWU Local to fulfill its duties related to these reports.

Section 501 imposes fiduciary obligations primarily of a pecuniary nature on the

- 10 -

**APPENDIX 50**

representatives of labor organizations. *See* 29 U.S.C. § 501; *see also Hoffman v. Kramer*, 362 F.3d 308, 316 n.3 (5th Cir. 2004) ("[T]he fiduciary obligations imposed are primarily pecuniary in nature—that is, having to do with the custody, control, and use of a union's money and its financial interests or property[.]"). Section 501(b) authorizes union members to bring a derivative suit on the union's behalf for a representative's violation of the duties prescribed by § 501. *See id.* § 501(b). But plaintiffs fail to plead *any* factual allegations relating to the fiduciary duties imposed in § 501, and they have therefore failed to state a plausible claim for relief on this basis.

C

Sections 481 and 482 of the LMRDA provide the exclusive remedy for challenging a union election that has already been conducted. *See* 29 U.S.C. § 483 ("The remedy provided by this subchapter for challenging an election already conducted shall be exclusive."). Section 481 provides, in relevant part:

> [i]f the Secretary [of Labor], upon application of any member of a local labor organization, finds after [a] hearing . . . that the constitution and bylaws of such labor organization do not provide an adequate procedure for the removal of an elected officer guilty of serious misconduct, such officer may be removed, for cause shown and after notice and hearing, by the members in good standing voting in a secret ballot.

Under § 482, except in two instances, only the Secretary of Labor can bring an action for a violation of § 481. *See* 29 U.S.C. § 482(a)-(b); *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964) (noting that Congress "decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of [§ 481]"). A union member can bring a civil action

- 11 -

in the following circumstances: (1) against the Secretary of Labor to review the Secretary's decision not to file an action under § 482, *see Dunlop v. Bachowski*, 421 U.S. 560, 574-75 (1975), *overruled on other grounds*, 467 U.S. 526 (1984); and (2) to enforce "a candidate's right to distribution of campaign literature and equal access to membership lists." *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 540 n.15 (1984). Plaintiffs have not pleaded any factual allegations that enable the court to draw the reasonable inference that they are seeking relief under either of these exceptions. Accordingly, plaintiffs have failed to state a claim on which relief can be granted under §§ 481 and 482.

V

Plaintiffs also allege that TWU Local violated §§ 411, 412, and 529 of the LMRDA.

A

Section 411 of the LMRDA sets out the core of the guarantees afforded to members of labor organizations by the LMRDA. It constitutes a "bill of rights," and it is "designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline." *Local No. 82*, 467 U.S. at 536-37. The LMRDA provides two provisions that enable a union member to enforce the member's rights under this "bill of rights:" §§ 412 and 529.

Section 412 grants union members a private cause of action for a union's infringement of the rights secured by §§ 411-15. To state a claim under § 412, plaintiffs must show (1) that they are members of a labor organization and (2) that the organization infringed a

- 12 -

**APPENDIX 52**

right secured by § 411, 412, 413, 414, or 415.  *See Martinez v. Am. Fed'n of Gov't Emps.*, 980 F.2d 1039, 1041-42 (5th Cir. 1993).  "Union leaders, *per se*, are not themselves a protected class under [the LMRDA], except that they, too, may not be deprived of the basic rights attending on union membership." *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 731 F.2d 1154, 1156 (5th Cir. 1984) ("*Adams-Lundy I*").  Thus it is generally insufficient for a plaintiff to plead a plausible claim under § 412 if the plaintiff only alleges the infringement of a right that he or she only has in the capacity of a union officer.  *See id.*

There is an exception to this general rule.  If plaintiffs can show that their removal from office "was part of a scheme to subvert the union's basic democratic structure or otherwise directly implicated rights of members," they can state a claim for relief as officers under § 412.  *See Adams-Lundy I*, 731 F.2d at 1159.  To state a claim under this exception, plaintiffs must show "that the defendants are attempting to dismantle the union's electoral system, . . . or that members opposing that faction are . . . suppressed or threatened with reprisals."  *Id.*  Allegations that merely suggest that an internal union struggle is "anti-democratic" are insufficient to plausibly allege the existence of a pattern of intimidation and stifled dissent.  *Id.*

Section 529 provides members a private cause of action when their union fines, suspends, expels, "or otherwise discipline[s]" them for exercising any right to which they are entitled under the LMRDA.  "The primary difference between § [529] and § [412] is that § [529] protects against retaliation for the exercise of any right secured under the LMRDA, whereas § [412] only protects rights secured under [§§ 411-15]." *United Steel Workers Local*

- 13 -

**APPENDIX 53**

*12-369 v. United Steel Workers Int'l*, 728 F.3d 1107, 1115 (9th Cir. 2013) (citing *Finnegan*, 456 U.S. at 439 n.10).  Depending on the right the member seeks to protect, §§ 412 and 529 can be entirely duplicative.  *See id.* at 1115 n.4 (citing *Finnegan*, 456 U.S. at 439 n.10).  To state a claim under § 529, plaintiffs must show that (1) they are members of a labor organization; (2) the organization fined, suspended, expelled, or otherwise disciplined them; and (3) the organization imposed the punishment in retaliation for their exercise of a right protected by the LMRDA.  *See* 29 U.S.C. § 529.  As under § 412, to state a claim under § 529, plaintiffs must allege that any punishment or restriction imposed by TWU Local was a limitation or restriction on their membership rights.  Removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529.  *See Finnegan*, 456 U.S. at 438 n.9 (dictum) (explaining that discipline referred to in §§ 411(a)(5) and 529 means limitations on membership rights, not removal from union office); *Adams-Lundy I*, 731 F.2d at 1157 (dictum) (citing *Finnegan* for proposition that "§ [411(a)(5)] and § [529] protect only the rights of membership per se, and that a union officer who is removed from office but not deprived of membership in the union has suffered no loss cognizable as 'discipline' proscribed by these sections of the Act").

### B

The court considers first plaintiffs' allegations under § 411.  They assert that TWU Local violated the LMRDA by infringing on their right to free speech.

- 14 -

Section 411(a)(2) of the LMRDA provides, in pertinent part:

> Every member of any labor organization shall have the right to
> meet and assemble freely with other members; and to express
> any views, arguments, or opinions; and to express at meetings
> of the labor organization his views, upon candidates in an
> election of the labor organization or upon any business properly
> before the meeting, subject to the organization's established and
> reasonable rules pertaining to the conduct of meetings[.]

"Where the injury allegedly suffered by union officers is done to them in their status as

officers, not as individual members, there can be no cause of action under section[] 411[.]"

*Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 792 F.2d 1368, 1372 (5th Cir. 1986)

("*Adams-Lundy II*").   The court must therefore decide whether plaintiffs have pleaded

sufficient facts to permit the court to draw the reasonable inference that TWU Local

disciplined plaintiffs for exercising their rights to free speech *as members* rather than *as*

*officers*, or that plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent.

The amended complaint does not plead factual content that would permit the court to

draw the reasonable inference that TWU Local disciplined plaintiffs for exercising their

rights to free speech *as members* rather than *as officers*.  Plaintiffs allege that the charges

leveled against Click and Lindemann were based on their "actions regarding information they

provided the Local 556 membership at membership meetings in 2013[.]"  Am. Compl. ¶ 19.

Plaintiffs assert that the charges leveled against Martin were based on "various conduct

including making presentations to the members on issues surrounding Local 556, allegedly

making false representations to the membership, and for standing in opposition to the Local

556 Executive Board."  *Id.* ¶ 37.  The only reasonable inference the court can draw from

- 15 -

these allegations is that plaintiffs engaged in this conduct in their capacities as officers. With respect to the additional, internal charges leveled against Click that are "related to a rally that occurred [in March 2013] to protest the TSA's knives on planes decision[,]" *id.* ¶ 20, plaintiffs have failed to allege facts from which the court can reasonably infer that the charges were based on Click's speech as opposed to his conduct.

The amended complaint also fails to plead factual content that permits the court to draw the reasonable inference that plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent. Plaintiffs allege that their opponents "infiltrated" the Executive Board and "usurped" their offices. Am. Compl. ¶¶ 47 & 62. These allegations clearly express plaintiffs' concern that the Executive Board's actions were undemocratic, but that alone is insufficient. *See Adams-Lundy I*, 731 F.2d at 1159 (holding that plaintiffs' allegations that defendants' conduct was anti-democratic were insufficient to show infringement of basic rights of membership). Plaintiffs have not plausibly alleged that TWU Local is "attempting to dismantle the union's electoral system," or "that members opposing [plaintiffs' opponents] are in any fashion suppressed or threatened with reprisals." *Id.* Absent any further aggravating allegations, plaintiffs' allegations are insufficient to state a claim for relief under § 411(a)(2).

## C

Plaintiffs also allege that TWU Local violated the LMRDA by giving Click only a week to prepare for the second trials against him. Section 411(a)(5)(B) provides that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise

- 16 -

disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been . . . (B) given a reasonable time to prepare his defense[.]" "[D]iscipline," as used in § 411(a)(5), refers to "punitive actions diminishing membership rights." *Finnegan*, 456 U.S. at 438.  Plaintiffs allege that TWU Local disciplined them both by removing them from union office and banning them from holding any union office for three years.  Removal from an elected office is not a form of "discipline" actionable under § 411(a)(5). *See Adams-Lundy I*, 731 F.2d at 1156-57 (holding that an elected union officer's removal from office does not constitute "infringement" of the rights secured by § 411). Although the Fifth Circuit has not specifically held that being banned from holding union office is a form of discipline, it has stated in *dicta* that the right to run for office is a membership right.  *See id.* at 1156.  The court will therefore assume that a ban against running for union office is a form of discipline that is actionable under § 411(a)(5).  It will consider whether plaintiffs have plausibly alleged that TWU Local violated Click's rights under § 411(a)(5)(B) by banning him from running for union office without providing him a reasonable time to prepare his defense.

Section 411(a)(5)(B) does not specify the amount of time that is necessary to comply with the "adequate time" requirement.  Courts generally decide whether a requirement such as this has been satisfied "with due regard to the practicalities and peculiarities of the case." *See, e.g., Air Lines Stewards & Stewardesses Ass'n, Local 550 v. Am. Airlines, Inc.* 455 F.2d 101, 108 (7th Cir. 1972) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313-14 (1950)).  The LMRDA gives plaintiffs the right to present evidence and to cross-

- 17 -

**APPENDIX 57**

examine witnesses, *see, e.g., Holschen v. Int'l Union of Painters*, 598 F.3d 454, 463-64 (8th Cir. 2010), but it does not guarantee "the specific protections associated with judicial proceedings, including the right to be represented by counsel and the technical rules of pleading, procedure, and evidence." *Frye v. United Steelworkers*, 767 F.2d 1216, 1224 (7th Cir. 1985); *see also Conway v. Int'l Ass'n of Heat & Frost Insulators*, 209 F.Supp.2d 731, 751 (N.D. Ohio 2002) (holding that LMRDA did not guarantee discovery), *aff'd*, 93 Fed. Appx. 780 (6th Cir. 2004).

The amended complaint does not plead sufficient facts to enable the court to draw the reasonable inference that TWU Local failed to give Click a reasonable time to prepare his defense. Plaintiffs aver that Click was notified of at least some of the charges against him in March 2013, that Click's trial dates were set in April 2013, and that his initial trials were conducted on May 14 and 15, 2013. Plaintiffs maintain that the Executive Board notified Click on May 16 that it was nullifying the results of the initial trials and scheduling retrial for May 24.[6] Plaintiffs do not plead any factual allegations suggesting that the May 14 and 15 trials differed substantially from the May 23 and 24 retrials. Assuming that Click did not learn about all of the charges against him until the trial dates were set in April 2013, Click had 14 and 15 days, respectively, to prepare for his first trials, and six and seven days more,

---

[6]Without explanation, plaintiffs later aver that the retrial committee conducted an individual hearing against Click on May 23. Plaintiffs do not contend that the Executive Board failed to notify Click of the May 23 retrial. Thus there is no basis for the court to reasonably draw any inference other than that the Executive Board notified Click of the May 23 proceeding at least several days before the hearing was conducted.

respectively, to hone his defense in light of what he learned about TWU Local's case at his first trials.  This is well within the range that courts have considered reasonable under § 411(a)(5)(B).  *See Wellman v. Int'l Union of Operating Eng'rs*, 812 F.2d 1204, 1206 (9th Cir. 1987) (28 days); *Falcone v. Dantinne*, 288 F. Supp. 719, 727 (E.D. Pa. 1968) (23 days), *rev'd on other grounds*, 420 F.2d 1157 (3d Cir. 1969); *Vars v. Int'l Bhd. of Boilermakers*, 215 F. Supp. 943, 947 (D. Conn. 1963) (14 days), *aff'd*, 320 F.2d 576 (2d Cir. 1963).  Thus plaintiffs have failed to state a plausible claim for relief under § 411(a)(5)(B).

### D

Plaintiffs allege that TWU Local violated the LMRDA by infringing their rights to a full and fair hearing.  They assert that TWU Local deprived them of a full and fair hearing when (1) Click and Lindemann were tried twice for the same offense; (2) Lindemann was retried *in absentia* while on authorized medical leave; (3) Martin was tried before a panel of his accusers; (4) Martin was denied the right to have the assistance of counsel; and (5) Martin was convicted on insufficient evidence.

### 1

Section 411(a)(5)(C) of the LMRDA protects members of labor organizations from being disciplined without first being afforded a full and fair hearing.  *See* 29 U.S.C. § 411(a)(5)(C).  "The full and fair hearing clause does not require unions to provide the 'full panoply of procedural safeguards found in criminal proceedings,' but only to comply with the 'fundamental and traditional concepts of due process.'"  *Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188, 1193 (D.C. Cir. 1996) (quoting *Ritz v. O'Donnell*, 566 F.2d 731,

- 19 -

735 (D.C. Cir. 1977)); *see United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 385 (2d

Cir. 2001) (same) ("*Teamsters*"); *Bell v. Int'l Bhd. of Teamsters*, 108 F.3d 1376, 1997 WL

103320, at *5 (6th Cir. 1997) (unpublished table decision) (same).  "Not all of the due

process protections available in the federal courts apply to union disciplinary proceedings."

*Teamsters*, 247 F.3d at 385.  "A violation of a procedural provision of a union's constitution

is actionable only if the violation deprived the party of a full and fair hearing under the

LMRDA."  *Id.* at 387.

2

Plaintiffs have failed to state a plausible claim that TWU Local violated the LMRDA

by trying Click and Lindemann twice for the same offense.  As a general proposition, the

Supreme Court has declined to interpret the Due Process Clause as extending double

jeopardy protection beyond the context of criminal prosecution.  *See Dowling v. United

States*, 493 U.S. 342, 354 (1990).  Although courts have found a violation of § 411(a)(5)(C)

where a union member was retried by individuals who had previously heard the charges and

found the member guilty, *see, e.g., Rosario v. Amalgamated Ladies' Garment Cutters'

Union, Local 10*, 605 F.2d 1228, 1243 (2d Cir. 1979), this is not what plaintiffs allege.

Plaintiffs fail to plead any factual allegations that explain why the Executive Board nullified

Click and Lindemann's May 14 and 15 trials and ordered retrials, or that there were any other

circumstances of unfairness surrounding the retrials that would enable the court to draw the

reasonable inference that plaintiffs' rights to a full and fair hearing were violated.  Merely

alleging that a union ordered a new trial, without more, does not state a plausible claim that

- 20 -

**APPENDIX 60**

the union failed to afford a member a full and fair hearing. *See Frye*, 767 F.2d at 1224 (stating that plaintiff's "contention that a trial *de novo* by the International's Commission was improper as a matter of law is not supported by reason or authority").

3

Plaintiffs have also failed to state a plausible claim that TWU Local violated § 411(a)(5)(C) when it tried Lindemann *in absentia* during his absence from work on approved medical leave. "Fundamental due process . . . gives a party the right to be *present* during proceedings brought against him . . ., subject to limited exceptions." *Holschen*, 598 F.3d at 464 n.4. This right is infringed when the circumstances of the case suggest that the accused did not have a "fair opportunity" to attend the relevant hearing. *Moody v. Miller*, 864 F.2d 1178, 1181 (5th Cir. 1989) (per curiam). Plaintiffs allege that TWU Local violated Lindemann's rights by conducting the retrial when they knew that he was out on formally approved extended medical leave. But merely alleging that Lindemann was ill and unable to attend the hearing does not enable the court to draw the reasonable inference that TWU Local failed to afford Lindemann a full and fair hearing. If, through no fault of TWU Local, a member "[was] unable or refuse[d] to attend a disciplinary hearing, due process requires no more than that the hearing be held in accordance with all of the other requirements of due process that are called for under the circumstances." *Id.*; *see also Rosario*, 605 F.2d at 1244 (finding no due process violation where parties were entitled to be present at second trial but chose to boycott proceeding instead). This conclusion is strengthened by plaintiffs' failure to allege that Lindemann notified TWU Local that he was too ill to attend the May 24 retrial

- 21 -

**APPENDIX 61**

or to request a continuance.  *See Parker v. Ellis*, 258 F.2d 937, 940 (5th Cir. 1958) (dismissing due process claim where defendant failed to raise health issue or seek continuance during trial).  Thus plaintiffs' allegations regarding Lindemann's trial *in absentia* do not state a plausible claim on which relief can be granted.

4

Plaintiffs allege that TWU Local violated Martin's rights to a full and fair hearing under the LMRDA when he was tried by the Executive Board, which included the person or people who filed the charges against him initially.  Essentially, plaintiffs' complain that the combination of investigative, prosecutorial, and adjudicatory functions in the Executive Board violated Martin's right to due process under § 411(a)(5)(C).

"The basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) (citing *Gibson v. Berryhill*, 411 U.S. 564, 569 (1973)).  "In an effort to prevent 'even the probability of unfairness,' courts have identified situations in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty., Tex.*, 57 F.3d 436, 444 (1995) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).  A union's "combination of investigative, prosecutorial, and adjudicatory functions in [a single body] does not, by itself, violate the LMRDA." *Wildberger*, 86 F.3d at 1195.  But when this combination occurs, courts "should be alert to the possibilities of bias that may lurk in the way particular procedures actually

- 22 -

**APPENDIX 62**

work in practice." *Withrow v. Larkin*, 421 U.S. 35, 54 (1975). It is therefore insufficient for plaintiffs merely to allege that the tribunal that filed charges against them also adjudicates the charges. *See id.* at 58 (holding that "[t]he fact that the same agency makes [the initial decision to charge and the ultimate adjudicative decision] in tandem . . . relat[ing] to the same issues does not result in a procedural due process violation"). Plaintiffs "must overcome a presumption of honesty and integrity in those serving as adjudicators; and [they] must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment" to constitute a denial of the right to a full and fair hearing. *Id.* at 47.

The court holds that plaintiffs have plausibly pleaded that Martin was denied a full and fair hearing when he was tried by a panel that included his accusers. Plaintiffs' allegations regarding the "running controversy" between Martin and the faction associated with McDaniel enable the court to draw the plausible inference that there was "the possibility of bias." *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994) (applying *Withrow* and holding that plaintiff had adduced sufficient evidence at summary judgment stage to overcome presumption of impartiality); *see also Valley*, 118 F.3d at 1053 & n.4 (quoting *Bakalis* with approval for proposition that "appellate jurisprudence has favored recusing board members who display a bias or prejudice that would result in an unconstitutional decision"). In support of their claim that the Executive Board prejudged Martin's guilt, plaintiffs allege that they all ran together on a slate of candidates opposed by past-president

- 23 -

**APPENDIX 63**

McDaniel.  They aver that, when Martin refused to assist the Executive Board in rescheduling Click and Lindemann's trials, the Executive Board suspended Martin from the office of union president in retaliation.  Plaintiffs allege that the Executive Board did not explain its decision to suspend Martin until May 16, when it charged him with violating the union constitution.  Based on these allegations, and taking a realistic appraisal of psychological tendencies and human weaknesses, the court holds that plaintiffs' allegation that the Executive Board acted in a prosecutorial and adjudicative role during the same hearing plausibly suggests a risk of actual bias or prejudgment.  *Cf. Stein v. Mutuel Clerks' Guild of Mass., Inc.*, 560 F.2d 486, 491 (1st Cir. 1977) (upholding trial court's conclusion that plaintiff did not get full and fair hearing where union president, who was also member of executive committee, made comments to committee revealing he had prejudged case).

5

Plaintiffs allege that TWU Local violated Martin's right to a full and fair hearing when Martin was denied assistance of counsel.  Plaintiffs assert that this right is guaranteed by TWU Local's constitution.

As noted above, the LMRDA's guarantee of a right to a full and fair hearing does not include the right to be represented by counsel.  *See Frye*, 267 F.2d at 1224.  Although the TWU Local constitution may guarantee a union member the right to assistance of counsel, "[a] union's violation of its own constitution is not *per se* a violation of the LMRDA." *Adams-Lundy II*, 792 F.2d at 1373.  Rights guaranteed solely by a local union's constitution are contractual rights—not LMRDA rights—and "a federal court has no jurisdiction to

- 24 -

**APPENDIX 64**

enforce union constitutions and by-laws as such." *Id.* (citing *McGovern v. New Orleans Clerks & Checkers, Local 1497 ILA*, 343 F. Supp. 351, 352 (E.D. La. 1972), *aff'd per curiam*, 463 F.2d 423 (5th Cir. 1972)).  Thus plaintiffs' bare allegations that Martin was not afforded the right to counsel, in violation of TWU Local's constitution, are insufficient of themselves to state a plausible claim for relief.

6

Plaintiffs assert that the Executive Board convicted Martin on insufficient evidence presented to support the charges against him.  Section 411(a)(5)(C) "requires the charging party to provide some evidence at the disciplinary hearing to support the charges made." *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 246 (1971) (noting that the Supreme Court has "repeatedly held that conviction on charges unsupported by any evidence is a denial of due process," and that § 411(a)(5)(C) "import[s] a similar requirement into union disciplinary proceedings").  This standard respects "the apparent congressional intent to allow unions to govern their own affairs."  *Id.*   Nevertheless, although § 411(a)(5)(C) requires "some evidence," plaintiffs' conclusory allegation that the evidence presented at Martin's trial was insufficient does not enable the court to draw the reasonable inference that TWU Local violated Martin's right to a full and fair hearing.  *Cf. Rosario*, 605 F.2d at 1243 (noting that "union disciplinary proceedings . . . except in extreme cases, are not reviewed in the federal courts for the sufficiency of the evidence").

- 25 -

**APPENDIX 65**

E

The court finally considers whether plaintiffs have stated a plausible claim for relief under § 529, which protects a union member from retaliation for exercising his or her rights under the LMRDA.

Plaintiffs allege that Martin's suspension from office occurred in retaliation for his refusal to reschedule Click's and Lindemann's trials.  But removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529.  *See Finnegan*, 456 U.S. at 439 n.9 (dictum).  Nowhere in the amended complaint do plaintiffs allege that the Executive Board's decision to ban plaintiffs from running for office was taken in retaliation for the exercise of plaintiffs' rights.  Accordingly, the court holds that the amended complaint does not plausibly allege a right to relief under § 529.

VI

Although the court is dismissing some of plaintiffs' claims, it will permit them to replead.  *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567–68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." (citation and internal quotation marks omitted)).  The defects with respect to § 102 of the NLA and §§ 401, 413, and 530 of the LMRDA are incurable, and the court therefore declines to permit plaintiffs to attempt to plead a claim under any of these provisions.  But because plaintiffs have not stated that they cannot, or are unwilling to, cure

- 26 -

**APPENDIX 66**

the other defects that the court has identified, it grants them 28 days from the date this memorandum opinion and order is filed to file a second amended complaint.

* * *

The court grants TWU Local's motion to dismiss count II under Rule 12(b)(1), and it grants in part and denies in part TWU Local's Rule 12(b)(6) motion as to plaintiffs' claims in count I.

**SO ORDERED**.

September 3, 2014.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE

- 27 -

**APPENDIX 67**