**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| ROBERT (BOB) ROSS,<br>Plaintiff/Counterclaim Defendant, | § <br> § <br> § | |
| v. | § <br> § | Civil Action No. 4:22-cv-343-Y |
| ASSOCIATION OF PROFESSIONAL<br>FLIGHT ATTENDANTS, *et al.*,<br>Defendants/Counterclaim Plaintiffs, | § <br> § <br> § | Consolidated with 4:22-CV-430-Y<br><br>Judge Terry R. Means |
| AND | § <br> § | |
| EUGENIO VARGAS,<br>Plaintiff/Counterclaim Defendant, | § <br> § <br> § | |
| v. | § <br> § <br> § | |
| ASSOCIATION OF PROFESSIONAL<br>FLIGHT ATTENDANTS, *et al.*,<br>Defendants/Counterclaim Plaintiffs. | § <br> § <br> § | |

**APPENDIX TO APFA DEFENDANTS' MOTION FOR RULE 30(d) AND 37(b)
SANCTIONS AND BRIEF IN SUPPORT**

Pursuant to Local Rule 7.1(i), the Association of Professional Flight Attendants

("APFA"), its National President, Julie Hedrick, and National Treasurer, Erik Harris

(collectively, "the APFA Defendants"), hereby submit the following appendix to its Motion for

Rule 30(d) and 37(b) Sanctions and Brief in Support.

| Tab | Description | APFA Appx. |
|---|---|---|
| Ex. 1 | APFA's Second Amended Notice of Deposition for Bob Ross dated January 5, 2024 | 1-2 |
| Ex. 2 | APFA's Second Amended Notice of Deposition for Eugenio Vargas dated January 5, 2024 | 3-4 |
| Ex. 3 | Transcript Excerpts of Bob Ross Deposition of February 1, 2024 with redactions for potentially confidential health information. | 5-31 |

| Tab | Description | APFA Appx. |
|-----|------------|------------|
| Ex. 4 | Transcript Excerpts of Eugenio Vargas Deposition of February 2, 2024. | 32-42 |
| Ex. 5 | *Lincoln Gen. Ins. Co. v. Maxwell,* 16-CV-03198, 2018 WL 4610533 (N.D. Tex. Sept. 26, 2018) | 43-45 |
| Ex. 6 | *Murillo Modular Group, Ltd. v. Sullivan*, 13-cv-3020, 2016 WL 6139096 (N.D. Tex. Oct. 20, 2016) | 46-55 |
| Ex. 7 | *Carter v. Burlington Northern Santa, LLC*, 15-cv-366, 2016 WL 3388707 (N.D. Tex. Feb. 8, 2016) | 56-60 |
| Ex. 8 | *Nieman v. Hale*, 12-cv-2433, 2014 WL 4375669 (N.D. Tex. Sept. 4, 2014) | 61-65 |
| Ex. 9 | *VirnetX Inc. v. Cisco Sys., Inc.*, 10-cv-417, 2012 WL 7997962 (E.D. Tex. Aug. 8, 2012) | 66-70 |

Date: February 16, 2023

Respectfully Submitted,

/s/   *James D. Sanford*

JAMES D. SANFORD
Tex. Bar No. 24051289
Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX 75246
Tel.: (214) 800-5111; Fax.: (214) 838-0001
Email: jim@gillespiesanford.com

JEFFREY A. BARTOS, pro hac vice
D.C. Bar No. 435832
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
Tele.: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com

*Counsel for the APFA Defendants*

CHARLETTE L. BRODERICK (pro hac vice)
Tex. Bar No. 24133870
Association of Professional Flight Attendants
1004 W. Euless Blvd.
Euless, TX 76040
Tel.: (682) 301-8454
Email: Cbroderick@apfa.org

*Counsel for APFA*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 16, 2024, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's ECF system.

KERRI PHILLIPS
K.D. Phillips Law Firm, PLLC
6010 W. Spring Creek Parkway
Plano, TX 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com

MICHAEL R RAKE
Michael R. Rake, Attorney at Law PO Box 1556
Lake Dallas, TX 75065
Tel.: (940) 498-2103
Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com

/s/  *James D. Sanford*
JAMES D. SANFORD

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| ROBERT (BOB) ROSS, | § | |
| | § | |
| Plaintiff/Counterclaim Defendant, | § | Civil Action No. 4:22-cv-343-Y |
| | § | |
| v. | § | Judge Terry R. Means |
| | § | |
| ASSOCIATION OF PROFESSIONAL | § | |
| FLIGHT ATTENDANTS, *et al.*, | § | |
| | § | |
| Defendants/Counterclaim Plaintiff. | § | |

2d AMENDED NOTICE OF DEPOSITION - BOB ROSS

PLEASE TAKE NOTICE that counsel for Defendants Association of Professional Flight Attendants, Julie Hedrick and Erik Harris will take the deposition of Plaintiff Robert ("Bob") Ross upon oral examination, under oath before a notary public duly licensed in the State of Texas on Thursday, February 1, 2024 beginning at 10:00 a.m. at the following location:

Springhill Suites - DFW Airport South/Centreport
4360 Highway 360
Fort Worth, TX, 76155

The deposition will be conducted pursuant to Rule 30 of the Federal Rules of Civil Procedure, for all purposes permissible under those Rules. Testimony will be recorded by stenographic and videographic means.

Dated: January 5, 2024

**APPENDIX 1**

_/s/ Jeffrey A. Bartos_
JEFFREY A. BARTOS (*pro hac vice*)
D.C. Bar No. 435832
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
Tel.: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com


JAMES D. SANFORD
Tex. Bar No. 24051289
Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX  75246
Tel.: (214) 800-5111; Fax.: (214) 838-0001
Email: jim@gillespiesanford.com


*Counsel for Defendant and Counterclaim Plaintiff*
*Association of Professional Flight Attendants, and*
*Defendants Julie Hedrick and Erik Harris*

CHARLETTE L. MATTS (*pro hac vice*)
Tex. Bar No. 24133870
Association of Professional Flight Attendants
1004 W. Euless Blvd.
Euless, TX 76040
Tel.: (682) 301-8454
Email: Cmatts@apfa.org


*Counsel for Defendant and Counterclaim Plaintiff*
*Association of Professional Flight Attendants*

**APPENDIX 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| EUGENIO VARGAS, | § § § | |
| Plaintiff/Counterclaim Defendant, | § § | Civil Action No. 4:22-cv-430-Y |
| v. | § § | Judge Terry R. Means |
| ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, *et al.*, | § § § | |
| Defendants/Counterclaim Plaintiff. | § § | |

**2d AMENDED NOTICE OF DEPOSITION -
EUGENIO VARGAS**

PLEASE TAKE NOTICE that counsel for Defendants Association of Professional Flight Attendants, Julie Hedrick and Erik Harris will take the deposition of Plaintiff Eugenio Vargas upon oral examination, under oath before a notary public duly licensed in the State of Texas on Friday, February 2, 2024, beginning at 10:00 a.m. at the following location:

Springhill Suites - DFW Airport South/Centreport
4360 Highway 360
Fort Worth, TX, 76155

The deposition will be conducted pursuant to Rule 30 of the Federal Rules of Civil Procedure, for all purposes permissible under those Rules. Testimony will be recorded by stenographic and videographic means.

Dated: January 5, 2024

**APPENDIX 3**

   /s/ Jeffrey A. Bartos
JEFFREY A. BARTOS (*pro hac vice*)
D.C. Bar No. 435832
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
Tel.: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com

JAMES D. SANFORD
Tex. Bar No. 24051289
Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX  75246
Tel.: (214) 800-5111; Fax: (214) 838-0001
Email: jim@gillespiesanford.com

*Counsel for Defendant and Counterclaim Plaintiff
Association of Professional Flight Attendants, and
Defendants Julie Hedrick and Erik Harris*

CHARLETTE L. MATTS (*pro hac vice*)
Tex. Bar No. 24133870
Association of Professional Flight Attendants
1004 W. Euless Blvd.
Euless, TX 76040
Tel.: (682) 301-8454
Email: Cmatts@apfa.org

*Counsel for Defendant and Counterclaim Plaintiff
Association of Professional Flight Attendants*

2

**APPENDIX 4**

Robert Ross                                                    2/1/2024

```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
                 FORT WORTH DIVISION

ROBERT (BOB) ROSS,            §
                              §
Plaintiff/                    §
Counterclaim Defendant,       §
                              §   Civil Action No.
VS.                           §   4:22-cv-343-Y
                              §
ASSOCIATION OF                §   Judge Terry R. Means
PROFESSIONAL FLIGHT           §
ATTENDANTS, et al.,           §
                              §
Defendants/                   §
Counterclaim Plaintiff.       §


         -----------------------------------
              VIDEOTAPED ORAL DEPOSITION OF
                      ROBERT ROSS
                       VOLUME 1
                   FEBRUARY 1, 2024
         -----------------------------------
```

          VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 1, 2024, from 10:53 a.m. to 4:56 p.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

---

**2**

1   A P P E A R A N C E S
2
    FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:
3
    MS. KERRI PHILLIPS
4   K.D. PHILLIPS LAW FIRM, PLLC
    6010 West Spring Creek Parkway
5   Plano, Texas 75024
    (972) 327-5800
6   kerri@KDPhillipslaw.com
7
    FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFF ASSOCIATION OF
8   PROFESSIONAL FLIGHT ATTENDANTS AND DEFENDANTS JULIE
    HEDRICK AND ERIK HARRIS:
9
    MR. JEFFREY A. BARTOS
10  GUERRIERI, BARTOS & ROMA, P.C.
    1900 M Street, N.W.
11  Suite 700
    Washington, D.C.  20036
12  (202) 624-7400
    jbartos@geclaw.com
13
    MS. CHARLETTE L. BRODERICK
14  Association of Professional Flight Attendants
    1004 West Euless Boulevard
15  Euless, Texas  76040
    (682) 301-8454
16  cmatts@apfa.org
17
    ALSO PRESENT:
18
    Ms. Michelle Cliatt, APFA Legal Assistant
19
    Mr. Erik Harris, APFA National Treasurer
20
    Ms. Julie Hedrick, APFA National President
21
    Mr. Adam Phillips, Paralegal
22     K.D. Phillips Law Firm, PLLC
23  Mr. John Hines, Videographer
    Elite Video Productions
24  3018 Commerce Street
    Dallas, Texas 75226
25  (214) 747-1952

---

**4**

1   Exhibit 12 2/28/22 email from Ruben Armendariz     90
        to National Secretary
2
    Exhibit 13 Staples receipts              128
3       [Appendix 190-191]
4   Exhibit 14 Uber receipts                 130
        [Appendix 204-208]
5
    Exhibit 15 Affidavit of Robert "Bob" Ross in    134
6       Support of Damages
        [Appendix 183-189]
7
    Exhibit 16 Medical records               140
8       [Appendix 220-231]
9   Exhibit 17 Medical records               143
        [Appendix 246-253]
10
11
12
13
14
15
16
17
18
19
20
21
22
23  REPORTER'S NOTE:
24     Quotation marks are used for clarity and do
        not necessarily reflect a direct quote.
25

---

**3**

Table of Contents
                        PAGE

1   TABLE OF CONTENTS
                        PAGE
2
    Appearances.......................  2
3
    ROBERT ROSS, VOLUME 1
4
    Examination by Mr. Bartos.................  8
5
    Changes and Signature...................... 161
6   Reporter's Certification..................... 163
7
        EXHIBITS
8   NUMBER  DESCRIPTION              PAGE
9   Exhibit 1  Online posts         18
        [Ross/Vargas 001190-1197]
10
    Exhibit 2  Transcript excerpt, pages 382-384    26
11
    Exhibit 3  Transition Agreement     45
12
    Exhibit 4  3/2/18 Calculation of vacation    53
13      and sick benefits
        [Ross/Vargas 000459-460]
14
    Exhibit 5  Affidavit of Robert Ross in Support   57
15      of Plaintiff's Original Petition and
        Motion to Vacate
16
    Exhibit 6  Online posts          62
17      10/13/16 letter to Sara Nelson
        [Appendix 27-30]
18
    Exhibit 7  The Constitution of the Association   70
19      of Professional Flight Attendants
20  Exhibit 8  Article VII Charges - Ross - Post   78
        Hearing Brief
21
    Exhibit 9  Typewritten notes       84
22
    Exhibit 10 10/22/20 Confidential Memorandum   86
23      [APFA0164-176]
24  Exhibit 11 2/27/22 email from Kit Gomez Alba to   89
        National Secretary
25

---

**5**

1       (February 1, 2024, 10:53 a.m.)
2           MR. BARTOS:  For the record, this is Jeff
3   Bartos, attorney for the APFA defendants.  It is
4   whatever the time the court reporter has indicated,
5   nearly 11:00 a.m., for the deposition we've noticed for
6   10:00 a.m.
7       I'm here with Charlette Matts, counsel in the
8   case as well at APFA, in-house counsel; Michelle Cliatt,
9   who works for Ms. Matts -- Ms. Broderick.  I'm also here
10  with the defendants Julie Hedrick and Erik Harris and
11  then two of APFA's national officers who are here on
12  behalf of APFA, Larry Salas and Josh Black.  Also
13  present is counsel for Mr. Bob Ross and another
14  individual.
15      A dispute has arisen about whether or not the
16  individuals who are here on behalf of APFA are allowed
17  to be here or should be here or whether the deposition
18  can proceed with them here.  It's my understanding that
19  Mr. Ross is refusing to testify in his deposition unless
20  Mr. Salas and Mr. Black leave the room.
21          MS. PHILLIPS:  That's incorrect.
22          MR. BARTOS:  Okay.  Let me just finish.
23      It's our position that as party
24  representatives of APFA, they are wholly entitled to be
25  here.  I've offered for Mr. Salas to leave the room.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                            2/1/2024

---

**6**

1  But we are entitled to have a representative from APFA
2  here and intend to proceed on that basis.
3       I wanted to go on the record and have counsel
4  for Mr. Ross say whatever it is that she wants to say.
5       MS. PHILLIPS:  My name is Kerri Phillips.
6  For the record, I represent Robert Ross.  I'm going on
7  the record to state that we've been called and appeared
8  to the deposition at 10:00 and discovered that the
9  deposition was originally scheduled and planned to be
10 conducted at a neutral location, at counsel's office,
11 and was rescheduled to be conducted at a hotel that --
12 where the Union's negotiation team and all four national
13 officers were in attendance, as well as other numerous
14 Union personnel and employees were staying.
15      Mr. Ross, when he appeared, saw many of these
16 Union officials in the parking lot and began to have a
17 panic attack and chest pains, at which point he called
18 me while I was in transit to the location.
19      And we discovered that the last -- the change
20 with the new scheduled date, from the attorney's office
21 to the new hotel, was clearly a game-playing move
22 designed to cause abuse and harassment for purposes of
23 pressuring Mr. Ross for his deposition testimony.
24      We have never received notice that Mr. Black
25 and Mr. Salas were going to be in attendance.  And the

---

**7**

1  two named defendants are also capable of representing
2  APFA.  There is no need for Mr. Black and Mr. Salas to
3  be in attendance.
4       Mr. Ross is willing to come in and do his
5  deposition testimony provided that the two additional
6  officers leave the room.  We have also offered and are
7  willing to do the deposition today at the attorney's
8  office in downtown Dallas, provided that we relocate to
9  the downtown Dallas office, if you guys are willing to
10 do so.
11      MR. BARTOS:  Just for clarity, that last
12 part is news to me.  Are you referring to moving to Jim
13 Sanford's office?
14      MS. PHILLIPS:  Yes.
15      MR. BARTOS:  And instead of doing it
16 here?
17      MS. PHILLIPS:  Yes.
18      MR. BARTOS:  Okay.  I'd like to discuss
19 that with our group, the two different scenarios.  We
20 obviously want to proceed with the deposition.  Let me
21 talk with them, and we can come back on the record, if
22 needed.  Hopefully we will either have a resolution or
23 we won't.
24      We can go off the record.
25      (Recess from 10:57 a.m. to 11:17 a.m.)

---

**8**

1            P R O C E E D I N G S
2       THE VIDEOGRAPHER:  This is Tape 1 in the
3  video deposition of Bob Ross in the matter of Robert
4  Ross versus Association of Professional Flight
5  Attendants, et al., in the U.S. District Court for the
6  Northern District of Texas, Fort Worth Division.  Today
7  is Thursday, February 1st, 2024.  We're now on record at
8  11:18 a.m.
9       Will the attorneys please introduce themselves
10 for the record.
11      MR. BARTOS:  Jeffrey Bartos, counsel for
12 the APFA defendants.
13      MS. BRODERICK:  Charlette Broderick,
14 counsel for APFA.
15      MS. PHILLIPS:  Kerri Phillips, counsel
16 for Bob Ross.
17      (Witness sworn by reporter)
18           ROBERT ROSS,
19 having been first duly sworn, testifies as follows:
20           EXAMINATION
21 BY MR. BARTOS:
22  Q.  Good morning, Mr. Ross.  Can you tell me what
23 you did to prepare for today's deposition.
24  A.  What do you mean by that?
25  Q.  Did you do anything?  Review documents?  Talk

---

**9**

1  to anybody to get ready --
2       MS. PHILLIPS:  Objection --
3  Q.  -- for today's deposition?
4       MS. PHILLIPS:  -- privileged.
5  A.  I --
6  Q.  And just for -- I'm not asking you about any
7  conversations with your lawyer.
8  A.  -- simply know what I know, and that's my
9  preparation.
10 Q.  Okay.  Have you ever been deposed in a lawsuit
11 before?
12 A.  No.
13 Q.  Have you ever been a party to a lawsuit
14 before?
15 A.  No.
16 Q.  Can you describe, briefly, your educational
17 experience following high school.
18 A.  I have two or three years of college and a
19 military background.
20 Q.  Okay.  And did you do the college immediately
21 after high school, or did you do military first?
22 A.  During -- during military service --
23 Q.  Okay.
24 A.  -- and after.
25 Q.  Okay.  Can you just briefly describe your

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                          2/1/2024

---

**10**

1  employment history from graduating high school up until
2  when you started working at American Airlines.
3      A.  I held several -- several jobs after high
4  school.  I joined the military in 1978.  While in the
5  military, I learned to fly aircraft.  And I have a
6  charter boat captain's license, so I worked for --
7          (Reporter clarifying)
8      A.  Charter boat captain's license.  After leaving
9  the military in 1982, I did several side jobs and got
10  hired by American Airlines in 1983.
11      Q.  Okay.  And what position did you have when you
12  were hired by American Airlines in 1983?
13      A.  Flight attendant.
14      Q.  Okay.  And have you worked continuously for
15  American Airlines from then until now?
16      A.  I took a couple of small three-month leaves.
17      Q.  Okay.  Aside from leaves, that's been your
18  employment?
19      A.  It's been my employment for 40 years.
20      Q.  Okay.  Okay.  Have you ever received any
21  education or training in being a reliability engineer?
22      A.  What is a reliability engineer?
23      Q.  I'm just asking if you've ever had any kind of
24  training in being a reliability engineer.
25      A.  I would have to know what a reliability --

---

**11**

1          MS. PHILLIPS:  Objection; relevance.
2      A.  -- engineer is because trainings that I've had
3  over the course of my lifetime may qualify for that.
4      Q.  Okay.  All right.  And where do you live,
5  Mr. Ross?
6      A.  I live in California.
7      Q.  And what -- what city or what metro area?
8      A.  I live in the Sacramento metro area, El Dorado
9  County.
10      Q.  And, as an American Airlines flight attendant,
11  you have a base for work purposes.  Is that right?
12      A.  I do.
13      Q.  And your -- your base is here in
14  Dallas-Fort Worth.  Is that right?
15      A.  Unfortunately, they closed our San Francisco
16  base.  So now, yes, I am based here.
17      Q.  Okay.  All right.  Are you married?
18      A.  I am.
19      Q.  And you have two children.  Is that right?
20      A.  Yes.
21      Q.  Can you tell me how old they are.
22      A.  20 and 22.
23      Q.  Now, are they in college?
24      A.  Yes, they are.
25      Q.  Can you tell me when they started college and

---

**12**

1  what schools they go to.
2      A.  My son started college in 2021, and he goes to
3  Sacramento State now.  He attended two years at
4  community college.  He's now at Sacramento State.  My
5  daughter joined college in 2022.  She went to University
6  of North -- North Dakota, Jamestown, and is now
7  attending Sacramento Community College, going on to
8  Sacramento State, Chico.
9      Q.  Okay.  And just for my -- so I can have this
10  correct in my head, is the 22-year-old your daughter or
11  your son?
12      A.  The 22-year-old is my son.
13      Q.  Okay.  Okay.  So your son -- just for the
14  dates, your son began college in the year 2021 and your
15  daughter in the year 2022?
16      A.  No.  I believe my son started college --
17  correction -- in 2020.  He graduated high school in the
18  spring of 2020 --
19      Q.  Okay.
20      A.  -- and started high school then in August of
21  2020.
22      Q.  Okay.
23      A.  So that's a correction.
24      Q.  Okay.  So your son just -- I know it's not
25  something you -- I -- as a parent I mix up those dates.

---

**13**

1          So your son, as best you recall, began college
2  in 2020?
3      A.  2020.
4      Q.  Your daughter, as best you can recall, began
5  in 2022?
6      A.  I believe that's a correction as well.  She
7  attended college in August of '21.
8      Q.  Okay.
9      A.  She graduated high school in June of '21 --
10      Q.  Okay.
11      A.  -- and then college in August.
12      Q.  Fair enough.  Okay.  Thank you.  Appreciate
13  it.
14      A.  Again, correction.
15      Q.  And if at any point in this deposition you
16  recall, maybe you misspoke or had a correction, please
17  let me know.
18      A.  Uh-huh.
19      Q.  And have you ever been subjected to any
20  disciplinary -- or discipline from American Airlines?
21      A.  No.
22      Q.  Okay.  Starting from when you first came to
23  work for American, you've been a flight attendant the
24  whole time -- is that right -- at American?
25      A.  At American Airlines, yes.

* * * * *

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                              2/1/2024

*****

22

1    A.  There were a lot of people that were --
2         MS. PHILLIPS:  So I'm going to object to
3    all of this.  This is all hearsay.
4    Q.  Okay.  The -- so just for clarity, you -- you
5    don't recall exactly if this document Exhibit 1 came
6    from you in the document production in this case.  Is
7    that right?  Or did it?
8    A.  I don't recall if it did or it didn't.  I
9    don't recall a document looking like this.
10   Q.  Okay.
11   A.  I don't recall what the word "pegged" mean in
12   my mind back then.
13   Q.  Okay.
14   A.  But, in today's talk, "pegged" to me does not
15   mean "selected."
16   Q.  Okay.  If we go back to the first page of the
17   document, and I'd like you to look down about halfway
18   down that says -- there is a heading for "Melissa," and
19   it says, "Probably not everyone on this thread is going
20   to be my friend anymore but Bob until you make it right
21   with Kiri....it's just not right.  I'm pissed you played
22   wrong."  Do you see that?
23   A.  I see it.
24   Q.  Okay.  And then there is a response from
25   "Bob."  Right?  And that's -- that's you.  Right?

23

1    A.  I'm assuming.
2    Q.  Okay.  Under "Bob," it says, "I did nothing
3    wrong to Kiri at the BOD meeting or since."  Do you see
4    that?
5    A.  Yes.
6    Q.  And then further down in that text it says, "I
7    had good places and perfect appointments for both of you
8    but they were to be doled out at my convenience when the
9    time was right.  I'm saddened this turned out this way
10   but perhaps it's best.  Good luck to us all, I have a
11   much harder job to do now."  Do you see that?
12   A.  I see that.
13   Q.  Okay.  Do you recall --
14        MS. PHILLIPS:  Objection.
15   Q.  -- making that communication to Ms. --
16   Ms. Chinery?
17        MS. PHILLIPS:  Objection; hearsay.
18   Objection; form.
19   Q.  You can still answer the question.
20   A.  I read that as somebody who may have been
21   considered for positions or -- or whatever, but -- but,
22   due to circumstance, those were no longer viable
23   options.  I don't know the exact state of mind at the
24   time.
25   Q.  But you had some online conversation with

24

1    Melissa Chinery at around the time of your very first
2    day in office.  Correct?
3         MS. PHILLIPS:  Objection --
4    A.  I don't -- don't recall having that.
5         MS. PHILLIPS:  -- hearsay.
6    Q.  Okay.  Do you recall arguing in your
7    Article VII hearing that that very phrase that she used,
8    "I will work tirelessly" --
9         MS. PHILLIPS:  Objection; hearsay.
10   Q.  -- "I will work tirelessly" -- let me just
11   find the right word -- "to make sure you are out of
12   office," was -- was used in the questioning of
13   Ms. Chinery during your Article VII hearing?
14   A.  Possibly.
15   Q.  In fact, you put it in your posthearing brief
16   as describing part of her motivation.
17        MS. PHILLIPS:  Objection; hearsay.
18   Q.  Do you remember that?
19   A.  I don't remember what all was in my closing
20   argument.
21   Q.  Uh-huh.  Okay.  If we wanted to see what was
22   said or not said in your Article VII arbitration, I
23   assume we could just look at the transcript.  Right?  Is
24   that right?
25        MS. PHILLIPS:  Objection; hearsay.

25

1         MR. BARTOS:  Okay.  You can --
2    A.  As far as I know --
3         MR. BARTOS:  Just on the record, you can
4    object all you want.  That's not hearsay.  But go ahead.
5    Go ahead.
6         MS. PHILLIPS:  You haven't turned over
7    all the documents from the arbitration.
8    A.  I was waiting for somebody to --
9    Q.  So I think I was -- let me retract that
10   question.
11        MS. PHILLIPS:  Would you like a break?
12        THE WITNESS:  I would like a break.
13        MS. PHILLIPS:  All right.  Let's take a
14   break.
15        THE VIDEOGRAPHER:  We're off record at
16   11:38 a.m.
17        (Recess from 11:38 a.m. to 11:55 a.m.)
18        (Deposition Exhibit 2 marked)
19        THE VIDEOGRAPHER:  We're back on record
20   at 11:55 a.m.
21   BY MR. BARTOS:
22   Q.  So, Mr. Ross, when we took a break, we had
23   been -- I had asked you some questions about your
24   communications with Melissa Chinery around the time of
25   your election to president.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 9**

Robert Ross                                                          2/1/2024

---

26

1       And just maybe to refresh your recollection, I
2   would like you to look at Exhibit 2, which is in front
3   of you.  It's portions of a transcript.  If you could
4   just take a look, and let me know when you've had a
5   chance to look at it.
6       A.  (Reading).
7       Q.  Have you had a chance to look that over?
8       A.  I've skimmed it, yeah.
9       Q.  Okay.  And I'll just represent to you this is
10  an excerpt from the transcript of your Article VII
11  arbitration dated, for this portion, November 18th,
12  2021, and -- and beginning on page 382 and running
13  through page 384.
14      You had a representative in your Article VII
15  arbitration.  Right?
16      A.  Yes.
17      Q.  Is that Gina Guidry?
18      A.  Yes.
19      Q.  Okay.  And, during your Article VII
20  arbitration, Ms. Guidry cross-examined some witnesses.
21  Is that right?
22      A.  I believe so.
23      Q.  Okay.  And you also questioned some witnesses
24  yourself.  Right?
25      A.  If I recall.

---

27

1       Q.  Okay.  And, again, I'm just representing for
2   the record that this portion starting on page 382 is the
3   testimony of Melissa Chinery, being questioned by
4   Ms. Guidry.
5       Do you remember Melissa Chinery testifying in
6   your arbitration?
7       A.  She did testify in the arbitration.
8       Q.  Okay.  All right.  And I want to see if this
9   helps refresh your recollection about the topic we were
10  discussing.
11      Do you see at the very top of page 382, on
12  line 4, Ms. Guidry asking, "Are you familiar with I will
13  work tirelessly to make sure you are out of office; are
14  you familiar with that?"
15      And the answer is, "I wrote it."  Do you see
16  that?
17      A.  I see that.
18      Q.  Okay.  Does that help refresh your
19  recollection about the exchange that we looked at on
20  Exhibit 1?
21      A.  No, because this document here doesn't state
22  who made that answer.
23      Q.  Okay.  I guess we could look at the whole
24  transcript and figure that out, couldn't we?
25      A.  If you'd like.

---

28

1       Q.  Okay.  The -- do you recall there being
2   questioning of Ms. Chinery in your Article VII
3   arbitration about the meaning and -- and purpose of why
4   she wrote, "I will work tirelessly to make sure you are
5   out of office"?
6       A.  I recollect that there were discussions during
7   Article VII hearings having to do with posts and
8   behaviors of Melissa Chinery.  I don't recall exactly
9   the context.
10      Q.  Okay.  But one of those posts was saying, "I
11  will work tirelessly to make sure you are out of
12  office."  Right?
13      A.  She did make that comment.
14      Q.  Okay.  Okay.  And your view was that the
15  charges that she filed against you were part of that
16  effort to work tirelessly to make sure you were out of
17  office.  Right?
18      A.  That would be an opinion.
19      Q.  I'm asking your opinion.
20      A.  She filed charges years after I was out -- out
21  of office.
22      Q.  I'm asking your opinion.  Yeah.
23      A.  And I don't have an opinion what her motive
24  for filing Article VII charges are.
25      Q.  Well, you argued to the --

---

29

1       MS. PHILLIPS:  This is --
2       Q.  You argued to the arbitrator --
3       MS. PHILLIPS:  Objection; form.
4       Q.  You argued to the arbitrator that's why she
5   filed the charges.  Do you remember that?
6       A.  I recall there being lots of reasons she gave
7   for filing Article VII.
8       Q.  Okay.  And I'm asking about do you recall you
9   and your representatives arguing that this stemmed from
10  her position she took, back on your very first or second
11  day in office, that she was going to work tirelessly to
12  make sure you were out of office.
13      A.  I recall that comment back then in 2016, and
14  she was successful up until 2018 to make sure I was out
15  of office, and at that point she had fulfilled her
16  solemn swear of what she would do.  That was my opinion.
17      Q.  All right.  Now, when you became president of
18  APFA, could you describe generally what your
19  responsibilities were in that capacity.
20      MS. PHILLIPS:  Objection.  He's not here
21  to testify as to a president's responsibilities.  He's
22  here to testify as to his experiences, elections.
23      Q.  You can still answer the question.
24      A.  It's the president's responsibility to head
25  and lead the organization both internally and

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 10**

Robert Ross                                                    2/1/2024

---

30

1  externally.
2      Q.  Did you have an understanding at the time you
3  were a president that you had a fiduciary obligation or
4  fiduciary duty to the organization?
5      A.  In broad terms, that's -- you do.
6      Q.  Okay.  And would you agree or did you have an
7  understanding that the members you represent had a right
8  to challenge your decisionmaking and contest your --
9  your conduct as president?  That was one of their rights
10  as members?
11      A.  As U.S. citizens, you have that right.
12      Q.  And, as union members, they have that right.
13  Isn't that so?
14      A.  That would include union members.
15      Q.  All right.  Now, you were elected or took
16  office in 2016, correct?
17      A.  Yes.
18      Q.  Okay.  And there came a point where a
19  complaint was made to the Department of Labor about the
20  election that you won.  Is that correct?
21      A.  There was a complaint to the Department of
22  Labor.
23      Q.  Okay.  And the labor department concluded that
24  the election -- from its point of view, the election
25  needed to be rerun.  Is that right?

---

31

1          MS. PHILLIPS:  Objection; form.
2      A.  Can you state that again?
3      Q.  Sure.  Do you recall the labor department
4  taking the position that the election had to be run over
5  again?
6      A.  I do.
7      Q.  Okay.  And APFA, in fact, agreed to do a rerun
8  election.  Correct?
9      A.  APFA at the time had no choice because it was
10  called upon by the Department of Labor.
11      Q.  Okay.  But you didn't wait for the Department
12  of Labor to sue you.  You agreed to do a -- to do a
13  rerun.  Right?
14      A.  I don't recall the Department of Labor ever
15  threatening to sue us.
16      Q.  Okay.  But, in any event, APFA was going to do
17  a rerun election in 2018.  Correct?
18      A.  In 2018 the Department of Labor ordered a
19  rerun election.
20      Q.  Okay.  All right.  All right.  Now, the -- and
21  I just want to get the dates correct.
22          You resigned as president in March of 2018.
23  Is that right?
24          MS. PHILLIPS:  Objection; form, all of
25  these questions.

---

32

1      A.  It was -- I'm slowing down on my dates too
2  because I got my kids' college --
3      Q.  Got it.
4      A.  -- messed up.
5      Q.  Understood.
6      A.  Yes.
7      Q.  Okay.  And subsequently you ran for base
8  president of San Francisco.  Is that right?
9      A.  Subsequently, yes.
10      Q.  And you were elected base president for
11  San Francisco, correct?
12      A.  Yes.
13      Q.  And was that approximately 2020?
14      A.  That's a good question.  Was it 2020, or was
15  it 2021?  I don't recall which one of those two years
16  that was.
17      Q.  Fair enough.  And just for the dates, you
18  then later resigned as base president following the
19  Article VII arbitration.  Correct?
20          MS. PHILLIPS:  Objection; form.
21      A.  I resigned under duress with a letter written
22  to the Union stating so.
23      Q.  Okay.  And just a couple questions about your
24  understanding of the Union's structure.
25          The president is elected by the membership

---

33

1  directly.  Correct?
2          MS. PHILLIPS:  Objection; form.
3      A.  At APFA it is.
4      Q.  At APFA.  That's what I'm asking.
5      A.  Not all unions.
6      Q.  I'm only -- these are only about APFA, but
7  feel free if you have any -- if it's unclear.
8          And at APFA the board of directors -- each
9  base president is elected by -- by the base that they
10  represent.  Correct?
11          MS. PHILLIPS:  Objection.  He's not here
12  to testify on -- on the APFA procedures.
13      Q.  You can answer the question.
14      A.  The base presidents are elected by their base
15  membership.
16      Q.  Okay.  And the base presidents make up the
17  board of directors.  Correct?
18      A.  They make up the voting board of directors.
19      Q.  Okay.  So the national officers, are they on
20  the board of directors?
21      A.  They are.
22      Q.  Okay.  But they don't have a vote.  Is that
23  right?
24      A.  That's correct.
25      Q.  Okay.  You would say they have a voice but not

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                                2/1/2024

**34**

1  a vote.  Is that correct?
2      A.  I stand corrected.  The national president has
3  a vote on the board in the event of a tie without an
4  abstention.
5      Q.  Fair enough.  And one of the obligations of
6  the president is to carry out duties that the board of
7  directors requests them to carry out.  Is that correct?
8      A.  I'm not sure I understand.  That's vague.
9      Q.  Okay.  Well --
10     A.  If the board of directors told a national
11 president to steal from a bank, they would not be
12 obligated to follow the board of directors.
13     Q.  Fair enough.  If I wanted to find the relative
14 responsibilities of the board of directors and the
15 president, would I look in the APFA Constitution?
16     A.  Yes.
17     Q.  Okay.  All right.  Now, while you were
18 president, do you recall that APFA worked with an
19 accounting firm called Wood, Stephens & O'Neil?
20     A.  That name sounds familiar.
21     Q.  Okay.  Did you -- as president did it fall
22 within your responsibilities or authority to deal
23 directly with Wood, Stephens, O'Neil, or was that
24 somebody else's responsibility?
25     A.  That was generally someone else's

**35**

1  responsibility.
2      Q.  Okay.  Do you recall, during your term as
3  president, ever interact -- ever interacting personally
4  with anyone that firm, Wood, Stephens, O'Neil?
5      A.  I do not recall.
6      Q.  Okay.  Do you ever remember reviewing, while
7  president, just in that 2016-2018 time period, reviewing
8  any of the work product of Wood, Stephens, O'Neil?
9      A.  I don't recall being qualified to review or
10 critique an accountant's work.
11     Q.  Fair enough.  Fair enough.  Did you, in your
12 capacity as president, ever make any effort to replace
13 that accounting firm as the outside accountant for APFA?
14     A.  I don't recall that being part of my authority
15 or department's responsibility.
16     Q.  Okay.  But, leaving aside whether it was part
17 of your authority, you never tried to replace that
18 accounting firm?
19         MS. PHILLIPS:  Objection; form.  And
20 objection; asked and answered.
21     A.  I do not recall personally trying to replace
22 that accounting firm.
23     Q.  Okay.  All right.  Now, you were elected and
24 took office in April of 2016.
25         Would it be fair to say that by the latter

**36**

1  part of 2017 you were having a difficult relationship
2  with the board of directors of APFA?
3      A.  I can't attest to that.  That would be a vague
4  summary.
5      Q.  Do you recall, in the latter part of 2017,
6  members of the board of directors putting forth
7  statements that they had a lack of trust in you as
8  president?
9      A.  I do not recall a direct communication.
10         MS. PHILLIPS:  Objection.  This is
11 hearsay.  He can't testify to other people's statements.
12     Q.  Are you familiar with a term "full operational
13 integration"?
14     A.  I am familiar with FOI.
15     Q.  Okay.  And you remember that FOI stands for
16 "full operational integration."  Right?
17     A.  Yes.
18     Q.  Okay.  And, just broadly speaking, that had to
19 do with the integration of the legacy US Airways and the
20 legacy American operations under your contract.
21 Correct?
22     A.  I think that would be too vague and simple of
23 an explanation of what FOI is.
24     Q.  Okay.  Could you explain what FOI was, to
25 your -- to your understanding?

**37**

1      A.  FOI was, to my recollection, was a date, a
2  date at which -- full operational integration was when
3  all flight attendants were under the same operating
4  system, under the same scheduling management platform.
5      Q.  Okay.
6      A.  Would be still a broad statement.
7      Q.  I appreciate that.  That's more accurate than
8  what I said.
9         Do you recall there being a grievance filed by
10 you, as president, involving whether or not American had
11 met its contractual obligation with respect to FOI?
12     A.  I don't recall exactly what the terms of that
13 grievance was, but there was a grievance filed over the
14 date of FOI.
15     Q.  And do you recall that, in the context of that
16 grievance, you eventually reached a settlement agreement
17 with American Airlines to settle that grievance?
18     A.  We did.
19         MS. PHILLIPS:  My client's going to take
20 a break now.
21         MR. BARTOS:  We're not going to keep
22 breaking.
23         MS. PHILLIPS:  My client is going to take
24 a break now.
25         MR. BARTOS:  Okay.  We're going to -- we

**STRYKER REPORTING SERVICES**                          **(817) 494-0700**

Robert Ross                                                    2/1/2024

38

1  need to proceed with this deposition. We'll take a
2  break now.
3          MS. PHILLIPS: Yeah, my client's going to
4  take a break now.
5          MR. BARTOS: But we're not going to keep
6  breaking and drag this out.
7          MS. PHILLIPS: We're in between
8  questions. My client is going to take a break.
9          THE VIDEOGRAPHER: We're off the record
10 at 12:11 p.m.
11         (Recess from 12:11 p.m. to 12:19 p.m.)
12         THE VIDEOGRAPHER: We're back on record
13 at 12:19 p.m.
14 BY MR. BARTOS:
15 Q.  Now, Mr. Ross, when we took a break, I was
16 asking you a little bit about the FOI grievance.
17     And, at the risk of repeating myself, do you
18 recall settling the FOI grievance in 2017?
19 A.  I recall an FOI grievance in 2017, if that's
20 the year it was.
21 Q.  Okay. And do you recall reaching a settlement
22 that you signed with the Company?
23 A.  APFA reached a settlement.
24 Q.  Okay. And who signed it on behalf of APFA?
25 A.  All settlements are signed by the national

39

1  president.
2  Q.  Okay. So you signed that settlement?
3  A.  If my name is on it, I assume.
4  Q.  Well, no one else was president at that time.
5  Right? It must have been you.
6  A.  Well, there were -- there were two agreements
7  made.
8  Q.  Okay. I'm talking about the first one. If
9  you recall.
10 A.  From what I recall, the committee who grieved
11 that FOI, number one, came to an agreement, of which
12 then they bring it to the president to sign.
13 Q.  Okay. And the president signed the first
14 agreement. Correct?
15 A.  The president was directed by counsel to sign.
16 Q.  Okay. And, following that signing of that
17 agreement, there was a dispute or controversy with the
18 board of directors, who wanted to undo the settlement
19 and start over. Is that right?
20         MS. PHILLIPS: Objection; form.
21 Q.  Do you remember that?
22 A.  I remember the board of directors having an
23 issue with counsel that was demanding at the time that
24 it be signed prior to being discussed at a board
25 meeting.

40

1  Q.  Okay. And the board of directors then went
2  back to the Company to renegotiate the settlement.
3  Right?
4  A.  They did.
5  Q.  Okay. And, in your recollection, there was an
6  expression by the board of a lack of trust in you, as
7  president, given what had transpired. Isn't that right?
8  A.  I don't agree with that.
9  Q.  Okay. So, despite the fact that they rejected
10 the settlement you had negotiated and went back to
11 renegotiate a new one, you felt that they trusted you?
12         MS. PHILLIPS: Objection; form.
13 Q.  Is that right?
14 A.  I guess I don't understand your question.
15 Because an agreement had to be renegotiated, you're
16 inferring that that meant they distrusted me?
17 Q.  I'm just asking a question.
18 A.  Then I don't understand your question.
19 Q.  Okay. Now, the APFA Constitution has a
20 provision for the recall or removal of national
21 officers. Right?
22         MS. PHILLIPS: Objection; form.
23 A.  Can you repeat that?
24 Q.  Sure. Let me restate it, maybe.
25         APFA has a Constitution. Correct?

41

1  A.  We have established that. Yes.
2  Q.  Okay. And there is a provision in the
3  Constitution for the election of national officers
4  directly by the membership. Right?
5  A.  Yes.
6  Q.  Okay. And there is also a provision in the
7  Constitution for a process by which a duly elected
8  national officer can be removed from office. Right?
9  A.  You'd have to explain to me what your version
10 of "duly elected" is, because national officers are not
11 duly elected.
12 Q.  Okay. Let me take out the word "duly."
13         Do you recall there is a provision in the
14 Constitution by which an elected national president can
15 be removed from office under the Constitution?
16 A.  There are provisions for a change of a
17 national president.
18 Q.  Okay. And one way for there to be a change is
19 for two-thirds of the board of directors to vote on
20 having a recall election. Is that right?
21         MS. PHILLIPS: Objection; form.
22 A.  I don't recall exactly what the wording is in
23 that language.
24 Q.  Okay. All right. Do you recall there is a
25 position -- a way by which the board of directors can

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                        2/1/2024

---

**42**

1   initiate a recall election?  Do you remember that?
2       A.   There is a process.
3       Q.   Okay.  Okay.  For the board of directors to
4   start that, right?
5       A.   There is a process for the board of directors
6   to start a process, provided that there is the means to
7   do so.
8       Q.   Okay.  And there is a process by which members
9   can initiate a recall election by submitting a
10  sufficient number of names on a petition.  Isn't that
11  right?
12          MS. PHILLIPS:  Objection; form.
13      Q.   If you remember.
14      A.   I don't recall or I don't remember exactly
15  what that process is.
16      Q.   Okay.  Do you remember generally that members
17  can initiate a recall process?
18      A.   I believe they can.
19      Q.   Okay.  And, if we wanted to see what the exact
20  terms of it was, we could just look at the APFA
21  Constitution.  Right?
22          MS. PHILLIPS:  Objection; form.
23      A.   That would be a better answer than mine.
24      Q.   Okay.  Now, do you remember in early 2018
25  there was a board of directors meeting of APFA, which

---

**43**

1   you attended, in Charlotte, North Carolina?
2       A.   I attended a lot of board of directors
3   meetings.  You're talking about a specific board
4   meeting?  Convention?  There are differences between
5   them.
6       Q.   Okay.  Sure.  My fault for a bad question.
7          Do you remember the board of directors
8   convention in the spring of 2018 in Charlotte,
9   North Carolina?
10      A.   I do.
11      Q.   Okay.  And that -- part of what happened in
12  that convention or during that convention was you
13  executed the Transition Agreement by which you left
14  office as president.  Right?  Do you remember that?
15      A.   I'm not comfortable with your phrase of I
16  executed --
17      Q.   Okay.
18      A.   -- a Transition Agreement.
19      Q.   All right.  Let's back up.
20         You recall being at the board of directors
21  convention in the February/March 2018.  Is that right?
22      A.   Yes.
23      Q.   Okay.  And you were there in Charlotte?
24      A.   Yes.
25      Q.   Okay.  And do you recall that there was an

---

**44**

1   open discussion by members about having a recall --
2   having recall petitions to present to the board?
3       A.   That's vague to me.  I don't know what you
4   mean by an "open discussion" with members.
5       Q.   Okay.  Do you remember being aware that there
6   was a recall petition that was going to be submitted to
7   the board of directors at that meeting?
8       A.   I vaguely recall there was a threat.  There
9   was a threat given of a recall petition action by
10  members.
11      Q.   Do you remember a discussion about bringing
12  petitions in red wagons?
13          MS. PHILLIPS:  Objection; leading.
14      Q.   Do you remember that?
15      A.   I do not remember a discussion at that board
16  meeting about bringing petitions in a red wagon.
17      Q.   Okay.  All right.  And who is Mark Richard?
18      A.   Mark Richard was the counsel, in-house -- or
19  he was the -- he was one of the counsels for APFA at the
20  time.
21      Q.   Okay.  And Mr. Richard was at that same board
22  convention in Charlotte.  Right?
23      A.   I believe so.
24      Q.   Okay.  And there came a point in time where
25  you entered into a Transition Agreement between you and

---

**45**

1   the APFA.  Do you remember that?
2          MS. PHILLIPS:  Objection; form, leading
3   the witness.
4       A.   Can you repeat that because it was --
5       Q.   Do you remember signing a document called the
6   Transition Agreement?
7       A.   I remember signing a document called the
8   Transition Agreement.  I don't recall signing it at
9   that.
10          MR. BARTOS:  Okay.  Can we mark this as
11  Exhibit 3, please.
12          (Deposition Exhibit 3 marked)
13      Q.   If you can take a look at that.  Please let me
14  know when you've had a chance.
15      A.   (Reading).
16      Q.   Have you seen this document before?
17      A.   I've seen one similar.
18      Q.   Okay.  Is that your signature on the third
19  page?
20      A.   This is a photocopy.  I can't attest that that
21  is my signature.  But it appears there is a signature
22  with my name there, yes.
23      Q.   You signed a document that you referred to in
24  your lawsuit as the Transition Agreement.  Correct?
25      A.   Correct.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

---

46

1    Q.  You signed it on March 1st, 2018.  Is that
2  right?
3    A.  I don't recall the exact date I signed it.
4    Q.  You signed it during the Charlotte board of
5  directors convention.  Right?
6         MS. PHILLIPS:  Objection; leading.
7    A.  I don't recall the exact date that I left that
8  convention because it was -- there was a lot going on.
9  So, if it was March 1st, then that's the date.  I
10  recalled it was -- it was effective March 2nd, I
11  thought, but this says March 1st on the bottom here.  So
12  I'm not sure what date it was.
13    Q.  All right.  Let's just -- let's just back up.
14         So you -- you -- you will remember or you do
15  remember that you signed a document called Transition
16  Agreement.  Right?
17         MS. PHILLIPS:  Objection; leading the
18  witness.
19    Q.  You do remember signing a Transition
20  Agreement?
21    A.  I remember signing a Transition Agreement.  I
22  don't recall the date.
23    Q.  Okay.  And you indicate that on page 3 that
24  looks like your signature, but you can't say for sure
25  under oath today that that's the document you signed.

---

47

1  Is that correct?
2         MS. PHILLIPS:  Objection; asked and
3  answered.
4    A.  That's correct.
5    Q.  Okay.  You're suing the APFA for violating the
6  Transition Agreement that you did sign.  Is that right?
7  Are you aware of that?
8    A.  I am aware that that is one of the charges.
9    Q.  Okay.  Is this document, Exhibit 3, the
10  Transition Agreement that you're asserting was violated?
11    A.  I have not read every word in it.
12    Q.  Okay.  Please do.  And let me know.
13    A.  I'm a slow reader.
14    Q.  Take your time.
15    A.  (Reading).
16    Q.  Have you had a chance to look it over, sir?
17    A.  I have.
18    Q.  To the best of your recollection, is that the
19  Transition Agreement that you signed --
20         MS. PHILLIPS:  Objection; hearsay.
21    Q.  -- on March 1, 2018?
22         MS. PHILLIPS:  Objection; hearsay.
23    A.  From my recollection, I would have to have it
24  next to the one that I possessed on that day to make
25  sure that no words in here were changed.

---

48

1    Q.  Fair enough.  Let me ask you a question.  Do
2  you recall submitting an affidavit, or more than one
3  affidavit in this case, in which you attached a copy of
4  what you said was the Transition Agreement?  Do you
5  remember that?
6    A.  I believe I did.
7    Q.  All right.  And, to the best of your
8  recollection, would the copy of the Transition Agreement
9  you submitted with your affidavit be the actual
10  Transition Agreement that you signed?
11    A.  I would -- I would have to see that, the one
12  that I actually --
13    Q.  All right.  I'm going to just --
14         MR. BARTOS:  Off the record for a second.
15         THE VIDEOGRAPHER:  We're off record at
16  12:37 p.m.
17         (Recess from 12:37 p.m. to 12:38 p.m.)
18         THE VIDEOGRAPHER:  We're back on record
19  at 12:38 p.m.
20  BY MR. BARTOS:
21    Q.  I want to leave aside that particular exhibit
22  right now.  I'm not asking you questions about that
23  exhibit.  Okay.
24         I just want to ask you about the occasion on
25  which you signed the Transition Agreement.  All right.

---

49

1  You were in Charlotte, North Carolina.  Correct?
2    A.  Correct.
3    Q.  All right.  And Mark Richard facilitated the
4  signatures of you and the members of the board of
5  directors.  Is that right?
6         MS. PHILLIPS:  Objection; leading.
7    A.  I don't know who facilitated it.  I was never
8  in the same room when all of that was done.
9    Q.  Okay.  So, at the time when you were
10  considering or looking at the Transition Agreement in
11  2018, you were not in the same room as the board of
12  directors.  Is that right?
13    A.  I requested several times to be in the
14  board -- room with the board of directors, and I was not
15  allowed.
16    Q.  Okay.  So they were -- the board of directors
17  was in one location in the same hotel, I presume, and
18  you were in another location.  Is that right?
19    A.  That's correct.
20    Q.  Okay.  And was Mark Richard going between you
21  in your location and the board in their location?  Is
22  that how it worked?
23    A.  It was my understanding that that was -- that
24  was --
25    Q.  Well, how did it come to you?  Who presented

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

---

50

1   you with a draft of the Transition Agreement?  Was it
2   Mark?
3       A.  I don't recall when --
4           MS. PHILLIPS:  Objection; leading.
5       A.  -- he actually did the draft or not.  But it
6   was -- he was my counsel.  And we had Mady Gilson there
7   too.  And I don't know which one of them actually
8   presented me with the draft.
9       Q.  So Ms. Gilson is or was a lawyer also?
10      A.  She was.
11      Q.  Okay.  So one of the lawyers presented you
12  with a document that was a draft of the Transition
13  Agreement.  Is that fair to say?
14      A.  Yes.
15      Q.  Okay.  And at no point between did you have a
16  direct discussion or meeting with the board of directors
17  about any of the terms of the Transition Agreement,
18  where you and the board were in the same room.  Is that
19  right?
20      A.  That is correct.  I was never allowed to be in
21  the same room with the board of directors, after several
22  requests.
23      Q.  Okay.  After you signed the document while you
24  were there in Charlotte, did Mr. Richard or anybody else
25  give you a copy of the fully executed Transition

---

51

1   Agreement, the fully signed?
2       A.  I don't recall.  I know there were other
3   people that had to sign nondisclosures because they knew
4   about the negotiations, but I don't recall when the
5   actual document was handed.
6       Q.  So, when you left Charlotte, did you have a
7   copy of the fully signed Transition Agreement with you?
8           MS. PHILLIPS:  Objection; asked and
9   answered.
10      A.  I don't recall.
11      Q.  Okay.  Okay.  Did you read the whole document
12  before you signed it?
13      A.  To my knowledge, that was my practice.
14      Q.  Okay.  All right.  After you signed the
15  Transition Agreement -- well, let me back up a second.
16          The Transition Agreement that you signed --
17  and I'm not asking you to say that this exhibit that's
18  in front of you is the one that you signed.  But the one
19  you did sign had certain provisions for your receipt of
20  full salary and benefits.  Is that right?
21          MS. PHILLIPS:  Objection; leading.
22      A.  Repeat that.
23      Q.  Okay.  I'm not -- I'm not asking you about the
24  exhibit in front of you because you're not sure that
25  that's the one you signed.  So --

---

52

1       A.  Okay.
2       Q.  -- I'm just asking your memory.
3           One of the basic terms of the Transition
4   Agreement was you were going to leave office.  Correct?
5       A.  Correct.
6       Q.  Okay.  And another one of the terms was you
7   were going to be paid certain salary and benefits
8   running through the date specified in the document?  I'm
9   not trying to --
10      A.  Correct.
11      Q.  Okay.  And what I really want to understand is
12  when you got those payments.  Right.  Your secretary --
13  your treasurer at that time was whom?
14      A.  Eugenio Vargas.
15      Q.  Did Mr. Vargas -- was he responsible for
16  calculating and paying you the amounts due --
17          MS. PHILLIPS:  Objection.
18      Q.  -- after the Transition Agreement was signed?
19          MS. PHILLIPS:  Objection; form.
20      A.  After the Transition Agreement was signed, I
21  was no longer the president or in the building or a part
22  of any of Eugenio Vargas's responsibilities as
23  treasurer.  I did not receive any payments from Eugenio
24  Vargas or APFA on March 1st or 2nd; so, after that, I
25  would have no idea who was responsible for.

---

53

1       Q.  You received the payments under the Transition
2   Agreement in April of 2018.  Right?
3       A.  I don't recall the exact date that I received
4   that.
5       Q.  Leaving aside whether you recall the exact
6   date, does it sound correct to you that it was in April
7   of 2018?
8       A.  There were several disbursements made; so I
9   honestly don't know exactly which disbursement we're
10  talking about.
11          MR. BARTOS:  Okay.  If we could mark
12  as -- what is our next exhibit number?  I'm sorry.
13  Mark it as Exhibit 4.
14          (Deposition Exhibit 4 marked)
15      Q.  And, if you'll look, Exhibit 4 should have two
16  sides to it.
17      A.  (Reading).
18      Q.  Have you had a chance to look at Exhibit 4?
19      A.  I have.
20      Q.  Okay.  And looking -- directing your attention
21  to the page that has the APFA letterhead at the top and
22  is dated March 2nd, 2018, do you see that?
23      A.  Uh-huh.
24      Q.  Okay.  And it's directed to you from
25  Mr. Vargas.  Right?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

---

54

1    A.  Yes.
2    Q.  Okay.  And at the bottom -- or the bottom of
3  the body of it, there is a signature line, Robert Ross
4  National President, and there is a signature.  Is that
5  your signature?
6    A.  I can't attest yes or no.
7    Q.  Okay.  Let me just represent to you that this
8  document came from the plaintiffs, in your document
9  production.
10      Do you recall having this document in your
11  possession at some point?
12      MS. PHILLIPS:  Objection; hearsay.
13    Q.  Do you recall having this document in your
14  possession, ever?
15    A.  I can't say yes or no.  I've had a lot of
16  documents.
17    Q.  Okay.  If you would look at the second page,
18  which has a block letter A on the top of it, if you flip
19  it over, do you see that page?  And at the bottom there
20  is a number, says Ross/Vargas 000460.  Do you see it?
21    A.  Uh-huh.
22    Q.  Okay.  And there is typed text and then there
23  are some markings with some arrows and handwriting.  Do
24  you see that?
25    A.  Yes.

---

55

1    Q.  Is that your handwriting?
2    A.  I don't know.
3    Q.  Does it appear to you to be your handwriting?
4      MS. PHILLIPS:  Objection; leading.
5    A.  It appears pretty good to be my handwriting.
6    Q.  Okay.  Is it your testimony that it's not your
7  handwriting?
8    A.  No, it's not my testimony one way or the
9  other.
10      MS. PHILLIPS:  Objection; leading,
11  speculation.
12    A.  What year was this?  2018.
13    Q.  Let me just ask.  The -- in the handwritten
14  portions at the very bottom, there is a notation that
15  seems to say "with stipends" and then some numbers and
16  letters.  Do you see that at the very bottom?
17    A.  I do.
18    Q.  And then, if you look up above, the next
19  handwriting says "paid 3/29/18."  Do you see that?
20    A.  Where are you referring to?  "Paid 3/29/18."
21  Here.  Okay.
22    Q.  Yeah.  Is that -- is that your handwriting?
23      MS. PHILLIPS:  Objection; asked and
24  answered.
25    A.  I honestly don't know if that's my handwriting

---

56

1  or not.
2    Q.  Okay.
3    A.  I'm trying to refamiliarize myself with this
4  whole document.
5    Q.  Okay.  Do you -- well, this is a document that
6  you produced.  I'm trying to figure out where it came
7  from.
8    A.  It may have.
9      MS. PHILLIPS:  Objection.
10    Q.  Is it, in fact, the case that you were paid
11  the -- the amount listed, the bimonthly pay, leading to
12  4,495.58, on March 29th, 2018?
13    A.  4,495.58.
14    Q.  The dollar amount there on the --
15    A.  In the box?
16    Q.  Yeah.
17    A.  Okay.  And what's your question again?
18    Q.  Were you paid -- did you get paid out on
19  March 29th, 2018?
20    A.  I'd have to go back into my accounts and all
21  that.
22    Q.  Okay.  All right.
23    A.  I assume.
24    Q.  Okay.  Let's -- I want to go back to the
25  Transition Agreement and mark as Exhibit 5 -- thank

---

57

1  you -- some pages from -- that you filed or your lawyer
2  filed in -- in court earlier this month.
3      (Deposition Exhibit 5 marked)
4    Q.  And, if you would just take a look, it's the
5  Affidavit of Robert Ross and with one attachment which
6  says Transition Agreement.  If you could look at that,
7  please.
8    A.  (Reading).
9    Q.  Have you had a chance to look at Exhibit 5?
10    A.  I have.
11    Q.  Okay.  And is the beginning part of Exhibit 5
12  an affidavit executed by you?
13    A.  It appears so, yes.
14    Q.  Okay.  And in your -- on the first page, which
15  says Appendix 377 at the bottom, you refer to a
16  Transition Agreement that was negotiated in 2018 that
17  you signed.  Do you see that?
18    A.  Yes.
19    Q.  Okay.  And if you flip ahead -- and it refers
20  there, on page Appendix 378, it says, "A true and
21  correct copy of that Transition Agreement that I signed
22  is attached hereto and marked as Exhibit A-1."  Do you
23  see that?
24    A.  Uh-huh.
25    Q.  Okay.  And then if you could go further into

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                2/1/2024

---

**58**

1  where it says Appendix page 383 at the bottom, in the
2  same exhibit.
3      A.  Uh-huh.
4      Q.  Do you have that in front of you?  And it says
5  Exhibit A-1 at the bottom.
6           MS. PHILLIPS:  So I'll -- objection;
7  hearsay.
8      Q.  Is that the Transition Agreement?
9           MS. PHILLIPS:  He can't verify that this
10  was actually filed of record.
11      Q.  Is that the Transition Agreement that you
12  signed, as represented in your affidavit?
13      A.  It's a copy of -- it's a copy of one that I
14  signed.  It's not the one that I signed.
15      Q.  Okay.
16      A.  It's a copy of it.
17      Q.  When you say "the one I signed," you meant the
18  original with the ink, ink on paper?
19      A.  Yes.
20      Q.  Okay.  But this is an accurate facsimile, as
21  you testified in your affidavit.  Right?
22      A.  It appears to be.
23      Q.  Okay.  Well, did you look at it when you
24  signed your affidavit?
25      A.  Did I look at this when I signed my affidavit?

---

**59**

1      Q.  Yeah.  You filed an affidavit in federal
2  court.
3      A.  Yes.
4      Q.  You said, "This is the Transition Agreement I
5  signed."
6      A.  Okay.  Yes.
7      Q.  Is that correct or not?
8           MS. PHILLIPS:  We need a break here.
9           MR. BARTOS:  No.  We're going until 1:00.
10           MS. PHILLIPS:  We need a break.
11           MR. BARTOS:  No, we're not going to
12  break.
13           MS. PHILLIPS:  Oh, no.  We need a break.
14  BY MR. BARTOS:
15      Q.  Is this correct?
16           MS. PHILLIPS:  We need a break.
17           MR. BARTOS:  I'm asking a question.
18           MS. PHILLIPS:  We need a break.
19           MR. BARTOS:  He can answer the question.
20           MS. PHILLIPS:  We need a break.
21           MR. BARTOS:  Not until he's answered the
22  question.
23           MS. PHILLIPS:  We need a break.
24           MR. BARTOS:  Okay.  You can have a break
25  after we answer the question.

---

**60**

1           MS. PHILLIPS:  We need a break.
2           THE WITNESS:  Will you restate your
3  question?
4  BY MR. BARTOS:
5      Q.  Is it your testimony that this Exhibit 5 does
6  not contain the Transition Agreement that you signed on
7  March 1, 2018?
8      A.  No.
9      Q.  Okay.
10      A.  Can you repeat that again the way you just
11  repeated it.
12           MR. BARTOS:  The reporter can read it
13  back.
14           (Requested text was read)
15           MS. PHILLIPS:  Objection.  This is
16  confusing.
17      A.  It is not -- yeah, that's a --
18           MS. PHILLIPS:  It's a confusing question.
19      Q.  What do you mean?  That it does not --
20      Q.  Exhibit 5 -- let me ask.  Exhibit 5 has the
21  Transition Agreement that you signed on March 1st, 2018.
22      A.  Right.
23      Q.  Is that correct?
24      A.  Yes.
25      Q.  Okay.

---

**61**

1      A.  But you're trying to get me to say that this
2  Exhibit 5 does not include the --
3           MS. PHILLIPS:  He doesn't understand the
4  question.
5           MR. BARTOS:  He's answered it.  We can
6  break for lunch, if you want, or we can keep going.  Do
7  you want to keep going?  It's good for me.
8      Q.  Okay.  Now, you're familiar that the APFA
9  Constitution --
10           MS. PHILLIPS:  No.  We're off the record.
11      Q.  -- has a provision for Article VII --
12           MS. PHILLIPS:  Let's go.
13           THE WITNESS:  Are we on record or off?
14           MR. BARTOS:  We're on the record.
15           MS. PHILLIPS:  I'm not on the record.
16           MR. BARTOS:  We are on the record until
17  we agree we're going off.
18           MS. PHILLIPS:  You just said you were off
19  the record.
20           MR. BARTOS:  We're on the record.  I
21  said, we're on the record.
22           MS. PHILLIPS:  You just said that we're
23  off the record or we can keep going.
24           MR. BARTOS:  Do you want to break for
25  lunch.  We can break for lunch?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                            2/1/2024

---

**62**

1    MS. PHILLIPS:  We can break for lunch.
2    MR. BARTOS:  Let's go off the record.
3    THE VIDEOGRAPHER:  We're off the record
4  at 12:54 p.m.
5    (Recess from 12:54 p.m. to 2:06 p.m.)
6    THE VIDEOGRAPHER:  We're back on the
7  record at 2:06 p.m.
8    (Deposition Exhibit 6 marked)
9    MR. BARTOS:  This is going to be
10 Exhibit 6.
11 BY MR. BARTOS:
12   Q.  Mr. Ross, you have in front of you Deposition
13 Exhibit 6, which has the Court's filing docket numbers
14 across the top and starts on the first page, at the
15 bottom, says Appendix 27.  Do you see that?
16   A.  Uh-huh.
17   Q.  Okay.  Do you recall earlier this month that
18 you signed an affidavit that was then filed with the
19 Court in support of your motion for summary judgment?
20   A.  I believe I did.
21   Q.  Okay.  And do you remember that attached to
22 your affidavit were a number of exhibits?
23   A.  There were exhibits attached that I recall.
24   Q.  And just representing to you that the docket
25 reflects these pages here, 27 -- Appendix 27, 28, 29, 30

---

**63**

1  are in the appendix to your affidavit.  Does that ring a
2  bell to you?
3    A.  They appear what I would call.  I don't know
4  exactly which -- which ones were in there and in what
5  order.
6    Q.  Okay.  The -- we started off here --
7    MS. PHILLIPS:  I object based on the fact
8  that these aren't attached to the affidavit.  There is
9  no way to tell these are the actual documents with the
10 affidavit.
11   MR. BARTOS:  Okay.  The court record can
12 reflect what's -- what's accurate or not.  The --
13   MS. PHILLIPS:  But he's testifying to it.
14   A.  Yeah.  I can't testify if this not --
15   MR. BARTOS:  Okay.  I'm asking questions.
16 You're not testifying.
17   MS. PHILLIPS:  Correct.  But I need to
18 object.
19   MR. BARTOS:  Okay.  Object.
20   Q.  Mr. Ross --
21   MS. PHILLIPS:  So I'm objecting based on
22 hearsay.
23   Q.  All right.  Mr. Ross, when you signed your
24 affidavit that was filed in support of summary judgment
25 in this case earlier in January 2024, did you look at

---

**64**

1  the exhibits that went along with your affidavit?
2    A.  Yes.
3    Q.  Okay.  Do you recall these pages that are in
4  front of you as Deposition Exhibit 6 as being amongst
5  those exhibits?
6    A.  I don't remember everything that was in there
7  on that date that I signed that.
8    Q.  All right.  Do you remember seeing these pages
9  of -- of texts back and forth between Melissa Chinery
10 and you?
11   A.  I recognize them from documents that I have.
12   Q.  Okay.
13   A.  I recognize the R1s and the R2s --
14   Q.  Okay.
15   A.  -- from documents I had in arbitration.
16   Q.  Okay.  All right.  All right.  Do you have any
17 reason to believe that Deposition Exhibit 6 is not a
18 document that you submitted to federal court in January
19 of 2024?
20   MS. PHILLIPS:  Objection; hearsay.
21   A.  I don't -- I don't recall exactly what all
22 documents were presented to federal court.
23   Q.  All right.  Does this refresh your
24 recollection about your exchange of discussion back and
25 forth with Ms. Chinery which led to her ultimately

---

**65**

1  saying, "I will work tirelessly to make sure you're out
2  of office"?
3    A.  State your question again.
4    Q.  Does this document, Exhibit 6, refresh your
5  recollection at all about your discussion online with
6  Ms. Chinery that led her to say she would work
7  tirelessly to make sure you were out of office?
8    A.  The fact of the matter is these documents were
9  produced for an arbitration in 2018, but these comments
10 were made in 2016.  I don't recall everything that led
11 up to this or reason for it, other than it's
12 unexplainable behavior and motive.
13   But what led up to it and whatever this
14 document was from 2016, introduced into arbitration in
15 2018, and I never had a discussion as to her motive for
16 writing that.
17   Q.  All right.  Now, are you aware with the fact
18 that the APFA Constitution has Article VII dealing with
19 hearing and disciplinary procedures?
20   A.  Article VII deals with arbitrations and
21 disciplinary hearings, but those are within Article VII.
22 That's not what Article VII specifically is, to my
23 recollection.
24   Q.  All right.  And, if we wanted to see what
25 Article VII provides, we'd just look at Article VII.

---

Robert Ross                                                    2/1/2024

66

1  Right?
2      A.  That's right.
3      Q.  Okay.  And just to get your recollection or
4  understanding, is it your understanding that under
5  Article VII a member of APFA can file charges against
6  another member of APFA?
7          MS. PHILLIPS:  I mean, objection.  You
8  know, he's not here to testify about APFA Constitution.
9      A.  If Article VII charges are filed against a
10 member, they would have to be filed under the guidelines
11 of Article VII against a member or from a member or
12 officer.
13     Q.  All right.  And as yourself, an APFA member,
14 you are -- you could file charges against another APFA
15 member, if you had a basis for it.  Isn't that right?
16     A.  You could.  Anyone could.
17     Q.  And, when charges are filed, they have to be
18 reviewed by the Executive Committee.  Isn't that right?
19         MS. PHILLIPS:  Objection; leading.
20     A.  I think you'd have to define what the word
21 "review" means.
22     Q.  Okay.  Is the Executive Committee supposed to
23 conduct a vote as to whether the charges are timely,
24 valid, and specific?
25         MS. PHILLIPS:  Objection; leading.

67

1      Q.  Do you know?
2      A.  Those -- those parameters are within the test
3  to decide as to whether Article VII charges could move
4  forward.
5      Q.  Okay.  And, if the Executive Committee votes
6  that, in its view, charges are timely, specific, and
7  valid, those charges must then go to the Article VII
8  arbitrator.  Correct?
9      A.  To my knowledge, that's not correct.
10     Q.  What?  What's wrong with that statement?
11     A.  It's always been the premise that the
12 Executive Committee does an investigation, not merely
13 look at somebody's charges and vote yes or no.  There
14 has to be some investigation.  There has to be some
15 inquiry.  There has to be some defense given to the
16 person who is being accused.
17     Q.  And do you think that's written down somewhere
18 in Article VII?
19     A.  There are a lot of things not written in
20 Article VII that are part of proper protocol.
21     Q.  So that is not in Article VII, what you
22 described as the investigation, is it?
23     A.  Well, I've been involved --
24         MS. PHILLIPS:  I mean, objection.  This
25 is all speculative.

68

1      A.  I've been involved in union work for many
2  years, and I have never witnessed an Executive Committee
3  that didn't do some kind of due diligence on their part
4  to make sure that those accusations have merit.
5      Q.  How many Article VII charges were filed while
6  you were president?
7      A.  None.
8      Q.  Okay.  The Article VII arbitrator is someone
9  who is appointed by the board of directors.  Right?  If
10 you know.
11     A.  They are voted on by members of the board of
12 directors.
13     Q.  Okay.  So, if someone gets a majority vote,
14 they can be an Article VII arbitrator; if they don't get
15 a majority, then they're not.  Is that fair to say?
16     A.  Well, they would be either the lead arbitrator
17 or they would be an alternate.
18     Q.  If they're voted on?
19     A.  Right.
20     Q.  Okay.  And you're familiar with Arbitrator
21 Armendariz?
22     A.  I am familiar with that name.
23     Q.  Okay.  In fact, you voted for him to renew his
24 term as Article VII arbitrator, didn't you?
25         MS. PHILLIPS:  Objection; leading.

69

1      A.  I felt I was required to because I was having
2  Article VII charges at the time.
3      Q.  But you did vote?
4      A.  If I voted no, it would have -- it would have
5  adversely affected his opinion of me.
6      Q.  So you did vote yes?
7      A.  Yes.
8      Q.  Okay.  And would you agree with me that under
9  Article VII the arbitrator has the jurisdiction to
10 decide whether or not charges are timely or untimely?
11     A.  Again, another flaw in the Article VII
12 process.  He would have to know all the facts and
13 specifics to know whether it was timely or not.
14     Q.  But does he have that jurisdiction?
15     A.  He has the jurisdiction if he's given the
16 proper authority -- proper documentation to prove it,
17 and he would have that.
18     Q.  And he has jurisdiction to find that charges
19 are not specific, doesn't he?
20         MS. PHILLIPS:  Objection; leading.
21     A.  I don't know what his process is.  Once it
22 gets to the arbitrator, it's already gone beyond the EC.
23     Q.  Okay.  All right.  But we could look at
24 Article VII and it would tell us what his jurisdiction
25 is.  Right?

* * * * *

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

\*\*\*\*\*

---

**90**

1  Q.  Okay.  And the purpose of this letter is to
2  ask the arbitrator to reopen the hearing.  Correct?
3  A.  Yes.  The arbitrator had not made his ruling
4  yet.
5  Q.  Okay.  So this is the request to reopen the
6  hearing?
7  A.  Yes.
8  Q.  Okay.  And the arbitrator denied that request,
9  right?
10  A.  He did.
11  Q.  And --
12  A.  His email -- his denial is not in here.
13  Q.  No.  I'm going to show you that exhibit in
14  just a second.
15       (Deposition Exhibit 12 marked)
16  Q.  This is Exhibit 12.  And Exhibit 12 is the
17  arbitrator's email in which he denies the request to
18  reopen the record.  Right?
19  A.  That's what it says.
20  Q.  Okay.  I want to go back to the prior
21  Exhibit 11 and ask a question.
22       In your posthearing brief, you state that the
23  Confidential Memo surfaced on January 14th, 2022.  And,
24  in your motion to reopen, you say this document was
25  received in the mail on February 11th, 2022.

---

**91**

1  Do you know why those dates are different in
2  the -- in the two different communications?
3        MS. PHILLIPS:  I would object based on
4  leading.
5  A.  I would imagine someone has their dates wrong.
6  Q.  Okay.  Just curious.  All right.
7  A.  It looks to me like it's stating that it
8  surfaced on January 14th.  Could be a typo --
9  Q.  Okay.
10  A.  -- on the request to reopen.
11  Q.  Okay.  After you had submitted your brief and
12  your request to reopen and the ruling on the request to
13  reopen, the arbitrator ultimately issued a decision --
14  correct -- in your Article VII case?
15  A.  He it's correct he -- yes.  It's correct he
16  made a decision.  I'm not saying his decision was
17  correct.  So I guess I don't understand.
18  Q.  Sure.  I'm not asking you to say the decision
19  was correct.  I know you disagree with that.
20       But it is correct -- it is true to say that
21  the arbitrator issued a decision, a written decision?
22  A.  He issued a decision.
23  Q.  Okay.  And, after that decision was issued,
24  you filed your lawsuit against the APFA and Ms. Hedrick
25  and Mr. Harris?

---

**92**

1  A.  Did I?
2  Q.  If you don't remember, that's fine.  I can
3  only ask you what you remember.
4  A.  I don't -- I don't remember the exact dates
5  that everything --
6  Q.  Okay.  Okay.  Fair enough.  And the -- the
7  first award by the Article VII arbitrator in your case
8  directed the APFA to do certain things.  Do you remember
9  that?
10  A.  I don't know that I'd title it like that, but
11  it's -- yeah, if that's what you classify it.
12  Q.  Okay.  Well, we can -- we can read -- I'll
13  read the decision and figure out what we want to call
14  it.
15       But, in any event, after the first award,
16  there was a second award that was issued by the
17  arbitrator.  Do you remember that?
18  A.  I don't know -- to be honest, I don't know the
19  difference between the two.
20  Q.  Sure.
21       MS. PHILLIPS:  Take a break after this.
22       MR. BARTOS:  You know what, let me
23  just -- rather than ask an additional question, I just
24  want to just say on the record I'm very -- I think we're
25  not proceeding in an efficient way.  We were supposed to

---

**93**

1  start at 10:00.  It's now almost 3:00.  And I think the
2  court reporter can probably tell us how little time
3  we've actually been able to spend with questions, in
4  light of the delay and the breaks.
5       We have the full right to depose Mr. Ross for
6  up to seven hours, and we're going to do so.  These
7  delays are disruptive.  And we intend to complete his
8  deposition.
9       MS. PHILLIPS:  I will state on the record
10  that Mr. Ross has suffered a broken rib as of --
11       THE WITNESS:  I can't sit long.
12       MS. PHILLIPS:  -- a week ago, two weeks
13  ago.
14       THE WITNESS:  Yeah.
15       MS. PHILLIPS:  This morning's incidents,
16  moving the deposition to this location, was jarring for
17  him.  And I think you knew that he was susceptible to
18  that -- to that form of abuse.  And I'm sorry for that
19  delay, and I'm sorry for circumstances that he went
20  through.  But, unfortunately, on the record, the delay
21  was suffered as a result of the abuse and harassing
22  tactic that was taken.  So, if we need to take that up
23  with the judge, then that is something that we can
24  probably address tomorrow.
25       MR. BARTOS:  I want to complete the

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

94

1  deposition. That's all I'm saying. We can take a
2  break. I'll respect his medical condition. But we're
3  going to finish the deposition.
4       MS. PHILLIPS: If you want to finish your
5  question, I didn't mean to interrupt your question.
6       MR. BARTOS: No. That's fine. We can
7  take a break right now.
8       MS. PHILLIPS: We had discussed at lunch
9  trying to take a break every -- every half an hour for
10 him, I think. I was concerned that it would cause him
11 pain to sit for too long with a broken rib in his back.
12 So that was my concern.
13      THE WITNESS: My schedule -- they can
14 look it up at APFA. My schedule will corroborate that I
15 was out.
16      MR. BARTOS: Let's take a break. Off the
17 record.
18      THE VIDEOGRAPHER: We're off record at
19 3:02 p.m.
20      (Recess from 3:02 p.m. to 3:11 p.m.)
21      THE VIDEOGRAPHER: We're back on record
22 at 3:11 p.m.
23 BY MR. BARTOS:
24   Q.  Can you tell me, Mr. Ross, in your own words,
25 how it is you think the Confidential Memo demonstrates

95

1  that you -- you didn't owe -- you had not made an
2  overpayment?
3    A.  How does the Confidential Memo demonstrate
4  that I did not make an overpayment?
5    Q.  Receive -- did not receive an overpayment.
6    A.  I can read the document.
7    Q.  Sure.
8    A.  In Section 2 it says that his job was to
9  prepare an overpayment schedule of accrued and unused
10 sick, and accrued and unused vacation time made to Bob
11 Ross in 2018, similar -- not exact, but similar -- to
12 the overpayment schedules prepared for the previous
13 three officers.
14      It goes on to say, "These overpayment
15 schedules for the other officers were previously
16 provided to the Board of Directors." I was not aware of
17 any of that. "Please note the Bob Ross confidential
18 transition agreement states that he will be paid all of
19 his accrued and unused sick, and accrued and unused
20 vacation time. This agreement doesn't specify that the
21 payments be made in accordance with the policy
22 guidelines," which is a correct statement.
23 "Consequently, these payments appear appropriate and in
24 compliance with the transition agreement."
25      The $5,400 that they were putting me into

96

1  collections for was based on an overpayment, and that
2  overpayment was the result, in a letter from Erik Harris
3  sent to me on the day before Thanksgiving, stating that
4  the board's finding was based on an independent
5  accounting, who had found that I was overpaid.
6       My request the whole time was, where is that
7  accounting? Show me the accounting where the accountant
8  stated that I was overpaid, so that I could prove it,
9  because I felt that I was paid correctly. And I was
10 told that I had gotten all the paperwork that they have,
11 charts, graphs. I couldn't explain the charts and
12 graphs that he gave me. I didn't know one number from
13 another.
14      And, at some point in there, I had made an
15 arrangement with the Union to pay them $100 a month
16 until we came to a conclusion on this. If they found
17 out that I was not overpaid, they could refund the
18 money; and, if I was overpaid, they could apply what I
19 had already paid, and at that point we would make
20 arrangements.
21      I was told, not confirmed, but I was told that
22 that offer was presented to the board and the board said
23 no.
24   Q.  Back to my question about how the Confidential
25 Memo establishes or shows that you weren't overpaid, I'd

97

1  like you to look at the last page, which is -- has the
2  number 176 at the bottom. Do you see that?
3    A.  Yeah.
4    Q.  It says -- it says "National Officer: Bob
5  Ross." Do you see that?
6    A.  I see that.
7    Q.  And then it says "Overpayment Calculation."
8  Do you see that?
9    A.  Uh-huh.
10   Q.  And, if you look down along the left-hand
11 side, there is a bold that says "Vacation Pay - 2017,"
12 "Sick Pay - 2017," as you go down, and we get down to
13 "Vacation Pay - 2017," and then it says, "Original
14 amount - paid in error," and then, "Correct calculation
15 amount." Do you see that?
16   A.  Uh-huh.
17   Q.  Okay. And then on -- towards the middle there
18 is a bolded section that says "Overpayment" with a
19 dollar value. Do you see that?
20   A.  I see this as a chart with numbers filled in.
21   Q.  Okay. And there's words too, and one of the
22 words at the bottom says, "Total overpayment - due to
23 APFA." Do you see that?
24   A.  I see that. But there is no proof here that
25 the accountant put these words in. The accountant was

*****

Robert Ross                                                    2/1/2024

\*\*\*\*\*

110

1    Q.   Okay.  And is it your contention that that's a
2    duty that arises under the APFA Constitution?
3    A.   Yes.
4    Q.   Okay.  And is it your contention that that's a
5    fiduciary duty individually to you and individually to
6    every other APFA member as an individual?
7    A.   As a member in good standing and dues-paying
8    member, yes.
9    Q.   Okay.  How did Julie Hedrick violate a
10   fiduciary duty toward you?
11   A.   Which one?
12   Q.   Julie Hedrick.
13   A.   No.  Which -- you said "a fiduciary duty."
14   Q.   Yeah.  Any.
15   A.   Oh.  She violated the Transition Agreement.
16        MS. PHILLIPS:  I would object based on
17   asking for his legal opinion.
18   Q.   You still can answer.
19   A.   She violated confidentiality.  She violated
20   Code of Conduct by putting a false hotline out to my
21   membership and co-workers that I did not have equal
22   access to their emails, knowingly knowing that there was
23   false information on it.  Violated the terms of the
24   Transition Agreement confidentiality, Section 13, that
25   had to do with disputes and arbitrations.  Just to name

111

1    a few.
2    Q.   Well, this is our one chance to talk to you;
3    so I need you to tell me what you -- what you claim she
4    violated.
5    A.   I just did.
6    Q.   Okay.  Well, you mentioned a hotline.  I'm not
7    going to ask you to remember every last hotline.  Okay.
8    But my question is -- I know there were hotlines after
9    the arbitration award that described the outcome of the
10   arbitration award.
11       Is that the hotline that you're talking about?
12   A.   That's one of them.
13   Q.   Okay.  And what were the subjects of the other
14   ones besides that?
15   A.   Well, as a long-standing Union rep with
16   knowledge of prior arbitrations, prior litigations, it
17   has always been the long-standing practice that we don't
18   name names, that you don't single out a person, that you
19   redact names when you're talking about things like dues
20   forgiveness.
21       My name wasn't redacted.  It was a full-page
22   spread out there of what the arbitration award was, and
23   there were numbers given to the membership that they
24   know were incorrect.  And at no time was I ever
25   conferred with to correct those.  And it was done

112

1    specifically to mar my reputation, as a dues-paying
2    member in good standing, to my co-workers, of which I
3    have had to live with harassment and volatility ever
4    since.
5    Q.   So I've asked you -- my question was, what
6    were the hotlines that went out that you're claiming
7    violated these duties.  And tell me if I'm wrong.  What
8    I'm hearing is the hotlines had to do with the outcome
9    of the Article VII arbitration.  I know you don't agree
10   with what was said.  I'm not asking you to.  I just want
11   to identify that that's the hotline, or if there is more
12   than one, but they talk about the Article VII
13   arbitration.
14   A.   That's correct.
15   Q.   Okay.
16        MS. PHILLIPS:  So, in lieu of trying to
17   accommodate and not take too many breaks, can I just
18   check and see if he's okay?
19        MR. BARTOS:  Please.
20        MS. PHILLIPS:  Are you okay?  Do you need
21   a break?
22        THE WITNESS:  No.  I'm good, as long as I
23   don't move.
24        MR. BARTOS:  Okay.  And I don't know
25   enough to know if this is helpful, but if it's helpful

113

1    to stand, that's certainly acceptable.
2        THE WITNESS:  Sometimes it is.
3        MR. BARTOS:  Okay.  All right.
4    Q.   All right.  Now, you also claim that Erik
5    Harris had a fiduciary duty to you.  Right?
6    A.   They all had a fiduciary duty.
7    Q.   Okay.  Okay.  But you're suing Erik Harris?
8    A.   Right.
9    Q.   And Julie Hedrick?
10   A.   And APFA.
11   Q.   I understand.  I want to talk about Erik
12   Harris for a second.
13       What is -- what did Mr. Harris do that you
14   claim violated a fiduciary duty to you?
15   A.   How much time do we have?
16   Q.   Give your answer.
17   A.   This was withheld from me, the Confidential
18   Memo.  Emails where he knew that this Confidential Memo
19   existed yet refused to talk to me about it.  There are
20   so many opportunities that APFA had to settle this and
21   to discuss this with me, that they purposely chose not
22   to go down that avenue, so much to the point where I was
23   sent an email with a "you are blocked," to no longer be
24   able to talk to APFA about it.  So I was given no other
25   choice but to wrangle through the legal system, rather

\*\*\*\*\*

Robert Ross                                                           2/1/2024

\* \* \* \* \*

134

1  going to the hospital in the summer of 2022 for various
2  symptoms you were suffering and going back in July,
3  August, September 2023.  And it's your contention these
4  were all precipitated by the APFA.
5      Is that your claim in this lawsuit?
6      A.  That's -- I don't know what all of those dates
7  are that you put there; so I don't know the exact cause
8  on each one of them.
9      Q.  Well, let me -- I'm sorry.  I'm not trying to
10 hide the ball.  Let me make an exhibit of your
11 declaration.  We are on 15.
12     (Deposition Exhibit 15 marked)
13     Q.  Is Exhibit 15 an affidavit that you signed?
14     A.  I'd have to read through the whole thing.  I
15 don't know.  This is not my document, but they are
16 yours.
17     Q.  Okay.  Well, I'll just represent to you it was
18 filed by your -- in court by your lawyer.
19     MS. PHILLIPS:  Well, then I'll object to
20 hearsay because I can't verify this.
21     Q.  Do you see the last page?  Is that your
22 signature?
23     A.  It appears that it's a replica of an
24 electronic signature.  It doesn't ...
25     Q.  Well, let me ask you this.  Do you recall

135

1  signing this affidavit?
2      A.  I recall signing an affidavit.  I can't
3  guarantee that this is the affidavit unless I read every
4  word and compare it to the affidavit that I have.
5      Q.  Do you have a copy of the affidavit you signed
6  somewhere else?
7      A.  Not -- somewhere else I do.
8      Q.  You do.
9      MR. BARTOS:  Okay.  We'd ask that be
10 produced.  He can't tell that the document filed in
11 court was the same thing he signed.
12     Q.  Your -- you live in California.  Right?
13     A.  Yes.
14     Q.  And you're based in DFW.
15     Can you tell me why this affidavit has your
16 signature and has a notary from the state of Florida?
17     A.  I don't know that I ask people where they're
18 living when they're doing it.
19     MS. PHILLIPS:  Objection; relevance.
20     Q.  Well, I guess my problem, Mr. Ross, is
21 we're -- you filed a motion in which you're asking for
22 over a million dollars in damages partly based on an
23 affidavit.  And I'm not -- from what I'm hearing, you're
24 not sure if this is the affidavit that you actually
25 signed.

136

1      A.  You're asking me if I signed this affidavit?
2      MS. PHILLIPS:  Objection; relevance.
3      Q.  Yeah, I'm asking if you signed this affidavit
4  that was filed in federal court.
5      A.  I filed an affidavit.
6      MS. PHILLIPS:  Objection; hearsay.  I
7  mean ...
8      Q.  Well, let's -- let's -- let's look at a few
9  things in here.
10     A.  Okay.
11     Q.  Let's look at the medical costs, which I was
12 just asking you, which is on Appendix 187.  Do you see
13 that?  Can you read that Medical Costs section.
14     A.  You want me to read it out loud?
15     Q.  No.  Just to yourself.
16     A.  (Reading.)
17     Q.  Is -- is -- the affidavit you signed, did it
18 contain this provision, this subparagraph h., Medical
19 Costs?
20     MS. PHILLIPS:  Objection; asked and
21 answered.
22     A.  I'm familiar with some of the wording in here;
23 but, to attest to this is the actual one, I'm not
24 sure.
25     Q.  Okay.  All right.  You produced --

137

1      MR. BARTOS:  Again, I'll just reiterate
2  we want to see the affidavit that he signed.
3      Q.  You produced along with your filing a number
4  of pages of medical records.  Do you recall that?
5      A.  I believe my attorney did.
6      Q.  Okay.  Are you aware that medical records were
7  submitted in support of your claim?
8      A.  I supplied my attorney medical records --
9      Q.  Okay.
10     A.  -- in behalf of my ...
11     Q.  And these were records that you obtained from
12 the VA.  Is that right?
13     A.  Yes.

17     MS. PHILLIPS:  Objection; leading.

23     Q.  You're seeking substantial damages from the
24 people in this room; so they're allowed to be at the
25 deposition.

\* \* \* \* \*

**STRYKER REPORTING SERVICES**                    (817) 494-0700

Robert Ross                                                    2/1/2024

\* \* \* \* \*

142

1    A.   But I'm not a doctor; so I don't know.  And I
2  honestly don't -- I don't know and could not, in my
3  wildest imagination, tell you what those -- what those
4  two dates represent.
5    Q.   Okay.  All right.  And I asked you about a
6  recollection of being hospitalized.  And I want to just
7  mark as another --
8         MS. PHILLIPS:  We need to take a break.
9         MR. BARTOS:  Sure.  Can we just -- we
10  take a break right now, if you want.  Right now?
11        MS. PHILLIPS:  Yeah, I need to take a
12  break.
13        MR. BARTOS:  Okay.  We'll have these
14  marked and ready for the next.
15        THE VIDEOGRAPHER:  We're off record at
16  4:30 p.m.
17        (Recess from 4:30 p.m. to 4:36 p.m.)
18        (Deposition Exhibit 17 marked)
19        THE VIDEOGRAPHER:  We're back on record
20  at 4:36.
21        MR. BARTOS:  Could I ask -- I think we
22  discussed this before, but could I ask the court
23  reporter to advise how much time on the record we've
24  had.
25        THE REPORTER:  Three hours and six

143

1  minutes.
2         MR. BARTOS:  Okay.  The -- what exhibit
3  number are we on?
4         THE REPORTER:  17.
5         MR. BARTOS:  17.
6  BY MR. BARTOS:



144

145

1    A.   On this one here, can you restate your
2  question?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 25**

Robert Ross                                                    2/1/2024



146

7        MS. PHILLIPS:  I'm going to object again.
8    This is -- this is all hearsay testimony about
9    secondhand information, and it doesn't even appear to be
10   accurate, any of it.
11       Q.   Do you think your medical records that you
12   submitted are accurate, Mr. Ross?
13       A.   I don't have any control over what people
14   type. T

20       Q.   Okay.  So you would not recommend that we rely
21   on that particular portion of your record to conclude
22   anything?
23       A.   I'm not saying that, either.
24       Q.   Well --
25       A.   I'm saying --

147

1        Q.   That's what I'm trying to figure out.  I want
2    to know if you think that description is accurate and
3    reliable or not.  It's a record you submitted.  I'm just
4    trying to understand.
5        A.   I'm not stating that the way that this is
6    described is accurate, and I'm not stating that this
7    didn't happen on -- I don't even see a date on here.  I
8    don't see a date.
9        Q.   Let's go on.  You -- if you can look at the
10   Appendix page 227.  I think it might be on the prior
11   exhibit.  Can you tell me, sir, the exhibit you're
12   holding in the right hand, what are the page numbers on
13   it.
14       A.   You said 227.
15       Q.   Okay.  All right.  So where it says
16   Appendix 227 at the bottom, if we go down to the bottom
17   block of text, it says Date/Time:  22 September 2023.
18       A.   Okay.

148

18   been                                  you tell the interviewer that you had
19                   MS. PHILLIPS:  Again, objection.  This is
20   hearsay.  He doesn't -- I mean, these are impressions by
21   another person.  They're all hearsay.  This is somebody
22   else.
23                   MR. BARTOS:  We can -- if you want to
24   withdraw them from the -- from the court file, that's
25   fine.  But this is where they are.  So can you --

149

1                    MS. PHILLIPS:  They're -- they are his
2    medical records.  He can't testify as to what their
3    mental impressions were.
4                    MR. BARTOS:  Okay.
5        A.   Well, to me --
6        Q.   Yeah.  Go ahead.
7        A.   -- it says
9        Q.   Okay.  And the individual who you felt was
11                   MS. PHILLIPS:  Objection.  He can't
12   testify as to what --
13       A.   She was not the only one.
14                   MS. PHILLIPS:  -- that person thought.
15       Q.   Okay.  I'm sorry.  Your answer was what?
16       A.   She was not the only one.
20       Q.   Okay.  Now, you -- now, this appears to
21   read -- and, again, I just want to ask you.  Do you --
22   did you tell the -- the medical provider that
24                   MS. PHILLIPS:  Objection; privilege.
25                   MR. BARTOS:  Excuse me.  Stop

**STRYKER REPORTING SERVICES**                    (817) 494-0700

Robert Ross                                                    2/1/2024



150
1  interrupting my question.
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
9        MS. PHILLIPS:  Objection; privileged.
10       Q.  And I'm asking you, did you tell the
11  interviewer that [redacted]
[redacted]
13       MS. PHILLIPS:  Objection; privileged.
14       Q.  If you remember.
15       MS. PHILLIPS:  You don't have to answer
16  medical privileged information and conversations, Bob.
17       A.  I'm not going to give up any of my HIPAA
18  rights.  But ...
19       Q.  Well, you just filed a hundred pages of
20  medical records in federal court.
21       A.  I don't know that what you're -- that --
22       Q.  Okay.
23       A.  I can't --
24       Q.  Okay.
25       A.  -- can't classify what you just said as being

151
1  accurate.
[redacted]
[redacted]
[redacted]
7        Q.  Right.  That's the part that your lawyer
8  highlighted and filed in court.
9        A.  Uh-huh.
10       Q.  So I'm asking you, is that right?
11       A.  Yes.
12       Q.  Okay.
13       A.  But you --
[redacted]
[redacted]
[redacted]
[redacted]    the -- the -- the VA
20  that your --
21       MS. PHILLIPS:  Objection; medically
22  privileged.
[redacted]
25       MS. PHILLIPS:  Objection.

152
[redacted]
2        MS. PHILLIPS:  Objection; medically
3  privileged.
[redacted]
6        Q.  Including you?
7        MS. PHILLIPS:  Objection; medically --
8        A.  No.
9        MS. PHILLIPS:  -- privileged.
10       Q.  No?  Okay.  Well, let's look at the document.
11       MS. PHILLIPS:  You don't have to answer
12  questions about conversations, Bob.
13       A.  I don't recall that.
14       Q.  I'm going to -- I'm going to ask you about the
15  documents that you've submitted for which you are
16  seeking damages.
17       MS. PHILLIPS:  Ten minutes.
18       Q.  Okay.  I'd like you to look in your exhibits
19  with the one that has the Appendix page 248 on it,
20  Mr. Ross.  I believe it might be the other one.  Okay.
21  Which exhibit are you looking at?
22       A.  You told me 248.
23       Q.  Okay.
24       A.  17.
25       Q.  17.  Okay.  And could you go to page 248.  Are

153
1  you on that page, sir?
2        A.  I'm on that page.
3        Q.  Okay.  And if you just look at the top section
4  that's been highlighted, that sort of carryover first
5  paragraph, it says, [redacted]
[redacted]
[redacted]    Do you see that?
9        A.  Yes.
10       Q.  Okay.  And does that accurately reflect your
11  self-understanding?
12       MS. PHILLIPS:  Objection; obscure, form.
13       A.  Can you repeat that question?  It sounds like
14  it's leading.
15       Q.  Well, I'm allowed to ask leading questions.
16  So ...
17       A.  Okay.  Can you repeat the question the way --
18  the way you just said it.
19       Q.  So we can have it read back the way I just
20  said it.
21       A.  Okay.  That's fine.  I'm not asking you to
22  change it.  I'm asking you to read it.
23       (Requested text was read)
24       MS. PHILLIPS:  Medically privileged;
25  objection.  Bob, you don't have to answer that.

Robert Ross                                                    2/1/2024

---

154

1   MR. BARTOS:  Are you directing him not to
2   answer?
3         MS. PHILLIPS:  I'm directing him not to
4   answer.
5         MR. BARTOS:  Okay.  So just to be clear,
6   you've submitted about a hundred pages of medical
7   records.  And your position is I'm not allowed to ask
8   questions about them?
9         MS. PHILLIPS:  You can compel it, if you
10  want it.
11        MR. BARTOS:  I just want to understand
12  your position.
13        THE WITNESS:  You can't form your own
14  opinion on what a document --
15        MS. PHILLIPS:  My position is that he
16  does not have to interpret what somebody else --
17        THE WITNESS:  Right.
18        MS. PHILLIPS:  -- said about a
19  conversation.
20        THE WITNESS:  Right.
21        MS. PHILLIPS:  This is all hearsay.
22        MR. BARTOS:  I'm asking if you're
23  asserting it's privileged and he's not allowed to answer
24  it.  You're directing him not to answer?
25        MS. PHILLIPS:  I'm directing him not to

---

155

1   answer it.
2         MR. BARTOS:  Based on privilege?
3         MS. PHILLIPS:  Based on -- based on a
4   conversation with his doctor.  Yeah, medically
5   privileged conversation.
6         MR. BARTOS:  In the very records that you
7   submitted in court.  That's your position?
8         MS. PHILLIPS:  Do you have any other
9   questions?
10        MR. BARTOS:  Well, I will ask the same
11  question.
12  BY MR. BARTOS:
13        Q.  Does that statement that ██████████
██████████████████████████████████████████████████
does that reflect your self-understanding?
17        A.  Only -- only if it's added to the --
18            (Speaking simultaneously)
19        MS. PHILLIPS:  That's -- we can do nine
20  minutes of objection; privileged.  I'm directing you not
21  to answer that.
22        THE REPORTER:  I did not get his answer.
23        MS. PHILLIPS:  Yeah, well --
24        MR. BARTOS:  That was the intention.
25        THE REPORTER:  Will you please let him

---

156

1   finish so I can -- I can only do one at a time.
2         MS. PHILLIPS:  I'm directing you not to
3   answer that.
4         MR. BARTOS:  Okay.  Okay.  I just want to
5   establish, for clarity, that that's what you're doing.
6   Okay.
7   BY MR. BARTOS:
8         Q.  Do you want to withdraw your claims for
9   medical damages and emotional distress, Mr. Ross?
10        A.  No.
11        Q.  Okay.  All right.  Mr. Ross, how much have you
12  actually paid in legal fees in this case to date?
13        MS. PHILLIPS:  Objection; privileged.
14  I'm directing you not to answer.
15        MR. BARTOS:  Just for the record, there
16  is an affidavit from Ms. Phillips and a request for
17  payment of legal fees in excess of $300,000, and I think
18  I'm entitled to ask questions about that when there is a
19  motion for summary judgment seeking that to be paid by
20  the Union.  So let me just restate it, and if you want
21  to instruct him not to answer, that's fine.
22        Q.  Mr. Ross, how much have you actually paid in
23  legal fees in this matter to date?
24        MS. PHILLIPS:  Objection; privileged.
25        A.  I object to that.  Under legal advice, I'm

---

157

1   objecting to answering that question.
2         Q.  Do you have a retainer agreement with
3   Ms. Phillips?
4         A.  I do.
5         Q.  Okay.  Who else is a party to that agreement
6   besides you and Ms. Phillips?
7         MS. PHILLIPS:  Objection; privileged.
8         A.  Maybe I don't understand what you mean by
9   "agreement."
10        Q.  You said you had a retainer agreement.
11        A.  I do.
12        Q.  So that's the agreement I'm talking about.
13        A.  She is my attorney.
14        Q.  Okay.  And is anyone else a party to that same
15  retainer agreement?
16        MS. PHILLIPS:  Objection.
17        A.  I don't know.
18        Q.  Okay.  Has anyone else agreed to pay your
19  legal fees in this case?
20        MS. PHILLIPS:  Objection; privileged.  We
21  already -- we've already ...
22        A.  I guess I don't know how to answer that
23  because ...
24        Q.  Do you know?  Has anybody else agreed to pay
25  your legal fees in this case?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

158
1    A.  No.  No.
2    Q.  Have you discussed with any labor organization
3  and they are paying your legal fees in this case?
4        MS. PHILLIPS:  Objection.  This is
5  ridiculous.
6    A.  No.
7    Q.  No.  Have you discussed with any
8  representatives of other labor organizations --
9        MS. PHILLIPS:  We're done.
10    Q.  -- they're paying your legal fees in this
11  case?
12        MS. PHILLIPS:  We're done.  It's 5:00.
13  We're done.  Let's go.
14    A.  There is no union -- other union, if that's
15  what you're saying, labor organization agreeing to pay
16  my legal fees.
17        MS. PHILLIPS:  Let's go.
18        MR. BARTOS:  Okay.  Just for the record,
19  we have not -- we have barely touched four hours of
20  time.  We will resume tomorrow morning.  And I suggest
21  we start at 9:00 so we can get Mr. Vargas done.
22        MS. PHILLIPS:  Yeah, you have me at
23  10:00.  That's what you scheduled and noticed for.
24        MR. BARTOS:  We had you at 10:00 a.m.
25  this morning, and we didn't start until 11:00.  We'd be

159
1  done by now.
2        MS. PHILLIPS:  Well, you probably
3  shouldn't sabotage people.  I highly recommend --
4        MR. BARTOS:  We will be here at 9:00
5  ready to go.
6        MS. PHILLIPS:  You need to re-notice and
7  give five days' notice.
8        MR. BARTOS:  We'll be here at 10:00, and
9  we expect Mr. Ross to be here to complete his deposition
10  because he's indicated on the record --
11        MS. PHILLIPS:  Tomorrow?
12        MR. BARTOS:  Tomorrow.
13        MS. PHILLIPS:  You have Vargas tomorrow.
14        MR. BARTOS:  We're continuing until we're
15  done.
16        MS. PHILLIPS:  What are you planning on
17  doing with Mr. Vargas?
18        MR. BARTOS:  We'll resume Mr. Vargas --
19  we'll start Mr. Vargas when Mr. Ross is done.
20        MS. PHILLIPS:  Mr. Vargas has -- has --
21  he has work.  So you want to -- Mr. Ross has his work
22  schedule; so that's not going to work.
23        MR. BARTOS:  We'll be here and expect to
24  finish with Mr. Ross tomorrow at 10:00 a.m.  Yeah, we
25  can go off the record.

160
1        THE VIDEOGRAPHER:  We're off record at
2  4:56 p.m.
3        (Proceedings adjourned at 4:56 p.m.)
4        (Per Federal Rule of Civil Procedure
5        30(e)(1), signature was requested via
6        email by Counsel after completion of the
7        deposition)

161
1        CHANGES AND SIGNATURE
2  WITNESS NAME:  ROBERT ROSS, VOLUME 1
   DEPOSITION DATE:  FEBRUARY 1, 2024
3  PAGELINE          CHANGE/REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24    I, ROBERT ROSS, have read the foregoing deposition
25  and hereby affix my signature that same is true and

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 29**

Robert Ross                                                          2/1/2024

---

162

1  correct, except as noted above.
2
3        _____
         SIGNATURE OF WITNESS
4  STATE OF _____ x
5  COUNTY OF _____ x
6
7     Before me, _____, on this day
8  personally appeared ROBERT ROSS, known to me (or proved
9  to me under oath or through _____) (description of
10 identity card or other document) to be the person whose
11 name is subscribed to the foregoing instrument and
12 acknowledged to me that they executed the same for the
13 purposes and consideration therein expressed.
14    GIVEN UNDER MY HAND AND SEAL of office this
15 _____ day of _____, 2024.
16
17
18
19 (Seal)          _____
                    Notary Public in and for the
20                  State of _____.
21
22
23
24
25

---

164

1     I further certify that pursuant to FRCP Rule
2  30(e)(1) that the signature of the deponent was
3  requested by the Counsel for the deponent after the
4  completion of the deposition and that the signature is
5  to be before any notary public and returned within
6  30 days from date of receipt of the transcript.  If
7  returned, the attached Changes and Signature page
8  contains any changes and the reasons therefor.
9     I further certify that I am neither attorney or
10 counsel for, nor related to or employed by, any of the
11 parties to the action in which this deposition is taken,
12 and further that I am not a relative or employee of any
13 attorney or counsel employed by the parties hereto, or
14 financially interested in the action.
15    Certified to by me on this the 7th day of February,
16 2024.
17
18                             _Angela L Mancuso_
19        _____
         ANGELA L. MANCUSO, CSR 4514
20       Expiration Date: 10/31/24
         Stryker Reporting
21       Firm Registration No. 806
         1450 Hughes Road, Suite 230
22       Grapevine, Texas 76051
         (817) 494-0700
23
24
25

---

163

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                 FORT WORTH DIVISION
3  ROBERT (BOB) ROSS,        §
                             §
4  Plaintiff/                §
   Counterclaim Defendant,   §
5                            §  Civil Action No.
   VS.                       §  4:22-cv-343-Y
6                            §
   ASSOCIATION OF            §  Judge Terry R. Means
7  PROFESSIONAL FLIGHT       §
   ATTENDANTS, et al.,       §
8                            §
   Defendants/               §
9  Counterclaim Plaintiff.   §
10       REPORTER'S CERTIFICATION
11   VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS
12               VOLUME 1
13             FEBRUARY 1, 2024
14    I, Angela L. Mancuso, Certified Shorthand Reporter
15 in and for the State of Texas, hereby certify to the
16 following:
17    That the witness, ROBERT ROSS was duly sworn by the
18 officer and that the transcript of the oral deposition
19 is a true record of the testimony given by the witness;
20    That the original deposition was delivered to
21 Ms. Kerri Phillips for examination and signature by the
22 witness;
23    That the time used by the parties is as follows:
24 MS. KERRI PHILLIPS:  0 minutes
25 MR. JEFFREY A. BARTOS:  3 hours, 25 minutes

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 30**

Robert Ross                                                         2/1/2024

| | | | | |
|---|---|---|---|---|
| **object** 22:2 | 151:25, 152:2 | 6:13, 7:6, 33:19 | 26:23, 27:1 | 55:21, 56:2 |
| 25:4, 63:7 | 152:7, 153:12 | 40:21, 41:3 | 27:8, 27:18 | 56:5, 56:17 |
| 63:18, 63:19 | 153:25, 155:20 | 41:10, 82:15 | 27:23, 28:1 | 56:22, 56:24 |
| 70:8, 91:3 | 156:13, 156:24 | 82:19, 82:20 | 28:10, 28:14 | 57:11, 57:14 |
| 110:16, 114:12 | 157:7, 157:16 | 95:13, 95:15 | 28:14, 29:8 | 57:19, 57:25 |
| 115:9, 115:12 | 157:20, 158:4 | 109:19, 114:5 | 30:6, 30:18 | 58:15, 58:20 |
| 134:19, 146:7 | **objective** 99:4 | 114:20, 116:5 | 30:23, 31:7 | 58:23, 59:6 |
| 156:25 | **obligated** 34:12 | **official** 18:18 | 31:11, 31:16 | 59:24, 60:9 |
| **objecting** 63:21 | **obligation** 30:3 | 118:14 | 31:20, 32:7 | 60:25, 61:8 |
| 137:20, 157:1 | 37:11 | **officials** 6:16 | 32:23, 33:16 | 62:17, 62:21 |
| **objection** 9:2 | **obligations** 34:5 | **oh** 59:13, 104:24 | 33:19, 33:22 | 63:6, 63:11 |
| 11:1, 23:14 | **obscure** 153:12 | 110:15, 144:23 | 33:25, 34:9 | 63:15, 63:19 |
| 23:17, 23:18 | **obtained** 137:11 | **okay** 5:22, 7:18 | 34:17, 34:21 | 64:3, 64:12 |
| 24:3, 24:9 | 140:9 | 9:10, 9:20, 9:23 | 35:2, 35:6 | 64:14, 64:16 |
| 24:17, 24:25 | **obvious** 145:14 | 9:25, 10:11 | 35:16, 35:23 | 66:3, 66:22 |
| 29:3, 29:20 | **obviously** 7:20 | 10:14, 10:17 | 36:15, 36:18 | 67:5, 68:8 |
| 31:1, 31:24 | 72:17 | 10:20, 10:20 | 36:24, 37:5 | 68:13, 68:20 |
| 32:20, 33:2 | **occasion** 48:24 | 11:4, 11:17 | 37:25, 38:21 | 68:23, 69:8 |
| 33:11, 35:19 | **occasions** | 12:9, 12:13 | 38:24, 39:2 | 69:23, 70:16 |
| 35:20, 36:10 | 116:21 | 12:13, 12:19 | 39:8, 39:13 | 71:4, 71:7 |
| 39:20, 40:12 | **OCRs** 14:18 | 12:22, 12:24 | 39:16, 40:1 | 71:16, 71:18 |
| 40:22, 41:21 | **Oebker** 116:16 | 13:8, 13:10 | 40:5, 40:9 | 71:25, 72:5 |
| 42:12, 42:22 | 116:25, 118:4 | 13:12, 13:22 | 40:19, 41:2 | 72:18, 72:23 |
| 44:13, 45:2 | 119:18, 121:6 | 14:1, 14:4 | 41:6, 41:12 | 73:5, 73:5 |
| 46:6, 46:17 | 121:7 | 14:11, 14:15 | 41:18, 41:24 | 73:10, 73:14 |
| 47:2, 47:20 | **offer** 96:22 | 14:24, 15:6 | 42:3, 42:3, 42:8 | 73:20, 74:1 |
| 47:22, 49:6 | **offered** 5:25, 7:6 | 15:11, 15:14 | 42:16, 42:19 | 74:4, 74:7 |
| 50:4, 51:8 | **office** 6:10, 6:20 | 15:22, 15:25 | 42:24, 43:6 | 74:10, 74:21 |
| 51:21, 52:17 | 7:8, 7:9, 7:13 | 16:6, 16:9 | 43:11, 43:17 | 74:24, 74:24 |
| 52:19, 54:12 | 17:10, 18:11 | 16:11, 16:19 | 43:23, 43:25 | 75:3, 75:6 |
| 55:4, 55:10 | 19:13, 20:15 | 16:24, 17:3 | 44:5, 44:17 | 75:12, 75:15 |
| 55:23, 56:9 | 24:2, 24:12 | 17:5, 17:7 | 44:21, 44:24 | 75:20, 75:25 |
| 58:6, 60:15 | 27:13, 28:5 | 17:16, 17:24 | 45:10, 45:18 | 76:3, 76:5, 76:8 |
| 64:20, 66:7 | 28:12, 28:17 | 18:8, 18:20 | 46:23, 47:5 | 76:8, 76:15 |
| 66:19, 66:25 | 28:21, 29:11 | 18:24, 19:5 | 47:9, 47:12 | 76:15, 76:19 |
| 67:24, 68:25 | 29:12, 29:15 | 19:10, 19:15 | 48:23, 49:9 | 76:23, 77:5 |
| 69:20, 81:8 | 30:16, 35:24 | 19:23, 20:3 | 49:16, 49:20 | 77:12, 77:19 |
| 100:1, 106:14 | 41:8, 41:15 | 20:17, 20:20 | 50:11, 50:15 | 77:23, 78:3 |
| 126:23, 127:9 | 43:14, 52:4 | 21:1, 21:16 | 50:23, 51:11 | 78:22, 79:1 |
| 129:5, 135:19 | 65:2, 65:7 | 21:19, 21:25 | 51:11, 51:14 | 79:3, 79:8 |
| 136:2, 136:6 | 128:5, 145:17 | 22:4, 22:10 | 51:23, 52:1 | 79:13, 79:19 |
| 136:20, 137:17 | 162:14 | 22:13, 22:16 | 52:6, 52:11 | 80:1, 80:3, 80:6 |
| 139:4, 148:19 | **officer** 41:8 | 22:24, 23:2 | 53:11, 53:20 | 80:9, 80:12 |
| 149:11, 149:24 | 66:12, 97:4 | 23:13, 24:6 | 53:24, 54:2 | 80:17, 80:19 |
| 150:4, 150:9 | 163:18 | 24:21, 25:1 | 54:7, 54:17 | 80:21, 81:6 |
| 150:13, 151:21 | **officers** 5:11 | 26:9, 26:19 | 54:22, 55:6 | 81:21, 82:2 |

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                          2/2/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

EUGENIO VARGAS,                §
                               §
Plaintiff/                     §
Counterclaim Defendant,        §
                               §   Civil Action No.
VS.                            §   4:22-cv-430-Y
                               §
ASSOCIATION OF                 §   Judge Terry R. Means
PROFESSIONAL FLIGHT            §
ATTENDANTS, et al.,            §
                               §
Defendants/                    §
Counterclaim Plaintiff.        §


------------------------------------
VIDEOTAPED ORAL DEPOSITION OF
EUGENIO VARGAS
VOLUME 1
FEBRUARY 2, 2024
------------------------------------


        VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 2, 2024, from 10:03 a.m. to 11:47 a.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 32**

Eugenio Vargas                                                    2/2/2024

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:

   MS. KERRI PHILLIPS
   K.D. PHILLIPS LAW FIRM, PLLC
   6010 West Spring Creek Parkway
   Plano, Texas  75024
   (972) 327-5800
   kerri@KDphillipslaw.com

FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFF ASSOCIATION OF
PROFESSIONAL FLIGHT ATTENDANTS AND DEFENDANTS JULIE
HEDRICK AND ERIK HARRIS:

   MR. JEFFREY A. BARTOS
   GUERRIERI, BARTOS & ROMA, P.C.
   1900 M Street, N.W.
   Suite 700
   Washington, D.C.  20036
   (202) 624-7400
   jbartos@geclaw.com

   MS. CHARLETTE L. BRODERICK
   Association of Professional Flight Attendants
   1004 West Euless Boulevard
   Euless, Texas  76040
   (682) 301-8454
   cmatts@apfa.org

ALSO PRESENT:

   Mr. Erik Harris, APFA National Treasurer

   Ms. Michelle Cliatt, APFA Legal Assistant

   Mr. John Hines, Videographer
   Elite Video Productions
   3018 Commerce Street
   Dallas, Texas 75226
   (214) 747-1952

**Page 3**

TABLE OF CONTENTS
                     PAGE

Appearances....................................  2

EUGENIO VARGAS, VOLUME 1

Examination by Mr. Bartos.......................  5

Changes and Signature...........................  51
Reporter's Certification........................  53

EXHIBITS
NUMBER      DESCRIPTION                    PAGE

Exhibit 1  Affidavit of Eugenio Vargas in      10
   Support of Motion for Summary Judgment
   [Appendix 56-61]

Exhibit 2  Plaintiff's Amended Complaint       12

Exhibit 3  9/18/19 letter from Susannah Bender    29
   to Eugenio Vargas
Exhibit 4  11/8/19 letter from Susannah Bender    30
   to Eugenio Vargas

Exhibit 5  1/10/20 APFA Installment Promissory    34
   Note

REPORTER'S NOTE:
   Quotation marks are used for clarity and do
   not necessarily reflect a direct quote.

**Page 4**

P R O C E E D I N G S

(February 2, 2024, 10:03 a.m.)

   THE VIDEOGRAPHER:  This is Tape 1 in the video deposition of Eugenio Vargas, in the matter of Robert Ross versus Association of Professional Flight Attendants, et al., in the U.S. District Court, for the Northern District of Texas, Fort Worth Division.  Today is Friday, February 2nd, 2024.  We are now on record at 10:03 a.m.

   Will the attorneys please introduce themselves for the record.

   MR. BARTOS:  Jeffrey Bartos, attorney for the APFA defendants.

   MS. BRODERICK:  Charlette Broderick, attorney for APFA.

   MS. PHILLIPS:  Kerri Phillips, attorney for Eugenio Vargas.

   MR. BARTOS:  I'd like to just make a correction on the record.  I think in the opening the videographer referenced -- there is a related case of Ross.  The Vargas and Ross cases are two separate cases, and we'll make sure that the court reporter has the correct caption.

   (Witness sworn by reporter)

   EUGENIO VARGAS,

**Page 5**

having been first duly sworn, testifies as follows:
           EXAMINATION
BY MR. BARTOS:

   Q.  Good morning, Mr. Vargas.

   A.  Good morning.

   Q.  Can you tell me what you did to prepare for your deposition today.

   MS. PHILLIPS:  Objection. I'm directing my client not to answer.  It's privileged.

   Q.  I'm not asking anything you might have discussed with your attorney.  I'm just asking you, what did you do to prepare for your deposition today?

   A.  Woke up, had coffee.  That was it.

   Q.  Did you review any documents to get ready?

   A.  No.

   Q.  Did you discuss with Mr. Ross his deposition yesterday?

   A.  No.

   Q.  Can you describe, please, any education you've had since high school.

   A.  Some college.

   Q.  Where did you go to college?

   A.  City College of New York.

   Q.  Okay.  And how many years did you do at City College?

\* \* \* \* \*

**STRYKER REPORTING SERVICES**              **(817) 494-0700**

Eugenio Vargas                                                    2/2/2024

\*\*\*\*\*

---

**26**

1    Q.  Okay.
2         MS. PHILLIPS:  Objection.
3    Q.  Is that what you did in 2018?
4         MS. PHILLIPS:  Objection.
5    A.  In consultation with Rene, yes.
6    Q.  Okay.  And, when the time came later in 2018
7    to calculate payments that were due to you, to Marcy
8    Dunaway, and Nena Martin, you used the same formula.
9    Correct?
10        MS. PHILLIPS:  Objection; form.  It's a
11   leading question.
12   A.  Again, in consultation with Rene Berthelot,
13   yes.
14   Q.  Okay.  Now, after you left office when your --
15   your term as treasurer ended, did you become aware at
16   some point that certain members had raised an issue with
17   the board of directors about the end-of-your-term
18   payouts?
19        MS. PHILLIPS:  Objection; form.
20   Q.  Do you remember learning about that?
21        MS. PHILLIPS:  Objection; form.
22   A.  Yes, I remember.
23   Q.  Okay.  And --
24   A.  Kind of.
25   Q.  Okay.  And, at the time of those complaints,

---

**27**

1    is it right that Lori Bassani was the president of APFA?
2         MS. PHILLIPS:  Objection; form.  You're
3    leading the witness.
4    A.  Yes, Lori Bassani was the president.
5    Q.  Okay.  And Lori Bassani was also a, like you,
6    legacy American flight attendant.  Right?  She was not a
7    legacy US Airways?
8         MS. PHILLIPS:  Objection; form.  You're
9    leading the witness.
10   A.  I believe so, yes.
11   Q.  Okay.  And, at the time after you, was Craig
12   Gunter the treasurer?
13        MS. PHILLIPS:  Objection; leading the
14   witness.
15   A.  At the time?
16   Q.  After you stopped being treasurer, Mr. Gunter
17   was treasurer.  Is that right?
18   A.  Yes.
19   Q.  Julie Hedrick and Erik Harris were not holding
20   any national office at that time, were they?
21        MS. PHILLIPS:  Objection; leading the
22   witness.
23   A.  They were not.
24   Q.  Okay.  Now, did you become aware or did you
25   learn from the APFA that the board of directors had --

---

**28**

1    in 2019 had determined that you and Ms. Dunaway and
2    Ms. Martin may have been overpaid at the end of your
3    term?
4         MS. PHILLIPS:  Objection.
5    Q.  Do you remember learning about that?
6         MS. PHILLIPS:  Objection; form.
7    A.  I learned from Craig.
8    Q.  Craig Gunter?
9    A.  Yes.
10   Q.  Okay.  How did Mr. Gunter communicate that to
11   you?  And what I mean is did he call you?  Did you get a
12   letter?
13   A.  I'm not a hundred percent sure.
14   Q.  Okay.
15   A.  I believe it was -- I don't know.
16   Q.  Okay.  And what is your recollection about
17   what Mr. Gunter told you?
18   A.  It's been so long.  I mean --
19   Q.  Okay.  Okay.  Do you remember learning about a
20   board of directors meeting that had decided that the
21   payments made at the end of your term were -- for
22   yourself, Ms. Martin, and Ms. Dunaway -- were
23   overpayments?
24        MS. PHILLIPS:  Objection; form, leading.
25   A.  I mean, I cannot say how I -- if I learned

---

**29**

1    from the board.  I cannot.
2    Q.  You don't remember that?  It's okay.  If you
3    don't remember, just tell me.
4    A.  Yeah, I mean, I don't.  I mean, it's been so
5    long.
6    Q.  Okay.  Do you remember receiving a series of
7    letters from APFA telling you that you -- you had made
8    an overpayment and you owed money back?
9    A.  I remember getting letters, yes.
10   Q.  Okay.  We can mark as Exhibit 3 --
11        MS. PHILLIPS:  I'm going to say
12   "Objection; hearsay" on any of these APFA documents.
13        (Deposition Exhibit 3 marked)
14   Q.  If you could look at Exhibit 3, please, and
15   tell me if this is one of the letters you received in
16   2019.
17        MS. PHILLIPS:  Objection; hearsay.
18   Q.  Do you remember receiving that letter,
19   Mr. Vargas?
20   A.  I remember receiving letters.  I cannot tell
21   you it's this exact letter.
22   Q.  Okay.  You don't remember if you received that
23   particular letter or not?
24   A.  This particular one, I cannot say.
25   Q.  And you received more than one letter in that

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                    2/2/2024

---

**30**

1 same rough time period about the overpayment?
2       A.  I mean, I --
3       Q.  We can mark as Exhibit 2 [sic] a letter dated
4 November 8th, 2019.
5            MS. PHILLIPS:  Objection; hearsay.
6            (Deposition Exhibit 4 marked)
7       Q.  And I'd ask you, Mr. Vargas, do you remember
8 receiving this letter?  If you can pass the extra to
9 your counsel, I'd appreciate it.  And I'll just say for
10 the record these were produced by your counsel in
11 discovery in this case.
12           Do you remember receiving the November 8th,
13 2019, letter?
14      A.  Are you going to let me read it or not?
15      Q.  Feel free.
16      A.  Okay.  I read it.
17      Q.  Okay.  Do you remember receiving that letter?
18      A.  I said earlier, I remember receiving letters.
19      Q.  I'm asking, do you remember receiving that
20 letter?
21      A.  Not this particular letter.  I cannot say that
22 it's a letter I received.
23      Q.  Okay.  The -- whether or not you received it,
24 the second paragraph refers to a meeting held on
25 October 30th, 2019, to allow you to review the

---

**31**

1 independent auditor's calculations.  Do you see that
2 sentence?
3       A.  Yes.
4       Q.  Okay.  Do you remember having a meeting on
5 October 30th, 2019?
6       A.  Yes.
7       Q.  Okay.  Where was that meeting?
8       A.  At O'Neil's office.
9       Q.  O'Neil, the auditor?
10      A.  Yes.
11      Q.  Okay.  And Craig Gunter was there, wasn't he?
12      A.  Yes.
13      Q.  Okay.  And what did you review at that
14 meeting?
15      A.  They gave us -- I think it was -- I think it
16 was a sheet of paper with calculations that they had
17 made.
18      Q.  Okay.  And did you ask questions about what
19 was on the -- in the calculations?
20      A.  Yes.
21      Q.  Okay.  And what was your view of those
22 calculations, about whether they were right or wrong?
23      A.  The amount that they were saying?
24      Q.  Correct.
25      A.  I didn't agree with them.

---

**32**

1       Q.  Okay.  Why not?
2       A.  They couldn't produce the formula they used to
3 produce those numbers.
4       Q.  Okay.  And the formula that you're talking
5 about is the formula that you had used for yourself as
6 well as for Mr. Ross earlier in the year, right?
7       A.  Can you --
8            MS. PHILLIPS:  Objection; leading.
9       A.  -- repeat that?
10      Q.  Sure.  You had used a formula to calculate the
11 vacation and sick payout for Mr. Ross.  Do you remember?
12      A.  (No answer).
13           MS. PHILLIPS:  Objection.
14      Q.  And you used the same formula for yourself,
15 Ms. Martin, and Ms. Dunaway.  Correct?
16           MS. PHILLIPS:  Objection; leading.
17      A.  In consultation with Rene, yes.
18      Q.  Okay.  And do you remember, in your meeting
19 with Mr. Gunter, telling him that -- or in connection
20 with that meeting where Mr. Gunter was present, telling
21 Mr. Gunter that if the calculation was wrong as to you
22 and Ms. Martin and Ms. Dunaway, it was also wrong as to
23 Bob Ross?
24           MS. PHILLIPS:  Objection; leading.
25      A.  I mean, I cannot be a hundred percent sure

---

**33**

1 that those were the same exact words that were used.
2       Q.  Uh-huh.  Okay.  But the gist of what I said --
3       A.  Yes.
4       Q.  -- you told Mr. Gunter?
5       A.  Yes.
6       Q.  And, in fact, you testified about that in your
7 Article VII arbitration in that conversation.  Right?
8            MS. PHILLIPS:  Objection; leading.
9       A.  I'll have to go back and review my transcript.
10      Q.  Okay.  We could look at the transcript and
11 figure that out.  Okay.
12      A.  (Nodding head up and down).
13      Q.  Ultimately, after a series of letters and
14 after your meeting, you did enter into a promissory note
15 agreement to pay back the money you had overpaid.
16 Correct?
17      A.  Yes.
18      Q.  Okay.  And, under that promissory note, you
19 agreed to pay back 22 consecutive payments.  Does that
20 sound right?
21           MS. PHILLIPS:  I think we need to take a
22 break, please.
23      A.  I can't answer that.  I mean, I would have to
24 look at the promissory note --
25      Q.  Okay.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                    2/2/2024

---

**34**

1    A.  -- that I signed.
2         MS. PHILLIPS:  We need to take a break.
3         MR. BARTOS:  All right.  I'm going to
4  object to the repeated breaks.  We're going to run out
5  of time.
6         MS. PHILLIPS:  I'm going to take a break
7  of five minutes.  Thank you.
8         THE VIDEOGRAPHER:  Go off the record?
9         MR. BARTOS:  Yes.
10        THE VIDEOGRAPHER:  We're off record at
11 11:28 a.m.
12        (Recess from 11:28 a.m. to 11:30 a.m.)
13        (Deposition Exhibit 5 marked)
14        THE VIDEOGRAPHER:  We're back on record
15 at 11:30 a.m.
16 BY MR. BARTOS:
17    Q.  Mr. Vargas, you have in front of you a
18 document marked as Exhibit 5.  It says across the top,
19 Association of Professional Flight Attendants, APFA
20 Installment Promissory Note.  And then at the bottom
21 there is a signature.
22        And my first question is, is that your
23 signature?
24    A.  What was your question?
25    Q.  Is that your signature at the bottom?

---

**35**

1    A.  It looks like my signature.
2    Q.  Did you sign the APFA Installment Promissory
3  Note?
4    A.  I signed an -- I signed one promissory note,
5  yes.
6    Q.  And did you make payments of $172.62 every
7  month?
8    A.  Yes.
9    Q.  Okay.
10   A.  I mean, I'm not going to -- the amount I'm not
11 going to question.  I mean, I don't know if this is what
12 I signed, but I did make payments every month.
13   Q.  Okay.  And have you completed all the payments
14 under your promissory note?
15   A.  Yes.
16   Q.  And do you recall telling the Article VII
17 arbitrator that you took full responsibility for the
18 overpayment, if you remember?
19   A.  I don't.
20   Q.  And you're aware that Ms. Martin also agreed
21 to repay the amount of overpayment that was to her?
22   A.  I don't know.
23   Q.  You don't know?
24   A.  (No answer.)
25   Q.  She never told you?

---

**36**

1    A.  I don't speak to Marcy.
2    Q.  Nena Martin.
3    A.  I don't know what Nena did.
4    Q.  You don't speak to Nena Martin?
5    A.  Oh, I speak to Nena.
6    Q.  Okay.  You just don't know?
7    A.  I don't know.
8    Q.  What about Marcy Dunaway?
9         MS. PHILLIPS:  Objection; hearsay.
10   Q.  Do you know if Marcy Dunaway --
11   A.  Didn't you just ask me about Marcy and I
12 responded?
13   Q.  No.  I asked you about Nena, and I think you
14 answered about Marcy.
15   A.  I don't know if she paid or not.
16   Q.  Okay.  And isn't it true that, of you,
17 Ms. Martin, Ms. Dunaway, and Mr. Ross, the only person
18 who has not repaid the overpayment --
19        MS. PHILLIPS:  Objection --
20   Q.  -- is Mr. Ross?  Isn't that right?
21        MS. PHILLIPS:  -- speculation.
22   A.  I don't know.
23   Q.  You don't know.
24        MS. PHILLIPS:  He can't confirm this.
25        MR. BARTOS:  I'm sorry?  I didn't hear

---

**37**

1  that.
2         MS. PHILLIPS:  I said he can't -- it's
3  speculation.  He doesn't know what Ross paid.
4    Q.  Now, you participated in an arbitration under
5  Article VII of the APFA Constitution.  Is that right?
6    A.  Yes.
7    Q.  Okay.  And you were --
8         MS. PHILLIPS:  Objection; leading.
9    Q.  You were charged by two members, and that's
10 what led to that hearing.  Correct?
11   A.  I guess, yes.
12   Q.  And before -- prior to the time of your own
13 Article VII arbitration, had you ever participated in
14 any capacity in any other Article VII arbitration?
15   A.  Yes.
16   Q.  And what was that?
17   A.  It was with Mr. Morales.
18        MS. PHILLIPS:  I need to take a brief
19 moment off the record with my client for a moment.  I
20 want to make sure he clears the record on something that
21 he's testified to.
22        MR. BARTOS:  Sure.
23        THE VIDEOGRAPHER:  We're off record at
24 11:34 a.m.
25        (Recess from 11:34 a.m. to 11:35 a.m.)

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                    2/2/2024

---

**38**

1     THE VIDEOGRAPHER:  We're back on record
2  at 11:35 a.m.
3  BY MR. BARTOS:
4     Q.  Mr. Vargas, you just had a consultation with
5  your counsel.  Is that right?
6     A.  Yes, I did.
7     Q.  Do you want to change any of your answers
8  you've given thus far?
9     A.  I want to go back to the promissory note
10  subject and say why I signed it.
11     Q.  Okay.  That wasn't my question I asked you.
12     A.  But I want to say it.
13     Q.  No.  Your lawyer is allowed to ask you
14  questions.
15     The -- the -- where we were in my questioning
16  was a prior Article VII arbitration that you
17  participated in.
18     A.  Yes.
19     Q.  And you -- you said a name.  I believe it was
20  Morales?
21     A.  Mr. Morales.
22     Q.  Okay.  What was the -- was Mr. Morales the
23  party who was charged, or was he the charging party?  Or
24  what -- what was his role in that case?
25     MS. PHILLIPS:  The issue that we went off

**39**

1  the record for and discussed what he needs to go back
2  and clarify the record about is the promissory note.
3     MR. BARTOS:  That's what he's testified
4  to.  That's fine.  But that's not a pending question.
5     Q.  I'm asking you about the prior Article VII
6  arbitration.  What was your role in that arbitration?
7     A.  I was charged party from Mr. Morales, and then
8  I became the charging party.
9     Q.  Okay.  So just to clarify for my sake,
10  Mr. Morales charged you with some violation?
11     A.  Yes.
12     Q.  Okay.  And then eventually you charged
13  Mr. Morales with a violation.  Is that -- do I
14  understand that correctly?
15     A.  I mean, yes.
16     Q.  Okay.  Roughly, when was this?
17     A.  Between 2016 and 2018.  2018.
18     Q.  So was it while you were national treasurer?
19     A.  Correct.
20     Q.  Okay.  What was the -- what was Mr. -- what
21  did Mr. Morales charge you with?
22     A.  I cannot give you specific.
23     Q.  You don't recollect?
24     A.  I mean, I will have to go back and --
25     Q.  I'm just asking in general terms.

**40**

1     A.  And I'm telling you I cannot give specific.
2     Q.  You have no idea?
3     A.  No.  I mean, I will have to go back and --
4     Q.  Was it financial?
5     A.  I don't remember.
6     Q.  You charged Mr. Morales with something, then,
7  after he charged you.  Is that right?
8     A.  Yes.
9     Q.  Okay.  What did you charge him with?  Do you
10  remember that?
11     A.  Not all the specifics.
12     Q.  What about generally?
13     A.  It was that his charges didn't go forward or
14  wouldn't have any --
15     MS. PHILLIPS:  He's already -- objection.
16     MR. BARTOS:  He's in the middle of his
17  answer.
18     MS. PHILLIPS:  No.  Objection.  He's
19  answered that he does not know, and you are badgering
20  him.  He has answered this.  He has answered that he
21  does not recall.
22     MR. BARTOS:  No.  I think he was
23  answering right now how much he did recall.
24     MS. PHILLIPS:  Objection.  He has asked
25  and answered.  You are badgering him.

**41**

1     Q.  Mr. Vargas, you charged Mr. Morales with a
2  violation under Article VII.  Correct?
3     A.  Yes.
4     Q.  Okay.  And the violation had to do with a
5  lack of merit or lack of evidence of his charges against
6  you.  Is that fair to say?
7     A.  Yes.
8     Q.  Okay.  When -- his charges against you, were
9  they dismissed by the arbitrator?
10     A.  I mean, I don't know specific what's the word
11  that they use.
12     Q.  Well, did you have an arbitration with
13  witnesses and testimony in the charges against you?
14     A.  I don't recall.
15     Q.  You don't recall.  Okay.
16     Did you -- in your charges against
17  Mr. Morales, did you have a hearing with an arbitrator
18  and witnesses?
19     A.  I mean, there was one -- I remember there was
20  a hearing.  I cannot remember if it was when I was
21  getting charged or when I was charging.  There was a
22  hearing, yes, but I cannot be for sure that --
23     Q.  Okay.
24     A.  -- which one it was.
25     Q.  Okay.  In your charges that you brought, did

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 37**

Eugenio Vargas                                                      2/2/2024

---

42

1  you get any -- an order in your favor from the
2  arbitrator?
3      A.  I don't remember what was the outcome,
4  totally.
5      Q.  Did you ever sue Mr. Morales in court?
6      A.  No.
7      Q.  Have you ever been a party in a lawsuit
8  besides this case?
9      A.  No.
10     Q.  You've never sued any -- never sued anybody
11 else?
12     A.  No.
13     Q.  Okay.  And you've never been sued by anybody?
14     A.  I don't think so.
15     Q.  Okay.
16         MS. PHILLIPS:  Sir, I would like to take
17 this moment and go back and allow the opportunity for
18 Mr. -- no.  I think he needs to correct the record as to
19 his testimony.
20         MR. BARTOS:  No.  You can ask him
21 questions when it's your turn.  Right now it's my turn.
22         MS. PHILLIPS:  No.  I think that he needs
23 to correct the record.
24         MR. BARTOS:  No.
25         MS. PHILLIPS:  Mr. Vargas --

---

43

1          MR. BARTOS:  I'm asking questions, not
2  you.
3          MS. PHILLIPS:  He needs to correct the
4  record on his testimony for the promissory note.
5          MR. BARTOS:  He is welcome to when he has
6  a question in that regard from someone who has the power
7  to question him.  You're not asking the questions right
8  now.
9          MS. PHILLIPS:  He's requested the
10 opportunity to clear the record on the testimony for his
11 promissory note.
12         MR. BARTOS:  He'll be welcome to do so
13 later.  Please stop interrupting my questioning.
14 BY MR. BARTOS:
15     Q.  Now, you were charged in 2020, under
16 Article VII, by Melissa Chinery and Sandra Lee.  Is that
17 right?  Do you remember that?
18     A.  Charged, yes.
19         MS. PHILLIPS:  I want a break after this
20 question.
21         MR. BARTOS:  We're not going to take more
22 breaks.
23         MS. PHILLIPS:  Yeah, we're taking a
24 break.  I'm entitled to a break whenever the deponent
25 wants a break.

---

44

1          MR. BARTOS:  The deponent has not
2  indicated he wants a break.
3          THE WITNESS:  I want a break.
4          MS. PHILLIPS:  His representative has
5  indicated a break; so the deponent's representative is
6  taking a break.
7          MR. BARTOS:  And I repeat my objection to
8  these repeated breaks.
9          MS. PHILLIPS:  Well, you can -- on record
10 you can object to it.  That's fine.
11         MR. BARTOS:  And I have.
12         MS. PHILLIPS:  That's fine.  But if
13 you're not going to let him clarify his testimony that
14 he is a second -- English is his second language.  It is
15 not his first language.  He doesn't have a translator
16 here.  He doesn't understand the words fully.  This
17 is -- he is employed at American Airlines as a -- as a
18 translator, for the love of God.
19         He hasn't been given the opportunity for
20 somebody who can translate the words fully, in his
21 primary language.  And you're shotgunning questions at
22 him, and you're not even allowing him the opportunity to
23 go back and fully explain things that you have put in
24 front of him.
25         So I am going to go on record and state the

---

45

1  fact that he would like the opportunity to state and
2  explain a document that you put in front of him.
3          MR. BARTOS:  Can I continue with the
4  questioning, or are you taking a break?
5          MS. PHILLIPS:  Are you going to allow him
6  to clarify his testimony?
7          MR. BARTOS:  I'm going to continue
8  questioning.
9          MS. PHILLIPS:  Are you going to allow him
10 the opportunity to clarify his testimony?
11         MR. BARTOS:  I'm going to ask questions,
12 and he's going to answer them.
13         MS. PHILLIPS:  Am I going to have to stop
14 the deposition at this point?
15         MR. BARTOS:  I'm going to --
16         MS. PHILLIPS:  Because, you know,
17 yesterday was an appalling display of behavior on your
18 part.  I have to -- I have to state that it was just
19 embarrassing.  It was embarrassing.
20 BY MR. BARTOS:
21     Q.  Mr. Vargas, you learned in 2020 that you
22 were -- had Article VII charges filed against you by
23 Melissa Chinery and Sandra Lee.  Correct?
24         MS. PHILLIPS:  Mr. Bartos --
25     Q.  Is that right?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 38**

Eugenio Vargas                                                                2/2/2024

---

**46**

1      MS. PHILLIPS:  -- are you going to allow
2  my client the opportunity to clarify the record --
3      MR. BARTOS:  I am asking questions.
4      MS. PHILLIPS:  -- as to his testimony?
5  Because I'm going to object that -- if you don't allow
6  him to clarify the record about his testimony on the
7  promissory note, then I'm going to object.
8      MR. BARTOS:  You feel free to object.
9  I'm going to ask questions.
10      Q.  Mr. Vargas --
11      MS. PHILLIPS:  I am going to object, and
12  I'm going to take a break with my client.
13      MR. BARTOS:  If you're going to get up
14  and leave, get up and leave.  But I'm going to keep
15  asking questions.
16      MS. PHILLIPS:  I'm going to stop the
17  deposition at this point because I think that you are
18  creating a circumstance that is hostile at this point.
19  This is not the way to conduct a deposition.  You should
20  be investigating the actual facts.  If you want to know
21  the facts as to what happened, then you should ask the
22  questions and find out the testimony.
23  BY MR. BARTOS:
24      Q.  Mr. Vargas, are you prepared to continue with
25  your testimony?

---

**47**

1      MS. PHILLIPS:  Don't address my client.
2  You can address questions at me when we are discussing
3  the matters before -- in this case.
4      MR. BARTOS:  We are here for a
5  deposition, and I'm going to conduct the deposition.
6      MS. PHILLIPS:  Correct.  We are here for
7  a deposition, and we are discussing matters pertaining
8  to this case.  So you and I can discuss and hammer out
9  issues relating to this case.
10      MR. BARTOS:  You will have the full right
11  to ask Mr. Vargas whatever questions you want.  I am
12  asking questions now.  And I need to be permitted to ask
13  my questions.
14      MS. PHILLIPS:  I think we need to stop.
15  I think we need to stop.
16      MR. BARTOS:  I am not stopping.
17      MS. PHILLIPS:  Well, I am.  I am
18  stopping.  And I think that we need -- at this point we
19  need to stop, and we can schedule something with the
20  Court and find out what -- what the next steps need to
21  be to come to a resolution on something as simple as a
22  confidentiality order, as something as simple as a
23  deposition and -- and whether or not a break needs to
24  take place, whether or not lunch needs to be 30 minutes
25  or -- or, you know, whether or not Mr. Ross can stand up

---

**48**

1  while you ask him questions and whether or not
2  Mr. Vargas can clarify his testimony on record.
3      Are you asking questions for purposes of
4  discovering what -- what actually happened, or are you
5  asking questions so that you can tilt the stage in your
6  favor?
7      MR. BARTOS:  I'm here to take the
8  deposition as ordered by the Court, and I intend to keep
9  doing so as long as you're here.
10      MS. PHILLIPS:  Well, unfortunately, I am
11  not of the opinion that you are going to ask questions
12  and not allow my client the opportunity to clarify a
13  response when English is not his primary language --
14      MR. BARTOS:  He will have every
15  opportunity to answer --
16      MS. PHILLIPS:  -- and he can't clarify a
17  response.
18      MR. BARTOS:  -- when you get to ask
19  questions.
20      MS. PHILLIPS:  If you're not going to
21  allow him to --
22      MR. BARTOS:  I go first.
23      MS. PHILLIPS:  Are you going to allow him
24  to clarify his testimony?
25      MR. BARTOS:  You are welcome to ask any

---

**49**

1  questions you want when it's your turn.  Please stop
2  interfering with my deposition.
3      MS. PHILLIPS:  Are you going to allow him
4  to clarify his response?
5      MR. BARTOS:  I've answered your question.
6      MS. PHILLIPS:  You did not.  You answered
7  my question --
8  BY MR. BARTOS:
9      Q.  Mr. Vargas --
10      MS. PHILLIPS:  -- with a different -- are
11  you going to allow him to clarify his testimony?
12      MR. BARTOS:  Please stop interfering with
13  the deposition.
14      MS. PHILLIPS:  I'm going to end this if
15  you don't allow him to clarify his testimony.
16      MR. BARTOS:  Please stop interfering with
17  my deposition.  You will have every right to ask him a
18  question when I'm done.
19      MS. PHILLIPS:  You have -- you can answer
20  my question.  Will you allow him to clarify his
21  testimony?  If you don't, we're done.
22      MR. BARTOS:  He is allowed to answer your
23  questions when you ask him your questions when I am
24  finished.
25      MS. PHILLIPS:  It's a yes-or-no question.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                          2/2/2024

**50**
1  Will you allow him to clarify his testimony?  Yes or no?
2        MR. BARTOS:  When you ask him
3  questions --
4        MS. PHILLIPS:  We're done.  Let's go.
5        MR. BARTOS:  -- he can testify what he
6  wants.
7  I object to your leaving.  I am going to ask
8  for --
9        MS. PHILLIPS:  I object to your, you
10  know -- I object to this entire situation.
11        MR. BARTOS:  We will seek full relief
12  from the Court.
13        (Ms. Phillips and the Witness exit
14        the room)
15        MR. BARTOS:  We can stop the record.
16  That's fine.
17        THE VIDEOGRAPHER:  Off the record at
18  11:47 a.m.
19        (Proceedings adjourned at 11:47 a.m.)
20        (Per Federal Rule of Civil Procedure
21        30(e)(1), signature was requested via
22        email by Counsel after completion of the
23        deposition)
24
25

**51**
1        CHANGES AND SIGNATURE
2  WITNESS NAME:  EUGENIO VARGAS, VOLUME 1
   DEPOSITION DATE:  FEBRUARY 2, 2024
3  PAGELINE        CHANGE/REASON
4  ___ _____
5  ___ _____
6  ___ _____
7  ___ _____
8  ___ _____
9  ___ _____
10  ___ _____
11  ___ _____
12  ___ _____
13  ___ _____
14  ___ _____
15  ___ _____
16  ___ _____
17  ___ _____
18  ___ _____
19  ___ _____
20  ___ _____
21  ___ _____
22  ___ _____
23  ___ _____
24  I, EUGENIO VARGAS, have read the foregoing
25  deposition and hereby affix my signature that same is

**52**
1  true and correct, except as noted above.
2
3        _____
         SIGNATURE OF WITNESS
4  STATE OF _____ x
5  COUNTY OF _____ x
6
7    Before me, _____, on this day
8  personally appeared EUGENIO VARGAS, known to me (or
9  proved to me under oath or through _____)
10  (description of identity card or other document) to be
11  the person whose name is subscribed to the foregoing
12  instrument and acknowledged to me that they executed the
13  same for the purposes and consideration therein
14  expressed.
15    GIVEN UNDER MY HAND AND SEAL of office this
16  _____ day of _____, 2024.
17
18
19
20    (Seal)        _____
                    Notary Public in and for the
21                  State of _____.
22
23
24
25

**53**
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2           FORT WORTH DIVISION
3  EUGENIO VARGAS,        §
                          §
4  Plaintiff/             §
   Counterclaim Defendant,  §
5                § Civil Action No.
   VS.          §  4:22-cv-430-Y
6                §
   ASSOCIATION OF        §  Judge Terry R. Means
7  PROFESSIONAL FLIGHT    §
   ATTENDANTS, et al.,    §
8                §
   Defendants/            §
9  Counterclaim Plaintiff.   §
10        REPORTER'S CERTIFICATION
11   VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS
12           VOLUME 1
13         FEBRUARY 2, 2024
14
15    I, Angela L. Mancuso, Certified Shorthand Reporter
16  in and for the State of Texas, hereby certify to the
17  following:
18    That the witness, EUGENIO VARGAS was duly sworn by
19  the officer and that the transcript of the oral
20  deposition is a true record of the testimony given by
21  the witness;
22    That the original deposition was delivered to
23  Ms. Kerri Phillips for examination and signature by the
24  witness;
25    That the time used by the parties is as follows:

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**APPENDIX 40**

Eugenio Vargas                                                    2/2/2024

54

1   MS. KERRI PHILLIPS:  0 minutes
2   MR. JEFFREY A. BARTOS:  58 minutes
3       I further certify that pursuant to FRCP Rule
4   30(e)(1) that the signature of the deponent was
5   requested by the Counsel for the deponent after the
6   completion of the deposition and that the signature is
7   to be before any notary public and returned within
8   30 days from date of receipt of the transcript.  If
9   returned, the attached Changes and Signature page
10  contains any changes and the reasons therefor.
11      I further certify that I am neither attorney or
12  counsel for, nor related to or employed by, any of the
13  parties to the action in which this deposition is taken,
14  and further that I am not a relative or employee of any
15  attorney or counsel employed by the parties hereto, or
16  financially interested in the action.
17      Certified to me on this the 7th day of February,
18  2024.
19
20              _____
21              ANGELA L. MANCUSO, CSR 4514
                Expiration Date: 10/31/24
22              Stryker Reporting
                Firm Registration No. 806
23              1450 Hughes Road, Suite 230
                Grapevine, Texas 76051
24              (817) 494-0700
25

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                    2/2/2024

| O | | | P | |
|---|---|---|---|---|
| **O'Neil** 16:17 | **31:8, 52:15** | 31:21, 32:1 | **P.C** 2:10 | 28:13, 32:25 |
| 16:20, 16:22 | **officer** 53:19 | 32:4, 32:18 | **page** 3:1, 3:7 | **period** 30:1 |
| 17:4, 31:9 | **Oh** 6:18, 8:4 | 33:2, 33:10 | 19:20, 20:7 | **permitted** 47:12 |
| **O'Neil's** 31:8 | 36:5 | 33:11, 33:18 | 21:9, 54:9 | **person** 16:19 |
| **oath** 20:10 | **okay** 5:24, 6:2 | 33:25, 35:9 | **PAGELINE** | 16:22, 36:17 |
| 22:16, 52:9 | 6:11, 6:14, 7:24 | 35:13, 36:6 | 51:3 | 52:11 |
| **object** 34:4 | 8:11, 8:15, 9:3 | 36:16, 37:7 | **paid** 36:15, 37:3 | **personally** 20:7 |
| 44:10, 46:5 | 9:5, 9:8, 9:11 | 38:11, 38:22 | **paper** 31:16 | 52:8 |
| 46:7, 46:8 | 9:13, 9:16, 9:21 | 39:9, 39:12 | **paragraph** | **pertaining** 47:7 |
| 46:11, 50:7 | 9:24, 10:2, 10:4 | 39:16, 39:20 | 19:18, 19:20 | **Phillips** 2:3, 2:4 |
| 50:9, 50:10 | 10:7, 10:11 | 40:9, 41:4, 41:8 | 20:2, 20:9 | 4:16, 4:16, 5:8 |
| **objecting** 25:14 | 10:16, 10:19 | 41:15, 41:23 | 20:18, 21:8 | 10:13, 10:23 |
| 25:16 | 10:21, 10:24 | 41:25, 42:13 | 23:8, 24:24 | 12:1, 12:21 |
| **objection** 5:8 | 11:7, 11:15 | 42:15 | 30:24 | 15:11, 15:23 |
| 15:11, 15:13 | 12:10, 12:21 | **opening** 4:19 | **paragraphs** | 17:20, 17:24 |
| 15:23, 17:20 | 12:24, 13:20 | **opinion** 48:11 | 23:18, 23:22 | 18:3, 18:13 |
| 17:24, 18:3 | 14:3, 14:4 | **opportunity** | 24:1 | 18:20, 18:24 |
| 18:13, 18:20 | 14:10, 14:15 | 42:17, 43:10 | **Parkway** 2:4 | 19:4, 19:9 |
| 18:24, 19:4 | 14:25, 15:2 | 44:19, 44:22 | **part** 45:18 | 20:16, 21:2 |
| 19:9, 24:3 | 15:8, 15:19 | 45:1, 45:10 | **participated** | 21:6, 21:13 |
| 24:15, 24:19 | 16:3, 16:11 | 46:2, 48:12 | 37:4, 37:13 | 21:24, 24:3 |
| 25:1, 25:6 | 16:15, 16:19 | 48:15 | 38:17 | 24:15, 24:19 |
| 25:13, 25:16 | 16:22, 17:6 | **oral** 1:11, 1:15 | **particular** 29:23 | 24:22, 25:1 |
| 25:24, 26:2 | 17:10, 17:14 | 53:11, 53:19 | 29:24, 30:21 | 25:6, 25:13 |
| 26:4, 26:10 | 18:7, 18:10 | **order** 42:1 | **parties** 53:25 | 25:16, 25:24 |
| 26:19, 26:21 | 19:6, 19:19 | 47:22 | 54:13, 54:15 | 26:2, 26:4 |
| 27:2, 27:8 | 19:22, 20:1 | **ordered** 48:8 | **parts** 16:11 | 26:10, 26:19 |
| 27:13, 27:21 | 22:2, 22:17 | **organization** | **party** 38:23 | 26:21, 27:2 |
| 28:4, 28:6 | 22:22, 23:8 | 15:9 | 38:23, 39:7 | 27:8, 27:13 |
| 28:24, 29:12 | 23:13, 23:15 | **original** 53:22 | 39:8, 42:7 | 27:21, 28:4 |
| 29:17, 30:5 | 23:18, 23:22 | **outcome** 42:3 | **pass** 10:13, 30:8 | 28:6, 28:24 |
| 32:8, 32:13 | 23:25, 24:7 | **outside** 17:8 | **pay** 33:15, 33:19 | 29:11, 29:17 |
| 32:16, 32:24 | 24:9, 24:11 | **overpaid** 28:2 | **payments** 19:7 | 30:5, 32:8 |
| 33:8, 36:9 | 24:18, 26:1 | 33:15 | 19:23, 24:1 | 32:13, 32:16 |
| 36:19, 37:8 | 26:6, 26:14 | **overpayment** | 24:12, 24:25 | 32:24, 33:8 |
| 40:15, 40:18 | 26:23, 26:25 | 29:8, 30:1 | 25:20, 26:7 | 33:21, 34:2 |
| 40:24, 44:7 | 27:5, 27:11 | 35:18, 35:21 | 28:21, 33:19 | 34:6, 36:9 |
| **obligations** | 27:24, 28:10 | 36:18 | 35:6, 35:12 | 36:19, 36:21 |
| 16:12 | 28:14, 28:16 | **overpayments** | 35:13 | 36:24, 37:2 |
| **October** 30:25 | 28:19, 28:19 | 28:23 | **payout** 32:11 | 37:8, 37:18 |
| 31:5 | 29:2, 29:6 | **oversaw** 19:6 | **payouts** 26:18 | 38:25, 40:15 |
| **office** 17:11 | 29:10, 29:22 | **oversight** 14:12 | **pending** 39:4 | 40:18, 40:24 |
| 19:3, 19:8 | 30:16, 30:17 | **owed** 29:8 | **percent** 16:14 | 42:16, 42:22 |
| 26:14, 27:20 | 30:23, 31:4 | | 20:13, 23:5 | 42:25, 43:3 |
| | 31:7, 31:11 | | | 43:9, 43:19 |
| | 31:13, 31:18 | | | 43:23, 44:4 |

Lincoln General Insurance Company v. Maxwell, Not Reported in Fed. Supp. (2018)

2018 WL 4610533

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 46 of 73   PageID 4842

2018 WL 4610533
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

LINCOLN GENERAL INSURANCE
COMPANY (in Liquidation), Plaintiff,

v.

James Thornton MAXWELL, Defendant.

CIVIL ACTION NO. 3:16-CV-03198-B
|
Signed 09/26/2018

**Attorneys and Law Firms**

William N. Radford, Thompson Coe Cousins & Irons LLP,
Bradford K. Burdette, Glast, Phillips & Murray, P.C., David
B. Winter, Zelle Hofmann Voelbel & Mason LLP, Dallas, TX,
Albert B. Miller, York, PA, for Plaintiff.

John W. Arnold, Bailey Crowe Arnold & Majors LLP, Dallas,
TX, for Defendant.

James Douglas Maxwell, Dallas, TX, pro se.

**ORDER ADOPTING FINDINGS, CONCLUSIONS,
AND RECOMMENDATION OF THE UNITED STATES
MAGISTRATE JUDGE**

JANE J. BOYLE, UNITED STATES DISTRICT JUDGE

*\*1* Before the Court is Magistrate Judge Rebecca
Rutherford's Findings, Conclusions, and Recommendation
(Doc. 253) on Plaintiff Lincoln General Insurance Company's
Motion to Enforce Court's Order and for Sanctions Against
James T. Maxwell (Doc. 246) and Defendant James
Thornton Maxwell's Objections to Findings, Conclusions,
and Recommendation of the United States Magistrate Judge
(Doc. 256). Before Defendant James Thornton Maxwell's,
a/k/a Jim Maxwell, objections were filed, this Court
entered its Order Adopting Findings, Conclusions, and
Recommendation of the United States Magistrate Judge (Doc.
255) on September 20, 2018. One day later, on September
21, 2018, Maxwell filed his objections. Pursuant to Federal
Rule of Civil Procedure 6(d), Maxwell had an additional
three days to file his objections to the Findings, Conclusions,
and Recommendations of the United States Magistrate Judge

because he was served via certified mail. Thus, on September
21, 2018 Maxwell's objections were timely.

The Court will therefore **VACATE** its September 20, 2018
Order Adopting Findings, Conclusions and Recommendation
of the United States Magistrate Judge (Doc. 255) and conduct
a *de novo* review of the pleadings, files, and record in the case
pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil
Procedure 72(b), as well as the Findings, Conclusions, and
Recommendation of the United States Magistrate Judge and
Defendant Jim Maxwell's Objections thereto.

**I.**

**BACKGROUND**

The issue before the Court relates to Defendant Jim Maxwell's
abusive and dilatory conduct during post-judgment discovery
proceedings. The Court tried this case in 2013, which resulted
in a $16.5 million judgment in favor of Plaintiff. *See Lincoln
General Insurance Co. v. U.S. Auto Insurance Services Inc.,
et al.*, No. 3:10–CV–2307–B (N.D. Tex. Jan. 25, 2017)
(Doc. 170). On November 15, 2016, after a lengthy appeals
process, the Court determined it was appropriate to sever the
remaining claims against Defendants. Doc. 227, Order on
Severance. Pursuant to that Order, this civil case (No. 3:16–
CV–3198) was opened against Defendant James ("Jim")
Maxwell. *Id.* In that order, this Court also granted Plaintiff
"the right to fully pursue discovery concerning the financial
and personal assets of Doug Maxwell and Jim Maxwell in the
severed case." *Id.* at 2.

After the severance order, Plaintiff served Defendant Jim
Maxwell with a Notice of Oral and Video Deposition and
a Subpoena *Duces Tecum.* Doc. 229, Pl.'s Mot. to Compel,
4. On March 23, 2017, Plaintiff took Maxwell's deposition,
but Maxwell provided only limited responsive documents and
refused to answer numerous questions. *Id.* On June 6, 2017,
Plaintiff moved the Court to compel Maxwell to respond to
the document requests and retake Maxwell's deposition. *Id.*
Plaintiff also requested sanctions. *Id.* On July 5, 2017, this
Court referred Plaintiff's motion to United States Magistrate
Judge Paul D. Stickney. Doc. 230, Order Referring Mot.
After conducting a hearing on this motion, Judge Stickney
granted the Plaintiff's motion on October 17, 2017. Doc. 241,
Order ("Judge Stickney's Order"). Judge Stickney's Order
required Maxwell to produce a number of documents related
to his financial status, and appear at another deposition

Lincoln General Insurance Company v. Maxwell, Not Reported in Fed. Supp. (2018)
2018 WL 4610533

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 47 of 73   PageID 4843

where he was required to answer questions completely and honestly. *Id.* Importantly, the Order also specifically warned Maxwell: "Further abuse by Respondent [Maxwell] will result in sanctions and the striking of his pleadings." *Id.* at 2.

**\*2** However, despite Judge Stickney's clear admonition, Maxwell still refused to comply. Plaintiff noticed a second deposition, pursuant to Judge Stickney's Order, on November 16, 2017. Doc. 246, Pl.'s Mot. to Enforce Court's Order, 2. While Maxwell did appear for the deposition, he failed to produce documents that were responsive to the straightforward terms set out in Judge Stickney's Order. *See* Doc. 253, Findings, Conclusions, and Recommendation of the United States Magistrate Judge, 8–9. Additionally, Plaintiff characterized Maxwell's testimony during the deposition as "evasive, combative, and misleading." *Id.* at 9–10.

On August 31, 2018, based on Maxwell's abusive behavior at the deposition and disregard for document requests, Judge Rutherford found that Maxwell "willfully ignored the Court's warning and did not correct his behavior when he had the opportunity." *Id.* Further, Judge Rutherford found that Maxwell demonstrated a pattern of "contumacious conduct" towards his discovery obligations and this Court's orders without any justifiable excuse. *Id.* at 10–11. Judge Rutherford then, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), recommended that this Court order the sanction Judge Stickney originally warned of in the October 17, 2017 Order —the striking of Maxwell's pleadings—because "no lesser sanction would be sufficient to deter Respondent's behavior." *Id.* at 11. Judge Rutherford also recommended that Maxwell pay Plaintiff's reasonable attorneys' fees and costs incurred in bringing its Motion to Enforce Court's Order and for Sanctions under Federal Rule of Civil Procedure 27(b)(2)(A).

## II.

### ANALYSIS

After conducting a *de novo* review of the motions, responses, files, and records in this case, as well as the Findings, Conclusions, and Recommendation of United States Magistrate Judge Rutherford and Defendant Maxwell's Objections, the Court is of the opinion that the Findings, Conclusions, and Recommendation are correct. A district court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson*,

898 F.3d 1018, 1021 (5th Cir. 1990). However, typically, to impose the severest of remedies under Rule 37(b)—*e.g.*, striking pleadings, entering default judgment, or dismissing the action with prejudice—a party's violation of a discovery order must be committed willfully or in bad faith. *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012); *Plasticsource Workers Comm. v. Coburn*, 283 F. App'x 181, 184 (5th Cir. 2008) (affirming default judgment under Rule 37(b) based on willful violation of discovery order). Additionally, the district court should find that "a lesser sanction [under Rule 37(b) ] would not substantially achieve the desired deterrent effect." *Coburn*, 283 F. App'x at 184 (citing *Smith v. Smith*, 145 F.3d 335, 344 (5th Cir. 1998) ).

Here, this Court agrees with Magistrate Judge Rutherford's findings and application of the law. Based on the unambiguous requirements and warnings in Judge Stickney's Order, Judge Rutherford had ample evidence to conclude that Maxwell behaved willfully when he violated that Order. Further, with good reason, Judge Rutherford concluded that Maxwell's "pattern of contumacious conduct" in these proceedings indicated that "no lesser sanction" would be "sufficient to deter" Maxwell. Doc. 253, Findings, Conclusions, and Recommendation, 10–11.

From his Objections, the Court is able to discern two specific objections that Maxwell has raised in response to Judge Rutherford's Findings, Conclusions, and Recommendation: (1) that this Court should have ordered a protective order based on counsel for Plaintiff's discovery requests; and (2) that his discovery productions are, in fact, responsive to Judge Stickney's Order.

**\*3** First, Maxwell argues that both his Motion to Dismiss or for Protective Order (Doc. 235) and Plaintiff Lincoln General Insurance Company's Response (Doc. 236) "have been ignored by the Court without comment" and that he is entitled to a protective order based on the "oppression and undue burden" caused by Plaintiff's discovery requests. *See* Doc. 256, Maxwell's Objs., 2–3. To start, Maxwell was put on notice that "a party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made." Doc. 253, Findings, Conclusions, and Recommendations, 12. Thus, Maxwell's first objection is unrelated to Magistrate Judge Rutherford's Findings, Conclusions, and Recommendation and can be overruled on that ground alone. However, the Court will note on January 9, 2018, Magistrate Judge Stickney denied his motion after full briefing and a hearing because, in large

Lincoln General Insurance Company v. Maxwell, Not Reported in Fed. Supp. (2018)
2018 WL 4610533

Case 4:22-cv-00343-Y Document 206 Filed 02/16/24 Page 48 of 73 PageID 4844

part, Maxwell's Motion to Dismiss was a "reiteration of his Response to Plaintiff's Motion to Compel." Doc. 245, Order Denying Mot. to Dismiss or for Protective Order, 2. Thus, Maxwell's Motion to Dismiss was considered and subsequently denied after a hearing and full consideration by Magistrate Judge Stickney. Maxwell's first objection is overruled.

Next, Maxwell argues again, as he has in previous motions (*See* Doc. 247, Def.'s Resp. to Pla.'s Mot. to Enforce Court's Order and for Sanctions, 3–5 and Doc. 249, Def.'s Mot. to Quash, 1–2), that his previous production is sufficiently responsive to Judge Stickney's Order on October 17, 2017. Doc. 256, Def.'s Objs., 4–5. Maxwell claims the flash drive he produced covers the items Judge Stickney ordered him to produce, except for documents that were previously produced or that do not exist. *Id.* However, of the 360 pages of documents produced in the flash drive, 323 were banking documents related Sante Fe Insurance Company in 2010, which were "marginally relevant" to the items he was ordered to produced. Doc. 248, Pl.'s Reply in Support of Mot. To Enforce, 3–4. Further, of the remaining 37 pages, it appears that only a few of these were new and responsive documents. *Id.* (noting that his 2016 tax returns and some K-1's related to Neutron Depot were new documents). Thus, the Court finds that Maxwell's objection that he produced all the requested items in Judge Stickney's Order "to the maximum extent possible" baseless. Maxwell's behavior and testimony at his November 16, 2017 deposition further undercut his assertions that he has fully complied with this Court's orders.[1] The Court overrules this objection as well.

---

[1]   *See* Doc. 246-2, Def.'s Oral Depo., 7–8 (testifying he produced most of the documents from his file cabinet and that they were mostly reproduction); *Id.* at 8–9 (testifying the only third party he requested documents from was his son-in-law, but he did not inform him or any other party of Judge Stickney's Order); *Id.* at 18–19, (testifying he made no effort to obtain documents related to money transfers to his family or regarding the Maxwell Family

Trust, which were both items covered in Judge Stickney's Order); *Id.* at 22 (testifying that in regard to corporate and financial documents he was ordered to produced, he attempted to obtain them by logging in to his account online, and when that failed, he never contacted the bank or made any additional effort to obtain them).

It is therefore **ORDERED** that the Findings, Conclusions, and Recommendation of the United States Magistrate Judge (Doc. 253) are **ADOPTED,** and Plaintiff Lincoln General Insurance Company's Motion to Enforce Court's Order and for Sanctions Against James T. Maxwell (Doc. 246) is **GRANTED**. Defendant James Thornton Maxwell's Objections to Findings, Conclusions, and Recommendation of the United States Magistrate Judge (Doc. 256) are **OVERRULED**. This Court's September 20, 2018 Order Adopting Findings, Conclusions, and Recommendation of the United States Magistrate Judge (Doc. 255) is **VACATED**.

Accordingly, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), the Court **ORDERS** Defendant James Thornton Maxwell's pleadings related to Plaintiff's remaining claims against him be struck from the record. Thus, Maxwell's Answer found in *Lincoln General Insurance Co. v. U.S. Auto Insurance Servs. Inc., et al.*, No. 3:10–CV–2307–B (N.D. Tex. Sept. 20, 2011) (Doc. 68) is hereby **STRUCK** from the record. The Court also **ORDERS** under Federal Rule of Civil Procedure 37(b)(2)(C) that Maxwell pay Plaintiff's reasonable attorneys' fees and costs incurred in bringing this motion. Finally, Plaintiff Lincoln is **ORDERED** to file an application for attorneys' fees and costs, accompanied by supporting evidence establishing the reasonable amount to be awarded under Rule 37(b)(2)(C) no later than **October 10, 2018, fourteen days** after the entry of this order.

**\*4 SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4610533

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 49 of 73   PageID 4845

2016 WL 6139096
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

MURILLO MODULAR
GROUP, LTD., Plaintiff,

v.

Ann SULLIVAN and Crenshaw,
Ware & Martin, P.L.C., Defendants.

No. 3:13-cv-3020-M
|
Signed 10/20/2016

**Attorneys and Law Firms**

Evan L. Van Shaw, David Welch, Janet R. Randle, Law Offices of Van Shaw, Michael S. Alfred, Hallett & Perrin, Dallas, TX, for Plaintiff.

D. Craig Brinker, E. Stratton Horres, Jr., Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Susan A. Schwartz, Henslee Schwartz LLP, Dallas, TX, for Defendants.


**MEMORANDUM OPINION AND ORDER**[1]

[1]   Under Section 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[ ] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

DAVID L. HORAN, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Murillo Modular Group, Ltd. ("Murillo" or "Plaintiff") has filed a Motion to Compel Defendants to Comply with Their Discovery Obligations [Dkt. No. 64] (the "Discovery MTC") and a Motion to Compel Ann Sullivan to Respond to Deposition Questions [Dkt. No. 69] (the "Sullivan Deposition MTC"), both of which Chief Judge Barbara M. G. Lynn has referred to the undersigned United States magistrate judge for determination pursuant to 28 U.S.C. § 636(b). See

Dkt. Nos. 66 & 71. Defendants Crenshaw, Ware & Martin, P.L.C. ("CWM") and Ann Sullivan ("Sullivan"; collectively with CWM, "Defendants") have filed responses to each motion, see Dkt. Nos. 75 & 76, and Murillo has filed replies, see Dkt. Nos. 80 & 81.

Defendants have also filed a Motion for Protective Order [Dkt. No. 77] (the "MPO"), which Judge Lynn has also referred to the undersigned for determination. See Dkt. No. 78.

The Court heard oral argument on all three motions on October 18, 2016. See Dkt. No. 90.

For the reasons and to the extent explained below, the Court DENIES Murillo's Motion to Compel Ann Sullivan to Respond to Deposition Questions [Dkt. No. 69] and GRANTS in part and DENIES in part Murillo's Motion to Compel Defendants to Comply with Their Discovery Obligations [Dkt. No. 64] and Defendants' Motion for Protective Order [Dkt. No. 77].


**Background**

Murillo has sued Defendant Sullivan and her former law firm of 35 years, CWM, for professional negligence and breach of contract "regarding various litigation where Defendants represented Plaintiff, including a lawsuit that ended in an unfavorable settlement for Plaintiff." Dkt. No. 80 at 1; see Dkt. No. 36. "Specifically, and as set forth in Plaintiff's Third Amended Complaint, Plaintiff claims that Defendants committed malpractice with respect to entering into a flawed and grossly inadequate settlement agreement, as well as with respect to a commercially-unreasonable foreclosure sale of certain HVAC Equipment." Dkt. No. 69 at 1.

On September 6, 2016, CWM served objections to Plaintiff's Second Request for Production Nos. 1, 2, 3, 5, 6, 9, 10, 15, and 16 and to Plaintiff's First Set of Interrogatories Nos. 14, 15, 16, 17, 18, and 19. In the Discovery MTC, Murillo asserts that Defendants' objections are improper and that the Court should compel Defendants to properly respond to the discovery requests.

Murillo took Sullivan's deposition at her counsel's law firm on July 20, 2016. In their Sullivan MTC, Murillo asserts that, "[d]uring the deposition, Sullivan was evasive, non-responsive, and refused to answer many critical questions

APPENDIX 46

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 50 of 73   PageID 4846

related to the prosecution of Plaintiff's claims and the defenses thereto" and that, "[d]espite efforts by Plaintiff's counsel to convey the necessity and relevancy of the information requested during Sullivan's deposition, Sullivan and her counsel refused to cooperate." Dkt. No. 69 at 1-2. Murillo contends that Sullivan "and her counsel impeded, delayed, and frustrated her fair examination on repeated occasions in violation of Rule 30's requirements as shown in the full and complete transcript of Sullivan's deposition." *Id.* at 2. The Sullivan MTC enumerates 12 "specific instances of misconduct by Sullivan and her counsel during the July 20, 2016 deposition." *Id.* at 3.

 **\*2** Murillo "requests that, after reviewing the [cited] testimony, the Court compel Sullivan to re-appear for the resumption of her deposition for a reasonable period of time to answer these remaining questions in a forthright, accurate, and complete manner without improper obstruction or disruption by herself or her counsel." *Id.* at 6. Murillo "believes that an additional deposition period of ninety minutes will be sufficient, and proposes that her deposition be scheduled to re-open immediately following the conclusion of the deposition of Ryan Snow, for which the parties are tentatively trying to schedule for during the month of October." *Id.*

Murillo also reports that it "is concerned that such deposition tactics will be repeated with the upcoming deposition of Mr. Snow and other of Defendants' witnesses that are in the process of being set" and "respectfully requests that the Court address this behavior in the context of providing an admonishment against any future such conduct during the depositions of Defendants' witnesses." *Id.* Murillo "further requests that the Court consider awarding Plaintiff its legal fees and costs incurred in connection with this motion, including the costs for re-opening Sullivan's deposition (meaning, the attorneys' fees for the additional deposition preparation and examination time as well as the costs associated with the court reporter and videographer)." *Id.* at 7.

More specifically, Murillo explains that its two motions to compel each "seek[ ] financial information regarding Defendants and their financial motivations to induce Plaintiff to settle the underlying lawsuit" and that Defendants' "financial motivations are completely relevant to determine if Defendants breached their duties owed to Plaintiff." Dkt. No. 80 at 1; Dkt. No. 81 at 1.

In their MPO, Defendants move the Court for a protective order directing Plaintiffs to restrain from "examining W. Ryan Snow, Ann K. Sullivan, or any 30(b)(6) witness of Defendants, in a manner designed or tending to embarrass, annoy, or oppress." Dkt. No. 77 at 1. "If Defendants are ordered to produce further information, Defendants request a protective order to permit Defendants to provide Plaintiff with Defendants' financial[,] personal[,] and business information with protection from unnecessary and inappropriate dissemination," but "[t]his request is made without waiving the objections asserted by Defendants as to any discovery, written or oral, in this case." *Id.* at 1-2. Defendants also request "that any information disclosed by Defendants which reveals any proprietary business or personal information be treated as "Confidential Material" under a proposed protective order." *Id.* at 2.

More specifically, Defendants

• "seek a protective order [under Federal Rules of Civil Procedure 26(c)(1) and 30(d)(3)] in response to [written] discovery request[s] from Plaintiff [and deposition questioning of Sullivan] that exceed the scope of discovery regarding Ann Sullivan's compensation with Crenshaw, Ware, & Martin, and Crenshaw, Ware, & Martin's financial information" and, specifically, "forbidding the disclosure or discovery of Ann Sullivan's compensation from Crenshaw, Ware, & Martin," "forbidding any inquiry into Ann Sullivan's compensation from Crenshaw, Ware, & Martin," "forbidding the disclosure or discovery of Crenshaw, Ware, & Martin's financial information; or in the alternative prescribing a discovery method other than the one selected by the party seeking discovery," and "forbidding inquiry into Crenshaw, Ware, & Martin's financial information";

• seek a protective order from discovery regarding Sullivan's departure from CWM, which Defendants assert exceeds the scope of [Federal Rule of Civil Procedure] 26(b)(1) and, specifically, "forbidding the disclosure or further discovery of Ann Sullivan's basis for ending her employment with Crenshaw, Ware, & Martin";

• **\*3** • seek "a protective order prohibiting the distribution of any financial, business, proprietary or personal information to any person not specifically employed by counsel in this litigation or designated as the corporate representative for this action";

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y    Document 206    Filed 02/16/24    Page 51 of 73    PageID 4847

- seek a protective order from further dissemination of "portions of a report by Plaintiff's expert, which contain inflammatory comments designed to harass, annoy and otherwise impermissibly threaten Defendants" and which Defendants have moved to strike – or, more specifically, seek a protective order "[s]ealing any portion of the Daniel's report which is struck pursuant to this Court's order";

- seek "a protective order designating pages 16-17 of Ann Sullivan's deposition 'confidential' for the reason that it relates to a Complaint which was summarily dismissed, has no bearing on any relevant issues in this case, but could be harmful and prejudicial to the reputation of Ann Sullivan";

- seek a protective order to "mark the Expert Report of Rhetta Daniel as confidential, as the opinions stated therein, on their face, are so obviously lacking in relevance and reliability and are so prejudicial they can never meet the requisites of the Federal Rules of Evidence"; and

- seek an order to quash the deposition of Ryan Snow, which Murillo noticed "for October 21, 2016 without consulting Defendant or defense counsel for availability," where "defense counsel is unable to present Mr. Snow on this date."

*Id.* at 4-9.

## Legal Standards

### Murillo's Discovery MTC

Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production or answers against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34 or to answer interrogatories under Federal Rule of Civil Procedure 33. *See* Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv). For purposes of Rule 37(a), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). In response to a Rule 34 request, "[f]or each item or category, the response

must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." Fed. R. Civ. P. 34(b)(2)(C). And, in response to an interrogatory under Rule 33, "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath"; "[t]he grounds for objecting to an interrogatory must be stated with specificity"; and "[a]ny ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." Fed. R. Civ. P. 33(b)(3)-(4).

**\*4** Federal Rules of Civil Procedure Rules 26(b), 26(c), and 34 have been amended, effective December 1, 2015. Rule 26(b)(1) now provides that, "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

The amendments to Rules 26 and 34 govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, in all proceedings then pending. The Court finds that applying the standards of Rules 26 and 34, as amended, to these motions is both just and practicable.

Further, for the reasons the Court has previously explained, the Court concludes that the amendments to Rule 26 do not alter the burdens imposed on the party resisting discovery discussed above. *See Carr v. State Farm Mutual Automobile Insurance Company*, 312 F.R.D. 459, 463-69 (N.D. Tex. 2015). Rather, just as was the case before the December 1, 2015 amendments, under Rules 26(b)(1) and 26(b)(2)(C)(iii), a court can – and must – limit proposed discovery that it determines is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden

or expense of the proposed discovery outweighs its likely benefit – and the court must do so even in the absence of a motion. *See Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011). Thus, as amended, Rule 26(b)(2)(C) provides that, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

But a party seeking to resist discovery on these grounds still bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by Federal Rule of Civil Procedure 26(b) by coming forward with specific information to address – insofar as that information is available to it – the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

The party seeking discovery, to prevail on a motion to compel, may well need to make its own showing of many or all of the proportionality factors, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues, in opposition to the resisting party's showing.

**\*5** And the party seeking discovery is required to comply with Rule 26(b)(1)'s proportionality limits on discovery requests; that party is also subject to Federal Rule of Civil Procedure 26(g)(1)'s requirement to certify "that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:...(B) with respect to a discovery request..., it is: (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and

the importance of the issues at stake in the action"; and faces Rule 26(g)(3) sanctions "[i]f a certification violates this rule without substantial justification." Fed. R. Civ. P. 26(g)(1)(B), 26(g)(3); *see generally Heller v. City of Dallas*, 303 F.R.D. 466, 475-77, 493-95 (N.D. Tex. 2014).

But the amendments to Rule 26(b) do not alter the basic allocation of the burden on the party resisting discovery to – in order to successfully resist a motion to compel – specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable. *See McLeod*, 894 F.2d at 1485; *Heller*, 303 F.R.D. at 483-93.

Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, or if the requested discovery is provided after the motion was filed, "the court must, after giving an opportunity to be heard, require the party...whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).

Federal Rule of Civil Procedure 37(a)(5)(B)-(C) further provides in pertinent part that, "[i]f the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party...who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees," "[b]ut the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust," and that, "[i]f the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(B)-(C).

## Murillo's Sullivan MTC

Federal Rule of Civil Procedure 30 governs the conduct or counsel, parties, and deponents in connection with a party's deposition as an initial matter, and Rule 30(c)(2) governs

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y    Document 206    Filed 02/16/24    Page 53 of 73    PageID 4849

objections to deposition questions and when a party must answer. *See* Fed. R. Civ. P. 30(c)(2). "An objection at the time of the examination – whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition – must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection." *Id.* "An objection must be stated concisely in a nonargumentative and nonsuggestive manner." *Id.*

And Rule 30(c)(2) provides only three situations in which a deponent may properly be instructed not to answer a question – "only when necessary" (1) to preserve a privilege, (2) to enforce a limitation previously ordered by a court, or (3) to present a motion under Federal Rule of Civil Procedure 30(d)(3) to terminate or limit the deposition on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. *Id.* ("A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).")." " 'Directions to a deponent not to answer a question can be even more disruptive than objections.' " *Rangel v. Gonzalez Mascorro*, 274 F.R.D. 585, 591 n.7 (S.D. Tex. 2011) (quoting Fed. R. Civ. P. 30(d) 1993 Advisory Committee's Note). "Because the plain language of Rule 30 is rather clear on what types of objections counsel may make and when counsel may instruct a deponent not to answer a question, courts have generally concluded that it is improper to instruct a witness not to answer a question based on a relevancy objection. However, if counsel's questions go so far beyond the realm of possible relevance where the deposition is being conducted in an abusive manner (i.e., in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party), then it would be permissive to instruct a deponent not to answer and move for a protective order under Rule 30(d)(3)." *Id.* at 591 (footnote and citations omitted).

 *6 "The only ground for [a Rule 30(d)(3)] motion to limit or terminate the deposition is that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." *Mayberry v. Wal-Mart La., LLC*, Civ. A. No. 14-cv-478, 2015 WL 420284, at *3 (W.D. La. Jan. 29, 2015). And Rule 30(d)(3)(A) expressly limits the timing for a Rule 30(d)(3) motion: "At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or

oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A); *see Mashiri v. Ocwen Loan Servicing, LLC*, No. 12cv2838-L (MDD), 2014 WL 4608718, at *2 (S.D. Cal. Sept. 15, 2014) ("If counsel for Plaintiff believed that counsel for Defendant was asking the same question repeatedly in bad faith or to unreasonably annoy, embarrass or oppress Plaintiff, counsel's option was to move to terminate or limit the deposition under Rule 30(d)(3). Plaintiff's current motion to terminate the deposition is untimely for that purpose as Rule 30(d)(3) requires the motion be made during the deposition."); *see also Redwood v. Dobson*, 476 F.3d 462, 467-68 (7th Cir. 2007) ("Webber gave no reason beyond his declaration that the questions were designed to harass rather than obtain information – which may well have been their point, but Fed. R. Civ. P. 30(d) specifies how harassment is to be handled. Counsel for the witness may halt the deposition and apply for a protective order, *see* Rule 30(d)(4), but must not instruct the witness to remain silent. 'Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30(d)(4).' Fed. R. Civ. P. 30(d)(1). Webber violated this rule repeatedly by telling Gerstein not to answer yet never presenting a motion for a protective order. The provocation was clear, but so was Webber's violation."). But Murillo does not contend that any Rule 30(d)(3) motion is untimely, perhaps because Murillo contends that Sullivan's deposition testimony is incomplete and seeks itself to continue or reopen the deposition.

Rule 30(d)(3) further provides that "[t]he motion may be filed in the court where the action is pending or the deposition is being taken"; that, "[i]f the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order"; that "[t]he court may order that the deposition be terminated or may limit its scope and manner as provided in [Federal Rule of Civil Procedure] 26(c)"; that, "[i]f terminated, the deposition may be resumed only by order of the court where the action is pending"; and that Federal Rule of Civil Procedure "37(a)(5) applies to the award of expenses" in connection with a Rule 30(d)(3) motion. Fed. R. Civ. P. 30(d)(3)(A)-(C).

Once a deponent has appeared for a deposition, Federal Rule of Civil Procedure 37(a)(3)(B)(i) governs a motion to compel a deponent to answer a question. *See* Fed. R. Civ. P. 37(a)(3)(B)(i) ("A party seeking discovery may move for an order compelling an answer, designation, production, or inspection.

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y    Document 206    Filed 02/16/24    Page 54 of 73    PageID 4850

This motion may be made if: (i) a deponent fails to answer a question asked under Rule 30....."). And Rule 37(a)(2) provides that "[a] motion for an order to a party must be made in the court where the action is pending." Fed. R. Civ. P. 37(a)(2).

For Rule 37(a)(3)(B)'s purposes, "an evasive or incomplete...answer...must be treated as a failure to...answer." Fed. R. Civ. P. 37(a)(4). And Rule 37(a)(5) provides, in pertinent part, that, on a Rule 37(a)(3)(B)(i) motion to compel an answer from a deponent, including a non-party:

- "If the motion is granted...the court must, after giving an opportunity to be heard, require the...deponent whose conduct necessitated the motion, the... attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust."

- "If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust."

- **\*7** • "If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."

Fed. R. Civ. P. 37(a)(5)(A)-(C).

Federal Rule of Civil Procedure 30(d)(2) provides that "[t]he court may impose an appropriate sanction – including the reasonable expenses and attorney's fees incurred by any party – on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). "The meaning of 'appropriate sanction' in Rule 30(d)(2) has been broadly interpreted as [t]he full scope of sanctions available under Rule 30(d)(2) is not expressly described in the text of the rule." *Howell v. Avante Servs., LLC*, Civ. A. No. 12-293, 2013 WL 824715, at *5 (E.D. La. Mar. 6, 2013) (internal

quotation marks omitted). "Many courts have construed Rule 30(d)(2) to apply to circumstances where a party's conduct at a deposition warranted remedial action." *S. La. Ethanol, L.L.C. v. Fireman's Fund Ins. Co.*, Civ. A. Nos. 11-2715 & 12-0379, 2013 WL 1196604, at *8 (E.D. La. Mar. 22, 2013) (citing cases). "The broad scope of appropriate sanctions under Rule 30(d)(2) includes, where appropriate, an award of expenses associated with a deposition's continuation that is necessitated by a [person's] conduct that impedes, delays, or frustrates the fair examination of the deponent." *Nieman v. Hale*, No. 3:12-cv-2433-L-BN, 2014 WL 4375669, at *5 (N.D. Tex. Sept. 4, 2014). The movant bears the burden on any Rule 30(d)(2) motion that it makes. See *Kleppinger v. Tex. Dep't of Transp.*, 283 F.R.D. 330, 333 (S.D. Tex. 2012).

### Defendants' MPO

As amended effective December 1, 2015, Rule 26(c)(1) authorizes protective orders, for good cause shown, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; (B) specifying terms, including time and place or allocation of expenses, for the disclosure or discovery; (C) prescribing a discovery method other than the one selected by the party seeking discovery; (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters; (E) designating the persons who may be present while the discovery is conducted; (F) requiring that a deposition be sealed and opened only on court order; (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and (H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs." Fed. R. Civ. P. 26(c)(1).

"[T]he burden is upon [the party seeking the protective order] to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998) (citation omitted). A protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection. See *Landry v. Air Line Pilots Ass'n*, 901 F.2d 404, 435 (5th Cir. 1990). And the United States Court of Appeals for the Fifth Circuit recently explained that "[t]he federal courts have superimposed a somewhat demanding balancing of interests approach to the Rule. Under the balancing standard, the district judge must compare the

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)
2016 WL 6139096

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 55 of 73   PageID 4851

hardship to the party against whom discovery is sought against the probative value of the information to the other party. Courts also weigh relevant public interests in this analysis." *Cazorla v. Koch Foods of Mississippi, L.L.C., ___ F.3d ____, No. 15-60562, 2016 WL 5400401, at \*10 (5th Cir. Sept. 27, 2016)* (footnotes and internal quotation marks omitted); *see also id.* at \*18 ("Rule 26(d) gives that court wide discretion to craft flexible and nuanced terms of discovery." (footnote omitted)).

**\*8**  The Court has broad discretion in determining whether to grant a motion for a protective order. *See Harris v. Amoco Prod. Co.,* 768 F.2d 669, 684 (5th Cir. 1985). "The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36 (1984).

Federal Rule of Civil Procedure 26(c)(3) provides that, in connection with a motion under Rule 26(c) for a protective order, Federal Rule of Civil Procedure "37(a)(5) applies to the award of expenses." Fed. R. Civ. P. 26(c)(3).

**Analysis**

I. Discovery regarding Sullivan's compensation and departure and CWM's finances

With regard to Murillo's Interrogatory Nos. 14, 15, and 16 to CWM and Murillo's Second Request for Production Nos. 1, 2, 3, 4, 5, 6, 9, and 10, the Court has carefully considered the parties' arguments regarding whether discovery is proper under Rules 26(b) and 26(c) as to Sullivan's compensation with and departure from CWM and CWM's finances for certain years.

Murillo argues that discovery on these topics may show that Defendants acted in their self-interest when recommending that it settle the case. For instance, if CWM was experiencing financial difficulty, CWM may have had a motive to encourage Murillo to settle and collect any outstanding fees that Murillo owed. Similarly, if Sullivan's compensation or employment status depended on the fees that she collected for her cases, she may have had a motive to encourage CMW to settle and collect any outstanding fees.

But Murillo's relevance theories assume that CWM and Sullivan were especially eager to collect any outstanding fees owed. But Defendants note that Murillo continued to owe Defendants money for their services well after Murillo agreed

to settle the case and that this did not impact the parties working relationship. Defendants continued to represent Murillo in other matters even though Murillo 's bill was still outstanding'.

Defendants' proffered evidence also indicate that Sullivan's employment status was not connected to the date that CWM collected its fees for the lawsuit. Sullivan left the firm two-and-a-half years after the settlement was concluded. CWM has already responded to an interrogatory request on the matter by explaining that it has no personal knowledge about why Sullivan decided to leave the firm; and Sullivan herself testified that the amount CWM owed is "not an issue that caused [her] to leave the firm." Dkt. No. 70, Ex. 1 at 296. Defendants have also responded to an interrogatory explaining that "there were no documents referencing any criticism of [Sullivan's] representation of Plaintiff." Dkt. No. 75 at 4.

Further, Defendants note that Sal Murillo, acting as the principal person in charge of Murillo, has already "testified he was willing to enter into the agreement if it was the best deal they could reach with AMC." Dkt. 75 at 6.

In the face of Sullivan's and Murillo's deposition testimony, and Defendants' showing of why this requested information is not relevant to the claims and defenses in this case, Murillo has not shown any factual basis to suggest that discovery into these matters will show that Defendants' representation of Murillo in connection with the settlement agreement at issue was influenced or driven by a concern for Murillo's receivable with CWM or Sullivan's compensation or that Sullivan's departure from CWM was motivated or caused by her representation of Murillo. Murillo's speculation that discovery could be relevant to its claims to corroborate or impeach Sullivan's deposition testimony is not sufficient.

**\*9**  Accordingly, the Court determines, under Rules 26(b)(1), 26(b)(3), and 26(c)(1), that the requested discovery into these matters is not proportional to the needs of the case, considering the importance of the issues at stake in the action and the importance of the discovery in resolving the issues. The Court will deny Murillo's motion to compel, and grant Defendants their requested protective order, as to these discovery requests.

II. Discovery regarding Defendants' involvement in other lawsuits

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y    Document 206    Filed 02/16/24    Page 56 of 73    PageID 4852

As to Murillo's Interrogatory Nos. 16, 17, 18, and 19 to CWM and Murillo's Second Request for Production No. 15, the Court determines that the information requested as to Sullivan's alleged role in a related lawsuit is within the proper scope of discovery under Rule 26(b)(1) and denies Defendants' request for a protective order.

Information relevant to a party's or likely witness's credibility may fall within Rule 26(b)(1)'s scope. *See* Fed. R. Civ. P. 26, 2015 comm. note ("The amendment deletes the former provision authorizing the court, for good cause, to order discovery of any matter relevant to the subject matter involved in the action. The Committee has been informed that this language is rarely invoked. Proportional discovery relevant to any party's claim or defense suffices, given a proper understanding of what is relevant to a claim or defense. The distinction between matter relevant to a claim or defense and matter relevant to the subject matter was introduced in 2000. The 2000 Note offered three examples of information that, suitably focused, would be relevant to the parties' claims or defenses. The examples were 'other incidents of the same type, or involving the same product'; 'information about organizational arrangements or filing systems'; and 'information that could be used to impeach a likely witness.' Such discovery is not foreclosed by the amendments."); *see also* S.E.C. v. Cuban, No. 3:08-cv-2050-D, 2012 WL 456532, at *1 (N.D. Tex. Feb. 10, 2012) ("Cuban has at least shown that the nonprivileged portions of the SEC's investigative file for the investigation of Mamma.com, and documents pertaining to the relationship between the Mamma.com investigation and the investigation of Cuban, are relevant to the credibility of Mamma.com witnesses, including CEO Guy Faure ('Faure'), and are therefore within the scope of Rule 26(b)(1). Cuban has established that he is doing more than engaging in a fishing expedition in seeking this discovery."). "Although the rules pertaining to initial and pretrial disclosures allows a party to withhold impeachment evidence, *see* Fed. R. Civ. P. 26(a)(1) and (3), the rules regarding the discovery of evidence, *see* Fed. R. Civ. P. 26(b), do not preclude impeachment materials from being subject to a discovery request." *Baxter v. Anderson*, No. CV 16-142-JWD-RLB, 2016 WL 4443178, at *5 (M.D. La. Aug. 19, 2016) (emphasis removed; citing Wright, Miller, Kane, Marcus, & Steinman, Federal Practice and Procedure § 2015 (3d ed. 1998) ('[T]he intention of the party from whom discovery is sought to use materials for possible impeachment does not narrow discovery of items that are relevant.' The initial disclosure requirements exclude items that the disclosing party may use 'solely for impeachment,' but no

such categorical limitation applies to material sought through discovery.")). Impeachment evidence is thus discoverable when relevant – in other words, when "disclosure may reveal information affecting the credence afforded to a witness' trial testimony." *Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455, 462 (S.D.N.Y. 2010).

**\*10**  The impeachment evidence Plaintiff seeks is plainly discoverable here. Plaintiff seeks discovery relating to a sanctions order that was entered in a related case where Sullivan allegedly allowed Sal Murillo to sign a false affidavit. Any such allowance speaks to Sullivan's credibility as a witness since it "demonstrate[s] a propensity for deception...in a context where there is a premium on veracity." *See id.* at 462-63 (noting that "sworn statements to a court or government agency, employment applications, and even applications for credit carry an obligation for truthfulness, so that falsehoods in such situations may be probative of a lack of credibility").

In their response, Defendants do not dispute that discovery on these topics could lead to evidence that challenges Sullivan's credibility. Defendants instead insist that Plaintiff should not be entitled to discovery on the prior lawsuit since it concerns Sullivan's actions as an attorney in a different matter that pertains only to parties indirectly related to this action. The prior lawsuit specifically concerns Sullivan's representation of Lonestrella – an entity set up by the principals of Murillo to obtain credit and own property for the benefit of Murillo. But "permit[ting] discovery only of matters otherwise relevant to the case...improperly limits the scope of discovery given the frequent admissibility for purposes of impeachment of matters not otherwise admissible." 8 Wright & Miller, Federal Practice and Procedure: Civil § 2015 2 (3d ed. 2016).

While evidence discovered pursuant to these requests may prove to be inadmissible to the extent it improperly suggests guilt based on Sullivan's past actions, *see Thompson v. Bank of America, N.A.*, 13 F. Supp. 3d 636, 656 (N.D. Tex. 2014), "[i]nformation within [its] scope of discovery need not be admissible in evidence to be discoverable," Fed. R. Civ. P. 26(b)(1).

The Court thus determines that Murillo is entitled to discovery on requests concerning Sullivan's representation of Lonestrella, subject to any attorney-client privilege or attorney-work product protections that may apply and are properly asserted as required by Federal Rule of Civil Procedure 26(b)(5), and ORDERS Defendants to fully

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)
2016 WL 6139096

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 57 of 73   PageID 4853

respond to Murillo's Interrogatory Nos. 16, 17, 18, and 19 to CWM and Murillo's Second Request for Production No. 15 by **November 3, 2016**.

### III. Ann Sullivan's deposition

Murillo's complaints about Sullivan's deposition answers do not merit relief under Rules 37(a)(3)(B)(i) and 37(a)(4) or Rule 30(d)(2). The Court has reviewed the testimony on which Murillo relies and determines that Sullivan did not give incomplete or evasive answers that amount to a failure to answer deposition questions and did not impede, delay, or frustrate Murillo's counsel's fair examination of Sullivan.

More specifically, as to Murillo's complaint numbers 1, 2, 5, and 11, Sullivan testified as to what she recalled. Nothing in Sullivan's answers at issue suggests or evidences a "feigned inability to remember." *Redwood*, 476 F.3d at 469; *see also* Peterson v. Burris, *No. 14-CV-13000, 2016 WL 1458107, at *2 (E.D. Mich. Apr. 14,* 2016) ("As noted by the magistrate judge, there is nothing extraordinary about the fact that Burris could not remember events that took place over three years ago, and the circumstantial evidence did not suggest Burris was being evasive within the meaning of Rule 37(a)(4).").

As to Murillo's complaint numbers 3, 7, 8, 9, 10, and 12, the Court determines that, for purposes of Rules 37(a)(3)(B) (i) and 37(a)(4), Sullivan gave a complete and non-evasive answer to the questions asked. Insofar as Murillo complains that Sullivan's counsel took a break and inappropriately conferred with his client about a pending question, Murillo's counsel did not object when Sullivan said, "Why don't you give me a minute to confer with my counsel." Dkt. No. 70-1 at 21 of 305.

 *11  And, as to Murillo's complaint number 6, the Court determines that Sullivan should not be required to answer further questions as to why her attorney might have asked Sal Murillo a particular question as his deposition, particularly where any further answers may require her to testify to confidential attorney-client communications or attorney work-product.

As to Murillo's complaint number 4, for the reasons explained above, the Court will not require Sullivan to answer the question regarding her compensation with CWM because it is beyond the scope of proper discovery under Rule 26(b)(1) in this case and will grant Defendants' request for a protective order as to this line of questioning.

### IV. Proposed confidentiality order

Because the Court is denying Murillo's Discovery MTC and Sullivan MTC and is correspondingly granting Defendants' MPO as to the matters at issue in these three motions, the Court denies as moot Defendants' request for a protective order to permit Defendants to provide Plaintiff with Defendants' financial personal and business information with protection from unnecessary and inappropriate dissemination.

### V. Requests to seal or mark depositions or expert reports as confidential

The Court has not yet ruled on Defendants' motion to strike portions of the report of Murillo's expert Rhetta Daniel. And Defendants' request to seal and mark as confidential portions of that report relies entirely on conclusory statements. The Court therefore denies without prejudice Defendants' motion for protective order as to this report.

Defendants likewise have not sufficiently shown that pages 16-17 of Sullivan's deposition could be harmful and prejudicial to her reputation, particularly given the limited information to which she testified there. The Court denies Defendants' motion seeking to mark these pages as confidential.

### VI. Deposition of Ryan Snow

At oral argument, the parties' counsel reported that they have agreed to reschedule Mr. Snow's deposition from October 21, 2016 and would confer to work out a mutually agreeable date.

### VII. Award of expenses

Under Rules 26(c)(3) and 37(a)(5), the Court determines that, under all of the circumstances presented here, Murillo and Defendants should bear their own expenses, including attorneys' fees, in connection with each of these motions.

### Conclusion

For the reasons and to the extent explained above, the Court DENIES Murillo's Motion to Compel Ann Sullivan to Respond to Deposition Questions [Dkt. No. 69] and GRANTS in part and DENIES in part Murillo's Motion to Compel Defendants to Comply with Their Discovery Obligations [Dkt. No. 64] and Defendants' Motion for Protective Order [Dkt. No. 77].

Murillo Modular Group, Ltd. v. Sullivan, Not Reported in Fed. Supp. (2016)

2016 WL 6139096

Case 4:22-cv-00343-Y   Document 206   Filed 02/16/24   Page 58 of 73   PageID 4854

SO ORDERED.

DATED: October 20, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6139096

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Carter v. Burlington Northern Santa, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 3388707

Case 4:22-cv-00343-Y Document 206 Filed 02/16/24 Page 59 of 73 PageID 4855

2016 WL 3388707
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

Kasonia L. CARTER

v.

BURLINGTON NORTHERN SANTA,
LLC, f/k/a Burlington Northern Santa
Fe Corporation a/k/a Burlington
Northern Santa Fe Railway a/k/a BNSF.

CIVIL ACTION NO. 4:15-CV-366-O
|
Signed 02/08/2016

**Attorneys and Law Firms**

Hiram McBeth, III, Hiram McBeth Attorney at Law, Dallas, TX, for Kasonia L. Carter.

Russell D. Cawyer, Paige Pritchard Biggs, Kelly Hart & Hallman LLP, Fort Worth, TX, for Burlington Northern Santa, LLC.

**ORDER GRANTING DEFENDANT'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

JEFFREY L. CURETON, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Defendant's Motion for Sanctions for Spoliation of Evidence [doc. 43],[1] filed December 18, 2015. The Court held a hearing on the motion on January 14, 2016. Having carefully considered the motion, response, reply, the evidence presented at the hearing, and the summaries filed by the parties after the hearing, the Court concludes that Defendant's motion should be **GRANTED**.

---

[1]   The Court notes that Defendant's motion was titled "Motion for Show Cause Hearing, Contempt and Sanctions for Spoliation of Evidence." Because the Court has already granted the motion for show cause hearing, the Court will now reference Defendant's motion as a Motion for Sanctions for Spoliation of Evidence.

In its motion and summary filed after the hearing, Defendant requests that the Court sanction Plaintiff and her attorney, Hiram McBeth ("McBeth"), pursuant to Federal Rules of Civil Procedure 11, 30 and 37 and 28 U.S.C. § 1927 for their "egregious misconduct, including: (1) refusing to answer relevant, non-privileged questions during Plaintiff's deposition; (2) refusing to provide the legal basis for counsel's instruction not to answer deposition questions; (3) failure to comply with the Court's [December 16, 2015] order to produce evidence; (4) spoliation of evidence after a preservation instruction; (5) perjury in affidavit, deposition, and courtroom testimony to conceal or distract from the spoliation of evidence; and (6) the filing of a retaliatory motion for sanctions based on false allegations." (Defendant's Summary of Arguments [doc. 60] ("Def.'s Summ.") at 1.)

A court may sanction parties and their attorneys under the court's inherent powers. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "In order to impose sanctions against an attorney under its inherent power, a court must make a specific finding that the attorney acted in 'bad faith.' " *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995) (quoting *Resolution Trust Corp. v. Bright*, 6 F.3d 336, 340 (5th Cir. 1993)); *see Toon v. Wackenhut Corrs. Corp.*, 250 F.3d 950, 952 (5th Cir. 2001). "Courts have the authority to make credibility determinations to resolve whether such misconduct has occurred." *Howard v. State Farm Lloyds*, No. H-04-0352, 2005 WL 2600442, at \*9 (S.D. Tex. Oct. 13, 2005). A primary purpose in imposing sanctions is to deter "frivolous litigation and abusive tactics." *Howard*, 2005 WL 2600442, at \*9. The sanction imposed must be the least severe sanction adequate to achieve the purpose for which it is imposed. *Id.* Courts may use their inherent power to sanction parties for lying under oath or destroying or altering relevant evidence. *Howard*, 2005 WL 2600442, at \*9.

Ordinarily, a court should rely on sanctioning power granted by rule or statute, rather than imposing sanctions under its inherent powers. *Id.* at 50; *Allstate Ins. Co. v. Mader*, 201 Fed.Appx. 261, 265 (5th Cir. 2006). There are several rules in the Federal Rules of Civil Procedure ("FRCP") that authorize the issuance of sanctions and are applicable in this case. As relevant here, FRCP 30(d)(2) states that "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).[2] In addition,

FRCP 37 "empowers the district court to compel compliance with Federal discovery procedures through a broad choice of remedies and penalties." *Griffin v. Aluminum Co. of Am.*, 564 F.2d 1171, 1172 (5th Cir. 1977). Specifically, FRCP 37(b)(2)(A) allows a range of sanctions when a party fails to obey a court order to provide or permit discovery, including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." FRCP 37(2)(A)(i). In addition, the court pursuant to FRCP 37(b)(2)(C), must "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances made an award of expenses unjust." FRCP 37(b)(2)(C). Moreover, sanctions are permitted under FRCP 11 against an attorney, law firm, or party under certain circumstances when an attorney presents a court with a signed written pleading, motion or other paper and it, *inter alia*, is found to have been presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation or its factual contentions lack evidentiary support. Fed. R. Civ. P. 11(b); *see* Fed. R. Civ. P. 11(c).

2    "The meaning of 'appropriate sanction' in Rule 30(d)(2) has been broadly interpreted as the full scope of sanctions available under Rule 30(d)(2) is not expressly described in the text of the rule." *Howell v. Avante Servs., LLC*, No. 12-293, 2013 WL 824715, at *5 (E.D. La. Mar. 6, 2013) (internal quotation marks omitted).

**\*2** The dispute in this case began due to the conduct of Plaintiff and her attorney, McBeth, at Plaintiff's deposition, which was taken on December 16, 2015 at the offices of Defendant's attorney. Based upon the evidence presented by the parties in their written submissions to the Court as well as at the January 14, 2016 hearing, the Court finds that the following facts have been established.[3]

3    After hearing the testimony of the witnesses called at the January 14, 2016 hearing, the Court finds that the testimony of Carolyn Ritchie, Gaylord Sturgess, and Russell Cawyer was credible as to the events of the deposition in question and the testimony of Plaintiff and McBeth was not credible.

When Defendant's counsel, Russell Cawyer ("Cawyer") and corporate representative, Carolyn Ritchie ("Ritchie"), entered the conference room to start the deposition, Plaintiff was sitting on one side of a large conference room table next to McBeth. The court reporter, Gaylord Sturgess ("Sturgess"),

was present and sitting at the end of the table, next to and facing Plaintiff. Plaintiff was reviewing the contents of an open, manila folder that contained a stack of pages. The top page of the stack of pages, at least, was a piece of white, lined paper that contained handwritten notes written across the page in paragraph, narrative form.

Immediately prior to beginning the deposition, Cawyer asked to review the pages that Plaintiff was looking at in the manila folder. Plaintiff and McBeth refused the request, claiming the pages were "personal" and Plaintiff closed the folder and put it away in a black, canvas bag. At the beginning of the deposition after Plaintiff had been placed under oath, Cawyer asked Plaintiff about the contents of the manila folder. (Deposition Transcript of Plaintiff Kasonia Carter ("Pl.'s Dep.") at 5-13.) Plaintiff stated that the notes were her "personal business" and were "[g]rocery lists, things like that." (Pl.'s Dep. at 7; *see* Pl.'s Dep. at 8-9.) Plaintiff further stated that there were no references to Defendant or her employment with Defendant in any of the notes. (Pl.'s Dep. at 7.) McBeth further represented on the deposition record that the contents of the file had "nothing to do with BNSF in this case," claimed they were Plaintiff's personal business, and instructed Plaintiff not to answer any further questions about the notes or the contents of the manila folder. (Pl.'s Dep. at 9-10.) McBeth also refused to show Cawyer the manila folder and its contents. (Pl.'s Dep. at 10.) Cawyer then informed McBeth that they were going to take up the matter with District Judge Reed O'Connor and asked McBeth and Plaintiff to "preserve that manila folder and all of its contents exactly as it exists right now." (Pl.'s Dep. at 10.)

Upon breaks during the deposition, Plaintiff carried the black canvas bag containing the manila folder and notes out of the conference on at least two occasions. After a lunch break, Defendant presented to Plaintiff and McBeth a copy of an order signed by Judge O'Connor [doc. 41] that ordered Plaintiff to immediately turn over the manila folder and its contents to the court reporter and instructed the court reporter to submit such items to the Court for *in camera* inspection.

When the folder was presented to the Court, the outside of the folder contained the following handwritten notation: "K Carver vs. BNSF, EEOC 2-13-15, filed 5-12-15, Atty McBeth." Inside the folder was the following: (1) a single, BNSF form titled "Performance Management Process Form" with a handwritten list of six grocery items on the back in blue ink[4] and (2) a copy of the Original Complaint filed in this action. Apparently, Plaintiff's counsel added the copy of the

Carter v. Burlington Northern Santa LLC, Not Reported in Fed. Supp. (2016)

2016 WL 3388707

complaint to the manila file after it had been given to Sturgess. (Pl.'s Dep. at 130-32.) Sturgess then turned the manila folder over to the Court as per the Court's order.

4     The following words were written on the back in blue ink in list form: eggs, bacon, paper towels, "Deordarant," milk, bread.

**\*3** After the deposition, Defendant filed the above-referenced Motion for Sanctions for Spoliation of Evidence. In response, Plaintiff filed a joint response as well as her own Motion for Sanctions [doc. 46]. In her motion for sanctions, Plaintiff alleged that Cawyer engaged in misconduct by speaking to Plaintiff in a loud, belligerent and threatening tone at the deposition, demanding that Plaintiff open her purse to him, and acting in an appalling, disrespectful, unprofessional, and discourteous manner toward Plaintiff and McBeth. (Pl.'s Response and Motion for Sanctions ("Pl.'s Mot.") at 4.) In the motion, which was signed by McBeth, Plaintiff also claimed, "As the deposition and breaks proceeded Plaintiff said she felt sexually harassed especially when Mr. Cawyer continued to reference her purse and demanded that she empty the contents of her purse on the table for Mr. Cawyer to inspect." (Pl.'s Mot. at 5.) Attached to the Plaintiff's motion for sanctions was an affidavit dated December 23, 2015 and signed by Plaintiff in which Plaintiff, *inter alia*, stated, "On December 16, 2015, during the deposition and breaks I felt sexually harassed especially when Mr. Cawyer continued to reference my purse and demanded that I empty the contents of my purse on the table for him to inspect." (Affidavit of Carter ("Aff. of Carter") at 2.) Plaintiff also stated that she complied with the Court's December 16, 2015 order and "turned over all the documents [she] had in [her] possession contained in the manila folder to the Court Reporter." (Aff. of Carter at 2.)

In an order dated January 4, 2016 [doc. 48], the Court set a hearing on both parties' motions for sanctions for Thursday, January 14, 2016. At the hearing, when pressed about her claims against Cawyer for sexual harassment, Carter conceded that Cawyer wasn't making sexual advances or improper remarks consistent with claims of sexual harassment but instead was engaging in gender harassment, in her opinion, because he asked her to empty the contents of her purse. (Transcript of January 14, 2016 Hearing ("Hearing Trans.") at 88.) Carter clarified that she was not sexually harassed but that she thought sexual harassment was the same thing as gender harassment. (Hearing Trans. at 117-19.) In addition, Carter admitted that, while she claimed at the deposition that there was nothing in the manila folder that related to BNSF, there actually were references to BNSF and

she had been incorrect at the deposition. (Hearing Trans. at 102-06.)

Furthermore, at the hearing, McBeth testified that he stood by his motion for sanctions accusing Cawyer of sexually harassing Plaintiff. (Hearing Trans. at 123.) He admitted that he did sign the motion and that it was his client that was making the accusation. (Hearing Trans. at 126.) When asked about Plaintiff's recanting of the sexual harassment allegation during the hearing, McBeth stated, "On cross examination, [Plaintiff] recanted or used the term for what she believed that she was going through. I have no obligation but to believe what she says, and if she recants it here and now, then my attitude is revised." (Hearing Trans. at 128.)

Based upon the evidence presented at the hearing and with the parties' motions for sanctions and related filings, the Court finds that Plaintiff and McBeth engaged in multiple instances of sanctionable conduct. As to sanctions pursuant to FRCP 30(d)(2), the Court finds that Plaintiff engaged in conduct that impeded, delayed, and frustrated the taking of her deposition when she made untruthful statements regarding the manila folder and its contents. Specifically, Plaintiff stated that nothing in the folder related to BNSF, which she admitted at the hearing was an incorrect statement. In addition, McBeth engaged in conduct that impeded, delayed, and frustrated the taking of Plaintiff's deposition when he improperly objected to the line of questioning relating to the manila folder and its contents and improperly directed Plaintiff not to answer the questions relating to such folder. *See* FRCP 30(c)(2) (stating that a "person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).")

In addition, Plaintiff and McBeth violated FRCP 37(b)(2)(A) by failing to obey the Court's December 16, 2015 order to turn over the manila folder with all the papers that were in such folder prior to the start of Plaintiff's deposition. The Court finds that Plaintiff and McBeth's testimony regarding such contents is not credible and that they failed to turn over everything that was in the manila folder prior to Plaintiff's deposition. The Court finds that the testimony of Sturgess, an uninterested witness, Ritchie, and Cawyer that the manila folder contained a stack of pages and, at the very least, the top page of the stack of pages was a piece of white, lined paper that contained handwritten notes written across the page in paragraph, narrative form was credible. No such piece of

white, lined paper with handwritten notes was produced by Plaintiff and McBeth in the manila folder.

**\*4** As sanctions for the above-described conduct under FRCP 30 (d)(2) and 37(b)(2)(A) & (C), Plaintiff and McBeth will be ordered to pay Defendant's reasonable attorney's fees associated with having to file its Motion for Sanctions for Spoliation of Evidence [doc. 43] and all related costs and fees, including the costs associated with the deposition. The Court finds that this sanction is reasonable in light of Plaintiff's and McBeth's inexcusable conduct in the deposition and failure to fully comply with an order of this Court. While Plaintiff and McBeth, during the hearing, attempted to make excuses for their behavior during the deposition, their excuses were neither reasonable nor credible and were, at times, offensive to the Court's attempts to decipher the truth.

As to the issue of sanctions for spoliation of evidence, the Court finds that sanctions for such behavior is not adequately provided for in the Federal Rules of Civil Procedure. Thus, the Court will use its inherent powers to impose such a sanction. *See Ashton v. Knight Tramp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2001) ("A federal court has the inherent power to sanction a party who has abused the judicial process" and "[t]he spoliation of evidence is one such abuse."); *see Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 449 (4th Cir. 2004). "Spoliation is the destruction or material alteration of evidence or ... the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Ashton*, 772 F. Supp. 2d at 799 (internal quotations omitted). "The party seeking the spoliation sanction bears the burden of proof." *Ashton*, 772 F. Supp. 2d at 800. In the Fifth Circuit, the elements of spoliation are: (1) a duty to preserve the information; (2) a culpable breach of that duty; and (3) resulting prejudice to the innocent party. *See Ashton*, 772 F. Supp. 2d at 800; *see also Rimkus Consulting Grp. v. Cammarata*, 688 F. Supp. 2d 598, 615-16 (S.D. Tex. 2010).

"Courts have broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party," including awarding attorneys' fees, deeming certain facts admitted, giving the jury an adverse inference instruction, striking pleadings, entering a default judgment, and dismissing the case entirely. *Ashton*, 772 F. Supp. 2d at 801 (citing *Anadarko Petroleum Corp. v. Davis*, No. H-06-2849, 2006 WL 3837518, at *27 (S.D. Tex. Dec. 28, 2006)). "In choosing the appropriate remedy, a court must ensure that it is no harsher than necessary to respond to the need to punish or

deter and to address the impact on discovery." *Ashton*, 772 F. Supp. 2d at 801 (internal quotations omitted). The appropriate sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."[5] *Id.* (internal quotations omitted).

[5]   "In order to satisfy the prejudice requirement, the party seeking sanctions must demonstrate that the missing or altered evidence would have been relevant to her case." *Ashton*, 772 F. Supp. 2d at 801 (citing *Rimkus*, 688 F. Supp. 2d at 616). "Lost or destroyed evidence is relevant if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Ashton*, 772 F. Supp. 2d at 801. (internal quotations omitted). "Generally, the prejudice element is satisfied where a party's ability to present its case or to defend is compromised." *Id.* (internal quotations omitted).

The Fifth Circuit permits an adverse inference against a spoliating party upon a showing of bad faith or bad conduct. *Condrey v. SanTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005). "The Fifth Circuit has instructed that an adverse inference jury instruction for spoliation is appropriate where a showing is made that the malfeasant party intentionally destroyed important evidence in bad faith and did so because the contents of those documents were unfavorable to that party." *Ashton*, 772 F. Supp. 2d at 801 (internal quotations omitted). If a court finds that both evidence of destruction and bad faith have been demonstrated, it may then infer that the evidence would be unfavorable to the destroying party if it were introduced in court. *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874, 878 (Fed. Cir. 1986).

**\*5** Based upon the standard set forth above regarding spoliation of evidence, the Court finds that Plaintiff and McBeth: (1) had a duty to preserve the information in the manila folder after being requested to do so by Cawyer at the deposition, (2) breached such duty by removing documents from the manila folder after being asked to preserve such folder in its original condition, and (3) their actions prejudiced Defendant. The Court further finds that Plaintiff and McBeth acted in bad faith as they could not provide any credible explanation for their behavior in refusing to turn over the contents of the manila folder when first requested and their proffered reason for refusing to do so was admitted to be untrue. While it is impossible for the Court to know what is on

Carter v. Burlington Northern-Santa LLC, Not Reported in Fed. Supp. (2016)

2016 WL 3388707

Case 4:22-cv-00343-Y  Document 206  Filed 02/16/24  Page 63 of 73  PageID 4859

the missing documents, based on the above, it is reasonable to infer that such documents were relevant to the lawsuit, the loss of which is prejudicial to Defendant. As a result, in addition to the attorney's fees mentioned above, the Court finds that the appropriate sanction for such spoliation pursuant to its inherent sanctioning powers will be that the jury will be given an adverse inference instruction concerning Plaintiff's and McBeth's conduct at the deposition regarding the papers in the manila folder. The jury will further be instructed that it can infer such missing documents, if they were introduced in court, would be unfavorable to Plaintiff and her position in this case.

Based on the evidence presented and after considering several lesser and greater alternatives, including the awarding of no sanctions, a private reprimand, a public reprimand, nonmonetary sanctions such as ethics training, striking pleadings, entering a default judgment, and outright dismissal of Plaintiff's case, the Court finds that the above sanctions appropriately deters Plaintiff and McBeth from engaging in additional misconduct and spoliation, places the risk of an erroneous judgment on Plaintiff, and restores the Defendant to the same position it would have been in absent the misconduct and spoliation.

As to McBeth's filing of a retaliatory motion for sanctions based on false allegations of sexual harassment against Cawyer, the Court finds that, pursuant to FRCP 11 (c)(3), Plaintiff and McBeth shall be ordered, in an separate order, to show cause why their behavior has not violated FRCP 11(b) and why they should not be sanctioned pursuant to FRCP 11(c).

Based on the foregoing, it is **ORDERED** that Defendant's Motion for Sanctions for Spoliation of Evidence [doc. 43] is **GRANTED**.

It is further **ORDERED** that Defendant shall submit to the Court, **no later than February 22, 2016**, evidence of its *reasonable* attorney's fees and costs, including the costs associated with the taking of Plaintiff's deposition and the filing of its Motion for Sanctions for Spoliation of Evidence. Plaintiff's response, if any, to Defendant's submission is due **no later than February 29, 2016**.

It is further **ORDERED** that Defendant is entitled to a spoliation instruction to the jury that sets forth Plaintiff's and McBeth's conduct at Plaintiff's deposition and states that the jury can infer from such conduct that the missing documents in the manila folder are unfavorable to Plaintiff and her position in this case.

SIGNED February 8, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3388707

---

End of Document                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 60**

2014 WL 4375669
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Jason Lee NIEMAN, Plaintiff,

v.

Keith HALE, et al., Defendants.

No. 3:12–cv–2433–L–BN.
|
Signed Sept. 4, 2014.

**Attorneys and Law Firms**

Jason Lee Nieman, Springfield, IL, pro se.

Keith Hale, Grapevine, TX, pro se.

*MEMORANDUM OPINION AND ORDER DENYING
SUPPLEMENTAL MOTION FOR DISCOVERY
SANCTIONS AND ORDER TO SHOW CAUSE*

DAVID L. HORAN, United States Magistrate Judge.

**\*1** Plaintiff Jason Lee Nieman has filed a Supplemental
Motion for Discovery Sanctions in Regard to the Failed
Deposition of Defendant Keith Hale, 3/24/2014. *See* Dkt. No.
139. Defendants Keith Hale and Insurance Search Group have
filed a response, *see* Dkt. No. 141, and Plaintiff has filed a
reply, *see* Dkt. No. 142. For the reasons explained below,
Plaintiff's Supplemental Motion for Discovery Sanctions in
Regard to the Failed Deposition of Defendant Keith Hale,
3/24/2014 [Dkt. No. 139] is DENIED, but Defendant Keith
Hale is ordered to show cause why he should not be
sanctioned under Federal Rule of Civil Procedure 30(d)(2).

**Background**

The background and procedural history of this case are well
known to the parties and to the undersigned and need not be
discussed in detail in this order.

On March 24, 2014, Nieman took a partial deposition of
Hale. Hale has contended that many of the questions posed

"were objectionable on the grounds of privacy, attorney-client
privilege and form. Many were argumentative and harassing."
Dkt. 111 at 1. Hale objected to questions based on allegedly
incomplete email strings, to questions requesting speculative
answers and opinions on legal matters, to questions that
were compound, and to objections asserted by Nieman that
Hale's deposition answers were non-responsive. *See id.* at
2. In an April 2, 2014 Motion for Protective Order and
for Suspension of Deposition [Dkt. No. 111], Hale provided
a list of 111 proposed question that constitute "examples
of objectionable questions" in the deposition for which he
asserted an objection, *see* Dkt. No. 111–1, and requested that
the Court issue a protective order under Federal Rule of Civil
Procedure 30(d)(3)(A) requiring Nieman to comply with the
Federal Rules of Civil Procedure, *see* Dkt. No. 111.

The Court denied that motion in an August 6, 2014
Memorandum Opinion and Order. *See* Dkt. No. 134. The
Court ruled as follows:

> Under Federal Rule of Civil Procedure 26(c), the Court
> may, for good cause, issue an order to protect a party
> or person from annoyance, embarrassment, oppression, or
> undue burden or expense. *See* Fed. R. Civ. P. 26(c)(1).
> "[T]he burden is upon [the party seeking the protective
> order] to show the necessity of its issuance, which
> contemplates a particular and specific demonstration of
> fact as distinguished from stereotyped and conclusory
> statements." *In re Terra Int'l,* 134 F.3d 302, 306 (5th
> Cir.1998) (citation omitted). A party resisting discovery
> must show how the requested discovery was overly broad,
> burdensome, or oppressive by submitting affidavits or
> offering evidence revealing the nature of the burden.
> *See Merrill v. Waffle House, Inc.,* 227 F.R.D. 475, 477
> (N.D.Tex.2005).

> ....

> The Court determines that Hale has failed to establish
> through a "particular and specific demonstration of fact"
> that the proposed deposition questions, and those posed
> by Nieman at the March 24, 2014 deposition, necessitate
> an order protecting Hale from "annoyance, embarrassment,
> oppression, or undue burden or expense" under Rule 26(c).
> Nieman is permitted under the Federal Rules to seek,
> through discovery, relevant information that is "reasonably
> calculated to lead to the discovery of admissible evidence."
> Fed. R. Civ. P. 26(b)(1).

**\*2** Hale simply lists, without explanation, 111 proposed questions that he believes to be objectionable based on a privacy interest, attorney-client privilege, on speculation or because the question calls for a legal conclusion, is argumentative, mischaracterizes the evidence, is "harassing," subjects him to "oppression," or is repetitive. *See* Dkt. No. 111–1. These objections were the basis for Hale's refusal to answer a number of questions during the March 24 deposition and his refusal to continue with the deposition after approximately 70 minutes had passed. *See* Dkt. No. 122–4 at 7 through 122–5 at 31.

But the fact that Hale believes many of Nieman's questions to be objectionable does not permit him to refuse to answer them, walk out of the deposition, or obtain the broad and non-specific protective order he seeks. Instead, Federal Rule of Civil Procedure 30(c)(2) provides:

> An objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, but *the examination still proceeds; the testimony is taken subject to any objection.* An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Fed. R. Civ. P. 30(c)(2) (emphasis added). To be clear, Rule 30 provides only three situations in which a deponent may refuse to respond to a deposition question. Namely, a deponent may refrain from answering (1) to preserve a privilege, (2) to enforce a limitation previously ordered by the Court, or (3) to present a motion under Federal Rule of Civil Procedure 30(d)(3) to terminate or limit the deposition on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party.

The only objection that Hale asserted that arguably permits his refusal to answer the deposition questions posed is that certain information sought by Nieman may be covered by the attorney-client privilege. *See* Dkt. No. 111–1 at 2. Hale has not cited any questions actually posed during the March 24, 2014 deposition that are covered by the attorney-client privilege, and it is not the Court's obligation to search the record and assert privilege on Hale's behalf.

At his deposition, Hale may assert privilege regarding —and is not required to answer—questions that request information covered by the attorney-client privilege. The attorney-client privilege prevents disclosure of communications between an attorney and client that were made while seeking or rendering legal services. *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). "[T]he attorney-client privilege attaches only to communications made for the purpose of giving or obtaining legal advice or services, not business or technical advice or management decisions." *Stoffels v. SBC Communications, Inc.,* 263 F.R.D. 406, 411 (W.D.Tex.2009) (citing *Navigant Consulting, Inc. v. Wilkinson,* 220 F.R.D. 467, 474 (N.D.Tex.2004)). Only communications made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding" are privileged. *United States v. Harrelson,* 754 F.2d 1153, 1167 (5th Cir.1985) (internal citations omitted).

**\*3** The burden is on the party asserting the privilege to demonstrate how the information satisfies all the elements of the privilege. *See Hodges, Grant & Kaufmann v. United States,* 768 F.2d 719, 721 (5th Cir.1985). Additionally, the party asserting the attorney-client privilege must prove that waiver by breach of confidentiality did not occur. *See id.* It is well settled that disclosure of attorney-client communications to a third party lacking a common legal interest will result in a waiver of the privilege. *See In re Auclair,* 961 F.2d 65, 69 (5th Cir.1992).

On the record before the Court, Hale has not established that he is entitled to a protective order to protect him from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). The Court's review of the deposition transcript suggests that Hale himself unnecessarily asserted objections to numerous questions, refused to answer questions due to objections that did not assert privilege, and failed to comply with his discovery obligations. Hale is not eligible for a protective order simply based on his belief that Nieman is a vexatious litigant with a frivolous case. Good cause does not exist to prohibit the gathering of relevant discovery through Hale's deposition in this matter.

The Court finds that Hale has failed to show good cause and a specific need for protection or that justice requires his protection from any annoyance, embarrassment,

**APPENDIX 62**

oppression, or undue burden or expense represented by the deposition.

*Id.* at 2–6.

Plaintiff now seeks sanctions based primarily on Hale's conduct at the March 24, 2014 deposition. *See* Dkt. No. 139. Plaintiff invokes the Court's authority to impose sanctions under Federal Rules of Civil Procedure 30(d)(3), 37(a), and 37(b). *See id.* Plaintiff asserts that Hall should be sanctioned because "Hale willfully failed to comply with discovery duties, and this Court's orders by way of (1) unilaterally and prematurely ending the deposition of Keith Hale on March 24, 2014 and (2) by refusing to participate in the deposition of March 24, 2014, such refusal being unreasonable, unjustified, and/or in objective bad faith." *Id.* at 1. Plaintiff requests "that the Court assess appropriate and measured discovery sanctions against [Hale] for willful violation of federal and local rules as to discovery, as well as willful violation of this Court's express discovery orders, including violating the letter and/or spirit of *Order* [Dkt. 97, 3/11/2014] ." *Id.*

As legal authority, Plaintiff argues that the Court can and should sanction Hale under Rule 37(a) based on the Court's denial of Hale's Motion for Protective Order and for Suspension of Deposition [Dkt. No. 111] filed under Rule 30(d)(3)(A). Plaintiff also urges the Court to exercise its "broad authority to sanction improper conduct under Fed.R.Civ.P. 37, and also under the doctrine of inherent authority." *Id.* at 5. According to Plaintiff, "the Court is within its discretion to bar [Defendants] from attempting to argue its various shifting and non-credible 'reasons' for failing to submit Nieman to Paul Neir/Southwest Selective Search and/or Republic Group, leaving the case to effectively go to trial on the issue of damages alone, or even supporting entry of judgment in favor of Plaintiff Nieman." *Id.* at 5–6. Plaintiff also invokes Federal Rule of Civil Procedure 37(d), which, Plaintiff explains, "allows the district court to, among other sanctions, dismiss an action if a party 'fails to appear' for his or her deposition." *Id.* at 8. Plaintiff candidly concedes that he "does not believe that the Court will find that Defendant Hale's continued and willful non-compliance as to discovery justifies, as of yet, summary or default disposition in Plaintiff Nieman's favor," but Plaintiff reports that he "does believe that this Court will recognize that Defendant Hale's discovery misconduct shows no signs of abating, and that until or unless this Court elects to properly sanction Hale, or to find him in contempt of court, that Defendant Hale simply will only comply at bare minimum with the rules, and/or this Court's orders, if at all." *Id.* at 8–9.

**\*4** Defendants responded primarily to resist any sanctions in the form of a default judgment or to take the case to jury trial on the so-called "discovery misconduct" alone, *see* Dkt. No. 141 at 5, and also to assert that "granting of a sanctions award against the Defendants would give more energy to Nieman's bad faith efforts to exact revenge on the Defendants for having been dismissed from the RLI Case and pursuing sanctions against Plaintiff Nieman," *id.* at 4.

In reply, Plaintiff asserts that Defendants' response offered "no good reason for [Hale's] bad faith deposition conduct or the conduct that followed as to his purported protective order motion" and that "the Court should award the measured and reasonable discovery sanctions against Defendant Hale that Plaintiff Nieman is seeking, and should order that such amounts should be paid, in full, prior to Defendant Hale sitting for his re-deposition on September 15, 2014." Dkt. No. 142 at 1. Plaintiff asserts that "Hale has offered no argument whatsoever against the imposition of sanction other than sanction of summary judgment in favor of Plaintiff Nieman, and/or denial of summary judgment potential to Defendant Hale, as a sanction" and "has not opposed this reasonable and measured financial sanction," where "Plaintiff primarily asked only that Defendant Hale be required to pay part of the costs of Nieman's travel to Dallas for Hale's re-deposition ($937.50, as supported) and that Hale be required to have remitted such funds to Plaintiff in full no later than September 8, 2014" and suggested that "[d]efault judgment would only be entered if Hale was ordered to pay and refused to do so." *Id.* at 7.

"Plaintiff respectfully requests that the Court issue the Order (motion exhibit 1, [Dkt. 139–1] ) in his favor, assessing measured and appropriate discovery sanctions against Defendants Hale/ISG for their willful disobedience of this Court's prior discovery orders, and for the unjustified conduct as to (1) improperly obstructing the deposition of Keith Hale on March 24, 2014, (2) walking out of said deposition prior to conclusion and without Court permission and (3) in failing to make any type of legitimate factual or legal argument in the following protective order motion, which was flatly denied" and "also believes that since Defendant Hale has provided no legitimate excuse or justification for his confirmed discovery misconduct, that this Court should strongly consider ordering that Hale may not seek Defendant's summary judgment in this case, as additional sanction, because of Hale's clear lack of remorse for his misconduct, and in light of the Court's decision not to

recommend (sua sponte) summary judgment in this case." *Id.* at 10.

## Legal Standards and Analysis

The shortcoming in Plaintiff's motion is that it invokes legal authority for sanctions that does not apply on the record before the Court. Hale did not violate the Court's March 11, 2014 Order [Dkt. No. 97] denying a protective order and ordering that "the deposition of Hale noticed by Plaintiff's Amended Notice of Deposition of Hale shall go forward." Dkt. No. 97 at 17–18. Hale appeared for the deposition, which did go forward on March 24, 2014, but Hale later terminated the deposition and, eight days later, filed a motion for protective order and suspension of the deposition under Rule 30(d)(3). Invoking the "spirit" of the March 11, 2014 Order [Dkt. No. 97] is too slim a reed to support the sanctions that Plaintiff seeks.

**\*5** For the same reason, sanctions are not authorized under Rule 37(d). That rule provides that "[t]he court where the action is pending may, on motion, order sanctions if: (i) a party ... fails, after being served with proper notice, to appear for that person's deposition." Fed. R. Civ. P. 37(d)(1)(A)(i). After the Court denied Hale's motion for a protective order to avoid the deposition as noticed, Hale appeared for his deposition on March 24, 2014.

Hale's April 2, 2014 Motion for Protective Order and for Suspension of Deposition [Dkt. No. 111] asked the Court to, under Rule 30(d)(3)(A), "(1) enter a protective order forbidding Nieman to make inquiry into certain matters, thereby limiting the scope of Nieman's deposition questions of Hale, if the Court determines that a future deposition of Hale is required, and (2) dispense a warning to Nieman ordering him to abide by Federal civil procedure with regard to conducting depositions." Dkt. No. 111 at 3. The Court denied that motion in its entirety and ordered the continuation of Hale's deposition on September 15, 2014. *See* Dkt. Nos. 134 & 138.

Rule 30(d) (3)(C) provides that "Rule 37(a)(5) applies to the award of expenses" on a Rule 30(d)(3)(A) motion. Fed. R. Civ. P. 30(d)(3)(C). Rule 37(a)(5)(B), in turn, provides that, if a motion is denied, the Court "must, after giving an opportunity to be heard, require the movant ... to pay the party ... who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees"

but "must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(B).

But Plaintiff does not seek his expenses incurred in opposing Hale's April 2, 2014 Motion for Protective Order and for Suspension of Deposition [Dkt. No. 111]. Plaintiff has not even tried to prove up those expenses, whatever they may be. Given what Plaintiff has asked for, the Court is not inclined to find that the circumstances justly warrant awarding Plaintiff additional, unasked-for relief

Finally, Plaintiff invokes the Court's inherent powers or authority to impose sanctions. But the Court must "exercise caution" in invoking its inherent powers and should "ordinarily" rely on a rule or statute rather than its inherent power. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). That is, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power," although, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

Here, there is a rule that contemplates sanctions for the kind of deposition conduct for which Plaintiff alleges Hale should be sanctioned and authorizes sanctions of the sort that Plaintiff seeks, that is, that Hale be required to pay part of the costs of Plaintiff's travel to Dallas for Hale's re-deposition. Rule 30(d) (2) provides that "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). "The meaning of 'appropriate sanction' in Rule 30(d) (2) has been broadly interpreted as [t]he full scope of sanctions available under Rule 30(d)(2) is not expressly described in the text of the rule." *Howell v. Avante Servs., LLC,* Civ. A. No. 12–293, 2013 WL 824715, at \*5 (E.D.La. Mar.6, 2013) (internal quotation marks omitted). "Many courts have construed Rule 30(d) (2) to apply to circumstances where a party's conduct at a deposition warranted remedial action." *S. La. Ethanol, L.L.C. v. Fireman's Fund Ins. Co.,* Civ. A. Nos. 11–2715 & 12–0379, 2013 WL 1196604, at \*8 (E.D.La. Mar.22, 2013) (citing cases). The broad scope of appropriate sanctions under Rule 30(d)(2) includes, where appropriate, an award of expenses associated with a deposition's continuation that is necessitated

by a party's conduct that impedes, delays, or frustrates the fair examination of the deponent.

**\*6** The Court concludes that invoking its inherent powers is inappropriate under these circumstances in light of Rule 30(d)(2)'s provisions. And Plaintiff has not actually invoked Rule 30(d)(2). While Rule 30(d)(2)'s text imposes no limitation on the Court's authority to sanction deposition conduct, including by a *sua sponte* order, *see Security Nat'l Bank of Sioux City, Iowa v. Abbott Labs.,* 299 F.R.D. 595, 599 (N.D.Iowa 2014), Plaintiff's did not put motion for sanctions did not put Defendants on notice of the rule's possible application to Hale's conduct at his March 24, 2014 deposition.

For all these reasons, the Court does not find it appropriate to award sanctions on Plaintiff's Supplemental Motion for Discovery Sanctions in Regard to the Failed Deposition of Defendant Keith Hale, 3/24/2014 [Dkt. No. 139].

Further, Plaintiff also requests that the Court modify the current scheduling order to enlarge time for discovery by a period of approximately 45 to 60 days, if the Court wishes to order Defendant Hale to appear for re-deposition. *See* Dkt. No. 139. But, as the Court already ruled while ordering the continuation of Hale's deposition, *see* Dkt. No. 138 at 1–2, the discovery deadline passed months ago and will not be further extended at this time other than to permit the depositions of Neiman and Hale scheduled for September 15, 2014.

**Conclusion and Order to Show Cause**

Plaintiff's Supplemental Motion for Discovery Sanctions in Regard to the Failed Deposition of Defendant Keith Hale, 3/24/2014 [Dkt. No. 139] is DENIED as explained above.

But the Court *sua sponte* ORDERS Defendant Keith Hale to file a written response to this Order to Show Cause by **September 12, 2014,** explaining why he should not be sanctioned pursuant to Federal Rule of Civil Procedure 30(d)(2)—including by an order that Hale pay part of the costs of Plaintiff's travel to Dallas for Hale's re-deposition on September 15, 2014—for conduct at Hale's March 24, 2014 deposition that impeded, delayed, or frustrated the fair examination of Hale by Plaintiff and necessitated this Court's order providing that the continuation of Hale's deposition take place in the Court's courtroom or conference room, on the 15th Floor of the Earle Cabell Federal Building in Dallas, Texas, on September 15, 2014.

The Court does not believe that additional briefing is needed from Plaintiff on this matter in light of his submissions in support of his motion for sanctions. Accordingly, no additional briefing will be permitted on the matter of possible Rule 30(d)(2) sanctions unless ordered by the Court.

Further, the Court advises the parties that they must comply with the Court's August 15, 2014 Order Scheduling Deposition [Dkt. No. 138] whether or not the Court has issued an order as to possible Rule 30(d)(2) sanctions before September 15, 2014.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4375669

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7997962
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Tyler Division.

VIRNETX INC., Plaintiff,

v.

CISCO SYSTEMS, INC. et al., Defendants.

No. 6:10–CV–417.
|
Aug. 8, 2012.

**Attorneys and Law Firms**

Douglas A. Cawley, Christopher Lee Limpus, Mitchell Reed Sibley, Rosemary Tyson Snider, Ryan Abbott Hargrave, Stacie Lynn Greskowiak, McKool Smith, Dallas, TX, Andrew Thompson Gorham, Charles Ainsworth, Robert Christopher Bunt, Robert M. Parker, Parker Bunt & Ainsworth, P.C., Tyler, TX, Bradley Wayne Caldwell, Daniel R. Pearson, Jason Dodd Cassady, John Austin Curry, Caldwell Cassady Curry, Dallas, TX, Ramzi Ragheb Khazen, Seth Raymond Hasenour, Trent Edward Campione, McKool Smith, Austin, TX, Samuel Franklin Baxter, McKool Smith, Marshall, TX, for Plaintiff.

Allen Franklin Gardner, John Frederick Bufe, Michael E. Jones, Potter Minton, a Professional Corporation, Tyler, TX, Ameet A. Modi, John M. Desmarais, John C. Spaccarotella, Karim Z. Oussayef, Michael P. Stadnick, Paul A. Bondor, Tamir Packin, Xiao Li, Desmarais LLP, New York, NY, Andrew G. Hamill, Bradford J. Black, Peter H. Chang, Black Chang & Hamill LLP, San Francisco, CA, Eric Hugh Findlay, Roger Brian Craft, Walter Wayne Lackey, Jr., Eric Hugh Findlay, Findlay Craft, Tyler, TX, John C. O'Quinn, William H. Burgess, Kirkland & Ellis LLP, Washington, DC, Danny Lloyd Williams, Christopher Needham Cravey, Kyung Kim, Leisa Talbert Peschel, Matthew Richard Rodgers, Ruben Singh Bains, Terry D. Morgan, Williams Morgan & Amerson PC, Houston, TX, Eric M. Albritton, Stephen Edwards, Albritton Law Firm, Longview, TX, Marcia H. Sundeen, Kenyon & Kenyon, Washington, DC, Megan Whyman Olesek, Kenyon & Kenyon, Palo Alto, CA, for Defendants.

**ORDER**

LEONARD DAVIS, District Judge.

**\*1** Before the Court are Apple's Motion for Protective Order for Halting the Deposition of Mr. Christophe Allié Pursuant to Rule 30(d) and Rule 26 (Docket No. 250, "PO Motion") and VirnetX's Motion for Sanctions (Docket No. 272, "Sanctions Motion"). The Court held a hearing on July 12, 2012, and after hearing extensive argument regarding both motions, **DENIED** Apple's motion for a protective order and **GRANTED** VirnetX's motion for sanctions. The Court now memorializes its orders.

**BACKGROUND**

On April 6, 2012, VirnetX took the deposition of Mr. Christophe Allié, noticed pursuant to Federal Rule of Civil Procedure 30(b) (1), in Palo Alto, California. PO Motion at 2. Mr. Allié is an engineering manager at Apple who was sitting for his first deposition. Id. Mr. Allié testified that he worked on Apple's VPN on Demand and claimed to have come up with the idea of "determining whether to establish a VPN based on a domain name for Apple's VPN on Demand" for the iPhone. Sanctions Motion, EX. C at 27:10–29:5. Mr. Allié confirmed that he is a listed inventor on Apple's U.S. Patent Application No. 10/940,225 ("the ′225 application"). Sanctions Motion, EX. B. Mr. Allié also agreed that, via the ′225 application, he tried to patent the idea of using a domain name to determine whether to establish a VPN. Id. at 30:11–15. Mr. Allié further testified that he had consulted with Apple's experts in this case and helped Apple's attorneys respond to interrogatories regarding his work on Apple's VPN on Demand.

VirnetX is asserting U.S. Patent No. 6,502,135 ("the ′135 patent") against Apple, which VirnetX alleges claims systems and methods that create a VPN based on a DNS request. Sanctions Motion at 1. In sum, VirnetX is alleging that Apple attempted to patent identical ideas in its ′225 patent application, hence the importance of Mr. Allié's testimony, as a listed co-inventor and person with extensive knowledge of the technology behind the application.

During his deposition, Mr. Allié testified that he had no knowledge of VirnetX's ′135 patent and had never seen

it before. PO Motion, EX. 1 at 36:12–37:6; 52:11–53:14. VirnetX's counsel presented the ′135 patent to Mr. Allié, then asked him to turn to claim 1 of the ′135 patent and had him review each limitation of the claim. *Id.* at 37:11– 38:13. VirnetX's counsel next asked Mr. Allié whether he still thought Apple was first to come up with the idea of determining whether to establish a VPN based on a domain name request. *Id.* At this point, Apple's counsel lodged a speaking objection and stated that Mr. Allié should be given an opportunity to read and analyze the document before answering. *Id* . at 38:14–23. Ultimately, Mr. Allié stated that he could not state whether there is overlap between the ′225 application and the ′135 patent. *Id.* at 39:7–22; 52:11–53:14.

VirnetX's counsel then asked Mr. Allié whether he would be willing to go through the ′135 patent and testify regarding the differences between it and the ′225 application. *Id.* at 55:22– 56:8. Mr. Allié stated that he may need some explanation regarding the content of the ′135 patent. *Id.* VirnetX's counsel then asked Mr. Allié again to turn to claim 1 of the ′135 patent and stated that he would read the claim and Mr. Allié could state if there was anything he did not understand. *Id.* at 56:10– 20. At that point, Apple's counsel stated that he objected to the line of questioning and that Mr. Allié should have an opportunity to review the patent in detail. *Id.* at 56:21–25.

 **\*2**  VirnetX's counsel then walked Mr. Allié through every limitation of claim 1 and asked him whether he understood; to which, Mr. Allié responded that despite being slightly vague, he understood. *Id.* at 57:6–58:24. Once Mr. Allié confirmed that he understood claim 1, VirnetX's counsel then asked him how claim 1 of the ′135 patent was different from what Apple tried to patent in the ′225 application. *Id.* at 59:1– 4. At this point, Apple's counsel objected and stated that if "we're going to continue this line of questioning," he was going to shut the deposition down and move for a protective order. *Id.* at 59:5–61:6. Apple's counsel stated that he was going to shut the deposition down because Mr. Allié should be allowed to review the entirety of the ′135 patent specification and prosecution history prior to answering any questions regarding the patent. *Id.*

At that point, the parties were at an impasse, and VirnetX's counsel suggested calling the Court's discovery hotline to resolve the issue. *Id.* 61:7–21. Given that the deposition was taking place during a Court holiday, the hotline was unavailable. During the approximately 15–minute recess, Mr. Allié made no attempt to review the ′135 patent, and at no point did Mr. Allié affirmatively state that he did not

understand claim 1 of the ′135 patent. VirnetX's counsel persisted in attempting to get Mr. Allié to answer the question after the recess, and Apple's counsel ultimately shut down the deposition. *Id.* at 62:1–66:9.

### APPLE'S MOTION FOR PROTECTIVE ORDER

Apple contends that VirnetX's counsel conducted the deposition of Mr. Allié in an "oppressive manner," and requests a protective order pursuant to Federal Rule of Civil Procedure 30(d)(3). PO Motion at 4.

*Applicable Law*

Federal Rule of Civil Procedure 30(c)(2) states that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d) (3)." Fed. R. Civ. P. 30(c)(2). In turn, Federal Rule of Civil Procedure 30(d)(3)(A) states that "[a]t any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3) (A).

*Analysis*

As an initial matter, the Court has reviewed the transcript excerpts submitted by the parties and viewed the entirety of the video of Mr. Allié's deposition. At no point did VirnetX's counsel conduct the deposition in a manner that could be characterized as intended to annoy, embarrass, or oppress Mr. Allié. VirnetX's counsel did not badger Mr. Allié, raise his voice, or use inappropriate language. On the contrary, VirnetX's counsel conducted the deposition in a professional and respectful manner.

The crux of Apple's complaint is that VirnetX's counsel denied Mr. Allié an opportunity to review the entirety of the ′135 patent and prosecution history at his deposition prior to asking him any related questions. PO Motion at 4–6. VirnetX's counsel, however, never refused a request from Mr. Allié to read the ′135 specification. In fact, Mr. Allié never requested to read the specification or prosecution history.

 **\*3**  As detailed above, VirnetX's counsel took Mr. Allié through claim 1 of the ′135 patent, and Mr. Allié affirmatively confirmed that he understood each limitation. PO Motion,

EX 1 at 55:22–56:8. At no point after VirnetX's counsel read the text of claim 1 did Mr. Allié state that he did not understand the claim. Apple's counsel, however, repeatedly lodged speaking objections during the deposition, stating that Mr. Allié was not in a position to understand the ′135 patent until he had reviewed the entirety of the specification and prosecution history. Yet when asked, Mr. Allié himself confirmed that he understood the limitations of claim 1 of the ′135 patent as recited by VirnetX's counsel and never requested to review the specification nor the prosecution history. *Id.*

Even after Apple's counsel's not so subtle speaking objections, Mr. Allié never asked for clarification or explanation of the meaning of any of the claim language. Thus, he was presumably willing and able to answer VirnetX's counsel's questions. Nevertheless, Apple's counsel did not allow him to answer the questions. Mr. Allié is a person of skill in the art of the ′135 patent and the intended audience of such a document; therefore, it is not surprising that he was in a position to understand the meaning of the claims. Indeed, Mr. Allié is an engineering manager at Apple, and despite the ′135 patent covering a sophisticated technology, he is intelligent enough to know when he does not understand a question or material presented to him. *See Quantachrome Corp. v. Micromeritics Instrument Corp.,* 189 F.R.D. 694, 700 (S.D.Fla.1999) ("The witnesses in this case are scientists and engineers who work with and create complex technology. Surely they are intelligent enough to know when they do not understand a question.").

Rule 30 was amended in 1993 and places strict limits on when an attorney may instruct a deponent not to answer a question. *See Bristol–Myers Squibb Co. v. Rhône–Poulenc Rorer, Inc.,* 1998 WL 2829, at *3, n. 4 (S.D.N.Y. Jan.6, 1998). "The underlying purpose of a deposition is to find out what a witness saw, heard, or did—what the *witness thinks* ... [t]here is no proper need for the witness's own lawyer to act as intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers." *Hall v. Clifton Precision,* 150 F.R.D. 525, 528 (E.D.Pa.1993) (emphasis added). Due to Apple's counsel's termination of the deposition, VirnetX has been deprived of that opportunity.

Apple's counsel had no justification under Rule 30 to terminate the deposition. The deposition was not conducted in a manner that annoyed, embarrassed, or oppressed Mr. Allié. Apple's counsel should have simply lodged his objections,

allowed Mr. Allié to answer the questions, and then either: (1) taken an opportunity to redirect Mr. Allié on the ′135 patent; or (2) contested the admissibility of the testimony by way of any relevant objections at the pretrial hearing or during trial. Instead, Apple's counsel chose to end the deposition in violation of Rule 30(d)(3)(A). Merely disagreeing with a particular line of questioning is not justification to shut down the deposition. As such, Apple's motion for protective order is **DENIED.**

## VIRNETX'S MOTION FOR SANCTIONS

**\*4** Rule 30(d)(2) provides that "[t]he court may impose an appropriate sanction—including the reasonable expenses and attorneys' fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

As explained above, Apple's counsel inappropriately shut down Mr. Allié's deposition; thus, "imped[ing] and frustrat[ing] the fair examination of the deponent." *Id.* Determining the "appropriate sanction," under these circumstances is not a simple matter. VirnetX requests: (1) precluding Apple from calling Mr. Allié at trial or any other witness to testify concerning the ′225 application; (2) precluding Apple from presenting counter or rebuttal designations of Mr. Allié's deposition testimony; and (3) an adverse inference instruction at trial regarding Apple's improper termination of Mr. Allié's deposition. Sanctions Motion at 9. Apple contends that VirnetX's proposed sanctions are unjust, and that there are lesser sanctions—such as attorneys' fees or compelling another deposition—that are more appropriate. Docket No. 320 at 5.

While not directly addressing sanctions pursuant to Rule 30(d) (2), the Fifth Circuit recently stated that it is "well within [a district court's] discretion to use sanctions to deter future abuse of discovery." *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.,* 685 F.3d 486, 2012 WL 2345024, at *4 (5th Cir. June 21, 2012) (discussing the purpose of sanctions pursuant to Rule 37). The same deterrent effect must be reflected in any sanction imposed pursuant to Rule 30(d)(2) under the circumstances. Any sanction this Court imposes for Apple's improper termination of Mr. Allié's deposition must serve the dual purpose of deterring any similar discovery abuse in this case, as well as deterring similar abuse in future cases. Additionally, the sanction imposed must attempt to

address any harm suffered by VirnetX as a result of Apple's improper termination of the deposition.

As a result of Apple's counsel's improper termination of the deposition, VirnetX has been deprived of the opportunity of obtaining Mr. Allié's answers regarding the comparison of VirnetX's ′135 patent and Apple's ′225 application. Apple's counsel terminated the deposition at the precise moment Mr. Allié was going to provide his answers. While Apple may not have "prepared" Mr. Allié to answer questions regarding the ′135 patent, that did not give it the right to stop the deposition.

In determining an appropriate sanction, an important factor is Apple's motivation in stopping the deposition. Was it truly to allow the witness an opportunity to review the patent and prosecution history, or was it to provide an opportunity to "woodshed" the witness as to the importance of the question and possibly how to respond? VirnetX's line of questions addressed a very important issue in this case, which the witness was well qualified to answer. Indeed, the witness never said he could not answer the question; it was only Apple's lawyer, who did not want him to answer the question. Furthermore, during the fifteen minutes that VirnetX's counsel was trying to call the Eastern District Discovery Hotline, one as skilled in the art as this witness could have easily reviewed the patent, and if more time was needed the witness could have asked for more. There is no indication he did either, again reinforcing the notion that it was Apple's counsel that needed time, not the witness. All of these facts raise a strong inference that Apple's motivation to shut down the deposition was to provide an opportunity to "woodshed" the witness, rather than to protect the witness from any unfair conduct or questioning by opposing counsel. Depositions are designed to cull the unbiased facts in an attempt to develop a truthful record. *See Hall,* 150 F.R.D. at 528 ("The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record.").

*5  If the Court simply imposes fees and expenses and orders completion of Mr. Allié's deposition, it would be a nominal sanction at best, as Apple would have accomplished what it conceivably wanted—disruption of the deposition and an opportunity to visit with the witness regarding his testimony. Such a nominal sanction would not provide any deterrent effect and would not put VirnetX in the position it was in prior to the termination of the deposition. In fact, such a nominal sanction would conceivably encourage tactical violations of the Rules in this case and future cases. Absent a true and meaningful sanction, future litigants faced with a witness about to give potentially unfavorable testimony may choose to improperly terminate the deposition knowing that the most likely result is that they will merely be required to offer the witness for additional testimony at their expense at a later date.

Additionally, it is important that VirnetX not be prejudiced by Apple's counsel's conduct. VirnetX needs to be placed in as close to the position it would have been in, but for Apple's improper termination of the deposition. At the same time, to give an adverse inference instruction, as requested by VirnetX, is to conclude that Apple did in fact terminate the deposition to give it an opportunity to coach the witness and that the testimony would have been unfavorable to Apple. While there is a strong inference that this is indeed the case, the Court is hesitant to make such a definitive finding against Apple's counsel. The Court expects better of counsel, and hopes its expectations were met in this case.

Accordingly, given that Apple's counsel improperly terminated the deposition of Mr. Allié in violation of Rule 30(d)(3)(A), to address the relative harm VirnetX has suffered from such improper termination, and to act as a deterrent to such future conduct in this and other cases, the Court **GRANTS** VirnetX's motion for sanctions and imposes the following sanctions:

  (1) Apple must pay VirnetX's reasonable attorneys' fees and costs associated with responding to Apple's motion for a protective order and the filing of VirnetX's motion for sanctions;

  (2) Apple must produce Mr. Allié for completion of his deposition at a time and location selected by VirnetX, all costs of such deposition to be paid by Apple. Apple shall not, through counsel or otherwise, further communicate in any way with Mr. Allié regarding the patents about which the witness was testifying prior to termination of his deposition. To the extent Apple has communicated with Mr. Allié about the patents since his deposition was terminated, Apple and Mr. Allié are deemed to have waived any privilege they might otherwise assert as to these conversations, and the witness will truthfully answer any and all questions regarding any such communications between Mr. Allié and Apple or any of its counsel, employees or representatives. Apple is precluded from asking any questions of the witness with regard to the comparison of the two patents.

**\*6** (3) However, in lieu of Sanction # 2 above, Apple may elect the following sanction and no further deposition of Mr. Allié will be taken:

a. Apple is precluded from calling Mr. Allié at trial, or providing any rebuttal or counter-designations from Mr. Allié's deposition testimony regarding the comparison of ′225 application and ′135 patent; and

b. The Court will give the following adverse inference instruction to the jury at an appropriate time during the trial:

"During the deposition of Mr. Allié, counsel for VirnetX asked questions related to comparison of VirnetX's ′135 patent and Apple's ′225 patent application. Counsel for Apple improperly terminated the deposition and did not permit Mr. Allié to answer these questions. You may, although you are not required to, infer that had Apple's counsel not terminated Mr. Allié's deposition, the testimony provided would have been unfavorable to Apple, and that Apple's counsel's reason for terminating the deposition was to prevent such unfavorable testimony from being presented to you in this case."

This choice of sanctions allows Apple to complete the deposition and avoid the adverse inference instruction, but prohibits it from potentially profiting from having stopped the deposition. At the same time, if Apple chooses not to complete the deposition with any otherwise privileged post-termination communications waived, then such an adverse inference instruction is justified and appropriate. An adverse inference instruction is appropriate upon a showing of bad faith or bad contact, as in this case. *Condrey v. SunTrust Bank of Georgia,* 431 F.3d 191, 203 (5th Cir.2005) (citing *King v. Ill. Cent. R.R.,* 337 F.3d 550, 556 (5th Cir.2003)). If Apple does not want to disclose any post-termination communications, then any lesser sanction would not serve to address the harm caused as a result of Apple's improper termination of the deposition and would not serve to deter other similar violations.

Apple shall file a Notice of Election within three business days of this order.

**So ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7997962

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 70**