**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ROBERT "BOB" ROSS AND** | § | |
| **EUGENIO VARGAS,** | § | |
| | § | |
| **Plaintiffs/Counterclaim Defendants,** | § | |
| | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-cv-00343** |
| | § | **Judge Terry R Means** |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, ET AL** | § | |
| | § | |
| | § | |
| **Defendants/Counterclaim Plaintiffs.** | § | |

---

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' MOTION FOR SANCTIONS**
**AND BRIEF IN SUPPORT**

Plaintiff pursuant to Local Rules 7.1(i), 7.2 (e) and § C of this Court's Case Management

Requirements, submits this appendix of documents, and in support of "PLAINTIFFS' RESPONSE

TO DEFENDANTS' MOTION SANCTIONS AND BRIEF IN SUPPORT:"

| Item | Description | Pgs. |
|:---:|:---|:---:|
| | **SUPPORTING DOCUMENTS** | |
| 1 | Ross Deposition Transcript Excerpts | 1-13 |
| 2 | Vargas Deposition Transcript Excerpts | 14-28 |
| 3 | Board Resolution | 29-30 |
| 4 | Medical Report (Redacted) | 31 |
| 5 | American Airlines/Sabre Access document | 32 |
| | **NONPUBLISHED CASE CITATION** | |
| 5 | <u>Cordero v City of New York</u>, 15-cv-03436, slip op. (E.D. N.Y. May 17, 2017) | 33-49 |
| 6 | <u>MetroPCS v. Thomas</u>, 3:18-mc-00037-S, slip op. (N.D. Tex. Sep 26, 2022) | 50-62 |

Respectfully submitted,

K.D. PHILLIPS LAW FIRM, PLLC

By:   /s/   Kerri   Phillips
Kerri Phillips
Texas   Bar   No.   24065906
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com

6010 W. Spring Creek Parkway
Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com

**ATTORNEY FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF Filing **on this the 26th  day of February 2024.**

/s/  Kerri Phillips
Kerri Phillips, Esq.

**Jeffrey Bartos**
**Guerrieri, Bartos, & Roma, P.C.**
**1900 M Street, NW, Suite 700**
**Washington, DC 20036**
**Tel: (202) 624-7400; Fax: (202) 624-7420**
**Email: jbartos@geclaw.com**

**Charlette Matts**
**In-House Counsel for APFA**
**1004 West Euless Blvd**
**Euless, TX 76040**
**Tel: (682) 301-8454**
**Cmatts@apfa.org**

**James Sanford**
**4803 Gaston Avenue**
**Dallas, TX 75249-1020**
**Tel: (214) 800-5111; Fax: (214) 838-**

**0001**
**Email jim@gillespiesanford.com**
**Email: joe@gillespiesanford.com**

**Michael Rake**
**PO Box 1556**
**Lake Dallas, TX 75065-1556**
**Tel: (940) 498-2103 Fax: (940) 498-2103**
**Email: mrake1@mrakeattorney.com**

Robert Ross                                                    2/1/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ROBERT (BOB) ROSS,               §
                                 §
Plaintiff/                       §
Counterclaim Defendant,          §
                                 §   Civil Action No.
VS.                              §   4:22-cv-343-Y
                                 §
ASSOCIATION OF                   §   Judge Terry R. Means
PROFESSIONAL FLIGHT              §
ATTENDANTS, et al.,              §
                                 §
Defendants/                      §
Counterclaim Plaintiff.          §


-----------------------------------
VIDEOTAPED ORAL DEPOSITION OF
ROBERT ROSS
VOLUME 1
FEBRUARY 1, 2024
-----------------------------------


VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 1, 2024, from 10:53 a.m. to 4:56 p.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

Robert Ross                                              2/1/2024

5

```
 1              (February 1, 2024, 10:53 a.m.)
 2              MR. BARTOS:  For the record, this is Jeff
 3   Bartos, attorney for the APFA defendants.  It is
 4   whatever the time the court reporter has indicated,
 5   nearly 11:00 a.m., for the deposition we've noticed for
 6   10:00 a.m.
 7              I'm here with Charlette Matts, counsel in the
 8   case as well at APFA, in-house counsel; Michelle Cliatt,
 9   who works for Ms. Matts -- Ms. Broderick.  I'm also here
10   with the defendants Julie Hedrick and Erik Harris and
11   then two of APFA's national officers who are here on
12   behalf of APFA, Larry Salas and Josh Black.  Also
13   present is counsel for Mr. Bob Ross and another
14   individual.
15              A dispute has arisen about whether or not the
16   individuals who are here on behalf of APFA are allowed
17   to be here or should be here or whether the deposition
18   can proceed with them here.  It's my understanding that
19   Mr. Ross is refusing to testify in his deposition unless
20   Mr. Salas and Mr. Black leave the room.
21              MS. PHILLIPS:  That's incorrect.
22              MR. BARTOS:  Okay.  Let me just finish.
23              It's our position that as party
24   representatives of APFA, they are wholly entitled to be
25   here.  I've offered for Mr. Salas to leave the room.
```

**Appendix 2**

Robert Ross                                              2/1/2024

6

1    But we are entitled to have a representative from APFA

2    here and intend to proceed on that basis.

3            I wanted to go on the record and have counsel

4    for Mr. Ross say whatever it is that she wants to say.

5                    MS. PHILLIPS:  My name is Kerri Phillips.

6    For the record, I represent Robert Ross.  I'm going on

7    the record to state that we've been called and appeared

8    to the deposition at 10:00 and discovered that the

9    deposition was originally scheduled and planned to be

10   conducted at a neutral location, at counsel's office,

11   and was rescheduled to be conducted at a hotel that --

12   where the Union's negotiation team and all four national

13   officers were in attendance, as well as other numerous

14   Union personnel and employees were staying.

15           Mr. Ross, when he appeared, saw many of these

16   Union officials in the parking lot and began to have a

17   panic attack and chest pains, at which point he called

18   me while I was in transit to the location.

19           And we discovered that the last -- the change

20   with the new scheduled date, from the attorney's office

21   to the new hotel, was clearly a game-playing move

22   designed to cause abuse and harassment for purposes of

23   pressuring Mr. Ross for his deposition testimony.

24           We have never received notice that Mr. Black

25   and Mr. Salas were going to be in attendance.  And the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 3**

Robert Ross                                                    2/1/2024

7

1   two named defendants are also capable of representing

2   APFA.  There is no need for Mr. Black and Mr. Salas to

3   be in attendance.

4              Mr. Ross is willing to come in and do his

5   deposition testimony provided that the two additional

6   officers leave the room.  We have also offered and are

7   willing to do the deposition today at the attorney's

8   office in downtown Dallas, provided that we relocate to

9   the downtown Dallas office, if you guys are willing to

10  do so.

11             MR. BARTOS:  Just for clarity, that last

12  part is news to me.  Are you referring to moving to Jim

13  Sanford's office?

14             MS. PHILLIPS:  Yes.

15             MR. BARTOS:  And instead of doing it

16  here?

17             MS. PHILLIPS:  Yes.

18             MR. BARTOS:  Okay.  I'd like to discuss

19  that with our group, the two different scenarios.  We

20  obviously want to proceed with the deposition.  Let me

21  talk with them, and we can come back on the record, if

22  needed.  Hopefully we will either have a resolution or

23  we won't.

24             We can go off the record.

25             (Recess from 10:57 a.m. to 11:17 a.m.)

**Appendix 4**

Robert Ross                                              2/1/2024

8

1                     P R O C E E D I N G S

2               THE VIDEOGRAPHER:  This is Tape 1 in the

3   video deposition of Bob Ross in the matter of Robert

4   Ross versus Association of Professional Flight

5   Attendants, et al., in the U.S. District Court for the

6   Northern District of Texas, Fort Worth Division.  Today

7   is Thursday, February 1st, 2024.  We're now on record at

8   11:18 a.m.

9               Will the attorneys please introduce themselves

10  for the record.

11              MR. BARTOS:  Jeffrey Bartos, counsel for

12  the APFA defendants.

13              MS. BRODERICK:  Charlette Broderick,

14  counsel for APFA.

15              MS. PHILLIPS:  Kerri Phillips, counsel

16  for Bob Ross.

17              (Witness sworn by reporter)

18                     ROBERT ROSS,

19  having been first duly sworn, testifies as follows:

20                     EXAMINATION

21  BY MR. BARTOS:

22     Q.   Good morning, Mr. Ross.  Can you tell me what

23  you did to prepare for today's deposition.

24     A.   What do you mean by that?

25     Q.   Did you do anything?  Review documents?  Talk

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 5**

Robert Ross                                           2/1/2024

13

1          So your son, as best you recall, began college
2     in 2020?
3          A.   2020.
4          Q.   Your daughter, as best you can recall, began
5     in 2022?
6          A.   I believe that's a correction as well.  She
7     attended college in August of '21.
8          Q.   Okay.
9          A.   She graduated high school in June of '21 --
10         Q.   Okay.
11         A.   -- and then college in August.
12         Q.   Fair enough.  Okay.  Thank you.  Appreciate
13    it.
14         A.   Again, correction.
15         Q.   And if at any point in this deposition you
16    recall, maybe you misspoke or had a correction, please
17    let me know.
18         A.   Uh-huh.
19         Q.   And have you ever been subjected to any
20    disciplinary -- or discipline from American Airlines?
21         A.   No.
22         Q.   Okay.  Starting from when you first came to
23    work for American, you've been a flight attendant the
24    whole time -- is that right -- at American?
25         A.   At American Airlines, yes.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 6**

Robert Ross                                                    2/1/2024

                                                                    93

1    start at 10:00.  It's now almost 3:00.  And I think the

2    court reporter can probably tell us how little time

3    we've actually been able to spend with questions, in

4    light of the delay and the breaks.

5            We have the full right to depose Mr. Ross for

6    up to seven hours, and we're going to do so.  These

7    delays are disruptive.  And we intend to complete his

8    deposition.

9            MS. PHILLIPS:  I will state on the record

10   that Mr. Ross has suffered a broken rib as of --

11           THE WITNESS:  I can't sit long.

12           MS. PHILLIPS:  -- a week ago, two weeks

13   ago.

14           THE WITNESS:  Yeah.

15           MS. PHILLIPS:  This morning's incidents,

16   moving the deposition to this location, was jarring for

17   him.  And I think you knew that he was susceptible to

18   that -- to that form of abuse.  And I'm sorry for that

19   delay, and I'm sorry for circumstances that he went

20   through.  But, unfortunately, on the record, the delay

21   was suffered as a result of the abuse and harassing

22   tactic that was taken.  So, if we need to take that up

23   with the judge, then that is something that we can

24   probably address tomorrow.

25           MR. BARTOS:  I want to complete the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

                                                        **Appendix 7**

Robert Ross                                                    2/1/2024

94

1   deposition.  That's all I'm saying.  We can take a
2   break.  I'll respect his medical condition.  But we're
3   going to finish the deposition.
4                  MS. PHILLIPS:  If you want to finish your
5   question, I didn't mean to interrupt your question.
6                  MR. BARTOS:  No.  That's fine.  We can
7   take a break right now.
8                  MS. PHILLIPS:  We had discussed at lunch
9   trying to take a break every -- every half an hour for
10  him, I think.  I was concerned that it would cause him
11  pain to sit for too long with a broken rib in his back.
12  So that was my concern.
13                 THE WITNESS:  My schedule -- they can
14  look it up at APFA.  My schedule will corroborate that I
15  was out.
16                 MR. BARTOS:  Let's take a break.  Off the
17  record.
18                 THE VIDEOGRAPHER:  We're off record at
19  3:02 p.m.
20                 (Recess from 3:02 p.m. to 3:11 p.m.)
21                 THE VIDEOGRAPHER:  We're back on record
22  at 3:11 p.m.
23  BY MR. BARTOS:
24      Q.  Can you tell me, Mr. Ross, in your own words,
25  how it is you think the Confidential Memo demonstrates

**Appendix 8**

Robert Ross                                                    2/1/2024

1        A.   No.   No.

2        Q.   Have you discussed with any labor organization

3   and they are paying your legal fees in this case?

4               MS. PHILLIPS:  Objection.  This is

5   ridiculous.

6        A.   No.

7        Q.   No.  Have you discussed with any

8   representatives of other labor organizations --

9               MS. PHILLIPS:  We're done.

10       Q.   -- they're paying your legal fees in this

11  case?

12              MS. PHILLIPS:  We're done.  It's 5:00.

13  We're done.  Let's go.

14       A.   There is no union -- other union, if that's

15  what you're saying, labor organization agreeing to pay

16  my legal fees.

17              MS. PHILLIPS:  Let's go.

18              MR. BARTOS:  Okay.  Just for the record,

19  we have not -- we have barely touched four hours of

20  time.  We will resume tomorrow morning.  And I suggest

21  we start at 9:00 so we can get Mr. Vargas done.

22              MS. PHILLIPS:  Yeah, you have me at

23  10:00.  That's what you scheduled and noticed for.

24              MR. BARTOS:  We had you at 10:00 a.m.

25  this morning, and we didn't start until 11:00.  We'd be

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 9**

Robert Ross                                                      2/1/2024

159

1   done by now.

2                MS. PHILLIPS:  Well, you probably

3   shouldn't sabotage people.  I highly recommend --

4                MR. BARTOS:  We will be here at 9:00

5   ready to go.

6                MS. PHILLIPS:  You need to re-notice and

7   give five days' notice.

8                MR. BARTOS:  We'll be here at 10:00, and

9   we expect Mr. Ross to be here to complete his deposition

10  because he's indicated on the record --

11               MS. PHILLIPS:  Tomorrow?

12               MR. BARTOS:  Tomorrow.

13               MS. PHILLIPS:  You have Vargas tomorrow.

14               MR. BARTOS:  We're continuing until we're

15  done.

16               MS. PHILLIPS:  What are you planning on

17  doing with Mr. Vargas?

18               MR. BARTOS:  We'll resume Mr. Vargas --

19  we'll start Mr. Vargas when Mr. Ross is done.

20               MS. PHILLIPS:  Mr. Vargas has -- has --

21  he has work.  So you want to -- Mr. Ross has his work

22  schedule; so that's not going to work.

23               MR. BARTOS:  We'll be here and expect to

24  finish with Mr. Ross tomorrow at 10:00 a.m.  Yeah, we

25  can go off the record.

Appendix 10

Robert Ross                                          2/1/2024

160

1              THE VIDEOGRAPHER:  We're off record at

2  4:56 p.m.

3              (Proceedings adjourned at 4:56 p.m.)

4              (Per Federal Rule of Civil Procedure

5              30(e)(1), signature was requested via

6              email by Counsel after completion of the

7              deposition)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 11**

Robert Ross                                                      2/1/2024

163

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
2                            FORT WORTH DIVISION

3   ROBERT (BOB) ROSS,              §
                                    §
4   Plaintiff/                      §
    Counterclaim Defendant,         §
5                                   §   Civil Action No.
    VS.                             §   4:22-cv-343-Y
6                                   §
    ASSOCIATION OF                  §   Judge Terry R. Means
7   PROFESSIONAL FLIGHT             §
    ATTENDANTS, et al.,             §
8                                   §
    Defendants/                     §
9   Counterclaim Plaintiff.         §

10                    REPORTER'S CERTIFICATION

11          VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS

12                            VOLUME 1

13                        FEBRUARY 1, 2024

14       I, Angela L. Mancuso, Certified Shorthand Reporter

15   in and for the State of Texas, hereby certify to the

16   following:

17       That the witness, ROBERT ROSS was duly sworn by the

18   officer and that the transcript of the oral deposition

19   is a true record of the testimony given by the witness;

20       That the original deposition was delivered to

21   Ms. Kerri Phillips for examination and signature by the

22   witness;

23       That the time used by the parties is as follows:

24   MS. KERRI PHILLIPS:  0 minutes

25   MR. JEFFREY A. BARTOS:  3 hours, 25 minutes

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 12**

Robert Ross                                                2/1/2024

164

1      I further certify that pursuant to FRCP Rule

2  30(e)(1) that the signature of the deponent was

3  requested by the Counsel for the deponent after the

4  completion of the deposition and that the signature is

5  to be before any notary public and returned within

6  30 days from date of receipt of the transcript.  If

7  returned, the attached Changes and Signature page

8  contains any changes and the reasons therefor.

9      I further certify that I am neither attorney or

10 counsel for, nor related to or employed by, any of the

11 parties to the action in which this deposition is taken,

12 and further that I am not a relative or employee of any

13 attorney or counsel employed by the parties hereto, or

14 financially interested in the action.

15     Certified to by me on this the 7th day of February,

16 2024.

17

18                    _____

19                    ANGELA L. MANCUSO, CSR 4514
                       Expiration Date: 10/31/24
20                    Stryker Reporting
                       Firm Registration No. 806
21                    1450 Hughes Road, Suite 230
                       Grapevine, Texas 76051
22                    (817) 494-0700

23

24

25

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 13**

Eugenio Vargas                                                    2/2/2024

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
                 FORT WORTH DIVISION

EUGENIO VARGAS,                §
                               §
Plaintiff/                     §
Counterclaim Defendant,        §
                               §   Civil Action No.
VS.                            §   4:22-cv-430-Y
                               §
ASSOCIATION OF                 §   Judge Terry R. Means
PROFESSIONAL FLIGHT            §
ATTENDANTS, et al.,            §
                               §
Defendants/                    §
Counterclaim Plaintiff.        §


          ------------------------------------
              VIDEOTAPED ORAL DEPOSITION OF
                     EUGENIO VARGAS
                        VOLUME 1
                    FEBRUARY 2, 2024
          ------------------------------------
```

        VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 2, 2024, from 10:03 a.m. to 11:47 a.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

**Appendix 14**

Eugenio Vargas                                           2/2/2024

34

1      A.    -- that I signed.

2                  MS. PHILLIPS:  We need to take a break.

3                  MR. BARTOS:  All right.  I'm going to

4      object to the repeated breaks.  We're going to run out

5      of time.

6                  MS. PHILLIPS:  I'm going to take a break

7      of five minutes.  Thank you.

8                  THE VIDEOGRAPHER:  Go off the record?

9                  MR. BARTOS:  Yes.

10                 THE VIDEOGRAPHER:  We're off record at

11     11:28 a.m.

12                 (Recess from 11:28 a.m. to 11:30 a.m.)

13                 (Deposition Exhibit 5 marked)

14                 THE VIDEOGRAPHER:  We're back on record

15     at 11:30 a.m.

16     BY MR. BARTOS:

17     Q.    Mr. Vargas, you have in front of you a

18     document marked as Exhibit 5.  It says across the top,

19     Association of Professional Flight Attendants, APFA

20     Installment Promissory Note.  And then at the bottom

21     there is a signature.

22           And my first question is, is that your

23     signature?

24     A.    What was your question?

25     Q.    Is that your signature at the bottom?

Eugenio Vargas                                                2/2/2024

35

1    A.   It looks like my signature.

2    Q.   Did you sign the APFA Installment Promissory

3 Note?

4    A.   I signed an -- I signed one promissory note,

5 yes.

6    Q.   And did you make payments of $172.62 every

7 month?

8    A.   Yes.

9    Q.   Okay.

10    A.   I mean, I'm not going to -- the amount I'm not

11 going to question.  I mean, I don't know if this is what

12 I signed, but I did make payments every month.

13    Q.   Okay.  And have you completed all the payments

14 under your promissory note?

15    A.   Yes.

16    Q.   And do you recall telling the Article VII

17 arbitrator that you took full responsibility for the

18 overpayment, if you remember?

19    A.   I don't.

20    Q.   And you're aware that Ms. Martin also agreed

21 to repay the amount of overpayment that was to her?

22    A.   I don't know.

23    Q.   You don't know?

24    A.   (No answer).

25    Q.   She never told you?

**STRYKER REPORTING SERVICES**            **(817) 494-0700**

**Appendix 16**

Eugenio Vargas                                          2/2/2024

                                                               37

1    that.

2              MS. PHILLIPS:  I said he can't -- it's

3    speculation.  He doesn't know what Ross paid.

4      Q.    Now, you participated in an arbitration under

5    Article VII of the APFA Constitution.  Is that right?

6      A.    Yes.

7      Q.    Okay.  And you were --

8              MS. PHILLIPS:  Objection; leading.

9      Q.    You were charged by two members, and that's

10   what led to that hearing.  Correct?

11     A.    I guess, yes.

12     Q.    And before -- prior to the time of your own

13   Article VII arbitration, had you ever participated in

14   any capacity in any other Article VII arbitration?

15     A.    Yes.

16     Q.    And what was that?

17     A.    It was with Mr. Morales.

18              MS. PHILLIPS:  I need to take a brief

19   moment off the record with my client for a moment.  I

20   want to make sure he clears the record on something that

21   he's testified to.

22              MR. BARTOS:  Sure.

23              THE VIDEOGRAPHER:  We're off record at

24   11:34 a.m.

25              (Recess from 11:34 a.m. to 11:35 a.m.)

Eugenio Vargas                                          2/2/2024

38

1              THE VIDEOGRAPHER:  We're back on record

2    at 11:35 a.m.

3    BY MR. BARTOS:

4        Q.    Mr. Vargas, you just had a consultation with

5    your counsel.  Is that right?

6        A.    Yes, I did.

7        Q.    Do you want to change any of your answers

8    you've given thus far?

9        A.    I want to go back to the promissory note

10   subject and say why I signed it.

11       Q.    Okay.  That wasn't my question I asked you.

12       A.    But I want to say it.

13       Q.    No.  Your lawyer is allowed to ask you

14   questions.

15             The -- the -- where we were in my questioning

16   was a prior Article VII arbitration that you

17   participated in.

18       A.    Yes.

19       Q.    And you -- you said a name.  I believe it was

20   Morales?

21       A.    Mr. Morales.

22       Q.    Okay.  What was the -- was Mr. Morales the

23   party who was charged, or was he the charging party?  Or

24   what -- what was his role in that case?

25             MS. PHILLIPS:  The issue that we went off

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Appendix 18**

Eugenio Vargas                                              2/2/2024

39

1   the record for and discussed what he needs to go back

2   and clarify the record about is the promissory note.

3              MR. BARTOS:  That's what he's testified

4   to.  That's fine.  But that's not a pending question.

5        Q.    I'm asking you about the prior Article VII

6   arbitration.  What was your role in that arbitration?

7        A.    I was charged party from Mr. Morales, and then

8   I became the charging party.

9        Q.    Okay.  So just to clarify for my sake,

10  Mr. Morales charged you with some violation?

11       A.    Yes.

12       Q.    Okay.  And then eventually you charged

13  Mr. Morales with a violation.  Is that -- do I

14  understand that correctly?

15       A.    I mean, yes.

16       Q.    Okay.  Roughly, when was this?

17       A.    Between 2016 and 2018.  2018.

18       Q.    So was it while you were national treasurer?

19       A.    Correct.

20       Q.    Okay.  What was the -- what was Mr. -- what

21  did Mr. Morales charge you with?

22       A.    I cannot give you specific.

23       Q.    You don't recollect?

24       A.    I mean, I will have to go back and --

25       Q.    I'm just asking in general terms.

Eugenio Vargas                                              2/2/2024

44

```
 1          MR. BARTOS:  The deponent has not
 2   indicated he wants a break.
 3                THE WITNESS:  I want a break.
 4          MS. PHILLIPS:  His representative has
 5   indicated a break; so the deponent's representative is
 6   taking a break.
 7          MR. BARTOS:  And I repeat my objection to
 8   these repeated breaks.
 9          MS. PHILLIPS:  Well, you can -- on record
10   you can object to it.  That's fine.
11          MR. BARTOS:  And I have.
12          MS. PHILLIPS:  That's fine.  But if
13   you're not going to let him clarify his testimony that
14   he is a second -- English is his second language.  It is
15   not his first language.  He doesn't have a translator
16   here.  He doesn't understand the words fully.  This
17   is -- he is employed at American Airlines as a -- as a
18   translator, for the love of God.
19          He hasn't been given the opportunity for
20   somebody who can translate the words fully, in his
21   primary language.  And you're shotgunning questions at
22   him, and you're not even allowing him the opportunity to
23   go back and fully explain things that you have put in
24   front of him.
25          So I am going to go on record and state the
```

**STRYKER REPORTING SERVICES**                  **(817) 494-0700**

**Appendix 20**

Eugenio Vargas                                              2/2/2024

45

1   fact that he would like the opportunity to state and

2   explain a document that you put in front of him.

3                MR. BARTOS:  Can I continue with the

4   questioning, or are you taking a break?

5                MS. PHILLIPS:  Are you going to allow him

6   to clarify his testimony?

7                MR. BARTOS:  I'm going to continue

8   questioning.

9                MS. PHILLIPS:  Are you going to allow him

10  the opportunity to clarify his testimony?

11               MR. BARTOS:  I'm going to ask questions,

12  and he's going to answer them.

13               MS. PHILLIPS:  Am I going to have to stop

14  the deposition at this point?

15               MR. BARTOS:  I'm going to --

16               MS. PHILLIPS:  Because, you know,

17  yesterday was an appalling display of behavior on your

18  part.  I have to -- I have to state that it was just

19  embarrassing.  It was embarrassing.

20  BY MR. BARTOS:

21      Q.   Mr. Vargas, you learned in 2020 that you

22  were -- had Article VII charges filed against you by

23  Melissa Chinery and Sandra Lee.  Correct?

24               MS. PHILLIPS:  Mr. Bartos --

25      Q.   Is that right?

**STRYKER REPORTING SERVICES**                      **(817) 494-0700**

**Appendix 21**

Eugenio Vargas                                          2/2/2024

46

1              MS. PHILLIPS:  -- are you going to allow
2    my client the opportunity to clarify the record --
3              MR. BARTOS:  I am asking questions.
4              MS. PHILLIPS:  -- as to his testimony?
5    Because I'm going to object that -- if you don't allow
6    him to clarify the record about his testimony on the
7    promissory note, then I'm going to object.
8              MR. BARTOS:  You feel free to object.
9    I'm going to ask questions.
10       Q.   Mr. Vargas --
11             MS. PHILLIPS:  I am going to object, and
12   I'm going to take a break with my client.
13             MR. BARTOS:  If you're going to get up
14   and leave, get up and leave.  But I'm going to keep
15   asking questions.
16             MS. PHILLIPS:  I'm going to stop the
17   deposition at this point because I think that you are
18   creating a circumstance that is hostile at this point.
19   This is not the way to conduct a deposition.  You should
20   be investigating the actual facts.  If you want to know
21   the facts as to what happened, then you should ask the
22   questions and find out the testimony.
23   BY MR. BARTOS:
24       Q.   Mr. Vargas, are you prepared to continue with
25   your testimony?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                2/2/2024

```
                                                              47
 1             MS. PHILLIPS:  Don't address my client.
 2  You can address questions at me when we are discussing
 3  the matters before -- in this case.
 4             MR. BARTOS:  We are here for a
 5  deposition, and I'm going to conduct the deposition.
 6             MS. PHILLIPS:  Correct.  We are here for
 7  a deposition, and we are discussing matters pertaining
 8  to this case.  So you and I can discuss and hammer out
 9  issues relating to this case.
10             MR. BARTOS:  You will have the full right
11  to ask Mr. Vargas whatever questions you want.  I am
12  asking questions now.  And I need to be permitted to ask
13  my questions.
14             MS. PHILLIPS:  I think we need to stop.
15  I think we need to stop.
16             MR. BARTOS:  I am not stopping.
17             MS. PHILLIPS:  Well, I am.  I am
18  stopping.  And I think that we need -- at this point we
19  need to stop, and we can schedule something with the
20  Court and find out what -- what the next steps need to
21  be to come to a resolution on something as simple as a
22  confidentiality order, as something as simple as a
23  deposition and -- and whether or not a break needs to
24  take place, whether or not lunch needs to be 30 minutes
25  or -- or, you know, whether or not Mr. Ross can stand up
```

Eugenio Vargas                                            2/2/2024

48

1   while you ask him questions and whether or not

2   Mr. Vargas can clarify his testimony on record.

3          Are you asking questions for purposes of

4   discovering what -- what actually happened, or are you

5   asking questions so that you can tilt the stage in your

6   favor?

7                MR. BARTOS:  I'm here to take the

8   deposition as ordered by the Court, and I intend to keep

9   doing so as long as you're here.

10               MS. PHILLIPS:  Well, unfortunately, I am

11  not of the opinion that you are going to ask questions

12  and not allow my client the opportunity to clarify a

13  response when English is not his primary language --

14               MR. BARTOS:  He will have every

15  opportunity to answer --

16               MS. PHILLIPS:  -- and he can't clarify a

17  response.

18               MR. BARTOS:  -- when you get to ask

19  questions.

20               MS. PHILLIPS:  If you're not going to

21  allow him to --

22               MR. BARTOS:  I go first.

23               MS. PHILLIPS:  Are you going to allow him

24  to clarify his testimony?

25               MR. BARTOS:  You are welcome to ask any

Eugenio Vargas                                          2/2/2024

                                                             49

 1   questions you want when it's your turn.  Please stop
 2   interfering with my deposition.
 3                MS. PHILLIPS:  Are you going to allow him
 4   to clarify his response?
 5                MR. BARTOS:  I've answered your question.
 6                MS. PHILLIPS:  You did not.  You answered
 7   my question --
 8   BY MR. BARTOS:
 9       Q.   Mr. Vargas --
10                MS. PHILLIPS:  -- with a different -- are
11   you going to allow him to clarify his testimony?
12                MR. BARTOS:  Please stop interfering with
13   the deposition.
14                MS. PHILLIPS:  I'm going to end this if
15   you don't allow him to clarify his testimony.
16                MR. BARTOS:  Please stop interfering with
17   my deposition.  You will have every right to ask him a
18   question when I'm done.
19                MS. PHILLIPS:  You have -- you can answer
20   my question.  Will you allow him to clarify his
21   testimony?  If you don't, we're done.
22                MR. BARTOS:  He is allowed to answer your
23   questions when you ask him your questions when I am
24   finished.
25                MS. PHILLIPS:  It's a yes-or-no question.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

                                              **Appendix 25**

Eugenio Vargas                                          2/2/2024

50

1   Will you allow him to clarify his testimony?  Yes or no?

2                   MR. BARTOS:  When you ask him

3   questions --

4                   MS. PHILLIPS:  We're done.  Let's go.

5                   MR. BARTOS:  -- he can testify what he

6   wants.

7           I object to your leaving.  I am going to ask

8   for --

9                   MS. PHILLIPS:  I object to your, you

10  know -- I object to this entire situation.

11                  MR. BARTOS:  We will seek full relief

12  from the Court.

13                  (Ms. Phillips and the Witness exit

14                  the room)

15                  MR. BARTOS:  We can stop the record.

16  That's fine.

17                  THE VIDEOGRAPHER:  Off the record at

18  11:47 a.m.

19                  (Proceedings adjourned at 11:47 a.m.)

20                  (Per Federal Rule of Civil Procedure

21                  30(e)(1), signature was requested via

22                  email by Counsel after completion of the

23                  deposition)

24

25

Eugenio Vargas                                              2/2/2024

53

```
                 IN THE UNITED STATES DISTRICT COURT
1
                 FOR THE NORTHERN DISTRICT OF TEXAS
2                          FORT WORTH DIVISION

3   EUGENIO VARGAS,              §
                                 §
4   Plaintiff/                   §
    Counterclaim Defendant,      §
5                                §   Civil Action No.
    VS.                          §   4:22-cv-430-Y
6                                §
    ASSOCIATION OF               §   Judge Terry R. Means
7   PROFESSIONAL FLIGHT          §
    ATTENDANTS, et al.,          §
8                                §
    Defendants/                  §
9   Counterclaim Plaintiff.      §
```

10                  REPORTER'S CERTIFICATION

11          VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS

12                          VOLUME 1

13                       FEBRUARY 2, 2024

14

15      I, Angela L. Mancuso, Certified Shorthand Reporter

16   in and for the State of Texas, hereby certify to the

17   following:

18      That the witness, EUGENIO VARGAS was duly sworn by

19   the officer and that the transcript of the oral

20   deposition is a true record of the testimony given by

21   the witness;

22      That the original deposition was delivered to

23   Ms. Kerri Phillips for examination and signature by the

24   witness;

25      That the time used by the parties is as follows:

Eugenio Vargas                                                    2/2/2024

54

1    MS. KERRI PHILLIPS:  0 minutes

2    MR. JEFFREY A. BARTOS:  58 minutes

3        I further certify that pursuant to FRCP Rule

4    30(e)(1) that the signature of the deponent was

5    requested by the Counsel for the deponent after the

6    completion of the deposition and that the signature is

7    to be before any notary public and returned within

8    30 days from date of receipt of the transcript.  If

9    returned, the attached Changes and Signature page

10   contains any changes and the reasons therefor.

11       I further certify that I am neither attorney or

12   counsel for, nor related to or employed by, any of the

13   parties to the action in which this deposition is taken,

14   and further that I am not a relative or employee of any

15   attorney or counsel employed by the parties hereto, or

16   financially interested in the action.

17       Certified to by me on this the 7th day of February,

18   2024.

19

20

21   ANGELA L. MANCUSO, CSR 4514
     Expiration Date: 10/31/24
22   Stryker Reporting
     Firm Registration No. 806
23   1450 Hughes Road, Suite 230
     Grapevine, Texas 76051
24   (817) 494-0700

25

# APFA

## FALL BOARD OF DIRECTORS MEETING



## October 10-12, 2023

*APFA Unity Pays Conference Room*

| | Resolution Information |
|---|---|
| **Resolution #:** | **3** |
| **Resolution Name:** | **Confidentiality** |
| **Status:** | **Pass** |
| **Maker:** | Montanari |
| **Second:** | Pennel |
| **Date:** | 10/12/2023 |
| **Time:** | 9:54 a.m. CT |
| **Affects PM:** | ☒ Section 1.E |
| **Comments:** | |

| | BOS Powers | CLT Hazlewood | DCA Pennel | DFW De Roxtra | LAX Nikides | LGA Santana | MIA Trautman | ORD Howard | PHL Montanari | PHX Agee | Hedrick |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **YES** | ☒ | ☐ | ☒ | ☒ | ☒ | ☐ | ☐ | ☒ | ☒ | ☒ | ☐ |
| **NO** | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| **ABS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **N/A** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Yes:** 8  **No:** 2  **Abstain:** 0  **Absent:** 0  **Show of Hands:** ☐

**WHEREAS**, APFA Policy Manual Section 1.E.1 states "The National Officers, voting Board of Directors, Ad-Hoc Members of the Executive Committee, members of any APFA Negotiating committee, Base Vice Presidents, National Chairs, and Regional Representatives are required to maintain confidentiality in connection with conducting the business of the Union. Every person holding one (1) or more of these positions shall sign a Code of Confidentiality;" and

**WHEREAS**, APFA representatives are bound by APFA Policy Manual Section 1.E to safeguard confidential communications and information disseminated to them in their official capacity; and

**WHEREAS**, all members of the APFA have a right to individual privacy under Article II, Section 3.C of the APFA Constitution; and

**WHEREAS**, all officers, agents and other representatives of the APFA occupy a position of trust in relation to APFA and its members as a group. Therefore representatives have a duty to refrain from dealing with APFA as an adverse party or on behalf of any adverse party in any matter connected with their duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization pursuant to Section 501(a) of the Labor-Management Reporting and Disclosure Act; and

**WHEREAS**, breaches of confidentiality may undermine the APFA negotiations strategy, may harm APFA's position in litigation, and erode the trust of its members.

**Appendix 29**

APFA
BOARD OF DIRECTORS MEETING

**BE IT THEREFORE RESOLVED**,  any National Officers, voting Board of Directors, Ad-Hoc Members of the Executive Committee, members of any APFA Negotiating committee, Base Vice Presidents, National Chairs, Regional Representatives or other representative of APFA who violates the APFA Policy Manual Section 1.E or APFA Code of Confidentiality will be sent a letter admonishing the breach of confidentiality and be barred from receiving any confidential and privileged information for an amount of time necessary, in the judgment of the Board of Directors, to protect the interests of the APFA and its members; and

**BE IT FURTHER RESOLVED,**  that APFA Policy Manual Section 1.E.1 include the following edits:

"The National Officers, voting Board of Directors, Ad-Hoc Members of the Executive Committee, members of any APFA Negotiating committee, Base Vice Presidents, National Chairs, ~~and~~ Regional Representatives, and other APFA Representatives are required to maintain confidentiality in connection with conducting the business of the Union. Every person holding one (1) or more of these positions shall sign a Code of Confidentiality." and

**BE IT FURTHER RESOLVED**, APFA Policy Manual Section 1.E be updated to include the following paragraph:

4. Failure to execute or comply with the APFA Code of Confidentiality will result in exclusion from receiving confidential and proprietary information. The Board of Directors shall determine the duration of exclusion from receiving confidential and proprietary information. A letter will be sent to the offender by the APFA Board of Directors describing the breach of confidentiality and the consequence.

Report from: SACRAMENTO VA MEDICAL CENTER     Station #612A4
Imaging (local only)                                          Page 1
ROSS, ROBERT ALLEN

Case 4:22-cv-00343-Y   Document 213   Filed 02/26/24   Page 34 of 65   PageID 4946
Redacted by Plaintiffs                    Redacted by Plaintiffs

===============================================================================
                    *** WORK COPY ONLY ***                Printed: 01/17/2024 15:24

RIBS UNILAT 2 VIEWS

Proc Ord: CHEST 2 VIEWS
Exm Date: JAN 17, 2024@14:14

# Redacted by Plaintiffs

Redacted by Plaintiffs

(Case 612-011724-1295 COMPLETE) RIBS UNILAT 2 VIEWS          (RAD  Detailed) CPT:71100
    Reason for Study: right lower back pain conerning for rib fx s/p
                      fall

    Clinical History:

    Report Status: Verified              Date Reported: JAN 17, 2024
                                         Date Verified: JAN 17, 2024

    Verifier E-Sig:/ES/Chad Goodman, MD

    Report:
       Discussion: 3 views of the right ribs are submitted for

# Redacted by Plaintiffs

    Impression:
    Acute right 11th rib fracture without associated pneumothorax or
    pleural effusion appreciated.

       1/17/2024 14:26 PST

    Primary Diagnostic Code: SIGNIFICANT ABNORMALITY, ATTN NEEDED

Primary Interpreting Staff:
   Chad Goodman, MD, Staff Radiologist (Verifier)
/CG


                    *** WORK COPY ONLY ***



To: _____     _____     _____

          Print Name                Employee #              APFA Position

**Re: DECS61 SABRE Access**

You have been granted enhanced SABRE capabilities by upgrading your SABRE EPR to include the following KEYWORD: **DECS61**.

By accepting this enhanced SABRE keyword you understand and agree to the following:

- I understand that my enhanced SABRE capabilities are for the sole purpose of completing only my duties as a representative of the APFA.

- I understand that any misuse of these expanded SABRE capabilities, or violations of Company password policies will be viewed as a serious infraction and may result in corrective action.

- I agree with and understand the American Airlines Employee Policy Guide statement regarding Company Information Systems:

> **Company Information Systems**
> Our company information systems and all the data residing on them are the property of AA and intended primarily for business purposes.  This includes any hardware or software, voicemail systems, e-mail, faxes, copiers, printers, and SABRE.  You should protect these systems as confidential and proprietary company information at all times.  Never share your passwords or accounts or provide access to unauthorized users.

- I understand and state that I will not issue my SABRE password(s) to another individual or Trip Trade/Bid Service.

**I have read and fully understand and agree to the above information.**

_____          _____

Employee Signature                         Date

cc:     Personnel File
         Employee Relations
         APFA

**Appendix 32**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
HECTOR CORDERO,

                    Plaintiff,

        - against -

CITY OF NEW YORK, et al.,

                    Defendants.
-----------------------------------------------------------X

                    **ORDER**
                    15 CV 3436 (JBW) (CLP)

**POLLAK**, United States Magistrate Judge:

      On June 12, 2015, Hector Cordero ("plaintiff") commenced this action, pursuant to 42

U.S.C. §§ 1983 and 1988, against defendants the City of New York and John and Jane Doe 1

through 10, individually and in their official capacities, alleging violations of his Fourth, Fifth,

Sixth, and Fourteenth Amendment rights.  On November 30, 2015, plaintiff filed an Amended

Complaint, adding as defendants Lieutenant Christopher Moran ("Moran") and Police Officers

Hugo Hugasian ("Hugasian"), Paul Palminteri ("Palminteri"), Raul Narea ("Narea"), John Essig

("Essig"), Lynette Reyes ("Reyes"), Peter Rubin ("Rubin"), and Marco Artale ("Artale"), and

John and Jane Doe 1 through 10, individually and in their official capacities (collectively,

"defendants").

      Presently before the Court is plaintiff's motion for sanctions based on alleged improper

objections raised by defendants' counsel, Amatullah K. Booth, Esq. ("Booth"), during the

deposition of defendant Essig on September 22, 2016.

**APP 33**

BACKGROUND

Plaintiff alleges that at approximately 1:00 p.m. on October 24, 2014, plaintiff was working inside of a bodega at 42 Irving Place in Brooklyn, New York. (Am. Compl.[1] ¶ 19). Plaintiff alleges that defendants entered the bodega, ordered plaintiff to go outside, and suddenly and without probable cause or reasonable suspicion to believe plaintiff had committed any crime or offense, arrested plaintiff and handcuffed him "tightly." (Id. ¶¶ 20-22). Plaintiff alleges that after being arrested, he asked "what was going on," but defendants did not respond. (Id. ¶ 23). Plaintiff claims that he was taken to the 83rd Precinct, where he was illegally strip-searched. (Id. ¶¶ 24, 25). Plaintiff claims that defendants unlawfully stopped and searched him, falsely arrested, and maliciously prosecuted him, in violation of his Fourth and Fourteenth Amendment rights. (Id. ¶¶ 32-41).

Plaintiff further alleges that, despite never witnessing plaintiff commit any crime or offense, defendants falsely informed employees of the Kings County District Attorney's Office that they had observed plaintiff commit several crimes including criminal sale of a controlled substance, denying plaintiff his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. (Id. ¶¶ 26, 27, 42-46). Additionally, plaintiff alleges that those defendants who were present but did not actively participate in the unlawful conduct, failed to prevent such conduct, despite a duty to intervene, and in so doing violated the plaintiff's Fourth, Fifth, Sixth, and Fourteenth Amendment rights. (Id. ¶¶ 47-50). Finally, plaintiff brings a Monell claim against the City of New York, alleging that the City, through

---

[1]Citations to "Am. Compl." refer to the Amended Complaint, filed on November 30, 2015.

policies, practices, and customs, directly caused the constitutional violations allegedly suffered by the plaintiff.  (Id. ¶¶ 51-58).

On October 25, 2015, plaintiff was arraigned in Kings County Criminal Court and released on his own recognizance after approximately twelve hours in custody.  (Id. ¶ 29).  On March 4, 2015, after appearing in criminal court several times, all criminal charges against plaintiff were dropped.  (Id. ¶ 30).  As a result of defendants' conduct, plaintiff claims that he was "deprived of his liberty, suffered emotional distress, mental anguish, fear, pain, anxiety, embarrassment, humiliation, an unlawful strip search and damage to his reputation."  (Id. ¶ 31).

Discovery is ongoing.  On September 22, 2016, plaintiff deposed defendant Essig. According to plaintiff, defendants' counsel objected to plaintiff's questions over 600 times across 83 percent of the pages of the deposition transcript.  (See 10/12/16 Pl.'s Ltr.[2] at 5).

During the deposition, defendants' counsel objected to a question posed by plaintiff's counsel, asking Essig what he remembered happening on October 24, 2014, the date of plaintiff's arrest.  (Tr.[3] at 83).  The parties agreed to call Judge Go's[4] chambers to seek guidance.  Although Judge Go was unable to take the call, her law clerk instructed the parties that "objections should be short and concise and should be either to the form of the question and there is really nothing else that needs to be said, other than objection to form."  (Id. at 90).

When questioning resumed, despite the clerk's instructions, defendants' counsel

---

[2] Citations to "10/12/16 Pl.'s Ltr." refer to plaintiff's letter, filed on October 12, 2016.

[3] Citations to "Tr." refer to transcript of John Essig's deposition, attached as Exhibit A to plaintiff's letter, dated October 12, 2016.

[4] At the time of the deposition, the case was assigned to the Honorable Marilyn D. Go. The case has since been reassigned to the undersigned.

3

frequently stated the grounds for her objections without being requested to do so by plaintiff's

counsel. Many of defense counsel's numerous objections appear to have impacted the witness'

responses. For example:

> Q      Did you see yourself on the video?
> A      Yes.
> Q      What were you doing?
> MS. BOOTH: Objection. Vague.
> A      What – where?

(Id. at 146).

On several occasions, specifically regarding defendants' counsel's more egregious

objections, plaintiff's counsel demanded the reason for defense counsel's objections. For

example:

> Q      What did you do for the rest of that tour?
> A      As far as what? As far as what's in my memo book or as
>        far as what I –
> Q      No, I'm not interested in your memo book. I want to know
>        what you did.
> MS. BOOTH: Objection. Asked and answered.
> A      When? After, after what?
> Q      After you left Hector Cordero in the cell?
> A      I finished processing my other arrest.
> Q      What did that involve?
> MS. BOOTH: Objection. He's not going to testify about the other
>              arrests, unrelated arrests.
> MR. HARVIS: You're directing him not to answer the question?
> MS. BOOTH: I am directing him not to testify about other arrests
>              on that day.
> MR. HARVIS: On what grounds?
> MS. BOOTH: That may be protected under the law.

(Id. at 263-64).

Ms. Booth instructed the witness not to answer questions at least twenty (20) times. For

example:

4

> Q     Do you have Detective Rubin's, like, phone number in your phone?
>
> MS. BOOTH:  Objection.  Direct him not to answer the question.

(Id. at 42).  Additionally:

> Q     When – did you leave the room that the cells are in at that point?
>
> A     I don't recall.
>
> Q     Well, what's the next thing that you recall?
>
> A     As far as what?
>
> Q     As far as that tour, after you finished making sure that Rubin was secure while he was searching Hector Cordero?
>
> MS. BOOTH:  Anything after his involvement with the plaintiff ended, is beyond the scope of this deposition.
>
> MR. HARVIS:  Let's agree to disagree about that.
>
> MS. BOOTH:  I'm going to direct him not to answer.

(Id. at 250).  At one point, the following colloquy occurred:

> Q     Do you know whether or not there was a TAC meeting on October 23, 2014?
>
> MS. BOOTH:  Objection.  And I'm directing the witness to not answer that question.  It has been asked and answered several times.
>
> MR. HARVIS:  It's not an objection.
>
> MS. BOOTH:  Well, its harassment.
>
> MR. HARVIS:  To ask if there was a TAC meeting is harassment?
>
> MS. BOOTH:  You went through a very long series of questions in regard to TAC plans, TAC meetings, whether one occurred on this day.  We're not going back down that road.
>
> MR. HARVIS:  I can ask him any questions I want.
>
> MS. BOOTH:  I'm directing him not to answer because that is harassment.
>
> MR. HARVIS:  I can ask him about it as many times as I want.
>
> MS. BOOTH:  I'm directing him not to answer.
>
> MR. HARVIS:  Okay, fine.  We'll make a record and then we'll move for costs.
>
> MS. BOOTH:  Yes, that's what you do.
>
> Q     Did you – who led the TAC meeting that day?
>
> MS. BOOTH:  Objection.  I'm directing the witness not to answer that question.

5

> Q        Did you make any notes during the TAC meeting?
> MS. BOOTH: Objection.  Directing the witness not to answer that
>                 question.
> Q        Were any handouts given out during the TAC meeting?
> MS. BOOTH: Objection. I'm directing the witness to not answer
>                 that question.

(Id. at 307-09).

At times, Ms. Booth directed her witness not to answer questions on the basis that they

had already been asked and answered, even though they had not been answered.  For example,

early in the deposition, plaintiff's counsel asked defendant Essig, "What memo book entries are

you required to make when you're working on a SNEU operation?"  (Id. at 95).  Ms. Booth

objected on the grounds that the question "[c]all[ed] for speculation."  (Id.)  Counsel proceeded

to have a discussion regarding whether Ms. Booth was permitted to state the grounds for her

objections, and the question was never answered.  (See id. at 95-96).  Thus, plaintiff's counsel

returned to the subject later in the deposition, and the following exchange occurred:

> Q        Do you know if there are any entries that are specifically
>                 required in your memo book, when you're doing a SNEU
>                 operation?
> MS. BOOTH:  Objection.  Asked and answered.
> A        I don't have that information of what's required.
> Q        But to your knowledge?
> MS. BOOTH:  Objection.  Asked and answered.
> MR. HARVIS:  Asked and answered is not an appropriate
>                     objection.
> MS. BOOTH:  Harassment.
> MR. HARVIS:  None of those are.
> MS. BOOTH:  It is harassment.
> MR. HARVIS:  Okay, you can only say objection to form.
> MS. BOOTH:  That is not –
> MR. HARVIS:  That is what the court just said.  We had it read
>                     back.
>
> MS. BOOTH:  Like I said, it's harassment and if it continues, I'm

6

>        going to direct him not to answer the question. So
>        if you want to keep asking the same questions, that
>        is going to be the result.
> MR. HARVIS: Okay, that['s] fine.
> Q      Based on your training in the SNEU training, did you learn
>        when you train[ed] in the SNEU training about any
>        particular type of memo book entries that had to be made
>        for that kind of operation?
> MS. BOOTH: Objection. Harassment. I'm directing my client
>        not to answer that question.

(Id. at 295-97). Plaintiff's counsel's question regarding what entries, if any, were required to be

included in defendant Essig's memo book, was never answered.

Ms. Booth instructed her witness not to answer other questions on the grounds of

relevance and harassment, as well. For example:

> Q      This is from the City payroll records. Does this document
>        accurately reflect, to the best of your knowledge, your base
>        pay and total pay for the years 2014 through 2016?
> MS. BOOTH: Objection. I'm going – I need to inquire, what is the
>        basis of you asking him about his salary?
> MR. HARVIS: I would like to know if this information on this
>        form is accurate and he would know that.
> MS. BOOTH: What is the basis of that information? I'm going to
>        direct him not to answer that question.
> MR. HARVIS: On what ground?
> MS. BOOTH: I don't see how it's even remotely relevant and I
>        find it to be harassing.
> MR. HARVIS: It's harassing to – first of all, it goes to punitive
>        damages. There is case law in the Second Circuit
>        up and down, about how you are allowed to find out
>        the economic means of someone, assessment of
>        damages because the City doesn't pay that. So I
>        don't have to do it based on this document, I can
>        just ask him. But it's certainly a legitimate line of
>        questioning to find out, like, how much he earns in
>        overtime each year.
> MS. BOOTH: I don't – I'm going to direct him not to answer that
>        question at this point.
> MR. HARVIS: On what grounds?

7

MS. BOOTH: Based on what I just said.
(Id. at 389-91).

There were also several occasions when Ms. Booth did not directly instruct the witness

not to answer, but effectively made comments suggesting the answers to the witness. For

example:

> Q    To your knowledge, have any of the other officers that you
>       worked with on SNEU at the 83rd precinct, become
>       detectives?
> MS. BOOTH: Objection. Only if you have that information.
> A    I don't have that information.

(Id. at 41).

The parties later called the Court once again, and Judge Go directed defendants' counsel

that, if she had objections to specific questions, rather than instructing her witness not to answer,

she should "[a]sk the court reporter to mark the questions and just focus on the issues, rather

than, you know, rather than quibbling over procedures and conduct. But just move forward and

finish up." (Id. at 334-35). To the extent that defendants' counsel believed a question had

already been asked and answered, Judge Go instructed counsel, "don't jump to the conclusion

that simply because [a question] overlaps with a prior question, that it's not a different question.

Just, if you think it's an objectionable question because it was previously asked, [g]o now and

have the court reporter mark it and we'll go back to see who is correct on that." (Id. at 337).

Even after this instruction, defendants' counsel proceeded to instruct Essig not to answer

questions. For example, when Essig was asked to confirm whether certain payroll records were

accurate, defendants' counsel stated, "I'm going to direct him not to answer that question. . . . I

don't see how it's even remotely relevant and I find it to be harassing." (Id. at 390). When Essig

8

**APP 40**

was then asked about the amount of overtime pay he received, counsel stated:

> MS BOOTH: Objection. I'm going to direct him not to answer this line of questioning. The overtime in regards to this arrest, is one thing, but to ask him about his salary and how much he's earned in overtime, in general, is irrelevant. And the judge already ruled that she believes the overtime in general in this case, that information was very – not really relevant. So I mean, if you want to take it up with the court, that's fine.

(Id. at 391-92). Plaintiff's counsel's questions regarding Essig's pay or overtime compensation were not answered during the deposition.

Defendants' counsel also threatened to leave the deposition on several occasions, claiming that questions were harassing to Essig. For example, after the above discussion regarding the TAC meeting, the following exchange occurred:

> MS. BOOTH: I am going to state on the record that the questions have been harassing throughout this process. They have been asked and answered repeatedly, over and over again. And I am going to ask now, if you have a new, different question to ask my client, please ask it. If you do not, then we are going to be leaving.
>
> MR. HARVIS: Okay, well, you can leave if you want, but the deposition is not over.
>
> MS. BOOTH: We will be leaving if you do not ask a different, new question, we are leaving because I find this to be harassment.

(Id. at 311).

Since the conclusion of the Essig deposition, the parties have conducted additional depositions. (11/4/16 Defs.' Ltr.[5] at 2). Both parties agree that following the Essig deposition

---

[5] Citations to "11/4/16 Defs.' Ltr." refer to defendants' letter in opposition, filed on November 4, 2016.

9

the relationship between plaintiff's counsel and defendants' counsel has improved. (See 11/10/16 Pl.'s Ltr.[6] at 1; see also 11/4/16 Defs.' Ltr. at 2). However, on April 19, 2017, the parties contacted the Court twice regarding disputes that arose during plaintiff's deposition.

## DISCUSSION

A. Legal Standard

Rule 30(c)(2) of the Federal Rules of Civil Procedure provides that "[a]n objection [during a deposition] must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). "[R]elevance or the lack thereof does not provide a basis to direct a witness not to answer a question." Weinrib v. Winthrop-University Hosp., No. 14 CV 953, 2016 WL 1122033, at *3 (E.D.N.Y. Mar. 22, 2016) (citing Balk v. New York Inst. of Tech. No. 11 CV 509, 2012 WL 5866233, at *2 (E.D.N.Y. Nov. 19, 2012); Severstal Wheeling Inc. v. WPN Corp., No. 10 CV 954, 2012 WL 1982132, at *2 (S.D.N.Y. May 30, 2012); Luc Vets Diamant v. Akush, No. 05 CV 2934, 2006 WL 258293, at *1 (S.D.N.Y. Feb. 3, 2006)). Rule 30(d)(2) authorizes the Court to sanction any person who "impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). To impose sanctions, a Court need not find that a party acted in bad faith. See Sicurelli v. Jeneric/Pentron, Inc., No. 03 CV 4934, 2005 WL 3591701, at *8 (E.D.N.Y. Dec. 30, 2005). Rather, the only requirement for sanctions is that

---

[6] Citations to "11/10/16 Pl.'s Ltr" refer to plaintiff's letter in reply, filed on November 10, 2016.

the fair examination of the deponent was frustrated, impeded, or delayed. Fed. R. Civ. P. 30(c)(2). The decision to impose sanctions is at the discretion of the court. See Sicurelli v. Jeneric/Pentron, Inc., 2005 WL 3591701, at *8. "The making of an excessive number of unnecessary objections may itself constitute sanctionable conduct." Fed. R. Civ. P. 30 advisory committee's note to 1993 amendment.

However, courts in the Second Circuit have declined to impose sanctions based solely on voluminous, unwarranted, and argumentative objections where opposing counsel was not prevented from completing the deposition. See, e.g., Phillips v. Manufacturers' Hanover Trust Co., No. 92 CV 8527, 1994 WL 116078, at *3 (S.D.N.Y. March 29, 1994) (declining to issue sanctions, even when the attorney's conduct "clearly hampered the free flow of the deposition," and was "inappropriate and at times even obnoxious"). On the contrary, sanctions have been imposed where counsel's interruptions, while not necessarily in bad faith, included repeated improper instructions for the witness not to answer, preventing the deposing party from completing the deposition. See Morales v. Zondo Inc., 204 F.R.D. 50, 53-54 (S.D.N.Y. 2001).

### B. Analysis

By letter dated October 12, 2016, plaintiff moved for an Order awarding costs, pursuant to Rule 30(d)(2), based on defendants' counsel allegedly impeding, delaying, or frustrating the fair examination of the plaintiff's deposition of defendant Essig on September 22, 2016. (See 10/12/16 Pl.'s Ltr. at 5). More specifically, plaintiff alleges that his questioning of Essig "was frustrated by defense counsel's speaking objections . . . to the point that [the] deposition was futile." (Id. at 1). In support of this argument, plaintiff asserts that "over 750 statements from

11

[defendants' counsel] appear in the record, including over 600 objections across 84% of the examination's pages." (Id. at 5).

Plaintiff also alleges that defendants' counsel ignored the guidance given by the Court's clerk, arguing that "[w]hen questioning resumed, defense counsel's objections became more aggressive, despite the guidance received during the call – [defendants' counsel] incessantly interrupted the examiner to declare that questions called for speculation, were vague, leading or had been asked and answered." (Id. at 2). Finally, plaintiff contends that "[d]efense counsel repeatedly instructed the witness not to answer basic questions and threatened to leave." (Id. at 4). As a result of the alleged behavior; plaintiff contends that defendants' counsel impeded the fair examination of defendant Essig and plaintiff seeks sanctions against the defendants in the form of an order requiring them to pay the plaintiff's costs associated with the Essig deposition. (Id. at 1).

In response, defendants claim that "defendant Essig gave responsive answers to questions, sought clarification when he did not understand a question, and provided a full account of the disputed events." (11/4/16 Defs.'s Ltr. at 1). They contend that "defense counsel sought to preserve form objections, to provide plaintiff's counsel reasonable opportunity to correct the form of a question, to preserve a privilege, enforce a court limitation, and avoid abuse and harassment of the witness." (Id.) Defendants further claim that counsel's actions were meritorious and were not taken to harass or delay the deposition, and were not taken in bad faith. (Id. at 3-4).

Defendants also argue that defendants' counsel's instructions not to answer were proper. (Id. at 5). They contend that, "[w]hile defense counsel did direct the witness not to answer

12

**APP 44**

certain questions, that direction was given to either: to [sic] protect privilege/protected information, to protect a limitation ordered by the court, or to protect the witness from the abuse, harassment and humiliation from the plaintiff." (Id.)

Defendants also argue that plaintiff was "not using the deposition as a discovery device but rather as a means to harass the witness into giving him particular testimony and to punish the defendants for deposing plaintiff for almost seven hours, the day prior." (Id. at 2). In support of this allegation, defendants note that plaintiff did not request any remedy associated with gathering additional testimony from Essig, but rather, only seeks monetary damages. (See id. at 14-15).

In reply, plaintiff asserts that his counsel has never previously sought sanctions for the deposition conduct of an adversary, and does not do so lightly. (11/10/16 Pl.'s Ltr. at 1). Plaintiff also urges the Court to reject defendants' comparison between defendants' counsel's allegedly inappropriate objections and plaintiff's counsel's efforts to overcome them. (Id.)

Courts in the Second Circuit have described a deposition as:

> a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness – not the lawyer – who is the witness.

Abu Dhabi Commercial Bank, et. al. v. Morgan Stanley & Co. Inc., No. 08 CV 7508, 2011 WL 4526141, at *7 (S.D.N.Y. Sept. 21, 2011) (citing Hall v. Clifton Precision, 150 F.R.D. 525, 528 (E.D. Pa. 1993)).

13

APP 45

In the instant case, defendants' counsel repeatedly instructed Essig not to answer, failed to limit her objections to the statement "objection as to form," and threatened to leave the deposition on multiple occasions. (See supra at 3-9). The behavior of defendants' counsel clearly impeded the progress of and unnecessarily extended the length of the deposition, particularly given that certain questions, including whether there were any requirements for memo book entries, were left unanswered.

As an initial matter, defendants' counsel acted improperly by not limiting objections to the statement "objection as to form" as directed by the Court. (Tr. at 90). Frequently counsel's objections included extraneous comments, such as that questions called for speculation, were vague, leading or had been asked and answered; at times, her comments seemed to be suggesting answers to the witness. (See, e.g., id. at 33-34 ("Q: And did the members of that team change during the time you were at the 83rd?; MS. BOOTH: Objection. That's a very broad question. You're asking did the team – how would he know that?")). This improper behavior proceeded even after the Court's law clerk instructed defendants' counsel to limit her comments to "objection as to form" unless the plaintiff's counsel inquired into the reasoning of her objection. (See e.g., Tr. at 94 ("Q: Is one person called the operator, one person called the recorder?; MS. BOOTH: Objection, leading"); id. at 102 ("Q: And who prepared that form?. . . . MS. BOOTH: Objection. Calls for speculation")).

To the extent that defendants argue that their counsel acted to protect a witness who did not understand plaintiff's questions, it is well-established that the witness, not the witness's counsel, "should make the determination as to whether a question is clear and answer to the best of his or her ability." Severstal Wheeling Inc. v. WPN Corp., 2012 WL 1982132, at *2 (quoting

14

**APP 46**

Phillips v. Manufacturers Hanover Trust Co., 1994 WL 116078, at \*4). While it is impossible to determine how Essig would have answered but for defendants' counsel objections, it appears that, on at least several occasions, Essig's answers may have been influenced by defendants' counsel's objections. (Tr. at 146 ("Q: What were you doing?; MS. BOOTH: Objection. Vague.; A: What - - Where?"); id. at 134 ("Q: What happened inside the mini mart?; MS. BOOTH: Objection. Vague.; A:  What I did?").

      In addition to the plethora of speaking objections, defendants' counsel also repeatedly instructed the witness not to answer questions that were relevant to the case on the grounds that they were not relevant or had been "asked and answered." (See supra at 3-9). Contrary to defendants' claim, none of these questions seem to be asking for privileged information and lack of relevance is not an appropriate objection to raise during a deposition. See Weinrib v. Winthrop-University Hosp., 2016 WL 1122033, at \*3. A review of the transcript reveals that claims of privilege were rarely asserted. Indeed, the vast majority of counsel's instructions not to answer appear to be based on assertions that the questions had been previously "asked and answered" or were not relevant; neither of these grounds is a proper basis for instructing a witness not to answer in a deposition. (See supra at 10).

      In denying plaintiff access to this relevant information, defendants' counsel denied plaintiff the right to have deposition questions answered. Here, the witness, an NYPD Police Officer with nearly five (5) years on the job did not indicate that he could not understand English (Tr. at 26), was told at the beginning of the deposition to indicate if he did not understand a question (id. at 20-22), and never stated he did not understand a question unless prompted by counsel's objections. (See, e.g., id. at 46 ("Q: And then – and then if they see it, what do they

15

do?; MS. BOOTH: Objection.  Can you clarify the question?; Q: Do you understand what I'm

asking?; MS. BOOTH: Do you understand the question?; A: No, clarify it, please.  I would

appreciate it, thank you"); id. at 56 ("Q: The scenario that you were trained in, was that a

scenario where the cb officers were looking at one set?; MS. BOOTH: Objection.  Calls for

speculation.  That was not in his testimony.; MR. HARVIS: I'm asking what his training was.;

MS. BOOTH: Do you understand the question?  And if you can answer the question, based on

his question.; A: Could you just say it one more time, please?").  Defendants' counsel's improper

conduct in instructing the witness not to answer questions continued even after an explicit

instruction from the judge.  (See supra at 8-9).  Notwithstanding Judge Go's instructions, instead

of marking questions for a subsequent ruling, defendants' counsel instructed her client not to

answer questions regarding his compensation on the grounds that such questions were irrelevant,

resulting in those questions being left unanswered.  (Tr. at 389-92).

      Defendants' counsel's behavior is similar to that in which courts have granted sanctions

in the past.  See Morales v. Zondo, 204 F.R.D. at 54 (granting sanctions where "private

consultations with the witness, instructions not to answer, instructions how to answer, colloquies,

interruptions, and ad hominem attacks disrupted the examination"); see also Sicurelli v.

Jeneric/Pentron, Inc., 1994 WL 116078, at *2 (granting sanctions where a plaintiff's counsel

made argumentative and unprofessional comments to opposing counsel, instructed the witness

not to answer, and walked out of the room in the middle of the deposition).  Accordingly, the

Court Orders the defendants' counsel to pay the plaintiff's costs associated with the deposition of

defendant Essig, and grants the plaintiff an additional opportunity to depose defendant Essig.

16

CONCLUSION

In light of the foregoing, plaintiff's motion for sanctions is granted. Defendant is ordered to pay reasonable attorneys' fees and costs associated with the deposition of Essig. The parties are directed to meet and confer regarding an appropriate amount of fees to be paid by <u>May 26, 2017</u>. If the parties are unable to come to an agreement, plaintiff is directed to file a letter with the Court, including a proposed hourly rate and billing statements reflecting the hours requested, by <u>June 9, 2017</u>. Defendants' response is due <u>June 23, 2017</u>. Plaintiff may reply by <u>June 30, 2017</u>.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      May 12, 2017

/s/ Cheryl Pollak

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

17

**APP 49**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| METROPCS, a brand of T-MOBILE | § | |
| USA, INC., a Delaware Corporation, | § | |
| Plaintiff, | § | |
| v. | § | Misc. Action No. 3:18-mc-00037-S |
| | § | |
| ISAIAH MICHAEL THOMAS, et al., | § | |
| Defendants. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Before the Court are Jason Frazin's *Rule 60(b) Motion to Modify Order on Fee Reduction*, filed April 5, 2021 (doc. 56), and *Metro's Response in Opposition to Frazin's Rule 60 Motion*, filed April 26, 2021 (doc. 57), which includes a motion for sanctions. Based on the relevant filings, evidence, and applicable law, both motions should be **DENIED**.

## I. BACKGROUND

On May 22, 2018, T-Mobile USA, Inc., moved to compel non-party Jason Frazin to comply with a subpoena for information in connection with a Pennsylvania lawsuit involving its MetroPCS brand (Metro). (doc. 1.) On June 12, 2018, the court in a related miscellaneous action also pending in this district quashed a similar Metro subpoena issued in the same lawsuit. *See MetroPCS v. Thomas*, No. 3:18- MC-029-K (N.D. Tex.), doc. 21. Three days later, on June 15, 2018, Frazin responded to the motion to compel, arguing that it should be denied because Metro had failed to properly serve the subpoena, and that he should be awarded his attorney's fees incurred in opposing the motion. (doc. 7.) He also filed a motion to strike portions of a declaration attached to the motion to compel. (doc. 9)

On June 29, 2018, Metro filed a notice of the decision in the related action and stipulated

---

[1]By electronic order of reference filed July 3, 2018 (doc. 13), this case was referred for full case management.

to entry of an order dismissing its motion to compel without prejudice; it alternatively requested a seven-day extension of time to file a reply in support of its motion. (doc. 10.) On July 3, 2018, Frazin moved to strike the request for an extension of time and for sanctions against Metro on grounds that that it had not conferred with his counsel about the requested extension of time, in violation of the applicable rules. (doc. 12 at 1-2.)[2] Before filing the motion, Frazin's attorney exchanged emails with Metro's counsel regarding its stipulation and alternative request for an extension of time. (*See* doc. 56-1.) In an email dated July 3, 2018, Frazin's attorney stated that he would agree to a stipulated order denying the motion to compel and to terminate the request for attorney's fees if Metro would stipulate to not seeking further discovery from Frazin. (*Id.* at 2.)

On July 17, 2018, a hearing was conducted concerning the motions to strike and for sanctions. (doc. 15.) Metro's counsel explained that she and co-counsel did not confer with Frazin's attorney before filing the notice of stipulation because, among other reasons, he would only communicate with its local counsel. (doc. 27 at 6.)  She acknowledged that after filing the notice of stipulation, "there were emails back and forth . . . between our co-counsel and [Frazin's attorney] in which he indicated that if we agreed to all the relief he wanted, that he would agree [to the stipulated dismissal], but otherwise not." (*Id.* at 7.) At the hearing, Frazin's attorney admitted that he had refused to confer with anyone other than local counsel, but he stated that he would have talked with any Metro attorney who called him. (*Id.* at 14-15.) The Court found that Frazin's motion for sanctions based on Metro's failure to comply with the conference requirement was not well-founded, and that "other circumstances [made] an award of expenses unjust" under

---

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Rule 37, because Frazin's attorney admitted that he had refused to confer with Metro's non-local counsel, and early resolution of the underlying dispute could have been reached with a phone call to opposing counsel to discuss the related action. (*Id.* at 15-16.) Frazin's motion to strike portions of the declaration in support of the motion to compel was granted, but his motions for sanctions and to strike Metro's motion for an extension of time were denied. (doc. 16.)

On July 23, 2018, a second hearing was conducted, during which Metro's motion to compel was denied because Frazin had not been personally served with the subpoena. (doc. 28 at 23-24.) Except for the fees incurred in bring the "original motion to compel," Frazin's request for attorney's fees was denied. (*Id.* at 24-25.) He was reminded that his motion for sanctions had been denied, in part, because "refusing to confer with the other side and then moving for sanctions on a basis for their failure to confer is not good faith." (*Id.* at 24.)

On August 6, 2018, Frazin filed his motion for attorney's fees, requesting $37,126.50 for 46.7 hours of work at an hourly rate of $795. (doc. 23 at 18.) At a hearing on October 4, 2018, Frazin's attorney claimed the total amount was justified because he had attempted to confer with Metro's counsel at each stage of the proceedings, but Metro "refused to agree on any issue." (doc. 35 at 16.) He stated that email correspondence between him and Metro's counsel confirmed those attempts, and that he would file the emails post-hearing if requested. (*Id.* at 16-17.) The Court found that Frazin was entitled to some of his fees, but the total number of hours requested was "clearly excessive and unreasonable," especially for a case involving a "straight-up procedural issue." (*Id.* at 21-22.) Notably, some of the requested hours were for fees that it had already found were not compensable or had declined to award in relation to the motion to strike, and there were excessive hours requested for certain tasks, including three hours billed for a 43-minute hearing.

APP 52

(*Id.* at 19, 21-22.) Frazin also failed to sufficiently describe his attorney's qualifications in support of the $795 hourly rate. (*Id.*) Frazin was ultimately awarded fees in the amount of $4,800 for eight hours of work at an hourly rate of $600. (doc. 34.)

On April 3, 2020, the district court overruled Frazin's objections to the order on his motion for fees.  (doc. 47.) Frazin appealed the order to the Fifth Circuit on April 22, 2020. (doc. 48.) On November 18, 2020, the Fifth Circuit dismissed the appeal as frivolous, and awarded Metro its attorney's fees and costs against Frazin. (doc. 51.)

Frazin seeks modification of the fee order under Rule 60 of the Federal Rules of Civil Procedure. (doc. 56 at 7.) Metro responded and moved for sanctions against Frazin's attorney under 28 U.S.C. § 1927 or the Court's inherent sanction power on April 26, 2021. (doc. 57.) Frazin replied on May 10, 2021. (doc. 58.)

## II.  RULE 60

Frazin relies on Rules 60(b)(3) and 60(d)(3) in support of his motion "to correct the record to restore the good name and reputation of [his] Counsel, and jointly, to reconsider the fee reduction applied to [his] fee application." (doc. 56 at 3, 7.)

### A.    <u>Rule 60(b)(3)</u>

Rule 60(b) provides that a court may relieve a party from a final judgment or order for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered earlier; (3) fraud, misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or it is based on an earlier judgment that has been reversed or vacated, or that applying the judgment prospectively is no longer equitable; or (6) any

4

**APP 53**

other reason that justifies relief. Fed. R. Civ. P. 60(b)(1)-(6). "A party making a Rule 60(b)(3) motion must establish by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case." *In re Isbell Records, Inc.*, 774 F.3d. 859, 869 (5th Cir. 2014) (citing *Washington v. Patlis*, 916 F.2d 1036, 1039 (5th Cir. 1990)) (emphasis, internal quotation and citation omitted); *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978) ("The conduct complained of must be such as prevented the losing party from fully and fairly presenting his case or defense."). "Determining whether a party has made a sufficient showing to warrant relief lies in the sound discretion of the district court." *Gen. Universal Sys. Inc. v. Lee*, 379 F.3d 131, 157 (5th Cir. 2004).

Here, Frazin argues that "a ninety percent fee reduction was imposed on [his] attorney's fees, based largely on [Metro's] Counsel's representations to the Court that [his attorney] had purportedly failed to confer after [it] filed its 'stipulation'." (doc. 56 at 2.) Although he provides emails exchanged between his attorney and Metro's counsel as proof that his attorney did confer with them before filing his motion to strike, they are not clear and convincing evidence that Metro engaged in fraud, misrepresentation, or other misconduct. (*See* doc. 56-1.) At the first hearing, Metro's counsel expressly stated that after filing their stipulation, "there were emails back and forth . . . between our co-counsel and [Frazin's attorney] in which he indicated that if we agreed to all the relief he wanted, that he would agree [to the stipulated dismissal], but otherwise not." (doc. 27 at 7.) This statement is clearly consistent with the emails.

Even assuming for purposes of his motion that Metro misrepresented that Frazin's attorney failed to confer, Frazin cannot show that he was prevented from fully and fairly presenting his

5

case. *See In re Isbell Records*, 774 F.3d. at 869. The emails that allegedly establish proof of Metro's misrepresentations were in Frazin's attorney's custody, and they were discussed at two of the hearings. (*See* docs. 27 at 7; 35 at 16-17.)  Frazin had the opportunity to present the emails in support of his motion for fees, but he declined to do so.

Because Frazin has not shown by clear and convincing evidence that Metro engaged in fraud, misrepresentation, or other misconduct, or that the alleged misconduct deprived him of the opportunity to fully and fairly present his case, his Rule 60(b)(3) motion should be denied.

**B.**   **Rule 60(d)(3)**

Rule 60(d)(3) provides that "[t]his rule does not limit a court's power to ... set aside a judgment for fraud on the court." The standard for relief based on "fraud on the court" is very demanding, however. *Jackson v. Thaler*, 348 F. App'x 29, 34 (5th Cir. 2009). Relief is reserved for only the most egregious misconduct, "such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated." *Rozier*, 573 F.2d at 1338. It requires a showing of an "unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Id.* (citation omitted).  It should "embrace only the species of fraud which does or attempts to, defile the court itself." *Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*, 616 F.2d 833, 937 (5th Cir. 1980) (citation omitted). "Less egregious misconduct comes within the scope of Rule 60(b)(3)." *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989). Courts are given wide discretion in determining whether relief should be granted under Rule 60(d)(3) based on fraud. *Buck v. Thaler*, 452 F. App'x 423, 431 (5th Cir. 2011).

Frazin generally alleges that when Metro represented to the Court that his attorney "purportedly failed to confer with opposing counsel to resolve the underlying dispute despite [its]

**APP 55**

'stipulation', [its] Counsel were engaging in fraud upon the court and misrepresenting facts as to which they were personally aware and had participated." (doc. 56 at 3.) As discussed, he has not identified a single fraudulent statement in the record to support this allegation, however. Because Frazin has not alleged or provided any evidence to support the required level of egregious misconduct for relief under Rule 60(d)(3), his request for relief under this rule should be denied. *See Rozier*, 573 F.2d at 1338.

### III. SANCTIONS

In its response to Frazin's Rule 60 motion, Metro argues that sanctions against his attorney are warranted, and that "[a]n award of fees to [it] is appropriate under 28 U.S.C. § 1927 or this Court's inherent authority." (doc. 57 at 26-27.)

**A.**   <u>**28 U.S.C. § 1927**</u>

Section 1927 of the United State Code, Title 28, provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Before a court can award sanctions under § 1927, it must make detailed findings that the proceedings were both unreasonable and vexatious. *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1297 (5th Cir. 1994). This standard requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Edwards v. General Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998). The liability created under § 1927 is only for excessive costs due to persistent prosecution of a meritless claim. *Browning v. Kramer*, 931 F.2d 340, 344 (5th Cir. 1991). Courts often use repeated filings, despite warnings from the court, or other proof of excessive

7

litigiousness, to justify sanctions. *See Nat'l Ass'n of Gov't Employees v. Nat'l Fed'n of Fed.*
*Employees*, 844 F.2d 216, 224 (5th Cir. 1988) (noting that this section prohibits "the persistent
prosecution of a meritless claim") (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 875
(5th Cir. 1988) (en banc)); *Proctor & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525 (5th Cir.
2002).

The Fifth Circuit advises courts to impose sanctions under § 1927 "sparingly," and further
cautions that except when the entire proceeding has been unwarranted, unreasonable, and
vexatious, and should therefore not have been initiated nor pursued, it will be inappropriate under
§ 1927 to shift the entire financial burden of an action's defense. *See Meadowbriar Home for
Children, Inc. v. Gunn*, 81 F.3d 521, 535 (5th Cir. 1996) (citing *Calhoun*, 34 F.3d at 1297). Under
§ 1927, monetary sanctions for expenses, costs, and attorneys' fees may be "imposed only on
offending attorneys; clients may not be ordered to pay such awards." *Matta v. May*, 118 F.3d 410,
413-14 (5th Cir. 1997) (citing *Travelers Ins. Co. v. St. Jude Hosp.*, 38 F.3d 1414, 1416 (5th Cir.
1994)).

Here, Metro generally argues that § 1927 sanctions are warranted against Frazin's attorney
because his "pattern of excessive litigiousness, abuse of procedure, and baseless arguments in this
case and on appeal is well-documented and goes beyond legitimate zeal." (doc. 57 at 26.) It
contends that Frazin's Rule 60 motion "is not based in law or fact, the arguments have been
previously raised and repeatedly rejected, and the 'new evidence' is not new nor does it contradict
anything in the record," and that it "misrepresents the record on appeal and, through selective
editing, the findings of this Court." (*Id.*) Metro concludes that "[t]he lack of any legitimate grounds
for this motion establishes that Frazin's counsel is acting in bad faith and with an improper motive

8

or reckless disregard of the duty owed to the court." (*Id.*)

As discussed, Frazin has failed to make a sufficient showing to warrant relief under Rule 60, and it has been recommended that his motion be denied. Even if the grounds pursued for relief from the order were baseless, this alone does not mean they were brought in bad faith or for an improper purpose. *See Hencinski v. Austin Com., L.P.*, No. 3:05-CV-2368-D, 2006 WL 325764, at *2 (N.D. Tex. Feb. 13, 2006) (explaining that "there must be a showing of improper motive on the part of an attorney, independent of a showing that the claims pursued were baseless" to meet the high threshold for awarding costs under § 1927). As noted, courts have relied on repeated filings, despite warnings from the court, or other proof of excessive litigiousness to justify sanctions. *See Nat'l Ass'n of Gov't Employees*, 844 F.2d at 224; *see also EsNtion Records, Inc. v. TritonTM, Inc.*, No. 3:07-CV-2027-L, 2010 WL 3446910, at *5 (N.D. Tex. Aug. 31, 2010) (finding that party forced to defend against "objectively unreasonable" claims for which there was no evidence had not shown that opposing counsel had unreasonably and vexatiously multiplied the proceedings, bad faith, improper motive or reckless disregard so as to warrant an award for attorney's fees under § 1927). Although Metro argues that Frazin's motion generally relied on the same arguments that have been previously raised and repeatedly rejected in his other filings for more money in fees, it has not shown that he previously made the exact same arguments in other proceedings or that he was warned about further filings, however. Additionally, it offered no evidence of "specific conduct" on his part to show that he filed the motion in bad faith or for an improper purpose. *See EsNtion Records*, 2010 WL 3446910, at *5. Its allegations of the persistent prosecution of a meritless argument is based on a single motion. This is insufficient to show bad faith. *See Oblio Telecom, Inc. v. Patel*, No. 3:08-CV-0279-L, 2010 WL 99353, at *3 (N.D. Tex.

9

Jan. 8, 2010) (noting "bad faith" of counsel in bringing lawsuit or vexatiously multiplying proceedings cannot be inferred from pleadings alone).

Because Metro has failed to meet its burden to establish that the Rule 60 motion was both unreasonable and vexatious, it would not be appropriate under § 1927 to shift the entire cost of defense. *See Calhoun*, 34 F.3d at 1297. Accordingly, its request for an award of fees against Frazin's attorney under § 1927 should be denied.

**B.** **Inherent Power**

Courts possess the inherent power "to protect the efficient and orderly administration of justice and ... to command respect for the court's orders, judgments, procedures, and authority." *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993). Included in this inherent power is "the power to levy sanctions in response to abusive litigation practices." *Id.* "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292-93 (5th Cir. 1997) (citations omitted). Nevertheless, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991). "[T]he threshold for the use of inherent power sanctions is high." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). A court's inherent power is not "a broad reservoir of power, ready at the imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), *aff'd sub nom. Chambers*, 501 U.S. at 32.

Before imposing sanctions against a party under its inherent power, the court must make a specific finding that the party acted in bad faith. *In re Moore*, 739 F.3d 724, 729-30 (5th Cir. 2014)

10

**APP 59**

(citing *Gonzalez v. Trinity Marine Grp., Inc.*, 117 F.3d 894, 898 (5th Cir. 1997) (citation omitted)).

Bad faith "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will." *Turfgrass Grp., Inc. v. Ne. Louisiana Turf Farms, LLC*, No. CIV.A. 10-1354, 2013 WL 6145294, at *3 (W.D. La. Nov. 20, 2013) (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)). Bad faith conduct includes conduct that is motivated by improper purposes such as harassment or delay. *See Coghlan v. Starkey*, 852 F.2d 806, 814 (5th Cir. 1988). The court's finding of bad faith "must be supported by clear and convincing proof," which is a "high standard" that requires "more than a preponderance of the evidence." *See Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) (citing *In re: Medrano*, 956 F.2d 101, 102 (5th Cir. 1992)). The evidence supporting a finding of bad faith "must be so direct and weighty as to leave the factfinder with a firm belief in the truth of the facts of the case." *See id.* "Courts have the authority to make credibility determinations to resolve whether such misconduct has occurred." *United States v. Fisch*, No. CR H-11-722, 2018 WL 2335743, at *4-5 (S.D. Tex. May 23, 2018) (citing *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 808-09 (5th Cir. 2003)).

Here, Metro appears to rely on the same arguments for why sanctions against Frazin's attorney are warranted under a court's inherent power to sanction that it made in support of its request for sanctions under § 1927. (*See* doc. 57 at 26-27.) It similarly fails to show that Frazin's attorney acted in bad faith or in some other improper or prohibited way in this action. *See Cappa Fund III, L.L.C. v. Actherm Holding, a.s.*, No. 3:10-CV-897-L, 2011 WL 817384, at *4 (N.D. Tex. Feb. 21, 2011), *adopted by* 2011 WL 816861 (N.D. Tex. Mar. 9, 2011) (denying motion for sanctions under a court's "inherent power" because defendants failed to show that plaintiff "acted

11

**APP 60**

in bad faith or for any other prohibited reason in bringing this suit simply because they did not voluntarily dismiss a suit that was later dismissed"). While it contends that the motion misrepresented the record on appeal and the findings of the Court, it fails to specifically identify those misrepresentations. (doc. 57 at 26.)

Metro's contentions and allegations are insufficient to support a specific finding that Frazin's attorney filed and pursued the Rule 60 motion in bad faith as required for imposition of sanctions under the Court's inherent power. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980) (a specific finding as to whether counsel's conduct constituted or was tantamount to bad faith would have to precede any sanction under a court's inherent powers). Accordingly, its request for sanctions under the Court's inherent authority should be denied.

## IV.  RECOMMENDATION[3]

Frazin's Rule 60(b) motion and Metro's motion for sanctions against Frazin's attorney should be **DENIED**.

---

[3]While counsel are not expected to agree on matters that arise in this case, or even like each other, "the court and this district require parties and their counsel to conduct themselves with some level of civility." *See Klayman v. Obama*, No. 3:16-CV-2010-L, 2016 WL 5942227, at *6 (N.D. Tex. Oct. 12, 2016).  Given the contentious and acrimonious nature of this action, counsel are instructed "to be mindful of *Dondi Properties Corporation v. Commerce Savings & Loan Association*, 121 F.R.D. 284 (N.D. Tex. 1988), and its far-reaching implications." *Id.* Specifically, counsel are reminded that the *Dondi* Court had "admonished counsel that characterization of an opposing party's conduct as acting in bad faith 'should be sparingly employed by counsel and should be reserved for only those instances in which there is a sound basis in fact demonstrating a party's deliberate and intentional disregard of an order of the court or of obligations imposed under applicable Federal Rules.'" *See Andra Grp., LP v. JDA Software Grp., Inc.*, No. 3:15-MC-11-K-BN, 2015 WL 5459635, at *3 (N.D. Tex. Sept. 16, 2015) (quoting *Dondi*, 121 F.R.D. at 289).

**SO RECOMMENDED** on this 26th day of September, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

13

**APP 62**