# TAB 1

## DECLARATION OF JOSHUA BLACK

1.      I am an adult resident of the State of Texas, and I make this Declaration based on my personal knowledge and records maintained in the usual course of business by the Association of Professional Flight Attendants ("APFA").

2.      I am employed as a Flight Attendant by American Airlines, and I have served as the National Secretary of APFA since April 2020.  In that capacity, I am familiar with the records kept by the Union.

### APFA Constitution and APFA Policy Manual

3.      The internal affairs of the APFA are governed by the APFA Constitution and the APFA Policy Manual.  A true and correct copy of relevant excerpts from the APFA Constitution in effect at the time of the internal union hearings against Robert (Bob) Ross and Eugenio Vargas is attached as Exhibit A.   The APFA Constitution provides that the APFA Board of Directors shall establish the policies of the Union consistent with the Constitution and "shall establish a Policy Manual to incorporate those policies, procedures, rules and regulations affecting the governing bodies, officers, representatives and members of the APFA in accordance with this Constitution." Ex. A, Article III, Section 2.C; *see also id.*, Section 3.A.  A true and correct copy of relevant excerpts from the APFA Policy Manual in effect at the time of the internal union hearings against Mr. Ross and Mr. Vargas is attached as Exhibit B.

4.      The APFA has procedures for processing internal Union charges against any Union member or officer, which are outlined in Article VII of the Constitution, as well as Section 17 of the Policy Manual.  Article VII of the Constitution addresses internal "Hearing and Disciplinary Procedures" for fining, suspending, or expulsion, or for the removal from Union office, of any APFA member or officer for engaging in enumerated misconduct, including among other things,

financial misconduct and for, among other things, the "[w]illful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee." Ex. A, APFA Constitution, Art. VII, Section 1.F; *see also* Ex. B, Policy Manual at 17.1.

5.      Article VII charges are to be filed with the APFA's National Secretary, who then forwards a copy of the charges to the accused, as well as the Union's Executive Committee. At its next regular meeting after Article VII charges have been filed, the APFA Executive Committee reviews the charges for timeliness, specificity and validity. Charges are "invalid" under the Constitution, for example, if they "address conduct protected by th[e] Constitution and/or by law (including the LMRDA Bill of Rights)." Ex. A, APFA Constitution, Art. VII, Section 3.D. If the charges are found by the Executive Committee to be timely, specific and valid, the matter is then referred to the Article VII Arbitrator to hear the case.

6.      The Article VII Arbitrator is appointed by the Union's Board of Directors and must be a respected third-party with "experience as a neutral in adjudicating internal labor organization disputes, and who has no other prior or current involvement with the APFA." Ex. A, APFA Constitution, Art. VII, Section 5.C. The accused has 14 days after the Executive Committee's procedural findings to move the arbitrator to dismiss the charge as invalid based on timeliness, failure to state a cognizable claim, failure to be sufficiently specific, or to allege that the basis for the charges was conduct protected by the APFA's Bill of Rights or law. Ex. B, Policy Manual at 17.2. A party can also move for summary dismissal up until 14 days before the hearing. *Id.*

7.      Hearings take place in person in the Dallas-Fort Worth ("DFW") area and the accused must be provided with at least 30 days' prior notice of the hearing. Ex. B, Policy Manual at 17.1. Under the Policy Manual, the Arbitrator "shall be the judge of the relevancy and

materiality of the evidence offered" and conformity with the legal rules of evidence is not required. *See id.* at 17.4. Initial costs of Article VII proceedings are borne by the APFA under the Constitution. However, if a charge is dismissed, costs can be levied against the accuser; if the charges are sustained, they can be offset by a fine levied against the accused. Ex. A, APFA Constitution, Art. VII, Section 7.B-C. After the hearing, but prior to the issuance of the Arbitrator's decision, a party may file to reopen the hearing for good cause. Ex. B, Policy Manual at 17.5.

8.      The Article VII Arbitrator "shall have power to resolve all charges referred" to him during his tenure and "[t]he decision of the Article VII Arbitrator shall be final and binding upon the accused and the accuser." Ex. A, APFA Constitution, Art. VII, Section 6.A, H. Once the matter has been assigned to an Arbitrator, the APFA role is limited to minor administration functions and the Union is not a party to the dispute and plays no substantive role in the Article VII process.

## Internal Article VII Charges Filed Against Mr. Ross and Mr. Vargas

9.      In late November 2020, two rank and file union members, Sandra Lee and Melissa Chinery, filed Article VII charges against Mr. Ross, the former APFA National President, and Mr. Vargas, the former APFA National Treasurer, as well as another former Union officer, Nena Martin (whose charges were later dismissed).

10.      Ms. Lee and Ms. Chinery filed charges against Mr. Ross and Mr. Vargas on November 18 and November 20, 2020, respectively. True and correct copies of their original charges are included as Exhibits C-D. As National Secretary, I notified Mr. Ross and the APFA Executive Committee of the charges against Mr. Ross on November 19, 2020, and provided Mr. Ross with a copy of the charges, as well as a copy of the relevant provisions of the APFA Constitution (Art. VII) and APFA Policy Manual (Section 17). A true and correct copy of this notice, without attachments, is included as Exhibit E.

3

11.     On November 24, 2020, Ms. Chinery and Ms. Lee filed revised charges against Mr. Ross and Mr. Vargas, true and correct copies of which are attached as Exhibits F-G.     I then sent a copy of these revised charges to the APFA Executive Committee and to Mr. Ross and Mr. Vargas. A true and correct copy of the revised charge notices to Mr. Ross and Mr. Vargas, without attachments, is attached as Exhibits H-I.

12.     At its next regular meeting, conducted on December 1, 2020, the APFA's Executive Committee determined that the charges against Mr. Ross and Mr. Vargas were timely, specific and "valid" in accordance with the Constitution and that the matters should proceed to arbitration.   A true and correct copy of the record from these votes are attached as Exhibit J-K.

13.     In early December 2020, Mr. Ross and Mr. Vargas were advised that the charges against them were being referred to the Article VII Arbitrator for adjudication and were again provided with a copy of the charges.   At no point prior to the hearings did Plaintiffs move to dismiss the charges for being untimely, nonspecific or invalid as they could have under the APFA's Constitution and the APFA's Policy Manual (see 17.2).

14.     The APFA's Article VII Arbitrator for both cases was Ruben R. Armendariz, a nationally respected labor-management arbitrator with over 40 years of relevant experience, and member of the National Academy of Arbitrators.   Mr. Armendariz was added to the Union's pool of Article VII Arbitrators by the APFA's Board of Directors in January 2021, a true and correct copy of the record from this vote is attached as Exhibit L.   Arbitrator Armendariz's appointment was reaffirmed by the Board in October 2021, a true and correct copy of the record of this vote is attached as Exhibit M.   While serving on the Union's Board of Directors at this time, Mr. Ross affirmatively voted to approve Mr. Armendariz's continuing appointment as an Article VII Arbitrator.

## Mr. Ross' Article VII Hearing and Arbitrator's Award

15.     Mr. Ross' Article VII hearing commenced on June 16, 2021. The hearing was continued until November 17, 2021, and concluded on November 18, 2021. The parties to the proceedings were the charging parties (Chinery and Lee) and Mr. Ross. The APFA was not a party. During the hearing, the charging parties represented themselves and Mr. Ross represented himself and was also represented by two other APFA-members, including former APFA Base representative Gina Guidry and member Kit Gomez Alba. Dozens of documents were submitted into evidence and Mr. Ross called and cross-examined witnesses and took the stand in his own defense. A transcript of the proceedings was kept and provided to Mr. Ross. A true and correct copy of the relevant excerpts from the transcript to these proceedings is attached as Exhibit N.

16.     On February 18, 2022, both sides submitted post-hearing briefs following the hearing. A true and correct copy of Mr. Ross' Post-Hearing Brief is attached as Exhibit O.

17.     On February 26, 2022, after the conclusion of the hearing, Mr. Ross' representative requested to reopen the hearing and provided the Arbitrator with a copy of a memorandum dated October 22, 2020, from an accountant for the APFA, Hal O'Neil (which Mr. Ross refers to as the "Confidential Memorandum"). A true and correct copy of this February 26, 2022 request, and the accompanying memorandum, is attached as Exhibit P.

18.     Mr. Ross' request was denied by Arbitrator Armendariz on February 28, 2022, who stated in his response:

> Your request at this juncture to reopen the record is hereby denied. I am comfortable with the record as it stands now. This issue was raised and argued at hearing. I do not believe a showing of further good cause or additional substantive material should be introduced into the record as I believe the record is complete regarding the issue raised herein.

5

A true and correct copy of the Arbitrator's response denying Mr. Ross' request to reopen the hearing is attached at Exhibit Q.

19.     On March 19, 2022, the Arbitrator issued his decision on the charges against Mr. Ross, a true and correct copy of which is attached as Exhibit R.

20.     Among other things, Arbitrator Armendariz ordered APFA to hire "an Independent Forensic Auditor to audit Robert Ross' weekly reports, monthly reports and APFA credit card charges from April 1, 2016 through July 2018" to determine if claimed expenses were for legitimate business purposes or not. The APFA retained the firm of Cornwell Jackson, CPA, to conduct a financial review, and a true and correct copy of Cornwell Jackson's August 5, 2022, report regarding Mr. Ross' expenses provided to the Arbitrator is attached as Exhibit S. Following the receipt of this audit, the Arbitrator issued a Supplemental Award on August 24, 2022, a true and correct copy of which is attached as Exhibit T.

**Mr. Vargas' Article VII Hearing and Arbitrator's Award**

21.     The hearing on the Article VII charges filed against Mr. Vargas took place over three days: September 14-16, 2021. The APFA was not a party. The charging parties represented themselves and Mr. Vargas represented himself and was also represented by APFA Members Nena Martin, a former APFA National Officer, Base President and Board of Directors member, and Heidi Morgan, a former Base President and Board of Directors member. Dozens of documents were submitted into evidence from both sides. Mr. Vargas called and cross-examined witnesses and took the stand in his own defense. A transcript of the hearing proceedings was maintained and provided to Mr. Vargas. A true and correct copy of the relevant excerpts from these proceedings are attached at Exhibit U. Both sides submitted Post-Hearing Briefs. A true and correct copy of Mr. Vargas' Post-Hearing Brief is attached as Exhibit V.

6

22.     Mr. Armendariz issued his decision on February 18, 2022, a true and correct copy of which is attached as Exhibit W.    The Arbitrator found evidence of improper expenses charged to the Union by Mr. Vargas and ordered the APFA to "hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer."   *Id.* at 38.   The Union had questions about the Arbitrator's First Award and on March 10, 2022, the Arbitrator issued a Supplemental Decision Over APFA's Request for Clarification of the Remedy, a true and correct copy of which is attached at Exhibit X.

23.     The APFA retained the firm of Cornwell Jackson, CPA, to conduct this financial review, and a true and correct copy of Cornwell Jackson's August 5, 2022, report regarding Mr. Vargas' expenses provided to the Arbitrator is attached as Exhibit Y.   Following the receipt of this report, the Arbitrator issued a Supplemental Award on August 24, 2022, a true and correct copy of which is attached as Exhibit Z.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of April 2024.

Josh Black
APFA National Secretary

APPX. 0008

**Black Decl., Ex. A**

JY-2



# THE
# CONSTITUTION
## OF THE
# ASSOCIATION
## OF
# PROFESSIONAL
# FLIGHT
# ATTENDANTS

*As amended by the APFA Membership*
JUNE 18, 2014

APPX. 0009



RATIFIED BY THE
## APFA Membership on

*January 3, 1980*

## Amended by the
## APFA Membership on

*February 23, 1981*

*July 21, 1982*

*October 30, 1985*

*April 3, 1989*

*September 11, 1991*

*October 24, 1994*

*June 13, 1995*

*January 7, 2010*

# APFA CONSTITUTION

## TABLE OF CONTENTS

**ARTICLE I    GENERAL** ........................................... 1
- **SECTION 1** NAME ................................................. 1
- **SECTION 2** OBJECTIVES OF THE APFA ........................ 1
- **SECTION 3** INSIGNIA ............................................ 2
- **SECTION 4** OFFICE LOCATIONS ................................ 2
- **SECTION 5** DURATION ........................................... 2
- **SECTION 6** PARLIAMENTARY LAW .............................. 2
- **SECTION 7** DEFINITIONS ........................................ 3
- **SECTION 8** REQUIREMENTS ..................................... 5

**ARTICLE II   MEMBERSHIP** ................................... 6
- **SECTION 1** ELIGIBILITY FOR MEMBERSHIP ................... 6
- **SECTION 2** OBLIGATIONS OF MEMBERS ...................... 6
- **SECTION 3** BILL OF RIGHTS OF MEMBERS .................... 6
- **SECTION 4** CLASSIFICATION OF MEMBERSHIP – ACTIVE ...... 6
- **SECTION 5** CLASSIFICATION OF MEMBERSHIP – INACTIVE ... 8
- **SECTION 6** MEMBERSHIP CREDENTIALS ...................... 8

**ARTICLE III  GOVERNMENT OF THE APFA** ......................... 9
- **SECTION 1** THE APFA CONSTITUTION ......................... 9
- **SECTION 2** GOVERNING BODIES AND POLICIES .............. 9
- **SECTION 3** BOARD OF DIRECTORS ............................ 10
- **SECTION 4** EXECUTIVE COMMITTEE .......................... 14
- **SECTION 5** TELECONFERENCE MEETINGS ..................... 18
- **SECTION 6** OFFICERS ........................................... 20
- **SECTION 7** BASE COUNCILS / BASE REPRESENTATIVES ...... 24
- **SECTION 8** OAL OPERATION ADVISORY PANEL .............. 26

**ARTICLE IV  FINANCES** ........................................ 28
- **SECTION 1** DUES AND ASSESSMENTS ......................... 28
- **SECTION 2** INITIATION FEE .................................... 29
- **SECTION 3** DELINQUENT DUES, ASSESSMENTS OR INITIATION FEE(S) ................................................ 29
- **SECTION 4** FINANCIAL PROCEDURES ......................... 29
- **SECTION 5** BONDING ........................................... 31
- **SECTION 6** SAVINGS / RESERVES ............................. 31
- **SECTION 7** RETENTION OF RECORDS ......................... 31

**ARTICLE V   EXPENSES AND SALARIES** ........................ 32
- **SECTION 1** EXPENSES .......................................... 32
- **SECTION 2** COMPENSATION FOR NATIONAL OFFICERS AND DIVISION REPRESENTATIVES ................................ 32
- **SECTION 3** OTHER COMPENSATION ........................... 32

**ARTICLE VI  NOMINATIONS AND ELECTIONS** ................... 33
- **SECTION 1** NOMINATIONS ...................................... 33
- **SECTION 2** WILLINGNESS TO SERVE ......................... 33
- **SECTION 3** TERMS OF OFFICE ................................. 34
- **SECTION 4** ELIGIBILITY TO VOTE ............................. 34
- **SECTION 5** BALLOTING ......................................... 34

APPX. 0011

Black Decl. Ex. A

| SECTION 6 | ELECTION CONTEST FOR OFFICE | 36 |
| SECTION 7 | VACANCY IN OFFICE, NATIONAL OFFICERS | 37 |
| SECTION 8 | VACANCY IN OFFICE, BASE REPRESENTATIVES | 38 |

**ARTICLE VII    *HEARINGS AND DISCIPLINARY PROCEDURES* ..............................41**

| SECTION 1 | GROUNDS FOR CHARGES | 41 |
| SECTION 2 | FILING OF CHARGES | 41 |
| SECTION 3 | REVIEW OF CHARGES | 42 |
| SECTION 4 | SUSPENSION FROM OFFICE | 43 |
| SECTION 5 | APPOINTMENT OF THE ARTICLE VII ARBITRATOR | 44 |
| SECTION 6 | JURISDICTION AND AUTHORITY OF THE ARTICLE VII ARBITRATOR | 44 |
| SECTION 7 | COSTS | 45 |
| SECTION 8 | INTERNAL REMEDIES | 46 |

**ARTICLE VIII   *REMOVAL OF OFFICERS AND REPRESENTATIVES* .........................47**

| SECTION 1 | REMOVAL OF NATIONAL OFFICERS | 47 |
| SECTION 2 | REMOVAL OF A BASE REPRESENTATIVE | 47 |
| SECTION 3 | REMOVAL OF AN ELECTED MEMBER OF A NEGOTIATING COMMITTEE | 48 |
| SECTION 4 | REMOVAL PETITION | 48 |
| SECTION 5 | RETENTION OF RECORDS | 49 |
| SECTION 6 | APPEAL | 49 |

**ARTICLE IX    *ADMINISTRATIVE AND COMMITTEE POSITIONS* ...............................50**

| SECTION 1 | ELIGIBILITY | 50 |
| SECTION 2 | NOMINATION AND APPROVAL PROCEDURE | 50 |
| SECTION 3 | DURATION OF APPOINTMENT | 51 |
| SECTION 4 | DIVISION REPRESENTATIVES | 52 |
| SECTION 5 | NATIONAL COORDINATORS | 52 |
| SECTION 6 | NATIONAL BALLOTING COMMITTEE (NBC) | 53 |
| SECTION 7 | BUDGET COMMITTEE | 53 |
| SECTION 8 | OTHER APPOINTMENTS | 53 |
| SECTION 9 | VACANCY | 54 |
| SECTION 10 | REMOVAL | 54 |

**ARTICLE X    *NEGOTIATING COMMITTEES* ...........................55**

| SECTION 1 | ELIGIBILITY | 55 |
| SECTION 2 | DEFINITION AND DUTIES | 55 |
| SECTION 3 | TERMS | 55 |
| SECTION 4 | CHAIR OF THE NEGOTIATING COMMITTEE | 56 |
| SECTION 5 | COMPOSITION OF NEGOTIATING COMMITTEES | 56 |
| SECTION 6 | VACANCY | 57 |
| SECTION 7 | REMOVAL | 57 |

**ARTICLE XI    *CONTRACT RATIFICATION AND STRIKE PROCEDURES* ...................58**

| SECTION 1 | RATIFICATION PROCESS | 58 |
| SECTION 2 | STRIKE PROCEDURES | 59 |

APPX. 0012

**Black Decl. Ex. A**

**ARTICLE XII** *Affiliations, Mergers, Federations or Charters* ...................... 60

    **Section 1** ................................................. 60
    **Section 2** ................................................. 60
    **Section 3** ................................................. 60

**ARTICLE XIII** *Savings Clause* ........................................... 61
    **Section 1** ................................................. 61
    **Section 2** ................................................. 61

✶✶✶

**APPX. 0013**

# ARTICLE II
## *MEMBERSHIP*

**Section 1.**   ELIGIBILITY FOR MEMBERSHIP:

A. Any person in the craft and class of Flight Attendant at an airline at which the APFA is the recognized Bargaining Agent for the Flight Attendant employee group at that airline shall be eligible to join and maintain membership in the APFA as hereinafter provided.

B. A Flight Attendant who accepts a paid position with the employer outside the craft and class of Flight Attendant shall no longer be eligible for membership in the APFA. If the person returns to the position of Flight Attendant, he or she shall be eligible to rejoin the union, upon payment of APFA's re-initiation fee.

**Section 2.**   OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein.   Inherent in the rights, privileges, duties and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

**Section 3.**   BILL OF RIGHTS OF MEMBERS:

A. All members of the APFA shall have the right of free speech, freedom of assembly and freedom to dissent.

B. All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

C. All members of the APFA shall have the right to individual privacy.

D. All members of the APFA shall have the right to due process and equal representation.

E. All members of the APFA shall have full equality of rights and shall not be discriminated against because of national origin, race, religion, creed, age, disability, sex, sexual orientation or gender identity.

**Section 4.**   CLASSIFICATION OF MEMBERSHIP:
– ACTIVE:

✱✱✱APPX. 0014

**Black Decl. Ex. A**

***

# A R T I C L E   I I I

## G O V E R N M E N T   O F   T H E   A P F A

**Section 1.   THE APFA CONSTITUTION:**
This Constitution shall be the supreme law of the APFA.

A. This Constitution may be recommended to the membership for alteration, addition, deletion or amendment by:

(1) a two-thirds (2/3) majority of the Voting Board of Directors, or

(2) a petition(s) submitted in accordance with the provisions of this Constitution carrying signatures numbering twenty-five percent (25%) or more of active members in good standing. The office of the National Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names on the petition(s) are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting of the membership to begin no later than thirty (30) days following such certification.

B. An affirmative vote by a majority of those active members in good standing who return valid ballots shall be required for the passage of any proposed alteration, addition, deletion or amendment.

**Section 2.   GOVERNING BODIES AND POLICIES:**

A. The governmental powers of the APFA shall be vested in the Board of Directors, and the officers and representatives of the APFA in accordance with the provisions of this Constitution. The final control of the APFA shall be vested in the membership.

B. The APFA shall establish an Executive Committee. This Constitution shall confer and vest in the Executive Committee the rights, privileges, duties and responsibilities to act as agent for the Board of Directors in accordance with the provisions of this Constitution.

C. The APFA shall establish a Policy Manual to incorporate those policies, procedures, rules and regulations affecting the governing bodies, officers, representatives and members of the APFA in accordance with this Constitution. The Policy Manual shall include but not be limited to the following:  trip removal policy, expense policy, officer salaries, budget policy, headquarters policy, and policies governing conventions and meetings of the Board of Directors and the Executive Committee.

**APPX. 0015**

**Section 3.   BOARD OF DIRECTORS:**

A. The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this Constitution and to establish, prescribe and adopt such other policies which may be consistent with this Constitution as required for the direction and management of the affairs of the APFA.

B. Organization
  (1) The Board of Directors shall consist of the National President, National Vice President, National Secretary, National Treasurer, and each Base President.
  (2) The Voting Board of Directors shall consist of each Base President.
    a. The National President, National Vice President, National Secretary and National Treasurer shall have a voice but no vote at a Board of Directors meeting, except that:
    b. when all voting members are present, and when a vote on an issue by the voting members results in a tie, with no abstentions, the National President must cast the deciding vote.
  (3) The Delegate(s) shall be those Base Presidents (or in their absence, the Vice Presidents) who have been elected by the membership of their bases, or duly elected by virtue of running unopposed, to serve as delegates to the Annual or Special Convention(s) with the authority to elect or remove Ad Hoc Members of the Executive Committee.

C. Annual Training:  The Board of Directors shall participate in an annual training session.

D. Annual Convention:   The Board of Directors shall convene once a year as the Annual Convention of the APFA on a date and at a location determined by the National President. The Annual Convention shall be held no earlier than ninety (90) days and no later than fifteen (15) days prior to the expiration of the current fiscal year.

E. Special Meetings/Special Conventions:  The Board of Directors may convene for special meetings or special conventions.
  (1) A Special Meeting or a Special Convention may be called by the National President or by four (4) members of the Executive Committee, or by a

majority of the Voting Board of Directors by written request to the National Secretary.

    (2) The Special Meeting or the Special Convention must convene no later than fourteen (14) days following receipt by the National Secretary of such request.

F. Quorum: In order to conduct the business of the APFA, including business conducted by Teleconference Meeting, a quorum or more must be present. A quorum of the Board of Directors shall consist of two-thirds (2/3) of the total Board of Directors.

G. Agenda: There shall be no restrictions on business conducted at any convention or meeting of the Board of Directors provided however, that no business shall be acted upon without:

    (1) ten (10) days notice of the agenda in writing to the total Board of Directors prior to such meetings, or

    (2) approval by a majority of the Voting Board of Directors who are present at the meeting.

H. When more than a quorum is present at any convention or meeting of the Board of Directors, all issues shall be decided by a majority of the Voting Board of Directors, except as provided for in this Constitution. In the event that only a quorum is present, all issues shall be decided by a two-thirds (2/3) majority vote of the quorum, except as provided for in this Constitution.

I. At any convention or meeting , except as provided for in Section J below, each Base President shall be entitled to:

    (1) one (1) vote;

    (2) issue his/her proxy in writing to another Board member, provided:

        a. The member must be present at the meeting before giving a proxy to another member,

        b. A proxy shall not be exercised when the member is present at the table;

        c. A proxy shall not be exercised in a secret ballot; and

        d. A proxy shall be valid until the conclusion of the day's business;

    (3) hold one (1) written proxy.

    (4) Each Base President may duly designate.

        a. In the event that a Base President cannot attend all or part of a Board meeting, the Vice President shall attend in his/her absence. Should there be no Vice President available to fill the seat of the Base President at the Board meeting, the Base

President shall first designate from the Base Council, then from the base at large.

    b. Such designation shall be in writing, signed by the Base President, and given to the National Secretary prior to any vote by the designee.

(5) The Vice President or designee shall have the same powers as the Base President at any convention or meeting except as provided in J of this Section 3.

J. Only for the purposes of electing or removing an Ad Hoc Member of the Executive Committee at the Annual or Special Convention(s), each Delegate, as defined in Article I, Section 7,C of this Constitution and Section 3,B,(3) of this Article III, shall be entitled to:

(1) one (1) vote;

(2) issue his/her proxy in writing to another Delegate, provided that such proxy shall not be exercised when the Delegate is present at the table;

(3) hold one (1) written proxy; and

(4) in this instance only:

    a. the Delegate issuing the proxy need not be present at the Annual or Special Convention to issue the proxy; and

    b. the proxy may be used only for the secret ballot vote to elect or remove Ad Hoc Members of the Executive Committee.

K. Minority Report: Whenever two or more members of the total Board of Directors do not agree with the opinion of the majority on any matter, they shall have the right to submit a written report concerning that matter to the National Secretary. The National Secretary must then append that minority report to the minutes of the appropriate Board of Directors convention or meeting.

L. Jurisdiction and Duties: The Board of Directors shall have the following rights, privileges, duties and responsibilities;

(1) set policy for the APFA;

(2) modify the APFA Policy Manual as it deems appropriate;

(3) approve the annual budget;

(4) set annual goals for the APFA as it deems appropriate;

(5) assign to each Ad Hoc Member of the Executive Committee those Presidents with whom s/he shall maintain regular contact and communication;

(6) determine the number of administrative, committee, and support positions as may be required under

APPX. 0018

Article IX of this Constitution to meet the needs of the membership;

(7) nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;

(8) review the base assignment of any OAL Operation or satellite and, when necessary alter operation or satellite assignments;

While not limited to the following, the Board of Directors may:

(9) review the dues structure of the Association;

(10) override the Executive Committee rejection of a proposed Collective Bargaining Agreement;

(11) establish the Regions, and the National Vice President will assign the Regional Representatives;

(12) establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;

(13) direct special mailings to the membership;

(14) recognize the accomplishments and achievements of members of the APFA;

(15) give annual awards;

(16) confer Honorary membership;

(17) approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;

(18) appoint special committees;

(19) appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);

(20) approve Article VII administrative changes;

(21) suspend officers or representatives pursuant to Article VII;

(22) take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.B of this Constitution.

M. The Delegates at the Annual Convention shall nominate and elect Ad Hoc Members of the Executive Committee as terms expire or when a vacancy occurs. At the Annual

APPX. 0019

or Special Convention(s), Delegates may remove Ad Hoc Members and may nominate and elect Ad Hoc Members to fill a vacancy for the balance of the unexpired term.

**Section 4.   EXECUTIVE COMMITTEE:**

A. The Executive Committee shall act as the agent for and on behalf of the Voting Board of Directors, and shall interpret this Constitution, subject to the approval of the Board of Directors.

B. Organization: The Executive Committee shall consist of the National President, National Vice President, National Secretary, National Treasurer and five (5) Ad Hoc Members.

C. Quarterly Meetings:   The Executive Committee shall convene for the transaction of business at least once each quarter on a date and at a location determined by the National President.

D. Special Meetings:   The Executive Committee may convene for special meetings.

   (1) A Special Meeting of the Executive Committee may be called by the National President or by four (4) members of the Executive Committee by request to the National Secretary.

   (2) The Special Meeting must convene within seven (7) days following receipt by the National Secretary of such request.

E. Quorum: In order to conduct the business of the APFA, including business conducted by Teleconference Meeting, a quorum or more must be present. Seven (7) members of the Executive Committee shall constitute a quorum.

F. Agenda: There shall be no restrictions on business conducted at any meeting of the Executive Committee provided however, that no business shall be acted upon without:

   (1) three (3) days notice of the agenda in writing to the Executive Committee prior to such meeting, or

   (2) approval by a majority of the members of the Executive Committee who are present at the meeting.

G. All issues shall be decided by five (5) or more members of the Executive Committee voting in the affirmative except as provided for in this Constitution.

H. Each member of the Executive Committee shall be entitled to:

   (1) one (1) vote;

    (2)  issue his/her proxy in writing to another member of the Executive Committee, provided:

        a.  the member must be present at the meeting before giving a proxy to another member,

        b.  a proxy shall not be exercised when the member is present at the table;

        c.  a proxy shall not be exercised in a secret ballot;

        d.  a proxy shall be valid until the conclusion of the agenda's business;

        e.  hold one (1) written proxy.

I.  A member of the Executive Committee shall not be entitled to duly designate another person to act for such member at any meeting of the Executive Committee except as provided for in Article VII, Section 4.C of this Constitution.

J.  Ad Hoc Members of the Executive Committee:

    (1)  At least sixty (60) days prior to the Annual Convention, the National Secretary, via the official publication of the APFA, shall issue a Willingness-to-Serve (WTS) notification to advise the membership that the Delegates will elect Ad Hoc Member(s) of the Executive Committee. A WTS notification may be returned to the National Secretary at any time prior to the Annual Convention for distribution to the Board of Directors.

    (2)  Prior to the secret ballot election or removal of Ad Hoc Members at the Annual or Special Convention(s), the National Secretary shall read the names of those Base Presidents or Vice Presidents who have been elected as Delegates to the Annual or Special Convention(s) as certified by the National Balloting Committee. The National Secretary shall record the names of those Delegates present and/or the names of those Delegates issuing or holding a proxy, as provided for in Section 3.J of this Article III. Only those Delegates recorded by the Secretary may participate in the vote to elect or remove the Ad Hoc Members at that Convention.

    (3)  Any member of the Board of Directors may nominate an individual to serve as an Ad Hoc Member. In nominating and electing Ad Hoc Members, the Board shall not be limited to those individuals nominated by WTS notifications.

    (4)  Nominations shall be put forward during the first day of the Annual Convention, and elections shall be the last agenda item for the Annual Convention. At a Special Convention, nominations and elections may take place on the same day. In no event may a

Convention adjourn with a vacancy remaining in any position of Ad Hoc Member.

(5) Ad Hoc Members shall be elected to serve staggered three (3) year terms by a two-thirds (2/3) majority vote of the recorded Delegates by secret ballot. If no candidate receives a two-thirds (2/3) majority vote in the initial balloting, Delegates may nominate additional candidates in accordance with J,(3) above.

(6) The balloting process for the election or removal of Ad Hoc Members at the Annual or Special Convention(s) shall be conducted by members of the National Balloting Committee.

(7) Acceptance of a position as an Ad Hoc Member shall constitute acceptance of a position with the APFA for the purposes of this Constitution. An Ad Hoc Member may perform additional duties as deemed appropriate by the National Officers, the Board of Directors or the Executive Committee so long as such duties do not constitute acceptance of an additional position with the APFA as defined in Section 6 or Section 7 of this Article III, or in Article IX, Sections 4, 5, 6 or 7 of this Constitution.

(8) Ad Hoc Members shall not be full time salaried positions, but shall be compensated for expenses, pay continuance and/or trip removal in accordance with applicable provisions contained in Article V of this Constitution and in the APFA Policy Manual.

(9) An Ad Hoc Member may be removed from his/her position only at a Convention by a two-thirds (2/3) majority vote of the recorded Delegates by secret ballot, with or without cause.

(10) In the event of a vacancy in the position of Ad Hoc Member, or in the event an individual declines the position after the Annual Convention has adjourned, the Executive Committee shall function with a vacancy so long as at least a quorum of the Executive Committee exists until the next Annual or Special Convention.    At that Convention, the recorded Delegates shall elect a new Ad Hoc Member to fill the vacancy and complete the balance of the unexpired term.

(11) Ad Hoc Members shall function, when necessary, as the APFA Grievance Appeal Panel to review decisions of the Grievance Review Committee.

    a. When the Grievance Review Committee decides to withdraw a grievance, such decision may be

**Black Decl., Ex. A**

appealed by the grievant to the Grievance Appeal Panel.

b. The decision of the Grievance Appeal Panel shall be final and binding and not subject to reversal by the Executive Committee or the Board of Directors.

K. Jurisdiction and Duties: The Executive Committee shall be charged with the rights, privileges, duties, and responsibilities to:

(1) assure compliance with the policies as set forth and established by the Board of Directors;

(2) act on business or matters presented to the Executive Committee by any member of the Board of Directors or by administrative or committee personnel;

(3) communicate on a regular and consistent basis with members of the Board of Directors;

(4) determine the content of annual training for members of the Board of Directors;

(5) confirm or reject the nomination of individuals to serve in the administrative and committee positions as provided in Article IX of this Constitution;

(6) establish special committees and/or task forces which may be deemed necessary to the best interest of the membership;

(7) confirm or reject the nominations of members to other committees as established by this Constitution or as may be established by the Board of Directors;

(8) confirm the National Treasurer's recommendation of the accounting firm to prepare the annual audit;

(9) approve the initiation of litigation prior to commencement of a lawsuit;

(10) take any and all appropriate action deemed necessary by the Executive Committee and in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the National Officers or other representatives, except as provided in this Article III, Section 4.J.11.

While not limited to the following, the Executive Committee may:

(11) recommend changes to the APFA Policy Manual;

(12) accept a proposed Collective Bargaining Agreement as submitted by the Negotiating Committee for referral to the membership for ratification;

APPX. 0023

(13) reject a proposed Collective Bargaining Agreement as submitted by the Negotiating Committee;

(14) adjust the budget to meet the unexpected needs of the membership, provided that:

    a.  such budget adjustment shall require that the Board of Directors be notified of the adjustment within forty-eight (48) hours following the adjournment of the Executive Committee meeting wherein the budget was adjusted, and

    b.  such adjustment may not reduce any base budget without prior approval by a majority of the Voting Board of Directors;

(15) direct that a special mailing be sent to the membership;

(16) recognize the accomplishments and/or contributions of members and/or representatives of the APFA;

(17) approve hardship dues forgiveness and review other hardship requests that may be brought before the Executive Committee.

(18) order a special Base/Delegate election should a convention be scheduled to convene and there exists at such base a dual vacancy in the positions of Base President and Vice President, or in the event the base does not have an elected Delegate to the convention.  Such special election shall be held in accordance with the procedures provided for in the APFA Policy Manual.

## Section 5.   TELECONFERENCE MEETINGS:

When it becomes necessary for the Board of Directors and/or the Executive Committee to act on urgent or emergency business through the use of a Teleconference Meeting, the following procedures shall apply:

A. The National President, or four (4) members of the Executive Committee, or a majority of the Voting Board of Directors may advise the National Secretary that a Teleconference Meeting of the Board of Directors is required to conduct the business of the APFA.

B. The National President, or four (4) members of the Executive Committee may advise the National Secretary that a Teleconference Meeting of the Executive Committee is required to conduct the business of the APFA.

C. The purpose of the Teleconference Meeting must be submitted to the National Secretary in writing and any resolution(s) shall include the names of the maker and second.

✱✱✱

APPX. 0024

M. All business conducted by a Teleconference Meeting shall become a part of the permanent record of the APFA.

N. Any business conducted by a Teleconference Meeting is subject to reconsideration at the next meeting of the Executive Committee or Board of Directors, as appropriate.

## Section 6.   OFFICERS:

A. Definitions: The National Officers shall be the National President, National Vice President, National Secretary and National Treasurer.

B. Duties of the National President shall include but not be limited to the following:

(1) The National President shall be the chief executive officer of the APFA, and shall conduct the affairs of the APFA in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors and/or the Executive Committee.

(2) The National President shall sign any agreements, supervise the activities of the APFA and carry out any duties the Board of Directors and/or the Executive Committee may request, in accordance with this Constitution.

(3) The National President shall convene any convention or meeting of the Board of Directors and the Executive Committee. S/he must convene the Board to review any proposed Collective Bargaining Agreement between the APFA and AAL.

(4) The National President shall convene any meeting of the OAL Operation Advisory Panel. S/he must convene the Panel to review any proposed Collective Bargaining Agreement between the APFA and an airline other than AAL whose Flight Attendant employees are represented by the APFA.

(5) The National President shall act as Chairperson for the Board of Directors, the Executive Committee, the Negotiating Committee and the OAL Operation Advisory Panel. The National President shall oversee all other national committees, unless otherwise provided for in this Constitution or by resolution or policy of the Board of Directors or the Executive Committee.

(6) The National President shall recommend to the Executive Committee all changes in employment and staff requirements and, subject to the approval of the Executive Committee, fix compensation for all agents and employees of the APFA. The National

President shall be responsible for the employment, supervision and discharge of all agents and employees of the APFA.

(7) The National President may address an Annual Report to the membership.

(8) The National President shall nominate, and the Executive Committee shall confirm or reject, individual active members in good standing to serve as National Chairs.

(9) The National President shall appoint Negotiating Committee members in accordance with Article X, Section 5, A(1)b of this Constitution.

(10) The National President shall have the authority to hire, retain or employ general counsel and/or other legal counsel for the APFA, subject to the approval of the Executive Committee.

(11) The National President shall direct and coordinate legislative and political initiatives and any lobbying efforts on behalf of the Association to further the objectives of the APFA.

C. Duties of the National Vice President shall include but not be limited to the following:

(1) The National Vice President shall assist the National President in the discharge of all duties. In the absence of the National President, or should a vacancy occur in the office of National President, the National Vice President shall perform the duties of the National President.

(2) The primary responsibility of the National Vice President shall be to oversee the grievance and arbitration process provided for in the Railway Labor Act and the Collective Bargaining Agreement(s) entered into between the APFA and employers.

(3) The National Vice President shall serve as the APFA's permanent Chairperson of the Flight Attendant System Board(s) of Adjustment.

(4) The National Vice President shall coordinate activities of the System Board(s) of Adjustment with other departments within the APFA.

(5) The National Vice President shall nominate, and the Executive Committee shall confirm or reject, individual active members in good standing to serve as Regional Representatives.

(6) The National Vice President shall determine the specific base assignments of each Region and assign and coordinate the activities of the members appointed to serve as Regional Representatives.

APPX. 0026

(7) The National Vice President shall be authorized to hire, retain and employ legal counsel as may be required to provide members with representation in the grievance and arbitration process, subject to the approval of the Executive Committee.

(8) The National Vice President shall ensure the training and continuing education of all representatives involved in the grievance and arbitration process.

(9) The National Vice President shall coordinate and chair a Grievance Review Committee to oversee the disposition of grievances.

D. Duties of the National Secretary shall include but not be limited to the following:

(1) The National Secretary shall be responsible for all administrative records of the Association.

(2) The National Secretary shall cause to be kept an administrative record of all officers, representatives and appointees.

(3) The National Secretary shall notify the Board of Directors, the Executive Committee and the OAL Operation Advisory Panel of any convention or meeting.

(4) The National Secretary shall cause to be kept a record of all proceedings at any convention or meeting of the Board of Directors, or at any meeting of the Executive Committee and the OAL Operation Advisory Panel.

(5) The National Secretary shall submit a written report of all meetings of the Executive Committee and the OAL Operation Advisory Panel to the Board of Directors within fifteen (15) days following such meeting.

(6) The National Secretary shall oversee the National Balloting Committee.

(7) The National Secretary shall assist the National President in the preparation of any Annual Report to the members of the APFA.

(8) The National Secretary shall administer Article VII procedures.

(9) The National Secretary shall update and ensure distribution of the APFA Policy Manual.

(10) The National Secretary shall assist in establishing regular training and continuing education programs for representatives of the APFA, and shall maintain the APFA training records of all representatives.

APPX. 0027

(11) The National Secretary shall ensure that training and reference materials and Association publications and manuals are maintained.

(12) The National Secretary shall be responsible for the library of the Association.

(13) The National Secretary shall establish and maintain lines of communication between members of the Executive Committee, Base Representatives and all administrative departments and committees.

(14) The National Secretary shall assist the National Treasurer in the discharge of all duties. Should there be a temporary absence in the office of the National Treasurer; the National Secretary may perform the duties of the National Treasurer.

E. Duties of the National Treasurer shall include but not be limited to the following:

(1) The National Treasurer shall be responsible for the care and custody of the funds and securities of the APFA, receiving all dues, fees and special assessments assigned to the APFA.

(2) The National Treasurer shall be responsible for all financial records of the APFA.

(3) The National Treasurer shall cause to be kept a record of the APFA's membership so as to show at all times the number of members in each membership status or classification, their respective places of residence, their post office addresses, their base locations and the date when each person became a member of the APFA and/or changed membership status or classification.

(4) The National Treasurer shall cause to be kept an individual record of all dues and assessments for each member.

(5) The National Treasurer shall oversee the APFA Budget Committee and shall assist in the preparation of the annual budget.

(6) The National Treasurer shall submit the annual budget to the Board of Directors for approval at the Annual Convention.

(7) The National Treasurer shall advise the Board of Directors and the Executive Committee of any significant change in the financial standing of the APFA.

(8) The National Treasurer shall submit a monthly financial report to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4.C of this Constitution.

APPX. 0028

**Black Decl. Ex. A**

(9) The National Treasurer shall submit a quarterly financial review to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4.D of this Constitution.

(10) The National Treasurer shall submit with his/her signature all Federal and State Reports required by law.

(11) The National Treasurer shall oversee and coordinate ongoing computerization of the APFA headquarters files, records and systems.

(12) The National Treasurer shall oversee the daily activities of the APFA headquarters office staff.

(13) The National Treasurer shall coordinate the headquarters office staff to ensure assistance is provided to administrative, committee and support personnel.

(14) The National Treasurer shall assist the National Secretary in the discharge of all duties. Should there be a temporary absence in the office of the National Secretary; the National Treasurer may perform the duties of the National Secretary.

## Section 7. BASE COUNCILS / BASE REPRESENTATIVES:

A. Organization: The Base Council shall consist of the Base President, Vice President, and Base Council Representatives (BCRs). When a base contains both an American Airlines Operation and one or more OAL Operations (as defined in Article I, Section 7,K,2 of this Constitution), the Base Council shall also include an OAL Operation Advisory Panel Representative (APR). The members of a Base Council hold positions with the APFA as Base Representatives.

B. Base Representatives shall hold such positions only at the base where they are stationed.

C. The Base President and Vice President shall be elected by the membership of the base at large.

D. Base Council Representatives (BCRs) shall be elected by the membership of the American Airlines base at which they are stationed. BCRs shall hold such positions only at the base at which they are stationed.

   (1) Each base shall be entitled to one BCR for each one hundred (100) members or fraction thereof who are stationed at the base.

E. The Advisory Panel Representative (APR) shall be elected by the membership of the OAL Operation base at which he/she is stationed. The APR shall hold such position only from the OAL Operation base at which he/she is stationed.

***APPX. 0029

**Black Decl., Ex. A**

\*\*\*

# ARTICLE VII
## HEARINGS AND DISCIPLINARY PROCEDURES

**Section 1.   GROUNDS FOR CHARGES:**

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

A. Failure to pay dues, assessments or penalties levied by the Association;

B. Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

C. Willfully acting as a strike breaker during any work stoppage duly authorized by the Association;

  (1) Notwithstanding Section 1.C, above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

D. Willful violation of a Flight Attendant's Collective Bargaining Agreement;

E. Theft or embezzlement of Association monies or property;

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

G. Willfully acting in a manner that causes the Association to violate its legal obligations; or

H. Willfully bringing charges without reasonable basis against another member, officer or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

**Section 2.   FILING OF CHARGES:**

A. A charge may be filed by any member in good standing. All charges shall be filed with the National Secretary and shall be proffered in writing and shall be specific as to the alleged act(s) and/or the Article(s) of this Constitution

APPX. 0030

allegedly violated which constitute the basis of the charge(s).

B. The National Secretary shall cause a copy of the charges to be served upon the accused and the accuser within seven (7) days following receipt of the charges. Such notification shall be by registered mail, return receipt requested to their last known addresses, and shall furnish the accused and the accuser a description of all relevant procedures.

C. The National Secretary shall send a copy of all charges to the Executive Committee and to the Board of Directors within seven (7) days following his/her receipt of the charges.

D. Time Limits:

    (1) Charges based on Section 1.A through Section 1.F of this Article VII must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the alleged offense.

    (2) Charges based on Section 1.G of this Article VII may not be filed unless and until it has been determined, in a separate legal proceeding (such as a lawsuit), that the Association has violated its legal obligations, or unless and until the Association settles a legal proceeding brought against it by furnishing substantial relief to an opposing party. Charges based on Section 1.G above must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the completion or settlement of the legal proceeding.

    (3) Charges based on Section 1.H of this Article VII must be filed within sixty (60) days following the Article VII Arbitrator's decision which gives rise to such charge(s).

E. The accused and accuser may be represented during Article VII proceedings by any individual; however, the APFA will not compensate either party for attorney's fees.

## Section 3. REVIEW OF CHARGES:

At the first regularly scheduled meeting of the Executive Committee following receipt of charges by the National Secretary, the Executive Committee shall review the charges for timeliness, specificity and validity.

A. Should the charges be determined to be timely, specific and valid, such charges shall then be forwarded by the National Secretary via registered mail, return receipt requested to the Article VII Arbitrator designated herein

within seven (7) days following such Executive Committee meeting.

B. Charges deemed untimely by the Executive Committee will be dismissed without appeal.

C. Charges deemed non-specific by the Executive Committee shall be referred back to the accuser. The accuser may resubmit, one time only, such charges to the National Secretary for review by the Executive Committee at its next regularly scheduled meeting without affecting the time limits of Section 2.D of this Article VII.

D. Charges may be deemed invalid and dismissed if the Executive Committee determines that the charges address conduct protected by this Constitution and/or by law (including the LMRDA Bill of Rights). Charges may also be deemed invalid and dismissed if they fail to state a proper claim under Section 1 of this Article VII. Should such charges be dismissed as invalid, the accuser may, within seven (7) days following receipt of notification of dismissal by the Executive Committee, appeal to the Article VII Arbitrator designated herein. If the Article VII Arbitrator determines that the charges are valid, s/he shall so advise the National Secretary, the accused and the accuser, and the charges will be processed in accordance with this Article VII.

## Section 4.  SUSPENSION FROM OFFICE:

A. If charges are filed against a national officer or elected representative based on Section 1.B, Section 1.C or Section 1.E of this Article VII, the Board of Directors may determine at any time during the pendency of the charges that the alleged conduct giving rise to the charges threatens the APFA's vital interests. The Voting Board of Directors may then, by two-thirds (2/3) vote, suspend the accused's authority as national officer or elected representative until the threat is removed or the Article VII Arbitrator designated herein resolves the charges, whichever occurs sooner.

B. A national officer or elected representative suspended pursuant to this section shall be entitled, upon demand, to an expedited resolution of the charges, with a decision rendered within thirty (30) days following the Board of Directors Meeting where the officer or elected representative was suspended.

C. If the charges are filed by or against a member of the Executive Committee or the Board of Directors, such member must appoint an alternate member of the Association to participate in the review of the charges as

APPX. 0032

provided in Section 3 of this Article VII and, when necessary, to participate in the vote regarding the suspension of the member of the Executive Committee or Board of Directors as provided in this Section 4.

### Section 5. APPOINTMENT OF THE ARTICLE VII ARBITRATOR:

A. The Board of Directors shall appoint an arbitrator to resolve all charges filed under this Article VII. The Article VII Arbitrator, once appointed, shall serve until s/he resigns or until the Board of Directors determines to appoint a new Article VII Arbitrator.

B. The Board of Directors may also appoint one or more alternate Article VII Arbitrators who shall have the authority to hear and decide particular charges when the Article VII Arbitrator is not available.

C. C. The Article VII Arbitrator and any alternate Article VII Arbitrator(s) shall be a person expert in labor law who is a neutral (such as an academic or professional labor arbitrator), who has experience as a neutral in adjudicating internal labor organization disputes, and who has no other prior or current involvement with the APFA.

### Section 6. JURISDICTION AND AUTHORITY OF THE ARTICLE VII ARBITRATOR:

A. The Article VII Arbitrator shall have power to resolve all charges referred to him/her during his/her tenure.

B. The administrative procedures for handling Article VII charges shall be included in the APFA Policy Manual. The Article VII Arbitrator may from time to time propose changes in these administrative procedures, and such changes shall become effective and included in the Policy Manual if they are approved by the Board of Directors. The administrative procedures to be adopted shall be in general compliance with American Arbitration Association rules where practicable, but may not conflict in any respect with the provisions of this Constitution.

C. The Article VII Arbitrator may, on his/her own motion or upon motion filed by the accused, declare that charges are untimely or do not allege a violation cognizable as charges under this Article VII and thus are dismissed without the need for hearing.

D. The Article VII Arbitrator may, on his/her own motion, or upon motion filed by the accused, determine that charges are not sufficiently specific and that they will be dismissed unless the accuser amends them to provide sufficient specificity.

APPX. 0033

E. The accused may move for summary dismissal of the charges on the ground that the accuser does not have evidence sufficient to sustain the charges and thus there is no need for a full hearing. On receipt of such a motion, the Article VII Arbitrator shall afford the accuser an opportunity to identify evidence that would sustain the charges. If the Article VII Arbitrator concludes, following that opportunity, that the accuser does not have evidence sufficient to sustain the charges, the Article VII Arbitrator may grant summary dismissal of the charges.

F. If at any time during the pendency of the charges, the Article VII Arbitrator determines (whether on his/her own motion or the motion of the accused) that the conduct furnishing the basis for the charges is protected by this Constitution and/or by law (including the LMRDA Bill of Rights), the Article VII Arbitrator shall have the authority to dismiss the charges addressed to such protected conduct.

G. No ex-parte communication may be had with the Article VII Arbitrator either by the accused, the accuser or by the APFA, or any member of the APFA except with respect to scheduling, location and like administrative matters.

H. The decision of the Article VII Arbitrator shall be final and binding upon the accused and the accuser.

## Section 7.  COSTS:

A. Initial costs of the Article VII proceedings shall be borne by the APFA in accordance with the provisions of Article V of this Constitution.

B. In the event a charge is dismissed by the Article VII Arbitrator, or in the event the Article VII Arbitrator does not sustain a charge, up to one-half (1/2) of the fees and expenses of the Article VII Arbitrator and all administrative costs to the APFA relative to that charge may be levied against the accuser by the APFA upon completion of charge proceedings brought under Section 1.H of this Article VII.

C. In the event the Article VII Arbitrator sustains a charge, costs of the proceedings shall be paid by the APFA and may be offset by a fine levied against the accused in an amount determined by the Arbitrator, if a fine was requested by the accuser.

D. In the event that it becomes necessary to enforce an Article VII Arbitration award through judicial proceedings, attorney's fees for those judicial proceedings may be paid or reimbursed by the APFA to the appropriate party seeking such enforcement.

Black Decl., Ex. A

## Section 8.   INTERNAL REMEDIES:

Members, officers and representatives shall exhaust internal remedies under this Article VII for a period not to exceed four months prior to taking any legal action against members, officers or representatives of the APFA with respect to matters cognizable as charges under this Article VII.

\*\*\*

APPX. 0035

**Black Decl., Ex. B** 

# The APFA Policy Manual

*Established in accordance with
Article III of*

## THE APFA CONSTITUTION

*by*

## THE APFA BOARD OF DIRECTORS

MARCH 14, 1992

APPX. 0036

# Table of Contents

PREAMBLE ............................................................................................................. i

FORWARD - APFA Code of Conduct ................................................................. ii

SECTION 1 - General ........................................................................................ 1.1

    Policy Statement .......................................................................................... 1.1
    Definitions ..................................................................................................... 1.1
    Distribution of Policy Manual ..................................................................... 1.2
    Revisions to Policy Manual ......................................................................... 1.2
    Environmental Protection ............................................................................ 1.3
    Confidentiality ............................................................................................... 1.3

SECTION 2 — Membership and Awards ........................................................... 2.1

    Policy Statement .......................................................................................... 2.1
    Dues / Fees ................................................................................................... 2.1
    Dues / Fees Forgiveness Requests ........................................................... 2.2
    Membership Pins .......................................................................................... 2.3
    Membership Cards ....................................................................................... 2.3
    New / Probationary Flight Attendants ....................................................... 2.3
    APFA Address / Mailing / Telephone List ................................................. 2.4
    Honorary Members ....................................................................................... 2.4
    Recognition Of Accomplishments, Achievements, Contributions ........... 2.4
    Hardship Requests ...................................................................................... 2.7

SECTION 3 - Training and Qualifications ........................................................ 3.1

    Policy Statement .......................................................................................... 3.1
    Training and Continuing Education ............................................................ 3.1
    Base Representative / BCR Requirements for Participation in APFA Department / Committees
    ...................................................................................................................... 3.1
    Orientation Program(s) ................................................................................ 3.2
    Qualifications / Procedures for Appointment to Positions of Regional Representative, National
    Chair, or Appointed Negotiator .................................................................. 3.2
    Conflict of Interest Restriction .................................................................... 3.4

SECTION 4 - Board of Directors and Executive Committee .......................... 4.1

    Policy Statement .......................................................................................... 4.1
    General .......................................................................................................... 4.1
    Annual Convention of The APFA ................................................................ 4.10
    Meetings of the APFA Executive Committee ............................................ 4.10

SECTION 5 - Trip Removal and Expense Policy .............................................. 5.1

    Policy Statement .......................................................................................... 5.1
    Applicability of Trip Removal / Expense Policy Provisions ...................... 5.1
    Right to Petition the Executive Committee / Board of Directors .............. 5.1
    APFA Paid Trip Removal / Flight Time Loss ............................................. 5.2
    Special Assignment Fee (SAF) Policy ....................................................... 5.8
    Meal Expenses / Meal Expense Allowance (MEA) ................................... 5.11
    Other Expenses ........................................................................................... 5.13
    Relocation .................................................................................................... 5.20
    Submission of Expense Reports ................................................................ 5.23
    Transition Expense ...................................................................................... 5.24

SECTION 6 - National Officer Salaries and Benefits ..................................... 6.1

APPX. 0037

# Table of Contents

Policy Statement ..................................................................................................................6.1
Salaries..............................................................................................................................6.1
Benefits...............................................................................................................................6.1
Interim National Officers ....................................................................................................6.5

**SECTION 7 - Budget / Financial Policies ....................................................................7.1**

Policy Statement ................................................................................................................7.1
Composition of the APFA Budget Committee.....................................................................7.1
Responsibilities of the APFA Budget Committee................................................................7.1
Letting of Contracts ...........................................................................................................7.1
Seeking Unionized Purchases / Services...........................................................................7.1
Nepotism / Conflict of Interest...........................................................................................7.2
Balanced Budget................................................................................................................7.2
Financial Statements .........................................................................................................7.3
Institutional Stock ..............................................................................................................7.3

**SECTION 8 - Headquarters Policies and General Procedures ..............................8.1**

Policy Statement ................................................................................................................8.1
Headquarters Hours and Security......................................................................................8.1
Headquarters Orientation ..................................................................................................8.2
Building and Grounds .........................................................................................................8.2
Automobiles .......................................................................................................................8.2
Headquarters Staff .............................................................................................................8.2
Central Office Filing System / Archives ..............................................................................8.3
APFA Computer Systems ...................................................................................................8.4
Headquarters Smoking / No Smoking Policy......................................................................8.8
General Procedures ...........................................................................................................8.8

**SECTION 9 – Region and Base Policies.....................................................................9.1**

Policy Statement ................................................................................................................9.1
APFA Regions....................................................................................................................9.1
Base Representatives .........................................................................................................9.1
Office Supplies/Equipment .................................................................................................9.4

**SECTION 10 - APFA Political Action Committee.........................................................10.1**

Policy Statement ..............................................................................................................10.1
APFA Political Action Committee (PAC)............................................................................10.1
Supervision of the APFA PAC ..........................................................................................10.1
APFA Legislative Representative.......................................................................................10.1
Participation in APFA PAC ...............................................................................................10.1
Establishment of the APFA PAC Account .........................................................................10.1
Dispersal of PAC Funds ...................................................................................................10.1

**SECTION 11 - APFA Dispute Resolution Guidelines and Grievance Procedures....11.1**

Policy Statement ..............................................................................................................11.1
Determination of Merit ......................................................................................................11.1
DISPUTE Resolution Guidelines.......................................................................................11.1
Representation..................................................................................................................11.2
Training..............................................................................................................................11.4
APFA Members of the System Board ................................................................................11.4
Legal Counsel ...................................................................................................................11.4
Adverse NODs/Grievances...............................................................................................11.4
Grievance Review Committee (GRC) Guidelines ..............................................................11.4

APPX. 0038

# Table of Contents

Grievance Appeal Panel ............................................................. 11.5
Postponement of Cases ............................................................ 11.6

**SECTION 12 - Communications Policies** ........................................... 12.1

Policy Statement .................................................................. 12.1
Internal Communication ............................................................ 12.1
Official Publication .............................................................. 12.3
The APFA Website, apfa.org, Will Be An Official Form of Communication for the APFA ..... 12.5
Hotline ........................................................................... 12.5
National Mailings ................................................................. 12.6
Base / Operation Bulletin Boards ("APFA Bulletin Boards") .......................... 12.6
Base Briefs ....................................................................... 12.6
Public / Press Relations .......................................................... 12.7
New Member Packet ................................................................. 12.7
Activist Communications Program ................................................... 12.8

**SECTION 13 – National Administrative Departments / Committees / Chairs and Regional Representatives**
.................................................................................... 13.1

Policy Statement .................................................................. 13.1
General............................................................................ 13.1
Administrative Departments ........................................................ 13.1
Regional Representatives .......................................................... 13.19

**SECTION 14 - National Balloting Committee (NBC) / Voting Procedures** ............ 14.1

Policy Statement .................................................................. 14.1
National Balloting Committee (NBC) Objectives ..................................... 14.1
Scope Of Authority ................................................................ 14.1
Compliance......................................................................... 14.3
Composition of NBC ................................................................ 14.4
Nomination / Appointment to the NBC ............................................... 14.4
Elections / Independent Election Agency ........................................... 14.6
Willingness-To-Serve Notifications (WTS) .......................................... 14.6
Retrieval of Willingness-To-Serve Notifications (WTS) ............................. 14.9
Certification Of Duly Elected Candidates .......................................... 14.9
Determining Candidate Eligibility ................................................. 14.9
Preparation and Mailing of Ballots ................................................ 14.10
Post Office Procedures ............................................................ 14.11
Total Ballots Received / Determination of Ballot Validity ......................... 14.12
Ballot Count ...................................................................... 14.13
Electronic Balloting .............................................................. 14.16
National Officer Election Run-Off Debate .......................................... 14.16
Observers at Ballot Count ......................................................... 14.18
Certification / Notification of Balloting Results ................................. 14.19
Certificates of Election .......................................................... 14.19
Candidate Access to Membership Mailing Labels, Use of the APFA Mailing Service ........ 14.19
Procedures for Election of Ad Hoc Members of the Executive Committee................ 14.20
Insufficient WTS / Vacancy in Position of BCR ..................................... 14.27
Vacancy in Position of Base President, Base Vice Chair, and / or Delegate........... 14.27
Special Delegate Elections......................................................... 14.28
Declaration of Eligibility ........................................................ 14.29

**SECTION 15 - APFA Negotiating Committee** ....................................... 15.1

Policy Statement .................................................................. 15.1

APPX. 0039

**Black Decl. Ex. B**

# Table of Contents

Elected Portion of APFA Negotiating Committee....................................................15.1
Appointed Portion of APFA Negotiating Committee...............................................15.1
Composition of APFA Negotiating Committee ........................................................15.1
Budgetary and Other Adjustments .........................................................................15.1
Training of APFA Negotiating Committee Members ...............................................15.2
APFA Standing Negotiating Committee ..................................................................15.2
Confidentiality of APFA Negotiating Committee ....................................................15.2
Vacancy on APFA Negotiating Committee .............................................................15.3
Additional Assistance to APFA Negotiating Committee .........................................15.3
Duties of the Chair of APFA Negotiating Committee .............................................15.3
Openers ..................................................................................................................15.3

**SECTION 16 - Strike Policy** ........................................................................................**16.1**

Policy Statement ....................................................................................................16.1
APFA Strikes...........................................................................................................16.1
Strikes By Other Unions .........................................................................................16.1

**SECTION 17 - ARTICLE VII Administrative Policies and Procedures** ...................**17.1**

Policy Statement ....................................................................................................17.1
Filing of Charges ....................................................................................................17.1
Executive Committee Review of Charges ..............................................................17.1
Appeal When Charges Dismissed by Executive Committee ..................................17.1
Setting The Date, Time and Location of the Hearing .............................................17.1
Motions ...................................................................................................................17.2
Exchange of Documents and Witness Lists ...........................................................17.3
Stenographic Record ..............................................................................................17.3
Attendance at Hearings ..........................................................................................17.3
Adjournments..........................................................................................................17.3
Order of Proceedings .............................................................................................17.3
Oaths ......................................................................................................................17.3
Hearing in the Absence of a Party .........................................................................17.4
Evidence .................................................................................................................17.4
Initial Costs of Proceedings ...................................................................................17.4
Final Arguments .....................................................................................................17.4
Reopening the Hearing...........................................................................................17.4
Release of Documents for Judicial Proceedings ...................................................17.5
Communication with the Arbitrator .........................................................................17.5
Suspension of an Officer or Elected Representative During the Pendency of Charges........17.5
Interpretation and Application of Rules ..................................................................17.5
Procedures for Filing of Comments by Interested Parties .....................................17.5

**SECTION 18 - Proposed Collective Bargaining Agreements** ...............................**18.1**

Presentation to the Executive Committee ..............................................................18.1
Board of Director Input ...........................................................................................18.1
Rejection by the Executive Committee....................................................................18.1

APPX. 0040

**Black Decl. Ex. B**

# Preamble

This Policy Manual for the Association of Professional Flight Attendants is established pursuant to Article III, Section 2.C. of the APFA Constitution.

All previous policies of the Association established by the Board of Directors that are in conflict with any provision of this Policy Manual shall be deemed null and void by the approval of this Policy Manual by the Board of Directors of the APFA.

This Policy Manual shall remain in effect unless and until altered, added to, deleted from or amended by action of the Board of Directors pursuant to Article III, Section 3.L(1) and (2) of the APFA Constitution.

This Policy Manual became effective April 1, 1992.  A major revision of this Policy Manual became effective April 1, 1997 and shall remain in effect unless and until altered, added to, deleted from or amended by action of the Board of Directors pursuant to Article III, Section 3.L.(1) and (2) of the APFA Constitution.

A record of any subsequent revisions, alterations or amendments to this Policy Manual shall note the date of approval by the Board of Directors and will be kept in the Office of the National Secretary.

\*\*\*

# SECTION 5
## TRIP REMOVAL AND EXPENSE POLICY

**POLICY STATEMENT:** The APFA encourages the voluntary participation of all members in the day-to-day running of the organization. It is anticipated that members who participate in APFA activities and functions will do so from a desire to help improve their working conditions and to better their Union.

The APFA recognizes that the organization cannot function solely by the voluntary efforts of its members. Financial policies herein are structured to diminish any financial penalty that a member may incur as a result of providing Union services to Flight Attendants. It is not the intent of this policy for any individual to experience financial gain.

A.  **APPLICABILITY OF TRIP REMOVAL / EXPENSE POLICY PROVISIONS**

   1.  All provisions contained in this policy shall be applicable to all APFA members, except where specifically designated to apply to APFA Representatives only (see Section 5.A.3.).

   2.  No exceptions to this policy shall be made without the written approval and authorization of two (2) National Officers.

   3.  Ad Hoc Members of the Executive Committee shall be considered "representatives" for the purpose of this policy.

   4.  This policy presumes throughout that all business and activities of the individuals incurring expenses and / or trip removals will be performed with the approval of one (1) or more authorized individuals and such business will be for the purpose of furthering the objectives of the APFA, and for the benefit of the bargaining unit.

   5.  Expenses may be challenged and / or denied if submitted without proper substantiation such as receipts or documentation, or if the expense itself appears excessive or unreasonable. In such case, the National Treasurer shall advise the Executive Committee of the situation and the representative / member has the right to appeal by petition to the Executive Committee / Board of Directors, in accordance with paragraph B. below.

B.  **RIGHT TO PETITION THE EXECUTIVE COMMITTEE / BOARD OF DIRECTORS**

   1.  Any member who wishes to appeal the application of this policy may do so to the APFA Executive Committee. Any member who wishes to appeal the ruling of the Executive Committee regarding the application of this policy may do so to the APFA Board of Directors, except rulings regarding late expense reports. The APFA Executive Committee decision regarding the appeal of late submission of expense reports shall be final and binding.

   2.  All requests to appeal or to otherwise request consideration for an exception to this policy must be in writing and sent by certified mail to the National Treasurer.

   3.  Appeals shall be placed on the Agenda of the next regularly scheduled Executive Committee meeting provided;

**Black Decl. Ex. B**

\*\*\*

8.   The accrued credited time shall be cash-converted in the month following the required work for which Payback is requested, provided that the request is submitted in accordance with the provisions of I.9. below.

9.   The hourly rate to be used for cash conversion shall be the straight hourly rate according to the representative's seniority pay scale.

10.  Members of a Negotiating Committee may take their payback of accrued time in either actual corresponding consecutive vacation days off, or they may have the credited time converted into cash as provided herein.

11.  Paragraph D.6. above notwithstanding, a Negotiator involved in pre-Section 6 preparation or active Section 6 Negotiations may receive Payback up to eighty-five (85) hours upon authorization and approval of the National President.

12.  If both the Base President and Base Vice President are scheduled to take a Company vacation at the same time, either representative may take his / her payback of accrued time in actual corresponding consecutive vacation days off. Vacation should be taken within ninety (90) days.  Vacation must be taken in that fiscal year and must be taken within that person's term of office.

13.  If a National Chair is involved in an APFA project, or an emergency situation exists that requires a National Chair to perform work on behalf of APFA when otherwise scheduled for Company vacation, the National Chair may opt to take his / her payback of accrued time in actual corresponding consecutive vacation days.  Prior approval by two (2) National Officers is necessary to exercise this option.  Vacation should be taken within ninety (90) days.  Vacation must be taken in that fiscal year and must be taken within that Chair's term of office.

14.  If a Regional Representative is involved in an APFA project, or an emergency situation exists that requires a Regional Representative to perform work on behalf of APFA when otherwise scheduled for Company vacation, the Regional Representative may opt to take his / her payback of accrued time in actual corresponding consecutive vacation days.  Prior approval by two (2) National Officers is necessary to exercise this option.  Vacation should be taken within ninety (90) days.  Vacation must be taken in that fiscal year and must be taken within that Regional Representative's term of office.

E.   **SPECIAL ASSIGNMENT FEE (SAF) POLICY**

1.   Intent of the SAF

a.   The intent of the Special Assignment Fee (SAF) is to offer payment to representatives for the days that they conduct APFA business in excess of their normal scheduled bid line.  Amounts paid under this arrangement are reportable as wages on the representative's W-2 and are subject to withholding and payment of employment taxes.

b.   Representatives may be required to conduct APFA business on layovers / sit time in an effort to meet the needs at their base and shall be offered SAF payment for hours worked since no trip removal would apply.

2.   SAF Verification

a.   One (1) National Officer must verify that an SAF has been authorized as provided in E.3. and / or E.6. below and is otherwise consistent with APFA policy and budgetary considerations.

3.   SAF Authorization

a.   A National Officer may authorize payment of an SAF for any reason consistent with this policy.

b.   National Chairs and Base Presidents may authorize payment of an SAF to the extent allowed by their respective budgets, subject to verification by a National Officer.

c.   Payment of any SAF to a member and charged to a base budget must be authorized by the respective Base President.

4.   SAF Rates

a.   Daily SAF

(1)   If a representative performs work for the APFA, and is not otherwise paid for that day's work by means of an APFA Paid Trip Removal as provided for in paragraph C. above, or by Leave / Vacation Payback as provided in paragraph D. above, such representative shall receive the Daily SAF for work performed in accordance with the following schedule:

| | |
|---|---|
| One (1) to two (2) hours: | $10 |
| More than two (2), to five (5) hours: | $20 |
| More than five (5), to eight (8) hours: | $25 |
| More than eight (8), to eleven (11) hours: | $30 |
| More than eleven (11) hours: | $40 |

b.   Weekly SAF

(1)   If a representative works less than one (1) hour in any one (1) day, such time may be combined with time worked on other days in the same week. The maximum SAF that will be credited in any one (1) week, under the weekly rate, will be one hundred and twenty-five dollars ($125).

c.   Monthly SAF

(1)   Minimum Monthly SAF is authorized in accordance with the following schedule:

(a)   Base Presidents and Base Vice Presidents, calculated on a headcount as follows:

| Headcount | Base President | Base Vice President |
|---|---|---|
| 1 - 124 | $100 | $ 65 |
| 125 - 249 | 130 | 100 |
| 250 - 499 | 185 | 135 |
| 500 - 749 | 225 | 185 |
| 750 - 999 | 250 | 250 |
| 1000 - 1249 | 300 | 300 |
| 1250 - 1499 | 350 | 350 |
| 1500 + | 400 | 400 |

(b) Representatives and National Chairs authorized and utilizing a full month trip removal: $400 minimum, but not to exceed the $500 maximum.

(c) National Officers and Regional Representatives: $400 minimum, but not to exceed the $500 maximum.

(d) Minimum Monthly SAF payments shall not be withheld without approval of the Executive Committee.

(2) Assignment of SAF

    (a) A representative who is authorized to receive a Minimum Monthly SAF may assign payment of his / her Minimum Monthly SAF to another representative or member who is not otherwise eligible for a minimum monthly SAF or whose minimum monthly SAF is less than the amount being assigned.

        [1] Such assignment must be made in writing to the National Treasurer and signed by the representative making the assignment.

        [2] Such assignment shall be permitted only when a representative, otherwise eligible for a minimum monthly SAF, is not able to perform his / her normal duties because of a temporary absence as a result of vacations, leaves, or alternate Union responsibilities.

        [3] The assignment shall be effective for one (1) month only unless renewed in writing.

    (b) In no case shall a representative or member receive more than one (1) SAF in any one (1) month.

(3) Maintaining an Office Outside Residence

    (a) A National Officer, Regional Representative, National Chair, Base President and / or Base Vice President who is required to maintain an APFA office outside of his / her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF

APPX. 0045

provided above, or the actual SAF subject to reimbursement, whichever is greater.

    (b)    Payment shall be prorated in increments of weeks, not to exceed four (4) weeks. Payment will be verified by documentation of office use on said Representative's weekly expense report.

    (4)    Maximum Monthly SAF

        (a)    The maximum monthly SAF that may be paid is five hundred dollars ($500).

5.    Information Returns Required by Law

    a.    The APFA shall file information returns with respect to the payment of any SAF as required by law and the APFA and the member each shall be responsible for any applicable tax liabilities on any SAF payment made by the APFA.

6.    SAF Calendar

    a.    A detailed daily calendar must be kept and submitted with the claim for the SAF payment. Payment will be made for work actually performed, including travel time. An overnight stay away from place of residence will not ~~automatically entitle a member to the maximum daily SAF.~~

## F.    MEAL EXPENSES / MEAL EXPENSE ALLOWANCE (MEA)

1.    Per Diem MEA Away From Residence

    a.    Per Diem Rate (Accountable Plan)

        (1)    All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA when away from their residence for one (1) or more nights at the Collective Bargaining Agreement Domestic Per Diem rate while traveling domestically and the Collective Bargaining Agreement International Per Diem rate while traveling internationally, for each hour they are away from their residence.

    b.    Per Diem Session

        (1)    A National Officer may authorize an APFA function as a "Per Diem Session", as defined in Section 1.A.12. of this Policy Manual, for the purposes of this policy. The MEA does, however, apply up to the start time and following the conclusion of such session.

2.    Actual MEA at Residence

APPX. 0046

Black Deal Ex. B

a.   On days s/he is not trip removed, the APFA will reimburse a representative actual meal expenses at his / her residence city to the limit provided in F.2.a.(1) below when it is necessary to conduct APFA business during such meal, or when a representative is required by the transaction of APFA business to meet during a normal meal time.

  (1)   Allowable MEA at Residence City is as follows:

| Breakfast up to: | $ 6.00 |
|---|---|
| Lunch up to: | $10.00 |
| Dinner up to: | $17.00 |
| Snack up to: | $ 3.00 |

  (2)   In addition to the required receipt, all such MEA reimbursements shall require the representative to note the name(s) of the other individual(s) meeting during the meal time and the nature of the APFA business being conducted.

b.   The provisions of F.2.a. above shall also apply to those Flight Attendants who participate in second and / or third level hearings (such as the grievant or witness(es)), and to other members when authorized by a National Officer.

c.   The maximum "Actual MEA at Residence" that will be reimbursed to a member shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.

3.   Guaranteed MEA at Residence

a.   On days a representative is both trip removed by and performing work for the APFA at his / her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2. above.

b.   The "Guaranteed MEA at Residence" shall be paid at the rate of twenty-five dollars ($25) per day.

c.   The maximum "Guaranteed MEA at Residence" that will be paid to a member shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.

d.   National Officers, Regional Representatives, National Chairs and other representatives who are authorized a full month trip removal or the equivalent shall receive a "Guaranteed MEA at Residence" of three hundred dollars ($300) per month.

4.   Calculation of MEA

a.   National Officers, Regional Representatives, National Chairs and other representatives who are authorized a full month trip removal or the equivalent (e.g. "Payback" as provided in paragraph D. above) shall receive a minimum MEA of three hundred dollars ($300) per month.

**Black Decl., Ex. B**

    b.    The combination of "Per Diem MEA Away from Residence" as provided in F.1. above, "Actual MEA at Residence" as provided in F.2. above, and "Guaranteed MEA at Residence" as provided in F.3. above, shall not be capped.

    c.    MEA Expenses will be calculated and paid in the following order:

        (1)    "Per Diem MEA Away from Residence," then the remaining balance owed, if any, will be paid as

        (2)    "Actual MEA at Residence," then the remaining balance owed, if any, will be paid as

        (3)    "Guaranteed MEA at Residence."

5.    Business Related Expenses

    a.    Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

        (1)    Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

        (2)    In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.

        (3)    The reimbursement of a Business-Related Expense shall not count against a representative's maximum MEA.

**G.    OTHER EXPENSES**

1.    Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.

    a.    Air Travel

        (1)    A member shall be reimbursed the service charge for pass travel on an AAG airline while on APFA business.

            (a)    Only Coach Class service charges will be reimbursed, unless the member could not be accommodated in Coach Class.

            (b)    For flights scheduled in excess of five (5) hours, Business Class travel is authorized for representatives only. First

APPX. 0048

Class travel is authorized when Business Class is unavailable.

(2) When a member has employee pass travel benefits through a family member on other airlines, and when permissible, the service charge shall be reimbursed when travel may not be accomplished in an expeditious manner on an AAG airline, or when traveling to / from an off-line city, or at the convenience of the member eligible for such employee pass travel benefits.

(3) Full fare / reduced rate travel on a non-AAG airline may only be reimbursed in those instances when the conduct of APFA business requires travel to either an off-line city or when service between two cities does not exist on an AAG airline.

    (a) Prior approval should be obtained from two (2) National Officers for such travel.

    (b) The lowest possible fare category must be used, including industry reduced rate discounts ("ID75", "ID50", etc.), if available for APFA business use.

    (c) Payment for tickets may be obtained in advance if sufficient need for advanced ticketing can be demonstrated and prior authorization is given.

    (d) Copies of tickets and boarding passes must be attached to the expense report to receive reimbursement.

    (e) Travel in a class other than Coach Class must be approved by two (2) National Officers.

b. Ground Transportation

    (1) At Residence City

        (a) Mileage

            [1] A representative shall be reimbursed for mileage at the IRS standard mileage rate for travel to conduct APFA business, not to exceed a monthly maximum of one thousand (1000) miles. All mileage must be recorded on an "APFA Mileage Log" and submitted per Section 5.I.5. of this Policy Manual.

            [2] Mileage shall not be reimbursed for travel between a representative's residence and an APFA office that has been provided for the primary use of the representative for a period in excess of 31 days.

        (b) Public Transportation

APPX. 0049

      [1]    When public transportation (bus and / or subway) charges are claimed in lieu of mileage provided in G.1.b.(1)(a)[1] above, actual costs will be reimbursed.

      [2]    Airport bus / limo (or taxi when other options are unavailable / more costly) will be reimbursed for travel to / from an airport for the purposes of travel away from the city of residence for APFA business or for emergency situations.

(2)    Away from Residence City

    (a)    Any member shall be reimbursed for reasonable actual taxi fare, limo and / or bus, rental car and related expenses, and / or public transportation while conducting APFA business away from their city of residence.

    (b)    Rental car and related expenses must be with the prior approval of a National Officer.

c.    Parking and Tolls

(1)    Any member shall be reimbursed for actual parking and tolls incurred while conducting APFA business, whether at or away from their residence city, except

(2)    where employee parking is provided and the authorized member has access to such parking, the free parking facility should be used.

(3)    Should circumstances warrant that a member park in a pay parking lot at an airport in lieu of available free parking, such member will be reimbursed.

d.    Hotel Accommodations

(1)    Any member shall be reimbursed for lodging expenses incurred when required to remain overnight at a place other than his / her place of residence to conduct authorized APFA business. Prior approval must be obtained if direct billing of the hotel is requested, except that lodging expenses will not be reimbursed for base representatives performing base work while at their home base.

(2)    No member may authorize direct or indirect billing to APFA for any hotel room, meeting room or lodging without the prior approval of a National Officer.

(3)    To avoid unnecessary payment, representatives whose lodging has been authorized must directly inform the APFA National Secretary or the hotel in a timely manner to cancel a hotel reservation. If a representative fails to do so, s/he will be personally responsible for the hotel costs incurred.

(4)    A member shall be provided with single room accommodations whenever possible while attending to APFA business.

(1)    The APFA will provide personalized business cards for the following representatives:

    (a)    Members of the Executive Committee

    (b)    Base Presidents, Base Vice Presidents

    (c)    National Chairs

    (d)    Regional Representatives

    (e)    All members of National Committees

    (f)    Base Presidents may authorize Business Cards for Base Council Members to be charged to the respective budget.

(2)    APFA "generic" business cards will be provided at no charge to other representatives upon request; personalized business cards may be ordered at cost through the Office of the National Treasurer.

(3)    Business cards for all representatives will be of the same format and style.

(4)    A union bug will be displayed on all business cards.

i.    Base Computers

(1)    Base Presidents and Base Vice Presidents will be provided with computers which may be leased or purchased by the APFA.

(2)    Each computer will conform to guidelines set forth in Section 8.G. of this Policy Manual.

j.    Miscellaneous

(1)    Reasonable and necessary tips to porters and drivers are authorized for representatives.

(2)    Reasonable and necessary cleaning and laundry expenses are authorized to any representative who is away from his / her residence to conduct APFA business in excess of seven (7) consecutive days

**H.**    **RELOCATION**

1.    Upon assuming office / appointment, National Officer(s) / Chair(s) shall be expected and, for the purposes of this policy, shall be considered to reside in the DFW area. The DFW area, for purposes of this policy, shall not exceed a seventy-five (75) mile radius from APFA Headquarters.

2.    If, on the date of his / her election, a National Officer does not reside in the DFW area, s/he shall be reimbursed for actual moving expenses for relocation from / to his / her place of permanent primary residence by a certified mover as a condition of employment with the APFA, to a maximum of ten thousand ($10,000) per round-trip move.

a.   The provisions of H.2. above must be exercised within six (6) months following the end of the last term of office of the National Officer and must be substantiated by invoice or bill.

3.   A National Officer may choose not to relocate to the DFW area but may, instead, choose to accept suitable furnished accommodations paid for by the APFA as provided in H.7. below. If a National Officer accepts such accommodations in lieu of relocation expenses as provided in H.2. above, the following will apply:

a.   S/he must maintain permanent primary residency outside the DFW area. Prior to taking office, s/he must provide APFA's legal counsel with proof of such residency and continue to provide such proof every year prior to the apartment lease renewal, for the duration of their term. Once legal counsel has verified and determined that the National Chair qualifies for APFA furnished corporate accommodations, s/he will notify the Board of Directors via email that verification of proof of residency has been accomplished. Proof of residency can be established by the following, but not limited to:

(1)   At least one (1) document from Group A and two (2) from Group B in Table 5a below.

| ▪ Table 5a | |
| --- | --- |
| ▪ Group A | ▪ Group B |
| ▪ Mortgage<br>▪ Mortgage statement<br>▪ Home title<br>▪ Rental / lease agreement | ▪ Utility bill no more than thirty (30) days old (electricity, gas, water, cable or landline telephone)<br>▪ Copy of most current tax return<br>▪ Driver's license or State ID<br>▪ Vehicle registration<br>▪ Bank statement<br>▪ Voter registration card |

b.   S/he will be reimbursed only for Coach AAL service charges, or the equivalent on another airline, for travel between his / her permanent primary residence city and DFW; and

c.   S/he is not authorized to claim any other expenses as provided in this policy for the purpose of personal travel between DFW and his / her permanent residence.

4.   In addition to H.2 or H.3 above, the APFA will reimburse a National Officer / Chair for the cost of relocating one (1) personal automobile to / from the DFW area. Such reimbursement will be either for actual shipping charges or the applicable mileage rate by the APFA Board of Directors.

APPX. 0052

5.  Accommodations as provided in H.7. below may be offered to National Chairs in lieu of hotel accommodations when the city of residence of the Chair is outside of the DFW area and when travel to / from APFA Headquarters would require regular and continuous overnight stays away from his / her permanent primary residence.  If a National Chair accepts such accommodations, the following will apply:

   a.  S/he must maintain permanent primary residency outside the DFW area. Prior to assuming their position, s/he must provide APFA's legal counsel with proof of such residency and continue to provide such proof every year prior to the apartment lease renewal, for the duration of their term.  Once legal counsel has verified and determined that the National Chair qualifies for APFA furnished corporate accommodations, s/he will notify the Board of Directors via email that verification of proof of residency has been accomplished. Proof of residency can be established by the following, but not limited to:

      (1)  At least one (1) document from Group A and two (2) from Group B in Table 5b below.

| ▪ Table 5b | |
|---|---|
| ▪ Group A | ▪ Group B |
| ▪ Mortgage<br>▪ Mortgage statement<br>▪ Home title<br>▪ Rental / lease agreement | ▪ Utility bill no more than thirty (30) days old (electricity, gas, water, cable or landline telephone)<br>▪ Copy of most current tax return<br>▪ Driver's license or State ID<br>▪ Vehicle registration<br>▪ Bank statement<br>▪ Voter registration card |

   b.  S/he will be reimbursed only for coach AAL service charges, or the equivalent on another airline, for travel between his / her permanent residence city and DFW, and

   c.  S/he is not authorized to claim any other expenses as provided in this policy for the purpose of personal travel between DFW and his / her permanent residence.

6.  Furnished accommodations shall be no smaller than a one-bedroom apartment.

7.  Incoming National Officers and other Representatives shall normally be able to use outgoing National Officers' or Representatives' furniture and furnishings rather than replace these items with each change of National Officer or Representative, subject to the right to reasonably refuse furniture and furnishings.

   a.  Furniture, furnishings / appliances / equipment in need of replacement shall be replaced as needed.

b. Outgoing National Officers or Representatives shall have the option of purchasing at fair market value the furniture / furnishings / appliances / equipment that were provided in their APFA accommodations.

c. Any furniture / furnishing / appliances / equipment that is not purchased by an outgoing National Officer or Representative shall be sold through a consignment store. Any such items that are not sold within six (6) months of receipt by the consignment store shall be donated to charity.

8. Following specific elections and/or appointments, the following APFA entities shall be responsible for providing copies of this Section 5.H.

a. The NBC Chairperson shall mail a copy of the above to any elected / duly elected National Officer(s) within ten (10) business days following the certification of any National Officer elections

b. The newly-elected / duly elected National President shall hand deliver / mail a copy of the above to the Appointed / Reappointed Chairs within five (5) business days following their appointment.

## I.   SUBMISSION OF EXPENSE REPORTS

1. All expense reports must be submitted to the APFA National Treasurer on APFA expense report forms.

a. Requests for SAF as provided in 5.E. above, and "Guaranteed MEA at Residence" as provided in F.3. above must be claimed on the Weekly Activity Report form.

b. Requests for "Payback" pursuant to 5.D. above must be claimed on the Weekly Activity Report form.

c. Requests for reimbursement of "Per Diem MEA Away From Residence," as provided in F.1. above, or "Actual MEA at Residence," as provided in F.2. above, and all requests for direct reimbursement of expenses as provided in this policy, must be claimed on the Miscellaneous Expense Report form.

2. One form should be filled out for each week during which expenses are being requested / claimed. Requests for Per Diem or other actual expenses for a month may be combined on a single Miscellaneous Expense Report form when practical to do so.

3. When a member is claiming SAF or expense reimbursement for less than a full month, all calculations should be on a daily or weekly basis, as applicable. When a member is claiming SAF or expense reimbursement for a full month (28 or more days), all calculations should be on a monthly basis.

4. Requests for reimbursement of telephone expenses, including long-distance telephone, message units / toll calls, must be submitted on the Miscellaneous Expense Report form and long distance / toll calls must be documented by a telephone log showing the date, time, and name and telephone number of the party called.   Individual long-distance charges in excess of five dollars ($5.00) must include the reason or nature of the call.

5. Requests for direct reimbursement of expenses other than telephone should be submitted on the Miscellaneous Expense Report form at the same time as the request for SAF is submitted on the Weekly Activity Report form, for the week during which the expense was incurred.  Receipts, vouchers, mileage log forms and / or tickets must accompany all requests for direct reimbursement of expenses.

6. All requests for expense payment or reimbursement of any kind for a given month, except for requests for reimbursement of telephone charges, must be submitted together for that month and must be accompanied by the member's final Company Activity Record (HI1) for that month.

7. The nature of the Union business for which the expense reimbursement is being requested shall be indicated on the Weekly Activity Report and the corresponding Miscellaneous Expense Report.  The name of the representative authorizing the activity for which the expenses were incurred must be included.

8. All reports must be signed and dated when submitted.

9. Payment of Expenses

   a. Expense reports will be paid at the end of each month following the month in which the work is performed, if submitted as provided in I.9.b. below.  In order for payment to be made in a timely manner, all expense reports must be date-stamped at APFA Headquarters prior to the 16th of the calendar month in which they are to be paid (e.g., an expense report for July expenses must be date-stamped between August 1st and August 15th to be paid on August 30th).

   b. Any expense reports date-stamped between the 16th day and the 30th / 31st day of a calendar month will be paid on the 15th day of the following month.

   c. The APFA will reimburse telephone bills within fifteen (15) days of receipt of the expense report and supporting documentation.

10. Time Limit for Submission of Expense Reports

   a. Expense reports submitted more than three (3) months after the end of the calendar month in which they are incurred shall not be considered by the APFA National Treasurer.  If the last day of the three-month period falls on a weekend or holiday, the report may be submitted on the next business day.  If the member appeals, the APFA Executive Committee may allow late submission based on extenuating circumstances.  The decision of the Executive Committee will be final and binding.

J. **TRANSITION EXPENSE**

1. Some officers are eligible for both incoming and outgoing transition expenses.

   a. National Officers are eligible for transition expenses as outlined in Section 6.B.6. of this Policy Manual.

   b. National Officers are also eligible for relocation-related expenses as outlined in 5.H. above.

\*\*\*

***

# SECTION 6
## NATIONAL OFFICER SALARIES AND BENEFITS

**POLICY STATEMENT:**  The APFA recognizes the sacrifices of a flight attendant when they become a National Officer.  They relinquish a great deal of personal time to better the life of all APFA members.  Flight attendants serving in any union position are held to a higher standard by our members.  Our National Officers are, first and foremost, rank-and-file members serving the membership and as such shall be entitled to the same benefits as those afforded to our line flight attendants when they retire.

**A.   SALARIES**

1.   National Officers shall be considered salaried employees of the APFA and, as such, shall be entitled to annual salaries, payable semi-monthly.

   a.   The salary of the National President shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for a flight attendant based on 116 hours monthly.

   b.   The salary of the National Vice President shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for a flight attendant based on 110.5 hours monthly.

   c.   The salary of the National Secretary shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for a flight attendant based on 105 hours monthly.

   d.   The salary of the National Treasurer shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for a flight attendant based on 105 hours monthly.

2.   Increase in salaries shall correspond with percentage increases and any lump sum payment(s) negotiated for the most senior Flight Attendant in the employ of AAL.

**B.   BENEFITS**

1.   Vacation

   a.   National Officers shall be entitled to thirty-five (35) days of paid vacation to be taken in each fiscal year while in office or the seniority respective vacation allowance s/he is contractually entitled to as a Flight Attendant, whichever is greater.  This calculation will not be based on Article 6.H. of the Collective Bargaining Agreement referring to "trips missed."  This vacation allowance may be taken at the discretion of the National Officer, however, not more than fourteen (14) consecutive days may be taken at any one time.

   b.   National Officers should schedule their vacations so as to avoid the simultaneous absence of more than two (2) National Officers.  In no case shall the National President and the National Vice President be on vacation simultaneously.

**Black Decl. Ex. B**

c.   At the end of a fiscal year, up to fourteen (14) days of any unused APFA vacation allowance, as provided in B.1.a. above, will be paid to the National Officer at a rate prorated on the National Officer's annual salary for the period of APFA vacation allowance owed, less applicable state and federal taxes. If the National Officer is entitled to more than thirty-five (35) days vacation, up to twenty-one (21) days will be paid as stated above.

d.   At the beginning of a term, the National Officer should be paid by the Company for any vacation allowance accrued as a Flight Attendant.

e.   At the end of a term, the APFA will ensure that the departing National Officer is provided with the vacation time to which s/he would ordinarily be entitled as if the National Officer had been an active Flight Attendant for the previous and current calendar years. If the company does not provide the out-going Officer with the appropriate vacation allowance accrued for the previous and current calendar year the APFA will:

   (1)   Provide payback of accrued vacation allowance to be taken in corresponding consecutive vacation days in a block(s) that is seniority respective at his / her domicile per Article 6.I of the AA / APFA Collective Bargaining Agreement, within 13 months following the end of the applicable term; or

   (2)   The APFA will provide the departing National Officer with the appropriate Flight Attendant vacation by means of cash reimbursement at a rate prorated on the National Officer's annual salary for the period of APFA vacation allowance owed less applicable state and federal taxes..

2.   Retirement and Insurance

a.   The APFA will pay that portion of retirement and insurance normally paid by the employer if provision is made for employer payment under the applicable provisions of the Collective Bargaining Agreement covering the National Officers.

3.   Sick Time

a.   Sick Leave

   (1)   The APFA will absorb the payroll costs associated with the absence of a National Officer due to minor illness or injury for up to eighteen (18) cumulative days per year.

b.   Short Term Disability

   (1)   The APFA will absorb the payroll costs associated with the absence of a National Officer due to an incapacitating illness or injury for up to thirty (30) consecutive days.

c.   Long Term Disability (LTD)

   (1)   Long Term Disability is defined as any medical absence in excess of thirty (30) consecutive days.

**Black Decl., Ex. B**

(2)   Any National Officer in a disability status shall be paid LTD pay protection by the APFA in accordance with the following schedule:

    (a)   Full pay for the first thirty (30) days,

    (b)   three-quarters (3/4) monthly average of annual salary for the second thirty (30) days,

    (c)   One-half (½) monthly average of annual salary for the third thirty (30) days and thereafter, until a vacancy is declared and the National Officer position is filled.

(3)   LTD pay protection shall begin after a thirty (30) consecutive day absence, pursuant to B.3.b. above.

(4)   All National Officers shall be required to obtain LTD Insurance during their terms of office. If available, such insurance should be obtained through the Company. If such insurance is not available through the Company, comparable insurance shall be obtained elsewhere. The APFA will absorb the costs of LTD Insurance premiums for those individuals.

(5)   LTD pay protection shall be offset by any APFA-funded LTD insurance benefits, State Disability or Worker's Compensation benefits received by the National Officer.

(6)   Prior to a National Officer completing one hundred and twenty (120) days of LTD, the Executive Committee shall review the circumstances of the absence and recommend to the APFA Board of Directors whether a vacancy should be declared for the position.

d.   Offset / Loss of Sick Time

(1)   At the end of each fiscal year, the APFA will provide each National Officer a lump sum payment to offset the loss of Company sick time that would otherwise have been credited to his / her Company sick bank account.

    (a)   The lump sum payment will be calculated according to the following formula: Annual salary divided by 365 days (daily rate), multiplied by twelve (12) days per year.

    (b)   The yearly lump sum payment will be reduced by the daily rate cash value of one (1) day for each day used as a result of being on LTD status during that year and / or for each day used after the eighteen (18) cumulative days of sick leave during that year have been taken.

✶✶✶

APPX. 0058

# SECTION 7
## BUDGET / FINANCIAL POLICIES

**POLICY STATEMENT:** In furtherance of the objectives of the APFA the Board of Directors hereby adopts the following policies and procedures as a means of protecting the assets of the APFA by ensuring the use of sound budgetary practices.

### A.    COMPOSITION OF THE APFA BUDGET COMMITTEE

1.    There shall be a minimum of four (4) permanent members of the Budget Committee.

2.    The National Treasurer will chair the Committee and will be counted as a permanent member.

3.    The Board of Directors will, in accordance with Article IX of the APFA Constitution, nominate and appoint the Budget Committee at the Annual Convention.

4.    The National Treasurer may retain an accounting professional to assist and advise the Budget Committee.

### B.    RESPONSIBILITIES OF THE APFA BUDGET COMMITTEE

1.    The Budget Committee will meet annually to review the financial status of the APFA and to prepare a proposed annual budget.

2.    Not less than one-hundred and twenty (120) days prior to the end of the fiscal year, the National Treasurer shall prepare and send a Budget Request Form to each National Officer, Base President and National Chair or the heads of committees or departments, as appropriate, to solicit requests for the following year's appropriations.

3.    The proposed annual budget must be completed and forwarded to the Executive Committee and the Board of Directors no less than thirty (30) days prior to the scheduled date of the Annual Convention.

4.    The Budget Committee may meet periodically to review and propose adjustments to the budget as well as assist the National Treasurer in the preparation of the quarterly report pursuant to Article III, Section 6.E.(8) of the APFA Constitution.

### C.    "LETTING" OF CONTRACTS

1.    In addition to the budgetary approval of the Board of Directors, a single expenditure estimated to exceed $25,000, excluding payloss and other normal operating expenditures, shall require prior approval by the Executive Committee. Contracts for such expenditures shall be awarded following a sealed bid process.

2.    Members may be given preference in the "letting" of contracts provided they meet all specified requirements and qualifications being sought.

### D.    SEEKING UNIONIZED PURCHASES / SERVICES

1.  The APFA will support its fellow union brothers and sisters by seeking business purchases and services by those companies whose workers are represented by labor unions. Preference will be given to such companies. However, competency, quality, and cost will be considerations. If no such companies are available, the APFA may seek other choices in their purchases and services.

## E.  NEPOTISM / CONFLICT OF INTEREST

1.  It is in the best interest of the APFA to avoid the potential of perceived or actual improprieties and conflicts of interests between the Flight Attendants, representatives and employees of the APFA and the vendors with whom the Union does business. To this end, the following policy is established:

   a.  When entering into agreements for goods and / or services, the appropriate Officer, or his / her designee, shall ask prospective vendors whether they have relatives or domestic partners who are APFA Flight Attendants, representatives or employees of the APFA, or employees of AAG or any of its subsidiaries.

   b.  Should a vendor who is related to or is a domestic partner of an APFA Flight Attendant, representative or employee of the APFA, or an employee of AAG or any of its subsidiaries, be retained to provide goods and / or services to the Union, the contracting Officer shall promptly advise the remaining members of the Executive Committee.

   c.  Any vendor discovered to have falsified information concerning his / her relationship with an APFA Flight Attendant, representative or employee of the APFA, or an employee of AAG or any of its subsidiaries, shall be subject to termination of his / her contract with the Union.

2.  It is also in the best interest of the APFA to avoid the potential of perceived or actual improprieties and conflicts of interests between APFA Representatives and his / her spouse, domestic partner and / or family member. Under no circumstances shall any representative, in this position, provide sole approval for any APFA financial expenses.

## F.  BALANCED BUDGET

1.  Pursuant to the requirements of Article IV, Section 4. D. of the APFA Constitution, the National Treasurer should recommend adjustments to the annual budget so as to maintain at all times a balanced budget.

2.  When a base budget is exceeded by twenty percent (20%) for a three (3) month period, the overage will be reported to the Budget Committee. The Base President will make every effort to bring their budget back in line in a three (3) month period.

3.    When a headquarters budget is exceeded by twenty percent (20%) for a three (3) month period, a detailed explanation of the overage from the representative in charge of the respective budget will be reported via Board Packet to the Budget Committee, the Board of Directors and the Executive Committee.

4.    The National Treasurer will be the designated National Officer to report the General and Administrative budget.

5.    Pursuant to the requirements of Article III, Section 4.K.(15)b. of the APFA Constitution, the Executive Committee is deemed to be given prior approval by the majority of voting Board of Directors to reduce base budgets by not more than ten percent (10%) under the following circumstances:

    a.    Year-To-Date dues / fees revenue has not met budgeted revenue projections;

    b.    All APFA departments, committees and functions will be subjected to an equal budget reduction, on a percentage basis;

    c.    Such budget reduction is equal to and not more than, on a percentage basis, the actual reduction in projected revenue, adjusted to account for fixed costs which cannot be reduced; and

    d.    The notification requirements of Article III, Section 4.K.(15) are met.

**G.    FINANCIAL STATEMENTS**

1.    Financial records may be accessed for viewing by members through their Base President or through the Office of the National Treasurer. These records are not for publication or distribution and are deemed confidential. No copies of financial statements or audits, other than those sent to the Board of Directors, Executive Committee and National Chairs, shall be distributed. The only exception to this section is that the annual audit may be published in whole or in part on the "members only" section of the APFA website. In addition, the "members only" section of the website may contain information on the financial status of the Union.

**H.    INSTITUTIONAL STOCK**

1.    The Association will maintain two hundred (200) shares of Company stock for institutional purposes whenever such stock is available. The future utilization of this stock will be directed by the APFA Board of Directors, as to be in the best interest of the APFA.

**I.    EQUITY CLAIM DECISION**

1.    The APFA Board of Directors will determine a process to sell, trade or exercise stock options that are awarded to APFA and the allocation of funds if appropriate.

✱✱✱
**APPX. 0061**

# SECTION 17
## ARTICLE VII ADMINISTRATIVE POLICIES AND PROCEDURES

**POLICY STATEMENT:** In furtherance of the objectives of the APFA, the Board of Directors hereby adopts the following policy for the governance of administrative procedures for hearings conducted under Article VII of the APFA Constitution.

### A.   FILING OF CHARGES

1.   When charges have been filed in accordance with Article VII, Section 2. of the APFA Constitution, the parties must be notified by registered mail, return receipt requested. If the letter is not claimed by the addressee, this, nevertheless, shall be deemed sufficient notice of the proceedings.

### B.   EXECUTIVE COMMITTEE REVIEW OF CHARGES

1.   Refer to the APFA Constitution, Article VII, Section 3.

### C.   APPEAL WHEN CHARGES DISMISSED BY EXECUTIVE COMMITTEE

1.   The dismissal of charges deemed invalid by the Executive Committee, pursuant to Article VII, Section 3.D., because they address conduct protected by the APFA Bill of Rights and / or law, or fail to state a proper claim, may be appealed to the Arbitrator within seven (7) calendar days from the time that the accuser receives notice of the Executive Committee's dismissal.

2.   The appeal shall be made in writing and sent to the National Secretary who shall forward it to the Arbitrator and send a copy to the accused.

3.   The accused shall have fourteen (14) calendar days to respond to the appeal in writing.

4.   The response shall be sent to the National Secretary, who shall forward it to the Arbitrator and send a copy to the accuser.

### D.   RETIREMENT OF ONE OF THE PARTIES

1.   If a charged member retires while the charge is pending, the charge will be administratively dismissed.

2.   If the member who filed the charge retires while the charge is pending, the charge will be administratively be dismissed.

### E.   SETTING THE DATE, TIME AND LOCATION OF THE HEARING

1.   After the Executive Committee determines that the charges are timely and specific and the Executive Committee or the Arbitrator determines that the charges are valid, the National Secretary shall set the date, time and place of the hearing.

2.   At least thirty (30) days in advance of the hearing, the National Secretary shall mail the accused, the accuser and the Arbitrator notice of the date, time and place of the hearing along with a copy of the charges.

APPX. 0062

**F.   MOTIONS**

1.  Motions may be based on untimeliness, lack of specificity, failure to state a violation, or claiming that the conduct that is furnishing the basis for the charges is protected.

2.  Motions to dismiss

   a.  Motions to dismiss, which are filed pursuant to Article VII, Section 6.C., D. and / or F. of the APFA Constitution, wherein the accused makes the claim that the charges were untimely, do not allege a violation cognizable as charges, are not sufficiently specific, and / or that the conduct furnishing the basis for the charges are protected by the APFA Bill of Rights and / or law, shall be submitted in writing to the National Secretary within fourteen (14) calendar days following the Executive Committee's determination that the charges are timely, specific and valid.

   b.  The National Secretary shall forward such motion or motions to the Arbitrator and send a copy to the accuser.

     (1)  The accuser shall have fourteen (14) calendar days to respond in writing to such motion or motions.

     (2)  The response shall be sent to the National Secretary who shall forward it to the Arbitrator and send a copy to the accuser.

3.  Motions for Summary Dismissal

   a.  Motions for summary dismissal filed under Article VII, Section 6.E. of the APFA Constitution by either party to the charges must be filed in writing with the National Secretary no later than fourteen (14) calendar days before the date of the hearing.

   b.  Upon receipt, the National Secretary shall, immediately, forward the motion to the Arbitrator and the other party(ies).

     (1)  A response may be filed with the National Secretary no later than seven (7) calendar days before the hearing.

     (2)  The response shall be sent to the National Secretary who shall forward it to the Arbitrator and send a copy to the moving party.

4.  Other Motions

   a.  The time limit requirements for motions, not specifically detailed herein, shall be left to the discretion of the Article VII Arbitrator.

5.  Timeliness of Motions

   a.  Nothing herein shall restrict the Article VII Arbitrator's authority to extend the time limit requirements of any motion, so long as all parties are promptly advised of such extension.

**G.   EXCHANGE OF DOCUMENTS AND WITNESS LISTS**

1.   Not later than thirty (30) calendar days prior to the scheduled date set for the hearing, the representatives designated by the accused and the accuser shall exchange all documents they intend to enter in support of their respective positions and make available, in writing, the names of all witnesses they intend to summon whom they deem necessary to the dispute.

2.   The parties have a duty to exchange any changes, alterations and / or additions to the document and witness lists promptly throughout the thirty (30) days preceding the hearing.

3.   Nothing, herein, shall require the representative of either party to present the aforementioned documents or to summon the aforementioned witnesses during the course of the hearing.

4.   The exchange of documents and witness lists shall be coordinated through the Office of the National Secretary.

**H.   STENOGRAPHIC RECORD**

1.   The National Secretary shall make arrangements for a stenographer to be present at the hearing.

2.   The transcript shall be the official record of the proceeding and shall be made available to the Arbitrator.

3.   Parties who request a copy of the transcript are responsible for paying their share of the costs of such record.

**I.   ATTENDANCE AT HEARINGS**

1.   Members in good standing of the APFA are entitled to attend hearings.

2.   The Arbitrator may exclude any witness or witnesses, other than a party or other essential person during the testimony of other witnesses.

3.   The Arbitrator shall determine whether any other person may attend the hearing.

**J.   ADJOURNMENTS**

1.   The Arbitrator, when there is good cause, may adjourn or postpone the hearing upon the request of a party or on the Arbitrator's own initiative.

**K.   ORDER OF PROCEEDINGS**

1.   The Arbitrator shall determine how the case can best be presented so that all parties have a fair opportunity to contest the issues.

2.   The Arbitrator shall afford each party a full opportunity for the presentation of relevant proof.

**L.   OATHS**

     1.    All witnesses are required to testify under oath.

**M.    HEARING IN THE ABSENCE OF A PARTY**

     1.    The hearing may proceed in the absence of any party, who, after due notice, fails to be present or fails to obtain an adjournment.

     2.    The Arbitrator may not issue a decision based solely on the default of a party.

     3.    The Arbitrator shall require the other party to submit such evidence as may be required to make an award.

**N.    EVIDENCE**

     1.    The parties may offer such evidence as they desire and shall produce such additional evidence as the Arbitrator may deem necessary to an understanding and determination of the dispute.

     2.    The Arbitrator may subpoena witnesses and documents independently or upon the request of any party.

     3.    The Arbitrator shall be the judge of the relevancy and materiality of the evidence offered and conformity to the legal rules of evidence shall not be necessary.

     4.    Where possible the parties should stipulate to facts and circumstances which are not in dispute.

**O.    INITIAL COSTS OF PROCEEDINGS**

     1.    The Board of Directors interprets Article VII, Section 7.A. of the APFA Constitution to include the following costs and expenses:

          a.    Reasonable and ordinary costs associated with administering the proceedings, i.e. telephone, postage, copying, etc.;

          b.    The costs associated with obtaining the official transcript of the proceedings,

          c.    The fees and expenses of the Article VII Arbitrator;

          d.    The costs associated with providing the hearing room; and

          e.    Trip removal costs and expenses associated with the attendance of the accused, his / her representative, the accuser and his / her representative.

     2.    The payment of attorney fees and expenses, and expenses associated with the attendance of any witnesses, are specifically excluded.

**P.    FINAL ARGUMENTS**

     1.    The parties may submit oral arguments at the conclusion of the evidentiary hearing or written arguments at a time specified by the Arbitrator.

**Q.    REOPENING THE HEARING**

1.   At any time prior to the issuance of the Arbitrator's decision, a hearing may be reopened.

   a.   A hearing may be reopened only upon the showing of good cause.

**R.   RELEASE OF DOCUMENTS FOR JUDICIAL PROCEEDINGS**

1.   At the time the Arbitrator issues a decision, the Arbitrator shall forward all documentary evidence offered at the hearing and the official transcript to the National Secretary.

2.   The National Secretary shall, upon the written request of a party, furnish the party with copies of any documentary evidence that may be required in judicial proceedings related to the hearing.

3.   The party making this request shall bear the costs of copying the documents.

**S.   COMMUNICATION WITH THE ARBITRATOR**

1.   There shall be no ex parte communications between the parties and the Arbitrator.

2.   All communications shall be directed to the National Secretary for distribution to the opposing party and the Arbitrator, unless there is an advance agreement to allow direct mailing.

3.   If the parties agree to use direct mailing, they shall mail to all parties and to the National Secretary copies of all correspondence sent to the Arbitrator.

4.   The mailing of copies shall be indicated by a "cc" notation under the signature in the letter or the cover letter for another document sent to the Arbitrator.

**T.   SUSPENSION OF AN OFFICER OR ELECTED REPRESENTATIVE DURING THE PENDENCY OF CHARGES**

1.   When an officer or elected representative who is suspended by the Board of Directors demands an expedited resolution of the charges, pursuant to Article VII, Section 4.B. of the APFA Constitution, the National Secretary shall notify the Arbitrator and the accuser by telephone of the demand and subsequently send a confirming letter.

2.   All parties shall cooperate in doing whatever is necessary to expedite the resolution of the charges.

**U.   INTERPRETATION AND APPLICATION OF RULES**

1.   The Arbitrator shall interpret and apply these rules.

**V.   PROCEDURES FOR FILING OF COMMENTS BY INTERESTED PARTIES**

1.   Interested parties may file written comments on motions to dismiss, motions for summary dismissal and at the conclusion of the evidentiary hearing.

2.   Unless other arrangements have been agreed to in advance, interested party comments should be submitted to the National Secretary for distribution to the parties during the time for response to a motion or within the time specified by the Arbitrator for his / her written argument.

APPX. 0067

**Black Decl Ex C5**
**Thursday, November 19, 2020 at 09:11:51 Central Standard Time**

**Subject:** (none)
**Date:** Wednesday, November 18, 2020 at 6:27:00 PM Central Standard Time
**From:** melchinery@aol.com
**To:** National Secretary
**CC:** National President, National Vice President, National Treasurer, hussar.michelle@dol.gov, sel27995@gmail.com

Please consider this the formal filing of internal charges in accordance with Article VII 2. A. of the APFA Constitution and other Policy Manual violations against former APFA President Bob Ross.

After years of being denied the ability to view the underlying financial documentation of the Bob Ross administration, we were finally permitted to see specific documents that prove a plethora of violations of the APFA Policy Manual as well as Constitutional violations. Our ability to see these documents started on September 24, 2020. However, after 16 hours over two days, we still have not seen half of the documentation requested. Due to a lack of access to available dates to continue our investigation, we are forced to file on what has been uncovered due to time limits. We will undoubtedly have to file further Article VII charges.

The violations include many general violations of the constitution and policy manual as well as specific sections listed later in these charges.

Article VII Section 1.F: Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Policy Manual.

Article II Section 2: Obligations of members:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

Article I Section 7: Definitions (for clarification of the above violations)

E. "Duty" means an obligation of performance, care, or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

M: "Privilege" means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.

O. "Responsibility:" means an obligation to answer for a duty to act or failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

Q. "Rights" means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

**Violation: Misuse of Credit Card**

Bob Ross took advantage of many of the policies that govern how an APFA National Officer gets paid. The first of the most prevalent violations are the misuse of the APFA credit card that is issued to each of the National Officers. As is dictated by Federal law as well as APFA policy, the credit card is for business expenses, not for personal use. We have found examples of Mr. Ross charging the rental of a moving truck on August 2016 to the APFA, after being reimbursed for moving his belongings from Sacramento. There are other examples of his purchasing sheets, blankets, pillows, mattresses, furniture as well as smaller items such as toilet paper and candy. All of these items as well as many other personal items, such as tools, were purchased with the union credit. None of the items were inventoried with the Treasurer and none were returned to the APFA upon the cessation of his term of office. Furthermore, as Mr. Ross elected to relocate to the DFW area and was afforded a moving expense reimbursement, he was not entitled to buy any furnishings using APFA funds

These purchases violate Policy Manual Section 5 G: Business related expenses:

Actual out-of- pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member , but to compensate him /her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.

**Violation: Rental Car**

It was also recently found in our investigation that Mr. Ross also used the APFA to direct bill a rental car when he initially relocated to the Dallas area. He had charged the APFA for mileage per the relocation language in the Policy Manual after driving his personal car from Sacramento to Dallas in early July, 2016. The rental agreement spanned six months, from May to October, 2016 and APFA was billed at least $6230. Ross continued to have a rental car for more than 3 months after his car was in DFW.

• Policy Manual Section 5.H. Relocation states:

>4.  In addition to H.2 or H.3 above, the APFA will reimburse a National Officer/Chair for the cost of relocating one (1) personal automobile to/from the DFW area.  Such reimbursement will be either for actual shipping charges or the applicable mileage rate by the APFA Board of Directors.

**Violation: Reimbursement**

Additionally,  Mr. Ross claimed the mileage reimbursement on his APFA monthly expense form.  Per federal law, the purpose of the mileage reimbursement is to compensate for the wear and tear on the automobile used for business purposes.  Since APFA was paying for the rental car during this period, it would seem Ross was inappropriately billing APFA for wear on the rental car.  Additionally, the bylaws make clear that travel from a personal residence to an APFA office is limited to 31  days.

Section 5.G: Other Expenses:

>b. (1) a. Mileage:

>2.  Mileage shall not be reimbursed for travel between the representatives' residence and an APFA office that has been provided for the primary use of the representative for a period in excess of 31 days.

**Violation:  SAF/MEA and meal expenses**

The following is another large subsection of abuse involving the SAF/MEA sections of Section 5:  Trip Removal and Expense Policy.  The intent of the policy is outlined in the policy statement.
Policy Manual Section 5: Trip removal and Expense Policy:
.....Financial policies herein are structured to diminish any financial penalty that a member may incur as a result of providing Union services to Flight Attendants.  It is not the intent of this policy for any individual to experience financial gain.

As stated earlier, Mr. Ross used the APFA credit card for his own personal use.  In the brief time we were allowed to look over the APFA credit card statements, there were an excessive amount of meals charged on the credit card by Mr Ross. It was referenced multiple times that the participants at these meals were the National Officers, the Officers and their Regional Representatives, as well as when Bob Ross ate alone.

This violates Section 5.F:

>5.  Business Related Expenses:

>a. Representatives are authorized to pay for and to be reimbursed for the meal, snack, or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

>1.  Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense.  Abuse, as determined by the Executive Committee, may lead to the limitation and revocation of this privilege.

>2.  In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.

**Violation: Payout of Vacation--Change of formula to include MEA and SAF**

Another abuse of power was demonstrated when the long standing formula used for the vacation and sick time payout was changed during the Bob Ross administration.  This was not an official change in the Policy Manual; it was changed in practice by the previous Treasurer in the Ross administration Eugenio Vargas. The result was to pay the National Officers in the Ross administration money they were not entitled to according to Policy Manual language. Quite simply, it included MEA and SAF as well as the office stipend in with wages when considering the reimbursement of sick and vacation time.  This embezzlement was uncovered when the pay for the Vice President, Secretary and Treasurer was looked at more closely by the next administration long after the Ross administration had left office.

However, only when we were allowed to look at the financial records within the last was it discovered that the fourth recipient of these "overpayments" was in fact Bob Ross.  We had previously been told repeatedly Ross did not receive it.  The three National Officers were required to pay this windfall back to the Union, but to this day, Mr.Ross has not been required to do so.

This action violates Policy Manual Section 5.E.4:  SAF rates and 5.F.1:  Meal Expense Allowance (MEA)

>a. Daily SAF:

>(1) If a Representative performs work for the APFA, and it is not otherwise paid for that day's work by means of an APFA Paid Trip Removal.......such representative shall receive the Daily SAF for work performed in accordance with the following schedule....

**Black Deel Ex. C**

a.  Per Diem Rate (Accountable Plan)

(1) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA…..

Also required for the purposes of calculating how much Special Assignment Fee (SAF) an officer receives, it is imperative that the officer fill out the required weekly paperwork that would ascertain how many hours were worked for the APFA.

The intent of the SAF is explained in Section 5.E.1.

a. The intent of the SAF is to offer payment to the representatives for the days that they conduct APFA business in excess of their normal scheduled bid line.

Calculation for the National Officers' SAF is specifically delineated in Section 5.E.4.c.

c. National Officers and Regional Representatives:  $400 minimum, but not to exceed $500 maximum.

Section 5.F.c.  also clarifies that MEA is also calculated and not just considered salary:

The maximum "Actual MEA at Residence" that will be reimbursed  shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.

As is evident in the language, the weekly activity sheets must be the reference to what the officer should make.  It is clear the language did not automatically award a National Officer these payments of MEA and SAF without verification of hours worked.

Bob Ross frequently did not fill out the weekly forms to collect this money, therefore was in violation of Section 5.I:  Submission of Expense Reports:

1.  All expense forms must be submitted to the APFA National Treasurer on APFA expense report forms.

a. Requests for SAF as provided in 5.E. above, and "Guaranteed MEA at Residence" as provided in F.3. above must be claimed on the weekly activity Report Form.


**Violation:  Maintaining an Office.**

Following in the same vein of payments that Bob Ross collected which he was not entitled to as a part of his salary, is Section 5.E.3: Maintaining an Office Outside of Residence:

(a) a National Officer, Regional Representative, National Chair, Base President, and/or Base Vice President, JCBA Specialist or Strategic Communications Specialist who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred and fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.

Mr. Ross did not maintain an office outside his residence.  The main APFA office is maintained by the APFA, NOT by Mr. Ross.  No part of the building is his responsibility to maintain; therefore he requested compensation that is not due to him.


**Violation:  Payout of Vacation Days.**

The Policy Manual is also clear on the yearly payout of vacation days.

Section 6:  National Officer Pay and Benefits

B.1:  Vacation

c.  At the end of a fiscal year, up to fourteen (14) days of any unused APFA vacation allowance…..will be paid to the National Office at a rate prorated on the National Officers' annual salary for the period of APFA vacation allowance owed.


In the year of 2017, the documentation showed that Bob Ross was paid out for seventeen (17) days of vacation, three (3) days above what is allowed per the Policy.  It was also unclear if he was paid another stipend of vacation pay of 35 days for his "end of term payout" in2017.  Mr. Ross was paid out for 29 days of "unused vacation" and 20.44 days for the "end of term" for 2018.  How is it possible to get two "end of term" vacation payouts two years in a row?  There is also some question as to whether Mr. Ross was paid at his annual salary level for his vacation payout, as dictated by the APFA Policy Manual.


**Violation:  Buyout**

As has been recently revealed, former President Bob Ross received a"buyout" from the APFA Board of Directors, and was compensated for leaving office.  Indeed, he collected more money than if he had remained in office for the four (4) months left in his term. However,

**Black Decl. Ex. G**

once Mr. Ross left office, he asked for and collected from the APFA compensation in two forms he was not entitled to per the"agreement." One form of compensation which he received every month was MEA and SAF and Maintaining an Office Outside Residence.  Mr. Ross continued to collect one thousand and fifty dollars ($1050) a month.

He collected these payments for the months of:  March, April, May, June and July of 2018. This stipend is clearly hinged on reimbursement related to work and not part of the National Officer salary.  To accept this money is in clear violation of the intent of the Policies written that allows a representative extra compensation for working hours above and beyond their scheduled workload.  By taking this money this is another violation of the Section 5 policies outlined above.


**Remedy**


The relief sought in this multitude of offenses that all were designed to inflate pay and benefits that Mr. Ross received are the following:

1. An independent forensic audit must be accomplished to verify how much was fraudulently siphoned from the APFA payroll, and Mr. Ross must pay this money back.

2. Mr. Ross must be considered a member in bad standing and barred from representing American Airlines Flight Attendants for a period of 10 years.

3. There must be changes to the Policy Manual so that this amount of financial malfeasance is not allowed to happen again.

4. There must be a separate body of trained individuals that do not hold regular positions with the APFA that can oversee the annual audit.

5. The APFA credit card must have independent oversight as to whether the charges are reimbursable or appropriate pre the APFA Constitution, and Federal Law.  This oversight must go beyond the                     National Officers, as they have a vested interest in allowing inappropriate charges to be paid.

6. There should be yearly training in the LMRDA added to the continuing education of APFA officers.

7. This award must be disseminated to the line flight attendants with an explanation to encourage oversight of their dues dollars.

8. Any and All Other Relief deemed necessary.


Melissa Chinery LAX
Sandra Lee LAX

**Black Decl. Ex. D**

**Liz Marko**

| | |
|---|---|
| **From:** | melchinery@aol.com |
| **Sent:** | Friday, November 20, 2020 10:47 AM |
| **To:** | National Secretary |
| **Cc:** | National President; National Vice President; National Treasurer; hussar.michelle@dol.gov; sel27995@gmail.com |
| **Subject:** | Vargas Charges |

Please consider this the formal filing of internal charges in accordance with Article VII 2. A. of the APFA Constitution and other Policy Manual violations against former Treasurer Eugenio Vargas.

After years of being denied the ability to view the underlying financial documentation of the Bob Ross administration, we were finally permitted to see specific documents that prove a plethora of violations of the APFA policy Manual as well as Constitutional violations.  Our ability to see these documents started on September 24, 2020.  However, after 16 hours over two days, we still have not seen half of documentation requested. Due to a lack of access to available dates to continue our investigation, we are forced to file on what has been uncovered due to time limits.

In addition to the specific sections of the Constitution and Bylaws, Vargas violated the following general duties.

Article VII Section 1.F:

> Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Policy Manual.

## Article II Section 2: Obligations of members:

> Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution.  Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein.  Inherent in the rights, privileges, duties and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

Article I Section 7: Definitions (for clarification of the above violations)
> E. "Duty"  means an obligation of performance, care, or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.
> M:  "Privilege" means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.
> O. "Responsibility:" means an obligation to answer for a duty to act or failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.
> Q. "Rights" means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

**Violation: Credit Card Expenses**

As is dictated by Federal law as well as APFA policy, the credit card is to be used for business expenses, not for personal use.  Mr. Vargas charged a rental car for the week at a cost of almost $700 when he was on vacation in Madrid, Spain.  It was confirmed by the present National Treasurer that Mr. Vargas was indeed on vacation when the charges occurred on August 11, 2016.  He also charged meals on at least two other trips to Madrid.

   These purchases violate:

>   Policy Manual Section 5 G:  Business related expenses:  Actual out-of- pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy.  In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him /her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.

>    Article VII Section 1.F:  Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Policy Manual.

**Violation: Meal Expenses**
The following is another large subsection of abuse involving the SAF/MEA sections of Section 5:  Trip Removal and Expense Policy.   The intent of the policy is outlined in the policy statement.  Policy Manual Section 5: Trip removal and Expense Policy:  …..Financial policies herein are structured to diminish any financial penalty that a member may incur as a result of providing Union services to Flight Attendants.  It is not the intent of this policy for any individual to experience financial gain.

As stated earlier, Treasurer Vargas used the APFA credit card for his own personal use.  In the brief time we were allowed to look over the APFA credit card statements, we uncovered many meals charged by Vargas that did not meet the requirements of the meal provisions of the APFA policy manual.  Vargas charged meals where he was the only identified person or the other participants were also being paid MEA. The policy is clear that meals may only be reimbursed on rare and limited occasions when entertaining outside guests and in no instance where all participants are already receiving meal expenses.  This is to prevent double dipping by having APFA pay MEA for meal expenses and then also pay for a representative's meals.    This violates Section 5.F:

>   5.  Business Related Expenses:
>      a. Representatives are authorized to pay for and to be reimbursed for the meal, snack, or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

>>      1.   Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense.  Abuse, as determined by the Executive Committee, may lead to the limitation and revocation of this privilege.
>>      2.  In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.

**Violation of Duties as Treasurer.**

As National Treasurer Vargas had a duty to safeguard APFA funds and to ensure proper procedures were in place.  Vargas failed to ensure proper oversight of credit cards for the national officers.  In addition, Vargas allowed the National Officers to receive thousands of dollars in overpayments for sick and vacation payouts.  While other National Officers were instructed to repay the funds, Vargas claimed Bob Ross had not been overpaid.  Our recent review of the financials uncovered Ross was indeed overpaid thousands of dollars for sick and vacation payouts.

Additionally,  former President Bob Ross received a "buyout" from the APFA Board of Directors, and was compensated for leaving office.  Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining an Office Outside Residence all of which are not part of basic salary.

Finally, thousands of dollars of furniture, including furniture purchased by Vargas, is unaccounted for.  As Treasurer Vargas had an obligation under the APFA constitution and federal labor law to safeguard union property.   On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture.  There is no record or inventory of that furniture nor can the furniture be located.  The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done

The Treasurer has the responsibility to safeguard the funds of the APFA union members as outlined in Article III Section 6.E. of the APFA Constitution: Duties of the Treasurer:  The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA.

**Remedy**
The relief sought is:

1.  An independent forensic audit must be accomplished to verify how much was fraudulently siphoned from the APFA payroll, and Mr. Vargas must pay this money back.
2.  Mr. Vargas must be considered a member in bad standing and barred from representing American Airlines Flight Attendants for a period of 10 years.
3. There must be changes to the Policy Manual so that this amount of financial malfeasance is not allowed to happen again.
4. There must be a separate body of trained individuals that do not hold regular positions with the APFA that can oversee the annual audit.
5. Any and All Other Relief deemed necessary.

Melissa Chinery LAX
Sandra Lee  LAX

Sent from AOL Mobile Mail
Get the new AOL app: mail.mobile.aol.com

**APPX. 0074**



**Association of Professional
Flight Attendants**

Representing the Flight Attendants of AmericanAirlines

November 19, 2020

**VIA Return Receipt, Certified Mail #7019 1120 0000 0179 3052**

Robert Ross
4701 Hayloft Ct
El Dorado Hills, CA 95762

RE: Article VII Charges

Dear Bob:

In accordance with Article VII of the APFA Constitution this letter is to inform you that the enclosed charges have been filed against you by Melissa Chinery and Sandra Lee. Enclosed is a copy of the charges which were received on November 18, 2020.

I am also enclosing a copy of Article VII of the APFA Constitution and Section 17 of the APFA Policy Manual. These documents describe APFA's Article VII procedures.

Sincerely,

Josh Black
APFA National Secretary

Cc:     Melissa Chinery
        Sandra Lee
        APFA Board of Directors
        APFA Executive Committee
        Article VII File

**Subject:** (none)
**Date:** Tuesday, November 24, 2020 at 12:31:50 PM Central Standard Time
**From:** melchinery@aol.com
**To:** National Secretary
**CC:** Hussar.Michelle@dol.gov, National Treasurer, Sandra Lee, National Vice President, National President

Please consider this the formal filing of internal charges in accordance with Article VII 2. A. of the APFA Constitution and other Policy Manual violations against former APFA President Bob Ross.

After years of being denied the ability to view the underlying financial documentation of the Bob Ross administration, we were finally permitted to see specific documents that prove a plethora of violations of the APFA Policy Manual as well as Constitutional violations. Our ability to see these documents started on September 24, 2020. However, after 16 hours over two days, we still have not seen half of the documentation requested. Due to a lack of access to available dates to continue our investigation, we are forced to file on what has been uncovered due to time limits. We will undoubtedly have to file further Article VII charges.

The violations include many general violations of the constitution and policy manual as well as specific sections listed later in these charges.

Article VII Section 1.F: Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Policy Manual.

Article II Section 2: Obligations of members:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

Article I Section 7: Definitions (for clarification of the above violations)

E. "Duty" means an obligation of performance, care, or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

M: "Privilege" means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.

O. "Responsibility:" means an obligation to answer for a duty to act or failure to act by a person

**Black Decl. Ex. E**

in any position or fiduciary capacity with or as a member of the APFA.

Q. "Rights" means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

**Violation:  Misuse of Credit Card**

Bob Ross took advantage of many of the policies that govern how an APFA National Officer gets paid.  The first of the most prevalent violations are the misuse of the APFA credit card that is issued to each of the National Officers.  As is dictated by Federal law as well as APFA policy, the credit card is for business expenses, not for personal use.  We have found examples of Mr. Ross charging the rental of a moving truck on August 2016 to the APFA, after being reimbursed for moving his belongings from Sacramento. There are other examples of his purchasing sheets, blankets, pillows, mattresses, furniture as well as smaller items such as toilet paper and candy. All of these items as well as many other personal items, such as tools, were purchased with the union credit.  None of the items were inventoried with the Treasurer and none were returned to the APFA upon the cessation of his term of office.  Furthermore, as Mr. Ross elected to relocate to the DFW area and was afforded a moving expense reimbursement, he was not entitled to buy any furnishings using APFA funds

These purchases violate Policy Manual Section 5 G:  Business related expenses:

Actual out-of- pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy.  In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member , but to compensate him /her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.

**Violation:  Rental Car**

It was also recently found in our investigation that Mr. Ross also used the APFA to direct bill a rental car when he initially relocated to the Dallas area.  He had charged the APFA for mileage per the relocation language in the Policy Manual after driving his personal car from Sacramento to Dallas in early July, 2016.  The rental agreement spanned six months, from May to October, 2016 and APFA was billed at least $6230.  Ross continued to have a rental car for more than 3 months after his car was in DFW.

• Policy Manual Section 5.H. Relocation states:

4.  In addition to H.2 or H.3 above, the APFA will reimburse a National Officer/Chair for the cost of relocating one (1) personal automobile to/from the DFW area.  Such reimbursement will be either for actual shipping charges or the applicable mileage rate by the APFA Board of Directors.

**Violation: Reimbursement**

Additionally,  Mr. Ross claimed the mileage reimbursement on his APFA monthly expense form. Per federal law, the purpose of the mileage reimbursement is to compensate for the wear and tear on the automobile used for business purposes.  Since APFA was paying for the rental car during this period, it would seem Ross was inappropriately billing APFA for wear on the rental car.  Additionally, the bylaws make clear that travel from a personal residence to an APFA office is limited to 31  days.


Section 5.G: Other Expenses:

b. (1) a. Mileage:

2.  Mileage shall not be reimbursed for travel between the representatives' residence and an APFA office that has been provided for the primary use of the representative for a period in excess of 31 days.

**Violation:  SAF/MEA and meal expenses**

The following is another large subsection of abuse involving the SAF/MEA sections of Section 5:  Trip Removal and Expense Policy.  The intent of the policy is outlined in the policy statement.  Policy Manual Section 5: Trip removal and Expense Policy:
…..Financial policies herein are structured to diminish any financial penalty that a member may incur as a result of providing Union services to Flight Attendants.  It is not the intent of this policy for any individual to experience financial gain.

As stated earlier, Mr. Ross used the APFA credit card for his own personal use.  In the brief time we were allowed to look over the APFA credit card statements, there were an excessive amount of meals charged on the credit card by Mr Ross. It was referenced multiple times that the participants at these meals were the National Officers, the Officers and their Regional Representatives, as well as when Bob Ross ate alone.


This violates Section 5.F:

5.  Business Related Expenses:

a. Representatives are authorized to pay for and to be reimbursed for the meal, snack, or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or

Black Decl. Ex. E

meeting.

1.  Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense.  Abuse, as determined by the Executive Committee, may lead to the limitation and revocation of this privilege.

2.  In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.

**Violation: Payout of Vacation--Change of formula to include MEA and SAF**

Another abuse of power was demonstrated when the long standing formula used for the vacation and sick time payout was changed during the Bob Ross administration.  This was not an official change in the Policy Manual; it was changed in practice by the previous Treasurer in the Ross administration Eugenio Vargas. The result was to pay the National Officers in the Ross administration money they were not entitled to according to Policy Manual language.  Quite simply, it included MEA and SAF as well as the office stipend in with wages when considering the reimbursement of sick and vacation time.  This embezzlement was uncovered when the pay for the Vice President, Secretary and Treasurer was looked at more closely by the next administration long after the Ross administration had left office.

However, only when we were allowed to look at the financial records within the last was it discovered that the fourth recipient of these "overpayments" was in fact Bob Ross.  We had previously been told repeatedly Ross did not receive it.  The three National Officers were required to pay this windfall back to the Union, but to this day, Mr.Ross has not been required to do so.

This action violates Policy Manual Section 5.E.4:  SAF rates and 5.F.1:  Meal Expense Allowance (MEA)

a.  Daily SAF:

(1) If a Representative performs work for the APFA, and it is not otherwise paid for that day's work by means of an APFA Paid Trip Removal…….such representative shall receive the Daily SAF for work performed in accordance with the following schedule….

a.  Per Diem Rate (Accountable Plan)

(1) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA…..

**Black Decl. Ex. F**

Also required for the purposes of calculating how much Special Assignment Fee (SAF) an officer receives, it is imperative that the officer fill out the required weekly paperwork that would ascertain how many hours were worked for the APFA.

The intent of the SAF is explained in Section 5.E.1.

a. The intent of the SAF is to offer payment to the representatives for the days that they conduct APFA business in excess of their normal scheduled bid line.

Calculation for the National Officers' SAF is specifically delineated in Section 5.E.4.c.

c. National Officers and Regional Representatives:  $400 minimum, but not to exceed $500 maximum.

Section 5.F.c.  also clarifies that MEA is also calculated and not just considered salary:

 The maximum "Actual MEA at Residence" that will be reimbursed  shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.


As is evident in the language, the weekly activity sheets must be the reference to what the officer should make.  It is clear the language did not automatically award a National Officer these payments of MEA and SAF without verification of hours worked.


Bob Ross frequently did not fill out the weekly forms to collect this money, therefore was in violation of Section 5.I:  Submission of Expense Reports:

1.  All expense forms must be submitted to the APFA National Treasurer on APFA expense report forms.

a. Requests for SAF as provided in 5.E. above, and "Guaranteed MEA at Residence" as provided in F.3. above must be claimed on the weekly activity Report Form.


**Violation:  Maintaining an Office.**

Following in the same vein of payments that Bob Ross collected which he was not entitled to as a part of his salary, is Section 5.E.3:
Maintaining an Office Outside of Residence:

Black Decl. Ex. F

(a) a National Officer, Regional Representative, National Chair, Base President, and/or Base Vice President, JCBA Specialist or Strategic Communications Specialist who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred and fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.

Mr. Ross did not maintain an office outside his residence.  The main APFA office is maintained by the APFA, NOT by Mr. Ross.  No part of the building is his responsibility to maintain; therefore he requested compensation that is not due to him.

**Violation:  Payout of Vacation Days.**

The Policy Manual is also clear on the yearly payout of vacation days.

Section 6:  National Officer Pay and Benefits

B.1:  Vacation

c.  At the end of a fiscal year, up to fourteen (14) days of any unused APFA vacation allowance…..will be paid to the National Office at a rate prorated on the National Officers' annual salary for the period of APFA vacation allowance owed.

In the year of 2017 the documentation showed that Bob Ross was paid out for seventeen (17) days over policy limit for unused vacation. It was also unclear if he was paid another stipend of vacation pay of 35 days for his "end of term payout" in2017.  Mr. Ross was paid out for 29 days of "unused vacation" and 20.44 days for the "end of term" for 2018.  How is it possible to get two "end of term" vacation payouts two years in a row?  There is also some question as to whether Mr. Ross was paid at his annual salary level for his vacation payout, as dictated by the APFA Policy Manual.

**Violation:  Buyout**

As has been recently revealed, former President Bob Ross received a"buyout" from the APFA Board of Directors, and was compensated for leaving office.  Indeed, he collected more money than if he had remained in office for the four (4) months left in his term. However, once Mr. Ross left office, he asked for and collected from the APFA compensation in two forms he was not entitled to per the"agreement."  One form of compensation which he received every month was

**Black Decl. Ex. F**

MEA and SAF and Maintaining an Office Outside Residence.  Mr. Ross continued to collect one thousand and fifty dollars ($1050) a month.

He collected these payments for the months of:  March, April, May, June and July of 2018. This stipend is clearly hinged on reimbursement related to work and not part of the National Officer salary.  To accept this money is in clear violation of the intent of the Policies written that allows a representative extra compensation for working hours above and beyond their scheduled workload.  By taking this money this is another violation of the Section 5 policies outlined above.

**Remedy**

The relief sought in this multitude of offenses that all were designed to inflate pay and benefits that Mr. Ross received are the following:

1. An independent forensic audit must be accomplished to verify how much was fraudulently siphoned from the APFA payroll, and Mr. Ross must pay this money back.

2. Mr. Ross must be considered a member in bad standing and barred from representing American Airlines Flight Attendants for a period of 10 years.

3. There must be changes to the Policy Manual so that this amount of financial malfeasance is not allowed to happen again.

4. There must be a separate body of trained individuals that do not hold regular positions with the APFA that can oversee the annual audit.

5. The APFA credit card must have independent oversight as to whether the charges are reimbursable or appropriate pre the APFA Constitution, and Federal Law.  This oversight must go beyond the                        National Officers, as they have a vested interest in allowing inappropriate charges to be paid.

6. There should be yearly training in the LMRDA added to the continuing education of APFA officers.

7. This award must be disseminated to the line flight attendants with an explanation to encourage oversight of their dues dollars.

8. Any and All Other Relief deemed necessary.

**Black Decl. Ex. F**

Melissa Chinery LAX
Sandra Lee LAX

Sent from AOL Mobile Mail
Get the new AOL app: mail.mobile.aol.com

**Subject:** Vargas
**Date:** Tuesday, November 24, 2020 at 12:20:51 PM Central Standard Time
**From:** melchinery@aol.com
**To:** National Secretary
**CC:** National President, National Treasurer, Sandra Lee, National Vice President, Hussar.Michelle@dol.gov

Please consider this the formal filing of internal charges in accordance with Article VII 2. A. of the APFA Constitution and other Policy Manual violations against former Treasurer Eugenio Vargas.

After years of being denied the ability to view the underlying financial documentation of the Bob Ross administration, we were finally permitted to see specific documents that prove a plethora of violations of the APFA policy Manual as well as Constitutional violations.  Our ability to see these documents started on September 24, 2020.  However, after 16 hours over two days, we still have not seen half of documentation requested. Due to a lack of access to available dates to continue our investigation, we are forced to file on what has been uncovered due to time limits.

In addition to the specific sections of the Constitution and Bylaws, Vargas violated the following general duties.

Article VII Section 1.F:
Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Policy Manual.

Article II Section 2: Obligations of members:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution.  Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein.  Inherent in the rights, privileges, duties and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

Article I Section 7: Definitions (for clarification of the above violations)
E. "Duty"  means an obligation of performance, care, or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.
M:  "Privilege" means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.
O. "Responsibility:" means an obligation to answer for a duty to act or failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.
Q. "Rights" means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

**Violation: Credit Card Expenses**

As is dictated by Federal law as well as APFA policy, the credit card is to be used for business expenses, not for personal use.  Mr. Vargas charged a rental car for the week at a cost of almost $700 when he was on vacation in Madrid, Spain.  It was confirmed by the present National Treasurer that Mr. Vargas was indeed on vacation when the charges occurred on August 11, 2016.  He also charged meals on at least two other trips to Madrid.

These purchases violate:

Policy Manual Section 5 G:  Business related expenses:  Actual out-of- pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy.  In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him /her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.

 Article VII Section 1.F:  Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Policy Manual.

**Violation: Meal Expenses**

The following is another large subsection of abuse involving the SAF/MEA sections of Section 5:  Trip Removal and Expense Policy.   The intent of the policy is outlined in the policy statement.  Policy Manual Section 5: Trip removal and Expense Policy:  …..Financial policies herein are structured to diminish any financial penalty that a member may incur as a result of providing Union services to Flight Attendants.  It is not the intent of this policy for any individual to experience financial gain.

As stated earlier, Treasurer Vargas used the APFA credit card for his own personal use.  In the brief time we were allowed to look over the APFA credit card statements, we uncovered many meals charged by Vargas that did not meet the requirements of the meal provisions of the APFA policy manual.  Vargas charged meals where he was the only identified person or the other participants were also being paid MEA. The policy is clear that meals may only be reimbursed on rare and limited occasions when entertaining outside guests and in no instance when all participants are already receiving meal expenses.  This is to prevent double dipping by having

**Black Decl. Ex. G**

APFA pay MEA for meal expenses and then also pay for a representative's meals.  This violates Section 5.F:

5. Business Related Expenses:
a. Representatives are authorized to pay for and to be reimbursed for the meal, snack, or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

1.  Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense.  Abuse, as determined by the Executive Committee, may lead to the limitation and revocation of this privilege.
2.  In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.


**Violation of Duties as Treasurer.**

As National Treasurer Vargas had a duty to safeguard APFA funds and to ensure proper procedures were in place.  Vargas failed to ensure proper oversight of credit cards for the national officers.  In addition, Vargas allowed the National Officers to receive thousands of dollars in overpayments for sick and vacation payouts.  While other National Officers were instructed to repay the funds, Vargas claimed Bob Ross had not been overpaid.  Our recent review of the financials uncovered Ross was indeed overpaid thousands of dollars for sick and vacation payouts. Also, Mr Vargas overpaid Bob Ross 17 vacation days when he left office.

Additionally,  former President Bob Ross received a "buyout" from the APFA Board of Directors, and was compensated for leaving office.  Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining an Office Outside Residence all of which are not part of basic salary.

Finally, thousands of dollars of furniture, including furniture purchased by Vargas, is unaccounted for.  As Treasurer Vargas had an obligation under the APFA constitution and federal labor law to safeguard union property.   On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture.  There is no record or

inventory of that furniture nor can the furniture be located.  The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done

The Treasurer has the responsibility to safeguard the funds of the APFA union members as outlined in Article III Section 6.E. of the APFA Constitution: Duties of the Treasurer:  The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA.

**Remedy**
The relief sought is:

1.  An independent forensic audit must be accomplished to verify how much was fraudulently siphoned from the APFA payroll, and Mr. Vargas must pay this money back.
2.  Mr. Vargas must be considered a member in bad standing and barred from representing American Airlines Flight Attendants for a period of 10 years.
3. There must be changes to the Policy Manual so that this amount of financial malfeasance is not allowed to happen again.
4. There must be a separate body of trained individuals that do not hold regular positions with the APFA that can oversee the annual audit.
5. Any and All Other Relief deemed necessary.

Melissa Chinery LAX
Sandra Lee  LAX

Sent from AOL Mobile Mail
Get the new AOL app: mail.mobile.aol.com



**Association of Professional
Flight Attendants**
Representing the Flight Attendants of American Airlines

November 24, 2020

**VIA Return Receipt, Certified Mail #7019 1120 0000 0179 3182**

Robert Ross
4701 Hayloft Ct
El Dorado Hills, CA  95762

RE: Article VII Charges

Dear Bob:

In accordance with Article VII of the APFA Constitution this letter is to inform you that the
enclosed revised charges have been filed against you by Melissa Chinery and Sandra Lee.
Enclosed is a copy of the charges which were received on November 24, 2020.

I am also enclosing a copy of Article VII of the APFA Constitution and Section 17 of the APFA
Policy Manual. These documents describe APFA's Article VII procedures.

Sincerely,

Josh Black
APFA National Secretary

Cc:    Melissa Chinery
       Sandra Lee
       APFA Board of Directors
       APFA Executive Committee
       Article VII File

**Black Decl., Ex. 1**



**Association of Professional Flight Attendants**

Representing the Flight Attendants of American Airlines

November 24, 2020

**VIA Return Receipt, Certified Mail #7019 1120 0000 0179 3120**

Eugenio Vargas
1616 Brookhaven Cir
Bedford, TX  76022

RE: Article VII Charges

Dear Eugenio:

In accordance with Article VII of the APFA Constitution this letter is to inform you that the enclosed revised charges have been filed against you by Melissa Chinery and Sandra Lee. Enclosed is a copy of the charges which were received on November 24, 2020.

I am also enclosing a copy of Article VII of the APFA Constitution and Section 17 of the APFA Policy Manual. These documents describe APFA's Article VII procedures.

Sincerely,

Josh Black
APFA National Secretary

Cc:    Melissa Chinery
       Sandra Lee
       APFA Board of Directors
       APFA Executive Committee
       Article VII File



**APPX. 0089**

# APFA

## EXECUTIVE COMMITTEE MEETING

### 3Q20 EC MEETING
December 1-2, 2020
APFA Unity Pays Conference Room
Euless, TX

| Resolution Tally Sheet | | |
|---|---|---|
| | Resolution #: | 4 |
| | Maker: | Black |
| | Second: | Harris |
| | Date: | 12/01/2020 |
| | Time: | 11:51 a.m. |

Resolution Name: Chinery-Lee v Ross - Timely

| YES | = | Yes | ABS | = | Abstain | PXY | = | Proxy Vote |
|---|---|---|---|---|---|---|---|---|
| NO | = | No | N/A | = | Absent | REC | = | Recuse |
| PASS | = | Pass | | | | | | |

COMMENTS:

| | Watson | Gluth | Conners | Seelye | Hancock | Treasurer | Secretary | Vice President | President |
|---|---|---|---|---|---|---|---|---|---|
| YES | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| NO | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PASS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ABS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| N/A | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PXY | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| REC | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES:   9      NO:   0      ABSTAIN:   0      ABSENT:   0

Status:   Passed ☒      Failed ☐      Tabled ☐      Withdrawn ☐      Show of Hands ☐

**WHEREAS**, on November 18, 2020, Melissa Chinery and Sandra Lee filed charges against Bob Ross under Article VII of the APFA Constitution; and

**WHEREAS**, Article VII, Section 3 of the APFA Constitution provides that the Executive Committee shall review Article VII charges for timeliness, and

**WHEREAS**, the Executive Committee has conducted that review.

**BE IT THEREFORE RESOLVED**, that Melissa Chinery's and Sandra Lee's November 18, 2020 charges against Bob Ross are timely.

Black Decl. Ex. J

# APFA

## EXECUTIVE COMMITTEE MEETING

### 3Q20 EC MEETING
December 1-2, 2020
APFA Unity Pays Conference Room
Euless, TX

| Resolution Tally Sheet | |
|---|---|
| Resolution #: | 5 |
| Maker: | Black |
| Second: | Salas |
| Date: | 12/01/2020 |
| Time: | 1:45 p.m. |

Resolution Name: Chinery-Lee v Ross - Specific

| YES | = | Yes | ABS | = | Abstain | PXY | = | Proxy Vote |
|---|---|---|---|---|---|---|---|---|
| NO | = | No | N/A | = | Absent | REC | = | Recuse |
| PASS | = | Pass | | | | | | |

COMMENTS:

| | Watson | Gluth | Conners | Seelye | Hancock | Treasurer | Secretary | Vice President | President |
|---|---|---|---|---|---|---|---|---|---|
| YES | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| NO | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PASS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ABS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| N/A | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PXY | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| REC | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES:   9     NO:   0     ABSTAIN:   0     ABSENT:   0

Status:   Passed ☒     Failed ☐     Tabled ☐     Withdrawn ☐     Show of Hands ☐

**WHEREAS**, on November 18, 2020, Melissa Chinery and Sandra Lee filed charges against Bob Ross under Article VII of the APFA Constitution; and

**WHEREAS**, Article VII, Section 3 of the APFA Constitution provides that the Executive Committee shall review Article VII charges for specificity, and

**WHEREAS**, the Executive Committee has conducted that review.

**BE IT THEREFORE RESOLVED**, that Melissa Chinery's and Sandra Lee's November 18, 2020 charges against Bob Ross are specific.

**APPX. 0091**

# APFA

## EXECUTIVE COMMITTEE MEETING

### 3Q20 EC MEETING
December 1-2, 2020
APFA Unity Pays Conference Room
Euless, TX

| | |
|---|---|
| **Resolution #:** | 6 |
| **Maker:** | Black |
| **Second:** | Harris |
| **Date:** | 12/01/2020 |
| **Time:** | 1:47 p.m. |

*Resolution Tally Sheet*

**Resolution Name:** Chinery-Lee v Ross - Valid

| YES | = *Yes* | ABS | = *Abstain* | PXY | = *Proxy Vote* |
|---|---|---|---|---|---|
| NO | = *No* | N/A | = *Absent* | REC | = *Recuse* |
| PASS | = *Pass* | | | | |

*COMMENTS*:

| | Watson | Gluth | Conners | Seelye | Hancock | Treasurer | Secretary | Vice President | President |
|---|---|---|---|---|---|---|---|---|---|
| **YES** | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| **NO** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **PASS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **ABS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **N/A** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **PXY** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **REC** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES:   9       NO:   0       ABSTAIN:   0       ABSENT:   0

Status:   *Passed* ☒    *Failed* ☐    *Tabled* ☐    *Withdrawn* ☐    *Show of Hands* ☐

**WHEREAS**, on November 18, 2020, Melissa Chinery and Sandra Lee filed charges against Bob Ross under Article VII of the APFA Constitution; and

**WHEREAS**, Article VII, Section 3 of the APFA Constitution provides that the Executive Committee shall review Article VII charges for validity, and

**WHEREAS**, the Executive Committee has conducted that review.

**BE IT THEREFORE RESOLVED**, that Melissa Chinery's and Sandra Lee's November 18, 2020 charges against Bob Ross are valid.

**APPX. 0092**

# APFA

## EXECUTIVE COMMITTEE MEETING

### 3Q20 EC MEETING
December 1-2, 2020
APFA Unity Pays Conference Room
Euless, TX

**Resolution Tally Sheet**

| | |
|---|---|
| Resolution #: | 7 |
| Maker: | Black |
| Second: | Seelye |
| Date: | 12/01/2020 |
| Time: | 1:57 p.m. |

Resolution Name: Chinery-Lee v Vargas - Timely

| YES | = | Yes | ABS | = | Abstain | PXY | = | Proxy Vote |
|---|---|---|---|---|---|---|---|---|
| NO | = | No | N/A | = | Absent | REC | = | Recuse |
| PASS | = | Pass | | | | | | |

COMMENTS:

| | Watson | Gluth | Conners | Seelye | Hancock | Treasurer | Secretary | Vice President | President |
|---|---|---|---|---|---|---|---|---|---|
| YES | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| NO | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PASS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ABS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| N/A | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PXY | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| REC | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES:    9        NO:    0        ABSTAIN:    0        ABSENT:    0

Status:    Passed ☒        Failed ☐        Tabled ☐        Withdrawn ☐        Show of Hands ☐

**WHEREAS**, on November 20, 2020, Melissa Chinery and Sandra Lee filed charges against Eugenio Vargas under Article VII of the APFA Constitution; and

**WHEREAS**, Article VII, Section 3 of the APFA Constitution provides that the Executive Committee shall review Article VII charges for timeliness, and

**WHEREAS**, the Executive Committee has conducted that review.

**BE IT THEREFORE RESOLVED**, that Melissa Chinery's and Sandra Lee's November 20, 2020 charges against Eugenio Vargas are timely.

**APPX. 0093**

Black Decl. Ex. K

# APFA

## EXECUTIVE COMMITTEE MEETING

### 3Q20 EC MEETING
December 1-2, 2020
APFA Unity Pays Conference Room
Euless, TX

| Resolution Tally Sheet | |
|---|---|
| Resolution #: | 8 |
| Maker: | Black |
| Second: | Watson |
| Date: | 12/01/2020 |
| Time: | 2:00 p.m. |

**Resolution Name:** Chinery-Lee v Vargas - Specific

| YES | = | Yes | ABS | = | Abstain | PXY | = | Proxy Vote |
|---|---|---|---|---|---|---|---|---|
| NO | = | No | N/A | = | Absent | REC | = | Recuse |
| PASS | = | Pass | | | | | | |

COMMENTS:

| | Watson | Gluth | Conners | Seelye | Hancock | Treasurer | Secretary | Vice President | President |
|---|---|---|---|---|---|---|---|---|---|
| YES | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| NO | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PASS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ABS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| N/A | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PXY | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| REC | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES: 9    NO: 0    ABSTAIN: 0    ABSENT: 0

Status: Passed ☒    Failed ☐    Tabled ☐    Withdrawn ☐    Show of Hands ☐

---

**WHEREAS**, on November 20, 2020, Melissa Chinery and Sandra Lee filed charges against Eugenio Vargas under Article VII of the APFA Constitution; and

**WHEREAS**, Article VII, Section 3 of the APFA Constitution provides that the Executive Committee shall review Article VII charges for specificity, and

**WHEREAS**, the Executive Committee has conducted that review.

**BE IT THEREFORE RESOLVED**, that Melissa Chinery's and Sandra Lee's November 20, 2020 charges against Eugenio Vargas are specific.

**APPX. 0094**

**Black Decl. Ex. K**

# APFA

## EXECUTIVE COMMITTEE MEETING

### 3Q20 EC MEETING
December 1-2, 2020
APFA Unity Pays Conference Room
Euless, TX

| Resolution Tally Sheet | |
|---|---|
| Resolution #: | 9 |
| Maker: | Black |
| Second: | Watson |
| Date: | 12/01/2020 |
| Time: | 2:02 p.m. |

Resolution Name: Chinery-Lee v Vargas - Valid

| YES | = | Yes | ABS | = | Abstain | PXY | = | Proxy Vote |
|---|---|---|---|---|---|---|---|---|
| NO | = | No | N/A | = | Absent | REC | = | Recuse |
| PASS | = | Pass | | | | | | |

COMMENTS:

|  | Watson | Gluth | Conners | Seelye | Hancock | Treasurer | Secretary | Vice President | President |
|---|---|---|---|---|---|---|---|---|---|
| YES | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ |
| NO | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PASS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ABS | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| N/A | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| PXY | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| REC | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES: 9    NO: 0    ABSTAIN: 0    ABSENT: 0

Status: Passed ☒    Failed ☐    Tabled ☐    Withdrawn ☐    Show of Hands ☐

**WHEREAS**, on November 20, 2020, Melissa Chinery and Sandra Lee filed charges against Eugenio Vargas under Article VII of the APFA Constitution; and

**WHEREAS**, Article VII, Section 3 of the APFA Constitution provides that the Executive Committee shall review Article VII charges for validity, and

**WHEREAS**, the Executive Committee has conducted that review.

**BE IT THEREFORE RESOLVED**, that Melissa Chinery's and Sandra Lee's November 20, 2020 charges against Eugenio Vargas are valid.

**APPX. 0095**

Black Decl., Ex. L

# APFA
## BOARD OF DIRECTORS MEETING

## SPECIAL BOARD OF DIRECTORS MEETING
### January 12, 2021

### Via Teleconference

**Resolution Tally Sheet**

| | |
|---|---|
| Resolution #: | 3 |
| Maker: | Black |
| Second: | Salas |
| Date: | 01/12/2021 |
| Time: | 5:29 p.m. |

**Resolution Name: Alternate Article VII Arbitrators**

☐ *AFFECTS POLICY MANUAL:*

| YES | = | *Yes* | ABS | = | *Abstain* | PXY | = | *Proxy Vote* |
|---|---|---|---|---|---|---|---|---|
| NO | = | *No* | N/A | = | *Absent* | REC | = | *Recuse* |
| PASS | = | *Pass* | | | | | | |

*COMMENTS:*

| | BOS | CLT | DCA | DFW | LAX | LGA | MIA | ORD | PHL | PHX | RDUI | SFO | STL | PRES — *Tie-Breaker* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Milenkovic | Hazlewood | Pennel | De Roxtra | Nikides | Norvell | Trautman | Howard | Kaswinkel | Babi | Sullivan | Schwartz | Martin | Hedrick |
| **YES** | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☐ |
| **NO** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **PASS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **ABS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **N/A** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **PXY** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **REC** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

YES: 13    NO: 0    ABSTAIN: 0    ABSENT: 0

Status:    *Passed* ☒    *Failed* ☐    *Tabled* ☐    *Withdrawn* ☐    *Show of Hands* ☐

**WHEREAS**, Article VII Section 5.A of the APFA Constitution provides that "The Board of Directors shall appoint an arbitrator to resolve all charges filed under this Article VII. The Article VII Arbitrator, once appointed, shall serve until s/he resigns or until the Board of Directors determines to appoint a new Article VII Arbitrator;" and

**WHEREAS**, on October 13, 2010, the APFA Board of Directors appointed Howell Lankford as the Article VII Arbitrator; and

**APPX. 0096**

**Black Decl. Ex. 1**

**A P F A**
BOARD OF DIRECTORS MEETING

**WHEREAS**, Article VII Section 5.B of the APFA Constitution provides that "The Board of Directors may also appoint one or more alternate Article VII Arbitrators who shall have the authority to hear and decide particular charges when the Article VII Arbitrator is not available;" and

**WHEREAS**, on October 13, 2010, the APFA Board of Directors appointed Joan Ilivicky and Rosemary Townley as alternate Article VII Arbitrators; and

**WHEREAS**, Joan Ilivicky is regrettably deceased; and

**WHEREAS**, APFA Constitution Article VII Section 5.C states, in part, that an Article VII Arbitrator is an individual "who has no other prior or current involvement with the APFA;" and

**WHEREAS**, Rosemary Townley has previous involvement with the APFA; and

**WHEREAS**, this involvement with the APFA disqualifies Arbitrator Townley as an alternate Article VII Arbitrator according to APFA Constitution Article VII Section 5.C.

**BE IT THEREFORE RESOLVED**, that Joan Ilivicky and Rosemary Townley be removed as alternate Article VII Arbitrators; and

**BE IT FURTHER RESOLVED**, that the new alternate Article VII Arbitrators are Ruben Armendariz, Lynn Rubinett, and Edward B. Valverde.

**APPX. 0097**

Black Decl. Ex. M

# APFA

## FALL BOARD OF DIRECTORS MEETING



## October 19-20, 2021

*Marriott Dallas Las Colinas*

| | | BOS Milenkovic | CLT Hazlewood | DCA Pennel | DFW Green | LAX Nikides | LGA Santana | MIA Trautman | ORD Wroble | PHL Kaswinkel | PHX Agee | SFO Ross | Pres Hedrick |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **YES** | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☐ |
| | **NO** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | **ABS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | **N/A** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Resolution Information**

**Resolution #:** 3

**Resolution Name:** Article VII Arbitrators

**Status:** Pass

**Maker:** Black

**Second:** Trautman

**Date:** 10/20/2021

**Time:** 10:24 a.m.

**Affects PM:** ☐

**Comments:**

**Yes:** 11 **No:** 0 **Abstain:** 0 **Absent:** 0 **Show of Hands:** ☐

**WHEREAS**, Article VII Section 5.A of the APFA Constitution provides that "The Board of Directors shall appoint an arbitrator to resolve all charges filed under this Article VII. The Article VII Arbitrator, once appointed, shall serve until s/he resigns or until the Board of Directors determines to appoint a new Article VII Arbitrator;" and

**WHEREAS**, on October 13, 2010, the APFA Board of Directors appointed Howell Lankford as the Article VII Arbitrator; and

**WHEREAS**, Article VII Section 5.B of the APFA Constitution provides that "The Board of Directors may also appoint one or more alternate Article VII Arbitrators who shall have the authority to hear and decide particular charges when the Article VII Arbitrator is not available;" and

**WHEREAS**, on January 12, 2021, the APFA Board of Directors appointed Ruben Armendariz, Lynn Rubinett and Edward Valverde as alternate Article VII Arbitrators.

**BE IT THEREFORE RESOLVED**, that Howell Lankford be removed as the Article VII Arbitrator; and

**BE IT FURTHER RESOLVED**, that Edward B. Valverde be appointed as Article VII Arbitrator in accordance with APFA Constitution Article VII Section 5.A; and

**BE IT FURTHER RESOLVED**, that Ruben Armendariz and Lynn Rubinett remain as Alternate Article VII Arbitrators.

**APPX. 0098**

Page 1

```
 1              IN THE MATTER OF THE HEARING

 2  MELISSA CHINERY, Member       )
        and                       )
 3  SANDRA LEE, Member            )
                                  )BEFORE ARTICLE VII
 4      AND                       )     ARBITRATOR
                                  )HON. RUBEN B. ARMENDARIZ
 5                                )
    ROBERT ROSS, Member           )

 6

 7

 8

 9              **************************************

10                      JUNE 16, 2021

                        VOLUME 1

                **************************************

11

12

13

14          BE IT REMEMBERED that on the 16th day of June,

15  2021, the above cause came on for hearing before HON.

16  RUBEN R. ARMENDARIZ at the WESTIN IRVING CONVENTION

17  CENTER AT LAS COLINAS, 400 West Las Colinas Boulevard,

18  located in the City of Irving, County of Dallas, State

19  of Texas, whereupon the following proceedings were had.

20

21

22

23

24

25
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 100 of 506   PageID 5834
Black Deck, Ex. 4
Melissa Chinery   6/16/2021

Page 2

```
 1                    A P P E A R A N C E S:

 2        HON. RUBEN R. ARMENDARIZ
          LABOR MANAGEMENT ARBITRATOR
 3        29010 Pfeiffers Gate
          Fair Oaks Ranch, Texas  78015
 4        PHONE:  210.379.0860
          EMAIL:  arbruben@gmailcom
 5

 6        APPEARING AS THE ARBITRATOR

 7        MR. CHRISTIAN CASADEY
          3860 N.E. 170th Street
 8        Apartment 206
          North Miami Beach, Florida  33160
 9        PHONE:  347.525.4113
          EMAIL:  Christian.Casadey@gmail.com
10
                       AND
11
          MS. SANDRA LEE
12        9037 Cattaraugus Avenue
          Los Angeles, California  90034
13        PHONE:  310.591.7674
          EMAIL:  SEL27995@gmail.com
14

15        APPEARING FOR THE CHARGING PARTY

16        MR. ROBERT ROSS
          4701 Hayloft Court
17        El Dorado Hills, California  95762
          PHONE:  916.284.2402
18        EMAIL:  1RROSS@COMCAST.NET

19        APPEARING FOR THE CHARGED PARTY

20

21                     *   *   *   *

22

23

24

25
```

```
1                        EXHIBIT INDEX

2
   EXHIBIT                              ID'D    ADMITTED
3
       Joint Exhibit 1....................  19
4      Joint Exhibit 2....................  19
       Joint Exhibit 3....................  21
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 102 of 506   PageID 5324
Black Deck, Ex. N
Melissa Chinery   6/16/2021

Page 4

```
 1                P R O C E E D I N G S
 2                    THE ARBITRATOR:   The -- the hearing will
 3      be open.  This is an Article VII hearing between
 4      Melissa Chinery, Member, and Sandra Lee, Member, and
 5      Robert Ross, Member.
 6                    The Arbitrator appearing before you is
 7      Ruben R. Armendariz and that's spelled Ruben,
 8      R-U-B-E-N.  And will the parties please state your
 9      appearance for the record?
10                    MS. CHINERY:  Melissa Chinery.
11                    THE ARBITRATOR:  Okay.
12                    MR. CASADY:  Christian Casady.
13                    MS. LEE:  Sandra --
14                    THE ARBITRATOR:  How do you spell your
15      last name?
16                    MR. CASADY:  Casady, C-A-S-A-D, as in
17      David, A-Y.
18                    THE ARBITRATOR:   C-A --
19                    MR. CASADEY:  S-A.
20                    THE ARBITRATOR:   -- S-A?
21                    MR. CASADEY:  Uh-huh.
22                    THE ARBITRATOR:  Okay.
23                    MR. CASADEY:  D --
24                    THE ARBITRATOR:  D.
25                    MR. CASADY:   -- E-Y.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 103 of 506   PageID 5935
Black Law, T.X.N
Melissa Chinery   6/16/2021

Page 9

```
 1    that.  I can do that.  I can say did Robert Ross, ex
 2    officio President, APFA President, okay.  We can do it
 3    that way.
 4                 MR. CASADY:  Perfect.
 5                 THE ARBITRATOR:  Okay.  Okay.  Well,
 6    we've got a stipulation and we'll go ahead and hear
 7    opening arguments.  The charging parties, go ahead and
 8    do the opening.
 9                 MS. LEE:  Okay.
10                 THE ARBITRATOR:  Go ahead.
11                 MS. LEE:  Melissa and I are members of
12    F -- APFA.  Neither of -- of us have ever held Union
13    office.  We are here because we are very concerned
14    about how our dues money is being accounted for.
15                 Over the course of the last several
16    years, we have investigated our Union's finances
17    because we were concerned about how our dues were being
18    spent.  We will present testimony about our
19    investigation but also the incredible -- incredible
20    difficulties and challenges, excuse me, we've had
21    obtaining information.
22                 The APFA Constitution, policy
23    Constitution is clear, that we have the right to seek
24    financial information of the Union.  Federal law also
25    allows Union members to seek financial information for
```

```
 1    just cause.  Yet we faced years of obstruction where we
 2    not -- we were not allowed to see financial information
 3    for years.  We were given the runaround.  We wrote
 4    countless emails, went to Dallas to APFA headquarters
 5    numerous times but were allowed to see very little
 6    information.
 7                In April 2021 Julie Hedrick became
 8    President of APFA and with the support of her fellow
 9    Officers and Board of Directors, clear -- the clear
10    language of the APFA Constitutions which allowed
11    members to see the financial information was upheld.
12    When we finally went down there, we found that the
13    information, the financial information from the Ross
14    administration, was a complete mess with the receipts
15    in loose boxes, entire sets of financial information
16    mysteriously missing.
17                We will present evidence that upon
18    leaving office, his administration wiped clean emails
19    and other crucial files of ongoing Union work and did
20    not provide inventory lists to the incoming
21    administration of Lori Bassani and Liz Geiss.  This was
22    a violation of both the APFA Constitution and federal
23    law, which requires these documents to be held for five
24    years.
25                Despite these challenges, we will prove
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 105 of 506   PageID 5885
Black Deck, Ex. A
Melissa Chinery   6/16/2021

Page 11

 1   that Bob Ross violated the APFA Constitution and policy

 2   manual in a number of very specific ways and areas.

 3   What we found, indeed, what we've downloaded is

 4   disturbing.  Uncovering all of this was not easy.

 5                Federal law requires that financial

 6   information be kept for five years from the date of the

 7   LM-2s, from the date the LM-2s are filed.  Here in this

 8   case, the information should have been kept until at

 9   least the summer of 2022 or beyond.  Yet we will

10   demonstrate at the conclusion of the Ross

11   administration, files went missing, crucial financial

12   records were deleted, many of the receipts that were

13   turned in are missing the critical elements that

14   financial records should contain; who attended and --

15   who attended and what was the business purpose,

16   etcetera.

17                This was part and parcel of a policy of

18   Bob Ross' ignoring the policy manual, acting as --

19   acting as if because he's President the rules did not

20   apply to him.  But APFA has a Constitution and a policy

21   manual, both of which are binding on Union Officers.

22   In fact, the AP -- APFA Constitution explicitly says

23   ignorance of these provisions is no excuse.

24                Bob Ross, the charged party, was National

25   President of APFA from April 1st, 2016 to March 2nd,

1  2018.  Before taking office, he was given one paid

2  month of transition in which that time he was supposed

3  to locate housing.  According to the APFA bylaws,

4  elected National Officers receive either a paid move or

5  a furnished apartment.  As of April 1st, 2016, Ross was

6  considered to be living in Base as defined by the

7  policy manual; in other words, his job was in Dallas,

8  just like we as regular line Flight Attendants don't

9  get expenses and per diem and hotels in our Base city,

10  Ross was not supposed to, but he did, he took both.

11           The policy manual provides that the Union

12  will pay for moving a car from -- to Dallas, in this

13  case, from California.  Even after APFA paid to move

14  his car to Dallas, the policy manual says you can take

15  a Union provided apartment or receive $10,000 round

16  trip for your move, either or, Bob took both.  He

17  signed a lease for an apartment on June 1st, but he was

18  house hunting seven days later.

19           Ross spent thousands of dollars on and

20  around June 8th buying household goods allegedly for

21  his apartment that he did not intend to stay in.

22  Hundreds of dollars on the same days he was spent -- he

23  was spending house hunting.

24           The policy manual says the Officers were

25  not entitled to expenses to commute home.  Many of us

Case 4:22-cv-00343-Y  Document 236-1  Filed 04/26/24  Page 107 of 506  PageID 5825
Robert Ross   11/17/2021
Black Deck, Inc.
***

Page 24

```
 1              IN THE MATTER OF THE HEARING
 2   MELISSA CHINERY, Member     )
          and                   )
 3   SANDRA LEE, Member          )
                                 )BEFORE ARTICLE VII
 4       AND                     )     ARBITRATOR
                                 )HON. RUBEN B. ARMENDARIZ
 5                               )
     ROBERT ROSS, Member         )
 6
 7
 8
 9        **************************************
                  NOVEMBER 17, 2021
10                    VOLUME 2
          **************************************
11
12
13
14        BE IT REMEMBERED that on the 17th day of
15   November, 2021, the above cause came on for hearing
16   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING
17   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas
18   Boulevard, located in the City of Irving, County of
19   Dallas, State of Texas, whereupon the following
20   proceedings were had.
21
22
23
24
25
```

Case 4:22-cv-00343-Y  Document 236-1  Filed 04/26/24  Page 108 of 506  PageID 5325
**Black Deer, Ex. A**
Robert Ross   11/17/2021

Page 25

```
 1                    A P P E A R A N C E S:

 2         HON. RUBEN R. ARMENDARIZ
           LABOR MANAGEMENT ARBITRATOR
 3         29010 Pfeiffers Gate
           Fair Oaks Ranch, Texas  78015
 4         PHONE:  210.379.0860
           EMAIL:  arbruben@gmailcom
 5

 6         APPEARING AS THE ARBITRATOR

 7         MS. MELISSA CHINERY
           EMAIL:  Melchinery@aol.com
                        AND
 8         MS. SANDRA LEE
           EMAIL:  SEL27995@gmail.com
 9

10         APPEARING FOR THE CHARGING PARTY

11         MR. ROBERT ROSS
           EMAIL:  1RROSS@COMCAST.NET
                        AND
12         MS. GINA GUIDRY

13         APPEARING FOR THE CHARGED PARTY

14

15                       *    *    *    *

16

17

18

19

20

21

22

23

24

25
```

```
 1                      WITNESS INDEX

 2
    CATHY LUKENSMEYER                          PAGE
 3  Direct Examination by Ms. Chinery...............  54
    Cross-Examination by Ms. Guidry.................  74
 4  Redirect Examination by Ms. Chinery.............  84
    Recross-Examination by Mr. Ross.................  90
 5
    ERIK HARRIS
 6  Direct Examination by Ms. Lee...................  99
    Cross-Examination by Mr. Ross................... 132
 7  Redirect Examination by Ms. Lee................. 221
    Recross-Examination by Mr. Ross................. 231
 8
    MICHAEL TRAPP
 9  Direct Examination by Ms. Chinery............... 249
    Cross-Examination by Mr. Ross................... 259
10
    JOHN NIKIDES
11  Direct Examination by Ms. Chinery............... 272
    Cross-Examination by Ms. Guidry................. 297
12  Redirect Examination by Ms. Lee................. 321

13
    REPORTER'S NOTE:
14  Due to the horrible acoustics in the hearing room and
    without the use of microphones, there will be noted
15  (unintelligible) several times throughout the
    transcript.  I apologize for this; however, if I cannot
16  hear it, I cannot write it.

17  Additionally there are several notations of
    simultaneous speaking or simultaneous discussions
18  throughout the transcript.  When several people talk at
    the same time, there is no way to possibly discern who
19  is speaking.

20

21

22

23

24

25
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 110 of 506   PageID 5825
**Black Deer, Ex. N**
Robert Ross   11/17/2021

Page 27

```
 1                CHINERY LEE EXHIBIT INDEX
 2   EXHIBIT                             ID'D     ADMITTED
     Exhibit 1............................   64
 3   Exhibit 2............................
     Exhibit 3............................  107      108
 4   Exhibit 4............................  251      253
     Exhibits 5-6........................
 5   Exhibit 7............................   64
     Exhibit 8............................  101      107
 6   Exhibits 9-14.......................           107
     Exhibit 15..........................  109      107
 7   Exhibit 16..........................           107
     Exhibit 17..........................  243      107
 8   Exhibits 18-19......................           107
     Exhibit 20..........................  219      107
 9   Exhibits 21-24......................           107
     Exhibit 25..........................  246      107
10   Exhibits 26-46......................           107
     Exhibit 47..........................  228
11   Exhibit 48..........................  228      229
12                  ROSS EXHIBITS
     Exhibits 6..........................  142
13   Exhibit 13..........................  148
     Exhibit 15..........................  237
14   Exhibit 16..........................  143
     Exhibit 18..........................  194      194
15   Exhibit 19..........................  232
     Exhibit 36..........................  243
16
17                 JOINT EXHIBITS
18   Exhibit 4............................   28       28
19
20
21
22
23
24
25
```

```
 1   name.
 2              MS. LUKENSMEYER:   Cathy Lukensmeyer.
 3   Former Treasurer of APFA.
 4              THE ARBITRATOR:   How do you spell your
 5   last name?
 6              MS. LUKENSMEYER:  L-U-K-E-N-S-M-E-Y-E-R,
 7   Lukensmeyer.
 8              THE ARBITRATOR:   Okay.  Got it okay.  Go
 9   ahead.
10              CATHY LUKENSMEYER,
11   having been first duly sworn, testified as follows:
12              DIRECT EXAMINATION
13   BY MS. CHINERY:
14      Q.   Morning, Cathy.
15      A.   Morning.
16      Q.   Can you state your name?
17      A.   Cathy Lukensmeyer.
18      Q.   Okay.  Are you working or retired?
19      A.   Retired.
20      Q.   Okay.  Were you employed at AA?
21      A.   Yes.
22      Q.   Okay.  What was your position?
23      A.   Flight Attendant and then I held numerous
24   positions with the APFA.
25      Q.   Okay.  I haven't gotten to that yet.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 112 of 506   PageID 5955
**Black Diamond**
★ ★ ★
Robert Ross   11/17/2021

Page 68

```
 1        Q.   (BY MS. CHINERY)  So is the Union obligated to
 2   buy the meals, rental cars, etcetera, if they're living
 3   in Base?
 4        A.   The end of the question?
 5        Q.   Is the -- is the Union obligated to buy Union
 6   Officers meals, rental cars, if they live in Base?
 7        A.   No.
 8        Q.   Okay.  So when the National Officers take
 9   office, they're -- are they allowed at any time to --
10   excuse me, let me rephrase that.
11             So when the National Officers take
12   office, are they allowed at any time to -- actually,
13   I'm going to strike that question.  I'm sorry.
14             Can you please turn to H2 -- 5H 2 of the
15   policy manual?
16        A.   Sorry.  So it's -- H 2?
17        Q.   5 -- 5H, 5H in the 2016 one.
18        A.   Correct.
19        Q.   Yeah.  So we're going to ask you a couple
20   questions about housing information.
21        A.   Okay.
22        Q.   Okay.  Can you take a look at 5H of the policy
23   manual in terms of residence of the National Officer
24   and what sort of housing is provided?  This policy was
25   in place in 2016.
```

```
 1      A.    Okay.   A National Officer is offered to either
 2   commute from their permanent residence and have an
 3   apartment or they may choose to relocate and have the
 4   Union pay $10,000 roundtrip moving expense.
 5      Q.    Is this either or?
 6      A.    It's either or.   One or the other.   And you
 7   make your choice at the beginning.   Before you come
 8   down, this is what I'm going to do.
 9      Q.    Okay.   And so because they are considered to
10   live in DFW, what does that mean for expense purposes,
11   so the Union is not obligated to buy the meals?
12      A.    Right, you're local.
13      Q.    Yes, you're local.   And can you look at H2?   I
14   would just like you to read that.
15      A.    I do believe, H2?
16      Q.    Yes.   Can you just read that into the
17   record --
18      A.    Sure.
19      Q.    -- please?
20      A.    If on the date of his/her election, a National
21   Officer does not reside in the DFW area, she/he will --
22   shall be reimbursed for actual moving expenses for
23   relocation from/to his or her place of permanent
24   primary residence by a certified mover as a condition
25   of employment with the APFA for a maximum of $10,000
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 114 of 506   PageID 15296
Black Deck, Ex. A
Robert Ross   11/17/2021

Page 70

1   per roundtrip move.

2       Q.    Okay.  Can you continue on the next page,

3   please?

4       A.    The provisions of H2 above must be exercised

5   within six months following the end of the last term of

6   office of the National Officer and must be

7   substantiated by invoice or bill.

8       Q.    Okay.  Thank you.  And if they don't opt for

9   the paid move, the policy manual provides?

10      A.    An apartment.

11      Q.    Okay.  And H3, can you go to H3, please?

12      A.    Yes.

13      Q.    3, okay.  Can you just read --

14      A.    Number 3.

15      Q.    -- number 3?

16      A.    A National Officer may choose not to relocate

17  to the DFW area, but may instead choose to accept

18  suitable furnished accommodations paid for by the APFA

19  provided in H7 below.  If a National Officer accepts

20  such accommodations in lieu of relocation expenses

21  provided in H2 above, the following shall apply.

22      Q.    Okay.  Okay.  So if Mr. Ross chose the

23  apartment, was he eligible for a paid move?

24      A.    No.

25      Q.    Okay.  And if he took the paid move, was he

 1    eligible to receive APFA provided furniture?

 2         A.    No.

 3         Q.    So if the furniture is provided for APFA

 4    provided apartments pursuant to H3, is it for someone's

 5    personal residence?

 6         A.    No.

 7         Q.    And if you were Treasurer and you found out a

 8    National Officer had to use a Union credit card to

 9    purchase furniture, how would you view that?

10         A.    It's theft.   It's criminal.

11         Q.    And what if it was thousands of dollars in

12    furniture?

13         A.    Criminal again.

14         Q.    Under either scenario should a National

15    Officer be using the Union credit card to purchase

16    items such as Tide or household items?

17         A.    No.

18         Q.    Okay.  Can you explain -- okay.  Can you

19    explain how furniture in the apartments was normally

20    done?  Was it used or -- just explain.

21         A.    The incoming Officers would accept, when I was

22    in office, the unit of the outgoing Officer.   And if

23    the furniture was good, the furniture was to remain in

24    the unit.   If there was something falling apart and

25    needed replacing, like the unit that I went in to,

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 116 of 506   PageID 6063
ck Decl. Ex. ***
Robert Ross    11/17/2021

Page 85

```
 1      A.   Yes.
 2      Q.   Okay.  You also testified to the fact that Mr.
 3  Vargas broke policy often?
 4      A.   Yes.
 5      Q.   If the Treasurer is breaking policy and
 6  stealing money --
 7              MR. ROSS:  Objection, you can't --
 8              THE ARBITRATOR:  No, just --
 9              MS. CHINERY:  Okay.
10              THE ARBITRATOR:  -- rephrase your
11  question.
12              MS. CHINERY:  Okay.
13      Q.   (BY MS. CHINERY)  So if the Treasurer isn't
14  doing his job, then would you say it's easier for
15  someone else to get by with --
16              MR. ROSS:  Objection.
17      Q.   (BY MS. CHINERY) -- bogus charges?
18              THE ARBITRATOR:  No, that's an opinion.
19  Ask a -- rephrase the question.
20      Q.   (BY MS. CHINERY)  If the Treasurer is -- if
21  the Treasurer is not doing his job and allowing things
22  to go through, would you say it's much easier for
23  everyone to get bad charges to go through?
24      A.   Yes.  I think the Treasurer was doing what the
25  President was doing.
```

```
 1                    MR. ROSS:  Objection --
 2                    MS. CHINERY:  Thank you.
 3                    THE ARBITRATOR:  Yeah, that's --
 4  that's --
 5                    MR. ROSS:  -- irrelevant --
 6                    THE ARBITRATOR:   Strike that from the
 7  record.
 8                    THE WITNESS:  Oh, okay, because I was on
 9  both hearings.
10                    THE ARBITRATOR:  Do you have any other
11  questions?
12                    MS. LEE:  I -- I --
13                    THE ARBITRATOR:  Yes.
14                    MS. LEE:  -- have -- I do have one, just
15  one very simple question.
16                    THE ARBITRATOR:  Okay.
17      Q.   (BY MS. LEE)  If the Treasurer, if these --
18  the charges, any charges come through and the Treasurer
19  approves them, will normally that second just sign it?
20  Is it a rote routine?
21      A.   I don't know.
22                    MS. LEE:  Okay.
23                    THE ARBITRATOR:  Let me ask one
24  question.  Okay.  If -- if an invoice comes to the
25  Treasurer, okay, and the Treasurer doesn't question it
```

Robert Ross    11/17/2021

Page 99

```
 1   Treasurer.
 2                        ERIK HARRIS,
 3   having been first duly sworn, testified as follows:
 4                     DIRECT EXAMINATION
 5   BY MS. LEE:
 6       Q.   Hi, Erik.
 7       A.   Hello.
 8       Q.   Thank you for coming today.  We know it's been
 9   quite the week, so we appreciate it.
10       A.   Thank you.
11       Q.   So again, what is your name?
12       A.   Erik Harris.
13       Q.   Where are you employed?
14       A.   American Airlines and APFA.
15       Q.   Okay.  What is your position at APFA?
16       A.   I'm the National Treasurer.
17       Q.   How long have you been employed at American
18   Airlines?
19       A.   About eight years.
20       Q.   Okay.  Besides National Treasurer, have you
21   held any other positions -- positions at APFA during
22   your career?
23       A.   Yes, various positions.  Most recently --
24   well, prior to this position, I was a contract chair.
25   I served on the budget committee pretty much my entire
```

```
 1        A.   Okay.

 2        Q.   Or actually on Monday, take Monday the 6th --

 3        A.   Okay.

 4        Q.   -- and tell me about that day.

 5        A.   So on Monday the 6th looks like Bob flew to

 6   DFW from 8:00 to 11:30 a.m. and then he was in the

 7   office from noon till 5:30 --

 8        Q.   Okay.

 9        A.   -- for a nine hour day.

10        Q.   And how about the 7th?

11        A.   7th, he, I'm guessing with no time, the entire

12   day was spent on home search, phone calls, and emails.

13        Q.   So can you -- so as well as the 8th?

14        A.   Yes.

15        Q.   Can you look at that column and tell if he was

16   actually in the office that day?  Is there a way you

17   can tell by looking at that column?

18        A.   Yeah, it would say -- normally say in the

19   office, based on everything else, if I was reading this

20   or if I was approving this --

21        Q.   It was --

22        A.   -- I would see that he wasn't in the office.

23        Q.   Okay.  What's that?  Okay.  Can you explain to

24   me what guaranteed MEA is?

25        A.   So guaranteed MEA is a meal expense stipend
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 120 of 506   PageID 5386 **Black Dec., Ex. N**
Robert Ross    11/17/2021

Page 113

 1    that is provided to representatives who work on a
 2    full-time basis.
 3         Q.    And can you explain to me what SAF -- SAF is?
 4         A.    So SAF is a special assignment fee.  The
 5    difference between MEA and SAF is MEA is basically meal
 6    replacements for everything you would have made had you
 7    flown that trip.  SAF is a -- it's a -- it's a
 8    compensation for working on a day off --
 9         Q.    Okay.
10         A.    -- at the Union.
11         Q.    So if I were to look at this chart across the
12    bottom in five, how could I tell if he got SAF, MEA or
13    both?
14         A.    It would be marked as MEA.  Those -- the MEA
15    section would have a checked box.
16         Q.    So on Monday, the 6th, if you go down where
17    SAF is circled --
18         A.    Yes.
19         Q.    -- so that means he was away from home?
20         A.    That means he was --
21         Q.    Or was he in Dallas?
22         A.    That just means he was paid $30 SAF for that
23    day.
24         Q.    Okay.  So is this something they need to claim
25    every week to receive?

```
 1       A.   Yes.
 2       Q.   Are you aware of an issue related to the
 3  formula to pay out vacation time for former National
 4  Officers Vargas, Martin, Dunaway and Ross?
 5       A.   Yes.
 6       Q.   Can you explain the issue?
 7            MR. ROSS:  Objection.
 8            THE ARBITRATOR:   I'm going to allow it.
 9  Go ahead.
10       A.   The MEA and SAF payments were added to the
11  formula which inflated the number to calculate the
12  daily rate for the vacation and sick pay hours.
13       Q.   (BY MS. LEE)   Did Martin, Vargas, and Dunaway
14  pay back the money?
15       A.   Martin paid back in full.  Vargas and Dunaway
16  are currently on payment plans.
17       Q.   How about Bob Ross, did he pay it back?
18            MR. ROSS:  Objection --
19       A.   No.  Oh.
20            THE ARBITRATOR:   Hold on a minute.  Ask
21  that question again.
22            MS. LEE:  I asked if the other Officers
23  it involved paid the money back --
24            THE ARBITRATOR:  Yeah, I'm going --
25            MS. LEE:  -- and then after that I asked
```

```
 1   did Rob -- Bob Ross pay it back.
 2                THE ARBITRATOR:   Yeah.  Okay.  I'm going
 3   to --
 4                MR. ROSS:  I'm going to object to that
 5   because pay what back?  He hasn't been charged with
 6   anything.  He hasn't -- it hasn't been established that
 7   there was anything that he was -- had to pay back.
 8                MS. CHINERY:  The Board of --
 9                THE ARBITRATOR:   Well, wait a minute.
10   Ask him --
11                MS. LEE:  Okay.
12                THE ARBITRATOR:  -- ask him if there's
13   money due, okay?
14                MS. LEE:   Thank you.
15      Q.  (BY MS. LEE)   Okay.  During the time we
16   established that Martin, Vargas, and Dunaway owed APFA
17   that money, was it also established that Bob Ross owed
18   the money or did that come later?
19      A.   Can you ask that again?
20      Q.   Okay.  I'll restate that.
21      A.   Okay.
22      Q.   Was Bob Ross notified that he owed money?
23      A.   Yes.
24      Q.   How much was it?
25      A.   $5400.
```

```
 1   get -- I wanted to get it clear in my head.
 2              MS. LEE:   No, thank you.  It's
 3   confusing.
 4       Q.  (BY MS. LEE)   Okay.  So now we're going to
 5   talk about his sick payout.
 6       A.   Uh-huh.
 7       Q.   Okay.  So just to be really clear, he was
 8   overpaid his vacation payouts?
 9       A.   That -- it wasn't per policy.
10       Q.   It wasn't policy, okay.  Was this presented to
11   the Board of Directors?
12       A.   Yes.
13       Q.   Okay.  Now we get to our sick pay.  How many
14   sick days is a National Officer entitled to?
15       A.   18.
16       Q.   If a National Officer does not use their sick
17   days, what happens?
18       A.   Up to 12 of those days -- unused days can be
19   cashed out.
20       Q.   12 unused days.  How many unused sick days was
21   Bob Ross paid out for, for 2017?
22       A.   12.
23       Q.   How many -- how many unused sick days was Bob
24   Ross paid out for 2018?
25       A.   12.
```

1      Q.   Was that per policy?

2      A.   Yes.

3      Q.   Was a rental car provided to Bob Ross while --

4  while he was President -- because he was President?

5      A.   Yes.

6      Q.   How long was he provided the rental car?

7      A.   About six months.

8      Q.   How do you know that?

9      A.   Based on the receipts.

10     Q.   Did APFA pay to transport his personal vehicle

11  to the Dallas area from Sacramento, California?

12     A.   Yes.

13     Q.   How do you know that?

14     A.   Based on the receipts, were submitted.

15     Q.   Did Mr. Ross claim mileage expense while he

16  was here in Dallas while utilizing the rental car?

17     A.   Yes.

18     Q.   How do you know that?

19     A.   On the -- based on the mileage logs that were

20  submitted.

21          MR. ROSS:   Objection, which -- what

22  mileage logs?

23          THE WITNESS:   The -- the ones that were

24  submitted with the expenses.

25          MS. CHINERY:  1846.  1846.

```
 1                    THE WITNESS:  I -- I provided --
 2                    MR. ROSS:  So --
 3                    MS. CHINERY:  Which we gave you months
 4      ago.
 5                    MR. ROSS:  I didn't say I didn't have it.
 6      I asked a question.  I'm not going to try to
 7      cross-examine him, but I'll --
 8                    THE ARBITRATOR:  No, you'll have your
 9      opportunity.  Okay.  Explain that to me.
10                    MS. CHINERY:  Okay.
11                    THE ARBITRATOR:  He was paid mileage and
12      then he was also paid -- mileage for, I guess, personal
13      auto vehicle, right?
14                    THE WITNESS:  Right.
15                    THE ARBITRATOR:  And then he's -- the --
16      the rental car was paid?
17                    THE WITNESS:  Yes.
18                    THE ARBITRATOR:  Okay.
19          Q.   (BY MS. LEE)  So -- but I asked that
20      question.  Did Mr. Ross claim mileage expense while
21      here in DFW while driving a rented vehicle?
22          A.   Yes.
23          Q.   Why is mileage normally claimed?
24          A.   It's for the wear and tear on your own
25      personal vehicle.
```

```
 1   not allowed.
 2                   THE ARBITRATOR:   Okay.  That's not
 3   allowed?
 4                   MR. ROSS:  It is not allowed for a member
 5   to contact APFA or the Union --
 6                   MS. CHINERY:  I'm just --
 7                   MR. ROSS:  -- just to find out a
 8   financial status --
 9                   MS. CHINERY:  Ask the question --
10                   THE REPORTER:  I can't understand both of
11   you talking at the same time.
12                   THE ARBITRATOR:  We're not going to get
13   into this, okay?  You know, I -- I -- I'm going to say
14   this on the record.  I really don't care what happened
15   on FaceBook or social media.  I want to get down to
16   what the issues are, and this kind of -- whether you
17   owe money or you don't, okay?  So let's -- let's go --
18   let's go that way.  You got any more questions --
19                   MR. ROSS:  Is it --
20                   THE ARBITRATOR:  -- of this witness?
21                   MR. ROSS:  I'd like to retain the ability
22   to recall this witness.
23                   THE ARBITRATOR:  Okay.  Any other
24   questions?
25                   MS. CHINERY:  Yeah, sorry.
```

```
 1              MS. LEE:   I just have a few more.
 2                    REDIRECT EXAMINATION
 3   BY MS. LEE:
 4     Q.   I want to go back to -- I just want to clear
 5   this up.  In 2017 how many vacation days did Bob Ross
 6   have, 2017?
 7              THE ARBITRATOR:   We've already gone over
 8   that.
 9              MS. LEE:   Well, I didn't ask -- I didn't
10   know, I -- these past -- okay.  I didn't ask for 2017.
11   I asked for 2018.  So I do want this to be on record.
12              THE ARBITRATOR:   Okay.  Go ahead.
13     Q.   (BY MS. LEE)  So how many vacation days did
14   Ross have in 2017?
15     A.   35.
16     Q.   How many vacation days were paid out for 2017?
17     A.   34.
18     Q.   Thank you.  Are MEA and SAF benefits or
19   expenses?
20     A.   They're expenses.
21     Q.   Expenses?
22     A.   Expense reimbursement.
23     Q.   Has any other Treasurer used the formula for
24   the payout that the Vargas and Ross administration
25   used?
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 128 of 506   PageID 5987
**Black Deer, Ex. 7**
Robert Ross   11/17/2021

Page 222

```
 1        A.    No, not to my knowledge.
 2        Q.    Okay.  When people -- going back to MEA and
 3   SAF, would the National Officers, were their credit
 4   card statements part of weekly and monthly and the
 5   monthly expenses or are they separate?
 6        A.    Separate.
 7               MS. LEE:  Thank you.  That's all I have.
 8               MS. CHINERY:  I have some.  Sorry.
 9        Q.    (BY MS. CHINERY)  Oh, I'd like to -- Erik,
10   are you familiar with this document?
11        A.    Yes.
12        Q.    Can you please read the document to me -- us?
13        A.    The whole thing?
14        Q.    The first page --
15        A.    Oh.
16        Q.    -- starting with --
17        A.    It's from the Osborne law office.
18        Q.    Uh-huh.
19        A.    To Ruben Armendariz, I guess that's you,
20   regarding Chinery Lee versus Vargas on September 30th.
21   Dear Arbitrator Armendariz, I --
22               THE ARBITRATOR:  You know what, I'm
23   going to -- I'm going to -- let me interrupt.
24               MS. CHINERY:  Can we enter that?
25               THE ARBITRATOR:  Let me interrupt.  I
```

```
 1                    (Break from 3:18 to 3:30.)

 2                    THE ARBITRATOR:   On the record.   Hi.

 3                    MR. NIKIDES:  Hi.

 4                    THE ARBITRATOR:  I'm Arbitrator Ruben

 5      Armendariz.  We met before.

 6                    MR. NIKIDES:  Yes.

 7                    THE ARBITRATOR:  Would you raise your

 8      right hand, please?

 9                    (Witness sworn.)

10                    THE ARBITRATOR:   Okay.  Please give your

11      name and --

12                    MR. NIKIDES:   John Nikides.   I'm

13      currently the LAX Base President for APFA and I'm a

14      Flight Attendant for American Airlines.

15                    THE ARBITRATOR:   Okay.  Go ahead.

16                          JOHN NIKIDES,

17      having been first duly sworn, testified as follows:

18                       DIRECT EXAMINATION

19      BY MS. CHINERY:

20          Q.   Hi, John.

21          A.   Hi.

22          Q.   Thank you for coming today.  Would you state

23      your name, please?

24          A.    John Nikides.

25          Q.   Okay.  And how long have you been employed at
```

```
 1   AA?
 2        A.    37-and-a-half years.
 3        Q.    Okay.  And have you ever held position -- oh,
 4   do you belong to a Union?
 5        A.    Yes, I do.
 6        Q.    Okay.  Have you ever held positions with --
 7   what's the name of the Union?
 8        A.    Association of Professional Flight Attendants.
 9        Q.    Okay.  Have you ever held positions with APFA?
10        A.    Yes, I have.
11        Q.    Okay.  Can you tell us about your career?
12        A.    Yes.  I began with APFA in May of 1985 as the
13   LaGuardia safety rep.  Shortly thereafter I became San
14   Francisco Vice Chairperson, which is now Vice
15   President, called Vice President.  From there I went to
16   Dallas International, I was a Base Council
17   representative.  From there I went to Los Angeles
18   International, became Vice Chairperson, Vice President
19   in LA International.  I subsequently became assistant
20   to the President under an administration in the early
21   '90s.
22              I was the American Eagle organizer and
23   liaison.  From there I went to -- back to Los Angeles.
24   I flew domestic.  I became Los Angeles Domestic Vice
25   Chairperson, then Los Angeles Domestic Chairperson and
```

APPX. 0130

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 131 of 506   PageID 5987   Black Decl., Ex. N
Robert Ross    11/17/2021

Page 274

1    then we transitioned to the term President.

2        Q.    Okay.  And what's your current position?

3        A.    LAX Base President.

4        Q.    And how long have you held that position?

5        A.    20 years.

6        Q.    Wow.  Are you familiar with the policy for

7    National Officers?

8        A.    Yes, I am.

9        Q.    Okay.  Can you tell us about it?

10       A.    Yes.  When a National Officer is elected into

11   the position and if they obviously do not reside

12   already in the DFW area, they have the -- the choice of

13   either accepting a corporate apartment from APFA or

14   moving their household down to the DFW area and they

15   are reimbursed for that up to $10,000.  This was put

16   into place many years ago to encourage Flight

17   Attendants, APFA members at other Bases, into also

18   running for National Officer; otherwise, obviously, due

19   to financial issues, if these were not provided, what

20   would happen is that the -- the field of candidates

21   would probably be limited just to the DFW area.

22       Q.    Okay.  But it is -- it's defined either/or?

23       A.    It's very clear.  It's either/or.

24       Q.    Okay.

25       A.    You receive either the corporate apartment and

```
 1   no moving expenses or moving expenses up to $10,000.
 2       Q.   Okay.  Do you recall a missing furniture issue
 3   when Bob Ross was President?
 4       A.   Yes, I do.
 5       Q.   Can you tell us about that?
 6       A.   Yes.  Bob Ross initially elected to have the
 7   apartment, the corporate apartment.  And when the
 8   corporate apartment is selected, no moving expenses
 9   are -- are paid.  And this has been a policy that's
10   been alive very consistently over the years.
11              In violation of the policy, Bob Ross had
12   elected to take both.  He -- he entered into a lease
13   agreement for the apartment, then quickly decided that
14   that was not the way he wanted to go.  APFA was still
15   on the hook for the apartment; however, Bob Ross then
16   moved his household down to the DFW area.  And when you
17   move your household down to the DFW area, you're not
18   entitled to furnishings.  The only time that furnishing
19   would be made available to you would be if you took the
20   corporate apartment.
21              So what had happened was that shortly
22   after Bob Ross decided not to take the corporate -- to
23   take the corporate apartment and not to occupy it, he
24   moved his household down and purchased furniture and --
25       Q.   We'll get to that --
```

```
 1        A.   Yes.
 2        Q.   -- if that's okay.  Okay.  August 13th of
 3   2016, Mr. Ross purchased $3600 on the Union credit card
 4   for furniture at Ashley Furniture.  Did you question
 5   Mr. Ross about this purchase?
 6        A.   Yes, I did.
 7        Q.   Can you tell us about that, please?
 8        A.   I questioned Mr. Ross about this because of
 9   the fact that because on that date, August 13th, it was
10   already two months after Bob Ross had decided not to
11   occupy the corporate apartment that he'd entered into a
12   lease with.  His -- he was all -- had already moved his
13   family down to the DFW area.  APFA was reimbursing him
14   up to $10,000.  He was occupying a residence of his
15   own.  He was not entitled to that furniture.  But he
16   did enter into that purchase and the -- the furniture
17   was delivered to his residence, not to the corporate
18   apartment.
19        Q.   Okay.  And what was his response about the
20   furniture?
21        A.   He simply dismissed me and said it was
22   delivered to the wrong address.
23        Q.   Okay.  Do you recall a charge on the Union
24   credit card that was made on August 20th and 22nd on
25   the Union credit card for a U-Haul truck?
```

1      A.    Yes.

2      Q.    And had Mr. Ross, was he entitled to use the

3   credit card for this purchase?

4      A.    No.  I questioned him about that.  He stated

5   that he was -- he was using the U-Haul to move the

6   furniture that had allegedly been delivered to the

7   wrong address into an APFA storage unit.

8      Q.    Okay.  Does Bob Ross owe APFA money?

9      A.    Yes, he does.

10     Q.    How much?

11     A.    At the very least $5400.

12     Q.    Okay.  And how long has he owed?

13     A.    He's known about the -- the $5400 since at

14   least October 2020.

15     Q.    Okay.  And to your knowledge, has Mr. Ross

16   tried to pay this bill?

17     A.    He has not.

18     Q.    Okay.  Has the Board -- as -- has the Board of

19   Directors become aware that there was an overpaid up to

20   -- overpayment to his 401K?

21     A.    Yes.

22               MR. ROSS:  Objection.

23               THE ARBITRATOR:  What's --

24               MR. ROSS:  He's already answered, but --

25               THE ARBITRATOR:  No, but your --

**Black Decl., Ex. N**

Robert Ross   11/17/2021

Page 278

1                    MR. ROSS:   401K is -- anything about the

2       401K is off --

3                    MS. CHINERY:   Well, it goes to

4       foundation --

5                    THE ARBITRATOR:   Well --

6                    MR. ROSS:   401K is not in the charges and

7       she's already made arrange -- arrangements --

8                    MS. CHINERY:   He supplied many emails --

9                    MR. ROSS:   -- she's already made --

10                   MS. CHINERY:   Okay.

11                   MR. ROSS:   -- let me finish.   He's

12      already -- she's already made communication with APFA

13      and on social media that she intends this week to file

14      Article VII charges for the overpayment of 401K that

15      resulted from the Transition Agreement.   So she's

16      already --

17                   MS. CHINERY:   The moment --

18                   MR. ROSS:   -- making specific --

19                   MS. CHINERY:   -- excuse me, the -- the

20      moment he turned --

21                   THE ARBITRATOR:   Hold on a minute.

22                   MS. CHINERY:   -- the moment he chose to

23      put these emails about the 401K into document exchange,

24      he opened it up.   So he brought it here.

25                   THE ARBITRATOR:   Did you -- did you

**APPX. 0135**

```
 1    bring it up?  I mean, did you --
 2                 MR. ROSS:   I don't remember --
 3                 THE ARBITRATOR:   -- the 401K --
 4                 MR. ROSS:   -- what -- what 401K stuff did
 5    I bring up?
 6                 MS. CHINERY:   At the -- the -- I -- the
 7    letters, the letters that I wrote to the Board about
 8    this, he submitted them in document exchange.
 9                 THE ARBITRATOR:   Okay.  But -- but
10    they're not part of your charges, are they?
11                 MS. CHINERY:   But I think that they go
12    to foundation, Mr. Arbitrator.  I -- I think basically
13    it's -- it's -- it's the whole picture and it's -- it's
14    a valid question.
15                 THE ARBITRATOR:   Yeah, well, you know, if
16    you're going to file other charges, you can argue it
17    there then, okay?  Let's go -- let's go to something
18    else.
19                 MS. CHINERY:  Okay.
20                 THE ARBITRATOR:  You can't amend the
21    charges, in other words, okay?  In this proceeding, you
22    can't amend them.
23                 MS. CHINERY:   Okay.  Actually I was just
24    going to --
25                 THE ARBITRATOR:  Yeah.
```

```
 1   apartment policy?
 2        A.    Yes.   The then Treasurer of APFA, Juan
 3   Guerrera had -- had accepted the corporate apartment
 4   and let me backtrack a little bit.   When he came into
 5   office, he accepted the corporate apartment, that's
 6   what -- that was his election.   And under the policy,
 7   the corporate apartment could not be a primary
 8   residence.   In order to have the corporate apartment,
 9   you had to have proof that you were either paying rent
10   or a mortgage at a primary residence.   The APFA
11   corporate apartment could not be your primary
12   residence.   And Juan Guerrera did not have a primary
13   residence.   It was established after the fact when he
14   was in office that he had not provided any proof of
15   paying rent or a mortgage on a primary residence, so
16   therefore he was in violation of policy because the
17   corporate apartment was his primary residence and that
18   was in violation.
19        Q.    And what -- what steps did the Board take?
20        A.    We investigated it.   We had a Board of
21   Directors' meeting and prior to Juan Guerrera being
22   removed from office, he resigned.
23        Q.    Okay.   And how much money did he have to pay
24   back or did -- did he have to pay back any money?
25        A.    Yes, he did.   Approximately $15,000 and he did
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 138 of 506   PageID 5985
**Black Deck, Ex. 41**
Robert Ross    11/17/2021

Page 287

1    pay.

2         Q.   Okay.  Moving on.  Can you tell me who Marcus

3    Gluth is?

4         A.   Marcus Gluth is a previous Vice President of

5    APFA, previous President, and he has served in multiple

6    positions at APFA.  Currently he's an Executive

7    Committee member.

8         Q.   Okay.  And he was the National President, you

9    just --

10        A.   Yes, he was.

11        Q.   Okay.  Did you recently have a conversation

12   with Marcus Gluth regarding his furniture when -- that

13   was left in his corporate apartment when he left office

14   in 2016?

15        A.   Yes, I did.  I --

16        Q.   Can you tell us about that, please?

17        A.    I had a conversation with him at the October

18   2021 Board meeting.  Marcus said to me specifically

19   that Bob Ross had told him that his daughter was

20   enjoying Marcus Gluth's bedroom furniture from his

21   corporate apartment.

22        Q.   Okay.  Was Mr. Ross entitled to take that

23   furniture?

24        A.   No, he was not.

25        Q.   All right.  So -- okay.  So moving on.  Okay.

1    intent of --

2              THE ARBITRATOR:   Did you ever make --

3    with the intent what?

4              MR. ROSS:  That it would be used for the

5    corporate --

6              THE ARBITRATOR:   Okay.

7              MR. ROSS:  -- apartment.

8              THE ARBITRATOR:   Okay.  Now, did you ever

9    -- did you ever tell or put in writing that -- that you

10   were going to move your family down here?

11             MR. ROSS:  Yes, I did.  And the Board was

12   aware I was going to move my family down if it could

13   work out by the school year.

14             MS. CHINERY:   Objection.  There's policy

15   set for a reason.  You cannot take one or two.  He took

16   both.  There's a signed lease --

17             THE ARBITRATOR:   Well --

18             MS. LEE:   He had a -- we had -- and we

19   do have the signed lease --

20             MS. CHINERY:   And the furniture as

21   questioned was delivered to his house in Southlake

22   after we paid for him to move down here.

23             THE ARBITRATOR:   Okay.  Hold on a

24   minute.  Did you -- did you sign a lease?

25             MR. ROSS:  I do not ever recall signing a

```
 1   lease at that time.
 2                   MS. CHINERY:  Okay.
 3                   MR. ROSS:  I signed an occupancy
 4   agreement which gave me the authority to have a front
 5   door key, a garage door opener and the --
 6                   MS. CHINERY:  Actually Exhibit 8 --
 7                   MR. ROSS:  -- for the corporate
 8   apartment.
 9                   MS. CHINERY:  -- Mr. Arbitrator --
10                   THE ARBITRATOR:  Okay.  Well, I'm not
11   going to get into that right now.  Go ahead and -- do
12   you have anymore questions of this witness?
13                   MR. ROSS:  I -- I do.  I have a lot of
14   them.
15        Q.  (BY MR. ROSS)  You --
16                   MS. CHINERY:  Can --
17        Q.  (BY MR. ROSS)  -- you realize that the
18   elections are -- are cast in February, the -- you find
19   out in March whether you got elected or not and you
20   take office April 1st, okay?  Has there been any other
21   Officers that moved their families from another state,
22   came to Texas to become a National --
23                   MS. CHINERY:  Objection, relevance.
24        Q.  (BY MR. ROSS)  -- Officer --
25                   MS. CHINERY:  Doesn't have anything to do
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 141 of 506   PageID 9329
**Black Deck, TEXN**
★★★
Robert Ross   11/18/2021

Page 326

```
1                 IN THE MATTER OF THE HEARING

2    MELISSA CHINERY, Member       )
          and                      )
3    SANDRA LEE, Member            )
                                   )BEFORE ARTICLE VII
4        AND                       )     ARBITRATOR
                                   )HON. RUBEN B. ARMENDARIZ
5                                  )
     ROBERT ROSS, Member           )
6

7

8

9        ***************************************
                   NOVEMBER 18, 2021
10                    VOLUME 3
         ***************************************
11

12

13

14        BE IT REMEMBERED that on the 18th day of

15   November, 2021, the above cause came on for hearing

16   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

17   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

18   Boulevard, located in the City of Irving, County of

19   Dallas, State of Texas, whereupon the following

20   proceedings were had.

21

22

23

24

25
```

```
 1              A P P E A R A N C E S:

 2    HON. RUBEN R. ARMENDARIZ
      LABOR MANAGEMENT ARBITRATOR
 3    29010 Pfeiffers Gate
      Fair Oaks Ranch, Texas  78015
 4    PHONE:  210.379.0860
      EMAIL:  arbruben@gmailcom
 5

 6    APPEARING AS THE ARBITRATOR

 7    MS. MELISSA CHINERY
      EMAIL:  Melchinery@aol.com
 8            AND
      MS. SANDRA LEE
 9    EMAIL:  SEL27995@gmail.com

10    APPEARING FOR THE CHARGING PARTY

11    MR. ROBERT ROSS
      EMAIL:  1RROSS@COMCAST.NET
12            AND
      MS. GINA GUIDRY
13
      APPEARING FOR THE CHARGED PARTY
14

15
                      *   *   *   *
16

17

18

19

20

21

22

23

24

25
```

```
 1                          WITNESS INDEX

 2
      MELISSA CHINERY                                 PAGE
 3    Direct Examination by Ms. Lee.................... 330
      Cross-Examination by Ms. Guidry................. 369
 4    Redirect Examination by Ms. Lee................. 401

 5    CASEY VELOSO
      Direct Examination by Ms. Guidry................ 407
 6
      ANTHONY THURIAULT
 7    Direct Examination by Ms. Guidry................ 420
      Cross-Examination by Ms. Lee.................... 443
 8    Redirect Examination by Mr. Ross................ 463

 9    ROBERT ROSS
      Direct Examination by Ms. Guidry................ 465
10    Cross-Examination by Ms. Lee.................... 488
      Redirect Examination by Ms. Guidry.............. 500

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CHINERY LEE EXHIBIT INDEX

2
   EXHIBIT                                    ID'D     ADMITTED
3  Exhibit 1.............................               332
   Exhibit 5.............................  342          344
4  Exhibit 6.............................  345          346
   Exhibit 7.............................               358
5  Exhibit 45............................  449

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      A.   Yes.

 2      Q.   Did you review what Mr. Ross was doing on the

 3   weeklies during that transition?

 4      A.   Yes.

 5      Q.   So now I want you to turn to Exhibit 5, the

 6   credit card charges.

 7      A.   Okay.

 8      Q.   So starting around May 30th and going through

 9   a few weeks, can you walk through any of the purchases

10   which were cause for concern?

11      A.   Yes.

12           MR. ROSS:   Objection.  May 30th when?

13   What year?  I'm not looking directly at your -- you're

14   talking about May 30th on 6 or May 30th on 3?

15           THE ARBITRATOR:   On the charging party

16   Exhibit 5.

17           MR. ROSS:   Okay.  I wasn't sure.

18           THE ARBITRATOR:   Okay.  Go ahead.

19      A.   Okay.  There were several things that were

20   alarming.  As we know, APFA provided Mr. Ross with the

21   apartment on June 1st.  Starting on May 30th, he went

22   to Target, he bought Shout, Tide, Reese's mints,

23   chocolate Skittles, a pillow case, bath towel, bath

24   towel, drink ware, Glad, Charmin, for $131.31.  The

25   receipt said Bob's apartment.
```

```
 1              Moving on the same day, he went back to
 2   Bed Bath & Beyond, bought a coffee maker, a $49 pillow,
 3   another $49 pillow.  A $30 pillow, a $30 pillow,
 4   linens, iron, hangers.  That was for $567.09.  The
 5   receipt also indicated it was for Bob's apartment.
 6              Moving on.  June 3rd of 2016, Mr. Ross
 7   went to Home Depot.  He bought two shower heads for
 8   42.13.  The receipt indicated it was for Mr. Ross'
 9   apartment.
10              So Monday, June 6, he went -- Mr. Ross
11   went to Target.  He bought a mattress pad for $54.99, a
12   down comforter, $119.99, two bath towels, another bath
13   towel, another bath towel, another bath towel, another
14   bath towel for $261.81.  The receipt indicated it was
15   for Mr. Ross' apartment.
16              Moving on.  As we know in the weeklies
17   for those days, for -- for June 8th he was house
18   hunting, that's what his weeklies indicated.  He then
19   later that day went to Bed Bath & Beyond and bought
20   $721.96 for household items that the receipt indicated
21   it was for Bob's apartment.
22              So he takes an apartment given to him by
23   APFA on the 1st of June, but then he's house hunting,
24   later that day he's buying stuff for his apartment.
25   Why are you buying stuff for your house?
```

1          MR. ROSS:    Objection.

2          THE ARBITRATOR:   What?

3          MR. ROSS:   Where -- where -- where does

4     she get that later on that day I was house hunting?

5          THE WITNESS:    Well, it's actually

6     indicated in your weeklies.

7          MR. ROSS:  Okay.

8          THE ARBITRATOR:   Okay.

9          MR. ROSS:  You talking about the weeklies

10    that --

11          THE WITNESS:   I'm just telling you how

12    it's broken down.

13          THE ARBITRATOR:   Okay.  Okay.  I'm

14    overruling your objection.  Continue on.

15     A.   Okay.  So as we proceed on, now it begins

16    where Mr. Ross is purchasing pots in July and this is

17    now for Bob's move.  So once again that's for $1234.

18    Then he had another pod move for $6858.40 that's billed

19    to his apartment, but he's already -- if you -- why are

20    we paying for an apartment and paying for a move?  You

21    get either or, not both.

22          But then what's very alarming is you go

23    to the next page in August and you've got him staying

24    in hotels because he's moving, but yet he's shopping at

25    Home Depot in Dallas.  So somehow he's charging hotels

```
 1    across the country, but like he's purchasing things in
 2    Dallas.   It doesn't make sense to me.
 3         Q.    (BY MS. LEE)   Let me stop you there, Melissa.
 4    So you're saying that -- are we talking of hotel stay
 5    receipts?
 6         A.    Yes.
 7         Q.    Okay.   So on April 1st he --
 8         A.    August 1st.
 9         Q.    -- August 1st, excuse me, he charged a hotel
10    to APFA?
11         A.    He expensed it.
12         Q.    He expensed it, but at the same time he was
13    shopping in Dallas?
14         A.    That's not the same day, but it's for that
15    day, okay, so you go to the 8th of August in 2016, he's
16    at the Holiday Inn Express in Kingman, Arizona, but yet
17    he's in -- Sunday he's at Home Depot for $159, it
18    doesn't make sense.   I'm just --
19         Q.    Okay.
20         A.    -- it was disturbing.   However -- can I
21    continue?
22         Q.    Yes, you may.
23         A.    Okay.   The most disturbing thing that I found
24    was furniture.   On August 13th of 2016, he purchased
25    $3637.92.   It was billed to his home residence in -- it
```

```
 1   was billed on the credit card and he'd already moved to
 2   Dallas, but he had it delivered to his house.  And what
 3   I found even more alarming was then on the 19th and
 4   20th, he rents a U-Haul truck, his personal address was
 5   used to rent it, and then he's using the Union credit
 6   card.
 7             Meanwhile, as you can see, I've listed
 8   the months that we've verified through the monthlies
 9   that he has his apartments (sic).  I mean, we're paying
10   for that.  That's a lot of money.  So those are some of
11   the things.
12             MR. ROSS:  This is a narrative here.  Is
13   there a question?
14             THE ARBITRATOR:  Well, she's explaining
15   what these charts are and I'm allowing it.
16        A.   So it's a compilation of the things I found
17   disturbing, that's the...
18        Q.   (BY MS. LEE)  Thank you, Ms. Chinery.  So one
19   week after he signed for the -- one week after APFA
20   signed a six month lease for Mr. Ross, he was house
21   hunting?
22        A.   Correct.
23        Q.   Thank you.  Okay.  Okay.  Looking at Exhibit
24   6, just the timeline --
25        A.   Uh-huh.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 150 of 506   PageID 6097
**Black Decl. ***N
Robert Ross    11/18/2021

Page 367

1    Q.    (BY MS. LEE)    How long did Mr. Ross rent a
2    rental car for once he came to Dallas?    How long did
3    that -- how long --
4    A.    He had it from -- for six months.
5    Q.    Six months.    Do you happen to know if part of
6    that six months his own personal car had already been
7    transported to Dallas?
8    A.    Yes.
9                    MR. ROSS:    Objection.
10                   THE ARBITRATOR:    Why?
11                   MR. ROSS:    The policy is very clear, you
12   don't have to move one personal car, it doesn't have to
13   say his car, that that's the car he's using.
14                   THE WITNESS:    What?
15                   MR. ROSS:    And the policy has been
16   cleaned up since 2021, has been cleaned up in language,
17   but at the time it doesn't say he moved his car here.
18   So alls you have to do is move a vehicle here.    Just I
19   want it -- clear it here when you're saying he had his
20   car, it gives the impression that the car that was --
21   is moved here is at your avail the entire time.    And
22   it's not unusual whatsoever, I know I'm giving
23   testimony, but it was not unusual whatsoever to have a
24   rental car --
25                   THE ARBITRATOR:    Well, I tell you what,

1    you can cross-examine, okay, and you clarify this and

2    you're encouraged to do that, too.  Okay?  So let's --

3    let's go on.

4         Q.   (BY MS. LEE)   Do you know if a personal car is

5    transported in to Base as a permanent resident, are you

6    allowed long term use of a rental car?

7         A.   From what we were told, no.

8         Q.   Approximately how much did this rental car

9    cost?  Just approximately.

10        A.   From our calculation, it was about $6200.

11        Q.   $6200.  Can you tell me what you're looking

12   for in this arbitration, Melissa?

13        A.   We would like the membership to be made whole.

14   We would like there to be -- this can never happen

15   again.  I mean, it shouldn't -- we shouldn't be here

16   doing this.  This is not something common members

17   should have to be doing.

18                  MS. LEE:   I have no more questions.

19                  THE ARBITRATOR:   You don't have any

20   more?

21                  MS. LEE:  I do not.

22                  THE ARBITRATOR:   Okay.  You need -- you

23   need some time for cross or are you ready?

24                  MR. ROSS:  Are you ready?

25                  THE ARBITRATOR:   Okay.  Let's go on.

Robert Ross    11/18/2021

```
 1   Cross-Examination.
 2                        CROSS-EXAMINATION
 3   BY MS. GUIDRY:
 4       Q.   Melissa, have you ever run for office with
 5   APFA?
 6       A.   Yes.
 7       Q.   When and what positions?
 8       A.   I ran for President in Philadelphia and
 9   President in Phoenix.  2015 and 2018, I believe.  I
10   could be wrong about the years.  It's early, I'm sorry.
11       Q.   When you went for documents and you said they
12   were in a disarray, that was after Mr. Ross'
13   administration, correct?
14       A.   Well, no, because we went down with the --
15   when we went down to see Craig and Liz Geiss and
16   everything, we only got to see the monthlies, but there
17   was a lot of things missing, so I consider, you know --
18       Q.   Craig was not in his administration.
19       A.   Well no, but that was after the -- immediately
20   following the Ross administration.
21       Q.   That was my question.  So it was after Ross
22   had left office?
23       A.   Oh, yes.
24       Q.   So how was he responsible in any way for the
25   disarray of documents?
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 153 of 506   PageID 11459
**Black Deer, Tx. ✯✯✯**
Robert Ross   11/18/2021

Page 380

```
 1              THE ARBITRATOR:  Any more questions?
 2              MS. GUIDRY:   Yes.
 3      Q.   (BY MS. GUIDRY)  Are you married to an
 4   attorney?
 5      A.   I'm married to an attorney.
 6      Q.   And does he work for the APFA?
 7      A.   He works for AFA and he's on loan to -- he --
 8   he works -- he's doing the negotiations, he's a
 9   negotiating attorney.
10      Q.   So that's a yes?
11      A.   Yes.
12      Q.   Did you at any time ask him for his help or --
13   or -- or did he give you any help at any time in these
14   proceedings, with these proceedings?
15      A.   We started this three years ago -- actually
16   four years, four years ago.  I don't involve my
17   husband.  I have spent my own money.  I have taken time
18   off work.  I've taken classes.  It does not take a
19   rocket scientist to sit up there and know that somebody
20   is jacking the credit card.
21              MR. ROSS:   Objection.
22              THE ARBITRATOR:   Well, that was uncalled
23   for.
24              THE WITNESS:  Sorry.
25              THE ARBITRATOR:  Yeah.
```

```
 1                 THE WITNESS:  Sorry.
 2        Q.   (BY MS. GUIDRY)  So is that a no?  Is that a
 3   no?
 4        A.   That's a no.
 5        Q.   He hasn't helped you in any way.  That -- does
 6   your husband have any history with the Ross
 7   administration?
 8        A.   What -- what does this -- do I have to answer
 9   a question I --
10                 THE ARBITRATOR:   Just answer it yes or
11   no.
12        A.   Not that I'm aware of, no.
13                 THE ARBITRATOR:  Okay.
14        Q.   (BY MS. GUIDRY)  Well, was it an amicable
15   relationship with Mr. Ross' administration?
16                 MS. LEE:   Objection.  She said she
17   didn't know of a relationship.
18                 THE ARBITRATOR:  Yeah, let's go to
19   something else.
20                 THE WITNESS:  Wait, what does amicable
21   mean?
22                 MS. LEE:  Okay.
23                 THE ARBITRATOR:  We're getting into
24   speculation.
25                 MS. GUIDRY:  All right.  I'll be happy
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 155 of 506   PageID 11541
Black Deck, Ex. A
Robert Ross   11/18/2021

Page 382

```
 1    to move on.
 2                   THE WITNESS:  Sorry about saying jacking.
 3    I'm sorry.  I didn't mean to.
 4        Q.  (BY MS. GUIDRY)  Are -- are you familiar with
 5    I will work tirelessly to make sure you are out of
 6    office; are you familiar with that?
 7        A.   I wrote it.
 8        Q.   You wrote it?
 9        A.   Yes.
10        Q.   And where was it posted?
11        A.   I think I messaged him that.  It was on
12    FaceBook.  It was a private messenger.
13        Q.   When was that?
14        A.   I don't remember.
15        Q.   It was 24 hours after Mr. Ross left office.
16        A.   Left?
17        Q.   Started -- I'm sorry, started office.
18        A.   Okay.
19        Q.   April --
20                   MS. LEE:  Objection, foundation.  We
21    don't believe that to be true.
22                   THE ARBITRATOR:   Well, she's -- she's
23    asking --
24                   (Simultaneous speaking.)
25                   THE ARBITRATOR:  Let her answer.
```

```
 1              MS. LEE:   Okay.
 2      Q.   (BY MS. GUIDRY)   It was 24 hours after he
 3   took office.
 4      A.   Okay.
 5      Q.   Okay.   Did you support him in his --
 6      A.   I did.
 7      Q.   -- election?
 8      A.   I did.
 9      Q.   So from the time you supported him to the
10   election and then 24 hours after he's in office, you
11   write that you will tirelessly get him out of office.
12   What changed?
13      A.   I think what changed for me was I didn't -- he
14   promised he was going to unite the LUS and the legacy
15   carriers.   He -- he said he was going to bring us
16   together.   And to be honest with you, I think that
17   issue was he was rude to a friend of mine, that
18   particular one.   But that was at the start of seeing
19   some very not nice behavior to someone that I really
20   respected.
21      Q.   So he was supposed to fulfill these promises
22   in 24 hours?
23      A.   No.
24      Q.   Be complete --
25      A.   That's not what I said.
```

1        Q.    You did.

2        A.    Well, no, that's what I came to understand

3    about him, you know, where he divided us.   But that

4    you're talking about a private conversation where he

5    was really rude to a then friend of mine.

6             THE ARBITRATOR:   Let's go to a different

7    topic.

8             MS. GUIDRY:   Okay.

9        Q.   (BY MS. GUIDRY)   Just why did you withdraw

10   your charges against Craig Gunter?

11       A.   Because we didn't know to ask for the right

12   remedy and the only remedy that we were asking for was

13   to see the stuff.  So when we saw the stuff, it was --

14   and we knew he wasn't going to run again and it was --

15   it was, to be honest with you, like, we didn't ask for

16   a penalty when we did the remedy in the charges.  We

17   didn't know to do that.  We were new to it.

18            MS. GUIDRY:  Mr. Ross has some questions.

19       Q.   (BY MR. ROSS)   I'll just briefly touch on

20   what she said because it really does bring it full

21   circle back to the beginning.  Is that -- I'm sorry,

22   the -- the phrase that she was referring to, I will

23   work tirelessly to make sure you're out of office as

24   relevant, not really that communication, but many, what

25   -- what was -- what was your specific reason at that

★ ★ ★
Black Deck, Ex. N
Robert Ross   11/18/2021

Page 465

```
 1   going to have one of my witnesses, excuse me, Susan
 2   Baldridge (phonetic) is out there waiting, but I'm
 3   not -- not going to use her.
 4                THE ARBITRATOR:  Okay.
 5                MR. ROSS:  So if somebody wants to let
 6   her she can --
 7                (Simultaneous discussions.)
 8                THE REPORTER:  Are we off the record?
 9                THE ARBITRATOR:  We're off the record.
10                (Discussion off the record.)
11                THE ARBITRATOR:  Raise your right hand.
12                (Witness sworn.)
13                THE ARBITRATOR:   Have a seat.  State
14   your name.
15                MR. ROSS:  Robert Ross.
16                THE ARBITRATOR:   State your position for
17   the record.
18                MR. ROSS:  Robert Ross, Flight Attendant,
19   APFA Board of Director.
20                THE ARBITRATOR:  Go ahead.
21                        ROBERT ROSS,
22   having been first duly sworn, testified as follows:
23                   DIRECT EXAMINATION
24   BY MS. GUIDRY:
25      Q.  Mr. Ross, just to clarify this, Jodi, your
```

**Black Deck, Ex. N**

Robert Ross   11/18/2021

Page 466

```
 1   secretary is the one who books all rental cars?
 2                   THE REPORTER:  I -- I'm sorry, I didn't
 3   hear.
 4                   MS. GUIDRY:  Jodi is the one who books
 5   all the rental cars in the office.
 6      A.   She books the rental cars that are requested
 7   for purposes to run through the President's --
 8      Q.   (BY MS. GUIDRY)  And when --
 9      A.   -- department.
10      Q.   And when she says Bob's rental, does she mean
11   your personal or the department?
12      A.   I believe she means that the car is there.
13   The rental that was requested through Bob's authority
14   through the President's department.
15      Q.   Okay.
16      A.   I can't attest exactly why she would send an
17   email like that between the two of us.  She would refer
18   to it (unintelligible).
19      Q.   Mike Trapp testified that he moved something
20   from storage unit to your house, he didn't recall what.
21   What did he move to your house from the Union storage
22   to your Southlake house?
23      A.   I don't recall him ever moving anything from
24   Union storage to my house.
25      Q.   The question about that when you left office,
```

1   you didn't inventory, why?

2       A.   When I -- when I left it -- office, I left

3   office immediately.  I didn't have an opportunity then

4   to go in and inventory housing, furnishings, do

5   whatever (unintelligible).  My -- once I moved out of

6   the apartment, that was done.  My office I had very

7   little time to move anything out of it that -- other

8   than my computer.  Most of that time in the office,

9   after I resigned and was gone, was getting boxes to

10  take pictures and globes, anything that was my personal

11  items that I had furnished in my apartment.  Get my

12  computer given to the computer department.  Anything

13  personal that was on it I rehooked up (unintelligible)

14  to my personal computer.  Anything that was APFA

15  related was left on the computer to be wiped clean.

16  Turn over anything that I had to archives so that they

17  had record of anything that I had in my office, that

18  they had it.  So that was what I did.

19      Q.   So the charges on the credit card that were

20  charged after you left office was used for what?

21      A.   For -- for leaving office.  For moving out and

22  leaving office.

23      Q.   What did you purchase?

24      A.   Gosh, I don't remember.  I think I purchased

25  boxes or filing something.  To be perfectly honest, I

```
 1    don't remember what I -- if I saw the receipt, I could
 2    tell you what it may have been for, but --
 3        Q.   Okay.  So once you left office, who took over
 4    the remainder of your term?
 5        A.   The Vice President, Nena Martin.
 6        Q.   So the rest of your team fulfilled your four
 7    month obligation to APFA?
 8        A.   Yes.
 9        Q.   And so as they -- as Sandra stated, it's the
10    Treasurer's responsibility to do any inventory.  So at
11    the end of the term, your Treasurer should have
12    inventoried?
13        A.   Yes.
14             MS. CHINERY:   Objection, leading.
15             THE ARBITRATOR:   He's already answered.
16        Q.   (BY MS. GUIDRY) Okay.
17             THE ARBITRATOR:   That was -- that was a
18    take off on your question.
19             MS. LEE:   Yeah, I saw, I just clicked my
20    pen.
21        Q.   (BY MS. GUIDRY)  The delivery of the furniture
22    was earlier than you expected it to be, correct?
23        A.   It was -- yes.  Well, it was later than I
24    expected to be, but earlier than when I had an
25    opportunity to cancel it all, it was delivered.  So
```

```
 1  yes, it was -- I probably had an opportunity to cancel
 2  it had it been delivered in August or later.  It came
 3  in earlier than expected and because I -- at the time I
 4  did not know for sure whether my family could move in.
 5  I accepted the furniture but did not accept several
 6  other items.  It was those other items that were being
 7  delivered.  The receipt that they're referring to had
 8  dates of delivery that actually did not take place
 9  (unintelligible).  There were returned items, so...
10      Q.   Could you explain the overlap or the apparent
11  overlap of an apartment and a house lease?
12      A.   Yeah.  That can -- everything was in -- it was
13  chaotic order on how we decided to move down and when
14  we decided to move down.  So the corporate apartment
15  was the previous President's apartment.  The
16  furnishings in that apartment were barren and
17  disheveled.  It was furniture that was haphazardly
18  delivered in there from another outgoing Officer's
19  apartment.  Other things were old furniture from
20  previous administrations.
21            The garage itself was packed full of
22  other administrations.  Our administration went from --
23  the out -- the outgoing administration had seven
24  furnished apartments throughout the apartment complex
25  and also in Downtown Dallas.  There was a turnover in
```

```
 1    that administration prior to our administration coming

 2    over.  The President that was in that particular unit

 3    had left office.  That unit itself and its garage was

 4    then used pretty much as storage and had a long-term

 5    lease on it.

 6                 When I took office, that was assumed to

 7    be my apartment.  And it was the outgoing, Laura

 8    Glading's apartment, bedding and furniture.  And it was

 9    in an area and location that was notorious in that area

10    for break-ins and we knew that.  The furnishings were

11    bad.  But I stayed there, whatever days I commuted in,

12    I would stay there with that furniture sleeping on the

13    previous President's bed who was in office I think at

14    that time, two terms.  I don't know when that bed was

15    purchased, probably eight years, but it was her bed.

16                 And the bedroom, the other bedroom that

17    was in there was barren, had one file cabinet.  So over

18    the course of June and July or so, the commuting back

19    and forth was strenuous on the family, it was strenuous

20    on me and we had contemplated ideas on how to move the

21    family down here and at the same time keep the kids in

22    their schooling and in their sports.

23                 I'm the first President or first National

24    Officer to ever move their family to Texas.   The

25    policy at the time was that when you took office, you
```

1  were expected to live in Texas.  And it was difficult

2  to be expected to live in Texas by that policy and to

3  have a family back home.  When you take office is in

4  April.  The school year for our children are not out

5  yet.  The children wouldn't be out of school until

6  June.

7           So the way the policy is is you're

8  expected to -- to live in Dallas.  Which is fine if you

9  either already live in Dallas or you're single, but

10 when you have a family, and I was the first one in this

11 situation in my memory, and I've been here for 38

12 years, that you had to move your family down here

13 somewhere between taking office in June, making a

14 decision on an apartment -- pardon me, taking office in

15 April, having an apartment in June and getting your

16 kids down in the school year was a near impossibility.

17           My wife is a Realtor.  She had real

18 estate transactions in the pipeline.  My children were

19 nationally ranked swimmers.  I actually, when I took

20 office, was also the Northern California head of the

21 referees for the USA Swim.  My wife was one of the head

22 coaches.  So we had a lot of personal obligations in

23 California that preempted me from being able to say on

24 April 1st when I take office, we're moving to Texas.

25 Couldn't do it.  And so I was going to commute, but it

1    was really difficult.

2              By the time that we had even wanted to

3    start looking for ideas to move to Texas, we needed to

4    figure out a way, well, how would we do it

5    logistically, how would we get the kids to stay in

6    their swim program because their times wouldn't match

7    up with what they were doing in Texas.  They were in a

8    Blue Ribbon school in California and they were on a

9    nationally ranked and a state championship swim team in

10   their high school.

11             I wanted to get them into a program in

12   Texas that was equivalent to what they had.  And the

13   only place in the Dallas area that could do that was

14   Southlake.  Southlake had a nationally ranked swim

15   team.  Their U.S.A. swim program, the Matadors, was

16   nationally ranked.  Their swim team was the state

17   championship swim team and they had a LaCrosse program

18   that was second to none for my son who's at school

19   right now, LaCrosse.  So it was next to impossible.

20             The school system -- or pardon me, the

21   Southlake area, we looked in Colleyville, we looked in

22   Keller, we looked in Grapevine, we looked everywhere.

23   When they went to the high school there to swim for a

24   practice while they were down here visiting, the coach,

25   the head coach of the high school team, saw them swim

 1    and wanted to know -- I get choked up because I'm

 2    talking about my kids -- they wanted to know who they

 3    were.  And I did what I could to get them in to school.

 4              They saw them swim.  They said obviously

 5    there's rumors where they're from.  My wife said, well,

 6    we're thinking about moving down here, but we can't

 7    get -- we're not sure we can get in somewhere.  And he

 8    watched them swim and said, what's their times and when

 9    she told him what their times were, he said you've got

10    to be here.  You've got to be in Southlake.  We -- we

11    want you.  So it's almost like they recruited them.

12              That put me in a position now where I

13    was, like, holy crap, they can either stay in

14    California or we move them down here and we get them in

15    Southlake.  This -- we have this apartment, corporate

16    apartment in Euless that's already rented.  The lease

17    on it was leased by APFA, not by myself, and there was

18    no need for me to sign a lease on a different apartment

19    that was in a different area because if I was going to

20    bring kids down here, I wouldn't be in an apartment.  I

21    had a dog, it wouldn't be in an apartment.

22              The City Ordinance of Southlake does not

23    have apartments.  There are no apartments in Southlake.

24    It's only homes.  So we drove around at one point when

25    the kids were here and -- and my wife.  Tony had driven

1  It was delivered back to Bear Creek with a U-Haul truck
2  and that is exactly how it happened.  As it turned out,
3  by September -- by October 1st, my kids were able to
4  get in.  They actually came down here in September.
5  They drove the car down in August because the policy
6  manual says that you can bring one car, but that car
7  was my wife's car.  She had two kids in two schools,
8  you had a senior in high school and -- no, middle
9  school and high school.  She had to find a job.  She
10  had to drive around.
11           So any time that that rental car during
12  those period of times was not available, if I drove it
13  home, I drove it back the next morning.  If I didn't
14  have a rental car, Tony, my assistant gave me a ride
15  home.  He would come by and pick me up and bring me in.
16  So this whole thing was an absolute cluster.  But at no
17  time did we ever do anything willfully, purposely to
18  waste Union's funds or inadvertently used Union funds
19  in a way that was not intended.  It was just a
20  conglomeration of timing, effort, and praise the Lord
21  that it happened the way it did because we were able to
22  find what worked for us.
23           All of this was done under the premise
24  that I was there for a four year term.  I would have
25  never moved my family.  I would have never done any of

```
 1   this had I known anything about a Department of Labor
 2   investigation into the electronic balloting, everybody
 3   knows that.  There's no way I would have ever, ever
 4   attempted any of this for two years.
 5               Sorry, long winded, but...
 6       Q.   Could you just briefly tell us why you left
 7   that $3200 when you left office?
 8       A.   When I left office, one of the last
 9   conversations I had with Eugenio, the Treasurer, was is
10   there anything that my office from an accounting
11   standpoint is not up to snuff.
12               THE REPORTER:  Is not what?
13               MR. ROSS:  Up to snuff.
14       A.    Is there -- there -- are we above, are we
15   below, he was -- everything is buttoned up except we've
16   never been able to reconcile the furniture.  And I said
17   it was never located.  It was never -- I said what -- I
18   had him pull up the receipts and what it was, it was
19   $3300.
20       Q.   (BY MS. GUIDRY)  33?
21       A.   And I said -- he goes, I -- I don't know what
22   to do about it.  I can explain it to the Board.  And I
23   said what if we just, because you have given me a
24   package to leave, what if I just take out $3300 out of
25   my package and leave it here in the accounts receivable
```

1    treasury.  And I was very emphatic with both Mark

2    Richards and Eugenio that I am leaving.  I would be

3    willing to leave $3200 or $3300 in two payments, the

4    last two payments, to cover the cost of that furniture.

5              But in no way, shape or form should it

6    ever be misconstrued that I am paying for furniture

7    that I have or that it is an indication of guilt on

8    having it, that I would be willing to pay the value of

9    that furniture and that's what I would leave behind.

10   You can put it toward furniture.  You can put in

11   accounts receivable.  If the furniture is not where it

12   goes, that this money I'm leaving in accounts

13   receivable.  If everything in my office is up to snuff,

14   you can apply it towards furniture.

15             But I would not accept being labeled

16   having had it, but it was the value of -- ultimately

17   that was a huge mistake because it made me look as

18   though I'm paying for furniture.  One of the main

19   reasons that I did that, and I've said this several

20   times, that I felt accountable for the disappearance of

21   that furniture.  The whole part of it that did not get

22   a response for the disappearance of the furniture.

23        Q.   Did you ever at any time have a long-term

24   rental car for personal use paid for by the APFA?

25        A.   No, that was not my personal rental car.

1      Q.   Okay.  Could you explain the expenses of

2  hotels in Sacramento, I think she said (unintelligible)

3  Amarillo, and was it Phoenix?

4      A.   Yeah.  There were --

5              THE REPORTER:  Was it what?

6              MS. GUIDRY:  Phoenix, Amarillo.

7              THE REPORTER:  Got it.

8      A.   Yes.  When we moved out, I had my friend,

9  Casey Veloso, who testified earlier, flew to Sacramento

10  to help me move into the pods.  The pods had to come in

11  stages because they wouldn't all fit.  Three pods

12  wouldn't fit in my driveway.  So he came up to help me

13  move things into the pods, helped me move things

14  into -- we had storage in Sacramento, leave some stuff

15  there for prospective tenants that we had or if my wife

16  wasn't able to get in the school district, they still

17  had couch, beds, what have you.

18          The weekend that -- that we were supposed

19  to move out, we had found the week -- the week before

20  we had found somebody who was building a home that we

21  knew, the home would be completed within two months.

22  They needed a place to stay.  They would stay in our

23  house, then we would continue to rent it after that.

24  If they didn't need it, we would rent it out.  If it

25  didn't work out that my family couldn't move to Texas,

```
 1   we still had the house in California, right?
 2                  When Casey came up to help us move, I was
 3   on the phone, I forget now what was going on, but there
 4   was something going on that whole weekend at APFA and I
 5   spent nearly the whole time when he had come up --
 6                  THE WITNESS:  Am I going too fast?
 7                  THE REPORTER:  Huh-uh.  I'm just kind of
 8   sore.
 9                  THE WITNESS:  You need a break.
10       A.   Long story short, because I couldn't help and
11   I had to leave to fly back to Texas, Casey stayed until
12   midnight loading that -- well, Casey had left earlier
13   that day, but my wife couldn't leave until midnight.
14   She was supposed to on that day be all the way down to
15   Bakersfield, would have been her first stop, which
16   would have been about five hours away, if she left in
17   (unintelligible).
18                  She couldn't get things buttoned up
19   because I wasn't there to help.  I wasn't there all
20   weekend to help.  She was frustrated.  But when I --
21   she would have had a hotel paid for in Bakersfield.  I
22   said just leave first thing in the morning and get --
23   use the Bakersfield hotel here and you'll just have to
24   drive farther the next day.  And that was on the 2nd.
25   That's what they did.  I contacted Eugenio and I said
```

Robert Ross    11/18/2021

```
 1   what should I do?  He said put it down as moving and
 2   we'll deal with it later.
 3               The next day what they did was drove to
 4   Bakersfield and beyond and they had decided at that
 5   point that they would spend a few days, because the
 6   pods wouldn't be in Texas for another week or so.  I
 7   didn't need the car, so they went to LA area for five
 8   or six days at our expense.  Then went on to Flagstaff
 9   and then from Flagstaff, my wife took the kids who were
10   riding with her, up to the Grand Canyon, back to Grand
11   Canyon down through Albuquerque.
12               That portion of it was never charged --
13   the LA portion of it was never charged.  We billed what
14   Eugenio and the Board said nonstop direct mileage from
15   my house, the most direct way to Texas.  That is all
16   APFA got billed for.  There was nothing in policy that
17   stated that on the day that they left California to
18   deliver one vehicle, that you had to continue your
19   moving, your -- your driving.  It just said to deliver
20   one personal vehicle to Dallas.  So that's what we did.
21               They hopped, skipped around on their way
22   to get there, but APFA never got billed one extra mile
23   for anything or one extra hotel room other than three
24   hotels on the way to Texas.  And that's the explanation
25   as to why two hotels were within a couple of hours of
```

```
 1   each other.  One night up to Grand Canyon, then back,
 2   then continue their trip.
 3        Q.   (BY MS. GUIDRY)  Did -- did you leave the
 4   administration in an orderly and viable manner?
 5        A.   I believe I did.
 6        Q.   Did you keep, for personal use, anything that
 7   you purchased for the apartment or anything did you
 8   keep for personal use?
 9        A.   No.  As a matter of fact, everything is still
10   in its wrappers or anything that was kept and not
11   returned was taken to that apartment and it was offered
12   to the other reps who had apartment -- who had
13   apartments there.  It was left in a huge box at the
14   base of the stairs down into the garage, huge box, and
15   it had bedding, anything that was there.  The bedding
16   that was purchased was purchased to cover up the divot
17   in Laura Glading's bed that I was made to sleep on or
18   expected to sleep on.  Once it was slept on, once it
19   was opened and slept on once or twice, it could not be
20   returned.
21                  MS. GUIDRY:  I have no more questions.
22                  THE ARBITRATOR:   Cross?
23                  MS. LEE:  Can we take a break for lunch?
24                  MS. CHINERY:  Oh, make it -- we have to
25   get our stuff out and that's just for (unintelligible)
```

Robert Ross    11/18/2021

Page 488

```
 1   so we need to just take a minute.
 2                THE ARBITRATOR:  Okay.  Let's take 10
 3   minutes.
 4                (Break from 12:33 to 12:50.)
 5                THE ARBITRATOR:  Back on the record.  Do
 6   you have questions?
 7                MS. LEE:   Yeah.  We're going to make it
 8   short, hopefully, yes.
 9                     CROSS-EXAMINATION
10   BY MS. LEE:
11       Q.   Mr. Ross, you served as San Francisco Base
12   President around 2008, correct?
13       A.   Yes.
14       Q.   And at the same time your wife served as San
15   Francisco Vice President?
16       A.   Yes.
17       Q.   Okay.  Prior to that you both worked at APFA?
18       A.   Yes.
19       Q.   So when you ran for National President, you
20   both had full knowledge that the job would require you
21   to relocate or move into corporate housing?
22       A.   Yes.
23       Q.   So you chose to run for President knowing that
24   your children were involved in sports and school in
25   California?
```

1   can you please go to Exhibit 5?

2              MS. CHINERY:  I'm almost done.

3        Q.   (BY MS. CHINERY)  If you look at the -- I

4   think it's what one, two, three, four, if you go five

5   pages in, you'll see where your -- your payments, these

6   come from the monthlies.  You see that what we're --

7   can you read, so for May, June, July, August,

8   September, October, November, the membership was

9   charged $1300 and 23 -- for an apartment, correct --

10       A.   Yes.

11       Q.   -- in your name?   Yes?

12       A.   Yes.

13       Q.   Okay.  So you testified before, I just want to

14   be clear, so you did not drive across country, your

15   family did; that's what you said?

16       A.   That's correct.

17       Q.   Okay.  So I'm counting, if you go two pages

18   up, one, two, three, four, five, five hotels that were

19   billed to the Union credit card and you were not --

20       A.   Where --

21       Q.   -- even present?

22       A.   -- where are you at?

23       Q.   Is that correct?  It's yes or no.

24       A.   I show four instead of five.  I show four.

25       Q.   Which one are you disputing?

```
 1      A.   Well, I see Staybridge, right?

 2      Q.   Okay.

 3      A.   And I see Kingman, Arizona, Flagstaff,

 4   Amarillo.

 5      Q.   Okay.  And the Expedia, that was a hotel also.

 6      A.   For $57?

 7      Q.   Yes.

 8      A.   It just says Bob's move, says Expedia.

 9      Q.   Okay.  So basically what we're getting at here

10   is, so you're in Dallas using the credit card and then

11   your family who's not with you is also on the road

12   using the credit card?

13      A.   No, they're not using the credit card.  The --

14   the --

15      Q.   Well, they stayed here.  You testified that --

16      A.   They're not using the credit card.  The credit

17   card --

18      Q.   Well they stayed --

19      A.   -- is --

20      Q.   -- there, they used it.

21      A.   They are not using the credit card.  The

22   credit card is being used for the hotel.  They

23   themselves are not using the credit card.  The hotel --

24      Q.   But if you weren't --

25      A.   -- the credit card is used to book their
```

Robert Ross   11/18/2021

```
 1    hotel, which is part of the move.
 2         Q.   Their expenses are being paid with the credit
 3    card and you weren't --
 4         A.   The hotel is being --
 5         Q.   -- present.
 6         A.   -- the --
 7         Q.   I just want to know --
 8              (Simultaneous speaking.)
 9         A.   There's no food, there's no --
10              THE ARBITRATOR:  Wait a minute.  He's
11    trying to answer.
12              MS. CHINERY:  I'm sorry.
13         A.   I may have been mistaken whether they stayed
14    three nights, they stayed four nights, but they were
15    not using the hotel (sic) that was a move expense to
16    move the car.  There's no gasoline.  There's no food.
17         Q.   (BY MS. CHINERY)  Actually --
18         A.   There's -- that I know of.
19         Q.   Okay.  So if you go two pages over, we
20    actually have, it's on the --
21         A.   Two pages over.  You say over, up or down?
22         Q.   I'm going over for the U-Haul moving storage
23    truck.  Right --
24         A.   Wait, wait, wait.  You say two pages over.
25    When you -- when you say over, are you meaning --
```

```
 1        Q.    Two pages.
 2        A.    -- forward or backwards?
 3        Q.    Forward.
 4              MS. LEE:   Flip the page to the part of
 5   the book that has nothing.
 6              MS. CHINERY:  Okay.
 7        A.    I don't know about --
 8              MS LEE:  This way.
 9              THE WITNESS:  This way?
10        Q.    (BY MS. CHINERY)  Okay.  So you know what,
11   I'll make this easy.
12        A.    Please do.
13        Q.    So --
14        A.    They had --
15        Q.    -- when did you -- when did you -- when did
16   you move into your house in Southlake?
17        A.    Technically moved into the house --
18        Q.    Yes, you had leased your house?
19        A.    When did -- the -- the -- the actual lease the
20   first payment was made on that house September.
21        Q.    Okay.  So you weren't living there in August?
22        A.    The -- the -- the month of August?  No, we
23   were not --
24        Q.    How do you have furniture delivered when no
25   one was there?
```

```
 1                THE ARBITRATOR:   Let him finish.  Let
 2    him finish.
 3                MS. CHINERY:   I thought he did.  I
 4    thought he did.  I thought he did.
 5                THE ARBITRATOR:   Let him finish and then
 6    you can ask a question.  Go ahead.
 7         A.   I thought in my testimony I had said that the
 8    landlord was still there.  We found a house with the
 9    landlord still in it.  The furniture was delivered.
10    The landlord accepted it to be delivered to his garage.
11    But in order for him to move out of that, we had to get
12    it out of his garage and back over to APFA corporate
13    apartment as quick as possible so that it didn't
14    inconvenience him so that he could start moving out so
15    we could start moving in.
16         Q.   (BY MS. LEE)  When did your family move to
17    DFW?  When did they arrive in DFW?
18         A.   Which time?  They drove --
19         Q.   The time they --
20         A.   -- the vehicle down --
21         Q.   -- drove across country?
22         A.   They drove across country, then they went back
23    to finish, swim, to finish my -- my wife's job.  They
24    didn't actually technically end up with their physical
25    bodies in Texas until sometime in September when they
```

```
 1   flew back down here, shipped clothes or whatever they
 2   had and then they were here.
 3        Q.   What day did --
 4        A.   They were -- go ahead.
 5        Q.   What day did your family arrive in Dallas
 6   after that five day trip cross country?
 7        A.   Oh, whatever their last hotel is in Amarillo,
 8   I guess, would have been the -- the 11th or the 12th, I
 9   don't know.  It was exhausting.  The dog was sick.  One
10   of my kids was sick, yeah.
11        Q.   So was it --
12        A.   I think it was -- had to have been around the
13   11th or 12th.
14        Q.   And you -- how long did they stay in Dallas?
15        A.   On that -- on that trip?
16        Q.   Yes.
17        A.   Maybe for the week.
18        Q.   Where did they stay?
19        A.   In the apartment with me.
20        Q.   Okay.  Thank you.
21             MS. LEE:   Have anything else, Melissa?
22             THE WITNESS:  We weren't technically
23   residents.
24        Q.   (BY MS. CHINERY)  When did you purchase the
25   Ashley furniture?  Was it -- it was -- it was August
```

```
 1                    THE WITNESS:  -- Maddie Gilson, which is
 2       our in-house attorney.  She's also the one that you
 3       would turn things in to to make sure that you -- and
 4       she would look in to your housing and stuff and make
 5       sure that you're legally entitled to apartments because
 6       you have -- and so I think most of the -- the legal
 7       part of it was dictated through legal office.
 8                    THE ARBITRATOR:  Okay.  That's all --
 9       that's all I have.  You're excused.
10                    Okay?  Any more?  No more witnesses?
11                    MS. GUIDRY:  No.
12                    THE ARBITRATOR:  Okay.  You rest.  Any
13       rebuttal?
14                    MS. CHINERY:  Oh, God, no.  We'll do it
15       in the brief.
16                    MS. LEE:  We'll do --
17                    (Simultaneous discussions.)
18                    THE ARBITRATOR:  No rebuttal.  Okay.
19       Let's go off the record a minute.
20                    (Discussion off the record.)
21                    THE ARBITRATOR:  In an off-the-record
22       discussion, we talked about transcripts.  Melissa
23       Carson will deliver the transcript no later than
24       December 18th.  Briefs will then be due by the parties
25       by January the 18th close of business and they will be
```

Robert Ross    11/18/2021

Page 506

1  emailed to me.  And then on the 19th they will email

2  their briefs to each other, okay?

3              As soon as we get the -- as soon as I get

4  the briefs, this matter is closed, okay?  The hearing

5  is closed and when I get the briefs, which will be

6  January the 18th, okay?  And but -- now let me say

7  this, if you need more time to write this up, then talk

8  to each other about it, you know, go through Josh, say

9  you need more time or whatever and that way y'all can

10  get a date that's reasonable for you both, okay?

11  Because there's a lot here to talk about, so you know,

12  okay?  Okay.

13              MR. ROSS:   When you say email each other

14  our briefs --

15              THE ARBITRATOR:  Yeah.

16              MR. ROSS:  -- is that through Josh?

17              MS. CHINERY:   Yes.

18              THE ARBITRATOR:   Oh, I'm sorry.  That's

19  right.  That's right.  You've got to send it to Josh

20  first and then -- you know, send it to Josh, mine too,

21  send it to Josh and Josh will send it to me, okay?  And

22  then the -- your -- your briefs to each other the next

23  day to Josh and to me.  I'm glad you reminded me about

24  that.  You know, in a regular setting, it's different.

25              MS. CHINERY:  I have -- just to clarify,

```
 1   so you want us to make all the charges to evidence,

 2   then transcripts by the 18th of December, January 18th

 3   we switch them with you and Josh, next day.  So for the

 4   Vargas one, that's due December 30th, correct?

 5                THE ARBITRATOR:   Yeah.

 6                MS. CHINERY:  Is that -- can I ask about

 7   the other one, too?  Okay.  You said something --

 8                THE ARBITRATOR:  Let's go off the record.

 9                (End of Volume 3.)

10                (Proceedings concluded at 1:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    STATE OF TEXAS        )

 2    COUNTY OF DALLAS       )

 3            THIS IS TO CERTIFY THAT I, MELISSA J. CARSON,

 4    a Certified Shorthand Reporter in and for the State of

 5    Texas, reported in shorthand the proceedings had at the

 6    time and place set forth in the caption hereof, and

 7    that the above and foregoing 183 pages contain a full,

 8    true, and correct transcript of the said proceedings.

 9            Certified to on this the 17th day of December,

10    2021.

11

12

13    _____

14    MELISSA J. CARSON, Certified
      Shorthand Reporter in and for
14    The State of Texas

15

16

17    Certification No. 1737

18    CRCB Firm Registration #489

19    Expires August 31, 2022

20    CARSON REPORTING & ASSOCIATES

21    Post Office Box 551628

22    Dallas, Texas 75355-1628

23    Telephone 214.346.3434

24

25
```

**Black Decl. Ex. O**

## Fwd: Ross - Post Hearing Brief 02/18/22

### National Secretary

Fri 2/18/2022 7:12 PM

To:Ruben Armendariz <arbruben@gmail.com>

📎 1 attachments (1 MB)
ROSS POST HEARING BRIEF.pdf;

Please see below and attached

Josh Black
National Secretary
Association of Professional Flight Attendants
Office 817.540.0108x822 | Email jblack
secretary@apfa.org
The content of this email is intended solely for the recipient(s).
It is not to be shared, forwarded or posted without the author's written consent.

---

**From:** 1rross@comcast.net <1rross@comcast.net>
**Sent:** Friday, February 18, 2022 12:01:00 PM
**To:** National Secretary <secretary@apfa.org>
**Cc:** 'Gina Guidry' <guidrygina@yahoo.com>; 'Kit Gomez Alba' <sable227@gmail.com>
**Subject:** Ross - Post Hearing Brief 02/18/22

Josh,
Please forward this Confidential email with Attachment to Arbitrator Ruben Armendariz and Charging Party.
This Confidential Attachment is not to be Opened or Shared by any Party except Arbitrator Armendariz and the Charging Party.

Thank you Josh.
Regards,

Bob

---

February 18, 2022

Dear Arbitrator Armendariz,

Please accept the attached Post Hearing Brief as our finalized Closing Argument.
We look forward to a resolution in this matter and that all parties can soon move forward.

Respectfully,

Bob Ross
916-284-2402 Mobile/Text
1Rross@comcast.net

**APPX. 0185**

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 188 of 506   PageID 6963

**Black Decl. Ex. O**

*This e-mail, including attachments, is intended for the exclusive use of the addressee. If you are not the intended recipient, any dissemination, use, distribution or copying is prohibited.*

APPX. 0186

Association of Professional Flight Attendants
Article VII Charges
Before Arbitrator Ruben R. Armendariz

Robert Ross
Former APFA National President
Charged Party

and

Melissa Chinery
Sandra Lee
Members
Charging Parties

**ARTICLE VII CHARGES – ROSS – POST HEARING BRIEF**
Closing Brief

By:   Robert Ross            Gina Guidry              Kit Gomez Alba
      1Rross@comcast.net     Guidrygina@yahoo.com     Sable227@gmail.com
      (916) 284-2402         (817) 793-8828           (360) 270-9552

# Charged Party Robert Ross
# Closing Brief

## **Table of Contents**

I.      INTRODUCTION

II.     STATEMENT OF ISSUE

III.    STATEMENT OF FACTS

IV.     VIOLATION ARGUMENT

        A.  Charged Violation #1: Misuse of Credit Card
        B.  Charged Violation #2: Rental Car
        C.  Charged Violation #3: Reimbursement
        D.  Charged Violation #4: SAF/MEA Meal Expense
        E.  Charged Violation #5: Payout of Vacation
        F.  Charged Violation #6: Maintaining an Office
        G.  Charged Violation #7: Payout of Vacation Days
        H.  Charged Violation #8: Buyout

V.      CONCLUSION

## I.   INTRODUCTION – Discussion / Background

Robert (Bob) Ross has currently been employed as a Flight Attendant/Purser at American Airlines for 38 years, beginning in 1983. During that time, throughout his career, he has been a trusted and respected member of the Flight Attendant labor union, Association of Professional Flight Attendants (APFA). For nearly twenty-five of those years, Ross held an appointed or elected position at both the local and national levels.

Bob Ross took office as APFA National President on April 1st, 2016, having won a landslide election with a 71% of votes cast. Bob Ross' years long reputation and trust among the predominantly Legacy American Airlines APFA members who, just over one year earlier had merged with US Air /America West Airlines, was instrumental in electing a member of their peers whom they trusted.

Bob Ross had been elected to a four-year term, starting on April 1, 2016. None of the candidates that ran for positions, nor any of the appointed department knew there was the potential for a re-run election in less than two years due to an ongoing DOL investigation into the electronic balloting process employed by APFA. It was discovered during the Ross Administration that the 2015 APFA Board of Directors (BOD) had been warned to revert to "Paper Ballots" to avoid any foreseen candidate complaints. Ross was not involved in any APFA leadership role in 2015 and would not have run for office or moved his family with that knowledge. An early DOL ordered re-run election caused much political turmoil to surface within the organization. It was impossible for Ross to successfully fulfill his campaign pledges or unite the membership. This was the reason Bob Ross chose not to re-Run for office for the remaining 18 months.

In 1977 the Association of Professional Flight Attendants (APFA) was founded. The most recent Constitution was approved by membership ratification in 1991. One of the more significant improvements to the Constitution was its authority to protect its Membership, Officers and Representatives, and ultimately the entity itself, through the **Article VII - Hearings and Disciplinary Procedures** process.

In the event of a **"willful"** act in violation of the terms of the APFA Constitution there is a process that could lead to an Arbitrated Hearing.

The intention and importance of this Article VII process was to provide a Fair and Equal opportunity for both the Accuser and the Accused so as not to violate the APFA Constitutional Rights provided for both parties. The APFA Constitution [Joint-Ex 1] parallels the U.S. Constitution in that they are to protect the Rights of all parties equally and to establish a Fair and Balanced procedure to establish the "Truth" behind charges or accusations and to adjudicate a fair and equitable discipline or remedy.

The intentions of the Article VII provisions and process were never designed to provide a means to weaponize this Article of the Constitution against a member, officer, or representative for personal or political gain. It was never intended to become a member's vehicle to harass or cause great harm against an opposing member, officer or representative, as the Charging Party has done on a consistent basis and at the financial, psychological, and social harm to their Accused. The term "Vexatious Behavior" [Tr. 41, 1-16] was used to describe the actions of the Charging Party toward Ross over the last 5 years, and it financially harmed the membership and the Union.

For this reason, a deterrent for such actions was included.

**Article VII, Section 1.H** is an actionable charge and states –

> **"Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained"**

Equally important in the process, is that of the Executive Committee (EC) to make an attempt to verify if the charges are indeed true and valid under **Article VII Section 1**, or if the charge is not protected under the Constitution or LMRDA Bill of Rights, that they are true.

This is an area of Article VII that Chinery and Lee use as a weapon against the person and not the practice. There are few avenues that provide the Accused the

opportunity to defend themselves against false charges prior to the Arbitration process.

Aside from being notified in a timely manner, so that the Accused can collect and provide proof or documentation on their behalf, and/or to attend an EC meeting on short notice in Dallas to speak to the charges or to show them to be Untimely and/or Not Valid. In essence, the Accused is at the mercy of the Accuser, and to some degree the EC as well.

The only requirement of the EC to find Validity and to pass charges, true or false, on to a costly Arbitration process for the Accused is to deem the accusations as Valid simply under the notion that "If the charges were true, then they are Valid". In the case of the Ross charges, there was no fair or timely avenue for Ross to be notified and to defend himself against false charges outside the Article VII and Policy Manual, Section 17 procedures. Article VII Section 8 – Internal Remedies addresses the avenue an Accused shall be given to defend themselves prior to an arbitration.

A simple email or phone call to Ross in the days leading up to the EC meeting on Dec. 1st, 2020, could have avoided these costly and humiliating charges. But then again, as stated in the Ross Opening Argument these charges really have nothing to do with truth, honesty, or the protection of membership dues money. As stated in the Ross Opening Argument, these Article VII charges were filed by the Charging Party as a weapon against Ross and the Officers of the Ross Administration.

The underlying reason for these charges and the use of the Article VII process as their weapon is two-fold. Ms. Chinery feels she was slighted in 2016 because she was not automatically given a paid appointed position within the Ross Administration in exchange for her election support. This is what led to her vow on April 2, 2016 "**I will work tirelessly to make sure you are out of office**". One day after Ross took office.

## II.  STATEMENT OF ISSUE

The issue to be determined in these Article VII proceedings is whether former APFA National President Bob Ross "**willfully**" committed the act of violating

==Article VII Section 1.F, as alleged by the Charging Parties, Melissa Chinery and Sandra Lee.==

**APFA Constitution Article VII – Grounds for Charges – Section 1.F – Willful Violation:**
> **Article VII Section 1.F.**
> **"Willful violation of an express article of this Constitution, or a proper express written resolution or policy of the Board of Directors or the Executive Committee"**

The Charging Party has alleged that former APFA National President Ross willfully committed up to Eight (8) violations or infractions of the APFA Constitution or Policy Manual during his term from April 1, 2016, to March 2, 2018 culminating into a single Article VII charge. Documents and discussion presented show that most of the alleged violations are the direct result of a mutual and legally binding agreement known as the "Ross Transition Agreement" (TA) executed on March 1, 2018.

The below alleged violations were the direct result of the "Ross Transition Agreement" and because Ross accepted the terms of a resignation agreement authorized and freely offered by the 2018 Board of Directors (BOD). The Ross TA, and not the Policy Manual, was the controlling document for the following alleged violations.

> **Charged Violation #5: Payout of Vacation**
> **Charged Violation #6: Maintaining an Office**
> **Charged Violation #7: Payout of Vacation Days**
> **Charged Violation #8: Buyout**

The "Ross Transition Agreement" was deemed to be a legally authorized and acceptable agreement in the Award Summary by Arbitrator Valverde in the Arbitration case Moyer vs 2018, dated September 21, 2021. In fact, the agreement would have never been necessary, as a means to save the membership tens of thousands of membership dues dollars, if it weren't for the misguided and irresponsible actions of Ms. Chinery and Lee. In the Award ruling by Arbitrator Valverde, in the case Moyer vs 2018 APFA BOD, heard on June 1-3, 2021, and subsequently awarded on September 21, 2021. In that case the Arbitrator found the dispute that Ross received a benefit he was not entitled to was "***without merit***". The charges in that case were dismissed. Therefore, it stands to reason the Accusers, Chinery and Lee, would have no claim that Ross received a benefit from

**Black Decl. Ex. O**

the "Ross Transition Agreement" that he was not entitled to and any alleged violation stemming from his acceptance of the agreement, should be dismissed.

Whereas the Arbitrator, designated in these Chinery/Lee v Ross Article VII proceedings, has the jurisdiction and authority to rule on the validity of charges and the remedy sought by the Charging Party to the allegation. Did former National President Ross knowingly or **"willfully"** violate an express Article of the APFA Constitution or Policy Manual, and did Ross "**willfully**" violate any express article of the Constitution and/or Policy Manual when he accepted the terms of the "Ross Transition Agreement"? [Ex. R6]. The Arbitrator also has the jurisdiction and authority to dismiss the Article VII Charges against the Accused.

The Article VII Arbitrator also has the jurisdiction and authority to rule, if Melissa Chinery and Sandra Lee did **"willfully"** bring charges against former National President, Bob Ross, as well as against the other Officers of the Ross Administration without having just cause and/or sufficient evidence to sustain the charges.

> **Article VII Section 1.G**
> *"Willfully acting in a manner that causes the Association to violate its legal obligations."*

Whereas it is within the right of the APFA BOD and Leadership to do all necessary to safeguard and protect APFA, They do not have the authority to unilaterally violate written agreements that harm a party to the agreement while aiding a non-involved member to the agreement in their quest to use that information against Ross.

> **Article III Section 3.A. – Board of Directors**
> A. **"The Board of Directors is authorized empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this Constitution and to establish, prescribe and adopt such other policies which may be consistent with this Constitution as requires for the direction and management of the affairs of the APFA.**

By violating the NDA clause of the "Ross Transition Agreement", APFA National President, Julie Hedrick, aided and abetted the agenda of Chinery and Lee to harm Ross and his family, financially, socially, and credibility.

The Charging Party used the information attained in the confidential agreement to libel Ross on social media, while misquoting and spreading misinformation from the agreement. After stating "we copied it word for word", they made it appear to Ross' coworkers that he demanded this agreement against the will of the BOD and profited from the agreement in a way that harmed the membership assets.

By supporting their actions against the Ross Administration in these Article VII proceedings and unilaterally violating the privacy of Ross by supplying the "Ross Transition Agreement (TA)" to the Charging Party, APFA deliberately violated stipulations #7 & #13 of the agreement.

> **Ross Transition Agreement**
> **#7 *"The parties agree that the existence, terms and content of this Agreement are completely confidential…"* and**
>
> **#13 "The Parties agree to submit any and all disputes regarding the Validity and Enforcement of this Agreement to a mutually chosen arbitrator whose decision shall be binding on all Parties…. "**

## III. STATEMENT OF FACTS

- April 2, 2016, a Social Medial Facebook post was declared by the Charging Party Melissa Chinery [TR. 383 9-23]
    - *"I will work tirelessly to make sure you are out of office"*
    - *Melissa Chinery – April 2, 2016, 11:54pm*
- Moyer vs 2018 BOD Arbitration - Trautman (witness) states he received no complaints from his base of 4500 Flight Attendants concerning Ross receiving the TA. Moyer Brief page 8 [Tr.404-15] (witness) testified that Attorney Mark Richards APFA Legal Advisor

- gave him confidence that the Ross TA was a legal action per the constitution. Moyer Brief pg. 6 [Tr.346]
- Charging Party used the terms Embezzlement in their description of Ross' actions, yet they do not charge Ross with Embezzlement in any charges.
- At no time between April 1, 2016 and 2022 (nearly 6 years), including any period leading up to or surrounding the Ross Resignation, has any APFA Officer or representative in any capacity ever filed a single charge or violation of any Constitution or Policy Manual Provision, nor has any union official ever accused Ross or presented evidence of any wrongdoings alleged by Chinery and Lee.
- At no time was Ross ever "requested" to pay for missing furniture. Any monetary value given to accounts receivable by Ross was strictly voluntary and the sole decision of Ross to do so. For the Charging Party to twist that voluntary offer in good faith into an admission of wrongdoing is akin to "Let no good deed go Unpunished".
- The APFA 2018 Policy Manual Section 8.I.3.b.(3) was silent on inventory of apartment furniture or furnishings and only required that office equipment and furnishings with a value over $125 be inventoried
- In charges Chinery and Lee state Tools and other items were never inventoried and were not returned to APFA when he resigned. In Fact: Ross left abruptly in Mar 2018. Three Administrations occupied APFA Headquarters between Mar. 2018 and Nov. 2020. The Charging Party would have no knowledge to allege Ross took any items simply because they were not located three years later.
- Erik Harris, APFA Treasure testified and agreed Ross is still owed pay for 12 "SICK" Days, per the Ross TA [Tr.171 23-25 / Tr. 172 1-3] [Tr.180 23-25]

On Aug. 3rd, 2020, recently elected National President Julie Hedrick, at the advice of recently hired Attorney William Osborne, took it upon themselves to expose the "Ross Transition Agreement" to the Charging Party, while violating the APFA Policy Manual, 7.G.1, without any discussion or input from Ross. Osborne felt the terms of the agreement should not have been subject to an NDA requirement and that the NDA was in violation of both the APFA Constitution and the Landrum Griffin Act [Ex.R10] Mr. Ross disputed this action with Mr. Osborne [Ex. R10-11] as the unilateral decision to expose the agreement with "a member" was in violation of Stipulation #13 of the "Ross Transition Agreement,. [Ex. R6] Doing so unilaterally was also a violation of Ross' Privacy under Article II Section 3.C.

President Hedrick gave Ross no prior notice or opportunity to object to the release of his Transition Agreement and it was released to Chinery and Lee the next day.

This action not only violated the terms of the Ross TA, Stipulation #13, it also violated the APFA Constitution Article VII, Section 1.F.

At no time was Ross afforded the terms of the Ross TA Stipulation #13 and to this day President Hedrick and APFA Legal counsel refuse to acknowledge that stipulation #13 exists, further violating Ross' rights under **Article II Section 3.D – "All members of APFA shall have the Right to Due Process and Equal Representation"**.

On June 1st, 2021, the Article VII case, Moyer vs 2018 BOD was heard by Arbitrator Valverde. This case was filed by former APFA member Julie Moyer, stating that the 2018 APFA BOD did not have the legal authority to authorize and enter into the confidential Exit Package, known as the "Ross Transition Agreement", and that it did not have the authority to include an NDA. [Ex. R7]

What the Charging Party did with their knowledge of the Ross Transition Agreement as of Aug. 2020 was to rewrite the agreement separately, [Ex. R6B], changing many of the verbiage of stipulations and omitting portions of the agreement, after stating to the membership "they copied it, word for word". Most notably and troublesome was the alteration of Stipulation #4 then releasing their document on social media as the original and accurate Ross Transition Agreement.

Were they given an altered document by APFA or did Chinery and Lee alter the document on their own prior to its release on social media? Through the record, the Charging Party states they haven't seen the Ross Transition Agreement. [Tr. 142 9-15] APFA to date has refused to meet to discuss the issue concerning the difference in language given to Chinery and Lee and what was portrayed as the actual document on social media declaring, "we copied it word for word".

<u>Original Signed – Ross Transition Agreement (Stipulation #4) [Ex. R6]</u>
**#4 – "APFA Agrees to Pay ROSS all of his accrued and unused Sick and accrued and unused Vacation time, from April 1, 2016, through July 31, 2018."**

<u>Altered Unsigned – Document [Ex.R6B]</u>
**#4 – "APFA agrees to pay Ross all of his accrued and unused <u>back</u> vacation time from April 2016 through July 31, 2018."**

Note the omission of the reference to "accrued and unused "Sick" time in the altered document and the additional word "back" vacation time. The word "back" is not mentioned in the original document and the exclusion of any reference to Ross' "accrued and unused Sick time" from April 2016 (missing April 1), gives the illusion, when compared to the final payout Ross received, that Ross was overpaid.

This altered document was not only spread to many Facebook and social media outlets, it was given to the Director of the Dallas DOL and to Aviation news columnists. It was also used as the supporting documentation in the Moyer vs 2018 APFA BOD Article VII case and in other Article VII charges against the Ross administration. The Executive Committee's decision and vote on validity was also based on this altered document, not to mention all correspondence to Arbitrator Howell Lankford was based on this altered Transition Agreement.

At no time was it made known that the Ross TA, used to incriminate Ross as well as the 2018 BOD and other members of the Ross administration, was in fact an altered and unsigned document.

Even more troubling is that members of the 2018 BOD were still on the 2020 BOD and, as signators to the agreement, had direct knowledge of the Ross Transition Agreement because they signed the agreement. Yet to date, at no time has the APFA BOD or its legal staff acknowledged that the altered Ross TA had led them to believe Ross was overpaid. In fact, the original signed TA does not state that the formula for payments of accrued and unused Sick and Vacation were to be paid "per policy" for a normal end-of-term officer.

Mr. Osborne was fully aware of a similar Resignation Transition Agreement [Ex. R8 Amicus Brief] between the 2015 APFA BOD and the former National President Laura Glading. Ms. Glading was also persuaded to resign early in October 2015, months before the normal end of her term. That 2015 Glading TA was never exposed to the membership in Aug. 2020, as was the Ross Agreement, even though it also contained an NDA that Mr. Osborne felt was not legal in the Ross Agreement. The Glading agreement contained, not only a similar NDA as the Ross Agreement, but it also contained language stating Glading is to be made whole for advancing her resignation date and that Glading was to receive a pay formula similar to that which Ross received. That included salary, SAF and related

payments, vacation and sick accrual and health insurance. <mark>Nowhere in the Glading or Ross agreements does it state payments were to be made in accordance with the APFA Policy Manual.</mark> [Ex. R8 Amicus Brief ]

**Agreement between the APFA BOD and National President Laura Glading**

**Stipulation #2**

"Laura shall receive all of the compensation and benefits that she would have received had she resigned effective December 2, 2015 and shall be made whole for advancing her resignation date. This shall include but not be limited to:

a.  Through December 2, 2015:
1) National President Salary
2) SAF and related payments
3) Vacation and sick leave accrual; and
4) Health and other Insurance
b.  One month's Transition accordance with Section 6.B.7 of the APFA Policy Manual
c.  Accrued vacation and accrued sick leave payout
d.  Make whole for the flex spending account money Laura shall forfeit; and
e.  Expenses in connection with returning her car and her personal possessions to her permanent residence.

**Stipulation #6**

"Neither Laura nor any member of the Board, in their official or personal capacities, shall state or imply, either publicly or privately, that in exchange for advancing her resignation date Laura sought and/or was given and payment or other financial benefit to which she would have not been entitled had her resignation been effective December 2, 2015."

**Stipulation #10**

"Except as may be necessary to enforce this Agreement, the existence of this Agreement and its terms shall remain strictly confidential, and shall not be shared oin writing or verbally with any parson or entity other than the current Base Presidents and the current National Officers"

As is shown in the stipulations from the 2015 Glading agreement above, stipulations are worded differently but similar in intent and enforcement. However, the Ross Agreement has been the target of National President Julie Hedrick and her hired outside legal counsel William Osborne for the intent to nullify the NDA of the Ross TA and expose the contents of the Ross TA to the Charging Party. Mr.

**Black Decl. Ex. O**

Osborne is apparently an APFA Paid Attorney that Ross, as a current member of the APFA BOD, has never met. Neither Mr. Osborne nor National President Hedrick have ever consulted with Ross as a BOD member on any issue or direction of APFA.

Mr. Osborne's role was to determine that the Terms of the Ross TA and the NDA within it were not legally negotiated in accordance with the Landrum Griffith Act in an effort to expose the agreement in support of an Article VII campaign by the Charging Party. By doing so the Agreement could be provided to the Charging Party and terms within the agreement could then be scrutinized as violations of APFA Constitution and/or APFA Policy manual by Ross. If successful, Chinery could once again petition the APFA BOD to remove Ross form his position as San Francisco Base President and BOD member.

The fact that a similar Resignation TA was negotiated and authorized by the APFA BOD has never been a deterrent for the 2020 BOD or EC from allowing the Charging Party to move forward with Article VII as valid charges. This information would have certainly come out early in the process had **Article VII Section 8 – Remedy** been afforded Ross as a course of action. That would have been an opportunity to deem all violations in the Chinery/Lee vs Ross Article VII charges invalid and most certainly all alleged violations having to do with the terms approved by the BOD in the Ross TA.

Any alleged violation having to do with the terms of the Ross TA should be considered invalid and withdrawn by the charging party or dismissed by the Article VII Arbitrator, as they were not a "Willful" violation of any provision in Article VII Section 1. As it stands now, all violations pertaining to the provisions in the Ross Transition Agreement have been deemed legally authorized by the BOD, as per the award in the Moyer vs 2018 BOD Article VII case heard on June 1, 2021, by Arbitrator Valverde.

It is ironic and contradictory to think that APFA and Attorney Osborne would defend the 2018 BOD, in the Moyer vs 2018 BOD arbitration, as it supported the Union's position that the Ross Agreement, with its NDA, was entered into legally at the advice of then APFA Legal Counsel, Mark Richard in 2018. However at the same time APFA President Hedrick and Attorney Osborne unilaterally exposed the Ross TA by deeming the Agreement's included NDA to be invalid. This Attorney

**Black Decl. Ex. O**

William Osborne immediately exposed the agreement to Chinery and Lee in August 2020 [Ex.9&10] without consulting Ross who was a party to the agreement and was directly harmed when Chinery and Lee exposed the agreement to the membership. The Ross TA is the center point of several Charging Party's accusations.

This disparate treatment against Mr. Ross is a violation of APFA Constitution Article II Section 3.C and D.

Article II Section 3 – Bill of Rights of Members
C.    All members of the APFA shall have the right to individual privacy
D.    All members of the APFA shall have the right to Due Process and Equal Representation.

By denying APFA member Ross his equal rights under the APFA Constitution Article II Section 3.C and 3.D; and by violating Ross' rights under the conditions and stipulations of the 2018 Ross TA, APFA President Hedrick, with the aid and support of the 2020 BOD has also violated **Article VII Section F – Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee**. Although the verbiage, "or Agreements of the BOD" is not specifically written in the Article VII Section 1.F, the Ross TA is a legally signed and authorized Agreement by the Board of Directors. Willfully violating the intent and terms of stipulations within the agreement, without the knowledge or consent of Ross. This a violation of the express written agreement. The BOD and Ross entered into the agreement upon the advice of long-time labor attorney Mark Richard. Mr. Richard is a long-practiced attorney with decades of experience in labor law.

One important element of the Article VII process that could have, and should have, been exercised as a means to seek the truth to these charges and to avoid the costly and damaging Article VII Arbitration process was not provided. Mr. Ross' right to Due Process was violated because at no time was Ross offered remedy under the terms of **Article VII, Section 8 – Internal Remedies:**

### Article VII Section 8 – Internal Remedies
*"Members, Officers and Representatives shall exhaust internal remedies under this Article for a period not to exceed four months prior to taking any legal action against*

*members, officers or representatives of the APFA with respect to matters cognizable under this Article VII"*

In fact, Mr. Ross was not notified in a timely manner that Article VII charges had been filed against him. He never knew there was any issue with any aspect of his previous tenure as APFA National President from over 2 years prior until days after the EC had meet and ruled on the charges to send them to Arbitration. This is not how the Article VII process was intended to be used. At no time was it assured that Ross was properly notified of Article VII charges submitted by the Accusers until after the EC had meet and heard the charges on Dec.1st, 2020. At the very least, Ross should have been offered a form of mediation and the ability to rectify any issues that were unknown to him prior to or in lieu of Arbitration against false charges.

Regardless of the language in the **Constitution Article VII** or **Policy Manual Section 17**, this was an abrogation of Ross' due process rights as afforded to every APFA member according to **Constitution Article II Section 3.D – Bill of Rights of Members:**

> **Article II Section 3.D**
> *"All members of the APFA shall have the right to Due Process and Equal Representation."*

Mr. Ross has now been needlessly embroiled in these Article VII charges and has endured an additional 14 months of social media harassment and libel by Ms. Chinery and Ms. Lee, which has created a hostile work environment by the cult like followers who react to Chinery's daily Facebook attacks against Mr. Ross. These daily attacks include constant social media libel as well as letters to the APFA BOD including their Attorneys, the DOL Dallas District Inspector and to News media outlets and reporters, as recently as Jan. 22nd, 2022.

Melissa Chinery continues to follow through with her social media post:
> ***"I will work tirelessly to make sure you are out of office"***
> ***Melissa Chinery – April 2, 2016 @ 11:54pm***

Black Decl. Ex. O

## IV. VIOLATION AURGUMENT

## A.   Misuse of Credit Cards

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.G. as "Business Related Expenses".

Chinery and Lee state that multiple purchases violate Policy Manual 5.G – Business Related Expenses, however, Business Related Expenses are actually defined in Policy Manual Section 5.F.5. Section 5.G is "*Other Expenses*".

**5.G Other Expenses – Actual out-of-pocket expenses incurred by a member conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for personal profit of the APFA member, but to compensate him/her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.**

The parties cited the wrong policy in their support of these charges, evidence of their lack of understanding the process and policy. No purchases made on the Ross union credit card was submitted for reimbursement on the weekly/monthly expenses. Receipts were submitted for each credit card charge and reviewed per policy by the appropriate accounting and legal departments. Chinery and Lee admitted they did not review any other administrations union credit card charges for similar purchases or past practice or for expenses when said officers relocated to DFW.

## B.   Misuse of Rental Car / Section 5.H. Relocation

Charging Party have alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.H. Relocation.

**Policy Manual Section 5.H.4 – Relocation states:**
**In addition to H.2 or H.3 above, the APFA will reimburse a National Officer/Chair for the cost of relocating one (1) personal automobile to/from the DFW area. Such reimbursement will be either for actual shipping charges or the applicable mileage rate by the APFA Board of Directors.**

Chinery and Lee have alleged that former APFA National President, Bob Ross, billed APFA for a rental car when he relocated to Dallas. Provided in an email dated March 20, 2019. [Tr.364 23-25 and Tr.365 20-25] [Ex. R31] This email to the APFA National Treasurer substantiates a timeline that is outside the scope of timeliness that could be used in these charges.

The use of a rental car, billed to the National President's department during the timeframe according to the Charging party's allegation, is coincidental to the timeframe of the Ross relocation, but was not as a condition of the relocation. 2016 APFA Policy Manual Section 5.H – Relocation – was silent on the use of rental cars in connection with or during the timeframe of a relocation.

This issue was previously reviewed by the APFA BOD at the time the email was sent to the National Treasurer in March 2019. The APFA BOD and Budget Committee members tasked with this review took no action on this matter and the issue was closed. [Tr. 366 1-18]

Point of clarification: Several rental cars were rented through the President's office for numerous representatives during this time frame and not specifically to Bob Ross for personal use. [Tr. 390 10-25] [Tr. 422 10-25] Department representatives having access to rental cars during this timeframe included, but is not limited to, uniform committee members, toxic fume events and other committee representatives. At no time did the Charging Party cite evidence that a rental car was provided for Ross' sole personal use.

**Black Decl. Ex. O**

## C.    Reimbursement

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.G. – Other Expenses / Mileage.

**Section 5.G: Other Expenses:**
**5.G.1.b. (1).(a) Mileage:**
**[2]. Mileage shall not be reimbursed for travel between the representatives' residence and an APFA office that has been provided for the primary use of the representative for a period in excess of 31 days.**

Chinery and Lee have formed their own theory and alleged that former APFA National President, Bob Ross is in violation for claiming mileage for attending meetings with the Company or claiming mileage for any event outside of APFA headquarters while conducting APFA business while using a rental car.

At no time did Bob Ross, file for reimbursement for mileage from his residence to the APFA headquarters. The Charging Party did not present evidence that Ross claimed a mileage reimbursement while using a rental can and not his own vehicle.

Section 5.G.b.1(a)[1] is silent on a specific vehicle to be used in the reimbursement of mileage. At any given time, an APFA Representative could be subject to using their personal vehicle or a "Rental Car" for conducting APFA business.

## D.    SAF/MEA and Meal Expenses

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.F: Business Related Expenses:

**Section 5.F.5. Business Related Expenses:**

a. **Representatives are authorized to pay for and to be reimbursed for the meal, snack, or beverage of a guest(s) or other business associate(s)on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.**

1. **Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to the limitation and revocation of this privilege.**

2. **In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.**

APFA had no policy on how to differentiate or separate any amounts from the guaranteed MEA/SAF totals when National Officers, Regional Representatives, National Chairs, or other Representatives, who are authorized a full month trip removal pay and are receiving guaranteed stipends of MEA/SAF and are considered a host of an authorized APFA meeting.

APFA also had no policy in place until 2021, for a National Officer in relation to one's union credit card practice. At the APFA BOD Convention in March 2021, APFA National Vice President, Larry Salas, put forth Resolution #10, Business Related Meals which provides a clear policy on reimbursement of business-related meals and group meals and entertainment expenditures. The resolution unanimously passed. Resolution #10 [Ex. R39] was not only put forth to establish policy but to prevent further Article VII charges against APFA leadership.

This resolution secures the established practice for an APFA Representative authorization to pay for meals of a guest associate when the representative would be considered the host of an authorized APFA function or meeting, while not counting against the representatives MEA. Examples would be the National Treasurer providing lunch for the Budget Committee, the National Vice President providing lunch for their Regional Representatives or the National President providing lunch for their PR Firm, Negotiating Committee or Department Chairs.

Once again, the Policy Manual was silent on this issue. Had Ross been afforded the rights under Article VII, Section 8 – Internal Remedies, these facts would have surfaced within the four months prior to taking any legal action against Ross, who was a member at the time of charges.

**Black Decl. Ex. O**

## E.   Payout of Vacation – Change of formula to include MEA/SAF

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of 5.E.4 Special Assignment Fee (SAF) and 5.F.1 Meal Expense Allowance (MEA) rates:

**Special Assignment Fee (SAF) Policy:**
**The intent of the SAF is explained in Section 5.E.1**

**5.E.1.a. – The intent of the Special Assignment Fee (SAF) is to offer payment to the representatives for the days that they conduct APFA business in excess of their normal scheduled bid line. Amounts paid under this arrangement are reportable as <u>wages</u> on the representative's W-2 and are subject to withholding and payment of employment taxes.**

**5.E.4.a.(1) – If a Representative performs work for the APFA, and is not otherwise paid for that day's work by means of an APFA Paid Trip Removal…….such representative shall receive the Daily SAF for work performed in accordance with the following schedule.**

**Calculation for the National Officers' SAF is specifically delineated in Section 5.E.4.c – SAF Rates – Monthly –**
    **(c)National Officers and Regional Representatives: $400 minimum, but not to exceed $500 maximum.**

**<u>Meal Expense/Meal Expense Allowance (MEA)</u>**
**Guaranteed MEA at Residence is explained in Section 5.F.3.a**

**5.F.3.a – On days a representative is both trip removed and performing work for the APFA at his/her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2.**

**5.F.3.d – National Officers, Regional Representatives, National Chairs and other representatives who are authorized full month trip removal or the equivalent shall receive a "Guaranteed MEA at Residence" of Three Hundred dollars ($300) per month.**

**Section 5.F.4.a – Calculation of MEA**
**National Officers, Regional Representatives, National Chairs and other representatives who are authorized full month trip removal or the equivalent (e.g. "Payback as provided in D above) shall receive a minimum MEA of Three Hundred dollars ($300) per month**

**Maintaining an Office Outside of Residence (MOOR)**
**Maintaining an Office outside of residence is required of APFA President, as the office is located and maintained at APFA Headquarters and is paid in addition to SAF.**

**5.E.4.c.(3).(a) – A National Officer, Regional Representative, National Chair, Base President and/or Base Vice-President who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.**

**5.F.1.a.(1) – Per Diem Rate (Accountable Plan)**
**(1) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA. Also required for the purposes of calculating how much Special Assignment Fee (SAF) an officer receives, it is imperative that the officer fill out the required weekly paperwork that would ascertain how many hours were worked for the APFA.**

All payouts and formula used to calculate the payout for vacation, sick and end of term buyout of accrued and unused Sick and Vacation days occurred after former APFA President Ross had left office and was the product of a Transition Agreement and not specific to APFA Policy. Through sworn testimony, former APFA National Treasurer, Eugenio Vargas, used full salary vs basic salary in these calculations, which include MEA and SAF in compliance with the terms of the controlling document, the Ross TA.

National Officer or Regional Representative on a full month trip removal shall receive per policy a $500 maximum of SAF payment.

National Officers, Regional Representatives, National Chairs and other APFA Representatives on a full month trip removal shall receive a minimum Guaranteed MEA of $300 per month.

Each National Officer, per policy, each month received the guaranteed amount of $1050 ($500 SAF, $300 MEA and $250 MOOR) in addition to basic salary. This amount was determined by the APFA Accounting Department. [Tr.136-138] and was the combined stipend included as Salary and Benefits per the Ross TA used by the former APFA Treasurer, after Ross left office, to calculate the daily rate of unused Sick and Vacation Days that Ross was not allowed to use during his final 5 months as National President to "make him whole". These amounts were paid after Ross left office and as a condition of the Ross TA. It is irrational for the Charging Party to request that weekly timesheets were required to receive these payments for the months after Ross left office.

On January 14, 2022, an APFA document surfaced that was withheld from document retrieval that corroborates the Policy Manual was not the controlling document to the Ross TA and therefore Ross was paid in compliance with the TA. This document would have been exculpatory to the defense of Mr. Ross on this and other matters pertaining to the Ross TA had it been provided.


## F.   Maintaining an Office (MOOR)

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.E.3 Maintaining an Office Outside of Residence:

**Maintaining an Office Outside of Residence (MOOR)**
Maintaining an Office outside of residence is required of APFA President, as the office is located and maintained at APFA Headquarters and is paid in addition to SAF.

**5.E.4.c.(3).(a) – A National Officer, Regional Representative, National Chair, Base President and/or Base Vice-President who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.**

National Officers, Regional Representatives, National Chairs and other APFA Representatives on a full month trip removal shall receive $250 per month for maintaining an office outside of residence.

Each National Officer, per policy, each month received the guaranteed amount of $1050. This amount included $500 for SAF, $300 for MEA and $250 for office outside of residence. This amount was determined by the APFA Accounting Department and provided to all National Officers as part of their salary. This charge also should be dismissed as Ross did not pay himself the payments under the terms of the Ross TA.

## G.   Payout of Vacation Days

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 6.B.1: National Officer Salary and Benefits

**B.1: Vacation:**
> **c. – At the end of a fiscal year, up to fourteen (14) days of any unused APFA vacation allowance will be paid to the National Office at a rate prorated on the National Officers' annual salary for the period of APFA vacation allowance owed.**

Any change to the formula used to calculate the payout for vacation, sick and end of term buyout occurred after former APFA President Ross had left office. Through sworn testimony, former APFA National Treasurer, Eugenio Vargas, used full salary vs basic salary in these calculations, in compliance with the Ross TA.

The Ross Transition Agreement stated Ross would be paid any and all accrued and unused sick and vacation from April 1, 2016 – July 31, 2018. The calculation of the unused days was to be paid as though Ross was able to use any of those days while in office as President for his remaining 5 months had he not resigned. [Tr. 147 25 / Tr. 148 1-2] There was no agreement that these days were to be paid per Policy as the Charging Party insists. [Tr. 160 12-18] [Tr.182 3-9]

It has, however, been determined in sworn testimony by the APFA National Treasurer, Erik Harris, that Bob Ross was incorrectly paid for his accrued and

unused Sick days per the Ross TA. To date, Ross is still owed monies for 12 days of sick time per the agreement. [Tr.171 23-25 / Tr. 172 1-3] [Tr.180 23-25]

Ironically, an investigation into the payout of the Sick and Vacation days paid, brought about by the Charging Party's allegations, it was discovered Ross was not properly paid "All" of his accrued and unused Sick days from April 1, 2016 – July 31, 2018. Ross earned and did not use 18 Sick days in each of the fiscal years April 2016-March 2017 and April 2017-March 2018. Ross was only paid Per Policy 6.B.3.d Offset/Loss of Sick Time, of 12 days for each fiscal year. The additional 12 days, (6) days Apr. 2016-2017 and (6) days Apr. 2017-2018 have still not been acknowledged or paid to Ross in accordance with the Ross TA. The value of these lost Sick days, depending on the calculation used, is in excess of $3400 still owed to Ross.

The fact that "Sick Days" was not mentioned in these charges, when the payout of sick days was identical to the payout of vacation days lends credence that the altered Ross TA document was used as the basis for these Article VII charges.

## H.   Buyout

Charging Party alleged that former APFA National President, Bob Ross, failed in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of the Ross Transition Agreement. The Charging Party states:

**"As has been recently revealed, former President Bob Ross received a "buyout" from the APFA Board of Directors, and was compensated for leaving office. Indeed, he collected more money than if he had remained in office for the four (4) months left in his term. However, once Mr. Ross left office, he asked for and collected from the APFA compensation in two forms he was not entitled to per the "agreement." One form of compensation which he received every month was MEA and SAF and Maintaining an Office Outside Residence. Mr. Ross continued to collect one thousand and fifty dollars ($1050) a month."**

**"He collected these payments for the months of: March, April, May, June and July of 2018. This stipend is clearly hinged on reimbursement related to work and not part of the National Officer salary. To accept this money is in clear**

**violation of the intent of the Policies written that allows a representative extra compensation for working hours above and beyond their scheduled workload. By taking this money this is another violation of the Section 5 policies outlined above.**"

Charging Party alleged that former APFA National President, Bob Ross, **asked** for and collected more compensation than he was entitled to in the Ross Transition Agreement.

In February 2018, in Charlotte, North Carolina, the APFA BOD convened for their annual convention, the voting BOD, under strict consult of APFA legal counsel, Mark Richard negotiated the Ross Transition Agreement.

These negotiations were solely between the voting BOD, APFA Legal Counsel Mark Richard and APFA President Bob Ross.

Bob Ross was to receive no more or no less than he would have received had he remaining in office. The APFA Treasurer was tasked with the payout of this agreement by viewing only the economic portions of the Agreement which encompassed stipulations #3, #4 and #5. There was no copy of the Ross Transition Agreement on file at APFA headquarters.

Stipulation #3 of the Ross Transition Agreement states "APFA agrees that Ross will continue to receive from APFA his current **full** salary and benefits, including full insurance coverage, through July 31, 2018. [Tr.190 12-23]

**Full Salary** for a National Officer, per the APFA Policy Manual, Section 5 entitles the officer to receive guaranteed MEA, SAF, and Office Outside of Residence payment. This guaranteed payment is $1050, which is considered gross wages and recorded in "Box 1" of the National Officers W-2 tax form.

Former APFA National Treasurer Vargas has stated in sworn testimony he used full salary vs basic salary for all calculations in compliance with the Ross Transition Agreement. This full salary calculation would include the benefits of MEA, SAF and any accrued and unused sick and vacation that he would have coming to him as President for those 5 months (4/1/16-7/31/18), as if he remained in office. [Tr. 147 25 / Tr. 148 1-2]

While the Charging Party state in their remedy sought, that the payments to Ross were "designed to inflate pay and benefits that Mr. Ross received", the purpose of the Ross TA, offered and authorized by the APFA BOD was to "make Ross whole" not to inflate pay and benefits.

The NDA on both the Glading and Ross Transition Agreements were lifted at the same time by APFA National President, Julie Hedrick, allowing both Chinery and Lee to view both agreements in their entirety for language and payment comparisons. This review would provide the timeline needed to hold all parties accountable for the alleged improper calculation used in the Glading agreement and afford them the opportunity to continue their vigorous campaign to discover the truth. To date, no other Article VII charges have been filed against any member of the APFA Leadership in regard to the Glading agreement.

Article VII charges were filed against the 2018 APFA BOD by member Julie Moyer, questioning their constitutional authority as the governing body to safeguard and protect APFA by entering into the Ross Transition Agreement.

The hearing in the matter of arbitration between Julie Moyer and the 2018 BOD, before Article VII Arbitrator, Edward B. Valverde was held on June 1-3, 2021, with a decision on September 21, 2021.

Arbitrator Valverde found credible evidence that the action of the APFA BOD was permissible under the provisions of the APFA Constitution and the charges brought forth by Julie Moyer were without merit. The matter was dismissed in its entirety.

Based on the "Award" in the Moyer vs the 2018 BOD, we ask that any portion of these charges associated with the Ross Transition Agreement be found invalid, which through the award was proven the BOD acted within their constitutional authority under Article III, Section 3.A. of the APFA Constitution.

## V.  Conclusion

The premise of Ms. Chinery and Ms. Lees's allegations are that former APFA National President Ross "willfully" violated APFA Constitution Article VII, Section 1.F, "Willful violation of an express article of this Constitution, or a proper express written resolution or policy of the Board of Directors or the Executive Committee"

In these Article VII charges the "Burden of Proof" belong to the Charging Parties, Melissa Chinery and Sandra Lee. The obligation to present and meet this criteria has not been meet.

Based on their obvious flawed Article VII charges, the personal attacks against former APFA National President, Bob Ross, starting as a vow on social media on April 2, 2016, which started this vicious journey, along with the failure to prove their case, while ignoring any and all past practice at APFA. The actions of Mr. Ross, in these charges, was not deliberate, intentional, premeditated and they were not **"Willful"**.

We ask that the Article VII charges against Bob Ross be dismissed in their entirety.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct original of the foregoing was sent via electronic email to APFA Secretary, Josh Black, email: Secretary@apfa.org on this 18th day of February 2022.

By: /s/  Kit Gomez Alba, Representative
     /s/  Gina Guidry, Representative

**Black Decl. Ex. P**

Letter

## Kit Gomez Alba <sable227@gmail.com>

Sun 2/27/2022 8:54 PM

To:National Secretary <secretary@apfa.org>

Cc:1Rross <1rross@comcast.net>

📎 2 attachments (485 KB)

Oct. 22. 2020 Audit Bob Ross.pdf; Bob Ross Letter to Arbitrator Feb 26 1d 1 1 1 1(1).docx;

Dear Josh:

Please forward this letter immediately to the Arbitrator.

Thank you.

Kit Gomez Alba

Co-counsel for Bob Ross

**APPX. 0214**

February 26, 2022

Dear Arbitrator Armenderiz:

We apologize for bothering you after submission of our final post-closing brief, however vital information came to our attention and we thought it prudent for you to have in your possession while considering this matter. Attached is a document that Mr. Ross received in the mail on February 11, 2022 related to a separate legal matter. His legal counsel considered it confidential and only gave us permission to release it to you today. This document was attached to a separate Tarrant County court filing, referred to as Exhibit B, called "Confidential Memorandum" dated October 22, 2020. It appears to have been drafted and issued by the accounting firm Wood, Stephens & O'Neill, LLP. This is an independent accounting firm with long history of working with APFA. This "Confidential Memorandum" was directed to the APFA Board of Directors and the APFA Executive Committee and states the following:

**"To prepare an overpayment schedule of the accrued and unused sick, and accrued and unused vacation time payments made to Bob Ross in 2018, _similar_ to the overpayment schedules we prepared previously for the other three officers. Please see the enclosed schedules B and C for each officer. These overpayment schedules for the other officers were previously provided to the Board of Directors. Please note the Bob Ross confidential transition agreement states that he will be paid all his accrued and unused sick, and accrued and unused vacation time. _This agreement doesn't specify that the payments be made in accordance with the policy manual guidelines. Consequently, these payments appear appropriate and in compliance with the transition agreement._ This agreement also specifies reimbursement payments to him of up to $10,000 in actual moving expenses. His moving expense reimbursement payments did not exceed this amount."**

We need to make you aware of this document since Mr. Ross was never given a copy of this in the document dump delivered to us by APFA just before arbitration hearing.

We believe this document may have been intentionally withheld due to the nature of its content and the fact it is exculpatory with regard to the calculation Ross' sick and vacation pay as well as his moving expenses under his transition agreement.

The intended recipients of this document were the APFA Board of Directors and Executive Committee. We have confirmed the intended recipients were in fact, never shown this document. Had the Executive Committee been given this document for review, this would have had significant impact when they were considering the validity of the charges against Mr. Ross. To have withheld a document from its intended recipients (the governing body) is indicative of nefarious behavior within APFA

Had this document been properly disseminated, it's existence would have been known and could have been used in Mr. Ross' defense at the hearing. It has only surfaced due to being obtained in the separate legal issue.

**Black Decl. Ex. P**

We therefore request that this document be included for your review under the APFA Policy Manual Section 17.Q, which allows for consideration of additional documentation, information and testimony after the closing of a hearing upon "showing good cause." The relevant language from the Policy Manual is as follows:

"**Section 17.Q: REOPENING THE HEARING**

**1. At any time prior to the issuance of the Arbitrator's decision, a hearing may be reopened.**

**a. A hearing may be reopened only upon the showing of good cause.**"

Good Cause clearly exists, as this clarifying document was withheld despite its exculpatory nature. It is reasonable to assume that it was withheld because of its content. It should not escape your notice that this document was something Mr. Ross should have been made aware of this internal matter.

Furthermore, we now must question whether Ms. Chinery and Ms. Lee were made aware of this document by Mr. Black who was one of the recipients. We must also question the impartiality of Mr. Black and other APFA National officers as they recently attended the wedding of Ms. Chinery in Hawaii to one of APFA's attorneys. We await your response to these matters and request that no award is rendered without consideration of this important document. We are enclosing the document for your review and entered into the record.

If you have any questions, please feel free to contact us.

Sincerely,

/s/ Kit Gomez Alba

sable227@gmail.com

Co-counsel for Robert Ross

Cc: Robert Ross

    Gina Guidry

Attachment: October 22, 2020 Audit

**Black Decl. Ex. Q**

---

## Liz Marko

| | |
|---|---|
| **From:** | Ruben Armendariz <arbruben@gmail.com> |
| **Sent:** | Monday, February 28, 2022 3:37 PM |
| **To:** | National Secretary |
| **Subject:** | Re: Letter |

Good Afternoon Josh, please forward to Ms. Gomez Alba.

Dear Ms. Gomez Alba,

I have reviewed your request to reopen the record on the the Ross Case. While I recognize the Policy Manual states;

> **"Section 17.Q: REOPENING THE HEARING**
>
> **1. At any time prior to the issuance of the Arbitrator's decision, a hearing may be reopened.**
>
> **a. A hearing may be reopened only upon the showing of good cause."**

Your request at this juncture to reopen the record is hereby denied. I am comfortable with the record as it stands now. This issue was raised and argued at hearing. I do not believe a showing of further good cause or additional substantive material should be introduced into the record as I believe the record is complete regarding the issue raised herein.

Yours truly,

Ruben Armendariz, Arbitrator
Member: National Academy of Arbitrators
29010 Pfeiffers Gate
Fair Oaks Ranch, TX 78015
arbruben@gmail.com
210-379-0860

> On Feb 28, 2022, at 11:52 AM, National Secretary <secretary@apfa.org> wrote:
>
> Please see attached
>
> ---
>
> **From:** Kit Gomez Alba <sable227@gmail.com>
> **Date:** Sunday, February 27, 2022 at 8:54 PM
> **To:** National Secretary <secretary@apfa.org>
> **Cc:** 1Rross <1rross@comcast.net>
> **Subject:** Letter
>
> Dear Josh:
> Please forward this letter immediately to the Arbitrator.
> Thank you.

APPX. 0217

Kit Gomez Alba
Co-counsel for Bob Ross

<Oct. 22. 2020 Audit Bob Ross.pdf><Bob Ross Letter to Arbitrator Feb 26 1d 1 1 1 1(1).docx>

2

Black Decl. Ex. R

<u>In the Matter of Arbitration Between</u>

|  |  |  |
|---|---|---|
| | ) | |
| **Melissa Chinery** | ) | |
| **Sandra Lee** | ) | **RE: Article VII Charges** |
| | ) | **Violations of APFA Constitution** |
| **APFA Charging Party Members** | ) | **and APFA Policy Manual** |
| **(Plaintiff)** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **Robert Ross, Former APFA National** | ) | |
| **President** | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |

**Before:**               **Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:**      **The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

**June 16, 2021, continued to November 17 and 18, 2021**

**Appearances:**

**For Charging Party Members:**      **Melissa Chinery, Representative**
      **(Plaintiff's)**                **Sandra Lee, Representative**

**For Charged Party Member:**      **Kit Gomez Alba, Esq.**
      **(Defendant)**                **Gina Guidry, Representative**
                **Robert Ross, Representative**

APPX. 0219

Black Decl. Ex. R

## INTRODUCTION

This is an Article VII Hearing that was heard at the Westin Irving Convention Center at Las Colinas, Irving, Texas on June 16, 2021 and continued to November 17 and 18, 2021. The arbitration hearing was transcribed by Carson Reporting & Associates.

Charging Party Melissa Chinery and Sandra Lee, will be hereinafter referred to as the "Plaintiff." Charged Party Robert Ross, will be hereinafter referred to as the "Defendant."

Plaintiff presented for testimony Cathy Lukensmeyer, Erik Harris, Michael Trapp, John Nikides and Melissa Chinery.

Defendant presented for testimony Casey Veloso, Anthony Thuriault and Robert Ross.

All of these witnesses were afforded full opportunity to be heard, to be examined, and to be cross-examined. The parties were allowed to introduce evidence on the issues. Based on the entire record, my observation of the witnesses, examination of the evidence, exhibits presented, post-hearing briefs[1] submitted, and arguments presented therein, this arbitrator makes the following findings and renders the following Discussion, Opinion, and Award.

## THE ISSUES

Plaintiff submits the issue to be addressed by the Alternate Article VII Arbitrator is stated as follows:

Did Bob Ross, the Defendent herein violate the APFA Policy Manual and the APFA Constitution by engaging in malfeasance, fraud, misappropriation of funds while he was in office during the term of April 1, 2016 to March 2, 2018. If so, what shall be the appropriate remedy?

Defendant submits the issue to be addressed by the Alternate Article VII Arbitrator is stated as follows:

Whether the Plaintiff's allegations raised against him are true or false? Did former National President Ross knowingly or "willfully" violate any express Article of the APFA Constitution or Policy Manual? If so, what is the appropriate remedy?

## FACTS

The facts in this matter center on Defendant Ross assuming office as the APFA National President and moving to Dallas, TX during the months of April 2016 through October 2016.

---

[1] The parties agreed to submit post-hearing briefs by e-mail to arbruben@gmail.com on January 31, 2021 and extended to February 18, 2021. The post-hearing briefs were timely emailed and received. Thus, the arbitrator finds the record in this matter closed on February 18, 2021.

**APPX. 0220**

Defendant Ross is alleged to have misused the APFA credit card on several matters during his term in office.

Plaintiff alleged in the Article VII grievance and heard are described as follows:

Defendant is charged with eight (**8**) specific violations of the Policy Manual and the APFA Constitution.

**(1)  Misuse of Credit Card:**

As APFA National President, Plaintiff Ross was provided an APFA credit card.
  a. Defendant Ross spent thousands on purchasing sheets, blankets, pillows, mattresses, furniture as well as smaller items such as toilet paper and candy.
  b. Defendant Ross purchased over $3600 in furniture on his APFA credit card and had it delivered to his personal residence in South Lake, Texas.
  c. Defendant Ross charged an APFA rental truck in August 2016.

**(2) Rental Car:**
Defendant Ross is charged with billing APFA for a rental car for six months at a cost of over $6200.00 Ross was considered living in the DFW area and was not entitled to a rental car.

**(3) Reimbursement:**
Defendant Ross claimed mileage that he was not entitled to, including the period when he had a rental car.

**(4) SAF/MEA and meal expenses--Change of formula to include Meal Expense Allowance (MEA) and Special Assignment Fee (SAF):**
Defendant Ross and his fellow officers changed the longstanding formula for Vacation reimbursement. Defendant Ross also violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card.

**(5) Payout of Vacation**-Change of Formula to include MEA and SAF and an office stipend in with wages when considering the reimbursement of sick and vacation time. This was discovered when the pay for the Vice President, Secretary and Treasurer was looked at more closely by the next administration long after the Ross Administration had left office.

**(6) Maintaining an Office:**
Defendant Ross claimed thousands for maintaining an office he was not entitled to.

**(7) Payout of Vacation Days:**
Defendant Ross received compensation for expense payments beyond his term in office.

**(8) Buyout:** Defendant Ross collected compensation in two forms. (1) MEA and SAF (2) Maintaining an office outside Residence.

Defendant argued at the hearing that these Article VII charges were filed by the Charging Party (Plaintiff) as a weapon against Ross and the Officers of the Ross Administration.

This matter was submitted to this Alternate Article VII Arbitrator to make a decision on the charges cited herein.

**Black Decl. Ex. R**

# THE RELEVANT PORTIONS OF THE APFA CONSTITUTION AND POLICY MANUAL

## THE APFA CONSTITUTION

### Article I. Section 7.   DEFINITIONS:

As used in this Constitution, the following words or terms shall mean:

 E.   **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

 **M.**   **"Privilege"** means a benefit or advantage enjoyed by a person in any position or   fiduciary capacity with or as a member of the APFA.

 **O.**   **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

 Q   **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as  a  member  of  the APFA.

### Article II. Section 2. OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from, or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties, and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties, and responsibilities.

### Section 3. BILL OF RIGHTS OF MEMBERS

 **B.**   All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

### Article III, GOVERNMENT OF THE APFA
### Section 3 Board of Directors

 A.  The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights and privileges, duties and responsibilities of the officers, representatives and members of the APFA.  The Board of Directors is authorized to interpret this constitution and to establish, prescribe and adopt such other policies which may be consistent with this constitution as required for the direction and management of the affairs of the APFA.

**L.**   Jurisdiction and Duties: The Board of Directors shall have the following rights, privileges, duties and responsibilities;

1.  Set policy for the APFA;
2.  Modify the APFA Policy Manual as it deems appropriate;
3.  Approve the annual budget;
4.  Set annual goals for the APFA as it deems appropriate;
5.  Assign to each Ad Hoc Member of the Executive Committee those Presidents with whom s/he shall maintain regular contact and communication;
6.  Determine the number of administrative, committee, and support positions as may be required under Article IX of this Constitution to meet the needs of the membership;
7.  Nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;
8.  Review the base assignment of any OAL Operation or satellite and, when necessary alter operation or satellite assignments.
    While not limited to the following, the Board of Directors may:
9.  Review the dues structure of the Association;
10. Override the Executive Committee rejection of a proposed Collective Bargaining Agreement;
11. Establish the Regions and the National Vice President will assign the Regional Representatives;
12. Establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;
13. Direct special mailings to the membership;
14. Recognize the accomplishments and achievements of members of the APFA;
15. Give annual awards;
16. Confer Honorary membership;
17. Approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;
18. Appoint special committees;
19. Appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);
20. Approve Article VII administrative changes;
21. Suspend officers or representatives pursuany to Article VII;
22. Take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.Bof this Constitution.

**Article VII. Section 1. Grounds For Charges:**

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

**A.**  Failure to pay dues, assessments or penalties levied by the Association.

**B.**  Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

**C.**  Willfully acting as a strike breaker during any work stoppage duly authorized by the Association; (1) Notwithstanding Section 1.C., above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

**D.**  Willful violation of a Flight Attendant's Collective Bargaining Agreement

**E.**  Theft or embezzlement of Association monies or property

**F.**  Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee

**G.**  Willfully acting in a manner that causes the Association to violate its legal obligations; or

**H.**  Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

*APFA POLICY MANUAL*

**Section 5.G.1. Trip Removal and Expense Policy – Other Expenses**

**1.**  Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

**Section 5.F.5.a. Trip Removal and Expense Policy–Meal Expense/Allowance**

**a.** Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

**(1)** Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

**(2)** The reimbursement of a Business-Related Expense shall not count against a representative's MEA.

## Section 5.H. Relocation

1. Upon assuming office/appointment, National Officer(s)/Chairs shall be expected and, for the purpose of this policy, shall be considered to reside in the DFW area. The DFW area, for purposes of this policy, shall not exceed a seventy-five (75) mile radius from APFA Headquarters.

2. If, on the date of his/her election, a National Officer does not reside in the DFW area, s/he shall be reimbursed for actual moving expenses for relocation from/to his/her place of permanent primary residence by a certified mover as a condition of employment with the APFA, to a maximum of ten thousand ($10,000) per round trip move.

   a. The provisions of H.2 above must be exercised within six (6) months following the end of the last term of office of the National Officer and must be substantiated by invoice or bill.

3. A National Officer may choose not to relocate to the DFW area but may, instead, choose to accept suitable furnished accommodations paid for by the APFA as provided in H.7. below. If a National Officer accepts such accommodations in lieu of relocation expenses as provided in H.2. above, the following will apply:

   ….

7. Incoming National Officers incoming and other Representatives shall normally be able to use outgoing National Officers or Representatives furniture and furnishings rather than replace these items with each change of National Officer or Representative, subject to the right to reasonably refuse furniture and furnishings.

**PLAINTIFF'S ARGUMENT**

Plaintiff argued the violations center on Defendant Ross assuming office as the APFA National President and moving to Dallas, TX during the months of April 2016 through October 2016. Defendant Ross misused the APFA credit card on several matters during his term in office. The APFA Policy Manual provides that National Officers will be provided up to $10,000 in moving expenses or, provided they can demonstrate a permanent residence outside of DFW, the officer can get a corporate apartment furnished by APFA. Defendant Ross leased an apartment at the Bear Creek complex on June 1, 2016, thus he chose both options for relocation when he is only to choose one option. Defendant Ross purchased $3600 of furniture from Ashley Furniture to be delivered to his home in South Lake, Texas. Defendant Ross had a rental car for six months at a cost of $6,200.00. He was living in the DFW area and was not entitled to a rental car. Defendant Ross claimed mileage when he was not entitled to claim mileage. Defendant Ross and his fellow officers changed the longstanding formula for Vacation reimbursement. Defendant Ross violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. The change of formula to include MEA and SAF with an office stipend in wages when considering the reimbursement of sick and vacation time. This was discovered when the pay for the Vice President, Secretary and Treasurer was looked at more closely by the next administration long after the Ross Administration had left office. Defendant Ross claimed for maintaining an office he was not entitled to. Defendant Ross received compensation for expense payments beyond his term in office. Defendant Ross collected compensation in two forms. (1) MEA and SAF (2) and maintaining an office outside Residence when he was not working.

## DEFENDANT'S ARGUMENT

Defendant Ross argued the alleged violations were the direct result of the "Ross Transition Agreement." Defendant argued that charged violation No. 5: Payout of Vacation, Charged Violation, No. 6: Maintaining an Office, Charged Violation No. 7: Payout of Vacation Days and Charged Violation No. 8: Buyout are a part of the Transition Agreement (TA).

Defendant Ross argued the "Ross Transition Agreement" was deemed to be a legally authorized by Arbitrator Valverde in the Arbitration case, Moyer vs BOD (2018) dated September 21, 2021. Arbitrator Valverde ruled the dispute that Ross received a benefit was "without merit." The charges in that case were dismissed. Defendant argued that it stands to reason the accusers (Plaintiff) would have no claim that Defendant Ross received a benefit from the "Ross Transition Agreement" that he was not entitled to and any alleged violation stemming from his acceptance of the agreement, should be dismissed.

Defendant Ross argued the arbitrator, designated in these Article VII proceedings, has the jurisdiction and authority to rule on the validity of charges and the remedy sought by the Plaintiff to the allegation. Did former National President Ross knowingly or "willfully" violate an express Article of the APFA Constitution or Policy Manual, and did Ross "willfully" violate any express Article of the Constitution and/or Policy Manual when he accepted the terms of the "Ross Transition Agreement"? The arbitrator also has the jurisdiction and authority to dismiss the Article VII Charges against the Defendant.

Defendant Ross argued with respect to the *misuse of the APFA credit card* that multiple alleged purchases violated Policy Manual 5.G – Business Related Expenses. Defendant argued Business Related Expenses are actually defined in Policy Manual *Section 5.F.5. Section 5.G, "Other Expenses" where it states,*

> *5.G Other Expenses – Actual out-of-pocket expenses incurred by a member conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for personal profit of the APFA member, but to compensate him/her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.*

Defendant Ross argued the Plaintiff cited the wrong policy in their support of these charges, evidence of their lack of understanding the process and policy. No purchases were made on the APFA union credit card were submitted for reimbursement on the weekly/monthly expenses. Receipts were submitted for each credit card charge and reviewed per policy by the appropriate accounting and legal departments. Plaintiff admitted they did not review any other administrations union credit card charges for similar purchases or past practice or for expenses when said officers relocated to DFW.

Defendant Ross argued with respect to the *misuse of a Rental Car* was billed to the National President's department during the timeframe according to the Plaintiff allegation, is coincidental to the timeframe of the Ross relocation, but was not as a condition of the relocation. 2016 APFA Policy Manual Section 5.H – Relocation – was silent on the use of rental cars in connection with or during the timeframe of a relocation. This issue was previously reviewed by the APFA BOD at the time the email was sent to the National Treasurer in March 2019. The APFA BOD and Budget Committee members tasked with this review took no action on this matter and the issue was closed. Defendant argued that several rental cars were rented through the President's office for numerous representatives during this time frame and not specifically to Bob Ross for personal use. Department representatives having access to rental cars during this timeframe included, but is not limited to, uniform committee members, toxic fume events and other committee representatives. At no time did the Plaintiff cite evidence that a rental car was provided for Ross' sole personal use.

Defendant Ross argued with respect to *mileage* the following that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.G. – Other Expenses / Mileage.
5.G.1.b. (1).(a) Mileage:
[2]. Mileage shall not be reimbursed for travel between the representatives' residence and an APFA office that has been provided for the primary use of the representative for a period in excess of 31 days.

Defendant Ross states that the Plaintiff have formed their own theory and alleged that former APFA National President, Bob Ross is in violation for claiming mileage for attending meetings with the Company or claiming mileage for any event outside of APFA headquarters while conducting APFA business while using a rental car. At no time did Ross file for reimbursement for mileage from his residence to the APFA headquarters. The Plaintiff did not

present evidence that Ross claimed a mileage reimbursement while using a rental car and not his own vehicle. Defendant Ross submits Section 5.G.b.1.a.1., is silent on a specific vehicle to be used in the reimbursement of mileage. At any given time, an APFA Representative could be subject to using their personal vehicle or a "Rental Car" for conducting APFA business.

Defendant Ross argued with respect *to SAF/MEA and meal expenses* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.F: Business Related Expenses. He states that the APFA had no policy on how to differentiate or separate any amounts from the guaranteed MEA/SAF totals when National Officers, Regional Representatives, National Chairs, or other Representatives, who are authorized a full month trip removal pay and are receiving guaranteed stipends of MEA/SAF and are considered a host of an authorized APFA meeting. APFA also had no policy in place until 2021, for a National Officer in relation to one's union credit card practice.

Special Assignment Fee (SAF) Policy:
The intent of the SAF is explained in Section 5.E.1

5.E.1.a. – The intent of the Special Assignment Fee (SAF) is to offer payment to the representatives for the days that they conduct APFA business in excess of their normal scheduled bid line. Amounts paid under this arrangement are reportable as wages on the representative's W-2 and are subject to withholding and payment of employment taxes.

5.E.4.a.(1) – If a Representative performs work for the APFA, and is not otherwise paid for that day's work by means of an APFA Paid Trip Removal.......such representative shall receive the Daily SAF for work performed in accordance with the following schedule.

Calculation for the National Officers' SAF is specifically delineated in Section 5.E.4.c – SAF Rates – Monthly –

(c)National Officers and Regional Representatives: $400 minimum, but not to exceed $500 maximum.

Meal Expense/Meal Expense Allowance (MEA)

Defendant Ross argued with respect to the *payout of vacation* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of 5.E.4 Special Assignment Fee (SAF) above and 5.F.1 Meal Expense Allowance (MEA) rates.

Guaranteed MEA at Residence is explained in Section 5.F.3.a

5.F.3.a – On days a representative is both trip removed and performing work for the APFA at his/her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2.

5.F.3.d – National Officers, Regional Representatives, National Chairs and other representatives who are authorized full month trip removal or the equivalent shall receive a "Guaranteed MEA at Residence" of Three Hundred dollars ($300) per month.

Section 5.F.4.a – Calculation of MEA
National Officers, Regional Representatives, National Chairs and other representatives who are authorized full month trip removal or the equivalent (e.g. "Payback as provided in D above) shall receive a minimum MEA of Three Hundred dollars ($300) per month

Maintaining an Office Outside of Residence (MOOR)

Maintaining an Office outside of residence is required of APFA President, as the office is located and maintained at APFA Headquarters and is paid in addition to SAF.

5.E.4.c.(3).(a) – A National Officer, Regional Representative, National Chair, Base President and/or Base Vice-President who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.

5.F.1.a.(1) – Per Diem Rate (Accountable Plan)
(1) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA. Also required for the purposes of calculating how much Special Assignment Fee (SAF) an officer receives, it is imperative that the officer fill out the required weekly paperwork that would ascertain how many hours were worked for the APFA.

Defendant Ross argued that all payouts and formula used to calculate the payout for vacation, sick and end of term buyout of accrued and unused Sick and Vacation days occurred after former APFA President Ross had left office and was the product of a Transition Agreement and not specific to APFA Policy. Through sworn testimony, former APFA National Treasurer, Eugenio Vargas, used full salary vs basic salary in these calculations, which include MEA and SAF in compliance with the terms of the controlling document, the Ross TA.

Defendant Ross argued that a National Officer or Regional Representative on a full month trip removal shall receive per policy a $500 maximum of SAF payment. National Officers, Regional Representatives, National Chairs and other APFA Representatives on a full month trip removal shall receive a minimum Guaranteed MEA of $300 per month. Each National Officer, per policy, each month received the guaranteed amount of $1050 ($500 SAF, $300 MEA and $250 MOOR) in addition to basic salary. This amount was determined by the APFA Accounting Department. and was the combined stipend included as Salary and Benefits per the Ross TA used by the former APFA Treasurer, after Ross left office, to calculate the daily rate of unused Sick and Vacation Days that Ross was not allowed to use during his final 5 months as National President to "make him whole." These amounts were paid after Ross left office and as a condition of the Ross TA. It is irrational for the Plaintiff to request that weekly timesheets were required to receive these payments for the months after Ross left office.

Defendant Ross argued that on January 14, 2022, an APFA document surfaced that was withheld from document retrieval that corroborates the Policy Manual was not the controlling document to the Ross TA and therefore Ross was paid in compliance with the TA. This document would have been exculpatory to the defense of Mr. Ross on this and other matters pertaining to the Ross TA had it been provided.

Defendant Ross with respect to "*maintain an office outside of residence*" that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.E.3 Maintaining an Office Outside of Residence. The maintaining an office outside of residence is required of APFA President, as the office is located and maintained at APFA Headquarters and is paid in addition to SAF.

5.E.4.c.(3).(a) – A National Officer, Regional Representative, National Chair, Base President and/or Base Vice-President who is required to maintain an APFA office outside of his/her place of residence shall be paid an additional two hundred fifty dollars ($250) per month over and above the minimum monthly SAF provided above, or the actual SAF subject to reimbursement, whichever is greater.

Defendant Ross argued that each National Officer, per policy, each month received the guaranteed amount of $1050. This amount included $500 for SAF, $300 for MEA and $250 for office outside of residence. This amount was determined by the APFA Accounting Department and provided to all National Officers as part of their salary. This charge also should be dismissed as Ross did not pay himself the payments under the terms of the Ross TA.

Defendant Ross argued with respect to the *payout of vacation days* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 6.B.1: National Officer Salary and Benefits. Defendant Ross states that any change to the formula used to calculate the payout for vacation, sick and end of term buyout occurred after former APFA President Ross had left office. Through sworn testimony, former APFA National Treasurer, Eugenio Vargas, used full salary vs basic salary in these calculations, in compliance with the Ross TA.

Defendant Ross argued the Ross Transition Agreement stated Ross would be paid any and all accrued and unused sick and vacation from April 1, 2016 – July 31, 2018. The calculation of the unused days was to be paid as though Ross was able to use any of those days while in office as President for his remaining 5 months had he not resigned. There was no agreement that these days were to be paid per Policy as the Plaintiff insists. An investigation into the payout of the Sick and Vacation days paid, brought about by Plaintiff's allegations that it was discovered Ross was not properly paid "All" of his accrued and unused Sick days from April 1, 2016 – July 31, 2018. Ross earned and did not use 18 Sick days in each of the fiscal years April 2016-March 2017 and April 2017-March 2018. Ross was only paid Per Policy 6.B.3.d Offset/Loss of Sick Time, of 12 days for each fiscal year. The additional 12 days, (6) days Apr. 2016-2017 and (6) days Apr. 2017-2018 have still not been acknowledged or paid to Ross in accordance with the Ross TA. The value of these lost Sick days, depending on the calculation used, is in excess of $3400 still owed to Ross.

Defendant Ross argued that he received a *buyout but it is cited as the Ross Transition Agreement*. The charging party submits that Ross collected more money than if he had remained in office for the four (4) months left in his term. However, once Ross left office, he asked for and collected from the APFA compensation in two forms he was not entitled to per the "agreement." One form of compensation which he received every month was MEA and SAF and Maintaining an Office Outside Residence. Mr. Ross continued to collect one thousand and fifty dollars ($1050) a month."

"He collected these payments for the months of: March, April, May, June and July of 2018. This stipend is clearly hinged on reimbursement related to work and not part of the National Officer salary. To accept this money is in clear violation of the intent of the Policies written that allows a representative extra compensation for working hours above and beyond their scheduled workload. By taking this money this is another violation of the Section 5 policies outlined above."

Defendant Ross argued in Item no. 3 of the Ross Transition Agreement states "APFA agrees that Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018.  Full Salary for a National Officer, per the APFA Policy Manual, Section 5 entitles the officer to receive guaranteed MEA, SAF, and Office Outside of Residence payment. This guaranteed payment is $1050, which is considered gross wages and recorded in "Box 1" of the National Officers W-2 tax form.

Defendant Ross argued that former APFA National Treasurer Vargas has stated in sworn testimony he used full salary vs basic salary for all calculations in compliance with the Ross Transition Agreement. This full salary calculation would include the benefits of MEA, SAF and any accrued and unused sick and vacation that he would have coming to him as President for those 5 months (4/1/16-7/31/18), as if he remained in office.

**DISCUSSION AND OPINION**

Defendant Ross assumed office on April 1, 2016 as National President of the APFA. In that position he is entrusted with a Fiduciary duty to the APFA for cost and expenditures. This report revealed that Defendant Ross abused his fiduciary duty to the members of the APFA. The arbitrator has consolidated certain violations in this report.

1. **Misuse of the APFA Credit Card and**
2. **SAF/MEA and Meal Expense Policy**

Plaintiff argued in these allegations that Defendant Ross moved into the South Lake home during the week of August 11, 2016.  Defendant Ross used the APFA credit card for his personal use and was not for any Union related business activities and abused his fiduciary duty to the APFA. He charged the renting of a moving truck on August 20, 2016 to move furniture after being reimbursed for moving his belongings from Sacramento.  He has purchased tools, sheets, blankets, pillows, mattresses, furniture and even smaller items such as toilet paper and candy. None of the larger items were ever inventoried or returned to the APFA upon cessation of his term of office. Defendant Ross elected to relocate to the DFW area and was afforded a moving expense reimbursement, he was not entitled to buy any furnishings using APFA funds. Plaintiff argued Defendant Ross violated Section 5.G. **Other Expenses** of the Policy Manual. Kim Ross, wife of

the Defendant packed up the California house in August 2016. Defendant Ross's wife and kids stayed in 5 different hotels as they drove across the country, including vacation stops at the Grand Canyon and Flagstaff. They used the union credit card for these hotels, except for one hotel stay on August 2nd that Ross expensed in his weekly report to the APFA.  It also appears in the documentation that APFA paid for all of Ross's family meal expenses. (CLX-17, CLX-37, and CLX-42) All of these expenses were billed to APFA as part of the cost of moving the Ross family from California to Texas. Defendant Ross was not present for any of these hotel stays.

The arbitrator finds that if his family was driving directly from California to Dallas, Texas, the APFA would not have incurred additional costs for hotels, meals and mileage. It appears APFA paid for Ross's family vacation in the Grand Canyon with Defendant Ross' APFA credit card. The cost of this vacation to include meals and hotels should be borne by Defendant Ross.  This is an abuse of Ross's fiduciary duty to the APFA membership. This is a per se violation of the Policy Manual.

On August 9, 2016 Defendant Ross bought tools at Home Depot on the APFA credit card. On this same date, the APFA handyman delivers APFA furniture to the South Lake home. (CLX-4). On August 12, 2016 the moving pods that Ross had rented arrived to the South Lake house. On this same date, Defendant Ross charges $64.30 for gas at Shell Oil in South Lake on the union credit card and bills it to the move but he also claimed mileage and was paid. On August 13, 2016 Defendant Ross *purchased $3,637 in furniture on the APFA credit card from Ashley Furniture (CLX-40)* and had it delivered to his personal residence at the South Lake home.  The furniture was delivered to Kim Ross at the South Lake home in two installments – on August 18, 2016 and August 25, 2016.  Defendant Ross claimed the family did not move until September 2016 but the record evidence clearly revealed they actually moved in August, 2016. A couple of bed frames and small items were returned costing $331.28 to Ashley Furniture on August 24, 2016 (CLX-40). John Nikides testified that Defendant Ross was ordered by APFA to repay $3600.00 to APFA for this furniture and he did so through payroll deduction. Here, Defendant Ross abused his fiduciary duty to the members of the APFA.

Plaintiff argues Defendant Ross used the APFA credit card for his own personal use. Several meals were charged on the credit card and the participants were National Officers, the Officers and their Regional Representatives as well as himself eating alone. This violates Section 5.F. **Meal Expenses/Meal Expense Allowance (MEA)**, 5. **Business Related Expenses**, a.1.2. Plaintiff argues this violates the following:

**Section 5 Business Related Expenses:**
  a. *Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions with a representative would reasonably be considered the host of an authorized APFA function or meeting.*
 1. *Discretion and good judgment should be used when exercising this privilege and when incurring such a legitimate and necessary business-related expense. Abuse, as determined by the executive committee, may lead to the limitation of revocation of this privilege.*

2. *In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision.*

**Section 5.G of the Policy Manual provides the following:**

> *Actual out-of- pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him /her for actual expenses and losses, and is exclusive of other applicable reimbursement provisions in this policy.*

Additionally, the items Defendant Ross purchased were for his personal benefit such as dry cleaning, trips to the gas station, 7-eleven, and a monthly GOGO internet subscription.

Plaintiff argued Defendant Ross violated the Meal Expense provisions of the APFA Policy Manual during his term in office. Ross claimed per diem and actual meals. He used the APFA credit card for meals at fast food restaurants by himself. As a National Officer Defendant Ross received a guarantee MEA ($300.00 per month). The APFA Policy Manual does not permit National Officers to charge actual meals in their city of residence. National Officers are provided Guaranteed MEA instead of actual meal expense. There are no provisions for National Officers to receive actual meals. Actual meals are covered in F.2 of the Policy Manual and do not include the National Officers or other full-time representatives nor is there a working lunch exception. The only time an APFA National Officer can purchase actual meals is the hosting exception.

Defendant Ross argued with respect *to SAF/MEA and meal expenses* that he did not fail in his responsibility to act in accordance with the APFA Policy Manual by citing a violation of Section 5.F: Business Related Expenses. He states that the APFA had no policy on how to differentiate or separate any amounts from the guaranteed MEA/SAF totals when National Officers, Regional Representatives, National Chairs, or other Representatives, who are authorized a full month trip removal pay and are receiving guaranteed stipends of MEA/SAF and are considered a host of an authorized APFA meeting. APFA also had no policy in place until 2021, for a National Officer in relation to one's union credit card practice.

Defendant Ross additionally argued the parties cited the wrong policy in support of these charges, evidence of their lack of understanding of the process and policy. No purchases were made on the APFA union credit card were submitted for reimbursement on the weekly/monthly expenses. Receipts were submitted for each credit card charge and reviewed per policy by the appropriate accounting and legal departments.

The arbitrator finds the Plaintiff provided sufficient evidence to establish merit and a violation of the Policy Manual to reveal Defendant Ross abused his fiduciary duty to the membership of the APFA. Under these circumstances, the APFA will hire an Independent Auditor to perform the task of auditing Defendant Ross purchase of meals and other items on the APFA credit card from April 1, 2016 through July 31, 2018. Record evidence revealed that he had purchased meals and used the APFA credit card for a personal vacation for his family at the Grand

Canyon and other items that are not business related. The Independent Auditor will have to determine if such meal(s) or other purchases were for conducting union business or not. Defendant Ross as the National President was required to submit documentation to support all credit card expenses for meals as well as other expenses. If no documentation was provided to support the expenses were for union related business, then Defendant Ross will be required to repay APFA for all of those expenses not substantiated. Moreover, the audit must comply with federal income tax guidelines which distinguish between personal and nonpersonal expenses. Additionally, Defendant Ross is hereby Ordered to repay all of the Independent Auditor's fee to the APFA.

## 3. Rental Car

Plaintiff argued Defendant Ross violated the APFA Policy Manual by having a rental car in DFW for six months. The Policy Manual in Section 5.G.1 does not allow a National Officer to have a rental car in base. Defendant Ross upon assuming office is considered for all expenses to be living in Dallas. The only way a rental car would be approved is if the APFA Representative was renting it away from their city of residence per 5.G.1.b. If it is used for personal reasons, it is considered income. Moreover Section 8.D governs the use of APFA provided vans and cars, "Automobiles owned or leased by the APFA are to be used primarily to conduct APFA business during normal business hours. After hours, they may be reserved on a first-come, first served basis for the use of representatives who reside outside of the DFW metropolitan area," Section 8.D.1. in Section 8.D.2 a Regional Representative whose residence is outside of DFW may get a rental car when leased cars are not available. Cathy Lukensmeyer testified that National Officers should not be getting a rental car in Dallas for their personal use. Defendant Ross received a rental car from March 2016 until October 16, 2016. He booked a rental on March 28, 2016 for 24 days. On May 5, 2016, Defendant Ross upgraded the car to a luxury car. The car rentals were updated several times into October 2016. At hearing, Defendant Ross denied having a rental car but when confronted with rental car receipts, he then claimed it was for his department and not for him. Several emails (June 16, 2016 extended the rental to July 29, 2016, July 18, 2018, September 30, 2016 extended to October 3, 2016) from APFA secretaries disclosed it was for Bob's rental car (CLX-45). Additionally, ross did not have a personal car in DFW to commute to APFA headquarters. Here, the arbitrator finds Defendant Ross abused his Fiduciary duty to the membership of the APFA by renting cars for his personal use to commute to work.

Defendant Ross did not move his wife's car to Dallas until August, 2016 so Ross was using APFA rental cars exclusively during that period. He charged APFA for the mileage, hotels, gas and meals. Ross admitted he did not have a vehicle to get to work so he used the rental car. Plaintiff argued that if an Employer provides an automobile to an employee, including for commuting to and from work, that is considered a fringe benefit and is considered taxable income by the IRS. (26 CFR § 1.61-21(a)(1) - Taxation of fringe benefits.) Under the LMRDA the governing body is the APFA Board of Directors and they have an obligation to recover the money. (29 U.S.C. 501) So Defendant Ross saying the Board looked into the matter in 2019 does not resolve the matter. If it is determined Defendant Ross received over $6200 in unlawful compensation in the form of a rental car he was not entitled to under federal labor law, the money must be paid back to the APFA.

Defendant Ross argued with respect to the *misuse of a Rental Car* was billed to the National President's department during the timeframe according to the Charging party's allegation, is

coincidental to the timeframe of the Ross relocation, but was not as a condition of the relocation. 2016 APFA Policy Manual Section 5.H – Relocation – was silent on the use of rental cars in connection with or during the timeframe of a relocation.

The arbitrator finds the Plaintiff has supported their charge to establish merit and a violation of the Policy Manual over the use of rental cars, thus, Defendant Ross abused his Fiduciary duty to the membership of the APFA. the Independent Auditor will audit Defendant Ross' use of a rental car from April 2016 through October 2016 and determine the cost of the rental from April 2016 through October 16, 2016. If Defendant Ross did not support the use of a rental car with documentation for Union related business matters, Defendant Ross will be required to repay APFA for the use of the rental cars. Whatever the amount of dollars the Independent Auditor has determined Defendant Ross owes for using a rental car for his personal use in lieu of a union business, he shall be Ordered to repay that amount to the APFA.

## 4. Mileage

Plaintiff argued Defendant Ross claimed mileage that he was not entitled to, including the period he had a rental car. The AFPA Policy Manual has detailed language to a National Officer assuming office.

> **Relevant Provisions**
> Upon assuming office/appointment, National Officer(s) / Chair(s) shall be expected and, for the purposes of this policy, shall be considered to reside in the DFW area per 5.H.1.
>
> *5.G.1.b. Ground Transportation*
> "[1] A representative shall be reimbursed for mileage at the IRS standard mileage rate for travel to conduct APFA business, not to exceed a monthly maximum of one thousand (1000) miles. All mileage must be recorded on an "APFA Mileage Log" and submitted per Section 5.I.5. of this Policy Manual," per Section 5G.1.b.1.
>
> " S/he is not authorized to claim any other expenses as provided in this policy for the purpose of personal travel between DFW and his/her permanent residence," per Section H.5.c.

The mileage logs are included in CLX-13-19 and specify that Ross drove the following mileage:

| | |
|---|---|
| March 2016 | 336 miles |
| April 2016 | 294 miles |
| May 2016 | 294 miles |
| June 2016 | 336 miles |
| July 2016 | 294 miles |

Plaintiff argued Defendant Ross violated the APFA Policy Manual by claiming mileage to and from his permanent residence in Sacramento and the Sacramento airport. He claimed mileage between his Sacramento permanent residence and the Sacramento Airport at 42 miles each way. The APFA Policy Manual states that a National Officer may not claim expenses for his commute home. All commuting back to your home city is on your own money. But Defendant Ross charged mileage, parking and meals at the airport. Defendant Ross also charged APFA $105 a month for parking his vehicle at the Sacramento Airport. This is not an authorized expense as no additional expenses for commuting home were authorized. All of this occurred at the same time Defendant Ross had a rental car.

Defendant Ross states Plaintiff's have formed their own theory and alleged that former APFA National President, Bob Ross is in violation for claiming mileage for attending meetings with the Company or claiming mileage for any event outside of APFA headquarters while conducting APFA business while using a rental car. At no time did Ross file for reimbursement for mileage from his residence to the APFA headquarters. The Charging Party did not present evidence that Ross claimed a mileage reimbursement while using a rental car and not his own vehicle. Defendant Ross submits Section 5.G.b.1.a.1., is silent on a specific vehicle to be used in the reimbursement of mileage. At any given time, an APFA Representative could be subject to using their personal vehicle or a "Rental Car" for conducting APFA business.

The arbitrator finds the plaintiff has supported their charge to establish merit and a violation of the Policy Manual. Thus, Defendant Ross abused his Fiduciary duty to the membership of the APFA by claiming mileage to and from his residence and parking his personal vehicle in the Sacramento Airport. The arbitrator requests the Independent Auditor to look at the mileage logs or statements from April 1, 2016 through October, 2016 and determine the amount of money Defendant Ross was paid for claiming mileage from the Sacramento airport and return. Defendant Ross' claimed 42 miles from the Sacramento airport to his residence and 42 miles to return to the airport on weekends.  Additionally, Defendant Ross charged $105.00 a month for parking his car at the Sacramento airport and claimed this cost to APFA for payment.  The Independent Auditor shall investigate the claims for parking his car and determine how much he claimed and received payment from the APFA Whatever dollar amount the Independent Auditor has determined for mileage and parking, Defendant Ross is hereby Ordered to repay the APFA.

**5.   Maintaining an Office**

Plaintiff withdrew this charge in their post-hearing brief.

**6.   Charges related to Ross Leaving Office as National President (Buyout)**
**7.   Sick and Vacation Payouts**
**8.   Receiving MEA and SAF when Performing no work.**

Defendant Ross left office on March 1, 2018 in the face of a DOL ordered rerun election. He was elected to a four-year term but he voluntarily resigned and negotiated a Transition Agreement to leave. The economic terms of the Transition Agreement are as follows:

3.   APFA agrees that ROSS will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018.

**Black Decl. Ex. R**

4. APFA agrees to pay ROSS all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018.
5. APFA agrees to pay ROSS, upon his request, a one-time lump sum in the total amount of ten thousand dollars ($10,000), which represents ROSS's moving expenses. ROSS shall present the moving expenses to a APFA for payment through 2019.

Plaintiff argued that nowhere in the exit package language does it specify that Defendant Ross should get paid MEA and SAF expense payments for the months he is not working in March, April, May, June and July 2016. Yet, Defendant Ross received $1050 a month in these payments for five months for a total of $5250. MEA and SAF are considered expenses. Salary is included in Section 6-National Officer Salary and benefits. In Section 5-Trip Removal and Expense Policy is where SAF and MEA are located and discussed. The APFA Constitution defines salary in Section 6.A which provides, "The salary of the National President shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for a flight attendant based on 116 hours monthly."

## Section 6: National Officer Pay and Benefits
### B.1: Vacation

   a.   National officers shall be entitled to thirty-five (35) days of paid vacation to be taken in each fiscal year while in office or the seniority respective vacation allowance s/he is contractually entitled to as a Flight Attendant, whichever is greater. This calculation will not be based on the Article 6.H of the Collective Bargaining Agreement referring to "trips missed." This vacation allowance may be taken at the discretion of the National Officer, however, not more than fourteen (14) consecutive days taken at any one time.

   b.   National Officers should schedule their vacations so as to avoid the simultaneous absence of more than two (2) National Officers. In no case shall the National President and the National Vice President be on vacation simultaneously.

   c.   At the end of a fiscal year, up to fourteen (14) days of any unused APFA vacation allowance, as provided in B.1.a above, will be paid to the National Officer at a rate prorated on the National Officers' annual salary for the period of APFA vacation allowance owed, less applicable state and federal taxes. If the National Officer is entitled to more than thirty-five days vacation, up to twenty-one (21) days will be paid as stated above.

   d.   At the beginning of a term, the National Officer should be paid by the Company for any vacation allowance accrued as a flight attendant.

   e.   At the end of the term, the APFA will ensure that the departing National Officer is provided with the vacation time to which s/he would ordinarily be entitled as if the National Officer had been an active Flight Attendant for the previous and current calendar years. If the company does not provide the out-going officer with the appropriate vacation allowance accrued for the previous and current calendar year the APFA will:

1. Provide payback of accrued vacation allowance to be taken in corresponding consecutive vacation days in a block(s) that is seniority respective at his/her domicile per Article 6.1 of the AA/APFA Collective Bargaining Agreement, within 13 months following the end of the applicable term; or
2. The APFA will provide the departing National Officer with the appropriate Flight Attendant vacation by means of cash reimbursement at a rate prorated on the National Officers annual salary for the period of APFA vacation allowance owed less applicable state and federal taxes.

Plaintiff argued that Defendant Ross was paid 14 days of vacation for fiscal year 2017 which ran from April 2016 and through March 2017. Ross used four vacation days and was entitled to be paid out 14 of the remaining 31 days. Ross was paid that amount in 2017. In fiscal year 2018 Ross was entitled to be paid out an additional 14 vacation days as he used 6 days and should have received the maximum 14 days. Ross was also entitled to his end of term vacation which provides that he can receive vacation he would have accrued during present and previous year. For bidding purposes as a Flight Attendant, he should have received 35 days of vacation.  So, the total amount Ross should have received in 2018 was 49 days which would have been 35 days for the end of term and 14 days maximum payout for fiscal year 2018. This is on top of the 14 days Ross already received for fiscal year 2018.

Plaintiff additionally argued that Ross received 101.44 days paid out in the amount of $38,574.68. Part of this payment includes the inflated pay which is the subject of a separate violation. Ross was overpaid 52.44 hours of vacation.

Defendant Ross argued the Ross TA is controlling. Defendant Ross would be paid any and all accrued and unused sick and vacation from April 1, 2016 – July 31, 2018. The calculation of the unused days was to be paid as though Ross was able to use any of those days while in office as President for his remaining 5 months had he not resigned. There was no agreement that these days were not to be paid per Policy as the Charging Party insists. An investigation into the payout of the Sick and Vacation days paid, brought about by the Charging Party's allegations, revealed Ross was not properly paid all of his accrued and unused Sick days from April 1, 2016 – July 31, 2018. Ross earned and did not use 18 Sick days in each of the fiscal years April 2016-March 2017 and April 2017-March 2018. Ross was only paid Per Policy 6.B.3.d Offset/Loss of Sick Time, of 12 days for each fiscal year. The additional 12 days, (6) days Apr. 2016-2017 and (6) days Apr. 2017-2018 have still not been acknowledged or paid to Ross in accordance with the Ross TA. The value of these lost Sick days, depending on the calculation used, is in excess of $3400 is still owed to Ross.

The arbitrator finds that MEA and SAF is guaranteed to the National Officers to compensate them for not working as a Flight Attendant.  The TA provides for "Full Salary" including benefits.  While one can argue that MEA and SAF is a guaranteed benefit, the Policy Manual states it is not wages or benefits but rather are expenses as stated in Section 5 of the Policy Manual. The TA does not mention MEA and SAF as a benefit but the purpose of providing a guaranteed MEA and SAF to the National Officers so they would not suffer monetarily. MEA and

Black Decl. Ex. R

SAF is a guaranteed expense to be paid monthly to the National Officers. If Defendant Ross did not receive the MEA and SAF that he was guaranteed as a National Officer, it would then be reasonable to assume that he would suffer monetarily.  The TA states he will continue to receive his current full salary and benefits.  The language regarding benefits in Section 6 of the Policy Manual and expenses in Section 5 of the Policy Manual is clear and unambiguous. However, if the BOD enters into a TA with an employee to pay his full salary for an additional 5 months without working then the TA language would be in conflict with the language over expenses (guaranteed MEA and SAF for National Officers) in Section 5 of the Policy Manual.  During these five months of the TA that Defendant Ross was paid his full salary, no evidence was introduced that Defendant Ross worked as a Flight Attendant while receiving guaranteed MEA and SAF. Under normal circumstances, expenses are listed in box 1 of a W-2 but they are not considered wages or salary. It is therefore, the Opinion of this arbitrator the intent of the TA reached between Attorney Mark Richards, Robert Ross and the 2018 BOD was for the purpose of maintaining the "status quo ante" for  Defendant Ross. Thus, it would be reasonable to conclude Defendant Ross received MEA and SAF for the months of March through July 2018 as a guaranteed expense benefit.  However, it should be noted that MEA and SAF are expenses and are not to be included in or considered with his full salary for use in the payout determination of accrued sick and vacation leave. For these reasons, the arbitrator is of the Opinion this charge over MEA and SAF should be dismissed.

With respect to sick and vacation payout, the APFA Board of Directors has determined that Defendant Ross was overpaid in the amount of $5,436.47 in 2018.  "The Board's finding was based on the results of a review from an independent accounting firm which determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect." Record evidence revealed National Treasurer Vasquez admitted he had changed the formula without the approval of the BOD or the EC.

Moreover, it is the arbitrator's understanding that Defendant Ross has refused to repay $5,436.47 to APFA and is presently in litigation to recoup the money owed to APFA. The arbitrator finds this is very troublesome in view of the fact that he is a standing Board member and the other National Officers have acknowledged the computation of their debt and has either paid their debt in full or have arranged to pay off their debt.  As National President, Defendant Ross was elected to a position of trust with the responsibility of protecting APFA assets.  Ross has a Fiduciary duty to the membership of the APFA and this arbitrator finds that he has abused this trust.

It is therefore arbitrator's Opinion, Defendant Ross has failed and abused his Fiduciary Duty.  The non-payment of these monies reveals Defendant Ross is not accepting this responsibility. Thus, it is this arbitrator's Opinion that Defendant Ross should be and is hereby Ordered to immediately repay the APFA $5,436.47.

**Leasing an Apartment at the Bear Creek Complex**

The APFA provides National Officers two choices for relocating to the Dallas metroplex. They can either accept a corporate apartment or they can accept the relocation moving expense entitling them up to $10,000 in moving expenses. But they are required to select their choice before they move. Here, the record evidence revealed Defendant Ross accepted both choices. Plaintiff argued that Defendant Ross leased an apartment at the Bear Creek Complex on June 1, 2016.

Defendant Ross testified and denied leasing an apartment at the Bear Creek Complex but after Plaintiff showed him documentation, Defendant Ross then admitted that he had leased the apartment at the Bear Creek Complex for one year to be paid by APFA.

On Defendant Ross's weekly report, he claimed that he was house hunting on June 7 and 8, 2016. Defendant Ross explained that his children's school in California ended in June 2016. Kim Ross, packed household items into pods without furniture because their furniture was too large for the South Lake home and was delivered in August 2016. Defendant Ross decided to order furniture from Ashley furniture and ordered $3,637.00 worth of furniture on August 13, 2016 with the APFA credit card. Defendant Ross denied that he had ordered the furniture for his residence, that it was ordered for the corporate apartment because it had no furniture. Documentation was presented to Defendant Ross revealing he had the furniture delivered to the South Lake residence on August 18 and 25, 2016. Thus, Defendant Ross chose both options for his own personal benefit and was not looking out for APFA's benefit. He also acquired APFA furniture to be moved to his his residence per Mike Trapp's testimony when he was not entitled to do so. As a result of his actions, the corporate apartment he leased for his own personal benefit at the Bear Creek Complex cost APFA $8,106.13 which is an unnecessary expense for the APFA.

Thus, it is the arbitrator's Opinion, that Defendant Ross abused his Fiduciary duty to the membership of the APFA and should be assessed the cost of leasing that apartment in the amount of $8,106.13.

**Conclusion:**

The arbitrator finds that throughout this proceeding, Defendant Ross *intentionally and willfully* ignored the provisions of the APFA Policy Manual and thus, has violated and abused his fiduciary duty entrusted to him by the APFA membership. Ross's testimony was inconsistent and not forthright. Because Ross abused his position of trust as well as his fiduciary duty to the membership of the APFA, he can no longer hold a position of trust with the APFA. Moreover, Article VII, Section 1 of the APFA Constitution provides that:

1. Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

……

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

Here, Defendant Ross has overwhelmingly violated the APFA Policy Manual and APFA Constitution. Ross has refused to repay APFA for an inappropriate overpayment in the amount of $5,436.47. The Union has been forced to put the matter in collections after Ross refused and is now forced to commence a lawsuit against Ross. The policy manual has a procedure for APFA representatives to follow if they disagree with the determination on any expenses which is to appeal to the APFA Executive Board and Board of Directors per Section 5.B. Ignoring the Board of Directors is not an option, especially *for a sitting Board member*. John Nikides testified that Ross's refusal to repay APFA as a sitting Board member undermines the Union, and the memberships faith in its officers.

Plaintiff argued that Defendant Ross should be expelled from membership. It is the Opinion of this arbitrator that Defendant Ross should be prohibited from serving in any official position for life within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified.  Additionally, if Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.

### REMEDY

1. The APFA will hire an Independent Forensic Auditor to audit Robert Ross' weekly reports, monthly reports and APFA credit card charges from April 1, 2016 through July, 2018 and perform the following tasks:

Specifically:

   a. The Auditor shall inspect the receipts for the Ross family vacation taken in the Grand Canyon in August 2016. Ross claimed all of hotel stays, meals and mileage charges as relocation moving expenses when some are for a personal vacation. Please determine what costs should not have been claimed as relocation moving expenses. Ross is liable for the excess cost and is hereby Ordered to repay APFA for all inappropriate charges!

   b. The Auditor shall inspect Ross' APFA credit card usage for personal and group meals and purchases for personal items such as tools, toiletries, bath towels, and candy from April 1, 2016 through July 2018 and determine the cost of all inappropriate charges. If no documentation was provided to support each purchase was a union related business cost, then Ross is liable for all inappropriate charges and is hereby Ordered to repay the APFA for all inappropriate charges!

   c. The Auditor shall inspect all of Ross' rental car usage from April 1, 2016 through October 16, 2016 and determine if these rentals were for union related business. APFA paid for the rental cars but there should be documentation to show if it was for union related business. If not, Ross is to be assessed the cost of the rental cars during the above period and is hereby Ordered to repay APFA for inappropriate rental car usage!

   d. The Auditor shall inspect all of Ross' claimed mileage from the Sacramento Airport to his residence (42 miles) and return (42 miles) as well as all monthly parking of his personal car. He claimed $105.00 per month from April 1, 2016 through July 2016 to park his car at the Sacramento airport. Ross is to be assessed the mileage and monthly parking he claimed and Ross is hereby Ordered to repay APFA for all of these inappropriate charges!

2. Ross is hereby Ordered to immediately repay the APFA $5,436.47 per the finding of the APFA Board of Directors. An independent accounting firm determined the formula used to determine the daily rate assessed for sick and vacation payout was incorrect.

3. Ross is hereby Ordered to repay the APFA $8,106.13 for leasing an apartment at the Bear Creek Complex where he had no intention of occupying.

4. Ross is hereby fined and Ordered to repay the APFA for all of the Arbitrator's Fee for this arbitration.

5. Ross is hereby ordered to repay the APFA the full cost of hiring the Independent Forensic Auditor.

6. Ross is hereby Ordered to repay $3,637.00 to the APFA for all of the furniture he had purchased and delivered to his residence located in South Lake, Texas.

7. Ross is prohibited from serving in any official position within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. If Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.

8. The APFA if it hasn't done so, must create a separate body of trained forensic accountants to oversee the annual audit and to create procedures and recommendations to preclude fraud for the BOD's review and action to be included within the Policy Manual. National Officers or Officers who have the authority to extend APFA to credit or use of an APFA credit card must be held economically responsible. The language created must be very clear and unambiguous. Training over the LMRDA must be a requirement for all National Officers or any person who can extend APFA to credit and whom is given an APFA credit card. These individuals must sign a document declaring and attesting that they have read and understand their responsibilities in using an APFA credit card or extending credit to the APFA for rental cars, apartments, etc., and that negligence will not be tolerated and will be dealt with severe penalties.

9. The arbitrator shall retain jurisdiction over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Ross, that will be the amount to be assessed or due for repayment to the APFA. The APFA shall either Order said repayment from Ross or submit the Independent Auditors findings to have this arbitrator issue a Supplemental Decision and Remedy.

**AWARD**

The grievance is sustained in part and denied in part.

**Issued in San Antonio, Texas the 19th day of March, 2022.**

Ruben R. Armendariz, Arbitrator

**Black Decl. Ex. S**

AGREED-UPON PROCEDURES
Association of Professional Flight Attendants
*Procedures Related to Robert Ross*

AGREED-UPON PROCEDURES

Association of Professional Flight Attendants

*Procedures Related to Robert Ross*

**Table of Contents**

Independent Accountant's Report                                                           3

Exhibits:

  A: List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and           12
     Relevant Testing Performed

  B: List of Reimbursements Made to Bob Ross for the Period of April 1, 2016 to October 31,          27
     2016 and Relevant Testing Performed

  C: List of Relocation Costs and Relevant Testing Performed                               29

  D: Relevant Testing of Rental Car Agreements                                            31

  E: Mileage Reimbursement and Relevant Testing                                           33

  F: Cornwell Jackson Invoices for the Performance of Agreed-Upon Procedures              35

**Black Decl. Ex. S**

CORNWELL JACKSON
CERTIFIED PUBLIC ACCOUNTANTS

*Independent Accountant's Report*

To the Board of Directors
Association of Professional Flight Attendants ("APFA") &
Arbitrator Ruben R. Armendariz

We have performed the procedures enumerated below regarding the forensic analysis mandated by Arbitrator Ruben R. Armendariz in his decision dated March 19, 2022 (the "arbitration decision") on the matter between Melissa Chinery and Sandra Lee, APFA Charging Party Members ("Plaintiff") and Robert ("Bob") Ross, Former APFA National President and APFA Charged Party Member ("Defendant"). APFA is responsible for selecting the procedures used in our analysis and for ensuring they meet the relevant criteria specified in the arbitration decision's remedy.

APFA has agreed to and acknowledged that the procedures performed are appropriate to meet the intended purpose of satisfying the relevant sections of the arbitration decision's remedy. This report may not be suitable for any other purpose. The procedures performed may not address all the items of interest to a user of this report and may not meet the needs of all users of this report and, as such, users are responsible for determining whether the procedures performed are appropriate for their purposes.

The procedures performed and associated findings are detailed below. Certain procedures were performed to satisfy all or a portion of the applicable remedies in the arbitration decision. Likewise, certain remedies required the performance of several procedures. In the table below, we have linked each remedy to the relevant procedure.

| | Arbitration Decision Remedy | Agreed-Upon Procedure |
|---|---|---|
| 1(a) | *The Auditor shall inspect the receipts for the Ross family vacation taken in the Grand Canyon in August 2016. Ross claimed all of hotel stays, meals and mileage charges as relocation moving expenses when some are for a personal vacation. Please determine what costs should not have been claimed as relocation moving expenses. Ross is liable for the excess cost and is hereby Ordered to repay APFA for all inappropriate charges!* | Procedure #1<br>Procedure #2<br>Procedure #3<br>Procedure #4<br>Procedure #6<br>Procedure #7 |
| 1(b) | *The Auditor shall inspect Ross' APFA credit card usage for personal and group meals and purchases for personal items such as tools, toiletries, bath towels, and candy from April 1, 2016 through July 2018 and determine the cost of all inappropriate charges. If no documentation was provided to support each purchase was a union related business cost, then Ross is liable for all inappropriate charges and is hereby Ordered to repay the APFA for all inappropriate charges!* | Procedure #1<br>Procedure #2<br>Procedure #3<br>Procedure #4<br>Procedure #5 |



**APPX. 0245**

**Black Decl., Ex. S**



CORNWELL JACKSON
CERTIFIED PUBLIC ACCOUNTANTS

| Arbitration Decision Remedy | Agreed-Upon Procedure |
|---|---|
| 1(c) *The Auditor shall inspect all of Ross' rental car usage from April 1, 2016 through October 16, 2016 and determine if these rentals were for union related business. APFA paid for the rental cars but there should be documentation to show if it was for union related business. If not, Ross is to be assessed the cost of the rental cars during the above period and is hereby Ordered to repay APFA for inappropriate rental car usage!* | Procedure #8 Procedure #9 |
| 1(d) *The Auditor shall inspect all of Ross' claimed mileage from the Sacramento Airport to his residence (42 miles) and return (42 miles) as well as all monthly parking of his personal car. He claimed $105.00 per month from April 1, 2016 through July 2016 to park his car at the Sacramento airport. Ross is to be assessed the mileage and monthly parking he claimed and Ross is hereby Ordered to repay APFA for all of these inappropriate charges!* | Procedure #6 Procedure #10 Procedure #11 Procedure #12 |

**Procedure #1**

Obtain a record of all credit card transactions initiated by Bob Ross on the APFA credit card for the period from April 1, 2016, to July 31, 2018. If the record is not in the form of the original credit card statement, perform necessary tests to ensure completeness of the report.

***Findings***: We obtained a monthly list of Bob Ross's credit card charges from April 11, 2016 to August 28, 2018, which was in the form of an excerpt from the APFA credit card statements and an internal allocation to the entity's general ledger expense accounts. We also obtained scanned copies of the original Chase credit card statements for account 4246 3152 1635 5741 which included transactions from April 11, 2016 through August 28, 2018. The statements included charges from all authorized users and was segregated by cardholder. Each month's list of charges made by Bob Ross agreed to the cardholder total listed on the monthly Chase credit card statement without exception. APFA has made representations that Mr. Ross did not have access to an APFA credit card until April 11, 2016, as the Chase account was not opened until this date. Therefore, there was no record of credit card transactions for the period from April 1, 2016 to April 10, 2016. Mr. Ross did not have any credit card transactions for the period from March 5, 2018 to July 31, 2018.

6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**APPX. 0246**



**Procedure #2**

Obtain supporting documentation for all credit card transactions initiated by Bob Ross on the APFA credit card for the period from April 1, 2016, to July 31, 2018.

*Findings:* We obtained scanned copies of purchase orders, invoices, signed and itemized credit card receipts, and other documentation showing details of the purchased goods or services. Some supporting documentation was illegible or unreadable. Therefore, we scheduled and performed an on-site inspection of certain documents. In regards to the scanned documents we deemed illegible or unreadable, we noted instances for which APFA was unable to provide a legible copy or original document. Some supporting documentation requested was not provided by APFA due to items being lost or not received by Mr. Ross. See the findings in Procedure #3 for more details.

**Procedure #3**

Conclude whether charges on Bob Ross's APFA credit card for the period from April 1, 2016 to July 31, 2018 were properly supported by documentation provided by Mr. Ross.

*Findings:* We were not provided with sufficient appropriate documentation for $4,527.26 in credit card charges. A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit A.

| | Number of Charges | Amount of Charges | |
|---|---|---|---|
| **Charges with Sufficient Documentation:** | | | |
| Total charges during the testing period where we were provided with sufficient appropriate documentation | 344 | $ | 92,588.50 |
| **Charges without Sufficient Documentation:** | | | |
| Total charges during the testing period where incomplete or insufficient documentation was provided | 35 | $ | 2,314.68 |
| Total charges during the testing period where no documentation was provided | 69 | | 2,212.58 |
| | 104 | $ | 4,527.26 |
| **Total charges during the testing period** | **448** | **$** | **97,115.76** |

**Procedure #4**

Classify charges on Bob Ross's APFA credit card for the period from April 1, 2016 to July 31, 2018 by the following categories: (a) meals and entertainment, (b) travel, (c) automotive and car rental, and (d) other.

APPX. 0247

**Black Decl. Ex. S**

**CORNWELL JACKSON**
CERTIFIED PUBLIC ACCOUNTANTS

***Findings:*** A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit A.

| Classification | Number of Charges | Amount of Charges |
|---|---|---|
| Meals and entertainment | 108 | $ 9,087.51 |
| Travel | 222 | 60,882.14 |
| Automotive and car rental | 3 | 357.44 |
| Other | 115 | 26,788.67 |
| **Total charges during the testing period** | **448** | **$ 97,115.76** |

**Procedure #5**

For charges on Bob Ross's APFA credit card for the period from April 1, 2016 to July 31, 2018 where documentation could be reviewed, conclude whether the expenses were likely (a) personal expenses, (b) non-personal expenses for union-related business, or (c) undeterminable and presumed personal expenses. We based our conclusion on the documentation available for review, the guidelines in IRS Publication 463, *Travel, Gift, and Car Expenses*, the guidelines in IRS Publication 535, *Business Expenses*, relevant Tax Court opinions, and our professional judgement.

***Findings:*** We identified $12,274.00 in credit card charges that were deemed personal in nature. This total does not include any transactions related to Mr. Ross's relocation, as those transactions were tested in Procedure #7. A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit A.

In applying relevant guidance to this procedure for meal expenses, we consulted certain Tax Court opinions including *Brown v. Comm'r*, Docket No. 16604-19 (U.S.T.C. Mar. 18, 2021) (an adequate record must also be a contemporaneous record) and *Heinbockel v. Comm'r*, T.C. Memo. 2013-125 (U.S.T.C. May. 13, 2013) (disallowance of deductions for meal expenses with employees or coworkers without a wholly documented business purpose). The guidance in the IRS Publications and these opinions emphasize that a receipt alone will not meet the standard to be considered a business expense. Further, business meals must be substantiated by all five of the following: (1) amount, (2) date, (3) location, (4) business purpose of the meal, and (5) identification of individuals present. The business purpose may be simple and brief. We noted most non-travel meals did not include all 5 of these required items, with a majority lacking a documented business purpose. Items in Exhibit A where a receipt was produced but lacked any of the five documentation requirements were classified as "Undeterminable; Presumed Personal."



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

**APPX. 0248**

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**Black Decl., Ex. S**

CORNWELL JACKSON
CERTIFIED PUBLIC ACCOUNTANTS

| Classification | Number of Charges | Amount of Charges |
|---|---|---|
| **Charges Deemed Non-Personal:** | | |
| Non-personal (union-related) | 300 | $ 74,535.57 |
| | | |
| **Charges Deemed Personal:** | | |
| Personal | 46 | 6,144.07 |
| Undeterminable and presumed personal expenses | 93 | 6,129.93 |
| | 139 | $ 12,274.00 |
| | | |
| Related to relocation and tested in Procedure #7 | 9 | $ 10,306.19 |
| **Total charges during the testing period** | **448** | **$ 97,115.76** |

**Procedure #6**

Obtain reimbursement requests submitted by Bob Ross, associated supporting documentation, and related payment support (check copies, pay stubs, etc.) for reimbursements made to Mr. Ross for the period from April 1, 2016, to October 31, 2016.

*Findings:* We obtained scanned copies of the Monthly Miscellaneous Expense Reports submitted for periods between April 1, 2016 and October 31, 2016 and related supporting documentation. We also obtained the remittance advice included with each reimbursement payment made during the period that included information related to each check. To ensure the completeness of the documentation, we obtained a check register exported from APFA's accounting system and verified any checks issued to Bob Ross were included in our analysis. See Exhibit B.

**Procedure #7**

For charges on Bob Ross's APFA credit card and reimbursements made related to Mr. Ross's relocation from California to Texas in August 2016, conclude based on review of documentation whether the expenses were likely (a) personal expenses related to Mr. Ross's relocation that would likely not meet the IRS's definition of a business expense, (b) reasonable costs associated with Mr. Ross's relocation that would likely meet the IRS's definition of a business expense, or (c) undeterminable and presumed it would likely not meet the IRS's definition of a business expense.

*Findings:* We identified $775.05 in credit card charges and reimbursements related to Mr. Ross's relocation that were deemed personal in nature. A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit C.



6865 Windcrest Drive | Suite 100 | Plano, TX 75024 | Main: 972.202.8000
www.CornwellJackson.com

APPX. 0249

An Independent Member Firm of BKR International. Firms in Principal Cities Worldwide.

**Black Decl. Ex. S**



Our assessment was based on review of the supporting documentation, relevant IRS Regulations, the APFA Policy Manual in effect in August 2016, and information contained in the Arbitration Decision. We noted that the APFA Policy Manual section 5H regarding relocation allows for reimbursement for actual moving expenses for relocation by a "certified mover" and the cost of relocating one vehicle (based on actual shipping or the standard mileage rate.) This language is much narrower in scope than what the IRS considers to be a business expense. For example, reimbursement of an employee's cost incurred for a self-rented moving truck is a business expense under IRS Regulations but would not be eligible for reimbursement under the APFA Policy Manual. In addition, the IRS has said that reasonable moving expenses include gas for a moving vehicle, short-term storage, packing, hotels (for long-distance moves), and mileage.

The Remedy included in the Arbitration Decision and language of this procedure directed us to only conclude on whether APFA expended funds that should not have been claimed as relocation moving expenses, and the amount. We applied our procedures using the more broad definition used by the IRS. This specifically relates to Mr. Ross's use of rental pods to move his personal affects, which we deemed to be appropriate business-related expenses.

| Classification | Number of Transactions | Amount of Transactions |
|---|---|---|
| **Charges Deemed Non-Personal:** | | |
| Expenses considered reasonable costs associated with Mr. Ross's relocation that would likely meet the IRS's definition of a business expense | 5 | $ 10,669.69 |
| **Charges Deemed Personal:** | | |
| Expenses related to Mr. Ross's relocation that would likely not meet the IRS's definition of a business expense (personal expenses) | 4 | $ 541.94 |
| Undeterminable and presumed personal expenses | 4 | 233.11 |
| | 8 | $ 775.05 |
| **Total charges during the testing period** | **13** | **$ 11,444.74** |



6865 Windcrest Drive | Suite 100 | Plano, TX 75024 | Main: 972.202.8000
www.CornwellJackson.com

**APPX. 0250**

An Independent Member Firm of BKR International. Firms in Principal Cities Worldwide.

As the APFA Policy Manual allows for the reimbursement of one vehicle's relocation to DFW using the standard mileage rate, we noted the amount reimbursed for mileage is appropriate. APFA reimbursed Mr. Ross based on the most direct route from his former residence in California to DFW. We recalculated the route using Google Maps and noted the number of miles agreed within 15 miles. Therefore, we determined that the miles listed on the expense report did not include miles for additional stops.

We determined that APFA also paid for four hotel stays in August 2016 totaling $541.94 that were not valid union expenses or allowed under the APFA Policy Manual. The hearing transcripts showed that Mr. Ross was not present during the hotel stays. We also noted that while the costs of relocating Mr. Ross's vehicle are eligible for reimbursement, such reimbursement would not extend beyond the actual milage.

We did not identify any costs related to meals or gas being paid or reimbursed by APFA during the trip in August 2016 from Sacramento to DFW.

We were unable to determine if the changes related to the U-Haul rental in August 2016 in DFW were a reasonable business expense. Other than the invoice and fuel receipts, we can only rely on the hearing transcripts where it was discussed the rental was for moving furniture from Ross's Southlake home to an APFA apartment. Therefore, we classified these transactions as "Undeterminable and Presumed Non-Business Expense" as AFPA would likely never have incurred the expense had furniture not been delivered to the Southlake residence.

**Procedure #8**

Obtain copies of rental agreements and other evidence documenting the purpose of expenses for credit card charges and reimbursements paid for car rental expenses for the period from April 1, 2016 to October 16, 2016.

***Findings:*** We obtained the monthly Enterprise rental car statements, which detailed the rental agreement number, driver listed on each rental agreement, the term, and charges. We were unable to obtain copies of the underlying rental agreements. We noted that there were no reimbursement requests for rental car charges. See Exhibit D.

**Procedure #9**

Calculate total expenses for car rentals for the period from April 1, 2016 to October 16, 2016 where evidence does not support the use as being Union-related and, therefore, would likely not meet the IRS's definition of a business expense.



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

**APPX. 0251**

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**Black Decl. Ex. S**

**Findings:** A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit D.

| Classification | Number of Charges | Amount of Charges |
|---|---|---|
| Union-related (business expense) | - | $    - |
| Personal | - | - |
| Undeterminable and presumed personal expenses | 6 | 6,454.38 |
| **Total charges during the testing period** | **6** | **$    6,454.38** |

Other than the Enterprise Statements, only 1 rental included any other supporting documentation. The 1 rental with supporting documentation included a May 2016 purchase order that was signed and approved by Bob Ross for a rental that indicated it was for Bob Ross. No documentation provided for our review included information supporting whether or not the rental was for union business. Therefore, we were required to classify all such rentals as "Undeterminable and presumed personal expenses."

**Procedure #10**

Obtain Bob Ross's mileage logs, or similar reports, for the period from April 1, 2016 to October 31, 2016.

**Findings:** Mileage Logs were included as supporting documentation for all Monthly Miscellaneous Expense Reports. See Exhibit E.

**Procedure #11**

Calculate the amount paid to Bob Ross for reimbursement of mileage from his California residence to Sacramento International Airport.

**Findings:** We calculated that Bob Ross was reimbursed a total of $725.76 for mileage from his California residence to Sacramento International Airport. See Exhibit E for further details.

**Procedure #12**

Calculate the total amount of charges on Bob Ross's APFA credit card and reimbursements made to Bob Ross related to airport parking at the Sacramental International Airport incurred from April 1, 2016 to October 31, 2016.

**Findings:** We determined that Bob Ross was charged a total of $107 for airport parking at the Sacramental International Airport incurred from April 1, 2016 to October 31, 2016. We noted all Sacramento airport parking changes were reimbursements and not charged to the APFA credit card. A summary of the results of this procedure is presented in detail in Exhibit B.



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**APPX. 0252**

Black Decl. Ex. 5

**Procedure #13**

Communicate to the Board of Directors and Arbitrator any transactions for which we were unable to obtain sufficient appropriate evidence or where we believe the transaction was recorded improperly.

*Findings:* We were not able to obtain sufficient evidence for 69 credit card transactions. Refer to Exhibit A for details on these transactions.

We were unable to obtain sufficient evidence for 5 items included on Bob Ross's reimbursement requests. Refer to Exhibit B for details on these transactions.

We were not able to obtain sufficient evidence for any car rental agreements and documentation showing the purpose of the rentals in Exhibit D.

**Summary of Inappropriate Transactions**

A summary of the transactions we determined to be inappropriate is detailed in the table below and organized by the associated remedy. Transactions deemed inappropriate were those without sufficient documentation under the relevant standards, transactions determined to be personal in nature and unrelated to union-business, and those where no evidence was provided.

| Arbitration Decision Remedy | Inappropriate Amount | |
|---|---|---|
| 1(a): inappropriate costs claimed as moving expenses | $ | 775.05 |
| 1(b): inappropriate credit card charges for meals and personal items | | 12,274.00 |
| 1(c): inappropriate costs related to rental cars | | 6,454.38 |
| 1(d): inappropriate costs related to mileage to Sacramento airport | | 725.76 |
| 1(d): inappropriate costs related to airport parking | | 107.00 |
| | $ | 20,336.19 |

Our fees related to this engagement totaled $14,846.86. Copies of our invoices are included in Exhibit F.

We were engaged by APFA to perform this agreed-upon procedures engagement and conducted our engagement in accordance with attestation standards established by the AICPA. We were not engaged to and did not conduct an audit or review, the objective of which would be the expression of an opinion or conclusion on the entity's financial statements as a whole. Accordingly, we do not express such an opinion or conclusion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

We are required to be independent of APFA and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements related to our agreed-upon procedures engagement.

*Cornwell Jackson, PLLC*

Cornwell Jackson
Plano, TX
August 5, 2022



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

**APPX. 0253**

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**Black Decl. Ex. S**

**Exhibit A**

List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

Agreed-Upon Procedures - Bob Ross
List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

**Summary of Findings**

| | Amount | No. of Transactions |
|---|---|---|
| Charges with with sufficient appropriate documentation: | 92,588.50 | 344 |
| Charges with incomplete or insufficient documentation: | 2,314.68 | 35 |
| Charges with no documentation: | 2,212.58 | 69 |
| | 97,115.76 | 448 |

| | Amount | No. of Transactions |
|---|---|---|
| Meals and entertainment: | 9,087.51 | 108 |
| Travel: | 60,882.14 | 222 |
| Automotive and car rental: | 357.44 | 3 |
| Other: | 26,788.67 | 115 |
| | 97,115.76 | 448 |

| | Amount | No. of Transactions |
|---|---|---|
| Non-Personal Expense for Union-Related Business: | 74,535.57 | 300 |
| Personal Expenses: | 6,144.07 | 46 |
| Undeterminable/Presumed Personal: | 6,129.93 | 93 |
| Personal Related to Relocation: | 10,306.19 | 9 |
| | 97,115.76 | 448 |

**Data from Chase Credit Card Statements - Procedure #1**

| | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | 4/16/2016 | 52.01 | GOGOAIR | Y | Receipt | Other | Undeterminable; Presumed Personal | In-flight internet subscription; no purpose liste d |
| 2 | 4/19/2016 | 309.99 | AMAZON | Y | Invoice Receipt | Other | Non-personal (Union-Related Business) | |
| 3 | 4/20/2016 | 41.65 | AMAZON | Y | Invoice Receipt | Other | Non-personal (Union-Related Business) | |
| 4 | 4/26/2016 | 62.50 | FLIPS PATIO GRILL TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Comm Nat. Chair: Heather/Gen#" noted on receip t |
| 5 | 4/27/2016 | 31.86 | SUBWAY TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Lunch w/Sched/Const" noted on receipt |
| 6 | 5/2/2016 | 150.78 | ONE BISTRO & BAR TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "SBA Dept w/Mark Richards" noted on receipt |
| 7 | 5/3/2016 | 339.80 | AMAZON | N | Non-Itemized Receipt | Other | Undeterminable; Presumed Personal | Not enough support provided to determine if related to Union business |
| 8 | 5/3/2016 | 148.27 | OFFICE DEPOT EULESS | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 9 | 5/5/2016 | 55.31 | SOUVLAKI GR NY | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Unicef NYC w/Marcy" noted on receipt |
| 10 | 5/6/2016 | 8.80 | NYC TAXI | N | Unable to Read | Travel | Undeterminable; Presumed Personal | Unable to read |
| 11 | 5/8/2016 | 180.93 | AMAZON | Y | Invoice Receipt | Other | Non-personal (Union-Related Business) | |
| 12 | 5/6/2016 | 231.85 | THE STRAND HOTEL NY | Y | Invoice Receipt | Travel | Non-personal (Union-Related Business) | |
| 13 | 5/6/2016 | 46.01 | NYC TAXI | Y | Original Receipt | Travel | Non-personal (Union-Related Business) | |
| 14 | 5/11/2016 | 19.69 | HITCH TAXI D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 15 | 5/12/2016 | 15.54 | HITCH TAXI D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 16 | 5/11/2016 | 322.20 | SONOMA RESTAURANT D.C. | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "NALDC Rally Comm; O'Neil 6 Assoc/Peter:T.Theriault/Alli Shane" noted on receipt |
| 17 | 5/11/2016 | 18.04 | GRAND CAB D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 18 | 5/12/2016 | 17.47 | DC VIP CAB D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 19 | 5/12/2016 | 23.81 | DC VIP CAB D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 20 | 5/12/2016 | 525.56 | HILTON GARDEN INN D.C. | Y | Purchase Order | Travel | Non-personal (Union-Related Business) | Purchase Order for hotel rooms for Tony Theriault, Bob Ross and Shane Staples |
| 21 | 5/12/2016 | 17.39 | GRAND CAB D.C. | Y | Original Receipt | Travel | Non-personal (Union-Related Business) | |
| 22 | 5/12/2016 | 102.07 | YELLOW CAB VA | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 23 | 5/12/2016 | 114.91 | PHILLIPS SEAFOOD MD | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Bus DC NAI Rally w/CP F/A's from rally;" noted on receipt. CP noted the transaction is large enough for a group order. Individual names not required. |

List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

| | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 24 | 5/12/2016 | 65.94 | HILTON GARDEN INN D.C. | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC NatFndtn Dinner for Tony T/Shane S" Noted on receipt |
| 25 | 5/12/2016 | 525.56 | HILTON GARDEN INN D.C. | Y | Purchase Order | Travel | Non-personal (Union-Related Business) | Purchase Order for hotel rooms for Tony Thernail, Bob Ross and Shane Staples |
| 26 | 5/16/2016 | 52.01 | GOGOAIR | Y | Receipt | Other | Undeterminable; Presumed Personal | In-flight internet subscription; no purpose listed; d |
| 27 | 5/21/2016 | 212.20 | BEST BUY CA | Y | Receipt | Other | Non-personal (Union-Related Business) | Not related to Union business; CJ noted pillows, linens and other personal items purchased on receipt |
| 28 | 5/23/2016 | 65.15 | PF CHANGS GRAPEVINE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Comm Corp. Schep/Rep" noted on receipt |
| 29 | 5/23/2016 | 28.92 | QT EULESS | Y | Receipt | Travel | Undeterminable; Presumed Personal | Unable to determine if expense is Union business related d |
| 30 | 5/25/2016 | 8.73 | ASIAN CHAO PA | Y | Receipt | Meals & Entertainment | Personal Expense | Personal meal, CJ noted there were no names listed at the top of the receipt |
| 31 | 5/26/2016 | 22.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 32 | 5/30/2016 | 131.31 | TARGET EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted both towels and personal items purchased on receipt |
| 33 | 5/30/2016 | 567.09 | BED BATH & BEYOND EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted pillows, linens and other personal items purchased on receipt |
| 34 | 6/1/2016 | 237.30 | PIRANHA KILLER TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "EC Meet Exec A/Jhae (6)" noted on receipt, CJ noted the transaction is large enough for a group order; Individual names not required |
| 35 | 6/3/2016 | 42.13 | HOME DEPOT EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted showerhead and other personal items purchased on receipt |
| 36 | 6/6/2016 | 261.81 | TARGET EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted mattress pad and other personal items purchased on receipt |
| 37 | 7/7/2016 | (311.89) | PLN-HOTEL BOOK ONLINE CT | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | Refund support not obtained |
| 38 | 6/8/2016 | 148.28 | PAPPADEAUX TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "APFA Comm: w/Thernil/Staples/Krouse" noted on receipt |
| 39 | 6/9/2016 | 75.47 | LING & LOUIES TX | Y | Original Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | Personal meal, CJ noted there were no names listed at the top of the receipt |
| 40 | 6/8/2016 | 721.96 | BED BATH & BEYOND EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted bedding and other personal items purchased on receipt |
| 41 | 6/10/2016 | 3.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 42 | 6/10/2016 | 10.42 | STARBUCKS CA | Y | Receipt | Other | Personal Expense | Not related to Union business; personal meal listed on receipt |
| 43 | 6/13/2016 | 54.08 | UNCLE JULIOS TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Strategy & Process W/Cef Tony/Shane" noted on receipt |
| 44 | 6/16/2016 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 45 | 6/15/2016 | 19.58 | PIZZA HUT FT W TX | Y | Original Receipt | Meals & Entertainment | Personal Expense | Personal meal, CJ noted there were no names listed at the top of the receipt |
| 46 | 6/16/2016 | 7.78 | NATALIE'S CANDY JAR TX | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 47 | 6/16/2016 | 36.47 | SAVIANO'S EULESS TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Meeting: Nina/Bob/Cindy" noted on receipt |
| 48 | 6/21/2016 | 199.65 | AMAZON | Y | Invoice | Other | Non-personal (Union-Related Business) | Receipt indicated for Dell Pro Screen |
| 49 | 6/22/2016 | 33.65 | BOOMERJACKS GRL DFW TX | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "B.Thernor" noted on receipt. No business purpose listed. Due to lack of support we must classify as undeterminable |
| 50 | 6/22/2016 | 22.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 51 | 6/22/2016 | 40.00 | STARBUCKS RELOAD TX | Y | Receipt1 | Meals & Entertainment | Personal Expense | Personal charge to reload Starbucks account |
| 52 | 6/24/2016 | 43.29 | OFFICE DEPOT EULESS | Y | Receipt | Other | Undeterminable; Presumed Personal | CJ noted decorative items purchased on receipt |
| 53 | 6/24/2016 | 7.78 | NATALIE'S CANDY JAR TX | Y | Receipt | Other | Non-personal (Union-Related Business) | For Linder Chocolates |
| 54 | 6/24/2016 | 66.74 | MKS SUSHI BEDFORD TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Comm: Tony/Bob" noted on receipt |
| 55 | 7/1/2016 | 75.75 | TLF BUCES FLORIST TX | Y | Purchase Order | Other | Non-personal (Union-Related Business) | |
| 56 | 7/1/2016 | 13.52 | DRY CLEAN EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business |
| 57 | 7/5/2016 | 16.77 | KROGER EULESS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted candy was purchased on receipt |

| | Data from Chase Credit Card Statements - Procedure #1 | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/s - Procedure #1 | | | | |
| 58 | 7/6/2016 | 27.04 | QT FUELESS | Y | Original Receipt | Other | Personal Expense | Unable to determine if expense is Union business relate d |
| 59 | 7/6/2016 | 6.00 | STAR EXPRESS CAR WASH | Y | Receipt1 | Other | Personal Expense | Not related to Union business |
| 60 | 7/7/2016 | 311.89 | PLN-MOTEL BOOK ONLINE CT | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 61 | 7/8/2016 | 22.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 62 | 7/6/2016 | 37.03 | VILLA GRANDE FT WORTH TX | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names listed on receipt. Due to lack of support we must classify as undeterminable. |
| 63 | 7/8/2016 | 13.33 | NATALIE'S CANDY JAR TX | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 64 | 7/12/2016 | 347.28 | BISTRO BIS D.C. | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Senate: Peter Goetz/Allie M/Tony T" noted on receipt |
| 65 | 7/12/2016 | 43.18 | DUBLINER RESTAURANT D.C. | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names listed on receipt. Due to lack of support we must classify as undeterminable. |
| 66 | 7/12/2016 | 8.40 | METRO AIRPRRT | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 67 | 7/12/2016 | 50.22 | BEARNAISE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Lunch: Peter G/Allie M/Tony T noted on receipt |
| 68 | 7/13/2016 | 69.60 | BARREL | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Trip: Allie M/Tony/Bob/Brandon" noted on receipt |
| 69 | 7/13/2016 | 95.41 | OLD EBBITT GRILL | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Trip: Allie M/ Tony T/ Peter G/Brandon S" noted on receipt |
| 70 | 7/13/2016 | 10.74 | HITCH TAXI D.C. | Y | Original Receipt | Travel | Non-personal (Union-Related Business) | |
| 71 | 7/13/2016 | 9.94 | VTS DISTRICT CAB/NGN | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 72 | 7/13/2016 | 5.85 | DC TAXI I534 | Y | Original Receipt | Travel | Non-personal (Union-Related Business) | |
| 73 | 7/13/2016 | 13.80 | DC TAXI G315 | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 74 | 7/13/2016 | 12.01 | DC TAXI I534 | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 75 | 7/14/2016 | 13.18 | HITCH TAXI D.C. | Y | Original Receipt | Travel | Non-personal (Union-Related Business) | |
| 76 | 7/14/2016 | 66.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 77 | 7/14/2016 | 9.31 | VTS DISTRICT CAB/NGN | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 78 | 7/14/2016 | 9.39 | DIAL CAB CO. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 79 | 7/14/2016 | 7.99 | GRAND CAB | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 80 | 7/15/2016 | 885.10 | HOTEL GEORGE | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FOR B.ROSS |
| 81 | 7/15/2016 | 885.10 | HOTEL GEORGE | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 82 | 7/16/2016 | 53.01 | GOGOAIR | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 83 | 7/20/2016 | 93.00 | CQ ROLL CALL INC | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 84 | 7/20/2016 | 426.92 | EXPEDIA | Y | Online Reservation Confirmation | Travel | Non-personal (Union-Related Business) | S.PRATER |
| 85 | 7/20/2016 | 426.92 | EXPEDIA | Y | Online Reservation Confirmation | Travel | Non-personal (Union-Related Business) | T.HERIAULT |
| 86 | 7/20/2016 | 426.92 | EXPEDIA | Y | Online Reservation Confirmation | Travel | Non-personal (Union-Related Business) | S.STAPLES |
| 87 | 7/20/2016 | 426.92 | EXPEDIA | Y | Online Reservation Confirmation | Travel | Non-personal (Union-Related Business) | M.DUNAWAY |
| 88 | 7/23/2016 | 1,234.76 | PODS 9/100 | Y | Receipt | Other | Personal, Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |
| 89 | 7/26/2016 | 6,858.40 | PODS 9/100 | Y | Receipt | Other | Personal, Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |
| 90 | 8/2/2016 | (426.92) | EXPEDIA WA | N | N/A - None Provided | Travel | Personal Expense | Refund for Expedia charge above |
| 91 | 8/7/2016 | (177.43) | THE HOME DEPOT TX | N | N/A - None Provided | Other | Non-personal (Union-Related Business) | |
| 92 | 8/24/2016 | (331.28) | ASHLEY FURNITURE | N | N/A - None Provided | Other | Personal Expense | Partial Refund |
| 93 | 8/2/2016 | 1,259.70 | PODS FL | Y | Receipt | Other | Personal, Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |
| 94 | 8/2/2016 | 42.65 | STARBUCKS RELOAD TX | Y | Receipt | Other | Personal Expense | Personal charge to reload Starbucks account |
| 95 | 8/2/2016 | 11.20 | SACRAMENTO 412B CA | Y | Receipt | Other | Personal Expense | |
| 96 | 8/5/2016 | 57.38 | EXPEDIA WA | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | Not related to Union business; CI noted transaction related to moving expense |
| 97 | 8/5/2016 | 379.93 | PODS FL | Y | Receipt | Other | Personal, Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |

Exhibit A          List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed          Page 3 of 14

APPX. 0257

List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

| | Date | Amount | Vendor/s/o | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| 98 | 8/3/2016 | 55.00 | AA CONF CENTER OUTLET | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 99 | 8/7/2016 | 177.43 | THE HOME DEPOT TX | Y | Receipt | Other | Non-personal (Union-Related Business) | Refunded 8/7 |
| 100 | 8/7/2016 | 159.69 | THE HOME DEPOT TX | Y | Receipt | Other | Personal Expense | Not related to Union business; CI noted tools and other personal items purchased on receipt |
| 101 | 8/8/2016 | 0.69 | LOWES FLOWER MOUND | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 102 | 8/10/2016 | 142.70 | PRICELINE - LA QUINTA AZ | Y | Online Reservation Confirmation | Other | Personal; Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense and reserved by K.ROSS. |
| 103 | 8/10/2016 | 449.88 | EXPEDIA WA | Y | Online Reservation Confirmation | Travel | Non-personal (Union-Related Business) | |
| 104 | 8/9/2016 | 157.18 | HOLIDAY INNS AZ | Y | Receipt | Other | Personal; Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |
| 105 | 8/11/2016 | 80.49 | FIFTH SEASON AMARILLO TX | N | N/A – None Provided | Other | Personal; Related to Relocation (refer to separate testing) | No support provided; Auditing records indicate this is related to relocation of Bob Ross |
| 106 | 8/11/2016 | 47.50 | SNAPPY SALADS SOUTHLAKE | N | N/A – None Provided | Meals & Entertainment | Undeterminable; Presumed Personal | No support provided |
| 107 | 8/12/2016 | 64.30 | SHELL OIL SOUTHLAKE | Y | Receipt | Other | Undeterminable; Presumed Personal | Support does not show what business purpose this relates to. |
| 108 | 8/13/2016 | 3,637.92 | ASHLEY FURNITURE TX | Y | Receipt | Other | Personal Expense | Not related to Union business; CI noted furniture and other personal items purchased on receipt |
| 109 | 8/16/2016 | 52.01 | GOGOAIR | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 110 | 8/15/2016 | 724.02 | TLF FLOWERS NY | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 111 | 8/22/2016 | 80.22 | UHAUL MOVING GRAPEVINE | Y | Invoice/Confirmation | Other | Personal; Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |
| 112 | 8/20/2016 | 112.81 | UHAUL MOVING GRAPEVINE | Y | Invoice/Confirmation | Other | Personal; Related to Relocation (refer to separate testing) | Not related to Union business; CI noted transaction related to moving expense |
| 113 | 8/24/2016 | 120.67 | TAVERNA ROSSA SOUTHLAKE | Y | Original Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Shane/Cassidy/Brent/Bob/Chuck" noted on receipt. No business purpose listed or individual names. Due to lack of support we must classify as undeterminable |
| 114 | 8/24/2016 | 91.29 | TEXAS L&C BEDFORD | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Meeting with APFA" noted on receipt |
| 115 | 8/29/2016 | 14.84 | DAIRY QUEEN #43122 EULESS | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | Personal meal; CI noted there were no names listed at the top of the receipt |
| 116 | 9/2/2016 | 3.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 117 | 9/5/2016 | 2.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 118 | 9/7/2016 | 130.63 | JRS STEAKHOUSE | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "APFA Strategy; Mack R/Nena/Bob" noted on receipt |
| 119 | 9/14/2016 | 67.56 | RAVENS GRILLE TX STAR GLF | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "APFA Agenda; Nena/Marcy/Maureen" noted on receipt |
| 120 | 9/16/2016 | 52.01 | GOGOAIR.COM | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 121 | 9/19/2016 | 63.33 | BISTRO IBS D.C. | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Dinner Meeting; Peter Gold/Shane Staples" noted on receipt |
| 122 | 9/20/2016 | 12.63 | YELLOW CAB CO D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 123 | 9/20/2016 | 24.40 | TAXICHARGE D.C. BROOKLYN | Y | Original Receipt | Travel | Non-personal (Union-Related Business) | |
| 124 | 9/20/2016 | 456.86 | HYATT REGENCY D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM B.ROSS |
| 125 | 9/20/2016 | 456.86 | HYATT REGENCY D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM S.STAPLES |
| 126 | 9/21/2016 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 127 | 9/28/2016 | 292.67 | HILTON HOTEL | Y | Folio | Travel | Non-personal (Union-Related Business) | |
| 128 | 9/28/2016 | 292.67 | HILTON HOTEL | Y | Folio | Travel | Non-personal (Union-Related Business) | |
| 129 | 10/1/2016 | 78.17 | MARCOS PIZZA | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | CI noted APFA purchase order was created alongside receipt. The transaction was large enough for a group order. |
| 130 | 10/4/2016 | 341.94 | UNCLE BUCK'S STEAK | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "BOD Meeting; 18 APFA Reps" noted on receipt. CI noted several meals charged on receipt indicating a large group. Individual names not re-quired. |
| 131 | 10/13/2016 | 19.13 | ROSAS CAFÉ EULESS | N | N/A – None Provided | Meals & Entertainment | Undeterminable; Presumed Personal | No support provided |

| | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Underminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 132 | 10/16/2016 | 82.01 | GOGOAIR | N | N/A - None Provided | Other | Underminable; Presumed Personal | No support provided |
| 133 | 10/17/2016 | 8.20 | AA CONF CENTER OUTLET | Y | Original Receipt | Travel | Personal Expense | Not related to Union business; CJ noted no additional names on receipt and determined transaction as a personal meal |
| 134 | 10/20/2016 | 2.00 | DFW AIRPORT PARKING | N | N/A - None Provided | Travel | Underminable; Presumed Personal | No support provided |
| 135 | 10/26/2016 | 2.00 | DFW AIRPORT PARKING | N | Receipt | Travel | Non-personal (Union-Related Business) | |
| 136 | 10/28/2016 | 10.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 137 | 11/1/2016 | 11.70 | HITCH TAXI D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 138 | 11/1/2016 | 8.79 | AA INFLIGHT PURCH | Y | Receipt | Meals & Entertainment | Personal Expense | Personal meal, CJ noted there were no names listed at the top of the receipt |
| 139 | 11/1/2016 | 12.09 | DC VIP CAB | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 140 | 11/2/2016 | 24.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 141 | 11/9/2016 | 41.25 | ROSAS CAFÉ | Y | Receipt | Meals & Entertainment | Underminable; Presumed Personal | *Marcy/Nena/Eugenia/Bob* noted on receipt. No business purpose listed. Due to lack of support we must classify as underminable. |
| 142 | 11/16/2016 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Underminable; Presumed Personal | No support provided |
| 143 | 11/24/2016 | 10.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 144 | 11/28/2016 | 163.98 | HAMPTON INN & SUITES | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 145 | 12/1/2016 | 15.54 | NATALIES CANDY JAR | N | N/A - None Provided | Other | Underminable; Presumed Personal | No support provided |
| 146 | 12/2/2016 | 184.10 | MARRIOTT LAX AIRPORT | Y | Email | Travel | Non-personal (Union-Related Business) | |
| 147 | 12/2/2016 | 184.10 | MARRIOTT LAX AIRPORT | Y | Email | Travel | Non-personal (Union-Related Business) | |
| 148 | 12/2/2016 | 184.10 | MARRIOTT LAX AIRPORT | Y | Email | Travel | Non-personal (Union-Related Business) | |
| 149 | 12/3/2016 | 184.10 | MARRIOTT LAX AIRPORT | Y | Email | Travel | Non-personal (Union-Related Business) | |
| 150 | 12/3/2016 | 2.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 151 | 12/5/2016 | 22.08 | SQ ALEXANDRIA UNION CAB | N | N/A - None Provided | Travel | Underminable; Presumed Personal | No support provided |
| 152 | 12/5/2016 | 16.59 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 153 | 12/5/2016 | 6.41 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 154 | 12/5/2016 | 14.18 | HITCH TAXI D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 155 | 12/6/2016 | 24.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 156 | 12/16/2016 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Underminable; Presumed Personal | No support provided |
| 157 | 12/16/2016 | 2.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 158 | 12/20/2016 | 26.29 | NATALIES CANDY JAR | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 159 | 12/22/2016 | 27,508.34 | HILTON CAPITAL | Y | Invoice | Travel | Non-personal (Union-Related Business) | PART REFUND 1/12/17 |
| 160 | 12/24/2016 | 25.50 | SUNSETNEWSST2620 | Y | Receipt | Other | Personal Expense | Not related to Union business - FOR CHOCOLATE |
| 161 | 1/3/2017 | 12.53 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 162 | 1/3/2017 | 10.15 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 163 | 1/3/2017 | 8.15 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 164 | 1/3/2017 | 17.24 | STARBUCKS GATES | Y | Receipt | Other | Personal Expense | Not related to Union business; Personal charge to Starbucks |
| 165 | 1/3/2017 | 40.00 | STARBUCKS RELOAD | Y | Receipt | Other | Personal Expense | Personal charge to reload Starbucks account |
| 166 | 1/3/2017 | 6.99 | TRAVEL TRADERS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted Advil purchased on receipt |
| 167 | 1/4/2017 | 57.63 | FUEL PIZZA | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Transitman: Holmid/Therisori/Glath/Price" noted on receipt |
| 168 | 1/4/2017 | 58.60 | HAWK N' DOVE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "O'Neil Associates; Peter & Assoc lunch" noted on receipt |
| 169 | 1/5/2017 | 9.07 | SUBWAY | N | N/A - None Provided | Meals & Entertainment | Underminable; Presumed Personal | No support provided |

APPX. 0259

| | Data from Chase Credit Card Statements - Procedure #1 | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 170 | 1/5/2017 | 124.48 | TLF BRUCES FLORIST | Y | Invoice | Other | Non-personal (Union-Related Business) | |
| 171 | 1/5/2017 | 363.20 | KELLARI TAVERNA | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Jan Adv. 5 Union Rep/2 Attorney" noted on receipt. CI noted several meals charged on the receipt indicating a large group. Individual names not re quired. |
| 172 | 1/7/2017 | 15.41 | UBER | Y | Screenshot of Receipt | Other | Non-personal (Union-Related Business) | |
| 173 | 1/8/2017 | 17.99 | VIASAT IN-FLIGHT WIB | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 174 | 1/9/2017 | 13.70 | SFO PEET'S COFFEE | Y | Receipt | Other | Personal Expense | Coffee for flight crew |
| 175 | 1/22/2017 | (6,735.86) | HILTON CAPITAL | Y | Invoice Reversal | Travel | Non-personal (Union-Related Business) | PARTIAL REFUND FOR 12/22/2016 |
| 176 | 1/16/2017 | 52.01 | GOGOAIR | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 177 | 1/17/2017 | 358.25 | ROWN NYC FD | Y | Reservation Confirmation | Travel | Non-personal (Union-Related Business) | |
| 178 | 1/17/2017 | 424.88 | ROWN NYC FD | Y | Reservation Confirmation | Travel | Non-personal (Union-Related Business) | |
| 179 | 1/17/2017 | 427.19 | ROWN NYC FD | Y | Reservation Confirmation | Travel | Non-personal (Union-Related Business) | |
| 180 | 1/17/2017 | 427.19 | ROWN NYC FD | Y | Reservation Confirmation | Travel | Non-personal (Union-Related Business) | |
| 181 | 1/18/2017 | (182.06) | HILTON CAPITAL | Y | Invoice Reversal | Travel | Non-personal (Union-Related Business) | PARTIAL REFUND FOR 12/22/2016 |
| 182 | 1/18/2017 | 108.59 | THE LAVA GRILL | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Union Meeting: 4 APFA Reps, names are illegible" noted on receipt. CI noted several meals charged on receipt indicating a large group. |
| 183 | 1/20/2017 | 2.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 184 | 1/21/2017 | 25.55 | FREEBIRDS | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Office lunch" noted on receipt. No names listed on receipt. Due to lack of support we must classify as undeterminable. |
| 185 | 1/21/2017 | 60.54 | MICHAELS STORES | Y | Receipt | Other | Non-personal (Union-Related Business) | CI noted frames purchased on receipt |
| 186 | 1/23/2017 | 172.51 | LA HACIENDA RANCH | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "APFA Reps" noted on receipt. No business purpose listed or individual names. Due to lack of support we must classify as undeterminable |
| 187 | 1/25/2017 | 77.21 | OUTBACK | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names listed on receipt. Due to lack of support we must classify as undeterminable. |
| 188 | 1/30/2017 | 55.67 | RAVENS GRILLE TX STAR GLF | Y | Original Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Officer Meeting: Bob/Nena/Eugenio" noted on receipt |
| 189 | 2/1/2017 | 15.53 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 190 | 2/3/2017 | 28.79 | SIMPLY BURGERS FT WORTH | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Apt Review: Bob/Rachel/Eugenio" noted on receipt |
| 191 | 2/5/2017 | 39.56 | THE GINGER MAN | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Joll Sunleck :3" noted on receipt." No business purpose listed. Due to lack of support we must classify as undeterminable. |
| 192 | 2/7/2017 | 9.00 | ACE PARKING | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 193 | 2/7/2017 | 89.82 | ROWN NYC | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM P.HANCOCK |
| 194 | 2/7/2017 | 89.82 | ROWN NYC | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM R.HARRIS |
| 195 | 2/7/2017 | 89.94 | ROWN NYC | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM A.MALIS |
| 196 | 2/7/2017 | 89.82 | ROWN NYC | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM R.COLE |
| 197 | 2/14/2017 | 86.28 | I.FRATELLI PIZZA | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "APFA: Judi Czaplejski" is listed on receipt by vendor. CI noted the transaction is large enough for a group order. Individual names not required. |
| 198 | 2/16/2017 | 52.01 | GOGOAIR | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No Support provided |
| 199 | 2/17/2017 | 34.35 | ARAMARK AM AIRLINES | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Neil/Nena/Kim R/Cindy S" noted on receipt. No business purpose listed. Due to lack of support we must classify as undeterminable. |
| 200 | 2/21/2017 | 14.45 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 201 | 2/21/2017 | 6.96 | THE HOME DEPOT | Y | Receipt | Other | Personal Expense | Not related to Union business; CI noted bottled water purchased on receipt |

| | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| 202 | 2/23/2017 | 8.29 | WALGREENS | Y | Receipt | Other | Personal Expense | Not related to Union business; CJ noted antiseptic spray purchased on receipt 1 |
| 203 | 2/28/2017 | 9.50 | ROSA'S CAFÉ EULESS | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names listed on receipt. Due to lack of support we cannot classify as undeterminable. |
| 204 | 3/1/2017 | 50.00 | STARBUCKS RELOAD DALLAS | Y | Receipt1 | Other | Personal Expense | Personal charge to reload Starbucks account |
| 205 | 3/22/2017 | 12.45 | MCDONALDS IRVING | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "MIA/DFW Lunch w/FA @ Airport" noted on receipt |
| 206 | 3/2/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 207 | 3/2/2017 | 16.56 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 208 | 3/2/2017 | 2.00 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 209 | 3/2/2017 | 37.88 | DFW 1270 ISTORE AZ1 | Y | Invoice | Other | Personal Expense | Not related to Union business; CJ noted lightning cable purchased on receipt 1 CONFIRM B.ROSS |
| 210 | 3/3/2017 | 224.87 | HAMPTON INN MIAMI FL | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 211 | 3/5/2017 | 234.15 | CARMINE'S STEAKHOUSE MO | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "STL BOD Steve Watson/Randy/Tony" noted on receipt |
| 212 | 3/7/2017 | 102.15 | IMO'S PIZZA MO | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "STL BOD Meeting Pizza" noted on receipt. CJ noted the transaction was a large group order. Individual names not required |
| 213 | 3/8/2017 | 39.74 | GAREWAY IRISH PUB MO | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "BOD Meeting w/Tony" noted on receipt |
| 214 | 3/9/2017 | 93.85 | IMO'S PIZZA MO | Y | Invoice Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names listed on receipt. Due to lack of support we cannot classify as undeterminable. |
| 215 | 3/9/2017 | 304.33 | SUGARFIRE MO | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "St Louis BOD Meet Dinner for 13 Reps" noted on receipt. CJ noted the transaction was large enough for a group order. Individual names not required. |
| 216 | 3/10/2017 | 22.46 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 217 | 3/14/2017 | 39.96 | CHUY'S SOUTHLAKE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "APFA Meet w/Tony T./Julie H." noted on receipt |
| 218 | 3/15/2017 | 1,098.52 | HYATT REGENCY PA | Y | Invoice Receipt | Travel | Non-personal (Union-Related Business) | |
| 219 | 3/16/2017 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 220 | 3/19/2017 | 9.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 221 | 3/20/2017 | 205.00 | PAYPAL | Y | Receipt | Other | Non-personal (Union-Related Business) | Officer handbook |
| 222 | 3/21/2017 | 11.16 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 223 | 3/21/2017 | 13.71 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 224 | 3/22/2017 | 195.20 | DBLTREE AIR PA | Y | Invoice | Other | Non-personal (Union-Related Business) | CONFIRM R.HARRIS |
| 225 | 3/22/2017 | 195.20 | DBLTREE AIR PA | Y | Invoice | Other | Non-personal (Union-Related Business) | CONFIRM P.HANCOCK |
| 226 | 3/22/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 227 | 3/22/2017 | 445.40 | WASHINGTON COURT HOTEL | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM B.ROSS |
| 228 | 3/23/2017 | 217.82 | HAMPTON INN & SUITES NC | Y | Confirmation | Travel | Non-personal (Union-Related Business) | REFUNDED 4/12 |
| 229 | 3/23/2017 | 217.82 | HAMPTON INN & SUITES NC | Y | Confirmation | Travel | Non-personal (Union-Related Business) | REFUNDED 4/12 |
| 230 | 3/23/2017 | (183.09) | HYATT REGENCY PA | Y | Invoice | Travel | Non-personal (Union-Related Business) | Refund |
| 231 | 3/24/2017 | 376.71 | COURTYARD EMBASSY D.C. | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | REFUNDED 04/08 |
| 232 | 3/28/2017 | 15.02 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 233 | 3/28/2017 | 8.64 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 234 | 3/28/2017 | 35.80 | THE GARDEN GRILLE D.C. | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "w/Julie Frederick DC" noted on receipt. No business purpose listed. Due to lack of support we must classify as undeterminable. |
| 235 | 3/29/2017 | 6.93 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |

Exhibit A                                    List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

APPX. 0261

| | | Data from Chase Credit Card Statements - Procedure #1 | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 236 | 3/29/2017 | 29.35 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 237 | 3/29/2017 | 5.60 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 238 | 3/29/2017 | 1.29 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 239 | 3/29/2017 | 15.59 | DC TAXI D.C. | N | Illegible Receipt | Travel | Undeterminable; Presumed Personal | No additional support provided to determine |
| 240 | 3/29/2017 | 8.28 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 241 | 3/30/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 242 | 3/30/2017 | 525.56 | HILTON GARDEN INN D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM B.ROSS |
| 243 | 3/30/2017 | 525.56 | HILTON GARDEN INN D.C. | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | CONFIRM FREDERICK |
| 244 | 4/7/2017 | 48.05 | VIA REAL IRVING | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "APFA Interview for Assist 2 Pres." noted on receipt. No copy of itemized receipt and no names listed. Due to lack of support we must classify as undeterminable. |
| 245 | 4/8/2017 | (376.71) | COURTYARD EMBASSY D.C. | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | Refund support not obtained |
| 246 | 4/12/2017 | (217.82) | HAMPTON INN & SUITES NC | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | Refund support not obtained |
| 247 | 4/12/2017 | (217.82) | HAMPTON INN & SUITES NC | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | Refund support not obtained |
| 248 | 4/16/2017 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 249 | 4/17/2017 | 56.50 | SUSHI ZEN SOUTHLAKE | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Bassy T. Steve" noted on receipt. No business purpose listed. Due to lack of support we must classify as undeterminable. |
| 250 | 4/17/2017 | 135.08 | RAVENS GRILLE TX STAR GLF | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names noted on receipt. However, billing/client info is billed to APFA and their address. CJ noted as undeterminable. |
| 251 | 4/19/2017 | 129.89 | EINSTEIN BROS LAKEWOOD | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | No business purpose or names noted on invoice receipt. However, billing/client info is billed to APFA and their address. CJ noted a large group order was purchased and determined the ex. purse was Union-Related "For Meet Randy/Neil/Shane" noted on receipt † |
| 252 | 4/19/2017 | 110.18 | MI DIA GRAPEVINE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | |
| 253 | 4/25/2017 | 13.85 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 254 | 4/25/2017 | 94.20 | BOBBY VANS STEAKHOUSE | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Macy/Peter/James Horotz/John Shiffn/Shane" noted on receipt CJ noted that 5 alcoholic beverages were purchased but there was no business purpose listed. Due to lack of support we must classify as undeterminable. |
| 255 | 4/25/2017 | 57.37 | BLACKFINN AMERPUB DC | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "D.C. w/Shane" is noted on receipt. No business purpose is listed and no itemized copy of the receipt. Due to lack of support we must classify as undeterminable. |
| 256 | 4/26/2017 | 845.02 | HILTON GARDEN INN D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM B.ROSS |
| 257 | 4/26/2017 | 845.02 | HILTON GARDEN INN D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM B.ROSS |
| 258 | 4/26/2017 | 15.68 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 259 | 4/28/2017 | 36.24 | LUBAFS PIZZA | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "EC/BOD Call - Illegible Name" itemized portion of meals is illegible. Due to lack of support we must classify as undeterminable. "Base Meet. Kodkes/Plevrina/Ramsaak" noted on receipt |
| 260 | 5/2/2017 | 151.03 | LEHMAN'S TAVERN | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Holiday Inn Commun: Mark/Rich/Steve" noted on receipt |
| 261 | 5/2/2017 | 35.25 | ONE BISTRO AND BAR | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | |
| 262 | 5/2/2017 | 61.21 | INMOTION PHL-C1 | Y | Receipt | Other | Personal Expense | Not related to Union business. CJ noted charger cable purchased on receipt |
| 263 | 5/2/2017 | 7.78 | NATALIES CANDY JAR | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 264 | 5/2/2017 | 50.00 | STARBUCKS RELOAD | Y | Receipt | Other ; | Personal Expense | Personal charge to reload Starbucks account |
| 265 | 5/4/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |

| # | Date | Amount | Vendor/Co – Procedure #1 | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| 266 | 5/4/2017 | 183.65 | HAMPTON INN PA | Y | Folio | Travel | Non-personal (Union-Related Business) | |
| 267 | 5/4/2017 | 172.10 | HAMPTON INN PA | Y | Folio | Travel | Non-personal (Union-Related Business) | |
| 268 | 5/4/2017 | 183.65 | HAMPTON INN PA | Y | Folio | Travel | Non-personal (Union-Related Business) | |
| 269 | 5/10/2017 | 8.17 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 270 | 5/10/2017 | 6.59 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 271 | 5/10/2017 | 15.14 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 272 | 5/10/2017 | 366.26 | ZAYTINYA | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose or names listed on receipt. Due to lack of support we must classify as undeterminable. |
| 273 | 5/11/2017 | 7.69 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 274 | 5/11/2017 | 7.14 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 275 | 5/11/2017 | 15.89 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 276 | 5/11/2017 | 6.55 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 277 | 5/11/2017 | (6.55) | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | Refund |
| 278 | 5/11/2017 | 45.09 | EL CENTRO DF | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Coalition DC- Steve W/Julie F/Noelle W" noted on receipt |
| 279 | 5/11/2017 | 8.96 | TAXI SVS D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 280 | 5/12/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 281 | 5/12/2017 | 376.71 | COURTYARD EMBASSY ROW | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FREDERICK |
| 282 | 5/12/2017 | 376.71 | COURTYARD EMBASSY ROW | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM S.WATSON |
| 283 | 5/12/2017 | 468.31 | COURTYARD EMBASSY ROW | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FOR B.ROSS |
| 284 | 5/12/2017 | 376.71 | COURTYARD EMBASSY ROW | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM N.WEILER |
| 285 | 5/16/2017 | 52.01 | GOGOAir | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 286 | 5/17/2017 | 101.82 | COLUMBIA FLORIST GALLERY | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 287 | 5/18/2017 | 309.94 | HILTON HOTELS OHARE | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 288 | 5/18/2017 | 309.94 | HILTON HOTELS OHARE | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 289 | 5/23/2017 | 140.44 | MAC'S SPEED SHOP | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Client Base Visit. BCR Meal" noted on receipt. CJ noted several meals charged on receipt indicating a large group. Individual names not re-quired. |
| 290 | 5/24/2017 | 183.25 | HAMPTON INN & SUITES | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 291 | 5/24/2017 | 13.32 | HAMPTON INN & SUITES | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 292 | 5/24/2017 | 16.95 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 293 | 5/24/2017 | 183.25 | HAMPTON INN & SUITES | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 294 | 5/24/2017 | 240.87 | HAMPTON INN & SUITES | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 295 | 5/24/2017 | 240.87 | HAMPTON INN & SUITES | Y | Invoice | Travel | Non-personal (Union-Related Business) | |
| 296 | 5/24/2017 | 50.00 | STARBUCKS RELOAD | Y | Receipt | Other | Personal Expense | Personal charge to reload Starbucks account |
| 297 | 5/25/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 298 | 5/26/2017 | 9,307.32 | WESTIN DALLAS FT WORTH | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 299 | 5/27/2017 | 145.77 | HILTON GARDEN INN MIAMI | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 300 | 5/27/2017 | 145.77 | HILTON GARDEN INN MIAMI | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |

Exhibit A    List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

| # | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 301 | 5/29/2017 | 240.87 | HAMPTON INN & SUITES NC | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FOR EJ/ESS |
| 302 | 5/29/2017 | 240.87 | HAMPTON INN & SUITES NC | Y | Invoice | Invoice | Non-personal (Union-Related Business) | CONFIRM S.WATSON |
| 303 | 6/1/2017 | 37.06 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 304 | 6/1/2017 | 5.37 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 305 | 5/31/2017 | 90.89 | SUSHI RAN | N | Unreadable | Meals & Entertainment | Undeterminable; Presumed Personal | Unreadable |
| 306 | 5/31/2017 | 22.49 | STARBUCKS DALLAS | Y | Receipt | Meals & Entertainment | Personal Personal Expense | Non related to Union business; Personal charge to Starbucks |
| 307 | 6/1/2017 | 5.14 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 308 | 6/2/2017 | 48.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 309 | 6/1/2017 | 217.61 | THE BEVERLY GARLAND CA | Y | Invoice Confirmation & Email Correspondence | Travel | Non-personal (Union-Related Business) | |
| 310 | 6/2/2017 | 77.64 | THE FRONTYARD BEVERLYCA | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Dateline NBC LA / Janice Harowitz/Noelle Wizen" noted on receipt |
| 311 | 6/2/2017 | 150.00 | ARIES SHUTTLE DALLAS | Y | Reservation Confirmation | Automotive & Car Rental | Non-personal (Union-Related Business) | |
| 312 | 6/8/2017 | 8.74 | EINSTEIN BROS BAGEL | N | Post-it provided | Meals & Entertainment | Undeterminable; Presumed Personal | No additional support provided to determine "BOD, illegible names" noted on receipt. CJ noted several meals charged on receipt indicating a large group. Individual names not required |
| 313 | 6/9/2017 | 64.73 | SALT/GRASS GRAPEVINE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | |
| 314 | 6/14/2017 | 43.08 | SIMPLY BURGERS | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "For refer meet 'Chuck/Steve/Daniel'" noted on receipt |
| 315 | 6/16/2017 | 53.01 | GOGOAR | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 316 | 6/18/2017 | 12.10 | DALLAS 1259C DALLAS TX | N | Receipt | Personal Expense | Personal Expense | Not related to Union business; for snacks |
| 317 | 6/18/2017 | 6.85 | STARBUCKS DALLAS | Y | Receipt | Travel | Personal Expense | Not related to Union business; CJ noted no additional names on receipt and determined transaction as a personal meal |
| 318 | 6/20/2017 | 160.20 | HAMPTON INN & SUITES NC | Y | Invoice Confirmation | Travel | Non-personal (Union-Related Business) | |
| 319 | 6/20/2017 | 160.20 | HAMPTON INN & SUITES NC | Y | Invoice Confirmation | Travel | Non-personal (Union-Related Business) | |
| 320 | 6/22/2017 | 450.74 | CRYSTAL INN VA | Y | Invoice | Travel | Non-personal (Union-Related Business) | |
| 321 | 6/27/2017 | 16.78 | MARRIOTT SOLANA DRW | N | N/A – None Provided | Travel | Undeterminable; Presumed Personal | |
| 322 | 7/10/2017 | 63.53 | RAVENS GRILLE EULESS | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | |
| 323 | 7/16/2017 | 52.01 | GOGOAR | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | "APFA Contract Schedule C commute" noted on receipt. CJ noted several meals charged on the receipt indicating a large group. Individual names not required |
| 324 | 7/17/2017 | 20.54 | UBER | N | N/A – None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 325 | 7/16/2017 | 42.43 | BLACKFINN AMERIPUB D.C. | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "D.C. w/Peter" noted on receipt. No business purpose listed. Due to lack of support we must classify as undeterminable. |
| 326 | 7/16/2017 | 7.78 | NATALIE'S CANDY JAR TX | Y | Receipt | Other | Non-personal (Union-Related Business) | Chocolate |
| 327 | 7/17/2017 | 10.26 | DC TAXI D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 328 | 7/17/2017 | 39.70 | CARMINE'S D.C. | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "DC Air Safety Forum w/Peter" noted on receipt |
| 329 | 7/18/2017 | 2.00 | HILTON GARDEN INN D.C. | N | N/A – None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 330 | 7/18/2017 | 9.02 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 331 | 7/17/2017 | 10.01 | CMT WASHINGTON D.C. | N | N/A – None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 332 | 7/18/2017 | 7.67 | TAXI SVS D.C. | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 333 | 7/20/2017 | 12.77 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 334 | 7/19/2017 | 6.87 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 335 | 7/18/2017 | 11.36 | DC TAXI D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 336 | 7/19/2017 | 12.01 | HITCH TAXI D.C. | N | Unreadable | Travel | Undeterminable; Presumed Personal | Unreadable |
| 337 | 7/18/2017 | 10.28 | CMT WASHINGTON D.C. | N | Receipt | Travel | Non-personal (Union-Related Business) | |
| 338 | 7/20/2017 | 14.78 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |

Exhibit A   List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed   Page 10 of 14

APPX. 0264

| | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | **Data from Chase Credit Card Statements – Procedure #1** | | | | | | | |
| 339 | 7/20/2017 | 46.52 | EL CENTRO DF VA | Y | Y | Meals & Entertainment | Undeterminable; Presumed Personal | "Gov't ATTZC export" noted on receipt. Unable to determine business purpose and no names listed Due to lack of support we must classif y as undeterminable. |
| 340 | 7/19/2017 | 13.82 | TAXI SVS D.C. | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 341 | 7/20/2017 | 3.65 | GEORGETOWN MKT VA | Y | Receipt | Other | Personal Expense | Not related to Union business. CJ noted bottled water purchased on receipt |
| 342 | 7/21/2017 | 365.26 | HILTON INTERNATIONAL D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FREDERICK |
| 343 | 7/20/2017 | 1,762.08 | HILTON GARDEN INN D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FREDERICK |
| 344 | 7/26/2017 | 3.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 345 | 7/26/2017 | 12.99 | HOTEL BOOKING SVS FEE | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided |
| 346 | 7/26/2017 | 8.36 | NATALIE'S CANDY JAR TX | Y | Receipt | Other | Non-personal (Union-Related Business) | |
| 347 | 7/28/2017 | 34.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 348 | 7/27/2017 | 190.44 | ENTERPRISE RENT-A-CAR NY | Y | Receipt | Automotive & Car Rental | Non-personal (Union-Related Business) | FOR R.ROSS IN NYC |
| 349 | 7/27/2017 | 8.60 | AUNTIE ANNE'S NY | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | Not related to Union business; CJ noted no additional names on receipt and determined transaction as a personal meal. |
| 350 | 7/27/2017 | 14.22 | CONOCO GAS STATION NY | N | Illegible receipt | Travel | Undeterminable; Presumed Personal | Unreadable |
| 351 | 7/28/2017 | 155.95 | SPRINGHILL SUITES NY | Y | Invoice | Travel | Non-personal (Union-Related Business) | |
| 352 | 7/28/2017 | 289.30 | MHF LOGAN HAMPTON MA | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM R.HARRIS |
| 353 | 8/3/2017 | 587.22 | PAYPAL AIRLINEMB VA | Y | Receipt | Other | Non-personal (Union-Related Business) | EVENT REFUNDED 9/18 |
| 354 | 8/6/2017 | 17.00 | ENTERPRISE CAR TOLLS | N | N/A - None Provided | Automotive & Car Rental | Undeterminable; Presumed Personal | No support provided |
| 355 | 8/11/2017 | 426.88 | COURTYARD BY MARRIOTT | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM FREDERICK |
| 356 | 8/12/2017 | 151.74 | WINEWOOD GRL GRAPEVINE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "APPA For PBS/ Randy/Neil* noted on receip t |
| 357 | 8/16/2017 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 358 | 8/22/2017 | 9.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 359 | 8/24/2017 | 24.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 360 | 8/24/2017 | 7.84 | G-MIAMI FOOD AIRPORT FL | Y | Receipt | Meals & Entertainment | Personal Expense | Not related to Union business; CJ noted no additional names on receipt and determined transaction as a personal meal. |
| 361 | 8/24/2017 | 40.00 (587.22) | STARBUCKS RELOAD DALLAS | Y | Receipt1 | Other | Personal Expense | Personal charge to reload Starbucks account For Event |
| 362 | 9/18/2017 | | PAYPAL AIRLINEMB VA | Y | Refund Confirmation | Other | Non-personal (Union-Related Business) | |
| 363 | 8/29/2017 | 23.78 | KFC EULESS | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "UAW Eugenio/Nana" noted on receipt |
| 364 | 8/30/2017 | 157.78 | HAMPTON INN & SUITES DFW | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM TRAUTMAN |
| 365 | 8/30/2017 | 157.78 | HAMPTON INN & SUITES DFW | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM CLAYMAN |
| 366 | 9/4/2017 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 367 | 9/9/2017 | 134.77 | HIBDU MORRISVILLE NC | Y | Invoice Confirmation | Travel | Non-personal (Union-Related Business) | Holiday Inn room for Ronald Harris |
| 368 | 9/27/2017 | 789.66 | HYATT REGENCY PA | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM R.HARRIS |
| 369 | 10/3/2017 | 160.55 | HAMPTON INN PA | Y | Reservation Confirmation R.Harris | Travel | Non-personal (Union-Related Business) | |
| 370 | 10/3/2017 | 160.55 | HAMPTON INN PA | Y | Reservation Confirmation P.Hancock | Travel | Non-personal (Union-Related Business) | |
| 371 | 10/4/2017 | 122.57 | SUSHI ZUSHI SOUTHLAKE | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "CIRT Rep 3 OLD LAX" noted on receipt. No names were listed. Due to lack of support we must classify as undeterminable. CONFIRM R.HARRIS |
| 372 | 10/6/2017 | 399.92 | HYATT REGENCY PA | Y | Invoice | Other | Non-personal (Union-Related Business) | |
| 373 | 10/12/2017 | 107.41 | SUSHI ZUSHI SOUTHLAKE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "BOD Mtg" noted on receipt. CJ noted several meals charged on the receipt indicating a large group. Individual names not required |
| 374 | 10/16/2017 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |

| | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedures #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/s | | | | | |
| 375 | 10/17/2017 | 218.80 | HILTON HOTELS AIRPORT CA | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM R.HARRIS |
| 376 | 10/17/2017 | 218.80 | HILTON HOTELS AIRPORT CA | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM P.HANCOCK |
| 377 | 10/18/2017 | 35.93 | AMAZON MKETPLACE | Y | Invoice | Other | Personal Expense | Purchase was for a lumbar cushion for Jodi Csabajki and mailed to a residence. Not related to Union business; CI noted charger cables purchased on receipt |
| 378 | 10/17/2017 | 64.93 | OFFICE DEPOT EULESS | Y | Receipt | Other | Personal Expense | |
| 379 | 10/19/2017 | 3,673.78 | MARRIOTT SOLANA DFW | Y | Invoice | Other | Non-personal (Union-Related Business) | FOR EVENT |
| 380 | 10/18/2017 | 312.71 | CLUB QUARTERS SF CA | Y | Invoice | Other | Non-personal (Union-Related Business) | CONFIRM R. HARRIS |
| 381 | 10/18/2017 | 312.71 | CLUB QUARTERS SF CA | Y | Invoice | Other | Non-personal (Union-Related Business) | CONFIRM P.HANCOCK |
| 382 | 10/23/2017 | 26.71 | SAVIANOS EULESS | Y | Receipt | Meals & Entertainment | Personal Expense | "School Contract Review Interview" noted on receipt. No additional names listed. CI Noted that food was for only one guest. Determined personal. |
| 383 | 10/26/2017 | 19.27 | 5GUYS SOUTHLAKE | Y | Receipt | Meals & Entertainment | Undeterminable, Presumed Personal | "For Pro-Arb SBA" noted on receipt. No additional names listed. Due to lack of support we must classify as undeterminable |
| 384 | 10/25/2017 | 184.93 | #54 BRIO SOUTHLAKE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Pro-Arb: Ross/Randy/Illigible Name" noted |
| 385 | 10/28/2017 | 95.11 | SUSHI ZUSHI SOUTHLAKE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "BOD, for Pre Arbitration Conf" noted on receipt. CI noted several meals charged on the receipt indicating a large group. Individual names not required. |
| 386 | 10/31/2017 | 97.41 | LAZY DOG EULESS | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "ABPA: Daniel/Chuck/Shane" noted on receipt. |
| 387 | 11/4/2017 | 169.86 | HAMPTON INNS IL | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 388 | 11/8/2017 | 2.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 389 | 11/16/2017 | 52.01 | GOGOAR | N | N/A - None Provided | Other | Undeterminable, Presumed Personal | No support provided |
| 390 | 11/16/2017 | 55.50 | NOTHING BUNDT CAKES | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | |
| 391 | 11/20/2017 | 17.30 | NATALIE'S CANDY JAR TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | |
| 392 | 11/30/2017 | 120.67 | ROCKFISH SEAFOOD TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "For ARB. Ross/Randy T" noted on receipt |
| 393 | 11/30/2017 | 121.57 | COWTOWN SUSHI TX | Y | Receipt | Meals & Entertainment | Undeterminable, Presumed Personal | "For ARBIT" noted on receipt. No names were listed. Due to lack of support we must classify as undeterminable. |
| 394 | 12/2/2017 | 52.75 | 7-ELEVEN SOUTHLAKE | N | N/A - None Provided | Other | Undeterminable, Presumed Personal | No support provided |
| 395 | 12/5/2017 | 7.78 | NATALIE'S CANDY JAR TX | N | Receipt | Other | Non-personal (Union-Related Business) | Chocolate |
| 396 | 12/6/2017 | 15.68 | VIP CAB D.C. | N | N/A - None Provided | Travel | Undeterminable, Presumed Personal | No support provided |
| 397 | 12/7/2017 | 16.19 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 398 | 12/7/2017 | 2.86 | STARBUCKS D.C. | N | N/A - None Provided | Meals & Entertainment | Undeterminable, Presumed Personal | No support provided |
| 399 | 499.50 | CAPITOL HILL SUITES D.C. | | Y | Reservation Confirmation | Travel | Non-personal (Union-Related Business) | Bob Ross |
| 400 | 12/8/2017 | 138.32 | R.A SUSHI SOUTHLAKE | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "ARB BOD Benefit: Rob/Clayman/Randy Treatman" noted on receipt |
| 401 | 12/10/2017 | 18.83 | JERSEY MIKES FT WORTH | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "Lunch Randy T for Communications" noted on receipt |
| 402 | 12/8/2017 | 500.00 | BW ISLAND HOTEL CA | Y | Meeting Space Agreement | Other | Non-personal (Union-Related Business) | Catering |
| 403 | 12/10/2017 | 49.77 | COWTOWN SUSHI TX | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "ARBIT: Randy/Stacks" noted on receipt. |
| 404 | 12/12/2017 | 159.18 | HAMPTON INN & SUITES DFW | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 405 | 12/16/2017 | 52.01 | GOGOAR | N | N/A - None Provided | Other | Undeterminable, Presumed Personal | No support provided |
| 406 | 12/17/2017 | 21.64 | BESTBUY GRAPEVINE | N | Receipt | Other | Personal Expense | Not related to Union business; CI noted phone case purchased on receipt |
| 407 | 12/21/2017 | 9.15 | STARBUCKS OMNI | Y | Receipt | Other | Personal Expense | Non related to Union business; Personal charge to Starbucks |
| 408 | 12/27/2017 | 6.81 | OFFICE DEPOT EULESS | N | N/A - None Provided | Other | Undeterminable, Presumed Personal | No support provided |
| 409 | 12/28/2017 | 43.28 | STAPLES SOUTHLAKE | Y | Receipt | Other | Personal Expense | Not related to Union business; CI noted charger cables purchased on receipt |

Exhibit A    List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed    Page 12 of 14

APPX. 0266

| | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 410 | 12/29/2017 | 75.76 | TARGET T6155 | Y | Receipt | Other | Personal Expense | Not related to Union business. CJ noted butter purchased on receipt and unable to determine if related to office |
| 411 | 1/6/2018 | 15.00 | COWTOWN SUSHI TX | | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "ABBIT: Randy Stacks" noted on receipt For Tip Portion |
| 412 | 1/16/2018 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 413 | 1/22/2018 | 92.41 | CAPITOL HILL SUITES D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CANCELLATION FEE |
| 414 | 1/22/2018 | 92.41 | CAPITOL HILL SUITES D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CANCELLATION FEE |
| 415 | 2/7/2018 | (1.99) | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | Refund |
| 416 | 1/30/2018 | 245.67 | CAPITOL HILL SUITES D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM N.WEILER |
| 417 | 1/30/2018 | 245.67 | CAPITOL HILL SUITES D.C. | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM CARRILLO |
| 418 | 1/30/2018 | 500.00 | BW ISLAND HOTEL CA | Y | Invoice/Confirmation | Other | Non-personal (Union-Related Business) | Catering |
| 419 | 1/30/2018 | 245.67 | CAPITOL HILL SUITES D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided. Based on description it could be assumed that this relates to business travel, but due to lack of support we must classify it as presumed personal |
| 420 | 1/30/2018 | 245.67 | CAPITOL HILL SUITES D.C. | N | N/A - None Provided | Travel | Undeterminable; Presumed Personal | No support provided. Based on description it could be assumed that this relates to business travel, but due to lack of support we must classify it as presumed personal |
| 421 | 1/31/2018 | 2.44 | STARBUCKS FT WORTH | Y | Receipt | Meals & Entertainment | Personal Expense | Not related to Union business. CJ noted no names were listed on receipt and determined the transaction was for a personal coffee |
| 422 | 2/6/2018 | 247.47 | HAMPTON INN FL | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 423 | 2/6/2018 | 247.47 | HAMPTON INN FL | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 424 | 2/6/2018 | 14.17 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 425 | 2/7/2018 | 31.67 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 426 | 2/6/2018 | 28.14 | O'MALLEY'S PUB VA | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | No business purpose listed on receipt. Due to lack of support we must classify as undeterminable |
| 427 | 2/6/2018 | 37.13 | MATSUTAKE SUSHI D.C. | Y | Receipt | Meals & Entertainment | Undeterminable; Presumed Personal | "Aviation Safety Symposium" is noted on receipt but no additional list of names. Due to lack of support we must classify as undeterminable |
| 428 | 2/8/2018 | 35.34 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 429 | 2/9/2018 | 490.56 | DOUBLETREE HOTEL VA | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 430 | 2/8/2018 | 105.49 | LEGAL SEA FOODS D.C. | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | AV Safety Symposium: Frederick, Boetz, Wilke, & Ross |
| 431 | 2/10/2018 | 178.82 | HAMPTON INN MO | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 432 | 2/10/2018 | 178.82 | HAMPTON INN MO | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 433 | 2/9/2018 | 9.00 | DFW AIRPORT PARKING | Y | Receipt | Travel | Non-personal (Union-Related Business) | |
| 434 | 2/9/2018 | 490.56 | DOUBLETREE HOTEL VA | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 435 | 2/8/2018 | 217.82 | HAMPTON INN & SUITES NC | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 436 | 2/9/2018 | 490.56 | DOUBLETREE HOTEL VA | Y | Invoice/Confirmation | Travel | Non-personal (Union-Related Business) | |
| 437 | 2/8/2018 | 217.82 | HAMPTON INN & SUITES NC | Y | Invoice | Travel | Non-personal (Union-Related Business) | CONFIRM P.HANCOCK |
| 438 | 2/16/2018 | 52.01 | GOGOAIR | N | N/A - None Provided | Other | Undeterminable; Presumed Personal | No support provided |
| 439 | 2/22/2018 | 553.19 | BW ISLAND HOTEL CA | Y | Confirmation | Travel | Non-personal (Union-Related Business) | |
| 440 | 2/26/2018 | 20.83 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 441 | 2/26/2018 | 108.70 | BOARDWALK BILLY'S NC | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "BOD Conference: Ross/Watson/Frederick" is noted on receipt |

| | | Data from Chase Credit Card Statements - Procedure #1 | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Personal, Non-Personal, or Undeterminable Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | | |
| 442 | 3/6/2018 | (939.06) | HILTON CAPITAL D.C. | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | Refund support not obtained |
| 443 | 2/28/2018 | 79.93 | FIREWATER CHARLOTTE N.C. | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "CLT BOD Conference" is noted on receipt. CJ noted several meals charged on the receipt indicating a large group. Individual names not re quired. |
| 444 | 3/2/2018 | 123.51 | FIRST IN FLIGHT CLT N.C. | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "CLT BOD Conference, Hotel J SRC" is noted on receipt. CJ noted several meals charged on the receipt indicating a large group. Individual names not required. |
| 445 | 3/1/2018 | 83.44 | BAR LOUIE NC | Y | Receipt | Meals & Entertainment | Non-personal (Union-Related Business) | "CLT BOD Conference" is noted on receipt. CJ noted several meals charged on the receipt indicating a large group. Individual names not required. |
| 446 | 3/3/2018 | 18.42 | UBER | Y | Screenshot of Receipt | Travel | Non-personal (Union-Related Business) | |
| 447 | 3/5/2018 | 939.06 | HILTON CAPITAL D.C. | N | N/A - Refund | Travel | Non-personal (Union-Related Business) | REFUNDED ON 3/6/2018 |
| 448 | 3/5/2018 | 11.82 | OFFICE DEPOT EULESS | Y | Receipt | Other | Non-personal (Union-Related Business) | Related to file box for move of president's office |
| | | 97,115.76 | | | | | | |

Black Decl. Ex. S

**Exhibit B**

List of Reimbursements Made to Bob Ross for the Period of April 1, 2016 to October 31, 2016 and
Relevant Testing Performed

Agreed-Upon Procedures - Bob Ross
List of Reimbursement Checks Issued for the Period of April 1, 2016 to October 31, 2016 and Relevant Testing Performed

| Summary of Findings | |
| --- | --- |
| Amount related to Airport Parking: | 107.00 |
| Unrelated to Airport Parking: | 3,492.31 |
| | 3,599.31 |

**Data from Monthly Miscellaneous Expense Report** (Procedure #6 & #12)

| Reimbursement Month | Expense Report Line Item (Procedure #6 & #12) | Amount | Check Number (Procedure #6 & #12) | Amount on Check/Remittance Advice (Procedure #6 & #12) | Difference (Procedure #6 & #12) | Classification of Reimbursement (Relocation, Rental Car, Mileage, Airport Parking, or Other) (Procedure #6 & #12) | Supporting Documentation Provided? (Y or N) (Procedure #6 & #12) | Testing Comments |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| April 2016 | M&A at Residence | 459.67 | E9862 | 450.67 | - | Other | | Calculated on Expense Report |
| | Mileage | 82.92 | | | | Mileage | | Agreed to Mileage Log |
| | Internet | 158.76 / 50.00 | | | | Other | Y | Support showed bundled services and manually written $50 allocated to internet. |
| | Taxi/Public Transit | 20.00 | | | | Other | Y | Agreed to receipt |
| | Meals/Tips | 138.99 | | | | Other | Y | Agreed to receipt; CI noted that some receipts did not include all necessary components to meet the IRS business expense standard. |
| May 2016 | M&A at Residence | 581.47 | E9917 | 581.47 | - | Other | | Calculated on Expense Report |
| | Mileage | 152.71 | | | | Mileage | Y | Agreed to Mileage Log |
| | Parking Tolls | 158.76 / 105.00 | | | | Airport Parking | Y | Agreed to receipt |
| | Internet | 50.00 | | | | Other | Y | Support showed bundled services and manually written $50 allocated to internet. |
| | Taxi/Public Transit | 55.00 | | | | Other | N | |
| | TCCI, C/Cash | 60.00 | | | | Other | N | |
| June 2016 | Mileage | 370.14 / 181.44 | E9292 | 370.14 | - | Mileage | Y | Agreed to Mileage Log |
| | Parking Tolls | 2.00 | | | | Airport Parking | Y | Agreed to receipt |
| | Internet | 50.00 | | | | Other | Y | Support showed bundled services and manually written $50 allocated to internet. |
| | Meals/Tips | 136.70 | | | | Other | | Agreed to receipt; CI noted that the receipt did not include all necessary components to meet the IRS business expense standard. |
| July 2016 | M&A at Residence | 338.90 / 130.14 | E9411 | 338.90 | - | Other | N per diem support not provided | Calculated on Expense Report |
| | Internet | 158.76 / 50.00 | | | | Mileage | Y | Agreed to receipt. Support showed bundled services and manually written $50 allocated to internet. |
| August 2016 | Mileage – Relocation | 1,389.17 / 936.90 | E9497 | 1,389.17 | - | Relocation | Y | Agreed to Mileage Log, Google Maps trip support. CI recalculated trip and noted no material deviation in miles. See Exhibit C. |
| | Mileage – Other | 68.04 | | | | Mileage | Y | Agreed to Mileage Log |
| | Internet | 50.00 | | | | Other | Y | Support showed bundled services and manually written $50 allocated to internet. |
| | Auto/Gas | 40.08 | | | | Other | Y | Receipts noted gas was for rental car. |
| | Lodging | 161.57 | | | | Relocation | Y | Hotel in Ross's former city of residence. Transcript from hearing shows this is where his spouse stayed the night before they began their drive for DFW from California. See Exhibit C. |
| | Meals/Misc | 123.58 | | | | Other | Y | |
| September 2016 | M&A at Residence | 156.72 / 76.62 | E9591 | 156.72 | - | Other | N per diem support not provided | Calculated on Expense Report |
| | Mileage | 11.88 | | | | Mileage | Y | Agreed to Mileage Log |
| | Internet | 68.22 | | | | Other | Y | Support showed bundled services, including internet with phone service added |
| October 2016 | M&A at Residence | 321.24 / 157.41 | E9632 | 321.24 | - | Other | N per diem support not provided | Calculated on Expense Report |
| | Mileage | 9.72 | | | | Mileage | Y | Agreed to Mileage Log |
| | Meals/Tips | 79.88 | | | | Other | Y | Agreed to receipt; CI noted that the receipt did not include all necessary components to meet the IRS business expense standard. |
| | Internet | 74.23 | | | | Other | Y | Support showed bundle services, including internet with phone service added |

Note: The Monthly Miscellaneous Expense Report serves as support for M&A at Residence. As we obtained all items for this time period, all M&A expenses are deemed to have supporting documentation.

**Exhibit C**

List of Relocation Costs and Relevant Testing Performed

Agreed-Upon Procedures - Bob Ross
List of Relocation Expenses and Relevant Testing

**Summary of Findings**

| | Amount | No. of Transactions |
|---|---|---|
| Reasonable Business Expense: | 10,669.69 | 5 |
| Personal Expenses: | 541.94 | 4 |
| Undeterminable; Presumed Personal: | 233.11 | 4 |
| | 11,444.74 | 13 |

| Source (Reimbursement or APFA Credit Card) Procedure #7 | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #7 | Documentation Description Procedure #7 | Classification of Expense (Personal Expense, Reasonable Business Expense, or Undeterminable and Presumed Non-Business Expense) Procedure #7 | Testing Comments |
|---|---|---|---|---|---|---|---|
| APFA Credit Card | 7/23/2016 | 1,234.76 | PODS W100 | Y | Receipt | Reasonable Business Expense | Cost of Pods to move personal effects from CA to TX would be considered a reasonable business expense. |
| APFA Credit Card | 7/26/2016 | 6,858.40 | PODS W100 | Y | Receipt | Reasonable Business Expense | Cost of Pods to move personal effects from CA to TX would be considered a reasonable business expense. |
| Reimbursement | 8/1/2016 | 161.57 | Staybridge Suites Sacramento, CA | Y | Folio Receipt | Personal Expense | Hotel in Ross's former city of residence. Transcript from hearing shows this is where his spouse stayed the night before they began their drive for DFW from California. Hotel for family members are not a reasonable business expense and IRS regulations and is not eligible for reimbursement under APFA policy manual. |
| APFA Credit Card | 8/2/2016 | 1,259.70 | PODS FL | Y | Receipt | Reasonable Business Expense | Cost of Pods to move personal effects from CA to TX would be considered a reasonable business expense. |
| APFA Credit Card | 8/5/2016 | 379.93 | PODS FL | Y | Receipt | Reasonable Business Expense | Cost of Pods to move personal effects from CA to TX would be considered a reasonable business expense. |
| APFA Credit Card | 8/10/2016 | 142.70 | PRICELINE - LA QUINTA AZ | Y | Reservation Confirmation | Personal Expense | Transcript from hearing shows this is where Ross's family stayed and he was not present. Hotel for family members are not a reasonable business expense under IRS regulations and is not eligible for reimbursement under APFA policy manual. |
| APFA Credit Card | 8/9/2016 | 157.18 | HOLIDAY INNS AZ | Y | Folio Receipt | Personal Expense | Transcript from hearing shows this is where Ross's family stayed and he was not present. Hotel for family members are not a reasonable business expense under IRS regulations and is not eligible for reimbursement under APFA policy manual. |
| APFA Credit Card | 8/10/2016 | 80.49 | FIFTH SEASON AMARILLO TX | N | N/A | Personal Expense | No documentation for expense was provided. However transcripts of hearing indicated this is related to a hotel where Ross's family stayed and he was not present. Hotel for family members are not a reasonable business expense under IRS regulations and is not eligible for reimbursement under APFA policy manual. |
| APFA Credit Card | 8/20/2016 | 112.81 | UHAUL MOVING GRAPEVINE | Y | Invoice | Undeterminable and Presumed Non-Business Expense | While we were able to review supporting documentation, we were unable to determine whether the cost of the rental and gas were truly for union business. Based on review of the hearing transcripts and arbitration decision, we determine that this cost would not have been incurred if furniture was not delivered to Ross' Southlake home. |
| Reimbursement | 8/20/2016 | 19.19 | Illegible on Receipt | Y | Receipt (vendor illegible) | Undeterminable and Presumed Non-Business Expense | While we were able to review supporting documentation, we were unable to determine whether the cost of the rental and gas were truly for union business. Based on review of the hearing transcripts and arbitration decision, we determine that this cost would not have been incurred if furniture was not delivered to Ross' Southlake home. |
| Reimbursement | 8/21/2016 | 20.89 | Illegible on Receipt | Y | Receipt (vendor illegible) | Undeterminable and Presumed Non-Business Expense | While we were able to review supporting documentation, we were unable to determine whether the cost of the rental and gas were truly for union business. Based on review of the hearing transcripts and arbitration decision, we determine that this cost would not have been incurred if furniture was not delivered to Ross' Southlake home. |
| APFA Credit Card | 8/22/2016 | 80.22 | UHAUL MOVING GRAPEVINE | Y | Invoice | Undeterminable and Presumed Non-Business Expense | While we were able to review supporting documentation, we were unable to determine whether the cost of the rental and gas were truly for union business. Based on review of the hearing transcripts and arbitration decision, we determine that this cost would not have been incurred if furniture was not delivered to Ross' Southlake home. |
| Mileage | 8/31/2016 | 936.90 | Standard Mileage Calculation | Y | Google Maps Calculation | Reasonable Business Expense | We independently verified the miles to drive from 4701 Haydell Ct, El Dorado Hills, CA, to 2405 Johnson Rd, Southlake, TX using Google Maps. We noted the trip totaled 1,723 miles. Ross claimed 1,735 miles on his expense report related to this trip. The APFA Manual allows for reimbursement using the standard mileage rate. While hearing transcripts indicated that Ross did not drive the vehicle from California, the driver is not relevant. |
| | | 11,444.74 | | | | | |

Exhibit B

List of Relocation Costs and Relevant Testing Performed

Page 1 of 1

APPX. 0272

Black Decl. Ex. S

**Exhibit D**

Relevant Testing of Rental Car Agreements

Case 4:22-cv-00343-Y Document 236-1 Filed 04/26/24 Page 2?? of 506 PageID 6221 **Black Decl. Ex. S**

Page 1 of 1

Agreed-Upon Procedures - Bob Ross
Testing of Rental Car Agreements

| | | Data from Enterprise Monthly Statements - Procedures #8 - #9 | | | Rental Agreement Reviewed Procedures #8 - #9 | Other Documentation Provided (Y or N) Procedures #8 - #9 | Documentation Notes Procedures #8 - #9 | Union Related? (Y or N) Procedures #8 - #9 |
|---|---|---|---|---|---|---|---|---|
| Statement Date | Statement Number | Rental Agreement # | Rental Dates | Amount | | | | |
| 5/31/2016 | 4257 | 32TF9F | 3/28/2016 - 4/29/2016 | 997.26 | [a] | N | N/A | [b] |
| 7/31/2016 | 4369 | 4982HJ | 5/2/2016 - 7/18/2016 | 2,439.67 | [a] | Y | Purchase Order P-5-1434 dated 5/2/2016 authorized a rental car for May and June 2016 at a pre-tax rate of $379.99 per month. PO indicates rental car is for Bob Ross and was both request and signed by Bob Ross. CJ also reviewed an email from the EA to the NP detailing that Bob Ross's rental car was extended through 7/29. | [b] |
| 8/31/2016 | 4427 | 56DYM | 8/1/2016 - 8/3/2016 | 89.65 | [a] | N | N/A | [b] |
| 9/30/2016 | 4483 | 5GRTL1 | 8/29/2016 - 9/1/2016 | 224.18 | [a] | N | N/A | [b] |
| 10/31/2016 | 4540 | 56338X | 8/1/2016 - 9/30/2016 | 1,784.34 | [a] | N | N/A | [b] |
| 10/31/2016 | 4540 | 5SHF30 | 9/30/2016 - 10/27/2016 | 919.28 | [a] | N | N/A | [b] |
| | | | Total: | 6,454.38 | | | | |

**Tickmark Legend:**

[a] CJ noted that rental agreements were not maintained. PDW, Erik Harris, Treasurer, he reached out to Enterprise and could not obtain the agreements.

[b] CJ noted that based of the support PBC, we were unable to determine if the car rental agreements listed was for union-related business.

Exhibit D

Relevant Testing of Rental Car Agreements

APPX. 0274

**Exhibit E**

Mileage Reimbursement and Relevant Testing

Agreed-Upon Procedures – Bob Ross
Mileage Reimbursement

| Summary of Findings | |
|---|---|
| Related to Sacramento Airport: | 725.76 |
| Unrelated to Sacramento Airport: | 958.50 |
| | 1,684.26 |

**Obtained from Monthly Miscellaneous Expense Reports and Check Stub**
Procedure #10

| Reimbursement Month | Disbursement Date | Amount Distributed | Invoice # | Electronic Check # |
|---|---|---|---|---|
| Apr-16 | 5/5/2016 | 158.76 | FA771196 | E09082 |
| May-16 | 6/3/2016 | 158.76 | FA680164 | E09171 |
| Jun-16 | 7/11/2016 | 181.44 | FA230920 | E09292 |
| Jul-16 | 8/18/2016 | 158.76 | FA909774 | E09411 |
| Aug-16 | 9/6/2016 | 68.04 | FA151733 | E09457 |
| Aug-16 | 9/6/2016 | 936.90 | FA151733 | E09457 |
| Sep-16 | 10/20/2016 | 11.88 | FA39551 | E09591 |
| Oct-16 | 11/3/2016 | 9.72 | FA763502 | E09632 |
| | | 1,684.26 | | |

**Obtained from Mileage Log**
Procedure #11

| Related to Sacramento Airport | Total Miles Claimed | Mileage Rate | Total Reimbursement for Miles |
|---|---|---|---|
| Y | 294 | 0.54 | 158.76 |
| Y | 294 | 0.54 | 158.76 |
| Y | 336 | 0.54 | 181.44 |
| Y | 294 | 0.54 | 158.76 |
| Y | 126 | 0.54 | 68.04 |
| N | 1,735 | 0.54 | 936.90 |
| N | 22 | 0.54 | 11.88 |
| N | 18 | 0.54 | 9.72 |

Black Decl. Ex. S

**Exhibit F**

Cornwell Jackson Invoices for the Performance of Agreed-Upon Procedures

**Black Decl. Ex. S**



6865 Windcrest Drive , Suite 100
Plano, Texas  75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 30431
Date:      5/31/2022

---

**INTERIM PROGRESS BILL - *Fees listed below may only reflect a portion of the total engagement fee.***

---

Fees related to the agreed-upon procedures for  ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS:

AUP Fees - Ross                                                                                           $150.00

**PAYMENT METHOD**



**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

| Accounts Receivable Aging | | | | | |
|---|---|---|---|---|---|
| **0-30** | **31-60** | **61-90** | **91-120** | **Over 120** | **Balance** |
| $300.00 | $0.00 | $0.00 | $0.00 | $0.00 | $300.00 |

**Invoice Due Upon Receipt**

**APPX. 0278**

**Black Decl. Ex. S**



6865 Windcrest Drive , Suite 100
Plano, Texas 75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 30708
Date:        6/30/2022

---

**INTERIM PROGRESS BILL -** *Fees listed below may only reflect a portion of the total engagement fee.*

---

Fees related to the agreed-upon procedures engagement related to Bob Ross

Agreed-upon procedure fees                                                              $3,325.00

Invoice Total:   $3,325.00

**PAYMENT METHOD**



**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX 75024

**By Bill.com**
Company Name: Cornwell Jackson, PLLC
Send requests to: Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

| | | Accounts Receivable Aging | | | |
|---|---|---|---|---|---|
| **0-30** | **31-60** | **61-90** | **91-120** | **Over 120** | **Balance** |
| $6,625.00 | $300.00 | $0.00 | $0.00 | $0.00 | $6,925.00 |

**Invoice Due Upon Receipt**

**APPX. 0279**



6865 Windcrest Drive , Suite 100
Plano, Texas  75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 31070
Date:      7/31/2022

---------------------------------------------------------------------------------------------------------------------------
**INTERIM PROGRESS BILL - *Fees listed below may only reflect a portion of the total engagement fee.***
---------------------------------------------------------------------------------------------------------------------------

Fees related to the agreed-upon procedures engagement related to Bob Ross

Agreed-upon procedure fees                                                              $11,000.00

Reimbursable expenses

$21.06

Invoice Total:   $11,021.06

**PAYMENT METHOD**



**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

| Accounts Receivable Aging | | | | | |
|---|---|---|---|---|---|
| **0-30** | **31-60** | **61-90** | **91-120** | **Over 120** | **Balance** |
| $11,021.06 | $0.00 | $0.00 | $0.00 | $0.00 | $11,021.06 |

**Invoice Due Upon Receipt**

**APPX. 0280**

**Black Decl. Ex. S**



**CORNWELL JACKSON**
CERTIFIED PUBLIC ACCOUNTANTS

6865 Windcrest Drive , Suite 100
Plano, Texas  75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 31073
Date:      8/5/2022

---

**FINAL BILL - *Fees listed below may only reflect a portion of the total engagement fee. However, this is the final bill for these services.***

---

Fees related to the agreed-upon procedures engagement related to Bob Ross

Agreed-upon procedure fees                                              $350.00

Invoice Total:   $350.00

**PAYMENT METHOD**

**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

| Accounts Receivable Aging | | | | | |
|---|---|---|---|---|---|
| 0-30 | 31-60 | 61-90 | 91-120 | Over 120 | Balance |
| $350.00 | $0.00 | $0.00 | $0.00 | $0.00 | $350.00 |

**Invoice Due Upon Receipt**

APPX. 0281

**Black Decl. Ex. T**

**In the Matter of Arbitration Between**

|  |  |  |
|---|---|---|
| | ) | |
| Melissa Chinery | ) | |
| Sandra Lee | ) | **RE: Article VII Charges** |
| | ) | **Violations of APFA Constitution** |
| **APFA Charging Party Members** | ) | **and APFA Policy Manual** |
| **(Plaintiff)** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **Robert Ross, Former APFA National** | ) | |
| **President** | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |

---

## SUPPLEMENTAL DECISION AND REMEDY MODIFICATION

**Before:**                               **Alternate Article VII Arbitrator Ruben R.
                                          Armendariz**


**Place and Dates of Hearing:**           **The Westin Irving Convention Center at Las
                                          Colinas, 400 West Las Colinas Boulevard,
                                          located in the City of Irving, Texas.**

                                          **June 16, 2021, continued to November 17 and 18,
                                          2021**

**Appearances:**

    **For Charging Party Members:**      **Melissa Chinery, Representative**
    **(Plaintiff's)**                    **Sandra Lee, Representative**


    **For Charged Party Member:**        **Kit Gomez Alba, Representative**
    **(Defendant)**                      **Gina Guidry, Representative**
                                                              **Robert Ross, Representative**

RE: Supplemental Decision and Remedy Modification
  Article VII Charges

On the 19th day of March 2022, the undersigned arbitrator issued a Decision in the above matter. In the original Remedy, the undersigned arbitrator requested APFA to hire a forensic auditor to audit certain items of this case to identify all inappropriate charges listed in item 1., 1(a.), 1(b)., 1(c.), and 1(d.) concerning Defendant Ross.

In accordance with the original remedy, the APFA hired Cornwell Jackson, Certified Public Accountants to conduct the requested audits. On August 5, 2022, the Independent Accountant's Audit Report was completed and submitted to the APFA. This report was subsequently transmitted to this arbitrator to review and to issue a "Supplemental Decision and Remedy Modification."

The arbitrator has reviewed the Independent Accountant's Audit Report and finds Defendant Ross has violated certain identified items. Thus, the March 19, 2022 Original Remedy is hereby modified to reflect the Auditors' identified items. Accordingly, the arbitrator finds those monetary amounts found inappropriate are now subject for repayment to APFA. Additionally, the Auditors invoices for services rendered shall be included for repayment.

## REMEDY MODIFICATION

It is hereby Ordered that Defendant Ross shall repay the APFA the following amounts the auditors identified as inappropriate. The accountant's Audit Report is a thorough explanation of the auditor's findings and those amounts found inappropriate.[1]

| | |
|---|---|
| 1(a): Inappropriate costs claimed as moving expenses. | $.    775.05 |
| 1(b): Inappropriate credit card charges for meals and personal items. | 12, 274.00 |
| 1(c): Inappropriate costs related to rental cars. | 6, 454.38 |
| 1(d): Inappropriate costs related to mileage to Sacramento airport. | 725.76 |
| 1(d): Inappropriate costs related to airport parking. | 107.00 |
| | **$   20,336.19** |

**Auditors Invoices:**

| | |
|---|---|
| 05/31/2022 | $     150.00 |
| 06/30/2022 | 3,325.00 |
| 07/31/2022 | 11,000.00 |
| 08/05/2022 | 350.00 |
| **Total** | **$  14,825.00** |

2. Ross is hereby Ordered to immediately repay the APFA **$5,436.47** per the finding of the APFA Board of Directors. An independent accounting firm determined the formula used to determine the daily rate assessed for sick and vacation payout was incorrect.
3. Ross is hereby Ordered to repay the APFA **$8,106.13** for leasing an apartment at the Bear Creek Complex where he had no intention of occupying.
4. Ross is hereby fined and Ordered to repay the APFA for all of the Arbitrator's Fee of **$10, 217.96** for this arbitration.
5. Ross is hereby Ordered to repay **$3,637.00** to the APFA for all of the furniture he had purchased and delivered to his residence located in South Lake, Texas.

---

[1] Mr. Ross can request a copy of the auditor's report from the APFA if he has not already received a copy of it.

**Black Decl. Ex. T**

RE: Supplemental Decision and Remedy Modification
     Article VII Charges

6. Ross is prohibited from serving in any official position within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. If Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.

7. The APFA if it hasn't done so, must create a separate body of trained forensic accountants to oversee the annual audit and to create procedures and recommendations to preclude fraud for the BOD's review and action to be included within the Policy Manual. National Officers or Officers who have the authority to extend APFA to credit or use of an APFA credit card must be held economically responsible. The language created must be very clear and unambiguous. Training over the LMRDA must be a requirement for all National Officers or any person who can extend APFA to credit and whom is given an APFA credit card. These individuals must sign a document declaring and attesting that they have read and understand their responsibilities in using an APFA credit card or extending credit to the APFA for rental cars, apartments, etc., and that negligence will not be tolerated and will be dealt with severe penalties.

8. The arbitrator shall retain jurisdiction over any issue involving this remedy for only 90 days from the date of this Supplemental Decision and Remedy Modification.

**Issued the 24th day of August, 2022, in San Antonio, Texas.**

Ruben R. Armendáriz, Arbitrator

3

APPX. 0284

```
 1           IN THE MATTER OF THE ARBITRATION BETWEEN

 2   MELISSA CHINERY, Member      )BEFORE THE ARTICLE VII
     And                         )
 3   SANDRA LEE, Member          )
                                 )ARBITRATOR
 4   AND                         )
                                 )
 5   EUGENIO VARGAS, Member      )HON. RUBEN R. ARMENDARIZ

 6

 7

 8           *************************************

 9                   SEPTEMBER 14, 2021

10                       VOLUME 1

11           *************************************

12

13

14

15           BE IT REMEMBERED that on the 14th day of

16   September, 2021, the above cause came on for hearing

17   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

18   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

19   Boulevard, located in the City of Irving, County of

20   Dallas, State of Texas, whereupon the following

21   proceedings were had.

22

23

24

25
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 286 of 506   PageID 6283
Black Decl. Ex. H
Melissa Chinery   9/14/2021

Page 2

```
 1                A P P E A R A N C E S:

 2      HON. RUBEN R. ARMENDARIZ
        LABOR MANAGEMENT ARBITRATOR
 3      29010 Pfeiffers Gate
        Fair Oaks Ranch, Texas  78015
 4      PHONE:  210.379.0860
        EMAIL:  arbruben@gmail.com
 5

 6      APPEARING AS THE ARBITRATOR

 7

 8      MS. MELISSA CHINERY
        EMAIL:  Melchinery@aol.com
                AND
 9      MS. SANDRA LEE
        EMAIL:  SEL27995@gmail.com
10              AND
        MS. HEATHER OLENJACK
11
        APPEARING FOR THE CHARGING PARTIES
12

13      MS. HEIDI J. MORGAN
        EMAIL:  heidimorgan65@gmail.com
14              AND
        MS. NENA MARTIN
15
        APPEARING FOR THE CHARGED PARTY, EUGENIO VARGAS
16

17                      *   *   *   *

18

19

20

21

22

23

24

25
```

1                            WITNESS INDEX
2

    CATHY LUKENSMEYER                               PAGE
3   Direct Examination by Ms. Chinery...............  25
    Cross-Examination by Ms. Morgan.................  51
4   Redirect Examination by Ms. Chinery.............  75

5   MICHAEL TRAPP
    Direct Examination by Ms. Chinery...............  79
6   Cross-Examination by Ms. Morgan.................  91
    Redirect Examination by Ms. Chinery............. 100
7

    JENNIFER McCAULEY
8   Direct Examination by Ms. Chinery............... 102

9   MICHAEL TRUAN
    Direct Examination by Ms. Lee................... 116
10  Cross-Examination by Ms. Morgan................. 121
    Redirect Examination by Ms. Lee................. 134
11  Recross-Examination by Ms. Morgan............... 139
    Further Redirect Examination by Ms. Lee......... 143
12  Further Recross-Examination by Ms. Morgan....... 146

13  HEATHER OLENJACK
    Direct Examination by Ms. Chinery............... 148
14  Cross-Examination by Ms. Morgan................. 155
    Redirect Examination by Ms. Chinery............. 169
15
    JOHN NIKIDES
16  Direct Examination by Ms. Chinery............... 171
    Cross-Examination by Ms. Martin................. 185
17  Redirect Examination by Ms. Chinery............. 212
    Recross-Examination by Ms. Martin............... 214
18  Further Redirect Examination by Ms. Chinery..... 216
    Further Recross-Examination by Ms. Martin....... 218
19  Further Redirect Examination by Ms. Chinery..... 220

20  ERIK HARRIS
    Direct Examination by Ms. Lee................... 221
21

22

23

24

25

```
 1                      EXHIBIT INDEX
 2
     EXHIBIT                             ID'D    ADMITTED
 3
     Joint Exhibit No. 1...................   24
 4   Joint Exhibit No. 2...................   30
 5   EXHIBIT                             ID'D    ADMITTED
 6   Chinery-Lee Exhibit No. 1.............   36    242
     Chinery-Lee Exhibit No. 2.............   38    242
 7   Chinery-Lee Exhibit No. 3.............  229    242
     Chinery-Lee Exhibit No. 5.............  234    242
 8   Chinery-Lee Exhibit No. 6.............  235    242
     Chinery-Lee Exhibit No. 7.............  236    242
 9   Chinery-Lee Exhibit No. 8.............  236    242
     Chinery-Lee Exhibit No. 9.............  238    242
10   Chinery-Lee Exhibit No. 10............  240    242
     Chinery-Lee Exhibit No. 11............  241    242
11   Chinery-Lee Exhibit No. 12............   50     50
     Chinery-Lee Exhibit No. 13............   81     84
12   Chinery-Lee Exhibit No. 14............  108    114
     Chinery-Lee Exhibit No. 15............  105    114
13   Chinery-Lee Exhibit No. 16............  105    114
     Chinery-Lee Exhibit No. 17............  119    121
14   Chinery-Lee Exhibit No. 18............  120    121
     Chinery-Lee Exhibit No. 24............   50     51
15
     EXHIBIT                             ID'D    ADMITTED
16
     Vargas Exhibit No. 10.................  159    173
17   Vargas Exhibit No. 12.................  132    134
     Vargas Exhibit No. 14.................   53
18   Vargas Exhibit No. 26.................   62     64
     Vargas Exhibit No. 27.................   66
19   Vargas Exhibit No. 29.................  162    173
     Vargas Exhibit No. 30.................  162    173
20   Vargas Exhibit No. 33.................  161
     Vargas Exhibit No. 36.................  160    173
21   Vargas Exhibit No. 98.................  205
     Vargas Exhibit No. 99.................  127    134
22
23
24
25
```

```
 1              P R O C E E D I N G S
 2                   THE ARBITRATOR:  This is -- this is an
 3  Article VII 2.A arbitration of the APFA Constitution.
 4  Today's date is September 14th, 2021.  The Arbitrator
 5  appearing before you is Ruben R. Armendariz.
 6                   Will the parties please state their
 7  appearance for the record?
 8                   MS. CHINERY:  Melissa Chinery.
 9                   THE ARBITRATOR:  And?
10                   MS. OLENJACK:  Heather Olenjack.
11                   THE ARBITRATOR:  Okay.
12                   THE REPORTER:  Say again?
13                   MS. OLENJACK:  Heather Olenjack.
14                   THE REPORTER:  Thank you.
15                   MS. OLENJACK:  O-L-E-N-J-A-C-K.
16                   THE ARBITRATOR:  And?
17                   MS. LEE:  Sandra Lee.
18                   THE ARBITRATOR:  Okay.  And for Mr.
19  Vargas?
20                   MS. MARTIN:  Nena Martin.
21                   THE ARBITRATOR:  Okay.  And?
22                   MS. MORGAN:  Heidi Morgan.
23                   THE ARBITRATOR:  And you are, sir?
24                   MR. VARGAS:  Eugenio Vargas.
25                   THE ARBITRATOR:  You're the -- oh, you're
```

Melissa Chinery   9/14/2021

Page 6

```
 1   Mr. Vargas, okay.  Okay.  You've both provided a
 2   witness list.  Are there -- usually I ask are there any
 3   procedural, you know, arguments, but in this case this
 4   is kind of a different type of case than -- than I'm
 5   used to hearing, you know, so this is -- anyway, the
 6   issue, how do you define the issue in this case?
 7                   MS. CHINERY:   Fraud, malfeasance.
 8                   THE ARBITRATOR:   Malfeasance?
 9                   MS. CHINERY:  Uh-huh.
10                   THE ARBITRATOR:  So you want to -- what
11   time period are you going to use?
12                   MS. CHINERY:   Excuse me?
13                   THE ARBITRATOR:  Time period.
14                   MS. CHINERY:   Time period would be 2016
15   to 2018.
16                   THE ARBITRATOR:   Okay.  So we can say --
17   let me -- let me see if you agree with it.  Did Eugenio
18   Vargas engage in fraud.
19                   MS. CHINERY:   Misappropriation.
20                   THE ARBITRATOR:   Misappropriation?
21                   MS. CHINERY:  Yes.
22                   THE ARBITRATOR:   That's a better word.
23   Misappropriation of APFA funds, right?
24                   MS. CHINERY:   Funds, yes.
25                   THE ARBITRATOR:  Okay.  If so, what is
```

```
 1    the appropriate remedy.
 2                   MS. CHINERY:    Well, we would like an
 3    audit of their administration.  We would like pay back
 4    of all monies.  We'd like it disclosed that the --
 5                   THE ARBITRATOR:   Okay.  We can get into
 6    that in more detail.  But the main thing for the issue
 7    statement, we want to say, if so, what is the
 8    appropriate remedy, you can tell us what it is, we'll
 9    get it on the record in a couple of minutes, okay?
10                   MS. CHINERY:   Okay.
11                   THE ARBITRATOR:   Okay.   Ms. Morgan, do
12    you agree with this issue statement?
13                   MS. MORGAN:   Do I agree with that?
14                   THE ARBITRATOR:   Yes.
15                   MS. MORGAN:   No.
16                   THE ARBITRATOR:   You don't agree with
17    it.  How would you define it?  They're -- they're
18    trying to show that Mr. Vargas engaged in misconduct,
19    this misconduct, okay, and your position is no, he
20    didn't, okay?
21                   MS. MORGAN:   Okay.
22                   THE ARBITRATOR:   So this is the issue
23    statement.
24                   MS. MORGAN:  Right.
25                   THE ARBITRATOR:  Did Eugenio Vargas
```

```
 1   engage in misappropriation of APFA funds.  Okay.  And
 2   if so, what is the appropriate remedy.  So you're going
 3   to argue that he did not.  Okay.  So you agree with
 4   this statement?
 5               MS. MORGAN:   No.  Our position is that
 6   Ms. Chinery and Ms. Lee are engaging in a pattern of
 7   harassment.  They have a historical practice of
 8   harassing people with whom they do not politically
 9   agree.  They have targeted the administration in which
10   Mr. Vargas worked.
11               THE ARBITRATOR:   Okay.  We'll get to
12   that.  Will -- that will be your opening, okay?
13               MS. MORGAN:   Okay.
14               THE ARBITRATOR:   But as far as the issue
15   statement, I think we'll go ahead and use that.
16               MS. MORGAN:   Okay.
17               THE ARBITRATOR:   Okay.  Let's go to
18   openings.  Ms. Chinery?
19               MS. CHINERY:   Never done one before.  We
20   are here today to hear charges based on the APFA
21   Constitution and policy manual that --
22               THE REPORTER:  Slow down.  When you're
23   reading, you --
24               MS. CHINERY:  Okay.
25               THE REPORTER:  -- everybody reads --
```

```
 1                  MS. CHINERY:  Okay.
 2                  THE REPORTER:   -- fast.  I have to write
 3      it down.
 4                  MS. CHINERY:  Gotcha.
 5                  THE ARBITRATOR:  Can you hear them?  Can
 6      you hear them?
 7                  THE REPORTER:  Somewhat.
 8                  THE ARBITRATOR:  Somewhat?  You want
 9      them -- you want to move them closer?
10                  THE REPORTER:  No, just speak up --
11                  MS. CHINERY:  Okay.
12                  THE REPORTER:  -- a little bit.
13                  MS. CHINERY:  We are here today to hear
14      charges based on the APFA Constitution and policy
15      manual that Eugenio -- Eugenio Vargas violated.
16      Getting to this point was not an easy process.
17                  Sandra Lee and myself are Flight
18      Attendants currently based in Los Angeles.  Neither of
19      us hold Union office nor do we ever -- or have we ever
20      held a Union position with APFA, but we are dues paying
21      members and we care about how our dues money is spent
22      and how our Union functions.
23                  Is that slow enough?  Good.
24                  We first attempted to see the Union
25      finances back in 2018 when we wanted to check on
```

 1    mileage of a couple of -- two Base Presidents, but we

 2    were also concerned about disturbing reports of

 3    missing -- missing, unaccounted furniture, which

 4    actually ended up resulting in funds being paid back by

 5    one of them to APFA.

 6              Little did we know what we were getting

 7    in to.  What followed was a two year battle to see

 8    financial information.  The APFA Constitution is

 9    crystal clear.  Section -- sorry.  Excuse me, like I

10    said, I've never done -- Article IV says the -- says

11    members have a right to see financial information.

12    Federal labor law also provides members can see the

13    books for cause, but we were stonewalled.  When we --

14    when we were finally allowed to see the financials,

15    they only gave us summaries of the next -- of the next

16    administration.

17              It was not until the administration --

18    the next administration of Julie Hedrick that we were

19    finally allowed to see the Union finances.  We made up

20    multiple trips to DFW to see the books and the

21    underlying receipts.  It was not easy sorting out, as

22    the documents inherited by the new Treasurer, Mr.

23    Harris, were a mess, piles of receipts, missing

24    documents, etcetera.  But what we found was really

25    disturbing.

1              Eugenio Vargas was National Treasurer

2    between April of 2016 through July of 2018.  His fellow

3    National Officers were President, Bob Ross; Vice

4    President, Nena Martin; and Secretary, Marcy Dunaway,

5    who has subsequently took a -- a company position.

6    This case involves Mr. Vargas and we have a separate

7    arbitration scheduled for charges against Ms. Martin

8    and Mr. Ross.

9              We will present evidence at this hearing

10   substantiating multiple violations of the policy manual

11   on a number of distinct charges.  I'm going to walk you

12   through each charge in order.  The first charge

13   involves violation of the meal expense provisions of

14   the bylaws.  The APFA Constitution, excuse me,

15   violates -- allows National Officers to claim what is

16   called guaranteed meal expense allowance, which is

17   shortened to -- to be called guaranteed MEA.  This is a

18   daily rate for meals with maximum of $300 a month.

19   National Officers receive guaranteed MEA even though

20   they are considered to live in the city of the national

21   office, which is DFW -- Dallas, excuse me.

22              Now, the bylaws explicitly states

23   guaranteed MEA is in -- in lieu of actual expenses,

24   which is called actual MEA.  The language is clear.

25   You do not get to claim both of the guaranteed MEA and

Melissa Chinery   9/14/2021

Page 12

1    the actual MEA.  Doing so is double-dipping.

2              We will present testimony from a long

3    standing APFA National Treasurer and retired Flight

4    Attendant about the policy.  There's a narrow exception

5    for which is hosting individuals outside the

6    organization.  The record will show that the accused

7    routinely violated this policy, pocketing the

8    guaranteed MEA allowance while routinely billing meals

9    to the Union paid for with the Union credit card.

10             We have clear -- we have clear evidence

11   in the form of the credit card statements and receipts

12   that show that the four National Officers, while

13   receiving guaranteed MEA, also routinely purchased

14   meals on the Union credit card.  They ordered in

15   breakfast for department chairs who were also receiving

16   meal expenses, guaranteed MEA, and purchased meals on

17   the Union credit card while they were receiving per

18   diem.

19             Now, these examples of double-dipping

20   were not simply occasional lapses, but flagrant

21   violations of the policy manual which amounted to tens

22   of thousands of dollars in meals.  It was truly a

23   feeding frenzy.  They did not adjust their guaranteed

24   meal to reflect the meals purchased with the Union

25   credit card.

  1            One of the things guilty people like to

  2    say is everyone else is doing it.  But the Constitution

  3    explicitly states that the ignorance of the -- of the

  4    provisions is not a defense.  And the fact that others

  5    may have -- may or may have not violated the Union's

  6    bylaws and procedures does not absolve the accused of

  7    responsibility for their misconduct.

  8            The second set of charges is especially

  9    troublesome.  The National Treasurer is entrusted with

 10    safeguarding the Union funds and property.  Among those

 11    responsibility (sic) is maintaining an inventory for

 12    the Union furniture.  APFA Officers are required to

 13    move to Dallas-Fort Worth upon summing -- assuming

 14    office.  They are given a choice of electing a paid

 15    move to Dallas or a Union furnished apartment.  Other

 16    Union representatives such as the department chairs --

 17            THE REPORTER:  Slow down, please.

 18            MS. CHINERY:  -- sorry -- who -- who also

 19    here full time -- who are also here full time are also

 20    provided furnished Union apartments.

 21            Now, keeping track of the Union inventory

 22    is obviously an important task and there are detailed

 23    provisions in the bylaws explaining how furniture is to

 24    be inventoried and subsequently disposed of.  This --

 25    the policy in place at 2016 provided that the furniture

 1   should be normally used by the incoming Officer subject

 2   to the right of reasonable refusal.  Furniture which

 3   was not utilized was to be sold in a silent auction,

 4   giving Flight Attendants and staff who worked in the

 5   national office an equal chance to buy the furniture.

 6   Too fast.

 7              THE REPORTER:  I'm only certified for 225

 8   words a minute.

 9              MS. CHINERY:  Sorry.  That process of

10   silent auction did not happen under Vargas' tenure as

11   Treasurer.  When we were talk -- and we -- when we are

12   talking about furniture, we're not talking about some

13   cheap furniture.  The furniture just in the apartments

14   of the National Officers the three years earlier was

15   valued in tens of thousands of dollars.  So when policy

16   was not followed, there was understandably a lot of

17   concern among the members working at the APFA office

18   and among the broader membership.

19              The question was what happened to this

20   furniture.  One of the difficulties in answering this

21   question was that most of the documents related to the

22   furniture disappeared.  And Mr. Harris will testify

23   that -- Mr. Harris, the National Treasurer, will

24   testify that there are no longer -- they were -- they

25   are no longer in custody of the Union.  This is in

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 299 of 506   PageID 6246
**Black Decl. Ex. 11**
Melissa Chinery   9/14/2021

Page 15

1   further violation of Union bylaws which requires

2   Officers to keep complete and accurate financial

3   records of Union businesses -- business.

4            Although many important documents are

5   missing from the Union files, the record will show that

6   some of these lost or stolen records are in the

7   possession of the charged party.  The administrate --

8   administration prior to Vargas was Laura Glading

9   administration.  The evidence will show that the

10  National Officers under Laura Glading purchased tens of

11  thousands of dollars in furniture.  Per the policy

12  manual and the furniture -- for the furniture is

13  supposed to be normally reused, but if not, the policy

14  in place prior to October 16th stated it be sold in

15  silent auction.

16           We now know what happened to some of the

17  furniture.  Mr. Vargas was -- who was responsible for

18  safeguarding Union property took the furniture for his

19  use in his own residence.  Mr. Vargas opted to move to

20  Dallas and get his own apartment.  He was reimbursed

21  for his moving expenses, as such was not entitled to

22  the furnishings.  In question was the furniture of Mr.

23  Greg Gunter, Vargas' predecessor who unfortunately died

24  just before this term of office ended.

25           The original cost of the furniture for

```
 1   the two bedroom apartment was around $17,000.  After
 2   Mr. Gunter died in April -- excuse me, March of 2016,
 3   the furniture temper -- temporarily was moved to
 4   APFA -- F -- APFA offices.  We will demonstrate that in
 5   May furniture was moved to Mr. Vargas' private
 6   residence, spending Union money to make that move.
 7   The rest of the furniture disappeared from the office
 8   during the -- that -- that time frame.  There was not a
 9   silent auction and no opportunity for anyone to bid on
10   the furniture.
11           When members began to raise questions in
12   September 2016, Vargas lied to cover his tracks.  The
13   record will show he told APFA executive committee that
14   he would sell the furniture in a silent bid on
15   September the 9th, concealing the fact that he'd
16   already taken the furniture.  Two weeks later he told
17   Heather Olenjack, a member investigating Union
18   finances, that he had bought the furniture.
19           On September 29th with questions
20   mounting, Mr. Vargas paid pennies on the dollars for
21   the furniture, which he had already taken months prior.
22   The furniture that Vargas took was valued around
23   $17,000.  Even after being caught, he did not pay a
24   fair market value for the four-year-old furniture, but
25   paid it on a depreciated value using a date in June
```

 1   which had -- which had the furniture almost depreciated

 2   to zero.  In Mr. Vargas' case only $219 of the

 3   furniture originally worked.  Then after the fact at

 4   the Board meeting on October 6th, Vargas changed the

 5   policy to have furniture sold at fair market value.

 6              So to recap, we will show Vargas had no

 7   right to the furniture.  The record will show that

 8   Vargas took the -- took the furniture in May without

 9   paying for it, he lied about having the furniture, that

10   he paid pennies on the dollars, not fair market value

11   for the furniture and through this all he committed the

12   violation of self-dealing.  As the APFA Treasurer who

13   had the obligation to safeguard Union property, he

14   conducted illegal transaction with himself.

15              But it was not just Mr. Vargas' furniture

16   which disappeared.  Marcus Gluth was Vice President of

17   APFA and temper -- temporarily present -- President

18   after Laura Glading had stepped down.  His furniture

19   was worth thousands of dollars.  We will show that some

20   of that furniture was taken to Bob Ross' house who,

21   like Mr. Vargas, had no right to the furniture.  Other

22   furniture was missing as well, including Laura

23   Glading's.  They had to store the furniture in APFA

24   offices because the storage units were full, but it

25   disappeared.

 1                One of the difficulties of sorting this

 2     out is that entire sets of records relating to Mr.

 3     Vargas and the furniture are missing from APFA.  We

 4     will demonstrate as National Treasurer Mr. Vargas was

 5     responsible for maintaining the records of the Union.

 6     The record will show that this improper documentation

 7     was a problem throughout Mr. Vargas' tenure as

 8     Treasurer.

 9                The record will show that Mr. Vargas was

10     repeatedly forced to pay back money, thousands of

11     dollars for violating the policy manual.  The record

12     will show that Vargas changed the long standing formula

13     on vacation payout for himself and his fellow Officers

14     in violation of APFA bylaws and policies.  The record

15     will also show that the Board of Directors forced

16     Vargas to pay it back.  The record will show, however,

17     that Vargas failed to get Bob Ross to pay it back.  He

18     used the Union credit card to rent a car on vacation

19     and had to pay that back.

20                The case of the charging party is based

21     on testimony of multiple witnesses and dozens of page

22     of doc -- documents.  The charged parties have a choice

23     in this hearing.  They can address these concrete

24     allegations to attempt to refute them or they can

25     attempt to confuse the issue, pointing fingers at

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 303 of 506   PageID 6250   **Black Decl. Ex. 11**

Melissa Chinery   9/14/2021

Page 19

1   others.  Personal attacks and accounts of things put

2   battles and have no place in an arbitration hearing.

3   Nor, frankly, does endless discussion of what happened

4   in other administrations, including those that followed

5   the term of Mr. Vargas.

6             Mr. Arbitrator, APFA has no parent body

7   to oversee the finances of -- of the Union, especially

8   when the conduct involves National Arbitrators --

9   National Officers, I'm sorry.  This is a -- this --

10  this is the process set up where ordinary members can

11  hold Union officials accountable.  You are entrusted as

12  the ultimate safeguard of our Constitution and our dues

13  dollars.  We look forward to presenting our evidence in

14  a professional manner and we are confident that the --

15  that the evidence will show serious violations of the

16  APFA Constitution and bylaws.

17            Mr. Vargas' behavior was systematic

18  self-dealing on many fronts.  Thank you.

19            THE ARBITRATOR:   Okay.  For the charged

20  party?

21            MS. MORGAN:   May I ask a question first?

22            THE ARBITRATOR:   Yes, go ahead.

23            MS. MORGAN:   You -- you said in our

24  phone conversation that witnesses would be sequestered.

25            THE ARBITRATOR:   Yes.

Melissa Chinery  9/14/2021

 1                    MS. MORGAN:   Yes.

 2                    THE ARBITRATOR:   Okay.   Joint Exhibit 2,

 3  what do you recommend?  Do you have any other Joint

 4  Exhibits?

 5                    MS. CHINERY:  No.

 6                    MS. MORGAN:   Constitution?

 7                    THE ARBITRATOR:   The Constitution is

 8  already part of Joint 1, okay?  Okay.  So we only have

 9  one Joint Exhibit.  Okay.  Now we're to the first

10  witness, Ms. Lukensmeyer.

11                    MS. CHINERY:   The policy manual and

12  Constitution.

13                    THE ARBITRATOR:   We've all -- you've

14  already been sworn under oath, right?  Okay.  Go ahead

15  and proceed.

16                    CATHY LUKENSMEYER,

17  having been first duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19  BY MS. CHINERY:

20      Q.   What is your name, please?

21      A.   Cathy Lukensmeyer.

22      Q.   Can you state your name -- spell your name for

23  the record, please?

24      A.   Oh, Cathy with a C, C-A-T-H-Y, Lukensmeyer,

25  L-U-K-E-N-S-M-E-Y-E-R.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 305 of 506   PageID 6252
**Black Decl. Ex. 11**
Melissa Chinery   9/14/2021

Page 26

```
 1        Q.   Are you working or retired?

 2        A.   Retired.

 3        Q.   Where were you employed?

 4        A.   American Airlines IOR.

 5        Q.   And what is -- what was your position?

 6        A.   Flight Attendant.

 7        Q.   How long have you -- were you employed with

 8   them?

 9        A.   30 years.

10        Q.   Okay.  Did you hold any positions with the

11   APFA during your career?

12        A.   I did.  Council -- this was all in Chicago,

13   council rep, Vice Chair, chairperson, negotiations in

14   1986, and Treasurer from 2004 to 2008.

15        Q.   How long were you Treasurer?

16        A.   Four years.

17        Q.   Did you receive training as a Treasurer?

18        A.   We had a transition month.  Wasn't much

19   training.

20        Q.   And as former Treasurer, are you familiar with

21   the APFA Constitution as written?

22        A.   Yes.

23        Q.   As it relates to financial matters and the

24   role of the Treasurer?

25        A.   Yes.
```

Melissa Chinery   9/14/2021

Page 27

```
 1        Q.    Are you familiar with the APFA policy manual?
 2        A.    Yes.
 3        Q.    What is the policy manual?
 4        A.    The policy manual dictates the day to day
 5   operations of the Union.   It's what you can do, what
 6   you can't do.   The financial, what money you can have,
 7   what you can't have.   Your service to the Union.   It
 8   dictates -- if you have a question about what you can
 9   or can't do, you go to the policy manual.
10        Q.    Who approves the policy manual?
11        A.    The Board, Board of Directors.
12        Q.    And the Board is the --
13        A.    All Base Chairs.   Actually, the Officers, I
14   believe, don't vote, but the President's a tie breaker.
15        Q.    We're going to start with the Constitution.
16   I'm going to ask you to point to Article II, Section 2,
17   ignorance is not an excuse.
18        A.    Article II?
19        Q.    Section 2, ignorance is not an excuse.
20        A.    Oh, got it.   Okay.   Ignorance of the
21   Constitution will not be --
22        Q.    Okay.
23        A.    -- considered a proper excuse.
24        Q.    What is your understanding of this -- for that
25   provision?
```

```
 1        A.   You cannot come and claim I didn't know.  I
 2   couldn't do whatever because your job is to be familiar
 3   with the Constitution and the policy manual.
 4        Q.   Okay.  Article II, 3B?
 5        A.   3D?
 6        Q.   3B.
 7        A.   Yes.
 8        Q.   Right to access all financial info?
 9        A.   Yes.
10        Q.   What is your understanding of this provision?
11        A.   The members had a right to review any of the
12   finances of the Union and they would contact the
13   Treasurer's office and make -- make an appointment.
14        Q.   Okay.
15        A.   And they were entitled to review everything.
16        Q.   Why is it important?
17        A.   Transparency.
18        Q.   Can you explain the duties of the National
19   Treasurer?
20        A.   Yeah.  In -- in a Union, the National
21   Treasurer is like the business manager.  They take care
22   of the office, the staff, all of the assets of the
23   Union.  They inventory that.  They're in charge of
24   expense reports and monitoring expense reports,
25   questioning expense reports if they need to.  They did
```

 1   the governmental filings.  We sent out a -- monthly

 2   financials to the Board.

 3       Q.    Okay.  And does this include making sure all

 4   meals are properly receipted and taken into accordance

 5   with the policy manual?

 6       A.    Yes, that's part of the expense reports.

 7       Q.    How -- to your understanding, how long did

 8   APFA maintain financial records?  How long did they

 9   main -- maintain --

10       A.    Oh, how long did they keep them?   My

11   experience was we -- when I was there, we always kept

12   them because they would go, I don't know, year end to

13   the archives.  And then when the archives got full,

14   they'd go to University of Texas or UNT, some -- one of

15   the colleges, but we -- we archived.

16       Q.    Can you point your attention to Article III,

17   L, please?

18       A.    Okay.  Got it.

19       Q.    Can you please explain that?

20       A.    Jurisdiction and duties.  Oh, okay.  So this

21   is for the Board.  Actually the Board did everything

22   for the AP -- they set policy, they set committees.

23   They nominated.  They -- the Board would receive, I'm

24   not sure if it's right here, financials every month

25   that they were to review and -- and be on top of.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 309 of 506   PageID 6256   **Black Decl. Ex. 11**

Melissa Chinery   9/14/2021

Page 30

1   Sometimes we'd have dues forgiveness, hardship, things
2   like that.  That's all controlled by the Board.
3       Q.   Okay.  So who can modify the policy manual?
4       A.   The Board.
5       Q.   Okay.  And is it true of expenses and
6   compensation policy, who sets those?
7       A.   The Board.
8       Q.   I'm now going to point your attention to the
9   policy manual, which is Joint Exhibit 2.  Are you
10  familiar with the policy manual?
11      A.   Yes.
12      Q.   Okay.  Is the policy manual binding on
13  National Officers?
14      A.   Yes.
15      Q.   So now let's talk about meal expenses.  Are
16  you familiar with how meal expenses are handled per
17  policy?
18      A.   Yes.
19      Q.   Okay.  I'm going to point your attention to 5F
20  of the policy manual.
21      A.   5F?
22               THE ARBITRATOR:   Excuse me, I don't have
23  the policy manual.
24               MS. CHINERY:   Excuse me, I'm sorry?
25               THE ARBITRATOR:   The policy manual, where

```
 1  is it?
 2                 MS. CHINERY:  We can --
 3                 THE ARBITRATOR:  Where is it?  I don't
 4  have the policy manual.  I have the Constitution.
 5  Okay.  Great.  Thank you.  We're on Article III; is
 6  that right?   Where are we at?
 7                 MS. CHINERY:   It's 5F.
 8                 THE ARBITRATOR:  5F.
 9                 MS. CHINERY:  Section 5.
10                 THE ARBITRATOR:   Okay.  Go ahead.  Okay.
11  Go ahead.
12                 MS. CHINERY:   It's page 5.12,  I'm
13  sorry.
14     Q.   (BY MS. CHINERY)  Are you familiar with the
15  provisions on MEA and per diem?
16     A.   Yes.
17     Q.   Could you explain these provisions generally,
18  please?
19     A.   Okay.  Generally the MEA comes into the policy
20  manual because when you do work for the Union, we want
21  to ensure that you don't lose money.  So you're not
22  getting that position to make money, but you want to
23  guarantee that you're made whole.  So the Flight
24  Attendants would receive an expense, a per diem and an
25  MEA so the Officers, the people on full time removal,
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 311 of 506   PageID 6258
Black Decl. Ex. 11
Melissa Chinery   9/14/2021

Page 32

1    would lose out on that source of income.  So they -- it

2    started to include MEA, which is your meal expense and

3    it reflected what the Flight Attendants got.

4        Q.   So can you explain what actual MEA is?

5        A.   Well, the actual MEA is you had actual and you

6    had guaranteed.  So the actual would be your actual

7    costs up to a certain point as defined in the policy

8    manual how much you would get.  But you could be -- and

9    this is for people who -- that the per diem is for in

10   the MEA is for away from base, the per diem's away from

11   base.  The Officers got a guaranteed MEA because we

12   weren't out flying.  So that was what would make us

13   whole.

14       Q.   Okay.

15       A.   You got either or.

16       Q.   Okay.  So how is guaranteed MEA claimed?  Is

17   there a form?

18       A.   Well, you put it on your expense report.  You

19   have to fill out your weekly expenses.

20       Q.   Okay.  Should one be getting the Union credit

21   card to buy meals and getting guaranteed with MEA for

22   the --

23       A.   No.

24       Q.   -- same days?

25       A.   No.

1      Q.    Why not?

2      A.    It's double-dipping.   They're already getting

3    it paid.   It doesn't go on the credit card.

4      Q.    What is per diem?

5      A.    The per diem is the daily allowance.   The --

6    like I said, it's negotiated for the Flight Attendants

7    and then we copied the Collective Bargaining Agreement

8    and it would cover those expenses.

9      Q.    So would per diem be -- only be away from your

10   home base and for special --

11     A.    Per diem's away from base.

12     Q.    Okay.   Where are National Officers assumed to

13   be living per the policy manual for purposes of

14   expenses and other policies?

15     A.    Within a radius of Dallas.

16     Q.    And this is regardless of where their

17   permanent residence is?

18     A.    Correct.

19     Q.    Can you explain the hosting exception?

20     A.    Yes.   Sometimes, well even such as this, you

21   might have a hearing or something.   Say a Flight

22   Attendant arbitration, they got terminated or

23   something, you'd have witnesses, you'd have lawyers

24   there and then everyone would go out to lunch.   And in

25   that case, say the -- the Vice President or whoever is

1   doing the hearing might order a meal and everybody

2   would be included.  You're not going to say you're out,

3   you're out, you're in, so it would include -- and that

4   was an exception.  It was said -- it's stated in here

5   somewhere that it was to be used very judiciously.

6        Q.   I was going to ask you for an example, but you

7   gave one --

8        A.   Okay.

9        Q.   And would the four National Officers having

10   lunch qualify for that hosting exception, just --

11        A.   No.

12        Q.   Why not?

13        A.   You're just doing Union business, having a

14   Union -- no, a Union meeting.

15        Q.   How about department chair meetings, does that

16   qualify?

17        A.   No.

18        Q.   Okay.  Assuming there's no hosting exception,

19   should one be getting actual meals on the credit card

20   and per diem for the same time?

21        A.   No.

22        Q.   Why not?

23        A.   It's double-dipping again.

24        Q.   Should one be getting guaranteed MEA while

25   getting per diem?

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 314 of 506   PageID 6261
**Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 35

 1      A.    No.

 2      Q.    Should one be getting guaranteed MEA while on

 3   vacation?

 4      A.    No.

 5      Q.    If one did charge a meal such as a group meal,

 6   which does not qualify for the business meal exception,

 7   should they be claiming guaranteed MEA for that day?

 8      A.    Can you run that by me again?

 9      Q.    If one did charge a meal, such as a group meal

10   which does not qualify for a business meal exception,

11   should they be claiming guaranteed MEA for that day?

12      A.    No.

13      Q.    Okay.  Just want to be clear, if all the Union

14   Officers are receiving meal allowance and they have a

15   lunch, should they be charging a meal to the Union if

16   everyone is on MEA and they're all --

17      A.    No, absolutely not.

18      Q.    Does it matter if they're discussing Union

19   business?

20      A.    No.

21      Q.    What is required on a meal receipt?

22      A.    Well, usually the receipts are already dated

23   by whomever it's from, but you have to put in the

24   purpose of the expense and who was present at that

25   meeting that you picked up, that you paid for on a

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 315 of 506   PageID 6262
**Black Decl. Ex. H**

Melissa Chinery   9/14/2021

Page 36

 1   credit card.  But you've got to put down the purpose

 2   and the participants.

 3        Q.   Under the APFA Constitution, who is

 4   responsible for making sure expense forms and receipts

 5   are properly filled out?  I'm sorry.  Under the APFA

 6   Constitution, who is responsible for making sure

 7   expense form --

 8        A.   Treasurer.

 9        Q.   Okay.  If meal receipts lack documentation of

10   who attended and the purpose, do you consider this

11   proper expense?

12        A.   No.  I would go back and ask.

13        Q.   Okay.  I'm going to ask you to look at charged

14   party Exhibit 1.

15        A.   Okay.

16        Q.   Have you had a chance to review some of the

17   credit card and receipts related to Mr. Vargas' meal

18   expenses?

19        A.   Not the -- no.

20        Q.   I'll give you some time.

21        A.   Okay.  So this is right here in the front,

22   right?

23        Q.   Yes, it's --

24        A.   Okay.

25        Q.   Yes, it's the big section.

```
 1        A.    All of these?
 2        Q.    Just flip through it.  Just get -- yeah.  Some
 3    of the -- the receipts it's in the back.
 4        A.    I see.
 5        Q.    Yeah, in the -- in the back.
 6                  MS. MORGAN:   Objection.  Arbitrator
 7    Armendariz, who's admitting this document?  Who's
 8    testifying to this?
 9                  THE ARBITRATOR:  She is.
10                  MS. MORGAN:   Okay.  So she's -- but
11    she -- she's been retired for --
12                  THE ARBITRATOR:   Oh, I know that, but
13    she's -- used to be the Treasurer.
14                  MS. MORGAN:   Yeah.
15                  THE ARBITRATOR:   Used to be the
16    Treasurer, so she's --
17                  MS. MORGAN:  But she's been retired
18    for --
19                  THE ARBITRATOR:  -- giving us -- she's
20    giving us background.
21                  MS. MORGAN:   So it's not specifically on
22    the charges, it's the --
23                  THE ARBITRATOR:   Well, she's -- she's
24    going to talk about these expenses and, you know, I
25    guess and whether they're -- whether or not they're
```

Melissa Chinery   9/14/2021

```
 1   prohibited or not.
 2                MS. MORGAN:   But she's unaware of
 3   current policy.  Policies -- policies have changed --
 4                THE ARBITRATOR:   You can ask her on --
 5                MS. MORGAN:  -- extraordinarily.
 6                THE ARBITRATOR:  -- cross-examination.
 7                MS. MORGAN:   Okay.
 8       Q.   (BY MS. CHINERY)  Do you believe there are any
 9   violations of the policy with the receipts?
10       A.   I don't know what all of these are from.
11   These are all for the Treasurer, all of these expenses?
12       Q.   The receipts are in the back.  They're --
13   yeah, in the back.
14       A.   Past all the expense reports?  Because I'm not
15   seeing receipts to the expense reports.
16       Q.   Oh, I'm sorry, I said 1, it's 2, excuse me.
17   I'm so sorry.  That's my fault.  I'm sorry, forgive me.
18       A.   Oh, okay.
19       Q.   I'll give you a chance to look it over.
20       A.   Okay.  Well, I guess for all this furniture
21   stuff --
22       Q.   And there's meals in the back.
23       A.   -- right, I'm seeing that, but I would want to
24   know where it is.  Where it -- some of these meals it
25   says Officers' meeting, Taco Cabana.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 318 of 506   PageID 6265   **Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 39

 1     Q.   Are there individual names on the receipts?
 2     A.   No, but Officers don't get to order any food
 3   for an Officers' meeting.
 4     Q.   Okay.   Thank you.   When you were Treasurer,
 5   did you allow Officers to take both guaranteed and
 6   actual meal expense?
 7     A.   No.
 8     Q.   Okay.
 9     A.   I see a rental agreement.
10     Q.   Okay.
11     A.   So I don't know if he brought his --
12     Q.   That's -- that's fine.
13     A.   Okay.
14     Q.   Yeah, we'll get to that.
15     A.   Okay.
16     Q.   Are you ready?
17     A.   Yeah.
18     Q.   Okay.  Now I'm going to ask you a few
19   questions about housing and furniture.  Can you take a
20   look at 5H in terms of residence of the National
21   Officer and what sort of housing is provided?  This is
22   in the policy manual.
23     A.   Yeah.
24     Q.   This policy was in place in 2016.
25     A.   Okay.  That's 5 point what?

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 319 of 506   PageID 6266

**Black Decl. Ex. H**
Melissa Chinery   9/14/2021
***

Page 43

```
 1      A.    National Officer --
 2                 MS. MORGAN:  Pardon me.  Pardon me.
 3                 THE ARBITRATOR:  Just a minute.
 4                 MS. MORGAN:  We need -- we need the
 5      exhibits that they've already entered into the record.
 6                 MS. CHINERY:  We haven't entered anything
 7      in --
 8                 THE ARBITRATOR:   They haven't entered --
 9      they haven't offered anything.
10                 MS. MORGAN:  Okay.
11                 THE ARBITRATOR:   Of course the policy
12      manual -- the current policy manual is a Joint Exhibit.
13                 MS. CHINERY:  Correct.
14                 MS. MORGAN:  Do have that.
15                 THE ARBITRATOR:   This one, the 2016 has
16      not been offered into the record --
17                 MS. MORGAN:  Okay.
18                 THE ARBITRATOR:  -- but I'm sure they
19      will.
20                 MS. MORGAN:   Okay.
21                 THE ARBITRATOR:   Okay.  I'm sorry.  Go
22      ahead.  Repeat that.
23      Q.    (BY MS. CHINERY)   What -- what does the
24      bylaws say about where National Officers are living?
25      A.    They were considered to reside in Dallas, DFW.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 320 of 506   PageID 6267
**Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 44

 1    Q.   Okay.  And for purposes of the expenses
 2 regardless of the permanent residence, where are they
 3 considered to live?
 4    A.   Dallas.
 5    Q.   And why is that important?
 6    A.   Why is it important that they be considered to
 7 live in Dallas?   Well, we weren't able to keep -- if
 8 you live in Dallas, that's considered your base.   So
 9 there's stuff like going home and expenses like that,
10 that were not incurred because you're living in Dallas.
11 So it was important that the National Officers be
12 Dallas based.
13    Q.   Okay.  5H 3 deals with electing an apartment
14 or a paid move.
15    A.   Yes.
16    Q.   Can you please walk us through some of those
17 provisions?
18    A.   Okay.  When you come -- when you get elected
19 to office, you have a choice.   You can either move,
20 transfer totally to Dallas and the Union will cover
21 moving expenses, $10,000 or you could choose to have an
22 apartment in Dallas that is furnished, no smaller than
23 one bedroom, the Officers got two bedrooms that have an
24 office in there.   When I came into office, my apartment
25 was from the preceding Treasurer and it was already

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 321 of 506   PageID 6268
**Black Decl. Ex. 11**
Melissa Chinery   9/14/2021

Page 45

```
 1   furnished, towels, sheets, you name it, it was there
 2   except for one room, the office, I had to get a couch
 3   and a table because that wasn't there, but the rest of
 4   it was fully furnished.
 5        Q.   Okay.  If a National Officer opts to take a
 6   paid move, then -- then they were to move to -- I'm
 7   sorry.  If a National Officer opts to take a paid move
 8   when they move to Dallas, do they -- do they get an
 9   apartment?
10        A.   No.  Either or.
11        Q.   It's either or?
12        A.   Either or.
13        Q.   Okay.  Can you explain how corporate
14   apartments are provided by APFA?
15        A.   Well, actually, the Treasurer's office takes
16   care of that.  That they would be -- the Treasurer's
17   office would obtain the apartments, they would take
18   care of furnishing them if there was not any furniture
19   there, but if there was furniture there it would
20   already -- you know, it's just move in.
21        Q.   Okay.  And how is the furnishing provided for
22   these apartments?
23        A.   How was the furniture provided?
24        Q.   Uh-huh.
25        A.   It should already be there.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 322 of 506   PageID 6269
**Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 46

1    Q.   I'm going to point your attention to the
2   policy in place before October 2016 and that's the
3   policy you currently have that I just gave you.  Can
4   you walk us through these decisions?
5    A.   Through which?
6    Q.   So we're going to talk about the -- the
7   policy, the -- the furniture policy.
8    A.   Okay.  Well, when I was in office, I wrote a
9   policy, because sometimes furniture would go missing or
10  somebody would decide they wanted to buy it.  So I put
11  in place a policy, here it is on 5.22, number seven,
12  incoming National Officers and other reps shall
13  normally be able to use outgoing National Officers' or
14  reps' furniture and furnishings rather than replace
15  these items with each change of National Officer or
16  representative, subject to the right to reasonably
17  refuse furniture and furnishings.
18   Q.   Okay.  And in your experience, what happened
19  when reps moved out of their apartment?
20   A.   The incoming reps took over that apartment and
21  it should be fully furnished.
22   Q.   Okay.  So now the policy in place back before
23  October 2016 would require that there would be a silent
24  auction --
25   A.   Yes.

```
 1       Q.   -- and did you do any of these silent auctions
 2   when you were the Treasurer?
 3       A.   It occurred after I left office.
 4       Q.   Okay.  So --
 5       A.   They had one, I know about it, but they had it
 6   at APFA.
 7       Q.   And so who would -- who would partake in these
 8   auctions?
 9       A.   Anybody that worked in the building, nearby
10   flight -- it was open to APFA.
11       Q.   Okay.  So --
12       A.   If you were staff or --
13       Q.   And why not just let the National Officers buy
14   the furniture?
15       A.   No.  You could see to me where there would be,
16   I don't know, I don't know what you call it, fraud or
17   whatever.  They come in and buy up whatever they want
18   and then they decide, well, when I leave, I'm going to
19   take this home with me.  No.
20       Q.   Okay.
21       A.   It's assets of the Union.
22       Q.   Are you familiar with the terms depreciated
23   value, market fair value?
24       A.   Yes.
25       Q.   Can you explain the difference between the
```

1   two?

2       A.   Depreciated would be like buying a car.  You

3   drive it off the lot, it's worth a little bit less.

4   They would depreciate it according to a table.  It

5   almost never gets down to zero.  And then market value

6   would be what's -- what do you think it's worth.  What

7   are you going to pay for this car.

8       Q.   Okay.  So --

9       A.   And what am I going to sell it to you for.

10      Q.   So do you think it's possible for an item to

11  be depreciated to zero?

12      A.   No.

13      Q.   Okay.  Do the bylaws provide for rental cars

14  in the city of residence?

15      A.   No.

16      Q.   So once a National Officer takes office, are

17  they entitled to a car in DFW or Dallas?

18      A.   No.

19      Q.   Why not?

20      A.   Well, I imagine they move their car down here.

21  They'd -- they would be paid mileage to bring their car

22  down here, so -- or you could transport your car down

23  here, so you don't need a rental car.

24      Q.   Are you familiar with the term self-dealing?

25      A.   Yes.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 325 of 506   PageID 6272
**Black Decl. Ex. 17**
***
Melissa Chinery   9/14/2021

Page 116

```
 1                    THE ARBITRATOR:   Okay.

 2                    MS. CHINERY:  Okay.  I apologize.

 3                    THE ARBITRATOR:  Off the record.

 4                    (Discussion off the record.)

 5                    THE ARBITRATOR:   Please have a seat.

 6     State your name and your position for the record.

 7                    MR. TRUAN:  Michael Truan, Flight

 8     Attendant.

 9                    THE ARBITRATOR:  Spell your last name.

10                    MR. TRUAN:  T-R-U-A-N, Truan.

11                    THE ARBITRATOR:  Go ahead.

12                         MICHAEL TRUAN,

13     having been first duly sworn, testified as follows:

14                    DIRECT EXAMINATION

15     BY MS. LEE:

16         Q.  Hi, Michael.  Okay.  I'm going to ask you

17     again, what is your name?

18         A.   Michael Truan.

19         Q.   Where are you employed?

20         A.   American Airlines.

21         Q.   What is your position?

22         A.   Flight Attendant.

23         Q.   How long have you been employed with American

24     Airlines?

25         A.   23 years.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 326 of 506   PageID 6273
**Black Decl. Ex. 17**
Melissa Chinery   9/14/2021

Page 117

1    Q.    Did you hold any position with APFA?

2    A.    Yes.

3    Q.    Can you summarize your experience, please?

4    A.    Sure.  Back in 2004, started working with the

5    communications departments and moved on to a Base

6    representative at DFW and then became a full-time

7    representative in the Dallas Base.  And shortly

8    thereafter started working the contract scheduling desk

9    at APFA headquarters and through the years, that safety

10   department.  Got elected a domestic negotiator with the

11   negotiating team back in 2013.  Dallas Base Vice

12   President in 2018 and Base President for DFW in 2019.

13   Q.    Thank you.  Were you at the Board meeting when

14   it was discovered that Mr. Vargas, Ms. Martin, and Mrs.

15   Dunaway received large payouts at the end of their term

16   for unused vacation and sick payout?

17   A.    Yes, I was.

18   Q.    Tell me what happened.

19   A.    It had been brought to the Board of Directors'

20   attention that there was a discrepancy with the -- Mr.

21   Vargas, Ms. Martin, Ms. Dunaway's vacation and sick

22   payout at the end of their term and that it wasn't

23   calculated correctly.

24   Q.    As a Board member did you address this issue?

25   A.    Yes, we did.  We had two special Board of

Melissa Chinery   9/14/2021

Page 118

1    Directors' meetings and via resolution that the Board

2    had passed to have these former Officers pay back the

3    money to the Union.

4        Q.   Do you remember how the payout was calculated?

5        A.   It's supposed to be through APFA policy and

6    National Officers' salary and the former Treasurer had

7    calculated additional income into that calculation

8    which was not part of a policy at APFA.

9        Q.   Do you know how much?

10       A.   It was in the tune of about 5500, 6000,

11   somewhere in that range.

12       Q.   Each Officer?

13       A.   Yes.

14       Q.   Did they pay it back?

15       A.   Not when I was a Base President, which these

16   Board meetings took place in -- in August.  We had two

17   Board meetings where a resolution had directed them to

18   pay this back and it had been several months and I know

19   the Officers had asked for a settlement and that wasn't

20   considered and the Executive Committee at the end of

21   the year in December, I don't know the exact date,

22   2019, also passed a resolution threatening a lawsuit if

23   these former Officers did not pay the money back.

24       Q.   Okay.  Did they eventually pay it back?

25       A.   I think they did, yes.  I wasn't in office

```
 1                     THE ARBITRATOR:   Okay.
 2                     MS. MORGAN:   And 12.
 3                     THE ARBITRATOR:   Okay.  Any objection?
 4                     MS. CHINERY:   No.  No, we're good.
 5                     THE ARBITRATOR:   Hearing no objection,
 6     99 and 12 are received into the record.  Any other
 7     questions of this witness?
 8                     MS. LEE:  Yeah, I'd like to redirect.
 9                     THE ARBITRATOR:   Hold on a minute.  Any
10     other questions of this witness, Heidi?
11                     MS. MORGAN:  No, thank you.
12                     THE ARBITRATOR:  Redirect?
13                     MS. LEE:   Yes, please.
14                     REDIRECT EXAMINATION
15     BY MS. LEE:
16        Q.   Michael, there was a meeting on August 16th --
17     August 12th, in that meeting they gave a 12 point --
18     a -- a -- a 14-page PowerPoint presentation on the
19     calculation; do you recall that?
20        A.   I recall seeing it on the screen.
21        Q.   Okay.  Was Mr. Vargas in attendance?
22        A.   In the gallery that was the 12th of August.  I
23     cannot recall.  I recall seeing him on another meeting,
24     but --
25        Q.   Was Ms. Martin in attendance?
```

**Black Decl. Ex. 17**

Melissa Chinery   9/14/2021

Page 135

```
 1        A.    She was a member of the Board.

 2        Q.    And this was a Board meeting, right?

 3        A.    Correct.

 4        Q.    So Board members probably would be there?

 5        A.    Correct.

 6        Q.    Okay.  Was Bob there, Bob Ross?

 7        A.    Well, gosh, I can't say yes or no.  I do not

 8  remember that.

 9        Q.    Okay.  So on that 14 point PowerPoint

10  presentation, they discussed the formula that was --

11  should have been used for the payout, that's what the

12  presentation was about, correct?

13        A.    Correct, the National Officers.

14        Q.    Okay.  So that calculation that they used,

15  that they presented to the Board, was that the same

16  calculation that eventually many, many months later,

17  Mr. Vargas, Ms. Martin, and Mrs. Dunaway, was that the

18  -- was that calculation used to formulate the amount

19  that they paid, calculation as given on August 12th?

20        A.    No, because that wasn't the calculation that

21  was used.

22        Q.    Who -- who presented that PowerPoint?

23        A.    Oh, my gosh.  I think it was Larry Salas, if

24  I'm correct.  I think Jeff Pharr maybe.  I think it was

25  Jeff and Larry, if memory serves me.
```

**APPX. 0329**

```
 1        Q.   Okay.  Let me ask you, was that calculation
 2   used for what they had to pay back, that PowerPoint?
 3        A.   That was a PowerPoint used to explain what the
 4   payout should have been.
 5        Q.   Should have been?
 6        A.   Correct.
 7        Q.   And that is what they eventually paid out on?
 8        A.   Correct.
 9        Q.   Thank you.  I have a few more questions.
10             MS. CHINERY:   Can I -- can we take a --
11   can I confer?
12             THE ARBITRATOR:  Pardon?
13             MS. CHINERY:  Can we confer?
14             THE ARBITRATOR:  Yes, you can confer.  I
15   mean, you can confer right there.
16             MS. CHINERY:  Okay.  Thank you.
17             THE ARBITRATOR:   Any questions?
18             MS. CHINERY:  Thank you.
19             MS. LEE:   Yes.
20        Q.   (BY MS. LEE)    Were you ever on a Board call
21   where Mr. Vargas -- where Mr. Vargas was asked if Bob
22   Ross received the same payout calculations that the
23   other three Officers did, the overpayment?
24        A.   Yeah, we were on a Base President call with
25   our APFA attorney, Bruce Lerner, and there was several
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 331 of 506  PageID 6278   **Black Decl., Ex. 17**
Melissa Chinery   9/14/2021

Page 137

1    Board members on that call when Mr. Vargas was asked of

2    this payout and how it came about.  And again, it was

3    mentioned by Mr. Vargas that Mr. Ross had his package,

4    so that wasn't included, it was just a vote that Ms.

5    Dunaway, Ms. Martin, and Mr. Vargas took amongst

6    themselves whether to pay themselves, yes or no on this

7    and that's how that came about.

8        Q.    Okay.  Did he mention whether or not he, Bob,

9    got the payout, the elevated payout?

10       A.    That that was included with Bob, so he was --

11       Q.    Okay.

12       A.    -- included in his pay.

13       Q.    He said it was included in his exit package?

14       A.    In his -- in his package that --

15       Q.    Okay.

16       A.    -- he got.

17       Q.    Can you tell -- who else was on that call?

18   You missed probably -- you mentioned Mr. Lerner?

19       A.    Bruce Lerner was our APFA attorney at the

20   time.

21       Q.    Okay.  Why was he on the call?

22       A.    He was the one that was doing the

23   investigation with this payout.

24               MS. MORGAN:    I'm -- I'm sorry, I

25   can't -- I can't hear you, Michael.  I'm sorry.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 3 of 509   PageID 6279
**Black Decl. Ex. 17**
Melissa Chinery   9/14/2021

Page 138

1           THE WITNESS:   Bruce Lerner was the

2   attorney that a -- was the attorney that spoke with us

3   on the Board and gave us the information moving forward

4   as the investigation ensued.

5       Q.   (BY MS. LEE)  Did Mr. Lerner ask -- ask

6   Eugenio during that conversation if he wanted to obtain

7   a lawyer?

8       A.   Yes, he did tell Mr. Vargas that he's free to

9   get an attorney as this could -- could possibly become

10  criminal charges.

11      Q.   Okay.  Who else was on -- I know Mr. Lerner.

12  Who else was on the call?

13      A.   Our attorney, myself, Dallas, Mr. Nikides,

14  President from Los Angeles, Ms. Babi from Phoenix,

15  Kaswinkel, Ms. Kaswinkel from Philadelphia, Mr.

16  Trautman from Miami, Mr. Norvell from New York.

17      Q.   So pretty much --

18      A.   Mr. Hazelwood from Charlotte.   It wasn't

19  the --

20      Q.   Entire Board.

21      A.   -- entire Board, but it was --

22      Q.   A lot.

23      A.   -- I think about seven to eight Board

24  Presidents.

25           MS. LEE:   Okay.  One second.  Thank you,

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 333 of 506   PageID 6280
**Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 171

```
 1      A.   -- it had just been taken to the consignment

 2   store when I went in.

 3      Q.   So you don't know?

 4      A.   I don't know.  I never got an answer about how

 5   much APFA made.

 6      Q.   Okay.

 7               THE ARBITRATOR:   Any others?   Any

 8   others?  You're excused.  Thank you very much.

 9               THE REPORTER:  I've got to have a break.

10               THE ARBITRATOR:  Okay.  Let's take a 10

11   minute break.

12               (Break from 2:21 to 2:36.)

13               THE ARBITRATOR:   Your first witness?

14               MS. CHINERY:  Oh, are we -- can I just

15   ask about --

16               THE ARBITRATOR:  No, we'll get in to

17   that.

18               MS. CHINERY:  Gotcha.  Okay.

19                    JOHN NIKIDES,

20   having been first duly sworn, testified as follows:

21                    DIRECT EXAMINATION

22   BY MS. CHINERY:

23      Q.   Can you state your name for the record?

24               THE ARBITRATOR:  No.

25      A.   John Nikides.
```

```
 1                 THE ARBITRATOR:  Okay.  Have you been
 2    sworn in here?
 3                 THE WITNESS:  Yes.
 4                 THE ARBITRATOR:  Okay.  Good.  And spell
 5    your last name.
 6                 THE WITNESS:  N-I-K-I-D-E-S.
 7                 THE ARBITRATOR:  Okay.  Before we go on
 8    the -- before we start questioning you, you wanted to
 9    offer some -- some exhibits --
10                 MS. MORGAN:  Yes.
11                 THE ARBITRATOR:  -- into the record?
12                 MS. MORGAN:  Yes.
13                 THE ARBITRATOR:  Which ones?
14                 MS. MORGAN:  29 and 30 and 36 --
15                 MS. CHINERY:  We object.
16                 MS. MORGAN:  -- and 10.
17                 THE ARBITRATOR:  And 36?  And you
18    object?
19                 MS. CHINERY:  Yes.
20                 THE ARBITRATOR:  Why?
21                 MS. CHINERY:  Because Ms. Casey is not
22    here to speak to this and it's a lack of foundation.
23    Anybody could have said that.
24                 THE REPORTER:  Anybody could have what?
25                 MS. CHINERY:  Anybody -- we don't know
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 335 of 506   PageID 6282   **Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 173

```
 1   what the -- where they came from.
 2             THE ARBITRATOR:   Well, she brought it in
 3   through the witness, so --
 4             MS. CHINERY:  But the emails are not --
 5             THE ARBITRATOR:  -- there was no
 6   objection at that time, so I'm going to go ahead and
 7   overrule your objection.  It's received into the
 8   record.
 9             Okay.  Let's go ahead and hear some
10   questions.
11             MS. CHINERY:  Okay.
12        Q.  (BY MS. CHINERY)  What is your name?
13        A.   John Nikides.
14        Q.   Where are you employed?
15        A.   American Airlines.
16        Q.   Okay.  What is your position?
17        A.   I'm a Flight Attendant.
18        Q.   How long have you been a Flight Attendant?
19        A.   37-and-a-half years.
20        Q.   Okay.  Do you have a position with the Union?
21        A.   Yes.  I'm the Los Angeles Base President.
22        Q.   Okay.  And what other positions have you held?
23        A.   I've been safety rep with LaGuardia, San
24   Francisco Vice Chair, Assistant to the President,
25   American Eagle liaison, LAX International Vice
```

Melissa Chinery   9/14/2021

Page 174

1    Chairperson, LAX Domestic Vice Chairperson, LAX

2    Domestic Chairperson, and then LAX Base President.

3        Q.    And how long have you been the Base President

4    for Los Angeles?

5        A.    Since April 1st, 2001.

6        Q.    Wow.  Okay.  And can you please tell us, were

7    you ever on a Board call with Mr. Vargas discussing the

8    change of formula for vacation payouts?

9        A.    Yes.

10       Q.    And who else was on this call?

11       A.    If I recall correctly, I believe the Miami

12   Base President, Randy Trautman.  I think also the San

13   Francisco Base President at the time, P.J. Toms, and

14   Mr. Vargas.  I -- I also believe our attorney, Mr.

15   Lerner --

16       Q.    Okay.

17       A.    -- was on.

18       Q.    And what was discussed on that call?

19       A.    MEA and SAF.

20       Q.    Can you explain those things to us?

21       A.    Yes.  Actually the genesis of MEA and SAF come

22   from the previous policy manual that was in effect up

23   until 1991.  It was originally called the 2040 and what

24   it was originally intended to do was to replace the per

25   diem that we would be losing as Flight Attendants when

Melissa Chinery   9/14/2021

1    we're removed from trips.

2              This 2040 was a single pay, a rated item

3    and it was single pay rate and it was based on a

4    sliding scale of how many hours you worked.  This

5    transition with the new policy manual in 1991 said the

6    MEA and SAF would essentially be -- the MEA was the

7    meal expense allowance; SAF is -- I believe it's --

8    I've been calling it SAF for so long, but special

9    activity fee or something like that.

10             And essentially what it does for those of

11   us on the line, for example I base schedule a room for

12   my trips, it does replace the per diem.  Now, if I'm

13   away from home, for example I attend a Board meeting, I

14   will put in for MEA because that covers my meal

15   allowance.

16        Q.   Okay.  So why were you discussing this --

17   these topics on that call?

18        A.   Because -- well, the MEA and SAF there was

19   this issue that had come up whether MEA and SAF were

20   considered wages and --

21        Q.   I'm sorry.  Excuse me.  Who --

22        A.   Okay.

23        Q.   -- the issues with who?

24        A.   Mr. Vargas claimed that the MEA and SAF were

25   wages and that was what they based certain payouts to

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 338 of 506   PageID 6285   **Black Decl. Ex. 11**

Melissa Chinery   9/14/2021

Page 176

1    the National Officers or three of the National

2    Officers --

3         Q.    Okay.

4         A.    -- on.

5         Q.    Okay.  So at any time during this call, did

6    Mr. Vargas inform you that Bob Ross had not gotten this

7    formula?

8         A.    Yes, he did.

9         Q.    What did he say?

10        A.    He said that Bob Ross was not included.  And

11   in fact, I was in text contact with Bob Ross shortly

12   thereafter and I did confirm that with Bob Ross,

13   because I did ask him and I said, well, if you're happy

14   that you weren't included in the same.

15        Q.    Because?

16        A.    Technical miscalculation.

17        Q.    Because the -- the three in question, I mean,

18   they had to be paid back?

19        A.    Correct.

20        Q.    They had to be paid back --

21        A.    Correct.

22        Q.    -- so if it's -- a Board member would have

23   known from the Treasurer, you would have been after

24   that money --

25        A.    Absolutely --

```
 1      Q.    -- as well?
 2      A.    -- there would have been no reason to exclude
 3   Bob Ross from our actions, the actions that we took to
 4   secure the monies from the other three National
 5   Officers.  There was no reason for us to -- to --
 6      Q.    Did --
 7      A.    -- exclude Bob.
 8      Q.    -- on this call did Bruce Lerner inform Mr.
 9   Vargas to get legal counsel?
10      A.    Yes, he did.  He suggested that Eugenio get
11   legal counsel and it -- it did appear to be a pretty
12   strong recommendation.
13      Q.    Okay.  So in your, how many years of being a
14   President, I'm sorry, 37 --
15      A.    37 and a half.
16      Q.    Okay.  And 35 of doing Union work?
17      A.    36.
18      Q.    Have you ever known any other administration
19   to use the MEA, SAF or --
20      A.    No.
21      Q.    Okay.
22      A.    No.
23      Q.    Okay.
24      A.    In fact, I would object strenuously to this
25   day.  MEA and SAF were never intended to be wages.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 340 of 506   PageID 6287

**Black Decl. Ex. H**
Melissa Chinery   9/14/2021   **\***

Page 212

```
 1                    MS. CHINERY:   Yes.
 2                          REDIRECT EXAMINATION
 3   BY MS. CHINERY:
 4        Q.   When you looked at -- when you are at the
 5   Board meetings or the special Board meeting when you
 6   reviewed all the calculations, did you happen to say
 7   anything to -- did Randy Trautman say anything to you
 8   at that Board meeting?
 9        A.   Yes, he did.
10        Q.   And can you tell us what he said?
11        A.   I recall that he stated that he felt that they
12   had taken advantage of us.
13                    MS. MORGAN:   Pardon, what did you say?
14                    THE WITNESS:   That they had taken
15   advantage of -- that they had taken advantage of us.
16        Q.   (BY MS. CHINERY)   In regards to?
17        A.   The payout.
18        Q.   Okay.  And do you -- as a Base President, do
19   you feel that they took advantage of the system?
20        A.   I believe based on the long-standing policy of
21   APFA that MEA and SAF were not wages, that nobody had
22   any business treating them as wages when it came to a
23   calculation of a payout.
24        Q.   In your opinion -- or I'm sorry, excuse me.
25   As a Base President, you're familiar with the policy
```

1   manual?

2       A.   Yes, I am.

3       Q.   Okay.

4       A.   As best as I could be.

5       Q.   Okay.

6       A.   Yeah.

7       Q.   Do you -- if somebody is getting MEA and they

8   go out on their credit card, do you think that that's

9   okay?

10      A.   No.   MEA --

11      Q.   Why is that?

12      A.   -- MEA is meant to be a reimbursement for

13  meals that you partake in.   To use the credit card to

14  purchase meals and then to receive the MEA, which means

15  the MEA goes into your pocket, that's double-dipping.

16      Q.   Okay.

17      A.   Can't do that.

18      Q.   So also in your opinion -- or I'm sorry,

19  excuse me.   Before they left office, three days before

20  they left office, they all signed each other's checks.

21  So if there was -- there was four $4000 -- sets of

22  $4000 checks and they all signed it for each other,

23  have you ever heard of that practice?   Because normally

24  when -- isn't the -- correct me if I -- oh, isn't it

25  correct the policy is the incoming administration signs

1  off on their checks and then that's --

2      A.    That's my understanding --

3      Q.    Okay.

4      A.    -- yes.

5      Q.    So have you ever known in your years of --

6      A.    No.

7      Q.    -- Union work for the -- their own

8  administration to sign off on their checks?

9      A.    No.

10     Q.    Okay.

11          MS. CHINERY:  We reserve the right to

12  recall him if we need to, please.

13          THE ARBITRATOR:  Any other questions?

14          MS. MARTIN:  Uh-huh.

15              RECROSS-EXAMINATION

16  BY MS. MARTIN:

17     Q.    Jonathan, when you attend Board meetings, are

18  meals provided for the Base Presidents on most

19  occasions?

20     A.    Well, sometimes they will bring in lunch, yes.

21     Q.    Okay.

22     A.    That's true.

23     Q.    When you are at those meetings, you're

24  collecting MEA --

25     A.    Correct.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 343 of 506   PageID 6290

**Black Decl. Ex. I**
***
Melissa Chinery   9/14/2021

Page 221

```
 1              THE ARBITRATOR:  Please have a seat.
 2    State your name, your position for the record.
 3              MR. HARRIS:  My name's Erik Harris and
 4    I'm the APFA Treasurer.
 5                        ERIK HARRIS,
 6    having been first duly sworn, testified as follows:
 7                    DIRECT EXAMINATION
 8    BY MS. LEE:
 9         Q.   Hi, Erik.
10         A.   Hello.
11         Q.   Okay.  I'll start with the obvious.  What is
12    your name?
13         A.   Erik Harris.
14         Q.   Where are you employed, Erik?
15         A.   I'm employed for APFA right now, but also an
16    American Airlines Flight Attendant.
17         Q.   Okay.  What is your position at APFA?
18         A.   National Treasurer.
19         Q.   How long have you been employed at APFA?
20         A.   Since April 2020.  April 1st.  Employed at
21    APFA.
22         Q.   At American Airlines?
23         A.   American since May 2014, yes.
24         Q.   Okay.  Did you hold any positions with APFA
25    during your career, other positions?
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 344 of 506   PageID 6291
**Black Decl. Ex. 11**
Melissa Chinery   9/14/2021

Page 222

```
 1        A.    Yes.

 2        Q.    Could you tell us about those?

 3        A.    Okay.  Started contract and scheduling

 4   representative.  I was a health department rep, IOD

 5   department rep, safety and security department rep, a

 6   BCR Philadelphia, budget committee member, and national

 7   contract chair.  I might have forgot something.

 8        Q.    In your role as National Treasurer, have you

 9   been responsible for responding to requests to see

10   financial information?

11        A.    Primarily, yes.

12        Q.    I've got to back up.  To your knowledge, has

13   an incoming Officer who has chosen to relocate to DFW

14   or Dallas been able to purchase outgoing furniture?

15        A.    Incoming --

16        Q.    The furniture of an outgoing Officer per

17   policy?

18        A.    Would the incoming be able to purchase that?

19        Q.    Would the incoming -- incoming Officer who has

20   chosen to relocate, not living --

21        A.    Oh, relocate --

22        Q.    -- in corporate --

23        A.    -- okay.

24        Q.    -- housing --

25        A.    Okay.  That's the requirements.
```

```
 1        Q.   Okay.  Not living in corporate housing,
 2   they've chosen to relocate, has that incoming Officer
 3   or have they ever been able to purchase the furniture
 4   of an outgoing Officer per policy, do you know?
 5        A.   I don't know.  I've not since my -- since me
 6   being here, that hasn't happened.
 7        Q.   Okay.  Okay.  Okay.  We'll move on.  I'm going
 8   to reask this question.  In your role as National
 9   Treasurer, have you been responsible for responding to
10   requests to see financial information?
11        A.   Yes.
12        Q.   Did you see requests for -- from Melissa and
13   myself?
14        A.   Yes.
15        Q.   To come down and see financial records?
16        A.   Yes.
17        Q.   And did you set up times for us to see the
18   information?
19        A.   Yes.
20        Q.   Approximately how many times did we come down
21   to review the information?
22        A.   I would say since we -- since I came into the
23   office --
24        Q.   Approximately?
25        A.   -- five to 10.
```

**Black Decl. Ex. 11**

Melissa Chinery   9/14/2021

Page 224

```
 1      Q.   Five to 10?
 2      A.   Yeah.
 3      Q.   So you've been present with both Melissa and
 4  myself when we came down?
 5      A.   The majority, yes.
 6      Q.   Okay.  If you weren't present, who was
 7  present?
 8      A.   The assistant to the Treasurer, Robert
 9  (unintelligible).
10      Q.   Who was Treasurer before you took office?
11      A.   Craig Gunter.
12      Q.   And before him?
13      A.   Eugenio Vargas.
14      Q.   When you came into office, how would you
15  describe the state of the Union financial records?
16      A.   They were very bad.
17      Q.   Could you elaborate?
18      A.   The -- there were pay loss bills behind.
19  There was a lot of overspending and just -- just not
20  very well kept books in general.
21      Q.   Do you think the financial records that you
22  were supposed to keep for what we think is five years,
23  were they there?  Did you have an opportunity to look?
24      A.   I didn't look thoroughly, but I -- when I did
25  look, there were a lot of things missing or not -- not
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 347 of 506   PageID 6294   **Black Decl. Ex. H**
Melissa Chinery   9/14/2021

Page 225

```
 1    there --
 2         Q.    Okay.
 3         A.    -- were not kept well.
 4         Q.    We'll get further into that.  What is the
 5    obligation for Union Officers to substantiate credit
 6    card, their credit card spending?
 7         A.    There's -- well, I'll say prior to this year,
 8    the only requirement or obligation was that the OL --
 9    OLMS and the requirement was to provide receipts and
10    substantiate credit card purchases and document those
11    items.
12         Q.    How do you document them?  How do you document
13    it?  I came over with a credit card, how would I
14    document it --
15         A.    It was done --
16         Q.    -- for a receipt?
17         A.    -- different ways.  Are you talking about for
18    me?
19         Q.    For any of the Officers.
20         A.    Oh.  Just they were provided to the
21    Treasurer's office, the receipts along with the credit
22    card statements.
23         Q.    Is there documentation required on the
24    receipt?
25         A.    Document -- say that again.
```

1    Q.    When you get a receipt from -- when a receipt

2    comes across your desk, what do you expect to be on

3    that receipt?

4    A.    Oh, definitely matching the charge amount.

5    Q.    Okay.

6    A.    And the date.

7    Q.    Okay.

8    A.    And the same information that's on there and

9    any details to --

10   Q.    What details?

11   A.    -- what was purchased.  What was purchased --

12   Q.     Uh-huh.

13   A.    -- why it was purchased.

14   Q.    Uh-huh.

15   A.    What -- what department to charge it to for

16   financials in the budget and who was there, who made

17   the purchase.

18   Q.    Okay.  So what is the procedure for submitting

19   receipts for the credit cards?  Is this done monthly?

20   A.    It is done -- we try to do it monthly.

21   Q.    Did you receive subpoenas from Melissa and

22   myself, the charging parties, for the financial

23   documents related to this hearing?

24   A.    Yes.

25   Q.    Did you see the -- oversee the effort to

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 349 of 506   PageID 6296

Black Decl. Ex. H
***
Melissa Chinery   9/14/2021

Page 247

```
 1        A.   Which -- which --
 2                  MS. CHINERY:   The box.
 3        Q.   (BY MS. LEE)  The box --
 4        A.   The box --
 5        Q.   -- that's missing?
 6        A.   -- S through V, yes, Trapp.
 7        Q.   So that includes --
 8        A.   Yes.
 9        Q.   -- Michael Trapp?
10        A.   Yes.
11        Q.   So his invoices are lost too?
12        A.   Yes.
13        Q.   Okay.  Thank you.  So is it -- again, I'm
14   saying this over and over, but we're talking about the
15   fiscal year April 2017 to March 2018?
16        A.   No.
17        Q.   I'm sorry, '16 to '17?
18        A.   Yes.
19        Q.   Okay.  Who has the ultimate responsibility
20   under APFA Constitution to maintain financial records?
21        A.   The Treasurer.
22        Q.   Does APFA have a policy on keeping inventory?
23        A.   Yes.
24        Q.   Can you explain what the policy is?
25        A.   The policy just states that inventory must be
```

 1   kept.  There's no specifics on how.

 2       Q.   Okay.  So who has the responsibility for

 3   maintaining the inventory list?

 4       A.   The Treasurer.

 5       Q.   So that would be one of your duties to ensure

 6   that inventory list was kept.  Were you able to locate

 7   the inventory list for furniture from the Vargas

 8   administration?

 9       A.   No -- well, I only supplied what I received

10   and --

11       Q.   So --

12       A.   -- if it contained anything from there.

13       Q.   So were you able to locate any inventory from

14   the Vargas administration?

15       A.   No, and there's no inventory list.

16       Q.   Thank you.  Are you aware of an issue related

17   to the formula for the payout of vacation for former

18   National Officers Mr. Vargas, Ms. Martin, and Mrs.

19   Dunaway, and Bob Ross?

20       A.   Yes.

21       Q.   Can you explain the issue?

22       A.   So there was some -- there was a disagreement

23   on how the formula was -- or what the formula was.  If

24   it included the MEA and SAF payments -- I guess let me

25   back up.  For calculating the payout, the annual payout

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 351 of 506   PageID 6298
**Black Decl. Ex. 11**
Melissa Chinery   9/14/2021

Page 249

1    takes your annual salary and it's a formula based on
2    that.  The MEA and SAF are payments above and beyond
3    the salary and those amounts were included on the -- in
4    the formula, but there was a disagreement on that.
5        Q.   Okay.
6                MS. CHINERY:  May I confer for a second?
7                THE ARBITRATOR:  Go ahead.  I tell you
8    what, let's continue this tomorrow.
9                MS. CHINERY:  Okay.
10               THE ARBITRATOR:  Okay.  Do you want to --
11   you want to start at 8:30?
12               MS. CHINERY:  Yes.
13               MS. LEE:  Yes.
14               THE ARBITRATOR:  Yeah, let's start at
15   8:30.  Can y'all do --
16               MS. MORGAN:  Uh-huh, yes.
17               THE ARBITRATOR:  Okay.  Let's start at --
18   it's -- we'll continue this tomorrow, 8:30 a.m.
19               (Proceedings recessed at 4:34 p.m.)
20               (End of Volume 1.)
21
22
23
24
25

```
 1   STATE OF TEXAS          )

 2   COUNTY OF DALLAS        )

 3           THIS IS TO CERTIFY THAT I, MELISSA J. CARSON,

 4   a Certified Shorthand Reporter in and for the State of

 5   Texas, reported in shorthand the proceedings had at the

 6   time and place set forth in the caption hereof, and

 7   that the above and foregoing 250 pages contain a full,

 8   true, and correct transcript of the said proceedings to

 9   the best of my ability.

10           Certified to on this the 27th day of October,

11   2021.

12

13

14                          _____

15                          MELISSA J. CARSON, Certified
                            Shorthand Reporter in and for
16                          The State of Texas

17

18   Certification No. 1737

19   CRCB Firm Registration #489

20   Expires August 31, 2022

21   CARSON REPORTING & ASSOCIATES

22   Post Office Box 551628

23   Dallas, Texas 75355-1628

24   Telephone 214.346.3434

25
```

**Black Decl. Ex. U**

Melissa Chinery   9/15/2021

```
 1            IN THE MATTER OF THE ARBITRATION BETWEEN

 2   MELISSA CHINERY, Member      )BEFORE THE ARTICLE VII
     And                         )
 3   SANDRA LEE, Member          )
                                 )ARBITRATOR
 4   AND                         )
                                 )
 5   EUGENIO VARGAS, Member      )HON. RUBEN R. ARMENDARIZ

 6

 7

 8

 9        *************************************

10                 SEPTEMBER 15, 2021

11                     VOLUME 2

12        *************************************

13

14

15

16            BE IT REMEMBERED that on the 15th day of

17   September, 2021, the above cause came on for hearing

18   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

19   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

20   Boulevard, located in the City of Irving, County of

21   Dallas, State of Texas, whereupon the following

22   proceedings were had.

23

24

25
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 354 of 506   PageID 6801
**Black Decl. Ex. U**
Melissa Chinery   9/15/2021

Page 252

```
 1              A P P E A R A N C E S:

 2     HON. RUBEN R. ARMENDARIZ
       LABOR MANAGEMENT ARBITRATOR
 3     29010 Pfeiffers Gate
       Fair Oaks Ranch, Texas  78015
 4     PHONE:  210.379.0860
       EMAIL:  arbruben@gmail.com
 5

 6     APPEARING AS THE ARBITRATOR

 7

       MS. MELISSA CHINERY
 8     EMAIL:  Melchinery@aol.com
                   AND
 9     MS. SANDRA LEE
       EMAIL:  SEL27995@gmail.com
10

11     APPEARING FOR THE CHARGING PARTIES

12     MS. HEIDI J. MORGAN
       EMAIL:  heidimorgan65@gmail.com
13                 AND
       MS. NENA MARTIN
14
       APPEARING FOR THE CHARGED PARTY, EUGENIO VARGAS
15

16
                       *   *   *   *
17

18

19

20

21

22

23

24

25
```

```
 1                    WITNESS INDEX
 2
```

ERIK HARRIS                                    PAGE
Direct Examination (Cont'd) by Ms. Lee.......... 257
Cross-Examination by Ms. Martin................. 276
Redirect Examination by Ms. Chinery............. 351
Recross-Examination by Ms. Morgan............... 373
Further Redirect Examination by Ms. Lee......... 378
SHANE STAPES
Direct Examination by Ms. Morgan................ 383
Cross-Examination by Ms. Chinery................ 392
CHUCK RANSDALE
Direct Examination by Ms. Morgan................ 394
Cross-Examination by Ms. Chinery................ 401
Redirect Examination by Ms. Morgan.............. 403

CHRISTOPHER THEDFORD
Direct Examination by Ms. Chinery............... 404
Cross-Examination by Ms. Morgan................. 413

DEBBIE HOOVER
Direct Examination by Ms. Chinery............... 415
Cross-Examination by Ms. Morgan................. 422

JOSH BLACK
Direct Examination by Ms. Chinery............... 426
Cross-Examination by Ms. Martin................. 430

SANDRA LEE
Direct Examination by Ms. Chinery............... 434
Cross-Examination by Ms. Morgan................. 444

MELISSA CHINERY
Direct Examination by Ms. Lee................... 455
Cross-Examination by Ms. Morgan................. 485
Redirect Examination by Ms. Lee................. 511

```
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                     EXHIBIT INDEX

 2
      EXHIBIT                        ID'D    ADMITTED
 3
      Chinery-Lee Exhibit No. 23............. 474      480
 4

 5    EXHIBIT                        ID'D    ADMITTED

 6    Vargas Exhibit No. 1................... 501
      Vargas Exhibit No. 8................... 424
 7    Vargas Exhibit No. 20................. 374
      Vargas Exhibit No. 21................. 374
 8    Vargas Exhibit No. 32................. 388      389
      Vargas Exhibit No. 35................. 387      388
 9    Vargas Exhibit No. 44................. 309      350
      Vargas Exhibit No. 45................. 302
10    Vargas Exhibit No. 84................. 488
      Vargas Exhibit No. 85................. 488
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

APPX. 0356

```
 1                P R O C E E D I N G S
 2                    THE ARBITRATOR:    Okay.   The hearing will
 3      be in order.   This is a continuation of the hearing of
 4      September 14th, 2021.   We left off with Mr. Erik Harris
 5      and understand, Mr. Harris, that you're still under
 6      oath.   Okay.
 7                    We have the same representatives for both
 8      sides.   Is there anything the parties wish to raise at
 9      this time with the Arbitrator?
10                    MS. MORGAN:    I have a housekeeping
11      question.
12                    THE ARBITRATOR:    You have what?
13                    MS. MORGAN:   A housekeeping question.
14                    THE ARBITRATOR:   Okay.
15                    MS. MORGAN:    We have -- since our
16      hearing was supposed to be two days --
17                    THE ARBITRATOR:   Right.
18                    MS. MORGAN:    -- we have a witness that is
19      very pertinent to our case who is scheduled to fly
20      tomorrow and so has to go home tonight.   So how do we
21      intend to deal with that issue?
22                    THE ARBITRATOR:    They have to go home
23      tonight?
24                    MS. MORGAN:    They have to because they
25      fly tomorrow.
```

Melissa Chinery   9/15/2021

Page 256

```
 1                    THE ARBITRATOR:   They fly tomorrow?
 2                    MS. MORGAN:  Yes.
 3                    THE ARBITRATOR:  Okay.  And they're your
 4   witnesses, right?
 5                    MS. MORGAN:   Yes.
 6                    THE ARBITRATOR:   I don't know, you know.
 7   This case -- this case presents itself with a lot of
 8   witnesses and -- and I don't know when they'll finish
 9   your -- your -- when are you going to finish your case,
10   do you think, with the witnesses you have?
11                    MS. CHINERY:   We've got more -- we've
12   got several more witnesses.
13                    THE ARBITRATOR:   Okay.  Does that mean
14   today?
15                    MS. LEE:  Six.
16                    MS. CHINERY:   Probably.
17                    THE ARBITRATOR:  Okay.  Most of the day?
18                    MS. CHINERY:  Yes.
19                    THE ARBITRATOR:   Okay.  Let's go off the
20   record.
21                    (Break from 8:37 to 8:42.)
22                    THE ARBITRATOR:   Back on the record.
23   We're with Mr. Harris.  Would you like to start
24   questioning?
25                    MS. LEE:   Yes.
```

Melissa Chinery   9/15/2021

 1   furniture.

 2       Q.   So what does that mean?

 3       A.   So that means that it was written off the

 4   books.

 5       Q.   How was it disposed of?

 6       A.   I don't know.

 7       Q.   Is there any record of Greg Gunter's furniture

 8   being purchased?

 9       A.   I don't have any record of it being purchased.

10       Q.   Sold?

11       A.   No.

12       Q.   Inventoried?

13       A.   No.

14            MS. LEE:   I think we're about done, just

15   one second.  I want to confer with them.  I think we're

16   about done.

17       Q.   (BY MS. LEE)   Okay.  So could you guys go to

18   Exhibit 5, please?  Do you have a sheet like this for

19   Craig -- Greg Gunter's furniture, Greg?

20       A.   No, this is the only one.  This is the latest

21   one I have and the only one I have.

22       Q.   Do you have a sheet like this for anyone, any

23   furniture?

24       A.   Yes.

25       Q.   Okay.  What do you have?

 1      A.   It had -- well, this lists furniture --

 2      Q.   The list --

 3      A.   -- from -- this -- this listed the assets we

 4   have.  There's various furniture based on the person.

 5              MS. CHINERY:   Confer just a minute.

 6              MS. LEE:   Hold on one second.

 7      Q.   (BY MS. LEE)  What term is this furniture

 8   from?

 9      A.   So the problem with this depreciation schedule

10   that I have --

11      Q.   Yes.

12      A.   -- is that it is not an inventory list, it

13   just lumps all furniture together as one item or one

14   number and it's depreciated.  So it shows where -- who

15   purchased it.  So various furniture, C. Gunter.  It

16   just shows that Craig Gunter purchased this furniture,

17   but there is no -- we don't know where that ended up,

18   so --

19      Q.   You don't know where it ended up?

20      A.   There has been no -- well, I know what Craig's

21   has (sic), I'm sorry, but if you were to ask me where

22   Greg's is --

23              MS. MORGAN:   Objection.  Are you talking

24   about Craig Gunter or Greg Gunter?

25              THE WITNESS:  Well, I --

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 361 of 506   PageID 6808
**Black Decl. Ex. U**
\*\*\*
Melissa Chinery   9/15/2021

Page 415

```
 1   standing up and raising your right hand, please?
 2                   (Witness sworn.)
 3                   THE ARBITRATOR:  Have a seat.  State your
 4   name --
 5                   THE WITNESS:  Debbie Hoover.
 6                   THE ARBITRATOR:  -- and your position --
 7   and your position.
 8                   THE WITNESS:  Accountant.
 9                   THE ARBITRATOR:   Okay.  Go ahead.
10                      DEBBIE HOOVER,
11   having been first duly sworn, testified as follows:
12                   DIRECT EXAMINATION
13   BY MS. CHINERY:
14       Q.    What is your name, please?
15       A.    Debbie Hoover.
16       Q.    Where are you employed?
17       A.    APFA.
18       Q.    How long have you been employed at APFA?
19       A.    22 years next month.
20       Q.    What is your position?
21       A.    Accountant.
22       Q.    Can you describe your job duties, please?
23       A.    I do payroll, trip removal stuff, and that's
24   pretty much it.  Well, I mean, I started in July also
25   expenses, like the Flight Attendants' expenses, but I
```

1   just started July month.   So I paid them August 30th.

2       Q.   Are you familiar with an issue related to

3   former National Officers during the Ross administration

4   changing their vacation formula for their vacation

5   payout?

6       A.   Yes.

7       Q.   This would have been at the end of the --

8   their term in June of 2018, correct?

9       A.   Yes.

10      Q.   Can you explain the process?   So did any of

11  the Officers approach you about changing this formula?

12      A.   Yes.

13      Q.   Who told you to change this formula?

14      A.   Eugenio.

15              THE ARBITRATOR:   I'm sorry, what was --

16              THE WITNESS:   Eugenio Vargas.

17              THE ARBITRATOR:   Eugenio --

18              THE WITNESS:   Yeah.

19              THE ARBITRATOR:   -- Vargas.   Mr. Vargas.

20              THE WITNESS:   Sorry, I don't know if I

21  ever said his name right.   I tried.

22              MR. VARGAS:   You're close enough.

23      Q.   (BY MS. CHINERY)   And can you explain what you

24  were told to do?

25      A.   Add SAF and MEA.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 363 of 506   PageID 6810   **Black Decl. Ex. U**
Melissa Chinery   9/15/2021

Page 417

```
 1        Q.    Had this ever been done before?
 2        A.    Not that I'm aware of.
 3        Q.    And this -- and -- and was this consistent
 4   with how the vacation payout formula had been done,
 5   administered in previous administrations?
 6        A.    Can you rephrase the question?
 7        Q.    Had you ever know it to be done before?
 8        A.    No.
 9        Q.    Okay.  How long had you worked on paying out
10   vacation for outgoing National Officers?  How long have
11   you done it?
12        A.    March 2015 is when I started.
13        Q.    When he asked you to do this, did it raise --
14   raise any red flags with you?
15        A.    Yes.
16        Q.    What were they?
17        A.    Just that it hadn't been done before.  It
18   wasn't past practice.
19        Q.    Okay.  So when they wrote these checks, why
20   were you told to break the payments up into four $4000
21   checks?  They were like four, four, four, four?
22        A.    Taxes purposes, so they didn't take as much
23   out.
24        Q.    Who told you that?
25        A.    I don't recall.  I think it was a joint.  I
```

Case 4:22-cv-00343-Y  Document 236-1  Filed 04/26/24  Page 364 of 506  PageID 6811
Black Decl., Ex. U
Melissa Chinery  9/15/2021

Page 418

 1  don't...

 2      Q.  Was there more than one of the National

 3  Officers that told you to do that?

 4      A.  I don't remember that.

 5      Q.  Okay.  Would it be a National Officer that

 6  would tell you something to -- to do something like

 7  that?

 8      A.  Yes.  I wouldn't do it without an Officer.

 9      Q.  And that person was Eugenio Vargas, right?

10      A.  Again, I don't really recall that.

11      Q.  Were you on May 25th of 2018 sent an email by

12  Mr. Vargas talking about Bob Ross having to pay back

13  furniture and to deduct it out of his paycheck; do you

14  recall that?

15      A.  I believe that email went to Rene, but Rene

16  may have forwarded it to me.

17              MS. MORGAN:  Objection.  I believe.

18              THE ARBITRATOR:  If you don't know --

19              THE WITNESS:  I don't know.

20              THE ARBITRATOR:  Okay.  There you go.

21      Q.  (BY MS. CHINERY)  Were you subpoenaed to

22  testify here today?

23      A.  Yes.

24      Q.  Have you ever testified in APFA internal

25  charges before?

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 365 of 506   PageID 6812   **Black Decl. Ex. 11**
Melissa Chinery   9/15/2021   ✳✳✳

Page 455

```
 1                    THE ARBITRATOR:   Okay.  You're excused.
 2      Next witness.
 3                    MS. CHINERY:   Can we take a little
 4      break?
 5                    THE ARBITRATOR:   Yeah, let's take 10
 6      minutes again.
 7                    MS. CHINERY:  Okay.
 8                    THE ARBITRATOR:  Off the record.
 9                    (Break from 2:58 to 3:04.)
10                    MS. CHINERY:   I'm the last witness.
11                    THE ARBITRATOR:   You're the last
12      witness, okay.
13                    (Witness sworn.)
14                    THE ARBITRATOR:  Please have a seat.
15      State your name, position for the record.
16                    MS. CHINERY:   My name is Melissa Chinery
17      and I don't -- I'm a Flight Attendant.
18                        MELISSA CHINERY,
19      having been first duly sworn, testified as follows:
20                        DIRECT EXAMINATION
21      BY MS. LEE:
22          Q.   Melissa, where are you employed?
23          A.   American Airlines.
24          Q.   What is your position?
25          A.   Flight Attendant.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 366 of 506   PageID 6813
Black Decl. Ex. U
Melissa Chinery   9/15/2021

Page 456

```
 1      Q.    How long have you been employed at American
 2   Airlines?
 3      A.    25 years, I think.
 4      Q.    Are you a member of the Union?
 5      A.    Yes.
 6      Q.    Have you ever held a position with the Union?
 7      A.    No.
 8      Q.    Have you ever run for office?
 9      A.    Yes.
10      Q.    Can you tell me about what you ran for and the
11   time frame?
12      A.    I ran for Philly Base President in 2016, I
13   believe, and then Phoenix Base President in 2019.  I'm
14   not good with dates, but yeah, or '20 or maybe it was
15   '20, I don't know.
16      Q.    Do you know Eugenio Vargas?
17      A.    I do not know him personally.
18      Q.    Do you know who he is?
19      A.    Yes.
20      Q.    What positions he's held with the Union?
21      A.    I -- I know he was the National Treasurer,
22   but -- and I think -- I think he held a Base position,
23   too.  I'm not really sure.
24      Q.    Okay.  When he ran for office, who did he run
25   with, do you know?
```

```
 1        A.    He ran with Bob and Nena and -- oh, I'm sorry,
 2   Bob Ross, Nena Martin, Marcy Dunaway, and him.
 3        Q.    What time period were they in office?
 4        A.    2 -- 2016 to 2018.
 5        Q.    Did you support Bob Ross and Eugenio Vargas --
 6        A.    Yes.
 7        Q.    -- when they were running?
 8        A.    I -- I -- yes, I did.
 9        Q.    Were they elected?
10        A.    Yes, they were.
11        Q.    Did you subsequently come to no longer support
12   Mr. Ross?
13        A.    Yes.
14        Q.    Can you explain why?
15        A.    There were -- there were a couple -- well,
16   actually, there was two main reasons.  One, he promised
17   a lot to do for -- this was about a merger, LE --
18   Legacy U.S. Air and Legacy American, and he promised
19   to, you know, bring us together and unite us and quite
20   frankly, he soon came to ignore the U.S. Airways Flight
21   Attendants.
22        Q.    Did you take any action?
23        A.    Yes, we did.  Yes, we did.
24        Q.    What did you do?
25        A.    Well, what we're afforded to by our
```

```
 1   here, like, 34 letters to -- to see the financials.
 2   And basically the more evasive she got, the more
 3   curious I got.  So that's pretty much...
 4       Q.   And were -- are we allowed to see the Union
 5   finances?
 6       A.   No.
 7       Q.   For the Phoenix Base, were you allowed to see
 8   the Union finances?
 9       A.   Well, she wouldn't ever show up to show me.
10   And the day that she did show up to show me, I flew in,
11   I lived in Honolulu at the time, I flew in, I dropped a
12   trip, I went to the airport, I had my witness and she
13   showed up with basically nothing.  Like, she showed up
14   with the -- just the summaries, which I'd already seen
15   at national after she was ignoring me.  So it was -- it
16   was -- it was a loss to -- financial loss to me.
17       Q.   Okay.  Were you allowed to see the APFA
18   National Union finances?
19       A.   We went down and we were showed over, you
20   know, all -- they were all spread out, because I --
21   we'd asked for three years.  We'd asked for three years
22   and so we started to -- went down to see that, but we
23   didn't really understand what we were looking at.  I
24   mean, I -- I didn't.  But then we had asked on that
25   visit if -- about the furniture.  Like, we were asking
```

1    about inventory and we were asking about, you know,

2    like, we really wanted to see the credit card receipts.

3              I mean, I'm sorry, but I -- you know, it

4    says right there in the Constitution that we're allowed

5    to see all financials.  So -- and they wouldn't show it

6    to us.  But we were allowed to see summaries and that

7    kind of thing.

8        Q.   So when you were looking at this -- this table

9    of documents, who's in the room with you?

10       A.   It was you, Liz Geiss, Craig Gunter, oh, and

11   he was the National Treasurer, and she was the National

12   Vice President at the time.

13              MS. LEE:  Let's take a minute to confer.

14       Q.   (BY MS. LEE)  Do you remember what years --

15   what three years were presented?

16       A.   I think it was -- it was -- it was three

17   years.  It was --

18       Q.   Okay.

19       A.   -- it was a three year look back, that's

20   basically --

21       Q.   I'm going to rephrase that.  Do you remember

22   what administrations were included in that three year

23   look back?

24       A.   Oh, sure.  It was the Ross administration and

25   then maybe a couple -- maybe a -- I don't know, maybe

Melissa Chinery   9/15/2021

Page 464

1   some Laura Glading stuff.  No, I mean, it was because

2   it was a three year look back, so yeah.  So...

3        Q.   So the Ross administration --

4             (Simultaneous speaking.)

5        A.   And the Glading administration.

6        Q.   -- was there and then a portion of --

7        A.   Well, some of the stuff they brought out was

8   from their term.  I -- I'm -- yeah.

9        Q.   And so --

10       A.   I mean, it was a long time ago, so --

11       Q.   Okay.  So do you agree that a portion of it

12   was from the Ross administration and a portion --

13   portion of it was from the Bassani administration?

14       A.   I don't really recall because I --

15       Q.   Okay.

16       A.   -- I -- to be honest, I don't --

17       Q.   If you don't --

18       A.   -- really recall.

19       Q.   -- know, you don't know?

20       A.   Yeah.

21       Q.   Do you remember you were looking at these

22   papers and realizing there was a difference in the way

23   the monthly finances for the Officers were presented

24   from administration to administration?

25       A.   Um...

1   Q.   If you don't remember, you don't remember?

2   A.   I don't remember.

3   Q.   Okay.  We'll move on.  So when you were

4   allowed to finally see the Union finances, who was the

5   President and who was the Treasurer at the time?

6   A.   It was Julie Hedrick and Erik Harris.

7   Q.   Do you remember what you were allowed to see?

8   A.   We were allowed to see the exit package and

9   then we were allowed to see the credit cards and then

10  we were allowed to see, like, all documents, financial

11  records.

12  Q.   Okay.  Did you request from Mr. Gunter to see

13  the underlying documents, meaning the receipts, weekly

14  credit cards, etcetera, based on what you saw that day

15  with --

16  A.   But from the Bassani administration?  Yes,

17  I --

18  Q.   Yes.

19  A.   -- did.

20  Q.   What happened?

21  A.   We eventually -- we went down a couple more

22  times.  We eventually got to see things, but I mean, we

23  couldn't see -- with that administration, yes.

24  Q.   With that administration, I'm talking the Ross

25  administration.

1    A.   Oh, no, I didn't see -- no.  No.  No.

2    Q.   Did you ask to see the credit card at least --

3  or the credit card receipts, speaking on the Gunter,

4  the Ross administration, did you ask to see the credit

5  card receipts, the underlying documents?

6    A.   Wait, is this for Ross or Gunter?

7    Q.   Ross administration.

8    A.   Ross.

9    Q.   Did you ask --

10   A.   I -- I -- I might have wrote a letter maybe

11 once asking to -- I mean, maybe.  I don't know.  That

12 was, like, six --

13   Q.   But did you ask to see the inventory list?

14   A.   Yes.

15   Q.   Did you ask to see the mileage for Smarts --

16   A.   Yes.

17   Q.   -- Sarnacki and Babi?

18   A.   Yes.

19   Q.   Did you see it?

20   A.   Eventually.

21   Q.   Did you see it that day in that meeting?

22   A.   No.

23   Q.   So you considered it important to your

24 investigation to see those things, right?

25   A.   Well, to me it turned out -- I mean, Wanda

Case 4:22-cv-00343-Y  Document 236-1  Filed 04/26/24  Page 373 of 506  PageID 6820
**Black Decl. Ex. U**
Melissa Chinery  9/15/2021

Page 467

```
 1   Sarnacki, the -- the Charlotte Base President, she
 2   turned out to live, like, 1.6 miles from the house, her
 3   house, and so she had to (unintelligible) like eight
 4   grand.  So I -- I -- it -- it was for mileage.  So --
 5   and quite frankly, I truly believed my Base President
 6   was doing the same thing.  I mean, when somebody
 7   avoids, that's evasive, I mean, it makes you more
 8   curious, so...
 9        Q.   Okay.  We're going to move on, away from that.
10   When you were trying to see -- away from your Base
11   President.  When you were trying to see this
12   information, financial documents, credit card receipts,
13   those things, when you were trying to see this
14   information, were there provisions of the Constitution
15   you were -- you were relying upon?
16        A.   Yeah, Constitution.
17        Q.   Did you file charges against anyone over the
18   failure to provide information?
19        A.   The Treasurer, Craig Gunter, because he kept
20   -- he wouldn't -- yes, I did, Craig Gunter in --
21        Q.   And --
22        A.   -- that administration.
23        Q.   And did those charges go to a hearing?
24        A.   They were going to but, however, we didn't
25   know to ask for a remedy.  It was something we'd never
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 374 of 506   PageID 6821
**Black Decl. Ex. U**
Melissa Chinery   9/15/2021

Page 468

1    done before.  We didn't know to ask for a remedy.  All

2    we asked to see, like, was to view them and once we got

3    to view them, I mean -- I mean, there's really no

4    charges.  I mean, he left office and -- yeah.

5         Q.   Did there come a point where you were able to

6    see the underlying documents?

7         A.   Yes.

8         Q.   When was that?

9         A.   I -- do you remember?  I don't remember.

10        Q.   Who was President?

11        A.   Oh, Julie Hedrick.

12        Q.   When did the Hedrick administration start?

13        A.   That would be, I think, a year ago.  A year

14    ago.  Do I have to be date specific?

15        Q.   Okay.  So April 2020, you're close.  Can you

16    explain how you came to see them?

17        A.   Yes.  We came down to national and we went

18    into the unity pays room, sat with the lawyer and Erik

19    and I believe actually all four National Officers were

20    there that day and the lawyer and then they showed us

21    everything.  And then it started because there was so

22    much stuff and then it was, like, I want -- you know,

23    you see one thing and then that one thing leads to -- I

24    mean, so it was, you know, a lot of boxes.

25        Q.   Approximately how many times did you go down

```
 1   there?
 2        A.    Erik says five or 10, but I always thought it
 3   was more.  So I mean, I -- maybe.
 4        Q.    How many hours did you stay there each time?
 5        A.    Like 12 to -- because I would fly in.  I'd fly
 6   in and then I would -- you know, you're in there and
 7   time just slips away.  So I mean, probably eight or 10
 8   hours.
 9        Q.    Can you explain the process for arranging a
10   time to see the information?
11        A.    So you write the Treasurer and, you know, if
12   your schedule is available, his schedule is available,
13   then you go in.
14        Q.    Did you receive any funds from the Union to go
15   down there?
16        A.    No.
17        Q.    Did you go on your own time?
18        A.    Yes.
19        Q.    Did you lose flight pay --
20        A.    Yes.
21        Q.    -- going down there?   Did you drop trips --
22        A.    Yes.
23        Q.    -- in order to go down there?  Did the Union
24   provide hotels?
25        A.    No.
```

```
 1    National Officers' ones.  It's what they put on the --
 2    it's like a -- it's like a clock-in sheet for every
 3    day.  So you write what -- what you've done or you type
 4    it or whatever.  It's like a calendar of what you do.
 5         Q.    In looking at the credit card charges for Mr.
 6    Vargas, how many restaurant charges were there, just
 7    approximately?
 8         A.    I want to say like a hundred and fifty --
 9         Q.    Restaurant --
10         A.    -- maybe --
11         Q.    -- charges?
12         A.    -- more.  Maybe more.  I mean, I've got it --
13         Q.    Okay.
14         A.    -- written down.
15         Q.    So it could be, though, he charged those,
16    those were charged for other individuals, reps --
17         A.    Yes.
18         Q.    -- under his card?
19         A.    Yep.
20         Q.    One second, please.  Can you turn to Exhibit
21    23, please?  Do you have it in front of you --
22         A.    Yes.
23         Q.    -- Ms. Chinery?
24         A.    Yes.
25         Q.    Do you recognize this document?
```

```
 1      A.   Yes.

 2      Q.   Please tell me what it is.

 3      A.   This is a demonstrative exhibit and this is

 4   a -- from the receipts in here, the weeklies in here,

 5   and the location of where they were on the weeklies.

 6   This is basically a chart of the --

 7                MS. MORGAN:   Objection.  Who created

 8   this document?

 9                THE WITNESS:   Myself.

10                MS. LEE:  You know what, I -- I -- we're

11   going to -- we can pause the --

12                THE ARBITRATOR:   Let her -- let her ask

13   the questions.

14      Q.   (BY MS. LEE)  Continue.

15      A.   And basically it's just a compilation of where

16   and what they were eating and basically it's everything

17   that's in here, it's on here.  It's in the weeklies,

18   the monthlies -- oh, not the monthlies, excuse me, the

19   credit cards.

20      Q.   Did you prepare -- did you prepare this

21   document?

22      A.   Yes, I did.

23      Q.   Where --

24      A.   It took forever.

25      Q.   Where did you get the information for each of
```

1    these documents?

2        A.    So I would get -- I would take the weeklies

3    and, you know, put the day of the week and then the

4    location where they were and then I would put the --

5    where the restaurant was and I would match it up.

6    That's how we found out about --

7        Q.    Okay.  So you prepared this document with the

8    Exhibit 1 and 2?

9        A.    Yes.  It took 10 days.

10       Q.    All right.  So we got the information from the

11   columns from one and two compared against the receipts?

12       A.    Yes.

13       Q.    Okay.  Again, what are the weeklies?

14       A.    The weeklies are basically time stamped of

15   what they're doing that day, the -- that's their

16   calendar.

17       Q.    Okay.  I want you to look at your Exhibit 23.

18   So we're going to start at the first column.

19       A.    Okay.

20       Q.    What does the first column tell us?

21       A.    That's the day of the week it was.

22       Q.    Day of the week.  And this second column?

23       A.    The date.

24       Q.    The third column?

25       A.    The location.

1    Q.    So the location --

2    A.    Of where they were.

3    Q.    That day?

4    A.    Yeah.

5    Q.    What if it's blank?

6    A.    Then we don't know.

7    Q.    So if, I'm just going to pick a random day

8  here, Thursday, on a Thursday if everything across here

9  is blank but it says Villa Grande, 3053, we don't know

10 where that person was?

11   A.    Correct.

12   Q.    Okay.  So we have in the third column

13 location.  And in our fourth column, what is that?

14   A.    That's the restaurant name.

15   Q.    The restaurant name.  What's the next column?

16   A.    The amount.

17   Q.    The amount that was spent at that restaurant.

18 Next column?

19   A.    The receipt and if -- if there is one, yes or

20 no.

21   Q.    Pardon me?

22   A.    If there is a receipt, yes or no.

23   Q.    Okay.  And the next column?

24   A.    Who attended.  The names of the --

25   Q.    Was --

```
 1        A.    -- people that -- who attended.
 2        Q.    -- would you look at -- okay.   Look at your
 3   document.
 4        A.    I -- I -- I am.
 5        Q.    Okay.
 6        A.    And who attended.
 7        Q.    Why are some -- so many blank?
 8        A.    Because there's no names on them.
 9        Q.    Okay.   The -- the last column, what's it say?
10        A.    Reason stated.   If there was a reason --
11        Q.    What does --
12        A.    -- stated.
13        Q.    -- that mean?
14        A.    If there was a reason stated.
15        Q.    There's a lot of blank spaces there, isn't
16   there?
17        A.    Yes, there is.
18        Q.    Okay.   Before I continue, I want to ask you,
19   when you were filling this out, some of these dates are
20   on weekends, correct?
21        A.    Yes.
22        Q.    So how long -- how many months did you prepare
23   this chart for?
24        A.    Well, it's -- yeah, it's the whole time in
25   office.
```

Melissa Chinery   9/15/2021

1     Q.   Okay.  So look at the -- look at the front,

2  what's the -- what's the first date on there?

3     A.   Hmm.

4     Q.   The first entry?

5     A.   May 9th.

6     Q.   What -- what year?

7     A.   2016.

8     Q.   The last entry?

9     A.   May 25th, 2018.

10     Q.   Okay.  I want you to turn to the last page.

11  In the -- the very last bottom, you'll see a number

12  there.  Would you read that number?

13     A.   $10,945.28.

14     Q.   So what is that?

15     A.   Represents how much he spent with the credit

16  card on food.

17     Q.   Okay.

18            MS. LEE:  I move to admit Exhibit 23 into

19  the record.

20            MS. MORGAN:   Objection.

21            THE ARBITRATOR:   What is the objection?

22            MS. MORGAN:   The objection is there's no

23  way to verify the math.  The -- the date, they have the

24  credit cards and the receipts, just like we have the

25  documents, these are handmade documents by them.

```
 1                    THE ARBITRATOR:   If I remember right, I
 2      think she said she matched it up with Exhibit CL-1 and
 3      2.
 4                    MS. CHINERY:  That's correct.
 5                    THE ARBITRATOR:  So --
 6                    MS. MORGAN:   We can't verify that it is
 7      what she --
 8                    (Simultaneous speaking.)
 9                    THE ARBITRATOR:   I'm going to overrule
10      the objection, receive it into the record.
11          Q.   (BY MS. LEE)   So this -- during this period
12      of this chart, Exhibit 3 -- I'm sorry, 23, was Mr.
13      Vargas receiving guaranteed MEA?
14          A.   Yes.
15          Q.   The food chart exhibit you just walked through
16      includes meals purchased on Mr. Vargas' credit card,
17      correct?
18          A.   Yes.
19          Q.   How many meals did you count?
20          A.   Around a hundred and fifty.
21          Q.   And the total cost of the meals again?
22          A.   $10,945.28.
23          Q.   And not all meals were eaten by him, correct?
24          A.   No.
25          Q.   Are there other meals in the records bought
```

1     Q.   Did you see food purchases?

2     A.   Oh, there were food -- they -- they were for

3  food, yes.

4     Q.   On the direct billing, did it normally state a

5  reason why?  EC Christmas party or did it tell you why?

6     A.   Not really, but those weren't --

7     Q.   Okay.

8     A.   -- on the direct -- I mean, those really

9  weren't direct bills, so --

10    Q.   Were you able to view petty cash?

11    A.   That didn't come through.

12    Q.   Okay.  Does the policy manual allow an Officer

13 to take both guaranteed meal expense and actual meal

14 expense?

15    A.   No.

16    Q.   And in looking through these financial

17 records, when Mr. Vargas actually charged a meal, did

18 he reduce guaranteed meals for the day, for that day?

19    A.   No.

20    Q.   Where would you find that information?

21    A.   That was on the weekly.

22    Q.   Okay.  If you don't know the answer to this,

23 don't, it's fine, but I'm going to ask you, did you

24 tally up how much Vargas received in MEA, which is

25 guaranteed meal expenses, at the same time he's

1   claiming actual meals?

2       A.   I'm not an accountant, so I -- I'm not

3   qualified to give a -- an exact number.  It was just

4   excessive and to -- so...

5               MS. LEE:  Thank you, Melissa.  We're

6   finished questioning this witness.

7               THE ARBITRATOR:   Okay.  Cross?

8                    CROSS-EXAMINATION

9   BY MS. MORGAN:

10      Q.   You stated that Eugenio ran on a slate with

11  Marcy, Nena and Bob, correct?

12      A.   That's correct, yeah.

13      Q.   Do you know that's not true?

14      A.   I thought they all -- well, actually when --

15  when they all funneled out, I thought they all came

16  together.

17      Q.   No, you stated they ran on a slate, that is

18  not true, correct?

19              MS. LEE:   Asked and answered, objection.

20              MS. MORGAN:   No, she did not answer

21  that.

22      A.   Well, I don't know if I said that -- I -- I

23  don't know.

24      Q.   (BY MS. MORGAN)  You did say that.

25      A.   I mean --

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 385 of 506   PageID 6882
Black Decl. Ex. U
Melissa Chinery   9/16/2021

Page 516

```
 1              IN THE MATTER OF THE ARBITRATION BETWEEN

 2   MELISSA CHINERY, Member      )BEFORE THE ARTICLE VII
     And                         )
 3   SANDRA LEE, Member           )
                                  )ARBITRATOR
 4   AND                          )
                                  )
 5   EUGENIO VARGAS, Member       )HON. RUBEN R. ARMENDARIZ

 6

 7

 8

 9        *************************************

10                 SEPTEMBER 16, 2021

11                    VOLUME 3

12        *************************************

13

14

15

16        BE IT REMEMBERED that on the 16th day of

17   September, 2021, the above cause came on for hearing

18   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

19   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

20   Boulevard, located in the City of Irving, County of

21   Dallas, State of Texas, whereupon the following

22   proceedings were had.

23

24

25
```

Case 4:22-cv-00343-Y  Document 236-1  Filed 04/26/24  Page 386 of 506  PageID 6583  **Black Decl. Ex. U**

Melissa Chinery   9/16/2021

Page 517

```
 1                A P P E A R A N C E S:

 2      HON. RUBEN R. ARMENDARIZ
        LABOR MANAGEMENT ARBITRATOR
 3      29010 Pfeiffers Gate
        Fair Oaks Ranch, Texas  78015
 4      PHONE:  210.379.0860
        EMAIL:  arbruben@gmail.com
 5

 6      APPEARING AS THE ARBITRATOR

 7

 8      MS. MELISSA CHINERY
        EMAIL:  Melchinery@aol.com
                AND
 9      MS. SANDRA LEE
        EMAIL:  SEL27995@gmail.com
10

11      APPEARING FOR THE CHARGING PARTIES

12      MS. HEIDI J. MORGAN
        EMAIL:  heidimorgan65@gmail.com
13              AND
        MS. NENA MARTIN
14
        APPEARING FOR THE CHARGED PARTY, EUGENIO VARGAS
15

16                      *   *   *   *

17

18

19

20

21

22

23

24

25
```

```
 1                        WITNESS INDEX

 2

    YVONNE JOHNSTON                                    PAGE
 3
    Direct Examination by Ms. Morgan................ 520
 4  Cross-Examination by Ms. Chinery............... 531

 5  CRAIG GUNTER
    Direct Examination by Ms. Morgan................ 533
 6  Cross-Examination by Ms. Lee.................... 548
    Redirect Examination by Ms. Morgan.............. 562
 7
    MARCUS GLUTH
 8  Direct Examination by Ms. Morgan................ 572
    Cross-Examination by Ms. Chinery................ 585
 9  Redirect Examination by Ms. Morgan.............. 588

10  RANDY TRAUTMAN
    Direct Examination by Ms. Morgan................ 594
11  Cross-Examination by Ms. Chinery............... 599
    Redirect Examination by Ms. Martin.............. 608
12
    EUGENIO VARGAS
13  Direct Examination by Ms. Morgan................ 611
    Cross-Examination by Ms. Chinery................ 638
14  Redirect Examination by Ms. Morgan.............. 659
    Recross-Examination by Ms. Chinery............. 661
15
                      REBUTTAL WITNESSES
16
    JOHN NIKIDES
17  Examination by Ms. Chinery..................... 664

18  CATHY LUKENSMEYER
    Examination by Ms. Chinery..................... 669
19

20

21

22

23

24

25
```

```
 1                    EXHIBIT INDEX

 2
     EXHIBIT                              ID'D   ADMITTED
 3
     Chinery-Lee Exhibit No. 25............. 671
 4
     EXHIBIT                              ID'D   ADMITTED
 5
     Vargas Exhibit No. 17.................. 618    660
 6   Vargas Exhibit No. 19.................. 613    660
     Vargas Exhibit No. 20..................        660
 7   Vargas Exhibit No. 21..................        660
     Vargas Exhibit No. 28.................. 622    660
 8   Vargas Exhibit No. 31..................        660
     Vargas Exhibit No. 34..................        660
 9   Vargas Exhibit No. 39.................. 524
     Vargas Exhibit No. 40..................        660
10   Vargas Exhibit No. 100................. 576    593

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE WITNESS:  Thank you.
 2                    THE ARBITRATOR:   Your next witness?
 3                    MR. DELAHUNTY:  Do you want me to get
 4      him?
 5                    MS. MORGAN:   Yes.
 6                    THE ARBITRATOR:  I'm Ruben Armendariz;
 7      I'm the Arbitrator in this proceeding.  Would you
 8      raise -- raise your hand?
 9                    (Witness sworn.)
10                    THE ARBITRATOR:  Please have a seat.
11      State your name and your position for the record.
12                    MR. GUNTER:  Craig Gunter, former
13      National Treasurer of APFA.
14                    THE ARBITRATOR:   Okay.  Go ahead.
15                    CRAIG GUNTER,
16      having been first duly sworn, testified as follows:
17                         DIRECT EXAMINATION
18      BY MS. MORGAN:
19         Q.   Good morning.
20         A.   Hey.
21         Q.   When you were Treasurer of APFA, do you recall
22      how many times Ms. Chinery and Ms. Lee came to APFA to
23      view documents?
24         A.   Not exactly, but probably about four or five.
25         Q.   Make sure she can hear you.
```

Melissa Chinery   9/16/2021

Page 534

```
 1                    THE WITNESS:  Oh, can you hear me?
 2                    THE REPORTER:  Kind of.
 3                    THE WITNESS:  Okay.  I can't hear
 4      anything, so...
 5           Q.   (BY MS. MORGAN)  Isn't it true 7G 1 of the
 6      APFA policy manual states:  Members may view financial
 7      records through their Base President or the office of
 8      the Treasurer and that no copies are permitted to be
 9      made?
10           A.   That's true.
11           Q.   Okay.
12           A.   That's true.
13           Q.   Backing -- backing up, tell us your
14      educational background, please.
15           A.   I have a double major in Accounting and
16      Business Administration and a Master's of Taxation.
17                    THE ARBITRATOR:  Master's of what?
18                    THE WITNESS:  Taxation.
19                    THE ARBITRATOR:  Taxation.
20           Q.   (BY MS. MORGAN)  Did you ever leave the room
21      when you met with Ms. Chinery and Ms. Lee?
22           A.   Not without someone else being in the room.
23           Q.   Who else was present in those meetings?
24           A.   There were a few meetings with different
25      people.  One was with, I can't remember her name, she
```

1      Q.   Do you know how many administrations those

2   three years covered?

3      A.   Well, '16 would have covered the Laura

4   Glading's, the end of Laura Glading's, and then the Bob

5   Ross and starting into our administration.

6      Q.   So that's three administrations?

7      A.   Correct.

8      Q.   Would it be a correct statement to -- if I

9   said that we looked through all three of those member

10  -- those administrations equally?

11     A.   Yes.

12     Q.   Thank you.  Craig, Ms. Martin says they

13  repeatedly asked you for recalculations of the formula

14  and you wouldn't respond to the request.  Isn't it true

15  that you did a PowerPoint presentation showing in great

16  detail how the payouts were calculated and the correct

17  amount?

18     A.   Yes.

19     Q.   And Ms. -- and when Ms. Martin requested

20  you -- you review the calculations again, your office

21  did, in fact, review the calculations and determine

22  that your calculations were correct?

23     A.   Correct.

24     Q.   And did Ms. Martin ask you to set up a

25  conference call with the Board to talk to Eugenio

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 392 of 506   PageID 6889
**Black Decl. Ex. U**
Melissa Chinery   9/16/2021

Page 550

1   Vargas because they did not trust your calculations?

2       A.   Yes.

3       Q.   And you did.  The attorneys and other -- and

4   did you and other -- excuse me.  And did you, the

5   attorneys, and other BOD members interview him?

6       A.   I was not on the call.  They set a call up,

7   but I was not on the call.

8       Q.   Okay.  Do you know if he admitted that he

9   calculated the amounts using the additional income

10  added into the salary amount?

11      A.   I'm sorry, can you just repeat --

12      Q.   Okay.

13      A.   -- that one more time?

14      Q.   Did Mr. Vargas admit to you that he calculated

15  the amounts using the additional salary, the additional

16  income added into the salary amounts?

17      A.   Yes.

18      Q.   And he also admitted -- admitted -- admitted

19  that he knew that past practice did not use this

20  calculation, correct?

21      A.   Yes.

22      Q.   Did he admit that he directed the accountant

23  to use his calculations and the accountant was not

24  comfortable in doing so?

25      A.   Yes.

1      Q.    After verifying the calculations and

2  interviewing Mr. Vargas, didn't -- didn't the Board

3  pass a resolution demanding repayment?

4      A.    Yes.

5      Q.    But Ms. Martin and Ms. Dunaway kept emailing

6  you and the Board and questioning -- questioning the

7  calculations, correct?

8      A.    Correct.

9      Q.    Didn't they -- didn't they email the entire

10 Board, that they -- that they were writing you and Base

11 Presidents and deleting the Presidents, Vice President,

12 and National Secretary from all the emails?

13     A.    Yes.

14     Q.    At some point after this, legal counsel took

15 over all communications with Ms. Martin and Ms. Dunaway

16 and Mr. Vargas and provided them with a paper copy of

17 the calculations and additional documents that they

18 requested to verify the amounts, correct?

19     A.    Correct.

20     Q.    And Ms. Martin had requested to you and a

21 portion of the Board to set the meeting with the

22 turner -- attorneys and the auditor in Fort Worth to

23 review these calculations again, correct?

24     A.    Correct.

25     Q.    Did you set up this meeting?

 1        A.    Yes.

 2        Q.    And at the meeting, the auditor's office

 3    identified that their numbers were off, not yours?

 4        A.    Correct.

 5        Q.    Because they had included profit sharing and

 6    grand slam payouts as salary, correct?

 7        A.    Correct.

 8        Q.    But again APFA's calculations were correct?

 9        A.    Correct.

10        Q.    Okay.  Just a few more questions from me.

11    Didn't Mr. Vargas provide retroactive payments using

12    his calculations of additional incomes added to the

13    salary starting at his administration and not to any of

14    the other previous administrations?

15        A.    Yes.

16        Q.    So again, Ms. Martin, Ms. Dunaway did send

17    numerous emails questioning your calculations and after

18    responding several times, providing them with the

19    calculation documents, providing pay documents they

20    requested and interviewing their Treasurer, they only

21    wanted to pay back the incorrect calculations and not

22    APFA's correct calculations, correct?

23        A.    Who did you say on that?

24        Q.    I'm going to read it again.

25        A.    Okay.

```
 1        Q.   So they only wanted -- they only wanted to pay
 2   out -- Ms. Martin and Ms. Dunaway, they sent several
 3   emails to -- or numerous emails to you requesting your
 4   calculations?
 5        A.   Correct.
 6        Q.   Okay.  And after responding several times,
 7   providing them the calculation document, providing pay
 8   documents, they requested an interview with their
 9   Treasurer, they only wanted to bay -- pay back the
10   incorrect calculations that involved the -- the
11   difference between their calculations and APF's
12   calculations; does that make sense?
13        A.   Yes.
14        Q.   Okay.
15        A.   And that's correct.
16        Q.   Thank you.  And when your office and legal
17   counsel maintained the calculations were correct and
18   basically stirred up doubt on the board, didn't they?
19        A.   Yes.  Correct.
20        Q.   And one last question -- a couple.  Did Ms.
21   Dunaway come to your office and try to get you to agree
22   to a settlement of a lesser amount?
23        A.   Yes.
24        Q.   And all these -- all these questions and
25   recalculations and interviews lasted over a period of
```

Melissa Chinery   9/16/2021

1    about four months?

2         A.    Correct.

3         Q.    So finally in December 2019, the executive --

4    Executive Committee had to threaten to file a lawsuit

5    if they did not pay it back within 30 days, correct?

6         A.    Correct.

7         Q.    And shortly after that resolution was passed

8    by the Executive Committee, Ms. Martin paid the full

9    amount?

10        A.    Correct.

11        Q.    Ms. Dunaway and Mr. Vargas set up a payment

12   plan to repay the money, correct?

13        A.    Correct.

14             MS. LEE:   Thank you, Craig.  Melissa's

15   going to keep going.

16        Q.    (BY MS. CHINERY)   You were National Treasurer

17   following Mr. Vargas?

18        A.    Correct.

19        Q.    And you were given a transition month when you

20   took office?

21        A.    Correct.

22        Q.    And did he review documents during his

23   transmission -- transition month with you?

24        A.    Correct.

25        Q.    And during the transition month, did Mr.

1   Vargas show you dock -- show you documents on -- on the
2   inventory of the furniture?
3        A.   No.
4        Q.   When you -- was there any furniture when you
5   took office?
6        A.   There was no furniture in the storage units.
7   There was furniture still because --
8             (Coughing.)
9        A.   -- (unintelligible) communication that was
10  still --
11            (Coughing.)
12       A.   -- (unintelligible) so there was furniture
13  there and there was furniture in Rene -- Rene's
14  office -- I mean, Rene's apartment.  And those had been
15  passed down from somewhere, but there was furniture
16  there.
17       Q.   (BY MS. CHINERY)  When Sandra and I came down
18  to visit to -- the first time, we asked you about the
19  -- did -- did we ask you about the inventory?
20       A.   Yes.
21       Q.   Did we ask you...  So out of all those reps,
22  only two -- two apartments were left -- well, I mean --
23       A.   That had --
24       Q.   -- with furniture?
25       A.   -- furniture.

Melissa Chinery   9/16/2021

```
 1       Q.    Were they full?  A lot of furniture?  A --
 2       A.    Yeah.
 3       Q.    -- little bit of furniture?
 4       A.    I believe that Shane Staples had a full house
 5  of furniture.  Rene's house -- Rene's apartment did not
 6  have a lot of furniture and it was very old.
 7       Q.    And we asked you this when we came down, if
 8  there was any documentation because we wanted to see
 9  it?
10       A.    Yeah.
11       Q.    And you said -- was there any documentation?
12       A.    There was no documentation.
13       Q.    So when you took office, did you buy
14  furniture?
15       A.    I did.
16       Q.    Okay.  And did other staff buy furniture?
17       A.    Yes.
18       Q.    Okay.  How much -- you've already stated about
19  the Uncle Bob's.  Okay.  Did -- why did you guys have
20  to buy furniture?
21       A.    There was nothing left for us.  The others
22  were already being used in those other two apartments
23  and there was nothing left for us to.
24       Q.    Did -- did Mr. Vargas -- okay.  I'm actually
25  -- we have a sworn affidavit here from you.
```

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 399 of 506   PageID 6846
**Black Decl. Ex. U**
Melissa Chinery   9/16/2021

Page 557

```
 1                    MS. MORGAN:   Objection.
 2                    THE ARBITRATOR:   For what?
 3                    MS. MORGAN:   She would not allow my
 4     sworn affidavit into the --
 5                    MS. CHINERY:  Well, he's here.
 6                    MS. MORGAN:  -- record.
 7                    THE ARBITRATOR:   Yeah.  Well, I'm
 8     going -- I'm going to allow the question to go on a
 9     little bit, see where we're going.
10                    MS. CHINERY:  Okay.
11                    THE ARBITRATOR:  Okay.
12       Q.   (BY MS. CHINERY)   Did Mr. Vargas -- did Mr.
13     Vargas tell you Bob Ross did not receive the vacation
14     formula?
15       A.   That he did not receive it?   Or that he did
16     receive it?
17       Q.   Did not.
18       A.   Did not receive it.   That conversation at
19     Howard Mills' office, as I stated earlier, was very
20     soft-spoken.  I was a little rattled with what went on
21     earlier, so if he did speak it at that point, I didn't
22     understand what he was saying.
23       Q.   Okay.  Is it true that you stated, after
24     reviewing the notes from the August 26th, 2019 Board
25     meeting, I remember the conference call with the BOD,
```

```
 1    Airlines Flight Attendant.
 2                    THE ARBITRATOR:   Go ahead.
 3                    MS. MORGAN:   Talk slowly so Melissa can
 4    hear you, okay?
 5                    THE WITNESS:   Yes.
 6                        EUGENIO VARGAS,
 7    having been first duly sworn, testified as follows:
 8                    DIRECT EXAMINATION
 9    BY MS. MORGAN:
10        Q.   How long have you been flying, Eugenio?
11        A.   Almost 26 years.
12        Q.   And tell us about your work experience as a
13    Union rep.
14        A.   I've been doing Union work on and off for
15    almost 18 years.  I held the position of Boston
16    International Vice Chair at the time, Boston
17    International Chairperson, and the position of APFA
18    National Treasurer.
19        Q.   So the things that you've been accused of are
20    serious, so let's talk about what's in the charges,
21    each item, okay?
22        A.   Okay.
23        Q.   With regard to the credit card expenses and
24    the rental car, can you turn to Exhibit 1?
25        A.   Yes.
```

```
 1              THE ARBITRATOR:  -- asking a question?
 2      Q.  (BY MS. CHINERY)  All right.  Did you send
 3  Rene Berthelot an email that stated that there would
 4  need to be a $3600 --
 5              MS. MORGAN:   Objection.  Is this a --
 6  is --
 7              MS. LEE:  That's all he said.
 8              MS. MORGAN:  -- is there an -- is -- is
 9  there an email she's talking about?  We haven't seen
10  any email?
11              THE ARBITRATOR:  Did you already enter
12  this as an email, that you're talking about?
13              MS. CHINERY:   It was in document
14  exchange, I believe.  I'll move on.
15      Q.  (BY MS. CHINERY)  Tell us how the MEA, SAF
16  formula came to happen.  Did you do that?
17      A.  What do you mean?
18      Q.  Was it your idea?
19      A.  What do you mean?
20      Q.  Was it your idea to change the formula?
21      A.  Which formula?
22      Q.  The MEA, SAF for their payouts -- for your
23  payouts?
24      A.  Okay.  Yes.
25      Q.  And was that per policy?
```

```
 1        A.    If you read the policy.
 2        Q.    Well, did you -- did you advise the Board that
 3   you were going to do that?
 4        A.    I did not.
 5        Q.    Okay.  When it came to light that that
 6   happened, did APFA legal staff tell you to get a
 7   lawyer?  Bruce Lerner?
 8        A.    I kind of remember something about lawyer.
 9   I'm not sure if it was Bruce Lerner that said it.
10        Q.    Okay.  Did you tell the Board that Bob Ross
11   did not receive that -- that formula also?
12        A.    Absolutely not.
13        Q.    Did you overpay Bob Ross in his vacation?
14        A.    Not to my knowledge.
15        Q.    Have you ever used Union money for personal
16   use?
17        A.    Can you define that a little bit?  I mean,
18   when you say Union money, exact...
19        Q.    Your credit card?
20        A.    Okay.  For personal use?
21        Q.    Uh-huh.
22        A.    I did for the Madrid trip.
23        Q.    And what else?
24        A.    I do not recall anything else.
25        Q.    Did any of the others, Officers --
```

```
 1   STATE OF TEXAS        )

 2   COUNTY OF DALLAS       )

 3            THIS IS TO CERTIFY THAT I, MELISSA J. CARSON,

 4   a Certified Shorthand Reporter in and for the State of

 5   Texas, reported in shorthand the proceedings had at the

 6   time and place set forth in the caption hereof, and

 7   that the above and foregoing 158 pages contain a full,

 8   true, and correct transcript of the said proceedings to

 9   the best of my ability.

10            Certified to on this the 28th day of October,

11   2021.

12

13

14            _____

15            MELISSA J. CARSON, Certified
              Shorthand Reporter in and for
16            The State of Texas

17

18   Certification No. 1737

19   CRCB Firm Registration #489

20   Expires August 31, 2022

21   CARSON REPORTING & ASSOCIATES

22   Post Office Box 551628

23   Dallas, Texas 75355-1628

24   Telephone 214.346.3434

25
```

**EUGENIO VARGAS, FORMER APFA NATIONAL TREASURER**

**AND**

**MELISSA CHINERY and SANDRA LEE, MEMBERS**

**ARTICLE VII CHARGES**

| | |
|---|---|
| IN THE MATTER OF ARBITRATION BETWEEN | Article VII Charges: Violations of APFA Constitution and APFA Policy Manual |
| EUGENIO VARGAS, | |
| Charged Party, | |
| FORMER APFA NATIONAL TREASURER | Hearing Before: Ruben R. Armendariz Article VII Arbitrator |
| and | |
| MELISSA CHINERY SANDRA LEE | Ruben R. Armendariz, Chairperson Melissa Chinery, APFA Member Sandra Lee, APFA Member Nena Martin, Representative Heidi Morgan, Representative |
| Charging Parties, | |
| MEMBERS | |

**ARTICLE VII CHARGES-VARGAS POST-HEARING BRIEF**

Nena Martin
nenarott@aol.com
502-418-5346

Heidi Morgan
heidimorgan65@gmail.com
703-919-1665

<u>**TABLE OF CONTENTS**</u>

**I.   INTRODUCTION**

**II.   STATEMENT OF ISSUE**

**III.   STATEMENT OF FACTS**

**IV.   APFA CONSTITUTION PROVISIONS CITED IN CHARGES**

    A.  Article VII – Hearings and Disciplinary Procedures – Grounds for Charges
    B.  Article I.7 – General – Definitions
    C.  Article II.2 – Membership – Obligation of Members

**V.   APFA POLICY MANUAL PROVISIONS CITED IN CHARGES**
    A.  Section 5.G.1 – Trip Removal and Expense Policy – Other Expenses
    B.  Section 5.F.5.a – Trip Removal and Expense Policy – Meal Expenses/Allowance

**VI.   ARGUMENT**

    A.  The Standard in an Article VII Charge / Willful Violation
    B.  Members Melissa Chinery and Sandra Lee bear the burden of proof in proving misappropriation of funds.
    C.  Credit Card Expense – union credit card used for personal use / rental car.
    D.  Meal Expense – reimbursement and union credit card meal charges.
    E.  Duties of the Treasurer – record / inventory of purchase at Ashley Furniture.
    F.  Duties of the Treasurer – oversight of the Ross Transition Agreement.
    G.  Duties of the Treasurer – over payment of National Officers sick and vacation.

**VII.   CONCLUSION**

Black Decl. Ex. V

## I.      INTRODUCTION

On June 19, 1991, the APFA Board of Directors overwhelmingly approved and recommended for member ratification a New Constitution for the Association of Professional Flight Attendants. It was an exciting and historic event that carried the promise of a new beginning for our Union.

The New Constitution was brought forward with the unanimous endorsement of the members of the Constitution Committee who had been appointed by the Board of Directors just six months earlier for the purpose of recommending changes to the current Constitution.

The New Constitution proposed a unique structure designed to promote internal strength and stability as it accommodated growth. It was the shared belief that the passage of the New Constitution would mark the beginning of a new era for the union. An era of decreased internal political polarization and increased strength and unity of purpose.

While the APFA Constitution had not been substantially altered since the Association of Professional Flight Attendants was founded in 1977, the New 1991 Constitution provided the same checks and balances, along with the authority to protect its members and the union. **Article VII of the Constitution was founded for this very protection.**

Article VII of the APFA Constitution was to provide the "Hearing and Disciplinary Procedures" in the event of a **willful** egregious act made against the union or its members. This

**Black Decl., Ex. Y**

process allows members with a **legitimate** claim, to have their voices heard, exercise their rights, challenge discrimination or hold union leadership accountable. **At no time was this Article of this Constitution to be weaponized for personal and political reasons.**

On **November 20, 2020**, Members Melissa Chinery and Sandra Lee brought Article VII charges [V. Exh. 1] against former APFA National Treasurer, Eugenio Vargas, for the third time while serving in his position of APFA National Treasurer.

In this set of Article VII charges, Members Melissa Chinnery and Sandra Lee challenge the decisions of the former APFA National Treasurer, Eugenio Vargas, for misappropriation of funds [Tr.6 19-24] over two (2) years after leaving his position.

## II.    STATEMENT OF ISSUE

There is no dispute that Members Melissa Chinery and Sandra Lee brought charges against the former APFA National Treasurer, Eugenio Vargas. It is also undisputed that this Arbitrator, designated by Article VII, has the jurisdiction and authority to dismiss the charges addressed. Thus, the only issue to be determined is whether former APFA National Treasurer, Eugenio Vargas, committed the following act "**willful** violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Executive Committee" of the APFA Constitution, Article VII, Section 1.F. and did Members Melissa Chinery and Sandra Lee willfully bring these charges against the former APFA National Treasurer, Eugenio Vargas, without having evidence sufficient to sustain the charges.

Black Decl. Ex. V

## III.    STATEMENT OF FACTS

Eugenio Vargas began his career as an American Airlines Flight Attendant nearly 26 years ago, [Tr.611 10-11] while serving in a union elected or appointed position for almost 18 years. [Tr.611 14-18]

Serving in any union position can mean anything from enforcing the contract, maintaining a working relationship with management and generously giving your time and talents to promote the goals of our union.

APFA strives for a standard of conduct and behavior wherein **all** Flight Attendants are treated with respect and consideration. Along with an atmosphere wherein **all** Flight Attendants conduct themselves in a manner which promotes unity and strength and reflects credit to the individual, other Flight Attendants and the union.

Being able to make a positive impact is what makes working in a union position so gratifying, but it also leaves one open to the professional attacks, character assassinations and the vindictiveness we have seen in this case without just cause.

There is an underlying theme with Members Melissa Chinery and Sandra Lee and that is a fundamental need for political recognition and when that is not achieved, those who stand in their way become the target of deliberate and sustained attacks that aim to destroy the credibility and reputation of the person in relation to their union career.

APPX. 0408

Black Decl. Ex. V

Members Melissa Chinery and Sandra Lee's attacks usually involve raising false accusations, planting and fostering rumors, and manipulating information to discredit the individual.

Member Melissa Chinery, in March 2017, after running a dirty campaign for APFA Base President in the crew base of Philadelphia (PHL) and losing, filed a federal lawsuit in U.S District Court in Philadelphia, Pennsylvania (Case 2:16-cv-02697) alleging American Airlines failed to enforce its social media policy barring online slurs and insults by employees, including on private accounts and failing to discipline the online harassers.

Member Melissa Chinery claimed the bullying and harassment occurred on Facebook and online accounts where thousands of airline workers talk to each other. U.S. District Court, Judge Eduardo Robreno, dismissed the case on August 27, when he granted American Airlines motion for summary judgment. An appeal was filed but for the foregoing reasons, the Court of Appeals affirmed the District Court's grant of summary judgement to American Airlines.

Following that same pattern of bullying and harassment, Member Melissa Chinery on March 1, 2019, after running another dirty campaign for APFA Base President in the crew base of Phoenix (PHX) and losing, started to wage a vicious email campaign against the newly elected Base President, Mischel Babi, which involved the entire APFA Board of Directors.

Member Melissa Chinery was able to validate her level of bullying and harassment, when reading into the record her email exchange [Tr.494 18-Tr.496 7] with Ms. Babi.

**Black Decl. Ex. V**

When former APFA National President, Bob Ross, did not accommodate Member Melissa Chinnery's insistent request for an appointment with his administration, compounded by her friend not receiving an appointment on the APFA Executive Committee, it comes as no surprise she began a self-imposed reign of terror directed at the entire Ross administration, though not running together on the same slate.

A vow made publicly against former APFA National President, Robert Ross, on Social Media/Facebook by Member Melissa Chinery stating "**I will work tirelessly to make sure you are out of office**", was the beginning of a journey that has continued since April 2, 2016. An attack that was fueled by a desire of revenge after a personal rejection. These professional attacks have gone too far and have now led to financial harm to all parties, including our union.

The incredible irony in this case are the claims and actions of Member Melissa Chinery. The alleged actions from her co-workers of bullying and harassment sited in her lawsuit against American Airlines, are the very same behavioral traits she has exhibited since April 2, 2016, regardless of fact.

Member Melissa Chinery expressing a negative opinion or sharing an embarrassing story about former APFA Treasurer, Eugenio Vargas is not the same as making false and defamatory statements that have cost him his credibility and professional reputation.

Armed with the power of truth, testimony, and documentation, we will continue to provide a clear picture of the facts in this post hearing brief, substantiating the false accusations against former APFA National Treasurer, Eugenio Vargas for a "**Willful Violation**" of the "**Misappropriation of Funds**". [Tr.6 19-24]

## IV.    APFA CONSTITUTION PROVISIONS CITED IN CHARGES

**Article VII. Section 1. GROUNDS FOR CHARGES:**

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

A.    Failure to pay dues, assessments or penalties levied by the Association.

B.    Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

C.    Willfully acting as a strike breaker during any work stoppage duly authorized by the Association; (1) Notwithstanding Section

1.C, above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

D.    Willful violation of a Flight Attendant's Collective Bargaining Agreement

E.    Theft or embezzlement of Association monies or property

**F.    Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee**

G.    Willfully acting in a manner that causes the Association to violate its legal obligations; or

H.    Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

**Article I. Section 7. DEFINITIONS:**

As used in this Constitution, the following words or terms shall mean:

E.    **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

M.    **"Privilege"** means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.

O. **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

Q. **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

Article II. Section 2. OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from, or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties, and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties, and responsibilities.

# V.      APFA POLICY MANUAL PROVISIONS CITED IN CHARGES

Section 5.G.1. **Trip Removal and Expense Policy – Other Expenses**

1. Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

Section 5.F.5.a. **Trip Removal and Expense Policy – Meal Expense / Allowance**

a. Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

(1) Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

(2) The reimbursement of a Business-Related Expense shall not count against a representative's MEA.

Black Decl. Ex. V

## VI.    ARGUMENT

### A.  The Standard in an Article VII Charge / Willful Violation

The alleged violations in the Chinery/Lee vs Vargas Article VII charges are cited under
Article VII, Section 1.F for the "**Willful** violation of an express Article of this Constitution, or
of a proper and express written resolution or policy of the Board of Directors or the Executive
Committee.

By definition, were the actions of the former APFA National Treasurer, Eugenio Vargas
deliberate, intentional, premeditated or calculated regardless of the consequences or effects?
Were they not accidental or done deliberately with disregard to the APFA Policy Manual
or APFA Constitution.

The alleged APFA Policy Manual and APFA Constitution violations, brought forward
as Article VII charges by Members Melissa Chinery and Sandra Lee against former APFA
Treasurer, Eugenio Vargas was not **willful**.

Mr. Vargas realizes that taking a defensive attitude in these Article VII charges only
provides an illusion of safety, but in reality, defensiveness is disempowering. It keeps you in
a reactive position, where you only react to something that has already happened in the past but
shifting into accountability places you in an active posture and provides the power to impact the
future. Mr. Vargas takes full responsibility for his actions and has provided his full support in
these charges.

**B. Members Melissa Chinery and Sandra Lee bear the burden of proof in proving misappropriation of funds.**

In these Article VII charges the "Burden of Proof" belong to the "Charging Parties",  Members Melissa Chinery and Sandra Lee. This is where the thoroughness of their investigation becomes critical.

The former APFA National Treasurer, Eugenio Vargas is "innocent until proven guilty". Members Melissa Chinery and Sandra Lee have made the allegations and must demonstrate the validity of those allegations.

There are three (3) burdens of proof generally recognized as available to a deciding Article VII Arbitrator when determining guilt.

- Preponderance of the Evidence
- Clear and Convincing Evidence
- Beyond a Reasonable Doubt

The obligation to present and meet this criteria has **not** been met by the "Charging Parties", Members Melissa Chinery and Sandra Lee.

**C. Credit Card Expense – union credit card used for personal use / rental car.**

In these Article VII charges former APFA National Treasurer, Eugenio Vargas was charged with the willful violation of APFA Policy Manual, Section 5.G. – Trip Removal and Expense Policy – Other Expenses, with regard to the inadvertent charging of a rental car in Madrid, Spain on August 11, 2016, while on a personal vacation with his spouse.

Black Decl. Ex. V

The APFA Policy Manual Section 5.G states in part:

Section 5.G.1. **Trip Removal and Expense Policy – Other Expenses**

Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

Members Melissa Chinery and Sandra Lee proclaim "**these purchases violate: Policy Manual Section 5.G: Business Related Expenses**", [V. Exh. 1] yet "**Business Related Expenses**" are defined in **Policy Manual Section 5.F.5**.

The charging parties cite **Policy Manual Section 5.G**. in support of their Article VII charges, when the referenced section of the Policy Manual actually applies to "Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed".

Not only was this an invalid citing of the APFA Policy Manual but an indication of their lack of understanding of said policy and it's interpretation, while arguing inaccurate and irrelevant points to support their charges.

Former APFA National Treasurer, Eugenio Vargas, explains through sworn testimony, the sequence of events while on vacation in Madrid, Spain [Tr.612 5-10] pertaining to the use of the union credit card for a personal rental car reservation.

While on vacation with his spouse in Madrid, Spain, and while awaiting the keys for a rental car at the Enterprise car rental counter, Mr. Vargas handed his spouse his wallet to pay for

the rental car while he went to the restroom. Upon his return to the car rental counter the rental agreement was ready for a signature and the car ready for pick up. [Tr.612 14-24]

Not until early September did, he realized a mistake [ TR.613 4-7] had been made with the payment for the rental car while in Madrid, Spain. Mr. Vargas realized his spouse had used the APFA Chase Credit Card from his wallet instead of his personal Chase Credit Card, when paying for the car rental in Madrid, Spain. [Tr.614 1-16] [V. Exh. 19]

The following day Mr. Vargas returned to APFA with the car rental receipt and explained to the APFA senior accountant, Rene Berthelot what had happened, to which he responded "don't worry, all you have to do is pay it back. It happens." [Tr.614 18-23]

Mr. Vargas made a payment of $614.20 [V. Exh. 21] to APFA on September 9, 2016, for the personal [V. Exh. 20] rental car charge made to his union credit card. [Tr.614 25]

Members Melissa Chinery and Sandra Lee fail to admit confirmation of the timely reimbursement of this charge to Mr. Vargas' union credit card, upon becoming aware in their multiple visits to APFA, only through questioning does Member Melissa Chinery admit on the record that "mistakes happen". [Tr.503 9-10] and if paid back, its not willful. [Tr.502 9-25]

Former APFA National Treasurer, Craig Gunter, a licensed CPA, was also questioned on the record about any personal purchases he may have inadvertently made with his union credit card, stating "I could have, but I don't think I ever charged anything on it, but you know, they're all in your wallet so". [Tr.544 20-24] further stating, if I had done so "I would have gone to the accountant and said I accidentally did this. Here, let me write you a check". [Tr.545 3-13]

Former APFA National Treasurer, Craig Gunter, also stated for the record the process for personal purchases inadvertently made on a union credit card by other officers in his administration. [Tr.545 17-25]

Current APFA National Treasurer, Erik Harris, also confirmed that the personal car rental purchase inadvertently made by Mr. Vargas on his union credit card while on vacation in Madrid, Spain was reimbursed to APFA. [Tr.377 20-25]

Longstanding APFA Budget Committee Member, Yvonne Johnston, holding a master's degree in forensic accounting [Tr.521 19-22] was questioned on her knowledge of the inadvertent rental car charge made by Mr. Vargas and the procedures that should have been followed for that type of accounting issue. [Tr.529 9-20] Mr. Vargas followed that process.

Personal purchases made by other APFA National Officers using their union credit card were identified on the record.

Former APFA National Secretary, Jeff Pharr's union credit card statements revealed multiple personal purchases. [Tr.334 1-13]  Mr. Pharr's union credit card statements also expose this practice as an acceptable habit, [Tr.335 3-25] with multiple personal credit card charges along with charges identified for other union representatives. [Tr.338 10-25]

Former APFA National Secretary, Jeff Pharr had approximately eight (8) identified personal charges to his union credit card along with personal charges made for other union representatives. Mr. Pharr was subpoenaed without acknowledgement.

Former APFA National Treasurer, Greg Gunter's union credit card statements also revealed the practice of making personal purchases on his union credit card, including a wedding gift [Tr.10-14] for a UAW Staff Member on behalf of the National Officers and reimbursed by each. [Tr.15-20]

Members Melissa Chinery and Sandra Lee have never filed Article VII charges against any other APFA National Officer for inadvertently using their union credit card for a personal purchase, confirming their targeting of a person and not the practice when filing Article VII charges for misappropriation of funds against the former APFA National Treasurer, Eugenio Vargas.

**D.  Meal Expense – reimbursement and union credit card meal charges.**

Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual Section 5.F., by citing "**The policy is clear that meals may only be reimbursed on rare and limited occasions when entertaining outside guests and in no instance when all participates are already receiving meal expenses. This is to prevent double dipping by having APFA pay MEA for meal expenses and then also pay for a representative's meals**".

APFA had no policy in place on how to differentiate or separate any amount from the guaranteed MEA/SAF totals when a National Officer, Regional Representative, National Chair, or another Representative, who are authorized a full month removal and receiving guaranteed payments of MEA/SAF, is considered a host of an authorized APFA meeting.

APFA also had no policy in place until this year for a National Officer in relation to ones union credit card practice. Current APFA National Treasurer, Erik Harris clarified this fact on the record. [Tr.225 4-11] [Tr.261 12-14] [Tr.285 1-6]

APFA MIA Base President, Randy Trautman also confirmed no polices were in place for said issues. [Tr.608 7-13]

APFA National Treasurer, Erik Harris identified on the record, he himself was non-compliant with the "OLMS Law" by not providing the required information. [Tr. 296 4-9] while receiving MEA/SAF [Tr. 297 9-18] [Tr. 346 15-20] and was never charged with Article VII. [Tr. 298 8-10]

The Budget Committee meetings hosted by the APFA National Treasurer is one example of an authorized APFA meeting. It is an established practice that has been followed through the years for the APFA National Treasurer to provide lunches/dinners for their committee members.

**Examples of this practice was validated by the witnesses below:**

- Yvonne Johnston, Budget Committee Member, serving under APFA National Treasurers Eugenio Vargas, Craig Gunter, and Erik Harris [Tr.522 22-25] [Tr.523 7-25] [Tr.524 1-10]

- Craig Gunter, former APFA National Treasurer [Tr.541 14-25] [Tr.542 1-25] [Tr.543 1-22]

- Erik Harris, APFA National Treasurer [Tr. 294 17-25] [Tr. 295 1-3]

**Black Decl. Ex. V**

At the APFA Board of Directors Annual Convention in March 2021, APFA National Vice President, Larry Salas, put forth Resolution #10, Business Related Meals (V. Exh. 15), which provides a clear policy on reimbursement of business-related meals and group meals and entertainment expenditures. The APFA Board of Directors unanimously passed, by a vote of 11, Yes, 0 No, Resolution #10 / Business Related Meals.

This resolution secures the established practice of an APFA Representatives authorization to pay for meals of a guest/business associate when the Representative would be considered the host of an authorized APFA function or meeting, while not counting against a Representatives MEA.

### E.  Duties of the Treasurer – record / inventory of purchase at Ashley Furniture .

Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual by citing "**As Treasurer Vargas had an obligation under the APFA Constitution and federal law to safeguard union property. On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture. There is no record of inventory of that furniture, nor can the furniture be located. The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done**"

Black Decl. Ex. V

Eugenio Vargas took office as the APFA National Treasurer on April 1, 2016. Within the month, APFA National President, Robert Ross, appointed National Department Chairs to head the individual departments at APFA Headquarters in Euless, Texas, per the qualification requirements set forth in the APFA Constitution and APFA Policy Manual.

Following a unanimous vote by the APFA Executive Committee, Chuck Ransdale was appointed to the position of APFA National Contract Chair, Shane Staples was appointed to the position of APFA National Communications Chair and Gabby Harty to the position of APFA National Health Chair, all other National Department Chairs resided in the Dallas/Ft. Worth area.

The APFA Chase Credit Card statement dating, May 9, 2016, to June 8, 2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016, in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs.

The G/L Acct 1246 document for Furniture & Fixtures [V. Exh. 28] provides a record of items purchased under the name of each APFA National Department Chair and amount spent. The total value of the initial charge differs due to a credit of $104.98.

In January 2017, APFA National Health Chair, Gabby Harty tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck,  as interim National Health Chair [V. Exh. 36] on January 17, 2017.

With 5 months [TR.626 13] remaining on the Harty apartment lease, in a cost saving measure for the union, Mr. Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. [Tr.626 15-23]

APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA with an estimate for the accepted furnishings remaining in the Harty apartment. [Tr.627 14-20] [V. Exh. 29]

Four (4) months after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with the total dollar amount sold by consignment. [TR.627 21-25] [Tr.628 1-5] APFA received $1159.00 in payment from "Kiss it Goodbye".

There was extensive testimony and documents exchanged regarding "Kiss it Goodbye" by both parties and the dollar amount ($1159.00) received. [CL. Exh 15] [Tr.111 4-13] [V. Exh 33] [Tr.628 1-5]

Member Heather Olenjack, witness, and clerk for the charging parties, testified [Tr. 160 4-14] she was aware of the sequence of events pertaining to the Harty resignation, APFA corporate apartment, remaining lease and furniture moved to "Kiss it Goodbye" by calling and visiting the consignment shop herself,  [Tr.169 1-10] yet displayed utter confusion when shown the email exchange between APFA and "Kiss it Goodbye", total furnishings accepted, receipts, and the check for goods sold in the amount of $1159.00 [Tr.167 1-25] [Tr.168 1-25] [Tr.169 1-14]

On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty.

Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified [ Tr.397 2-5] that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs, including queen bed, chest, and nightstand from Ashley Furniture. [Tr.623 8-9] [V. Exh. 28]

In December 2017, APFA National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture purchased by APFA from Ashley Furniture was in his corporate apartment when leaving Dallas. [Tr.397 16-17]

With months remaining on the Ransdale apartment lease, in a cost saving measure for the union, Mr. Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. [Tr.629 8-10]

On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Contract Chair, Chuck Ransdale. The furniture remained in the APFA corporate apartment.

Shane Staples, after being appointed to the position APFA National Communications Chair, testified [ Tr.385 14-23] he was instructed to salvage any furniture he could use for his corporate apartment from a garage at the Bear Creek apartment complex, which was being used

by APFA as storage.  After these items were repurposed, the Ashley Furniture items were purchased. [V. Exh. 28]

In preparation for the end of his term and transition period, APFA National Communications Chair, Shane Staples completed a detailed inventory of all furnishings in his APFA corporate apartment, which contained the contents purchased at Ashley Furniture. [V. Exh. 32] [Tr.389 17-25] [Tr.390 1-21]

On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Communications Chair, Shane Staples. The furniture remained in the APFA corporate apartment.

Eugenio Vargas left his position as APFA National Treasurer on July 2, 2018, due to a re-run election. The newly elected National Treasurer, Craig Gunter, would be responsible for the chain of custody of all furniture after that date.

**POINT OF CLARIFICATION**

Members Melissa Chinery and Sandra Lee have alleged that former APFA National  Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual by citing "**The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done**"

Members Melissa Chinery and Sandra Lee have cited language from Section 8.I.3.b.(5) of the APFA Policy Manual which governs the inventory and transfer of **Office Equipment** only.

The Charging Parties have once again quoted and used invalid language to substantiate their Article VII charges against former APFA National Treasurer, Eugenio Vargas.

## Section 8 - HEADQUARTERS POLICIES AND GENERAL PROCEDURES

I. **GENERAL PROCEDURES**
   3. Office Supplies and Equipment
   b. Office Equipment
   (5) The Office of the National Treasurer shall maintain a procedure to monitor the transfer of office equipment, when appropriate, between representatives in the field.

**F.  Duties of the Treasurer – oversight of the Ross Transition Agreement.**

Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual by citing " **Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all which is not part of basic salary**".

The APFA has an organizational structure that is two-tier, consisting of Base Presidents, who are the voting members and the four (4) National Officers, who are non-voting members. collectively they make up the APFA Board of Director.

In February 2018, Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual convention, the **voting** Board of Directors, under strict consult of APFA Legal Counsel, Mark Richard, negotiated a "Transition Agreement". [V. Exh. 100.A]

The negotiations were solely between the **voting** Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President, Robert Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations of the Ross "Transition Agreement". [Tr.629 23-25] nor was he present in the room [Tr.630 2-3] or a signatory of said agreement. [Tr.630 4-5]

In fact, APFA National Treasurer, Eugenio Vargas, had never viewed the Ross "Transition Agreement" in its entirety, only the economic portions [Tr.630 6-22] which encompassed covenants #3, #4 and #5. There was no copy of the Ross "Transition Agreement" on file at APFA headquarters, prior to Mr. Vargas leaving office. Mr. Vargas did not benefit directly or indirectly from the Ross "Transition Agreement". [Tr.631 18-20]

Only by virtue of the fact, that on March 1, 2018, the APFA National Treasurer **was** Eugenio Vargas, after the resignation of APFA National President, Robert Ross and **was** tasked, per Article III, Section 6.E.(1) of the APFA Constitution, with executing the Ross "Transition Agreement", a confidential agreement that **was** negotiated by the APFA **voting** Board of Directors, does he find himself here today.

Covenant #3 of the Ross "Transition Agreement" states "APFA agrees that ROSS will continue to receive from APFA his current **full** salary and benefits, including full insurance coverage, through July 31, 2018.

Former APFA National Treasurer, Eugenio Vargas, stated for the record the difference between "**Basic Salary**" and "**Full Salary**" regarding a National Officers compensation. [Tr.633 15-25] [Tr.634 1-19]

Former APFA National President, Laura Glading, also received "**Full Salary**" upon her exit, per the terms of her "Transition Agreement". [V. Exh. 100.B] [Tr.634 20-21]

"**Full Salary**" for a National Officer, per the APFA Policy Manual, Section 5, entitles them to receive guaranteed MEA, SAF and Office Outside Residents payments. This guaranteed payment of $1050 is included in the gross wages "Box 1" of the National Officers W-2 tax form. [Tr.425 7-22]

The Charging Parties have once again quoted and used invalid language to substantiate their Article VII charges against former APFA National Treasurer, Eugenio Vargas, by quoting "**Basic Salary**" vs the actual language of "**Full Salary**" in the Ross "Transition Agreement". [V. Exh. 100.A]

Former APFA National Vice President/President , Marcus Gluth, stated for the record the meaning of  "**Full Salary**" and how that would apply to the Ross "Transition Agreement" [Tr.583 16-22] by stating that Ross "**gets paid basically what he would have been paid had he done the job and that was the intent of the Board of Directors. In my defense, was that Bob got nothing more or less than he would have as a President had he remained in term**".

Mr. Gluth continues to provide clarity on the composition of "**Full Salary**" vs "**Basic Salary**" for former President Ross, stating "**full salary would include the benefits of the MEA, SAF and sick time and anything that he would have coming to him. That was the intent of the agreement, he was to get what he had coming to him as President for those five months, nothing more, nothing less**". [Tr.590 23-25] [Tr.591 1-5]

A pertinent difference in the Glading "Transition Agreement" and the Ross "Transition Agreement" is that all members of the APFA Board of Directors (including the officers) were instrumental in the negotiations of that agreement.

APFA National Vice President, Marcus Gluth, along with the other remaining National Officers, were present, privy and included in the discussions of the Glading "Transition Agreement" and were signatories of said agreement.

Following the resignation of APFA National President, Laura Glading, similar payments to that of Robert Ross, were made to Laura Glading, per her "Transition Agreement". Those payments were authorized by the remaining 2015 National Officers, including newly appointed APFA National President, Marcus Gluth. No Article VII charges were ever filed regarding the execution of the Glading "Transition Agreement", against President Gluth or any other APFA National Officer. [Tr.584 23-25] [Tr.586 1-3]

The NDAs on both the Glading "Transition Agreement" and the Ross "Transition Agreement" were lifted at the same time by APFA National President, Julie Hedrick, allowing Members Melissa Chinery and Sandra Lee, to view both agreements in their entirety for any language and payment comparisons. The review of both agreements by Members Melissa

Chinery and Sandra Lee would provide the timeline needed to hold all parties culpable for the alleged improper calculations used in the Glading "Transition Agreement" and afford them with a new opportunity to continue their crusade for justice within APFA. To date, **no** Article VII charges have been filed against any member of APFA Leadership in regard to the Glading "Transition Agreement".

MIA Base President and longstanding Board of Director, Randy Trautman, stated for the record that the Ross "Transition Agreement" was advised and negotiated by APFA Legal Counsel, Mark Richard, and parties Robert Ross and the Base Presidents. [Tr.596 1-3]

Mr. Trautman was a signatory for both the Ross "Transition Agreement" [V. Exh. 100.A] and the Glading "Transition Agreement" [V. Exh. 100.B] and identified for the record, the economic portion of both agreements.

Mr. Trautman continues to provide clarity on the APFA Board of Directors composition of "**Full  Salary**" for former President Glading stating her "**Full Salary**" included her President's Salary, SAF and related payments. [Tr.598 17-25] [Tr.599 1-8]

No Article VII charges were ever filed regarding the execution of the Glading "Transition Agreement", against MIA Base President Trautman or any other APFA Base President.

The calculations made by Mr. Vargas was based on "**Full Salary**" as was designated in the Ross "Transition Agreement" and not "**Basic Salary**" as charged by Members Melissa Chinery and Sandra Lee. " [V. Exh. 100.A]

**Black Decl. Ex. V**

Article VII charges were filed against the 2018 APFA Board of Directors by Member Julie Moyer, questioning their constitutional authority as the governing body to safeguard and protect APFA.

Julie Moyer, in her then role, as the MIA Domestic Base President, was among the signatories of the Glading "Transition Agreement" yet, Member Moyer filed Article VII charges against the 2018 APFA Board of Directors for the same actions she herself carried out in 2015, pertaining to the Glading "Transition Agreement".

The Hearing in the Matter of Arbitration between Julie Moyer (charging party) and the 2018 APFA Board of Directors (charged party), before Article VII Arbitrator, Edward B. Valverde, Esq., was held on June 1-3, 2021, with a decision rendered on September 21, 2021.

The Award clearly determined, in line with the charged party's defense, that Article III, Section 3.A authorizes the APFA Board of Directors to take any and all lawful action consistent with the Constitution to safeguard and protect APFA.

Arbitrator Valverde found "credible evidence" that the action of the APFA Board of Directors was permissible under the provisions of the APFA Constitution.

**Case: Julie Moyer vs Board of Directors (2018)**

**CONCLUSION**

Historically, Article III Section 3.A of the Constitution has been used by the BODs to address and contend with crises of one kind or another. Prior to recent changes, there were no specific provisions addressing the issue of resignation of national officers. In 2018, the entire BOD decided to address the crisis before it by doing that which it had done before regarding the resignation of a national officer; and in both

instances, relied on legal counsel to guide their actions. The arbitrator finds for the reasons stated above, the Charging Party's charges should be dismissed in their entirety.

**AWARD**

The arbitrator finds the charges are without merit for the reasons stated above, and this matter is dismissed in its entirety. Also, because the charges relate to internal union matters, the award is to remain confidential and used only as determined by the APFA (e.g., as precedent within the organization).

Date of Award: September 21, 2021

Edward B. Valverde, Esq. Arbitrator

Based on the "Award" in the case of "Julie Moyer vs the 2018 APFA Board of Directors" and the testimony heard in this case, we ask that this portion of the Article VII charges be found **INVALID** as former APFA National Treasurer, Eugenio Vargas acted upon the direction of the (voting) APFA Board of Directors, which, through the "Award" is proven to have acted within their constitutional authority under Article III, Section 3.A of the APFA Constitution.

### G. Duties of the Treasurer – overpayment of The National Officers sick and vacation.

Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual by citing "**Vargas allowed the National Officers to receive thousands of dollars in overpayments for sick and vacation payouts".**

**Black Decl. Ex. V**

On **July 11, 2019**, Member Sandra Lee made a Facebook post on their page "Checks and Balances" that they had just returned from APFA headquarters, stating it was the second visit for Member Sandra Lee and the fifth visit for Member Melissa Chinery. The date of "**July 11, 2019**" has been used to establish timelines in multiple Article VII charges filed by Members Melissa Chinery and Sandra Lee. [V. Exh. 99]

They state that "**any information we have shared here, we uncovered by rifling through stakes of papers and asking questions**". [V. Exh. 99]

The Facebook post stated they viewed financial records from the previous administration (Ross Administration), the Bob Ross exit package and a large series of checks written to the three previous National Officers on March 29th.

On the date of their visit to APFA headquarters on July 11, 2019, the Ross "Transition Agreement" was considered a highly confidential document (NDA) negotiated between, Robert Ross, the Board of Directors and APFA Legal Counsel, Mark Richard and perhaps even protected under attorney-client privilege, yet Members Melissa Chinery and Sandra Lee were able to view "parts of Bob Ross's exit package". [V. Exh. 99]

As the sitting National Treasurer in the Ross administration, Mr. Vargas was not privy to, nor had ever viewed, any parts of the Ross "Transition Agreement" except for the economic portions [Tr.630 6-9] which encompassed covenants #3, #4 and #5. There was no copy of the Ross "Transition Agreement" on file at APFA headquarters, prior to Mr. Vargas leaving office.

In fact, APFA National Treasurer, Eugenio Vargas, handled the Ross "Transition Agreement" with the same safeguards as the Glading "Transition Agreement" due to the Non-Disclosure Agreement (NDA). There was no copy of either agreement on file at APFA headquarters, prior to Mr. Vargas leaving office.

Given the neglect on APFA's part to conduct a thorough and impartial inquiry from any member of the Ross administration on the issue, and given the distorted, incomplete and confidential information that was provided to and posted to social media by Members Melissa Chinery and Sandra Lee, **a meeting was requested on July 11, 2019**, with the APFA accountant, the APFA attorney and the APFA National Treasurer by former APFA National Vice President, Nena Martin, former APFA National Secretary, Marcy Dunaway and former APFA National Treasurer, Eugenio Vargas, to discuss any concerns APFA might have on the alleged financial issues announced on social media. [V. Exh. 99]

All members of the Ross administration were made aware of the alleged financial issues, by Member Sandra Lee's, July 11, 2019, Facebook post and not from any member of the Bassani administration, who were the sitting APFA National Officers on July 11, 2019. [Tr.636 1-11] [Tr.191 4-25]

In a subsequent email dated July 12, 2019 (also posted to social media) by Member Melissa Chinery to APFA National Treasurer, Craig Gunter, she confirms a meeting on July 10, 2019, were she lists the check numbers and dollar amounts paid to three (3) of the former officers of the Ross administration, along with first suggestion that the alleged financial issue was that "**SAF and MEA pay was used to formulate figures for the 3 previous National Officers. These checks were issued for vacation accrual, vacation buyback, and sick**

**accrual**". [V. Exh. 99]

Former APFA National Treasurer, Eugenio Vargas used "**Full Salary**" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office, which included MEA and SAF.

**After numerous request for a meeting, the first written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on September 4, 2019, approximately 2 months after the original Facebook post on July 11, 2019.** [Tr.194 21-25]

The letter confirms that certain payouts made in 2018, incorrectly included  MEA and SAF in the calculation. [Tr.195 19-25] The letter continues to request that the "**Union be made whole**" but still no specific dollar amount owed had been established. Not until **September 18, 2019**, was the three (3) members of the Ross administration noticed of a dollar amount owed, supported by a single sheet of paper and without documents to substantiate the claim.

Through the entire process, the APFA Board of Directors had been provided a timeline and details (by email) of the multiple requests to meet with APFA to reconcile the alleged overpayment and agreed that the parties were deserving of information as to the alleged amount owed and the calculations used. [V. Exh. 99]

LAX Base President and Board of Director, John Nikides, stated for the record that "**I was a hundred percent in support of that because I felt it was wrong to withhold documents from you**". [Tr.197 19-21] and "**Because I believe you -- the documents were**

**being withheld from you all during the summer".** [Tr.198 5-6]

After approximately 60 emails between the former officers of the Ross administration, the APFA National Officers, APFA Attorney, APFA Board of Directors, 6 APFA Hotline Communications to the Membership, and 2 Special Board of Director Meetings, was a meeting with the APFA National Treasurer, Craig Gunter finally scheduled on **October 30, 2019**, to review the financial issue surrounding the July 11, 2019, social media post. [Tr.636 16-20] [V. Exh. 99]

Prior to the October 30, 2019, meeting, an independent audit was to have been conducted to establish the alleged overpayment. Regrettably, the meeting provided to be a waste of time. The amounts used in calculating the over payment could not be identified by the APFA National Treasurer, Craig Gunter or the independent auditor from Woods, Stephens, & O'Neil and far exceeded the maximums received for MEA and SAF, the premise on which the alleged overpayments were based.

APFA National Treasurer, Craig Gunter, shared documents with the three (3) members of the Ross administration that was the identical documents posted to social media by Members Melissa Chinery and Sandra Lee, containing check numbers, dates, hours, pay and our **social security numbers** visible at the top of each page.

Written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on November 8, 2019, stating "**After the meeting held on October 30, 2019, to allow you to review the independent auditor's calculations, it is our understanding that you take issue with how**

**Black Decl. Ex. V**

**the calculations were made. We researched the issue again and believe our initial calculation is correct".**

As a point of clarification, in the calculations provided at the October 30, 2019, meeting, simple math was used to determine the alleged monies owed by taking "**Full Salary**" minus "**Basic Salary**", then stating the difference was MEA and SAF. Calculating MEA and SAF in this manner was incorrect due to other income being included in the "**Full Salary**", like the UAL Arbitration payout, which provided a pay increase with retro pay.

The three (3) former National Officers never stated they would not pay the amount owed but expected the calculation to be accurate.

LAX Base President, John Nikides, and Board of Director, continues to express his concerns in writing on December 1, 2019, that the APFA National Treasurer, Craig Gunter, make immediate arrangements to resolve this issue stating "**Craig, please meet with the parties ASAP to review the amounts owed and the calculations so we can receive payment. I know they have made a number of attempts to meet with you and have not received a response**". [Tr. 200 1-9]

When the issue of the alleged miscalculation in payouts for the three (3) former officers of the Ross administration was posted to Facebook on July 11, 2019, by Member Sandra Lee, MEA and SAF was identified and **confirmed** in subsequent correspondence from the APFA National Treasurer, Craig Gunter and APFA In-House Counsel, Susannah Bender, but at the December 2019, Executive Committee Meeting, Ad Hoc Member, Patrick Hancock revealed that APFA believed their calculations were correct **based on a 1987 formula invented by**

**former APFA National President, Patt Gibbs.**

In **all** APFA correspondence up until this point, MEA and SAF were identified to be the error in the calculations used by former National Treasurer, Eugenio Vargas but now, a **new formula** had been exposed, as it now supported the APFA calculation. [V. Exh. 99]

The Base Presidents were alerted to this now stated change in the APFA calculations and the **new formula** that was identified from **1987**, after 5 months of focus on MEA and SAF.

LAX Base President, John Nikides, and Board of Director, states for the record that he had no knowledge of this "**1987 formula**" now being used for the APFA calculation for monies owed. [Tr.201 1-6]

Shouldn't the APFA National Treasurer, Craig Gunter, APFA In-House Counsel, Susannah Bender, the independent auditor from Woods, Stephens, & O'Neil who confirmed the APFA calculations, or **anyone** besides one member of the Executive Committee have some understanding of this "**original formula**" calculation from **1987**? [Tr.201 13-25]

That "**original formula**" calculation was now being utilized to determine the amounts owed by the three (3) former officers of the Ross administration.

Former APFA National Treasurer, Eugenio Vargas, stated for the record that he did include "**Full Salary**" which included MEA and SAF in the calculations of vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office.  He has **never** disputed that fact. [Tr.656 15-24]

Mr. Vargas used the same "**Full Salary**" logic that was used in the calculation

of the Ross "Transition Agreement" and the Glading "Transition Agreement". He used the one

and only number identified on the officers W-2 as gross wages, which include MEA and SAF

in his calculations, but in actuality this calculation was irrelevant due to the fact that a "**1987**

**formula**" should have been used.


Members Melissa Chinery and Sandra Lee have led the membership, by their continued

postings on social media, to believe that Mr. Vargas' miscalculation was tens of thousands of

dollars, when actually it totals approximately **$12,000** between the three (3) former officers of

the Ross administration.


Members Melissa Chinery and Sandra Lee have failed to notice the membership, by their

continued postings on social media, that the former officers of the Ross administration tried to

set up meetings from day one to meet and resolve the matter with the APFA National Treasurer,

Craig Gunter, by sending over one hundred (100) emails to APFA Leadership and APFA Legal.


Members Melissa Chinery and Sandra Lee have failed to notice the membership, by their

continued postings on social media, that APFA spent approximately **$150,000** of their dues

dollars on Special Board of Directors Meetings, including lodging, trip removals and food for

their Base Presidents to discuss this issue, while reimbursement by the three (3) former officers

would total approximately **$12,000**.


Members Melissa Chinery and Sandra Lee have failed to notice the membership,

by their continued postings on social media, that once APFA could provide a legitimate

calculation (**one allegedly from 1987**), that all three (3) former officers from the Ross

Administration made arrangements to repay the miscalculations. [Tr.204 1-4]

Members Melissa Chinery and Sandra Lee have failed to provide the membership, by their continued postings on social media, with anything resembling the **truth** in this matter.

The "**July 11, 2019**" Facebook post started a chain of events that continue today against the "Ross Administration" and former APFA National Treasurer, Eugenio Vargas, including Article VII, Section 2.A. of the APFA Constitution being exercised ten (10) times against the Ross administration, **three (3) of which were against Mr. Eugenio Vargas.**

Members Melissa Chinery and Sandra Lee have become fixated on the people and not the practice, even when provided the evidence to support the truth during the Vargas hearing.

Mr. Vargas takes full responsibility for his actions involving his union credit card being used for payment of a rental car while on vacation in Madrid and has provided his full support in these charges, including the expeditious repayment to APFA.

Mr. Vargas takes full responsibility for his actions involving his union credit card being used for lunches for his Budget Committee and other business related lunches when a National Officer, Regional Representative, National Chair, or another Representative attending,  are also authorized a full month removal and receiving guaranteed payments of MEA/SAF, and has provided his full support in these charges, including the acknowledgment that APFA had no policy in place until this year for a National Officer in relation to one's union credit card practice.

Mr. Vargas takes full responsibility for his actions involving his union credit card being used for the purchases made at the Ashley Furniture store to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs of the Ross administration and has provided his full support in these charges, including providing the supporting documents and a detailed timeline that clarifies without question, that upon the departure from his position as APFA National Treasurer,  Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for the former APFA National Department Chairs.

Mr. Vargas takes full responsibility for his actions involving his oversight and payment of the Ross "Transition Agreement" after only viewing the economic portions, which encompassed covenants #3, #4 and #5 and has provided his full support in these charges, including the mathematical determination used for "**Full Salary**" vs "**Basic Salary**" for said payments. The Ross "Transition Agreement" has been deemed valid  by Arbitrator, Edward B. Valverde, and the actions of the APFA Board of Directors were permissible under the provisions of the APFA Constitution and no evidence that the APFA Board of Directors was fiscally irresponsible when entering into the Ross "Transition Agreement".

Mr. Vargas takes full responsibility for his actions involving his mathematical determination when using "**Full Salary**" vs "**Basic Salary**" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office and has provided his full support in these charges, including months of correspondence between the three former officers, APFA National Officers, APFA Board of Directors, APFA In-House Counsel, APFA  Executive Committee and Members Melissa Chinery and Sandra Lee, providing

a clear picture of his willingness to repay the overage, once established from the "**1987** " formula that was exposed months after the July 11, 2019, Facebook post by Member Sandra Lee. Eugenio Vargas never stated he would not pay an amount if owed, but expected the calculation to be accurate and accounted for.

## VII.   CONCLUSION

Based on Members Melissa Chinery and Sandra Lee's obvious and flawed Article VII charges, and their failure to prove their case, highlighted by the overwhelming and consistent past practice at APFA which was completely ignored, as well as all other areas having been appropriately resolved long before Article VII charges had been filed, Representatives Martin and Morgan respectfully request that the Article VII charges against Eugenio Vargas be dismissed in their entirety.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct original of the foregoing was sent via electronic email to APFA National Secretary, Josh Black, email: secretary@apfa.org on this 29th day of December 2021.

By: */s/ Heidi Morgan*
Heidi Morgan, Representative

**Black Decl. Ex. W**

<u>In the Matter of Arbitration Between</u>

|  |  |
|---|---|
| Melissa Chinery | ) |
| Sandra Lee | ) |
| | ) |
| APFA Charging Party Members | ) |
| (Plaintiff) | ) |
| | ) |
| And | ) |
| | ) |
| Eugenio Vargas, Former APFA | ) |
| National Treasurer | ) |
| | ) |
| APFA Charged Party Member | ) |
| (Defendant) | ) |
| | ) |

RE: Article VII Charges
Violations of APFA Constitution
and APFA Policy Manual

---

**Before:**

**Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:**

**The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

**September 14, 15 and 16, 2021**

**Appearances:**

    **For Charging Party Members:**    **Melissa Chinery, Representative**
                                       **Sandra Lee, Representative**
                                       **Heather Olenjack, Representative**

    **For Charged Party Member:**    **Heidi Morgan, Representative**
                                       **Nena Martin, Representative**
                                       **Eugenio Vargas, Former National Treasurer**

**Black Decl. Ex. W**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

## *INTRODUCTION*

This is an Article VII Hearing that was heard at the Westin Irving Convention Center at Las Colinas, Irving, Texas on September 14, 15 and 16, 2021. The arbitration hearing was transcribed by Carson Reporting & Associates.

Charging Party Melissa Chinery and Sandra Lee, will be hereinafter referred to as the "Plaintiff." Charged Party Eugenio Vargas, will be hereinafter referred to as the "Defendant."

Plaintiff presented for testimony Former Treasurer and Retired Flight Attendant Cathy Lukensmeyer, Business Owner Michael Trapp, Former Boston Base President and Flight Attendant Jennifer McCauley, DFW Base President and Flight Attendant Michael Truan, Flight Attendant Heather Olenjack, Los Angeles Base President and Flight Attendant John Nikides, Flight Attendant and National Treasurer Erik Harris, Flight Attendant Christopher Thedford, Flight Attendant Debbie Hoover, Flight Attendant and National Secretary Josh Black, Flight Attendant Sandra Lee and Flight Attendant Melissa Chinery.

Defendant presented for testimony Former Base Council Representative and Flight Attendant Shane Staples, Flight Attendant Chuck Ransdale, Budget Committee person Yvonne Johnston, Former National Treasurer Craig Gunter, Former APFA President Marcus Gluth, Former Board of Director and Miami Base President Randy Trautman and Former National Treasurer Eugenio Vargas

All of these witnesses were afforded full opportunity to be heard, to be examined, and to be cross-examined. The parties were allowed to introduce evidence on the issues. Based on the entire record, my observation of the witnesses, examination of the evidence, exhibits presented, post-hearing briefs[1] submitted, and arguments presented therein, this arbitrator makes the following findings and renders the following Discussion, Opinion, and Award.

## *THE ISSUES*

The issues presented in the Article VII grievance and heard in this proceeding are described as follows:

**The Plaintiff**

Plaintiff submits the issue to be determined by the Article VII arbitrator is stated as follows:

Whether Eugenio Vargas, the Charged Party herein violated the terms of the APFA Constitution and Policy Manual by;

    (1) Violating the Meal Expense Policy?

---

[1] The parties agreed to submit post-hearing briefs by e-mail to arbruben@gmail.com on November 16, 2021 and requested an extended to December 31, 2021 and was granted. The post-hearing briefs were timely emailed and received, thus, the arbitrator finds the record in this matter closed on December 31, 2021.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

    (2) Failing to maintain an inventory thereby violating Article III,
        Section 6.E. of the APFA Constitution by failing to maintain
        union assets?

    (3) Allowing himself and his fellow National Officers to receive
        inflated sick and vacation payouts when they were not entitled to
        such?

    (4) Allowing the payment to former National President Bob Ross
        thousands of dollars in Meal Expenses Allowance (MEA) and
        SAF when he was no longer working for APFA?

    (5) Violating the credit card policy by charging a rental car and meals
        for a trip to Spain?

    (6) And, if so, what should be the appropriate remedy?

**The Defendant**

Defendant submits the only issue to be determined by the Article VII arbitrator is stated
as follows;

    (1) Whether Former APFA National Treasurer Eugenio Vargas committed
        the following act(s) was "**WILLFUL**" violation of an expressed Article
        of the APFA Policy Manual, the APFA Constitution, or of a proper and
        express written resolution or policy of the Board of Directors or
        Executive Committee of the APFA Constitution, as it is set forth in
        Article VII, Section 1.F.

    (2) And if not, what is the appropriate remedy?

### *THE FACTS*

It is undisputed the charges herein arose from an internal filing of an Article VII grievance
filed by Plaintiff Members Melissa Chinery and Sandra Lee against Defendant Member Eugenio
Vargas, Former National Treasurer.

Plaintiff alleged Former National Treasurer Eugenio Vargas violated the detailed language
of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA
credit card. Vargas charged meals in his city of residence, Dallas Fort Worth (DFW), when he had
no right to meals in his home location, double-dipped when he was receiving per diem out of base,
and claimed actual meals while receiving Guaranteed Meal Allowance. Vargas further violated his
responsibilities as treasurer by routinely authorizing inappropriate payments to other APFA
officers who were committing similar violations of the meal expense policy.

Plaintiff alleged Former National Treasurer Eugenio Vargas failed to maintain an inventory
and violated Article III Section 6.E. of the APFA Constitution by failing to maintain union assets.
Vargas failed to maintain an inventory of furniture and failed to safeguard union assets as required
by the APFA Constitution. Vargas failed to safeguard tens of thousands of dollars of furniture left
by his and prior administrations. The evidence will show Vargas misappropriated tens of thousands

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

of dollars of furniture that he had no right to take, concealing the fact from the APFA leadership and members.

Plaintiff alleged Former National Treasurer Eugenio Vargas allowed himself and his fellow National Officers to receive inflated sick and vacation payouts that they were not entitled to. Vargas changed the long-standing formula on the payout of sick and vacation payout to inflate his and his fellow national officer's payouts by thousands of dollars, failing to inform the Board of Directors.

Plaintiff alleged Former National Treasurer Eugenio Vargas was paying former National Officer Bob Ross thousands of dollars in Meal Expense Allowance (MEA) and SAF when he was no longer working for APFA. Vargas allowed Bob Ross to be paid expense allowances when he was no longer working for APFA. This payment was not specified in Ross' exit package.

Plaintiff alleged Former National Treasurer Eugenio Vargas violated the credit card policy by charging a rental car and meals for a trip to Spain. Vargas used the union credit card for a rental car while on vacation in Spain as well as charging a meal while also on per diem.

The APFA Board of Directors could not resolve this matter internally and pursuant to the provisions set forth in Article VII of the APFA Constitution, the undersigned Alternate Article VII arbitrator was selected solely to conduct an evidentiary hearing and decide this matter on its merits.

### *THE RELEVANT PROVISIONS OF THE APFA CONSTITUTION AND POLICY MANUAL CITED IN THE CHARGES*

### *APFA CONSTITUTION*

### Article I. Section 7.   DEFINITIONS:

As used in this Constitution, the following words or terms shall mean:

| | | |
|---|---|---|
| **E.** | **"Duty"** means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA. |
| **M.** | **"Privilege"** means a benefit or advantage enjoyed by a person in any position or   fiduciary capacity with or as a member of the APFA. |
| **O.** | **"Responsibility"** means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA. |
| **Q** | **"Rights"** means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as  a  member  of  the APFA. |

### Article II. Section 2. OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from, or

4

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties, and responsibilities of membership in the APFA is the obligation to responsibly exercise these rights, privileges, duties, and responsibilities.

### Section 3. BILL OF RIGHTS OF MEMBERS

B.      All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

### Article III, GOVERNMENT OF THE APFA
### Section 3 Board of Directors

A. The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights and privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this constitution and to establish, prescribe and adopt such other policies which may be consistent with this constitution as required for the direction and management of the affairs of the APFA.

L.      Jurisdiction and Duties: The Board of Directors shall have the following rights, privileges, duties and responsibilities;

1. Set policy for the APFA;
2. Modify the APFA Policy Manual as it deems appropriate;
3. Approve the annual budget;
4. Set annual goals for the APFA as it deems appropriate;
5. Assign to each Ad Hoc Member of the Executive Committee those Presidents with whom s/he shall maintain regular contact and communication;
6. Determine the number of administrative, committee, and support positions as may be required under Article IX of this Constitution to meet the needs of the membership;
7. Nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;
8. Review the base assignment of any OAL Operation or satellite and, when necessary alter operation or satellite assignments.
   While not limited to the following, the Board of Directors may:
9. Review the dues structure of the Association;
10. Override the Executive Committee rejection of a proposed Collective Bargaining Agreement;
11. Establish the Regions and the National Vice President will assign the Regional Representatives;

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 447 of 506   PageID 6094
Black Decl. Ex. W
**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

12. Establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;
13. Direct special mailings to the membership;
14. Recognize the accomplishments and achievements of members of the APFA;
15. Give annual awards;
16. Confer Honorary membership;
17. Approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;
18. Appoint special committees;
19. Appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);
20. Approve Article VII administrative changes;
21. Suspend officers or representatives pursuany to Article VII;
22. Take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4.J.11 or Article VIII, Section 6.Bof this Constitution.

## Article VII. Section 1. Grounds For Charges:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

**A.** Failure to pay dues, assessments or penalties levied by the Association.

**B.** Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

**C.** Willfully acting as a strike breaker during any work stoppage duly authorized by the Association; (1) Notwithstanding Section 1.C., above (which provides as a grounds for charges willfully acting as a strike breaker during any work stoppage duly authorized by the Association) APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

**D.** Willful violation of a Flight Attendant's Collective Bargaining Agreement

**E.** Theft or embezzlement of Association monies or property

APPX. 0447

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

**F.** Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee

**G.** Willfully acting in a manner that causes the Association to violate its legal obligations; or

**H.** Willfully bringing charges without reasonable basis against another member, officer, or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

*APFA POLICY MANUAL*

**Section 5.G.1. Trip Removal and Expense Policy – Other Expenses**

1. Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed to the extent provided in this policy. In all cases, receipts must be submitted to verify the expense and to substantiate reimbursement. Expense reimbursement is not intended to be for the personal profit of the APFA member, but to compensate him / her for actual expenses and losses and is exclusive of other applicable reimbursement provisions in this policy.

**Section 5.F.5.a. Trip Removal and Expense Policy–Meal Expense/Allowance**

**a.** Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.

**(1)** Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business-Related Expense. Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.

**(2)** The reimbursement of a Business-Related Expense shall not count against a representative's MEA.

*PLAINTIFF TESTIMONY*

Only certain testimony this arbitrator has deemed relevant to the issues at hand are as stated herein.

**Cathy Lukensmeyer**

7

APPX. 0448

**Black Decl. Ex. W**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Ms. Lukensmeyer is a retired 30-year American Airlines Flight Attendant. She is a member of the APFA. She has held several APFA positions in Chicago, Illinois as a Council Representative, Vice Chair, Chairperson, negotiations member in 1986 and National Treasurer for the APFA for 4-years from 2004 to 2008. She testified she had received training as a National Treasurer for only one transitional month. She stated she is familiar with the APFA Policy Manual and Constitution as it relates to financial matters and the role of the National Treasurer. The APFA Policy Manual dictates the day-to-day operations of the APFA and is approved by the Board of Directors. She further said, Article II, Section 2 states ignorance of the Constitution is not a proper excuse for any violation of the provisions. She further explained the duties of the National Treasurer to include the care of the office, the staff, all of the assets of the Union. They inventory the assets and are in charge of expense reports and the monitoring of expense reports, questioning expense reports, prepare government filings and to provide to the Board monthly financials. And making sure all meals have proper receipts in accordance with the policy manual, which is a part of the expense report. Only the Board of Directors (BOD) can modify the policy manual. Additionally, she testified that she was familiar with the Meal Expense Allowance (MEA) and per diem. When working for the Union, flight attendants would receive an expense, a per diem and an MEA. The Officers and the people on full time would lose out on that source of income. You have actual and you have guaranteed up to a certain point as defined by the policy manual as to how much you get. MEA is for persons away from their base and the per diem is also away from the base. The Officer's would receive a guaranteed base because they weren't flying and that is what would make them whole. And that is put on the weekly expense report. When asked, 'should one be getting the Union credit card to buy meals and getting guaranteed MEA for the …. same days?" She answered "No" it is double dipping. They are already getting paid, meals do not go on the credit card. The per diem is a daily allowance and was negotiated for the Flight Attendant and then copied the CBA and it would cover those expenses. Per diem's away from the base. National Officers are assumed to be living within a radius of Dallas per the policy manual and for purposes of expenses and other policies regardless of where their permanent residence is located. A hosting exception is when there is an arbitration for example with lawyers and witnesses, the Vice President would order a meal and everyone would be included. Lunch does not qualify for a hosting exception. She was asked if one should be getting guaranteed MEA while getting per diem and she said "No." She was asked, "if all Union officers are receiving meal allowance, should they be charging a meal to the Union when everyone is on MEA and she said, "No."

She further testified that under the APFA Constitution, the National Treasurer is responsible for assuring accurate receipts, the purpose of the expense and who was present. She was provided Exhibit (CP-2) and reviewed some of the credit card and receipts related to Vargas expenses. She said Officers are not allowed to take guaranteed and actual meal expense.

Lukensmeyer additionally testified that in 5h 3 deals with electing an apartment or a paid move. She said that when you get elected to office, you have a choice. You can either move, or transfer totally to Dallas. The Union will cover the expenses, $10,000.00 will be given or you could choose to have an apartment in Dallas that is furnished, no smaller than one bedroom. The Officers get two bedrooms that has an office. She explained that when she came into office, her apartment was from the preceding Treasurer and it was already furnished with towels and sheets, you name it, it was there, except for one room, the office. She had to get a couch and table because no furniture was there, but the rest of the apartment was fully furnished. The Treasurer's Office

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

takes care of corporate apartments. The Treasurer would obtain the apartments and take care of
furnishing them if there was no furniture. The furniture should already be there. She said she put
into place a policy 5.22, No. 7, for incoming National Officers and other representatives shall
normally be able to use outgoing National Officers or Representatives furniture and furnishings
rather than replace these items with each change of National Officer or Representative, subject to
the right to reasonably refuse furniture and furnishings.  This policy was in place before October
2016 and the policy requires that there be a silent auction of furniture.  These are assets of the
Union and we have to consider the depreciation value and the fair market value.  It's not possible
for an item to be depreciated to zero. The Bylaws do not provide for rental cars in the city of
residence. So once a National Officer takes office, they are not entitled to a car in DFW or Dallas.
The expense reports are supposed to have two signatures, so there should be another person who
is overseeing what the Treasurer is doing or spending, whomever signs the other half of that
expense report. It is not normal for a Treasurer to repeatedly have to pay back the organization for
erroneous charges.

On cross-examination, Defendant presented Resolution No. 14 into the record and was
identified as APFA Apartments Board of Directors Resolution No. 14 dated March 9, 2016. She
testified it is a new policy on apartments and furnishings. Equipment in need, furnishings in need
of replacement, replace as needed and they talk about damaged, worn out, depreciated, not useful
and that replacement items may be purchased in accordance with the table. Surplus furnishings
shall be sold through a public online market, Craigslist and it must be stored and inventoried.  It
also says, Outgoing National Officers or Representatives shall have the option of purchasing at
Fair Market Value the furniture, furnishings, appliances, equipment that were provided in their
APFA accommodations. Lukensmeyer said she was not aware of this new policy.

**Michael Trapp**

Mr. Trapp is the owner of Trapp's Residential Services, and Trapp's construction. He
testified that he has performed work for the APFA from 2014 until he became sick. He performed
maintenance, electrical, plumbing, painting, moving stuff and remodeling. He said he would clean
the apartment and move all of that stuff. Ms. LaDonna Casey would let him know where to go and
they would pack up everything. Take it to the office or other apartments. After Mr. Gunter, former
National Treasurer passed away, he moved his furniture from Corporate APFA apartments to the
back room of the APFA since there was no room to store the furniture at Uncle Bob's storage
place. Trapp identified Exhibit (CL-13) as being his invoices for work performed. There were three
storage lockers full at the time. After the elections Greg's stuff was moved to Mr. Vargas
apartment.

On Cross-examination, Trapp stated that between 2016 and June 2017 he picked up
furniture at the APFA storage units and dropped them off at donation. He said he dealt with Ms.
LaDonna for him to pick up items, take it, put it back together

**Jennifer McCauley**

Ms. McCauley is a Flight Attendant for American Airlines and based in Boston, MA.  She
has been employed with American Airlines for over 30 years.  She has held Union positions such

9

as Base President (1997-2012) for the Boston International and Domestic domiciles. From 2012 to 2016 she was appointed to the SBA department as a Regional Representative. And from 2016 to 2019 she was elected to the Executive Committee as an ad hoc by the APFA Board of Directors. She testified that she attended the Executive meeting on September 8 or 9, 2016 regarding furniture but was told by Eugenio Vargas the furniture was in storage and had not been inventoried because it was too hot to go to the storage area Exhibit (CL-14). Exhibits CL-14, Cl-15 and CL-16 were offered and received into the record without objection.

**Michael Truan**

Mr. Truan is a 23-year Flight Attendant with American Airlines. He has held several positions with the APFA. In 2004 he worked in the communications department and moved on to be a DFW Base Representative and then became a full-time Dallas Base Representative. He worked in contract scheduling as well in the safety department.  He was elected to the position of a domestic negotiator with the negotiating Team back in 2013 and DFW base president in 2019. Truan testified that at a Board of Directors meeting, it was discovered that Mr. Vargas, Ms. Martin and Mrs. Dunaway received large payouts at the end of their term for unused vacation and sick leave and it wasn't calculated correctly. Two Special BOD meetings were held on August 26, 2019 and via resolution the BOD passed to have these former Officers pay back the money owed to the Union. Payout is supposed to be calculated per APFA policy and National Officers salary. The former Treasurer had calculated additional income into that calculation which is not part of the policy at APFA. Exhibit (CLX-18) is the Executive Meeting that transpired on December 5-7, 2019 and Resolution No. 2 was passed on August 29, 2019. In this resolution, if the payouts were not paid back no later than January 26, 2020, the APFA Attorney was directed to file a civil lawsuit to collect these funds. Truan stated that from August to December, the money had not been paid back. Exhibit (CLX-17) is the second meeting of the BOD. National Treasurer Craig Gunter and BOD voted pretty much unanimously on Resolution No. 2 (Ms. Martin was on the Board of Directors and abstained), where it directed Mr. Vargas, Ms. Martin and Ms. Dunaway to make APFA whole to recover the overpayment. Both CLX-17 and 18 were received into the record without objection. On cross-examination, Truan was asked how is the Officer salary calculated and he said through APFA policy. The officers (President, Vice President and Secretary) are paid the highest international purser rates. As far as vacation, sick, or any other items included in their monthly salary. Truan said that according to their attorney's at the time, MEA, SAF was not additional income to be added to the payout. The officer's salary should only include the highest international rate, purser premiums per APFA policy. Charged Party Exhibit (CL-99) was introduced into the record and is a string of emails requesting an explanation of the formula used for the calculation. The formula should not have included MEA and SAF. The former National Officers were disputing the APFA calculation of the amount of overpayment owed back to the APFA in Resolution No. 2 (CL-99). Truan stated in the Executive Committee meeting, he became aware that the recalculation was based on a 1987 payout formula, Exhibit (CP-99) and Exhibit (CP-1) were received into the record. On re-direct, Truan stated a power point presentation was given of the formula that should have been used for payout.

Truan stated the elevated overpayment was included in the Bob Ross exit package. Truan said that they had a Base President call with Attorney Bruce Lerner and several BOD's where he asked Vargas if he wanted an attorney to be present as this could possibly become criminal charges. In

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

the e-mail chain from Patrick Hancock, he told Ms. Martin the original formula has been used for over 30 years and has been included in 30 plus audits and multiple DOL reviews and is a long-standing established practice. This is the appropriate starting point. The amount you owe APFA is calculated by taking what you should have been paid, original formula, and subtracting what you were actually paid. On further re-direct, Exhibit (CL-99) Truan was asked to further read it into the record as follows,

A. "APFA does not and should not have to decipher what was wrong with the new formulas and try and fix it for you. The fully functional original formula defines what you should have been paid. Your overpayment is easy to calculate using that number. The EC has now established the deadline of January 6, 2020 for you to reimburse the Union. I look forward to hearing that APFA has been reimbursed and we can move on to addressing the many challenges facing our Union. Patrick Hancock Ad hoc 5."

On re-cross-examination Truan was again asked, "isn't it true the original formula is a formula that has nothing to do with MEA and SAF and he said "yes."

**Heather Olenjack**

Ms. Olenjack has been an American Airlines Flight Attendant for over 24 years. She has been Base Council Representative and Health Representative from 2014-2015 at National Headquarters. Laura Glading was the National President from 2014 and 2015. In the summer of 2016, she had concerns over APFA furniture and spoke with National Treasurer Vargas on September 21, 2016. She had concerns of moving expenses, furniture. Vargas had a book of financials that he showed her. She discovered several APFA apartments were vacant. She discovered that Bob Ross and Nena Martin had used their whole allotment and was concerned that it may have gone over that amount. She asked about moving expenses and he showed her receipts of Bob Ross and Nena Martin. Vargas said Ross was about $2500.00 as he moved with nothing and that he actually purchased Greg Gunter's furniture. Vargas said Ross wrote a personal check to the Union. In the meeting of June 2017, Vargas said that he had paid $219.00. She further stated APFA policy was not used for the handling of this furniture. It could have been reused, given to another representative or National Officer in a corporate apartment. If not used, should have been placed into storage until needed and if it was deemed unusable, then it was to be placed on the silent auction at APFA for Flight Attendants to bid on or a staff member. She further said she was looking into furniture. Gaby Harty was the Health Chair and she had purchased quite a bit of new furniture. Harty resigned 8 months later and that furniture was sent to a consignment store for resale and not stored. Vargas said he was following the policy. She told him that he made a policy change in October to include it. The APFA took a big loss on reselling the furniture as they purchased a couch for $800.00 and listed it at the consignment store for $300.00. APFA would only receive 50% of the retail cost. On cross-examination Ms. Olenjack said the policy said $5000.00 one way move and $10,000.00 for a round trip. She was given Exhibit (CP-10), Resolution No. 12 dated October 5-6 as to the disposition of furniture of outgoing National Officers or Representatives. She also said she was aware Ms. Harty resigned in January and there was a lease on that apartment until May. The furniture remained in that apartment for the duration and a

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

representative was moved in. She said she was aware of this Resolution. She said she was aware
Vargas presented a change for the disposition of the furniture that passed where Outgoing National
Officers or Representatives shall have the option of purchasing furniture at fair market value. If
not, it shall be sold through a consignment store and if not sold within 6 months, it shall be donated
to charity. And four months later the consignment store gave a check for $1,159.00 for the items
submitted.

## John Nikides

Mr. Nikides has been employed with American Airlines for 37½ years. He is the Los
Angeles Base President. He has been a Rafety representative with LaGuardia, San Francisco Vice
Chair, Assistant to the President, American Eagle liaison, LAX International Vice Chairperson,
LAX Domestic Chairperson and LAX Base President since April 1, 2001. He testified that he was
on a BOD call with Vargas discussing the change of Formula for vacation payouts. Discussed at
this meeting was MEA and SAF. The MEA is the meal expense allowance. And SAF is Special
Activity fee. In the phone conversation MEA and SAF had come up as to whether were considered
wages. Vargas claimed MEA ands SAF are wages and that was based on certain payouts the
National Officers. Vargas said in this phone conversation that there would have been no reason to
exclude Bob ross from our actions, the actions we took to secure the monies from the other three
national officers. Attorney Bruce Lerner informed Vargas to get Legal Counsel. MEA and SAF
were never intended to be wages. He said he became aware of several moving resolutions in
September 2016 to October 16, 2016, that Bob Ross was in violation of the policy manual but had
been permitted by Vargas to first get an apartment, which he was entitled to under APFA Policy
Manual but then decided this wasn't working out for him and decided to move his family down
there and Vargas paid his moving expense. You get either an apartment or you get moving
expenses. You don't get both. This came up in the BOD meeting of what Bob Ross had been
permitted to do and that moving resolution was turned down. Ross had an exit package and Nikides
was one of the BOD members. Ross got paid MEA and SAF. MEA and SAF is intended for work
actually done. Ross wasn't working during that time period. Nikides stated he expected the
Treasurer to be the gate keeper.  Nikides also said there was a BOD call and was informed that
Bob Ross had to pay back $3600 for the furniture. This furniture went to Ross residence and not
to the Corporate apartment.  So, Ross paid it back two years later. Vargas also paid back some
money for a rental car. Vargas used the APFA credit card to rent a car in Spain.

Nikides also testified that once the formula was clarified using the 1987 formula calculation
Ms. Martin immediately paid off the owed debt. He stated that he is familiar with the Ross
Transition Agreement (CL-98), he also verified that was his signature on the last page. He said
they signed this page in the absence of a printed Transition Agreement. Nikides also stated you
cannot use a Union credit card to eat a meal when you are on MEA, that is double dipping. On re-
cross examination, Nikides was asked if any National Treasurer, the gatekeeper of the books, has
ever told him how to deduct MEA from your expenses because the secretary who sets up those
meetings are purchasing meals with an APFA credit card while you are on MEA, and he answered
"no." On further re-direct examination, Nikides was asked if it would be a violation to go to a golf
course 54 times when it's just the National Officers on the ticket and he answered "yes."

## Erik Harris

12

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Mr. Harris has been an American Airlines Flight Attendant since May 2014 and is currently the National Treasurer for APFA since April 1, 2020.  He said the state of the Union financial records were bad. There were pay loss bills behind and lots of overspending. The books were not kept well. Harris was asked what is the obligation for Union Officers to substantiate credit card spending. He said prior to this year, the only requirement or obligation was that OLMS and that requirement was to provide receipts and substantiate credit card purchases and document those items with a receipt along with credit card statements. On the receipt, it should be the same date, the same charge amount and what was purchased and what department to charge it to for financials in the budget and who was there and who made the purchase, and this is done on a monthly report. Harris issued the Charging Party's an email in response to a subpoena request. It was discovered while retrieving documents, certain items were missing. In item #1, the box containing all accounts payable invoices, reports and documents for fiscal year ending 2017 beginning with the letter S through V was missing. This would contain all backup and support documents, receipts for Eugenio Vargas monthly reports during this time frame. In item #2, receipts for Eugenio Vargas purchases -  purchase of Greg Gunter's APFA owned furniture. In item #3, we ended up locating the petty cash. Harris said they did not locate the record and receipts for letters S through V for fiscal year ending 2017 – April 1 through March 31.  Harris also talked about an email from Liz Marko to Rachel Early regarding a rental car that was reserved in Eugenio's name to be driven by Ellen Eherts and charged to the General Administrative Account. (CL-1, 2, 3, 5, 6, 7, 8, 9,10 and 11) were introduced and received into the record. Harris also said the monthly and weekly's were missing from April 1, 2016 to March 31, 2017 (S through V). Harris also said the receipts for furniture purchased by Eugenio Vargas from April 2016 through March 31, 2017 could not be found. Harris also said APFA has a policy on keeping inventory, there are no specifics on how they are to be kept and this is the responsibility of the Treasurer.  Harris also said he could not locate the inventory list for furniture from the Vargas Administration. Harris also talked about the issue related to the formula for the payout of vacation for former officers Vargas, Ms. Martin, Mrs. Dunaway and Bob Ross. There was a disagreement on the formula whether it included the MEA and SAF payments. For calculating the payout, the annual payout takes your annual salary and it's a formula based on that.  The MEA and SAF are payments above and beyond the salary and those amounts were included in the formula. Harris also said Vargas is currently making payments as well as Dunaway and Ms. Martin has paid her debt in full. Bob Ross has not paid back the money ($5400.00) owed. Harris did state Bob Ross received an exit package when he left office as National President and it paid him from March through July. Ross was paid a guaranteed meal expense during the time he was no longer working for APFA. Bob Ross did not fill out a weekly report. Payment is approved by two National Officers who would sign off on a weekly report. The weekly report would substantiate the meal allowances or the MEA and the SAF. Harris said they sponsored a set of Resolutions related to financial matters, financial reform. It was a cleaning up policy related to Section 5 and 6 of the Policy Manual. Section 5 is the trip removal and expense policy and Section 6 is the National Officers' salaries and benefits. Resolution No. 8 was APFA credit cards basically aligning APFA policy with OLMS and the OLMS standards for corporate cards for unions because there was no policy. Resolution No. 9 is creating policy or creating and cleaning up policy related to apartments and furnishings, relocations, determining limits, things that were not really defined. Harris said they saw a need to create parameters and boundaries concerning apartments and furnishings. Resolution No.10 deals with business related meals realigning the credit card policy with OLMS, but to also further clarify what business related meals

13

and expenses are and what the procedure is for seeking reimbursement or use of the APFA credit card. Harris said there was no policy in place for credit card expenses, name, nature of business, etc. but it was in place with OLMS, because it is the law. Resolution No. 10, business related meals and this new policy is for group meals to be incompliance with LMRDA regarding meal purchases using an APFA credit card. All meal charges must be accompanied with a written explanation of the specific union business conducted during the meal and the full name of and title of all attendees, created policy to reinforce what the law states. On Resolution No. 11, the policy language in the manual had very minimal language on parameters around rental cars. It only allowed officers to just authorize it, but we wanted to further clarify the procedures over rental cars. We don't provide rental cars for your home base as you are a resident. Resolution No. 12 deals with officer relocation and speaks of $10,000.00 round trip move to Dallas. We clarified what is round trip versus one way. Resolution No. 13 deals with the collection of non-dues owed to APFA. Resolution No. 14 deals with resignation or recall of a National Officer. This eliminated the need for an exit agreement in the future. Harris said that they realized the policy manual was not clear enough and were receiving a lot of questions about certain policy and it left areas open for interpretation. This is the reason for so many resolutions to be created to clarify policy.

On cross-examination, Ms. Morgan asked Harris, did the charging party's ever request to review documents from any other administration outside of the Ross Administration and he said "no." He also said they would have working lunches for the budget committee team. Harris also said that prior to March, the APFA did not have a set policy on the handling of receipts in Section 5 of the Policy Manual. Plaintiff objected to Ms. Morgan introduction of several documents into the record to reveal their conclusive proof these documents received disclosed a past practice and were shared with the Plaintiff through email as soon as Harris provided it to them. The arbitrator overruled the objection and allowed these documents into the record. Harris said no Article VII charges were ever filed against him for not having receipts. Harris said the Treasurer before him was Craig Gunter. He took office in 2018. Harris said that he was on Vargas budget committee in the administration prior. Harris further said APFA's finances were strong when Vargas left office on July 1, 2018. Harris said they went from a strong financial position to dire state October 31, 2019 due to rampant overspending. The prior administration brought in their own outside opinion and they advised the administration and the BOD that there needed to be some oversight. The BOD then created the budget oversight committee. Harris also said that it appeared from the depreciation schedule that two persons share the Ashley furniture. Harris also said that he has had to rent cars when additional representatives are in town and are rented under the National Officers name for the representative. Harris said Section 5 of the policy manual governs trip removals, which is a pay loss, representative salaries, reimbursements and meal expenses. National Officers are paid in accordance with Section 6. As an officer, Harris said he receives guaranteed MEA and SAF in Section 6 and stipend for maintaining an office outside of his home. Section 6 covers four officer salaries including him. Section 5 applies to all representatives. Defendant's Exhibit (V-44) was introduced and received into the record. Harris also said that in his email that he had read previously into the record that "there are individuals, who have seen these documents in the recent past; however, they have inexplicably disappeared from my custody." Defendant Exhibit (V-98), the Ross Transition Agreement was introduced into the record and discussed. Harris confirmed this was the document given to the Plaintiff. Harris read into the record Item No. 4, the economic terms of the Ross Transition Agreement, "APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time from April 1, 2016 through July 31, 2018."

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

On cross-examination, Harris testified to Laura Glading's administration was not providing receipts for year ending 2013. Harris testified that Marcus Gluth was not providing receipts for year ending 2014. Harris testified that based upon what he has seen the practices in the past are not the same as the present. The reason is, we have a different system and put in place policy procedures on how to use the corporate card to correct deficiencies and to be in alliance with the law. On re-direct, Harris said that Ross was overpaid on his vacation by 35 days. Vargas made this mistake and the check went to Ross. Vargas did not benefit from this error. Harris also said they got overpaid on their 401K, it was inflated wrong by the amount used to calculate that was based on that formula. Vargas made this mistake.

**Christopher Thedford**

Thedford testified that he has been employed with the APFA since November 2019 as a Staff Member and Senior Accountant. He does general ledger entries, credit card entries to the general ledger including invoicing and payments. He is very familiar with the standard accounting procedures. He says that it is important for a business or an organization to maintain proper inventory control of furniture. You need to know what you have in the building, the cost you paid for it and the current market value. There are different ways, different accounting methods that you can do it, one is just a simple depreciation where you recognize the initial value of it and then depreciate it over a certain time span, at a straight-line method, that's the most common method. So, each item, such as furniture, it needs to be accounted for until it's taken off the books. He says he has viewed APFA records, and seen the entries but that he really does not know their standards. He is not aware how long Union's are required to keep financial records. He explained book value is what you initially purchased an item. Market value is essentially the same thing but the price is now is set at a certain time period. And then the depreciated value is after a certain time period how much it's worth after depreciation. As to the APFA vans, they are paid off. After seven years in possession, the vans would have depreciated to zero for accounting purposes, but it would still have a fair market value and a salvage value. Exhibit (CL-6) was introduced, the APFA's General Ledger October 2016. He was asked to see the reference to Greg Gunter's furniture being written off. He said he doesn't recognize if it's normal or not and did not see a reason to write off the full value of the furniture with the information here. He was asked in terms of meal receipts, what should be on a receipt for a business meal. He said it would be an itemized receipt listing every item. What is needed on the receipt is the item, the amount and then a signature for payment. He said, the treasurer deals with policy and the accountant deals with accounting. He also said that he assisted in locating documents in response to the subpoenas and there were a few credit card receipts missing between fiscal year 2016 -2018. On cross-examination he said the missing credit card receipts for 2018 – 2020 were from National Officer Lori Bassani.

**Debbie Hoover**

Ms. Hoover has been employed with APFA for 22 years as an accountant. She does payroll, trip removal stuff and flight attendant expenses. She said she was familiar with the issue related to former National Officers during the Ross Administration changing their vacation formula for their vacation payout at the end of their term in June 2018. She said National Officer Eugenio Vargas approached her about changing the formula. She said she was told to add SAF and MEA. This did

raise a red flag to her because this has never been done before, it wasn't past practice. This was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they are included in box 1.

**Josh Black**

Black is employed with American Airlines and is currently, the National Secretary for APFA. He maintains files related to the Executive Board and BOD's meetings. And he oversees the Article VII process. At the August 4, 2020 meeting Melissa Chinery, Sandra Lee, Josh Black, Margot were present to view the Ross Transition Agreement. Union Attorney Bill Osborne provided a copy of the Ross Transition Agreement to the APFA.

**Sandra Lee**

Ms. Lee has been employed with American Airlines for 36 years as a Flight Attendant. She has never held a position with the Union. Her concern for looking into the Union's finances was the Bob Ross exit package. She had requested to see the Union's finances at APFA headquarters. She had a meeting with Liz Geiss APFA Vice President and Craig Gunter, the APFA National Treasurer in a conference room. The monthlies were spread out for each month of the year. It had a breakdown of payroll, fixed costs in the building, secretary's salaries, etc. Several months were missing of payroll for Bob Ross and Nena Martin. Chinery asked about furniture, an inventory list and she was told there was no inventory list. Exhibit (CL-2) is the furniture receipt purchased from Ashley Furniture. We were able to review the Ross Transition Agreement under Julie Hedrick's Administration. Bill Osborne was the attorney who allowed us access. Ms. Lee stated they also learned that MEA and SAF was included in the payout to the four National Officers. It was included in the Bob Ross exit agreement. Bob Ross was paid five months after he exited the building as President. The five months of pay included MEA and SAF. Also learned was that Ross had received extra vacation.

**Michele Chinery**

Ms. Chinery has been a Flight Attendant with American Airlines for 25 years. She stated she supported Bob Ross, Eugenio Vargas, Nena Martin and Marcy Dunaway. But, could no longer support Ross because he promised to do a lot for the merger with Legacy US. Air and Legacy American and unite us. Ross ignored the U.S. Airway Flight Attendants. She stated per the constitution, they initiated a recall for all four of them. It lasted about a year and they had enough signatures on the petition to trigger an election. Thirty percent is all that is required to trigger a recall and they presented the petitions at the National Convention but they were not validated and there was no recall vote. She also stated she was allowed to view financials from the Bassani Administration. She also asked for credit card receipts of the Ross Administration. Chinery stated they looked at the Ross exit package first and then looked at Laura Glading's exit package. We then looked at credit cards. We looked at mileage. We looked at monthlies, and weeklies receipts. The financial records were a mess. We only saw the records that were provided to us as some were missing. The receipts for Vargas monthlies were missing. We were also informed of missing boxes

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

of financial documents. Harris said the box S to Z was missing for fiscal year 2017. She also said there were a hundred and fifty restaurant charges. It could be Vargas charged those for other individuals, reps.. She also stated she prepared a document using Exhibit (CL-1 and 2) and compared this information against the receipts. The first entry was May 9, 2016 to May 25, 2018 and $10,945.28 was spent with the Union credit card on food. Vargas was receiving guaranteed MEA. The food chart exhibit mentioned includes meals purchased on Vargas credit card and equates 150 meals for a total cost of $10, 945.28. Vargas loved Taco Cabana and he went 52-54 times to the Raven's Grill & Golf course. Some of these receipts were filled out properly and some were not. Most of them were not. For example, June 30, 2016, it does not list the reason or who was there with him. Most of the receipts are undocumented.  There were receipts where Officers were purchasing meals for one or two other Officers and they were listed on the receipt. She said the policy manual does not allow an Officer to take both guaranteed meal expense and actual meal expense. When Vargas actually charged a meal, he did not reduce guaranteed meals for the day.

*DEFENDANT TESTIMONY*

Only certain testimony this arbitrator has deemed relevant to the issues at hand are as stated herein.

**Shane Staples**

Mr. Staples has been employed with American Airlines for over 30 years as a Flight Attendant. He served in the APFA Bob Ross Administration starting in March 2016 in Communications. APFA provided furniture to be used at the Bear Creek apartment he was given. He stayed in a hotel for a month prior to being accommodated. When his term ended in July 2018, he moved out of the apartment. This occurred after Vargas left office. He said it is standard practice for the Coordinators or the National Chairs to stay on with the new administration. When he moved out, he did an inventory of the items in the apartment. Exhibit (V-32) is an email of his inventory list.

**Chuck Ransdale**

Ransdale has worked as a Flight Attendant for American Airlines for over 33 years. With the APFA, he was the Vice President for the Baltimore domicile as well as the National Contract Chair. He served in the Bob Ross administration as a contract chair. APFA provided accommodations and he provided documentation in support.  Maddie was the attorney for the APFA at the time. He did go to a garage in the Bear Creek complex but all the furnishings were tagged going to other apartments. He said he was on a flight to Madrid doing a time study. Vargas was working the flight and we did have a working dinner to talk about the time study. Vargas picked up the dinner tab and he picked up the wine tab. And they were all on MEA and SAF and getting per diem. He paid for the wine with his personal credit card. On re-direct, Ransdale was asked if he knew of Melissa Dyer. He said Dyer worked on policies and procedures for American Airlines under Michelle Morenas.

**Yvonne Johnston**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Johnston has been employed with American Airlines for 34 years. She has a Bachelor's Degree in Behavioral Science and Health and Economics. She also has a Master's Degree in Forensic Accounting. She has served on APFA Budget Committee and served under National Treasurer(s) Eugenio Vargas, Craig Hunter, Erik Harris and Greg Gunter. She states that she helped streamline the way the taxes are taken out of APFA representative paychecks and unemployment insurance. On the budget committee she worked with Kimberly Smedley, Russ Reed, Erik Harris, Amy Milinkovich, Todd Breckenridge, Robert Norvell and Beth Flannery. She said usually the Treasurer would have lunch brought in so we could continue to work. The group would usually go out for dinner and the Treasurer would pay the bill with the APFA credit card. Some of them claimed MEA and SAF. Vargas would take them out and would pay using the Union credit card. Erik Harris, Craig Gunter, Greg Gunter would take her out and use the credit card to pay for the bill. She also said that she saw other officers in all other administrations have the practice of purchasing food and beverages for themselves and for others who were already receiving MEA and SAF. She stated it has been a standard practice across the board not only Treasurers but all other Officers to be permitted to use the APFA credit card for food purchases and beverage purposes when people are receiving MEA and SAF when they are at APFA. She resigned her position because she was not getting the proper financial documents in a timely manner in order to be able to do her job properly. She also stated that when Eugenio was in office, the state of the finances in her opinion looked good. She also said that if a personal purchase was made and it was corrected within the same billing cycle and repaid, the institution was not harmed. She also stated Vargas has an impeccable work ethic, he is fair, honest and reliable.

**Craig Gunter**

Gunter  was treasurer of APFA and said that Ms. Chinery and Ms. Lee came to APFA to view documents four or five times. He stated he was the Chair of the Budget Committee  and there were six persons on the budget committee. When the members of the budget committee came into town for their regularly scheduled meeting, he would order food for them to have a working lunch. The food was paid for on a APFA credit card and they were receiving MEA and SAF. This has been a past practice for many years. This was actually a cost savings to have the meetings continue. Ms. Lee and Ms. Chinery when examining Vargas documents never questioned him about similar expenditures. He said that when he took over from the Ross Administration the state of the APFA Treasury was in order.

On cross-examination, Gunter stated that he had prepared and presented a PowerPoint presentation showing in great detail how the payouts were calculated and determined the calculations were correct. Ms. Martin requested of him to set up a conference call with the BOD to talk to Eugenio Vargas because they did not trust the calculations he did. The attorneys and BOD members interviewed Vargas. Vargas admitted that he had calculated the amounts using additional salary, the additional income added into the salary amounts. And he admitted that he knew the past practice did not use this calculation. He admitted that he directed the accountant to use his calculations and the accountant was not comfortable in doing so. After verifying the calculations and interviewing Vargas, the Board passed a resolution demanding repayment. The attorney got involved as this was going on for over four months. In December the Executive Committee had to threaten to file a lawsuit if they did not pay it back within 30 days. The

**Black Decl., Ex. W**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Resolution was passed by the Executive Committee and Ms. Martin paid the full amount and
Vargas and Dunaway set up a repayment plan.

## Marcus Gluth

Mr. Gluth has been employed with American Airlines for approximately 30 years as a
Flight Attendant. He was the Southeastern Division Representative and had seven bases in his
division dealing with upper-level grievances. A member of the National Committee from 2000-
2002. In 2015 the APFA president resigned and he was elevated to the President until April 2016.
The Bob Ross agreement was negotiated with a Non-Disclosure Agreement (NDA). He assisted
the BOD as Lead Counsel in their representation when they were charged with violating the APFA
Constitution by Julie Moyer.

Mr. Gluth discussed the Ross Agreement and the Laura Gladings Agreement. Admitted
into the record as Exhibit (V-100) the amicus brief.

## Randy Trautman

Trautman is the APFA Miami Base President. He has been employed for over 38 years. He
has held positions such as National Scheduling Coordinator and International Negotiator.  He was
on the BOD on March 1, 2018. Attorney Mark Richards and the BOD were present regarding the
Ross Transition Agreement. In the Laura Glading's exit agreement, it included full salary and SAF
and related payments. He has been a member of the BOD for over 22 years. He represents the
fiduciary responsibility of the Union, sets policy and interprets the Constitution. As a Board
Member, he became aware at a Board meeting that Eugenio Vargas, Marcy Dunaway and Nena
Martin had received an inflated formula for MEA and SAF.

Trautman admitted that at the last convention in March, the BOD passed several
resolutions. Those resolutions passed by the BOD are to set policy on moving expenses, National
Officers payouts, APFA apartments and furniture because there was no policy in place.

## Eugenio Vargas

Vargas has been employed with American Airlines for 26 years. He has held the position
of Boston International Vice Chair, Boston International Chairperson and APFA National
Treasurer.  He testified that on August 11, 2016 he was on vacation with his spouse in Madrid,
Spain. He rented a car from Enterprise Car Rental. He walked over to the Enterprise counter but
he had to go to the restroom and asked his spouse to handle it. When he came back the car rental
agreement was ready for him to sign and he signed it. In early September when the bill for the
credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise
charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit
card was used. He brought the receipt back to APFA the following morning and when senior
Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you
have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase
account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from
his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 463 of 506   PageID 6408

**Black Decl. Ex. W**
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He has made one trip to Madrid on vacation and one trip to Madrid with APFA. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study. National Contract Chair Chuck Ransdale, AFPA Representative Neil Fernandez and Melissa Dyer. Exhibit (V-17) is Vargas (V-1) showing the dates on which he traveled to Madrid doing the time study as a working Flight Attendant where he displaced a Flight Attendant to work. He said he did have a working dinner with the group and he paid for the dinner and Chuck Ransdale paid for the alcohol tab. This was only time he charged meals in Madrid. He said he saw no issue for Flight Attendants who were receiving MEA. He also stated that he has working lunches with other officers. He said that he did order lunch for the budget committee. He took them to dinner and paid for it with the APFA credit card. He said that he has never used the APFA credit card for his personal use. He stated that in all of the years of eating food provided by APFA, no one from APFA has ever instructed him to deduct any amount from his MEA. Exhibit (V-28) is a document of purchased furniture. The three persons listed on the document of the furniture purchase were National Chairs, Shane Staples, the Communication Chair, Gaby Harty, Health and Chuck Ransdale were on the contract. Vargas said the purchase was for the Coordinator's. He asked them to go over to the garage where Bob Ross' apartment and go through the furniture that was there and see what they could use prior to going out and getting new furniture. Exhibit (V-36) is an email from Bob Ross stating that Gaby Harty had resigned and Kim Coats Tuck would be the interim National Health Chair until it is filled with a permanent appointment. Gaby's apartment lease was up in May, five months away and APFA had to pay for it. Vargas decided to move one of the representatives in the back, that there was a full month removal into Gaby's apartment and that would be a net savings for APFA. She moved in until the May 15, 2017 and allowed enough time to take inventory of what was there because the lease was up at the end of the month. Rachel Early worked in the account department and dealt with apartments, took inventory and packed some stuff. Exhibit (V-29) is an email from LaDonna stating that she had contacted, Kiss it Good Buy, and set up a meeting for May 25. Mike Trapp would move the furniture to, Kiss it Good Buy. Exhibit (V-30) is an email from LaDonna Casey to Vargas informing him that the items had been sold and they would send a check to APFA for $1,159.00. Exhibit (V-33) is a check for $339.10. All three of the representatives furniture were accounted for and this documentation accounts for the record location of the Ashley furniture addressed in the charges totaling $8,753.89. Attorney Mark Richards showed him Items 3, 4 and 5 of Exhibit (V-100) the Bob Ross Transition Agreement. Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and Ross was paid this way. Laura Glading received the same as Ross and the BOD agreed. Vargas said that Patrick Hancock informed him that the formula used was a 1987 package formula. Vargas said he entered into a payment agreement to repay the overage debt. Vargas also said that it was his interpretation to change the formula for the MEA, SAF to be included in their payouts.

### THE PLAINTIFF'S ARGUMENTS

Plaintiff argues Vargas violated the detailed language of the APFA expense policy by charging thousands of dollars of unauthorized meals to his APFA credit card. Vargas charged

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

meals in his city of residence, Dallas Fort Worth (DFW), when he had no right to meals in his home location, double-dipped when he was receiving per diem out of base, and claimed actual meals while receiving Guaranteed Meal Allowance. Vargas further violated his responsibilities as treasurer by routinely authorizing inappropriate payments to other APFA officers who were committing similar violations of the meal expense policy.

Plaintiff argues Section 5.F of the policy manual provides the following.

1. Per Diem MEA Away From Residence
   a. Per Diem Rate (Accountable Plan)
       (i) All members shall be entitled to an APFA Meal Expense Allowance (MEA) while performing work for the APFA when away from their residence for one (1) or more nights at the Collective Bargaining Agreement Domestic Per Diem rate while traveling domestically and the Collective Bargaining Agreement International Per Diem rates while traveling internationally, for each hour they are away from their residence.

2.     Actual MEA at Residence
   a. On days s/he is not trip removed, the APFA will reimburse a representative actual meal expenses at his / her residence city to the limit provided in F.2.a.(1) below when it is necessary to conduct APFA business during such meal, or when a representative is required by the transaction of APFA business to meet during a normal meal time.

       (1)    Allowable MEA at Residence City is as follows:
           Breakfast up to: $ 6.00
           Lunch up to: $10.00
           Dinner up to: $17.00
           Snack up to: $ 3.00

       (2) In addition to the required receipt, all such MEA reimbursements shall require the representative to note the name(s) of the other individual(s) meeting during the meal time and the nature of the APFA business being conducted.

3. Guaranteed MEA at Residence
   1. On days a representative is both trip removed by and performing work for the APFA at his / her residence city, such representative will receive a "Guaranteed MEA at Residence" in lieu of any actual MEA at residence as provided in F.2. above.
   2. The "Guaranteed MEA at Residence" shall be paid at the rate of twenty-five dollars ($25) per day.
   3. The maximum "Guaranteed MEA at Residence" that will be paid to a member shall be seventy-five dollars ($75) per week or three hundred dollars ($300) per month.

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

    4.  National Officers, Regional Representatives, National Chairs and other representatives who are authorized a full month trip removal or the equivalent shall receive a "Guaranteed MEA at Residence" of three hundred dollars ($300) per month.

4. Calculation of MEA
    a.  National Officers, Regional Representatives, National Chairs and other representatives who are authorized a full month trip removal or the equivalent (e.g. "Payback" as provided in paragraph D. above) shall receive a minimum MEA of three hundred dollars ($300) per month.
    b.  The combination of "Per Diem MEA Away from Residence" as provided in f.1 above, "Actual MEA at Residence" as provided in F.2 above, and "Guaranteed MEA at Residence" as provided in F.3 above shall not be capped.
    c.  MEA expenses will be calculated and paid in the following order:
       (1)  "Per Diem MEA Away from Residence," then the remaining balance owed, if any, will be paid as
       (2)  Actual MEA at Residence," then the remaining balance owed, if any, will be paid as
       (3).  "Guaranteed MEA at Residence."

5. Business Related Expenses
a.  Representatives are authorized to pay for and to be reimbursed for the meal, snack or beverage of a guest(s) or other business associate(s) on those occasions when the representative would reasonably be considered the host of an authorized APFA function or meeting.
    i.  Discretion and good judgment should be used when exercising this privilege and when incurring such legitimate and necessary Business- Related Expense.
    ii.  Abuse, as determined by the Executive Committee, may lead to limitation or revocation of this privilege.
    iii.  In no case may an individual who is otherwise receiving an APFA MEA in any manner be considered the "guest" for the purposes of this provision. The reimbursement of a Business-Related Expense shall not count against a representative's maximum MEA.

      Plaintiff argues that Vargas spent thousands of dollars in DFW on meals not allowed by the Policy Manual. The APFA Policy Manual does not permit National Officers to charge actual meals in their City of Residence, except for narrow exceptions. The hosting exception is very narrow. National Officers who travel away from DFW on Union business are paid at per diem at the same rate as American Air Lines Flight Attendants and are not permitted to "Double Dip: and receive actual meal expenses. There is no working lunch exception in the Policy Manual. APFA Representatives are required to follow Provisions of the Policy manual. The Charged parties failed to establish a practice of violating meal policy.

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

Plaintiff argues Vargas failed to maintain an inventory of furniture and failed to safeguard union assets as required by the APFA Constitution. Vargas failed to safeguard tens of thousands of dollars of furniture left by his and prior administrations. The evidence will show Vargas misappropriated tens of thousands of dollars of furniture he had no right to take, concealing the fact from the APFA leadership and members. The portion of the charges dealing with furniture reads as follows:

> Finally, thousands of dollars of furniture, including furniture purchased by Vargas, is unaccounted for. As Treasurer Vargas had an obligation under the APFA constitution and federal labor law to safeguard union property. On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture. There is no record or inventory of that furniture nor can the furniture be located. The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done.

> The Treasurer has the responsibility to safeguard the funds of the APFA union members as outlined in Article III Section 6.E. of the APFA Constitution: Duties of the Treasurer: The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA.

> The specific charge was failure to maintain an inventory list but the charges also listed a violation of the broad duty as APFA Treasurer to "be responsible for the care and custody of the funds and securities of the APFA."

> Article VII, Section 2 of the APFA Constitution states members can file charges over "act(s) *and/or* the Article(s) of this Constitution allegedly violated which constitute the basis of the charge(s)." (emphasis added) Here Vargas is charged with both a specific act and a violation of an article of the Constitution.

Vargas did not maintain an inventory list. The Ashley furniture purchased by Vargas cannot be accounted for. The missing furniture from the prior administration. Vargas last minute objections should be rejected. Eugenio Vargas failed to safeguard the furniture of the prior administration.

Plaintiff argues Vargas changed the long-standing formula on the payout of sick and vacation payout to inflate his and his fellow national officer's payouts by thousands of dollars, failing to inform the Board of Directors.

On his last days in office, Eugenio Vargas changed the longstanding formula on vacation payout to inflate the pay of himself and his fellow officers, Bob Ross, Nena Martin, and Marcy Dunaway. Rather than including just the salary in the payout of vacation, they included items from expenses such as Meal Expense Allowance and SAF.

23

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

The policy manual provides that officers may be paid out of unused sick and vacation. (Joint Ex 1.) This should be paid out at their rate of pay. Instead, Vargas inflated their pay to include MEA, SAF and stipend which caused them to each be paid over $5000 above what they were entitled to.

Section 6.B.1.c of the policy manual allows an outgoing National Officer to be paid out vacation " at a rate prorated on the National Officer's annual salary, as defined in 6.A above..." Section 6.A provides the "The salary of the National Treasurer shall be equivalent to the highest purser

flight attendant pay rates, including international override pay, for a flight attendant based on 105 hours monthly." (Joint Ex 1) There is no ambiguity in the language whatsoever.

Vargas, along with his fellow national officers Marcy Dunaway and Nena Martin, inflated this pay by adding in MEA, SAF and stipend. But nowhere in the policy does it provide that expenses and other payments are included.

This was simply a money grab on their last days in office. Vargas admitted on cross examination that this was his idea to do this and that he did not inform the BOD. (TR 656) Even worse they broke the checks up into a series of four $4000 checks which they signed for each other three days before they left office. (TR 213-214, 661.) While Vargas claims it was to avoid taxes that makes no sense since lump sum distributions are always taxed the same.A member of the APFA accounting department, Debbie Hoover was subpoenaed and testified in this hearing. Ms Hoover testified that she was ordered to add the MEA, SAF and stipend to their pay. She testified it raised red flags as it "just had not been done that way. It wasn't past practice."

In an exchange, Patrick Hancock, a longstanding member of the APFA leadership, explained to Vargas and his cohorts that this policy had been in place since 1987 and was very simple. It was based on their pay using their hourly rate. Hancock noted they had paid themselves based on a new formula which added in "things like profit sharing, MEA/SAF, Grand Slam rewards, and who knows what all. This New Formula was not approved by the BOD or EC...."

Plaintiff argues Vargas allowed Bob Ross to be paid expense allowances when he was no longer working for APFA. This payment was not specified in Ross' exit package.

Bob Ross resigned office in March, 2018 receiving an exit package negotiated by outside attorney Mark Richard. The validity of the Ross exit package is not in play in this arbitration. A separate arbitration ruled the BOD was within their authority to sign that deal. Chinery and Lee were not parties to that case.

Plaintiff argues this case does not challenge the exit package but rather charges Vargas allowed Ross to receive thousands of dollars in payments not provided for in the policy manual or the exit package. The exit package provides that Ross shall receive the following economic items:

3.      Bob Ross will continue to receive from APFA his current full salary and benefits including his insurance through July 31,2018.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

4.      APFA agrees to pay Ross all of his accrued and unused back vacation time from
         April 2016 through July 31 2018.

5.      APFA agrees to pay upon his request a one time lump sum in the total amount of
         ten thousand dollars ($10,000) which represents Ross's moving expenses. Ross
         shall present the moving expenses to APFA for payment through 2019.

Nowhere in the exit package language does it specify Ross should get paid expense
payments for months he is not working. Yet Vargas paid Ross $1050 for five months from
March through July 2018 for a total of $5250.

Plaintiff argues Vargas used the union credit card for a rental car while on vacation in
Spain as well as charging a meal while also on per diem. Vargas was charged with violating
policy by charging a rental car for the week at a cost of almost $700 when he was on vacation in
Madrid, Spain. Additionally, Vargas was charged with violating meal policy by charging meals
in Spain while on per diem. Here the record is undisputed that Vargas used the union credit card
to purchase the rental car. Vargas claims that he was on vacation with his husband and used the
restroom and somehow his credit card was signed. Vargas claims he paid it back on September 9
after discovering the mistake. The question then becomes was this an inadvertent mistake or did
Vargas intentionally misuse the credit card and pay after he realized? Current treasurer Erik
Harris testified that when Chinery and Lee originally filed the charges he could not find the
receipt. (TR 378-382.) The receipt was provided by Vargas. So based on the information
available at the time of charging, these charges were proper.

Plaintiff argues Article III, Section 6.E of the APFA Constitution places the responsibility
on the APFA National Treasurer the duty to safeguard the assets of the union. Vargas, in fact, did
the opposite, repeatedly violating the policy manual for the benefit of himself and others.

Plaintiff's request the following remedy:

1.  Vargas repay APFA for the following economic harm:

    a.  Vargas repay APFA for all meals charged to his card which lack a proper receipt
        containing itemized meal, business purpose, attendees and/or any meal which
        does not meet the hosting exception. Alternatively, Vargas should repay APFA
        the value of MEA he received during his term which is $7500.

    b.  Vargas repay APFA for the fair market value of Greg Gunther's furniture he
        embezzled.

    c.  Vargas repay APFA for the value of furniture he failed to protect, including from
        prior administrations.

2.  Vargas be prohibited from serving in any APFA position for life.
3.  We request that a fine be leveled against Vargas equal to the cost of this arbitration
    proceeding pursuant to Article, Section 7.C.

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 467 of 506   PageID 6914
**Black Decl. Ex. W**
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

4. That APFA be instructed to conduct a full audit of Vargas' administration and assess Vargas any additional funds which are uncovered in the audit.
5. We ask that the arbitrator retain jurisdiction in case the parties cannot agree on any amounts due.

## THE DEFENDANT'S ARGUMENTS

Defendant argues the only issue to be determined is whether former APFA National Treasurer, Eugenio Vargas, committed the following act(s) was a "**willful** violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or Executive Committee" of the APFA Constitution, Article VII, Section 1.F. and did Members Melissa Chinery and Sandra Lee (Plaintiff) willfully bring these charges against the former APFA National Treasurer, Eugenio Vargas (Defendant), without having evidence sufficiently sustain the charges.

Defendant argues that by definition, were the actions of the former APFA National Treasurer, Eugenio Vargas; deliberate, intentional, premeditated or calculated regardless of the consequences or effects? Or were they not accidental or done deliberately with disregard to the APFA Policy Manual or APFA Constitution.

Defendant argues the allegations raised by the Plaintiff against former National Treasurer Eugenio Vargas were not willful or deliberate, intentional, premeditated or calculated. Mr. Vargas however, takes full responsibility for his actions and has provided his full support in Defense of these charges.

Defendant argues the plaintiff has the burden of proof. There are three standards of the burden of proof, (1) preponderance of the evidence, (2) clear and convincing evidence and (3) beyond a reasonable doubt. This obligation has not been met by any the burden of proof standards.

Defendant argues the Plaintiff argued in the Article VII charges the credit card use and expenses, where the union credit card was used for personal use (rental car) in Madrid Spain.

Defendant argues the charging parties cite Policy Manual Section 5.G. in support of their Article VII charges, when the referenced section of the Policy Manual actually applies to "Actual out-of-pocket expenses incurred by a member in conducting APFA business will be reimbursed." Not only was this an invalid citing of the APFA Policy Manual but an indication of their lack of understanding of said policy and it's interpretation, while arguing inaccurate and irrelevant points to support their charges. While on vacation with his spouse in Madrid, Spain, and while awaiting the keys for a rental car at the Enterprise car rental counter, Vargas handed his spouse his wallet to pay for the rental car while he went to the restroom. Upon his return to the car rental counter the rental agreement was ready for a signature and the car was ready for pick up. Not until early September did Vargas realized a mistake had been made with the payment for the rental car while in Madrid, Spain. Vargas realized his spouse had used the APFA Chase Credit Card from his wallet instead of his personal Chase Credit Card, when paying for the car rental in Madrid, Spain. The following day Vargas returned to APFA with the car rental receipt and explained to the APFA senior accountant, Rene Berthelot what had happened, to which he responded "don't worry, all

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

you have to do is pay it back. It happens."  Vargas made a payment of $614.20 to APFA on
September 9, 2016, for the personal rental car charge made to his union credit card. Former APFA
National Treasurer, Craig Gunter, a licensed CPA, was also questioned on the record about any
personal purchases he may have inadvertently made with his union credit card, stating "I could
have, but I don't think I ever charged anything on it, but you know, they're all in your wallet so."
He further stated, if I had done so "I would have gone to the accountant and said I accidentally did
this. Here, let me write you a check". Former APFA National Treasurer, Craig Gunter, also stated
for the record the process for personal purchases inadvertently made on a union credit card by
other officers in his administration.

Defendant argues the Current APFA National Treasurer, Erik Harris, also confirmed that
the personal car rental purchase inadvertently made by Mr. Vargas on his union credit card while
on vacation in Madrid, Spain was reimbursed to APFA. Personal purchases made by other APFA
National Officers using their union credit card were identified on the record. Former APFA
National Secretary, Jeff Pharr's union credit card statements revealed multiple personal purchases.
Mr. Pharr's union credit card statements also expose this practice as an acceptable habit, multiple
personal credit card charges along with charges identified for other union representatives. Former
APFA National Secretary, Jeff Pharr had approximately eight (8) identified personal charges to
his union credit card along with personal charges made for other union representatives. Mr. Pharr
was subpoenaed without acknowledgement.

Defendant argues that former APFA National Treasurer, Eugenio Vargas was charged with
failing in his responsibility to act in accordance with the APFA Policy Manual Section 5.F., by
citing "The policy is clear that meals may only be reimbursed on rare and limited occasions when
entertaining outside guests and in no instance when all participates are already receiving meal
expenses. This is to prevent double dipping by having APFA pay MEA for meal expenses and
then also pay for a representative's meals."

Defendant argues APFA had no policy in place on how to differentiate or separate any
amount from the guaranteed MEA/SAF totals when a National Officer, Regional Representative,
National Chair, or another Representative, who are authorized a full month removal and receiving
guaranteed payments of MEA/SAF, is considered a host of an authorized APFA meeting. APFA
also had no policy in place until this year for a National Officer in relation to ones union credit
card practice. Current APFA National Treasurer, Erik Harris clarified this fact on the record. APFA
MIA Base President, Randy Trautman also confirmed no polices were in place for said issues.
APFA National Treasurer, Erik Harris identified on the record, he himself was non-compliant with
the "OLMS Law" by not providing the required information while receiving MEA/SAF and was
never charged with Article VII. The Budget Committee meetings hosted by the APFA National
Treasurer is one example of an authorized APFA meeting. It is an established practice that has
been followed through the years for the APFA National Treasurer to provide lunches/dinners for
their committee members. Yvonne Johnston, Craig Gunter and Erik Harris this practice.

Defendant argues that the APFA Board of Directors Annual Convention was held in March
2021, APFA National Vice President, Larry Salas, put forth Resolution No. 10, Business Related
Meals, which provides a clear policy on reimbursement of business-related meals and group meals
and entertainment expenditures. The APFA Board of Directors unanimously passed this resolution.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

This resolution secures the established practice of an APFA Representatives authorization to pay for meals of a guest/business associate when the Representative would be considered the host of an authorized APFA function or meeting, while not counting against a Representatives MEA.

Defendant argues The APFA Chase Credit Card statement dating, May 9, 2016, to June 8, 2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016, in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs. The G/L Acct 1246 document for Furniture & Fixtures provides a record of items purchased under the name of each APFA National Department Chair and amount spent. The total value of the initial charge differs due to a credit of $104.98.

Defendant argues that in January 2017, APFA National Health Chair, Gabby Harty tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck, as interim National Health Chair on January 17, 2017. With 5 months remaining on the Harty apartment lease, and in a cost saving measure for the union, Mr. Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA with an estimate for the accepted furnishings remaining in the Harty apartment. Four (4) months after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with the total dollar amount sold by consignment. APFA received $1159.00 in payment from "Kiss it Goodbye". There was extensive testimony and documents exchanged regarding "Kiss it Goodbye" by both parties and the dollar amount ($1159.00) received. On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty. Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs, including queen bed, chest, and nightstand from Ashley Furniture. In December 2017, APFA National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture purchased by APFA from Ashley Furniture was in his corporate apartment when leaving Dallas. Shane Staples, after being appointed to the position APFA National Communications Chair, testified he was instructed to salvage any furniture he could use for his corporate apartment from a garage at the Bear Creek apartment complex, which was being used by APFA as storage. After these items were repurposed, the Ashley Furniture items were purchased. In preparation for the end of his term and transition period, APFA National Communications Chair, Shane Staples completed a detailed inventory of all his furnishings in his APFA corporate apartment, which contained the contents purchased at Ashley Furniture.

Defendant argues Members Melissa Chinery and Sandra Lee have cited language from Section 8.I.3.b.(5) of the APFA Policy Manual which governs the inventory and transfer of Office Equipment only. The Charging Parties have once again quoted and used invalid language to substantiate their Article VII charges against former APFA National Treasurer, Eugenio Vargas.

Defendant argues Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with

**Black Decl. Ex. W**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

the APFA Policy Manual by citing *" Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all which is not part of basic salary."* The APFA has an organizational structure that is two-tier, consisting of Base Presidents, who are the voting members and the four (4) National Officers, who are non-voting members collectively they make up the APFA Board of Director. In February 2018, Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual convention, the voting Board of Directors, under strict consult of APFA Legal Counsel, Mark Richard, negotiated a Ross "Transition Agreement." The negotiations were solely between the voting Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President, Robert Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations of the Ross "Transition Agreement" nor was he present in the room or a signatory of said agreement. In fact, APFA National Treasurer, Eugenio Vargas, had never viewed the Ross "Transition Agreement" in its entirety, only the economic portions which encompassed covenants #3, #4 and #5.

Defendant argues Members Melissa Chinery and Sandra Lee have alleged that former APFA National Treasurer, Eugenio Vargas, failed in his responsibility to act in accordance with the APFA Policy Manual by citing *" Vargas failed to properly oversee Ross' payments and allowed Ross to receive payment for MEA, SAF and Maintaining Office Outside Residence all which is not part of basic salary."*

Defendant argues the APFA has an organizational structure that is two-tier, consisting of Base Presidents, who are the voting members and the four (4) National Officers, who are non-voting members collectively they make up the APFA Board of Director. In February 2018, Charlotte, North Carolina the APFA Board of Directors (BOD) convened for their annual convention, the voting Board of Directors, under strict consult of APFA Legal Counsel, Mark Richard, negotiated a "Transition Agreement". The negotiations were solely between the **voting** Board of Directors, APFA Legal Counsel, Mark Richard and APFA National President, Robert Ross. APFA National Treasurer, Eugenio Vargas was neither involved in the negotiations of the Ross "Transition Agreement" nor was he present in the room or a signatory of said agreement. APFA National Treasurer, Eugenio Vargas, had never viewed the Ross "Transition Agreement" in its entirety, only the economic portions which encompassed covenants #3, #4 and #5.

Defendant argues Covenant #3 of the Ross "Transition Agreement" states "APFA agrees that Bob Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018. Former APFA National Treasurer, Eugenio Vargas, stated for the record the difference between, "Basic Salary" and "Full Salary" regarding a National Officers compensation. Former APFA National President, Laura Glading, also received "Full Salary" upon her exit, per the terms of her "Transition Agreement." "Full Salary" for a National Officer, per the APFA Policy Manual, Section 5, entitles them to receive guaranteed MEA, SAF and Office Outside Residents payments. This guaranteed payment of $1050 is included in the gross wages "Box 1" of the National Officers W-2 tax form. Marcus Gluth corroborates the meaning of Basic Salary vs. Full Salary.

Defendant argues The NDAs on both the Glading "Transition Agreement" and the Ross "Transition Agreement" were lifted at the same time by APFA National President, Julie Hedrick,

29

APPX. 0470

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

allowing Members Melissa Chinery and Sandra Lee, to view both agreements in their entirety for any language and payment comparisons. No article VII charges were filed against Laura Glading for her 'Transition Agreement."

Defendant argues the hearing in the Matter of Arbitration between Julie Moyer (charging party) and the 2018 APFA Board of Directors (charged party), before Article VII Arbitrator, Edward B. Valverde, Esq., was held on June 1-3, 2021, with a decision rendered on September 21, 2021. The Award clearly determined, in line with the charged party's defense, that Article III, Section 3.A authorizes the APFA Board of Directors to take any and all lawful action consistent with the Constitution to safeguard and protect APFA.

Defendant argues Former APFA National Treasurer, Eugenio Vargas used "Full Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office, which included MEA and SAF. After numerous requests for a meeting, the first written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on September 4, 2019, approximately 2 months after the original Facebook post on July 11, 2019. The letter confirms that certain payouts made in 2018, incorrectly included MEA and SAF in the calculation. The letter continues to request that the "Union be made whole" but still no specific dollar amount owed had been established. Not until September 18, 2019, was the three (3) members of the Ross administration noticed of a dollar amount owed, supported by a single sheet of paper and without documents to substantiate the claim. Patrick Hancock revealed that APFA believed their calculations were correct based on a 1987 formula invented by former APFA National President, Patti Gibbs. Former APFA National Treasurer, Eugenio Vargas, stated for the record that he did include "Full Salary" which included MEA and SAF in the calculations of vacation buyback, sick buyback, and end of term calculations for the Ross administration when leaving office. He has **never** disputed that fact. Mr. Vargas used the same "Full Salary" logic that was used in the calculation of the Ross "Transition Agreement" and the Glading "Transition Agreement." He used the one and only number identified on the officers W-2 as gross wages, which include MEA and SAF in his calculations, but in actuality this calculation was irrelevant due to the fact that a "1987 formula" should have been used.

Defendant requests the Article VII charges against Eugenio Vargas be dismissed in its entirety.

## DISCUSSION AND OPINION

The arbitrator finds the allegations raised by Plaintiff against Defendant, the former National Treasurer Eugenio Vargas must be a *willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee.* (See Article VII, Section 1) The definition of "willful" has many meanings, its construction often influenced by its context. It often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal context it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. It may also be construed to mean an act or omission is willfully done, if done voluntarily and intentionally and with the specific intent to do something the law

30

**Black Decl. Ex. W**

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

forbids, or with the specific intent to fail to do something the law requires to be done; that is to
say, with bad purpose either to disobey or to disregard the law.  Additionally, a willful act may be
described as done intentionally, knowingly, and purposely, without justifiable excuse as
distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently. (Black's
Law Dictionary, 5th Edition, pg. 1434).

Additionally, the arbitrator is of the Opinion that in order for the Plaintiff to meet its'
burden of proof, it must not only be a "willful" violation but such proof must be supported with
clear and convincing evidence.

## Issue No. 1: – Violating the Meal Expense Policy

The arbitrator finds the scope of Section 5.F. of the Policy Manual deals with Meal
Expenses/Meal Expense Allowance (MEA); Per diem MEA Away from Residence; Actual MEA
at Residence; Guaranteed MEA at Residence; Calculation of MEA and Business Related
Expenses.

Plaintiff argued that Former National Treasurer Eugenio Vargas spent thousands of dollars
in DFW on meals that are not allowed by the policy manual. Vargas spent $10,945.28 on his APFA
Union credit card on meals during his two-year term of office. Plaintiff submits that many of the
meals lacked the proper documentation; by failing to provide an itemized receipt, the purpose,
and/or the attendees of the meal. At the same time, Vargas was receiving a guaranteed meal
expense allowance of $300.00 per month for his National Officer position and was therefore
double-dipping at the expense of the membership. Thus, for his 25-month tour as National
Treasurer, Vargas received $7,500.00.

The arbitrator finds and the record evidence supports the fact that APFA maintained a
check and balance system to insure the proper disposition of these expenses. Lukenmeyer testified
expenses are reported on an expense report and are supposed to have two signatures, so there
should be another person who is overseeing what the Treasurer is doing or spending, whomever
signs the other half of that expense report. Another National Officer is usually the person signing
and affirming the expenses are true and accurate. The only way this could be accomplished is by
having the proper documentation to include an itemized receipt, the purpose of the meal expense
and the name of the attendees. Plaintiff argued Vargas and his fellow National Officers frequented
Raven's Grill Country Club. Vargas spent $1,727.00 on his APFA credit card for several meals at
Raven's Grill but other National Officers took turns buying meals for each other on their own
APFA credit card.  This raises the question as to whether or not the check and balance system had
failed.  We however have to consider that the person who is approving these expenses was
knowledgeable of the policy manual and what was required for it to be a true and accurate expense
report was submitted with the proper documentation. Defendant argued this Check and balance
procedure is a past practice of prior administrations. Record evidence revealed that this has been
a frequent ongoing past practice in several administrations prior to and after the Ross
Administration.  Plaintiff filed an Article VII charge against Vargas when they could have filed
charges on other National Officers as well.  Plaintiff' represented that these meal expenses lacked
the proper documentation. Record evidence revealed there were missing files of the Vargas
administration, then it could be conceivable that these missing files contained the rest of the

Case 4:22-cv-00343-Y   Document 236-1   Filed 04/26/24   Page 145 of 506   PageID 6420   **Black Decl. Ex. W**
RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

documentation. Thus, the check and balance system in place may or may not have failed to catch the meal purchases lacked the proper documentation, as we are unsure. Record evidence revealed other National Officers were also taking turns in buying meals on their APFA credit card. They too may not have been aware of this activity could be viewed as "double dipping" to uphold an inappropriate use of the APFA Union credit card. So, when a weekly expense report is submitted to whomever for signature from Vargas, the individual signing it did not foresee a problem and signed off affirming the expenses were true and accurate. Present day National Treasurer Erik Harris testified there has been a lot of interpretation and no definitive policy was in place on the use of the APFA Union credit card. He also said the Union was aware of these shortcomings and the BOD recently took affirmative action and passed Resolution No. 10 - Business Related Meals, Exhibit (V-15) to correct and clarify. Without a clear policy in place, this arbitrator cannot affirm the expenses Vargas submitted for payment was proper.

Thus, the arbitrator is of the Opinion the evidence Plaintiff submitted is their interpretation of what they believe should be considered improper use of an APFA Union credit card. This arbitrator is not persuaded with the evidence presented. Additionally, no questions were asked of Vargas regarding all of these expenses. Plaintiff argued that the APFA Constitution states, "Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein." Without a definitive explanation or proper documentation from Vargas over each expense, we would be guessing if Vargas engaged in improper use of the APFA Union credit card!

It is the arbitrator's Opinion an independent auditor be hired to audit Vargas APFA credit card usage as to whether proper documentation was provided with the expense reports. Additionally, such auditor shall audit Vargas Tenure as National Treasurer and inspect his APFA credit card statements, expense reports, and whether two signatures were provided and whether it documented the purpose of the meal and with the names of the attendees. Thus, the evidence presented does not establish Vargas' behavior at this juncture was "willful" in violation of Article VII, Section 1, but if the audit conducted finds Vargas purchased meals for himself only then it would be found that his conduct was "willful" and would require him to repay APFA. This audit would reveal whether Defendant failed in his fiduciary duty as National Treasurer. Moreover, the record evidence at this point is not clear and convincing enough to establish Vargas expenses were inappropriate at this juncture. Only an independent audit will determine whether the evidence compiled is clear and convincing.

Moreover, the arbitrator finds in Exhibit (V-13, dated March 8-10, 2021) Resolution No. 8 where the BOD adopted a new credit card policy for APFA issued credit cards. Under "**Documentation of usage**" it states,

    a. Each National Officer shall submit an electronic report to the accounting department within thirty (30) days of the end of the month in which the charges were made. The report to be sent to the accounting department shall include:

        (1) The month and year must clearly be denoted on the report.
        (2) A copy of the itemized receipts for all purchases made.
        (3) The department(s)/budgets to which the charges are being made.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

b.  Each report must be signed by two (2) National Officers, one of whom must be the National Officer who submitted the report.

Resolution No. 8 also provides for the "Maintenance of Records", "Payment of statements should be paid as soon as possible so as to avoid unnecessary interest charges", "Policy Compliance", "Training" and all credit card holders are required to sign the APFA Card-Holder Agreement. The National Treasurer will maintain a copy of all signed agreements.

Under these given circumstances Issue No.1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Additionally, if the missing files are in the position of the Defendant, it is hereby Ordered that they be turned over to Erik Harris, the National Treasurer for the independent auditor's audit. In the hearing, Plaintiff argued that some of Defendant's evidence were part of the missing documents. If not provided, an adverse inference may be drawn.

## Issue No. 2: - Failing to Maintain an Inventory list thereby violating Article 11, Section 6.E. of the APFA Constitution by failing to maintain Union assets?

Plaintiff argued that Vargas handling of APFA furniture is unaccounted for. Plaintiff stated,

*"Finally, thousands of dollars of furniture, including furniture purchased by Vargas, is unaccounted for. As Treasurer Vargas had an obligation under the APFA constitution and federal labor law to safeguard union property. On one receipt dated 5/18/16 under Vargas's union credit card charges we found a purchase for $8733.89 at Ashley furniture. There is no record or inventory of that furniture nor can the furniture be located. The APFA policy manual requires that the National Treasurer inventory equipment and monitor the transfer of equipment between representatives. This was never done.*

*The Treasurer has the responsibility to safeguard the funds of the APFA union members as outlined in Article III Section 6.E. of the APFA Constitution: Duties of the Treasurer: The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA."*

Plaintiff argued Vargas is charged with an act of omission, the failure to maintain an inventory of furniture. Vargas is also charged with a violation of a specific Article of the Constitution, which is his duty "to safeguard the funds of the APFA union members as outlined in Article III, Section 6.E. of the APFA Constitution."

Plaintiff requested of then National Treasurer Craig Gunther to supply the inventory lists and Craig Gunther testified the APFA has no records of furniture from Vargas' tenure as National Treasurer. This is corroborated by present National Treasurer Erik Harris who also stated there is no record of inventory from the Vargas Administration.

Record evidence revealed the Defendant submitted a depreciation list which referenced the furniture but according to Erik Harris' testimony,  a depreciation list does not constitute a proper

33

inventory list. Defendant argued the Ashley Furniture has been accounted for as Vargas purchased the furniture for three committee chairs, Gaby Harty, Chuck Ransdale and Shane Staples.

Defendant argued the APFA Chase Credit Card statement dating, May 9, 2016, to June 8, 2016, reflects a purchase made by APFA National Treasurer, Eugenio Vargas, on May 18, 2016, in the amount of $8733.89 to Ashley Furniture. This purchase was to augment what was needed for the corporate apartments for the three (3) newly appointed APFA National Department Chairs. The General Ledger Account 1246 document for Furniture & Fixtures provides a record of items purchased under the name of each APFA National Department Chair and amount spent. The total value of the initial charge differs due to a credit of $104.98.

Defendant argued that in January 2017, APFA National Health Chair, Gabby Harty tendered her resignation. APFA National President, Robert Ross appointed Kim Coats Tuck, as interim National Health Chair on January 17, 2017. With 5 months remaining on the Harty apartment lease, and in a cost saving measure for the union, Vargas proffers the empty furnished apartment to full time APFA Representative, Renee Mayer in lieu of her Monday-Friday hotel expenditures. APFA Office Coordinator, LaDonna Casey scheduled an appointment at the end of the Harty apartment lease with "Kiss it Goodbye", a local consignment shop to provide APFA with an estimate for the accepted furnishings remaining in the Harty apartment. Four (4) months after receiving the furnishings from the Harty apartment, "Kiss it Goodbye" informed APFA with the total dollar amount sold by consignment. APFA received $1159.00 in payment from "Kiss it Goodbye". There was extensive testimony and documents exchanged regarding "Kiss it Goodbye" by both parties and the dollar amount ($1159.00) received. On July 2, 2018, upon the departure from his position as APFA National Treasurer, Eugenio Vargas had accounted for all of the furniture purchased from Ashley Furniture for former APFA National Health Chair, Gabby Harty. Chuck Ransdale, after being appointed to the position APFA National Contract Chair, testified that for his corporate apartment, APFA purchased bedroom furniture and mattress/box springs, including queen bed, chest, and nightstand from Ashley Furniture. In December 2017, APFA National Contract Chair, Chuck Ransdale tendered his resignation. The bedroom furniture purchased by APFA from Ashley Furniture was in his corporate apartment when he left Dallas. Shane Staples, after being appointed to the position APFA National Communications Chair, testified he was instructed to salvage any furniture he could use for his corporate apartment from a garage at the Bear Creek apartment complex, which was being used by APFA as storage.  After these items were repurposed, the Ashley Furniture items were purchased. In preparation for the end of his term and transition period, APFA National Communications Chair, Shane Staples completed a detailed inventory of all his furnishings in his APFA corporate apartment, which contained the contents purchased at Ashley Furniture.

Plaintiff argued Vargas violated his duty as National Treasurer of APFA to safeguard union property as required in Article III, Section 6.E.

Plaintiff argued the APFA Constitution, Article VII, Section 6.D specifies the procedure a charged party can utilize if they want to narrow the scope of charges, stating:

> D.      The Article VII Arbitrator may, on his/her own motion, or
>         upon motion filed by the accused, determine that charges are

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

not sufficiently specific and that they will be dismissed
unless the accuser amends them to provide sufficient
specificity.

Here, Defendant objected at hearing for Plaintiff broadening the scope of this charge over
questions asked of Vargas regarding Greg Gunter's furniture that he had purchased it for his own
personal use. Defendant states the charges were deemed valid, timely and specific before the EC
and it only raised issues with Ashley Furniture. Defendant agrees Vargas needs to answer to the
charge of the Ashley furniture of $8,733.95 that he purchased as the Treasurer of APFA. Plaintiff
however argues Defendant failed to follow proper procedure in raising objections and in doing so
failed to follow the APFA Policy Manual and Constitution. By failing to follow proper procedure,
Defendant raised an objection in a manner which does not protect the rights of the charging parties.
This arbitrator does not agree, the Ashley Furniture is the only issue that is valid, specific and
timely in the grievance charges. It does not say anything else about Greg Gunter's furniture.
Plaintiff failed to amend the grievance charge to include Greg Gunter's furniture. By Plaintiff
raising this additional issue at hearing for the first time, this is an attempt by Plaintiff to engage in
an "ambush through arbitration." Thus, the objection raised by Defendant is correct and is hereby
sustained.

Plaintiff argued that Section 8.I.3.b.(5) of the Policy Manual deals with the National
Treasurer duty to maintain a procedure to monitor the transfer of equipment, when appropriate,
between representatives in the field. The arbitrator finds no evidence was presented to support this
allegation.

The arbitrator finds Vargas failed to prepare an inventory list. This arbitrator is of the
Opinion that all of the Ashley furniture has been fully explained and accounted for. Record
evidence however revealed there was no inventory list prepared and Harris testified there was no
inventory list. Under these circumstances, Vargas did fail in his fiduciary duty as National
Treasurer to prepare an inventory list to maintain Union assets and violated Article 1, Section 2.J,
Section 7.E.O.Q and Article 1II, Section 6.E. of the APFA Constitution.

Thus, it is the arbitrator's Opinion Issue #2 has merit by Vargas failing to prepare an
inventory list to maintain Union assets.

**Issue No. 3**     **Allowing himself and his fellow National Officers to receive
inflated sick and vacation payouts when they were not entitled to
such, and**

**Issue No. 4**     **Allowing the payment to former National President Bob Ross
thousands of dollars in Meal Expenses Allowance (MEA) and
SAF when he was no longer working for APFA?**

The arbitrator has consolidated Issue No. 3 and Issue No. 4 as it involves the same issue.

Plaintiff argued that Vargas changed the longstanding formula on vacation payout for
himself and fellow officers Bob Ross, Nena Martin and Marcy Dunaway. Vargas included expense
items such as Meal Expense Allowance (MEA) and SAF.

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

Plaintiff argued the Policy Manual provides that officers may be paid out of unused sick and vacation. This should be paid at their rate of pay. Vargas inflated their pay to include MEA, SAF and stipend, which created an overpayment of $5,000.00 above what they were entitled.

Plaintiff argued Section 6.B.1.c of the Policy Manual allows an outgoing National Officer to be paid out vacation "at a rate prorated on the National Officer's annual salary, as defined in 6.A above…" Section 6.A provides, "The salary of the National Treasurer shall be equivalent to the highest purser flight attendant pay rates, including international override pay, for flight attendant based on 105 hours monthly." Plaintiff argued this was simply a money grab on their last days in office. Vargas admitted on cross-examination that this was his idea to do this and that he did not inform the BOD. Even worse they broke the checks up into a series of four $4000.00 checks which they signed for each other three days before they left office. Vargas claimed it was to avoid taxes.

Plaintiff presented accountant Debbie Hoover who testified that National Officer Eugenio Vargas approached her about changing the formula. She said she was also told to add SAF and MEA. This did raise a red flag with her because this has never been done before, it wasn't past practice and this was completely different. On cross-examination, she said Senior Accountant Rene Berthelot worked with her. She said in box number 1 of Vargas W-2 is everything you get paid minus the 401K because that's nontaxable. She was asked if that would include MEA, SAF and an office outside of residence and she said they were all included in box 1.

Defendant Vargas testified that Attorney Mark Richards showed him only the economic Items 3, 4 and 5 of the Bob Ross Transition Agreement, Exhibit (V-100). Vargas said he did not benefit directly or indirectly from the Ross Transition Agreement. Vargas was asked what the difference was between basic salary and full salary for a National Officer. Vargas stated that Basic salary is an hourly rate plus international override and purser pay times a set amount of hours. Full salary would include basic salary and include guaranteed MEA, and guaranteed SAF and this is what Ross was paid. Laura Glading in her exit agreement received the same as Ross and the BOD agreed.

Defendant Vargas takes full responsibility for his actions involving his oversight and payment of the Ross "Transition Agreement" after only viewing the economic portions, which encompassed covenants #3, #4 and #5 and has provided his full support in these charges, including the mathematical determination he created to be used for "Full Salary" vs "Basic Salary" for said payments. The Ross "Transition Agreement" has been deemed valid by Arbitrator, Edward B. Valverde, and the actions of the APFA Board of Directors were permissible under the provisions of the APFA Constitution and no evidence that the APFA Board of Directors was fiscally irresponsible when entering into the Ross "Transition Agreement".

Defendant Vargas takes full responsibility for his actions involving his changing of the mathematical formula when using "Full Salary" vs "Basic Salary" to calculate the vacation buyback, sick buyback, and end of term calculations for the Ross Administration when leaving office. Vargas said that Patrick Hancock informed him that the formula always used was a 1987 package formula. Vargas has provided his full support in these charges, including months of

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing

correspondence between the three former officers, APFA National Officers, APFA Board of Directors, APFA In-House Counsel, APFA Executive Committee and Members Melissa Chinery and Sandra Lee, by providing a clear picture of his willingness to repay the overage, once established from the "**1987** " formula that was exposed months after the July 11, 2019, Facebook post by Member Sandra Lee. Eugenio Vargas never stated he would not pay an amount if owed, but expected the calculation to be accurate and accounted for.

The arbitrator finds Vargas interpretation of the Ross Transition Agreement to not only include MEA and SAF but he included a stipend. Vargas had instructed Hoover to change the formula to include MEA and SAF and the stipend in the payouts of National Officers Ross, Martin, Dunaway and himself. Thereafter, written communication on behalf of APFA was sent by In-House Counsel, Susannah Bender, to the three (3) former National Officers of the Ross administration on November 8, 2019, stating *"After the meeting held on October 30, 2019, to allow you to review the independent auditor's calculations, it is our understanding that you take issue with how the calculations were made. We researched the issue again and believe our initial calculation is correct"*.

Defendant argued in the calculations provided at the October 30, 2019, meeting, simple math was used to determine the alleged monies owed by taking "**Full Salary**" minus "**Basic Salary**", then stating the difference was MEA and SAF. Calculating MEA and SAF in this manner was incorrect due to other income being included in the "**Full Salary**", like the UAL Arbitration payout, which provided a pay increase with retroactive pay.

The arbitrator finds in the APFA Executive Committee meeting dated December 5-7, 2019 Resolution #69 where the EC resolved this matter by stating, "that if the repayment plan is not received, the APFA Attorney is directed to file a State Civil lawsuit no later than January 6, 2020 to collect these funds," and any settlement agreements be approved by the Executive Committee prior to APFA acceptance.

Defendant Vargas said he has since entered into a payment agreement to repay the overage debt. Vargas admitted that it was his interpretation of the Ross Transition agreement to change the formula for the MEA, SAF to be included in their payouts and this is what created the overage.

It is this arbitrators Opinion, Vargas attempted to benefit monetarily and thus failed in his fiduciary duty as National Treasurer by willfully changing the formula for the payouts for Bob Ross, Nena Martin and Marcy Dunaway as well as himself.

It is therefore the Opinion of this arbitrator, Issue No. 3 has merit as Vargas violated his fiduciary duty as National Treasurer.

With respect to Issue No. 4, the arbitrator finds Vargas admitted that he had changed the formula, this has been established in Issue No. 3. But in Issue No. 4, Plaintiff argued that Vargas paid Ross MEA and SAF when he was not working. Under item No. 3 of the Ross Transition Agreement, it clearly states, *"APFA agrees that Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018."* The Ross agreement is binding as stated by Arbitrator Edward B. Valverde. Vargas did include MEA

RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member
Eugenio Vargas (Defendant), Article VII Hearing

and SAF in Ross's salary in accord with Item No. 3 as well as Item No. 4. *"APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018.*" But Ross too received an overage because Vargas had changed the formula and he too is required to pay the debt owed.

In Issue No. 4, Ross did receive an overpayment because Vargas admittedly changed the formula. It is my understanding Ross has an outstanding debt with the APFA. It is clear Vargas manipulated the payout formula.  In the Bob Ross Transition Agreement, MEA and SAF were included. The issue with MEA and SAF has been resolved as well as the overpayment to Ross, Nena Martin, Eugenio Vargas and Marcy Dunaway. Dunaway and Vargas have agreed to a payment plan and Martin has paid her debt in full.  Only Ross has not paid. Thus, Issue No. 4 has been resolved and is now moot.

## Issue No. 5    Violating the credit card policy by charging a rental car and meals for a trip to Spain?

Here, Vargas made two trips to Madrid Spain. One was for vacation and the other was work related for the APFA where he engaged in a time study aboard a 787 airplane. On the vacation trip, he approached the Enterprise Rental Car counter to rent a car. He told his spouse he needed to go to the restroom and gave his spouse his wallet. Upon his return was the rental agreement and he signed it. He did not notice the charge was on the APFA Union credit card and not on his Chase Visa card. In early September when the bill for the credit card came in, he was doing reconciliation of the credit card bill and noticed the Enterprise charge. When he arrived home, he obtained the enterprise receipt and noticed that the APFA credit card was used. He brought the receipt back to APFA the following morning and when senior Accountant Rene Berthelot arrived to work, he told him what happened. Berthelot said all you have to do is pay it back. He paid it back on September 9. Exhibit (V-19) is Vargas personal Chase account. Exhibit (V-20) is proof that Vargas made the payment and reconciled the rental car from his personal account for the full amount. Exhibit (V-21) is the bill in question. The total amount was $872.34 and deducted a credit of $258.07 (Deposit) owing APFA $614.29. He charged a meal, and this occurred when American Airlines introduced the premium economy class on the 787 aircraft with the time study.

The arbitrator finds Vargas in this instance recognized the charge of the rental car he rented in Spain while on vacation. The charge was on his APFA credit card statement. Vargas paid back the APFA $614.29. This reveals Vargas recognized that he had made an error and rectified it. As to the meal alleged this was a work-related meal when he conducted the time study on a trip to Madrid. It is therefore, the Opinion of this arbitrator this matter is now moot. Thus Issue No. 5 has no merit.

## Conclusion

The arbitrator having found no merit to Issue # 4, #5 are hereby dismissed.  Issue #2, #3 have merit. Issue No.1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Additionally, if there are missing files in the possession of the Defendant, it is hereby Ordered that they be turned over to Erik Harris,

**RE: Charging Party Members Melissa Chinery and Sandra Lee (Plaintiff) vs. Charged Party Member Eugenio Vargas (Defendant), Article VII Hearing**

the National Treasurer for the independent auditor's audit. If not, an adverse inference may be drawn.

**Remedy**

Vargas is to repay APFA for the following:

1. If after the Independent Auditors audit is completed and he/she determines that Vargas had used the APFA credit card for his own personal use on meals during his tenure as National Treasurer, Vargas is hereby Ordered to repay APFA for all meals he charged to the APFA credit card.
2. Vargas is prohibited from serving in any APFA National Officer position or Regional Officer position for life.
3. Vargas is hereby fined and Ordered to repay the APFA for half of the Arbitrator's Fee for this arbitration.
4. The arbitrator shall retain jurisdiction for 90-days over any issue involving this remedy only. Moreover, if the Independent Auditor determines any monies are due from Vargas, that will be the amount to be assessed or due and the BOD or EC shall Order said repayment from Vargas.

**AWARD**

The grievance is sustained in part and dismissed in part as stated above.

**Issued in San Antonio, Texas, the 18th day of February, 2022.**

Ruben R. Armendariz, Arbitrator

**In the Matter of Arbitration Between**

**Melissa Chinery**                          )
**Sandra Lee**                               )        **RE: Article VII Charges**
                                             )        **Violations of APFA Constitution**
    **APFA Charging Party Members**  )  **and APFA Policy Manual**
      **(Plaintiff).**           )
                                             )
**And**                                      )
                                             )
**Eugenio Vargas, Former APFA**              )
**National Treasurer**                       )
                                             )
    **APFA Charged Party Member**    )
      **(Defendant)**            )
                                             )

## Supplemental Decision
## Over
## APFA's Request for Clarification of the Remedy.

APFA's General Counsel Margot Nikitas has requested clarification of certain items of the Remedy as set forth in the Eugenio Vargas Decision that issued on February 18, 2022.

Ms. Nikitas has submitted the following questions for clarification.

**Question No. 1**

**1. Independent Auditor – Paragraph 1 of the Remedy.**

"Issue No. 1 *is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer.*"

Please clarify what is meant by Vargas's "personal use" as stated in paragraph 1 on page 39 of the decision. Would Vargas be required to repay APFA for only those meals he purchased for his own personal use, or for all meals purchased. And who is responsible for paying the cost of the Independent Auditor?

**Question No. 2**

**2. Paragraph 2 of the Remedy.**

Is the intent of paragraph 2 of the remedy that Vargas is prohibited from holding any elected position within APFA? Does this apply to ad hoc positions, elected and/or appointed members of

the negotiating committee and/or any other appointed positions. APFA does not have a position titled "Regional Officer."

**The Remedy**

The arbitrator has considered APFA's Request for Clarification of the Remedy and submits the following: "Issue No. 1 *is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer.* " The term "personal use" on page 39 of the Vargas decision refers only to Vargas' purchase of meals on the APFA credit card. However, the Independent Auditor is tasked to audit Vargas APFA credit card usage during his term in office as a National Treasurer. Record evidence revealed Vargas had purchased meals several times for himself only at fast food establishments and for others on the APFA credit card. The Independent Auditor will have to determine if such meal purchases were for conducting union business. Vargas as National Treasurer was required to submit documentation to support all meal expense(s). If no documentation was provided to support the meal expenses, Vargas will be required to repay APFA for all of those meals. Moreover, the audit must comply with federal income tax guidelines which distinguish between personal and nonpersonal expenses.

With respect as to who shall pay the Independent Auditor's fee, the APFA will have this responsibility. However, Vargas is hereby Ordered to repay ¼ of the Independent Auditor's fee to the APFA.

Under these circumstances, Item No. 1 of the Remedy is hereby modified to read as follows:

1. *Issue No. 1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Vargas is hereby Ordered to repay APFA for all meals he purchased on the APFA credit card for himself and for all other meals he has not properly documented. If he has failed to provide documentation to support the purchase of the meal expense, the Independent Auditor must determine if said expense was or was not for the sole purpose of conducting Union business. Moreover, the audit must comply with federal income tax guidelines which distinguish between personal and nonpersonal expenses.*

Additionally, Item 2 of the Remedy has created confusion as to its intent and coverage. Therefore, Item No. 2 is hereby modified to read as follows.

2. *Vargas is prohibited from serving any official position within the organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. This is to bar Vargas from any official position for life other than that of member.*

Issued in San Antonio, Texas the 10th day of March 2022.

Arbitrator Ruben R. Armendariz

2

Black Decl. Ex. Y

AGREED-UPON PROCEDURES
Association of Professional Flight Attendants
*Procedures Related to Eugenio Vargas*

AGREED-UPON PROCEDURES

Association of Professional Flight Attendants

*Procedures Related to Eugenio Vargas*

**Table of Contents**

| | |
|---|---|
| Independent Accountant's Report | 3 |
| Exhibits: | |
| A: List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed | 9 |
| B: Cornwell Jackson Invoices for the Performance of Agreed-Upon Procedures | 17 |

**Black Decl. Ex. Y**

CORNWELL JACKSON
CERTIFIED PUBLIC ACCOUNTANTS

*Independent Accountant's Report*

To the Board of Directors
Association of Professional Flight Attendants ("APFA") &
Arbitrator Ruben R. Armendariz

We have performed the procedures enumerated below regarding the forensic analysis mandated by Arbitrator Ruben R. Armendariz in his decision dated February 18, 2022 (the "arbitration decision") and supplemental decision dated March 10, 2022 (the "supplemental decision") on the matter between Melissa Chinery and Sandra Lee, APFA Charging Party Members ("Plaintiff") and Eugenio Vargas, Former APFA National Treasurer and APFA Charged Party Member ("Defendant"). APFA is responsible for selecting the procedures used in our analysis and for ensuring they meet the relevant criteria specified in the arbitration decision's and supplemental decision's remedy.

APFA has agreed to and acknowledged that the procedures performed are appropriate to meet the intended purpose of satisfying the relevant sections of the arbitration decision's remedy. This report may not be suitable for any other purpose. The procedures performed may not address all the items of interest to a user of this report and may not meet the needs of all users of this report and, as such, users are responsible for determining whether the procedures performed are appropriate for their purposes.

The procedures and the associated findings are detailed below. All of the procedures performed were related to Remedy #1 of the Supplemental Decision, which is reproduced in-full in the paragraph below.

> 1. *Issue No. 1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Vargas is hereby Ordered to repay APFA for all meals he purchased on the APFA credit card for himself and for all other meals he has not properly documented. If he has failed to provide documentation to support the purchase of the meal expense, the Independent Auditor must determine if said expense was or was not for the sole purpose of conducting Union business. Moreover, the audit must comply with federal income tax guidelines which distinguish between personal and nonpersonal expenses.*

**Procedure #1**

Obtain a record of all credit card transactions initiated by Eugenio Vargas on the APFA credit card for the period from April 1, 2016, to July 31, 2018. If the record is not in the form of the original credit card statement, perform necessary tests to ensure completeness of the report.

*Findings*: We obtained a monthly list of Eugenio Vargas's credit card charges from April 11, 2016 to August 28, 2018, which was in the form of an excerpt from the APFA credit card statements and an internal allocation to the entity's general ledger expense accounts. We also obtained scanned copies of the original Chase credit card statements for account 4246 3152 1635 5741 which included transactions from April 11, 2016 through August 28, 2018. The statements included charges from all authorized users and was segregated by cardholder. Each month's list of charges made by Eugenio Vargas agreed to the cardholder total listed on the monthly Chase credit card statement without exception. APFA has made representations that Mr. Vargas did not have access to an APFA credit card until April 11, 2016, as the Chase account was not opened until this date. Therefore, there was no record of credit card transactions for the period from April 1, 2016 to April 10, 2016.



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

**APPX. 0485**

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**Black Decl. Ex. Y**



## Procedure #2

Obtain supporting documentation for all credit card transactions initiated by Eugenio Vargas on the APFA credit card for the period from April 1, 2016, to July 31, 2018.

*Findings:* We obtained scanned copies of purchase orders, invoices, signed and itemized credit card receipts, and other documentation showing details of the purchased goods or services. Some supporting documentation was illegible or unreadable. Therefore, we scheduled and performed an on-site inspection of certain documents. In regard to the scanned documents, we deemed illegible or unreadable, we noted instances for which APFA was unable to provide a legible copy or original document. Some supporting documentation requested was not provided by APFA due to items being lost or not received by Mr. Vargas.  See the findings in Procedure #3 for more details.

## Procedure #3

Conclude whether charges on Eugenio Vargas's APFA credit card for the period from April 1, 2016 to July 31, 2018 were properly supported by documentation provided by Mr. Vargas.

*Findings:* A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit A.

| | Number of Charges | Amount of Charges |
|---|---|---|
| Total charges during the testing period where we were provided with sufficient appropriate documentation | 387 | $ 80,473.29 |
| Total charges during the testing period where incomplete or insufficient documentation was provided | - | - |
| Total charges during the testing period where no documentation was provided | 140 | 8,870.69 |
| **Total charges during the testing period** | **527** | **$ 89,343.98** |

## Procedure #4

Classify charges on Eugenio Vargas's APFA credit card for the period from April 1, 2016 to July 31, 2018 by the following categories: (a) meals and entertainment, (b) travel, (c) automotive and car rental, and (d) other.

*Findings:* A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit A.

6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000

WWW.CORNWELLJACKSON.COM

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

APPX. 0486

| Classification | Number of Charges | Amount of Charges |
|---|---|---|
| Meals and entertainment | 164 | $  16,251.46 |
| Travel | 91 | 14,278.01 |
| Automotive and car rental | 56 | 7,788.85 |
| Other | 216 | 51,025.66 |
| **Total charges during the testing period** | **527** | **$   89,343.98** |

**Procedure #5**

For charges on Eugenio Vargas's APFA credit card for the period from April 1, 2016 to July 31, 2018 classified as meals and entertainment in Procedure #4 and where documentation could be reviewed, conclude whether the documentation was sufficient to support classification as a business (non-personal) expense. We based our conclusion on the documentation available for review, the guidelines in IRS Publication 463, *Travel, Gift, and Car Expenses*, the guidelines in IRS Publication 535, *Business Expenses*, relevant Tax Court opinions, and our professional judgement.

***Findings:*** We identified $13,914.87 in transactions related to meals purchased on the APFA credit card exclusively for Eugenio Vargas or for other meals not properly documented. A summary of the results of this procedure is listed in the table below and presented in detail in Exhibit A.

In applying relevant guidance to this procedure, we consulted certain Tax Court opinions including *Brown v. Comm'r*, Docket No. 16604-19 (U.S.T.C. Mar. 18, 2021) (an adequate record must also be a contemporaneous record) and *Heinbockel v. Comm'r*, T.C. Memo. 2013-125 (U.S.T.C. May. 13, 2013) (disallowance of deductions for meal expenses with employees or coworkers without a wholly documented business purpose). The guidance in the IRS Publications and these opinions emphasize that a receipt alone will not meet the standard to be considered a business expense. Further, business meals must be substantiated by all five of the following: (1) amount, (2) date, (3) location, (4) business purpose of the meal, and (5) identification of individuals present. The business purpose may be simple and brief.

Charges with all five required elements are listed in the table below as "Charges with Sufficient Documentation" and charges lacking any of the five required elements are listed as "Charges without Sufficient Documentation."



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

APPX. 0487

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**Black Decl. Ex. Y**

|  | Number of Charges | Amount of Charges | |
|---|---|---|---|
| **Charges with Sufficient Documentation:** | | | |
| Charges with documentation supporting both (a) documented purpose for union-related business, and (b) names of individuals in attendance | 25 | $ | 2,336.59 |
| | 25 | $ | 2,336.59 |
| **Charges without Sufficient Documentation:** | | | |
| Charges with documentation supporting only a purpose for union-related business but did NOT include the names of individuals in attendance | 54 | | 6,407.48 |
| Charges with documentation supporting only the names of individuals in attendance but did NOT include support for a documented purpose for union-related business | 28 | | 1,596.06 |
| Charges with documentation provided but did NOT include support for a documented purpose for union-related business and did NOT include the names of individuals in attendance | 46 | | 5,813.29 |
| No documentation was provided | 11 | | 98.04 |
| | 139 | $ | 13,914.87 |
| **Total charges during the testing period** | **164** | **$** | **16,251.46** |

**Procedure #6**

Review each expense report submitted by Eugenio Vargas for the period from April 1, 2016 to July 31, 2018 and determine if two signatures of approval were obtained.



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

**APPX. 0488**

**Black Decl. Ex. Y**

*Findings:* A summary of the results of this procedure is listed in the table below. We were unable to obtain expense reports for the period from April 1, 2016 to December 31, 2016.

| Month | First Approval Obtained? (Y or N) | First Approval Individual Approving | Second Approval Obtained? (Y or N) | Second Approval Individual Approving |
|---|---|---|---|---|
| January 2017 | N | N/A | N | N/A |
| February 2017 | Y | Nena Martin | Y | Bob Ross |
| March 2017 | Y | Nena Martin | Y | Marcy Dunaway |
| April 2017 | Y | Bob Ross | Y | Marcy Dunaway |
| May 2017 | Y | Nena Martin | Y | Marcy Dunaway |
| June 2017 | Y | Marcy Dunaway | Y | Nena Martin |
| July 2017 | Y | Nena Martin | Y | Bob Ross |
| August 2017 | Y | Nena Martin | Y | Marcy Dunaway |
| September 2017 | Y | Nena Martin | Y | Bob Ross |
| October 2017 | Y | Nena Martin | Y | Marcy Dunaway |
| November 2017 | Y | Nena Martin | Y | Marcy Dunaway |
| December 2017 | Y | Nena Martin | Y | Bob Ross |
| January 2018 | N | N/A | Y | Marcy Dunaway |
| February 2018 | Y | Marcy Dunaway | Y | Nena Martin |
| March 2018 | Y | Nena Martin | Y | Marcy Dunaway |
| April 2018 | Y | Nena Martin | Y | Marcy Dunaway |
| May 2018 | N | N/A | Y | Marcy Dunaway |
| June 2018 | Y | Nena Martin | Y | Marcy Dunaway |
| July 2018 | Y | Lisabeth Hillman | Y | Craig Gunter |

**Procedure #7**

Communicate to the Board of Directors and Arbitrator any transactions for which we were unable to obtain sufficient appropriate evidence or where we believe the transaction was recorded improperly.

*Findings:* We were not able to obtain sufficient evidence for 140 credit card transactions. Refer to Exhibit A for details on these transactions.

We noted that expense reports for 2016 were lost and not able to be provided.



6865 WINDCREST DRIVE | SUITE 100 | PLANO, TX 75024 | MAIN: 972.202.8000
WWW.CORNWELLJACKSON.COM

APPX. 0489

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.



**Black Decl. Ex. Y**

Our fees related to this engagement totaled $8,425.  Copies of our invoices are included in Exhibit B.

We were engaged by APFA to perform this agreed-upon procedures engagement and conducted our engagement in accordance with attestation standards established by the AICPA. We were not engaged to and did not conduct an audit or review, the objective of which would be the expression of an opinion or conclusion on the entity's financial statements as a whole. Accordingly, we do not express such an opinion or conclusion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

We are required to be independent of APFA and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements related to our agreed-upon procedures engagement.

*Cornwell Jackson, PLLC*

Cornwell Jackson
Plano, TX
August 5, 2022



**APPX. 0490**

AN INDEPENDENT MEMBER FIRM OF BKR INTERNATIONAL. FIRMS IN PRINCIPAL CITIES WORLDWIDE.

## Exhibit A

List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

Agreed-Upon Procedures - Eugenio Vargas
List of Credit Card Transactions for the Period of April 1, 2016 to July 31, 2018 and Relevant Testing Performed

| Summary of Findings | | |
|---|---|---|
| | Amount | No. of Transactions |
| Charges with with sufficient appropriate documentation: | 80,473.29 | 387 |
| Charges with incomplete or insufficient documentation: | - | - |
| Charges with no documentation: | 8,870.69 | 140 |
| | 89,343.98 | 527 |
| | - | |
| | Amount | No. of Transactions |
| M&E Transactions With Support for Individuals in Attendance & Purpose: | 2,336.59 | 25 |
| M&E Transactions With Support for Individuals in Attendance Only: | 1,596.06 | 28 |
| M&E Transactions With Support for Purpose Only: | 6,407.48 | 54 |
| M&E Transactions Lacking Support for Individuals in Attendance & Purpose: | 5,813.29 | 46 |
| M&E Transactions With No Support: | 98.04 | 11 |
| | 16,251.46 | 164 |

| | | | Data from Chase Credit Card Statements - Procedure #1 | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | For Meals & Entertainment Transactions Only | | |
|---|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | Individuals Present Listed on Support (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | Additional Comments |
| 1 | 5/9/2016 | 96.67 | FRATELLI PIZZA | Y | Receipt | Meals & Entertainment | N | Y | |
| 2 | 5/12/2016 | 409.64 | AIR CANADA | Y | Email Confirm | Travel | | | |
| 3 | 5/12/2016 | 409.64 | AIR CANADA | Y | Email Confirm | Travel | | | |
| 4 | 5/13/2016 | 10.00 | CHEAPOAIR | Y | Email/Confirm | Travel | | | |
| 5 | 5/18/2016 | 917.00 | DEPENDABLE AUTO SHIPPERS | Y | Invoice | Automotive & Car Rental | | | |
| 6 | 5/18/2016 | 8,733.89 | ASHLEY FURNITURE | Y | Receipt | Other | | | |
| 7 | 5/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 8 | 5/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 9 | 5/19/2016 | 2.00 | AUTO RENEWAL STICK | Y | Vehicle Renewal Form | Automotive & Car Rental | | | |
| 10 | 5/19/2016 | 78.00 | TARRANT COUNTY VRF | Y | Vehicle Renewal Form | Automotive & Car Rental | | | |
| 11 | 5/19/2016 | 14.82 | TACOCABANA | Y | Email Receipt | Meals & Entertainment | N | Y | |
| 12 | 5/19/2016 | 41.21 | TACOCABANA | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 13 | 5/22/2016 | 22.00 | NTTACUSTSVC | Y | Transaction List | Travel | | | |
| 14 | 5/26/2016 | 20.00 | UNCLE BOB'S | Y | Receipt | Other | | | |
| 15 | 5/31/2016 | 264.13 | DALWORTH CARPET CLEANING | Y | Service Invoice | Other | | | |
| 16 | 5/31/2016 | 147.06 | HILTON ROSEMONT | Y | Confirm | Travel | | | |
| 17 | 6/2/2016 | 77.75 | T-MOBILE | Y | Receipt | Other | | | |
| 18 | 6/3/2016 | 224.24 | POTBELLY | Y | Email Receipt & Correspondence | Meals & Entertainment | N | Y | |
| 19 | 6/7/2016 | 98.53 | VILLA GRANDE | Y | Receipt | Meals & Entertainment | N | Y | |
| 20 | 6/13/2016 | 144.88 | WALMART | N | N/A - No Support Provided | Other | | | |
| 21 | 6/14/2016 | 15.51 | WALGREENS | Y | Receipt | Other | | | |
| 22 | 6/16/2016 | 549.00 | AATRIX SOFTWARE | N | N/A - No Support Provided | Other | | | |
| 23 | 6/17/2016 | 74.69 | WALMART | Y | Receipt | Other | | | |
| 24 | 6/17/2016 | 38.55 | RAVEN'S GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | Y | |
| 25 | 6/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 26 | 6/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 27 | 6/20/2016 | 37.50 | RAVEN'S GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | Y | |
| 28 | 6/22/2016 | 49.20 | PEI WEI PHEONIX | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 29 | 6/24/2016 | 112.90 | DON DAVIS DODGE | Y | Receipt | Automotive & Car Rental | | | |
| 30 | 6/27/2016 | 64.00 | ROCKET THEME | N | N/A - No Support Provided | Other | | | |
| 31 | 6/28/2016 | 8.35 | FEDEX | Y | Receipt | Other | | | |
| 32 | 6/28/2016 | 389.82 | CARRABBAS | Y | Receipt | Meals & Entertainment | N | Y | CJ noted that the receipt provided showed a different amount than the statement; the amount on the receipt was $391.80 |
| 33 | 6/30/2016 | 49.63 | RAVEN'S GRILLE EULESS TX | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 34 | 7/1/2016 | 27.68 | TACOCABANA | Y | Receipt | Meals & Entertainment | N | Y | |
| 35 | 7/6/2016 | 500.00 | ISASI | Y | Invoice | Other | | | |
| 36 | 7/7/2016 | (104.98) | ASHLEY FURNITURE | N | N/A - No Support Provided | Other | | | |
| 37 | 7/7/2016 | 51.18 | FIVE GUYS | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 38 | 7/8/2016 | 50.95 | OFFICE REPLACEMENT PARTS | Y | Email Confirm | Other | | | |
| 39 | 7/8/2016 | 612.00 | I SHIP CAR | Y | Invoice | Automotive & Car Rental | | | |
| 40 | 7/12/2016 | 29.64 | TACOCABANA | Y | Email Confirm | Meals & Entertainment | N | Y | |
| 41 | 7/12/2016 | 875.36 | SAGE | Y | Email Confirm | Other | | | |
| 42 | 7/12/2016 | 117.43 | VILLA GRANDE | Y | Receipt | Meals & Entertainment | N | Y | |
| 43 | 7/13/2016 | 46.50 | HOME DEPOT | Y | Receipt | Other | | | |
| 44 | 7/14/2016 | 143.88 | EDIBLE ARRANGEMENTS | Y | Web Confirm | Other | | | |
| 45 | 7/14/2016 | 102.12 | FRATELLI PIZZA | Y | Web Confirm | Meals & Entertainment | N | Y | |
| 46 | 7/14/2016 | 42.50 | OFFICE REPLACEMENT PARTS | Y | Web Confirm | Other | | | |
| 47 | 7/15/2016 | 204.00 | MAIL CHIMP | N | N/A - No Support Provided | Other | | | |
| 48 | 7/17/2016 | 303.09 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 49 | 7/18/2016 | 35.93 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | Y | |
| 50 | 7/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 51 | 7/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 52 | 7/19/2016 | 60.89 | CRACKER BARREL | Y | Receipt | Meals & Entertainment | Y | Y | |
| 53 | 7/20/2016 | 35.61 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | Y | |
| 54 | 7/22/2016 | 16.79 | FAUCET DEPOT | Y | Web Receipt | Other | | | |
| 55 | 7/26/2016 | 148.11 | TACO CASA | Y | Receipt | Meals & Entertainment | N | Y | |
| 56 | 7/27/2016 | 22.99 | SIMONIZ CAR WASH | Y | Receipt | Automotive & Car Rental | | | |
| 57 | 7/27/2016 | 931.77 | BRANDED ITEMS | Y | Invoice | Other | | | |
| 58 | 7/27/2016 | 22.99 | SIMONIZ CAR WASH | Y | Receipt | Automotive & Car Rental | | | |
| 59 | 7/27/2016 | 22.99 | SIMONIZ CAR WASH | Y | Receipt | Automotive & Car Rental | | | |
| 60 | 7/28/2016 | 3,970.00 | NTSB TRAINING CENTER | Y | Web Confirm | Other | | | |
| 61 | 7/30/2016 | 320.11 | HOME DEPOT | N | N/A - No Support Provided | Other | | | |
| 62 | 7/30/2016 | 332.99 | KIRKLANDS | N | N/A - No Support Provided | Other | | | |

Black Decl., Ex. Y

| | Data from Chase Credit Card Statements - Procedure #1 | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | For Meals & Entertainment Transactions Only | | |
|---|---|---|---|---|---|---|---|---|
| Date | Amount | Vendor/Co | | | | Individuals Present Listed on Support? (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | Additional Comments |
| 63 | 7/30/2016 | 138.01 | KIRKLANDS | N | N/A - No Support Provided | Other | | | |
| 64 | 7/31/2016 | 80.54 | HOME DEPOT | Y | Receipt | Other | | | |
| 65 | 8/1/2016 | 55.86 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 66 | 8/7/2016 | 219.66 | WALMART | N | N/A - No Support Provided | Other | | | |
| 67 | 8/7/2016 | 43.30 | WALMART | N | N/A - No Support Provided | Other | | | |
| 68 | 8/8/2016 | 34.52 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | Y | |
| 69 | 8/9/2016 | 29.64 | TACO CABANA | Y | Receipt | Meals & Entertainment | N | Y | |
| 70 | 8/11/2016 | 162.52 | ENTERPRISE HOLDINGS MADRID | Y | Rental Agreement (Personal Purchase Already Refunded/Arbitrated) | Travel | | | |
| 71 | 8/11/2016 | 684.44 | ENTERPRISE HOLDINGS MADRID | Y | Rental Agreement (Personal Purchase Already Refunded/Arbitrated) | Travel | | | |
| 72 | 8/11/2016 | 175.00 | AGI TMO DEDUCTIBLE | N | N/A - No Support Provided | Other | | | |
| 73 | 8/11/2016 | 286.19 | OFFICE DEPOT | Y | Order Confirm | Other | | | |
| 74 | 8/12/2016 | 4.87 | FOREIGN TRANSACTION FEE | Y | Rental Agreement (Personal Purchase Already Refunded/Arbitrated) | Travel | | | |
| 75 | 8/12/2016 | 20.53 | FOREIGN TRANSACTION FEE | Y | Rental Agreement (Personal Purchase Already Refunded/Arbitrated) | Travel | | | |
| 76 | 8/15/2016 | 204.00 | MAIL CHIMP | Y | E Receipt | Other | | | |
| 77 | 8/18/2016 | (250.56) | ENTERPRISE HOLDINGS MADRID | Y | Rental Agreement (Personal Purchase Already Refunded/Arbitrated) | Travel | | | |
| 78 | 8/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 79 | 8/18/2016 | - | ADOBE | N | N/A - No Support Provided | Other | | | |
| 80 | 8/19/2016 | (7.51) | FOREIGN TRANSACTION FEE | Y | Rental Agreement (Personal Purchase Already Refunded/Arbitrated) | Travel | | | |
| 81 | 8/20/2016 | 52.01 | GOGO AIR | N | N/A - No Support Provided | Travel | | | |
| 82 | 8/22/2016 | 50.93 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 83 | 8/23/2016 | 44.46 | TACO CABANA | Y | E Receipt | Meals & Entertainment | N | Y | |
| 84 | 8/23/2016 | 77.31 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 85 | 8/24/2016 | 750.00 | ACT INTERNATIONAL | Y | Receipt | Other | | | |
| 86 | 8/24/2016 | 54.77 | CRACKER BARREL | Y | Receipt | Meals & Entertainment | N | Y | |
| 87 | 8/28/2016 | 162.25 | ADOBE | Y | Email Receipt | Other | | | |
| 88 | 8/29/2016 | 110.03 | CVS | N | N/A - No Support Provided | Other | | | |
| 89 | 8/29/2016 | 56.18 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | N | |
| 90 | 8/30/2016 | 118.41 | ASPEN CREEK | Y | Receipt | Meals & Entertainment | Y | N | |
| 91 | 8/30/2016 | 24.65 | SHIPLEY DONUTS | Y | Receipt | Meals & Entertainment | N | N | |
| 92 | 9/2/2016 | 49.61 | WALMART | Y | Receipt | Other | | | |
| 93 | 9/2/2016 | 50.66 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 94 | 9/3/2016 | 69.28 | WALMART | Y | Receipt | Other | | | |
| 95 | 9/3/2016 | 129.84 | HOME DEPOT | Y | Receipt | Other | | | |
| 96 | 9/5/2016 | 19.42 | HOME DEPOT | Y | Receipt | Other | | | |
| 97 | 9/8/2016 | 30.53 | VILLA GRANDE | Y | Receipt | Meals & Entertainment | N | Y | |
| 98 | 9/8/2016 | 32.15 | VILLA GRANDE | Y | Receipt | Meals & Entertainment | N | Y | |
| 99 | 9/11/2016 | 63.74 | CRACKER BARREL | Y | Receipt | Meals & Entertainment | N | Y | |
| 100 | 9/13/2016 | 29.64 | TACO CABANA | Y | Email Receipt | Meals & Entertainment | N | N | |
| 101 | 9/14/2016 | 72.35 | ASPEN CREEK | Y | Receipt | Meals & Entertainment | Y | N | |
| 102 | 9/15/2016 | 204.00 | MAIL CHIMP | N | N/A - No Support Provided | Other | | | |
| 103 | 9/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 104 | 9/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 105 | 9/20/2016 | 132.50 | EULESS B & B | Y | Deposit | Automotive & Car Rental | | | |
| 106 | 9/20/2016 | 52.01 | GOGO AIR | N | N/A - No Support Provided | Travel | | | |
| 107 | 9/20/2016 | 5.56 | DISCOUNT FOOD MART | N | N/A - No Support Provided | Travel | | | |
| 108 | 9/21/2016 | 52.53 | TEXASL & C | Y | Receipt | Meals & Entertainment | Y | Y | |
| 109 | 9/24/2016 | 160.00 | NTTA AUTOCHARGE | Y | Receipt | Automotive & Car Rental | | | |
| 110 | 9/26/2016 | 44.30 | THE KEG STEAKHOUSE | Y | Receipt | Meals & Entertainment | Y | Y | |
| 111 | 9/26/2016 | 22.19 | GENGHIS GRILL | Y | Receipt | Meals & Entertainment | Y | Y | |
| 112 | 9/26/2016 | 235.93 | RESTO GARE & TRAIN BAR | Y | Receipt | Meals & Entertainment | N | Y | |
| 113 | 9/26/2016 | 4.57 | IM PARK | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 114 | 9/26/2016 | (39.96) | GOGO AIR | N | N/A - No Support Provided | Travel | | | |
| 115 | 9/26/2016 | 7.48 | UNICITY TAXI | N | N/A - No Support Provided | Travel | | | |
| 116 | 9/26/2016 | 6.43 | UNICITY TAXI | N | N/A - No Support Provided | Travel | | | |
| 117 | 9/27/2016 | 0.13 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Travel | | | |
| 118 | 9/27/2016 | 293.54 | THE KEG STEAKHOUSE | Y | Receipt | Meals & Entertainment | Y | Y | |
| 119 | 9/27/2016 | 5.28 | UNICITY TAXI | N | N/A - No Support Provided | Travel | | | |
| 120 | 9/28/2016 | 7.07 | FOREIGN TRANSACTION FEE | Y | Receipt | Travel | | | |
| 121 | 9/28/2016 | 0.22 | FOREIGN TRANSACTION FEE | Y | Receipt | Travel | | | |
| 122 | 9/28/2016 | 1.32 | FOREIGN TRANSACTION FEE | Y | Receipt | Travel | | | |
| 123 | 9/28/2016 | 16.15 | UNICITY TAXI | N | N/A - No Support Provided | Travel | | | |
| 124 | 9/28/2016 | 43.68 | MARCELLO'S MARKET | Y | Receipt | Meals & Entertainment | Y | Y | 30% Tip added |
| 125 | 9/29/2016 | 0.15 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Other | | | |
| 126 | 9/29/2016 | 8.80 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Other | | | |
| 127 | 9/29/2016 | 1.31 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Other | | | |
| 128 | 9/29/2016 | 0.19 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Other | | | |
| 129 | 9/29/2016 | 243.54 | T MOBILE | Y | Web Receipt | Other | | | |
| 130 | 10/4/2016 | 0.48 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Other | | | |
| 131 | 10/7/2016 | 71.02 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 132 | 10/11/2016 | 29.64 | TACO CABANA | Y | Email Receipt | Meals & Entertainment | N | Y | |
| 133 | 10/13/2016 | 22.07 | CHICK FIL A | Y | Receipt | Meals & Entertainment | Y | N | |
| 134 | 10/13/2016 | 73.16 | HOME DEPOT | N | N/A - No Support Provided | Other | | | |
| 135 | 10/15/2016 | 204.00 | MAIL CHIMP | N | N/A - No Support Provided | Other | | | |
| 136 | 10/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 137 | 10/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 138 | 10/18/2016 | 60.86 | SAVIANOS ITALIAN | Y | Receipt | Meals & Entertainment | Y | N | 20% tipadded |
| 139 | 10/25/2016 | 127.61 | POSADOS CAFÉ | Y | Receipt | Meals & Entertainment | N | N | |
| 140 | 10/25/2016 | 29.64 | TACO CABANA | Y | Receipt | Meals & Entertainment | N | Y | |
| 141 | 10/29/2016 | 10.00 | NTTA CUST SVC | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 142 | 10/31/2016 | 17.99 | TARGET | N | N/A - No Support Provided | Other | | | |

**Black Decl., Ex. Y**

| | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | For Meals & Entertainment Transactions Only | | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | Individuals Present Listed on Support? (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | |
| 143 | 11/1/2016 | 11.90 | HITCH TAXI | Y | Receipt | Travel | | | |
| 144 | 11/1/2016 | 25.81 | DCTAXI | Y | Receipt | Travel | | | |
| 145 | 11/2/2016 | 63.27 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | N | |
| 146 | 11/3/2016 | 199.80 | TRAVEL RESERVATION | Y | Web Receipt | Travel | | | |
| 147 | 11/4/2016 | 199.93 | TRAVEL RESERVATION | Y | Web Receipt | Travel | | | |
| 148 | 11/5/2016 | 1,502.76 | WILSON AMPLIFIERS | Y | Purchase Order & Email Confirm | Other | | | |
| 149 | 11/5/2016 | 101.58 | EL 3 DEGALDOS | Y | Receipt | Meals & Entertainment | N | N | |
| 150 | 11/6/2016 | 160.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 151 | 11/7/2016 | 50.47 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 152 | 11/8/2016 | 23.76 | CVS | Y | Receipt | Other | | | |
| 153 | 11/8/2016 | 31.06 | MCDONALDS | Y | Receipt | Meals & Entertainment | N | Y | |
| 154 | 11/8/2016 | 367.83 | EL FENIX | Y | Correspondence | Meals & Entertainment | N | Y | |
| 155 | 11/15/2016 | 204.00 | MAIL CHIMP | Y | Email Receipt | Other | | | |
| 156 | 11/16/2016 | 92.01 | ADOBOCAFÉ | Y | Receipt | Meals & Entertainment | N | Y | |
| 157 | 11/16/2016 | 313.71 | DICKEYS | Y | Receipt | Meals & Entertainment | N | Y | |
| 158 | 11/17/2016 | 54.07 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 159 | 11/18/2016 | 64.79 | FRATELLI PIZZA | Y | Receipt | Meals & Entertainment | N | Y | |
| 160 | 11/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 161 | 11/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 162 | 11/21/2016 | 50.03 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 163 | 11/22/2016 | 102.49 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 164 | 11/30/2016 | 12.99 | COSTCO | N | N/A - No Support Provided | Other | | | |
| 165 | 12/1/2016 | 134.75 | LARK CREEK GRILL | Y | Receipt | Meals & Entertainment | Y | Y | |
| 166 | 12/2/2016 | 23.58 | YELLOWCAB | Y | Receipt | Travel | | | |
| 167 | 12/2/2016 | 88.44 | MATISSE RESTAURANT | Y | Receipt | Meals & Entertainment | Y | Y | |
| 168 | 12/7/2016 | 473.30 | OTB CATERING | Y | Invoice | Meals & Entertainment | N | N | |
| 169 | 12/7/2016 | 378.88 | POTBELLY | Y | Receipt | Meals & Entertainment | N | N | |
| 170 | 12/9/2016 | 52.01 | GOGOAIR | N | N/A - No Support Provided | Travel | | | |
| 171 | 12/11/2016 | 100.00 | WALMART | Y | Receipt | Other | | | |
| 172 | 12/12/2016 | 242.85 | ALBERTSONS | Y | Receipt | Other | | | |
| 173 | 12/13/2016 | 29.64 | TACO CABANA | Y | Email Receipt | Meals & Entertainment | N | N | |
| 174 | 12/13/2016 | 314.85 | CVS | Y | Receipt | Other | | | |
| 175 | 12/14/2016 | 508.10 | BABE'S ARLINGTON | Y | Receipt | Meals & Entertainment | N | N | |
| 176 | 12/14/2016 | 35.26 | MELLOW MUSHROOM | Y | Receipt | Meals & Entertainment | N | Y | |
| 177 | 12/15/2016 | 204.00 | MAIL CHIMP | Y | Email Receipt | Other | | | |
| 178 | 12/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | E Receipt | | | |
| 179 | 12/18/2016 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 180 | 12/21/2016 | 362.56 | LA HACIENDA RANCH | Y | Receipt | Meals & Entertainment | N | Y | |
| 181 | 12/22/2016 | 100.96 | RAVENSGRILLE | Y | Receipt | Meals & Entertainment | Y | N | |
| 182 | 12/26/2016 | 24.00 | NTTA CUSTSVC | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 183 | 12/27/2016 | 29.64 | TACO CABANA | Y | Receipt | Meals & Entertainment | N | Y | |
| 184 | 12/28/2016 | 175.00 | AGI TMO DEDUCTIBLE | N | N/A - No Support Provided | Other | | | |
| 185 | 1/1/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 186 | 1/2/2017 | 132.68 | WALMART | N | N/A - No Support Provided | Other | | | |
| 187 | 1/3/2017 | 32.97 | TGI FRIDAYS | Y | Receipt | Meals & Entertainment | N | N | |
| 188 | 1/3/2017 | 118.37 | BLACKFINN AMERIPUB | Y | Receipt | Meals & Entertainment | N | N | |
| 189 | 1/4/2017 | 91.00 | BARCODE WASHINGTON | Y | Receipt | Meals & Entertainment | N | N | |
| 190 | 1/5/2017 | 132.00 | THE CAKE ROOM | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 191 | 1/13/2017 | 429.94 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 192 | 1/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 193 | 1/17/2017 | 14.95 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 194 | 1/17/2017 | 17.91 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 195 | 1/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 196 | 1/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 197 | 1/19/2017 | 975.00 | ANIMAL CONTROL | Y | Invoice | Other | | | |
| 198 | 1/20/2017 | 150.62 | ID ENHANCEMENTS | Y | Web Receipt | Other | | | |
| 199 | 1/20/2017 | 66.50 | JIMMY JOHNS | Y | Receipt | Meals & Entertainment | Y | Y | 20% tip added |
| 200 | 1/23/2017 | 867.00 | 1 SHIP CAR | Y | Shipping Agreement | Automotive & Car Rental | | | |
| 201 | 1/23/2017 | 65.53 | WALMART | Y | Receipt | Meals & Entertainment | N | Y | |
| 202 | 1/23/2017 | 45.70 | OSI BATTERIES | Y | Receipt | Other | | | |
| 203 | 1/25/2017 | 66.03 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | N | Y | |
| 204 | 1/25/2017 | 500.00 | DANA FARBER JIMMY FUND | Y | Email Confirm | Other | | | |
| 205 | 1/26/2017 | 28.98 | COSTCO | Y | Receipt | Other | | | |
| 206 | 1/27/2017 | 23.88 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 207 | 1/27/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 208 | 1/28/2017 | 269.90 | SOUTHWEST | Y | Email Confirm | Travel | | | |
| 209 | 1/28/2017 | 3,600.00 | SQ K SPORT MIAMI | Y | Web Receipt | Other | | | |
| 210 | 1/28/2017 | 184.01 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 211 | 1/28/2017 | 9.72 | HOME DEPOT | Y | Receipt | Other | | | |
| 212 | 2/3/2017 | 27.05 | ROSS STORES | Y | Receipt | Other | | | |
| 213 | 2/6/2017 | 304.70 | A A ARLINGTON ABANDONED | Y | Abandoned Vehicle Report | Automotive & Car Rental | | | |
| 214 | 2/6/2017 | 90.34 | FRATELLI PIZZA | Y | Receipt | Meals & Entertainment | Y | Y | |
| 215 | 2/9/2017 | 52.01 | GOGOAIR | N | N/A - No Support Provided | Travel | | | |
| 216 | 2/13/2017 | 83.89 | JOE GAMBINO'S BAKERY | Y | Email Order | Meals & Entertainment | N | N | |
| 217 | 2/14/2017 | 29.64 | TACO CABANA | Y | Email Receipt | Meals & Entertainment | | | |
| 218 | 2/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 219 | 2/16/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 220 | 2/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 221 | 2/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 222 | 2/21/2017 | 76.40 | BEST TRANSPORTATION | Y | Email Confirm | Travel | | | |
| 223 | 2/22/2017 | 48.05 | CHINO CHINATOWN | Y | Receipt | Meals & Entertainment | Y | N | |
| 224 | 2/28/2017 | 29.64 | TACO CABANA | Y | Email Receipt | Meals & Entertainment | N | N | |
| 225 | 3/1/2017 | 160.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 226 | 3/2/2017 | 127.71 | 180FLOWERS | Y | Email Receipt | Other | | | |
| 227 | 3/4/2017 | 192.43 | MAGGIANOS | Y | Receipt | Meals & Entertainment | Y | Y | |
| 228 | 3/5/2017 | 23.72 | SHELL CAR RENTAL | Y | Receipt | Automotive & Car Rental | | | |

**Black Decl., Ex. Y**

| | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Individuals Present Listed on Support (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|
| 229 | 3/5/2017 | 141.48 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 230 | 3/5/2017 | 78.01 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 231 | 3/5/2017 | 91.75 | ROSALITA'S CANTINA | Y | Receipt | Meals & Entertainment | Y | Y | |
| 232 | 3/11/2017 | 42.00 | EMBASSY SUITES | N | N/A - No Support Provided | Travel | | | |
| 233 | 3/15/2017 | 183.60 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 234 | 3/15/2017 | 505.36 | SUPERIOR PRESS | Y | Invoice | Other | | | |
| 235 | 3/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 236 | 3/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 237 | 3/23/2017 | 62.77 | 1800FLOWERS | Y | Email Receipt | Other | | | |
| 238 | 3/24/2017 | 39.31 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | Y | |
| 239 | 3/28/2017 | 500.00 | ISASI | Y | Invoice | Other | | | |
| 240 | 3/28/2017 | 29.64 | TACO CABANA | Y | Receipt | Meals & Entertainment | N | N | |
| 241 | 3/29/2017 | 1,255.88 | STERLING AIRCRAFT | Y | Email Confirm | Travel | | | |
| 242 | 3/31/2017 | 937.91 | HOBBY LOBBY | Y | Receipt | Other | | | |
| 243 | 4/2/2017 | 37.67 | FOREIGN TRANSACTION FEE | Y | Email/Confirm | Other | | | |
| 244 | 4/3/2017 | 59.87 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 245 | 4/3/2017 | 160.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 246 | 4/5/2017 | 59.77 | VILLA GRANDE | Y | Receipt | Meals & Entertainment | Y | N | |
| 247 | 4/7/2017 | 61.85 | LAZY DOG RESTAURANT | Y | Receipt | Meals & Entertainment | Y | N | |
| 248 | 4/11/2017 | 17.98 | DUNKIN | Y | Receipt | Meals & Entertainment | N | N | |
| 249 | 4/13/2017 | 50.57 | LAZY DOG RESTAURANT | Y | Receipt | Meals & Entertainment | Y | N | |
| 250 | 4/13/2017 | 794.77 | BINSWANGER GLASS | Y | Bill | Other | | | |
| 251 | 4/13/2017 | 580.23 | BINSWANGER GLASS | Y | Bill | Other | | | |
| 252 | 4/15/2017 | 183.60 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 253 | 4/18/2017 | 108.52 | FRATELLI PIZZA | Y | Receipt | Meals & Entertainment | N | N | |
| 254 | 4/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 255 | 4/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 256 | 4/22/2017 | 13.21 | DAIRY QUEEN EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 257 | 4/26/2017 | 77.75 | TARRANT VEHICLE REG | Y | Email Receipt & Renewal | Automotive & Car Rental | | | |
| 258 | 4/26/2017 | 2.00 | TX.GOV SVC FEE | Y | Email Receipt & Renewal | Other | | | |
| 259 | 4/26/2017 | 32.99 | DUNKIN | Y | Receipt | Meals & Entertainment | N | N | |
| 260 | 4/26/2017 | 28.14 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | 20% tip added |
| 261 | 5/1/2017 | 195.00 | ANNUAL MEMBERSHIP FEE | N | N/A - No Support Provided | Other | | | |
| 262 | 5/2/2017 | 170.00 | AEDLAND.COM | N | N/A - No Support Provided | Other | | | |
| 263 | 5/5/2017 | 30.65 | WALMART | Y | Receipt | Meals & Entertainment | N | N | |
| 264 | 5/5/2017 | 62.75 | FROM YOU FLOWERS | Y | Email Confirm | Other | | | |
| 265 | 5/7/2017 | 200.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 266 | 5/8/2017 | 36.09 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 267 | 5/9/2017 | 32.48 | TACO BELL | Y | Receipt | Meals & Entertainment | N | N | |
| 268 | 5/10/2017 | 98.59 | PIZZA HUT | Y | Receipt | Meals & Entertainment | N | Y | |
| 269 | 5/11/2017 | 46.27 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 270 | 5/14/2017 | 784.96 | HOTELS.COM | Y | Web Confirm | Travel | | | |
| 271 | 5/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 272 | 5/15/2017 | 64.88 | TIGIN IRISH PUB | Y | Receipt | Meals & Entertainment | Y | Y | |
| 273 | 5/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 274 | 5/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 275 | 5/19/2017 | 50.30 | NYPD DELI EULESS TX | Y | Receipt | Meals & Entertainment | N | N | |
| 276 | 5/22/2017 | 53.17 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | 20% tip added |
| 277 | 5/23/2017 | 434.36 | STERLING AIRCRAFT | Y | Email Confirm | Travel | | | |
| 278 | 5/24/2017 | 13.03 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Other | | | |
| 279 | 5/24/2017 | 583.70 | BLUE SHOE SOFTWARE | Y | Order Confirm | Other | | | |
| 280 | 5/30/2017 | 78.37 | TACO CABANA | Y | Receipt | Meals & Entertainment | N | N | |
| 281 | 5/30/2017 | 35.71 | DUNKIN | Y | Email Receipt | Meals & Entertainment | N | N | |
| 282 | 6/6/2017 | 263.11 | POTBELLY | Y | Email Receipt & Correspondence | Meals & Entertainment | N | Y | |
| 283 | 6/14/2017 | 95.01 | 1800FLOWERS | Y | Web Confirm | Other | | | |
| 284 | 6/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 285 | 6/16/2017 | 549.00 | AATRIX SOFTWARE | N | N/A - No Support Provided | Other | | | |
| 286 | 6/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 287 | 6/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 288 | 6/26/2017 | 35.71 | DUNKIN | Y | Receipt | Meals & Entertainment | N | N | |
| 289 | 6/27/2017 | 105.71 | PANERA BREAD | Y | Email Receipt & Correspondence | Meals & Entertainment | N | Y | |
| 290 | 6/30/2017 | 95.05 | CHEDDAR'S | Y | Receipt | Meals & Entertainment | Y | N | |
| 291 | 7/5/2017 | 160.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 292 | 7/12/2017 | 163.80 | RADWELL INTERNATIONAL | Y | Invoice | Other | | | |
| 293 | 7/13/2017 | 249.98 | ALL BATT CENTER | Y | Receipt | Automotive & Car Rental | | | |
| 294 | 7/13/2017 | 121.24 | POTBELLY | Y | Receipt & Correspondence | Meals & Entertainment | N | Y | |
| 295 | 7/13/2017 | (91.19) | SHERATON HOTEL PHX | N | N/A - No Support Provided | Travel | | | |
| 296 | 7/13/2017 | 91.19 | SHERATON HOTEL PHX | N | N/A - No Support Provided | Travel | | | |
| 297 | 7/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 298 | 7/15/2017 | (10.82) | LEVEL UP | N | N/A - No Support Provided | Other | | | |
| 299 | 7/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 300 | 7/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 301 | 7/18/2017 | 28.34 | MCDONALDS | Y | Receipt | Meals & Entertainment | N | N | |
| 302 | 7/18/2017 | 13.64 | TACO BELL | Y | Receipt | Meals & Entertainment | N | N | |
| 303 | 7/20/2017 | 88.45 | POTBELLY | Y | Email Confirm & Correspondence | Meals & Entertainment | N | N | |
| 304 | 7/26/2017 | (249.98) | ALL BATT CENTER | Y | Receipt | Automotive & Car Rental | | | |
| 305 | 8/3/2017 | 157.56 | LA MADELINE CATER | Y | Invoice & Email Confirm | Meals & Entertainment | N | Y | |
| 306 | 8/9/2017 | 172.07 | DISCOUNT TIRE | Y | Receipt | Automotive & Car Rental | | | |
| 307 | 8/10/2017 | 63.83 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 308 | 8/15/2017 | 29.64 | TACO CABANA | Y | Receipt | Meals & Entertainment | Y | N | |
| 309 | 8/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 310 | 8/16/2017 | 66.56 | NYPD DELI EULESS TX | Y | Receipt | Meals & Entertainment | N | Y | |
| 311 | 8/16/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 312 | 8/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 313 | 8/19/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 314 | 8/22/2017 | 50.44 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |

**Black Decl., Ex. Y**

| | Data from Chase Credit Card Statements - Procedure #1 | | | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description | Transaction Classification Procedure #4 | For Meals & Entertainment Transactions Only | | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Vendor/Co | | | | Individuals Present Listed on Support? (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | |
| 315 | 8/26/2017 | 191.76 | SPRINT STORE | Y | Receipt | Other | | | |
| 316 | 8/28/2017 | 162.25 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 317 | 8/30/2017 | 51.89 | RAVENS GRILLE EULESS TX | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 318 | 9/3/2017 | 169.10 | HOTELS.COM | Y | Email Confirm | Travel | | | |
| 319 | 9/4/2017 | 95.61 | LA QUINTA INN | Y | Email Reservation | Travel | | | |
| 320 | 9/11/2017 | 53.49 | NYPD DELI EULESS TX | Y | Receipt | Meals & Entertainment | N | Y | |
| 321 | 9/13/2017 | 4.99 | AMAZON | Y | N/A - No Support Provided | Other | | | |
| 322 | 9/13/2017 | 62.84 | B&H PHOTO | Y | Web Receipt | Other | | | |
| 323 | 9/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 324 | 9/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 325 | 9/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 326 | 9/20/2017 | 1,187.69 | AMAZON | Y | Web Confirm | Other | | | |
| 327 | 9/20/2017 | 139.59 | AMAZON | Y | Web Confirm | Other | | | |
| 328 | 9/21/2017 | 714.41 | HOTEL WATERLOO LONDON | Y | Booking Report | Travel | | | |
| 329 | 9/21/2017 | 714.41 | HOTEL WATERLOO LONDON | Y | Booking Report | Travel | | | |
| 330 | 9/21/2017 | 714.41 | HOTEL WATERLOO LONDON | Y | Booking Report | Travel | | | |
| 331 | 9/21/2017 | 714.41 | HOTEL WATERLOO LONDON | Y | Booking Report | Travel | | | |
| 332 | 9/22/2017 | 21.43 | FOREIGN TRANSACTION FEE | Y | Booking Report | Travel | | | |
| 333 | 9/22/2017 | 21.43 | FOREIGN TRANSACTION FEE | Y | Booking Report | Travel | | | |
| 334 | 9/22/2017 | 21.43 | FOREIGN TRANSACTION FEE | Y | Booking Report | Travel | | | |
| 335 | 9/22/2017 | 21.43 | FOREIGN TRANSACTION FEE | Y | Booking Report | Travel | | | |
| 336 | 9/22/2017 | 69.14 | POTBELLY | Y | Receipt & Correspondence | Meals & Entertainment | N | Y | |
| 337 | 9/25/2017 | 66.89 | ITALIANIS RESTAURANT | Y | Receipt | Meals & Entertainment | Y | Y | 18% tip added |
| 338 | 9/27/2017 | 77.75 | TARRANT VEHICLE REG | Y | Email Confirm & Renewal | Automotive & Car Rental | | | |
| 339 | 9/27/2017 | 2.00 | TX.GOV SVC FEE | Y | Email Confirm & Renewal | Automotive & Car Rental | | | |
| 340 | 9/29/2017 | 1,162.49 | SAGE SOFTWARE | Y | Web Receipt | Other | | | |
| 341 | 9/29/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 342 | 10/3/2017 | 42.59 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 343 | 10/6/2017 | 199.49 | SUPPLY GEEKS | Y | Order Confirm | Other | | | |
| 344 | 10/10/2017 | 797.82 | SPRINT | Y | Receipt | Other | | | |
| 345 | 10/15/2017 | 204.00 | MAILCHIMP | Y | Email Confirm | Other | | | |
| 346 | 10/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 347 | 10/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 348 | 10/19/2017 | 60.43 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | N | N | |
| 349 | 10/20/2017 | 34.99 | AMAZON | Y | Web Receipt | Other | | | |
| 350 | 10/23/2017 | 302.41 | AMERICAN AIR | Y | Web Confirm | Travel | | | |
| 351 | 10/23/2017 | 302.41 | AMERICAN AIR | Y | Web Confirm | Travel | | | |
| 352 | 10/27/2017 | 51.03 | SOUTHLAKE COPELANDS | Y | Receipt | Meals & Entertainment | N | N | |
| 353 | 10/27/2017 | 134.47 | BEDFORD TOWNEPLACE | Y | Authorization Form & Reservation | Travel | | | |
| 354 | 10/30/2017 | 72.21 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 355 | 10/31/2017 | 61.87 | OUTBACK | Y | Receipt | Meals & Entertainment | Y | N | |
| 356 | 11/1/2017 | 255.85 | GRAPEVINE DODGE | Y | Invoice | Automotive & Car Rental | | | |
| 357 | 11/2/2017 | 22.39 | FEDEX | Y | Receipt | Other | | | |
| 358 | 11/2/2017 | 313.88 | HOTELS.COM | Y | Email Confirm | Travel | | | |
| 359 | 11/6/2017 | 39.44 | T-MOBILE | Y | Receipt | Other | | | |
| 360 | 11/7/2017 | 64.86 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 361 | 11/8/2017 | 20.12 | NYPD DELI EULESS TX | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 362 | 11/8/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 363 | 11/10/2017 | 85.46 | DOMINOS | Y | Receipt | Meals & Entertainment | N | Y | |
| 364 | 11/10/2017 | 67.07 | PIZZAHUT | Y | Receipt | Meals & Entertainment | N | Y | |
| 365 | 11/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |
| 366 | 11/15/2017 | 90.87 | POTBELLY | Y | Receipt & Correspondence | Meals & Entertainment | Y | Y | |
| 367 | 11/15/2017 | (156.94) | HOTELS.COM | Y | Web Receipt | Travel | | | |
| 368 | 11/15/2017 | (156.94) | HOTELS.COM | Y | Web Receipt | Travel | | | |
| 369 | 11/17/2017 | 717.97 | BOSTON MARKET | Y | Receipt | Meals & Entertainment | N | N | |
| 370 | 11/19/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 371 | 11/19/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 372 | 11/21/2017 | 77.75 | TARRANT VEHIC REG | Y | Email Receipt | Automotive & Car Rental | | | |
| 373 | 11/21/2017 | 2.00 | TX.GOV SVC FEE | Y | Email Receipt | Automotive & Car Rental | | | |
| 374 | 11/21/2017 | 33.56 | TACO BELL | Y | Receipt | Meals & Entertainment | N | Y | |
| 375 | 11/23/2017 | (302.41) | AMERICAN AIR | Y | Chase Transaction Report & Correspondence | Travel | | | |
| 376 | 11/23/2017 | (302.41) | AMERICAN AIR | Y | Chase Transaction Report & Correspondence | Travel | | | |
| 377 | 11/28/2017 | 675.00 | ISHIPCAR.COM | Y | Shipping Order | Automotive & Car Rental | | | |
| 378 | 11/28/2017 | 31.52 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | N | |
| 379 | 11/29/2017 | 12.45 | THE STAMP MAKER | N | N/A - No Support Provided | Other | | | |
| 380 | 11/30/2017 | 18.05 | SOUTHLAKE COPELANDS | Y | Receipt | Meals & Entertainment | N | Y | |
| 381 | 12/2/2017 | 175.00 | AGI TMO DEDUCTIBLE | Y | Confirm | Other | | | |
| 382 | 12/7/2017 | 44.04 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | N | N | |
| 383 | 12/7/2017 | 152.56 | HOLIDAY INN CHICAGO | Y | Card Authorization | Travel | | | |
| 384 | 12/7/2017 | 152.56 | HOLIDAY INN CHICAGO | Y | Card Authorization | Travel | | | |
| 385 | 12/7/2017 | 152.56 | HOLIDAY INN CHICAGO | Y | Card Authorization | Travel | | | |
| 386 | 12/7/2017 | 110.67 | ADVANCE AUTO | Y | Receipt | Automotive & Car Rental | | | |
| 387 | 12/8/2017 | 316.20 | AMAZON | Y | Web Receipt | Other | | | |
| 388 | 12/8/2017 | 86.58 | STAPLES | Y | Receipt | Other | | | |
| 389 | 12/8/2017 | 246.44 | COURTYARD BY MARRIOTT | Y | Banquet Contract | Travel | | | |
| 390 | 12/10/2017 | 152.56 | HOLIDAY INN CHICAGO | Y | Card Authorization | Travel | | | |
| 391 | 12/11/2017 | 62.39 | AMAZON | Y | Web Receipt | Other | | | |
| 392 | 12/11/2017 | 92.01 | POTBELLY | Y | Receipt & Correspondence | Meals & Entertainment | N | Y | |
| 393 | 12/11/2017 | 43.25 | SPRINT | Y | Invoice | Other | | | |
| 394 | 12/12/2017 | 138.48 | COURTYARD BY MARRIOTT | Y | Banquet Contract | Travel | N | Y | |
| 395 | 12/12/2017 | 5.27 | AMAZON MKTPLACE PMTS | N | N/A - No Support Provided | Other | | | |
| 396 | 12/13/2017 | 568.64 | BABES ARLINGTON | Y | Receipt | Meals & Entertainment | N | Y | |
| 397 | 12/13/2017 | 209.07 | CVS | Y | Receipt | Other | | | |
| 398 | 12/15/2017 | 204.00 | MAILCHIMP | Y | Email Receipt | Other | | | |

**APPX. 0496**

**Black Decl., Ex. Y**

| # | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Individuals Present Listed on Support? (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|
| 399 | 12/15/2017 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 400 | 12/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 401 | 12/18/2017 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 402 | 12/18/2017 | 75.67 | RAVENS GRILLE EULESS TX | Y | Receipt | Meals & Entertainment | Y | Y | |
| 403 | 12/20/2017 | 42.52 | AMAZON | Y | Web Receipt | Other | | | |
| 404 | 12/20/2017 | 367.70 | BRIO SOUTHLAKE | Y | Receipt | Meals & Entertainment | Y | Y | |
| 405 | 12/22/2017 | 1,173.99 | SAFE SCAN USA | Y | Credit Memo | Other | | | |
| 406 | 12/29/2017 | 42.69 | ANA'S ISLAND GRILL | Y | Receipt | Meals & Entertainment | Y | Y | |
| 407 | 1/2/2018 | 47.74 | RAVENS GRILLE EULESS | Y | Receipt | Meals & Entertainment | N | N | |
| 408 | 1/8/2018 | 251.14 | DOMINOS | Y | Receipt | Meals & Entertainment | N | N | |
| 409 | 1/10/2018 | (1,173.99) | SAFE SCAN USA | Y | Credit Memo | Other | | | |
| 410 | 1/15/2018 | 318.75 | MAILCHIMP | Y | Digital Confirm | Other | | | |
| 411 | 1/16/2018 | 378.20 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 412 | 1/17/2018 | 14.95 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 413 | 1/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 414 | 1/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 415 | 1/22/2018 | 14.95 | AATRIX SOFTWARE | Y | EfileConfirm | Other | | | |
| 416 | 1/23/2018 | (0.19) | INTEREST CHARGE REVERSAL | N | N/A - No Support Provided | Other | | | |
| 417 | 1/23/2018 | (272.81) | FOREIGN CURRENCY FEE REVERSAL | N | N/A - No Support Provided | Travel | | | |
| 418 | 1/24/2018 | (415.68) | DICKEY'S BARBECUE PIT | N | N/A - No Support Provided | Meals & Entertainment | N | N | |
| 419 | 1/25/2018 | 77.60 | TLF FLOWER GARDEN FLORIST | Y | Order Confirm | Other | | | |
| 420 | 1/25/2018 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 421 | 1/30/2018 | 817.00 | MIAMI INTL AIRPORT | Y | MeetingContract | Other | | | |
| 422 | 1/30/2018 | 43.27 | HOME DEPOT | Y | Order Summary | Other | | | |
| 423 | 2/1/2018 | 26.97 | OPENTIP.COM | Y | Order Summary | Other | | | |
| 424 | 2/5/2018 | 41.26 | MIAMI INTL AIRPORT | Y | Meeting Contract | Other | | | |
| 425 | 2/5/2018 | 127.98 | SWEETWATERSOUND | Y | Apfa Statement | Other | | | |
| 426 | 2/9/2018 | 49.10 | SIMPLY BURGERS FT WORTH | Y | Receipt | Meals & Entertainment | N | Y | |
| 427 | 2/14/2018 | 47.80 | AA CONF CENTER OUTLET | Y | Receipt | Meals & Entertainment | N | N | |
| 428 | 2/15/2018 | 318.75 | MAILCHIMP | N | N/A - No Support Provided | Other | | | |
| 429 | 2/17/2018 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 430 | 2/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 431 | 2/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 432 | 2/20/2018 | 30.81 | KROGER | Y | Receipt | Meals & Entertainment | N | Y | |
| 433 | 2/21/2018 | 95.97 | FROM YOU FLOWERS | Y | Web Confirm & Email Request | Other | | | |
| 434 | 2/22/2018 | 140.82 | HOLIDAY INN CHICAGO | Y | EmailConfirm | Travel | | | |
| 435 | 2/23/2018 | 79.36 | JIMMY JOHNS | Y | Receipt | Meals & Entertainment | N | N | |
| 436 | 2/24/2018 | 38.00 | FEDEX | Y | Receipt | Other | | | |
| 437 | 2/26/2018 | 114.17 | BOARDWALK BILLYS | Y | Receipt | Meals & Entertainment | N | N | |
| 438 | 2/27/2018 | 234.90 | BUDGET RENT A CAR CHARLOTTE | Y | Receipt | Automotive & Car Rental | | | |
| 439 | 2/27/2018 | 5.01 | SHELL OIL | Y | Receipt | Travel | | | |
| 440 | 2/27/2018 | 298.97 | FIREWATER CHARLOTTE | Y | Receipt | Meals & Entertainment | N | N | |
| 441 | 3/1/2018 | 79.81 | BAR LOUIE CHARLOTTE | Y | Receipt | Meals & Entertainment | Y | N | 20% ipadded |
| 442 | 3/2/2018 | 268.23 | CIROS ITALIAN | Y | Receipt | Meals & Entertainment | N | N | |
| 443 | 3/4/2018 | 118.23 | HILTON | Y | Receipt | Meals & Entertainment | N | N | |
| 444 | 3/6/2018 | 155.97 | TACO CASA | Y | Receipt | Meals & Entertainment | N | N | |
| 445 | 3/7/2018 | 109.02 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | N | |
| 446 | 3/8/2018 | 19.40 | AA CONF CENTER OUTLET | Y | Receipt | Meals & Entertainment | N | N | |
| 447 | 3/15/2018 | 45.80 | AA CONF CENTER OUTLET | Y | Receipt | Meals & Entertainment | N | N | |
| 448 | 3/15/2018 | 339.79 | MAILCHIMP | Y | Email Confirm | Other | | | |
| 449 | 3/17/2018 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 450 | 3/18/2018 | 87.01 | COSTCO | Y | Receipt | Other | | | |
| 451 | 3/18/2018 | 90.92 | OFFICE DEPOT | Y | Receipt | Other | | | |
| 452 | 3/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 453 | 3/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 454 | 3/21/2018 | 98.36 | ASPEN CREEK | Y | Receipt | Meals & Entertainment | N | N | |
| 455 | 3/22/2018 | 36.80 | AA CONF CENTER OUTLET | Y | Receipt | Meals & Entertainment | N | N | |
| 456 | 3/24/2018 | 360.13 | HOLIDAY INN | Y | Email Confirm | Travel | | | |
| 457 | 3/24/2018 | 360.13 | HOLIDAY INN | Y | Email Confirm | Travel | | | |
| 458 | 3/26/2018 | 72.90 | COSTCO | Y | Receipt | Other | | | |
| 459 | 3/29/2018 | 276.80 | HILTON (EURO) | Y | Email Confirm | Travel | | | |
| 460 | 3/29/2018 | 245.44 | HILTON (EURO) | Y | Email Confirm | Travel | | | |
| 461 | 3/29/2018 | 245.44 | HILTON (EURO) | Y | Email Confirm | Travel | | | |
| 462 | 3/29/2018 | 245.44 | HILTON (EURO) | Y | Email Confirm | Travel | | | |
| 463 | 4/1/2018 | 8.30 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 464 | 4/1/2018 | 7.36 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 465 | 4/1/2018 | 7.36 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 466 | 4/1/2018 | 7.36 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 467 | 4/3/2018 | 39.51 | JIMMY JOHNS | Y | Expense Summary Report | Meals & Entertainment | N | N | 15% tip added |
| 468 | 4/7/2018 | 1,090.41 | ALOFT NEW YORK | Y | Expense Summary Report | Travel | | | |
| 469 | 4/7/2018 | 1,090.41 | ALOFT NEW YORK | Y | Expense Summary Report | Travel | | | |
| 470 | 4/8/2018 | 125.35 | SHERATON DFW | Y | Email Confirm | Travel | | | |
| 471 | 4/8/2018 | 9.16 | KROGER | Y | Receipt | Meals & Entertainment | | | |
| 472 | 4/11/2018 | 120.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 473 | 4/12/2018 | 100.00 | PAYPAL | Y | Email Correspondence | Other | | | |
| 474 | 4/13/2018 | 239.53 | BOOKED.NET | Y | Email Confirm | Travel | | | |
| 475 | 4/13/2018 | 239.53 | BOOKED.NET | Y | Email Confirm | Travel | | | |
| 476 | 4/13/2018 | 276.57 | BOOKED.NET | Y | Email Confirm | Travel | | | |
| 477 | 4/15/2018 | 7.18 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 478 | 4/15/2018 | 7.18 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 479 | 4/15/2018 | 8.29 | FOREIGN TRANSACTION FEE | Y | Email Confirm | Travel | | | |
| 480 | 4/15/2018 | 339.79 | MAILCHIMP | Y | Email Confirm | Other | | | |
| 481 | 4/17/2018 | 34.62 | TACO CABANA | Y | Email Receipt | Meals & Entertainment | N | N | |
| 482 | 4/18/2018 | 500.25 | THE COMMUTER STORE | Y | Receipt | Travel | | | |

| | Date | Amount | Vendor/Co | Supporting Documentation Provided? (Y or N) Procedure #2 & #3 | Documentation Description Procedure #2 & #3 | Transaction Classification Procedure #4 | Individuals Present Listed on Support (Y or N) Procedure #5 | Business Purpose Listed on Support? (Y or N) Procedure #5 | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|
| 483 | 4/19/2018 | 16.23 | ADOBE | Y | N/A - No Support Provided | Other | | | |
| 484 | 4/19/2018 | 24.00 | NTTA CUSTOMER SVC | Y | Parking Receipt | Automotive & Car Rental | | | |
| 485 | 4/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 486 | 4/19/2018 | 24.00 | NTTA CUSTOMER SVC | Y | Parking Receipt | Automotive & Car Rental | | | |
| 487 | 4/19/2018 | 228.87 | HYATT REGENCY DFW | Y | Receipt | Meals & Entertainment | N | N | |
| 488 | 4/20/2018 | 24.00 | NTTA CUSTOMER SVC | Y | Parking Receipt | Automotive & Car Rental | | | |
| 489 | 4/20/2018 | 24.00 | NTTA CUSTOMER SVC | Y | Parking Receipt | Automotive & Car Rental | | | |
| 490 | 4/20/2018 | 1,170.98 | CAPITOL HOST | Y | Order Summary | Meals & Entertainment | N | N | |
| 491 | 4/21/2018 | 24.00 | NTTA CUSTOMER SVC | Y | Parking Receipt | Automotive & Car Rental | | | |
| 492 | 4/22/2018 | 91.38 | COSTCO | Y | Receipt | Other | | | |
| 493 | 4/23/2018 | 319.37 | DOUBLETREE CRYSTL CITY | Y | Email Confirm | Travel | | | |
| 494 | 4/25/2018 | 21.94 | SQ UVC | Y | Email Receipt | Other | | | |
| 495 | 4/27/2018 | 131.65 | RED TORCH DUBLIN | Y | Receipt | Meals & Entertainment | Y | Y | |
| 496 | 4/29/2018 | 3.94 | FOREIGN TRANSACTION FEE | N | N/A - No Support Provided | Other | | | |
| 497 | 5/1/2018 | 500.00 | ISASI | Y | Invoice | Other | | | |
| 498 | 5/1/2018 | 79.30 | RAVENS GRILLE | Y | Receipt | Meals & Entertainment | N | N | |
| 499 | 5/1/2018 | 195.00 | ANNUAL MEMBERSHIP FEE | N | N/A - No Support Provided | Other | | | |
| 500 | 5/6/2018 | 160.00 | NTTA AUTOCHARGE | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 501 | 5/8/2018 | 24.00 | NTTA CUSTOMER SVC | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 502 | 5/8/2018 | 24.00 | NTTA CUSTOMER SVC | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 503 | 5/12/2018 | 24.00 | NTTA CUSTOMER SVC | N | N/A - No Support Provided | Automotive & Car Rental | | | |
| 504 | 5/13/2018 | 45.98 | AMAZON | Y | Website Confirm | Other | | | |
| 505 | 5/15/2018 | 339.79 | MAILCHIMP | Y | Email Confirm | Other | | | |
| 506 | 5/15/2018 | 439.88 | MARRIOTT | Y | Email Confirm | Travel | | | |
| 507 | 5/15/2018 | 219.94 | MARRIOTT | Y | Email Confirm & Correspondence | Travel | | | |
| 508 | 5/16/2018 | 439.88 | MARRIOTT | Y | Email Confirm | Travel | | | |
| 509 | 5/16/2018 | 600.00 | PAYPAL | Y | Email Confirm | Travel | | | |
| 510 | 5/18/2018 | (1,090.41) | ALOFT NEW YORK | Y | Email Confirm | Travel | | | |
| 511 | 5/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 512 | 5/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 513 | 5/19/2018 | (1,090.41) | ALOFT NEW YORK | Y | Email Confirm | Travel | | | |
| 514 | 5/22/2018 | 62.65 | FACTORY OUTLET STORE | Y | Email Confirm | Other | | | |
| 515 | 5/22/2018 | 67.66 | NYPDDELI | Y | Receipt | Meals & Entertainment | N | Y | |
| 516 | 5/23/2018 | 549.00 | AATRIX SOFTWARE | Y | Email Confirm & Correspondence | Other | | | |
| 517 | 5/24/2018 | 70.82 | ZOES | Y | Receipt | Meals & Entertainment | N | N | |
| 518 | 5/29/2018 | 2.00 | TX GOV SVC FEE | Y | Receipt | Automotive & Car Rental | | | |
| 519 | 5/29/2018 | 71.75 | TARRANT VEH REG | Y | Receipt & Renewal | Automotive & Car Rental | | | |
| 520 | 6/5/2018 | 366.50 | HOLIDAY INN CHARLOTTE | Y | Authorization Form & Confirm | Travel | | | |
| 521 | 6/6/2018 | 183.25 | HOLIDAY INN CHARLOTTE | Y | Authorization Form & Confirm | Travel | | | |
| 522 | 6/6/2018 | 200.00 | NTTA AUTOCHARGE | Y | Receipt | Automotive & Car Rental | | | |
| 523 | 6/8/2018 | 1,190.75 | SAGE SOFTWARE | Y | Email Receipt | Other | | | |
| 524 | 6/15/2018 | 339.79 | MAILCHIMP | N | N/A - No Support Provided | Other | | | |
| 525 | 6/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 526 | 6/19/2018 | 16.23 | ADOBE | N | N/A - No Support Provided | Other | | | |
| 527 | 7/2/2018 | 26.09 | AMAZON | Y | Website Receipt | Other | | | |
| | | 89,343.98 | | | | | | | |

**Exhibit B**

Cornwell Jackson Invoices for the Performance of Agreed-Upon Procedures



6865 Windcrest Drive , Suite 100
Plano, Texas  75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 30431
Date:      5/31/2022

--------------------------------------------------------------------------------------------------------------------------
**INTERIM PROGRESS BILL - *Fees listed below may only reflect a portion of the total engagement fee.***
--------------------------------------------------------------------------------------------------------------------------

Fees related to the agreed-upon procedures for  ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS:

AUP Fees - Vargas                                                                                      $150.00

**PAYMENT METHOD**



**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

Accounts Receivable Aging

| 0-30 | 31-60 | 61-90 | 91-120 | Over 120 | Balance |
|------|-------|-------|--------|----------|---------|
| $300.00 | $0.00 | $0.00 | $0.00 | $0.00 | $300.00 |

**Invoice Due Upon Receipt**

APPX. 0500

Black Decl. Ex. Y



6865 Windcrest Drive , Suite 100
Plano, Texas 75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 30709
Date:      6/30/2022

---------------------------------------------------------------------------------------------------------------------------
**INTERIM PROGRESS BILL - *Fees listed below may only reflect a portion of the total engagement fee.***
---------------------------------------------------------------------------------------------------------------------------

Fees related to the agreed-upon procedures engagement related to Eugenio Vargas

Agreed-upon procedure fees                                                    $3,300.00

                                             Invoice Total:   $3,300.00

**PAYMENT METHOD**

**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

Accounts Receivable Aging

| 0-30 | 31-60 | 61-90 | 91-120 | Over 120 | Balance |
|------|-------|-------|--------|----------|---------|
| $3,300.00 | $300.00 | $0.00 | $0.00 | $0.00 | $3,600.00 |

**Invoice Due Upon Receipt**

APPX. 0501

Black Decl. Ex. Y



6865 Windcrest Drive , Suite 100
Plano, Texas  75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 31072
Date:       7/31/2022
Client No:  6700

--------------------------------------------------------------------------------------------------------------------------
**INTERIM PROGRESS BILL - *Fees listed below may only reflect a portion of the total engagement fee.***
--------------------------------------------------------------------------------------------------------------------------

Fees related to the agreed-upon procedures engagement related to Eugenio Vargas

Agreed-upon procedure fees                                                                               $4,825.00


                                                                            Invoice Total:   $4,825.00


**PAYMENT METHOD**



**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com


**By e-check or credit card**
www.cornwelljackson.com

| | | Accounts Receivable Aging | | | |
|---|---|---|---|---|---|
| **0-30** | **31-60** | **61-90** | **91-120** | **Over 120** | **Balance** |
| $4,825.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,825.00 |

**Invoice Due Upon Receipt**

APPX. 0502

**Black Decl. Ex. Y**



6865 Windcrest Drive , Suite 100
Plano, Texas  75024
972.202.8000 p / 972.202.8010 f

ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
1004 W. EULESS BLVD.
EULESS, TX 76040

Invoice No: 31074
Date:       8/5/2022

---------------------------------------------------------------------------------------------------------------------------------------
**FINAL BILL - *Fees listed below may only reflect a portion of the total engagement fee. However, this is the final bill for these services.***
---------------------------------------------------------------------------------------------------------------------------------------

Fees related to the agreed-upon procedures engagement related to Eugenio Vargas

Agreed-upon procedure fees                                                                    $150.00

Invoice Total:    $150.00

**PAYMENT METHOD**

**By Bill.com**
Company Name:  Cornwell Jackson, PLLC
Send requests to:  Dawn.Groskopf@cornwelljackson.com

**By e-check or credit card**
www.cornwelljackson.com

**By Check:**
6865 Windcrest Drive Ste 100
Plano, TX  75024

**Accounts Receivable Aging**

| 0-30 | 31-60 | 61-90 | 91-120 | Over 120 | Balance |
|------|-------|-------|--------|----------|---------|
| $150.00 | $0.00 | $0.00 | $0.00 | $0.00 | $150.00 |

**Invoice Due Upon Receipt**

APPX. 0503

<u>In the Matter of Arbitration Between</u>

|  |  |  |
|---|---|---|
| | ) | |
| **Melissa Chinery** | ) | |
| **Sandra Lee** | ) | **RE: Article VII Charges** |
| | ) | **Violations of APFA Constitution** |
| **APFA Charging Party Members** | ) | **and APFA Policy Manual** |
| **(Plaintiff)** | ) | |
| | ) | |
| **And** | ) | |
| **Eugenio Vargas, Former APFA** | ) | |
| **National Treasurer** | ) | |
| | ) | |
| | ) | |
| **APFA Charged Party Member** | ) | |
| **(Defendant)** | ) | |
| | ) | |

---

### SUPPLEMENTAL DECISION AND REMEDY MODIFICATION

**Before:**                          **Alternate Article VII Arbitrator Ruben R. Armendariz**

**Place and Dates of Hearing:**      **The Westin Irving Convention Center at Las Colinas, 400 West Las Colinas Boulevard, located in the City of Irving, Texas.**

**September 14, 15, and 16, 2021**

**Appearances:**

**For Charging Party Members:**      **Melissa Chinery, Representative**
**(Plaintiff's)**                    **Sandra Lee, Representative**

**For Charged Party Member:**        **Heidi Morgan, Representative**
**(Defendant)**                      **Nena Martin, Representative**
                                     **Eugenio Vargas, Former National Treasurer**

**Black Decl. Ex. Z**

RE: Supplemental Decision and Remedy Modification
     Article VII Charges

On the 18th day of February 2022, the undersigned arbitrator issued a Decision and Remedy in the above case. In the original Remedy the undersigned arbitrator requested APFA to hire a forensic auditor to audit Mr. Eugenio Vargas credit card transactions as listed in item 1.

In accordance with the original remedy, the APFA hired Cornwell Jackson, Certified Public Accountants to conduct the requested audit. On August 5, 2022, the Independent Accountant's Audit Report was completed and submitted to the APFA. This report was subsequently transmitted to this arbitrator to review and to issue a "Supplemental Decision and Remedy Modification."

The arbitrator has reviewed the Independent Accountant's Audit Report and finds Defendant Eugenio Vargas has violated certain identified items. Thus, the February 18, 2022 Original Remedy is hereby modified to reflect the Auditors identified items. Accordingly, the arbitrator finds those monetary amounts found inappropriate are now subject for repayment to APFA. Additionally, the Auditors invoices for services rendered shall be included for repayment.

## REMEDY MODIFICATION

It is hereby Ordered that Defendant Vargas shall repay the APFA the following amounts the auditors deemed inappropriate. The Accountants Audit Report is a thorough explanation of the auditor's findings and those amounts found inappropriate. [1]

Vargas is to repay the APFA for the following:

1. **Inappropriate credit card charges related to meals.          $13,914.87**

   **Auditors Invoices**

   | | | |
   |---|---|---|
   | 05/31/2022 | $. | 150.00 |
   | 06/30/2022 | | 3,300.00 |
   | 07/31/2022 | | 4,825.00 |
   | 08/05/2022 | | 150.00 |
   | **Total** | **$** | **8,425.00** |

2. Vargas is prohibited from serving in any APFA National Officer position or Regional Officer position for life.
3. Vargas is hereby fined and Ordered to repay the APFA for half of the Arbitrator's Fee (1/2 x $17,246. 33 = **$8,623.16** ) for this arbitration.
4. The arbitrator shall retain jurisdiction for 90-days over any issue involving this modified remedy only.

---

[1] Mr. Vargas can request a copy of the auditor's report from the APFA if he has not already received a copy ot it.

**APPX. 0505**

Black Decl. Ex. Z

**RE: Supplemental Decision and Remedy Modification**
    **Article VII Charges**

Issued the 24ᵗʰ day of August, 2022, in San Antonio, Texas.

Ruben R. Armendariz, Arbitrator