# TAB 5

## DECLARATION OF JEFFREY A. BARTOS

1.      I am an adult resident of the Commonwealth of Virginia, and I make this Declaration based on personal knowledge.

2.      I am a principle in the law firm of Guerrieri, Bartos & Roma, PC, based in Washington, D.C., and counsel in this litigation for Association of Professional Flight Attendants ("APFA"), Julie Hedrick and Erik Harris (collectively "APFA Defendants").

3.      Attached as Exhibit A is a true and correct copy of Plaintiff Robert (Bob) Ross' Response and Objections to APFA Defendants' First Set of Interrogatories to Robert Ross

4.      Attached as Exhibit B is a true and correct copy of Plaintiff Eugenio Vargas' Response and Objections to APFA Defendants' First Set of Interrogatories to Eugenio Vargas.

5.      Attached as Exhibit C is a true and correct copy of relevant excerpts from Mr. Ross' deposition conducted in this matter.

6.      Attached as Exhibit D is a true and correct copy of relevant excerpts from Mr. Vargas' deposition conducted in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of April 2024.

Bartos Decl., Ex. A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| ROBERT (BOB) ROSS, | § | |
| | § | |
| Plaintiff/Counterclaim | § | Civil Action No. 4:22-cv-343-Y |
| Defendant, | § | |
| v. | § | Judge Terry R. Means |
| | § | |
| ASSOCIATION OF PROFESSIONAL | § | |
| FLIGHT ATTENDANTS, *et al.*, | § | |
| | § | |
| Defendants/Counterclaim | § | |
| Plaintiff. | § | |

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO APFA
## DEFENDANTS' FIRST SET OF INTERROGATORIES

1.      Do you contend that Julie Hedrick made defamatory statements about you?

RESPONSE:  Plaintiff objects to this interrogatory because it calls for the plaintiff to make a legal conclusion. Plaintiff further objects to this interrogatory as vague, ambiguous, argumentative, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

2.      If your answer to the forgoing question is "yes," for each statement by Julie Hedrick which you contend was defamatory about you,

RESPONSE:  Plaintiff objects to this interrogatory because it calls for the plaintiff to make a legal conclusion. Plaintiff further objects to this interrogatory as vague, ambiguous, argumentative, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

a.      Quote the exact language of the statement.
b.      State when and to whom the statement was made.
c.      Identify all documents in which the statement was made.

3.      Do you contend that Erik Harris made defamatory statements about you?

RESPONSE:  Plaintiff objects to this interrogatory because it calls for the plaintiff to make a legal conclusion. Plaintiff further objects to this interrogatory as vague, ambiguous, argumentative, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.


4.      If your answer to the forgoing question is "yes," for each statement by Erik Harris which you contend was defamatory about you,

RESPONSE:  Plaintiff objects to this interrogatory because it calls for the plaintiff to make a legal conclusion. Plaintiff further objects to this interrogatory as vague, ambiguous, argumentative, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.


    a.      Quote the exact language of the statement.
    b.      State when and to whom the statement was made.
    c.      Identify all documents in which the statement was made.


5.      Do you contend that APFA made defamatory statements about you?

RESPONSE:  Plaintiff objects to this interrogatory because it calls for the plaintiff to make a legal conclusion. Plaintiff further objects to this interrogatory as vague, ambiguous, argumentative, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.


6.      If your answer to the forgoing question is "yes," for each statement by APFA which you contend was defamatory about you,

RESPONSE:  Plaintiff objects to this interrogatory because it calls for the plaintiff to make a legal conclusion. Plaintiff further objects to this interrogatory as vague, ambiguous, argumentative, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.


    a.      Quote the exact language of the statement.
    b.      Identify which person made the statement.
    c.      State when and to whom the statement was made.
    d.      Identify all documents in which the statement was made.


7.      For every medical professional who provided you with any diagnosis or treatment which you contend was related in any way to the actions of any of the APFA Defendants that are

2

Bartos Decl. Ex. A

the subject of this litigation, provide the following:

RESPONSE: Plaintiff objects to this interrogatory because this interrogatory seeks HIPAA protected medically-privileged doctor patient confidential information.  Furthermore, Plaintiff objects to this interrogatory as it is vague, ambiguous unduly burdensome and irrelevant. Finally Plaintiff objects to this request as it improperly seeks information protected by personal rights to privacy.

    a.    The name, title, address and phone number of the medical professional.
    b.    The dates of all appointments or treatments.
    c.    All diagnoses made and treatments provided or recommended.
    d.    A list of all medications prescribed or recommended to you.

8.    State all facts that support Plaintiff's allegation that "APFA's Disciplinary Procedures were used to victimize any union member outspoken against a merger between AFA and APFA" as alleged in Paragraphs 2 and 12 of your First Amended Complaint in this action.

RESPONSE: Plaintiff objects to this interrogatory because it seeks information in the possession of, known to, or otherwise equally available to the plaintiff. Plaintiff further objects to this request as it is oppressive and unduly burdensome.  Plaintiff objects to this request as the information requested is equally available to Defendant.  Plaintiff objects to this request as Plaintiff already has any responsive information in its possession.

9.    State with specificity the due process violations that you allege occurred in connection with your Article VII proceedings as alleged in Paragraph 30 of your First Amended Complaint in this action.

RESPONSE: Plaintiff objects to this interrogatory because it seeks information in the possession of, known to, or otherwise equally available to the plaintiff. Plaintiff further objects to this request as it is oppressive and unduly burdensome.  Plaintiff objects to this request as the information requested is equally available to Defendant.  Plaintiff objects to this request as Plaintiff already has any responsive information in its possession.

10.    State with specificity Ross's "public announcements, beginning the day he took office on April 1, 2016, against a proposed merger of the two unions: AFA and APFA" as alleged in Paragraph 40 of your First Amended Complaint in this action.  For each such announcement,

    a.    Quote the exact language of the statement.

Bartos Decl. Ex. A

  b.  State when and to whom the statement was made. The statement was made in my inaugural speech on April 1, 2016, and to individuals thereafter.

  c.  Identify all documents in which the statement was made.  There are no documents.  It is my testimony.

RESPONSE: Plaintiff objects to this interrogatory because it seeks information in the possession of, known to, or otherwise equally available to the plaintiff. Plaintiff further objects to this request as it is oppressive and unduly burdensome.  Plaintiff objects to this request as the information requested is equally available to Defendant.  Plaintiff objects to this request as Plaintiff already has any responsive information in its possession.

  11.  Set forth and describe all facts that support Plaintiff's allegations that he "negotiated that he would be paid outside of APFA policy" as alleged in Paragraph 14 of your First Amended Complaint in this action.

RESPONSE: Objection. Plaintiff objects to this interrogatory as it is vague, ambiguous unduly burdensome and irrelevant. Plaintiff further objects to this request as the information requested is equally available to Defendant.  Plaintiff further objects to this request as Plaintiff already has any responsive information in its possession.

  12.  Identify all persons who have provided you or your attorney with any financial support or payments in connection with this litigation.

RESPONSE: Plaintiff objects to this interrogatory because this interrogatory seeks attorney-client privilege information.   Furthermore, Plaintiff objects to this interrogatory as it is vague, ambiguous unduly burdensome and irrelevant.  Plaintiff further objects to this request as it calls for information that is not relevant, nor reasonably calculated to lead to the discovery of relevant or admissible evidence.

            Respectfully submitted,
            KD PHILLIPS LAW FIRM, PLLC

            By:  /s/ Kerri Phillips
              Kerri Phillips
              Texas Bar No. 24065906
              Phone: (972) 327-5800
              Email:
              kerri@KDphillipslaw.com
              6010 W. Spring Creek Parkway

APPX. 0565

Bartos Decl. Ex. A

Plano, Texas 75024
Fax: (940) 400-0089
For Service of Filings:
notice@KDphillipslaw.com

**ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF filing on this the 28th day of September 2023.

Jeff Bartos
James Sanford
Charlette Matts


  /s/ Kerri Phillips
Kerri Phillips

5

**Bartos Decl. Ex. B**



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| | § | |
| EUGENIO VARGAS, | § | |
| | § | |
|      Plaintiff/Counterclaim | § | Civil Action No. 4:22-cv-430-Y |
|      Defendant, | § | |
| v. | § | Judge Terry R. Means |
| | § | |
| ASSOCIATION OF PROFESSIONAL | § | |
|      FLIGHT ATTENDANTS, *et al.*, | § | |
| | § | |
|      Defendants/Counterclaim | | |
|      Plaintiff. | | |

<u>PLAINTIFF'S RESPONSES AND OBJECTIONS TO APFA
DEFENDANTS' FIRST SET OF INTERROGATORIES TO
EUGENIO VARGAS</u>

     1.     For each statement described in paragraph 49 of your First Amended Complaint (doc. 55-1),

          a.     Quote the exact language of the statement.
          b.     State when and to whom the statement was made.
          c.     Identify all documents in which the statement was made.

RESPONSE: Plaintiff objects to this interrogatory because it references an Amended Complaint that Plaintiff was denied leave to amend.  Plaintiff objects to this request as it is vague and ambiguous as to the term "First Amended Complaint" in its entirety. Plaintiff also objects as Defendants seek information in the possession of, known to, or otherwise equally available to the plaintiff. Plaintiff further objects to this request as it is oppressive and unduly burdensome. Plaintiff objects to this request as the information requested is equally available to Defendant. Plaintiff objects to this request as Plaintiff already has any responsive information in its possession.

     2.     For each statement described in paragraph 50 of your First Amended Complaint (doc. 55-1),

          a.     Quote the exact language of the statement.
          b.     State when and to whom the statement was made.
          c.     Identify all documents in which the statement was made.

1

**Bartos Decl. Ex. B**

RESPONSE: Plaintiff objects to this interrogatory because it references an Amended Complaint that Plaintiff was denied leave to amend.  Plaintiff objects to this request as it is vague and ambiguous as to the term "First Amended Complaint" in its entirety. Plaintiff also objects as Defendants seek information in the possession of, known to, or otherwise equally available to the plaintiff. Plaintiff further objects to this request as it is oppressive and unduly burdensome. Plaintiff objects to this request as the information requested is equally available to Defendant. Plaintiff objects to this request as Plaintiff already has any responsive information in its possession.

       3.       For each statement described in paragraph 51 of your First Amended Complaint (doc. 55-1).

            a.     Quote the exact language of the statement.
            b.     State when and to whom the statement was made.
            c.     Identify all documents in which the statement was made.

RESPONSE: Plaintiff objects to this interrogatory because it references an Amended Complaint that Plaintiff was denied leave to amend.  Plaintiff objects to this request as it is vague and ambiguous as to the term "First Amended Complaint" in its entirety. Plaintiff also objects as Defendants seek information in the possession of, known to, or otherwise equally available to the plaintiff. Plaintiff further objects to this request as it is oppressive and unduly burdensome. Plaintiff objects to this request as the information requested is equally available to Defendant. Plaintiff objects to this request as Plaintiff already has any responsive information in its possession.

       4.     Identify all persons who have provided you or your attorney with any financial support or payments in connection with this litigation.

RESPONSE: Plaintiff objects to this interrogatory because this interrogatory seeks attorney-client privilege information.  Furthermore, Plaintiff objects to this interrogatory as it is vague, ambiguous unduly burdensome and irrelevant.  Plaintiff further objects to this request as it calls for information that is not relevant, nor reasonably calculated to lead to the discovery of relevant or admissible evidence.

                                      Respectfully submitted,
                                      KD PHILLIPS LAW FIRM, PLLC

**APPX. 0568**

Bartos Decl., Ex. B

By: /s/ Kerri Phillips
　　Kerri Phillips
　　Texas Bar No. 24065906
　　Phone: (972) 327-5800
　　Email:
　　kerri@KDphillipslaw.com
　　6010 W. Spring Creek Parkway
　　Plano, Texas 75024
　　Fax: (940) 400-0089
　　For Service of Filings:
　　notice@KDphillipslaw.com

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that true and correct copy of this document was sent to all counsel of record, hereunder listed via ECF filing on this the 28th day of September 2023.

Jeff Bartos
James Sanford
Charlette Matts

　　/s/ Kerri Phillips
　　Kerri Phillips

3

```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                      FORT WORTH DIVISION

ROBERT (BOB) ROSS,           §
                             §
Plaintiff/                   §
Counterclaim Defendant,      §
                             §   Civil Action No.
VS.                          §   4:22-cv-343-Y
                             §
ASSOCIATION OF               §   Judge Terry R. Means
PROFESSIONAL FLIGHT          §
ATTENDANTS, et al.,          §
                             §
Defendants/                  §
Counterclaim Plaintiff.      §


          -----------------------------------
              VIDEOTAPED ORAL DEPOSITION OF
                       ROBERT ROSS
                        VOLUME 1
                    FEBRUARY 1, 2024
          -----------------------------------
```

VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 1, 2024, from 10:53 a.m. to 4:56 p.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                     2/1/2024

---

**Page 2**

```
 1          A P P E A R A N C E S
 2
    FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:
 3
      MS. KERRI PHILLIPS
 4    K.D. PHILLIPS LAW FIRM, PLLC
      6010 West Spring Creek Parkway
 5    Plano, Texas  75024
      (972) 327-5800
 6    kerri@KDphillipslaw.com
 7
    FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFF ASSOCIATION OF
 8  PROFESSIONAL FLIGHT ATTENDANTS AND DEFENDANTS JULIE
    HEDRICK AND ERIK HARRIS:
 9
      MR. JEFFREY A. BARTOS
10    GUERRIERI, BARTOS & ROMA, P.C.
      1900 M Street, N.W.
11    Suite 700
      Washington, D.C.  20036
12    (202) 624-7400
      jbartos@geclaw.com
13
      MS. CHARLETTE L. BRODERICK
14    Association of Professional Flight Attendants
      1004 West Euless Boulevard
15    Euless, Texas  76040
      (682) 301-8454
16    cmatts@apfa.org
17
    ALSO PRESENT:
18
      Ms. Michelle Cliatt, APFA Legal Assistant
19
      Mr. Erik Harris, APFA National Treasurer
20
      Ms. Julie Hedrick, APFA National President
21
      Mr. Adam Phillips, Paralegal
22       K.D. Phillips Law Firm, PLLC
      Mr. John Hines, Videographer
23    Elite Video Productions
      3018 Commerce Street
24    Dallas, Texas 75226
      (214) 747-1952
25
```

---

**Page 4**

```
 1  Exhibit 12 2/28/22 email from Ruben Armendariz    90
        to National Secretary
 2
    Exhibit 13 Staples receipts           128
 3      [Appendix 190-191]
 4  Exhibit 14 Uber receipts             130
        [Appendix 204-208]
 5
    Exhibit 15 Affidavit of Robert "Bob" Ross in   134
 6      Support of Damages
        [Appendix 183-189]
 7
    Exhibit 16 Medical records           140
 8      [Appendix 220-231]
 9  Exhibit 17 Medical records           143
        [Appendix 246-253]
10
11
12
13
14
15
16
17
18
19
20
21
22
23  REPORTER'S NOTE:
24     Quotation marks are used for clarity and do
       not necessarily reflect a direct quote.
25
```

---

**Page 3**

```
 1          TABLE OF CONTENTS
                        PAGE
 2
 3  Appearances.......................  2
 4  ROBERT ROSS, VOLUME 1
 5  Examination by Mr. Bartos.................  8
 6  Changes and Signature.....................  161
    Reporter's Certification..................  163
 7
 8          EXHIBITS
    NUMBER    DESCRIPTION         PAGE
 9  Exhibit 1  Online posts        18
              [Ross/Vargas 001190-1197]
10
    Exhibit 2  Transcript excerpt, pages 382-384   26
11
    Exhibit 3  Transition Agreement     45
12
    Exhibit 4  3/2/18 Calculation of vacation    53
13      and sick benefits
        [Ross/Vargas 000459-460]
14
    Exhibit 5  Affidavit of Robert Ross in Support   57
15      of Plaintiff's Original Petition and
        Motion to Vacate
16
    Exhibit 6  Online posts          62
17      10/13/16 letter to Sara Nelson
        [Appendix 27-30]
18
    Exhibit 7  The Constitution of the Association   70
19      of Professional Flight Attendants
20  Exhibit 8  Article VII Charges - Ross - Post   78
        Hearing Brief
21
    Exhibit 9  Typewritten notes      84
22
    Exhibit 10 10/22/20 Confidential Memorandum    86
23      [APFA0164-176]
24  Exhibit 11 2/27/22 email from Kit Gomez Alba to   89
        National Secretary
25
```

---

**Page 5**

```
 1      (February 1, 2024, 10:53 a.m.)
 2          MR. BARTOS:  For the record, this is Jeff
 3  Bartos, attorney for the APFA defendants.  It is
 4  whatever the time the court reporter has indicated,
 5  nearly 11:00 a.m., for the deposition we've noticed for
 6  10:00 a.m.
 7      I'm here with Charlette Matts, counsel in the
 8  case as well at APFA, in-house counsel; Michelle Cliatt,
 9  who works for Ms. Matts -- Ms. Broderick.  I'm also here
10  with the defendants Julie Hedrick and Erik Harris and
11  then two of APFA's national officers who are here on
12  behalf of APFA, Larry Salas and Josh Black.  Also
13  present is counsel for Mr. Bob Ross and another
14  individual.
15      A dispute has arisen about whether or not the
16  individuals who are here on behalf of APFA are allowed
17  to be here or should be here or whether the deposition
18  can proceed with them here.  It's my understanding that
19  Mr. Ross is refusing to testify in his deposition unless
20  Mr. Salas and Mr. Black leave the room.
21          MS. PHILLIPS:  That's incorrect.
22          MR. BARTOS:  Okay.  Let me just finish.
23      It's our position that as party
24  representatives of APFA, they are wholly entitled to be
25  here.  I've offered for Mr. Salas to leave the room.
```

---

Robert Ross                                                                      2/1/2024

| | 66 |
|---|---|

1  Right?
2      A.  That's right.
3      Q.  Okay.  And just to get your recollection or
4  understanding, is it your understanding that under
5  Article VII a member of APFA can file charges against
6  another member of APFA?
7          MS. PHILLIPS:  I mean, objection.  You
8  know, he's not here to testify about APFA Constitution.
9      A.  If Article VII charges are filed against a
10  member, they would have to be filed under the guidelines
11  of Article VII against a member or from a member or
12  officer.
13      Q.  All right.  And as yourself, an APFA member,
14  you are -- you could file charges against another APFA
15  member, if you had a basis for it.  Isn't that right?
16      A.  You could.  Anyone could.
17      Q.  And, when charges are filed, they have to be
18  reviewed by the Executive Committee.  Isn't that right?
19          MS. PHILLIPS:  Objection; leading.
20      A.  I think you'd have to define what the word
21  "review" means.
22      Q.  Okay.  Is the Executive Committee supposed to
23  conduct a vote as to whether the charges are timely,
24  valid, and specific?
25          MS. PHILLIPS:  Objection; leading.

| | 67 |
|---|---|

1      Q.  Do you know?
2      A.  Those -- those parameters are within the test
3  to decide as to whether Article VII charges could move
4  forward.
5      Q.  Okay.  And, if the Executive Committee votes
6  that, in its view, charges are timely, specific, and
7  valid, those charges must then go to the Article VII
8  arbitrator.  Correct?
9      A.  To my knowledge, that's not correct.
10      Q.  What?  What's wrong with that statement?
11      A.  It's always been the premise that the
12  Executive Committee does an investigation, not merely
13  look at somebody's charges and vote yes or no.  There
14  has to be some investigation.  There has to be some
15  inquiry.  There has to be some defense given to the
16  person who is being accused.
17      Q.  And do you think that's written down somewhere
18  in Article VII?
19      A.  There are a lot of things not written in
20  Article VII that are part of proper protocol.
21      Q.  So that is not in Article VII, what you
22  described as the investigation, is it?
23      A.  Well, I've been involved --
24          MS. PHILLIPS:  I mean, objection.  This
25  is all speculative.

| | 68 |
|---|---|

1      A.  I've been involved in union work for many
2  years, and I have never witnessed an Executive Committee
3  that didn't do some kind of due diligence on their part
4  to make sure that those accusations have merit.
5      Q.  How many Article VII charges were filed while
6  you were president?
7      A.  None.
8      Q.  Okay.  The Article VII arbitrator is someone
9  who is appointed by the board of directors.  Right?  If
10  you know.
11      A.  They are voted on by members of the board of
12  directors.
13      Q.  Okay.  So, if someone gets a majority vote,
14  they can be an Article VII arbitrator; if they don't get
15  a majority, then they're not.  Is that fair to say?
16      A.  Well, they would be either the lead arbitrator
17  or they would be an alternate.
18      Q.  If they're voted on?
19      A.  Right.
20      Q.  Okay.  And you're familiar with Arbitrator
21  Armendariz?
22      A.  I am familiar with that name.
23      Q.  Okay.  In fact, you voted for him to renew his
24  term as Article VII arbitrator, didn't you?
25          MS. PHILLIPS:  Objection; leading.

| | 69 |
|---|---|

1      A.  I felt I was required to because I was having
2  Article VII charges at the time.
3      Q.  But you did vote?
4      A.  If I voted no, it would have -- it would have
5  adversely affected his opinion of me.
6      Q.  So you did vote yes?
7      A.  Yes.
8      Q.  Okay.  And would you agree with me that under
9  Article VII the arbitrator has the jurisdiction to
10  decide whether or not charges are timely or untimely?
11      A.  Again, another flaw in the Article VII
12  process.  He would have to know all the facts and
13  specifics to know whether it was timely or not.
14      Q.  But does he have that jurisdiction?
15      A.  He has the jurisdiction if he's given the
16  proper authority -- proper documentation to prove it,
17  and he would have that.
18      Q.  And he has jurisdiction to find that charges
19  are not specific, doesn't he?
20          MS. PHILLIPS:  Objection; leading.
21      A.  I don't know what his process is.  Once it
22  gets to the arbitrator, it's already gone beyond the EC.
23      Q.  Okay.  All right.  But we could look at
24  Article VII and it would tell us what his jurisdiction
25  is.  Right?

**STRYKER REPORTING SERVICES**                    ***        **(817) 494-0700**

Robert Ross                                                            2/1/2024

---

**74**

1  Q.  Okay.  Do you remember appearing before an
2  arbitrator in June of 2021?
3  A.  I do.
4  Q.  Okay.  And do you remember, then, coming back
5  for a continuation of the hearings in November of 2021?
6  A.  I do.
7  Q.  Okay.  And you recall that a transcript was
8  made of the proceedings.  Right?
9  A.  I believe there were.
10  Q.  Okay.  I mean, you submitted the whole
11  transcript as part of your affidavit.  Do you remember
12  that?
13  A.  There were transcripts made of both
14  arbitrations.  So ...
15  Q.  When you say "both," what do you mean?
16  A.  Well, the first arbitration that started out
17  and then was postponed, the one you were referring to in
18  June.
19  Q.  Uh-huh.
20  A.  That would be both.
21  Q.  Okay.
22  A.  You're talking about one in June and one in
23  November.  Correct?
24  Q.  Okay.  Okay.  I'm talking about those three
25  different dates, yeah.  There are transcripts of all the

**75**

1  dates of your arbitration?
2  A.  Right.
3  Q.  Okay.  And do you recall in November that you
4  personally made an opening statement to the arbitrator?
5  A.  I must have.
6  Q.  Okay.  And I think we mentioned this before.
7  But you had a representative at the hearing, Gina
8  Guidry?
9  A.  Yes.
10  Q.  Am I saying her name correctly?
11  A.  Close enough.
12  Q.  Close enough.  Okay.  And she's a fellow
13  flight attendant?
14  A.  She is a flight attendant.
15  Q.  Okay.  Why did you ask her to be your
16  representative?
17  A.  Because she had knowledge of the case and
18  was -- I had a choice of dozens of people.  Why I chose
19  her ...
20  Q.  Okay.  But you -- you had a choice.  You chose
21  her.  Nobody required you to have her be your
22  representative.  Is that right?
23  A.  She was not my only representative.  But
24  you're right.
25  Q.  Okay.  So you had another representative, Kit

**76**

1  Alba?
2  A.  She was there.
3  Q.  Okay.  Was she present at the hearings?
4  A.  Yes.
5  Q.  Okay.  And she also helped you on your -- the
6  brief that was filed after the hearings.  Right?
7  A.  I don't recall who helped me on those briefs.
8  Q.  Okay.  Okay.  And did you have any other
9  people, of the -- of the numbers of people who wanted to
10  help, who also helped you, besides Ms. Guidry and
11  Ms. Alba?
12  A.  Are you speaking of witnesses or specific
13  representatives?  The arbitration list is all there, and
14  it's all in the transcripts.
15  Q.  Okay.  Okay.  So, if I look at the arbitration
16  transcript, I can see who was present and who testified.
17  Right?
18  A.  I assume.
19  Q.  Okay.  And, in the course of the arbitration,
20  Ms. Chinery and Ms. Lee presented some witnesses of
21  their own.  Correct?
22  A.  They did.
23  Q.  Okay.  And you or Ms. Guidry had the
24  opportunity to cross-examine those witnesses.  Right?
25  A.  We had some opportunity to cross-examine

**77**

1  witnesses.
2  Q.  And they also presented some documentary
3  evidence into the record.  Right?
4  A.  They entered some into the record.
5  Q.  Okay.  And you -- on the second day of the
6  hearing in November, you put on three witnesses --
7  correct -- of your own?
8  A.  I put on three that were allowed.
9  Q.  And one of those was yourself.  Right?  You
10  were a witness in your own case?
11  A.  I was a witness in my own case.
12  Q.  Okay.  And then Casey Veloso?  Am I saying
13  that right?
14  A.  Yes.
15  Q.  And then Anthony -- I'm going to mispronounce
16  his last name; so I apologize.  Your former personal
17  assistant, how do you say his last name?
18  A.  Theriault.
19  Q.  Theriault.  Okay.  You three testified in --
20  in defense of your case.  Right?
21  A.  We were on the witness list, and we were
22  testifying.  Yeah.
23  Q.  Okay.  All right.  And, after the hearing,
24  each side filed a brief, a written document of argument,
25  for the arbitrator's consideration.  Right?

---

Robert Ross                                                                 2/1/2024

78

1    A.  We were required to file them in writing as
2    opposed to oral.
3    Q.  Okay.  And my question is, did you file one?
4    A.  I believe so.
5          MR. BARTOS:  We could just mark as
6    Exhibit 8.  If you could pass that to counsel, I'd
7    appreciate it.
8          (Deposition Exhibit 8 marked)
9    Q.  If you could please look initially just at the
10   cover page, which has the number APFA VII-000724 at the
11   bottom.  Do you see that?
12   A.  Uh-huh.
13   Q.  And at the very bottom there is -- looks to be
14   an email from you, February 18th, 2022, to the
15   arbitrator.  "Please accept the attached Post Hearing
16   Brief as our finalized Closing Argument."  Do you see
17   that?
18   A.  Uh-huh.
19   Q.  Do you remember sending the arbitrator your --
20   your brief on or about February 18th, 2022?
21   A.  I don't know the date it was sent.
22   Q.  Okay.  Do you remember writing an email to the
23   effect of submitting a brief for arbitration?
24   A.  I remember it had to be submitted to the APFA
25   secretary.

79

1    Q.  Okay.  And you did submit the brief?
2    A.  Yeah.
3    Q.  Okay.  And then I just want to verify, on
4    the -- the subsequent pages, that that's in fact your
5    brief that you submitted.
6    A.  I'm going to have to take your word for it
7    because I can't verify that this is --
8    Q.  Okay.
9    A.  -- the brief unless I read every page --
10   Q.  Sure.
11   A.  -- and compare it with the one that -- that I
12   have.
13   Q.  Fair enough.  Okay.  But you did -- let's just
14   back up a second.
15       You did submit a posthearing brief to the APFA
16   national secretary, who then, under the rules, was
17   supposed to send it on to the arbitrator?
18   A.  That was asked and answered.  Yes.
19   Q.  All right.  And, for the brief that you
20   did submit, who wrote it?  I'm not asking you to look at
21   the -- I just want to know who wrote your brief.
22   A.  Who wrote it?
23   Q.  Yeah.  Who wrote the brief?
24   A.  I had a lot of help in writing it.  I don't
25   recall all who helped.

80

1    Q.  Okay.  So did you write some of it?
2    A.  I wrote some of it.
3    Q.  Okay.  Did Ms. Guidry write some of it?
4    A.  I couldn't tell you which part, but she had a
5    say in what was written.
6    Q.  Okay.
7    A.  I don't know what part of it she actually
8    wrote.
9    Q.  Okay.  Did Ms. Alba do any of the writing?
10   A.  They all helped collaborate on the writing of
11   it.
12   Q.  Okay.  And it's your testimony that, if I
13   understand correctly, there were other people who also
14   helped collaborate on the writing.  Is that correct?
15   A.  I think I just said that, that there were
16   several people.
17   Q.  Okay.  So it is correct?
18   A.  I guess.
19   Q.  Okay.  All right.  Now, you've --
20   A.  To my knowledge, yes.
21   Q.  Okay.  At the time you filed this brief, you
22   were already represented by Ms. Phillips.  Is that
23   correct?
24   A.  I don't -- I don't recall the date that the
25   brief was filed and when I took on the services of Kerri

81

1    Phillips.
2    Q.  Well, do you recall that Ms. Phillips began
3    representing you in -- in January of 2022?
4    A.  You'd have to testify with her.  I don't know
5    the exact date.
6    Q.  Okay.  In the course of this lawsuit, do you
7    receive a monthly bill from Ms. Phillips?
8          MS. PHILLIPS:  Objection; privileged.
9          MR. BARTOS:  Well, with respect to
10   privilege, in the affidavit that you filed,
11   Ms. Phillips, you submitted all of your invoices and
12   indicated that you send them to Mr. Ross --
13         MS. PHILLIPS:  Our communications about
14   them would be privileged.
15         MR. BARTOS:  -- that you send them to
16   Mr. Ross.
17   A.  My arbitration was done on -- in November of
18   '21.  The law firm of Phillips was sought in January.
19   And much of this was written somewhere between
20   January -- or November and January.
21   Q.  Okay.  So my only question was whether or not
22   you had, in fact, already hired Ms. Phillips before the
23   point in time that you wrote and submitted this brief.
24   A.  I can unequivocally tell you that the vast
25   majority of this, probably not all of it, was written

**STRYKER REPORTING SERVICES**                      (817) 494-0700

Robert Ross                                                              2/1/2024

---

**82**

1  before I took on Ms. Phillips.
2      Q.  Okay.  And then -- but it was submitted after
3  you had already taken her on.  Is that right?
4      A.  I don't know the date that I submitted it.
5  February?  Is that it?  If you're -- if you're inferring
6  that Ms. Phillips wrote this, I can tell you that she
7  did not because Ms. Phillip was -- was hired for a
8  different reason --
9      Q.  Okay.
10     A.  -- originally.
11     Q.  Okay.  All right.  Now, I have a question.
12  I'm hoping you can explain a document that was produced.
13         Do you recall one of the issues in the
14  arbitration was whether or not there had been a change
15  in the formula for vacation pay for outgoing officers?
16  Do you remember that?
17     A.  I don't believe that there was a question
18  during arbitration about a change of formula for
19  outgoing officers unspecified, but for three specific
20  outgoing officers, myself not included.
21     Q.  Okay.  If you could look in the exhibit that
22  you have in front of you, the posthearing brief, go to
23  the page where it says, at the bottom, APFA VII and then
24  page 745.  It's sort of towards the end.
25         Do you see the heading says "Payout of

---

**83**

1  Vacation - Change of formula"?  Do you see that at the
2  top?
3      A.  I do.
4      Q.  Okay.  So is it fair to say that one of the
5  issues in your case involved whether there was a change
6  in formula that affected the payout?  I'm not saying
7  right or wrong.  I'm just asking you if that was an
8  issue about whether or not there had been a change in
9  formula and whether you were paid out appropriately.
10     A.  If I recall this correctly, E., Payout of
11  Vacation - Change of formula MEA and SAF, was a repeat
12  of the charges made by Melissa Chinery.  They were not
13  me stating that there was a change in formula.  That is
14  what she charged us with.
15     Q.  Fair enough.  That was one of the charges that
16  you were rebutting or defending against.  Right?
17     A.  It was -- it was a charge that she had made,
18  yes.  This is -- those were not my words.  Those were --
19     Q.  Sure.
20     A.  -- her charges.
21     Q.  Okay.  No, I'm not trying to put -- I just
22  want to identify that was an issue in your arbitration,
23  not that it was your claim or your contention.
24         MR. BARTOS:  I'd like to mark as
25  Exhibit 9.

---

**84**

1         (Deposition Exhibit 9 marked)
2      Q.  And this is really just a question on my part.
3  This was produced in discovery, except for the box
4  that's drawn on there.
5         Have you ever seen this document before?
6      A.  I don't recall.
7      Q.  Just to ask your recollection, if you look
8  at -- there are some numbers at the top.  "Changed a
9  formula for vacation - this was a decision unilaterally
10  made by Vargas not even voted on by the board as
11  admitted by Vargas."  Do you see that?
12     A.  I see where it says that.
13     Q.  Okay.  Do you recall?  Did you -- did you have
14  the view, in connection with your arbitration, that,
15  factually, Mr. Vargas had made the unilateral decision?
16     A.  No.  And this doesn't state that I do.
17     Q.  That's what I'm asking.  I'm trying to figure
18  out what this document is.
19         But you don't -- you've never seen it before?
20     A.  This could be typed by anyone about anything.
21  I've never --
22     Q.  Okay.
23     A.  No, this is not.
24     Q.  Okay.  If you could look again at the brief,
25  and I'll direct your attention to -- I think it's just

---

**85**

1  over from where we were looking, at page 747 at the
2  bottom.  And that's the page that has, about in the
3  middle of the page, subsection F.  Do you see that?
4      A.  Uh-huh.
5      Q.  Okay.  I want to ask you about the paragraph
6  just above that subsection F heading that says --
7  starts, "On January 14, 2022."  Do you see that?
8      A.  Yes.
9      Q.  Okay.  So that says, just for the record, "On
10  January 14, 2022, an APFA document surfaced that was
11  withheld from document retrieval that corroborates the
12  Policy Manual was not the controlling document to the
13  Ross TA and therefore Ross was paid in compliance with
14  the TA."  Do you see that?
15     A.  Uh-huh.
16     Q.  Okay.  And is that document the -- the one
17  that is described there that was surfaced on
18  January 14th, 2022, is that document the -- the one you
19  were referring to in this case as the "Confidential
20  Memo"?
21     A.  In what case do I refer?
22     Q.  This lawsuit that we're in this deposition
23  for.
24     A.  I'd have to see the document that you're
25  talking about to make sure that I would be saying it is.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                              2/1/2024

86
1  Q.  Okay.  If I say "Confidential Memo" in
2  connection with this case, what do you take that to
3  mean?
4  A.  I've only seen one Confidential Memo.
5  Q.  Okay.  What is that?
6  A.  Because it was withheld, I have to assume
7  there are others that I don't know about.
8  Q.  Okay.  All right.
9       MR. BARTOS:  The -- if we could mark as
10 Exhibit 10.
11      (Deposition Exhibit 10 marked)
12 Q.  Let me know when you have a chance to look at
13 Exhibit 10.
14 A.  (Reading).
15 Q.  Mr. Ross, is the cover page of that Exhibit 10
16 the document that you refer to as the Confidential Memo
17 in this case?
18 A.  It appears to be a copy --
19 Q.  Okay.
20 A.  -- of it or similar to it.
21 Q.  Okay.  Is this the document that you described
22 in your brief as what surfaced on January 14th, 2022?
23 A.  It appears it is.
24 Q.  Okay.  All right.  And it was your contention
25 in your posthearing brief that this document

87
1  corroborates the Policy Manual was not the controlling
2  document to the Ross TA.  Is that right?
3  A.  Can you repeat that?
4  Q.  I'm not sure I can.
5  A.  If you can't repeat it, then I can't answer
6  it.
7       MR. BARTOS:  Sure.  Can we ask the court
8  reporter to repeat the question.
9       (Requested text was read)
10 A.  That's one contention.
11 Q.  Okay.  All right.  You wrote -- or in your
12 brief you wrote that the document -- and used the word
13 "surfaced."  Can you describe what that meant, what you
14 meant by "surfaced"?
15 A.  I had been requesting documentation from the
16 supposed accounting firm that reviewed my documents and
17 determined that my payout of my sick and vacation was
18 incorrect.  And from December, after I received the
19 letter in the mail from the APFA that states that an
20 accounting firm had found that my sick and vacation was
21 incorrect and the board's finding was based on that, I
22 requested that in 2020.
23      I never saw it, and it was never claimed to
24 exist, until it was surfaced in court documents
25 submitted by APFA to the Tarrant County courts.  That's

88
1  the first I had ever seen of it, but I had been
2  requesting it for a year and a half.
3  Q.  So the Tarrant County -- that's the case that
4  Diversified filed against you to collect the --
5  A.  Yes.
6  Q.  Okay.  All right.  So when you -- when you
7  were -- you received that document in connection with
8  that state court lawsuit, the Diversified lawsuit.
9  Right?
10 A.  Yes.
11 Q.  Okay.  Now, you didn't submit that document,
12 the Confidential Memo, along with your -- at the time
13 you discovered it.  You didn't submit it to the
14 Article VII, did you?
15 A.  I didn't submit it to the Article VII?
16 Q.  Uh-huh.  Right.
17 A.  If you say so.
18 Q.  I'm asking.
19 A.  It was submitted to the Article that I recall.
20 Q.  Okay.  But it wasn't submitted in Jan -- in
21 January 2022, was it?
22 A.  I don't recall the exact date that it was sent
23 on to him.
24 Q.  It wasn't submitted in your posthearing brief,
25 was it?

89
1  A.  It was -- I don't recall the exact dates that
2  the posthearing brief or an email was sent to the
3  arbitrator to allow it.  I believe that we contacted the
4  arbitrator by email through APFA's secretary, Josh
5  Black, letting him know, because we weren't allowed
6  to -- no ex parte communication directly with the
7  arbitrator.  But everything had to go through APFA, and
8  it wasn't trusted that this particular document going
9  through APFA, because it was withheld by APFA.
10      MR. BARTOS:  Okay.  All right.  If we
11 could mark as Exhibit 11.
12      (Deposition Exhibit 11 marked)
13 Q.  Just for the record, Exhibit 11 has at the
14 bottom APFA VII, pages 753 to 755.
15      The cover of this document is an email from
16 Kit Gomez Alba to APFA National Secretary.  Right?
17 A.  It appears it was.
18 Q.  Okay.  And Ms. Alba is asking Josh, Josh
19 Black, to forward the letter, the attached letter, to
20 the arbitrator.  Right?  Is that right?
21 A.  Right.
22 Q.  Okay.  And then the next page is a letter to
23 the arbitrator from Ms. Alba, dated February 26, 2022.
24 Is that correct?
25 A.  It's what it says.

Robert Ross                                                          2/1/2024

---

**90**

1  Q.  Okay.  And the purpose of this letter is to
2  ask the arbitrator to reopen the hearing.  Correct?
3  A.  Yes.  The arbitrator had not made his ruling
4  yet.
5  Q.  Okay.  So this is the request to reopen the
6  hearing?
7  A.  Yes.
8  Q.  Okay.  And the arbitrator denied that request,
9  right?
10  A.  He did.
11  Q.  And --
12  A.  His email -- his denial is not in here.
13  Q.  No.  I'm going to show you that exhibit in
14  just a second.
15      (Deposition Exhibit 12 marked)
16  Q.  This is Exhibit 12.  And Exhibit 12 is the
17  arbitrator's email in which he denies the request to
18  reopen the record.  Right?
19  A.  That's what it says.
20  Q.  Okay.  I want to go back to the prior
21  Exhibit 11 and ask a question.
22      In your posthearing brief, you state that the
23  Confidential Memo surfaced on January 14th, 2022.  And,
24  in your motion to reopen, you say this document was
25  received in the mail on February 11th, 2022.

---

**91**

1      Do you know why those dates are different in
2  the -- in the two different communications?
3      MS. PHILLIPS:  I would object based on
4  leading.
5  A.  I would imagine someone has their dates wrong.
6  Q.  Okay.  Just curious.  All right.
7  A.  It looks to me like it's stating that it
8  surfaced on January 14th.  Could be a typo --
9  Q.  Okay.
10  A.  -- on the request to reopen.
11  Q.  Okay.  After you had submitted your brief and
12  your request to reopen and the ruling on the request to
13  reopen, the arbitrator ultimately issued a decision --
14  correct -- in your Article VII case?
15  A.  He -- it's correct he -- yes.  It's correct he
16  made a decision.  I'm not saying his decision was
17  correct.  So I guess I don't understand.
18  Q.  Sure.  I'm not asking you to say the decision
19  was correct.  I know you disagree with that.
20      But it is correct -- it is true to say that
21  the arbitrator issued a decision, a written decision?
22  A.  He issued a decision.
23  Q.  Okay.  And, after that decision was issued,
24  you filed your lawsuit against the APFA and Ms. Hedrick
25  and Mr. Harris?

---

**92**

1  A.  Did I?
2  Q.  If you don't remember, that's fine.  I can
3  only ask you what you remember.
4  A.  I don't -- I don't remember the exact dates
5  that everything --
6  Q.  Okay.  Okay.  Fair enough.  And the -- the
7  first award by the Article VII arbitrator in your case
8  directed the APFA to do certain things.  Do you remember
9  that?
10  A.  I don't know that I'd title it like that, but
11  it's -- yeah, if that's what you classify it.
12  Q.  Okay.  Well, we can -- we can read -- I'll
13  read the decision and figure out what we want to call
14  it.
15      But, in any event, after the first award,
16  there was a second award that was issued by the
17  arbitrator.  Do you remember that?
18  A.  I don't know -- to be honest, I don't know the
19  difference between the two.
20  Q.  Sure.
21      MS. PHILLIPS:  Take a break after this.
22      MR. BARTOS:  You know what, let me
23  just -- rather than ask an additional question, I just
24  want to just say on the record I'm very -- I think we're
25  not proceeding in an efficient way.  We were supposed to

---

**93**

1  start at 10:00.  It's now almost 3:00.  And I think the
2  court reporter can probably tell us how little time
3  we've actually been able to spend with questions, in
4  light of the delay and the breaks.
5      We have the full right to depose Mr. Ross for
6  up to seven hours, and we're going to do so.  These
7  delays are disruptive.  And we intend to complete his
8  deposition.
9      MS. PHILLIPS:  I will state on the record
10  that Mr. Ross has suffered a broken rib as of --
11      THE WITNESS:  I can't sit long.
12      MS. PHILLIPS:  -- a week ago, two weeks
13  ago.
14      THE WITNESS:  Yeah.
15      MS. PHILLIPS:  This morning's incidents,
16  moving the deposition to this location, was jarring for
17  him.  And I think you knew that he was susceptible to
18  that -- to that form of abuse.  And I'm sorry for that
19  delay, and I'm sorry for circumstances that he went
20  through.  But, unfortunately, on the record, the delay
21  was suffered as a result of the abuse and harassing
22  tactic that was taken.  So, if we need to take that up
23  with the judge, then that is something that we can
24  probably address tomorrow.
25      MR. BARTOS:  I want to complete the

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

**Bartos Decl. Ex. G**
25

Robert Ross                                                                 2/1/2024

---

**94**

1  deposition. That's all I'm saying. We can take a
2  break. I'll respect his medical condition. But we're
3  going to finish the deposition.
4        MS. PHILLIPS: If you want to finish your
5  question, I didn't mean to interrupt your question.
6        MR. BARTOS: No. That's fine. We can
7  take a break right now.
8        MS. PHILLIPS: We had discussed at lunch
9  trying to take a break every -- every half an hour for
10 him, I think. I was concerned that it would cause him
11 pain to sit for too long with a broken rib in his back.
12 So that was my concern.
13       THE WITNESS: My schedule -- they can
14 look it up at APFA. My schedule will corroborate that I
15 was out.
16       MR. BARTOS: Let's take a break. Off the
17 record.
18       THE VIDEOGRAPHER: We're off record at
19 3:02 p.m.
20       (Recess from 3:02 p.m. to 3:11 p.m.)
21       THE VIDEOGRAPHER: We're back on record
22 at 3:11 p.m.
23 BY MR. BARTOS:
24    Q.  Can you tell me, Mr. Ross, in your own words,
25 how it is you think the Confidential Memo demonstrates

---

**95**

1  that you -- you didn't owe -- you had not made an
2  overpayment?
3     A.  How does the Confidential Memo demonstrate
4  that I did not make an overpayment?
5     Q.  Receive -- did not receive an overpayment.
6     A.  I can read the document.
7     Q.  Sure.
8     A.  In Section 2 it says that his job was to
9  prepare an overpayment schedule of accrued and unused
10 sick, and accrued and unused vacation time made to Bob
11 Ross in 2018, similar -- not exact, but similar -- to
12 the overpayment schedules prepared for the previous
13 three officers.
14       It goes on to say, "These overpayment
15 schedules for the other officers were previously
16 provided to the Board of Directors." I was not aware of
17 any of that. "Please note the Bob Ross confidential
18 transition agreement states that he will be paid all of
19 his accrued and unused sick, and accrued and unused
20 vacation time. This agreement doesn't specify that the
21 payments be made in accordance with the policy
22 guidelines," which is a correct statement.
23 "Consequently, these payments appear appropriate and in
24 compliance with the transition agreement."
25       The $5,400 that they were putting me into

---

**96**

1  collections for was based on an overpayment, and that
2  overpayment was the result, in a letter from Erik Harris
3  sent to me on the day before Thanksgiving, stating that
4  the board's finding was based on an independent
5  accounting, who had found that I was overpaid.
6        My request the whole time was, where is that
7  accounting? Show me the accounting where the accountant
8  stated that I was overpaid, so that I could prove it,
9  because I felt that I was paid correctly. And I was
10 told that I had gotten all the paperwork that they have,
11 charts, graphs. I couldn't explain the charts and
12 graphs that he gave me. I didn't know one number from
13 another.
14       And, at some point in there, I had made an
15 arrangement with the Union to pay them $100 a month
16 until we came to a conclusion on this. If they found
17 out that I was not overpaid, they could refund the
18 money; and, if I was overpaid, they could apply what I
19 had already paid, and at that point we would make
20 arrangements.
21       I was told, not confirmed, but I was told that
22 that offer was presented to the board and the board said
23 no.
24    Q.  Back to my question about how the Confidential
25 Memo establishes or shows that you weren't overpaid, I'd

---

**97**

1  like you to look at the last page, which is -- has the
2  number 176 at the bottom. Do you see that?
3     A.  Yeah.
4     Q.  It says -- it says "National Officer: Bob
5  Ross." Do you see that?
6     A.  I see that.
7     Q.  And then it says "Overpayment Calculation."
8  Do you see that?
9     A.  Uh-huh.
10    Q.  And, if you look down along the left-hand
11 side, there is a bold that says "Vacation Pay - 2017,"
12 "Sick Pay - 2017," as you go down, and we get down to
13 "Vacation Pay - 2017," and then it says, "Original
14 amount - paid in error," and then, "Correct calculation
15 amount." Do you see that?
16    A.  Uh-huh.
17    Q.  Okay. And then on -- towards the middle there
18 is a bolded section that says "Overpayment" with a
19 dollar value. Do you see that?
20    A.  I see this as a chart with numbers filled in.
21    Q.  Okay. And there's words too, and one of the
22 words at the bottom says, "Total overpayment - due to
23 APFA." Do you see that?
24    A.  I see that. But there is no proof here that
25 the accountant put these words in. The accountant was

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                          2/1/2024

---

**98**

1  given what -- what qualified and didn't.  There is --
2  there is no proof that this came from the accountant.
3  This could be a chart and graph similar to the other
4  ones where my numbers were plugged in by someone.
5      Q.  Okay.
6      A.  And I could only assume that this chart is not
7  necessarily correct, because if you look under sick pay
8  for 2017, you'll see it says 12 days.  The documents
9  turned in to the Court show 18 days.  No sick time used,
10  but I was only paid 12 days.
11         Likewise, further down, under Sick Pay - 2018,
12  12 days.  I was entitled to 18 days.  The Transition
13  Agreement says, "All accrued and unused."  So those
14  numbers are wrong in this chart.  I couldn't assume that
15  the rest of the numbers weren't wrong too.
16      Q.  And this chart here is the same chart that
17  you -- you had in front of you when you were -- well,
18  strike that.
19         So is it your contention that the chart on 176
20  was not prepared by Hal O'Neil, the CPA?
21      A.  I have no idea.
22      Q.  Okay.  All right.
23      A.  The letter that I received stated that the
24  board's finding was based on an independent accounting.
25      Q.  All right.  And just back to that question,

---

**99**

1  since we're referring to this memo, tell me if I'm
2  reading this correctly at the top, the first paragraph.
3         "This informal engagement is substantially
4  less in scope than an audit engagement, the objective of
5  which would be the expression of an opinion regarding
6  these specific disbursements.  Accordingly, we did not
7  express an opinion or any form of assurance regarding
8  these disbursements."  Do you see that?  Did I read that
9  correctly?
10      A.  Where are you at?  What page you on?  I
11  thought you were reading --
12      Q.  First page.
13      A.  -- from something you have that I don't have.
14      Q.  No.  It's the first page.  You know, strike
15  that.  We don't need to read stuff on the record.  I'll
16  withdraw the question.
17         Now, I want to ask you about some of the
18  claims in your complaint.
19         Are you aware that you're making a claim
20  against APFA and Diversified under the Fair Credit
21  Reporting Act?
22      A.  I believe so.
23      Q.  Okay.  And would you agree with me that APFA
24  itself did not make any direct report of you to any
25  credit reporting agency?

---

**100**

1         MS. PHILLIPS:  Objection.
2      A.  I would have no way of knowing that.
3      Q.  Okay.  And have you reviewed any report, any
4  credit report, regarding your credit?
5      A.  I have.
6      Q.  Have you reviewed your credit score from one
7  of the -- the credit reporting agencies?
8      A.  Say that again.
9      Q.  Have you reviewed your -- a credit report
10  that's for yourself?
11      A.  I have.
12      Q.  Okay.  And are you aware that we requested
13  copies of any such credit reports in discovery in this
14  case?
15      A.  I'm not.
16      Q.  Did you provide any such reports to be
17  produced to counsel in this case?  Because we haven't
18  received any.
19         MS. PHILLIPS:  We actually just recently
20  were able to -- we were provided one, and just recently
21  we were able to recover it off of the --
22         MR. BARTOS:  Okay.  All right.  Well, I
23  would request that be produced.
24         MS. PHILLIPS:  Yes.  A week ago we were
25  able to get it off of a -- or, yeah, a DVD.

---

**101**

1      Q.  I want to ask you about some of the -- the
2  damages you claim in connection with the credit report.
3         In your complaint you refer to refinance
4  damages of $400,000.  Does that sound familiar to you?
5      A.  Vaguely.
6      Q.  Okay.
7      A.  The numbers are -- I don't know the exact
8  number.
9      Q.  Okay.  Well, let me just go through some of
10  the details.
11         You -- you refinanced your -- your
12  then-existing home mortgage in April of 2021.  Correct?
13      A.  I did.
14      Q.  Okay.  And you ended up with a new mortgage of
15  $515,200.  Right?
16      A.  That's the mortgage that I was able to
17  refinance.
18      Q.  Okay.  That's what I'm asking.  I'm asking
19  what you did.
20      A.  That was not -
21      Q.  I'm not asking about what you wanted to do.  I
22  just want to know what you did.  Okay.
23         You -- you came out of that in April 2021 with
24  a $515,200 mortgage.  Right?
25      A.  Yes.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                      2/1/2024

---

**102**

1  Q.  Okay.  The prior mortgage was $505,454, right?
2  A.  Yes.
3  Q.  Okay.  And when did you take out the mortgage,
4  the 505,000?  Do you remember?
5  A.  I don't remember.  Two years prior, maybe.
6  Q.  Okay.  You refinanced that at an interest rate
7  of 2.37, 2.375.  Does that sound right?
8  A.  I think you're mixing up refinances.  My
9  current refinance is 2.3.
10  Q.  Right.  I'm asking what was -- that's --
11  that's what I wanted to establish.
12  A.  You were talking about the other one.
13  Q.  What was the one -- what was the prior one?
14  A.  Probably closer to 4.
15  Q.  Okay.  So you refinanced to take advantage of
16  lower interest rates.  Right?
17  A.  No.  Anybody would take advantage of lower
18  interest rates.  But I refinanced and started the
19  process to take equity out of my home so that I could
20  pay for my children's college.
21  Q.  Okay.  Let me ask about that.
22     So you wanted your -- your affidavit says that
23  you wanted to increase your mortgage from what had been
24  505,000 to over 700,000.  Correct?
25  A.  Uh-huh.

---

**103**

1  Q.  So you wanted to draw out another 200,000,
2  roughly, in cash?
3  A.  Uh-huh.
4  Q.  And that would be a loan you would have to pay
5  back to the -- to the lender.  Right?
6  A.  Uh-huh.
7  Q.  I'm sorry?
8  A.  Yes.
9  Q.  Okay.  Now, we asked you in discovery for all
10  documents regarding the refinancing or efforts to
11  refinance your -- your mortgage, and all we got was one
12  statement of what your refinance was.
13     Do you have your applications for the
14  refinance or communications with the lender?
15  A.  Well, the lender that I used is no longer in
16  business at that time.
17  Q.  Okay.
18  A.  I am unable to locate, but I had my original
19  application for the original refinance to get into the
20  system.  And then the equity was being sought, if I
21  remember that many years ago.  The equity was being
22  sought.  After the application, after the original
23  credit report, and prior to closing and getting
24  authorization for that equity, a credit report was
25  pulled again that showed $5,000 credit for collections.

---

**104**

1  Q.  Now, we have received no credit report, no
2  finance documents, except for the final document.  This
3  is all just your -- your recollection.  We have no
4  documents to support that.  Is that right?
5  A.  I don't know what all documents you have or
6  not.
7  Q.  You produced them.  You tell me.
8  A.  Well, I'd have to go back through all the
9  documents that were turned in to you, to find out what
10  is there and what is not there.
11     MR. BARTOS:  Well, just to say for the
12  record, we specifically asked in our document production
13  request for all documents regarding the refinance of any
14  loan.  And we've gotten one short document.  And he's
15  just described multiple others that existed.  So we
16  would ask those be produced.
17  Q.  Now -- and there is no document you have
18  produced, at least that I've seen, that says anybody
19  telling you you couldn't take out the full $700,000
20  because of this $5,400 on your -- on your credit report.
21     Is there such written down somewhere?
22  A.  That -- that conversation was a phone
23  conversation with my lender, and I may have not ever
24  asked him to, oh, well, send it to me in writing.
25  Q.  All right.

---

**105**

1  A.  It was all changed and canceled, and no
2  further action was taken on that --
3  Q.  Okay.  All right.
4  A.  -- because of that.
5  Q.  Okay.  So just so it's clear to me that you --
6  you wanted to be able to borrow an additional $200,000?
7  A.  Yes.
8  Q.  Okay.  And had you succeeded in borrowing that
9  $200,000, you would have owed the lender $200,000 or
10  $200,004 [sic] plus interest.  Right?
11  A.  Plus 2.375 interest.
12  Q.  Okay.  Right.  Okay.  And your claim in this
13  lawsuit is you now want APFA and Diversified to pay you
14  the $204,000 that you would have borrowed from the
15  lender.  Is that right?
16  A.  Yes.
17  Q.  That's your damage claim?
18  A.  I believe so.
19  Q.  Okay.  Now, you say in your declaration or
20  your affidavit that you intended to use that money for
21  your -- I believe it was your daughter's college
22  expense.  Is that right?  Or was that for your son?
23  A.  It's both.  They're both in college.
24  Q.  Okay.  So in 20 -- early 2021 your intention
25  was to borrow an additional $200,000 to use it for your

---

Robert Ross                                                          2/1/2024

106

1  children's education?
2      A.  Uh-huh.
3      Q.  Okay.  And just for the record, we've received
4  no documents regarding college expenses, financial aid,
5  or tuition payment.
6          Do you have any documents that relate to those
7  two subjects?
8      A.  I do.  I don't know that that was requested.
9      Q.  All right.  Now, you also say that you
10 withdrew $29,000, $521 -- or $29,521 from your 401(k).
11         Where are the documents that show what that
12 money was spent for?
13     A.  I have what it was spent for?
14         MS. PHILLIPS:  Objection.
15     A.  I don't -- I probably don't have every dime
16 for dime, nor would I be required to show every expense.
17     Q.  You're seeking that in damages from the APFA
18 and Diversified, though.  Right?
19     A.  Uh-huh.
20     Q.  Okay.
21     A.  That was investment money that was no longer
22 available to me to pay for college expenses.  And --
23     Q.  Okay.
24     A.  And can I confer with my attorney or have --
25 go off record?

107

1          MS. PHILLIPS:  We can take a break.  We
2  can take a break.
3      Q.  Is your answer finished?
4          MS. PHILLIPS:  We can take a break.
5          MR. BARTOS:  I'm not sure his answer is
6  finished.
7          MS. PHILLIPS:  And you can answer your
8  question, and then we can take a break.
9      Q.  Have you finished your answer?
10     A.  Well, if you must, I'm a little --
11         MS. PHILLIPS:  Do you need him to repeat
12 the question?
13     Q.  My question was, have you finished your
14 answer?
15     A.  Well, you're talking about my finances in
16 front of two people over here who I don't know to have
17 confidentiality or know that any of this information is
18 sealed.  So talking about my medical and my financial
19 situation I don't think is appropriate given the fact
20 that there is plenty of history that goes on, on social
21 media.
22     Q.  The people in this room who are not the
23 lawyers are parties to this case that you're suing.
24     A.  My question was not that they don't know, but
25 is there --

108

1          MS. PHILLIPS:  Confidentiality has been
2  ordered by the Court, and we'll finalize the terms of
3  that tomorrow at a hearing.
4          THE WITNESS:  Great.  That's all I
5  needed.
6          MR. BARTOS:  Okay.  Did you need to
7  confer for something?
8          MS. PHILLIPS:  I think that rectifies it.
9  I don't know that we need a privilege on that
10 discussion.
11 BY MR. BARTOS:
12     Q.  All right.  Now, you claim in your lawsuit
13 that the APFA defendants breached a contract with you.
14 Are you aware of that?
15     A.  I believe so.
16     Q.  And am I right that the contract that you
17 claim was breached was the Transition Agreement?
18     A.  That's one of the contracts that was breached.
19     Q.  What other contracts do you think were
20 breached?
21     A.  Well, I'm a member in good standing; so my
22 union has a contract with me for fiduciary duty.
23     Q.  What contract is that?
24     A.  It's called a Constitution.
25     Q.  Okay.  So the APFA Constitution is one of the

109

1  contracts.  Is that right?
2      A.  Yes.
3      Q.  Okay.  And with respect to the Transition
4  Agreement, your claim is that the Union violated the
5  confidentiality provision of that agreement.  Is that
6  right?
7      A.  Yes.
8      Q.  Okay.  And I believe you also claim that there
9  was not full payment of amounts due to you under the
10 Transition Agreement.  Is that also a claim you have?
11     A.  That's correct.
12     Q.  Okay.  And you were paid out by the Union
13 after you left in approximately April 2018.  Correct?  I
14 know you are now saying you didn't get paid out the
15 right amount.  But the amount you got paid was back in
16 April 2018?
17     A.  March or April 2018, yes.
18     Q.  Okay.  You referenced the Union Constitution.
19 Is it your contention that the officers of the
20 Union have a fiduciary duty to the organization, under
21 the Constitution?
22     A.  Repeat that.
23     Q.  Sure.  You make a claim of breach of fiduciary
24 duty.  Do you know that?
25     A.  Yes.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                          2/1/2024

---

**110**

1  Q.  Okay.  And is it your contention that that's a
2  duty that arises under the APFA Constitution?
3  A.  Yes.
4  Q.  Okay.  And is it your contention that that's a
5  fiduciary duty individually to you and individually to
6  every other APFA member as an individual?
7  A.  As a member in good standing and dues-paying
8  member, yes.
9  Q.  Okay.  How did Julie Hedrick violate a
10  fiduciary duty toward you?
11  A.  Which one?
12  Q.  Julie Hedrick.
13  A.  No.  Which -- you said "a fiduciary duty."
14  Q.  Yeah.  Any.
15  A.  Oh.  She violated the Transition Agreement.
16         MS. PHILLIPS:  I would object based on
17  asking for his legal opinion.
18  Q.  You still can answer.
19  A.  She violated confidentiality.  She violated
20  Code of Conduct by putting a false hotline out to my
21  membership and co-workers that I did not have equal
22  access to their emails, knowingly knowing that there was
23  false information on it.  Violated the terms of the
24  Transition Agreement confidentiality, Section 13, that
25  had to do with disputes and arbitrations.  Just to name

---

**111**

1  a few.
2  Q.  Well, this is our one chance to talk to you;
3  so I need you to tell me what you -- what you claim she
4  violated.
5  A.  I just did.
6  Q.  Okay.  Well, you mentioned a hotline.  I'm not
7  going to ask you to remember every last hotline.  Okay.
8  But my question is -- I know there were hotlines after
9  the arbitration award that described the outcome of the
10  arbitration award.
11      Is that the hotline that you're talking about?
12  A.  That's one of them.
13  Q.  Okay.  And what were the subjects of the other
14  ones besides that?
15  A.  Well, as a long-standing Union rep with
16  knowledge of prior arbitrations, prior litigations, it
17  has always been the long-standing practice that we don't
18  name names, that you don't single out a person, that you
19  redact names when you're talking about things like dues
20  forgiveness.
21      My name wasn't redacted.  It was a full-page
22  spread out there of what the arbitration award was, and
23  there were numbers given to the membership that they
24  know were incorrect.  And at no time was I ever
25  conferred with to correct those.  And it was done

---

**112**

1  specifically to mar my reputation, as a dues-paying
2  member in good standing, to my co-workers, of which I
3  have had to live with harassment and volatility ever
4  since.
5  Q.  So I've asked you -- my question was, what
6  were the hotlines that went out that you're claiming
7  violated these duties.  And tell me if I'm wrong.  What
8  I'm hearing is the hotlines had to do with the outcome
9  of the Article VII arbitration.  I know you don't agree
10  with what was said.  I'm not asking you to.  I just want
11  to identify that that's the hotline, or if there is more
12  than one, but they talk about the Article VII
13  arbitration.
14  A.  That's correct.
15  Q.  Okay.
16         MS. PHILLIPS:  So, in lieu of trying to
17  accommodate and not take too many breaks, can I just
18  check and see if he's okay?
19         MR. BARTOS:  Please.
20         MS. PHILLIPS:  Are you okay?  Do you need
21  a break?
22         THE WITNESS:  No.  I'm good, as long as I
23  don't move.
24         MR. BARTOS:  Okay.  And I don't know
25  enough to know if this is helpful, but if it's helpful

---

**113**

1  to stand, that's certainly acceptable.
2         THE WITNESS:  Sometimes it is.
3         MR. BARTOS:  Okay.  All right.
4  Q.  All right.  Now, you also claim that Erik
5  Harris had a fiduciary duty to you.  Right?
6  A.  They all had a fiduciary duty.
7  Q.  Okay.  Okay.  But you're suing Erik Harris?
8  A.  Right.
9  Q.  And Julie Hedrick?
10  A.  And APFA.
11  Q.  I understand.  I want to talk about Erik
12  Harris for a second.
13      What is -- what did Mr. Harris do that you
14  claim violated a fiduciary duty to you?
15  A.  How much time do we have?
16  Q.  Give your answer.
17  A.  This was withheld from me, the Confidential
18  Memo.  Emails where he knew that this Confidential Memo
19  existed yet refused to talk to me about it.  There are
20  so many opportunities that APFA had to settle this and
21  to discuss this with me, that they purposely chose not
22  to go down that avenue, so much to the point where I was
23  sent an email with a "you are blocked," to no longer be
24  able to talk to APFA about it.  So I was given no other
25  choice but to wrangle through the legal system, rather

---

**STRYKER REPORTING SERVICES**                    (817) 494-0700

Robert Ross                                                    2/1/2024

114

1   than APFA do what was right.
2        Erik, as the treasurer, has the duty to all
3   individuals equally.  Withholding this information from
4   executive members and then voting on an arbitration
5   where the four national officers had information that
6   the other five Executive Committee ad hoc members did
7   not, and choosing to vote using that information he had,
8   and discarding it and not sharing that with the others,
9   is a violation of his fiduciary duty.  And many more can
10  be proven.
11       Q.  Well, what are the others?
12           MS. PHILLIPS:  Again, I'm going to object
13  based on asking for his legal opinion.  He's not a
14  lawyer.
15       A.  Yeah, that was where I was going to go with
16  that.  I don't have -- I'm not legal, but there are -- I
17  feel my -- my rights were violated by my union in
18  financially harming me and my family, creating a hostile
19  work environment, violating their Code of Conduct and
20  ethics as Union officers.
21       Q.  You make a claim in your complaint that the
22  APFA, Ms. Hedrick, and Mr. Harris made false statements
23  about you, and I believe you're calling that a
24  defamation claim.  Are you familiar with that?
25       A.  Am I familiar with a defamation claim?

115

1        Q.  The fact that you're making a defamation
2   claim.
3        A.  I am.
4        Q.  Okay.  What were the exact statements made
5   that you allege were defamatory?
6        A.  They put a hotline out from an arbitration
7   award that they knew was false.  The numbers in that
8   hotline --
9            MS. PHILLIPS:  And I'm going to object.
10  He does not have a legal background, and he's being
11  asked a legal question.
12           MR. BARTOS:  I'm going to object to your
13  intervening in the middle of his answer.
14       A.  That's -- in essence, that hotline has created
15  a hostile work environment for me.
16       Q.  Any others?
17       A.  Any others what?
18       Q.  Statements.  I just want to understand your
19  case.
20       A.  Well, can you ask -- can you reask your
21  question, then.
22       Q.  Any other statements you allege were
23  defamatory?  You mentioned the hotline.  I understand
24  that.
25       A.  They have caused my co-workers to think I'm a

116

1   thief and an embezzler.  And I was never charged with
2   that.
3        Q.  The hotline did?
4        A.  The hotline authorized and put out by APFA,
5   authorized by two Union officers.
6        Q.  All right.  You make an assertion in your
7   declaration that you suffered reputational damages
8   because of APFA.  Do you remember that?
9        A.  I believe so.
10       Q.  And you describe in your declaration a meeting
11  in April of 2021 with two people from American Airlines
12  management.
13       A.  I don't recall what specifically you're
14  talking about.
15       Q.  Okay.  Do you remember a meeting with Jim
16  Oebker and Debbie Carvatta in April 2021?
17       A.  I don't remember when the date of any specific
18  date.
19       Q.  Do you remember having a meeting with the two
20  of them sometime before your arbitration award came out?
21       A.  I have met with them on several occasions as a
22  San Francisco base president and Union rep.
23       Q.  Okay.  And what -- what were their positions?
24       A.  Debbie Carvatta was regional director, and Jim
25  Oebker was in human resources division.

117

1        Q.  Okay.  And your affidavit says you met with
2   them in April of 2021.  Let's assume that's correct.
3            That was before the arbitration took place.
4   Correct?
5        A.  Yes.
6        Q.  Okay.  Charges had been filed already?
7        A.  Huh?
8        Q.  The charges were filed before then, but there
9   had not been an arbitration.  Right?
10       A.  Correct.
11       Q.  Okay.  And were you having a job interview?
12       A.  When I met with them was not a job interview.
13  It was over situations that were arising from APFA, but
14  it was -- I was investigating other flight attendants,
15  corrective action issues --
16       Q.  Okay.
17       A.  -- Article XXXV charges, and that was the
18  premise of the meetings with them.
19       Q.  Article XXXV, that's American Airlines'
20  disciplinary proceeding --
21       A.  Yes.
22       Q.  -- or rule?  Okay.
23           So you weren't having a job interview with
24  them?
25       A.  Not at that time, no.

**STRYKER REPORTING SERVICES**                    (817) 494-0700

* * *

APPX. 0583

Robert Ross                                                    2/1/2024

---

158

1    A.  No.  No.
2    Q.  Have you discussed with any labor organization
3  and they are paying your legal fees in this case?
4         MS. PHILLIPS:  Objection.  This is
5  ridiculous.
6    A.  No.
7    Q.  No.  Have you discussed with any
8  representatives of other labor organizations --
9         MS. PHILLIPS:  We're done.
10    Q.  -- they're paying your legal fees in this
11  case?
12         MS. PHILLIPS:  We're done.  It's 5:00.
13  We're done.  Let's go.
14    A.  There is no union -- other union, if that's
15  what you're saying, labor organization agreeing to pay
16  my legal fees.
17         MS. PHILLIPS:  Let's go.
18         MR. BARTOS:  Okay.  Just for the record,
19  we have not -- we have barely touched four hours of
20  time.  We will resume tomorrow morning.  And I suggest
21  we start at 9:00 so we can get Mr. Vargas done.
22         MS. PHILLIPS:  Yeah, you have me at
23  10:00.  That's what you scheduled and noticed for.
24         MR. BARTOS:  We had you at 10:00 a.m.
25  this morning, and we didn't start until 11:00.  We'd be

---

159

1  done by now.
2         MS. PHILLIPS:  Well, you probably
3  shouldn't sabotage people.  I highly recommend --
4         MR. BARTOS:  We will be here at 9:00
5  ready to go.
6         MS. PHILLIPS:  You need to re-notice and
7  give five days' notice.
8         MR. BARTOS:  We'll be here at 10:00, and
9  we expect Mr. Ross to be here to complete his deposition
10  because he's indicated on the record --
11         MS. PHILLIPS:  Tomorrow?
12         MR. BARTOS:  Tomorrow.
13         MS. PHILLIPS:  You have Vargas tomorrow.
14         MR. BARTOS:  We're continuing until we're
15  done.
16         MS. PHILLIPS:  What are you planning on
17  doing with Mr. Vargas?
18         MR. BARTOS:  We'll resume Mr. Vargas --
19  we'll start Mr. Vargas when Mr. Ross is done.
20         MS. PHILLIPS:  Mr. Vargas has -- has --
21  he has work.  So you want to -- Mr. Ross has his work
22  schedule; so that's not going to work.
23         MR. BARTOS:  We'll be here and expect to
24  finish with Mr. Ross tomorrow at 10:00 a.m.  Yeah, we
25  can go off the record.

---

160

1         THE VIDEOGRAPHER:  We're off record at
2  4:56 p.m.
3         (Proceedings adjourned at 4:56 p.m.)
4         (Per Federal Rule of Civil Procedure
5         30(e)(1), signature was requested via
6         email by Counsel after completion of the
7         deposition)

---

161

1         CHANGES AND SIGNATURE
2  WITNESS NAME:  ROBERT ROSS, VOLUME 1
   DEPOSITION DATE:  FEBRUARY 1, 2024
3  PAGELINE         CHANGE/REASON
4  ____  _____
5  ____  _____
6  ____  _____
7  ____  _____
8  ____  _____
9  ____  _____
10  ____  _____
11  ____  _____
12  ____  _____
13  ____  _____
14  ____  _____
15  ____  _____
16  ____  _____
17  ____  _____
18  ____  _____
19  ____  _____
20  ____  _____
21  ____  _____
22  ____  _____
23  ____  _____
24    I, ROBERT ROSS, have read the foregoing deposition
25  and hereby affix my signature that same is true and

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                                                      2/1/2024

162

1    correct, except as noted above.
2
3    _____
     SIGNATURE OF WITNESS
4    STATE OF _____ x
5    COUNTY OF _____ x
6
7        Before me, _____, on this day
8    personally appeared ROBERT ROSS, known to me (or proved
9    to me under oath or through _____) (description of
10   identity card or other document) to be the person whose
11   name is subscribed to the foregoing instrument and
12   acknowledged to me that they executed the same for the
13   purposes and consideration therein expressed.
14       GIVEN UNDER MY HAND AND SEAL of office this
15   _____ day of _____, 2024.
16
17
18
19   (Seal)        _____
                   Notary Public in and for the
20                 State of _____.
21
22
23
24
25

164

1        I further certify that pursuant to FRCP Rule
2    30(e)(1) that the signature of the deponent was
3    requested by the Counsel for the deponent after the
4    completion of the deposition and that the signature is
5    to be before any notary public and returned within
6    30 days from date of receipt of the transcript.  If
7    returned, the attached Changes and Signature page
8    contains any changes and the reasons therefor.
9        I further certify that I am neither attorney or
10   counsel for, nor related to or employed by, any of the
11   parties to the action in which this deposition is taken,
12   and further that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto, or
14   financially interested in the action.
15       Certified to by me on this the 7th day of February,
16   2024.
17
18                        _Angela L Mancuso_
19                   _____
                     ANGELA L. MANCUSO, CSR 4514
20                   Expiration Date: 10/31/24
                     Stryker Reporting
21                   Firm Registration No. 806
                     1450 Hughes Road, Suite 230
22                   Grapevine, Texas 76051
                     (817) 494-0700
23
24
25

163

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2              FORT WORTH DIVISION
3    ROBERT (BOB) ROSS,         §
                                §
4    Plaintiff/                 §
     Counterclaim Defendant,    §
5                               §  Civil Action No.
     VS.                        §  4:22-cv-343-Y
6                               §
     ASSOCIATION OF             §  Judge Terry R. Means
7    PROFESSIONAL FLIGHT        §
     ATTENDANTS, et al.,        §
8                               §
     Defendants/               §
9    Counterclaim Plaintiff.    §
10         REPORTER'S CERTIFICATION
11     VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS
12                 VOLUME 1
13              FEBRUARY 1, 2024
14       I, Angela L. Mancuso, Certified Shorthand Reporter
15   in and for the State of Texas, hereby certify to the
16   following:
17       That the witness, ROBERT ROSS was duly sworn by the
18   officer and that the transcript of the oral deposition
19   is a true record of the testimony given by the witness;
20       That the original deposition was delivered to
21   Ms. Kerri Phillips for examination and signature by the
22   witness;
23       That the time used by the parties is as follows:
24   MS. KERRI PHILLIPS:  0 minutes
25   MR. JEFFREY A. BARTOS:  3 hours, 25 minutes

**STRYKER REPORTING SERVICES**                              **(817) 494-0700**

Robert Ross, Vol. 2                                    3/15/2024

```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                     FORT WORTH DIVISION

ROBERT (BOB) ROSS             §
                              §
VS.                           §    ACTION NO. 4:22-CV-343-Y
                              §
ASSOCIATION OF                §
PROFESSIONAL FLIGHT           §
ATTENDANTS, ET AL.            §
                              §
AND                           §
                              §
EUGENIO VARGAS                §
                              §
VS.                           §    ACTION NO. 4:22-CV-430-Y
                              §
ASSOCIATION OF                §
PROFESSIONAL FLIGHT           §
ATTENDANTS, ET AL.            §
```

```
          ------------------------------------
              VIDEOTAPED ORAL DEPOSITION OF
                       ROBERT ROSS
                        VOLUME 2
                     MARCH 15, 2024
          ------------------------------------
```

        VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

-numbered cause on March 15, 2024, from 9:11 a.m. to

11:44 a.m., before Angela L. Mancuso, CSR No. 4514 in

and for the State of Texas, reported by machine

shorthand, at Gillespie Sanford LLP, 4803 Gaston Avenue,

Dallas, Texas, pursuant to the Federal Rules of Civil

Procedure, Notice, and any provisions stated on the

record.

**STRYKER REPORTING SERVICES**                **(817) 494-0700**

Robert Ross, Vol. 2                                              3/15/2024

---

**166**

1
2        A P P E A R A N C E S
3
FOR THE PLAINTIFFS:
4    MS. KERRI PHILLIPS
     K.D. PHILLIPS LAW FIRM, PLLC
     6010 West Spring Creek Parkway
5    Plano, Texas  75024
     (972) 327-5800
6    kerri@KDPhillipslaw.com
7
FOR THE DEFENDANTS:
8
     MR. JEFFREY A. BARTOS
9    GUERRIERI, BARTOS & ROMA, P.C.
     1900 M Street, N.W.
10   Suite 700
     Washington, D.C.  20036
11   (202) 624-7400
     jbartos@geclaw.com
12
     MS. CHARLETTE L. BRODERICK
13   Association of Professional Flight Attendants
     1004 West Euless Boulevard
14   Euless, Texas  76040
     (682) 301-8454
15   cmatts@apfa.org
16
ALSO PRESENT:
17
     Mr. Josh Black, APFA National Secretary
18
     Ms. Julie, Hedrick, APFA National President
19
     Mr. Adam Phillips, Paralegal
20   K.D. Phillips Law Firm, PLLC
21   Mr. John Hines, Videographer
     Elite Video Productions
22   3018 Commerce Street
     Dallas, Texas 75226
23   (214) 747-1952
24
25

---

**167**

1        TABLE OF CONTENTS
                              PAGE
2
3    Appearances....................... 166
     ROBERT ROSS, VOLUME 2
4
     Examination by Mr. Bartos................ 169
5    Examination by Ms. Phillips................ 233
     Examination by Mr. Bartos................ 235
6    Examination by Ms. Phillips................ 245
     Examination by Mr. Bartos................ 247
7
     Changes and Signature.................... 250
8    Reporter's Certification.................... 252
9
         EXHIBITS
10   NUMBER   DESCRIPTION         PAGE
11   Exhibit 18 Robert Ross, Volume 1        171
         Changes and Signature
12       (with cover page)
13   Exhibit 19 Videotaped Oral Deposition of       172
         Robert Ross, Volume 1
14       (excerpts)
15   Exhibit 20 Copy of Transition Agreement produced   179
         by Robert Ross during the deposition
16
     Exhibit 21 8.26.19 - APFA Board of Directors   189
17       Special Meeting
         Hotline
18       [Ross/Vargas 000791]
19   Exhibit 22 8/26/19 Special Board of Directors  191
         Resolution Number 2
20
     Exhibit 23 The APFA Policy Manual        197
21       Section 6, National Officer Salaries
         and Benefits
22
     Exhibit 24 Payout under Transition Agreement   211
23       using Taxable Income Per Diem
         [Appendix 209]
24
25

---

**168**

1        PREVIOUSLY MARKED EXHIBITS
2    NUMBER    DESCRIPTION             PAGE
3    Exhibit 5  Affidavit of Robert Ross in Support     175
         of Plaintiff's Original Petition and
4        Motion to Vacate
         [Appendix 377-386]
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   REPORTER'S NOTE:
24       Quotation marks are used for clarity and do
         not necessarily reflect a direct quote.
25

---

**169**

1        P R O C E E D I N G S
2        (March 15, 2024, 9:11 a.m.)
3            THE VIDEOGRAPHER:  This is Tape 1 in the
4    continuation of the video deposition of Bob Ross.  Today
5    is Friday, March 15, 2024.  We are now on record at
6    9:11 a.m.  The witness may now be sworn in.
7        (Witness sworn by reporter)
8            ROBERT ROSS,
9    having been first duly sworn, testifies as follows:
10           EXAMINATION
11   BY MR. BARTOS:
12       Q.  Good morning, Mr. Ross.  I know when your --
13   when we started your deposition, there was an issue with
14   your ribs.  It was helpful to either stand or take a
15   break.  If you need any time for that reason, please let
16   me know.
17       A.  Appreciate that.
18       Q.  Since your -- the beginning of your deposition
19   on February 2nd, did you discuss your deposition with
20   anyone other than your lawyer?
21       A.  No.
22       Q.  Okay.  Did you do anything besides meet with
23   your lawyer to prepare for your resumed deposition
24   today?
25       A.  No.

---


Robert Ross, Vol. 2                                          3/15/2024

---

**186**

1  supporting what the SAF payment would be?
2      A.  We submitted weekly and monthly timesheets,
3  and within those timesheets were proof of our employment
4  or proof of our work during that period of time, I
5  believe.
6      Q.  Okay.  Okay.  And that would bear on what the
7  SAF payment was?
8      A.  It would.  But this -- since 2018, to be
9  perfectly honest with you, I don't recall how that was
10  all broke down in -- in a payment.
11     Q.  Okay.  And, again, understanding the passage
12  of time, do you remember if your SAF payment was the
13  same every month or if it went up and down?
14     A.  I believe it was, for the most part, the same.
15     Q.  Okay.  And do you know when -- when it varied,
16  what would make it vary from one -- one paycheck to the
17  other?
18     A.  I guess if I had taken time off or I didn't
19  show up for a week or -- or more.
20     Q.  Okay.  All right.  And are you familiar with,
21  under APFA policy, the meal expense allowance?
22     A.  It's a broad understanding, but, yes.
23     Q.  Okay.  And is that sometimes called the MEA?
24     A.  Yes.
25     Q.  Okay.  And, again, what is your core

---

**187**

1  understanding of what the MEA is?
2      A.  It was compensation for meals and
3  entertainment allowance that made up for what you were
4  doing as a national president because you're on a leave
5  of absence, and it somewhat correlated with what a
6  flight attendant would make if they're working.
7      Q.  All right.  And did you receive payments that
8  covered the MEA with your -- with your regular paycheck?
9      A.  I believe I did.
10     Q.  Okay.  And do you remember if, as part of
11  submitting your paperwork to the Union, your weekly or
12  monthly paperwork, whether you had forms or documents
13  that supported a claim for MEA or if it was just
14  automatic, a certain amount every month or every two
15  weeks?
16     A.  I believe that it was the same every two
17  weeks.  I don't recall it varying based on receipts, but
18  I could be wrong.  That has been some time now.
19     Q.  Okay.  Okay.  And, in addition, as national
20  president, you received an annual salary from the APFA,
21  correct?
22     A.  Yes.  There has been some controversy as to
23  whether it's a salary or it's specified pay, but, yes.
24     Q.  Okay.  Well, are you familiar what the Policy
25  Manual defines the term "annual salary"?

---

**188**

1      A.  Yes.
2      Q.  Okay.  So what is the dispute?
3      A.  Well, to me, we were paid a rate.  And that,
4  to me, is -- I guess I've just never really realized,
5  even as a flight attendant -- I've been here for
6  40 years -- I've never considered myself a salary,
7  because you actually had to work.  So it is one and the
8  same.
9      Q.  Okay.  Now, after you left office as national
10  president, did you become aware in 2019, with respect to
11  Mr. Vargas, Ms. Martin, and Ms. Dunaway, that the board
12  of directors had determined they had all been overpaid
13  when their terms ended?
14     A.  I don't know who made that determination, but
15  I know that it was discussed amongst the board of
16  directors.
17     Q.  Okay.  So you -- you had some awareness of
18  that after you left office, right?  It all happened
19  after you left office?
20     A.  I had some awareness of it.  I wasn't involved
21  in it.
22     Q.  Okay.  But these are the other members of your
23  administration, right?
24     A.  Right.  But I was not in constant contact with
25  them.  So I ...

---

**189**

1      Q.  Well, you've claimed in this lawsuit they were
2  part of a political faction that you're a part of,
3  right?
4      A.  I don't understand that.  What do you mean?
5      Q.  Okay.
6      A.  They are part of our -- part of our -- our
7  slate.  I don't know.  No.
8      Q.  Okay.  And do you recall that the essence of
9  the overpayment that had been asserted with respect to
10  them was that MEA and SAF had been added into their
11  salary for purposes of determining their sick pay and
12  vacation pay when they left office?
13     A.  I wasn't a part of that discussion or what it
14  was, but I know that there -- the questions evolved
15  around MEAs, SAF, or calculations.
16     Q.  Okay.  And do you remember seeing a hotline
17  from the APFA describing a board of directors meeting
18  that had determined there was that form of overpayment
19  to Mr. Vargas, Ms. Dunaway, and Ms. Martin?
20     A.  I believe there was a communication that was
21  put out by the administration at that time.
22         MR. BARTOS:  Okay.  If we could mark as
23  Exhibit 21.
24         (Deposition Exhibit 21 marked)
25     Q.  I'd just ask you to take a look at it, and

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**


190

1  I'll ask you a question about it.
2      A.  (Reviewing Exhibit 21).
3      Q.  Have you had a chance to read Deposition
4  Exhibit 21, Mr. Ross?
5      A.  I have.
6      Q.  Okay.  I'll just -- for the record, at the
7  very bottom right-hand corner, there are some numbers.
8  It says Ross/Vargas 000791.  That's -- our firm put that
9  number on it.  So I'm not asking you about that, sir.
10  But looking at just the -- the typed portion, it appears
11  to be a document dated August 26, 2019, APFA Board of
12  Directors Special Meeting.
13        Is this the communication that you recalled
14  seeing regarding the determination of overpayment to
15  Mr. Vargas, Ms. Martin, and Ms. Dunaway?
16     A.  I've seen a lot of communications.  This
17  appears to be a hotline that I may or may not have read.
18  But I do -- I do recall this conversation.
19     Q.  Okay.  So the -- just -- and just looking at
20  the first paragraph, which starts off referring to a
21  special meeting of the board of directors and then goes
22  on to say, "The BOD also determined that the
23  overpayments to these officers should be recovered and
24  that APFA be made whole."  Do you see that?
25     A.  Yes.

191

1      Q.  Okay.  So is that part of the substance of
2  what you became aware of in this 2019 time period?
3      A.  I was aware that there was a discussion about
4  it, yes.
5      Q.  Okay.  And that at that point in time in 2019,
6  that discussion, as far as you knew, didn't involve you;
7  it involved other people.  Is that right?
8      A.  It did not involve me.
9      Q.  Okay.  And did you ever see the board of
10  directors' resolution on the topic that it referred to
11  in that hotline?
12     A.  In twenty -- I don't.  I don't know exactly
13  which one you're referring to.
14     Q.  Okay.  Well, let me just ask you just so we
15  can see if you've seen it before.
16        MR. BARTOS:  If we can mark as
17  Exhibit 22, please.
18        (Deposition Exhibit 22 marked)
19     A.  (Reviewing Exhibit 22).
20     Q.  Have you had a chance to read Exhibit 22, sir?
21     A.  I just did.
22     Q.  Do you recall seeing this document before?
23     A.  I don't.  I don't recall, specifically --
24     Q.  Okay.
25     A.  -- at that time.

192

1      Q.  Okay.  Do you recall being aware of the board
2  of directors passing a resolution along the lines as
3  reflected in Exhibit 22?
4      A.  I don't recall.  I was not on the board of
5  directors at that time.  So I don't recall,
6  specifically.
7      Q.  Okay.  Do you know an individual named Craig
8  Gunter?
9      A.  I do.
10     Q.  And are you aware that an affidavit by
11  Mr. Gunter was filed in this case within the last couple
12  months?
13     A.  Yes.
14     Q.  Okay.  Did you have a discussion with
15  Mr. Gunter about his affidavit?
16     A.  I didn't have a discussion.  I believe my
17  attorney did.
18     Q.  Okay.  And if you look at Exhibit 22, it
19  indicates in the upper -- in the box on the left-hand
20  side, it says the maker of the resolution was Gunter.
21     A.  Uh-huh.
22     Q.  Mr. -- was Mr. Gunter on the -- on the board
23  at that time?
24     A.  Mr. Gunter was the treasurer of APFA at the
25  time.

193

1      Q.  Okay.  All right.  Okay.  Did you become aware
2  that the APFA Executive Committee, after that board of
3  directors' resolution, passed its own resolution about
4  taking action to file suit to collect funds from
5  Mr. Vargas, Ms. Martin, and Ms. Dunaway?
6      A.  Can you repeat that question?
7      Q.  Sure.  Did you become aware in 2019 that the
8  Executive Committee of APFA passed a resolution
9  regarding filing a civil lawsuit against Mr. Vargas,
10  Ms. Martin, or Ms. Dunaway if they didn't pay the
11  amounts owed?
12     A.  That discussion wasn't with me, so I don't
13  know what their private discussions were.
14     Q.  What about a resolution that they passed in
15  their official capacity?  Were you aware of that?
16     A.  I was not involved at that time, so I can't
17  say that I was aware of any resolutions passed in 2019.
18     Q.  Okay.  And did there come a point in 2020 that
19  you learned the board of directors or members of the
20  board of directors had a concern that maybe you had been
21  overpaid in the same way as Mr. Vargas, Ms. Martin, and
22  Ms. Dunaway?
23     A.  I received an email or a letter.  In November
24  of 2020 was the first I had heard of any questions about
25  my payment when I left office.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

---

194

1    Q.   And that was a letter from Erik Harris?
2    A.   Yes.
3    Q.   Okay.  And was the email also from Erik Harris
4    or from somebody else, if you remember?
5    A.   There were emails as well from Erik Harris.
6    I'd have to look back in my records to find out --
7    figure out exactly the dates and what those emails were.
8    Q.   Do you remember a letter from around November,
9    sometime in November of 2020?
10   A.   I do.
11   Q.   Okay.  And do you remember that you were
12   provided with a deadline to -- to make payment --
13   payment arrangements?
14   A.   I recall him making demand of payment
15   arrangements that was not the same as how the other
16   three officers were given their abilities to make
17   payments.  I was given a deadline to make a payment.
18   Q.   Okay.  And you did not make that payment,
19   correct?
20   A.   I offered to make payments to the Union until
21   the actual amount could be verified and corroborated
22   between all parties.
23   Q.   And your offer was to pay $100 per month; is
24   that right?
25   A.   You are correct.

---

195

1    Q.   All right.  And that offer was not accepted,
2    was it?
3    A.   It was -- from my recollection, Erik Harris
4    told me that he did not accept that payment, nor did he
5    at that point accept any payments other than the full
6    amount paid by January 10th, which was less than 60 days
7    from my original notice.
8    Q.   And there came a point when there was a
9    lawsuit filed against you in state court in Texas for
10   collecting the money that was alleged to be owed,
11   correct?
12   A.   I don't know how I'd describe what it was.
13   There was a collections.  We were sent to collections.
14   I know that we were -- I was not given the same
15   privilege or payment options that the other three
16   officers were given.  I remember them sending it to
17   collections and myself disputing it.  I don't remember
18   the dates that any lawsuits were ever filed.  But ...
19   Q.   All right.  And your -- and your -- your view is
20   that you were not overpaid; is that fair to say?
21   A.   It's my view I was not overpaid.
22   Q.   Okay.  I'll get to this later.  But, in
23   fact, your view was you were underpaid; is that right?
24   A.   It is my view I was underpaid.
25   Q.   Okay.  I want to talk about the overpayment

---

196

1    first, or the dispute about overpayment first.
2    I think you've already -- well, it's correct
3    that the Policy Manual describes that national officers,
4    among other things, are entitled to an annual salary.
5    Is that right?
6    A.   Yes.
7    Q.   Okay.  And national officers are also entitled
8    to certain benefits such as vacation pay, retirement
9    benefits, sick time, et cetera?
10   A.   Yes.
11   Q.   Okay.  And the Policy Manual provides a way
12   for vacation allowance to be paid for unused vacation at
13   the end of every fiscal year; is that right?
14   A.   The unused, yes.
15   Q.   Unused.
16   And also to be paid at the end of an officer's
17   term?
18   A.   There are provisions to pay unused sick and
19   vacation at the end of an officer's normal term.
20   Q.   Okay.  And for both sick and vacation, those
21   payments at the end of the fiscal year or the end of a
22   term are calculated on -- basically it's prorated based
23   on the annual salary.  Is that correct?
24   A.   That is correct.
25   Q.   Okay.  And that's all set forth in the Policy

---

197

1    Manual, right?
2    A.   There is a provision in the Policy Manual for
3    normal end-of-term circumstances.
4    Q.   Okay.  And would you also agree with me that
5    just under the Policy Manual, okay, that MEA and SAF are
6    not part of annual salary?
7    A.   I don't know.  I'm not -- I wasn't the
8    treasurer, so I don't -- I don't know what ...
9    MR. BARTOS:  If we could mark as -- I'm
10   sorry.  I keep forgetting the number.
11   (Deposition Exhibit 23 marked)
12   Q.   If you could look at Exhibit 23, sir, I have a
13   few questions.
14   A.   (Reviewing Exhibit 23).
15   Q.   Have you had a chance to look at Exhibit 23,
16   sir?
17   A.   I have not read every word of it.  I take it
18   that this is a copy of what's in the Policy Manual.
19   Q.   And just for the record, this is a copy of, as
20   reflected on the cover page, the Policy Manual and then
21   Section 6 of the excerpts.  And I'm going to ask you
22   some questions about your Transition Agreement, but I
23   want you to look at the Policy Manual first, if you
24   wouldn't mind.  And if you look at Section 6, it says
25   "National Officer Salaries and Benefits."  Do you see

---

Robert Ross, Vol. 2                                                3/15/2024



| | 198 |
|---|---|
| 1 | that? |
| 2 | A. Yes. |
| 3 | Q. Okay. And then there is an overall policy |
| 4 | statement at the first -- right after that, and then |
| 5 | there is Section A. It says "Salaries." Do you see |
| 6 | that? |
| 7 | A. Yes. |
| 8 | Q. Okay. And that's Section A, Salaries. |
| 9 | Section A.1. defines the annual salary of the national |
| 10 | president, correct? |
| 11 | A. It says, "The salary of the National |
| 12 | President," yes. |
| 13 | Q. Okay. And A.1 says, "National Officers shall |
| 14 | be considered salaried employees of the APFA and, as |
| 15 | such, shall be entitled to annual salaries, payable |
| 16 | semi-monthly." Do you see that? |
| 17 | A. Yes. |
| 18 | Q. Okay. And are you aware that when Mr. Vargas |
| 19 | calculated his own sick pay -- or his unused sick and |
| 20 | unused vacation at the end of the fiscal year in 2018, |
| 21 | he calculated his amount by adding MEA and SAF payments |
| 22 | he received to his annual salary and then dividing that |
| 23 | by 365 for a daily rate? Are you aware of that? |
| 24 | A. I was not aware of anything having to do with |
| 25 | his salary. I was not the president at the time, nor |

| | 199 |
|---|---|
| 1 | was I in office. So I'm not aware of what he did in his |
| 2 | own agreement or Transition Agreement or his own |
| 3 | end-of-term payouts. |
| 4 | Q. Okay. Sitting here today, you don't know how |
| 5 | he calculated his own vacation and sick payout in this |
| 6 | lawsuit in which you're both -- you're both parties? |
| 7 | A. I know that he calculated a payment for him |
| 8 | and the other three officers, and I know that he had |
| 9 | made arrangements to repay that as a condition that -- |
| 10 | that was set forth within his agreement with APFA. |
| 11 | Q. But your -- your -- your testimony is you're |
| 12 | not sure how it was that -- what formula Mr. Vargas used |
| 13 | that was an overpayment for himself or the others. You |
| 14 | just don't know; is that right? |
| 15 | A. I can't -- I can't make a verification |
| 16 | specific to what calculation he used for his own. |
| 17 | Q. Okay. |
| 18 | A. I was only concerned with how I was paid. |
| 19 | Q. Okay. And let's talk about how you were paid. |
| 20 | Mr. Vargas -- you left office under the |
| 21 | Transition Agreement, right? It was before the end of |
| 22 | what would have been the normal end of your term, |
| 23 | correct? |
| 24 | A. I left office under an agreement with the |
| 25 | board of directors, yes. |

| | 200 |
|---|---|
| 1 | Q. The Transition Agreement? |
| 2 | A. The Transition Agreement. |
| 3 | Q. And after you left, Mr. Vargas remained as |
| 4 | treasurer, correct? |
| 5 | A. Yes. |
| 6 | Q. And Mr. Vargas calculated your vacation -- |
| 7 | your unused vacation and unused sick payout, correct, |
| 8 | after you left office? |
| 9 | A. He did. |
| 10 | Q. Okay. And with respect to the sick and |
| 11 | vacation pay calculations, Mr. Vargas took your annual |
| 12 | salary, added in the MEA and SAF, and then divided that |
| 13 | by 365 to get the daily rate for each of your accrued |
| 14 | unused vacation and sick pay, right? |
| 15 | A. It's my understanding that that's pretty close |
| 16 | to an accurate description. |
| 17 | Q. And that's how the dispute about whether that |
| 18 | was appropriate is part of what you're -- we're |
| 19 | disputing in this lawsuit, right? You say that was |
| 20 | appropriate; APFA says it was not. Correct? |
| 21 | A. Repeat that question. |
| 22 | Q. Sure. Let me -- let me -- we don't need to go |
| 23 | there. |
| 24 | So let's just talk about that -- that part. |
| 25 | That -- that calculation using the MEA and the SAF as |

| | 201 |
|---|---|
| 1 | part of the formula to reach the daily pay, that |
| 2 | resulted in what the APFA says is an overpayment of |
| 3 | about $5,400, correct? |
| 4 | A. I don't -- to be honest with you, I don't know |
| 5 | what APFA designated as their reasoning. I have not |
| 6 | been able to get an actual breakdown of exactly dollar |
| 7 | for dollar what it was that I was overpaid. |
| 8 | Q. Okay. You have seen an overpayment |
| 9 | calculation? |
| 10 | A. I have seen several calculations. |
| 11 | Q. All right. And you've seen a memo from |
| 12 | Hal O'Neil, correct? Confidential memo? |
| 13 | A. These are two different -- two different |
| 14 | questions you're asking. |
| 15 | Q. Yeah, I'm asking you two different questions. |
| 16 | A. Okay. |
| 17 | Q. You've seen the overpayment -- you've seen an |
| 18 | overpayment calculation, right? |
| 19 | A. I've seen -- I've seen a demand of an |
| 20 | overpayment. I've seen several pages of charts and |
| 21 | graphs that I had asked several times of Erik Harris to |
| 22 | explain them. And he not only could not but would not |
| 23 | explain each one of those charts and graphs and how they |
| 24 | came to that. And then a year and a half or 18 months |
| 25 | or so later, I saw a memo from Hal O'Neil. That's how I |

Robert Ross, Vol. 2                                          3/15/2024

---

**202**

1  recall it.  But I've never seen a specific breakdown of
2  exactly dollar for dollar of how it was to be
3  calculated.
4      Q.  Just bear with me one second.
5          I'm going to ask you to -- so it's your
6  testimony today that you never saw the overpayment
7  calculation that was attached to a memorandum from
8  Hal O'Neil?  That's your testimony here today on
9  March 15th?
10     A.  You put two into one with your question there
11 because you said that I've never seen a calculation that
12 was put forward by Hal O'Neil.  Correct?
13         MR. BARTOS:  Can you read back the
14 question.
15         (Requested text was read)
16     A.  Yes.
17     Q.  Okay.  Did something come up in between your
18 testimony on February 1st and today that leads you to
19 have that answer today, as opposed to February 1st?
20     A.  It's probably in how you stated it because you
21 stated that there were calculations that were attached
22 to a memo from Hal O'Neil.  And I have never had any
23 calculations attached to any memo from Hal O'Neil.
24         I've had charts and graphs that I've asked
25 APFA to explain to me, and I've had a memo from Hal

---

**203**

1  O'Neil, but it is -- when I was given the charts and
2  graphs by APFA, Erik Harris, and by the collection
3  agency who sent me all of the documents APFA had sent
4  them, there was no attachment from Hal O'Neil.  It was
5  just a bunch of charts and graphs that could have been
6  put together by anyone.
7      Q.  But my question is there is nothing -- you
8  haven't learned some new information, from February 1st
9  until today, about whether or not you received an --
10 calculations by Hal O'Neil regarding your overpayment?
11     A.  I'm -- I don't -- I'm not going to say that I
12 received any calculations specific from Hal O'Neil.  The
13 document that I received was, from Hal O'Neil, that I
14 was paid correctly.
15     Q.  Okay.  All right.  I'd like to -- tell me as
16 best you can in your own words why you feel that APFA is
17 incorrect in claiming that you were overpaid by
18 approximately $5,400 in connection with your sick and
19 vacation payout.  Why is the Union wrong?
20     A.  The Union is wrong on several fronts.  I've
21 never been given, specifically, in those charts and
22 graphs, how they came up with the exact $5,400.  The
23 charts and graphs state an overpayment yet the memo from
24 Hal O'Neil states I was paid correctly.
25         Secondly, the numbers that were used to pay

---

**204**

1  out on certain items, such as sick, cannot be
2  corroborated with the actual sick pay that I was
3  entitled to.  The sick and vacation were to be paid on
4  all accrued and unused sick and vacation, not specified
5  by policy.
6          To my knowledge, the vacation time was paid
7  based on the difference between the vacation I had
8  accrued and that I had used, without condition of policy
9  stating that it's only 18 days.  I was paid all of my
10 unused but accrued sick and vacation -- pardon me --
11 vacation only.
12         As far as the sick goes, that too was to be
13 calculated at the same, all of the accrued and unused,
14 yet in those charts that I was provided, it appears that
15 I was only paid per policy on my sick of 12 days and not
16 my full accrued of 18 days.
17         I did not use any sick time, nor was as APFA
18 provided in documentation that shows that I used any
19 sick time during that period of time.  So I would still
20 be owed six sick days from fiscal year 2016-'17 and six
21 sick days for 2017-2018.
22     Q.  Okay.  I want to -- I'm trying to ask you
23 about the amount when Erik Harris sent you a letter
24 saying you had received an overpayment and he asked for
25 that to be paid back.  That was approximately $5,400,

---

**205**

1  right?  Do you remember that?
2      A.  Approximately 5,400.
3      Q.  You got that letter in November, and he said
4  you needed to pay it back by January, right?
5      A.  Yes.  I was given less than 60 days to pay it
6  back in full, and they denied my $100 a month.
7      Q.  I just want to ask you about the $5,400 --
8      A.  Okay.
9      Q.  -- and why -- why, in your view, that was
10 wrong.  Okay.
11         And is -- is your view of why that's wrong
12 just the answer that you've just given me, or is
13 there -- can you speak specifically to the $5,400 to why
14 you think that's incorrect?
15     A.  It appeared at the time, and it still does, is
16 that I was being held to the same standards as the other
17 three officers, that I was to be paid per policy at the
18 end of term.  And that was not the agreement in my
19 Transition Agreement, nor was it ever an agreement made
20 between myself, the board, or APFA's counsel when I
21 agreed to resign early.
22     Q.  Okay.  Now, you've testified to sort of what
23 were the correct number of days for which you should
24 have been paid, how many sick days, how many vacation
25 days.  Right?  You were saying that you were -- there

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross, Vol. 2                                          3/15/2024

---

**210**

1    MR. BARTOS:  If I can ask the court
2  reporter, please.
3        (Requested text was read)
4    A.  It's my understanding he was the treasurer who
5  was authorized to disburse the payments.
6    Q.  Okay.  And you received the payments that you
7  did receive under the Transition Agreement during the
8  time that Mr. Vargas was treasurer; is that right?
9    A.  No.
10   Q.  Okay.  Did you receive some of them while
11 Mr. Vargas was treasurer and some after he was
12 treasurer?
13   A.  That's correct.
14   Q.  Okay.  And Mr. Gunter was treasurer after
15 Mr. Vargas, right?
16   A.  That's correct.
17   Q.  Okay.  And there was some -- some portion
18 of the payment you received under the Transition
19 Agreement -- Agreement was authorized by Mr. Gunter,
20 right?
21   A.  Yes.
22   Q.  And was that your moving expense?
23   A.  Yes.
24   Q.  Okay.  But your -- the other expenses, the
25 other payments you received besides the moving expense,

---

**211**

1  were made while Mr. Vargas was treasurer?
2    A.  That's my -- to my knowledge, yes.
3    Q.  Okay.
4        (Deposition Exhibit 24 marked)
5    Q.  Let me know once you've had a chance to look
6  at 24, sir.
7    A.  Okay.
8    Q.  Have you ever seen the document that's been
9  marked as Exhibit 24?
10   A.  I don't recall this specific document.
11   Q.  Okay.  I'll just represent to you this was
12 filed by your lawyer in this court case as part of a
13 prior motion.  And I'm just asking so you are familiar
14 with some of this but not all of it?  I'm trying to
15 understand what it is you may not have seen before.
16   A.  I received several pages of different charts
17 and graphs, and those same charts and graphs were turned
18 over to the collection agency, which I received a copy
19 from them as well.  This may have been one of those
20 charts and graphs that ...
21   Q.  Okay.  Do you believe you have a remaining
22 balance due to you, under the Transition Agreement, of
23 $10,199.62?
24   A.  I believe it is an amount that is very close
25 to that amount.

---

**212**

1    Q.  Okay.  But you didn't prepare this document,
2  Exhibit 24?
3    A.  I myself did not prepare this document, no.
4    Q.  Did you review it before it was filed in
5  court?
6    A.  I did.
7    Q.  Okay.  Is it -- okay.  Sorry.  Go ahead.
8        Can you describe for me what it -- what it's
9  supposed to represent, or don't you know?
10   A.  I -- you know, I'm not an accountant, and so
11 I'm -- I'm not exactly sure it's showing my accrued and
12 unused vacation and sick for the two years I was in
13 office.
14   Q.  All right.  I don't have anything further
15 about 24.  Now, since you've -- I have no further
16 questions about that, sir.
17        Since the time that you left office as
18 national president, so from roughly March 2018 to the
19 present, okay, have you been called into any meetings
20 with American Airlines management about potential
21 discipline for yourself?
22   A.  I have been called into the office for a
23 discussion.  I don't recall it being potential
24 discipline for me, but I was called in.
25   Q.  Okay.  And was that just on one occasion or

---

**213**

1  more than one?
2    A.  I think, on two -- two occasions.
3    Q.  Okay.  And what years were those occasions?
4    A.  2023.
5    Q.  They were both in 2023?
6    A.  I don't recall.
7    Q.  Okay.  And who was it from management that --
8  that you met with?
9    A.  I met with my supervisor.
10   Q.  Was it a different person on the two meetings
11 or the same person?
12   A.  I met with my supervisor and the base manager.
13   Q.  On both occasions?
14   A.  No.  On one occasion, the supervisor.  The
15 other occasion was supervisor, base manager.
16   Q.  Okay.  And which --
17   A.  I don't recall who all else was in there.
18   Q.  And was the supervisor in the first time and
19 then more people on the second time?
20   A.  No.  It was probably less.  It was probably
21 the other way around.  I'm not sure.
22   Q.  Okay.  Who is your supervisor?
23   A.  Hayle Hilke.
24   Q.  Can you spell that last name?
25   A.  No, I can't, to be honest with you.  I think

---

**STRYKER REPORTING SERVICES**            ***            (817) 494-0700

Robert Ross, Vol. 2                                         3/15/2024

---

**246**

1  agreement.
2      Q.  And Mr. Vargas only saw portions of your
3  Transition Agreement prior to making calculations?
4      A.  I'm not sure what all he saw.  As the
5  treasurer he would have been privy to anything having to
6  do economically in my Transition Agreement.
7      Q.  So if a miscalculation was made under your
8  Transition Agreement, would it -- would it be fair to
9  say that there is more than one person responsible for
10  that miscalculation, seeing as the policies and
11  procedures of APFA --
12      A.  Oh, absolutely.
13          (Speaking simultaneously)
14          THE WITNESS:  Pardon.
15          THE REPORTER:  Hold on.
16          THE WITNESS:  I spoke over her.
17          MS. PHILLIPS:  I apologize as well.  Go
18  ahead.
19          THE REPORTER:  Give me your answer again.
20  I'm sorry.
21      A.  Eugenio Vargas would have had other people
22  overseeing his calculations and approving any payments
23  that were made.
24      Q.  And this would have been accounting
25  personnel --

---

**247**

1      A.  They would have been.
2      Q.  -- people who are licensed and authorized by
3  the -- with accounting degrees, right?
4      A.  Well, the budget committee and -- and the
5  bookkeepers and all that, I don't know what their
6  degrees are.  But, yes, the accountant, who has actual
7  oversight for disbursements of this, would have those
8  degrees.
9          MS. PHILLIPS:  I have no further
10  questions.
11          MR. BARTOS:  I just have one more.
12              EXAMINATION
13  BY MR. BARTOS:
14      Q.  You've given some testimony about procedures
15  and what might or might not have happened with
16  Mr. Vargas's processing of the payments under the
17  Transition Agreement.
18      But once you left office, you don't have any
19  personal knowledge of what Mr. Vargas did or who he
20  talked to or what he looked at, because you were -- you
21  were out of office, right?  You don't have any personal
22  knowledge of any of that?
23      A.  I don't -- even while I was in office, I
24  didn't have any personal knowledge of -- of how
25  calculations were made or -- I do know that from a

---

**248**

1  financial standpoint, there are checks and balances and
2  processes that are used.  And that was Eugenio Vargas
3  and that entire section of APFA's wheelhouse.  I
4  didn't -- I didn't oversee that.
5      Q.  And you definitely didn't oversee it after you
6  left?
7      A.  Well, I could not.  I could not have.
8      Q.  And did not?
9      A.  I did not, other than -- no, I did not have
10  anything to do with that.
11          MR. BARTOS:  I don't have anything
12  further.
13          MS. PHILLIPS:  Do you have anything else?
14          THE WITNESS:  No.
15          MS. PHILLIPS:  I think we're finished.
16          MR. BARTOS:  We can go off the record.
17          THE VIDEOGRAPHER:  We're off record at
18  11:44 a.m.
19          (Off the video record)
20          THE REPORTER:  Would you put on the
21  record if he is going to read and sign, please.  I just
22  need that for the federal rules.
23          MS. PHILLIPS:  If he is going to read and
24  sign the errata again?
25          THE REPORTER:  Yes.  Yes, ma'am.  Just

---

**249**

1  state it for me.
2          MS. PHILLIPS:  Back on.
3          THE REPORTER:  You don't need to do it on
4  video.  I'll do it on the record.
5          MS. PHILLIPS:  Okay.  Then, yeah, he will
6  read and sign the errata sheet after -- after the
7  allotted time to review.
8          THE REPORTER:  Thank you.
9          (Proceedings adjourned at 11:44 a.m.)
10          (Per Federal Rule of Civil Procedure
11          30(e)(1), signature was requested by
12          Counsel for the Witness before completion
13          of the deposition)
14
15
16
17
18
19
20
21
22
23
24
25

---

**STRYKER REPORTING SERVICES**                    (817) 494-0700

250

1              CHANGES AND SIGNATURE
2   WITNESS NAME:  ROBERT ROSS, VOLUME 2
    DEPOSITION DATE:  MARCH 15, 2024
3   PAGELINE          CHANGE/REASON
4   _____ _____
5   _____ _____
6   _____ _____
7   _____ _____
8   _____ _____
9   _____ _____
10  _____ _____
11  _____ _____
12  _____ _____
13  _____ _____
14  _____ _____
15  _____ _____
16  _____ _____
17  _____ _____
18  _____ _____
19  _____ _____
20  _____ _____
21  _____ _____
22  _____ _____
23  _____ _____
24     I, ROBERT ROSS, have read the foregoing deposition
25   and hereby affix my signature that same is true and

251

1   correct, except as noted above.
2
3                    _____
                     SIGNATURE OF WITNESS
4   STATE OF _____ x
5   COUNTY OF _____ x
6
7      Before me, _____, on this day
8   personally appeared ROBERT ROSS, known to me (or proved
9   to me under oath or through _____) (description of
10  identity card or other document) to be the person whose
11  name is subscribed to the foregoing instrument and
12  acknowledged to me that they executed the same for the
13  purposes and consideration therein expressed.
14     GIVEN UNDER MY HAND AND SEAL of office this
15  _____ day of _____, 2024.
16
17
18
19   (Seal)      _____
                 Notary Public in and for the
20               State of _____.
21
22
23
24
25

252

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2               FORT WORTH DIVISION
3   ROBERT (BOB) ROSS      §
                           §
4   VS.            §  ACTION NO. 4:22-CV-343-Y
                           §
5   ASSOCIATION OF         §
    PROFESSIONAL FLIGHT    §
6   ATTENDANTS, ET AL.     §
                           §
7   AND                    §
                           §
8   EUGENIO VARGAS         §
                           §
9   VS.            §  ACTION NO. 4:22-CV-430-Y
                           §
10  ASSOCIATION OF         §
    PROFESSIONAL FLIGHT    §
11  ATTENDANTS, ET AL.     §
12          REPORTER'S CERTIFICATION
13     VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS
14               VOLUME 2
15             MARCH 15, 2024
16     I, Angela L. Mancuso, Certified Shorthand Reporter
17  in and for the State of Texas, hereby certify to the
18  following:
19     That the witness, ROBERT ROSS was duly sworn by the
20  officer and that the transcript of the oral deposition
21  is a true record of the testimony given by the witness;
22     That the original deposition was delivered to
23  Ms. Kerri Phillips for examination and signature by the
24  witness;
25     That the time used by the parties is as follows:

253

1   MS. KERRI PHILLIPS:  6 minutes
2   MR. JEFFREY A. BARTOS:  1 hour, 50 minutes
3      I further certify that pursuant to FRCP Rule
4   30(e)(1) that the signature of the deponent was
5   requested by Counsel for the deponent before the
6   completion of the deposition and that the signature is
7   to be before any notary public and returned within
8   30 days from date of receipt of the transcript.  If
9   returned, the attached Changes and Signature page
10  contains any changes and the reasons therefor.
11     I further certify that I am neither attorney or
12  counsel for, nor related to or employed by, any of the
13  parties to the action in which this deposition is taken,
14  and further that I am not a relative or employee of any
15  attorney or counsel employed by the parties hereto, or
16  financially interested in the action.
17     Certified to by me on this the 26th day of March,
18  2024.
19
20
21     _____
       ANGELA L. MANCUSO, CSR 4514
22     Expiration Date: 10/31/24
       Stryker Reporting
23     Firm Registration No. 806
       1450 Hughes Road, Suite 230
24     Grapevine, Texas 76051
       (817) 494-0700
25

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Bartos Decl., Ex. C

MARCH 14, 2024

Mr. Jeffrey A. Bartos, Esq.
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W., Suite 700
Washington, D.C. 20036

RE:  Civil Action No. 4:22-cv-343-Y; Robert (Bob) Ross vs. Association of Professional
Flight Attendants, et al.

Dear Mr. Bartos:

Attached please find the errata page to the deposition of **Robert Ross**, which was
received in our office on February 28, 2024.

The original transcript has not been returned.

By copy of this letter, I am serving all parties through their counsel with a copy of the
executed errata page.

Best regards,

Tracy J. Kirkey
production@strykerreporting.com

cc:     Ms. Kerri Phillips, Esq.
        Ms. Charlette L. Broderick, Esq.

APPX. 0597

**Bartos Decl., Ex. C**

Robert Ross                                                        2/1/2024

161

                          CHANGES AND SIGNATURE

1

2  WITNESS NAME:  ROBERT ROSS, VOLUME 1
   DEPOSITION DATE:  FEBRUARY 1, 2024
3  PAGELINE                  CHANGE/REASON
4  49-2        "I do not recall"/confusing question,clarifying
               answer
5  51-5        "signed and handed to me"/ confusing, asked and
               answered,clarifying answer.
6
7  57-18       "I see that"/clarification
8  60-22       "I don't know" confusing series of questions
9  60-24        "I don't know" confusing series of questions
10 60-8        "I don't know" confusing series of questions
11 59-6        "I don't know" confusing series of questions
12 59-3        "I don't know" confusing series of questions
13 58-22       "I don't know" confusing series of questions
14 58-19       "I don't know" confusing series of questions
15 58/13-14    "I don't know" confusing series of questions
16 57-24       "I don't know" confusing series of questions
17 68-7        "At least 2"/ clarification, later recollection
18
19
20
21
22
23
24      I, ROBERT ROSS, have read the foregoing deposition
25  and hereby affix my signature that same is true and

**STRYKER REPORTING SERVICES**              (817) 494-0700

**Bartos Decl., Ex. C**

Robert Ross                                                    2/1/2024

```
                                                                   161
 1                        CHANGES AND SIGNATURE

 2    WITNESS NAME:  ROBERT ROSS, VOLUME 1
      DEPOSITION DATE:  FEBRUARY 1, 2024
 3    PAGELINE                CHANGE/REASON

 4      68-7    _____  _____

 5    _____  _____

 6    _____  _____

 7    _____  _____

 8    _  _____   _____

 9    _____  _____

10    _____  _____

11    _____  _____

12    ____   _   _____

13    _____  _____

14                 _____

15    _____  _____

16    _____  _____

17    _____  _____

18    _____  _____

19    _____  _____

20    _____  _____

21    _____  _____

22    _____  _____

23    _____  _____

24        I, ROBERT ROSS, have read the foregoing deposition

25    and hereby affix my signature that same is true and
```

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                      2/1/2024

                                                                      162

1    correct, except as noted above.

2

3                                    [signature]

                                                        Robert Ross

4    STATE OF  TEXAS        x        SIGNATURE OF WITNESS

5    COUNTY OF  WILLIAMSON  x

6

7        Before me,  Lashondra Gant        , on this day

8    personally appeared ROBERT ROSS, known to me (or proved

9    to me under oath or through DRIVERS LICENSE) (description of

10   identity card or other document) to be the person whose

11   name is subscribed to the foregoing instrument and

12   acknowledged to me that they executed the same for the

13   purposes and consideration therein expressed.

14       GIVEN UNDER MY HAND AND SEAL of office this

15   __27__ day of  February        , 2024.

16

17

18

19   (Seal)                           [signature]

20                            Notary Public in and for the
                              State of  Texas
21
                              This notarial act was an online notarization
22

23

24

25

**STRYKER REPORTING SERVICES**                  **(817) 494-0700**

✳✳✳

**STRYKER REPORTING**

APRIL 15, 2024

Ms. Charlette L. Broderick, Esq.
Association of Professional Flight Attendants
1004 West Euless Boulevard
Euless, Texas 76040

**Re: Civil Action No. 4:22-CV-343-Y; Robert (Bob) Ross vs. Association of Professional Flight Attendants, et al.**

Dear Ms. Broderick,

Enclosed please find the original transcript to the deposition of **Robert Ross, Vol. 2**, taken March 15, 2024.  It was received in our office on April 12, 2024, and has been sealed by Stryker Reporting Services according to Rule 30(f)(1) of the Federal Rules of Civil Procedure.

By copy of this letter, I am serving all parties with a copy of the errata page.

The originals will be retained by you for safekeeping and use at trial.

Please do not hesitate to contact our office should you have any questions or concerns.

Best regards,

Tracy J. Kirkey
production@strykerreporting.com

cc:    Ms. Kerri Phillips, Esq.
       Mr. Jeffrey A. Bartos, Esq.

Robert Ross, Vol. 2                                      3/15/2024

251

1    correct, except as noted above.

2

3                                         ~R~ [signature]

                                          SIGNATURE OF WITNESS
4    STATE OF  Texas          x           Robert A. Ross who produced California
                                          drivers license as identification
5    COUNTY OF  Jefferson     x

6

7         Before me, E'Chanda Manette Goodman; Notary Public, on this day

8    personally appeared ROBERT ROSS, known to me (or proved

9    to me under oath or through California drivers license ) (description of

10   identity card or other document) to be the person whose

11   name is subscribed to the foregoing instrument and

12   acknowledged to me that they executed the same for the

13   purposes and consideration therein expressed.

14        GIVEN UNDER MY HAND AND SEAL of office this

15   11th day of    April           , 2024.

16

17

18

19        (Seal)                    E'Chanda Manette Goodman

20                                  Notary Public in and for the
                                    State of  Texas         .
21   [Notary Seal:                  E'Chanda Manette Goodman
     ECHANDA MANETTE GOODMAN         Remote Online Notary Public
     Notary ID #132642149            State of Texas, Jefferson County
     My Commission Expires
22   August 25, 2024]

23   This notarial act was an online notarization
     along with multi-factor authentication and
24   using audio/video recording.

25

**STRYKER REPORTING SERVICES**                      **(817) 494-0700**

**Bartos Decl. Ex. C**

Robert Ross, Vol. 2                                3/15/2024

                                                            250
1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  ROBERT ROSS, VOLUME 2
     DEPOSITION DATE:  MARCH 15, 2024
3    PAGELINE              CHANGE/REASON

4    242/5-7 Clarification substitute "Mr. Vargas's mistake"for
              "someone's mistake" because I do not have personal
5             knowledge of who authorized or calculated payments
              made to pay me on my Transition Agreement.
6
              I am not qualified to testify on that matter.
7    244/8-11 Clarification as I have no personal knowledge about
              who calculated and made decisions about my payments
8             under the Transition Agreement and I am not
              qualified to testify on that issue and I did not
9             have any of my personal financial documents in front
              of me to confirm these numbers as I did when I
10            originally testified and signed this affidavit.
              "Well I do not know.  A mistake was made on what
11            days--what APFA used. APFA used the Transition for
              the vacation days, except for 2016, and used the
12            policy for the  APFA sick days and that was a mistake
              on its part."
13
14
     244/14-18
15
              Clarification -  I have no personal knowledge about
16            who calculated and made decisions about my payments under
              the Transition Agreement and I am not qualified to
17            testify on that issue, and I did not have any of my
              personal financial documents in front of me to confir
18            these numbers as I did when I originally testified
              and signed this affidavit.  Therefore change to "I do
19            not. And I was under the impression for several
              years I was paid correctly, until I got a letter in
20            November of 2020. No--even the -- even the 12 days,
              even if that was wrong, I was willing to -- to accept
21            the payment as correct. But then I discovered
              they had falsified the documents."
22
23
24       I, ROBERT ROSS, have read the foregoing deposition

25   and hereby affix my signature that same is true and

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

                                                  **APPX. 0603**

Eugenio Vargas                                    2/2/2024

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
                    FORT WORTH DIVISION

EUGENIO VARGAS,                §
                               §
Plaintiff/                     §
Counterclaim Defendant,        §
                               §   Civil Action No.
VS.                            §   4:22-cv-430-Y
                               §
ASSOCIATION OF                 §   Judge Terry R. Means
PROFESSIONAL FLIGHT            §
ATTENDANTS, et al.,            §
                               §
Defendants/                    §
Counterclaim Plaintiff.        §


          ------------------------------------
              VIDEOTAPED ORAL DEPOSITION OF
                      EUGENIO VARGAS
                        VOLUME 1
                    FEBRUARY 2, 2024
          ------------------------------------
```

          VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 2, 2024, from 10:03 a.m. to 11:47 a.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                          2/2/2024

**Page 2**

APPEARANCES

FOR THE PLAINTIFF/COUNTERCLAIM DEFENDANT:

MS. KERRI PHILLIPS
K.D. PHILLIPS LAW FIRM, PLLC
6010 West Spring Creek Parkway
Plano, Texas  75024
(972) 327-5800
kerri@KDphillipslaw.com

FOR THE DEFENDANTS/COUNTERCLAIM PLAINTIFF ASSOCIATION OF
PROFESSIONAL FLIGHT ATTENDANTS AND DEFENDANTS JULIE
HEDRICK AND ERIK HARRIS:

MR. JEFFREY A. BARTOS
GUERRIERI, BARTOS & ROMA, P.C.
1900 M Street, N.W.
Suite 700
Washington, D.C.  20036
(202) 624-7400
jbartos@geclaw.com

MS. CHARLETTE L. BRODERICK
Association of Professional Flight Attendants
1004 West Euless Boulevard
Euless, Texas  76040
(682) 301-8454
cmatts@apfa.org

ALSO PRESENT:

Mr. Erik Harris, APFA National Treasurer

Ms. Michelle Cliatt, APFA Legal Assistant

Mr. John Hines, Videographer
Elite Video Productions
3018 Commerce Street
Dallas, Texas 75226
(214) 747-1952

**Page 3**

TABLE OF CONTENTS
                                                    PAGE

Appearances........................................  2

EUGENIO VARGAS, VOLUME 1

Examination by Mr. Bartos........................  5

Changes and Signature............................  51
Reporter's Certification............................  53

EXHIBITS
NUMBER     DESCRIPTION                        PAGE

Exhibit 1  Affidavit of Eugenio Vargas in        10
           Support of Motion for Summary Judgment
           [Appendix 56-61]

Exhibit 2  Plaintiff's Amended Complaint         12

Exhibit 3  9/18/19 letter from Susannah Bender   29
           to Eugenio Vargas
Exhibit 4  11/8/19 letter from Susannah Bender   30
           to Eugenio Vargas

Exhibit 5  1/10/20 APFA Installment Promissory   34
           Note

REPORTER'S NOTE:
   Quotation marks are used for clarity and do
   not necessarily reflect a direct quote.

**Page 4**

PROCEEDINGS

(February 2, 2024, 10:03 a.m.)

THE VIDEOGRAPHER:  This is Tape 1 in the
video deposition of Eugenio Vargas, in the matter of
Robert Ross versus Association of Professional Flight
Attendants, et al., in the U.S. District Court, for the
Northern District of Texas, Fort Worth Division.  Today
is Friday, February 2nd, 2024.  We are now on record at
10:03 a.m.

Will the attorneys please introduce themselves
for the record.

MR. BARTOS:  Jeffrey Bartos, attorney for
the APFA defendants.

MS. BRODERICK:  Charlette Broderick,
attorney for APFA.

MS. PHILLIPS:  Kerri Phillips, attorney
for Eugenio Vargas.

MR. BARTOS:  I'd like to just make a
correction on the record.  I think in the opening the
videographer referenced -- there is a related case of
Ross.  The Vargas and Ross cases are two separate cases,
and we'll make sure that the court reporter has the
correct caption.

(Witness sworn by reporter)

EUGENIO VARGAS,

**Page 5**

having been first duly sworn, testifies as follows:

EXAMINATION

BY MR. BARTOS:

Q.  Good morning, Mr. Vargas.

A.  Good morning.

Q.  Can you tell me what you did to prepare for
your deposition today.

MS. PHILLIPS:  Objection.  I'm directing
my client not to answer.  It's privileged.

Q.  I'm not asking anything you might have
discussed with your attorney.  I'm just asking you, what
did you do to prepare for your deposition today?

A.  Woke up, had coffee.  That was it.

Q.  Did you review any documents to get ready?

A.  No.

Q.  Did you discuss with Mr. Ross his deposition
yesterday?

A.  No.

Q.  Can you describe, please, any education you've
had since high school.

A.  Some college.

Q.  Where did you go to college?

A.  City College of New York.

Q.  Okay.  And how many years did you do at City
College?

STRYKER REPORTING SERVICES                    (817) 494-0700

Eugenio Vargas                                                    2/2/2024

**6**

1    A.  One year.
2    Q.  Okay.  And can you describe, please, your
3  employment from after you left City College up until you
4  started working at American Airlines.
5    A.  I worked at a travel agency in New York.
6  Worked at a movie theater.  I was a messenger.  I had my
7  own agency for a while.
8    Q.  Was that a travel agency?
9    A.  Yes, sir.  Then I applied for being a flight
10  attendant at American Airlines.
11    Q.  Okay.  Was American Airlines the first airline
12  that you worked for?
13    A.  Yes.
14    Q.  Okay.  And when did you start your job at
15  American Airlines?
16    A.  It was a legacy carrier.
17    Q.  When?  I'm sorry.
18    A.  Oh, when?
19    Q.  Yeah.
20    A.  Training started in September of '95.
21    Q.  And have you been employed by American
22  Airlines continuously since then?
23    A.  Yes.
24    Q.  And has your position at American Airlines
25  been a flight attendant that whole time?

**7**

1    A.  Correct.
2    Q.  And, throughout your time at American
3  Airlines, your Union representation has been the APFA.
4  Correct?
5    A.  Correct.
6    Q.  And did there come a point in time where you
7  took on any responsibilities either as a volunteer or an
8  appointee or an elected position with the APFA?
9    A.  Yes.
10    Q.  What was your first such activity, whether it
11  was volunteer or appointed or elected?
12    A.  It was -- I did a training on their CAMI.
13    Q.  On the what?
14    A.  CAMI, I think, was the acronym that they used.
15  It's --
16    Q.  What was that about?
17    A.  It was basically a -- we did an evacuation of
18  an aircraft.  Like, I had a toddler, a dummy toddler,
19  with me that was, like, weighed, like, 20 pounds.  We
20  also -- I didn't do the hypoxia simulation because there
21  was something you needed to do prior to; so I didn't do
22  that one.  Then, after that, I believe that's when I
23  started doing the -- being a rep at APFA headquarters.
24    Q.  Okay.  So what was your first position as a
25  rep at APFA headquarters?  What was your title?

**8**

1    A.  (Inaudible).
2        THE REPORTER:  I'm sorry.  I didn't hear
3  you.
4        THE WITNESS:  Oh, I'm sorry.
5    A.  It was a -- I was a rep at APFA headquarters.
6    Q.  And who was the president of APFA at that
7  time?
8    A.  John Ward.
9    Q.  John Ward?
10    A.  (Nodding head up and down).
11    Q.  Okay.  And what was your next APFA position
12  after being a rep in that capacity?
13    A.  I mean, I've done so many things with APFA.  I
14  cannot tell you exactly what was next.
15    Q.  Okay.  All right.  Well, let me -- let me --
16  we'll narrow it down a little bit.  I appreciate that.
17        How many position -- well, what was your first
18  elected position at APFA?
19    A.  Boston international vice chair.
20        (Reporter clarifying)
21    Q.  So that was the Boston international base.  Is
22  that right?  Is that what you're saying?
23    A.  Can you --
24    Q.  You said Boston --
25    A.  International.

**9**

1    Q.  -- international --
2    A.  Vice chair.
3    Q.  -- vice chair.  Okay.
4        And when -- when did you hold that position?
5    A.  Okay.  Can you then go back to your question
6  because you said "elected."
7    Q.  I did say "elected."
8    A.  Okay.  So you want the first time that I was
9  elected by the membership?
10    Q.  That was my question, yes.
11    A.  Okay.  Then that would be in -- that was late
12  2000.
13    Q.  Okay.  And was that the Boston position you
14  just described?
15    A.  Yes.
16    Q.  Okay.  All right.  And what -- what was your
17  next -- after you stopped being the vice chair for
18  Boston, what was your next position you had?
19    A.  I eventually became the Boston international
20  chairperson.
21    Q.  Okay.  All right.  And then what was your next
22  position after that?
23    A.  The national treasurer position.
24    Q.  Okay.  And, when you first became national
25  treasurer, were you elected?

**STRYKER REPORTING SERVICES**                (817) 494-0700

APPX. 0606

Eugenio Vargas                                                    2/2/2024

---

**10**

1  A.  Yes.
2  Q.  Okay.  Was that 2016?
3  A.  Yes.
4  Q.  Okay.  And you served as national treasurer
5  until when?
6  A.  I believe it was July 31st of 2018.
7  Q.  Okay.  Now, why is it that your term ended in
8  July of 2018?
9  A.  We had a rerun election, and I lost the
10  election.
11  Q.  Okay.  All right.  I'd like to show you, sir,
12  an affidavit that was filed in this case, and we'll mark
13  this as Exhibit 1.  If you'd pass this to Ms. Phillips,
14  I'd appreciate it.
15      (Deposition Exhibit 1 marked)
16  A.  Okay.
17  Q.  Have you had a chance to read Exhibit 1?
18  A.  Yeah.
19  Q.  Okay.  Have you seen that document before?
20  A.  Yes.
21  Q.  Okay.  And did you sign this affidavit on
22  January 2nd, 2024?
23      MS. PHILLIPS:  I'd like to take a break
24  before we do the hearing, if that's okay.  So after this
25  question if we could take a break because we've got the

---

**11**

1  hearing in 15.
2      MR. BARTOS:  Sure.  That's fine.
3  Q.  Did you sign this document?
4  A.  I mean, it looks like my signature.
5  Q.  I'm asking you do you remember if you signed
6  this document on January --
7  A.  Okay.  This specific document, it looks like
8  my signature.  I cannot state that it's the same exact
9  document.
10  Q.  Did you sign an affidavit on January 2nd,
11  2024, with all the same words in it as this document?
12  A.  I signed affidavit.  I mean, I will have to go
13  back home and compare what I have to this, make sure
14  that it's the same.
15      MR. BARTOS:  Okay.  All right.  Just for
16  the record, as with Mr. Ross, we'd request a copy of
17  Mr. Vargas's copy, so we can make sure this is the
18  document that he signed.
19      And we can go off the record and get ready for
20  the hearing.
21      THE VIDEOGRAPHER:  We're off the record
22  at 10:18 a.m.
23      (Recess from 10:18 a.m. to 10:38 a.m.)
24      THE VIDEOGRAPHER:  We're back on record
25  at 10:38 a.m.

---

**12**

1      MS. PHILLIPS:  One housekeeping issue to
2  address on the record.
3      Before closing -- at the close of Ross
4  yesterday, we needed to get Ross to review his
5  transcripts and sign them.  We will have the transcripts
6  emailed over for him to review and sign for verification
7  of the transcription of his testimony.  So I will email
8  you my contact information.  And, if you want to email
9  it over to me, then I will have him review and sign
10  those.  We would get those verified.  Is that okay?
11      MR. BARTOS:  Just for the record, from my
12  point of view, I'm not sure if the word choice was
13  intended to mean anything.  But from our view the
14  deposition is not closed.  It's still incomplete.
15      (Deposition Exhibit 2 marked)
16  BY MR. BARTOS:
17  Q.  You have in front of you a document marked
18  Exhibit 2, which is the First Amended Complaint in this
19  action, and I would ask you to tell me if you can
20  identify that document.
21      MS. PHILLIPS:  Okay.  I think we're going
22  to need to go off the record.  We're supposed to call
23  the Court back immediately.
24      MR. BARTOS:  Okay.
25      THE VIDEOGRAPHER:  We're off record at

---

**13**

1  10:40 a.m.
2      (Recess from 10:40 a.m. to 10:47 a.m.)
3      THE VIDEOGRAPHER:  We're back on record
4  at 10:47 a.m.
5  BY MR. BARTOS:
6  Q.  Mr. Vargas, have you had a chance to look at
7  Exhibit 2?
8  A.  Not yet.
9  Q.  Well, let me just ask you.  Do you recall
10  filing a First Amended Complaint in this lawsuit?
11  A.  I guess.  I will have to go back and --
12  Q.  You're not sure?
13  A.  You're using a terminology that it's lawyer
14  talk.  I mean --
15  Q.  You're suing the APFA.  Correct?
16  A.  Yes.
17  Q.  And you're suing the APFA in federal court.
18  Is that right?  Do you know that?
19  A.  Yes.
20  Q.  Okay.  All right.  And do you recall filing a
21  complaint to initiate the lawsuit in this -- in this --
22  in this case?
23  A.  I mean, you have to file; otherwise, we
24  wouldn't be here.
25  Q.  And I'm asking you, is the document in front

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                          2/2/2024

---

**14**

1  of you, which is filed in the court, the First Amended
2  Complaint, and are you familiar with it?
3      A.  Okay.  Let me read it.
4      Q.  Okay.  I'm actually going to withdraw the
5  question.  You don't need to -- you don't need to take
6  up time to read that.  I'll withdraw the question.
7          Now, you were national treasurer of APFA.  Is
8  that right?
9      A.  Yes.
10     Q.  Okay.  And what was your understanding of the
11  responsibilities of national treasurer?
12     A.  Many.  You have oversight of the financials.
13  You sit at the Executive Committee.  You are also
14  responsible for the APFA staff.
15     Q.  Okay.  Would it be fair to say that, as
16  national treasurer, the national treasurer is
17  responsible for all the financial records of the APFA?
18     A.  Can you define that a little more?
19     Q.  No.  I'm reading you something from the APFA
20  Constitution.  I want to know if you agree that the
21  national treasurer shall be responsible for all
22  financial records of APFA.
23     A.  I'm not an expert on the Constitution.  I
24  mean, I will have to see it.
25     Q.  Okay.  So you're not sure about that one?

---

**15**

1      A.  Yeah.
2      Q.  Okay.  Would you agree with me that, under the
3  APFA Constitution, the national treasurer is responsible
4  for the care and custody of the funds and securities of
5  the APFA?
6      A.  Again, I don't have the Constitution in front
7  of me to --
8      Q.  Okay.  Now, would you agree that, as national
9  treasurer, you had a fiduciary duty to the organization,
10  the APFA?
11         MS. PHILLIPS:  Objection.
12     Q.  You still answer, even if there is an
13  objection.
14     A.  Can you define?  I mean, fiduciary duties,
15  exactly what does that --
16     Q.  So you're not -- you're not sure what
17  fiduciary duty is?
18     A.  I mean, I would say no.
19     Q.  Okay.  The -- are you -- are you familiar with
20  the -- strike that.
21         While you were national treasurer, the APFA
22  had a Policy Manual.  Isn't that right?
23         MS. PHILLIPS:  Objection; form.
24     A.  Can you repeat the question?
25     Q.  When you were national treasurer, did the APFA

---

**16**

1  have a Policy Manual?
2      A.  Yes.
3      Q.  Okay.  And, when you were national treasurer,
4  did you read that Policy Manual?
5      A.  Can you be more specific?
6      Q.  Did you read the Policy Manual when you were
7  national treasurer?
8      A.  Again, can you be specific?
9      Q.  No.  That's my question.
10     A.  Well, I can't answer that, then.
11     Q.  Okay.  Did you read the parts of the Policy
12  Manual that related to your obligations as national
13  treasurer?
14     A.  I cannot be a hundred percent sure.
15     Q.  Okay.  Do you remember, while you were
16  national treasurer, working with an accounting firm
17  called Wood, Stephens & O'Neil?
18     A.  Yes.
19     Q.  Okay.  And was the person you dealt with there
20  primarily Hal O'Neil?
21     A.  Correct.
22     Q.  Okay.  Did you ever meet Mr. O'Neil in person?
23     A.  Yes.
24     Q.  And did you ever review documents that he or
25  his firm produced for APFA?

---

**17**

1      A.  When you say "documents," I mean, what
2  documents are we referring to?
3      Q.  Any.  Did you review any documents prepared by
4  Wood, Stephens, O'Neil?
5      A.  I review some documents.
6      Q.  Okay.  Did there ever come a point while you
7  were treasurer that you tried to replace him as -- as
8  the outside auditor for APFA?
9      A.  Not that I can recall.
10     Q.  Okay.  Did you ever, during your time in
11  office, have any reason to question the quality of his
12  work?
13     A.  No.
14     Q.  Okay.  Now, you're aware that Bob Ross --
15  strike that.
16         Bob Ross was president when you were
17  treasurer, at least at the beginning.  Right?
18     A.  Correct.
19     Q.  And you're aware that he stepped down in 2018?
20         MS. PHILLIPS:  Objection; form.
21     Q.  Are you aware of that?
22     Q.  That he stepped down?
23     A.  Yes.
24         MS. PHILLIPS:  Objection; form.
25     A.  Can you define "stepped down"?

---

**STRYKER REPORTING SERVICES**                          (817) 494-0700

**Bartos Decl. Ex. D**
6

Eugenio Vargas                                                    2/2/2024

---

**18**

1   Q.  Are you aware that he stopped being president
2   in 2018?
3          MS. PHILLIPS:  Objection; form.
4   A.  Again, stop -- can you define what "stop" is?
5   Q.  What does "stop" mean to you, sir?
6   A.  You stop doing something.
7   Q.  Okay.  Are you aware that Mr. Ross stopped
8   being president during 2018?  Yes or no?
9   A.  Yes.
10  Q.  Okay.  And you're aware that he did that
11  during the board of directors convention in Charlotte,
12  North Carolina --
13         MS. PHILLIPS:  Objection; form.
14  Q.  -- in 2018.  Right?
15  A.  I believe it was, yeah, the convention.
16  Q.  And you did not have any role in negotiating
17  the terms of the Transition Agreement that he entered
18  into.  Correct?
19  A.  Correct.
20         MS. PHILLIPS:  Objection; form.
21  Q.  That -- at the time in 2018, you didn't even
22  see the whole agreement that he entered into.  Is that
23  right?
24         MS. PHILLIPS:  Objection; form.
25  A.  Can you -- I mean, no, I did not see the whole

---

**19**

1   agreement.
2   Q.  All right.  Now, you stayed on as treasurer
3   even after Mr. Ross left office.  Correct?
4          MS. PHILLIPS:  Objection; form.
5   A.  Correct.
6   Q.  Okay.  And as treasurer you oversaw the
7   payments to Mr. Ross that he was due upon leaving
8   office.  Correct?
9          MS. PHILLIPS:  Objection; form, leading.
10  A.  Can you repeat the question?
11  Q.  If you could look at Exhibit 1, please, your
12  affidavit.  Maybe this will be easier.
13  A.  Where do you want me to look?
14  Q.  Look on -- at the bottom where it says
15  Appendix 58.
16  A.  Uh-huh.
17  Q.  And I would just direct you to, please, just
18  reread to yourself paragraph number 5.
19  A.  Okay.
20  Q.  You've read paragraph 5 on Appendix page 58?
21  A.  Yes.
22  Q.  Okay.  Does that refresh your recollection
23  about your role in the payments to Mr. Ross after he
24  resigned?
25  A.  Kind of.

---

**20**

1   Q.  Kind of does.  Okay.
2          Is what you attested to in paragraph 5
3   accurate?
4   A.  Yeah, it looks like it, yeah.
5   Q.  Well, let me just ask you.  You -- assuming
6   your -- this document was filed in court, and on the
7   first page it represents that you appeared personally
8   before a notary, were sworn, and stated the following
9   items, including paragraph 5.  Right?  And do you
10  remember swearing under oath that what is in this
11  document was true or not?
12  A.  Well, again, you're saying "this document."
13  I'm not a hundred percent sure this is the document that
14  I signed.  I mean, I will have to go back and see what I
15  signed.  I don't have that in front of me.
16         MS. PHILLIPS:  Let's take a break after
17  this question.
18  Q.  So you're not sure if this paragraph 5 is what
19  you signed or if it's true or not.  Is that what I'm
20  hearing?
21  A.  From -- from the document that I have in front
22  of me?
23  Q.  Yeah.
24  A.  No.
25  Q.  You're not sure?  You don't even know if it's

---

**21**

1   true --
2          MS. PHILLIPS:  We're taking a break.
3          MR. BARTOS:  I'm in the middle of a
4   question.
5   Q.  You don't even know if it's true, do you?
6          MS. PHILLIPS:  Answer the question.
7   A.  What's the question?
8   Q.  Do you know if what's in paragraph 5 on
9   Appendix page 58 is true?
10  A.  And, again, I said, from this document that
11  you have in front of me, I cannot say if it's true or
12  not.
13         MS. PHILLIPS:  Great.  We're done.
14  Break.  Thank you.
15         MR. BARTOS:  I guess we're going off the
16  record.
17         THE VIDEOGRAPHER:  We're off record at
18  10:59 a.m.
19         (Recess from 10:59 a.m. to 11:11 a.m.)
20         THE VIDEOGRAPHER:  We're back on record
21  at 11:11 a.m.
22  BY MR. BARTOS:
23  Q.  Mr. Vargas --
24         MS. PHILLIPS:  I want to take a brief
25  minute and at least state on the record that again I

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                                    2/2/2024

---

**22**

1  need to leave at 5:00. I need to pick up my children.
2          MR. BARTOS: Okay. We're going to try to
3  get it done. We'll use our seven hours, if we can. If
4  not, we'll have to resume.
5      Q. Mr. Vargas --
6          MR. BARTOS: I understand the 5:00.
7      Q. -- tell me about the process you went through
8  January 2nd to sign an affidavit in this case.
9      A. January 2nd?
10     Q. Uh-huh.
11     A. When I get an affidavit, I get an email with a
12  link, just an attachment of the affidavit itself. You
13  click on the link. It connects you to a notary public.
14  You have to prove who you are by showing them IDs. They
15  ask you a series of questions. I guess they do their
16  oath, and you sign, and it's done.
17     Q. Okay. Now, my question was, what did you do
18  on January 2nd, not what you do in general when you get
19  an affidavit.
20         Did you do those things on January 2nd, 2024?
21     A. I believe so, yes.
22     Q. Okay. And do you have a copy of the signed
23  document somewhere?
24     A. Yes.
25     Q. And you're not sure, sitting here today, if

---

**23**

1  that's the same document as what filed in court,
2  which is Exhibit 1?
3      A. Yes.
4      Q. "Yes," you're not sure?
5      A. I mean, I cannot be a hundred percent sure if
6  what I have is the same document that I have in front of
7  me, no.
8      Q. Okay. All right. Let's look at paragraph 5
9  in Exhibit 1.
10     Did you become aware in March 2018 that
11  Mr. Ross had signed a Transition Agreement?
12     A. Yes.
13     Q. Okay. Did you -- who is Mark Richard?
14     A. Legal counsel for APFA.
15     Q. Okay. And did Mark Richard show you portions
16  of the Transition Agreement?
17     A. Yes.
18     Q. Okay. Certain paragraphs only?
19     A. (Nodding head up and down).
20     Q. You have to answer verbally.
21     A. Yes.
22     Q. Okay. And those paragraphs addressed his
23  compensation. Is that right?
24     A. Correct.
25     Q. Okay. And, after seeing that -- those

---

**24**

1  paragraphs, you calculated the payments that were to be
2  made to Mr. Ross. Correct?
3          MS. PHILLIPS: Objection; form.
4      A. With help, yes.
5      Q. When you say it would help, what do you mean?
6      A. With help.
7      Q. With help. Okay. You were the treasurer?
8      A. Yes.
9      Q. Okay. You did the calculations?
10     A. With input, yes.
11     Q. Okay. I mean, this document that was filed in
12  court says, "I calculated the payments."
13     A. Uh-huh.
14     Q. Is that true?
15         MS. PHILLIPS: Objection.
16     A. But it also says, "In consultation with APFA
17  Accountant, Rene Berthelot."
18     Q. Okay.
19         MS. PHILLIPS: Objection. He's already
20  asked --
21     Q. So --
22         MS. PHILLIPS: -- and answered these
23  questions about this document. Asked and answered.
24     Q. And in -- in paragraph 5, you -- the filing
25  says, "I calculated the payments using this" --

---

**25**

1          MS. PHILLIPS: Objection; form.
2      Q. -- "using this total annual income including
3  the Meal Expense Allowance and the Special Assignment
4  Fee guaranteed stipends and then dividing the amount by
5  365." Do you see that?
6          MS. PHILLIPS: Objection; form.
7      A. I see it.
8      Q. Is that correct? Is that what you did?
9      A. Again, I don't know if this is the correct
10  document.
11     Q. I'm asking you, is that what you did?
12     A. In consultation with --
13         MS. PHILLIPS: Objection; form.
14         MR. BARTOS: Are you objecting to his
15  answer or the question?
16         MS. PHILLIPS: Objection. I'm objecting
17  to the way that you are asking these questions.
18     Q. Mr. Vargas, let me just ask you again.
19         This document filed in court says, "I
20  calculated the payments using this total annual income
21  including the Meal Expense Allowance and the Special
22  Assignment Fee guaranteed stipends and then dividing the
23  amount by 365." Do you see that?
24         MS. PHILLIPS: Objection; form.
25     A. I see that there, yeah.

---

**STRYKER REPORTING SERVICES**                            **(817) 494-0700**

Eugenio Vargas                                                                    2/2/2024

26

1   Q.  Okay.
2         MS. PHILLIPS:  Objection.
3   Q.  Is that what you did in 2018?
4         MS. PHILLIPS:  Objection.
5   A.  In consultation with Rene, yes.
6   Q.  Okay.  And, when the time came later in 2018
7   to calculate payments that were due to you, to Marcy
8   Dunaway, and Nena Martin, you used the same formula.
9   Correct?
10        MS. PHILLIPS:  Objection; form.  It's a
11  leading question.
12  A.  Again, in consultation with Rene Berthelot,
13  yes.
14  Q.  Okay.  Now, after you left office when your --
15  your term as treasurer ended, did you become aware at
16  some point that certain members had raised an issue with
17  the board of directors about the end-of-your-term
18  payouts?
19        MS. PHILLIPS:  Objection; form.
20  Q.  Do you remember learning about that?
21        MS. PHILLIPS:  Objection; form.
22  A.  Yes, I remember.
23  Q.  Okay.  And --
24  A.  Kind of.
25  Q.  Okay.  And, at the time of those complaints,

27

1   is it right that Lori Bassani was the president of APFA?
2         MS. PHILLIPS:  Objection; form.  You're
3   leading the witness.
4   A.  Yes, Lori Bassani was the president.
5   Q.  Okay.  And Lori Bassani was also a, like you,
6   legacy American flight attendant.  Right?  She was not a
7   legacy US Airways?
8         MS. PHILLIPS:  Objection; form.  You're
9   leading the witness.
10  A.  I believe so, yes.
11  Q.  Okay.  And, at the time after you, was Craig
12  Gunter the treasurer?
13        MS. PHILLIPS:  Objection; leading the
14  witness.
15  A.  At the time?
16  Q.  After you stopped being treasurer, Mr. Gunter
17  was treasurer.  Is that right?
18  A.  Yes.
19  Q.  Julie Hedrick and Erik Harris were not holding
20  any national office at that time, were they?
21        MS. PHILLIPS:  Objection; leading the
22  witness.
23  A.  They were not.
24  Q.  Okay.  Now, did you become aware or did you
25  learn from the APFA that the board of directors had --

28

1   in 2019 had determined that you and Ms. Dunaway and
2   Ms. Martin may have been overpaid at the end of your
3   term?
4         MS. PHILLIPS:  Objection.
5   Q.  Do you remember learning about that?
6         MS. PHILLIPS:  Objection; form.
7   A.  I learned from Craig.
8   Q.  Craig Gunter?
9   A.  Yes.
10  Q.  Okay.  How did Mr. Gunter communicate that to
11  you?  And what I mean is did he call you?  Did you get a
12  letter?
13  A.  I'm not a hundred percent sure.
14  Q.  Okay.
15  A.  I believe it was -- I don't know.
16  Q.  Okay.  And what is your recollection about
17  what Mr. Gunter told you?
18  A.  It's been so long.  I mean --
19  Q.  Okay.  Okay.  Do you remember learning about a
20  board of directors meeting that had decided that the
21  payments made at the end of your term were -- for
22  yourself, Ms. Martin, and Ms. Dunaway -- were
23  overpayments?
24        MS. PHILLIPS:  Objection; form, leading.
25  A.  I mean, I cannot say how I -- if I learned

29

1   from the board.  I cannot.
2   Q.  You don't remember that?  It's okay.  If you
3   don't remember, just tell me.
4   A.  Yeah, I mean, I don't.  I mean, it's been so
5   long.
6   Q.  Okay.  Do you remember receiving a series of
7   letters from APFA telling you that you -- you had made
8   an overpayment and you owed money back?
9   A.  I remember getting letters, yes.
10  Q.  Okay.  We can mark as Exhibit 3 --
11        MS. PHILLIPS:  I'm going to say
12  "Objection; hearsay" on any of these APFA documents.
13        (Deposition Exhibit 3 marked)
14  Q.  If you could look at Exhibit 3, please, and
15  tell me if this is one of the letters you received in
16  2019.
17        MS. PHILLIPS:  Objection; hearsay.
18  Q.  Do you remember receiving that letter,
19  Mr. Vargas?
20  A.  I remember receiving letters.  I cannot tell
21  you it's this exact letter.
22  Q.  Okay.  You don't remember if you received that
23  particular letter or not?
24  A.  This particular one, I cannot say.
25  Q.  And you received more than one letter in that

Eugenio Vargas                                                          2/2/2024

---

**30**

1   same rough time period about the overpayment?
2       A.   I mean, I --
3       Q.   We can mark as Exhibit 2 [sic] a letter dated
4   November 8th, 2019.
5           MS. PHILLIPS:  Objection; hearsay.
6           (Deposition Exhibit 4 marked)
7       Q.   And I'd ask you, Mr. Vargas, do you remember
8   receiving this letter?  If you can pass the extra to
9   your counsel, I'd appreciate it.  And I'll just say for
10  the record these were produced by your counsel in
11  discovery in this case.
12          Do you remember receiving the November 8th,
13  2019, letter?
14      A.   Are you going to let me read it or not?
15      Q.   Feel free.
16      A.   Okay.  I read it.
17      Q.   Okay.  Do you remember receiving that letter?
18      A.   I said earlier, I remember receiving letters.
19      Q.   I'm asking, do you remember receiving that
20  letter?
21      A.   Not this particular letter.  I cannot say that
22  it's a letter I received.
23      Q.   Okay.  The -- whether or not you received it,
24  the second paragraph refers to a meeting held on
25  October 30th, 2019, to allow you to review the

---

**31**

1   independent auditor's calculations.  Do you see that
2   sentence?
3       A.   Yes.
4       Q.   Okay.  Do you remember having a meeting on
5   October 30th, 2019?
6       A.   Yes.
7       Q.   Okay.  Where was that meeting?
8       A.   At O'Neil's office.
9       Q.   O'Neil, the auditor?
10      A.   Yes.
11      Q.   Okay.  And Craig Gunter was there, wasn't he?
12      A.   Yes.
13      Q.   Okay.  And what did you review at that
14  meeting?
15      A.   They gave us -- I think it was -- I think it
16  was a sheet of paper with calculations that they had
17  made.
18      Q.   Okay.  And did you ask questions about what
19  was on the -- in the calculations?
20      A.   Yes.
21      Q.   Okay.  And what was your view of those
22  calculations, about whether they were right or wrong?
23      A.   The amount that they were saying?
24      Q.   Correct.
25      A.   I didn't agree with them.

---

**32**

1       Q.   Okay.  Why not?
2       A.   They couldn't produce the formula they used to
3   produce those numbers.
4       Q.   Okay.  And the formula that you're talking
5   about is the formula that you had used for yourself as
6   well as for Mr. Ross earlier in the year, right?
7       A.   Can you --
8           MS. PHILLIPS:  Objection; leading.
9       A.   -- repeat that?
10      Q.   Sure.  You had used a formula to calculate the
11  vacation and sick payout for Mr. Ross.  Do you remember?
12      A.   (No answer).
13          MS. PHILLIPS:  Objection.
14      Q.   And you used the same formula for yourself,
15  Ms. Martin, and Ms. Dunaway.  Correct?
16          MS. PHILLIPS:  Objection; leading.
17      A.   In consultation with Rene, yes.
18      Q.   Okay.  And do you remember, in your meeting
19  with Mr. Gunter, telling him that -- or in connection
20  with that meeting where Mr. Gunter was present, telling
21  Mr. Gunter that if the calculation was wrong as to you
22  and Ms. Martin and Ms. Dunaway, it was also wrong as to
23  Bob Ross?
24          MS. PHILLIPS:  Objection; leading.
25      A.   I mean, I cannot be a hundred percent sure

---

**33**

1   that those were the same exact words that were used.
2       Q.   Uh-huh.  Okay.  But the gist of what I said --
3       A.   Yes.
4       Q.   -- you told Mr. Gunter?
5       A.   Yes.
6       Q.   And, in fact, you testified about that in your
7   Article VII arbitration to that conversation.  Right?
8           MS. PHILLIPS:  Objection; leading.
9       A.   I'll have to go back and review my transcript.
10      Q.   Okay.  We could look at the transcript and
11  figure that out.  Okay.
12      A.   (Nodding head up and down).
13      Q.   Ultimately, after a series of letters and
14  after your meeting, you did enter into a promissory note
15  agreement to pay back the money you had overpaid.
16  Correct?
17      A.   Yes.
18      Q.   Okay.  And, under that promissory note, you
19  agreed to pay back 22 consecutive payments.  Does that
20  sound right?
21          MS. PHILLIPS:  I think we need to take a
22  break, please.
23      A.   I can't answer that.  I mean, I would have to
24  look at the promissory note --
25      Q.   Okay.

---

**STRYKER REPORTING SERVICES**                ✷✷✷        (817) 494-0700

Eugenio Vargas                                                           2/2/2024

| 42 |
|---|
| 1   you get any -- an order in your favor from the |
| 2   arbitrator? |
| 3      A.  I don't remember what was the outcome, |
| 4   totally. |
| 5      Q.  Did you ever sue Mr. Morales in court? |
| 6      A.  No. |
| 7      Q.  Have you ever been a party in a lawsuit |
| 8   besides this case? |
| 9      A.  No. |
| 10     Q.  You've never sued any -- never sued anybody |
| 11  else? |
| 12     A.  No. |
| 13     Q.  Okay.  And you've never been sued by anybody? |
| 14     A.  I don't think so. |
| 15     Q.  Okay. |
| 16          MS. PHILLIPS:  Sir, I would like to take |
| 17  this moment and go back and allow the opportunity for |
| 18  Mr. -- no.  I think he needs to correct the record as to |
| 19  his testimony. |
| 20          MR. BARTOS:  No.  You can ask him |
| 21  questions when it's your turn.  Right now it's my turn. |
| 22          MS. PHILLIPS:  No.  I think that he needs |
| 23  to correct the record. |
| 24          MR. BARTOS:  No. |
| 25          MS. PHILLIPS:  Mr. Vargas -- |

| 43 |
|---|
| 1           MR. BARTOS:  I'm asking questions, not |
| 2   you. |
| 3           MS. PHILLIPS:  He needs to correct the |
| 4   record on his testimony for the promissory note. |
| 5           MR. BARTOS:  He is welcome to when he has |
| 6   a question in that regard from someone who has the power |
| 7   to question him.  You're not asking the questions right |
| 8   now. |
| 9           MS. PHILLIPS:  He's requested the |
| 10  opportunity to clear the record on the testimony for his |
| 11  promissory note. |
| 12          MR. BARTOS:  He'll be welcome to do so |
| 13  later.  Please stop interrupting my questioning. |
| 14  BY MR. BARTOS: |
| 15     Q.  Now, you were charged in 2020, under |
| 16  Article VII, by Melissa Chinery and Sandra Lee.  Is that |
| 17  right?  Do you remember that? |
| 18     A.  Charged, yes. |
| 19          MS. PHILLIPS:  I want a break after this |
| 20  question. |
| 21          MR. BARTOS:  We're not going to take more |
| 22  breaks. |
| 23          MS. PHILLIPS:  Yeah, we're taking a |
| 24  break.  I'm entitled to a break whenever the deponent |
| 25  wants a break. |

| 44 |
|---|
| 1           MR. BARTOS:  The deponent has not |
| 2   indicated he wants a break. |
| 3           THE WITNESS:  I want a break. |
| 4           MS. PHILLIPS:  His representative has |
| 5   indicated a break; so the deponent's representative is |
| 6   taking a break. |
| 7           MR. BARTOS:  And I repeat my objection to |
| 8   these repeated breaks. |
| 9           MS. PHILLIPS:  Well, you can -- on record |
| 10  you can object to it.  That's fine. |
| 11          MR. BARTOS:  And I have. |
| 12          MS. PHILLIPS:  That's fine.  But if |
| 13  you're not going to let him clarify his testimony that |
| 14  he is a second -- English is his second language.  It is |
| 15  not his first language.  He doesn't have a translator |
| 16  here.  He doesn't understand the words fully.  This |
| 17  is -- he is employed at American Airlines as a -- as a |
| 18  translator, for the love of God. |
| 19          He hasn't been given the opportunity for |
| 20  somebody who can translate the words fully, in his |
| 21  primary language.  And you're shotgunning questions at |
| 22  him, and you're not even allowing him the opportunity to |
| 23  go back and fully explain things that you have put in |
| 24  front of him. |
| 25          So I am going to go on record and state the |

| 45 |
|---|
| 1   fact that he would like the opportunity to state and |
| 2   explain a document that you put in front of him. |
| 3           MR. BARTOS:  Can I continue with the |
| 4   questioning, or are you taking a break? |
| 5           MS. PHILLIPS:  Are you going to allow him |
| 6   to clarify his testimony? |
| 7           MR. BARTOS:  I'm going to continue |
| 8   questioning. |
| 9           MS. PHILLIPS:  Are you going to allow him |
| 10  the opportunity to clarify his testimony? |
| 11          MR. BARTOS:  I'm going to ask questions, |
| 12  and he's going to answer them. |
| 13          MS. PHILLIPS:  Am I going to have to stop |
| 14  the deposition at this point? |
| 15          MR. BARTOS:  I'm going to -- |
| 16          MS. PHILLIPS:  Because, you know, |
| 17  yesterday was an appalling display of behavior on your |
| 18  part.  I have to -- I have to state that it was just |
| 19  embarrassing.  It was embarrassing. |
| 20  BY MR. BARTOS: |
| 21     Q.  Mr. Vargas, you learned in 2020 that you |
| 22  were -- had Article VII charges filed against you by |
| 23  Melissa Chinery and Sandra Lee.  Correct? |
| 24          MS. PHILLIPS:  Mr. Bartos -- |
| 25     Q.  Is that right? |

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

Eugenio Vargas                                                    2/2/2024

---

46

1        MS. PHILLIPS: -- are you going to allow
2 my client the opportunity to clarify the record --
3        MR. BARTOS: I am asking questions.
4        MS. PHILLIPS: -- as to his testimony?
5 Because I'm going to object that -- if you don't allow
6 him to clarify the record about his testimony on the
7 promissory note, then I'm going to object.
8        MR. BARTOS: You feel free to object.
9 I'm going to ask questions.
10   Q. Mr. Vargas --
11        MS. PHILLIPS: I am going to object, and
12 I'm going to take a break with my client.
13        MR. BARTOS: If you're going to get up
14 and leave, get up and leave. But I'm going to keep
15 asking questions.
16        MS. PHILLIPS: I'm going to stop the
17 deposition at this point because I think that you are
18 creating a circumstance that is hostile at this point.
19 This is not the way to conduct a deposition. You should
20 be investigating the actual facts. If you want to know
21 the facts as to what happened, then you should ask the
22 questions and find out the testimony.
23 BY MR. BARTOS:
24   Q. Mr. Vargas, are you prepared to continue with
25 your testimony?

---

47

1        MS. PHILLIPS: Don't address my client.
2 You can address questions at me when we are discussing
3 the matters before -- in this case.
4        MR. BARTOS: We are here for a
5 deposition, and I'm going to conduct the deposition.
6        MS. PHILLIPS: Correct. We are here for
7 a deposition, and we are discussing matters pertaining
8 to this case. So you and I can discuss and hammer out
9 issues relating to this case.
10        MR. BARTOS: You will have the full right
11 to ask Mr. Vargas whatever questions you want. I am
12 asking questions now. And I need to be permitted to ask
13 my questions.
14        MS. PHILLIPS: I think we need to stop.
15 I think we need to stop.
16        MR. BARTOS: I am not stopping.
17        MS. PHILLIPS: Well, I am. I am
18 stopping. And I think that we need -- at this point we
19 need to stop, and we can schedule something with the
20 Court and find out what -- what the next steps need to
21 be to come to a resolution on something as simple as a
22 confidentiality order, as something as simple as a
23 deposition and -- and whether or not a break needs to
24 take place, whether or not lunch needs to be 30 minutes
25 or -- or, you know, whether or not Mr. Ross can stand up

---

48

1 while you ask him questions and whether or not
2 Mr. Vargas can clarify his testimony on record.
3        Are you asking questions for purposes of
4 discovering what -- what actually happened, or are you
5 asking questions so that you can tilt the stage in your
6 favor?
7        MR. BARTOS: I'm here to take the
8 deposition as ordered by the Court, and I intend to keep
9 doing so as long as you're here.
10        MS. PHILLIPS: Well, unfortunately, I am
11 not of the opinion that we are going to ask questions
12 and not allow my client the opportunity to clarify a
13 response when English is not his primary language --
14        MR. BARTOS: He will have every
15 opportunity to answer --
16        MS. PHILLIPS: -- and he can't clarify a
17 response.
18        MR. BARTOS: -- when you get to ask
19 questions.
20        MS. PHILLIPS: If you're not going to
21 allow him to --
22        MR. BARTOS: I go first.
23        MS. PHILLIPS: Are you going to allow him
24 to clarify his testimony?
25        MR. BARTOS: You are welcome to ask any

---

49

1 questions you want when it's your turn. Please stop
2 interfering with my deposition.
3        MS. PHILLIPS: Are you going to allow him
4 to clarify his response?
5        MR. BARTOS: I've answered your question.
6        MS. PHILLIPS: You did not. You answered
7 my question --
8 BY MR. BARTOS:
9   Q. Mr. Vargas --
10        MS. PHILLIPS: -- with a different -- are
11 you going to allow him to clarify his testimony?
12        MR. BARTOS: Please stop interfering with
13 the deposition.
14        MS. PHILLIPS: I'm going to end this if
15 you don't allow him to clarify his testimony.
16        MR. BARTOS: Please stop interfering with
17 my deposition. You will have every right to ask him a
18 question when I'm done.
19        MS. PHILLIPS: You have -- you can answer
20 my question. Will you allow him to clarify his
21 testimony? If you don't, we're done.
22        MR. BARTOS: He is allowed to answer your
23 questions when you ask him your questions when I
24 finished.
25        MS. PHILLIPS: It's a yes-or-no question.

---

Eugenio Vargas                                               2/2/2024

---

**50**

1  Will you allow him to clarify his testimony?  Yes or no?
2         MR. BARTOS:  When you ask him
3  questions --
4         MS. PHILLIPS:  We're done.  Let's go.
5         MR. BARTOS:  -- he can testify what he
6  wants.
7      I object to your leaving.  I am going to ask
8  for --
9         MS. PHILLIPS:  I object to your, you
10 know -- I object to this entire situation.
11        MR. BARTOS:  We will seek full relief
12 from the Court.
13        (Ms. Phillips and the Witness exit
14        the room)
15        MR. BARTOS:  We can stop the record.
16 That's fine.
17        THE VIDEOGRAPHER:  Off the record at
18 11:47 a.m.
19        (Proceedings adjourned at 11:47 a.m.)
20        (Per Federal Rule of Civil Procedure
21        30(e)(1), signature was requested via
22        email by Counsel after completion of the
23        deposition)
24
25

---

**52**

1  true and correct, except as noted above.
2
3         _____
4  STATE OF _____ x         SIGNATURE OF WITNESS
5  COUNTY OF _____ x
6
7     Before me, _____, on this day
8  personally appeared EUGENIO VARGAS, known to me (or
9  proved to me under oath or through _____)
10 (description of identity card or other document) to be
11 the person whose name is subscribed to the foregoing
12 instrument and acknowledged to me that they executed the
13 same for the purposes and consideration therein
14 expressed.
15    GIVEN UNDER MY HAND AND SEAL of office this
16 _____ day of _____, 2024.
17
18
19
20    (Seal)      _____
21               Notary Public in and for the
21               State of _____.
22
23
24
25

---

**51**

1         CHANGES AND SIGNATURE
2  WITNESS NAME:  EUGENIO VARGAS, VOLUME 1
   DEPOSITION DATE:  FEBRUARY 2, 2024
3  PAGELINE        CHANGE/REASON
4  _____ _____
5  _____ _____
6  _____ _____
7  _____ _____
8  _____ _____
9  _____ _____
10 _____ _____
11 _____ _____
12 _____ _____
13 _____ _____
14 _____ _____
15 _____ _____
16 _____ _____
17 _____ _____
18 _____ _____
19 _____ _____
20 _____ _____
21 _____ _____
22 _____ _____
23 _____ _____
24    I, EUGENIO VARGAS, have read the foregoing
25 deposition and hereby affix my signature that same is

---

**53**

1      IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2            FORT WORTH DIVISION
3  EUGENIO VARGAS,         §
                           §
4  Plaintiff/              §
   Counterclaim Defendant, §
5                          §  Civil Action No.
   VS.                     §  4:22-cv-430-Y
6                          §
   ASSOCIATION OF          §  Judge Terry R. Means
7  PROFESSIONAL FLIGHT      §
   ATTENDANTS, et al.,     §
8                          §
   Defendants/             §
9  Counterclaim Plaintiff. §
10      REPORTER'S CERTIFICATION
11  VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS
12            VOLUME 1
13         FEBRUARY 2, 2024
14
15    I, Angela L. Mancuso, Certified Shorthand Reporter
16 in and for the State of Texas, hereby certify to the
17 following:
18    That the witness, EUGENIO VARGAS was duly sworn by
19 the officer and that the transcript of the oral
20 deposition is a true record of the testimony given by
21 the witness;
22    That the original deposition was delivered to
23 Ms. Kerri Phillips for examination and signature by the
24 witness;
25    That the time used by the parties is as follows:

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas                                                          2/2/2024

54

1   MS. KERRI PHILLIPS:  0 minutes
2   MR. JEFFREY A. BARTOS:  58 minutes
3       I further certify that pursuant to FRCP Rule
4   30(e)(1) that the signature of the deponent was
5   requested by the Counsel for the deponent after the
6   completion of the deposition and that the signature is
7   to be before any notary public and returned within
8   30 days from date of receipt of the transcript.  If
9   returned, the attached Changes and Signature page
10  contains any changes and the reasons therefor.
11      I further certify that I am neither attorney or
12  counsel for, nor related to or employed by, any of the
13  parties to the action in which this deposition is taken,
14  and further that I am not a relative or employee of any
15  attorney or counsel employed by the parties hereto, or
16  financially interested in the action.
17      Certified to me on this the 7th day of February,
18  2024.
19
20
21      ANGELA L. MANCUSO, CSR 4514
        Expiration Date: 10/31/24
22      Stryker Reporting
        Firm Registration No. 806
23      1450 Hughes Road, Suite 230
        Grapevine, Texas 76051
24      (817) 494-0700
25

**STRYKER REPORTING SERVICES**                   **(817) 494-0700**

Eugenio Vargas, Vol. 2                                    3/8/2024

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
                   FORT WORTH DIVISION

ROBERT (BOB) ROSS              §
                               §
VS.                            §   ACTION NO. 4:22-CV-343-Y
                               §
ASSOCIATION OF                 §
PROFESSIONAL FLIGHT            §
ATTENDANTS, ET AL.             §
                               §
AND                            §
                               §
EUGENIO VARGAS                 §
                               §
VS.                            §   ACTION NO. 4:22-CV-430-Y
                               §
ASSOCIATION OF                 §
PROFESSIONAL FLIGHT            §
ATTENDANTS, ET AL.             §
```

```
          ------------------------------------
              VIDEOTAPED ORAL DEPOSITION OF
                     EUGENIO VARGAS
                       VOLUME 2
                     MARCH 8, 2024
          ------------------------------------
```

        VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

-numbered cause on March 8, 2024, from 9:17 a.m. to

12:56 p.m., before Angela L. Mancuso, CSR No. 4514 in

and for the State of Texas, reported by machine

shorthand, at Gillespie Sanford LLP, 4803 Gaston Avenue,

Dallas, Texas, pursuant to the Federal Rules of Civil

Procedure, Notice, and any provisions stated on the

record.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                    3/8/2024

---

**56**

```
 1        A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
 4      MS. KERRI PHILLIPS
        K.D. PHILLIPS LAW FIRM, PLLC
        6010 West Spring Creek Parkway
 5      Plano, Texas  75024
        (972) 327-5800
 6      kerri@KDphillipslaw.com
 7
    FOR THE DEFENDANTS:
 8
        MR. JEFFREY A. BARTOS
 9      GUERRIERI, BARTOS & ROMA, P.C.
        1900 M Street, N.W.
10      Suite 700
        Washington, D.C.  20036
11      (202) 624-7400
        jbartos@geclaw.com
12
13  ALSO PRESENT:
14      Mr. Josh Black, APFA National Secretary
15      Mr. Adam Phillips, Paralegal
        K.D. Phillips Law Firm, PLLC
16
        Mr. John Hines, Videographer
17      Elite Video Productions
        3018 Commerce Street
18      Dallas, Texas 75226
        (214) 747-1952
19
20
21
22
23
24
25
```

---

**57**

```
 1             TABLE OF CONTENTS
                               PAGE
 2
    Appearances......................  56
 3
    EUGENIO VARGAS, VOLUME 2
 4
    Examination by Mr. Bartos.............  58
 5
    Changes and Signature.................  128
 6  Reporter's Certification..............  130
 7
             EXHIBITS
 8  NUMBER   DESCRIPTION              PAGE
 9  Exhibit 6  Article VII Charges - Vargas    105
              Post-Hearing Brief
10
    Exhibit 7  Affidavit of Eugenio Vargas in   109
11             Support of Motion for Summary Judgment
12
          PREVIOUSLY MARKED EXHIBITS
13  NUMBER    DESCRIPTION             PAGE
14  Exhibit 2  Plaintiff's Amended Complaint    69
15
16
17
18
19
20
21
22
23  REPORTER'S NOTE:
24      Quotation marks are used for clarity and do
        not necessarily reflect a direct quote.
25
```

---

**58**

```
 1            P R O C E E D I N G S
 2       (March 8, 2024, 9:17 a.m.)
 3       THE VIDEOGRAPHER:  This is Tape 1 in the
 4  video deposition of Eugenio Vargas.  Today is Friday,
 5  March 8, 2024.  We're now on record at 9:17 a.m.
 6       Will attorneys please introduce themselves for
 7  the record.
 8       MR. BARTOS:  Jeffrey Bartos, for the APFA
 9  defendants.
10       MS. PHILLIPS:  Kerri Phillips, for
11  Eugenio Vargas.
12       (Witness sworn by reporter)
13           EUGENIO VARGAS,
14  having been first duly sworn, testifies as follows:
15            EXAMINATION
16  BY MR. BARTOS:
17     Q.  Good morning, Mr. Vargas.  Thanks for being
18  back.
19       Since the date of your -- the start of your
20  deposition in early February, have you discussed your
21  deposition at all with anyone besides your lawyer?
22     A.  No.
23     Q.  Okay.  Since that time have you had any
24  discussion with Craig -- with Craig Gunter?
25     A.  Me personally?
```

---

**59**

```
 1     Q.  Yes.
 2     A.  No.
 3     Q.  Did you read Mr. Gunter's affidavit that was
 4  filed in court recently?
 5     A.  Briefly.
 6     Q.  Okay.  Did you disagree with anything that was
 7  in his affidavit?
 8     A.  Not that I can recall.
 9     Q.  All right.  Since the start of your deposition
10  on February 2nd, have you reviewed any documents related
11  to this litigation?
12     A.  Just the transcript.
13     Q.  Okay.  So you read your transcript of your --
14  the start of your deposition?
15     A.  Yes.
16     Q.  Okay.  Where -- just to back up, I should have
17  asked you this in the initial deposition, but what base
18  do you work from for American Airlines?
19     A.  Here, Dallas-Fort Worth.
20     Q.  Do you live here in Texas?
21     A.  Yes.
22     Q.  And in the course of your time as an American
23  Airlines flight attendant, did you serve on the APFA
24  Board of Directors at any point?
25     A.  Yes.
```

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                      3/8/2024

---

**60**

1    Q.  Okay.  And when did -- when was that?
2    A.  I started back in, I think it was 2000, as
3  the Boston International vice president, back then
4  vice chair.
5    Q.  Okay.
6    A.  Took a break.  Came back; I think it was 2002.
7  I think I did another two years as the same position,
8  base vice pres -- vice chair.  Then I came back in 2006.
9  Don't remember if I was the base vice chair when I came
10  back, but during that time I changed over to the
11  chairperson.
12    Q.  Okay.
13    A.  And that was all the way until 2000 -- can't
14  remember if it was '14 or '15 when we merged the bases.
15    Q.  Okay.  And just for clarity, my question was
16  directed as to whether you were on the board of
17  directors.
18         And, when you were the base chair, did that
19  put you on the board of directors?
20    A.  Yeah.
21    Q.  Okay.
22    A.  Well, I mean, as the vice chair you could sit
23  on the board, so you technically can.
24    Q.  Okay.  Just for clarity I just wanted -- so
25  you were base chair for one period of time, correct?

**61**

1    A.  Yeah.
2    Q.  Okay.  You were vice chair for a few different
3  periods of time?
4    A.  Yeah.  Well, I was chair, I guess, also, you
5  can say.  If you're going to not take one block as one,
6  then I was chair for several.
7    Q.  Okay.  In a row?
8    A.  Yeah.
9    Q.  Several in a row.  Okay.  Okay.  All right.
10         But the vice chair does not have official
11  position on the board of directors, does it?
12    A.  It's up to you to interpret it that way.  I
13  mean, if you get to sit on the -- if the chair is not
14  there, you're going to take that.  So ...
15    Q.  Okay.  Understood.  All right.  Now I want to
16  focus on the period of time when you were a national
17  officer.  And you were the treasurer, correct --
18    A.  Uh-huh.
19    Q.  -- of APFA?
20         And that was from April 1, 2016, until
21  March 31, 2018; is that right?
22    A.  No.
23    Q.  No?  What was your period of time as
24  treasurer?
25    A.  Can't remember if it was July that we -- if it

**62**

1  was the end of June, if it was the end of July of 2018.
2    Q.  Okay.  All right.  So you started April 1st,
3  2016?
4    A.  Yes.
5    Q.  And you ended end of July 2018?
6    A.  Either at the end of July or end of June.
7    Q.  Okay.  Definitely not March.  That was my
8  mistake.
9    A.  Yeah.
10    Q.  Okay.  Now, during that time period, the
11  April 2016 until, let's just say, July 2018, whenever
12  you left office, did you interact at all in person with
13  Joe Burns?
14    A.  I mean, can you define "interact"?
15    Q.  Were you ever in the same room with Joe Burns,
16  to your recollection?
17    A.  I think so.
18    Q.  Okay.  What would have been the context in
19  that time period?
20    A.  I mean, we had meetings.  I cannot be for sure
21  of that.
22    Q.  What role did Joe Burns have with APFA in the
23  time period April 2016 until July 2018?
24    A.  I'm not a hundred percent sure, to tell you
25  what exactly he did.  I know he was one of the -- the

**63**

1  lead negotiator for -- the lead lawyer for negotiations,
2  but I cannot tell you if he was actually doing it
3  through that time or not.
4    Q.  Okay.  Were -- was APFA in negotiations with
5  American in the period April 1, 2016, to July 31 --
6    A.  They were in the process.
7    Q.  Just let me finish the question so the court
8  reporter can -- can get down what we're each saying.
9  Okay.
10         So, to your best of your recollection, was
11  APFA and American Airlines in contract negotiations
12  during the time when you were national treasurer?
13    A.  Not in contract negotiations.  They were still
14  implementing the contract.
15    Q.  Okay.  And did Mr. Burns play any role in the
16  implementation process?
17    A.  I'm going to assume he did, I mean, with PBS
18  still being not completely there.
19    Q.  Okay.  Just for the record, PBS, that's
20  Preferential Bidding System?
21    A.  Yes.
22    Q.  Okay.  Now, do you remember in that time
23  period while you were treasurer Mr. Burns saying
24  anything negative about you?
25    A.  I don't recall.

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                        3/8/2024

|  | 64 |
|---|---|

1  Q.  Okay.  Do you recall in that time period you
2  saying anything negative about Mr. Burns?
3  A.  Not that I can recall right now.
4  Q.  And, during that same time period when you
5  were treasurer, did you know Melissa Chinery?
6  A.  Knew the name.
7  Q.  Beyond just knowing her name, did you know her
8  in any other way?
9  A.  No.
10  Q.  I'm sorry.  You're shaking your head no?
11  A.  I said no.
12  Q.  And do you remember in that time period that
13  you were treasurer, Ms. Chinery saying anything negative
14  about you personally?
15  A.  I mean, just about me, no.  But, I mean, on
16  the administration, yes.
17  Q.  Okay.  And what do you recall her saying about
18  the administration that was negative while you were
19  treasurer?
20  A.  She was -- Bob, I think, was to take us out of
21  office, something to that nature.
22  Q.  Now, I think the record shows there is a
23  statement by Ms. Chinery saying she was going to work to
24  get Bob out of office, Bob Ross.
25      Do you remember any statement saying she

|  | 65 |
|---|---|

1  wanted to get the entire administration out of office?
2  A.  That might have been something on Facebook.  I
3  don't -- I cannot be a hundred percent sure if she said
4  the whole, but, yeah.
5  Q.  Okay.  And do you recall in that same time
6  period, again, while you were treasurer, okay, you
7  saying or writing anything negative about Ms. Chinery?
8  A.  No.
9  Q.  Do you recall during the beginning of your
10  administration, 2016, there being any dispute or
11  conflict between Mr. Ross and the AFA regarding
12  potential merger or potential raid or anything of that
13  nature?
14  A.  I remember us writing a letter that was
15  delivered to -- I think her name is Sara Nelson.
16  Q.  Okay.  So you remember signing -- having a
17  letter that was written?
18  A.  Yes.
19  Q.  Okay.  And do you think -- and do you recall,
20  other than that letter -- and did you sign the letter?
21  A.  Yes.
22  Q.  Okay.  Do you recall, other than that letter,
23  you personally putting your name to anything
24  communicated to AFA opposing a merger or raid or
25  anything of that nature?

|  | 66 |
|---|---|

1  A.  I don't remember if when I was the chairperson
2  we did send something in writing, but we did talk about
3  it in a lot of meetings.
4  Q.  When you say "chairperson," what do you mean?
5  A.  The Boston International base chair.
6  Q.  Okay.  So you were Boston International base
7  chair before you became treasurer?
8  A.  Before, yeah.
9  Q.  Okay.  So I'm talking about while you were a
10  national officer while you were treasurer.
11      So you remember having some discussions before
12  becoming a national officer --
13  A.  Yes.
14  Q.  -- about AFA.
15      And then you testified to a letter that you
16  signed that went to Sara Nelson, I believe?
17  A.  Yes.
18  Q.  And I'm asking if you remember anything after
19  that that you put in writing?
20  A.  Oh, after that?
21  Q.  Yes.
22  A.  I don't recall anything else.
23  Q.  Okay.  And just for context, when you were
24  Boston International base chair, was that before the
25  American/US Airways merger?

|  | 67 |
|---|---|

1  A.  Yes.
2  Q.  Okay.  Now --
3  A.  Yes and no.  Because I was still -- I was
4  still the chairperson during the actual merger.
5  Q.  Okay.  Fair enough.
6  A.  I want to clarify that.
7  Q.  Appreciate that.  Sometimes those dates -- I
8  get mixed up in my head what happened when.  So
9  appreciate it.
10      Now, are you aware that your attorney filed a
11  motion for summary judgment in this case in -- about
12  March 1st of this year?
13  A.  Yes.
14  Q.  Okay.  And are you aware that there was an
15  affidavit by you that was filed supporting that motion?
16  A.  Yes.
17  Q.  And do you recall that there was an earlier
18  motion for summary judgment filed back in January, prior
19  to your -- the first part of this deposition?
20  A.  Yes.
21  Q.  Okay.  And at the time -- just going back to
22  the first motion, so the -- there was a motion filed in
23  January before your deposition.  At the time you filed
24  your affidavit, had you read the -- the memorandum
25  supporting the motion for summary judgment?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                      3/8/2024

---

**68**

1    A.  Yes.
2    Q.  Okay.  And, when the motion or a modified
3  version of the motion was filed in March, do you
4  recall -- did you read the supporting memorandum before
5  it was filed?
6    A.  I believe I did.
7    Q.  Okay.  Are you aware, Mr. Vargas, that you're
8  suing Julie Hedrick for fraud?
9    A.  Yes.
10   Q.  Okay.  And you're aware that you're also suing
11 Erik Harris for fraud?
12   A.  Yes.
13   Q.  Okay.  And just in your own words, what would
14 you describe as the fraud that Ms. Hedrick committed
15 towards you or against you?
16   A.  I mean, I will have to go back and read
17 exactly what I put.
18   Q.  Okay.  Well, I'm asking you right now what's
19 your understanding.
20   A.  Again, I will have to go back and read what
21 I -- I don't want to say something that I did not put.
22   Q.  Okay.  So, if we wanted to see -- when you say
23 that you put, you mean that was in the complaint in this
24 case?
25   A.  Yes.

---

**69**

1    Q.  Okay.  I'm going to show you, Mr. Vargas, a
2  document that we marked back in February as Exhibit 2.
3  Let me know once you've had a chance to look at it.  My
4  first question will be, is that your understanding
5  that's your amended complaint in this case?
6    A.  (Reading document).
7    Q.  All right.  So, Mr. Vargas, you've had a
8  chance to review Exhibit 2?
9    A.  Yes.
10   Q.  Okay.  Are you aware this is the amended
11 complaint that you filed against the APFA, Ms. Hedrick,
12 and Mr. Harris?
13   A.  It looks like it.
14   Q.  Okay.  I want to direct your attention in
15 particular to page number -- written at the top -- it
16 says page 9 of 12.  At the top of that page, in the
17 black ink, there is a Roman numeral VIII, and it says,
18 Claim:  Breach of Union Constitution.  Do you see that?
19   A.  Yes.
20   Q.  And, if you look down further, there is a
21 Roman numeral IX, and it says, Claim:  Common Law Breach
22 of Fiduciary Duty and Fraud.  Do you see that?
23   A.  Yes.
24   Q.  Okay.  And I want to ask you some questions
25 about the particular allegations that are on the next

---

**70**

1  page, which is -- it says page 10 of 12 at the top.  And
2  I want to direct your attention in particular to
3  paragraph 49, which is the first numbered paragraph on
4  that page.  Do you see it?
5    A.  Uh-huh.
6    Q.  And that reads, "Defendants, APFA, the
7  national officers, in-house and outside counsel for APFA
8  all made statements that were material that Ross was
9  overpaid and Vargas was responsible for the overpayment
10 to Ross."  Do you see that?
11   A.  I do.
12   Q.  Okay.  And what, to your knowledge, is the
13 alleged overpayment you're referencing in paragraph 49?
14   A.  Ross Transition Agreement.
15   Q.  I'm sorry?
16   A.  Ross Transition Agreement.
17   Q.  Okay.  Do you mean payments under the Ross
18 Transition Agreement?
19   A.  Yes.
20   Q.  Okay.  And what were the overpayments under
21 the Ross Transition Agreement that were -- that were
22 alleged to have been made?
23   A.  The total that was paid to him.
24   Q.  Okay.  And what is your understanding about
25 what was the statement about why that was an

---

**71**

1  overpayment?
2    A.  APFA claims that they were not paid within the
3  guidelines of the Transition Agreement.
4    Q.  That Ross was not paid?
5    A.  Yeah.
6    Q.  Okay.  Do you have anything more specific,
7  besides that general statement, about what the claim
8  was, what APFA, in-house and outside counsel, and
9  national officers were stating?
10   A.  No.
11   Q.  Okay.  And you say in this paragraph 49 that
12 the national officers as a group made such statements.
13 And I'm wondering what statements?  Are you referring to
14 every single one of the national officers currently in
15 office or just some of them?
16   A.  All of them.
17   Q.  Okay.  And when you write -- or your complaint
18 alleges that in-house counsel made such statements,
19 which in-house counsel are you referring to?
20   A.  I don't have the -- list of their -- I
21 know -- I can remember one of them was Susannah Bender.
22 I don't remember the other names.
23        (Reporter clarifying)
24   Q.  Okay.  All right.  And what outside counsel
25 are you referring to in paragraph 49?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                                    3/8/2024

---

**72**

1    A.  I cannot think of his name right now.
2    Q.  Okay.  The -- so just for clarification, you
3  were alleging that all of the national officers, that
4  Julie Hedrick, Erik Harris, Josh Black, and Larry
5  Salas -- those are the national officers, right?
6    A.  Yes.
7    Q.  That all of them, also Ms. Bender, also
8  another outside counsel -- you're not sure of the name;
9  it's a male, a man -- all made statements that Ross was
10  overpaid and that you were responsible for the
11  overpayment?
12    A.  Yes.
13    Q.  Okay.  And I'm wondering, to the extent you
14  can, what exactly were the statements that Ms. Hedrick
15  made to that effect?
16    A.  Can't recall right now.
17    Q.  Okay.  What exactly were the statements that
18  Mr. Harris made to that effect?
19    A.  Can't recall right now.
20    Q.  All right.  Same question for Mr. Black.  What
21  exact statements --
22    A.  Can't recall right now.
23    Q.  Let me just -- let me just -- we need to make
24  the record.  That's all.  Okay.
25        What exact statements did Mr. Black make to

---

**73**

1  that effect?
2    A.  I can't recall right now.
3    Q.  Okay.  Is your answer the same for Mr. Salas?
4    A.  Yes.
5    Q.  Okay.  And is your answer the same for
6  Ms. Bender?
7    A.  Yes.
8    Q.  Okay.  Is your answer the same for the outside
9  counsel whose name you can't remember?
10    A.  Yes.
11    Q.  Okay.  All right.  Do you remember to whom
12  those statements were made by any of these individuals?
13    A.  I can't recall.
14    Q.  And were any of these statements, to your
15  knowledge, made in writing?
16    A.  I can't recall.
17    Q.  Were any of them made orally, spoken?
18    A.  I can't recall.
19    Q.  Okay.  And do you have an understanding, in
20  the allegation of paragraph 49, that all these people
21  made statements that were "material"?  I know you're not
22  a lawyer.  I'm just asking do you have an understanding
23  of what was the meaning of "material" in your complaint
24  that you filed?
25    A.  I'm going to say that's attorney language.

---

**74**

1  So, I mean, it might mean something else to me, mean
2  something else to you.  So it might be the same thing,
3  but, yeah.
4    Q.  Okay.  With that being said, what is your
5  understanding of what "material" means?
6    A.  Something that's clue, important.
7    Q.  Now, you're aware that the Article VII
8  arbitrator found that Mr. Ross was overpaid.  You're
9  aware of that?
10    A.  That's what he put in his arbitration award.
11    Q.  Right.  The arbitration decision --
12    A.  Yes.
13    Q.  -- for Mr. Ross said Mr. Ross was overpaid?
14    A.  Uh-huh.
15    Q.  Okay.  And do you recall from Mr. Gunter's
16  affidavit that you reviewed that he said there was a
17  determination that you, Marcy Dunaway, and Nena Martin
18  had also been overpaid?  Do you remember that?
19    A.  Yes.
20    Q.  Okay.  And the payment to Mr. Ross, which the
21  arbitrator found was an overpayment, was a payment that
22  you authorized, right?
23    A.  In conjunction with the accounting department,
24  yes.
25    Q.  You consulted with the accounting department?

---

**75**

1    A.  Yes.
2    Q.  You were the treasurer at the time of that
3  overpayment, though, right?
4    A.  Yes.
5    Q.  Now, I'd like you to look at paragraph 50.
6  Now, in paragraph 49 you refer to statements that were
7  alleged to be material.  Okay.  And in paragraph 50 the
8  allegation is that there were statements made that were
9  false.  Do you see that?
10    A.  Yes.
11    Q.  Okay.  All right.  And just to read that into
12  the record, it says, "Defendants, APFA, the national
13  officers, in-house and outside counsel for APFA violated
14  their fiduciary duty because they made false statements
15  to Ross, Vargas and third parties regarding debt that
16  Plaintiff paid to Ross that he was owed under Ross's
17  Transition Agreement."  Do you see that?
18    A.  I see that.
19    Q.  Okay.  Now, when you refer in paragraph 50 to
20  the national officers, in-house and outside counsel, are
21  those the same people that you described in paragraph 49
22  that you just testified to?
23    A.  Yes.
24    Q.  Okay.
25    A.  In addition to the debt collector.

---

**STRYKER REPORTING SERVICES**                          **(817) 494-0700**

Eugenio Vargas, Vol. 2                                         3/8/2024

---

76

1    Q.  Okay.  Well, I'm just looking at where you
2  describe APFA, the national officers, in-house and
3  outside counsel.  Do you see that?
4    A.  Yes.
5    Q.  Okay.  So national officers, that's
6  Ms. Hedrick, Mr. Harris, Mr. Black, and Mr. Salas?
7    A.  Unless they changed from paragraph 49 to 50,
8  yes, they are --
9    Q.  I'm just asking --
10    A.  -- they are the national officers.
11    Q.  Okay.  Okay.  And in-house counsel, is that
12  Ms. Bender again?
13    A.  Yes.
14    Q.  And outside counsel, who is that outside
15  counsel referred to in paragraph 50?
16    A.  I told you earlier I cannot remember --
17    Q.  Okay.
18    A.  -- the exact name.
19    Q.  Okay.  So -- all right.
20    A.  And in-house -- Bender was one of the
21  in-house.  They had several throughout this.  So ...
22    Q.  Okay.  The only one you can remember offhand
23  is Ms. Bender?
24    A.  From her -- her name, yeah.
25    Q.  Okay.  Okay.  All right.  Now, you allege in

---

77

1  paragraph 50 that these people made false statements.
2    A.  Yes.
3    Q.  Okay.  And they made false statements, you
4  say, to Mr. Ross, and they made false statements to you.
5  Is that right?
6    A.  Uh-huh.
7    Q.  And they made false statements to third
8  parties?
9    A.  Yes.
10    Q.  Okay.  Now, do you remember what false
11  statements were being made to you?  What is your claim
12  as to what were the false statements made to you?
13    A.  That I overpaid Ross.
14    Q.  Okay.  Okay.  And was the overpayment the
15  overpayment under the Transition Agreement?
16    A.  Correct.
17    Q.  Okay.  And who were the third parties that you
18  allege that false statements were made to in this
19  paragraph?
20    A.  The -- I forgot the name -- the firm's name,
21  but it's the debt collector that APFA uses.
22    Q.  Okay.  Okay.  So are you claiming that Julie
23  Hedrick made a false statement to the debt collector?
24    A.  Yes.
25    Q.  What did she say to the debt collector that

---

78

1  was false?
2    A.  What did she say?
3    Q.  Yeah, to the debt collector.  You said she
4  made -- Julie Hedrick made a false statement to the debt
5  collector.  So I'm asking you what was the false
6  statement that Ms. Hedrick made to the debt collector?
7    A.  That the O'Neil firm, company, said that the
8  payments made to Ross were within the Transition
9  Agreement.
10    Q.  Okay.  So Julie Hedrick told the debt
11  collector what you just said?
12    A.  Well, she knew about it.
13    A.  She knew about what?
14    A.  About the letter --
15    Q.  Okay.
16    A.  -- that O'Neil sent to APFA.
17    Q.  I'm asking you -- you're suing Julie Hedrick
18  and other people for fraud.
19    A.  Uh-huh.
20    Q.  Okay.  And you say in paragraph 50 that Julie
21  Hedrick and other people made false statements to
22  certain people.
23    A.  Yes.
24    Q.  And I'm trying to figure out who said what to
25  who.  Okay.  And you're telling me that Julie Hedrick

---

79

1  made a false statement to the debt collector.  And I'm
2  just trying to find out what was the false statement and
3  where could I find it.
4    A.  There is a memo that O'Neil sent APFA where it
5  says that payments made to Bob was within the Transition
6  Agreement.
7    Q.  Okay.  Was --
8    A.  And it was -- it was addressed to all four
9  national officers.
10    Q.  Okay.  And where is the -- what is the
11  statement from Julie Hedrick to the debt collector that
12  is false?  I'm just trying to find out where is the
13  statement that you're alleging in the complaint.
14    A.  Uh-huh.  I cannot answer that right now, right
15  here, this spot.
16    Q.  Okay.  Just for clarity, the debt collector
17  never came after you to collect a debt, did they?
18    A.  Because I paid it.
19    Q.  Okay.  My question was, did a debt collector
20  ever come after you to collect a debt?
21    A.  No.
22    Q.  Okay.  And your allegation about false
23  statements in paragraph 50 is about money that Mr. Ross
24  might have owed or maybe didn't owe, depending on who
25  you believe?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                    3/8/2024

---

80

1    A.  Uh-huh.
2    Q.  Okay.  It's not about a debt that you owe?
3    A.  No.
4    Q.  Okay.  All right.  Do you know what false
5  statements you're alleging were made by Erik Harris to a
6  debt collector?
7    A.  Well, again, that memo from O'Neil saying that
8  Bob was paid within his Transition Agreement.
9    Q.  The memo is a statement from O'Neil, right?
10   A.  Yeah.
11   Q.  It's not a statement from Harris.  Okay.
12       So my question is, what is the statement by
13 Harris to a third party that you're claiming was false?
14   A.  That Bob owed the money.
15   Q.  Okay.  And what exactly did Mr. Harris say to
16 the debt collector about that?
17   A.  I will have to go back and read exactly what
18 we have.
19   Q.  Okay.  Now, what about Mr. Black, Josh Black?
20 Let -- let me just ask a question.
21       What are you alleging was a false statement
22 made by Mr. Black to a third party?
23   A.  Same.  That they all knew that Bob was paid
24 within the Transition Agreement, according to Hal
25 O'Neil.

---

81

1    Q.  Okay.  But I'm not asking about what they
2  knew.  I'm asking what was the alleged false statement?
3    A.  I will have to go back.  I cannot answer that
4  right here, right now.
5    Q.  Okay.  And I'm going to ask you the same
6  question about Mr. Salas, Larry Salas.
7        What was the false statement you claim he made
8  to a third party in this paragraph?
9    A.  And I will give you the same answer.
10   Q.  And your answer is what?
11   A.  That Hal O'Neil said that Bob was paid within
12 the Transition Agreement.
13   Q.  That's what Mr. Salas told the third party?
14   A.  I cannot give you exactly that wording.
15   Q.  Okay.  All right.  And let me ask you about
16 the in-house counsel.  Maybe it was Ms. Bender; you're
17 saying maybe it was somebody else; you're not sure.
18 Okay.
19       That -- whoever that person was you're
20 claiming made a false statement to a third party
21 regarding debt that you paid to Ross under the
22 Transition Agreement, what is the false statement that
23 the in-house counsel made to the third party?
24   A.  Same.  Knew that the Transition Agreement was
25 paid within what it said.

---

82

1    Q.  Okay.  And that -- what was the false
2  statement?
3    A.  That Bob was overpaid and not paid within what
4  it said.
5    Q.  And that's the same payment that the
6  arbitrator found that Bob was overpaid?
7    A.  Yes.
8    Q.  Okay.  And I'm sorry to be repetitive, but
9  there is a list of a long number of people here, so I'm
10 going to ask you for each of them.
11       In paragraph 50 you're saying you're not sure
12 who was the outside counsel you're referring to?
13   A.  Correct.
14   Q.  And what is your understanding of what
15 this outside counsel said to the third party regarding
16 this overpayment?
17   A.  The payments made to Bob were outside of his
18 Transition Agreement.
19   Q.  Okay.  Is the outside counsel the counsel who
20 represented the debt collector, or is it outside counsel
21 who represented APFA?
22   A.  That part I don't know, if it's -- if they
23 represented the debt collector or not.
24   Q.  Okay.  But bottom line with paragraph 50, just
25 to summarize, if I can, the misstatement or false

---

83

1  statement is that Mr. Ross was overpaid under the
2  Transition Agreement.  Is that correct?
3    A.  Can you repeat that again?
4    Q.  Sure.  I just want to boil down paragraph 50
5  into -- into one concept.  And maybe we can't.  Okay.
6        But is it fair to say that what you're
7  alleging in paragraph 50 was that all these people --
8  the Union, all the national officers, in-house counsel
9  and outside counsel -- all falsely told the debt
10 collector that Ross had been overpaid under the
11 Transition Agreement and that you had authorized the
12 overpayment?
13   A.  According to Hal O'Neil's information, yes.
14   Q.  Okay.  And so just for clarity, your -- your
15 view is that Mr. O'Neil's memo is what proves that these
16 statements were all false?
17   A.  Correct.
18   Q.  Okay.  All right.  I want you to look at
19 paragraph 51, and I want to draw your attention to a
20 sentence about in the middle where you say, "The
21 national officers' statements made to the APFA Board of
22 Directors were defamatory and fraudulent."  Do you see
23 that?
24   A.  Yes.
25   Q.  Okay.  And, again, when you are alleging

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                    3/8/2024

---

84

1  conduct and statements by the national officers, you
2  mean every single one of the national officers --
3  Hedrick, Harris, Black, and Salas?
4      A. Yes.
5      Q. Okay. What statements were made by Julie
6  Hedrick to the APFA Board of Directors that you claim
7  were defamatory?
8      A. I cannot give you specifics right now. I
9  don't have them in front of me.
10     Q. Okay. Were those statements, to your
11 understanding, in writing, or were they oral?
12     A. Oral, I believe.
13     Q. Spoken?
14     A. Yes.
15     Q. Okay. When was --
16     A. And let me back up here. I'm going to also
17 add, in writing. Again, I don't have everything here in
18 front of me. I don't want to say oral and then have
19 something in writing.
20     Q. Okay. What exact -- so you don't recall
21 exactly what it is that Ms. Hedrick said to the board of
22 directors that you claim was defamatory?
23     A. Not -- no, I don't have it in front of me.
24     Q. And do you know exactly what is it you're
25 claiming that Mr. Harris said to the board of directors

---

85

1  that you claim was defamatory?
2      A. I'm going to give the same answer. I don't
3  have it in front of me.
4      Q. Okay. And for both those people you don't
5  know when they made those statements; is that right?
6      A. I cannot give you a date right here --
7      Q. Okay.
8      A. -- right now.
9      Q. And for Josh Black it's your contention that
10 he made statements to the board of directors that were
11 defamatory?
12     A. Again, my answer is yes.
13     Q. Okay. And they were defamatory about you?
14     A. Yes and no.
15     Q. What do you mean, "yes and no"?
16     A. Again, without having them here. But, if
17 you're charging me with overpaying someone, as an
18 example, and that not being true ...
19     Q. Okay. So the defamation would be saying that
20 you overpaid Mr. Ross?
21     A. That could be interpreted that, yes.
22     Q. Okay. And that's the overpayment that the
23 arbitrator found was an overpayment, in the arbitrator's
24 view, correct?
25     A. Correct.

---

86

1      Q. Okay. Then, lastly, Mr. Salas. Do you have
2  any recollection of what are the statements Mr. Salas
3  made to the board of directors that you claim were
4  defamatory?
5      A. I don't have them in front of me right now.
6      Q. That wasn't my question, whether you have them
7  in front of you. My question is, do you recall what
8  they are?
9      A. And, again, I don't have them in front of me
10 to tell you exactly what they are.
11     Q. Okay. So the answer is right now you can't
12 recall?
13     A. No.
14     Q. Okay. What would help you to recall what
15 those statements were?
16     A. I will have to go back and go through my notes
17 and ...
18     Q. Okay. Do you know -- have all your notes been
19 produced in the course of this litigation to the
20 defendants?
21     A. I'm going to assume that they have.
22     Q. Okay. So, if I look through all the documents
23 that were produced, I might find those statements in
24 your notes; is that right?
25     A. You mean, like, my specific notes or --

---

87

1      Q. Yeah, the notes you just testified you'd have
2  to look back at your notes. I'm trying to figure out
3  what it is I should look for.
4      A. Well, I mean, all the papers we have from this
5  case.
6      Q. Okay. Now, you're aware that Mr. O'Neil had
7  calculated overpayments -- overpayment amounts that you
8  had paid to yourself, to Ms. Dunaway, and to Ms. Martin,
9  right?
10     A. Yes.
11     Q. Okay. And each of you repaid those amounts,
12 correct?
13     A. I mean, I could speak for myself.
14     Q. Okay.
15     A. After being threatened with a lawsuit and
16 saying that if I made the payments, APFA would not file
17 a lawsuit against me, yes, I made payments.
18     Q. Okay. And Mr. Gunter testified in his
19 affidavit that you had -- you had made an overpayment to
20 yourself, right?
21     A. Yeah.
22     Q. And that's an affidavit that you and your
23 lawyer submitted to the Court in this case, right?
24     A. Correct.
25     Q. Okay. And you're aware that Mr. O'Neil had

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                        3/8/2024

88

1 calculated an overpayment regarding the same issue
2 regarding Mr. Ross?
3     A.  Not according to the memo that I read.
4     Q.  What about according to the charge attached to
5 the memo?  Did you ever see those?
6     A.  I don't know.  I can't recall right now.
7     Q.  But you paid Mr. Ross on the same basis that
8 you paid yourself, in terms of using SEA --
9     A.  And, again --
10     Q.  -- is that right?
11     A.  -- consulting with the accounting department.
12     Q.  You used the same formula for yourself, for
13 Ms. Martin, Ms. Dunaway, and for Mr. Ross, right?
14     A.  Correct.
15     Q.  Okay.  I don't have any more questions about
16 that right now.
17         On February 2nd when you were being deposed
18 in this case, you answered some questions about an
19 Article VII proceeding in which you were a participant.
20 Do you remember that?
21     A.  Yes.
22     Q.  Okay.  I'm sorry.  Not the -- not the one that
23 your -- not the one that's in this lawsuit.  An earlier
24 Article VII involving -- let me get the name right --
25 Morales.  Do you remember that?

89

1     A.  Yes.
2     Q.  Okay.  So just to reset, reorient myself,
3 Mr. Morales had charged you under Article VII with
4 something, right?
5     A.  Yes.
6     Q.  Okay.  Do you remember now, sitting here
7 today, what those charges were about?
8     A.  I did not go back after that to review that.
9     Q.  Okay.
10     A.  Didn't know that I had to.
11     Q.  No, you didn't have to do anything.  I'm just
12 trying to know what you remember, sitting here today.
13 Okay.
14         And, after Mr. Morales had filed charges
15 against you, you in turn filed charges against
16 Mr. Morales.  Do you remember that?
17     A.  Yes.
18     Q.  Okay.  And do you remember today the outcome
19 of your charges against him?
20     A.  Not completely.  I cannot remember if it was
21 dismissed, what exactly, no.
22     Q.  Okay.  You're not sure what happened with
23 your charges against him?
24     A.  No.
25     Q.  Do you remember if he was issued any form of

90

1 discipline?
2     A.  No.
3     Q.  You don't remember?
4     A.  No, no, he did not.
5     Q.  Okay.  He was not disciplined in any way --
6     A.  No.
7     Q.  -- by the arbitrator?  Okay.  All right.
8         Now, focusing on the time when you were a
9 national officer -- so April 1st, 2016, to July 31st,
10 2018 -- were you involved in any Article VII proceeding
11 whatsoever in that time period?
12     A.  Okay.  Can you define what you're trying to
13 ask.
14     Q.  Okay.
15     A.  I'm not understanding you.
16     Q.  Okay.  And you're familiar that the APFA
17 Constitution has an Article VII?
18     A.  Yes.
19     Q.  And that Article VII involves the bringing of
20 charges or potential discipline internally within the
21 APFA?
22     A.  Yes.
23     Q.  Okay.  And so my question is, while you were
24 in national office in just that period of time,
25 April 2016-July 2018, whether you were involved in any

91

1 Article VII proceedings during that -- during your term
2 of office.
3     A.  Okay.  Are you asking me if I was sitting on
4 the EC and proceeding -- and Article VII charges came
5 forward?
6     Q.  No.  Let me ask you first.  Were you -- did
7 anybody file charges against you in that time period?
8     A.  You just said Sam Morales did.
9     Q.  No.  So while you were a national officer, the
10 Morales charges took place then?
11     A.  Yes.
12     Q.  Okay.  I thought it was before.  My apologies.
13 Okay.
14         So, other than the Morales proceedings, were
15 you a party in any Article VII proceeding during your
16 time in office?
17     A.  On the charges against Morales.
18     Q.  Other than that?  Besides those?
19     A.  No.
20     Q.  Okay.  You were -- in that time period again
21 you were treasurer, right?
22     A.  Yes.
23     Q.  What's the treasurer's role -- or what was it
24 at that time?  What was the treasurer's role in
25 administering the Article VII process?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                    3/8/2024

92

1    A.  Well, you are an EC member.  Charges will come
2  in front of you to check for three things:  Timing --
3  timeliness, specif -- they're specific, and there is
4  another one.  And I think valid might be the other one.
5    Q.  Okay.  Okay.  So as treasurer you sat on the
6  Executive Committee?
7    A.  Yes.
8    Q.  Okay.  And the Executive Committee has a role
9  in the Article VII process?
10    A.  Yes.
11    Q.  Okay.  And other than -- and I'm going to get
12  to that in a second.
13      Just as treasurer, forgetting about Executive
14  Committee, does the treasurer play a role in the
15  Article VII process other than when he or she is on the
16  Executive Committee?
17    A.  When you say "play a role," can you be more
18  specific.
19    Q.  Do you deal with the Article VII arbitrator as
20  the treasurer?
21    A.  I'm not a hundred percent sure.
22    Q.  Okay.  Do you deal with the parties to an
23  Article VII arbitration, in terms of forwarding
24  documents or having communications in connection with
25  the Article VII?

93

1    A.  No.
2    Q.  Okay.  All right.  So just in terms of the
3  Executive Committee role -- so as treasurer you're on
4  the Executive Committee --
5    A.  Yes.
6    Q.  -- correct?  Okay.  Or you were.
7      And the Executive Committee has a role when
8  charges are filed by one member against another,
9  correct?
10    A.  Correct.
11    Q.  And you listed three things that they do.
12  They have to decide are charges timely, are they
13  specific, or are they -- and are they valid, right?
14  Okay.
15      And during your time on the Executive
16  Committee, did you participate in votes on Article VII
17  charges that were brought by one member against another?
18    A.  I'm not a hundred percent sure if we had
19  others besides the Morales.  And, if I recall correctly,
20  during the Morales, I recused myself from voting.
21    Q.  Sure.  Of course.
22    A.  So I had no --
23    Q.  Okay.  All right.  So -- fair enough.  But you
24  don't remember, besides the Morales, if there were any
25  others?

94

1    A.  I cannot remember if there were.
2    Q.  Okay.  Okay.  Now, is it your understanding
3  that under Article VII any member can file charges
4  against any other member, if you know?
5    A.  I believe any member in good standing can file
6  charges.
7    Q.  Fair enough.  And I think you already
8  testified to the Executive Committee's role in reviewing
9  charges.  Right?
10    A.  Yes.
11    Q.  And those charges are reviewed by the
12  Executive Committee before they are sent to an
13  Article VII arbitrator; is that right?
14    A.  Correct.
15    Q.  Okay.  So, if you had a proceeding -- let's
16  just say the Morales proceeding.  And I know you didn't
17  vote.  Okay.  But, if Morales had charges against you,
18  did the Executive Committee find them to be timely,
19  specific, and valid?
20    A.  You said if he had.  I mean --
21    Q.  He did.  I'm sorry.  When -- maybe I misspoke.
22      Mr. Morales filed charges against you?
23    A.  Yes.
24    Q.  Okay.  Those got referred to the Executive
25  Committee?

95

1    A.  Correct.
2    Q.  You recused yourself?
3    A.  Yes.
4    Q.  The Executive Committee voted.  Were they
5  timely, specific, and valid?
6    A.  I'm going to say yes because they went to an
7  arbitrator.
8    Q.  Okay.  Okay.  They went to an arbitrator, and
9  Mr. Morales did not win his arbitration against you?
10    A.  Correct.
11    Q.  Okay.  Then you filed charges against
12  Mr. Morales?
13    A.  Yes.
14    Q.  Okay.  And those charges went to the Executive
15  Committee?
16    A.  Correct.
17    Q.  You recused yourself, I assume?
18    A.  I believe, yes.
19    Q.  And the Executive Committee found your charges
20  to be timely, specific, and valid?
21    A.  Yes, because they went to the arbitrator.
22    Q.  They went to the arbitrator.  Okay.
23      And you're not sure what happened as a result
24  in that arbitration?
25    A.  I just don't remember the exact word, if they

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                    3/8/2024

---

96

1   were dismissed, what it was, but Mr. Morales was not
2   found -- was not given any disciplinary action.
3       Q.  Okay.  Okay.
4       A.  I guess I don't know if they were dismissed,
5   exactly what it was.
6       Q.  Right.  Okay.  That's fair.  All right.
7           Now, are you aware that under the APFA
8   Constitution, the Article VII arbitrator's decision is
9   considered final and binding?
10      A.  Yes and no.
11      Q.  Okay.  Can you explain the "yes" and then
12  explain the "no."
13      A.  I don't think the Constitution gives the
14  arbitrator -- arbitrator the right to take some
15  privileges away from members.
16      Q.  Okay.  If I wanted to figure that out, I might
17  look at Article VII --
18      A.  I'm sorry?
19      Q.  -- to find out what is the authority of the
20  arbitrator, right?
21      A.  Say it again.
22      Q.  Okay.  Article VII defines the authority of
23  the arbitrator, correct?
24      A.  Uh-huh.
25      Q.  Okay.  So we can look at Article VII and find

---

97

1   out what is their authority, correct?
2       A.  I guess.  I mean, I don't have it in front of
3   me.  But, yeah, I guess so.
4       Q.  You've read Article VII, right, of the
5   Constitution?
6       A.  Yes and no.  I mean, I read it.  I'm not a
7   hundred percent versed into it, but, yes.
8       Q.  Okay.  All right.  Now, you're aware that
9   Melissa Chinery and Sandra Lee filed charges against you
10  on November 20th, 2020, right?
11      A.  I mean, I can't remember the dates exactly,
12  but, yes, she did file charges against me.
13      Q.  Okay.  And that the charges were referred to
14  the Executive Committee of APFA, right?
15      A.  Yes.
16      Q.  Okay.  And the APFA Executive Committee found
17  those charges to be timely, specific, and valid,
18  correct?
19      A.  Yes.
20      Q.  Okay.  And those charges were then referred to
21  an Article VII arbitrator for resolution, right?
22      A.  Yes.
23      Q.  Okay.  Now, the charges were filed in
24  November 2020, and you had a hearing over three days in
25  September 2021.  Is that right?

---

98

1       A.  Yeah.
2       Q.  Okay.  So you had from November of 2020 to
3   September of 2021 in between knowing the charges and
4   having the hearing, right?
5       A.  Yes.
6       Q.  Okay.  Okay.  All right.  And that was an
7   in-person hearing, correct?
8       A.  Correct.
9       Q.  Okay.  And you had two people from APFA
10  representing you in that hearing, right?
11      A.  When you say "two people from APFA" --
12      Q.  Two other APFA members representing you.
13      A.  Yes.
14      Q.  Sorry.  Not -- they were not appointed by AFA
15  to represent you.  You chose them yourself?
16      A.  Not AFA.  APFA.
17      Q.  APFA.  I'm sorry.
18      A.  Yes.
19      Q.  And one of those people that represented you
20  was Nena Martin, right?
21      A.  Correct.
22      Q.  Okay.  And Ms. Martin had been a national
23  officer at the same time you were?
24      A.  Yes.
25      Q.  Okay.  And she was familiar with all the

---

99

1   context and circumstances of Mr. Ross leaving, just like
2   you were aware of those circumstances, right?
3       A.  I mean, I don't know how much Nena actually
4   knew.  So ...
5       Q.  What was her position in the -- when you were
6   national officers?
7       A.  She was the vice president.  After Ross left,
8   she became the president.
9       Q.  All right.  And you also -- so she -- she
10  became the president after Ross left, up until the point
11  of the election; is that right?
12      A.  Whenever Ross left, she became the president.
13      Q.  Okay.  All right.  So you had a former APFA
14  president and vice president representing you in the --
15  in the hearing?  That's Nena Martin?
16      A.  Correct.
17      Q.  And Heidi Morgan also represented you, right?
18      A.  Yes.
19      Q.  And what positions, to your knowledge, did
20  Heidi Morgan have within the Union before that time?
21      A.  I know she was chair, base chair, regional
22  director.  I mean, those are the ones I know for sure.
23      Q.  Okay.  All right.  And just to talk about Nena
24  Martin for a second, did you know Nena Martin before you
25  both served as national officers?

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                              3/8/2024

---

**100**

1   A.  We were both -- yes.
2   Q.  Okay.
3   A.  We were both board members.
4   Q.  Okay.  So she had been on the board of
5   directors, just like you had been on the board of
6   directors, and you knew her in that capacity?
7   A.  Correct.
8   Q.  And was she flying out of the same base as
9   you?
10   A.  No.
11   Q.  Okay.  And how about Ms. Morgan?  How did you
12   come to know Ms. Morgan to begin with?
13   A.  Also from the board of directors.
14   Q.  Okay.  All right.  So both Ms. Martin and
15   Ms. Morgan had previously been on the board of
16   directors?
17   A.  Yes.
18   Q.  And Ms. Martin had been a national officer?
19   A.  Yes.
20   Q.  Okay.  And, at the time of your arbitration,
21   was either Ms. Martin or Ms. Morgan on the board of
22   directors, if you know?
23   A.  I'm not a hundred percent sure.
24   Q.  Okay.  Okay.  All right.  Why did you ask
25   Ms. Martin to represent you?

---

**101**

1   A.  I think that that's something personal.  I
2   don't have to answer that.
3   Q.  Let me just ask you again.  Why did you ask
4   Ms. Martin to represent you?
5   A.  And, again, I think that's something personal,
6   and that's going to be -- personal reasons will be my
7   answer, then.
8   Q.  Okay.  What were the personal reasons?
9   A.  They're personal reasons.
10   Q.  Okay.  I'm going to just ask you one more time
11   if you could -- have to go to a judge on this topic.
12   Can you tell me, please, what were the reasons
13   why you asked Ms. Martin to represent you in your
14   Article VII charges?
15   A.  Again, personal reasons.
16   Q.  What were the reasons you asked Ms. Morgan --
17   MR. BARTOS:  And just for the record, I'm
18   going to object to that answer.
19   Q.  What were the reasons you asked Ms. Morgan
20   to represent you in your -- in your Article VII
21   arbitration?
22   A.  Personal reasons.
23   MR. BARTOS:  Okay.  I'm going to object
24   to that answer as well.
25   Q.  Ms. Martin is still supporting you in this

---

**102**

1   lawsuit, right?
2   A.  Can you define "supporting" me?
3   Q.  Well, she submitted at least one or more --
4   one affidavit on your behalf in this lawsuit, right?
5   A.  Yes.
6   Q.  Okay.  And you've also relied on affidavits,
7   at least one from Ms. Morgan in this lawsuit, correct?
8   A.  If I recall correctly, yes.
9   Q.  All right.  Did you think they did a good job
10   representing you in your Article VII?
11   A.  If I have to redo it, I will choose those two
12   person again.
13   Q.  Now, there was a transcript made of that
14   arbitration, right?
15   A.  Yes.
16   Q.  Okay.  And, during the course of that
17   arbitration, Ms. Chinery and Ms. Lee put on witnesses to
18   testify.  Do you remember that?
19   A.  Yes.
20   Q.  And they submitted exhibits to the arbitrator,
21   correct?
22   A.  Correct.
23   Q.  Okay.  And your representatives, Ms. Martin
24   and Ms. Morgan, cross-examined their witnesses that they
25   put on, that Melissa and Sandra put on, right?

---

**103**

1   A.  I believe so, yes.
2   Q.  Okay.  We could look at the transcript and
3   find out, right?  Is that right?
4   A.  I mean, yeah.  If it happened, it would be
5   there, yes.
6   Q.  Okay.  And do you remember there were Joint
7   exhibits that everybody agreed would be submitted?
8   A.  Yes.
9   Q.  Okay.  And you recall that you put on
10   witnesses in your own behalf, right?
11   A.  Correct.
12   Q.  Okay.  And your witnesses included Marcus
13   Gluth; is that right?
14   A.  Yes.
15   Q.  And Mr. Gluth was -- had been APFA president
16   at one point, right?
17   A.  Yes.
18   Q.  And you put on Randy Trautman as a witness?
19   A.  Yes.
20   Q.  Mr. Trautman had been on the board of
21   directors for a long time, right?
22   A.  Correct.
23   Q.  Okay.  And you also put on Craig Gunter --
24   A.  Correct.
25   Q.  -- as a witness?

---

**STRYKER REPORTING SERVICES**                      **(817) 494-0700**

Eugenio Vargas, Vol. 2                                          3/8/2024

---

**104**

1      And he was a treasurer of APFA, right?
2    A.  Correct.
3    Q.  Was he the treasurer right after you were
4  treasurer, or did somebody else?
5    A.  No.  He was.
6    Q.  Okay.  All right.  So all three of those
7  individuals testified on your behalf, right?
8    A.  Yes.
9    Q.  And you had other witnesses besides them; is
10  that right?
11    A.  Yes.
12    Q.  Okay.  And you in fact testified in your own
13  defense?
14    A.  Yes.
15    Q.  Okay.  All right.  Okay.  And after the -- all
16  the testimony was in, you -- do you recall that the
17  parties agreed that they would file briefs, written
18  briefs after the hearing?
19    A.  Yes.
20    Q.  Okay.  And do you remember that Ms. Chinery
21  and Ms. Lee filed a brief?
22    A.  Somebody did, yes.
23    Q.  Okay.  Do you remember ever reading it?
24    A.  I cannot recall right now.
25    Q.  Okay.  Okay.  And do you remember that

---

**105**

1  Ms. Martin and Ms. Morgan filed a brief on your behalf?
2    A.  Yes.
3    Q.  Okay.  Do you remember -- did you read that?
4    A.  I'm going to say, yeah, I did, yeah.
5    Q.  Okay.  Do you remember -- did you read it
6  before it was filed?
7    A.  I'm going to assume that it was before.
8    Q.  Okay.  I'd like to just mark as the next
9  exhibit -- just mark this first and then --
10    (Deposition Exhibit 6 marked)
11    Q.  Exhibit 6.  Before you -- before you read it,
12  Mr. Vargas, it's been about an hour and a half.  I'm
13  just going to ask you if this was in fact the brief that
14  they filed.  I want to give you a chance to look at it.
15  It's many, many pages.
16    MR. BARTOS:  I would suggest that we give
17  Mr. Vargas a chance to look at it and, if we're all
18  agreeable, to take a pause and let him look at it and
19  then have him answer the question of whether it's the
20  brief that was filed in his behalf after we break.  Is
21  that acceptable?
22    MS. PHILLIPS:  It's acceptable to me.  Is
23  it acceptable to you, Eugenio?  Do you want to spend --
24    THE WITNESS:  It all depends on one thing
25  here.

---

**106**

1    MS. PHILLIPS:  -- your break looking at
2  this?  Spend your break looking at this, or do you want
3  to take a minute, take a break?
4    THE WITNESS:  It is a lot to read, but I
5  need to get this done over and with because I have other
6  commitments.  I have kids.  So ...
7    Q.  Okay.  Well, maybe you can answer the
8  question.  Is this the brief that was filed on your
9  behalf?
10    A.  Well, I will have to go through it to see --
11    Q.  Okay.
12    A.  -- if it was or not.
13    MR. BARTOS:  Sure.  Okay.  Well, if you
14  want to not take a break right now and go through it on
15  the record, that's fine.
16    A.  With your understanding that I am not a
17  hundred percent sure this is what I submitted, yes.
18    Q.  Okay.  So you're not sure.  Okay.  All right.
19  Well, why don't you look it over until you feel whether
20  you can tell me it's what you submitted or not.  We can
21  do that on the record, or we can -- we can take a break
22  and you can do it in the other room, if you'd like.
23    A.  (Reading document).
24    Q.  All right.  Mr. Vargas, have you had a chance
25  to read Exhibit 6?

---

**107**

1    A.  Yes.
2    Q.  Okay.  Is that the brief that Ms. Martin and
3  Ms. Morgan filed on your behalf?
4    A.  I believe it is.
5    Q.  Okay.
6    A.  Not a hundred percent sure, but, yeah.
7    Q.  Okay.  All right.  They did a pretty good job,
8  didn't they?
9    A.  Huh?
10    Q.  They did a good job?
11    A.  Yes.
12    Q.  Okay.  Was there anything that you wanted
13  included in there that they didn't include?
14    A.  I cannot think of anything right now.
15    Q.  Okay.  Now, you -- you came to learn at some
16  point that Mr. Ross had received a copy of the memo from
17  Hal O'Neil that's been referred to as the confidential
18  memo, right?
19    A.  Yes.
20    Q.  Okay.  Was that after this brief was filed,
21  Exhibit 6?
22    A.  I believe it was.
23    Q.  Okay.  Was it before the decision was issued,
24  the initial Article VII decision was issued for you?
25    A.  Can't recall exact date.  But ...

---

**STRYKER REPORTING SERVICES**               ★★★        (817) 494-0700

Eugenio Vargas, Vol. 2                                          3/8/2024

---

**124**

1     When you brought the charges against
2  Mr. Morales, that was you in your personal capacity as a
3  Union member, right?
4     A.  I will have to go back and read exactly.
5     Q.  Is it your understanding today that you --
6     A.  I mean, it's a member, yes.  So ...
7     Q.  Okay.  But, when you brought charges, were you
8  bringing them in your capacity as an APFA officer trying
9  to -- with the resources of the Union or with your own
10  resources?
11     A.  I -- oh, it was my own resources.
12     Q.  Okay.  And it was your own charge?  You filed
13  the charges?
14     A.  Who else would file them --
15     Q.  Okay.
16     A.  -- if I didn't?
17     Q.  That's my question.
18     A.  Yeah.
19     Q.  Okay.  The charges weren't filed by the Union;
20  they were filed by you?
21     A.  Well, like I said, I would have to go back and
22  read to see if I was filing on behalf of the Union or
23  not.  I don't remember the exact wording, if it said
24  Eugenio Vargas as the APFA treasurer or if it was
25  Eugenio Vargas as a member.

---

**126**

1  Airlines?
2     A.  That's incorrect.
3     Q.  Not correct?  You didn't have PA days?
4     A.  For two days.
5     Q.  Okay.  For two days you did but not the third
6  day?
7     A.  Not the third day.
8     Q.  Okay.  All right.  And isn't it correct that
9  your hotel stay during the time of the hearing was paid
10  for by APFA?
11     A.  Yes.
12     Q.  Okay.  So, when you write, "The costs of the
13  hotel stay for myself and the witnesses, plus cost of
14  daycare totaled $1,842.05," the cost of the hotel stay
15  for you was zero?
16     A.  Yeah.  I mean, there was no -- not for me.
17  Correct.
18     Q.  Okay.
19     A.  That's why I said I don't have the receipts to
20  make sure that -- even though I say mine, it's not part
21  of the calculation.
22         MR. BARTOS:  Okay.  Okay.  All right.  I
23  have nothing further.
24         MS. PHILLIPS:  I pass the witness.  I
25  don't have any questions.

---

**125**

1         MR. BARTOS:  Okay.  All right.  I think
2  I'm about done.  If we can, I think it would be most
3  efficient if we took a few minutes for me just to make
4  sure and then come back and hopefully I think I'll be
5  done or will just have a minimal follow-up.
6         MS. PHILLIPS:  Yeah.  Do you want to grab
7  a bite to eat, maybe?
8         MR. BARTOS:  Sure.  Let's go off the
9  record.
10         THE VIDEOGRAPHER:  We're off record at
11  11:51 a.m.
12         (Recess from 11:51 a.m. to 12:54 p.m.)
13         THE VIDEOGRAPHER:  We're back on the
14  record at 12:54 p.m.
15  BY MR. BARTOS:
16     Q.  Mr. Vargas, if you could put in front of
17  you Exhibit 7, your affidavit, and turn again to
18  paragraph 15.  Do you see that, sir?
19     A.  Yes.
20     Q.  Okay.  And there is a reference in
21  paragraph 15, a sentence that says, "Daily pay rate is
22  $341.25."  Do you see that?
23     A.  Yes.
24     Q.  Isn't it correct that you were paid that
25  amount for each of your days of your hearing by American

---

**127**

1         MR. BARTOS:  Okay.
2         THE REPORTER:  Before we go off,
3  Ms. Phillips, would you state on the record if
4  Mr. Vargas is going to read and sign his transcript.
5         MS. PHILLIPS:  I think we are going to
6  need some time to read and sign the transcripts.  Can we
7  take the transcript with us to read and sign it?
8         THE REPORTER:  I just need you to state
9  if he wants to read it.
10         MS. PHILLIPS:  We'll read and sign the
11  transcript, yes.
12         THE REPORTER:  And when I have it done, I
13  will send it to you.
14         MS. PHILLIPS:  Yes.  That's fine.  Yes.
15         MR. BARTOS:  We're off the record, then.
16         THE VIDEOGRAPHER:  We're off the record
17  at 12:56 p.m.
18         (Proceedings adjourned at 12:56 p.m.)
19         (Per Federal Rule of Civil Procedure
20         30(e)(1), signature was requested by
21         Counsel for the Witness before completion
22         of the deposition)
23
24
25

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Eugenio Vargas, Vol. 2                                          3/8/2024

---

**128**

1              CHANGES AND SIGNATURE
2   WITNESS NAME: EUGENIO VARGAS, VOLUME 2
    DEPOSITION DATE: MARCH 8, 2024
3   PAGELINE        CHANGE/REASON
4   _____  _____
5   _____  _____
6   _____  _____
7   _____  _____
8   _____  _____
9   _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  _____  _____
22  _____  _____
23  _____  _____
24  I, EUGENIO VARGAS, have read the foregoing
25  deposition and hereby affix my signature that same is

---

**130**

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                  FORT WORTH DIVISION
3   ROBERT (BOB) ROSS        §
                             §
4   VS.               § ACTION NO. 4:22-CV-343-Y
                             §
5   ASSOCIATION OF           §
    PROFESSIONAL FLIGHT      §
6   ATTENDANTS, ET AL.       §
7   AND                      §
                             §
8   EUGENIO VARGAS           §
                             §
9   VS.               § ACTION NO. 4:22-CV-430-Y
                             §
10  ASSOCIATION OF           §
    PROFESSIONAL FLIGHT      §
11  ATTENDANTS, ET AL.       §
12          REPORTER'S CERTIFICATION
13     VIDEOTAPED ORAL DEPOSITION OF EUGENIO VARGAS
14                    VOLUME 2
15                 MARCH 8, 2024
16     I, Angela L. Mancuso, Certified Shorthand Reporter
17  in and for the State of Texas, hereby certify to the
18  following:
19     That the witness, EUGENIO VARGAS was duly sworn by
20  the officer and that the transcript of the oral
21  deposition is a true record of the testimony given by
22  the witness;
23     That the original deposition was delivered to
24  Ms. Kerri Phillips for examination and signature by the
25  witness;

---

**129**

1   true and correct, except as noted above.
2
3             _____
              SIGNATURE OF WITNESS
4   STATE OF _____ x
5   COUNTY OF _____ x
6
7     Before me, _____, on this day
8   personally appeared EUGENIO VARGAS, known to me (or
9   proved to me under oath or through _____)
10  (description of identity card or other document) to be
11  the person whose name is subscribed to the foregoing
12  instrument and acknowledged to me that they executed the
13  same for the purposes and consideration therein
14  expressed.
15     GIVEN UNDER MY HAND AND SEAL of office this
16  _____ day of _____, 2024.
17
18
19
20   (Seal)      _____
                 Notary Public in and for the
21               State of _____.
22
23
24
25

---

**131**

1     That the time used by the parties is as follows:
2   MS. KERRI PHILLIPS:  0 minutes
3   MR. JEFFREY A. BARTOS:  2 hours, 16 minutes
4     I further certify that pursuant to FRCP Rule
5   30(e)(1) that the signature of the deponent was
6   requested by the Counsel for the deponent before the
7   completion of the deposition and that the signature is
8   to be before any notary public and returned within
9   30 days from date of receipt of the transcript.  If
10  returned, the attached Changes and Signature page
11  contains any changes and the reasons therefor.
12     I further certify that I am neither attorney or
13  counsel for, nor related to or employed by, any of the
14  parties to the action in which this deposition is taken,
15  and further that I am not a relative or employee of any
16  attorney or counsel employed by the parties hereto, or
17  financially interested in the action.
18     Certified to by me on this the 13th day of March,
19  2024.
20
21             _____
22             ANGELA L. MANCUSO, CSR 4514
               Expiration Date: 10/31/24
23             Stryker Reporting
               Firm Registration No. 806
24             1450 Hughes Road, Suite 230
               Grapevine, Texas 76051
25             (817) 494-0700

---

**STRYKER REPORTING SERVICES**            ✶✶✶       **(817) 494-0700**

**Bartos Decl., Ex. D**

MARCH 14, 2024

Mr. Jeffrey A. Bartos, Esq.
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W., Suite 700
Washington, D.C. 20036

RE:  Civil Action No. 4:22-cv-430-Y; Eugenio Vargas vs. Association of Professional Flight Attendants, et al.

Dear Mr. Bartos:

Attached please find the errata page to the deposition of **Eugenio Vargas**, which was received in our office on March 2, 2024.

The original transcript has not been returned.

By copy of this letter, I am serving all parties through their counsel with a copy of the executed errata page.

Best regards,

Tracy J. Kirkey
production@strykerreporting.com

cc:      Ms. Kerri Phillips, Esq.
         Ms. Charlette L. Broderick, Esq.

APPX. 0633

**Bartos Decl., Ex. D**

Eugenio Vargas                                                          2/2/2024

```
                                                                    51
1                        CHANGES AND SIGNATURE

2    WITNESS NAME:   EUGENIO VARGAS, VOLUME 1
     DEPOSITION DATE:   FEBRUARY 2, 2024
3    PAGELINE                   CHANGE/REASON
      24/4      "With help, yes. Rena and I calculated payments
4
                made to Mr. Ross under his agreement."/question
5    _____   not clear

6     24/10     "With input, yes. Rene and I discussed how to
                calculate Bob's payment under the agreement.
7    _____   I made calculations and Rene reviewed and
                approve my calculations separately."/question
8    _____   not clear

9    _____

10    29/5      "long. No, don't remember." /question
                was confusing, did not understand the
11   _____   question

12    29/9      "I remember getting letters? no."/confusing
                question
13   _____

14    33/17     "Yes, APFA threatened to sue me,told me if I
                signed and paid, they would release me."
15   _____   /questions confused and stressed me

16   _____   _____

17   _____   _____

18   _____   _____

19   _____   _____

20   _____   _____

21   _____   _____

22   _____   _____

23   _____   _____

24       I, EUGENIO VARGAS, have read the foregoing

25   deposition and hereby affix my signature that same is
```

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

**Bartos Decl., Ex. D**

Eugenio Vargas                                                    2/2/2024

52

1   true and correct, except as noted above.

2

3                                   *Eugo Vargo*

                                      SIGNATURE OF WITNESS

4   STATE OF __Texas__    x

                                      Eugenio Vargas

5   COUNTY OF __Tarrant__  x

6

7       Before me, __Geraldine Pierre-Fleurimond__, on this day

8   personally appeared EUGENIO VARGAS, known to me (or

9   proved to me under oath or through __TX Driver's Lic__)

10  (description of identity card or other document) to be

11  the person whose name is subscribed to the foregoing

12  instrument and acknowledged to me that they executed the

13  same for the purposes and consideration therein

14  expressed.

15      GIVEN UNDER MY HAND AND SEAL of office this

16  __2nd__ day of __March_____, 2024.

17      ┌─────────────────────────────┐
        │  GERALDINE PIERRE-FLEURIMOND │
18      │  Notary Public - State of Florida │     Geraldine Pierre-Fleurimond
        │  Commission # HH 24703       │
19      │  My Comm. Expires Jul 28, 2024 │
        └─────────────────────────────┘
20      (Seal)

                                      Notary Public in and for the
21                                    State of __Florida  St Lucie__ County

22

23

24              This notarial act was an online notarization

25

**STRYKER REPORTING SERVICES**                    (817) 494-0700

APPX. 0635

**STRYKER REPORTING**

*Bartos Decl., Ex. D*

APRIL 5, 2024


Jeffrey A. Bartos, Esq.
Guerrieri, Bartos & Roma, P.C.
1900 M Street, N.W., Suite 700
Washington, D.C. 20036

**Re: Civil Action No. 4:22-cv-430-Y; Eugenio Vargas vs. Association of Professional Flight Attendants, et al.**

Dear Mr. Bartos,

Enclosed please find the original transcript to the deposition of Eugenio Vargas, Vol. 2, taken March 8, 2024.  It was received in our office on April 4, 2024, and has been sealed by Stryker Reporting Services according to Rule 30(f)(1) of the Federal Rules of Civil Procedure.

By copy of this letter, I am serving all parties with a copy of the errata page.

The originals will be retained by you for safekeeping and use at trial.

Please do not hesitate to contact our office should you have any questions or concerns.

Best regards,

Renee L. Barrett
renee@strykerreporting.com

cc:    Ms. Kerri Phillips, Esq.
       Ms. Charlette L. Broderick, Esq.

**APPX. 0636**

Eugenio Vargas, Vol. 2                                    3/8/2024

128

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  EUGENIO VARGAS, VOLUME 2
     DEPOSITION DATE:  MARCH 8, 2024
3    PAGELINE                  CHANGE/REASON

4    p. 71/line 21 - Susan Bender – change to Margot Nikitas – Mistaken Name Later recalled
     p. 71/ line 2-3 – Clarification - APFA claims that Hal O'Neil determined Ross was overpaid under the Transition
5    Agreement. – CLARIFICATION OF STATEMENT based on English is not my primary language and this
     was confusing phrasing.
6    p. 72/ line 12 – No, Ms. Nikitas.  Mistaken Name Later recalled.
     p. 74/line 6 – Strike "Clue" Substitute "key".  This is the incorrect word he said the word "key" or
7    "important"
     p. 76/ line 13 – No, it was Ms. Nikitas – Wrong Name recalled at the time.
8    p. 77/ line 13 – – Later recollection of additional statements -  "That I overpaid Ross, that the accounting
     firm determined this, that the Board of directors determined this, but I don't remember it all."
9    p. 77/ line 20 -21 – Later recollection of additional parties · A.· ·"The -- I forgot the name -- the firm's
     name,21 -- but it's the debt collector that APFA uses.  –ADD– Also, false statements were made to the
10   EC, the BOD and the Arbitrator."
     p. 77/ line 24 clarification - "yes, and others"
11   p. 78/lines 7-9: · clarification based on ESOL "A.· ·"That the O'Neil firm, company, said that Ross was
     overpaid under the Transition Agreement based on the wrong per diem used and that the BOD found he
12   was overpaid."
     p. 78/lines 14: Clarification based on ESOL – substitute "letter" for the words "Confidential Memo"
13   p. 78/lines 16: Clarification – substitute "APFA" for the words "National Officers and Counsel"
     p. 80/lines 7-9: Clarification· "A.· · That the O'Neil firm, company, said that Ross was overpaid under the Transition
14   Agreement based on the wrong per diem used and that the BOD found he was overpaid.
     p. 80/14: That the O'Neil firm, company, said that Ross was overpaid under the Transition Agreement
15   based on the wrong per diem used and that the BOD found he was overpaid and now Ross owes APFA
     for an overpayment made under the Transition Agreement by Vargas based on improper calculations
16   made by Vargas./ Clarification
     p. 82p. 3-4 clarification "That Bob was overpaid under the Transition Agreement."
17   p. 83/line13 – According to Hal O'Neil's information, yes, and many other were told including the Board of
     Directors, the Executive Committee, and the Arbitrator.   Clarification
18   p. 96/line 24 – uh-huh, but I am not a lawyer /Clarification
     p. 97/line 2-3 – I am not an expert on APFA Constitution and I am not a lawyer.  /Clarification
19   p. 107/ line 14 – I would have preferred the evidence that the National Officers withheld from the BOD,
     the EC, and the Arbitrator during Harris's testimony, not to mention the affidavits that could not be
20   submitted." /Clarification
     p. 108/line 12-14 clarification for the record– "yes, but the Arbitrator was represented by counsel and did not
21   communicate with my representatives after the filing of my case. I was not allowed the chance to talk to the
     Arbitrator once my case was filed, and my attorneys were not allowed to talk to the Arbitrator either since he
22   was represented by APFA's lawyers, and my representatives were no longer copied on any communications
     only my lawyers were copied and not able to reply to the Arbitrator since he was represented by lawyers for
23   APFA. So after the initial award, I did not get to argue to the Arbitrator any longer." /Clarification

24        I, EUGENIO VARGAS, have read the foregoing

25   deposition and hereby affix my signature that same is

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

APPX. 0637

**Bartos Decl., Ex. D**

Eugenio Vargas, Vol. 2                                                    3/8/2024

129

1    true and correct, except as noted above.

2

3                                          *Eugenio Vargas*
                                           SIGNATURE OF WITNESS

4    STATE OF __TEXAS__      x     County of Rockwall, State of Texas. Signer(s): Eugenio
                                   Vargas, appeared with Texas DL, as identification along with
5    COUNTY OF __ROCKWALL__  x     multi-factor KBA authentication, during this audio/video
                                   recorded remote online notarization.
6

7         Before me, _____Sonia Platz_____, on this day

8    personally appeared EUGENIO VARGAS, known to me (or

9    proved to me under oath or through __Texas DL__ )

10   (description of identity card or other document) to be

11   the person whose name is subscribed to the foregoing

12   instrument and acknowledged to me that they executed the

13   same for the purposes and consideration therein

14   expressed.

15        GIVEN UNDER MY HAND AND SEAL of office this

16   __1st__ day of _____April_____, 2024.

17   Sworn to or affirmed and subscribed before me.

18

19

20        (Seal)                          *Sonia Platz*
                                          Notary Public in and for the
21                                        State of __Texas__ .

22                              ┌─────────────────────────┐
                                │   NOTARY      SONIA PLATZ        │
23                              │  PUBLIC    Notary ID #11048993   │
                                │   ★        My Commission Expires │
24                              │ STATE OF TEXAS  May 12, 2028      │
                                └─────────────────────────┘
25

**APPX. 0638**