`

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| **ROBERT "BOB" ROSS AND** | § |  |
| **EUGENIO VARGAS** | § | **Civil Action No. 4:22-cv-343-Y** |
|  | § |  |
| **Plaintiffs/Counterclaim Defendants,** | § | **Consolidated with** |
|  | § | **Civil Action No. 4:22-cv-430-Y** |
| **v.** | § |  |
|  | § | **Judge Terry R. Means** |
| **ASSOCIATION OF PROFESSIONAL** | § |  |
| **FLIGHT ATTENDANTS,** *et al.*, | § |  |
|  | § |  |
| **Defendants/Counterclaim Plaintiffs.** | | |

---

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

# Table of Contents

I.  Summary of Argument ................................................................................................... 1

II.  FACTS ......................................................................................................................... 2

  A.  Pre-April 1, 2016: ................................................................................................... 2

  B.  April 1, 2016 to July 1, 2018: ................................................................................ 3

  C.  July 1, 2018 – March 31, 2018: ............................................................................. 5

  D.  April 1, 2020 – Current Day: ................................................................................. 6

    1)  September 2021 – Vargas Arbitration .............................................................. 9

    2)  October, 2021 – Ross Arbitration ..................................................................... 9

    3)  Martin Arbitration – September 2022 ............................................................. 11

III.  Summary Judgment should be granted in favor of Ross and Vargas against APFA's claim for Breach of Fiduciary Duty under LMRDA § 501. ........................................................... 11

  A.  No Admissible Evidence of a Breach of Fiduciary Duty. .................................... 12

  B.  No admissible evidence that the Union suffered damages. ................................. 14

  C.  No admissible evidence to extend the statute of limitations. .............................. 15

IV.  Summary Judgment should be granted in favor of Ross's Breach of Contract Claim ....... 16

  A.  Contract between APFA and Ross ....................................................................... 17

  B.  Breach by APFA ................................................................................................. 17

  C.  Damages – Actual, Attorneys, Reputational, Loss Income .............................. 20

V.  Summary Judgment should be granted in favor of Plaintiffs' claims under the Labor Management Disclosure and Reporting Act §§ 411(a)(2), 411(a)(5), and 529 ................................................. 24

  A.  29 U.S.C. § 529 Retaliation or Otherwise Disciplined: .................................... 25

  B.  LMRDA: Due Process Violation: ....................................................................... 26

    1)  APFA Constitution and Policy: Article VII Disciplinary Arbitrations ........................ 27

    2)  Defendants altered evidence by withholding parts of an accounting document that refuted Defendants' disciplinary accusations ................................................ 29

    3)  Plaintiffs were Deprived of Proportionate Time. ........................................... 30

    4)  Plaintiffs were Prevented from Presenting Evidence and from Cross-Examining Witnesses. ........................................................................................................ 30

  C.  Plaintiffs' Rights Under the LMRDA of Free Speech and Assembly were Violated. ..... 33

    1)  Facts showing Defendant stifled Free Speech ............................................... 35

    2)  Relief should be granted in favor of Plaintiffs including damages and injunction. ....... 37

VI.  Conclusion and Prayer ............................................................................................... 41

# Table of Authorities

Cases

*Federal*

*Adams-Lundy  v. APFA*, 731 F.2d 1154 (5th Cir. 1984)..……………………………………...24, 32, 35

*Adams-Lundy v. APFA*, 792 F.2d 1368 (5th Cir. 1986)………………………………….…14, 20, 24, 31

*Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961)………………...…..16

*Frye v. United Steelworkers,* 767 F.2d 1216 (7th Cir. 1985)…………………………………….…26

*Guidry v. Int'l Union of Operating Engineers, Loc*. 406, 882 F.2d 929

     (5th Cir. 1989) ………………………………………………….…………………...…37, 38, 40

*Hoffman v. Kramer*, 362 F.3d 308 (5th Cir. 2004)…………………………………………….…25

*Int'l Bhd. of Boilermakers v. Braswell*, 388 F.2d 193, 199 (5th Cir. 1968)…………………………...…38

*Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233 (1971)………………………………….…27

*King Ranch, Inc. v Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)…………………………........................11

*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D, slip op.     (N.D. Tex. Sep. 3, 2014)…………………………………………………….................. 24, 31

*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D, slip op.

     (N.D. Tex. May 19, 2016)……………………………………………………………...…..30, 31

*Martin v. Loc. 556, Transp. Workers Union of Am.,* 206 F.Supp.3d 1227……………….……….…... 14

*Ray v. Young,* 753 F.2d 386 (5th Cir.1985)……….…………………………….………..…….11, 12

*Ritz v. O'Donnell*, 566 F.2d 731 (D.C. Cir. 1977)…………………………………………….....25, 27

*Stewart v. Int'l Ass'n of Machinists & Aerospace Workers*,

     16 F.Supp.3d 783 (S.D. Tex. 2014) ……………………….……………………...……...15

*Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir.1975))…………………………………………..28*United Food & Com. Workers Int'l Union Loc. 911 v.*

          *United Food & Com. Workers Int'l,* 301 F.3d 468 (6th Cir 2002)………………...……………..25

*United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370 (2d Cir. 2001)………………………….25, 26

*United Steel Workers Loc. 12-369 v. United Steel Workers Int'l*,

     728 F3d 1107 (9th Cir. 2013) ………………………………………………...…….. 31

*Weinberger v. Romero—Barcelo, 456 U.S. 305* (1982) …………………………...……………..35

*Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188 (D.C. Cir. 1996)……………..…………..…..25

*Yager v. Carey, 910 F.Supp. 704 (D. D.C. 1995)*……………………………………….………..……28

*State*
Advantage Physical Therapy, Inc. v. Cruse, 165 S.W.3d 21,
  (Tex. App. –Houston [14[th] Dist. 2005)…………………………………………….…………………16
*Hubbard v. Shankle*, 138 S.W.2d 474, 481 (Tex. App.–Fort Worth 2004)…………………………16
*Labor Ready Cent. III, L.P. v Gonzalez,* 64 S.W.3d 519 (Tex. App –Corpus Christi 2001)…….17
*Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex. App. –Beaumont 2003)… ……….…………16
*Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548 (Tex. App. –Houston [14[th] Dist] 2002) ……….16
*Wright v. Christian & Smith*, 950 S.W.2d 411 (Tex. App. –Houston [1st Dist.] 1997) ………... 16

Statutes

*Federal*
29 U.S.C. §101(a)(5)……………………………………………………………… 23, 27, 28
29 U.S.C. § 401……………………………………………………………………………23
29 U.S.C. § 402 (i))…………………………………………………………………………23
29 U.S.C. § 402 (j))…………………………………………………………………………23
29 U.S.C. § 411(a)(2)…………………………………………..………...…1, 23, 32, 35, 42
29 U.S.C. § 411(a)(5)………………………………………………………...…….23, 26, 42
29 U.S.C. § 412………………………………………………………………....…...24, 31
29 U.S.C. § 431 ……………………………………………………………......……… 14
29 U.S.C. § 501 …………………………………………………………….......11, 12, 15
29 U.S.C. § 529………………………………………………....…...1,  23, 24, 25, 31, 35, 42

*State*
Tex. Civ. Prac. & Rem. Code § 16.004……………………………………………………15

Rules

*Federal*
Fed. R. Civ. P. 56………………………………………………………….…...1, 10
Fed. R. Civ. P. 166a(i)………………………………………………………….........1

*Local*
LR. 7.1…………………………………………………….......................................1
LR 7.2…………………………………………………….......................................1
LR 56.2…………………………………………………….....................................1
LR 56.3…………………………………………………….....................................1
LR 56.5…………………………………………………….....................................1
LR 56.6…………………………………………………….....................................1

Comes now, Plaintiffs, ROBERT (BOB) ROSS ("Ross") and EUGENIO VARGAS ("Vargas"), and files this their Motion for a Partial Summary Judgment under Fed. R. Civ. P. 56 and 166a(i), (the "Motion") and in accordance with Local Rules 7.1, 7.2, 56.2, 56.3, 56.5 and 56.6, respectfully shows the Court as follows:

## I.    SUMMARY OF ARGUMENT

Plaintiffs sued Defendants for breach of contract and union constitution, violations of their rights to free speech, association, due process, and wrongful discipline under 29 U.S.C. §§ 411 (a)(2), (a)(5), and 529.  Defendant, APFA, countersued Plaintiffs for breach of fiduciary duty under 29 U.S.C. § 501(a).  Plaintiffs are members of a labor union who brought claims that arise from a signed resignation agreement entered into by the labor union's governing body, APFA's Board of Directors, and Ross on or about March 1, 2018 ("Transition Agreement").  Thereafter, Ross was disciplined for receiving and failing to repay alleged overpayments made under the Transition Agreement. APFA Legal Counsel, Mark Richards, disclosed to Vargas and the APFA Accountants only those portions of the Ross Transition Agreement that related to calculation of Ross's exit payments one time, and none were allowed to view it a second time, retain a copy, or take notes for their records. These alleged overpayments were calculated by Vargas, the National Treasurer at the time, with the assistance of APFA's Senior Accountant, Rene Bertholet.  APFA disciplined Vargas for making these alleged overpayments under the Transition Agreement in addition to other claims of policy violations previously denied when brought in 2019. An adequate time for discovery has passed, so this Motion is timely filed.

Plaintiffs will show that Defendant, APFA, has no admissible evidence to establish any of the elements of APFA's final breach of fiduciary claim against Plaintiffs, nor any evidence to show the claims were filed timely, nor any evidence to show Defendants are entitled to a tolling

of the limitations period based on the doctrine of laches. Plaintiffs are entitled to a take-nothing judgment under Fed. R. Civ. P. 56(a) for the breach of fiduciary duty claims. Additionally, Plaintiffs are entitled to recover for their claims for breach of contract, violations of their union member's rights under the LMRDA §§ 411(a)(2) free speech, (a)(5) due process, and 529 otherwise discipline, as well as fraud and defamation claims.

## II.      FACTS

### A.  Pre-April 1, 2016:

On December 9, 2013, US Airways, Inc ("US Air") and American Airlines, Inc ("AA") announced a merger of the two airlines. With the proposed merger, the question arose as to whether AA's flight attendants' union or USAir's flight attendants' union would become the exclusive bargaining representative on behalf of the American Airlines flight attendants post-merger. AA flight attendants' union—the Association of Professional Flight Attendants ("APFA")—is a singular independent union. However, US Air flight attendants labor union at the time was the Association of Flight Attendants-CWA, AFL-CIO ("AFA"). The merger resulted in those AFA union members with US Air, leaving AFA's membership and becoming APFA members.

After the merger, two political factions began to form within APFA—each group defined by their union loyalties. On the one hand, the US Air Flight Attendants, who were former members of the labor union AFA, became known as "Legacy US" or "LUS" Flight Attendants. On the other hand, flight attendants that worked for AA prior to the merger were loyal members of their independent labor union, APFA, and are now commonly known as "Legacy AA" or "LAA" Flight Attendants. LUS loyalties remain with AFA's labor union, rather than APFA's labor union. The LUS group seeks a merger of the two unions. (App., pp. 286-292, 386-396). The LAA flight attendants seek to maintain APFA's independence. (App., pp. 286-292, 386-396). As illustration, a report was submitted to the APFA Board of Directors by three former APFA leaders in May of

2015 outlining their impressions after attending AFA's Board of Directors meeting on April 26, 2015. (App., pp. 397-408). This report addresses concerns the LAA group has over the intentions of AFA's leadership and the motivations for the LUS political faction.  (App., pp. 397-408).

Laura Glading resigned as APFA National President via a signed Transition Agreement in 2015. (App., pp. 38-41).  Ross was elected National President by an unprecedented 70% of the membership votes; Nena Martin ("Martin"), followed as the National Vice-President, Marcy Dunaway, as National Secretary, and Vargas as National Treasurer. The newly elected officers then took office April 1, 2016 ("Ross Administration"). (App., pp. 386-96).

### B.  April 1, 2016 to July 1, 2018:
Upon entering office, Ross' first speech addressed his goals during his term. (App., pp. 386-396).  He planned to clean up APFA finances, unify the membership, and would ***not*** consider a merger at the time.  (App., pp. 286-292, 386-396). Since the CBA was finalized in 2014, Ross, as National President, would be able to invite AFA onto APFA's property to solicit a merger of the two unions and initiate a vote from the membership in favor of it.

The Ross Administration opposed any merger at that time.  Ross felt the priority was to unite the membership before considering any merger between the two labor unions. (App., pp. 386-396).  On April 2, 2016, the day after Ross took office, Melissa Chinery-Burns[1] ("Chinery" or "Chinery-Burns") pledged to remove Ross from office.  (App., pp. 42-51; 410-11).

Thereafter, AFA sought a merger through acts targeted directly at APFA members, including a card campaign—a write-in solicitation directly from the membership to the National Mediation Board to de-certify a union as the exclusive bargaining agent—a 9/11 AFA-APFA

---

[1] In February of 2022, Melissa Chinery, LUS APFA member is the charging party in *all* of the Union Disciplinary charges and hearings made against the Ross Administration. Chinery married AFA General Counsel, Joe Burns, after the Ross and Vargas Arbitration hearings concluded.  Joe Burns is currently "on loan" to APFA as negotiating attorney of the CBA with AA. Burns, he is a member of the APFA leadership.

union pin sent to the membership, and letters soliciting an AFA/APFA merger. (App., pp. 286-292; 386-396; 412-423). These bold actions were taken without the Ross Administration's consent. (App., pp. 286-293; 386-396; 412-423). The Ross Administration, if seen as cooperating with this conduct, risked charges of "dual unionism" and removal from office if they did not address these actions ("dual unionism" is an offense under the APFA Constitution prohibiting any member or leader from "advocating, or working toward, the displacement of APFA as bargaining representative"). (App., pp. 286-293; 386-396; 412-423). The Ross Administration responded to this "raid" in a letter to the AFA International President at the time. (App., pp. 286-293; 386-396; 412-423). The letter demanded AFA cease all attempts at a merger or a "raid" of their union. (App., pp. 293, 412-423).  The letter was hand-delivered by Ross and signed by all four of the Ross Administration. (App., pp. 293; 386-396; 423). Additionally, Ross read the letter aloud at a labor union coalition meeting in which several union leaders, including International President of AFA-CWA Sara Nelson, were in attendance. (App., pp. 293; 386-396; 423). The letter served to dispel any notions or accusations of dual unionism by the Ross Administration. (App., pp. 293; 386-396; 423). The consequence of this action also solidified a deeply adversarial relationship between the Ross Administration and the LUS flight attendants that persists to this day.

Melissa Chinery-Burns, the charging party representing the union in all three Ross Administration Disciplinary Arbitrations, maintains a social media group site which she uses to mobilize the LUS flight attendants. (App., pp. 286-292, 386-396)  Upon the Ross Administration's election to office, Chinery began her "red wagon" campaign to gather the signatures required to force Ross's removal from office. (App., pp. 286-292, 386-396). This campaign led to the APFA Board of Directors meeting where the Board offered Ross a Transition Agreement in exchange for his resignation in March of 2018. (App., pp. 1-10, 386-396). The Transition Agreement contained

a non-disparagement clause and a non-disclosure and confidentiality provision. (App., pp. 7-10). APFA Counsel disclosed to Vargas and the APFA Accountants, on only one occasion, only those sections of the Transition Agreement concerning Ross's compensation to read only one time. (App., pp. 286-292). Thereafter, in conjunction with APFA Senior Accountant, Rene Bertholet, Vargas calculated Ross's payments based on the provisions he and Bertholet were shown. (App., pp. 286-292).

### C.  July 1, 2018 – March 31, 2018:

On July 1, 2018, the Bassani Administration took office consisting of Lori Bassani as National President, Liz Geiss as National Vice-President, Lizbeth Hillman as National Secretary, and Craig Gunter as National Treasurer.  Martin was elected to the APFA Board of Directors in 2019 to the St. Louis Base.  During this period, Chinery-Burns consistently demanded audits of the Ross Administration's expenditures, credit card charges, car rental, and other financials while in office. (App., pp. 286-292, 386-396). In response to Chinery-Burns's demands, an outside accountant audited the end-of-term payouts for Martin, Dunaway, and Vargas upon leaving office. (App., pp. 286-292; 187). However, no audit was performed on Ross's payments under the Transition Agreement at that time because his Transition Agreement was approved outside of APFA Policy. (App., pp. 214-16). The audit resulted in discovering a miscalculation in the daily rate of pay used to calculate the National Officers' end-of-term sick and vacation payment. The difference consisted of base salary divided by 365, per the APFA Policy, versus using taxable income (base salary plus guaranteed stipends) divided by 365. The APFA Board of Directors decided not to audit Ross's payments received under the Transition Agreement, as it was signed under confidentiality outside the scope of APFA Policy. (App., pp. 214-16).

Once notified of the miscalculation and after meeting with the National Treasurer and APFA Outside Accountants—Martin, Dunaway, and Vargas were threatened with legal action by

the APFA Board of Directors. (App., pp. 214-16; 286-92).Thereafter, APFA agreed to release Vargas and the other officers for their actions while in office if they agreed to sign a promissory note and repay APFA the outstanding amount of the overpayment in full. (App., pp. 214-16; 286-92). The APFA National Treasurer at the time, Craig Gunter, ("Gunter") testifies to this fact under oath. (App., pp. 214-16; 286-92). Additionally, Gunter testifies that Ross was not pursued for any overpayment in 2019 because the Ross Transition Agreement was negotiated outside the scope of APFA Policy, therefore all payments were made and approved by the 2018 APFA Board of Directors as shown by the signatures on his Transition Agreement. (App., pp. 214-16).

### D.  April 1, 2020 – Current Day:

On April 1, 2020, the Hedrick Administration took office, consisting of Julie Hedrick as National President ("Hedrick"), Larry Salas as National Vice-President, Josh Black as National Secretary, and Erik Harris as National Treasurer ("Harris"). On August 3, 2020, Hedrick informed Ross that she planned to disclose his confidential Transition Agreement to APFA members. (App., pp. 386-96; 424).  In August of 2020, Melissa Chinery-Burns posted an inaccurate version of the Transition Agreement on social media. (App., p. 386-96). On or about September of 2020, Harris and Hedrick met with and requested APFA's outside accounting firm conduct an "accounting review" of the payments made under the Ross Transition Agreement (App., pp. 142-146; 386-96; 445-447).

Hal O'Neil, APFA's outside accountant, ("O'Neil") sent documents asserting Ross was overpaid. (App., pp. 142-146; 185-199; 386-96; 445-447). However, in conjunction with these pay schedules, a cover letter was included to the Board of Directors, the Executive Committee, the Hedrick Administration, in-house and outside counsel for APFA on October 22, 2020. ("Confidential Memo"). (App., pp. 142-146; 185-199; 386-96; 445-447). The Confidential Memo disavowed the accounting review assertion of overpayment.  (App., pp. 142-146; 185-199).  The

Confidential Memo states:

> Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick and accrued and unused vacation time.  This agreement doesn't specify that the payments be made in accordance with the policy manual guidelines.  Consequently, these payments appear appropriate and in compliance with the transition agreement.  This agreement also specifies reimbursement payments to him of up to $10,000 in actual moving expenses.  His moving expense reimbursement payments did not exceed this amount." (App., p. 187).

On the same day that Erik Harris received the Confidential Memo and the accounting review, he forwarded the documents to the other three national officers, and to inside and outside counsel for APFA. (App., pp. 142-46; 185-99; 200-13).

On October 28, 2020, the National Officers presented the Board of Directors just the "accounting review" documents and stated they had been informed that APFA's outside accounting firm determined Ross was overpaid under the Transition Agreement. (App., pp. 217-25). The Confidential Memo was withheld. (App., pp. 217-25). The APFA Board of Directors held no finding and passed no resolution relating to Ross or the accounting review at this meeting. (App., pp. 217-25).

On November 10, 2020, Harris contacted Ross to notify him of the overpayment under the Transition Agreement. (App. pp. 1-6; 11-16). He confirmed this conversation in a letter to Ross on November 24, 2020, stating that:

> During our call, we discussed the finding of the APFA Board of Directors that you were overpaid in the amount of $5,436.47 in 2018.  The Board's finding was based on the results of a review from an independent accounting firm which determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect." ("Overpayment of Wages Letter")  (App., p. 11).

In November of 2020, Melissa Chinery ("Chinery") and Sandra Lee ("Lee") filed APFA Disciplinary charges against Ross and Vargas. (App., pp. 286-292, 386-396).

On December 1, 2020, APFA held its Executive Committee quarterly meeting.  The Executive Committee did not receive a copy of the Confidential Memo.  (App., pp. 217-25). All four national officers and in-house counsel attended and voted on the charges against Plaintiffs at

the December 1, 2023 APFA Executive Committee Quarterly meeting. (App., pp. 217-25).  No one disclosed the Confidential Memo. (App., pp. 217-25). The National Officers continued to assert that Ross was improperly paid based on a "finding" by the AFPA Board of Directors—when no "finding" ever took place. (App., pp. 217-25). This alleged "finding" is based on APFA's independent accountant's "review" that was contradicted by the accountant's own cover letter. (App., pp. 217-25).  Nevertheless, the Executive Committee deemed the disciplinary charges timely, valid and specific against both Plaintiffs. (App., pp. 47-49).

In January 2021, the alleged overpayment owed by Ross was assigned to a third-party debt collector, McGaughey, Reber and Associates, Inc, ("Diversified") (App., pp. 386-96; 433-48). Diversified published the alleged overpayment to Ross's credit report after Harris provided Ross's social security number, the Transition Agreement, and the "accounting review" to Diversified as well as Ross's former Texas address. (App., pp. 1-6; 52-62).

Ross discovered the adverse line item on his credit report while applying for a CashOut Refinance loan on his home to put his daughter through college.  (App., pp. 1-6; 52-62).  His mortgage lender informed Ross that he was denied for a Cash-out mortgage. (App., pp. 1-6; 52-62). The loan was denied for failing to meet the underwriting requirements for the lender based on the debt collection account on his credit. (App. pp. 386-96).  Ross disputed the debt to the Board of Directors, and Erik Harris in an email. (App., pp. 1-6; 52-62).  APFA Board Members and National Treasurer antagonized Ross for the alleged outstanding debt and publicized it to APFA members who shared the information on social media. (App., pp. 1-6; 42-51).  These hostile exchanges become common occurrences, followed by social media posts that accused Ross and Vargas of stealing, misappropriating, and embezzlement of union funds. (App., pp. 1-6; 42-92). This harassment was conducted regularly and publicly within APFA leadership and to the entire

8

APFA membership.

Ross was denied a cash-out VA loan.  Ross was able to fund his daughter for one year at college with a loan from the bank, but thereafter his daughter was forced to leave college due to Ross's financial constraints.  (App. pp. 386-96; 473-484).

### 1) SEPTEMBER 2021 – VARGAS ARBITRATION

In Vargas' disciplinary hearing, the Confidential Memo was concealed as well.  (App., pp. 286-292).   Additionally, evidence of APFA harassment and intimidation of witnesses was excluded from the hearing—a concerning result by the arbitrator in this circumstance. (App., pp. 286-92; 294-96).  The documents that formed the basis of the charges were unreliable. (App., pp. 286-92; 385; 270). Harris testified that the union did not properly maintain records prior to 2020, and that a substantial number of documents contained in a particular box from 2017 were not produced by the union as they "went missing." (App., pp. 286-92; 385; 270).  Additionally, the union caught the overpayment due to the change in the formula for calculating accrued and unused sick and vacation payout and threatened to sue Vargas for the miscalculation and the damages it caused in 2019. (App. pp. 214-16). However, the APFA Board of Directors agreed to release and not sue Vargas for the miscalculation provided he repays the outstanding amount owed. (App. pp. 214-16).

### 2) OCTOBER, 2021 – ROSS ARBITRATION

In Ross's disciplinary hearing, the Confidential Memo was concealed, despite a subpoena issued by the Arbitrator. (App., pp. 1-6; 93-96).  Evidence of APFA harassment and intimidation of witnesses was excluded from the hearing and never addressed by the Arbitrator. (App., pp. 286-92; 294-96).  The documents that formed the basis of the charges were unreliable.  (App., pp. 286-92; 385; 269-279). Harris testified that the union did not properly maintain records. (App., pp. 286-92; 385; 269-279).  Additionally, the charging parties received over nine hours of time to present

their case, while Ross received less than three hours of time to present his case. (App. pp. 1-6; 101-107; 108-114).

Most importantly, the Arbitrator forced Ross to waive his hearsay objections to a substantial number of documents that were entered into record when the Arbitrator told Ross "I hear—I hear your concern, but all we're – we're – we're accepting this for the reason that he--- he complied with the subpoena and that's what these documents are, nothing else. We're not saying that they're true, correct or whatever, we're just submitting it based upon the duces tecum. Okay? Okay. It's –do you still have an objection?" Mr. Ross: "No." (App. pp. 273-274). Harris had testified that the union did not properly maintain its records. Ross objected to the introduction of these documents and the Arbitrator immediately goes off-record for a conversation and concludes the conversation on record with this statement. (App. pp. 273-274; 386-96). This illustrates that the Arbitrator misrepresented the legal consequence to Ross of waiving this objection, which substantially prejudiced him in these proceedings. The same Arbitrator presided over both Ross's and Vargas's Disciplinary Arbitration hearings.

Additionally, Ross was unable to call most of his witnesses to testify. (App. pp. 275-284; 386-96; 430-32).. He could not call Eugenio Vargas or Nena Martin as witnesses on his behalf. (App. pp. 386-96; 430-32). He was continually interrupted and denied the chance to question witnesses by the Arbitrator. (App. pp. 275-284; 386-96; 430-32). He was unable to effectively cross-examine many witnesses, including Harris, the National Treasurer. (App. pp. 275-284; 386-96; 430-32).

On February 18, 2022, Vargas's Disciplinary Arbitration Award was issued banning him from holding union elected office for life and fining him a total of $30,963.03. (App., pp. 286-92; 309-350). On March 19, 2021, Ross's Disciplinary Arbitration Award was issued. (App., pp. 1-6;

115-138). Ross was banned from holding union leadership office for life, removed from his current position on the APFA Board of Directors, and fined a total of $62,558.75. (App., pp. 386-96; 467-69). For the first time, APFA banned its members from holding union office. (App., pp. 286-92; 386-96; 467-69). For the first time in APFA history, a Presidential Hotline was released announcing the resulting Arbitration Awards issued against APFA Members. (App., pp. 286-92; 297-308; 386-96; 467-69).

### 3) MARTIN ARBITRATION – SEPTEMBER 2022

After the filing of the current matters pending before this court, Nena Martin attended her Disciplinary Arbitration hearing. (App., pp. 226-31). All charges were summarily dismissed by the Arbitrator. (App., pp. 226-31). The basis of the dismissal was a lack of reliable evidence to support the charges. (App., pp. 226-31). To clear her name, Martin made multiple requests for a public Presidential Hotline announcing her Arbitration dismissal. (App., pp. 226-31). APFA denied Martin's request—no public announcement was ever made and the charges against Nena Martin were dismissed. (App., pp. 226-31).

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF ROSS AND VARGAS AGAINST APFA'S CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER LMRDA § 501.

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> (a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A no-evidence challenge will be sustained when under Rule 56(c), summary judgment is proper ". . . after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317

(1986).

**A.  No Admissible Evidence of a Breach of Fiduciary Duty.**

In *Ray v. Young,* the 5th Circuit Court reviews a union officer's expenses for possible violations of LMRDA § 501.  The *Ray* Court differentiates between those expenses incurred by the union where (1) the union benefits as does the officer who receive an *indirect personal benefit*, and those expenses where (2) the officer receives a *direct personal benefit*, but no benefit is incurred by the union 29 U.S.C. § 501. (*See Ray v. Young,* 753 F.2d 386, 389-90 (5th Cir.1985)). The 5th Circuit states that "[w]here. . . there is only an indirect personal benefit to a union officer, and the union itself has benefited, authorization by the union need only be technically correct under the rules of union procedure; we will not inquire into its substance." (*Ray v. Young*, 753 F.2d at 391-92.)  However, where the union receives no benefit, but the officer receives a direct personal benefit, "the defendant union officer must prove, first, that the funds or property were obtained with the valid authorization of the union after adequate disclosure and, second, that the expenditure was not manifestly unreasonable." (*Ray v. Young*, 753 F.2d at 389-90).

Defendant asserts that "Mr. Vargas breached his duty and failed to manage and expend APFA's money in accordance with its Constitution and Policy Manual. . . Mr. Vargas breached his duty by among, willfully manipulating the formula used to pay others in his administration, resulting in an unauthorized overpayment to former APFA National President Bob Ross which has yet to be recovered by APFA, and incurring over $13,000 in inappropriate credit card charges related to meals. In so doing, Mr. Ross violated the fiduciary duty provisions of 29 U.S.C. § 501(a)." (*22-cv-00430; Vargas v. APFA et al; See* Def. 3d Am. Answer and 1st Am. Counterclaims Doc. 108-1, PAGEID 3717).

Defendant asserts that "Mr. Ross breached his duty by, among other things: [1] using the APFA credit card for personal expenses; [2] claiming personal meals as business; [3] expenses for

reimbursement; [4] refusing to repay the overpayment of sick leave and vacation pay; and [5] wasting APFA funds to lease an apartment which he had no intention of occupying. In so doing, Mr. Ross violated the fiduciary duty provisions of 29 U.S.C. § 501(a)." (*22-cv-00343; Ross v. APFA et al; See* Def. 3d Am. Answer and 1ˢᵗ Am. Counterclaims Doc. 134, PAGEID 2672).

All expenses or purchases that Defendant, APFA, contend were improper were actually made, submitted, and approved via APFA procedures and policy at the time, or were pre-approved by APFA Board of Directors and were approved by the APFA accounting personnel responsible for payments. It is undisputed that expenses and payments made with union funds during the Ross Administration followed APFA procedures, which included an extensive review.

Prior authorization is evidenced by the signatures of the 2018 APFA Board of Directors on the Ross Transition Agreement and the lack of any reference to APFA policy for calculating payments made thereunder. Furthermore, the National Treasurer's calculation of payments made under the Ross Transition Agreement for sick and vacation leave were *reasonable*. The APFA National Treasurer used the same calculation method used to pay out the prior APFA National President, Laura Glading, under a similar agreement signed in 2015.

The Transition Agreement payments for sick and vacation leave were calculated and made to Ross *after* the Transition Agreement was signed on or about March 1, 2018—the date Ross left office—without Ross's input or influence. Ross no longer owed a duty to the union at this time. Vargas was shown only three sections of the Transition Agreement on one occasion prior to making his calculations due to APFA Outside Counsel's demands to comply with the nondisclosure and confidentiality provisions. (App., pp. 286-92). Additionally, in-house accountants advised Vargas on how to calculate Ross's payments. (App., pp. 286-92). Rene Bertholet was the Senior Accountant with APFA since 2010 who calculated payments made under

the Glading Transition Agreement. (App., pp. 286-92). Both Glading and Ross were former National Presidents paid under similar agreements using similar daily rates-of-pay calculations. (App., pp. 286-92). The calculations purported miscalculations, for APFA to comply with its obligation under Ross's Transition Agreement were subject to Rene Bertholet's oversight and were consistent with his prior experience calculating Glading's exit payments.

Moreover, the calculations were made in conjunction with in-house accountants, reviewed and approved by two APFA officers for compliance with policy, and approved by two additional APFA accounting personnel for accuracy of calculation, budgeting purposes, and issuance of payment. (App., pp. 286-92). Vargas always complied with APFA procedures.  (App., pp. 139-141; 286-92).  Additionally, when APFA asserted there were overpayments to Vargas, Martin and Dunaway, the APFA Board of Directors threatened to sue Vargas for the miscalculation. (App. pp. 214-216; 286-92). To avoid a dispute, Vargas agreed to repay the overpayment, signed a promissory note, and made all payments so that he could avoid being sued and halt the union's incessant demands for reimbursement of expenses incurred while in office. (App. pp. 214-216; 286-92). The Department of Labor also conducted its own investigation of the overpayments and cleared the Ross Administration officers of all charges of misappropriation and embezzlement. (App. pp. 286-92; 386-96).

The payments to Ross benefited APFA by fulfilling APFA's obligation under the Transition Agreement.

### B.  No admissible evidence that the union suffered damages.

Defendant asserts a breach of fiduciary duty claim wherein there are no damages proximately caused by any alleged breach of Ross's fiduciary duty. The 5th Circuit stated that "[t]he rights adjudicated by the arbitrator were thus not LMRDA rights, but a type of contractual rights provided for union officers in an agreement between the union and its members, the

constitution of the APFA.  A union's violation of its own constitution is not per se a violation of

the LMRDA, and a federal court has no jurisdiction to enforce union constitutions and by-laws as

such." *Adams-Lundy II,* 792 F.2d  at 1373; *Martin v. Loc. 556, Transp. Workers Union of Am.*,

206 F.Supp.3d 1227 (N.D. Tex. 2016).

There is no dispute between the parties, there is no damage suffered by APFA that can

form the basis of a breach of fiduciary duty.  The independent accounting firm of Woods, Stephens,

and O'Neil, L.L.P. conducts annual audits of all expenditures made with APFA funds. (App., pp.

286-292, 386-396).  The final audit report is submitted to the four National Officers, who submit

it to the APFA Board of Directors for a final review and approval.  This annual audit is conducted

by an outside accounting firm who coordinates with APFA accounting staff and National Officers

to draft the LM-2 Report.  (App., pp. 286-292, 386-396). The United States Department of Labor

requires the LM-2 Financial Report to indicate any loss of union assets or funds each year and to

date no such report has been made.[2]  The LM-2 Financial Report is required under 29 U.S.C. §

431 and are signed under penalty of perjury by the National Officers of APFA.

### C.  No admissible evidence to extend the statute of limitations.

Defendant's counterclaim under LMRDA § 501 for breach of fiduciary duty counterclaims

is legal in nature and therefore governed by the Tex. Civ. Prac. & Rem.Code § 16.004, which

applies a four-year statute of limitations to bring claims after the action occurred. *(Stewart v. Int'l*

---

[2] The LM-2 Filings require reporting any misappropriation, shortage, or theft of funds discovered within that year to the U.S. Department of Labor. See Question 13 on page 1 of the following LM-2 Filings by APFA.  The only years theft or shortages were reported were in 2018 and 2016. Clearly illustrating no misappropriation or theft was ever discovered by the union since 2018.  The only loss reported is the loss of furniture that was paid back on the 2018 LM-2 Report (notes on the last page of the LM-2 about the specific loss) and fraudulent charges on an officer's credit card reported on the 2016 LM-2 Report.  The LM-2 are signed by the APFA National Officers under penalty of perjury.

2022 - https://olmsapps.dol.gov/query/orgReport.do?rptId=840723&rptForm=LM2Form
2021 - https://olmsapps.dol.gov/query/orgReport.do?rptId=773865&rptForm=LM2Form
2020 - https://olmsapps.dol.gov/query/orgReport.do?rptId=731533&rptForm=LM2Form
2019 – https://olmsapps.dol.gov/query/orgReport.do?rptId=709508&rptForm=LM2Form
2018 – https://olmsapps.dol.gov/query/orgReport.do?rptId=679829&rptForm=LM2Form
2017 – https://olmsapps.dol.gov/query/orgReport.do?rptId=650505&rptForm=LM2Form
2016 – https://olmsapps.dol.gov/query/orgReport.do?rptId=628943&rptForm=LM2Form
2015 – https://olmsapps.dol.gov/query/orgReport.do?rptId=594782&rptForm=LM2Form

*Ass'n of Machinists & Aerospace Workers*, 16 F.Supp.3d 783 (S.D. Tex. 2014)).  Defendant has asserted the doctrine of laches as a defense.  The U.S. Supreme Court held that proving the doctrine of laches requires "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." (*Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961)). Defendant cannot prevail on its breach of fiduciary duty as it is unable to present evidence that will establish a doctrine of laches defense.  The claim is time-barred. In assessing the pleadings, the court decided that the doctrine of laches governed whether the claim might be time-barred in its Order Partially Granting Motion to Dismiss Counterclaims.  (Dkt. 72). On the pleadings, the court could not reach the conclusion that laches time-barred the claim. Based on the evidence presented with this motion, the court should now determine that the claim is barred by the doctrine of laches as there is no evidence to support this assertion.

Therefore, judgment in favor of Plaintiffs against  Defendant's counterclaim for breach of fiduciary duty is proper as Defendant has no evidence to support the defense of laches.

## IV.  <u>SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF ROSS'S BREACH OF CONTRACT CLAIM</u>

Ross is entitled to summary judgment in favor of his claim for breach of contract.

"To prove an action for breach of contract, a plaintiff must establish the existence of an enforceable contract." *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 25 (Tex. App. –Houston [14th Dist.] 2005, no pet.); *Wright v. Christian & Smith,* 950 S.W.2d 411, 412 (Tex. App.—Houston  [1st Dist.] 1997, no writ). Under Texas law, the requirements of a valid contract are: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Hubbard v. Shankle*, 138 S.W.2d 474, 481 (Tex. App. –Fort Worth 2004, pet. denied); (*Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555-56 (Tex.

App. –Houston [14th Dist.] 2002, no pet.)).

> Under Texas state law, the elements of a breach of contract cause of action include:
> (1) the existence of a valid contract;
> (2) the plaintiff's performance or tendered performance;
> (3) the Defendant's breach of the contract; and
> (4) damages from the breach. *(Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex. App. – Beaumont 2003, no pet.)).

The first element of a breach of contract claim is the existence of a valid contract. This element has its own unique set of sub-elements. Under Texas law a valid contract exists when there is: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. (*Labor Ready Cent. III, L.P. v. Gonzalez*, 64 S.W.3d 519, 522 (Tex. App.-Corpus Christi 2001, no pet.)).

### A.  Contract between APFA and Ross

Ross and APFA entered into the Transition Agreement on or about March 1, 2018.  (App. pp. 1-6; 7-10).  APFA admits to entering a valid contract with Ross. (App. pp. 386-96; 433-448). Both parties were citizens of Texas with substantial contacts in the state and performance occurred in the state of Texas. (App. pp. 386-96; 433-448). Additionally, Diversified, APFA's authorized agent, filed a lawsuit against Plaintiff on this contract in Tarrant County, Texas.  (App. pp. 386-96; 433-448). This is a contract between Ross and the entity that employed him, APFA. (App. pp. 386-96; 433-448). Ross resigned on or about March 1, 2018 after negotiating and signing the Transition Agreement. (App. pp. 386-96; 433-448). Ross maintained confidentiality and did not disparage the union during this time.  It is uncontested that Ross fully complied and performed his obligations under the Transition Agreement. (App. pp. 386-96).

### B.  Breach by APFA

ACCRUED AND UNUSED SICK AND VACATION DAYS: APFA breached the Transition Agreement by failing to properly pay Ross for his unused and accrued sick and vacation

pay.  Per APFA Policy at the time, National Officers accrued eighteen days of paid sick leave and thirty-five days of paid vacation leave each year.  APFA agreed to "pay Ross all of his accrued unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018." (App. pp. 386-96; 433-448).

Under APFA's "accounting review" calculations, Ross was not paid for only twelve days of sick leave for 2016 and twelve days of sick leave for 2017.  (App. pp. 386-96; 433-448).  There is no dispute over the number of days Ross is entitled to be paid for his unused sick and vacation days under the Transition Agreement. Ross is still owed a total of twelve days of pay—six days of pay for 2016 (at $314.06 per diem) and six days of sick pay for 2017 (at 334.58 per diem).  (App., pp. 16-27). Ross's vacation pay was miscalculated for 2016. (App., pp. 16-27). He was owed thirty-one days at a rate of $314.06 for a total of $9,735.86.  (App., pp. 16-27). However, Ross only received payment for $9,214.22 (a payment for $3,875.20 plus $5,339.02). (App., pp. 16-27). This miscalculation resulted in Ross being underpaid by $521.64 for his 2016 vacation. (App., pp. 16-27).

PER DIEM CALCULATION: Ross differs from APFA on the calculation of the "per diem" amount of pay to which Ross was entitled.  APFA use the calculation from the APFA Policy: Base Salary divided by 365, which resulted in a per diem of $276.80 for 2016, $290.64 for 2017, and $295.60 for 2018. (App., pp. 16-27). Vargas calculated Ross's per diem based on his *total* compensation or taxable income. The result of total compensation calculation resulted in a per diem of $314.06 for 2016, $334.58 for 2017 and 2018. (App., pp. 16-27). The higher calculated per diem rate is used when an APFA employee takes a sick or vacation day.  This fact is undisputed. Based on the per diem rate used by Ross and the total number of days unpaid multiplied by the per diem per year, Ross is still owed a total under the Transition Agreement of $4,663.32.  The contract

18

language clearly states "APFA agrees to pay Ross all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018." Nothing in this language requires this contract to be paid in accordance with APFA policy.

NONDISCLOSURE CLAUSE: The Transition Agreement contains a non-disclosure clause that states:

> "The Parties agree that the existence, terms, and content of this Agreement are completely confidential. ROSS agrees not to disclose the existence, terms, or content of this Agreement to any third party, except to his spouse, accountant, financial advisers, or attorney. APFA agrees not to disclose the existence, terms, or content of this Agreement, except to the signatories to this Agreement, and to any APFA officers, employees, accountants or attorneys who have an explicit need to know of this Agreement in order to execute its terms. The Parties shall be responsible for ensuring in writing that the confidentiality provisions of this Agreement are fully explained and adhered to by anyone to whom permitted disclosures are made pursuant to this paragraph. The Parties agree that they will respond to all inquiries regarding Ross' transition with APFA in accordance with the communications and talking points prepared pursuant to numbered paragraph 6 of this Agreement." (App. pp. 7-10).

APFA admits it disclosed the Transition Agreement to APFA members Melissa Chinery-Burns and Sandra Lee. (App. pp. 255-262). APFA union member, Melissa Chinery-Burns posted the details and a hand-written copy of the Transition Agreement on social media. She then pursued Article VII Disciplinary Charges against Ross and Vargas based on this Transition Agreement, and continued to allege Plaintiff's misappropriated funds and breached their fiduciary duty publicly. None of these facts are in dispute. APFA admits that it disclosed the confidential Transition Agreement to Woods, Stephens and O'Neil to achieve an accounting review that reflected a falsified overpayment. This alleged overpayment of wages resulted in union disciplinary charges brought by APFA charging party, Melissa Chinery-Burns, and an arbitration award of $62,558.75 against Ross. APFA also admits that it disclosed the confidential Transition Agreement to Diversified Credit, for purposes of reporting on Ross's credit report. Ross suffered damages as cited in his affidavit attached hereto and incorporated herein. (App. pp. 386-396; 473-484).

The Transition Agreement contains a non-disparagement clause that states:

> "APFA's Board of Directors, and its officers, employees and agents who are aware of this Agreement pursuant to the confidentiality provisions oi numbered paragraph 7 of this Agreement, agree not to make, orally or in writing, any statements disparaging ROSS or his immediate family, whether or not such statements legally constitute libel or slander, and whether such statements are made to the media, to other individuals, or otherwise." (App. pp. 7-8).

As a result of disclosing the Transition Agreement, Melissa Chinery-Burns posted the agreement publicly, and subsequently made public statements wherein she continued to discuss the Transition Agreement, disclose its terms and disparage Ross by alleging that he "misappropriated money" under this agreement, and refused to pay the union back. (App. pp. 1-6; 42-51; 52-92).  These allegations are not true.  (App. pp. 386-96). Ross did not disparage APFA until after APFA disclosed his Confidential Transition Agreement.  (App. pp. 386-96). He did not disclose the Transition Agreement to anyone except his wife and his accountant prior to APFA's disclosure of it to third party members. (App. pp. 386-96).

### C.  Damages for Breach of the Ross Transition Agreement

<u>Damages</u>

Ross sustained damages because APFA failed to pay the total number of sick and vacation days for 2016 and 2017; Ross is still owed $4,663.32 under the Transition Agreement.  (App. pp. 386-96). Additionally, Ross suffered $1,040.82 and $2,169.23 in lost reimbursable pay, $204,800 in loss use of funds, and $107,685.62 in loss funds from his 401k, and the amount of the Award $62,558.75 resulting from the Article VII Disciplinary Arbitration.  (App. pp. 386-96; 450-66; 467-69;470-472; 473-484; 485-493).

<u>Reputational Damages:</u>

Breach of confidentiality and non-disparagement clauses in the Transition Agreement caused Ross substantial foreseeable reputational damages.  It was also Chinery-Burns and her "Red Wagon" Campaign that created the circumstances that gave rise to the need for the Transition

Agreement and Ross's resignation.  The non-disparagement and non-disclosure or confidentiality provisions of the Transition Agreement were essential seeing as Chinery-Burns' vendetta against Ross made it foreseeable that additional damage could be suffered by APFA and Ross upon disclosure of the Transition Agreement. (App. pp. 386-96).  When Ross filed a willingness-to-serve on the APFA Board of Directors as the San Francisco Base President in November of 2020, Chinery filed Article VII disciplinary charges in the same month against Plaintiffs. (App. pp. 386-96). During December of 2020, while Ross campaigned for APFA Base President/Board of Directors, the APFA Executive Committee voted in favor of the Article VII Arbitration charges against Plaintiffs. (App. pp. 386-96)..  In January of 2021, while the union held elections for APFA San Francisco Base President, Ross's debt account was assigned to Diversified to collect and report on his credit report. (App. pp. 386-96). In April of 2021, upon taking office as SFO Base President, Chinery demanded Ross be removed from the Board of Directors seat that he won due to the pending disciplinary charges against him. (App. pp. 386-96). This fact pattern was last seen in the *Adams-Lundy v. APFA* case where one group battled another within the union for power attempted to remove opponents from the Board of Directors.[3]

Either way, LUS flight attendants and AFA's agenda against Ross necessitated the non-disparagement and confidentiality provisions in the Transition Agreement—to prevent *this exact* conduct.  The continued harassment and abuse that Ross and those associated with him have endured since he took office in 2016 is extensive.  But for APFA's disclosure of the Transition Agreement, Ross would not have been harassed, suffered financial harm, or discipline. (App. pp. 386-96).  It is within reason to consider that breaching the confidentiality and non-disparagement clauses could result in damage to his reputation with his employer or other potential employers.

---

[3] *Adams-Lundy v. A.P.F.A*, 792 F.2d 1368, 1370 (5th Cir. 1986).

Therefore, reputational damages were foreseeable.

The reputational harm caused Ross to lose potential job opportunities for management or consulting positions within AA. (App. pp. 386-96). Ross applied for positions with AA and was informed that he would not be hired until after the union disciplinary charges were dismissed. (App. pp. 386-96). Never in APFA history had the union publicized a disciplinary award in a presidential hotline emailed to the entire membership. (App. pp. 286-92; 297-308; 386-96). This fact is not in dispute, and one that is particularly jarring, seeing as Ross and Vargas have not ever been convicted of a crime. (App. pp. 286-92; 297-308; 386-96). Ross and Vargas both endured an APFA publicized hotline signed by the APFA National President. (App. pp. 286-92; 297-308; 386-96).

Laura Glading, prior APFA National President that similarly resigned after signing a Transition Agreement, was hired as a consultant with AA and now makes an annual salary of over $200,000 in a position with the Federal Aviation Administration.  Ross's reputation suffered because of the Arbitration award as he is unable to apply for positions within AA or elsewhere. (App. pp. 386-96). Former APFA National President Laura Glading was hired by American Airlines, Inc. as a consultant in the past.  Consultants for American Airlines, Inc. make an average of $121,500 - $173,200 annual salary.[4]  This is a minimum of $28,792 less than my current taxable income, therefore estimated damages suffered over the last three years by Ross as a result of his inability to apply with AA for a position is approximately $86,376.00 in potential income due to reputational harm. (App. pp. 386-96).

Ross's position with AA has become unstable due to the union publicizing his debts and his disciplinary award.  Magazine articles were published by Forbes and others discussing Ross's

---

[4] https://www.salary.com/research/salary/employer/american-airlines-group-inc/expert-consultant-reliability-engineer-salary

conflict with the LUS flight attendants and the disciplinary award stating he misappropriated funds—which is untrue.[5]   After almost 40 years with AA, Ross's work environment has become hostile. He fears he could lose his job due to the multiple anonymous complaints to Human Resources since the union's public hotline about the Arbitration Award.   He is unable to find positions at other airlines due to the publicity surrounding the union's discipline.   Ross fears for his future and his family's survival because of his union's conduct.

Credit Report Damage:

Ross discovered the alleged overpayment debt had been published on his credit report while he attempted to apply for a Cash-Out Refinance mortgage loan through the Veteran's Administration for 100% of the appraised value of his home so that he could afford to put his daughter through college. (App. pp. 1-6; 16-27; 52-92; 286-92; 386-96; 473-484). His mortgage lender contacted him and said that he could not qualify for the Cash-Out Refinance mortgage loan on his home due to failure to meet the credit and underwriting guidelines because of the defaulted collection account on his credit report. (App. pp. 1-6; 16-27; 52-92; 286-92; 386-96; 473-484). Ross subsequently lost the opportunity to liquidate over $204,800 of equity in his house.   (App. pp. 1-6; 16-27; 52-92; 286-92; 386-96; 473-484).   As a result, his daughter could not continue at school, and had to return home.

Ross's loss at the opportunity to qualify for a Cash-Out Refinance was foreseeable.   Ross informed APFA that he discovered the line item on his credit report and that he was in the middle of applying for a mortgage loan. (App. pp. 1-6; 52-92). This fact is undisputed.   APFA sought out publishing the line item on his credit report for the overpayment to injure his ability to obtain credit. (App. pp. 1-6; 52-92). The damages alleged for the cash-out refinance loan was $204,800.

---

[5] View from the Wing Article;   Forbes Article.

`

(App. pp. 1-6; 52-92).

<u>Attorney's Fees</u>

Under the Texas Civil Practices and Remedies Code §38.001(b)(8) "A person may recover reasonable attorney's fees from an individual or organization in addition to the valid claims and costs, if the claim is for an oral or written contact."  Ross has incurred $502,362.50 in attorney's fee for this pending action before the court. (App. pp. 797-899).

# V.     SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF ROSS'S AND VARGAS'S CLAIMS UNDER THE LABOR MANAGEMENT DISCLOSURE AND REPORTING ACT §§ 411(A)(2), 411(A)(5), AND 529

Congress enacted Labor Management Reporting Disclosure Act ("LMRDA") after investigations found that unions—which hold a position of trust—were particularly susceptible to corruption. (29 U.S.C. § 401 *et. seq.*). The answer was a statute that imposes reporting requirements and safeguards union members' rights and assets to ensure a union's integrity. The LMRDA governs:

"(i) . . . labor organization[s] engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body."  (29 U.S.C. § 402 (i)).

"A labor organization shall be deemed to be engaged in an industry affecting commerce if it . . . is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended." (29 U.S.C. 402(j)).

The LMRDA protects union member's right to:

(2) FREEDOM OF SPEECH AND ASSEMBLY -- Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor

organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations. . . .

(5) SAFEGUARDS AGAINST IMPROPER DISCIPLINARY ACTION -- No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.  (29 U.S.C. §§ 411(a)(2) and (a)(5)).

A member may pursue a violation of either the individual rights or any wrongful discipline upon exercising those rights protected by the Act.  Section 412 provides that:

[a]ny person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located. (29 U.S.C. § 412).

Section 529 provides that:

[i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act. The provisions of section 102 shall be applicable in the enforcement of this section. (29 U.S.C. § 529).

## A.  29 U.S.C. § 529 Retaliation or Otherwise Disciplined:

This Court spelled out the distinctions between claims made under 29 U.S.C. § 412 versus § 529.  *(Martin v. Loc.556, Transp. Workers Union of Am.,* Dist. Court, ND Tex. Sep. 3, 2014).

Depending on the right the member seeks to protect, §§ 412 and 529 can be entirely duplicative. To state a claim under § 529, plaintiffs must show that (1) they are members of a labor organization; (2) the organization fined, suspended, expelled, or otherwise disciplined them; and (3) the organization imposed the punishment in **retaliation** for their exercise of a right protected by the LMRDA. As under § 412, to state a claim under § 529, plaintiffs must allege that any punishment or restriction imposed by TWU Local was a limitation or restriction on their membership rights. (*Martin v. Loc. 556,* 3:14-CV-0500-D, (N.D. Tex. Sep. 3, 2014)).

Additionally, the *Martin* stated that:

[a]lthough the Fifth Circuit has not specifically held that being banned from holding union office is a form of discipline, it has stated in *dicta* that the right to run for office is a membership right.  The court will therefore assume that a ban against running for union office is a form of discipline that is actionable under § 411(a)(5). (*Martin v. Loc. 556,* No. 3:14-CV-0500-D, (N.D. Tex. Sep. 3, 2014)) (citing *Adams-Lundy I v. APFA*, 731 F.2d 1154, 1156).

Plaintiffs' claims under LMRDA § 529 are valid and properly asserted. It is undisputed

that Plaintiffs are members of the APFA, a labor organization, in good standing. (App. pp. 286-92; 386-96).  Further, it is undisputed that Plaintiffs were disciplined by APFA as seen in the Disciplinary Arbitration Award which issued fines of $62,558.75 against Ross and $30,963.03 against Vargas, removed Ross from his elected position on the APFA Board of Directors, and, most importantly, banned both Ross and Vargas from holding an elected position within the union for life. (App. pp. 1-6; 115-38; 286-92; 309-50; 386-96; 467-469).  As stated in *Martin*, a complete ban on a member's right to run for elected positions within the union falls within the scope of §529 discipline requiring the union to comport with due process requirements under §101(a)(5).

APFA admits that the union removed Ross from his elected position on the Board of Directors in the Disciplinary Arbitration Award.  APFA also admits that Plaintiffs have been banned from ever running for office.  Therefore §529 of the LRMDA has been met, Plaintiffs were wrongfully or otherwise disciplined.

### B.  LMRDA: Due Process Violation:
"The full and fair hearing clause does not require unions to provide the 'full panoply of procedural safeguards found in criminal proceedings,' but only to comply with the 'fundamental and traditional concepts of due process.'" *Martin v.  Loc. 556, Transp. Workers Union of Am*., No. 3:14-CV-0500-D (N.D. Tex. May 19, 2016) (quoting *Wildberger v. Am. Fed'n of Gov't Emps*., 86 F.3d 1188, 1193 (D.C. Cir. 1996) (quoting *Ritz v. O'Donnell*, 566 F.2d 731, 735 (D.C. Cir. 1977)); *see also, United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 385 (2d Cir. 2001) ("Teamsters"). The 5th Circuit Court held that the LMRDA "is not meant as a vehicle for judicial oversight of union activity, but only as a means of addressing unreasonable and arbitrary actions by union officials. The federal courts do not sit as a `super-review' board of internal union grievances ***unless there is evidence of impropriety in the proceedings.***" (emphasis added) (*Hoffman v. Kramer*, 362 F.3d 308, 316 (5th Cir. 2004) (quoting *United Food & Com. Workers Int'l Union Loc. 911 v.*

*United Food $ Com. Workers Int'l*, 301 F.3d 468, 475 (6th Cir.2002)).

"Not all of the due process protections available in the federal courts apply to union disciplinary proceedings. . . . [a] violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA." *Martin v.  Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D (N.D. Tex. May 19, 2016) (quoting *Int'l Bhd of Teamsters*, 247 F.3d at 385, 387).  Additionally, "[t]he LMRDA [§ 411 (a)(5)] gives plaintiffs ***the right to present evidence and to cross-examine witnesses***. . . .'" (emphasis added) *Martin v.  Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D (N.D. Tex. Sep. 3, 2014 (quoting *Frye v. United Steelworkers,* 767 F.2d 1216, 1224 (7th Cir. 1985). Therefore, to substantiate a claim under §411(a)(5), Plaintiffs must show that APFA's conduct either (1) violated the APFA Constitution or Policy which resulted in Plaintiffs' loss of a full and fair hearing; or (2) infringed on Plaintiffs' right to present evidence or cross-examine witnesses.

1) <u>APFA CONSTITUTION AND POLICY: ARTICLE VII DISCIPLINARY ARBITRATIONS</u>.

Article II of the APFA Constitution grants members a Bill of Rights.  The applicable section states:

**Section 3. BILL OF RIGHTS OF MEMBERS:**

A.      All members of the APFA shall have the right of free speech, freedom of assembly and freedom to dissent.

B.      All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II [inactive members].

C.      All members of the APFA shall have the right to individual privacy.

D.      All members of the APFA shall have the right to due process and equal representation. (APFA Const. Art. II, Sec. 3 *et. seq.*).[6]

All APFA union members are entitled to financial reports and records if you are an active

---

[6] APFA's full constitution is available at <u>https://www.apfa.org/constitution/</u>

member of the union (Section 5 defines Inactive Members of the union).   Article VII of the

APFA Constitution provides for disciplinary proceedings to be taken if a member commits a

defined stipulated act, including:

> F.      Willful violation[s] of an express Article of this Constitution, or of a proper and express
> written resolution or policy of the Board of Directors or the Executive Committee;
>
> G.      Willfully acting in a manner that causes the Association to violate its legal obligations."
> (APFA Const. Art. VII, Sec. 1F-1G).[7]

APFA Policy Manual, Section 17 entitled "Article VII Administrative Policies and

Procedures" more particularly defines the Article VII Disciplinary Hearing proceedings and

provides that:

> **K.      ORDER OF PROCEEDINGS**
>
> 1.      The Arbitrator shall determine how the case can best be presented so that all
> parties have a fair opportunity to contest issues.
>
> 2.      The Arbitrator shall afford each party a full opportunity for the presentation of
> relevant proof.  (APFA Policy, Sec. 17K).[8]
>
> **N.      EVIDENCE**
>
> 1.      The parties may offer such evidence as they desire and shall produce such
> additional evidence as the Arbitrator may deem necessary to an understanding
> and determination of the dispute.
>
> 2.      The Arbitrator may subpoena witnesses and documents independently or upon the
> request of any party. (APFA Policy, Sec. 17N).[9]

Plaintiffs' rights to due process under LMRDA § 101(a)(5) were violated because they

were deprived of their rights to receive, request, or inspect all relevant documents and financial

reports and records as required by APFA's Constitution. "[T]he fundamental due process rights

guaranteed under the LMRDA include: (1) the existence of "some evidence" to support the charges

made, (2) an impartial tribunal, (3) an opportunity to confront pertinent witnesses, and (4) an

---

[7] APFA's full Constitution is available at https://www.apfa.org/constitution/
[8] APFA's current Policy is available at https://www.apfa.org/policy-manual/
[9] APFA's current Policy is available at https://www.apfa.org/policy-manual/

opportunity to present evidence. . . ." (*International Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 246, 91 S.Ct. 609, 617, 28 L.Ed.2d 10 (1971); *"Ritz v. O'Donnell, 566 F.2d 731,* 735-36 *(D.C.Cir.1977). Yager v. Carey, 910 F.Supp. 704 (D. D.C. 1995)*, *Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir.1975)).

Plaintiffs were not afforded due process in compliance with those requirements.

2) <u>DEFENDANTS ALTERED EVIDENCE BY WITHHOLDING PARTS OF AN ACCOUNTING DOCUMENT THAT REFUTED DEFENDANT'S DISCIPLINARY ACCUSATIONS.</u>

To be subject to a disciplinary proceeding, there must be "some evidence" to support charges that would subject a person to discipline and satisfy the due process requirements under LMRDA § 411(a)(5).  Court review of the disciplinary arbitration is appropriate here because "***there is evidence of impropriety in the proceedings*.**" (*Martin v.  Loc. 556,* No. 3:14-CV-0500-D (N.D. Tex. Sep. 3, 2014).  Plaintiffs do not ask the court to act as a "'super-review' board of internal union disciplinary hearings." (*Ibid.).*

In the present case, documents were sought out and presented citing that they were from a state-licensed CPA.  But those documents were tainted because they were not accompanied by the Confidential Memo, which disavowed the assertion.  The Confidential Memo was never presented to the APFA Board of Directors or the APFA Executive Committee, or the APFA Article VII Arbitrator. (App., pp. 142-146; 185-199; 200-213; 217-225). Removing the Confidential Memo from the original document delivered by the CPA and citing his credentials as a CPA constitutes to fraudulent misrepresentation made to the governing bodies of the union charged with review and oversight of the union's disciplinary proceedings.  Only valid, timely, and specific disciplinary charges should proceed to arbitration hearings, however concealing the Confidential Memo stifled the due process of the Executive Committee's review and vote over the disciplinary charges.  Further, putting forth fraudulent misrepresentations in such an egregious manner during the

discovery process and hearing deprived the Plaintiffs of their right inspect the documents, question witnesses, and properly mount a defense based on the evidence.  It is a clear violation of the APFA Constitutional provision Art. II, Sec. 3B which grants all active members the right to all financial reports and records.

Additionally, citing it as an "accounting review" without delivery of the initial cover page is an attempt to mislead the audience to believe it is an audit. Presenting the miscalculations to the union's governing body, while withholding the Confidential Memo which explains the distinction from the licensed and certified public accountant who issued the calculations and opinion is misleading. (App., pp. 142-146; 185-199; 200-213; 217-225). The evidence was controlled by, presented by, testified to, and delivered by the APFA National Officers—those charged with conducting the disciplinary proceedings.  Considering the APFA National Officers involvement in requesting the accounting review, their receipt and concealment of the Confidential Memo, their attendance at the October 2020 Board of Directors meeting, and the December 1, 2020 Executive Committee meeting, it can only be concluded that those parties' involvement in conducting and influencing the Article VII Arbitration process resulted in a skewed Arbitration Award.

3) <u>PLAINTIFFS WERE DEPRIVED OF PROPORTIONATE TIME.</u>

Ross was not afforded an adequate opportunity to present evidence or properly cross-examine witnesses.  (App. pp. 1-6; 101-14; 386-96).  A review of the Disciplinary Arbitration Hearing transcripts shows that Ross did not have an adequate opportunity to present evidence or cross examine witnesses. (App. pp. 1-6; 101-14; 386-96).

Plaintiff received only 2 hours and 51 minutes to present his evidence and witnesses, whereas the charging party received 9 hours and 23 minutes.  (App. pp. 1-6; 101-14).  The disparity is clear.

4) <u>PLAINTIFFS WERE PREVENTED FROM PRESENTING EVIDENCE AND FROM CROSS-EXAMINING WITNESSES.</u>

Ross was only able to admit eleven exhibits into evidence during his Arbitration whereas Chinery-Burns was able to enter forty-eight exhibits into record, all over Ross's objection to hearsay. Vargas was unable to present evidence from witnesses that were intimidated and harassed by the union. Additionally, since exculpatory documents were withheld, Plaintiffs were not able to properly cross-examine their witnesses. (App. pp. 255-262; 263-285; 286-292; 386-96). Harris testified that Ross owed the overpayment under the Transition Agreement without disclosing anything about the Confidential Memo from the accounting firm in both Vargas's and Ross's hearings. (App. pp. 255-262; 263-285).

Most importantly, neither Ross nor Vargas were allowed to introduce any evidence related to Ross's Transition Agreement. (App. pp. 255-262; 263-285; 286-292; 386-96). This is strange considering the dominant charge at issue was an alleged overpayment made by Vargas to Ross based on the terms of Ross's Transition Agreement. (App. pp. 1-6; 115-38; 286-292; 309-50).

Vargas was not allowed to present evidence regarding Ross's Transition Agreement as well. This seems counterintuitive when considering the charges included using the improper formula for calculation of the per diem for payment to Ross under the Transition Agreement. Discussion relating to the Transition Agreement contract was strictly prohibited from his Arbitration, or anything related to Ross's overpayment. The overpayment allegedly owed under the Transition Agreement formed the basis of several charges against Ross and Vargas and ultimately formed the damage portion which resulted in the one charge that amounted to the only timely charge launched against Vargas by the union.

Finally, Ross was found guilty regarding the overpayment of these wages, and his refusal to pay it as seen in the Arbitration Award. (App. pp. 1-6; 115-38). Vargas was found guilty of improperly calculating payments under the Ross Transition Agreement. (App. pp. 286-292; 309-

50). Whereas records were withheld regarding the APFA accountant's true calculations and opinions on Ross's payments made under the Transition Agreement. (App. pp. 255-262; 263-285; 286-292; 386-96). Additionally, Ross was not provided any opportunity to introduce or discuss his Transition Agreement at his Arbitration hearing whatsoever, and yet the Arbitration Award rendered him guilty on the four counts that addressed the Ross Transition Agreement. (App. pp. 263-285; 386-96).

Evidence and testimony indicate that the union's records are not properly maintained. (App., pp. 286-92; 385; 270).  Harris admitted to the loss of an entire boxes of relevant documents and receipts from 2017 were misplaced by the union.  (App. p. 385). And yet the bulk of the documents admitted into record and taken under review to render the Arbitration Award were unreliable hearsay documents. (App., pp. 286-92; 385; 270). In both Ross's and Vargas's Arbitrations, the union deprived the charged parties, the arbitrator, and the governing bodies within the union the proper opportunity to access and to review those documents. (App., pp. 142-146; 185-199; 200-213; 217-225). The four National Officers received the Confidential Memorandum in October of 2020, which clearly states that Ross appears to have been properly paid under the Transition Agreement. (App., pp. 200-213; 217-225). However, the four National Officers were present at the Board of Director's meeting and presented documents about Ross's alleged overpayment owed to APFA.  (App., pp. 200-213; 217-225). The National Officers were also present and voted at the December 1, 2020 Executive Committee meeting wherein charges against Ross and Vargas were reviewed and the Executive committee voted the charges were timely, specific, and valid. (App., pp. 200-213; 217-225).  The four National Officers were subpoenaed in both Ross' and Vargas' Arbitration hearings. Erik Harris, APFA National Treasurer, gathered the documents, verified the documents, and testified as to their accuracy against Ross and Vargas at

their Arbitration Hearings. (App. pp. 255-262; 263-285; 286-292; 386-96).

Finally, there were multiple witnesses both Ross and Vargas served via a signed subpoena by the Arbitrator to have appear and testify at both Ross's and Vargas's Arbitration hearings, including Julie Hedrick, however several of these witnesses never attended, and thus the Charged Parties were never afforded an opportunity to question these witnesses. (App. pp. 255-262; 263-285; 286-292; 386-96).  This infringes on Plaintiff's right to present oral testimony and violates the APFA constitution as well as the rule this court established in the *Martin v. TWU* case.  (*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D, slip op. at 21 (N.D. Tex. May 19, 2016).

### C. Plaintiffs' Rights Under the LMRDA of Free Speech and Assembly were Violated.

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings. (29 U.S.C. § 411(a)(2)).  "The primary difference between § 529 and § 412 is that § 529 protects against retaliation for the exercise of any right secured under the LMRDA, whereas § 412 only protects rights secured under §§ 411-15." (*Martin v. Loc. 556, Transp. Workers Union of Am., AFL-CIO*, Dist. Court, (ND Texas 2016 May 19 2016)) (quoting *United Steel Workers Loc. 12-369 v. United Steel Workers Int'l,* 728 F.3d 1107, 1115 (9th Cir. 2013)).

The *Martin v. Loc. 556* Court states that "Union leaders, *per se,* are not themselves a protected class under the LMRDA, except that they, too, may not be deprived of the basic rights attending on union membership." (*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-

CV-0500-D, slip op. at 13 (N.D. Tex. Sep. 3, 2016))."Where the injury allegedly suffered by union officers is done to them in their status as officers, not as individual members, there can be no cause of action under section 411." *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 792 F.2d 1368, 1372 (5th Cir. 1986) ("Adams-Lundy II").  However, as this Court explains in *Martin v. TWU*,

> "There is an exception, however, to this general rule. If a plaintiff can show that the removal from office "was part of a scheme to subvert the union's basic democratic structure or directly implicated rights of members,' the plaintiff can prevail on a claim for relief as an officer under § 412. To recover under this exception, a plaintiff must show "that the defendants are attempting to dismantle the union's electoral system, [or] that members opposing that faction are . . . suppressed or threatened with reprisals.' Allegations that merely suggest that an internal union struggle is "anti-democratic" are insufficient to plausibly allege the existence of a pattern of intimidation and stifled dissent." (*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D, slip op. at 13 (N.D. Tex. Sep. 3, 2016)). (quoting *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 731 F.2d 1154, 1156 (5th Cir. 1984)).

If the court decides Plaintiffs plead sufficient facts to reasonably infer that APFA disciplined Plaintiffs for exercising his rights to free speech as members rather than as officers, or that Plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent, then Plaintiffs shall prevail.

Ross, and the officers in the Ross Administration, opposed an affiliation or merger with AFA upon taking office. (App. pp. 286-292; 293; 386-96; 409; 412-423). Since, leaving office, Ross has openly and vocally opposed an APFA/AFA merger while in office as National President of the union, Vargas and Martin both supported Ross's position on this matter. (App. pp. 286-292; 293; 386-96; 409; 412-423). He endured several attempts by Sara Nelson, AFA International President, to solicit the APFA membership for a possible merger without consent from the Ross Administration at the time. (App. pp. 286-292; 293; 386-96; 409; 412-423). The evidence illustrates the Ross Administration opposed any possible AFA/APFA merger. (App. pp. 286-292; 293; 386-96; 409; 412-423). Ross regularly speaks of his opposition to the LUS political faction, both on and off the Board of Directors seat. (App. pp. 386-96; 409; 412-423). He opposed structural changes to APFA leadership that gave the National Officers voting rights in key

positions arguing that it was a clear move to prepare for a proposed resolution to merge the two unions. (App. pp. 386-96; 409; 412-423). He argued against changes to the CBA, APFA Constitution and Policy that aligned APFA's structure to AFA's structure. (App. pp. 386-96; 409; 412-423). He often opposed LUS candidates for office due to their support of a merger between the two unions. (App. pp. 386-96; 409; 412-423). A pattern of intimidation and harassment from APFA leadership continues to stifle free speech and free association of the APFA membership.

29 U.S.C. § 411(a)(2) protects a union member's right to free speech and association. Defendant, APFA, violated LMRDA § 411(a)(2) by seeking disciplinary charges, achieving an award that sought his removal from the APFA Board of Directors, ban him for life from holding union office, and levying fines. There is a pattern of intimidation and stifled dissent within the union.

### 1)  FACTS SHOWING DEFENDANT STIFLED FREE SPEECH.

The facts evidencing these issues include:

- 2019: Chinery demanded financial audits of three Ross Administration officers—Marcy Dunaway, Eugenio Vargas and Nena Martin—led to demands to repay APFA for overpayments made upon exit. All three former officers complied and repaid the debt in full. (App. pp. 214-216).

- 2020: Demands by Chinery to APFA to disclose the Transition Agreement. She posted a copy of it on social media and demanded a financial accounting of the payments made thereunder. An "accounting review" of the payments made to Ross under the Transition Agreement led to the alleged overpayment debt. Chinery filed union disciplinary charges against Vargas, Ross and Martin. APFA Executive Committee approved the charges and sent Chinery v. Ross, Chinery v. Vargas to an arbitration hearing. (App. pp. 286-292; 386-396).

- 2021: AFPA disclosed the Transition Agreement to Diversified and referred Ross's alleged overpayment debt to Diversified. Diversified published the alleged debt on his credit report after receiving Ross's old Texas address. Ross and Vargas defended themselves in an arbitration hearing. Chinery v. Martin disciplinary charges were referred to an arbitration hearing. (App. pp. 1-6; 16-27; 52-92; 386-396).

Since 2022:

- January 2022: Diversified filed a lawsuit against Ross for the alleged overpayment in Texas small claims court. (App. pp. 386-396; 433-448).

- February 18, 2022: Vargas Arbitration Award was issued. (App. pp. 286-292; 309-347).

- March 19, 2022: Ross Arbitration Award was issued. (App. pp. 1-6; 115-138).

- March 24, 2022:  APFA released Presidential Hotline Email to APFA Membership announcing Ross and Vargas Arbitration Award and congratulating Chinery-Burns and Lee.  (App. pp. 286-292; 297-301).

- July of 2022: APFA released financial documents of various witnesses that testified for Ross and Vargas hearings to Chinery at her demand. (App. pp. 251).

- October 2022: Chinery v. Martin Disciplinary hearing resulted in dismissal of charges against Nena Martin without any public presidential hotline released to the membership, like with Chinery v. Ross and Chinery v. Vargas. (App. pp. 226-231).

- December 2022: Martin filed internal disciplinary charges against Chinery for filing frivolous claims against the Ross Administration.  Martin ultimately dismissed the charges. (App. pp. 252-254).

- August of 2023: Nena Martin and Marcy Dunaway were the subject of additional audits. (App. pp. 252-254).  The basis for conducting audits comes almost a year after the initial request was made.[10] However, the union waited until August of 2023 before conducting the audit.  (App. pp. 252-254).

- September 21, 2023: a complaint submitted against Heidi Morgan (former union representative for Eugenio Vargas and Nena Martin) for a social media post made in 2020. (App. pp. 232-251). The 2020 social media post complained of AFA General Counsel, Joe Burns being hired by Hedrick as negotiating attorney for APFA's new Collective Bargaining Agreement. (App. pp. 232-251).

- November 2023:  APFA adopted a resolution that prevents APFA leadership from assisting in litigation filed against APFA, in violation of the LMRDA §101(a)(4). (App. pp. 232-251).

The pattern of abuse, harassment, intimidation, and continued threats are undeniable.  It is a culture of chaos and fear designed to create distrust and internal conflict by those who vocalize opposition to the current leadership.  The purpose, and more importantly, the effect on the APFA members is a culture of suppression to achieve the silent obedience by LAA flight attendants that would otherwise dissent to the LUS platform.  APFA members that speak out publicly become the victim of anonymous reports made against them to AA human resources, receive threats of legal action, disciplinary charges from the union, or financial audits of their past union-related expenses. The looming threat lingers that whoever speaks out against AFA or APFA may become the next

---

[10] Melissa Chinery-Burns (spouse of AFA General Counsel and current APFA negotiating attorney, Joe Burns) requested audits on Nena Martin and Marcy Dunaway in November of 2022.  These audits have not been produced to either member nor per the order to compel document production of Nena Martin, despite Plaintiffs' Motion for Sanctions on such basis. No other administration has been audited by APFA to date.

"Bob Ross."  This conduct is not exhaustive, but evidentiary of a growing pattern of behavior by the union intended to silence its opposition.

2)  <u>RELIEF SHOULD BE GRANTED IN FAVOR OF PLAINTIFFS INCLUDING DAMAGES AND INJUNCTION.</u>

<u>Permanent Injunction</u>

Plaintiffs seek a permanent injunction against APFA's enforcement of its Disciplinary Arbitration Award as a violation of their rights under the LMRDA.  Plaintiffs seek their right to run for an elected position within the union and cease any improper collection activity for an improperly acquired arbitration award.

The Fifth Circuit held that a "the right to run for office is a membership right." (*Adams-Lundy v. APFA*, 731 F. 2d 1154 at 1156). As previously stated, this court held that the LMRDA entitles members to the right to run for office.  To determine whether or not to issue a permanent injunction, the plaintiff must prove that:

(1) that the plaintiff has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury;

(3) that the remedy in equity is warranted upon consideration of the balance of hardships between the plaintiff and defendant; and

(4) that the permanent injunction being sought would not hurt public interest.
(See, e.g., *Weinberger v. Romero—Barcelo, 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91* (1982)).

Plaintiffs suffered an irreparable injury as they lost the right to run for office without due process, which suppresses their free speech and the free speech of those that support them within the union.  Monetary damages will not compensate for this injury as Plaintiffs lost the right to run in the national officer election this year and lost their right to run for election within their union, a right afforded to them under the LMRDA as members in good standing. A permanent injunction prevents Plaintiffs from becoming a "cautionary tale" that discourages other APFA members from

exercising their free speech rights—stifling democracy within the union. Plaintiffs, and all APFA members, suffer a substantial hardship from a timid rather than vocal democratic electorate base. This undermines the very nature of the internal union democracy the courts should protect. Plaintiffs continually endure the shame and abuse from the loss of their right to run for office if the union's Disciplinary Award persists. Plaintiffs were both denied the right to run for office this year, in a very public announcement by the head of the balloting committee for the union on social media—another example of how Plaintiffs are shamed for speaking out, and yet have been asked time and again to stop speaking out on social media and elsewhere. A permanent injunction against collection and enforcement of the union's disciplinary award imposes very little hardship on the union since the union membership's free speech rights are currently stifled for so long as these disciplinary measures are allowed to persist. Issuing a permanent injunction against enforcement of the union's disciplinary award would serve the public interest rather than impose any injury because the injunction protects free speech and hinders the union's power from use for political purposes—a democratic ideal that should be upheld by this Court.  If a union is allowed to abuse its membership to maintain power, it undermines the free competition and speech available only to a democracy which should function within the union unencumbered.  Bolstering a union's internal democracy prevents corruption and abuse.

<u>Actual Damages</u>

Congress intended the LMRDA to provide an avenue for recovery of actual damages from violations of a member's rights guaranteed therein.  The damages from the Arbitration that Plaintiffs endured include the cost of hotel stays for himself and his witnesses, the costs of copies and the loss of workdays. (App. pp. 286-292; 351-384; 386-396; 450-466; 485-493). These damages also include the lost wages, expenses, loss use of funds, reputational damages, losses to

his 401k, and Arbitration award.  Ross suffered a total of $457,171.55 in actual damages plus reasonable attorney's fees of $482,048.80, and Vargas suffered $33,146.33 plus reasonable attorney's fees of $72,495.56. (App. pp. 286-292; 348-384; 386-396; 450-493; 797-899).

Emotional Damages:

Ross also suffered emotional distress damage resulting from the unlawful discipline.  The 5th Circuit held that "LMRDA claimants who seek damages for emotional distress must adduce some evidence of actual injury." (*Guidry v. International Union of Operating Engineers, Loc. 406,* 882 F.2d 929, 943 (5th Cir.1989), *vacated on other grounds,* 494 U.S. 1022, 110 S.Ct. 1465, 108 L.Ed.2d 603, *on remand,* 907 F.2d 1491 (5th Cir.) *cert. denied).*

Ross's Affidavit on damages includes his medical history and lays out the damages suffered therein due to conditions he has endured.  The physical manifestation of his actual injury he suffered due to the emotional and reputational damage he endured as a result of the union's abuse and harassment has been extensive. A conservative estimated amount of Ross's medical damages is $62,772.44. (App. pp. 386-396; 494-796). Ross seeks damages for emotional distress in the amount of five times the number of total damages incurred.

Punitive Damages:

The 5th Circuit Court held that "punitive damages may be awarded under the LMRDA where the union acted with "actual malice or reckless or wanton indifference to the rights of the plaintiff." (*Guidry v. International,* 882 F.2d at 943 (5th Cir.1989) (citing *International Bhd. of Boilermakers v. Braswell,* 388 F.2d 193, 199 (5th Cir. 1968).  Defendant, APFA and their National Officers acted with malice or reckless indifference toward Ross and Vargas when APFA conspired to pursue a debt collections, pursued disciplinary charges, concealed documents from the APFA governing bodies, sent Ross's account to collections and published to his credit report, and

39

published the disciplinary award to the APFA membership in a Presidential Hotline.  From 2016 to 2018, he was targeted for elimination from his position as National President, until he was offered a Transition Agreement by the Board of Directors to achieve his resignation from office. After Ross agreed and resigned, APFA disclosed his confidential agreement and conducted a financial review of his payments that resulted in a verdict that he was paid correctly. APFA then concealed that evidence, and claimed Ross was overpaid, Vargas was responsible, and Martin signed the checks to Ross. Then, knowing these payments were correct, APFA disciplined Ross and Vargas, publicized it to the membership, sued him, removed him from office, banned him from holding union office, and then sued him for breach of fiduciary duty. APFA disclosed Plaintiffs' personal private financial information to union members including Ross's confidential Transition Agreement, private flight schedules, 401k contributions, social security numbers, account and routing numbers, retirement account numbers.   Ross has recovered over 2000 social media posts discussing the integrity of his administration's conduct. Ross and Vargas ask for punitive damages four times the amount of their actual damages.

Attorney's Fees:

The 5th circuit court provides that attorney's fees are generally not recoverable under the LMRDA against a union violation, however there is an exception for prosecution of claims in bad faith.  The *Guidry* Court held that" the bad faith inquiry is not the actions that precipitated the lawsuit, but rather the way the litigation itself is carried out. That is, the rule is intended to penalize the litigant who brings to court a frivolous suit or defense or abuses the process so as to create an inquiry separate from the underlying claim."   (*Guidry v. International,* 882 F.2d at 944). Considering Defendant pursued meritless claims for breach of fiduciary duty beyond the statutory

period and sought enforcement of a union arbitration award in direct contrast to controlling case law on point, Plaintiffs requests attorney's fees be issued in his favor in his favor be issued.

Plaintiffs offered multiple non-monetary options to resolve these matters pending before this court. (cite to Ross Settlement Conference).  However, Defendant continues its pursuit of these claims despite the frivolous nature of its arguments and continues to harass and abuse Plaintiffs and his supporters.  APFA's claims comprise de minimus charges even if its allegations are true. It merely justifies its pursuit of this costly and time-consuming litigation and ignores that it pursues a judgment against a member for a fraction of the cost of its pursuit.  APFA has a duty to act in the best interests of its membership, however resolution of these claims for no additional costs would have been in the best interest of this union. The only reason for this pursuit is that the union's priority is its political agenda against Plaintiffs.   Additionally, the union pursued claims it knew or should have known had no merit.  State-law claims for breach of fiduciary duty were time-barred and consequently dismissed based on Plaintiffs leaving office over four years before filing of the claims. Furthermore, standing case law clearly does not provide enforcement of an arbitration award in federal court based solely on enforcement of a union constitution.  The union continues to argue it is entitled to a judgment for $62,558.75 from Ross and $30,963.03 from Vargas without producing any evidence substantiating the claims are valid or timely wasting this Court's, as well as Plaintiffs', time and resources.  Plaintiffs seek the Court to find Defendant, APFA, has acted in bad faith and grant Plaintiffs' attorney's fees in the amount of $502,362.50 for Ross and $72,495.56 for Vargas. (App. pp. 797-899).  Plaintiffs sought only to protect themselves, their families, and their fellow union members.

## VI.      CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs requests that the Court enter

summary judgment in its favor and against the Defendants and provide Plaintiff the following relief:

A.  A no-evidence summary judgment on Defendant's counterclaim for breach of fiduciary duty under 29 U.S.C. § 501 against Plaintiffs Ross and Vargas.

B.  A judgment granting Plaintiff, Ross's claim for damages in the amount of $4,663.32 for the remaining days of accrued and unused sick and vacation days for actual damages, damages for violation of nondisclosure and non-disparagement in the amount of $529,433.42, and reasonable attorney's fees of $502,362.50.

C.  A judgment granting Plaintiffs, Ross and Vargas, a permanent injunction against APFA's enforcement of its Disciplinary Arbitration Award against Plaintiffs.

D.  A judgment granting Plaintiff, Ross, damages for violation of LMRDA §§ 411(a)(2), 411(a)(5), and 529 in the amount of $65,768.80, emotional damages in the amount of five times the medical damages for $324,015.00, and punitive damages in the amount of four times the actual damages, and reasonable attorney's fees.

E.  A judgment granting Plaintiff, Vargas, damages for violation of LMRDA §§ 411(a)(2), 411(a)(5), and 529 in the amount of $33,146.33, for punitive damages in the amount of four times the actual damages, and reasonable attorney's fees of $72,495.56.

F.  Plaintiffs ask for any such other and further relief to which they may be justly entitled.

Respectfully submitted,
KD PHILLIPS LAW FIRM, PLLC

By: /s/ Kerri Phillips
Kerri Phillips
Texas Bar No. 24065906
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com
6010 W. Spring Creek Parkway
Plano, Texas 75024
Fax: (940) 400-0089
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on April 26, 2024 a true and correct copy of the foregoing instrument was served upon Defendants' attorney via the e-file manager and email to the following

/s/   Kerri Phillips
Kerri Phillips

Jeffrey Bartos
Guerrieri, Bartos, & Roma, P.C.
1900 M Street, NW, Suite 700
Washington, DC 20036
Tel: (202) 624-7400
Fax: (202) 624-7420
Email: jbartos@geclaw.com

Charlette Matts
In-House Counsel for APFA
1004 West Euless Blvd
Euless, TX 76040
Tel: (682) 301-8454
Cmatts@apfa.org

James Sanford
4803 Gaston Avenue
Dallas, TX 75249-1020
Tel: (214) 800-5111
Fax: (214) 838-0001
Email jim@gillespiesanford.com
Email: joe@gillespiesanford.com

Michael Rake
PO Box 1556
Lake Dallas, TX 75065-1556
Tel: (940) 498-2103
Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com