```
 1   STATE OF TEXAS          )

 2   COUNTY OF DALLAS         )

 3           THIS IS TO CERTIFY THAT I, MELISSA J. CARSON,

 4   a Certified Shorthand Reporter in and for the State of

 5   Texas, reported in shorthand the proceedings had at the

 6   time and place set forth in the caption hereof, and

 7   that the above and foregoing 265 pages contain a full,

 8   true, and correct transcript of the said proceedings to

 9   the best of my ability.

10           Certified to on this the 28th day of October,

11   2021.

12

13

14   _____

15               MELISSA J. CARSON, Certified
                 Shorthand Reporter in and for
16               The State of Texas

17

18   Certification No. 1737

19   CRCB Firm Registration #489

20   Expires August 31, 2022

21   CARSON REPORTING & ASSOCIATES

22   Post Office Box 551628

23   Dallas, Texas 75355-1628

24   Telephone 214.346.3434

25
```

Robert Ross   11/17/2021

Page 24

```
 1              IN THE MATTER OF THE HEARING

 2   MELISSA CHINERY, Member       )
           and                     )
 3   SANDRA LEE, Member            )
                                   )BEFORE ARTICLE VII
 4       AND                       )      ARBITRATOR
                                   )HON. RUBEN B. ARMENDARIZ
 5                                 )
     ROBERT ROSS, Member           )
 6

 7

 8
               ************************************
 9                   NOVEMBER 17, 2021

10                      VOLUME 2
               ************************************
11

12

13

14          BE IT REMEMBERED that on the 17th day of

15   November, 2021, the above cause came on for hearing

16   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

17   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

18   Boulevard, located in the City of Irving, County of

19   Dallas, State of Texas, whereupon the following

20   proceedings were had.

21

22

23

24

25
```

Robert Ross   11/17/2021

Page 25

1                  A P P E A R A N C E S:

2       HON. RUBEN R. ARMENDARIZ
        LABOR MANAGEMENT ARBITRATOR
3       29010 Pfeiffers Gate
        Fair Oaks Ranch, Texas  78015
4       PHONE:  210.379.0860
        EMAIL:  arbruben@gmailcom
5
        APPEARING AS THE ARBITRATOR
6
        MS. MELISSA CHINERY
7       EMAIL:  Melchinery@aol.com
                    AND
8       MS. SANDRA LEE
        EMAIL:  SEL27995@gmail.com
9
        APPEARING FOR THE CHARGING PARTY
10
        MR. ROBERT ROSS
11      EMAIL:  1RROSS@COMCAST.NET
                    AND
12      MS. GINA GUIDRY

13      APPEARING FOR THE CHARGED PARTY

14

15                          *    *    *    *

16

17

18

19

20

21

22

23

24

25

```
 1                      WITNESS INDEX

 2
     CATHY LUKENSMEYER                              PAGE
 3   Direct Examination by Ms. Chinery...............  54
     Cross-Examination by Ms. Guidry.................  74
 4   Redirect Examination by Ms. Chinery.............  84
     Recross-Examination by Mr. Ross.................  90
 5
     ERIK HARRIS
 6   Direct Examination by Ms. Lee...................  99
     Cross-Examination by Mr. Ross................... 132
 7   Redirect Examination by Ms. Lee................. 221
     Recross-Examination by Mr. Ross................. 231
 8
     MICHAEL TRAPP
 9   Direct Examination by Ms. Chinery............... 249
     Cross-Examination by Mr. Ross................... 259
10
     JOHN NIKIDES
11   Direct Examination by Ms. Chinery............... 272
     Cross-Examination by Ms. Guidry................. 297
12   Redirect Examination by Ms. Lee................. 321

13
     REPORTER'S NOTE:
14   Due to the horrible acoustics in the hearing room and
     without the use of microphones, there will be noted
15   (unintelligible) several times throughout the
     transcript.  I apologize for this; however, if I cannot
16   hear it, I cannot write it.

17   Additionally there are several notations of
     simultaneous speaking or simultaneous discussions
18   throughout the transcript.  When several people talk at
     the same time, there is no way to possibly discern who
19   is speaking.

20

21

22

23

24

25
```

 1   That is yet to be discovered.

 2              The first charge that they have are

 3   credit cards.  There will be no proven willful act of

 4   any credit card usage.  I've been frugal.  I've been

 5   honest.  I've saved the membership tens of thousands of

 6   dollars by my actions and by actions of my family, the

 7   move, and otherwise.  We will prove that we have not

 8   willfully violated any policy.

 9              Were there mistakes?  Possibly.  Could we

10   have found errors in accounting?  Possibly.  I don't

11   think so.  Could there be a receipt that's unexplained?

12   Possibly.  But I don't think that there's anybody that

13   can go through life and never make a mistake, but the

14   question is were they willful.

15              We have a question of rental cars, charge

16   number two, violation, rental car.  We have records

17   that show that this should have never been in these

18   charges and the entire charges should have been

19   dismissed for untimely.  We will show documentation

20   that they've known about any questions on rental cars

21   all the way back to 2019.  For them to include that in

22   these charges right here should have been investigated

23   and discovered prior to arbitration.  The process of

24   the Executive Committee did not allow myself to attend

25   that Executive Committee in a timely manner or to

Robert Ross    11/17/2021

```
 1   defend myself or any investigative process whatsoever
 2   that would have shown that that was untimely.  And if
 3   that of -- that charge is untimely within it, the
 4   entire charge should have been thrown out for
 5   timeliness.
```

```
 6               Reimbursement.  They'll show that under
 7   policy manual 5G 1B, ground transportation they claim
 8   at residence.  I have no idea what they're talking
 9   about on this, but I'm positive that through my actions
10   there was no violation of any reimbursement to myself
11   and I look forward to proving that today.
12               Number four, MEA and SAF expense.  There
13   have been resolutions passed that have cleared up any
14   confusion that was in the policy manual at the time.
15   In clearing up those confusions, the 2021 policy manual
16   is updated to actually include how the Ross
17   administration handled certain MEA and SAF meal
18   expenses to include how we actually did it.  That will
19   also be investigated while we're here today and you
20   will see that there were no MEA and SAF meal expense
21   and certainly no willful intent of any violation.
22               Number five, charge, payout of vacation,
23   changed the formula.  This is a good topic that should
24   have been investigated and should still be investigated
25   because the terms of Ross' Transition Agreement, though
```

 1    Treasurer.

 2                        ERIK HARRIS,

 3    having been first duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY MS. LEE:

 6        Q.    Hi, Erik.

 7        A.    Hello.

 8        Q.    Thank you for coming today.  We know it's been

 9    quite the week, so we appreciate it.

10        A.    Thank you.

11        Q.    So again, what is your name?

12        A.    Erik Harris.

13        Q.    Where are you employed?

14        A.    American Airlines and APFA.

15        Q.    Okay.  What is your position at APFA?

16        A.    I'm the National Treasurer.

17        Q.    How long have you been employed at American

18    Airlines?

19        A.    About eight years.

20        Q.    Okay.   Besides National Treasurer, have you

21    held any other positions -- positions at APFA during

22    your career?

23        A.    Yes, various positions.  Most recently --

24    well, prior to this position, I was a contract chair.

25    I served on the budget committee pretty much my entire

Robert Ross   11/17/2021

Page 100

1   career.

2       Q.   And in your role as National Treasurer, have

3   you been responsible for responding to requests to see

4   financial information?

5       A.   Yes.

6       Q.   Did you receive requests from Melissa and

7   myself to come down and see financial records?

8       A.   Yes.

9       Q.   And did you set up times for us to see the

10  information?

11      A.   Yes.

12      Q.   Approximately how many times have we come down

13  to review information?

14      A.   About five to 10.

15      Q.   So have you been present with myself and

16  Melissa when we came down?

17      A.   Yes.

18      Q.   If you were not present, who was present?

19      A.   I believe there was only one time and my

20  assistant, Robert, was there and Margot has been there

21  and there were a couple occasions where all four

22  Officers were there.

23      Q.   So we were never alone -- alone with these

24  financial documents?

25      A.   That's right.

Robert Ross   11/17/2021

Page 101

```
 1       Q.    Who was the Treasurer before you took office?
 2       A.    Craig Gunter.
 3       Q.    And before him?
 4       A.    Eugenio Vargas.
 5       Q.    How would you describe the state of the Union
 6    financial records when you took office?
 7       A.    They were -- it was pretty bad, in bad shape.
 8       Q.    Who has the responsibility under APFA
 9    Constitution to maintain the financial records?
10       A.    The National Treasurer does.
11       Q.    Did you receive a subpoena from Melissa and
12    myself, the charging parties, for financial documents
13    related to this hearing?
14       A.    Yes.
15       Q.    And did you oversee the efforts to locate and
16    provide those documents?
17       A.    Yes.
18       Q.    Can you explain the steps taken to ensure
19    which documents you had?  Oh, okay.  I'll tell you
20    what, I want you to look at Exhibits 8 through 46 in
21    the big book.
22       A.    Okay.
23             MS. LEE:  Oh, we need -- that too.
24             THE ARBITRATOR:  Which one, the blue
25    one?
```

Robert Ross     11/17/2021

Page 102

1           MS. LEE:  Yeah.

2           MS. CHINERY:   Hold on.  I'm coming.

3           MS. LEE:  We'll give you yours.

4           THE ARBITRATOR:  Oh, okay.  I guess we...

5           MS. LEE:   I'm going to move to submit

6    Exhibits 8 through 46 into evidence, which are

7    financial documents.

8                THE ARBITRATOR:   You got to prove them

9    up first.

10               MS. LEE:  Okay.

11       Q.   (BY MS. LEE)   Are there any items you were

12   unable to locate from the subpoena?

13       A.   Yes.

14       Q.   Okay.  I want you to take a look at those

15   documents, 8 through 46.

16       A.   Okay.

17               MR. ROSS:  8 through 46?

18               MS. LEE:   8 through 46.  Take your time.

19               MR. ROSS:  I have 27 here.

20               MS. LEE:  I think it's 46.

21               MR. ROSS:  8 through 46?

22               MS. LEE:  8 through 46.

23               MR. ROSS:  So --

24               (Simultaneous speaking.)

25               MS. LEE:  She's going to give them to

Robert Ross    11/17/2021

Page 105

1   A list of hotels for Bob Ross.  All paperwork for

2   rental cars.  Any equipment purchase.  Correspondence

3   with the collection agency regarding Ross' failure to

4   provide information.  Emails from -- between Debbie

5   Hoover and Eugenio regarding repayment.  Receipts for

6   hotel stays, U-Hauls, and a list of vacation days.

7   Accounting of vacation payout and Bob Ross' exit -- Bob

8   Ross' exit package and documents from outside Counsel,

9   Mike (sic) Richards.

10       Q.   Okay.  Can you explain the steps that we took

11   to -- that you took to give us these documents besides

12   the subpoena?  Had we -- had we gone over these

13   documents?

14       A.   Yes.  So for these documents, are you

15   saying -- what was the question?

16       Q.   Those financial documents.

17       A.   But what was the question?

18       Q.   Okay.  So the documents that you have in front

19   of you are the documents that we subpoenaed?

20       A.   Yes.  Yes.

21            MS. LEE:  Okay.  So these are Exhibits 8

22   through 46, which I'd have like -- like to have

23   admitted into evidence, which are financial documents.

24            THE ARBITRATOR:  Any objection?

25            MR. ROSS:  I think we've already

Robert Ross    11/17/2021

Page 106

```
1    established on the credit cards that there was a

2    protocol and that any credit card submitted went

3    through its proper channels and was approved.  So now

4    we're going to get into every one, so there's a lot of

5    papers here and I'm just now getting --

6                 MS. CHINERY:    They were all --

7                 MR. ROSS:  -- and I've not

8                 MS. CHINERY:     sent to you.

9                 MR. ROSS:  -- been able to go through.

10                THE ARBITRATOR:    Let me try to sum it up

11   for you.

12                MR. ROSS:  Okay.

13                THE ARBITRATOR:  Subpoena duces tecum was

14   issued to him and he complied with the subpoena duces

15   tecum and all of these exhibits, the credit cards,

16   monthly reports, weekly reports, and mileage and

17   everything else, he submitted to the party that asked

18   for the subpoena.  She's   he's already looked at it.

19   He's verified it.  Now I'm asking you do you want to

20   object to that inclusion into the record or -- or will

21   you approve it?

22                MR. ROSS:  I don't know that I'm   I'm

23   comfortable approving it all in the records as a bundle

24   unless we go through each particular one and then put

25   it in the record that way.  Some of the stuff
```

Carson Reporting & Associates    214.346.3434

Robert Ross    11/17/2021

Page 107

1           MS. CHINERY:  Objection, we -- we --

2           MR. ROSS:  -- I'm still speaking -- if

3  some of this stuff could be entered into the record and

4  we get into it and find out it's not correct, not true,

5  now it's been entered into the record -- record.  So I

6  am not familiar enough with protocol to make sure

7  that --

8           MS. CHINERY:   You've had these documents

9  for months.

10          THE ARBITRATOR:  Well look, let's --

11  let's get something -- off the record.

12          (Discussion off the record.)

13          THE ARBITRATOR:  I hear -- I hear your

14  concern, but all we're -- we're -- we're accepting this

15  for the reason that he -- he complied with the subpoena

16  and that's what these documents are, nothing else.

17  We're not saying that they're true, correct or

18  whatever, we're just submitting it in based upon the

19  duces tecum.  Okay?  Okay.  It's -- do you still have

20  an objection?

21          MR. ROSS:  No.

22          THE ARBITRATOR:  Okay.  Hearing no

23  objection, charging party CP Exhibit 8 through 46 -- is

24  it 8 --

25          MS. CHINERY:  Yes.

Robert Ross     11/17/2021

Page 180

```
 1                    MS. CHINERY:    This is --
 2                    MR. ROSS:   Okay.  All kind of assumptions
 3    have been made based on a false or altered
 4    (unintelligible) altered agreement and which gives the
 5    assumption that Ross was under -- overpaid.  It's in
 6    collections right now and I think we just established
 7    the fact that there are --
 8                    MS. CHINERY:    Objection --
 9                    MR. ROSS:   12 --
10                    MS. CHINERY:   -- you didn't establish
11    anything --
12                    THE ARBITRATOR:   Yeah.
13                    MR. ROSS:   -- 12 days of vacation --
14                    THE ARBITRATOR:   Why don't you ask him a
15    question.
16         Q.   (BY MR. ROSS)   Are there -- based on the
17    information that I showed you, does it appear that
18    there are 12 days of sick --
19                    MS. CHINERY:   Objection, leading.
20                    THE ARBITRATOR:   No, I'm going to --
21                    MR. ROSS:  Here's the question --
22                    THE ARBITRATOR:   -- allow it.
23         Q.   (BY MR. ROSS)   Does it appear that there are
24    12 days of sick still unpaid?
25         A.    Yes.
```

Robert Ross    11/17/2021

Page 181

1     Q.   Okay.  Going back to Section 16, the color

2  chart, one page behind it says part two, you accept

3  that --

4     A.   Yes.

5     Q.   -- (unintelligible) and the very next page

6  back should be a chart.  This chart was provided by

7  APFA?

8     A.   Oh, yes.

9     Q.   Okay.

10     A.   It's my chart, yeah.

11     Q.   And as you thumb through it, you'll get to a

12  page that has got an A on it on the top.  This is --

13  these numbers in here represent how much for each one

14  of the sick and vacation days, the day rate that was

15  paid for each one of those, what it was paid for,

16  correct?  And on that particular one it shows Bob Ross

17  and it says overpayment calculation.

18     A.   Yes.

19     Q.   All right.  Overpayment calculation and it's

20  based on, if you look down at vacation pay 2017, if you

21  look on the right-hand side -- or left-hand side --

22     A.   Yes.

23     Q.   -- okay?  And if you skim across and it says

24  eligible days to pay, 14?

25     A.   Yes.

Robert Ross    11/17/2021

Page 182

```
 1        Q.   That's per policy, correct?
 2        A.   Yes.
 3        Q.   But it's not necessarily per Transition
 4   Agreement because the Transition Agreement says all
 5   accrued and unused?
 6        A.   Yes.
 7        Q.   That doesn't specify per policy, it specifies
 8   outside of policy, right, in --
 9        A.   Yes.
10        Q.   -- the Transition Agreement, okay?
11        A.   Yes.
12        Q.   And then sick pay for 2017, if you skim
13   across, has 12 eligible days?
14        A.   Yes.
15        Q.   Okay.  So there were more days accrued than 14
16   and there were more days accrued than 12 for those
17   two --
18        A.   Yes.
19        Q.   -- right?  And that's what Ross was to be paid
20   out above and beyond policy per Transition Agreement?
21             MS. LEE:   Objection, he -- he's asking a
22   question and then he's answering it.
23             THE ARBITRATOR:   Yeah.  Why don't you
24   ask a question.
25        Q.   (BY MR. ROSS)   Based on the policy agreement,
```

Robert Ross   11/17/2021

Page 183

```
 1   would you ascertain that Ross was to be paid out above
 2   policy, based on the wording of the Transition
 3   Agreement?
 4        A.   Yes.  Yeah.
 5        Q.   So that transition was proved and signed by
 6   the Board?
 7        A.   Yes.
 8        Q.   So they knew it.  They knew that there was a
 9   certain amount of monies, right?
10        A.   I believe so.  I --
11        Q.   And --
12             (Simultaneous speaking.)
13        A.   -- wasn't there --
14        Q.   Okay.  So -- but if Ross was really only paid
15   12, that's per policy, per se --
16        A.   Yes.
17        Q.   -- and 14 for vacation per policy and that's
18   all he was paid, then he would be underpaid, correct?
19             MS. LEE:   Objection, it's leading.
20             THE ARBITRATOR:   No, he's asked the
21   question.
22             MS. LEE:   Okay.
23             THE ARBITRATOR:   He asked the question --
24             MS. LEE:   I'm waiting for him to ask --
25             THE ARBITRATOR:   -- would he be
```

Robert Ross    11/17/2021

Page 184

```
 1   underpaid.

 2                   MS. LEE:  Okay.  Yes.

 3        A.   Yes.

 4        Q.   (BY MR. ROSS)   Okay.  So if a wrong

 5   calculation was used, right, the daily rate --

 6        A.   Oh, the formula --

 7        Q.   -- to --

 8                   (Simultaneous speaking.)

 9        A.   -- yes.

10        Q.   (BY MR. ROSS) -- see the -- say the formula --

11   say the formula coming up for how much he got paid for

12   each one of those days was incorrect, all right?

13        A.   Uh-huh.

14        Q.   Because it had numbers that should or should

15   not have -- we don't know because nobody was at the

16   actual negotiations of that tentative agreement or that

17   Transition Agreement except the parties who were there,

18   right?  Would that be -- you wouldn't -- you didn't

19   have any paper that says what I was supposed to be

20   paid?

21        A.   No, I didn't.

22        Q.   And Eugenio Vargas, the Treasurer at the time,

23   he wasn't a part -- he wasn't a Board member, so he

24   wasn't a part, he didn't sign it.  So you could only

25   really -- would you -- would you agree that you could
```

Robert Ross     11/17/2021

Page 214

```
 1                    THE ARBITRATOR:  Well --
 2                    MR. ROSS:  I have -- I have.
 3                    (Simultaneous speaking.)
 4                    THE ARBITRATOR:   Look --
 5                    MR. ROSS:  The reason -- the reason I'm
 6       trying to bring it up --
 7                    THE ARBITRATOR:   You can argue this in
 8       brief, okay?
 9                    MR. ROSS:  Okay.
10                    THE ARBITRATOR:   Let's go on to
11       something else.
12           Q.   (BY MR. ROSS)  The documentation that you sent
13       when you responded is the same documentation; is
14       that --
15           A.   Yes.
16           Q.   They're a duplicate --
17           A.   Yes.
18           Q.   -- right?  So when Diversified came and got
19       all the documents that Ross himself prior didn't
20       understand and couldn't figure out and asked questions
21       about, when -- when Ross received this, and can you
22       look at it and can you see that it's the same documents
23       that went to Diversified that you had sent Mr. Ross?
24           A.   Yes.
25           Q.   Okay.  So instead of Ross understanding what
```

Robert Ross    11/17/2021

Page 215

```
1   it was and still didn't understand what it was,
2   Diversified Credit just simply got all the exact same
3   documents, right?
4       A.   Right.
5       Q.   Okay.  Look at the very front page and -- on
6   Diversified where the number one is checked.
7       A.   Yes.
8       Q.   Can you read that?
9       A.   We have determined that the information in our
10  file regarding the account is accurate.  Attached
11  hereto is validation of the account information in our
12  file.
13      Q.   Okay.  Are they accountants?  Do they know the
14  inner workings?  Have they ever seen Ross' Transition
15  Agreement?   That's three questions, but --
16              MS. CHINERY:   Objection, your
17  transition, what does that have to do with --
18              THE ARBITRATOR:  Yeah, they're not --
19              MR. ROSS:  Since Ross was paid for his
20  Transition Agreement --
21              THE ARBITRATOR:   Okay.  Mr. Ross --
22              MR. ROSS:  Alls I did was just --
23              THE ARBITRATOR:   Mr. Ross, this -- this
24  outfit, Diversified, they're not aware of the
25  Transition Agreement.
```

Robert Ross    11/17/2021

Page 216

```
 1              MR. ROSS:  Right.
 2              THE ARBITRATOR:  Okay.  And so --
 3              MR. ROSS:  How could they still -- how
 4  can they attest --
 5              THE ARBITRATOR:   Well, you're making an
 6  assumption that they looked at your Transition
 7  Agreement.  Let's, you know --
 8              MR. ROSS:  No, I'm sorry --
 9              THE ARBITRATOR:  -- you --
10              MR. ROSS:   -- that's not the right
11  assumption as --
12              THE ARBITRATOR:  Okay.
13              THE WITNESS:   It's also a part of -- did
14  say it's also a part of pending litigation.  So we --
15  we -- she doesn't want us to discuss much of the
16  collections in -- in that as well, so --
17              THE ARBITRATOR:   Okay.
18     Q.   (BY MR. ROSS)   Has Ross ever -- has Ross
19  ever --
20              THE ARBITRATOR:   Is that -- is that
21  true --
22              MR. ROSS:  That's not --
23              THE ARBITRATOR:  -- that they --
24              MR. ROSS:  -- true.
25              THE ARBITRATOR:  -- say pending
```

Robert Ross    11/17/2021

Page 217

1    litigation.

2                    MR. ROSS:  No, they claim it is that I

3    received no -- no litigation, I've received zero --

4                    THE ARBITRATOR:    Notice.

5                    MR. ROSS:  -- no, they've -- they've

6    called, I've talked to them.  I finally had to tell

7    them that -- Diversified that I'm not going to have a

8    conversation with them because they report and --

9                    THE ARBITRATOR:  That's okay --

10                   (Simultaneous speaking.)

11                   MS. CHINERY:  Objection --

12                   THE REPORTER:  I can't --

13                   THE ARBITRATOR:  So let me -- let me say

14   this, Mr. Ross.  We've gone through this a lot --

15                   MR. ROSS:  Right.

16                   THE ARBITRATOR:  -- today.  You can argue

17   this in a brief.  You can show the formulas, you can do

18   whatever, but you can argue it in the brief and let's

19   get on with this.  Let's ask what other questions you

20   have of Mr. Harris.

21                   MR. ROSS:  That was a -- that was a major

22   part of it, because that statement right there --

23                   THE ARBITRATOR:  No, what --

24                   MR. ROSS:  (Unintelligible.)

25                   THE ARBITRATOR:  -- did I say?  Let's go

1    on.  Let's move on.

2                 MR. ROSS:  We'll deal with this in brief.

3       Q.   (BY MR. ROSS)  When Ross was put into

4    collections, was he put into collections by will of the

5    Board or did he -- at that point had he violated any --

6                 MS. CHINERY:   Objection, he didn't pay

7    his bill.

8                 THE REPORTER:  I didn't understand that.

9                 THE ARBITRATOR:   Well, you know, he's

10   asking a question and I told you, let's go to something

11   else, okay?

12                MR. ROSS:  Want to get completely off of

13   that.  Okay.

14                MS. BRUNS:   Move from collections to

15   something else.

16                MR. ROSS:  (Sotto voce.)  Yeah, can we

17   take a -- take a break here?

18                THE ARBITRATOR:  No, let's -- let's

19   finish with this witness, okay?

20      Q.   (BY MR. ROSS)  Do you recall an email between

21   an update on the former National Officers which were

22   paid out on November 10th, 2019?

23      A.   August 10th, 2019?

24      Q.   Yes.

25      A.   No.

Robert Ross    11/17/2021

Page 325

```
 1   STATE OF TEXAS        )

 2   COUNTY OF DALLAS       )

 3           THIS IS TO CERTIFY THAT I, MELISSA J. CARSON,

 4   a Certified Shorthand Reporter in and for the State of

 5   Texas, reported in shorthand the proceedings had at the

 6   time and place set forth in the caption hereof, and

 7   that the above and foregoing 302 pages contain a full,

 8   true, and correct transcript of the said proceedings.

 9           Certified to on this the 13th day of December,

10   2021.

11

12

13   _____

14   MELISSA J. CARSON, Certified
     Shorthand Reporter in and for
15   The State of Texas

16

17   Certification No. 1737

18   CRCB Firm Registration #489

19   Expires August 31, 2022

20   CARSON REPORTING & ASSOCIATES

21   Post Office Box 551628

22   Dallas, Texas 75355-1628

23   Telephone 214.346.3434

24

25
```

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FT. WORTH DIVISION**

| | | |
|---|---|---|
| **ROBERT "BOB" ROSS** | § | |
| **Plaintiff/Counterclaim Defendant** | § | |
| | § | **Case No. 4:22-CV-00343-Y** |
| | § | |
| | § | |
| **ASSOCIATION OF** | § | |
| **PROFESSIONAL FLIGHT** | § | |
| **ATTENDANTS, MCGAUGHEY,** | § | |
| **REBER AND ASSOCIATES, INC.,** | § | |
| **JULIE HEDRICK, ERIK HARRIS,** | § | |
| **LARRY SALAS, JOSH BLACK** | § | |
| **Defendants/Counterclaim Plaintiff.** | § | |
| | § | |
| **EUGENIO VARGAS** | § | |
| **Plaintiff/Counterclaim Defendant** | § | |
| | § | **Case No. 4:22-CV-00430-Y** |
| | § | |
| | § | |
| **ASSOCIATION OF** | § | |
| **PROFESSIONAL FLIGHT** | § | |
| **ATTENDANTS, JULIE HEDRICK,** | § | |
| **ERIK HARRIS, LARRY SALAS,** | § | |
| **JOSH BLACK** | § | |
| **Defendants/Counterclaim Plaintiff.** | § | |
| | § | |

---

**AFFIDAVIT OF EUGENIO VARGAS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

BEFORE ME, the undersigned authority, on this day personally appeared EUGENIO

VARGAS, who being by me first duly sworn, did state:

1.  "I have been employed as a flight attendant working with American Airlines, Inc.

    since November 1995. I am also a member of the Association of Professional Flight

    Attendants ("APFA").  I have personal knowledge of the facts contained herein, I

    am 21 years or older and of sound mind to make these statements.

**APPENDIX 286**

2.  I have read the foregoing Plaintiff's Motion for Partial Summary Judgment and every factual contention for which I have personal knowledge is true and correct.

3.  I am a current member of APFA in good standing.  I met with an investigator with the United States Department of Labor in 2021 investigating the end-of-term payments I made while National Treasurer to myself, Marcy Dunaway, Nena Martin, and Robert "Bob" Ross. I have never been charged with or convicted of a crime.

4.  On April 1, 2016 I was voted into office as the APFA National Treasurer.  While serving in office, I made public statements with regard to union-related matters in opposition of a merger between the Association of Flight Attendants-CWA's ("AFA")  or affiliation of any kind, with the APFA.  After multiple attempts were made by AFA to effectuate a merger or a "raid" of APFA during 2016, I assisted in drafting a letter to AFA's International President requesting that all attempts to merge or 'raid' our union cease immediately.  I authorized my signature to be used on the letter dated July 4, 2017.  A true and correct copy of a draft of the July 4, 2017 letter sent by the Ross Administration to the AFA during my term in office as National Treasurer is attached hereto and incorporated herein. Additionally, this letter was read aloud at a labor coalition meeting by Ross in which AFA's International President was in attendance on behalf of the entire Ross Administration. The original copy of the letter was left in the APFA archives.

5.  I have also held other positions within the APFA prior to being voted to the National Treasurer's position with the Ross Administration, including a position sitting on the APFA Board of Directors for two different terms.  I have vocally opposed any

merger or affiliation between APFA and AFA while in these positions. I continue to support the American Airlines Flight Attendants union as an individual and independent labor union and continue to oppose any affiliation with AFA in the future.

6. On March 2, 2018, I learned that Robert "Bob" Ross ("Ross") had negotiated and signed a Transition Agreement for his resignation from Mark Richards, Counsel for APFA at the time. Mark Richards showed me and APFA's in-house Senior Accountant Rene Berthelot sections 3, 4, and 5 of the Transition Agreement that addressed Ross's compensation on one occasion. In consultation with APFA Senior Accountant, Rene Berthelot, I calculated the payments made to Ross under his Transition Agreement. The payment calculations were approved by other APFA National Officers then forwarded to payroll and accounting staff for payment. I did not discuss nor consult with Ross about how to calculate these payments; Ross had no input on the calculations and payments made to him. I calculated the daily rate of pay using this total taxable annual income including the Meal Expense Allowance and the Special Assignment Fee guaranteed stipends and then dividing the amount by 365. This was in consultation with Rene Bartholet, APFA's Senior Accountant. It was similar to the per diem calculation used to calculate payments made under Laura Glading's, the prior APFA National President, Transition Agreement.

7. In 2019, I was contacted by APFA and told that I owed an overpayment made based on a miscalculation of the daily rate used to calculate and pay out my sick and vacation end-of-term payout. After several months of requesting a meeting, I met

with Hal O'Neil, APFA's outside accountant, Nena Martin and Marcy Dunaway, and Craig Gunter, APFA National Treasurer at the time, to review and discuss the miscalculation and alleged overpayment owed.  At this meeting, I informed Craig Gunter that the same method of calculation for the end-of-term payouts were used for myself, Nena Martin, and Marcy Dunaway as were used for Robert "Bob" Ross. APFA Board of Directors and APFA Legal Counsel met with me via telephone conference, wherein I was told APFA would file a lawsuit for my actions while in office based on this miscalculation.  APFA agreed not sue me if I would repay the overpayment of the end-of-term payout.  I agreed to repay APFA the amount of $4,143.57 and signed a promissory note in that amount.  I have made all payments thereunder.

8.     APFA Policy provided that calculations for payments were made in conjunction with staff accountants, reviewed and approved by two APFA officers for compliance with policy, and approved by two additional APFA accounting personnel for accuracy of calculation, budgeting purposes, and issuance of payment.  If anything did not meet my approval, I escalated all matters to APFA Board of Directors for approval. I always followed procedures and policies while in office.

9.     On September 14, 2021, *Chinery v. Vargas* Arbitration Hearing was held which I attended and was represented by Heidi Morgan and Nena Martin.  During the Arbitration Hearing, I subpoenaed all four national officers to testify. Erik Harris testified regarding the overpayment damages and declared Ross was overpaid as a result of the change in the per diem formula used to pay out sick and vacation days

under his Transition Agreement.  Additionally, I never received the Confidential Memo prior to or during the Arbitration Hearing.  Erik Harris never informed the Arbitrator of the Confidential Memo.

10.     All evidence and testimony regarding the Ross Transition Agreement was limited by the Arbitrator during my Arbitration Hearing.  I was unable to fully question witnesses or present evidence about the interpretation of terms, the calculation of payments, or the determination of an overpayment.

11.     I objected to witnesses that were intimidated and harassed to alter their testimony or prevent them from testifying for me.  I was not provided with the chance to admit this evidence or address this issue at my Arbitration Hearing by the Arbitrator. Attached is a true and correct copy of an affidavit that I was denied admission on record by the Arbitrator.

12.     To my personal knowledge, APFA has never banned an APFA member from holding office for life, until myself and Robert "Bob" Ross received Article VII Arbitration Awards.

13.     To my personal knowledge, APFA has never publicly announced an Article VII Award in a Presidential Hotline Email to the APFA membership, until myself and Robert "Bob" Ross received Article VII Arbitration Awards.  A true and correct copy of the Presidential Hotlines emailed to the APFA membership are attached hereto and incorporated herein.

14.     Attached hereto and incorporated herein is a true and correct copy of the Article VII Arbitration Award issued against me on February 17, 2022.

15.     Attached hereto and incorporated herein is a true and correct copy of the

Supplemental Arbitration Award increasing the fines against me to **$30,963.03** based on an audit conducted by APFA.

16.     I was not given notice of the manner in which the audit was conducted, nor ever given a copy of the documents used to create the audit.  I was never given the opportunity to attend or witness the audit.  No one ever contacted me or my representatives to inquire as to expenses or charges and the circumstances surrounding those charges.

17.     Attached hereto and incorporated herein are the receipts for all costs and expenses incurred because of my Article VII Disciplinary Arbitration as well as the final day of the Arbitration which was unpaid.  The daily pay rate is $341.25.  The costs of the hotel stay for the witnesses, plus costs all other additional costs totaled $1,842.05. The total amount of actual damages from Article VII Arbitration Hearing are $2,183.30.

18.     I have publicly opposed any possible merger between AFA and APFA.  The Article VII Arbitration Award, the ban against my ability to hold office and the public statements made against me have intimidated me and stifled my dissent, as I fear that I will suffer retaliation by my labor union for my position against APFA.

19.     Attached hereto and incorporated herein is a true and correct copy of a letter from Erik Harris to all parties in my Arbitration related to documents that could not be located.  This was an exhibit used in my Arbitration Hearing to question Erik Harris about missing documentation and whether the documents were well maintained."

FURTHER AFFIANT SAYETH NOT.

**APPENDIX 291**

County of Rockwall, State of Texas. Signer(s): Eugenio
Vargas, appeared with Texas DL, as identification along with
multi-factor KBA authentication, during this audio/video
recorded remote online notarization.

_____
Eugenio Vargas

SWORN AND SUBSCRIBED TO before me on this _25th_ day of ____April____ 2024.

**SONIA PLATZ**
NOTARY PUBLIC STATE OF TEXAS
Notary ID #11048993
My Commission Expires
May 12, 2028

_____
Notary Public            Sonia Platz

**AFFIDAVIT OF EUGENIO VARGAS – Page 7**

**APPENDIX 292**

July 4, 2017

Sara Nelson, President                                   DRAFT
Association of Flight Attendants
1275 K Street NW 5th Floor
Washington, D.C. 20006

Dear Sara:

As AFA's President, you have sent many messages, both publicly and through AFA's mobilization efforts to get the public and APFA members to rally behind your effort to get APFA to affiliate with AFA. Despite your attempt to characterize AFA's conduct as a friendly overture rather than a hostile raid, you did not even have the courtesy to send the message to any of the APFA National Officers or Board of Directors.

You have, however, gone to the extent of sending AFA letters, Bag Tags and AFA pins to APFA members, as well as forcefully stating at the recent Coalition of Labor Unions meeting on May 11, 2017 "APFA stole 6000 of our AFA members and we are not going to stop until we have every one of them back".

You have also requested that APFA, along with our legal advisors, schedule a meeting with AFA, however you have refused our premeeting requirement to sign a no-raid agreement and also agree that any meeting between us would not include a discussion about a possible merger between AFA and APFA.

As APFA's National Officers, we once again wish to make it absolutely clear to you and any other AFA leaders who may support you in this matter that APFA is not interested in a discussing any affiliation with AFA. Moreover, any AFA effort to infiltrate the APFA Board of Directors will not work.

It is APFA's firm belief that a union's efforts to organize is best utilized in organizing "unorganized" workers. Therefore, we not only ask, but we demand that you leave APFA and its membership alone, and direct your energies and resources elsewhere.

On behalf of the APFA and the more than 26,000 Flight Attendants we represent,


Bob Ross                                      Nena Martin
President                                     Vice-President



Marcy Dunaway                                 Eugenio Vargus
Secretary                                     Treasurer

I was employed at APFA from August 15, 1996, to November 2018. I retired 4 months after Eugenio Vargas left office because when the new administration came in the work environment became hostile not only with the staff and an Officer.

I was a staff member, specifically I was the Office Coordinator at the time that I retired. One of my many responsibilities was the inventory of furniture. I was very thorough at what I did and had good job performance.

Regarding the furniture in Gabby Harty's apartment. I clearly remember Gabby vacated her apartment and resigned early due to personal reasons. When the lease was almost up Rachael Early (another staff member) and I went to her apartment and took photographs of all the furniture. Rachael was the employee who had the keys. When the lease was over Mike Trapp, Rosemary Cooper's brother (who is an Executive Secretary) picked up the furniture. I completed the inventory, entered that information into the Office Coordinator computer.

Some of Gabby's furniture was taken to consignment at Kiss it Goodbye and the items they wouldn't take were donated.

I would like to discuss what I know about the items on the attached inventory sheet.

Regarding Shane Staple's items. Shane moved out about the time the administration changed hands. He provided an inventory sheet. I entered the information into my system.

About Chuck Ransdale's furniture. Chuck was another representative who left his position early. I recall there still being time on his lease, so we had another representative move into his apartment. She stayed there for the duration of the lease. All his furnishings stayed in the apartment for use by her. She stayed in that apartment beyond Eugenio Vargas' term so the inventory of those items would be the responsibility of the Treasurer that came after Eugenio.

I would also like to explain how I did my inventory. There was a file cabinet with hanging file folders. Each Officer and representative had a hanging file with and inventory sheet when they came into office. When Eugenio came into office he required each rep to fill out the inventory and return it to me per the Policy Manual. I looked over them. Then I would sign off that it was received. During his

1

**APPENDIX 294**

administration we started scanning these documents and saving them electronically.

After I retired my Coordinator files were left accessible to other staff members and new Officers, some who, as I said were extremely hostile and vindictive. It is very well within the realm of possibility my work product was taken or modified by them.

The dynamics of the office environment and the stress it created were the very reasons for my early and sudden retirement. I couldn't handle that stress in my life anymore.

Due to dangers associated with COVID and my fears of retaliation I could not attend this hearing in person. I respectfully request you accept this sworn statement.

Thank you.

LaDonna Casey

*LaDonna Casey*

State of Texas
County of Parker
Sworn to and subscribed before me on the
8th day of Sept, 2021
*Sheri Eli Wil*
Notary Signature
My Commission Expires 05/21/2022

SHELSI ELIZABETH WILSON
Notary Public, State of Texas
Comm. Expires 05-21-2022
Notary ID 131576070

2

**APPENDIX 295**

Association of Professional Flight Attendants
Depreciation Schedule
FYE March 31, 2017

| Vendor | Description | Purchase Date | Cost | |
|---|---|---|---|---|
| **Shane Staples/Comm** | | | | |
| Ashley Furniture | Sofa/Loveseat/Media Chest/Cocktail Table/End Table King Bed/King Mattress | 08/16 | 4,098.22 | 4,098.22 |
| | Exchanged Loveseat for Chair | 08/16 | (104.98) | (104.98) |
| | Current Balance | | 3,993.24 | 3,993.24 |
| **Gaby Harty/Health** | | | | |
| Ashley Furniture | Sofa/Loveseat/Cocktail Table/End Table King Bed/King Mattress | 08/16 | 3,236.91 | 3,236.91 |
| **Chuck Ragsdale/Health** | | | | |
| Ashley Furniture | Chest/Nightstand/Queen Bed/Queen Mattress | 06/16 | 1,398.76 | 1,398.76 |
| TOTALS | | | 8,628.91 | 8,628.91 |

*LaDonna Casey*

State of Texas
County of Parker
Sworn to and subscribed before me on the
8th day of Sept , 2021

*Sheli Eli Wil*
Notary Signature
My Commission Expires 05/21/2022



SHELBI ELIZABETH WILSON
Notary Public, State of Texas
Comm. Expires 05-21-2022
Notary ID 131576070

**APPENDIX 296**

(https://www.apfa.org/)

Account (/my-account/)  |  Log In (/account/login/)

Search here...



# 3.24.22 – APFA Receives Article VII Arbitration Awards



**Thursday, March 24, 2022**

On March 19th, Arbitrator Ruben R. Armendariz issued a decision in Article VII charges brought under the APFA Constitution and Policy Manual against former APFA National President Bob Ross. Arbitrator Armendariz barred Ross from serving in any APFA position for life, ordered Ross to resign as San Francisco Base President, ordered Ross to repay APFA a substantial sum of money, and ordered an independent audit of certain expenses.

This decision follows a February 18th, 2022 decision that barred former APFA National Treasurer Eugenio Vargas from holding any APFA position for life and fined him half the cost of the arbitration, among other remedies.

Arbitrator Armendariz also ordered sweeping changes in the APFA financial policy, which requires training on allowable expenses, and instructed APFA to create a separate body of trained forensic accountants. This ruling demonstrates that this organization has spent years operating

**APPENDIX 297**

Case 4:22-cv-00343-Y   Document 239-6   Filed 04/26/24   Page 37 of 46   PageID 6976

without proper financial controls. We have attached the decisions below and encourage all members to educate themselves on these issues.

These charges were brought by APFA members Melissa Chinery and Sandra Lee under Article VII of the APFA Constitution. We thank them for bringing these issues forward. The fact that we are in this place illustrates the need for more reform. You deserve to have your dues money spent according to the strictest financial standards. The dues dollars that allow our union to operate and provide our paychecks are your dollars, and we have a fiduciary responsibility to safeguard union finances.

When our administration took office, we supported financial transparency and committed to upholding the language that members have the right to review the financial information of the union under Article III of the APFA Constitution and federal labor law. Previously, this union has prevented members from reviewing all financial documents. Following prior legal advice, members were only allowed to view monthly financial reports and the LM-2 reports (our annual Department of Labor filing). We believe our past outside attorneys and advisors guided us improperly. We will continue to ensure members are not kept in the dark about dues spending.

To view the Chinery-Lee v Ross Arbitration Award, please click **here** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/7488c141-524c-97d2-1cd8-53b497ea5173/22_Corrected_Decision_Robert_Ross_1.pdf).

To view the Chinery-Lee v Vargas Arbitration Award, please click **here** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/2eb32bb3-8897-24c5-50a7-e8be520735c0/22_Decision_Eugenio_Vargas.pdf).

**Next Steps: Ensuring Financial Transparency and Accountability at APFA**

These decisions are a wake-up call for our entire union. As an independent union, we have no parent body to scrutinize our actions and must hold ourselves to the strictest standards. In the coming months, we will be reviewing the APFA Policy Manual to further reform APFA's financial policies. We will fully cooperate with Arbitrator Armendariz's decisions and will draw on the expertise of legal and financial experts.

Financial accountability and transparency have been a priority for our administration. We have taken several steps to ensure that APFA is handling your dues dollars responsibly, including:

- Increasing membership visibility into our financial reports, including audits, LM-2 filings, monthly financial reports, expense and mileage reports, credit card statements, signed contr acts and agreements, and payroll registers.

**APPENDIX 298**

- PA/AR removals (flat rate of 5 hours per day) used for all known meetings (such as Board of Director's Meetings and Executive Committee Meetings). PA/AR days are pre-planned absences placed onto a union Representative's schedule before PBS processes and count towards the Representative's PBS award max (**Policy Manual 5.C.1.g** (https://www.apfa.org/members/)).

- Enforcement of the Financial Reform Initiative resolutions passed at the March 2021 APFA Annual Convention, which included the following updates to the APFA Policy Manual:

    - **Resolution #8- APFA Issued Credit Cards** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/33410129-1e48-4d7f-9286-9085e19b3a86/2021_Conv_08_APFA_Issued_Credit_Cards.01.pdf) creates a new section 5.L in the Policy Manual and limits APFA credit card usage to National Officers. It also requires accountability by ensuring that another National Officer has to sign off on charges, requires strict documentation of all charges, and implements twice-yearly reviews of credit card activity by the Budget Committee. At least one (1) random audit will be performed by the Budget Committee every six (6) months to ensure proper spending, and training on the policy will be required by all incoming National Officers.

    - **Resolution #9- APFA Apartments** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/c4308b62-2a91-4601-ad04-cfb5a33d7e1a/2021_Conv_09_APFA_Apartments.01.pdf) puts more stringent guidelines on spending and inventory for APFA provided apartments. The Budget Committee shall maintain a table of the approved costs for purchasing new or replacement items. It adds a new inventory system to track all items belonging to APFA.

    - **Resolution #10- Business Related Meals** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/ce5361e7-6fd8-4da8-8b5c-17d7420fab2d/2021_Conv_10_Business_Related_Meals.01.pdf) adds policy for group meals to ensure compliance with the Labor-Management Reporting and Disclosure Act of ██████ (LMRDA) regarding meals purchased using an APFA credit card. All meal charges must be accompanied by a written explanation of the specific union business conducted during the meal and the full names and titles of all attendees.

    - **Resolution #11- Rental Car Policy & APFA Provided Transportation** (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/3f9e49a6-7fe8-421b-aaed-2a21da0f9494/2021_Conv_11_Rental_Car_Polilcy_APFA_Provided_Transportion.01.pdf) adds language that any APFA Representative on union business in DFW should make every effort to utilize APFA-owned vehicles before using a taxi, rental cars, or other paid forms of transportation. This resolution also revises, further defines, and olicy Manual Section 5.H.4 by limiting rental car usage by incoming

**APPENDIX 299**

National Officers to thirty (30) days, except in extenuating circumstances and only upon approval from the APFA Executive Committee.

- **Resolution #12- National Officer Relocation**
  (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/f2c34cd8-f670-44fd-b288-741a6b9fac5f/2021_Conv_12_National_Officer_Relocation.01.pdf) updates the amount allowed for a National Officer to move to DFW. Instead of offering $10,000 round trip for a move to DFW, the Budget Committee shall maintain a table of approved relocation costs. Relocation reimbursement may be provided in accordance with the table.This resolution also limits the time in which a National Officer must decide to move to DFW or take an APFA provided apartment. This change allows the National Officer three (3) months from the election date to make their decision.
  This resolution also limits the amount of time a National Officer may reside in a hotel while deciding to move to DFW or take an APFA apartment. If a National Officer elects to live in an APFA apartment while in DFW, they will not be paid moving expenses if they suddenly change their mind and decide to relocate to DFW.

- **Resolution #13- Collection of Non-Dues Related Monies Owed by APFA Representatives**
  (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/82664914-049c-4ad0-92a7-580d909aa465/2021_Conv_13_Collection_of_Funds_from_APFA_Representatives.01.pdf) adds a new section to the APFA Policy Manual, Section 7.J. It states that Representatives owing non-dues related monies to APFA will receive written notification from the National Treasurer and ensures payment or a payment plan within thirty (30) days of receipt of such notification. If no payment is received, the monies will be sent to a collection agency.

- **Resolution #14- Resignation or Recall of a National Officer**
  (https://mcusercontent.com/1450c9c25bd3b5096022a9f71/files/901dadb6-fdd1-4990-bd05-b639a67cb8d1/2021_Conv_14_Resignation_or_Recall_of_a_National_Officer.01.pdf) adds new language. Before this resolution, APFA had no written policy or procedure outlining pay and benefits for a resigning or recalled National Officer. This resolution adds a new Section 6.E to the APFA Policy Manual outlining the pay and benefits for a resigning or recalled National Officer and will remove the possibility of any future National Officer exit agreements.

**APPENDIX 300**

Case 4:22-cv-00343-Y   Document 239-6   Filed 04/26/24   Page 40 of 46   PageID 6979

We will continue to review policies that have been in place for many years and make the changes necessary to ensure APFA is compliant with the Office of Labor-Management Standards (OLMS), the Labor-Management Reporting and Disclosure Act of ▮▮▮▮ (LMRDA), and the Internal Revenue Service (IRS) standards for labor unions.

In Solidarity,

*Julie*

**Julie Hedrick**
*APFA National President*

---

*Posted in Hotlines - 2022 (https://www.apfa.org/category/hotline-archives/hotlines-2022/) and tagged National President (https://www.apfa.org/tag/national-president/)*

1004 West Euless Boulevard
Euless, Texas 76040

Phone: (817) 540-0108 (tel:817-540-0108)
Fax: (817) 540-2077 (tel:817-540-2077)

**Headquarters**
M-F: 9:00AM - 5:00PM (CT)

**APFA Phone Reps**
M-F: 7:00AM - 7:00PM (CT)

**After-Hours Live Chat**
M-F: 3:00PM - 11:00 PM (CT)
Sat-Sun: 9:00AM - 5:00PM (CT)

## APFA Events

**2022 Fall Board of Directors Meeting
(https://www.apfa.org/event/2022-fall-board-of-directors-meeting/)**

**APPENDIX 301**



**Monday, June 6, 2022**

### Lawsuits Filed Against APFA

One of the first steps we took upon taking office a little over two years ago was reasserting APFA's adherence to financial accountability and transparency. Our administration and your Board of Directors implemented **financial reform** in many sections throughout our Policy Manual, but there is still more to accomplish.

Both the law and the **APFA Constitution** are clear- APFA members have a right to review the union's financial records to see how our dues dollars are spent. Previous allegations of financial impropriety were swept under the rug in the name of unity or protecting the institution.

After an in-depth review of APFA's financial records, members brought forward charges under Article VII of the APFA Constitution against former APFA National President Bob Ross and former APFA National Treasurer Eugenio Vargas for financial malfeasance and mismanagement. The problem is clear: APFA's structure lacks a higher level of financial oversight above the National Officer level. Our National Officers are expected to do the right thing concerning financial accountability. Under our imperfect system of checks and balances, APFA members are tasked with attempting to ensure financial accountability at APFA.

The aforementioned charges were heard by one of the most respected arbitrators in the country who had no prior involvement with APFA, Arbitrator Ruben Armendariz, a board member of the prestigious **National Academy of Arbitrators**. After days of hearing and reviewing lengthy briefs, Arbitrator Armendariz issued decisions in each case in February and March of this year and took the extraordinary step of banning both former officers from holding any position for life in APFA. Both were fined and ordered to repay certain costs related to the arbitration. In addition, Arbitrator Armendariz ordered an independent audit of meal expenses, car rentals, furniture purchases, and personal vacation expenses paid for by APFA, which is ongoing.

In the **Vargas award**, after a three-day hearing and full exchange of evidence, Arbitrator Armendariz determined: "*It is this arbitrators Opinion, Vargas attempted to benefit monetarily and thus failed in his fiduciary duty as National Treasurer by willfully changing the formula for the payouts for Bob Ross, Nena Martin, and Marcy Dunaway as well as himself.*" Arbitrator Armendariz also found Vargas failed in his duty to properly inventory furniture and ordered an audit of meal expenses.

In the **Ross award**, Arbitrator Armendariz determined that "*Defendant Ross has overwhelmingly violated the APFA Policy Manual and APFA Constitution.*" Arbitrator

**APPENDIX 302**

Armendariz further stated: *The arbitrator finds that throughout this proceeding, Defendant Ross intentionally and willfully ignored the provisions of the APFA Policy Manual and thus, has violated and abused his fiduciary duty entrusted to him by the APFA membership. Ross's testimony was inconsistent and not forthright. Because Ross abused his position of trust as well as his fiduciary duty to the membership of the APFA, he can no longer hold a position of trust with the APFA."*

The arbitrator took the rare step of ordering Mr. Ross to pay the full cost of the hearing and repay APFA for certain infractions. Ross was banned from holding any position with APFA for life and told to resign as SFO Base President.

To be clear, what was uncovered in these hearings was nothing short of shocking. The union credit card was used to the tune of tens of thousands of dollars on furniture and meals for officers **with insufficient documentation or adherence to proper procedure.** Much of this furniture is still unaccounted for. Key financial records are missing, and the meal policy was often not adhered to.

This should have been the end of the matter, and APFA should be able to focus on defending and negotiating our contract with American Airlines.

In the aftermath of the arbitration awards, rather than accepting the rulings, the Ross and Vargas teams have chosen to go to Federal Court to attempt to overturn the arbitration awards. In complaints filled with conspiracy theories and dubious legal theories, they argue everyone is to blame but themselves.

**Click here to read the Ross v APFA complaint.**

**Click here to read APFA's response to the Ross v APFA complaint.**

**Click here to read the Vargas v APFA complaint.**

**(Because the Vargas complaint was filed after the Ross complaint, APFA's response to the Vargas v APFA complaint has not yet been filed with the court.)**

The law and the APFA Constitution are very clear that arbitration awards are final and binding. By suing APFA to overturn the awards, the charged parties will cost the APFA membership a great deal of dues money in the form of legal fees (unless the charged parties are required to pay costs). These lawsuits serve no purpose but to divert attention from the workplace issues that matter to our Flight Attendants.

Another concern is the corruption that existed within APFA by limiting members' access to union financials out of fear that others would uncover potential impropriety. In the past, APFA Leaders were advised by their outside legal counsel to limit financial transparency and "protect the institution." The lack of financial oversight of APFA National Officers has created these problems. As a result, we are forced to hire an outside arbitrator to oversee Article VII charges, which is a costly procedure. Article VII, Section 6.H of the **APFA Constitution** provides that the decision of the Article VII Arbitrator shall be *final and binding on the accuser and the accused*. When we receive an arbitration award and the accused parties refuse to accept the results, they make a mockery of the APFA Constitution, and we must spend our dues dollars on defending our union and our leadership, instead of using those finances to improve the work lives of the membership. APFA cannot continue to operate this way in the long term.

We don't believe it was always this way at APFA. The founders of our union broke free from

**APPENDIX 303**

the male-dominated Transport Workers Union (TWU) and formed a union focused on Flight Attendants. By all accounts, they ran a clean union, and we have many accomplishments over the years. But things change, and good intentions are not enough. Over the last decade, this union has lurched from one internal crisis to another.

APFA members work hard for our dues money every day. We believe in the work conducted at APFA and all the Leaders and Flight Attendants who make up our union.

We deserve to know our dues are being spent for their intended purpose. We will maintain financial transparency, vigorously defend this union, and keep you apprised of the status of these lawsuits.

In Solidarity,

**Julie Hedrick**
**National President**

**Larry Salas**
**National Vice President**

**Josh Black**
**National Secretary**

**Erik Harris**
**National Treasurer**

---

### About APFA:

The Association of Professional Flight Attendants (APFA) represents the 24,000+ Flight Attendants of American Airlines, an airline that consists of aviation professionals with a diverse history brought together from multiple airlines. From APFA's inception in 1977, the Union has fiercely advocated for the Flight Attendant profession. Our Union has been at the forefront of the fight for workplace equality, legislative affairs, and worker's rights.

---

### APFA Headquarters:

(817) 540-0108 | www.apfa.org | 1004 W. Euless Blvd, Euless, TX 76040

Unsubscribe nenarott@aol.com from this list | Forward to a friend | Update your profile
*Copyright (C) 2022 APFA All rights reserved.*

**APPENDIX 304**



**Saturday, August 27, 2022**

### Supplemental Arbitrator Decisions for Article VII Charges Received

On March 24, 2022, we posted a **hotline** notifying APFA members of the issuance of arbitration decisions in connection with the charges filed by APFA members against former APFA National President Bob Ross and former APFA National Treasurer Eugenio Vargas under Article VII of the **APFA Constitution**.

In both decisions, Arbitrator Ruben R. Armendariz ordered the APFA Board of Directors (BOD) or the APFA Executive Committee (EC) to hire an Independent Forensic Auditor to audit various charges and expenses by Ross and Vargas. The audits are now complete. As a result of the auditor's findings, on August 24, 2022, Arbitrator Armendariz issued a *Supplemental Decision and Remedy Modification* in each case, which modified the remedies in both of the original decisions to reflect the Independent Forensic Auditor's identified items.

**To view the *Supplemental Decision and Remedy Modification* for former APFA National President Bob Ross, click here.**

**To view the *Supplemental Decision and remedy Modification* for former National Treasurer Eugenio Vargas, click here.**

---

### Independent Forensic Auditor Findings
### for Former National President Bob Ross

In his March 19, 2022, decision in connection with the charges against Bob Ross, Arbitrator Armendariz ordered as one aspect of the remedy that:

*"The APFA will hire an Independent Forensic Auditor to audit Robert Ross' weekly reports, monthly reports and APFA credit card charges from April 1, 2016, through July 2018 and perform the following tasks:*

*Specifically:*

1. *The Auditor shall inspect the receipts for the Ross family vacation taken in the Grand Canyon in August 2016. Ross claimed all of hotel stays, meals and mileage charges as relocation moving expenses when some are for a personal vacation. Please determine what costs should not have been claimed as relocation moving expenses. Ross is liable for the excess cost and is hereby Ordered to repay APFA for all inappropriate charges!*

**APPENDIX 305**

Case 4:22-cv-00343-Y   Document 239-6   Filed 04/26/24   Page 45 of 46   PageID 6984

2. *The Auditor shall inspect Ross' APFA credit card usage for personal and group meals and purchases for personal items such as tools, toiletries, bath towels, and candy from April 1, 2016, through July 2018 and determine the cost of all inappropriate charges. If no documentation was provided to support each purchase was a union related business cost, then Ross is liable for all inappropriate charges and is hereby Ordered to repay the APFA for all inappropriate charges!*

3. *The Auditor shall inspect all of Ross' rental car usage from April 1, 2016, through October 16, 2016, and determine if these rentals were for union related business. APFA paid for the rental cars but there should be documentation to show if it was for union related business. If not, Ross is to be assessed the cost of the rental cars during the above period and is hereby Ordered to repay APFA for inappropriate rental car usage!*

4. *The Auditor shall inspect all of Ross' claimed mileage from the Sacramento Airport to his residence (42 miles) and return (42 miles) as well as all monthly parking of his personal car. He claimed $105.00 per month from April 1, 2016, through July 2016 to park his car at the Sacramento airport. Ross is to be assessed the mileage and monthly parking he claimed, and Ross is hereby Ordered to repay APFA for all of these inappropriate charges!"*

**Upon completion of the audit, the Independent Forensic Auditor prepared a report which was submitted to the Arbitrator. In that report, the Auditor determined, after review of all the available financial records, that former National President Ross owed an additional *$20,336.19* to the Membership of the APFA, in addition to the monies the Arbitrator had already found to be owed in his March 18, 2022, decision. Based on the Auditor's findings and report, the Arbitrator issued his August 24, 2022, *Supplemental Decision and Remedy Modification*, linked above, in which he concluded and ordered that Ross owed and shall repay the APFA membership the following total amounts:**

*Click chart to enlarge*

| Repayment Due to APFA from Former National President Bob Ross | |
|---|---|
| Excess Vacation Payout | $5,436.47 |
| Bear Creek Apartment Lease | $8,106.13 |
| Personal Credit Card Charges on APFA credit card (non-Union purpose, per audit) | $12,274.00 |
| Relocation Expenses (per audit) | $775.05 |
| Car Rentals (per audit) | $6,454.38 |
| Airport Mileage and Parking (per audit) | $832.76 |
| Arbitration Fees | $10,217.96 |
| Forensic Auditor Fee | $14,825.00 |
| Furniture Delivered to Residence | $3,637.00 |
| **Total amount owed to APFA:** | **$62,558.75** |

## Independent Forensic Auditor Findings
## for Former National Treasurer Eugenio Vargas

In his February 18, 2022, decision, as clarified by his March 10, 2022, supplemental decision, in connection with the charges against Eugenio Vargas, Arbitrator Armendariz,

ordered as one aspect of the remedy that:

*"1. Issue No. 1 is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer. Vargas is hereby Ordered to repay APFA for all meals he purchased on the APFA credit card for himself and for all other meals he has not properly documented. If he has failed to provide documentation to support the purchase of the meal expense, the Independent Auditor must determine if said expense was or was not for the sole purpose of conducting Union business. Moreover, the audit must comply with federal income tax guidelines which distinguish between personal and nonpersonal expenses."*

**Upon completion of the audit, as was done in the Ross case, the Independent Forensic Auditor prepared a report which was submitted to the Arbitrator. In that report, the Auditor determined, after review of all the available financial records, that former National Treasurer Eugenio Vargas owed an additional** *$13,914.87* **to the Membership of the APFA, in addition to the monies the Arbitrator had already found to be owed in his February 18, 2022, decision and March 10, 2022, supplemental decision. Based on the Auditor's findings and report, the Arbitrator issued his August 24, 2022,** *Supplemental Decision and Remedy Modification***, linked above, in which he concluded and ordered that Vargas owed and shall repay the APFA membership the following total amounts:**

*Click chart to enlarge*

| Repayment Due to APFA from Former National Treasurer Eugenio Vargas | |
|---|---|
| Personal Credit Card Charges on APFA Credit Card (non-Union purpose, per audit) | $13,914.87 |
| *Half* of the Arbitration Fee* (per Arbitrator) | $8,623.16 |
| Forensic Auditor Fee | $8,425.00 |
| **Total amount owed to APFA:** | **$30,963.03** |

*\*The remaining $8,623.16 Arbitration Fee charged to the APFA was paid with your dues money.*

In addition to the monetary amounts that Arbitrator Armendariz ordered Ross and Vargas to repay APFA, he further ordered that the APFA must take certain steps to reform the way we do business. Your APFA Leadership is in the process implementing financial reforms to ensure APFA complies with this ruling. Arbitrator Armendariz ordered:

- *"The APFA if it hasn't done so, must create a separate body of trained forensic accountants to oversee the annual audit and to create procedures and recommendations to preclude fraud for the BOD's review and action to be included within the Policy Manual.*

- *National Officers or Officers who have the authority to extend APFA to credit or use of an APFA credit card must be held economically responsible. The language created must be very clear and unambiguous. Training over the LMRDA must be a requirement for all National Officers or any person who can extend APFA to credit and*

**APPENDIX 007**