**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ROBERT (BOB) ROSS** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, et al.,** | § | |
| | § | **Case No. 4:22-CV-343-Y** |
| **AND** | § | |
| | § | **Consolidated with** |
| **EUGENIO VARGAS** | § | **Case No. 4:22-CV-430-Y** |
| | § | |
| **VS.** | § | |
| | § | |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, et al.,** | § | |

---

**APFA DEFENDANTS' SUPPLEMENTAL APPENDIX SUPPORTING
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 7.1(i), Defendant and Counterclaim Plaintiff the Association of Professional Flight Attendants ("APFA"), its National President and Defendant, Julie Hedrick, and National Treasurer and Defendant, Erik Harris (collectively, "the APFA Defendants"), hereby submit the following Supplemental Appendix to its Opposition to Plaintiffs' Motion for Partial Summary Judgment. These materials supplement the APFA Defendants' Appendix filed in support of their Motion for Summary Judgment, Doc. 236.

| Tab | Description | APFA Supp. Appx. |
|---|---|---|
| **7** | **Factual Material** | 676 |
| | Vargas Article VII Hearing – Transcript (Excerpts) | 677-698 |

| | | |
|---|---|---|
| | Ross Deposition Transcript (Excerpts) | 699-702 |
| | APFA Form LM-2 (dated June 28, 2017) (Excerpt) | 703-704 |
| | APFA Form LM-2 (dated June 30, 2018) (Excerpt) | 705-706 |
| | "Instructions For Form LM-2 Labor Organization Annual Report," U.S. Dep't of Labor, Office of Labor-Management Standards (Excerpt) | 707-711 |
| **8** | **Unpublished Cases** | 712 |
| | *Smith v. Spizzirri*, No. 22-1218, 2024 WL 2193872 (U.S. May 16, 2024) | 713-717 |
| | *McCarthy v. IAM*,  No. 21-1673, 2021 WL 5766569 (3d Cir. Dec. 6, 2021) | 718-722 |
| | *Martin v. Local 556, Transport. Workers Union of Am*., No. 3:14-cv-0500-D, 2014 WL 4358480 (N.D. Tex. Sept. 3, 2014) | 723-732 |
| | *Abrams v. American Airlines*, No. 4:04-CV-919-Y, 2007 WL 9775358 (N.D. Tex. Aug. 30, 2007) | 733-736 |

Dated: May 24, 2024

Respectfully submitted,


 */s/ James D. Sanford*
JAMES D. SANFORD
Tex. Bar No. 24051289
Gillespie Sanford LLP
4803 Gaston Ave.
Dallas, TX 75246
Tel.: (214) 800-5111; Fax.: (214) 838-0001
Email: jim@gillespiesanford.com

JEFFREY A. BARTOS (pro hac vice)
D.C. Bar No. 435832
Guerrieri, Bartos & Roma, PC
1900 M Street, N.W. Suite 700
Washington, DC 20036
Tel.: (202) 624-7400; Fax: (202) 624-7420
Email: jbartos@geclaw.com

*Counsel for the APFA Defendants*

CHARLETTE L. BRODERICK (pro hac
vice)
Tex. Bar No. 24133870
Association of Professional Flight
Attendants
1004 W. Euless Blvd.
Euless, TX 76040
Tel.: (682) 301-8454
Email: Cbroderick@apfa.org

*Counsel for APFA*

## CERTIFICATE OF SERVICE

I certify that on May 24, 2024, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's ECF system.

KERRI PHILLIPS
K.D. Phillips Law Firm, PLLC
6010 W. Spring Creek Parkway
Plano, TX 75024
Phone: (972) 327-5800
Fax: (940) 400-0089
Email: kerri@KDphillipslaw.com

MICHAEL R RAKE
Michael R. Rake, Attorney at Law PO Box 1556
Lake Dallas, TX 75065
Tel.: (940) 498-2103
Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com

_/s/ James D. Sanford_____
JAMES D. SANFORD

4

TAB 7

Melissa Chinery    9/14/2021

```
 1            IN THE MATTER OF THE ARBITRATION BETWEEN

 2   MELISSA CHINERY, Member      )BEFORE THE ARTICLE VII
     And                         )
 3   SANDRA LEE, Member           )
                                  )ARBITRATOR
 4   AND                          )
                                  )
 5   EUGENIO VARGAS, Member       )HON. RUBEN R. ARMENDARIZ

 6

 7

 8         ************************************

 9              SEPTEMBER 14, 2021

10                   VOLUME 1

11         ************************************

12

13

14

15        BE IT REMEMBERED that on the 14th day of

16   September, 2021, the above cause came on for hearing

17   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

18   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

19   Boulevard, located in the City of Irving, County of

20   Dallas, State of Texas, whereupon the following

21   proceedings were had.

22

23

24

25
```

Carson Reporting & Associates    214.346.3434

APPX. 0677

Melissa Chinery    9/14/2021

Page 2

```
 1                 A P P E A R A N C E S:

 2       HON. RUBEN R. ARMENDARIZ
         LABOR MANAGEMENT ARBITRATOR
 3       29010 Pfeiffers Gate
         Fair Oaks Ranch, Texas   78015
 4       PHONE:  210.379.0860
         EMAIL:  arbruben@gmail.com
 5

 6       APPEARING AS THE ARBITRATOR

 7

         MS. MELISSA CHINERY
 8       EMAIL:  Melchinery@aol.com
                   AND
 9       MS. SANDRA LEE
         EMAIL:  SEL27995@gmail.com
10                 AND
         MS. HEATHER OLENJACK
11

         APPEARING FOR THE CHARGING PARTIES
12

13       MS. HEIDI J. MORGAN
         EMAIL:  heidimorgan65@gmail.com
14                 AND
         MS. NENA MARTIN
15

         APPEARING FOR THE CHARGED PARTY, EUGENIO VARGAS
16

17                      *   *   *   *

18

19

20

21

22

23

24

25
```

Carson Reporting & Associates   214.346.3434

Melissa Chinery   9/14/2021

Page 3

```
 1                    WITNESS INDEX
 2
     CATHY LUKENSMEYER                          PAGE
 3   Direct Examination by Ms. Chinery..............  25
     Cross-Examination by Ms. Morgan................  51
 4   Redirect Examination by Ms. Chinery............  75
 5   MICHAEL TRAPP
     Direct Examination by Ms. Chinery..............  79
 6   Cross-Examination by Ms. Morgan................  91
     Redirect Examination by Ms. Chinery............ 100
 7
     JENNIFER McCAULEY
 8   Direct Examination by Ms. Chinery.............. 102
 9   MICHAEL TRUAN
     Direct Examination by Ms. Lee.................. 116
10   Cross-Examination by Ms. Morgan................ 121
     Redirect Examination by Ms. Lee................ 134
11   Recross-Examination by Ms. Morgan.............. 139
     Further Redirect Examination by Ms. Lee........ 143
12   Further Recross-Examination by Ms. Morgan...... 146
13   HEATHER OLENJACK
     Direct Examination by Ms. Chinery.............. 148
14   Cross-Examination by Ms. Morgan................ 155
     Redirect Examination by Ms. Chinery............ 169
15
     JOHN NIKIDES
16   Direct Examination by Ms. Chinery.............. 171
     Cross-Examination by Ms. Martin................ 185
17   Redirect Examination by Ms. Chinery............ 212
     Recross-Examination by Ms. Martin.............. 214
18   Further Redirect Examination by Ms. Chinery.... 216
     Further Recross-Examination by Ms. Martin...... 218
19   Further Redirect Examination by Ms. Chinery.... 220
20   ERIK HARRIS
     Direct Examination by Ms. Lee.................. 221
21
22
23
24
25
```

Carson Reporting & Associates   214.346.3434

**APPX. 0679**

Melissa Chinery   9/14/2021

Page 4

```
 1                    EXHIBIT INDEX
 2
      EXHIBIT                           ID'D    ADMITTED
 3
      Joint Exhibit No. 1....................  24
 4    Joint Exhibit No. 2....................  30
 5    EXHIBIT                           ID'D    ADMITTED
 6    Chinery-Lee Exhibit No. 1.............  36      242
      Chinery-Lee Exhibit No. 2.............  38      242
 7    Chinery-Lee Exhibit No. 3............. 229      242
      Chinery-Lee Exhibit No. 5............. 234      242
 8    Chinery-Lee Exhibit No. 6............. 235      242
      Chinery-Lee Exhibit No. 7............. 236      242
 9    Chinery-Lee Exhibit No. 8............. 236      242
      Chinery-Lee Exhibit No. 9............. 238      242
10    Chinery-Lee Exhibit No. 10............ 240      242
      Chinery-Lee Exhibit No. 11............ 241      242
11    Chinery-Lee Exhibit No. 12............  50       50
      Chinery-Lee Exhibit No. 13............  81       84
12    Chinery-Lee Exhibit No. 14............ 108      114
      Chinery-Lee Exhibit No. 15............ 105      114
13    Chinery-Lee Exhibit No. 16............ 105      114
      Chinery-Lee Exhibit No. 17............ 119      121
14    Chinery-Lee Exhibit No. 18............ 120      121
      Chinery-Lee Exhibit No. 24............  50       51
15
      EXHIBIT                           ID'D    ADMITTED
16
      Vargas Exhibit No. 10................. 159      173
17    Vargas Exhibit No. 12................. 132      134
      Vargas Exhibit No. 14.................  53
18    Vargas Exhibit No. 26.................  62       64
      Vargas Exhibit No. 27.................  66
19    Vargas Exhibit No. 29................. 162      173
      Vargas Exhibit No. 30................. 162      173
20    Vargas Exhibit No. 33................. 161
      Vargas Exhibit No. 36................. 160      173
21    Vargas Exhibit No. 98................. 205
      Vargas Exhibit No. 99................. 127      134
22
23
24
25
```

Carson Reporting & Associates   214.346.3434   ***

Melissa Chinery   9/14/2021   ***

1    Q.   And tell us about that, please.

2    A.   Yeah, I was just telling Rachel I moved her

3    boss' head -- bed and headboard to the apartment.  Have

4    a great day.

5    Q.   And who was her -- who was her boss?

6    A.   Ooh, Eugenio.

7    Q.   Okay.

8         MS. CHINERY:  No more questions.

9         THE ARBITRATOR:   Okay.  Cross?

10                  CROSS-EXAMINATION

11   BY MS. MORGAN:

12   Q.   Mr. Trapp?

13   A.   Yes, ma'am.

14   Q.   Between October 2016 and June 2017, did you

15   ever pick up furniture at the APFA storage units and

16   drop them off at donation?

17   A.   Yeah.

18   Q.   You did?

19   A.   Yeah.

20   Q.   How many times would you say you did that?

21   A.   I don't know, probably two or three.

22   Q.   Two or three?

23   A.   Uh-huh.

24   Q.   What kind of vehicle did you use?

25   A.   Pickup truck and trailers.

APPX. 0681

Melissa Chinery   9/14/2021

Page 92

```
 1        Q.    Pickup truck with trailer?
 2        A.    Yeah.  Sometimes two trucks, two trailers.
 3        Q.    Who did you deal with at APFA headquarters
 4    with --
 5        A.    Mostly LaDonna.
 6        Q.    LaDonna?  Did she inventory those items
 7    before --
 8        A.    Not really.
 9        Q.    Okay.
10        A.    I mean, I'd go get it, take it, put it back
11    together and --
12              MS. CHINERY:   Objection.  How is he --
13    how is he supposed to know what -- what her business
14    practice is?
15              MS. MORGAN:   I just asked a question --
16              THE ARBITRATOR:   Well --
17              MS. MORGAN:  -- to his knowledge.
18              THE ARBITRATOR:  -- he gave an answer.
19    He gave an answer anyway.  So let's go from there.
20        Q.    (BY MS. MORGAN)  So to your knowledge, she
21    wasn't inventorying with you?
22        A.    She what?
23        Q.    To your knowledge, she wasn't with you?
24        A.    No, she wasn't when I was there.
25        Q.    Okay.  So when you would move items out of the
```

Carson Reporting & Associates   214.346.3434

APPX. 0682

Melissa Chinery   9/14/2021

Page 93

```
 1   corporate apartments, who would meet you there?
 2      A.   No one.
 3      Q.   No one?  They would give you the keys?
 4      A.   I'd go by APFA and pick up the keys.
 5      Q.   Okay.  So with regard to LaDonna Casey, we
 6   have a --
 7              MS. CHINERY:   Objection.  She's not
 8   here.
 9              MS. MORGAN:   I haven't even spoken.
10              THE ARBITRATOR:   Yeah, let her -- let
11   her --
12              MS. CHINERY:   Okay.
13              THE ARBITRATOR:  Go ahead.  Go ahead.
14              MS. MORGAN:  We have a notarized letter
15   from LaDonna Casey, who was the office coordinator at
16   this time.  She was a witness who was unable to attend
17   due to a comorbidity with regard to COVID.  Ms. Chinery
18   and Ms. Lee did submit a notarized --
19              MS. CHINERY:   We object.  She's not
20   here.
21              MS. MORGAN:   I was speaking.
22              THE ARBITRATOR:  Go ahead.
23              MS. MORGAN:  Ms. Chinery and Ms. Lee did
24   submit a notarized letter in their document exchange
25   for a witness also.  We don't have any intent to read
```

APPX. 0683

1    it into the record or provide any testimony to it.  We

2    will just ask that the Arbitrator use it as he deems

3    fit when he reviews the case.

4                    THE ARBITRATOR:    Okay.  You got a

5    position?

6                    MS. CHINERY:    We object.

7                    THE ARBITRATOR:    You object?

8                    MS. CHINERY:    She should be here.  How

9    do -- how do we know -- I mean, we don't have a chance

10   to -- I mean --

11                   THE ARBITRATOR:    Did you have -- did you

12   submit any documents to --

13                   MS. CHINERY:    We -- we put in an

14   affidavit, but then we realized we couldn't do it, we

15   couldn't use it.  I -- I mean --

16                   THE ARBITRATOR:    It's not in these

17   exhibits.

18                   MS. CHINERY:    No.  No.

19                   MS. MORGAN:    Arbitrator Armendariz, she

20   did submit a notarized letter from a witness --

21                   MS. CHINERY:    In document exchange, but

22   it's not in --

23                   MS. MORGAN:    I'm speaking.

24                   MS. CHINERY:    -- it's not in the exhibit.

25                   MS. MORGAN:    She --

APPX. 0684

Melissa Chinery   9/14/2021

```
 1              MS. CHINERY:  Well, I --
 2              MS. MORGAN:  -- she submitted -- she
 3   submitted a notarized letter from a witness who said he
 4   would not attend and then he agreed to attend on our
 5   behalf.  That's why she didn't submit it into the
 6   exchange.
 7              MS. CHINERY:   So objection again.
 8              THE ARBITRATOR:  So is this --
 9              MS. CHINERY:  So now you can read my
10   mind?
11              THE ARBITRATOR:  -- is this -- excuse me.
12   Is this witness going to be here today?
13              MS. MORGAN:  Yes, he is, that's why
14   her -- that's why he's notified his -- his -- notarized
15   document is --
16              THE ARBITRATOR:  Well then, you can bring
17   that document in with that person, okay?  Let's do it
18   that way.
19              MS. MORGAN:  No, but I -- that's why
20   she's not exchanging his notarized statement and that's
21   why she feels comfortable objecting to my notarized
22   statement.
23              THE ARBITRATOR:   Yeah.  Well, that's
24   fine.  You submit what you have to do, but do it
25   through your witness.
```

APPX. 0685

Melissa Chinery    9/14/2021

Page 96

```
 1              MS. MORGAN:   No, what I'm saying, my --
 2  my -- our notarized document is with LaDonna Casey.
 3  Hers is with a different witness.  I'm simply asking
 4  that we be allowed to submit LaDonna Casey's notarized
 5  statement about her job as office coordinator to you.
 6              THE ARBITRATOR:   Yeah.  Is she -- is she
 7  going to testify?
 8              MS. MORGAN:   She's unable to come
 9  because of COVID.
10              THE ARBITRATOR:   Because of COVID?
11              MS. MORGAN:   Yes.
12              THE ARBITRATOR:   Do you have any
13  objection?
14              MS. CHINERY:   Yes.
15              THE ARBITRATOR:   Well, I tell you what,
16  can't accept it.
17              MS. MORGAN:   Thank you.
18     Q.   (BY MS. MORGAN)   Mr. Trapp?
19     A.   Yes, ma'am.
20     Q.   Isn't it true that when the Ross
21  administration came into office, there were no
22  corporate apartments for them, that when the Glading
23  administration left office, all the --
24              MS. CHINERY:   Objection.
25              THE ARBITRATOR:   Let her finish the
```

Carson Reporting & Associates   214.346.3434                ***

*** 
Melissa Chinery   9/15/2021

Page 251

```
 1              IN THE MATTER OF THE ARBITRATION BETWEEN

 2   MELISSA CHINERY, Member      )BEFORE THE ARTICLE VII
     And                         )
 3   SANDRA LEE, Member          )
                                 )ARBITRATOR
 4   AND                         )
                                 )
 5   EUGENIO VARGAS, Member      )HON. RUBEN R. ARMENDARIZ

 6

 7

 8

 9          *************************************

10                 SEPTEMBER 15, 2021

11                     VOLUME 2

12          *************************************

13

14

15

16          BE IT REMEMBERED that on the 15th day of

17   September, 2021, the above cause came on for hearing

18   before HON. RUBEN R. ARMENDARIZ at the WESTIN IRVING

19   CONVENTION CENTER AT LAS COLINAS, 400 West Las Colinas

20   Boulevard, located in the City of Irving, County of

21   Dallas, State of Texas, whereupon the following

22   proceedings were had.

23

24

25
```

Carson Reporting & Associates   214.346.3434

Melissa Chinery   9/15/2021

Page 252

```
 1                    A P P E A R A N C E S:

 2        HON. RUBEN R. ARMENDARIZ
          LABOR MANAGEMENT ARBITRATOR
 3        29010 Pfeiffers Gate
          Fair Oaks Ranch, Texas   78015
 4        PHONE:  210.379.0860
          EMAIL:  arbruben@gmail.com
 5

 6        APPEARING AS THE ARBITRATOR

 7

 8        MS. MELISSA CHINERY
          EMAIL:  Melchinery@aol.com
                      AND
 9        MS. SANDRA LEE
          EMAIL:  SEL27995@gmail.com
10

          APPEARING FOR THE CHARGING PARTIES
11

12        MS. HEIDI J. MORGAN
          EMAIL:  heidimorgan65@gmail.com
13                    AND
          MS. NENA MARTIN
14

          APPEARING FOR THE CHARGED PARTY, EUGENIO VARGAS
15

16
                          *   *   *   *
17

18

19

20

21

22

23

24

25
```

Carson Reporting & Associates   214.346.3434

APPX. 0688

Melissa Chinery    9/15/2021

Page 253

```
  1                  WITNESS INDEX
  2
     ERIK HARRIS                              PAGE
  3  Direct Examination (Cont'd) by Ms. Lee.......... 257
     Cross-Examination by Ms. Martin................. 276
  4  Redirect Examination by Ms. Chinery............. 351
     Recross-Examination by Ms. Morgan............... 373
  5  Further Redirect Examination by Ms. Lee.......... 378
  6  SHANE STAPES
     Direct Examination by Ms. Morgan................ 383
  7  Cross-Examination by Ms. Chinery................ 392
  8  CHUCK RANSDALE
     Direct Examination by Ms. Morgan............... 394
  9  Cross-Examination by Ms. Chinery................ 401
     Redirect Examination by Ms. Morgan.............. 403
 10
     CHRISTOPHER THEDFORD
 11  Direct Examination by Ms. Chinery............... 404
     Cross-Examination by Ms. Morgan................. 413
 12
     DEBBIE HOOVER
 13  Direct Examination by Ms. Chinery............... 415
     Cross-Examination by Ms. Morgan................. 422
 14
     JOSH BLACK
 15  Direct Examination by Ms. Chinery............... 426
     Cross-Examination by Ms. Martin................. 430
 16
     SANDRA LEE
 17  Direct Examination by Ms. Chinery............... 434
     Cross-Examination by Ms. Morgan................. 444
 18
     MELISSA CHINERY
 19  Direct Examination by Ms. Lee................... 455
     Cross-Examination by Ms. Morgan................. 485
 20  Redirect Examination by Ms. Lee................. 511
 21
 22
 23
 24
 25
```

Carson Reporting & Associates    214.346.3434

Melissa Chinery   9/15/2021

Page 254

```
 1                        EXHIBIT INDEX

 2
         EXHIBIT                          ID'D      ADMITTED
 3
         Chinery-Lee Exhibit No. 23............ 474      480
 4

 5       EXHIBIT                          ID'D      ADMITTED

 6       Vargas Exhibit No. 1................... 501
         Vargas Exhibit No. 8................... 424
 7       Vargas Exhibit No. 20.................. 374
         Vargas Exhibit No. 21.................. 374
 8       Vargas Exhibit No. 32.................. 388      389
         Vargas Exhibit No. 35.................. 387      388
 9       Vargas Exhibit No. 44.................. 309      350
         Vargas Exhibit No. 45.................. 302
10       Vargas Exhibit No. 84.................. 488
         Vargas Exhibit No. 85.................. 488
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Carson Reporting & Associates   214.346.3434   ***

Melissa Chinery   9/15/2021

1      A.    There are still -- well, there are some

2   missing credit card receipts for Craig Gunter and Liz

3   Geiss that we are unable to locate.

4      Q.    So isn't it true you said that months of

5   those, quote, Chris, he just doesn't have?

6      A.    Yes.

7      Q.    Okay.  So in previous testimony and

8   questioning, Ms. Chinery and Lee with missing

9   documents, they have missing box and such they have

10  questioned as to whether there was tampering or things

11  stolen.  Do you have any reason to believe these were

12  stolen, deleted, anything like that?

13             MS. CHINERY:  Calls for speculation.

14             MS. MORGAN:   I'm asking the Treasurer

15  and his department.

16             THE ARBITRATOR:   Just asking whether he

17  has knowledge of it.  Are you aware of it?

18     A.    I don't know.

19             MS. MORGAN:  Okay.  So regarding their

20  Exhibit 8, we'd like to enter it as our Exhibit 44.  Go

21  back to the white one.

22     Q.    (BY MS. MORGAN)  Okay.  So Mr. Harris, they

23  had you read this email you sent yesterday into the

24  record.  That being said, they had you stop prior to

25  finishing the email.  So now we're going to ask you to

Melissa Chinery    9/15/2021

Page 310

```
 1    read it into the record in its entirety.
 2         A.   Sure.  The entire email?
 3         Q.   Yeah, start from the text that you wrote.
 4         A.   Oh, okay.  Hi, Melissa -- okay.  Hi, Melissa
 5    and Sandra.  You should have everything requested,
 6    however, I understand you're still going through
 7    everything.  If you encounter any missing or additional
 8    items needed, please send them over to me.  The
 9    following documents are missing:
10              Number one, the box containing all
11    accounts payable invoices, reports, and documents for
12    fiscal year ending 2017, beginning with letter S
13    through V.  This would contain all backup and support
14    documents or receipts for Eugenio Vargas' monthly
15    reports during this time frame.
16              Number two, receipts for Eugenio Vargas'
17    purchase of Greg Gunter's APFA owned furniture.
18              Number three, all petty cash logs,
19    records, and receipts for fiscal year ending 2017.
20              We continue to search every day for these
21    records.  There are individuals who have seen these
22    documents in the recent past; however, they have
23    been -- they have inexplicably disappeared from my
24    custody.
25              I will keep you posted on any information
```

APPX. 0692

Melissa Chinery   9/15/2021

Page 311

1  that I receive, should there be any updates.

2              Thank you again for your patience and

3  understanding.  Thanks, Erik.

4      Q.   Okay.  So isn't it true that this email

5  confirms in a direct quote from you that there are

6  individuals, quote, there are individuals, who have

7  seen these documents in the recent past; however, they

8  have inexplicably disappeared from my custody, end

9  quote?

10     A.   Yes.

11     Q.   Okay.  So you personally have taken ownership

12 for this issue because you as the Treasurer take

13 responsibility?

14     A.   Yes.

15     Q.   Isn't it also true yesterday that you

16 testified some of these items were found?

17     A.   Yes.

18     Q.   And we have every confidence in your ability

19 to locate them and we know the stress that this

20 arbitration has placed on your department.

21     A.   Yes.  Thank you.

22     Q.   So let's go to August 4th, 2020, the date Ms.

23 Chinery and Ms. Lee were, by their own claim, given the

24 Ross Transition Agreement.

25     A.   Yes, or shown it.

Carson Reporting & Associates   214.346.3434

APPX. 0693

Melissa Chinery   9/15/2021

```
 1        Q.   Shown it.  Well, given to review --
 2        A.   Oh, I didn't give it.
 3        Q.   -- shown, given to review.  Who was in the
 4   room with them?
 5        A.   At the time it was Julie, myself, Margot.  I
 6   believe the other two Officers that were there, from
 7   what I recall.
 8        Q.   Who gave them the document?
 9        A.   I did, yeah.
10        Q.   Okay.  Did you see the document?
11        A.   Yes.
12        Q.   Where did you get the document?
13        A.   I received it from our attorney.
14        Q.   Which attorney?
15        A.   Bill Osborne.
16        Q.   He handed it to you?
17        A.   No, he emailed it to me.
18        Q.   Would you recognize it if you saw the
19   document?
20        A.   Yes.
21        Q.   Okay.  Would you turn to Exhibit 98?
22                 MS. CHINERY:   Do we have 98?
23                 MS. MORGAN:   It's been admitted 98.
24                 MS. LEE:   Do we have 98?
25                 MS. MORGAN:   Yes, we gave it to you
```

Carson Reporting & Associates   214.346.3434

APPX. 0694

Melissa Chinery   9/15/2021

Page 313

1    yesterday.  It's the Ross -- the signed, executed Ross
2    Transition Agreement --
3                    MS. LEE:  (Unintelligible).
4                    MS. MORGAN:  Are you looking at it?
5                    THE WITNESS:  I looked through it.
6                    MS. MORGAN:  You guys ready?
7                    MS. CHINERY:  Yes.
8         Q.   (BY MS. MORGAN)  Erik, is that the document
9    you gave them?
10        A.   Yes, or showed them, yes.
11        Q.   Does it have a signature page?
12        A.   Yes.
13        Q.   Would you go back to the first page, Erik?
14   Would you read into the record item number four, which
15   is the economic terms of the Ross Transition Agreement?
16        A.   APFA agrees to pay Ross --
17                    THE REPORTER:  Read it slowly, please.
18                    THE WITNESS:  Sure.
19        A.   APFA agrees to pay Ross all of his accrued and
20   unused sick and accrued and unused vacation time --
21                    MS. CHINERY:  Objection.  We were not
22   allowed to talk about the Ross, and these -- this is
23   talking about Bob Ross.  There's a case for that.
24                    THE ARBITRATOR:  They're bringing it
25   into the record, so --

```
 1                MS. CHINERY:    So we can talk about Bob
 2   Ross, then?
 3                THE ARBITRATOR:    Well, I'm going to
 4   allow this -- this portion of it.  Go ahead.
 5                MS. MORGAN:   For clarification, the Ross
 6   Transition Agreement is part of the foundation of this
 7   case and his payout of the Ross Transition Agreement --
 8                THE ARBITRATOR:  Go --
 9                MS. MORGAN:  -- we're talking about
10   the --
11                MS. CHINERY:   It's in his case.
12                THE ARBITRATOR:   Okay.  Go ahead and
13   continue, please.
14                MS. MORGAN:   His payout of the economic
15   portions of the Ross Transition Agreement.
16   Q.   (BY MS. MORGAN)  So item number three -- item
17   number four?
18   A.   You want me to read it again?
19   Q.   Yes.
20                THE ARBITRATOR:  Yes.
21   A.   Okay.  APFA agrees to pay Ross all of his
22   accrued and unused sick and accrued and unused vacation
23   time from April 1st, 2016, through July 31st, 2018.
24   Q.   (BY MS. MORGAN)  So it is your testimony -- to
25   be clear, it is your testimony that these are the
```

APPX. 0696

1     Q.   Any fiscal year in particular?

2     A.   Let's see.  It was on and off between '18 and

3 -- and between fiscal year '18 through '20, there was

4 some receipts missing during that time period and a few

5 months in between '12 and '16, I believe, there was

6 some missing.  And we didn't find anything prior to

7 '12.

8     Q.   Was there anything from '16 -- 2016 to 2018

9 missing?

10     A.   There were a couple of months.

11     Q.   Okay.  So what about invoices and receipts?

12     A.   I wasn't looking at invoices, that was --

13     Q.   What -- what part of the subpoena did you

14 gather?

15     A.   I was pulling credit card receipts.

16     Q.   Would you say that the documents in the

17 possession of the Union from the Vargas

18 administration's complied with the recordkeeping

19 requirements of the LMRDA?

20     A.   I wouldn't know right offhand, no.

21          MS. CHINERY:  Okay.  No more questions.

22          THE ARBITRATOR:   Cross?

23             CROSS-EXAMINATION

24 BY MS. MORGAN:

25     Q.   You said there were missing credit card

Melissa Chinery   9/15/2021

Page 414

1   receipts for the fiscal 2018, '20 year?

2      A.   Yes.

3      Q.   Who was the National Officer that they were

4   missing for?

5      A.   See, it would be Lori Bassani mostly.   I think

6   it was Bob Ross before that was the administration

7   before.

8      Q.   He was not in in 2018 --

9      A.   Okay.   So then it would just be Lori Bassani.

10     Q.   Lori Bassani?

11     A.   Yeah, okay.

12     Q.   So they were never located?

13     A.   I have not been able to find them.

14           MS. MORGAN:   Okay.   Thank you.   No more

15   questions.

16           THE ARBITRATOR:   Anything else?

17           MS. CHINERY:   Thank you.

18           THE ARBITRATOR:   Thank you, sir.   You're

19   excused.   Okay.   Do you want to take a break?

20           MS. CHINERY:   Can we take a break,

21   please?

22           THE ARBITRATOR:   Yes.

23           (Break from 1:21 to 1:32.)

24           THE ARBITRATOR:   I'm Ruben Armendariz;

25   I'm the Arbitrator in this proceeding.   Would you mind

Robert Ross                                                      2/1/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ROBERT (BOB) ROSS,                §
                                  §
Plaintiff/                        §
Counterclaim Defendant,           §
                                  §   Civil Action No.
VS.                               §   4:22-cv-343-Y
                                  §
ASSOCIATION OF                    §   Judge Terry R. Means
PROFESSIONAL FLIGHT               §
ATTENDANTS, et al.,               §
                                  §
Defendants/                       §
Counterclaim Plaintiff.           §

------------------------------------
VIDEOTAPED ORAL DEPOSITION OF
ROBERT ROSS
VOLUME 1
FEBRUARY 1, 2024
------------------------------------

        VIDEOTAPED ORAL DEPOSITION OF ROBERT ROSS,

produced as a witness at the instance of the

Defendants/Counterclaim Plaintiff, and duly sworn, was

taken in the above-styled and -numbered cause on

February 1, 2024, from 10:53 a.m. to 4:56 p.m., before

Angela L. Mancuso, CSR No. 4514 in and for the State of

Texas, reported by machine shorthand, at Springhill

Suites - DFW Airport South/Centreport, 4360 Highway 360,

Fort Worth, Texas, pursuant to the Federal Rules of

Civil Procedure, Notice, and any provisions stated on

the record.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

APPX. 0699

Robert Ross                                                    2/1/2024

---

**118**

1  Q. Okay. And had you applied for a job with
2  American?
3  A. Yes, I have.
4  Q. Before that meeting with Oebker and Carvatta,
5  had you applied for a job?
6  A. I don't recall what the date was.
7  Q. But in any event this was not a job interview?
8  A. When I met with them was not -- well, it was
9  leading up to a job interview, yes. They were
10  interviewing me to see if it was even a potential fit.
11  Q. Okay. Now, I thought you said you were
12  meeting with them about flight attendant discipline; so
13  I'm a little confused.
14  A. I was. I did not have an official meeting
15  with them over a job interview.
16  Q. Okay. Okay. So you were doing Union business
17  and also maybe looking for a job to go into management
18  at the same time?
19  A. No. No.
20  Q. No?
21  A. That's -- I'm not --
22  Q. Well, I'm just trying to figure out. You said
23  the purpose of the meeting was this disciplinary
24  discussion, and then you also said it was also to
25  discuss your potentially going to work in management.

---

**120**

1  more conceptual and in the air?
2  A. I don't know the date that I had actually
3  applied. But you're inferring that one was part of the
4  other. And one was not.
5  MS. PHILLIPS: I need a break myself, if
6  you don't mind.
7  MR. BARTOS: Okay. As soon as he's done
8  with answering.
9  A. You gave a date. I don't know. I'm not --
10  I'm not sure on the date.
11  Q. Okay.
12  A. But you're inferring that you can't do one or
13  the other, if you're there to meet them as a Union rep
14  and that business is done and over with, and then later
15  in the day, with a phone call or whatever it is, that
16  you're discussing something different, that it's one or
17  the same.
18  It's -- that's not how I inferred it in that
19  declaration, is that on that particular day that whole
20  day was -- there were other things that happened on that
21  day too, and one did not cross over into the other.
22  MR. BARTOS: We can take a break.
23  THE VIDEOGRAPHER: We're off record at
24  3:47 p.m.
25  (Recess from 3:47 p.m. to 3:57 p.m.)

---

**119**

1  A. No. That's what led up to that. I didn't --
2  if that's how you inferred that, then I stand corrected.
3  It's not what I meant.
4  Q. Okay. Well, maybe I'm a little confused.
5  What led up to what? You said that --
6  A. They knew me from my work as a Union --
7  Q. Yep.
8  A. -- president.
9  Q. Okay. And so how did it come about that you
10  had this meeting?
11  A. Well, you're describing it as a meeting. I
12  don't describe it as a meeting. I describe it as a
13  casual conversation at the end of a day or -- where they
14  knew me from my work with them under Article XXXV
15  charges.
16  Q. Okay. Okay. Well, let me read you what you
17  said in your declaration. "In April of 2021, I met with
18  Jim Oebker and Debbie Carvatta and discussed my
19  consideration for hire in a position at American
20  Airlines as a management slash -- manager/consultant."
21  Okay?
22  A. Uh-huh.
23  Q. So, again, I'm just trying to figure out the
24  context. You had -- you had applied for a
25  manager/consultant position at that time, or it was just

---

**121**

1  THE VIDEOGRAPHER: We're back on record
2  at 3:57 p.m.
3  BY MR. BARTOS:
4  Q. Just to follow up some more on the issue of
5  reputational damage, where were you when you had this
6  conversation with Jim Oebker and -- or this meeting with
7  Jim Oebker and Debbie Carvatta?
8  A. I had an informal conversation with them over
9  the phone.
10  Q. Okay.
11  A. And a very loose walking-out-the-terminal type
12  of conversation.
13  Q. Okay. Are they based in SFO?
14  A. No. They -- they -- they represent --
15  represented people from SFO.
16  Q. Okay. All right. In any event, regardless of
17  where, you state in your affidavit that Ms. Carvatta
18  informed you you would be a good fit for their team but
19  American would not hire you because of the disciplinary
20  charges against you. Is that right?
21  A. That's correct.
22  Q. Do you remember her exact words?
23  A. Those were close to her exact words but not
24  necessarily in that direct line of sentence.
25  Q. All right. And at that point again -- forgive

---

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Robert Ross                                                    2/1/2024

**122**

1  me if this is repetitive, but I just want to make
2  sure. Your affidavit says April of '21. Had you
3  applied for a job prior to that conversation, or was it
4  just a more general?
5      A. I don't -- I don't think I did. I don't know
6  the exact date that I -- I did not approach them.
7      Q. Okay. And did you at some point after that
8  date apply for a job with American as a manager or
9  consultant?
10     A. I applied to American, yes.
11     Q. For what position?
12     A. I don't know the technical name for it, but it
13 had to do with -- I think they call it human -- not --
14 not HR but -- I'd have to go back in. I don't know the
15 exact name.
16     Q. Is it fair to say it had something to do with
17 employment relationships? It wasn't an engineering job
18 or --
19     A. No. It had to do with --
20     Q. -- coding job or something?
21     A. -- employment type of, yes.
22     Q. Okay. Okay. You go on in your declaration.
23 You mention that one of your predecessors, Laura
24 Glading, had at some point had a job as a consultant for
25 American. Right?

**123**

1      A. Say that again.
2      Q. You mention in your affidavit -- you know who
3  Laura Glading is. Correct?
4      A. Yes.
5      Q. Okay. She had been a president of APFA?
6      A. Uh-huh.
7      Q. And she, after that, went to work for American
8  Airlines. Correct? As -- in management?
9      A. I don't -- I don't recall the wording in the
10 affidavit.
11     Q. The word you used was "consultant."
12     A. Okay. That's a broad -- broad definition.
13     Q. All right. Well, let me just ask you, because
14 in your damage claim, you claim you've suffered --
15 you've lost $86,376 in potential income because you
16 couldn't get a good job at American as a consultant. Do
17 you remember making that statement?
18     A. Yes.
19     Q. Okay.
20     A. Very similar. I don't know the exact
21 statement.
22     Q. Okay.
23     A. So I won't say that that's the statement I
24 made, specifically.
25     Q. Okay. Okay. Well, you -- you swore under

**124**

1  oath. You said consultants for American Airlines make
2  an average of $121,500 to $173,200 annual salary.
3      A. That's --
4      Q. Do you remember that?
5      A. -- approximate, yeah.
6      Q. Okay. And there is a footnote that provides,
7  I take it, the source of your knowledge for how
8  consultants get paid.
9          Do you remember looking into that?
10     A. I looked into the feasibility of it back in --
11         (Interruption at the door)
12     A. I don't -- I don't recall the date, but it was
13 very loose. Once I realized that it wasn't -- they
14 wouldn't hire me, the application was there, I didn't
15 pursue it because I've been dealing with this.
16     Q. Okay. The -- your footnote that
17 provides the source material for the average salary of
18 consultants cites to a website called salary.com.
19         Do you remember looking on salary.com?
20     A. I have.
21     Q. Okay. And the -- the job, if you read out the
22 whole line of what it's looking for, is expert
23 consultant reliability engineer. Do you remember
24 looking that up?
25     A. That's one of several that were within that

**125**

1  same category, from what I recall.
2      Q. That's the source that you cite in your
3  affidavit. Right?
4      A. Okay.
5      Q. And I think you testified you weren't sure
6  what a reliability engineer was. Right? Do you
7  remember that earlier today?
8      A. I don't know what -- what a reliability
9  engineer is.
10     Q. Okay. And you had not applied for a job as a
11 reliability engineer, did you? You said you applied for
12 a job in the employment side.
13     A. I didn't apply for corporate security, but
14 corporate security is also within the same realms of the
15 HR division that I applied to, but I wasn't applying as
16 a corporate security agent.
17     Q. Okay. And you -- the other source for your
18 price range or your salary range is what looks like a
19 federal government pay rate that maybe Laura Glading
20 received.
21         Do you remember looking that up?
22     A. I have looked up a lot of different.
23     Q. Well, you put it in your affidavit. That's
24 why I'm trying to figure out --
25     A. Yeah.

Robert Ross                                                2/1/2024

126

1    Q.  -- what your rationale was for relying on what
2    somebody else's federal government salary was, when
3    you're talking about what you might have earned had you
4    gone to work as a consultant for American Airlines.
5    A.  Yeah, I think there is a lot of different
6    areas that I could have gone in had -- had APFA not done
7    what they did.
8    Q.  Okay.  But you're claiming here in this
9    lawsuit that you lost $86,000, because of the
10   disciplinary charges, in -- in potential income.
11   A.  I don't know.  I don't recall exactly the math
12   that I used then, but it was the difference between what
13   I'm making now and what I had the potential of making
14   then.
15   Q.  Okay.  And the potential you could have made
16   is based on the salary of an expert consultant
17   reliability engineer, based on salary.com and the
18   federal pay rate received by Laura Glading as a federal
19   employee.  Right?
20   A.  Okay.
21   Q.  Okay.
22   A.  That's what you're saying.
23   MS. PHILLIPS:  Objection; form of these
24   questions.
25   Q.  I'm just trying to read -- I'm reading your

127

1    affidavit.
2    MS. PHILLIPS:  The form of the
3    questions -- he's already testified to this in the
4    affidavit.  So what's the purpose of this line of
5    questioning?
6    Q.  Do you think it was appropriate to be
7    discussing a management position with the same people
8    that you were discussing employee discipline with?
9    MS. PHILLIPS:  Objection.
10   A.  Not going to comment on your definition of
11   "appropriate" or not.
12   Q.  I'm asking if you thought it was appropriate.
13   A.  I'm not going to answer that because it's not
14   even --
15   MS. PHILLIPS:  It's vague.
16   A.  Is it -- yeah, it's -- it's vague.  Every --
17   everyone is having to look out for their families and do
18   what's best.  You get locked up in what you are and
19   never -- never moving one direction or another.  It's
20   not appropriate to do -- to look for a better life
21   because the one that you have has been damaged by your
22   union?
23   Q.  Now, you have asserted in your affidavit that
24   you incurred over a thousand dollars in arbitration
25   expenses.  Do you remember that?

128

1    A.  Yes.
2    Q.  Okay.  And just so I'm clear, because it was
3    not as well marked as I maybe would have thought,
4    that -- your support for that material are receipts
5    from, for example, Staples, for office supplies, and
6    hotel stay, and from Uber.  Does that sound correct to
7    you?
8    A.  Vaguely, yes.
9    Q.  Okay.  Those were your sort of out-of-pocket
10   expenses for the arbitration that you went through?
11   A.  That -- that was.
12   Q.  Okay.  A couple I just want to ask you about.
13   Bear with me a second.
14   Were the Staples expenses purchases that you
15   made for yourself, or did somebody else make them?
16   A.  They are whatever are on your receipts there
17   or whatever.  There were a lot of people working on my
18   case.
19   Q.  Okay.  Do you recall as part of your -- one of
20   the things you bought, a USB charger for $60?
21   A.  I don't recall whether that was one or two or
22   three-pack.  So ...
23   (Deposition Exhibit 13 marked)
24   Q.  Okay.  Let me just ask you just so we can --
25   there's just a few I want to understand.

129

1    I'm just showing you for the next exhibit,
2    it's your appendix, page 190.  If you could look, the
3    last item on there is a 59.99 charge for USB charger.
4    Do you know what that was for?
5    MS. PHILLIPS:  Objection.  It's
6    incorrect.  It's a USB-C charger.
7    MR. BARTOS:  Stand corrected.
8    Q.  USB-C charger.
9    A.  That USB-C charger is no different than you
10   have a charger on your computer right here.
11   Q.  Okay.
12   A.  And I challenge you to find one of those
13   anywhere for less than $60.
14   Q.  Okay.  So you bought, as part of your
15   arbitration prep, a charger for some electronic device.
16   Is that correct?
17   A.  That's right.
18   Q.  Okay.  And the APFA should pay you back for
19   that?
20   A.  Yeah.
21   Q.  Okay.  You -- some of the Uber expenses were
22   to -- to Kit.
23   Is that Kit Alba, the Union -- your
24   representative in the proceeding?
25   A.  I'd have to see the receipts.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

5/16/24, 4:47 PM

509-620 (LM2) 03/31/2017

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 07-31-2019

# FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTAL ANNUAL RECEIPTS AND
LABOR ORGANIZATIONS IN TRUSTEESHIP

This report is mandatory under P.L. 86-257, as amended.  Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER 509-620 | 2. PERIOD COVERED From 04/01/2016 Through 03/31/2017 | 3. (a) AMENDED - Is this an amended report: (b) HARDSHIP - Filed under the hardship procedures: (c) TERMINAL - This is a terminal report: | No No No |

**8. MAILING ADDRESS** (Type or print in capital letters)

| First Name EUGENIO | Last Name VARGAS |

P.O Box - Building and Room Number

Number and Street
1004 WEST EULESS BLVD

City
EULESS

| State TX | ZIP Code + 4 760405009 |

4. AFFILIATION OR ORGANIZATION NAME
ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS

5. DESIGNATION (Local, Lodge, etc.)

6. DESIGNATION NBR

7. UNIT NAME (if any)

9. Are your organization's records kept at its mailing address?   Yes

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

| 70. SIGNED: Robert A Ross | PRESIDENT | 71. SIGNED: EUGENIO VARGAS | TREASURER |
| Date: Jun 28, 2017   Telephone Number: 817-540-0108 | | Date: Jun 28, 2017   Telephone Number: 817-540-0108 | |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

APPX. 0703

5/16/24, 4:47 PM

## ITEMS 10 THROUGH 21

| | |
|---|---|
| 10. During the reporting period did the labor organization create or participate in the administration of a trust or a fund or organization, as defined in the instructions, which provides benefits for members or beneficiaries? | No |
| 11(a). During the reporting period did the labor organization have a political action committee (PAC) fund? | Yes |
| 11(b). During the reporting period did the labor organization have a subsidiary organization as defined in Section X of these instructions? | No |
| 12. During the reporting period did the labor organization have an audit or review of its books and records by an outside accountant or by a parent body auditor/representative? | Yes |
| 13. During the reporting period did the labor organization discover any loss or shortage of funds or other assets? (Answer "Yes" even if there has been repayment or recovery.) | No |
| 14. What is the maximum amount recoverable under the labor organization's fidelity bond for a loss caused by any officer, employee or agent of the labor organization who handled union funds? | $2,000,000 |
| 15. During the reporting period did the labor organization acquire or dispose of any assets in a manner other than purchase or sale? | No |
| 16. Were any of the labor organization's assets pledged as security or encumbered in any way at the end of the reporting period? | No |
| 17. Did the labor organization have any contingent liabilities at the end of the reporting period? | No |
| 18. During the reporting period did the labor organization have any changes in its constitution or bylaws, other than rates of dues and fees, or in practices/procedures listed in the instructions? | No |
| 19. What is the date of the labor organization's next regular election of officers? | 02/2019 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

509-620 (LM2) 03/31/2017                     FILE NUMBER: 509-620

| | |
|---|---|
| 20. How many members did the labor organization have at the end of the reporting period? | 25,179 |

21. What are the labor organization's rates of dues and fees?

| Dues/Fees | Rates of Dues and Fees | | | |
|---|---|---|---|---|
| | Amount | Unit | Minimum | Maximum |
| (a) Regular Dues/Fees | $41 | per month | $41 | $41 |
| (b) Working Dues/Fees | | per | | |
| (c) Initiation Fees | $50 | per | N/A | |
| (d) Transfer Fees | | per | | |
| (e) Work Permits | | per | | |

APPX. 0704

5/16/24, 4:49 PM

509-620 (LM2) 03/31/2018

## FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

**MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS IN TRUSTEESHIP**

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 07-31-2019

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

**READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.**

| For Official Use Only | 1. FILE NUMBER 509-620 | 2. PERIOD COVERED From 04/01/2017 Through 03/31/2018 | 3. (a) AMENDED - Is this an amended report: (b) HARDSHIP - Filed under the hardship procedures: (c) TERMINAL - This is a terminal report: | Yes No No |
|---|---|---|---|---|

**8. MAILING ADDRESS (Type or print in capital letters)**

| First Name EUGENIO | Last Name VARGAS |
|---|---|

P.O Box - Building and Room Number

Number and Street
1004 WEST EULESS BLVD

City
EULESS

| State TX | ZIP Code + 4 760405009 |
|---|---|

**4. AFFILIATION OR ORGANIZATION NAME**
ASSOCIATION OF PROFESSIONAL FLIGHT

**5. DESIGNATION** (Local, Lodge, etc.)

**6. DESIGNATION NBR**

**7. UNIT NAME (If any)**

**9. Are your organization's records kept at its mailing address?**  Yes

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

| 70. SIGNED: Nena J Martin  PRESIDENT | 71. SIGNED: EUGENIO VARGAS  TREASURER |
|---|---|
| Date: Jun 30, 2018   Telephone Number: 817-540-0108 | Date: Jun 30, 2018   Telephone Number: 817-540-0108 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

APPX. 0705

5/16/24, 4:49 PM

509-620 (LM2) 03/31/2018

FILE NUMBER: 509-620

**69. ADDITIONAL INFORMATION SUMMARY**

Question 11(a):

Question 11(a): Association of Professional Flight Attendants PAC. Reports filed with the Federal Election Commission. Funds kept separately and not included in this report. FEC Identification Number C00246421.

Question 13: Furniture was paid in full.

Question 15: Through a consignment store.

Question 12: Outside accounting firm - Wood, Stephens & O'Neill, LLP

Schedule 13, Row1:All active members are obligated to pay full dues in order to vote.

Schedule 13, Row2:Certain classes of inactive members are obligated to pay full dues, such as those on a leave of absence for education, personal and overage leaves. Members on a leave of absence for military, sickness, injury on duty, maternity or furlough are not dues obligated. If those members choose to vote they would be dues obligated. Form LM-2 (Revised 2010)). (Tech. Rev. 2/2013)

https://olmsapps.dol.gov/query/orgReport.do?rptId=6798298rptForm=LM2Form

65/65

**APPX. 0706**

Office of Labor-Management Standards

# INSTRUCTIONS FOR FORM LM–2 LABOR ORGANIZATION ANNUAL REPORT

Completing Form LM-2>

**GENERAL INSTRUCTIONS**

**I. WHO MUST FILE**

Every labor organization subject to the LaborManagement Reporting and Disclosure Act, as amended (LMRDA), the Civil Service Reform Act (CSRA), or the Foreign Service Act (FSA) must file a financial report, Form LM-2, LM-3, or LM-4, each year with the Office of Labor-Management Standards (OLMS) of the U.S. Department of Labor. These laws cover labor organizations that represent employees who work in private industry, employees of the U.S. Postal Service, and most Federal government employees. Labor organizations that include or represent only state, county, or municipal government employees are not covered by these laws and, therefore, are not required to file. If you have a question about whether the labor organization is required to file, contact the nearest OLMS field office listed at the end of these instructions.

**II. WHAT FORM TO FILE**

Every labor organization subject to the LMRDA, CSRA, or FSA with total annual receipts of $250,000 or more must file Form LM-2. Labor organizations with total annual receipts of less than $250,000 may file the simplified Form LM-3, if not in trusteeship as defined in Section IX (Labor Organization In Trusteeship) of these instructions. Labor organizations with total annual receipts of less than $10,000 may file the abbreviated annual report Form LM-4, if not in trusteeship. The term "total annual receipts" means all financial receipts of the labor organization during its fiscal year, regardless of the source, including receipts of any special funds as described in Section VIII (Funds To Be Reported) or as described in Section X (Labor Organizations With Subsidiary Organizations). Receipts of an LMRDA section 3(l) trust in which the labor organization is interested (as described in Information Item 10) should not be included in the total annual receipts of the labor organization when determining which form to file, unless the 3(l) trust is a subsidiary organization of the union.

**III. WHEN TO FILE**

Form LM-2 must be filed within 90 days after the end of the labor organization's fiscal year (12-month reporting period). The law does not authorize the Department to grant an extension of time for filing reports. The penalties for delinquency are described in Section VI (Officer Responsibilities and Penalties) of these instructions.

If the labor organization went out of existence during its fiscal year, a terminal financial report must be filed within 30 days after the date it ceased to exist. See Section XII (Labor Organizations That Have Ceased to Exist) of these instructions for information on filing a terminal financial report.

**IV. HOW TO FILE**

Form LM-2 must be submitted electronically to the Department. Form LM-2 filers will be able to file reports in paper format only if they assert a temporary hardship exemption. If you have difficulty navigating the software, or have questions about its functions and features, call the OLMS Help Desk at: (866) 401-1109. For questions concerning the reporting requirements, please send an e-mail to OLMS-Public@dol.gov or call (202) 693-0123.

**TEMPORARY HARDSHIP EXEMPTION**: If a labor organization experiences unanticipated technical difficulties that prevent the timely preparation and submission of an electronic filing, the organization may assert a temporary hardship exemption to prepare and submit Form LM-2 in paper format by the required due date. An electronic format copy of the filed paper format document shall be submitted to the Department within ten business days after the required due date. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing under the hardship exemption procedures. Unanticipated technical difficulties that may result in additional delays should be brought to the attention of the OLMS Division of Interpretations and Standards, which can be reached at the address below, by email at OLMS-Public@dol.gov, by phone at (202) 693- 0123, or by fax at 202-693-1340.

Submit Feedback

✳✳✳✳

APPX. 0707

U.S. DEPARTMENT OF LABOR

Office of Labor-Management Standards

# INFORMATION ITEMS 10-21

| < Page 1 | Statement A > |
|---|---|

Answer Items 10 through 21 as instructed. Select the appropriate box for those questions requiring a "Yes" or "No" answer; do not leave both boxes blank. Enter a single "0" in the boxes for items requiring a number or dollar amount if there is nothing to report.

**10. TRUSTS OR FUNDS —** Answer "Yes" to Item 10, if the labor organization has an interest in a trust or other fund as defined in 29 U.S.C. 402(l). Provide in Item 69 (Additional Information) the full name, address, and purpose of each trust or other fund. If a report has been filed for the trust or other fund under the Employee Retirement Income Security Act of 1974 (ERISA), report in Item 69 (Additional Information) the ERISA file number (Employer Identification Number — EIN) and plan number, if any.

A trust in which a labor organization is interested is defined in Section 3(l) of the LMRDA (29 U.S.C. 402(l)) as:

...a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

The determination whether a particular entity is a trust in which a labor organization is interested will be based on the facts in each case.

**11. POLITICAL ACTION COMMITTEE FUNDS —** If the labor organization answered "Yes" to Item 11(a), in reference to a political action committee, provide in Item 69 (Additional Information) the full name of each separate political action committee (PAC) and list the name of any government agency, such as the Federal Election Commission or a state agency, with which the PAC has filed a publicly available report, and the relevant file number of the PAC. (PAC funds kept separate from the labor organization's treasury need not be included in the labor organization's Form LM-2 if publicly available reports on the PAC funds are filed with a Federal or state agency.)

If the labor organization answered "Yes" to Item 11(b), in reference to a subsidiary organization, provide in Item 69 (Additional Information) the name, address, and purpose of each subsidiary organization. Indicate whether the information concerning its financial condition and operations is included in this Form LM-2 or in a separate report. See Section X of these instructions for information on reporting subsidiary organizations.

**12. AUDIT OR REVIEW OF BOOKS AND RECORDS —** If the labor organization answered "Yes" to Item 12, indicate in Item 69 (Additional Information) whether the audit or review was performed by an outside accountant or a parent body auditor/representative. If an outside accountant performed the audit or review, provide the name of the accountant or accounting firm. Report any audit or review by an outside accountant or a parent body auditor/representative in which the labor organization's books and records were examined to verify their accuracy and validity. The term "audit or review" does not include providing assistance in developing a bookkeeping system, providing routine bookkeeping services, or merely compiling information from the labor organization's books and records to prepare Form LM-2 or other financial reports. Also, do not answer "Yes" to Item 12 if an audit committee or trustees of the labor organization performed the audit or review.

**13. LOSSES OR SHORTAGES —** Answer "Yes" to Item 13 if the labor organization experienced a loss, shortage, or other discrepancy in its finances during the period covered. Describe the loss or shortage in detail in Item 69 (Additional Information), including such information as the amount of the loss or shortage of funds or a description of the property that was lost, how it was lost, and to what extent, if any, there has been an agreement to make restitution or any recovery by means of repayment, fidelity bond, insurance, or other means.

**14. FIDELITY BOND —** Enter the maximum amount recoverable for a loss caused by any officer, employee, or agent of the labor organization who handled the labor organization's funds. Enter "0" if the labor organization was not covered by a fidelity bond during the reporting period.

APPX. 0708

officers, employees, and agents who handles funds or other property of the labor organization must be bonded. The amount of the bond must be at least 10% of the value of the funds handled by the individual during the last reporting period, up to a maximum bond of $500,000. The bond must be obtained from a surety company approved by the Secretary of the Treasury. If you have any questions or need more information about bonding requirements, contact the nearest OLMS field office.

**15. ACQUISITION OR DISPOSITION OF ASSETS** — If the labor organization answered "Yes" to Item 15, describe in Item 69 (Additional Information) the manner in which the labor organization acquired or disposed of the asset(s), such as donating office furniture or equipment to charitable organizations, trading in assets, writing off a receivable, or giving away other tangible or intangible property of the labor organization. Include the type of asset, its value, and the identity of the recipient or donor, if any. Also report in Item 69 the cost or other basis at which any acquired assets were entered on the labor organization's books or the cost or other basis at which any assets disposed of were carried on the labor organization's books. For example, assets may be entered on the labor organization's books at cost and carried at that value; carried at cost less accumulated depreciation; or carried at scrap value or other nominal value because the assets were fully depreciated or were expensed when purchased (that is, the cost was charged to current expenses rather than entered on the books and periodically depreciated).

For assets that were traded in, enter in Item 69 the cost, book value, and trade-in allowance.

**16. PLEDGED OR ENCUMBERED ASSETS** — If the labor organization answered "Yes" to Item 16, identify in Item 69 (Additional Information) all of the labor organization's assets pledged or encumbered in any way (such as those pledged as collateral for a loan) at the end of the reporting period. Also report in Item 69 their fair market value, and provide details of transactions related to the encumbrance.

**17. CONTINGENT LIABILITIES** — If the labor organization answered "Yes" to Item 17, describe in Item 69 (Additional Information) the transactions or events resulting in the contingent liabilities and include the identity of the claimant or creditor. Contingent liabilities are potential obligations that may or may not develop into actual liabilities in the future. Examples of a contingent liability are a loan co-signed by the labor organization, or a pending lawsuit that could result in the labor organization being ordered to pay damages or make other payments.

A pending administrative or judicial action is considered a contingent liability that must be reported in Item 17 if, in the opinion of legal counsel, it is reasonably possible that the labor organization will be required to make some payment. Such administrative or judicial actions must be reported as contingent liabilities regardless of whether or not the possible losses would have a materially adverse effect on the labor organization's financial condition. List in Item 69 each administrative or judicial action, including the case number, court, and caption.

**18. CHANGES IN CONSTITUTION AND BYLAWS OR PRACTICES AND PROCEDURES** — If the labor organization answered "Yes" to Item 18 because the labor organization's constitution and bylaws were changed during the reporting period (other than rates of dues and fees), a dated copy of the new constitution and bylaws must be submitted to OLMS as an electronic attachment to the Form LM-2.

If the labor organization is governed by a uniform or model constitution and bylaws prescribed by the labor organization's parent national or international body, the labor organization's parent body may file the constitution and bylaws on the labor organization's behalf. If the parent body files a constitution and bylaws on the labor organization's behalf, answer "Yes" to Item 18 and state that fact in Item 69 (Additional Information). If the labor organization has any supplemental governing documents or has modified a model constitution and bylaws, the labor organization must file these documents.

If the labor organization answered "Yes" to Item 18 because the labor organization changed any of the practices/procedures listed below during the reporting period and the practices/procedures are not described in the labor organization's constitution or bylaws, the labor organization must file an amended Form LM-1 (Labor Organization Information Report) to update information on file with the Department:

- qualifications for or restrictions on membership;
- levying assessments;
- participating in insurance or other benefit plans;
- authorizing disbursement of labor organization funds;
- auditing financial transactions of the labor organization;
- calling regular and special meetings;
- authorizing bargaining demands;
- ratifying contract terms;
- authorizing strikes;

APPX. 0709

- disciplining or removing officers or agents for breaches of their trust;
- imposing fines and suspending or expelling members including the grounds for such action and any provision made for notice, hearing, judgment on the evidence, and appeal procedures;
- selecting officers and stewards and any representatives to other bodies composed of labor organizations' representatives;
- invoking procedures by which a member may protest a defect in the election of officers (including not only all procedures for initiating an election protest but also all procedures for subsequently appealing an adverse decision, e.g., procedures for appeals to superior or parent bodies, if any); and
- issuing work permits.

Information on obtaining Form LM-1 may be obtained from the OLMS Web site at **www.olms.dol.gov** or from any OLMS field office.

**NOTE:** Federal employee labor organizations subject solely to the Civil Service Reform Act or Foreign Service Act are not required to submit an amended Form LM-1 to describe revised or changed practices/procedures.

**19. NEXT REGULAR ELECTION** —Enter the month and year of the labor organization's next regular election of general officers (president, vice president, treasurer, secretary, etc.). Do not report the date of any interim election to fill vacancies.

**20. NUMBER OF MEMBERS** —After Schedule 13 is completed and the "Save and Calculate" button is clicked, the software will enter the total number of members into Item 20.

**21. DUES AND FEES** — Enter the dues and fees established by the labor organization. If more than one rate applies, enter the minimum and maximum rates. Enter "0" where appropriate.

**Line (a):** Enter the regular dues, fees or other periodic payments that a member must pay to be in good standing in the labor organization, including the calendar basis for the payment (per month, per year, etc.). Include only the dues or fees of regular members and not dues or fees of members with special rates, such as apprentices, retirees, or unemployed members.

**Line (b)** If individuals covered by your organization's collective bargaining agreement(s) pay "working" dues in addition to their regular dues, enter the amount or percent of "working" dues, including the basis for the payment (per hour, per month, etc.).

**Line (c):** Enter the initiation fees required from new members.

**Line (d):** Enter the fees other than dues required from transferred members. Such fees are those charged to persons applying for a transfer of membership to the labor organization from another labor organization with the same affiliation. Do not report fees charged to members transferring from one class of membership to another within the labor organization.

**Line (e):** If the labor organization issues work permits, enter the fees required and enter the calendar basis for the payment (per month, per year, etc.). Work permit fees are fees charged to nonmembers of the labor organization who work within its jurisdiction. Do not report as work permit fees those fees charged to nonmember applicants for membership pending acceptance of their membership application, or fees charged to persons applying for transfer of membership to the labor organization pending acceptance of their application for transfer.

**Last Updated: 6-13-12**

| File Labor-Management (LM) Reports | Search Labor-Management (LM) Reports | Enforcement | Compliance Assistance |
| Laws and Regulations | About Us | OLMS En Español | |



**FEDERAL GOVERNMENT** ⊞

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

**LABOR DEPARTMENT** ⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

**ABOUT THE SITE** ⊞

Freedom of Information Act

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

**Office of Labor-Management Standards**

An agency within the U.S.
Department of Labor

APPX. 0710

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 40 of 65   PageID 7727

U.S. Office of Special Counsel

200 Constitution Ave NW
Washington, DC 20210

1-866-4-USA-DOL

1-866-487-2365

Submit Feedback

APPX. 0711

# TAB 8

2024 WL 2193872

Only the Westlaw citation is currently available.

Supreme Court of the United States.

Wendy SMITH, et al., Petitioners

v.

Keith SPIZZIRRI, et al.

No. 22-1218

|

Argued April 22, 2024

|

Decided May 16, 2024

**Synopsis**

**Background:** Current and former employees who worked as delivery drivers brought action in state court against employer, an on-demand delivery service, for allegedly violating state and federal employment laws by, among other things, misclassifying them as independent contractors, failing to pay them required minimum and overtime wages, and failing to provide paid sick leave. Following removal, the United States District Court for the District of Arizona, G. Murray Snow, Chief Judge, 2022 WL 2191931, granted employer's motion to compel arbitration under the Federal Arbitration Act (FAA) and to dismiss. Employees appealed. The United States Court of Appeals for the Ninth Circuit, Bennett, Circuit Judge, 62 F.4th 1201, affirmed, holding that under the FAA, the district court could dismiss rather than stay suit after determining all claims were subject to arbitration. The Supreme Court granted certiorari.

**[Holding:]** In a unanimous opinion, the Supreme Court, Justice Sotomayor, held that when a federal court finds that a dispute is subject to arbitration and a party has requested a stay of the court proceeding pending arbitration, the FAA compels the court to stay the proceeding; abrogating *Green v. SuperShuttle Int'l, Inc.*, 653 F. 3d 766, *Bercovitch v. Baldwin School, Inc.*, 133 F. 3d 141, *Alford v. Dean Witter Reynolds, Inc.*, 975 F. 2d 1161, and *Sparling v. Hoffman Constr. Co.*, 864 F. 2d 635.

Reversed and remanded.

West Headnotes (8)

**[1]   Alternative Dispute Resolution** 🖙 Dismissal

When a federal court finds that a dispute is subject to arbitration under the Federal Arbitration Act (FAA), and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration; rather, the FAA compels the court to stay the proceeding; abrogating *Green v. SuperShuttle Int'l, Inc.*, 653 F. 3d 766, *Bercovitch v. Baldwin School, Inc.*, 133 F. 3d 141, *Alford v. Dean Witter Reynolds, Inc.*, 975 F. 2d 1161, and *Sparling v. Hoffman Constr. Co.*, 864 F. 2d 635. 9 U.S.C.A. § 3.

**[2]   Alternative Dispute Resolution** 🖙 Dismissal

Consistent with the Federal Arbitration Act (FAA), a court may dismiss a suit, despite a requested stay pending arbitration, if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration; for example, if a court lacks jurisdiction. 9 U.S.C.A. § 3.

**[3]   Alternative Dispute Resolution** 🖙 Stay of Proceedings Pending Arbitration

By directing a court to stay the proceeding "until such arbitration has been had in accordance with the terms of the agreement," and only so long as the applicant "is not in default in proceeding with the arbitration," the Federal Arbitration Act (FAA) ensures that the parties can return to federal court if arbitration breaks down or fails to resolve the dispute. 9 U.S.C.A. § 3.

**[4]   Federal Courts** 🖙 Inherent powers

The inherent powers of the courts may be controlled or overridden by statute or rule.

**Smith v. Spizzirri, --- S.Ct. ---- (2024)**

[5]   **Alternative Dispute Resolution** 🔑 **Decisions reviewable; finality**

When a court denies a request for arbitration, the Federal Arbitration Act (FAA) authorizes an immediate interlocutory appeal. 9 U.S.C.A. § 16(a)(1)(C).

[6]   **Alternative Dispute Resolution** 🔑 **Decisions reviewable; finality**

Pursuant to the Federal Arbitration Act (FAA), when a court compels arbitration, absent certification of a controlling question of law by the district court, the order compelling arbitration is not immediately appealable. 9 U.S.C.A. § 16(b).

[7]   **Alternative Dispute Resolution** 🔑 **Constitutional and statutory provisions and rules of court**

One purpose of the Federal Arbitration Act (FAA) is to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. 9 U.S.C.A. § 1 et seq.

[8]   **Alternative Dispute Resolution** 🔑 **Constitutional and statutory provisions and rules of court**

The Federal Arbitration Act (FAA) envisions a supervisory role for the courts. 9 U.S.C.A. § 1 et seq.

*Syllabus* [*]

[*]   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** The Federal Arbitration Act (FAA) sets forth procedures for enforcing arbitration agreements in federal court. Section 3 of the FAA, entitled "Stay of proceedings where issue therein referable to arbitration," provides that when a dispute is subject to arbitration, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. In this case, petitioners filed suit against respondents in state court alleging violations of federal and state employment laws. Respondents then removed to federal court and filed a motion to compel arbitration and dismiss the suit. Petitioners agreed their claims were arbitrable, but contended that § 3 of the FAA required the District Court to stay the action pending arbitration rather than dismissing it entirely. The District Court issued an order compelling arbitration and dismissed the case without prejudice. The Ninth Circuit affirmed.

*Held*: When a district court finds that a lawsuit involves an arbitrable dispute and a party has requested a stay of the court proceeding pending arbitration, § 3 compels the court to issue a stay, and the court lacks discretion to dismiss the suit. Statutory text, structure, and purpose all point to this conclusion. The plain text of § 3 requires a court to stay the proceeding upon request. The statute's use of the word "shall" "creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62. The obligation is to "stay" the proceeding. Respondents insist that "stay" "means only that the court must stop parallel in-court litigation, which a court may achieve by dismissing," Brief for Respondents 15, but respondents' reading disregards the long-established legal meaning of the word "stay" as a "temporary suspension" of legal proceedings. And respondents' attempt to read "stay" to include "dismiss" cannot be squared with the surrounding statutory text, which anticipates that the parties can return to federal court if arbitration breaks down or fails to resolve the dispute. Notwithstanding § 3's text, respondents suggest that district courts retain the inherent authority to dismiss proceedings subject to arbitration. But even assuming such inherent authority, "the inherent powers of the courts may be controlled or overridden by statute or rule," *Degen v. United States*, 517 U.S. 820, 823, 116 S.Ct. 1777, 135 L.Ed.2d 102, and § 3 does exactly that.

The FAA's structure and purpose confirm that a stay is required. Section 16(a)(1)(C) of the FAA authorizes an

APPX. 0714

Smith v. Spizzirri, --- S.Ct. ---- (2024)

immediate interlocutory appeal of the denial of an arbitration request. By contrast, Congress made clear in § 16(b) that, outside of a narrow exception not applicable here, an order compelling arbitration is not immediately appealable. If a district court could dismiss a suit subject to arbitration even when a party requests a stay, that dismissal would trigger the right to an immediate appeal where Congress sought to forbid such an appeal. Finally, staying rather than dismissing a suit comports with the supervisory role that the FAA envisions for the courts. Keeping the suit on the court's docket makes good sense in light of the FAA's mechanisms for courts with proper jurisdiction to assist parties in arbitration. Pp. ——— – ———.

*2  62 F.4th 1201, reversed and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

**Attorneys and Law Firms**

Nicholas J. Enoch, Clara S. Bustamante, Morgan L. Bigelow, Lubin & Enoch, P.C., Phoenix, AZ, Angela M. Oliver, Haynes and Boone, LLP, Washington, DC, Daniel L. Geyser, Counsel of Record, Chance Fletcher, Haynes and Boone, LLP, Dallas, TX, for Petitioners.

Laurent R.G. Badoux, Littler Mendelson P.C., Phoenix, AZ, Jeremy R. Peterman, Orrick, Herrington & Sutcliffe LLP, Seattle, WA, E. Joshua Rosenkranz, Counsel of Record, Thomas M. Bondy, Jodie C. Liu, Melanie R. Hallums, Duncan Hosie, Orrick, Herrington & Sutcliffe LLP, New York, NY, Counsel for Respondents.

**Opinion**

Justice SOTOMAYOR delivered the opinion of the Court.

The Federal Arbitration Act (FAA) sets forth procedures for enforcing arbitration agreements in federal court. Section 3 of the FAA specifies that, when a dispute is subject to arbitration, the court "shall on application of one of the parties stay the trial of the action until [the] arbitration" has concluded. 9 U.S.C. § 3. The question here is whether § 3 permits a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration. It does not.

I

Petitioners are current and former delivery drivers for an on-demand delivery service operated by respondents. They sued respondents in Arizona state court, alleging violations of federal and state employment laws. Petitioners claimed that respondents misclassified them as independent contractors, failed to pay required minimum and overtime wages, and failed to provide paid sick leave. After removing the case to federal court, respondents moved to compel arbitration and dismiss the suit. Petitioners conceded that all of their claims were arbitrable, but they argued that § 3 of the FAA required the District Court to stay the action pending arbitration rather than dismissing it entirely.

The District Court issued an order compelling arbitration and dismissing the case without prejudice. The court noted that "the text of 9 U.S.C. § 3 suggests that the action should be stayed," but that Circuit precedent "instructed that 'notwithstanding the language of § 3, a district court may either stay the action or dismiss it outright when, ... the court determines that all of the claims raised in the action are subject to arbitration.'" Forrest v. Spizzirri, 2022 WL 2191931, *1 (D Ariz., June 17, 2022) (quoting Johnmohammadi v. Bloomingdale's, Inc., 755 F.3d 1072, 1074 (CA9 2014)). Because "all claims raised [were] subject to arbitration," the District Court concluded that it "retain[ed] discretion to dismiss the action." 2022 WL 2191931, *1.

The Ninth Circuit affirmed. While that court likewise acknowledged that "the plain text of the FAA appears to mandate a stay," the court explained that it was bound by Circuit precedent recognizing the District Court's "discretion to dismiss." Forrest v. Spizzirri, 62 F.4th 1201, 1203, 1205 (2023). Judge Graber, joined by Judge Desai, concurred, asserting that the Ninth Circuit's position was wrong and urging this Court "to take up this question, which it has sidestepped previously, and on which the courts of appeals are divided." Id., at 1206 (citation omitted).

This Court granted certiorari to answer the question it previously left open and resolve the Circuit split.[1] 601 U. S. ———, 144 S.Ct. 680, 217 L.Ed.2d 341 (2024).

[1]  This Court has previously reserved the question presented in this case. See Green Tree Financial Corp.-Ala. v. Randolph, 531 U.S. 79, 87, n. 2, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) ("Had the District Court entered a stay instead of a dismissal in this case, that order would not be appealable.... The question whether the District Court should have taken that course is not before us, and

APPX. 0715

we do not address it"); see also *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 181, n. 1, 139 S.Ct. 1407, 203 L.Ed.2d 636 (2019) (noting that the Court reserved this question in *Randolph* and that it remained unanswered).

The split on the question has since deepened. Compare *Arabian Motors Group W.L.L. v. Ford Motor Co.*, 19 F.4th 938, 941–943 (CA6 2021) (reading § 3 to mandate a stay when all claims are subject to arbitration and a party properly requests a stay); *Katz v. Cellco Partnership*, 794 F.3d 341, 345–347 (CA2 2015) (same); *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269–271 (CA3 2004) (same); *Adair Bus Sales, Inc. v. Blue Bird Corp.*, 25 F.3d 953, 955 (CA10 1994) (same); *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (CA11 1992) (per curiam) (same); *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (CA7 2008) (reaching the same conclusion even where no party requested a stay), with *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769–770 (CA8 2011) (recognizing a district court's discretion to dismiss, rather than stay, action where all of the issues are subject to arbitration); *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 156, n. 21 (CA1 1998); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (CA5 1992) (same); *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 637–638 (CA9 1988) (same).

II

**\*3**  [1]  [2]  <mark>In this statutory interpretation case, text, structure, and purpose all point to the same conclusion: When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration.</mark>[2]

[2]  That is not to say that the court is barred from dismissing the suit if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration. If, for example, the court lacks jurisdiction, § 3 is no bar to dismissing on that basis. See *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (observing that "[t]he district courts of the United States ... are 'courts of limited jurisdiction' " and " 'possess only that power authorized by Constitution and statute' ").

Section 3 of the FAA, entitled "Stay of proceedings where issue therein referable to arbitration," provides that, when any issue in a suit is subject to arbitration, the court

"shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance

with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

Here, as in other contexts, the use of the word "shall" "creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). That plain statutory text requires a court to stay the proceeding. See *Maine Community Health Options v. United States*, 590 U.S. 296, 310, 140 S.Ct. 1308, 206 L.Ed.2d 764 (2020) (" 'Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement' "). Indeed, this Court previously noted that the use of "shall" in neighboring sections of the FAA created a mandatory obligation that left "no place for the exercise of discretion by a district court." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (discussing §§ 2–4 and explaining that the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed"). The same is true here. When § 3 says that a court "shall ... stay" the proceeding, the court must do so.

[3]  Just as "shall" means "shall," "stay" means "stay." Respondents insist that "stay" in § 3 "means only that the court must stop parallel in-court litigation, which a court may achieve by dismissing without retaining jurisdiction." Brief for Respondents 15. There are, however, two significant problems with that reading. First, it disregards the long-established legal meaning of the word "stay." Even at the time of the enactment of the FAA, that term denoted the "temporary suspension" of legal proceedings, not the conclusive termination of such proceedings. Black's Law Dictionary 1109 (2d ed. 1910) (Stay of proceedings"). Second, respondents' attempt to read "stay" to include "dismiss" cannot be squared with the surrounding statutory text. By directing a court to stay the proceeding "until such arbitration has been had in accordance with the terms of the agreement," and only so long as "the applicant ... is not in default in proceeding with the arbitration," § 3 ensures that the parties can return to federal court if arbitration breaks down or fails to resolve the dispute. That return ticket is not available if the court dismisses the suit rather than staying it.[3]

[3]  It is no answer to say, as respondents do, that a party can file a new suit in federal court in those circumstances. Even if that is true as a practical matter, but see *Green*, 653 F.3d at 770 (flagging potential statute-of-limitations

problem), requiring a party to file a new suit ignores the plain text of § 3.

**\*4** **[4]** Respondents also suggest that, notwithstanding the statutory language, district courts retain inherent authority to dismiss proceedings subject to arbitration. This attempt to evade the plain meaning of the text also falls short. Even assuming district courts have this inherent authority, "the inherent powers of the courts may be controlled or overridden by statute or rule." *Degen v. United States*, 517 U.S. 820, 823, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996). Section 3 does exactly that. It overrides any discretion a district court might otherwise have had to dismiss a suit when the parties have agreed to arbitration.

**[5]** **[6]** **[7]** If there were any doubt, the FAA's structure and purpose confirm that a stay is required. When a court denies a request for arbitration, § 16 of the FAA authorizes an immediate interlocutory appeal. See 9 U.S.C. § 16(a)(1)(C). When a court compels arbitration, by contrast, Congress made clear that, absent certification of a controlling question of law by the district court under 28 U.S.C. § 1292(b), the order compelling arbitration is not immediately appealable. See 9 U.S.C. § 16(b). The choice to "provid[e] for immediate interlocutory appeals of orders *denying*—but not of orders *granting*—motions to compel arbitration," *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740, 143 S.Ct. 1915, 216 L.Ed.2d 671 (2023), is consistent with Congress's purpose in the FAA "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 22, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). If a district court dismisses a suit subject to arbitration even when a party requests a stay, that dismissal triggers the right to an

immediate appeal where Congress sought to forbid such an appeal.

**[8]** Finally, staying rather than dismissing a suit comports with the supervisory role that the FAA envisions for the courts. The FAA provides mechanisms for courts with proper jurisdiction to assist parties in arbitration by, for example, appointing an arbitrator, see 9 U.S.C. § 5; enforcing subpoenas issued by arbitrators to compel testimony or produce evidence, see § 7; and facilitating recovery on an arbitral award, see § 9. Keeping the suit on the court's docket makes good sense in light of this potential ongoing role, and it avoids costs and complications that might arise if a party were required to bring a new suit and pay a new filing fee to invoke the FAA's procedural protections. District courts can, of course, adopt practices to minimize any administrative burden caused by the stays that § 3 requires.

\* \* \*

When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding. The contrary judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**All Citations**

--- S.Ct. ----, 2024 WL 2193872

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 47 of 65   PageID 7734

McCarthy v. International Association of Machinists and..., Not Reported in Fed....

2021 WL 5766569
Only the Westlaw citation is currently available.
**NOT PRECEDENTIAL**
United States Court of Appeals, Third Circuit.

Michael MCCARTHY; Robert Eddis; the Rank
and File Members of IAM District Lodge 19

v.

INTERNATIONAL ASSOCIATION
OF MACHINISTS AND AEROSPACE
WORKERS; Michael Perry, President
of IAM District Lodge 19 Michael
McCarthy; Robert Eddis, Appellants

No. 21-1673
|
Submitted Pursuant to Third Circuit
L.A.R. 34.1(a) December 6, 2021
|
Filed: December 6, 2021

Appeal from the United States District Court for the Eastern
District of Pennsylvania (D.C. No. 2-19-cv-05727), District
Judge: Hon. Berle M. Schiller

**Attorneys and Law Firms**

Alice W. Ballard, Esq., Philadelphia, PA, Willem Bloom,
Esq., Thomas H. Geoghegan, Esq., Despres Schwartz &
Geoghegan, Chicago, IL, Robert S. Goggin, III, Esq., Keller
& Goggin, Philadelphia, PA, for Michael McCarthy, Robert
Eddis.

Alice W. Ballard, Esq., Philadelphia, PA, Robert S. Goggin,
III, Esq., Keller & Goggin, Philadelphia, PA, for Rank and
File Members of IAM District Lodge 19.

Jeffrey A. Bartos, Esq., John J. Grunert, Jr., Esq., Guerrieri
Bartos & Roma, Washington, DC, for Appellants.

Before: SHWARTZ, PORTER, and FISHER, Circuit Judges.

**OPINION**[*]

SHWARTZ, Circuit Judge.

[*]   This disposition is not an opinion of the full Court
and, pursuant to I.O.P. 5.7, does not constitute binding
precedent.

**\*1**  Michael McCarthy, Robert Eddis, and other members of
District Lodge 19 initiated this action pursuant to the Labor-
Management Reporting and Disclosure Act ("LMRDA"), 29
U.S.C. § 401 et seq., against the International Association
of Machinists and Aerospace Workers ("IAM") and Michael
Perry, the President of District Lodge 19. McCarthy contends
that he was removed from his IAM position for improper
reasons, but Defendants counter that he was removed
for incompetent job performance. Because (1) Plaintiffs'
LMRDA voting rights were not violated by McCarthy's
removal; and (2) McCarthy failed to demonstrate that his
alleged protected speech caused the adverse action, we will
affirm.

I

A

IAM is an international labor organization. It includes
hundreds of local lodges and thirty-five intermediate-level
district lodges, including District Lodge 19. District Lodge
19 has nationwide responsibility for employees in the rail
industry, and it is governed by thirteen General Chairmen and
one President.

In 2012, McCarthy was appointed as a General Chairman of
District Lodge 19. In 2015, he was elected to a full, four-year
term as a General Chairman. In 2016, McCarthy declined to
sign a no-confidence letter seeking the removal of the then-
District Lodge 19 President from office but later changed his
mind and agreed to sign the petition.

Perry became the President of District Lodge 19 in 2019,
and McCarthy was reelected as a General Chairman.
As President, Perry received several complaints about
McCarthy's representation of District Lodge 19 members.
Perry investigated the allegations and thereafter informed
McCarthy that he could either resign or face formal
disciplinary charges. After McCarthy declined to resign,
Perry removed McCarthy from his assignments and, pursuant
to Article L of the IAM Constitution,[1] initiated five
charges against McCarthy related to alleged instances of
incompetence, negligence, and insubordination.[2] Thereafter,
IAM President Robert Martinez referred these charges

APPX. 0718

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 48 of 65   PageID 7735

McCarthy v. International Association of Machinists and..., Not Reported in Fed....

to a Special Trial Committee, which was composed of three IAM representatives from other district and local lodges. The Special Trial Committee conducted a preliminary investigation and determined there was sufficient substance to the charges to warrant a formal trial. The Special Trial Committee then conducted a trial at which Perry and McCarthy testified, introduced evidence, and called and cross-examined witnesses.

[1]   IAM's governing document is its Constitution. Article L of the IAM Constitution governs allegations of misconduct by IAM officers, representatives, and members, and it includes certain "due process guarantees and safeguards[.]" J.A. 233. It provides, in relevant part, that (1) officers may be removed from office; (2) allegations of misconduct must be made in writing to the IAM President, who may refer the matter to a Special Trial Committee; (3) the Special Trial Committee may recommend that the charges be dismissed or a trial be held; (4) if a trial is held, both sides have the right to present evidence and arguments; (5) the Special Trial committee reports its verdict and recommended penalty to the IAM President, who may affirm, modify, or reverse the verdict; (6) the IAM President's decision may be appealed to the IAM Executive Council; and (7) the decision of the Executive Council may be appealed to the Grand Lodge Convention.

[2]   These charges alleged, among other things, that McCarthy: (1) acted incompetently when representing Amtrak members of the Wilmington, Delaware Shops, by failing to appear and represent twenty-five members when they were pressured to recant certain statements, failing to investigate the nature of the dispute with Amtrak, and visiting the Wilmington shop after he was removed from the Wilmington assignment; (2) failed to properly process two grievances sent to him by a local lodge; and (3) provided poor representation to the Kansas and Oklahoma Railroad, most notably by signing a collective bargaining agreement that did not provide for premium pay for overtime.

*2   The Special Trial Committee found McCarthy guilty of four of the five charges and recommended that he be removed from his office as a General Chairman and banned from holding any IAM office for five years. Martinez agreed, removed McCarthy as a General Chairman, and implemented the five-year office-holding ban, thereby preventing him from running in the 2023 union elections. The IAM Executive Council affirmed Martinez's decision. McCarthy's appeal to the Convention of the IAM Grand Lodge remains pending.

**B**

Meanwhile, Plaintiffs initiated this action. In their Amended Complaint, Plaintiffs allege that Defendants violated Plaintiffs' equal right to vote in union elections and McCarthy's right to free speech as guaranteed by the LMRDA, 29 U.S.C. § 411(a).[3] The District Court granted summary judgment for Defendants. McCarthy v. Int'l Ass'n of Machinists & Aerospace Workers, No. 19-CV-5727, 2021 WL 859400, at *9 (E.D. Pa. Mar. 8, 2021). The Court explained that Plaintiffs' claims failed because, among other things, (1) Plaintiffs' right to vote was not violated since the 2019 election was issue-free and McCarthy was reasonably removed from office; and (2) McCarthy's right to free speech was not violated since he failed to demonstrate that the charges against him in 2019 were caused by his initial refusal to sign the no-confidence letter in 2016. Id. at *4-8.

[3]   Plaintiffs abandoned their claims under the Labor Management Relations Act, specifically 29 U.S.C. § 462, regarding trusteeships, and under the IAM Constitution by omitting any reference to them in their opposition to Defendants' motion for summary judgment. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); Carroll v. Lancaster Cnty., 301 F. Supp. 3d 486, 511-12 (E.D. Pa. 2018) (same).

Plaintiffs appeal. **J.A. 1.**

**II**[4]

[4]   The District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

Our review of a district court's order granting summary judgment is plenary. Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant is entitled to judgment as a matter of law when the non-movant fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When conducting this analysis, we "view the facts in the light most favorable to the non-

[movant] and must make all reasonable inferences in that party's favor." Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

The LMRDA's "primary objective" is to ensure "that unions [are] democratically governed and responsive to the will of their memberships." Finnegan v. Leu, 456 U.S. 431, 436 (1982). Title I of the LMRDA includes a "bill of rights" that "was designed to guarantee every union member equal voting rights, rights of free speech and assembly, and a right to sue." United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski, 457 U.S. 102, 109 (1982). The LMRDA provides "a cause of action to any person whose" Title I rights have been violated. Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1298 (3d Cir. 1991); see also 29 U.S.C. § 412.

**\*3** Plaintiffs contend that Defendants' actions violated Plaintiffs' LMRDA equal voting and free speech rights. We disagree.

A

Under the LMRDA, every member of a labor organization must have "equal rights ... to vote in elections." 29 U.S.C. § 411(a)(1). To this end, § 411(a)(1) provides "a command that members and classes of members shall not be discriminated against in their right to nominate and vote." Calhoon v. Harvey, 379 U.S. 134, 139 (1964). Here, McCarthy does not contend that the 2019 elections were somehow unfair or fraudulent. Rather, he asserts that his removal from an elected position violated the § 411(a)(1) rights of the District Lodge 19 members, such as Eddis, who voted for McCarthy. As the Supreme Court has explained in the context of a free speech claim, "when an elected official ... is removed from his post, the union members are denied the representative of their choice." Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 355 (1989).

A union member's right to vote, however, is "subject to reasonable rules and regulations in such organization's constitution and bylaws." 29 U.S.C. § 411(a)(1). As relevant, Article L of the IAM Constitution provides that an officer may be removed from office or disqualified from holding office for up to five years for "[i]ncompetence; negligence or insubordination in the performance of official duties; or failure or refusal to perform duties validly assigned." J.A. 233. McCarthy does not dispute that Article L provides a reasonable framework. In compliance with that framework,

the Special Trial Committee recommended that McCarthy be removed from office and banned from holding office due to incompetence and insubordination. Thus, McCarthy's removal did not violate Plaintiffs' equal right to vote. Rather, as contemplated by § 411(a)(1), McCarthy was subject to the same IAM rules and regulations applicable to all IAM officers and was removed for poor performance.

Moreover, Plaintiffs do not contend that the Special Trial Committee trial lacked procedural safeguards. Rather, Plaintiffs contend that the District Court used the wrong standard in evaluating the sufficiency of the evidence to support the Special Trial Committee's verdict. The Court applied the "some evidence" standard, McCarthy, 2021 WL 859400, at *6, which is typically applied to assess claims brought under 29 U.S.C. § 411(a)(5). See Lewis v. Am. Fed'n of State Cnty. & Mun. Emp., AFL-CIO, 407 F.2d 1185, 1195 (3d Cir. 1969) (explaining that implicit in § 411(a)(5)'s guarantee of a "full and fair hearing" is the "requirement that there be some evidence to support the charges made" (citation omitted)). Section 411(a)(5) is not at issue here, however, and there is some authority suggesting that this standard applies only to due process-style claims under § 411(a)(5). See Black v. Ryder/P.I.E. Nationwide, Inc., 970 F.2d 1461, 1468 (6th Cir. 1992) ("While the 'some evidence' standard applies when reviewing a union's decision for procedural sufficiency, this deferential standard cannot apply to cases concerning the free speech guarantees of the LMRDA if those protections are to mean anything."); Bise v. Int'l Bhd. of Elec. Workers, AFL-CIO Loc. 1969, 618 F.2d 1299, 1304 n.5 (9th Cir. 1979) (explaining that the "some evidence" standard is more properly used when assessing the procedure used by the union but is less proper when the question is whether "discipline is being imposed for an improper purpose").

**\*4** Even if a higher standard applied, such as the substantial evidence standard used to review administrative agency fact finding, we would conclude the evidence supported the Special Trial Committee's findings. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion .... It is more than a mere scintilla but may be somewhat less than a preponderance of the evidence[.]" Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (quotation marks and citations omitted). The record meets this standard. For example, testimony was offered to support each of the alleged acts of misconduct and the fact finders credited that testimony. McCarthy's denials or explanations for his actions do not negate that substantial evidence supported the verdict against him.

APPX. 0720

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 50 of 65   PageID 7737

McCarthy v. International Association of Machinists and..., Not Reported in Fed....

In sum, because McCarthy was removed from his position as General Chairman in compliance with Article L, and substantial evidence supported the Special Trial Committee's findings, his removal did not violate Plaintiffs' § 411(a)(1) equal voting rights.


B

McCarthy's free speech claim also fails. The LMRDA provides that every member of a labor organization has the right "to express any views, arguments, or opinions[.]" 29 U.S.C. § 411(a)(2). Thus, the removal of an elected union representative in retaliation for protected speech violates the LMRDA. Lynn, 488 U.S. at 349. A plaintiff claiming retaliation must establish three elements: (1) he engaged in protected expression; (2) he was subjected to an adverse action; and (3) the retaliation was a direct result of the protected expression. Casumpang v. Int'l Longshoremen's & Warehousemen's Union, Loc. 142, 269 F.3d 1042, 1058 (9th Cir. 2001); see also Trail v. Loc. 2850 UAW United Def. Workers of Am., 710 F.3d 541, 546 (4th Cir. 2013) ("To state a retaliation claim [ ], a plaintiff must allege that the retaliation was in response to her exercise of a right guaranteed by some other provision of the LMRDA.").

McCarthy contends that he engaged in protected speech in 2016 when he initially refused to sign the no-confidence letter and that Defendants retaliated against him in 2019 by bringing the charges that ultimately led to his removal from office. However, McCarthy has failed to show that the alleged retaliation was causally connected to his protected expression.

To show a causal connection, a plaintiff must generally show either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing[.]" Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). McCarthy has made neither showing. First, McCarthy has failed to demonstrate a temporal connection between his 2016 initial refusal to sign the no-confidence letter and his 2019 removal. See Watson v. Rozum, 834 F.3d 417, 423 (3d Cir. 2016) (holding that a two-year delay between the protected activity and the alleged retaliatory conduct "is just too remote to suggest a retaliatory motive"). Second, McCarthy has failed to demonstrate a pattern of antagonism targeting him in the period between 2016 and 2019. To the contrary, McCarthy and Perry ran on the same

slate of nominees and were elected together in the 2019 elections.

McCarthy counters that when Perry demanded McCarthy's resignation, Perry said "something to the effect of you were never on my team and now it's official." J.A. 212. Perry denies making that statement, however, and, even if we assume that Perry's 2019 statement was referring back to the 2016 no-confidence letter, McCarthy's self-serving testimony on this front is insufficient, without more, to establish causation. See Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) ("As a general proposition, conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." (quotation marks and citation omitted)); see also Johnson v. Washington Metro. Area Transit Auth., 883 F.2d 125, 128 (D.C. Cir. 1989) ("The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence[.]").[5]

[5]   McCarthy also emphasizes that shortly after he refused to sign the no-confidence letter in 2016, Brian Orwan, the then-District Lodge 19 Assistant to the President, told McCarthy that "[y]ou need to learn to do what you're told, not what you want." Appellants' Br. 3 (quoting J.A. 207). Orwan denied making this statement and explained that he met with McCarthy in 2016 due to McCarthy's work performance issues. Regardless, Orwan resigned in 2017 and thus had no role in the 2019 decision to charge and terminate McCarthy. See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

*5   In sum, McCarthy failed to demonstrate that the alleged 2019 adverse action was caused by his 2016 protected expression. Thus, his retaliation claim under § 411(a)(2) fails.


III

For the foregoing reasons, we will affirm.

All Citations

Not Reported in Fed. Rptr., 2021 WL 5766569

APPX. 0721

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

APPX. 0722

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 52 of 65   PageID 7739
Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...
201 L.R.R.M. (BNA) 3036

2014 WL 4358480
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

Stacy K. MARTIN, et al., Plaintiffs,

v.

LOCAL 556, TRANSPORTATION
WORKERS UNION OF
AMERICA, AFL–CIO, Defendant.

Civil Action No. 3:14–CV–0500–D.
|
Signed Sept. 3, 2014.

**Attorneys and Law Firms**

Daniel B. Nelson, John F. Nelson, Nelson Pursley PLLC, Houston, TX, for Plaintiffs.

Edward Cloutman, IV, Edward B Cloutman, III, Cloutman & Cloutman, L.L.P., Dallas, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, Chief Judge.

**\*1** In this labor dispute arising from disciplinary actions taken against officers of a union local, the court must decide whether it has subject matter jurisdiction over one claim and whether plaintiffs have stated a claim on which relief can be granted. For the reasons that follow, the court grants defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(1), grants in part and denies in part defendant's motion to dismiss under Rule 12(b)(6), and grants plaintiffs leave to amend as to all claims that are curable by amendment.

I

This is an action by plaintiffs Stacy K. Martin ("Martin"), Chris Click ("Click"), and Jerry Lindemann ("Lindemann") against defendant Local 556, Transportation Workers Union of America, AFL–CIO ("TWU Local"), seeking relief under the Norris LaGuardia Act, 29 U.S.C. §§ 101–15 ("NLA"), the Labor Management Relations Act of 1947, 29 U.S.C. §

§ 141–97 ("LMRA"), and the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. § § 401–531 ("LMRDA"). Plaintiffs are flight attendants employed by Southwest Airlines. They are also members of TWU Local, the local of the labor union that represents Southwest Airlines' flight attendants.[1] Each plaintiff ran for and was elected to a union local office in 2012. Martin was elected President, Click First Vice President, and Lindemann Treasurer.

> [1] In deciding TWU Local's Rule 12(b)(6) motion, the court construes the amended complaint in the light most favorable to plaintiffs, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor. *See, e.g.,* *Lovick v. Ritemoney Ltd.,* 378 F.3d 433, 437 (5th Cir.2004). "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir.2010).
>
> A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See* *Hunter v. Branch Banking & Trust Co.,* 2013 WL 607151, at *2 (N.D.Tex. Feb.19, 2013)* (Fitzwater, C.J.) (citing *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* (citation omitted) (citing *Paterson,* 644 F.2d at 523).

Following the elections, the President of the international union ("TWU International") requested that the TWU Local Executive Board grant leave to Thom McDaniel ("McDaniel"), the Immediate Past President of the TWU Local, so that he could accept a position with TWU International. McDaniel allegedly opposed plaintiffs during the 2012 elections. Plaintiffs contend that, as union President, Martin opposed TWU International's request because TWU International did not follow proper protocol in submitting it. The Executive Board denied the request. TWU International's President then allegedly threatened to charge Martin with violations of union rules if he continued to oppose the request. Ultimately, the dispute was submitted to arbitration, and the arbitrator ruled in McDaniel's favor.

APPX. 0723

**Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...**

201 L.R.R.M. (BNA) 3036

In the spring of 2013, a member of the TWU Local Executive Board charged Click and Lindemann jointly with violations of union rules, and another member[2] separately charged Click with other union rules violations. Click's individual trial was scheduled for May 14, 2013, and Click and Lindemann's joint trial was scheduled for May 15, 2013. On May 13 the Executive Board attempted to delay the trial dates to May 22 and May 23, 2013, respectively, by insisting that Martin reschedule the trials. Martin allegedly refused to assist the Executive Board in its attempt to delay the trials on the basis that doing so would constitute a violation of union rules. Click and Lindemann attended their trials on May 14 and 15, 2013 and were acquitted of all charges. On May 16, 2013 Lindemann went on formally approved, extended medical leave. On the same day, the Executive Board notified Click and Lindemann that it was nullifying the results of the May 14 and 15 trials and scheduling their retrials for May 23 and 24, 2013, respectively. On May 23 a retrial committee found Click guilty and removed him from office. On May 24 a retrial committee found Click and Lindemann guilty, removed them from office, and banned them from holding union office for three years. Plaintiffs allege that neither Click nor Lindemann was present for the retrials on May 23 and 24. On May 16, 2013 the Executive Board also charged Martin with violating union rules. The Executive Board conducted Martin's trial on May 29 and 30, found him guilty, removed him from office, and banned him from holding union office for three years.

[2]    Plaintiffs' amended complaint does not specify whether this person was a member of the Executive Board or a member of the union. *See* Am. Compl. ¶ 20.

*2  Plaintiffs then brought the instant lawsuit against TWU Local, alleging that it had violated their rights under the LMRDA. TWU Local filed a motion to dismiss and an amended motion to dismiss. Plaintiffs then filed an amended complaint, and TWU Local filed the instant motion to dismiss the amended complaint. In its present motion, TWU Local incorporates by reference the arguments and authorities asserted in its first motion to dismiss.[3] TWU Local moves to dismiss count II of plaintiffs' amended complaint under *Rule 12(b)(1)* for failure to establish federal question jurisdiction, and to dismiss count I under *Rule 12(b)(6)* for failure to plead a plausible claim for relief under the LMRDA.

[3]    TWU Local's first motion to dismiss predates plaintiffs' amended complaint. "The court may nevertheless treat defendant's motion as directed to the amended complaint because the defects in plaintiff[s'] complaint reappear

in the amended complaint." *Moore v. Dall. Indep. Sch. Dist.,* 557 F.Supp.2d 755, 760 (N.D.Tex.2008) (Fitzwater, C.J.) (internal quotation marks and brackets omitted), *aff'd,* 370 Fed. Appx. 455 (5th Cir.2010). Because TWU Local asserts that the amended complaint is subject to dismissal on the same grounds as the complaint, and the parties have fully briefed the sufficiency of the amended complaint, the court will consider TWU Local's arguments in its first motion to dismiss in assessing whether the amended complaint is subject to dismissal under *Rules 12(b)(1)* and *12(b)(6)*.

**II**

The court considers first TWU Local's *Rule 12(b)(1)* motion to dismiss.[4]

[4]    *See Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001) (per curiam) ("When a *Rule 12(b)(1)* motion is filed in conjunction with other *Rule 12* motions, the court should consider the *Rule 12(b)(1)* jurisdictional attack before addressing any attack on the merits.").

**A**

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 (5th Cir.1998). "The burden of proof for a *Rule 12(b)(1)* motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001) (per curiam) (citations omitted).

**B**

Plaintiffs predicate subject matter jurisdiction over count II on the jurisdictional grant found in *29 U.S.C. § 185(a)* of the LMRA,[5] which provides:

[5]    Plaintiffs cite identical provisions of the NLA and LMRDA in counts I and II as the basis for their claims. *Compare* Am. Compl. ¶ 71, *with* ¶ 83 (citing *29 U.S.C. §§ 102, 401, 411, 412, 413, 431, 481, 482, 501, 529,* and *530*). The primary difference between each count is that, in count I, plaintiffs seek relief for "violation of the LM[RD]A," Am. Compl. at 10 (bold font and upper

APPX. 0724

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 54 of 65   PageID 7741

Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...

201 L.R.R.M. (BNA) 3036

case text omitted), while in count II, they seek relief for "breach of the TWU [International] Constitution & violation of the LM[RD]A," *id.* (bold font and some upper case text omitted).

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Section 185(a) imposes a jurisdictional requirement. *See, e.g., Tex. Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 642–43, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) ("In this vein, this Court has read § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), ... as granting jurisdiction over defined areas of labor law[.]"); *Hou. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indust. & Serv. Workers Int'l Union,* —— F.3d ——, 2014 WL 4197057, at *3 (5th Cir. Aug.25, 2014) ("We have in the past read section 301(a) as a jurisdictional requirement."). "[A]n allegation of a labor contract violation is both necessary and sufficient to support subject-matter jurisdiction under section 301(a). If the court later finds the allegedly violated contract to be non-existent or invalid, it must dismiss for failure to state a claim, not for lack of jurisdiction." *Hou. Ref. L.P.,* 2014 WL 4197057, at *5 (footnote omitted); *see also id.* at *6 ("[T]he alleged violation of a labor contract is both necessary and sufficient to invoke federal subject-matter jurisdiction under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).").

*3 The amended complaint does not allege that count II pertains to a violation of a contract between an employer and a labor organization or between labor organizations. The only conceivable contract mentioned in count II is the TWU International Constitution. *See* Am. Compl. ¶¶ 73–76. But the amended complaint does not allege that the TWU International Constitution is a contract between an employer and a labor organization or between labor organizations. Plaintiffs allege that the TWU International Constitution "is a contract between [TWU] Local and its members." *Id.* at ¶ 76. They assert that the TWU Local Executive Board violated its duties and responsibilities under the TWU International Constitution. *Id.* at ¶¶ 77–80.

Accordingly, because an allegation of a labor contract violation is necessary to support subject matter jurisdiction

under § 301(a), 29 U.S.C. § 185(a), and plaintiffs have not alleged such a violation, the court grants TWU Local's motion to dismiss count II of the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction.

### III

TWU Local moves under Rule 12(b)(6) to dismiss count I of plaintiffs' amended complaint.

### A

In deciding defendant's Rule 12(b)(6) motion, the court evaluates the sufficiency of plaintiffs' amended complaint "by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.,* 855 F.Supp.2d 615, 618 (N.D.Tex.2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007) (internal quotation marks and alteration omitted)). To survive defendant's motion to dismiss under Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556); *see also Twombly,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)) (alteration omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Furthermore, under Rule 8(a) (2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' " it demands more than "labels and conclusions." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555). "[A] formulaic recitation of the

APPX. 0725

Case 4:22-cv-00343-Y    Document 244    Filed 05/24/24    Page 55 of 65    PageID 7742

Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...

201 L.R.R.M. (BNA) 3036

elements of a cause of action will not do." *Id* . (quoting *Twombly,* 550 U.S. at 555).

## B

**\*4** "The Labor–Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu,* 456 U.S. 431, 435, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). Although the LMRDA as originally enacted focused on disclosure requirements and regulating union elections, over time various amendments have shifted the focus toward "protection for members of unions paralleling certain rights guaranteed by the Federal Constitution[.]" *Id.* In count I of the amended complaint, plaintiffs allege violations of the LMRDA, citing sections that deal with a host of topics, including reporting and disclosure requirements, the bill of rights for members of labor organizations, and provisions governing criminal violations of the Act. Plaintiffs request relief under § 102 of the NLA and § § 401, 411, 412, 413, 431, 481, 482, 501, 529, and 530 of the LMRDA.

## IV

### A

Count I must be dismissed to the extent based on § 102 of the NLA and § § 401, 413, and 530 of the LMRDA because these provisions do not expressly authorize a private cause of action. Section 102 is an introductory provision of the NLA that merely sets out the public policy underlying the Act. 29 U.S.C. § 102 ("It is necessary that [the individual unorganized worker] have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment"). Similarly, § 401 of the LMRDA declares the public policy that underlies the LMRDA. 29 U.S.C. § 401 (declaring that LRMDA is intended to protect members of labor unions from various "improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies" of the LMRA and the Railway Labor Act).

Section 413 of the LMRDA provides that nothing in § § 411–15 should be interpreted to limit the rights and remedies that members of labor organizations have under other provisions

of state or federal law, or under the constitution and bylaws of their respective labor organizations. *See* 29 U.S.C. § 413. It does not create a private right of action.

Section 530 is a statute that imposes criminal penalties on labor organizations that use "force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate ... any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled" under the LMRDA. 29 U.S.C. § 530. Section 530 does not create a private cause of action. The Supreme Court "rarely implie[s] a private right of action under a criminal statute[,]" and where the Court has, " 'there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.' " *Chrysler Corp. v. Brown,* 441 U.S. 281, 316, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (quoting *Cort v. Ash,* 422 U.S. 66, 79, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). Section 530 does not contain any language suggesting that Congress intended to authorize a private cause of action. Thus plaintiffs do not plausibly state a claim for relief under § 530.

## B

**\*5** Count I must be dismissed to the extent based on § § 431 and 501 of the LMRDA because, although these sections do confer a private cause of action, plaintiffs have not pleaded *any* factual allegations to state a claim for relief under either section. Section 431 pertains to certain disclosure and reporting requirements. *See* 29 U.S.C. § 431. For example, it provides that every labor organization must submit to the Secretary of Labor certain reports about the organization and annual reports that detail the organization's use of funds. *See id.* (a)-(b). Section 431 also requires that labor organizations make the information in these reports available to its members. *See id.* § 431(c). But plaintiffs have neither pleaded any factual allegations that mention the reports covered by § 431 nor alleged any failure by TWU Local to fulfill its duties related to these reports.

Section 501 imposes fiduciary obligations primarily of a pecuniary nature on the representatives of labor organizations. *See* 29 U.S.C. § 501; *see also Hoffman v. Kramer,* 362 F.3d 308, 316 n. 3 (5th Cir.2004) ("[T]he fiduciary obligations imposed are primarily pecuniary in nature-that is, having to do with the custody, control, and use of a union's money and its financial interests or property[.]"). Section 501(b) authorizes union members

APPX. 0726

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 56 of 65   PageID 7743
**Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...**
201 L.R.R.M. (BNA) 3036

to bring a derivative suit on the union's behalf for a representative's violation of the duties prescribed by § 501. *See id.* § 501(b). But plaintiffs fail to plead *any* factual allegations relating to the fiduciary duties imposed in § 501, and they have therefore failed to state a plausible claim for relief on this basis.

C

Sections 481 and 482 of the LMRDA provide the exclusive remedy for challenging a union election that has already been conducted. *See* 29 U.S.C. § 483 ("The remedy provided by this subchapter for challenging an election already conducted shall be exclusive."). Section 481 provides, in relevant part:

> [i]f the Secretary [of Labor], upon application of any member of a local labor organization, finds after [a] hearing ... that the constitution and bylaws of such labor organization do not provide an adequate procedure for the removal of an elected officer guilty of serious misconduct, such officer may be removed, for cause shown and after notice and hearing, by the members in good standing voting in a secret ballot.

Under § 482, except in two instances, only the Secretary of Labor can bring an action for a violation of § 481. *See* 29 U.S.C. § 482(a)-(b); *Calhoun v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964) (noting that Congress "decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of [§ 481 ]"). A union member can bring a civil action in the following circumstances: (1) against the Secretary of Labor to review the Secretary's decision not to file an action under § 482, *see Dunlop v. Bachowski,* 421 U.S. 560, 574–75, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), *overruled on other grounds,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984); and (2) to enforce "a candidate's right to distribution of campaign literature and equal access to membership lists." *Local No. 82, Furniture & Piano Moving v. Crowley,* 467 U.S. 526, 540 n. 15, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). Plaintiffs have not pleaded any factual allegations that enable the court to draw the reasonable inference that they are seeking relief under either of these exceptions. Accordingly, plaintiffs have failed to state a claim on which relief can be granted under § 481 and § 482.

V

\*6  Plaintiffs also allege that TWU Local violated § § 411, 412, and 529 of the LMRDA.

A

Section 411 of the LMRDA sets out the core of the guarantees afforded to members of labor organizations by the LMRDA. It constitutes a "bill of rights," and it is "designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline." *Local No. 82,* 467 U.S. at 536–37. The LMRDA provides two provisions that enable a union member to enforce the member's rights under this "bill of rights:" § § 412 and 529.

Section 412 grants union members a private cause of action for a union's infringement of the rights secured by § § 411–15. To state a claim under § 412, plaintiffs must show (1) that they are members of a labor organization and (2) that the organization infringed a right secured by § 411, 412, 413, 414, or 415. *See Martinez v. Am. Fed'n of Gov't Emps.,* 980 F.2d 1039, 1041–42 (5th Cir.1993). "Union leaders, *per se,* are not themselves a protected class under [the LMRDA], except that they, too, may not be deprived of the basic rights attending on union membership." *Adams–Lundy v. Ass'n ofProf'l Flight Attendants,* 731 F.2d 1154, 1156 (5th Cir.1984) ("*Adams– Lundy I* "). Thus it is generally insufficient for a plaintiff to plead a plausible claim under § 412 if the plaintiff only alleges the infringement of a right that he or she only has in the capacity of a union officer. *See id.*

There is an exception to this general rule. If plaintiffs can show that their removal from office "was part of a scheme to subvert the union's basic democratic structure or otherwise directly implicated rights of members," they can state a claim for relief as officers under § 412. *See Adams–Lundy I,* 731 F.2d at 1159. To state a claim under this exception, plaintiffs must show "that the defendants are attempting to dismantle the union's electoral system, ... or that members opposing that faction are ... suppressed or threatened with reprisals." *Id.* Allegations that merely suggest that an internal union struggle is "antidemocratic" are insufficient to plausibly allege the existence of a pattern of intimidation and stifled dissent. *Id.*

Section 529 provides members a private cause of action when their union fines, suspends, expels, "or otherwise discipline[s]" them for exercising any right to which they are

APPX. 0727

**Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...**

201 L.R.R.M. (BNA) 3036

entitled under the LMRDA. "The primary difference between § [529] and § [412] is that § [529] protects against retaliation for the exercise of any right secured under the LMRDA, whereas § [412] only protects rights secured under [§ § 411–15]." *United Steel Workers Local 12–369 v. United Steel Workers Int'l,* 728 F.3d 1107, 1115 (9th Cir.2013) (citing *Finnegan,* 456 U.S. at 439 n. 10). Depending on the right the member seeks to protect, § § 412 and 529 can be entirely duplicative. *See id.* at 1115 n. 4 (citing *Finnegan,* 456 U.S. at 439 n. 10). To state a claim under § 529, plaintiffs must show that (1) they are members of a labor organization; (2) the organization fined, suspended, expelled, or otherwise disciplined them; and (3) the organization imposed the punishment in retaliation for their exercise of a right protected by the LMRDA. *See* 29 U.S.C. § 529. As under § 412, to state a claim under § 529, plaintiffs must allege that any punishment or restriction imposed by TWU Local was a limitation or restriction on their membership rights. Removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529. *See Finnegan,* 456 U.S. at 438 n. 9 (dictum) (explaining that discipline referred to in § § 411(a)(5) and 529 means limitations on membership rights, not removal from union office); *Adams–Lundy I,* 731 F.2d at 1157 (dictum) (citing *Finnegan* for proposition that " § [411(a)(5) ] and § [529]" protect only the rights of membership per se, and that a union officer who is removed from office but not deprived of membership in the union has suffered no loss cognizable as 'discipline' proscribed by these sections of the Act").

**B**

\*7 The court considers first plaintiffs' allegations under § 411. They assert that TWU Local violated the LMRDA by infringing on their right to free speech.

Section 411(a) (2) of the LMRDA provides, in pertinent part:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings[.]

"Where the injury allegedly suffered by union officers is done to them in their status as officers, not as individual

members, there can be no cause of action under section[ ] 411[.]" *Adams–Lundy v. Ass'n of Prof'l Flight Attendants,* 792 F.2d 1368, 1372 (5th Cir.1986) ("*Adams–Lundy II* "). The court must therefore decide whether plaintiffs have pleaded sufficient facts to permit the court to draw the reasonable inference that TWU Local disciplined plaintiffs for exercising their rights to free speech *as members* rather than *as officers,* or that plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent.

The amended complaint does not plead factual content that would permit the court to draw the reasonable inference that TWU Local disciplined plaintiffs for exercising their rights to free speech *as members* rather than *as officers.* Plaintiffs allege that the charges leveled against Click and Lindemann were based on their "actions regarding information they provided the Local 556 membership at membership meetings in 2013[.]" Am. Compl. ¶ 19. Plaintiffs assert that the charges leveled against Martin were based on "various conduct including making presentations to the members on issues surrounding Local 556, allegedly making false representations to the membership, and for standing in opposition to the Local 556 Executive Board." *Id.* ¶ 37. The only reasonable inference the court can draw from these allegations is that plaintiffs engaged in this conduct in their capacities as officers. With respect to the additional, internal charges leveled against Click that are "related to a rally that occurred [in March 2013] to protest the TSA's knives on planes decision [,]" *id.* ¶ 20, plaintiffs have failed to allege facts from which the court can reasonably infer that the charges were based on Click's speech as opposed to his conduct.

The amended complaint also fails to plead factual content that permits the court to draw the reasonable inference that plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent. Plaintiffs allege that their opponents "infiltrated" the Executive Board and "usurped" their offices. Am. Compl. ¶¶ 47 & 62. These allegations clearly express plaintiffs' concern that the Executive Board's actions were undemocratic, but that alone is insufficient. *See Adams–Lundy I,* 731 F.2d at 1159 (holding that plaintiffs' allegations that defendants' conduct was anti-democratic were insufficient to show infringement of basic rights of membership). Plaintiffs have not plausibly alleged that TWU Local is "attempting to dismantle the union's electoral system," or that "members opposing [plaintiffs' opponents] are in any fashion suppressed or threatened with reprisals." *Id.* Absent any further aggravating allegations, plaintiffs'

APPX. 0728

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 58 of 65   PageID 7745
Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...
201 L.R.R.M. (BNA) 3036

allegations are insufficient to state a claim for relief under § 411(a)(2).

C

*8 Plaintiffs also allege that TWU Local violated the LMRDA by giving Click only a week to prepare for the second trials against him. Section 411(a)(5)(B) provides that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been ... (B) given a reasonable time to prepare his defense[.]" "[D]iscipline," as used in § 411(a)(5), refers to "punitive actions diminishing membership rights." Finnegan, 456 U.S. at 438. Plaintiffs allege that TWU Local disciplined them both by removing them from union office and banning them from holding any union office for three years. Removal from an elected office is not a form of "discipline" actionable under § 411(a)(5). See Adams–Lundy I, 731 F.2d at 1156–57 (holding that an elected union officer's removal from office does not constitute "infringement" of the rights secured by § 411). Although the Fifth Circuit has not specifically held that being banned from holding union office is a form of discipline, it has stated in dicta that the right to run for office is a membership right. See id. at 1156. The court will therefore assume that a ban against running for union office is a form of discipline that is actionable under § 411(a)(5). It will consider whether plaintiffs have plausibly alleged that TWU Local violated Click's rights under § 411(a)(5)(B) by banning him from running for union office without providing him a reasonable time to prepare his defense.

Section 411(a)(5)(B) does not specify the amount of time that is necessary to comply with the "adequate time" requirement. Courts generally decide whether a requirement such as this has been satisfied "with due regard to the practicalities and peculiarities of the case." See, e.g., Air Lines Stewards & Stewardesses Ass'n, Local 550 v. Am. Airlines, Inc. 455 F.2d 101, 108 (7th Cir.1972) (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313–14, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The LMRDA gives plaintiffs the right to present evidence and to cross-examine witnesses, see, e.g., Holschen v. Int'l Union of Painters, 598 F.3d 454, 463–64 (8th Cir.2010), but it does not guarantee "the specific protections associated with judicial proceedings, including the right to be represented by counsel and the technical rules of pleading, procedure, and evidence." Frye v. United Steelworkers, 767

F.2d 1216, 1224 (7th Cir.1985); see also Conway v. Int'l Ass'n of Heat & Frost Insulators, 209 F.Supp.2d 731, 751 (N.D.Ohio 2002) (holding that LMRDA did not guarantee discovery), aff'd, 93 Fed. Appx. 780 (6th Cir.2004).

The amended complaint does not plead sufficient facts to enable the court to draw the reasonable inference that TWU Local failed to give Click a reasonable time to prepare his defense. Plaintiffs aver that Click was notified of at least some of the charges against him in March 2013, that Click's trial dates were set in April 2013, and that his initial trials were conducted on May 14 and 15, 2013. Plaintiffs maintain that the Executive Board notified Click on May 16 that it was nullifying the results of the initial trials and scheduling retrial for May 24.[6] Plaintiffs do not plead any factual allegations suggesting that the May 14 and 15 trials differed substantially from the May 23 and 24 retrials. Assuming that Click did not learn about all of the charges against him until the trial dates were set in April 2013, Click had 14 and 15 days, respectively, to prepare for his first trials, and six and seven days more, respectively, to hone his defense in light of what he learned about TWU Local's case at his first trials. This is well within the range that courts have considered reasonable under § 41 1(a)(5)(B). See Wellman v. Int'l Union of Operating Eng'rs, 812 F.2d 1204, 1206 (9th Cir.1987) (28 days); Falcone v. Dantinne, 288 F.Supp. 719, 727 (E.D.Pa.1968) (23 days), rev'd on other grounds, 420 F.2d 1157 (3d Cir.1969); Vars v. Int'l Bhd. of Boilermakers, 215 F.Supp. 943, 947 (D.Conn.1963) (14 days), aff'd, 320 F.2d 576 (2d Cir.1963). Thus plaintiffs have failed to state a plausible claim for relief under § 411(a)(5)(B).

6      Without explanation, plaintiffs later aver that the retrial committee conducted an individual hearing against Click on May 23. Plaintiffs do not contend that the Executive Board failed to notify Click of the May 23 retrial. Thus there is no basis for the court to reasonably draw any inference other than that the Executive Board notified Click of the May 23 proceeding at least several days before the hearing was conducted.

D

*9 Plaintiffs allege that TWU Local violated the LMRDA by infringing their rights to a full and fair hearing. They assert that TWU Local deprived them of a full and fair hearing when (1) Click and Lindemann were tried twice for the same offense; (2) Lindemann was retried in absentia while on authorized medical leave; (3) Martin was tried before a

APPX. 0729

panel of his accusers; (4) Martin was denied the right to have the assistance of counsel; and (5) Martin was convicted on insufficient evidence.

**1**

Section 411(a)(5)(C) of the LMRDA protects members of labor organizations from being disciplined without first being afforded a full and fair hearing. *See* 29 U.S.C. § 411(a)(5)(C). "The full and fair hearing clause does not require unions to provide the 'full panoply of procedural safeguards found in criminal proceedings,' but only to comply with the 'fundamental and traditional concepts of due process.' " *Wildberger v. Am. Fed'n of Gov't Emps.,* 86 F.3d 1188, 1193 (D.C.Cir.1996) (quoting *Ritz v. O'Donnell,* 566 F.2d 731, 735 (D.C.Cir.1977)); *see United States v. Int'l Bhd. of Teamsters,* 247 F.3d 370, 385 (2d Cir.2001) (same) ("*Teamsters* "); *Bell v. Int'l Bhd. of Teamsters,* 108 F.3d 1376, 1997 WL 103320, at *5 (6th Cir.1997) (unpublished table decision) (same). "Not all of the due process protections available in the federal courts apply to union disciplinary proceedings." *Teamsters,* 247 F.3d at 385. "A violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA." *Id.* at 387.

**2**

Plaintiffs have failed to state a plausible claim that TWU Local violated the LMRDA by trying Click and Lindemann twice for the same offense. As a general proposition, the Supreme Court has declined to interpret the Due Process Clause as extending double jeopardy protection beyond the context of criminal prosecution. *See Dowling v. United States,* 493 U.S. 342, 354, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). Although courts have found a violation of § 411(a)(5)(C) where a union member was retried by individuals who had previously heard the charges and found the member guilty, *see, e.g., Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,* 605 F.2d 1228, 1243 (2d Cir.1979), this is not what plaintiffs allege. Plaintiffs fail to plead any factual allegations that explain why the Executive Board nullified Click and Lindemann's May 14 and 15 trials and ordered retrials, or that there were any other circumstances of unfairness surrounding the retrials that would enable the court to draw the reasonable inference that plaintiffs' rights to a full and fair hearing were violated. Merely alleging that

a union ordered a new trial, without more, does not state a plausible claim that the union failed to afford a member a full and fair hearing. *See Frye,* 767 F.2d at 1224 (stating that plaintiff's "contention that a trial *de novo* by the International's Commission was improper as a matter of law is not supported by reason or authority").

**3**

**\*10** Plaintiffs have also failed to state a plausible claim that TWU Local violated § 411(a)(5)(C) when it tried Lindemann *in absentia* during his absence from work on approved medical leave. "Fundamental due process ... gives a party the right to be *present* during proceedings brought against him ..., subject to limited exceptions." *Holschen,* 598 F.3d at 464 n. 4. This right is infringed when the circumstances of the case suggest that the accused did not have a "fair opportunity" to attend the relevant hearing. *Moody v. Miller,* 864 F.2d 1178, 1181 (5th Cir.1989) (per curiam). Plaintiffs allege that TWU Local violated Lindemann's rights by conducting the retrial when they knew that he was out on formally approved extended medical leave. But merely alleging that Lindemann was ill and unable to attend the hearing does not enable the court to draw the reasonable inference that TWU Local failed to afford Lindemann a full and fair hearing. If, through no fault of TWU Local, a member "[was] unable or refuse[d] to attend a disciplinary hearing, due process requires no more than that the hearing be held in accordance with all of the other requirements of due process that are called for under the circumstances." *Id.; see also Rosario,* 605 F.2d at 1244 (finding no due process violation where parties were entitled to be present at second trial but chose to boycott proceeding instead). This conclusion is strengthened by plaintiffs' failure to allege that Lindemann notified TWU Local that he was too ill to attend the May 24 retrial or to request a continuance. *See Parker v. Ellis,* 258 F.2d 937, 940 (5th Cir.1958) (dismissing due process claim where defendant failed to raise health issue or seek continuance during trial). Thus plaintiffs' allegations regarding Lindemann's trial *in absentia* do not state a plausible claim on which relief can be granted.

**4**

Plaintiffs allege that TWU Local violated Martin's rights to a full and fair hearing under the LMRDA when he was tried by the Executive Board, which included the person or

Case 4:22-cv-00343-Y   Document 244   Filed 05/24/24   Page 60 of 65   PageID 7747

Martin v. Local 556, Transp. Workers Union of America AFL-CIO, Not Reported in...

201 L.R.R.M. (BNA) 3036

people who filed the charges against him initially. Essentially, plaintiffs' complain that the combination of investigative, prosecutorial, and adjudicatory functions in the Executive Board violated Martin's right to due process under § 411(a)(5)(C).

"The basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer." *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1052 (5th Cir.1997) (citing *Gibson v. Berryhill,* 411 U.S. 564, 569, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)). "In an effort to prevent 'even the probability of unfairness,' courts have identified situations in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty., Tex.,* 57 F.3d 436, 444 (1995) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). A union's "combination of investigative, prosecutorial, and adjudicatory functions in [a single body] does not, by itself, violate the LMRDA." *Wildberger,* 86 F.3d at 1195. But when this combination occurs, courts "should be alert to the possibilities of actual bias that may lurk in the way particular procedures actually work in practice." *Withrow v. Larkin,* 421 U.S. 35, 54, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). It is therefore insufficient for plaintiffs merely to allege that the tribunal that filed charges against them also adjudicates the charges. *See id.* at 58 (holding that "[t]he fact that the same agency makes [the initial decision to charge and the ultimate adjudicative decision] in tandem ... relat[ing] to the same issues does not result in a procedural due process violation"). Plaintiffs "must overcome a presumption of honesty and integrity in those serving as adjudicators; and [they] must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment" to constitute a denial of the right to a full and fair hearing. *Id.* at 47.

**\*11** The court holds that plaintiffs have plausibly pleaded that Martin was denied a full and fair hearing when he was tried by a panel that included his accusers. Plaintiffs' allegations regarding the "running controversy" between Martin and the faction associated with McDaniel enable the court to draw the plausible inference that there was "the possibility of bias." *Bakalis v. Golembeski,* 35 F.3d 318, 326 (7th Cir.1994) (applying *Withrow* and holding that plaintiff had adduced sufficient evidence at summary judgment stage

to overcome presumption of impartiality); *see also Valley,* 118 F.3d at 1053 & n. 4 (quoting *Bakalis* with approval for proposition that "appellate jurisprudence has favored recusing board members who display a bias or prejudice that would result in an unconstitutional decision"). In support of their claim that the Executive Board prejudged Martin's guilt, plaintiffs allege that they all ran together on a slate of candidates opposed by past-president McDaniel. They aver that, when Martin refused to assist the Executive Board in rescheduling Click and Lindemann's trials, the Executive Board suspended Martin from the office of union president in retaliation. Plaintiffs allege that the Executive Board did not explain its decision to suspend Martin until May 16, when it charged him with violating the union constitution. Based on these allegations, and taking a realistic appraisal of psychological tendencies and human weaknesses, the court holds that plaintiffs' allegation that the Executive Board acted in a prosecutorial and adjudicative role during the same hearing plausibly suggests a risk of actual bias or prejudgment. *Cf. Stein v. Mutuel Clerks' Guild of Mass., Inc.,* 560 F.2d 486, 491 (1st Cir.1977) (upholding trial court's conclusion that plaintiff did not get full and fair hearing where union president, who was also member of executive committee, made comments to committee revealing he had prejudged case).

5

Plaintiffs allege that TWU Local violated Martin's right to a full and fair hearing when Martin was denied assistance of counsel. Plaintiffs assert that this right is guaranteed by TWU Local's constitution.

As noted above, the LMRDA's guarantee of a right to a full and fair hearing does not include the right to be represented by counsel. *See Frye,* 267 F.2d at 1224. Although the TWU Local constitution may guarantee a union member the right to assistance of counsel, "[a] union's violation of its own constitution is not *per se* a violation of the LMRDA." *Adams-Lundy II,* 792 F.2d at 1373. Rights guaranteed solely by a local union's constitution are contractual rights-not LMRDA rights-and "a federal court has no jurisdiction to enforce union constitutions and by-laws as such." *Id.* (citing *McGovern v. New Orleans Clerks & Checkers, Local 1497 ILA,* 343 F.Supp. 351, 352 (E.D.La.1972), *aff'd per curiam,* 463 F.2d 423 (5th Cir.1972)). Thus plaintiffs' bare allegations that Martin was not afforded the right to counsel, in violation of

APPX. 0731

201 L.R.R.M. (BNA) 3036

TWU Local's constitution, are insufficient of themselves to state a plausible claim for relief.

6

**\*12** Plaintiffs assert that the Executive Board convicted Martin on insufficient evidence presented to support the charges against him. Section 411(a)(5)(C) "requires the charging party to provide some evidence at the disciplinary hearing to support the charges made." *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 246, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) (noting that the Supreme Court has "repeatedly held that conviction on charges unsupported by any evidence is a denial of due process," and that § 411(a)(5)(C) "import[s] a similar requirement into union disciplinary proceedings"). This standard respects "the apparent congressional intent to allow unions to govern their own affairs." *Id.* Nevertheless, although § 411(a) (5)(C) requires "some evidence," plaintiffs' conclusory allegation that the evidence presented at Martin's trial was insufficient does not enable the court to draw the reasonable inference that TWU Local violated Martin's right to a full and fair hearing. *Cf. Rosario*, 605 F.2d at 1243 (noting that "union disciplinary proceedings ... except in extreme cases, are not reviewed in the federal courts for the sufficiency of the evidence").

E

The court finally considers whether plaintiffs have stated a plausible claim for relief under § 529, which protects a union member from retaliation for exercising his or her rights under the LMRDA.

Plaintiffs allege that Martin's suspension from office occurred in retaliation for his refusal to reschedule Click's and Lindemann's trials. But removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529. *See Finnegan*, 456 U.S. at 439 n. 9 (dictum). Nowhere in the amended complaint do plaintiffs allege

that the Executive Board's decision to ban plaintiffs from running for office was taken in retaliation for the exercise of plaintiffs' rights. Accordingly, the court holds that the amended complaint does not plausibly allege a right to relief under § 529.

VI

Although the court is dismissing some of plaintiffs' claims, it will permit them to replead. *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567–68 (N.D.Tex.2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." (citation and internal quotation marks omitted)). The defects with respect to § 102 of the NLA and § 401, 413, and 530 of the LMRDA are incurable, and the court therefore declines to permit plaintiffs to attempt to plead a claim under any of these provisions. But because plaintiffs have not stated that they cannot, or are unwilling to, cure the other defects that the court has identified, it grants them 28 days from the date this memorandum opinion and order is filed to file a second amended complaint.

\* \* \*

**\*13** The court grants TWU Local's motion to dismiss count II under Rule 12(b)(1), and it grants in part and denies in part TWU Local's Rule 12(b)(6) motion as to plaintiffs' claims in count I.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4358480, 201 L.R.R.M. (BNA) 3036

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

APPX. 0732

Abrams v. American Airlines, Inc., Not Reported in Fed. Supp. (2007)

2007 WL 9775358
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

Jamie ABRAMS

v.

AMERICAN AIRLINES, INC., et al.

ACTION NO. 4:04-CV-919-Y
|
Signed 08/30/2007

**Attorneys and Law Firms**

Raul H. Loya, Matthew B. Abraham, Loya & Associates, Dallas, TX, John Bruster Loyd, Jones Gillaspia & Loyd LLP, Houston, TX, Sidney L. Ravkind, Ravkind Firm, Montgomery, TX, for Jamie Abrams.

Lars L. Berg, Kelly Hart & Hallman, Fort Worth, TX, Carrie A. Brantley, Holme Roberts & Owen LLP, Denver, CO, for American Airlines Inc., Henry Moore.

ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT

TERRY R. MEANS, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is the Motion for Summary Judgment [document number 83] filed by defendants American Airlines, Inc. ("American") and Henry Moore. After review of the motion and related briefs, the evidence highlighted in the parties' briefs,[1] and the applicable law, the Court concludes that the motion should be and hereby is GRANTED.

---

[1] Plaintiff's response often fails to point the Court to any evidence in support of its factual assertions. For example, page nineteen of Plaintiff's response contains four paragraphs, all of which are replete with factual allegations. Nevertheless, the only citation to Plaintiff's appendix of evidence found on the page is in the second paragraph, and it wholly fails to direct the court to a valid page of Plaintiff's appendix. *See* Pl.'s Resp. Br. at 19, ¶ 2 ("App. Xx Abrams affidavit"). In other parts of the brief where Plaintiff actually has cited to her appendix, the evidence to which Plaintiff cites often does

not support the proposition for which it is appended. For example, in the fourth paragraph on page thirty of Plaintiff's brief, Plaintiff cites to "App. 61-63" for the proposition that "Moore became extremely upset when the employees went outside the company for help." The Court has thoroughly reviewed the cited pages, however, and they wholly fail to support this assertion (by happenstance, the Court noticed that support for that proposition is instead found on page seventy-seven of Plaintiff's appendix). It is not the Court's responsibility to ferret through the evidentiary record to find evidence in support of Plaintiff's assertions. Federal Rule of Civil Procedure 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's [motion for or] opposition to summary judgment...." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and ... articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

This case arises out of an unfortunate situation where one of American's employees, Tim White (also a defendant in this cause), repeatedly harassed other employees of American in and away from the workplace. In the spring of 2001, White allegedly began harassing certain of American's employees with lewd, depraved, and threatening phone calls and messages, and even once allegedly drugged Plaintiff at a bar. American, through Moore, their corporate security officer, investigated the allegations of harassment but allegedly could not determine who was the harasser. Ultimately the FBI became involved, however, and White was arrested for his conduct in 2003. After failing a polygraph examination, White admitted, in a qualified manner, that he was the harasser.[2] Thereafter, on November 6, 2003, American terminated White's employment, albeit not because of the harassment but because White continually called in sick to avoid meeting with American's human-resources personnel to discuss the situation.

---

[2] One of the FBI agents allegedly told Moore that White said, "if you say I did it, I did it." (Defs.' App. at 188-189, ¶ 35.)

**\*2** Plaintiff, one of the subjects of White's harassment, brought this suit against White, American, and Moore. Plaintiff asserts against American a hostile-work-environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2 (2003) ("Title VII"), a gender-discrimination claim under Title VII and the Texas Commission on Human Rights Act, Tex. Lab. Code ann. §

21.051 (Vernon 2006), and state-law claims for intentional infliction of emotional distress ("IIED") and negligent hiring, supervision and retention. She asserts the latter two claims against Moore as well.[3] After careful review of the parties' briefs and the evidence highlighted therein, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims.

[3]     Plaintiff also asserted an IIED claim and a defamation claim against White; the clerk entered default against him on October 21, 2005.

Initially, the Court concludes that Plaintiff's Title VII and TCHRA claims are time barred. A Title VII plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission within 180 days after the occurrence of the unlawful discrimination. 42 U.S.C.A. § 2000e-5(e)(1) (West 2003); *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.*, 139 F.3d 532, 537 (5th Cir. 1998). If the plaintiff instead institutes proceedings with the corresponding state agency, however, the limitations period for Title VII claims extends to 300 days. *Webb*, 139 F.3d at 537. Nevertheless, state-law claims for discrimination under the TCHRA must be filed within the 180-day period. *See Specialty Retailers, Inc. v. DeMoranville*, 933 S.W. 2d 490, 492 (Tex. 1996); *see also Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 531 (S.D. Tex. 1999) ("State law claims of employment discrimination are time barred when filed after the 180 day period, while the same claims brought under federal law would be timely if filed within 300 days of the alleged discriminatory conduct.").

Plaintiff filed her initial charge of discrimination with the state agency on or about May 20, 2004.[4] Thus, Abrams may only recover under Title VII for discrimination that occurred after July 24, 2003, which is 300 days before she filed her charge of discrimination with the state agency.[5] Her recovery under the TCHRA is limited to discriminatory acts occurring after November 21, 2003, which is 180 days before the filing of her May 20 charge. Plaintiff fails to specifically point to any acts of harassment by White or discrimination by American that occurred within these periods. Instead, she merely contends, in conclusory fashion in her charge of discrimination, that the harassment continued until December 2003.

[4]     Defendants' brief contends the charge was filed on May 20, citing as evidence in support of that contention pages 109-113 of their appendix. (Defs.' Br. at 15 ("App. 0109-0113, Ex. A-2 (Depo., Ex. 2)").) The Court

discerns no notation of a file date on that document, however; instead, the only date from May 2004 noted on the document is May 5, which is the date that Plaintiff signed the charge under penalty of perjury. Plaintiff does not dispute, however, the May 20 date proffered by Defendants. And, whether the charge was filed on May 5 or May 20, the result on the limitations issue is the same.

[5]     Defendants' brief marks the 300th day prior to May 20, 2004, as falling on July 10, 2003. (Defs.' Br. at 15.) The Court's calculation, however, yields July 24, 2003, as the 300th day prior to May 20, 2004.

Even assuming there was harassment by White and, more importantly for her Title VII and TCHRA claims, discrimination by American within the relevant periods, the time bar prevents her from recovering for instances of discrimination that occurred prior to those periods. Plaintiff tries to avoid this limitations bar under the "continuing-violation theory." This equitable exception exists "[w]here the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Abrams v. Baylor Coll. of Med.*, 805 F.2d 528, 532 (5th Cir. 1986). "Application of this theory relieves a Title VII plaintiff from the burden of proving that the entire violation occurred within the actionable period provided the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Webb*, 139 F.3d at 537. Nevertheless, the filing period begins to run once " 'facts supportive of a Title VII charge are ... or should be apparent to a reasonably prudent person similarly situated.' " *Id.* (quoting *Glass v. Petro-Tex. Chem. Corp.*, 757 F.2d 1554, 1560-61 (5th Cir. 1985)); *see also Sabree v. United Broth. of Carpenters and Joiners*, 921 F.2d 396, 402 (1st Cir. 1990) ("A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern."). " 'The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.' " *Webb*, 139 F.3d at 537 (quoting *Glass*, 757 F.2d at 1561).

**\*3**   Plaintiff contends that she should benefit from the continuing-violation theory because she reasonably assumed that "American's refusal to discipline or terminate White was not a final one." (Pl.'s Resp. at 23.) It is clear, however, that Plaintiff knew of the facts supportive of her Title VII claim against American well before the 300-day period. She chastises American for failing to take action against White well before it did, contending that in 2001 several employees

APPX. 0734

Abrams v. American Airlines, Inc., Not Reported in Fed. Supp. (2007)

had identified him as the harasser. (Pl.'s. Resp. at 6.) She also admits that she was told by Moore in May 2002 that American was ceasing its investigation into the harassment and closing its case. (Defs.' App. at 62.) And, she contends in her deposition that American's failure to fire White after his April 2003 arrest created a hostile working environment. Thus, she knew, or at least should have known, well before the 300-day period that she had claims against American.

In any event, even assuming her Title VII and TCHRA claims are not time-barred, they suffer from another flaw. Plaintiff simply has not demonstrated, prima-facie, a case of hostile-work-environment discrimination by Defendants.[6] To make such a demonstration, Plaintiff must show that the harassment was because of her sex. *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005). As noted by the Supreme Court, "[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (Ginsburg, J., concurring)). It is clear from the evidence presented by the parties that White was an equal-opportunity harasser. *See Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) ("Title VII does not cover the 'equal opportunity' or 'bisexual' harasser ... because such a person is not ... treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)."). Plaintiff has presented no evidence tending to demonstrate that she was exposed to worse harassment by White than was suffered by other male employees.

[6]   Plaintiff's brief contends she has direct evidence of discrimination, but she never specifically points to any such evidence. Thus, the Court has examined her claims under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

Similarly, to prove a prima-face case of gender discrimination, Plaintiff must demonstrate that she was treated less favorably than others outside of her protected class. *See Oboye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F. 3d 507, 512-13 (5th Cir. 2001). Aside from her mere subjective beliefs, Plaintiff has failed to demonstrate that American treated her complaints of harassment any differently than those of her male counterparts.

Plaintiff's state-law claims fail as well. Under Texas law, "IIED is a 'gap-filler' tort with the 'clear purpose ... to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied.' " *Johnson v. Blue Cross/Blue Shield of Tex.*, 375 F. Supp. 2d 545, 549 (N.D. Tex. 2005) (Cummings, J.) (quoting *Hoffmann-La Roches, Inc. v. Zeltwanger*, 144 S.W. 3d 438, 447 (Tex. 2004)). Because Plaintiff's IIED claim against American and Moore arises from the same facts as her Title VII and TCHRA claims, she may not pursue her IIED claim. *See id.* Furthermore, Plaintiff has not pointed to any proof of extreme or outrageous conduct sufficient to support an IIED claim on the part of American or Moore. An IIED claim "does not lie for 'ordinary employment disputes.' " *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W. 3d 735, 741 (Tex. 2003). An employer's alleged failure to conduct a proper workplace investigation is an ordinary employment dispute and does not constitute the type of extreme and outrageous conduct necessary to support an IIED claim. *See id.* (holding that employer's failure to properly investigate sexual-harassment claim was not extreme and outrageous).

**\*4** Finally, Plaintiff's negligent-hiring claim against Moore fails for the simple reason that he was not her employer. Thus, he did not owe her a duty to hire, supervise, or retain competent employees. That duty is instead imposed upon the employer. *See Mackey v. U.P. Enters.* 935 S.W.2d 446, 459 (Tex. App.--Tyler 1996). But Plaintiff has wholly failed to demonstrate that American negligently hired White. Plaintiff has pointed to no evidence tending to indicate that American knew or should have known that White had previously engaged in harassment before his employment with American began. Furthermore, because Plaintiff has failed to present evidence tending to demonstrate that White committed an actionable tort against her, her claim for negligent hiring supervision and retention must fail. *See Gonzales v. Willis*, 995 S.W.2d 729, 739-40 & n.2 (Tex. App.--San Antonio 1999, no pet.) (noting that "an employer cannot be held liable for negligently hiring[, supervising, or retaining] an employee unless the employee committed an actionable tort," and concluding that "negligent hiring[, supervising, and retaining] will be a viable cause of action in a sexual harassment case only if the harassment encompasses misconduct that is independently actionable under the common law, such as battery or intentional infliction of emotional distress").

APPX. 0735

**Abrams v. American Airlines, Inc., Not Reported in Fed. Supp. (2007)**

**All Citations**

Not Reported in Fed. Supp., 2007 WL 9775358

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.