`

AppIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **ROBERT "BOB" ROSS AND** | § | |
| **EUGENIO VARGAS** | § | **Civil Action No. 4:22-cv-343-Y** |
| | § | |
| **Plaintiffs/Counterclaim Defendants,** | § | **Consolidated with** |
| | § | **Civil Action No. 4:22-cv-430-Y** |
| **v.** | § | |
| | § | **Judge Terry R. Means** |
| **ASSOCIATION OF PROFESSIONAL FLIGHT** | § | |
| **ATTENDANTS,** *et al.*, | § | |
| | § | |
| **Defendants/Counterclaim Plaintiffs.** | | |

---

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE AND OBJECTIONS TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

---

# Table of Contents

I.      Introduction ................................................................................................................................1

II.     Plaintiffs Object to Defendants' Inadmissible Summary Judgment Evidence........................2

    A.    Hal O'Neil's Declaration, Accounting Review and Cornwall Jackson Accounting Review are summations of evidence based on inadmissible evidence by witness not designated as experts...................................................10

III.    Facts ........................................................................................................................................12

    1)    Ross' Administration's Arbitration Hearings: .................................................................21

IV.     As a matter of law, the plaintiffs assert that the defendants' motion for Summary Judgment against Ross and Vargas for Breach of Fiduciary Duty should be denied. ..............................................................17

    A.    Defendants have no evidence Plaintiffs violated their fiduciary duty. ............................................19

    B.    Defendants claim that the union suffered no damages between 2018-2022. .................................21

    C.    Defendants fail to prove the equitable doctrine of laches applies to their breach of fiduciary duty claims.....25

V.      Ross has a valid claim for breach of Contract against APFA. ................................................26

    A.    The plain language within the four corners of the Transition Agreement does not incorporate the APFA Constitution and Policy. .........................................................................................26

VI.     Plaintiffs Breach of Union Constitution claims substantiate violations of their due process rights. ...............29

VII.    Plaintiffs assert valid claims under LMRDA §§ 411(a)(2), 411(a)(5), and 529 against APFA. ......................31

    A.    29 U.S.C. § 529 Retaliation or Otherwise Disciplined:....................................................31

    B.    LMRDA: Due Process Violation and Breach of Union Constitution: .................................................32

        1)    APFA Constitution and Policy: We allege that the Article VII Disciplinary Arbitration provisions have been violated. ......................................................................................33

        2)    Defendants Altered Evidence by Withholding parts of An Accounting Document That Refuted Defendant's Disciplinary Accusations...........................................................................34

        3)    The Plaintiffs, including Mr. Ross, were deprived of proportionate time. ................................35

        4)    The Plaintiffs, including Mr. Ross, were prevented from presenting evidence and from cross-examining witnesses. ......................................................................................36

    C.    Plaintiffs' Rights Under the LMRDA of Free Speech were Violated...............................................38

        5)    Facts showing defendants stifled Free Speech ................................................................40

VIII.   Plaintiffs can substantiate claims for Common Law Fraud and Defamation ................................41

        1)    Vargas is entitled to recover for common law fraud from APFA, Julie Hedrick, and Erik Harris, jointly and severally. .....................................................................................41

        2)    Ross is entitled to recover for defamation against APFA, Julie Hedrick, and Erik Harris, jointly and severally. .....................................................................................44

IX.     Conclusion and Prayer ...........................................................................................................47

`

**Table of Authorities**

Cases

<u>**Federal**</u>

(Stewart v. Int'l Ass'n of Machinists & Aerospace Workers, 16 F.Supp.3d 783 (S.D. Tex. 2014)..............25

Adams-Lundy  v. APFA, 731 F.2d 1154 (5th Cir.1984)…………………………………………………31,39

*Adams-Lundy v. A.P.F.A*, 792 F.2d 1368 (5th Cir. 1986) ……………...…………………………….....18

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)……………………………….. ………19

*Boggan v. Data Systems Network Corp*., 969 F.2d 149-153 (5th Cir. 1992) …………….....……… .……41

*Booker v. Real Homes, Inc*., 103 S.W.3d 487, 492 (Tex.App. — San Antonio 2003, pet. denied) …………28

*Carr v. ALPA*, 866 F. 3d 597, 603 (5th Cir. 2017) ………………………………………………....29

Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 5 ………………………….....…………25

*Danciger Oil & Ref. Co. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941) ………...…………………………27

*DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) ………………………….…………..……2

*Encompass Office Solutions, Inc. v. Ingenix, Inc*., 775 F. Supp. 2d 938 (E.D. Tex. 2011)…....……………45

Frye v. United Steelworkers, 767 F.2d 1216 (7th Cir 1985)……………………………………….........33

Hoffman v. Kramer, 362 F.3d 308 (5th Cir. 2004)…………………………………….… ……………… 32

*IDA Eng'g, Inc. v. PBK Architects, Inc*., No. 05-15-01418-CV (Tex. App. Oct 04, 2016)…………….....29

*In re Bank of America, N.A.,* 278 S.W.3d 342, 346 (Tex.2009).  ………………………………………27

*In re Bank of America, N.A.,* 278 S.W.3d 342, 346 (Tex.2009).  ………………………………………27

Int'l Bhd. of Boilermakers v. Hardeman, 401 U.S. 233 (1971)………………………………… ………...27

*Jenkins v. C.R.E.S. Mgmt., LLC*, 881 F.3d 753, 756 (5th Cir. 2016)……………………...……………19

*JP Morgan Chase Bank, N.A. v. Classic Home Fin., Inc*., No. 12-20363 (5th Cir. Dec 09, 2013)………..... 3

Laughlin Prods., Inc. v. ETS, Inc., 257 F.Supp.2d 863, 866 (N.D. Tex. 2002) ………………………..……17

*Loc. 911 v. United Food $ Com. Workers Int'l*, 301 F.3d 468, 475 (6th Cir.2002)) ………………..……………….....32

*Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 1015, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001)………….... …………………………………………………………………………….6

*Mallick v. International Broth. of Elec. Workers*, 749 F.2d 771 (D.C. Cir. 1984))................................29

Martin v. Loc. 556, Transp. Workers Union (N.D. Tex. May 19, 2016).......................................27, 33, 38

Martin v. Loc. 556, Transp. Workers Union of Am., 206 F.Supp.3d 1227................................... ........14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986) ................................17

*Morris v. Equifax Info. Servs., LLC, 457 F.3d 460, 470-71 (5th Cir. 2006)* ...........................................23

*Morris v. Equifax Info. Servs., LLC, 457 F.3d 460, 470-71 (5th Cir. 2006) (citing 15 U.S.C. § 1681h(e))* ...45

*Nasti v. CIBA Specialty Chems. Corp.,* 492 F.3d 589, 596 (5th Cir. 2007).......................................28

*Newell v. IBEW*, 789 F.2d 1186, 1189 (5th Cir. 1986) ...................................................................29

*O'Neil v. ALPA*, 939 F. 2d 1199, 1206 (5th Cir. 1991)..................................................................29

PNC Bank v. Ruiz, 22-50584, p. 6-7 (5th Cir. May 10, 2023)............................................ .......................2

Ray v. Young, 753 F.2d 386 (5th Cir.1985)........................................................................19, 21

*Shaunfield v. MB Fin. Bank, N.A.*, Civil Action No. 3:15-CV-0856-L, 8 (N.D. Tex. Feb 17, 2016) ..........44

State *Booker v. Real Homes, Inc.*, 103 S.W.3d 487 (Tex.App. — San Antonio 2003, pet. denied) ..........27

Steelworkers v. Enterprise Wheel & Car Corp., 363 U. S. 593 (1960)....................................27

*Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex. App. – Beaumont 2003, no pet.) ....................................26

*Taita Chem. Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001). ...........................17

*Tex. Soil Recycling, Inc. v. Intercargo Ins. Co.*, 273 F. 3d 644, 650 (5th Cir. 2001)............................41

United Food & Com. Workers Int'l Union Loc. 911 v.
        United Food & Com. Workers Int'l, 301 F.3d 468 (6th Cir
(2002)...........................33

United Paperworkers Internat'l v. Misco, 484 U.S. 29 (1987)........................................ 1, 6

*United States v. Box*, 50 F.3d 345, 356 (5th Cir. 1995) ....................................................................2

United States v. Int'l Bhd. of Teamsters, 247 F.3d 370 (2d Cir. 2001)...........................33

United Steel Workers Loc. 12-369 v. United Steel Workers Int'l, 728 F3d 1107 (9th Cir. 2013) .............. 31

*Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988)........................................................27

*Wilmington Sav. Fund Soc'y FSB v. Hutchins*, 21-2094 (10th Cir. Apr 12, 2022)....................................1

Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (5th Cir. 1991). ....................................................3

*Wooddell v. International Brotherhood of Electrical Workers, Local 71*, 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991)..............................................................................................44

`

*Wooddell v. International Brotherhood of Electrical Workers, Local 71*, 502 U.S. 93(1991).............................29

*Wooddell v. International Brotherhood of Electrical Workers, Local 71*, 502 U.S. 93 (1991)..............................30


**Statutes**

    *Federal*

29 U.S.C. §101(a)(5)................................................................ 23, 27, 28

29 U.S.C. § 401...................................................................................23

29 U.S.C. § 402 (i)).............................................................................23

29 U.S.C. § 402 (j))............................................................................23

29 U.S.C. § 411(a)(2).............................................................1, 23, 32, 35, 42

29 U.S.C. § 411(a)(5)..............................................................23, 26, 42

29 U.S.C. § 412.............................................................................24, 31

29 U.S.C. § 431................................................................................ 14

29 U.S.C. § 501.........................................................................11, 12, 15

Fed. R. Civ. P. § 37(c)(1)..................................................................11

Fed. R. Civ. Proc. § 8(c) .................................................................28

Fed. R. Evid. § 602............................................................................3

Fed. R. Evid. § 801.......................................................................2, 3, 7

Fed. R. Evid. § 802.........................................................................2, 7

Fed. R. Evid. § 803....................................................................2, 4, 7, 9, 11

Fed. R. Evid. § 803(6) ................................................................2, 4, 7, 9, 11

Fed. R. of Evid. § 804.......................................................................6

Fed. R. Evid. § 805.........................................................................3, 5

Fed. R. of Evid. § 1006..................................................................9, 10, 11

*State*

Tex. Civ. Prac. & Rem. Code § 16.004...................................................................................................15

**Rules**

*Federal*

Fed. R. Civ. P. 56.....................................................................................................................1, 10

Fed. R. Civ. P. 166a(i)..................................................................................................................1

Fed. R. Evid. 37(1)......................................................................................................................11

Fed. R. Evid. 803 .......................................................................................................................11

Fed. R. Evid. 1006.......................................................................................................................

*Local*

*LR. 7.1.......................................................................................................................................1*

*LR 7.2.......................................................................................................................................1*

*LR 56.2......................................................................................................................................1*

*LR 56.3 .....................................................................................................................................1*

*LR 56.5......................................................................................................................................1*

*LR 56.6......................................................................................................................................1*

Plaintiffs, ROBERT (BOB) ROSS ("Ross") and EUGENIO VARGAS ("Vargas"), hereby file this their Brief in Support of Plaintiffs' Response and Objection to Defendants' Motion for Summary Judgment (Doc. 234) and show the Court as follows:

I.    <strong><u>INTRODUCTION</u></strong>

Plaintiffs, Robert "Bob" Ross ("Ross") and Eugenio Vargas ("Vargas") (collectively hereinafter referred to as "Plaintiffs") pursue claims for violations of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(2) (free speech and association), § 411(a)(5) (due process) *et seq. and* § 529 (retaliation) against the Association of Professional Flight Attendants (hereinafter "APFA" or the "Union"). Ross asserts additional claims against the APFA for Breach of Contract, and against the APFA, Julie Hedrick, and Erik Harris for Breach of the Union Constitution, Defamation, Breach of Fiduciary Duty, Fair Credit Reporting Act, and Intentional Interference with a Contract under Texas Common Law. Vargas asserts additional claims against APFA, Julie Hedrick and Erik Harris for Fraud, and Breach of Fiduciary Duty.

Defendants pursue a final claim for breach of fiduciary duty under 29 U.S.C. § 501 and rely on the facts, evidence, and a final determination from their self-designated Article VII Arbitrator. Defendants ignore the obvious problems to their final surviving claim before this Court—a resounding lack of jurisdiction and authority. Defendants file a claim under federal law and argue for this court to render a final determination on the merits of this claim based on APFA's disciplinary hearing administered by their non-attorney arbitrator under APFA's form of due process.

> ". . . [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

(*Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 596-597, 599 (1960); see also, *United Paperworkers Internat'l v. Misco,* 484 U.S. 29, 36 108 S.Ct. 364, 370, 98 L.Ed.2d 286] (1987)). The law is clear—it is a grant of congressional authority and jurisdiction which empowers this Court to interpret and administer claims under federal law—and that jurisdiction is exclusive to the federal courts—not a labor union,

1

and certainly not APFA. (28 U.S.C. § 1331).

II.     **PLAINTIFFS OBJECTIONS TO DEFENDANTS' INADMISSIBLE SUMMARY JUDGMENT EVIDENCE.**

Plaintiffs respectfully object to Defendants' evidence submitted in support of their Motion for Summary Judgment, on the following grounds:

1. HEARSAY: Plaintiffs object to Defendants' use of statements contained within documents and Declarations that have not been authenticated and are offered for the truth of the matter asserted, absent any applicable exception to the hearsay rule under Federal Rules of Evidence 801 through 807. The Federal Rules of Evidence exception § 803(6) allows for hearsay documents that fall within those regularly maintained as business records may be admissible on record. (Fed. R. Evid. §§801, 802). To fall within the business records exception, Defendants carry the burden to establish through business records testimony that ". . . the records were (A) made around the time of the events at issue, (B) kept in the course of a regularly conducted business activity, and (C) made as a regular practice of that activity. *Wilmington Sav. Fund Soc'y FSB v. Hutchins*, 21-2094 at 9 (10th Cir. Apr 12, 2022) (quoting Fed. R. Evid. 803(6)(A)-(C)). A business records affidavit will allow the hearsay evidence into record unless "**(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." (Fed. R. Evid. §803(6)(E)).

To qualify as a witness, the declarant must be able to "explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met." *PNC Bank v. Ruiz*, 22-50584, p. 6-7 (5th Cir. May 10, 2023) (quoting Fed.R.Evid. §803(6)(D); see also *United States v. Box*, 50 F.3d 345, 356 (5th Cir. 1995) (noting authentication requirement under Rule 803(6)); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005)). A witness that testifies to admitting records on behalf of a business must have a business records custodian testify to the true and correct nature of the document submitted, as compared to the document maintained in the business records in the regular course of business.  (Fed. R. Evid § 803(6)).

2. HEARSAY WITHIN HEARSAY: Plaintiffs respectfully object to Defendants' use of statements within

statements contained within documents and affidavits that have not been properly authenticated and are offered for the truth of the matter asserted, absent any applicable exception to the hearsay rule under Federal Rules of Evidence 801 through 807. Specifically, Plaintiffs object to any instances where a statement by one individual, an argument or a document is relayed by another individual within a document or affidavit, as this constitutes hearsay within hearsay, or double hearsay, which is inadmissible unless both layers of hearsay fall within an exception to the hearsay rule as outlined in Fed. R. Evid. 805. "Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (5th Cir. 1991).  *See also JP Morgan Chase Bank, N.A. v. Classic Home Fin., Inc.*, No. 12-20363 (5th Cir. Dec 09, 2013).  Without proper authentication that each layer of hearsay satisfies an applicable exception, such evidence cannot be considered reliable or admissible under the Federal Rules of Evidence and should be excluded from consideration in Defendants' Motion for Summary Judgment.

3. LACK OF PERSONAL KNOWLEDGE: Plaintiffs additionally object to any statements, affidavits, or declarations submitted by Defendants that are based on information and belief, rather than direct, personal knowledge as required under Federal Rule of Civil Procedure 56(c)(4).  Under Federal Rule of Evidence 602, a witness may not testify to a matter unless evidence is introduced to support that the witness has personal knowledge of the matter.  (Fed. R. Evid. §602).  Evidence or statements offered by Defendants that are based on speculative, second-hand knowledge, or assumptions, rather than direct, personal observation or involvement, fail to meet the threshold of admissibility required under this rule.

Harris testified as the business records custodian in both of Plaintiffs' hearings that the state of the business records are not well maintained. (Doc. 239-6, PAGEID 6948; 239-8, PAGEID 7063; App. pp. 156-197). Harris also testified that an entire box of documents requested by Parties went missing during the Article VII Hearings and he was unable to fully comply with the subpoena requests as a result. (Doc. 239-6, PAGEID 6948; App. pp. 156-197). He read a letter into record during his testimony that he wrote to parties during the

3

Chinery v. Vargas hearing admitting this fact. (Doc. 239-6, PAGEID 6948 Plaintiffs object to the admission of any and all of APFA's financial records as they are not properly maintained and are therefore unreliable inadmissible hearsay evidence. Plaintiffs further object to all documents submitted before this court which incorporate APFA's financial documents as hearsay within hearsay in which the underline hearsay statements must be excluded.

More specifically, any and all documents put forth containing statements or summations of evidence based upon the financial records of APFA that originated from the APFA archives are unreliable hearsay and Plaintiffs hereby object to their admissibility based thereon.

JOSH BLACK APFA NATIONAL TREASURER'S DECLARATION: In Defendants' Motion for Summary Judgment evidence, Black testifies that his position is the National Secretary of APFA since April 2020, and that in that capacity "I am familiar with the records kept by the Union." (Doc. 236-1, PAGEID 5948). Black fails to testify as to the business practices of the union in creating the documents attached at or near the time of the events at issue; he fails to testify how the union embarks on regular business practices and activities to ensure their business records are regularly maintained; and he fails to testify about how these records as a regular part of the union's activity.   Therefore, Black's declaration fails to meet the elements necessary to substantiate the business records exception to the hearsay rule for any of the documents attached to the Black declaration. (Fed. R. Evid. 803(6)(E)).   Furthermore, APFA's records are not well-maintained in the regular course of business, therefore the attached Exhibits to the Black Declaration are subject to exclusion as unreliable hearsay—in particular Exhibit O, R, S, T, U, V, W, X, Y, Z. (Doc.236-1; PAGEID 5948-6453).

Additionally, multiple exhibits attached to the Black Declaration contain hearsay within hearsay and are submitted for the truth of the facts and statements contained therein.

Furthermore, Exhibit O, and Exhibits R, S, T, U, V, W, X, Y, Z should all be excluded for statements of unreliable financial documentation from APFA's records and double hearsay statements.  As previously stated, double hearsay exists whenever a business record is created based on information from another

`

source. This would include the Plaintiffs' Post-Hearing Briefs, prepared using the documents and evidence produced during the Article VII Disciplinary hearings and marked as Exhibit O and Exhibit V. (Doc.236-1; PAGEID 5948-6453).

These briefs include statements and arguments addressing documents and evidence that has not been established as being admissible before this court. (Fed. R. Evid. § 805). Additionally, the Arbitrator's Decisions in Ross and Vargas, marked as Exhibits, R, T, W, X, and Z includes multiple out-of-court statements which are not sufficiently established as admissible evidence—the Arbitrator summarizes the evidence and testimony from the hearing. (Doc.236-1; PAGEID 5948-6453). Most importantly, financial records form the basis of the charges, the testimony, and the evidence used to draft and ultimately achieve the Disciplinary Decisions marked as Exhibits R, T, W, X, and Z. (Doc.236-1; PAGEID 5948-6453). Each of these Disciplinary Awards reference various inadmissible out-of-court statements. Attached hereto in Plaintiffs' Appendix is a list of examples of hearsay statements contained within these Exhibits attached to the Black Affidavit hearsay documents. (App. 596-599; Doc. 236-1).

Exhibit U attached to the Black Declaration, includes prior statements in the form of disciplinary hearing transcripts from both Disciplinary Hearings. The admissibility of these transcripts should be evaluated based on their status as official records of proceedings. These are transcripts from a disciplinary hearing conducted by flight attendants—not even the arbitrator is a lawyer—so examination and cross-examination of the witnesses was not given to both sides in the present case. Plaintiffs were denied due process throughout the Disciplinary hearings from the union concealing documents, denial of adequate time, inability to present evidence, inability to cross-examine witnesses, even the Arbitrator conducted numerous off record discussions about the merits of the evidence, issues, objections and the charges where the Arbitrator coerced Ross to waive objections to the admission of unreliable documents (App. pp. 156-197). Defendants acknowledge that they withheld documents, that Plaintiffs were given much less time to present their case thereby denying Plaintiffs a fair platform to present their case. (Doc. 236-3, PAGEID 6471 Harris Decl). Despite these actions,

5

Defendants argue that the union met the minimum standard in conducting its disciplinary hearings. (Doc. 235, PAGEID 5921). This raises serious concerns about the fairness and integrity of the proceedings and potential violations of due process. Defendants argue they met the minimum standard to comply with LMRDA due process requirements—however this is not the full panoply of due process rights provided under federal law. (ECF. No. 235, PAGEID 5892). To rely on the union's administration of due process denies Plaintiffs' due process under the law.  Therefore, these transcripts do not meet federal requirements for admissibility as the Disciplinary Hearing transcripts are not prior court hearing transcripts to be considered under the Fed. R. of Evid. § 804(b)(1).

Additionally, Plaintiff hereby objects to any legal conclusions contained in the Disciplinary Arbitration Decisions marked as Exhibits R, T, W, X, and Z as factual assertions. The Arbitrator does not hold a license to practice law in Texas. The Arbitrator never heard a case under union self-governing rules which applies the LMRDA.  (App. pp. 600-602). He had neither the qualifications, nor the authority, to make legal conclusions regarding claims of fiduciary duty. The weight and validity of the legal conclusions in the arbitration decisions are in serious question based on these facts. (*See Stolt-Nielsen S.A. v. Animal feeds Int'l Corp.*, 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) ("It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable."). *See also, Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 1015, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (per curiam) (quoting Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).  Therefore, any statements within these exhibits purporting to resolve questions of law are beyond the arbitrator's competence and authority, rendering them invalid and unenforceable. As such, these conclusory statements must be stricken from the record and given no weight or consideration by this Court.

ERIK HARRIS, APFA NATIONAL TREASURER'S DECLARATION: Erik Harris, APFA National Treasurer, admitted in both Plaintiffs' Article VII Disciplinary Hearings that APFA's record-keeping system is not reliable.

`

This calls into question the credibility of any documents presented by the APFA in this case and could weaken their case. It is necessary to provide additional evidence to support the validity of the documents submitted to substantiate the union's claims of breach of fiduciary duty. Significantly, Harris testified during the Arbitration hearings that a box of documents relevant to the charges against Plaintiffs had recently gone missing and therefore could not be produced. (Doc. 239-6, PAGEID 6948). This raises serious concerns about the APFA's document management and the potential impact on the fairness of the arbitration hearings, as well as the credibility of the APFA's case. APFA does not properly maintain its documents and records in good working condition on a regular routine basis. (Doc. 239-6, PAGEID 6948; 239-8, PAGEID 7063; App. pp. 156-197). As a result, the documents within APFA's possession are unreliable documents and require additional evidence to substantiate the credibility of the documents submitted by a party with personal knowledge of the facts. (Fed. R. Evid. 801, 802).

Harris, while testifying to business records, does not state that he is the business records custodian. Furthermore, his declaration does not explain the methods by which APFA maintains its records, APFA's record-keeping practices, or that APFA's documents are routinely kept as a business practice. This raises serious concerns about the validity and reliability of the documents submitted by the APFA. (Doc. 236-3; PAGEID 6468-75). Harris also fails to testify that the documents attached are true and correct copies of the documents maintained within APFA's business records therefore are not properly authenticated. (Doc. 236-3; PAGEID 6468-75). The Harris and the Black Declarations attached to the Defendants' Motion for Summary Judgment, and the documents attached thereto fail to satisfy the requirements of the business records exception laid out in Fed. R. Evid. § 803(6). (Doc.236-1; PAGEID 5948-55; 236-3; PAGEID 6468-75).

Harris lacks personal knowledge regarding the documents attached to his declaration. Exhibit A to the Harris Declaration is a letter to which Harris was not a party. (ECF No. 236-1, PAGEID 6468-79). Plaintiff objects to submission of these documents as inadmissible hearsay evidence and Harris lacks personal knowledge of this document. (Doc. 236-3; PAGEID 6468-79).

Paragraphs 4, 6, 7, 8, 9,10, 11, 12, 13 from the Harris Declaration and attached Exhibit A and must also be stricken from the record. (Doc. 236-3; PAGEID 6468-79). Harris improperly testifies on behalf of the APFA National Officers in Paragraphs 4 and 6 for which he lacks personal knowledge to testify to the beliefs and mental impressions of the other National Officers. (Doc. 236-3; PAGEID 6468-79). Harris testifies on behalf of the BOD and their actions in paragraph 6, 7, 8.  (Doc. 236-3; PAGEID 6468-79).  Harris has no personal knowledge of the beliefs and mental impressions of the National Officers, the BOD, therefore Plaintiffs object for lack of personal knowledge.

In Paragraph 7, 8 and 9 Harris testifies as to "business records for the APFA" without the proper foundation or elements of record-keeping practices by the union. (Doc. 236-3; PAGEID 6470-71). Furthermore, he previously testified that the business records are not well maintained.  (Doc. 239-6, PAGEID 6948; 239-8, PAGEID 7063; App. pp.185-197). Therefore, Plaintiff objects to this information as unreliable hearsay evidence.

Plaintiffs object to Paragraph 16 for lack of proper foundation and hearsay within hearsay with third parties identified as "Board members" meaning the APFA Board of Directors (hereinafter sometimes referred to as "BOD") which is the governing entity of the APFA.  Harris states "I had been asked by Board members to provide the results of Mr. O'Neil's analysis." (Doc. 236-3, PAGEID 6473). Yet this references conversations with unidentified people and the APFA Board of Directors is part of the entity APFA.  There is no evidence to support a conversation with the governing body of APFA as there is no resolution on the matter and the APFA Constitution requires the Board of Directors to have a quorum present to vote on any action taken within a resolution. (APFA Const. Art. III, Sec. 3F-H; 236-1; PAGEID 5964). There is no resolution passed or evidence attached suggesting this fact is true.  Plaintiff objections based on a lack of foundation.

Plaintiffs object to Paragraphs 10, 11, 12, 18, 20 and 22 as these statements address matters for which Harris has no basis to assert personal knowledge. (Doc 236-3, PAGEID 6468-75).  Harris has no personal knowledge of matters that occurred prior to him taking office as National Treasurer and cannot testify to it unless he establishes his personal knowledge to those facts relating to charges, and whether they were

`

withdrawn. He also cannot testify as to "his administrations' interpretation of the APFA Constitution and Policy Manual as he lacks personal knowledge and is not the business records custodian (Doc 236-3, PAGEID 6471-75). Paragraph 18 is not properly founded, as Harris has no personal knowledge of these matters about "repayment from Mr. Ross in the same manner as the overpayments to Mr. Vargas and the other former officers had been sought." (Doc 236-3, PAGEID 6474-75). As he has no personal knowledge and was not in office as National Treasurer when this occurred.  Paragraph 20, 22, is a summation of the APFA records and yet there is no foundation for the records to be admitted under the Fed. R. Evid. § 803(6).  (Doc 236-3, PAGEID 6474-75). Harris is not qualified to do so and has testified that the financial records are not properly maintained by the APFA.  Doc. 239-6, PAGEID 6948; 239-8, PAGEID 7063; App. pp. 156-197).

Plaintiffs object to any testimony submitted from Josh Black, Erik Harris, and Julie Hedrick, as to the conduct, testimony, or evidence submitted during the Plaintiffs' Article VII Disciplinary Hearings outside of the witness's personal knowledge and experiences (App. pp. 529-531; 600-602). The business records have not been maintained, and not one of these affiants attended either of Plaintiffs' Article VII Disciplinary Hearings.

The submission of the O'Neil "accounting review," the O'Neil Declaration and conclusions contained therein regarding payments made and owed to Ross are an improper summation of evidence that relies on inadmissible hearsay evidence not found on record. (Fed. R. of Evid. 1006). Plaintiff hereby objects to its submission as relying on hearsay evidence.

 Accordingly, Plaintiffs request that the Court exclude any and all statements, declarations, affidavits, or other evidentiary submissions presented by Defendants in their Motion for Summary Judgment that are not supported by direct, personal knowledge of the events, transactions, or occurrences to which they purport to testify. Such evidence cannot form the basis of a genuine dispute of material fact sufficient to overcome summary judgment, as it does not satisfy the foundational requirement of personal knowledge mandated by the Federal Rules of Evidence.

This objection is made to preserve the integrity of the evidentiary standards and to ensure that the

Court's consideration is limited to evidence that is legally capable of establishing a genuine issue of material fact for trial.

**A. Hal O'Neil's Declaration, Accounting Review and Cornwall Jackson Accounting Review are summations of evidence based on inadmissible evidence by witness not designated as experts.**

Any evidence that is a summary of other evidence falls under the Federal Rules of Evidence 1006. (Fed. R. Evid. §1006).  The 5th Circuit held that Rule 1006 admission of summaries of other evidence when "(1) the evidence previously admitted is voluminous, and (2) review by the jury would be inconvenient. A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case. Summary evidence must have an adequate foundation in evidence that is already admitted, and should be accompanied by a cautionary jury instruction. Full cross-examination and admonitions to the jury minimize the risk of prejudice." *U.S. v. Whitfield*, 590 F.3d 325 at 364-65(5th Cir. 2009) (citing *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir.2001) (internal citations omitted)).

O'Neil's Declaration submits testimony of his accounting review and audit as a summation of the total of evidence of payments made to Ross under the TA. O'Neil is APFA's long-time outside accountant that is currently represented by the same Counsel as the Defendants in this case.  (Doc. 236-4). The underline financial documents of APFA—as discussed above—are not adequately maintained and therefore inadmissible.  Furthermore, the underline financial documents relied upon to create this report were not turned over to Plaintiffs to give Plaintiff the opportunity to conduct their own financial audit and submit testimony to counter this expert's report and is therefore inadmissible by Defendants. (Doc. 113, PAGEID 2335-36). If the defendants have failed to provide the plaintiffs with necessary documents, it could be a violation of procedural fairness and due process.

HAL O'NEIL DECLARATION, EXHIBIT A "ACCOUNTING REVIEW" – The accounting review and testimony of O'Neil's Declaration may not be asserted for the truth of the matters contained therein.  O'Neil's testimony, the "accounting review," and the conclusions regarding his opinion about Ross's overpayment calculation and per

`

diem determination may not be asserted for the purposes of establishing that Ross was overpaid or that the incorrect per diem as used to calculate Ross's payments.  Plaintiffs object to a summation of evidence, or expert testimony may not be asserted based on inadmissible evidence. (Fed. R. Evid. § 1006). Payments made and owed to Ross are an improper summation of evidence based on the financial documents held and maintained by APFA—which are inadmissible as business records. (Fed. R. Evid. 803(6)). Plaintiffs' object to expert witness testimony without Defendants having timely designated an expert witness within the Court ordered timeframe.  (Fed. R. Civ.  P.  37(c)(1). APFA's financial documents are unreliable and inadmissible hearsay evidence. These documents were sought out and not produced, disclosed or delivered, as reflected on record in Plaintiffs' Motion to Compel (Doc. 113) in violation of Fed. R. of Evid. 1006.  Plaintiff hereby objects to its submission as relying on inadmissible evidence.

Plaintiffs object to the use and submission of the Cornwall Jackson "financial review" on the same grounds as those objections outlined for the O'Neil "accounting review." (App. pp. 156-197).  Plaintiffs object to a summation of evidence based on inadmissible unreliable financial evidence; Defendants failed to designate a witness to testify on their behalf in a timely manner; Defendants failed to produce all documents delivered to Cornwall Jackson when requested by Plaintiffs.  (Fed. R. Evid. 1006).

Defendant's summary judgment arguments rely on a substantial amount of double hearsay documents incorporating APFA's unreliable financial documents to argue that Plaintiffs violated their fiduciary duty. Plaintiffs request that the Court sustain their objections specifically regarding hearsay, lack of personal knowledge, legal conclusions, summations of evidence, and excludes such evidence from consideration on Defendants' Motion for Summary Judgment.  Additionally, this Court ordered Defendants meet the elements of the doctrine of laches to overcome Plaintiffs' statute of limitation defense against its LMRDA § 501 breach of fiduciary duty claim. (Doc. 72, PAGEID  1733).  Defendants' Motion for Summary Judgment fails to address this equitable defense and submit evidence of Plaintiffs' wrongdoing that contributed to any unreasonable delay of its claim. The consequence thereof is that dismissal of Defendant's breach of fiduciary duty claim is proper.

III.     **FACTS**

In 2016, Robert "Bob" Ross was elected National President; Nena Martin ("Martin"), followed as the National Vice-President, Marcy Dunaway, ("Dunaway") as National Secretary, and Vargas as National Treasurer ("Vargas") of their union, the APFA ("Ross Administration") . (Doc. 239-8 PAGEID 7064: 386-96).

The Ross Administration opposed any merger of their  independent union to the Association of Flight Attendants ("AFA") and—APFA—which created strife between two political groups fighting for power within the union. Ross became the target of Melissa Chinery-Burns a flight attendant now married to General Counsel of AFA, Joe Burns. The political infighting led the APFA BOD to offer Ross a Transition Agreement for his resignation as National President in March of 2018. ("TA") (Doc. 239, PAGEID 6679: 1-10).

On July 1, 2018, the Bassani Administration took office.[1]  Martin was elected to the APFA BOD in 2019 to the St. Louis Base.  During this period, Chinery-Burns pursued targeted investigations of the Ross Administration's expenses, and demanded audits of the Ross Administration's expenses, paystubs, 401k contributions and other financials. (Doc. 239-6, PAGEID 6964: 286-292). In response to Chinery-Burns's demands, an outside accountant audited the end-of-term payouts for Martin, Dunaway, and Vargas, which led to APFA's claims of a miscalculation and demands for repayment (Doc. 239-4, PAGEID 6865: 187).

Once notified of the miscalculation, and after meeting with the National Treasurer and Hal O'Neil, APFA's Accountant, Martin, Dunaway, and Vargas—faced with threats of legal action by the APFA BOD—the officers agreed to repay the monies for the release of liability by the union. (Doc. 239-4, PAGEID 6892: 214-16).

APFA's Motion (Doc. 235) lays out an incendiary factual depiction of Plaintiffs' Arbitrations, charges, and alleged facts that are simply untrue. Defendants, relying on uncredible evidence and testimony, claim

---

[1] The Court should note that the National Treasurer, Craig Gunter, who previously pursued Vargas, Martin, and Dunaway for the alleged overpayment miscalculation, now testifies on behalf of the Ross Administration.  Cheryl Elizabeth Geiss, former APFA National Vice-President under the Bassani Administration, and Michael Truan, former APFA BOD member—who both previously pursued Vargas, Martin, and Dunaway for the alleged overpayment miscalculation—have filed suit on May 1, 2024 against APFA for claims of Harassment, Assault and Defamation based on the actions of APFA National Treasurer—Erik Harris in Tarrant County District Court, cause no. 017-352392-24; *Geiss, et al v. APFA*. Plaintiffs' allegations of misconduct against Harris and Hedrick in this petition are substantially similar to those allegations asserted by the Bassani Administration officers.

Ross took a Grand Canyon Family Vacation, rented an apartment frivolously, took furniture, charged the union for rental cars. (Doc. 235, PAGEID 5904-10). The Court should disregard such facts about a Grand Canyon Family vacation, furniture, unapproved lease costs, meal expenses and the like. Though Defendants are rather inventive story-tellers, this is nothing more than speculation and conjecture that subverts from the legal issues at the heart of this case.

These factual contentions rely on unreliable hearsay documents and evidence—none of these facts are true and all are unsupported by the evidence. Ross paid for the furniture himself, but APFA's records are too disorganized for the union to determine this. They retain all records prohibit members to retain copies per policy, however when disciplinary charges are pursued—the member bears the burden of proving their innocence without evidence. Attached are copies of the receipts for the furniture in question: the first showing the purchase made for $3637.92, the second and hand written notations show the return of several items APFA resold and credit for $331.28 for a balance of $3306.64. (App. pp. 140-144) Thereafter are two of Ross's paystubs showing two payment made to APFA accounts receivable for $1653.32. (App. pp. 140-144). Attached is also a social media post made by Melissa Chinery on April 26, 2021 wherein she lays out these facts to everyone—but the Arbitrator. (App. pp. 145-147). Afterall, claiming the former National President charged the union for his "Grand Canyon Family Vacation" gets a lot more attention than the truth, or that the National President charged the union for a rental car for six months when he lived in Dallas, rather than explain that cars were rented under department head's names for budgetary purposes or his family stopped at a hotel one night and ate a meal while moving down to Texas. The vehicles rented under National President's department were not usually for him but representatives in Dallas conducting union work with his office.

The Motion's descriptions of Vargas' alleged misconduct are limited comparatively, however Vargas admitted he approved miscalculations made by APFA senior accountants to himself, Martin, and Dunaway

and the officers repaid it. Vargas Arbitration Decision—the same used in Ross[2]—stated that "The arbitrator finds Vargas failed to prepare an inventory list. This arbitrator is of the Opinion *that all of the Ashley furniture has been fully explained and accounted for.*" (Doc. 239-2, PAGEID 7020; 343). This contradicts the finding that in the Ross Arbitration Decision that Ross wrongfully took the Ashley's furniture and moved it into his house. (Doc. 239-3, PAGEID 6864 ). Vargas maintained inventory lists; the "findings" in Vargas' Arbitration Decision are erroneous. (Doc. 239-6, PAGEID 6964). The Arbitrator's decision also "found" Vargas misplaced the box of 2017 documents despite Harris testified he misplaced it. (Doc. 239-8, PAGEID 7063). Vargas did not have the opportunity to take any documents he did not review documents at APFA headquarters—Chinery and Lee did. The truth is, these erroneous results are due to prohibition on Plaintiffs submission of evidence at the hearings.

On April 1, 2020, the Hedrick Administration took office, consisting of Julie Hedrick as National President ("Hedrick"), Larry Salas as National Vice-President, Josh Black as National Secretary, and Erik Harris as National Treasurer ("Harris"). In May, 2020 Hedrick received a copy of Ross's Confidential TA; June 1, 2020 Hedrick hired Bill Osborne as APFA outside counsel; on June 11, 2020 former APFA counsel Mark Richards emailed a copy of the Ross TA to Bill Osborne; on July 9, 2020 Harris emails Hal O'Neil requesting a meeting between Harris, O'Neil and Hedrick to discuss the National Officers payout from 2018; and on August 3, 2020, Hedrick informed Ross that she planned to disclose his confidential TA to APFA members based on Osborne's legal advice. (Doc. 239-9, PAGEID 7102: 424). In August of 2020, Melissa Chinery-Burns posted an altered version of the TA on social media. (App. p. 386-96). On September 7, 2020, Harris and emails O'Neil to set up a meeting at APFA headquarters on September 17, 2020 with APFA General Counsel

---

[2] Note: Defendants argue Arbitrator Armendariz is well-known, however Bartos—Defendants' Counsel—submitted the attached Amicus Brief against Nena Martin after filing counter-charges against Melissa Chinery-Burns—"rank-and-file member of APFA" coincidentally married to General Counsel of AFA, Joe Burns. Ironically, Defendants' Counsel represents APFA in this Brief asserting arguments on behalf of Ms. Chinery-Burns; APFA is supposed to remain neutral throughout the Article VII Arbitration Process, bur they keep hiring attorneys to advocate for this particular "rank-and-file member." (App. pp. 532-536).

`

and the National Officers to review the Ross TA and discuss the "accounting review" of the payments made under the Ross TA to assist Chinery and Lee. (Doc. 239-3; PAGEID 6820-24: 142-146); (Doc.239-4; PAGEID 6863-77: 185-199); (Doc 239-8; PAGEID 7066-67:. 388-389); (Doc. 10; PAGEID 7123-2610: 445-448). Harris notes that the due date for the Accounting Review is September 24, 2020—60 days[3] prior to the week of Thanksgiving and just before the December 1, 2020 EC meeting.  (Doc. 239-8, PAGEID 7066-67: 388-389).

ACCOUNTING REVIEW: Hal O'Neil, APFA's outside accountant, ("O'Neil") sent documents asserting Ross was overpaid with a cover letter spelling out his findings and opinion on his accounting review. (Doc. 239-3; PAGEID 6820-24: 142-146); (Doc.239-4; PAGEID 6863-77: 185-199); (Doc 239-8; PAGEID 7066-67; 388-389); (Doc. 10; PAGEID 7123-2610: 445-448). ("Confidential Memo").  The Confidential Memo states:

> Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick and accrued and unused vacation time.  This agreement shall specify that the payments be made in accordance with the policy manual guidelines.  Consequently, these payments appear appropriate and in compliance with the transition agreement.  This agreement also specifies reimbursement payments to him of up to $10,000 in actual moving expenses.  His moving expense reimbursement payments did not exceed this amount." (Doc. 239-4, PAGEID 6865: 187).

The same day that Harris received the Confidential Memo, he forwarded the documents to the other three National Officers, and APFA's Counsel. (Doc. 239-3, PAGEID 6820-24: 142-46); (Doc.239-4; PAGEID 6863-77: 185-213).

BOARD OF DIRECTOR'S MEETING: On October 28, 2020, the National Officers presented the BOD the "accounting review" documents stating Ross owed APFA for an overpayment. However, the Meeting Minutes inaccurately refer to this review as an "audit." (Doc. 239-5, PAGEID 6895-903: 217-25). This is a substantial difference considering the Confidential Memo was withheld explaining that the "accounting review" is substantially different than an "audit" as it does not reflect any formal opinion on the matters (Doc. 239-5, PAGEID 6895-903: 217-25) The same language appears in the Cornwall Jackson documentation as well. The APFA BOD made no finding and passed no resolution relating to Ross at this meeting.  (App. pp. 117-122).

---

[3] Note: APFA Const. Art. VII Sec. 2D Requires charges to be filed within 60 days of discovery of the facts that gave rise to the charges.

On November 10, 2020, Harris called Ross to discuss the overpayment he owed to APFA and sent a letter to confirm the conversation and demand repayment. (Doc. 239, PAGEID 6679-68: 89-94). Harris told Ross in the letter:

> "During our call, we discussed the finding of the APFA Board of Directors that you were overpaid in the amount of $5,436.47 in 2018..   The Board's finding was based on the results of a review from an independent accounting firm which determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect." ("Overpayment of Wages Letter")  (Doc. 239, PAGEID 6689).

EXECUTIVE COMMITTEE MEETING: In November of 2020, Melissa Chinery ("Chinery") and Sandra Lee ("Lee") filed APFA Disciplinary Charges against Ross and Vargas. (Doc. 236-1, PAGEID 5951) On December 1, 2020, the APFA Executive Committee (sometimes hereinafter referred to as "EC") held its annual meeting.  The nine EC members reviewed the Disciplinary Charges filed against Plaintiffs. The nine EC members—which includes the four National Offices—voted on whether the charges were (1) valid, (2) specific, and (3) timely. (Doc. 236-1, PAGEID 5978).  Per APFA Constitution, if a majority of the EC members vote that the charges are (1) filed timely—within sixty days of learning of the facts that gave rise to the charges, (2) valid, and (3) specific, then the Article VII Charges against Plaintiffs proceed to a Disciplinary Hearing.  (Doc. 236-1, PAGEID 5978-79). All four National Officers voted yes to the disciplinary charges filed against Plaintiffs at the December  2020 EC Meeting.  Yet all four National Officers received a copy of the Confidential Memo. (Doc. 236-1, PAGEID 6037-6044). The four National Officers concealed the Confidential Memo at the October 28, 2020 BOD Meeting and at the December 1, 2020 EC Meeting. (Doc. 239-5, PAGEID 6895-903;  217-225)- need to check not sure it's this AFF *The National Officers voted that the charges against Plaintiffs were (1) valid, (2) specific, and (3) timely because Chinery learned of the O'Neil's audit on September 24, 2020 and filed charges against before November 24, 2020—within 60 days of discovering the facts that gave rise to those charges per APFA Const. Art. VII Sec. 2D.*  (Doc. 236-1, PAGEID 5978).

DEBT COLLECTION: In January 2021, the alleged overpayment claimed to be owed by Ross was assigned to a third-party debt collector, McGaughey, Reber and Associates, Inc, ("Diversified") (App. pp. 43-

`

68 ). Diversified published the alleged overpayment to Ross's credit report after Harris provided Ross's social security number, the TA, and the "accounting review" to Diversified as well as Ross's former Texas address. (Doc. 239, PAGEID 6679:1-6; 52-62).  Simultaneously with pursuit of disciplinary charges and pursuit of debt collection efforts in-house with APFA, Diversified continued collection efforts through telephone calls to him. (App. pp. 43-68).  APFA Board Members and National Treasurer antagonized and harassed Ross in their debt collection efforts and publicized it to APFA members who shared the information on social media. (Doc. 239, PAGEID 6679; App. pp. 156-197).

## IV.    AS A MATTER OF LAW, IT IS THE PLAINTIFFS' POSITION THAT THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST ROSS AND VARGAS FOR BREACH OF FIDUCIARY DUTY MUST BE DENIED.

Summary judgment is only appropriate when the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a).  *Jenkins v. C.R.E.S. Mgmt., LLC*, 881 F.3d 753, 756 (5th Cir. 2016). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." Laughlin Prods., Inc. v. ETS, Inc., 257 F.Supp.2d 863, 866 (N.D. Tex. 2002). Facts are "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986).

The Court must evaluate a motion for summary judgment through the lens of the non-moving party by accepting all evidence and assuming all conclusions in the non-moving party's favor. *(Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986); *See also, Taita Chem. Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001)).

A.    **Defendant's § 501(a) Counterclaim:** Plaintiffs followed procedures and received approval by the union for all charges and expenditures Defendant claims violates the LMRDA § 501.
In *Ray v. Young,* the 5th Circuit Appellate Court reviews expenses that the Plaintiff in that case argues violated LMRDA § 501.  (*Ray v. Young*, 753 F.2d 386, 391-92 (5th Cir. 1985). The *Ray* Court differentiates between those expenses incurred by the union where (1) the union benefits as does the officer receive an *indirect personal benefit*, or (2) the officer receives a *direct personal benefit*, but no benefit is incurred by the

17

union 29 U.S.C. 501. (*Id*.).  The 5th Circuit states that "[w]here. . . there is only an indirect personal benefit to a union officer, and the union itself has benefited, authorization by the union need only be technically correct under the rules of union procedure; we will not inquire into its substance." (*Id*. at 391-92.)  However, where the union receives no benefit, but the officer receives a direct personal benefit, "the defendant union officer must prove, first, that the funds or property were obtained with the valid authorization of the union after adequate disclosure and, second, that the expenditure was not manifestly unreasonable." (*Id*. at 389-90).

All charges that the Defendant alleges the Plaintiffs made in violation of APFA Policy were, in fact, submitted in accordance with the APFA procedures in place at the time and were approved.  This is a fact that is not in dispute. (Doc. 119) APFA maintains procedures to review and approve expenses that are covered by the APFA Constitution and Policy—including approval by two National Officers and a review by the in-house APFA senior accountants.  It is undisputed that expenses and payments made with union funds during the Ross Administration followed APFA procedures.  This is the only material fact in which the Court needs to concern itself to evaluate Defendant's §501 Breach of Fiduciary Duty claims against Plaintiffs.  (*Id*. at 391-92.) The union's Disciplinary Hearing is moot as the Arbitration Award may be unenforceable in federal court, subject to a determination by this court. (*Adams-Lundy v. A.P.F.A*, 792 F.2d 1368 (5th Cir. 1986)). Neither the Arbitrator, nor APFA, have authority to interpret and enforce 29 U.S.C. § 501.

Plaintiffs contests all facts contained in the Arbitrations Decisions as none of these factual contentions have been, nor can be, substantiated with any evidence.  Defendants' Counsel asserts that the APFA Disciplinary Arbitration is final and binding. (See Doc. 235, PAGEID 5926).

APFA argues Plaintiffs breached their duty for charges and expenses that violated APFA Constitution and Policy. (*22-cv-00343; See* Doc.  134, PAGEID 2660; *22-cv-00430;* Doc. 108-1 PAGEID 3708). This, APFA contends, forms the basis of Defendants' alleged breach of fiduciary duty.  It is not disputed that the Plaintiffs adhered to APFA procedures for submitting and approving all business expenses. (*22-cv-00343; See* Doc. 134, PAGEID 2660; *22-cv-00430;* Doc. 108-1). The TA payments for sick and vacation leave were calculated

`

and made *after* Ross resigned as National President therefore, he no longer held a fiduciary duty after March 1, 2018. (Doc. 239-8, PAGEID 7064: 388).

The "miscalculations" of the end-of-term payouts came on the heels of countless complaints, investigations, and threats to sue APFA leadership by Melissa Chinery if the Ross Administration was not pursued for fraud and embezzlement (App. pp. 117-122).  Between 2018-2019, APFA demanded repayment from the Ross Administration for legitimate business expenses incurred while in office, including furniture and rental car costs. When APFA threatened to sue for an alleged overpayment of the end-of-term payout, Vargas, Martin, and Dunaway acquiesced. Vargas agreed to repay the alleged miscalculation of the end-of-term payouts if the union released him of liability to stop the harassment. (Doc. 239, PAGEID 6992).

### A.  Defendants have no evidence Plaintiffs violated their fiduciary duty.

In *Ray v. Young,* the 5th Circuit Court reviews a union officer's expenses for possible violations of LMRDA § 501.  The *Ray* Court differentiates between those expenses incurred by the union where (1) the union benefits as does the officer who receive an *indirect personal benefit*, and those expenses where (2) the officer receives a *direct personal benefit*, but no benefit is incurred by the union 29 U.S.C. § 501. (*See Ray v. Young,* 753 F.2d 386, 389-90 (5th Cir.1985)).  The 5th Circuit states that "[w]here. . . there is only an indirect personal benefit to a union officer, and the union itself has benefited, authorization by the union need only be technically correct under the rules of union procedure; we will not inquire into its substance." (*Ray v. Young*, 753 F.2d at 391-92).  However, where the union receives no benefit, but the officer receives a direct personal benefit, "the defendant union officer must prove, first, that the funds or property were obtained with the valid authorization of the union after adequate disclosure and, second, that the expenditure was not manifestly unreasonable." (*Ray v. Young*, 753 F.2d at 389-90).

Defendants asserts that "Mr. Vargas breached his duty and failed to manage and expend APFA's money in accordance with its Constitution and Policy Manual. . . Mr. Vargas allegedly breached his duty by purportedly manipulating the formula used to pay others in his administration, resulting in a supposed

unauthorized overpayment to former APFA National President Bob Ross which APFA claims has yet to be recovered, and allegedly incurring over $13,000 in what APFA considers inappropriate credit card charges related to meals. In so doing, APFA alleges that Mr. Ross violated the fiduciary duty provisions of 29 U.S.C. § 501(a)." (*22-cv-00430;* Doc. 108-1, PAGEID 3717).

Defendant asserts that "Mr. Ross breached his duty by, among other things: [1] using the APFA credit card for personal expenses; [2] claiming personal meals as business; [3] expenses for reimbursement; [4] refusing to repay the overpayment of sick leave and vacation pay; and [5] wasting APFA funds to lease an apartment which he had no intention of occupying. In so doing, Mr. Ross violated the fiduciary duty provisions of 29 U.S.C. § 501(a)." (*22-cv-00343; See* Doc. 134, PAGEID 2672).

All expenses or purchases that Defendant, APFA, contend were improper were made, submitted, and approved via APFA procedures. This is an undisputed fact.

Payments under the Ross TA had prior authorization as evidenced by the signatures of the 2018 APFA BOD on the Ross TA and the lack of any reference to APFA policy for calculating payments made thereunder. Furthermore, the use of a daily rate of pay based on W-2 income is *reasonable* to calculate sick and vacation pay. The same calculation method was used to pay out the prior APFA National President, Laura Glading, under a similar agreement signed in 2015.

The TA payments for sick and vacation leave were calculated and made to Ross *after* the TA was signed on or about March of 2018—upon Ross's resignation from office—without Ross's input or influence. Ross no longer owed a duty to the union at this time. Rene Berthelot was a Senior Accountant with APFA who calculated payments made under the Glading Transition Agreement and calculated the payments under the Ross TA. (Doc. 239-6, PAGEID 6964: 286-92). Both Glading and Ross were former National Presidents paid under similar agreements using similar daily rates-of-pay calculations. (Doc. 239-6, PAGEID 6964: 286-92). The "miscalculations" of the Ross TA were subject to Rene Berthelot's oversight and were consistent with his prior experience calculating Glading's exit payments. It was Berthelot that made the calculations of Ross's

`

per diem, and it was Berthelot that created the spreadsheet used to calculate his payouts. (Doc. 239-6, PAGEID 6964:288).

Moreover, APFA procedures require all calculations are made in conjunction with in-house accountants, reviewed and approved by two APFA officers and approved by two additional APFA accounting personnel for accuracy of calculation, budgeting purposes, and issuance of payment. ((Doc. 239-6, PAGEID 6964: 286-92)). Vargas always complied with APFA procedures.  (Doc. 239-3, PAGEID 6817:139-141; 286-92).  Additionally, when APFA asserted there were overpayments to Vargas, Martin and Dunaway, the APFA BOD threatened to sue Vargas for the miscalculation. (Doc. 239-4, PAGEID 6892: 214-16; Doc. 239-4, PAGEID 6965: 286-92). To avoid a dispute, Vargas agreed to repay it, signed a promissory note, and made all payments so that he could avoid being sued and stop the union's harassment because of Chinery's investigations. (Doc. 239-4, PAGEID 6892: 214-16); (Doc. 239-4, PAGEID 6965: 286-92). Importantly, the U.S. Department of Labor conducted its own independent investigation of the alleged overpayments. This investigation cleared the Ross Administration officers of all charges of misappropriation and embezzlement. (Doc. 239-4, PAGEID 6965: 286-92; Doc. 239-8, PAGEID 7064: 286-96).

### 1)   ROSS ADMINISTRATION'S ARBITRATION HEARINGS:
In Vargas' disciplinary hearing, the Confidential Memo was not disclosed.  (Doc. 239-6, PAGEID 6964 :  286-292). Additionally, evidence of APFA harassment and intimidation of witnesses were excluded from the hearing. (Doc. 239-6, PAGEID 6964:286-92; 294-96). The Arbitrator expedited the proceedings with Vargas and his representatives, resulting in a substantial amount of evidence not being submitted.  (App. pp. 539-531). Documents went missing during this arbitration hearing, evidence of the TA could not be introduced, the arbitrator rushed the hearings to catch a flight, disallowed presentation of evidence on key issues like charges, expenses, calculations, etc.  Harris testified that the union did not properly maintain records prior to 2020, and that a substantial number of documents contained in a particular box from 2017 were not produced by the union as they "went missing." (Doc. 239, PAGEID 6933: 255-262). Additionally, the APFA BOD agreed to

release Vargas for the miscalculation if he repaid the amount owed. (Doc. 239-5, PAGEID 6892-6894).

In Ross' disciplinary hearing, the Confidential Memo remained concealed, despite a subpoena issued by the Arbitrator. (Doc. 239-2, PAGEID 6779-6792). Evidence of APFA harassment and intimidation of witnesses remained excluded from the hearing, as did evidence of the TA, evidence of calculations owed thereunder, evidence of negotiations, calculations, previous administration charges, social media posts, evidence of payments made by Ross for furniture, lack of a lease agreement, evidence of a vacation, rental cars, etc.  All never addressed by the Arbitrator not to mention the Arbitrator allowed unreliable hearsay evidence in despite informing Ross it would not be relied upon for the truth of the facts asserted therein. (Doc. 239-2, PAGEID 6779-6792). Harris testified that the union did not properly maintain its records. (Doc. 239-2, PAGEID 6779-6792). Additionally, the charging parties received over nine hours to present their case, while Ross received less than three hours to present his case. (Doc. 239-2, PAGEID 6779-6792).

Furthermore, Ross was unable to call most of his witnesses to testify. (Doc. 239-2, PAGEID 6779-6792). He could not call Eugenio Vargas or Nena Martin as witnesses on his behalf. (Doc. 239-2, PAGEID 6779-6792). He was denied the chance to question and properly cross-examine witnesses like Erik Harris, the National Treasurer, by the Arbitrator. ((Doc. 239-2, PAGEID 6779-6792).

On February 18, 2022, Vargas's Disciplinary Arbitration Award was issued banning him from holding union elected office for life and fining him a total of $30,963.03.  (Doc. 239-7, PAGEID 6987: 309-350). . On March 19, 2021, Ross's Disciplinary Arbitration Award was issued.  (Doc. 239-2, PAGEID 6793: 115-138). Ross was banned from holding union leadership office for life, removed from his current position on the APFA BOD, and fined a total of $62,558.75.  (Doc. 239-2, PAGEID 6793 115-138). It is unprecedented for APFA to ban its members from holding union offices, and, for the first time, a Presidential Hotline was released announcing the resulting Arbitration Awards issued against APFA Members.  (Doc. 239-7, PAGEID 6975 297-301 and 305-308). These penalties appear disproportionate, especially considering the procedural irregularities and potential violation of rights during the Disciplinary Hearing.

`

After the filing of the current matters pending before this court, Nena Martin attended her Disciplinary Arbitration hearing wherein all charges were summarily dismissed for lack of reliable evidence.[4] (Doc. 239, PAGEID 6904-6906).  The arbitration hearings results were inconsistent despite the same evidence leading to the same charges.

### B.   Defendants reported that the union suffered no losses between 2018-2022.

Defendant asserts a breach of fiduciary duty claim wherein there are no damages proximately caused by any alleged breach of Ross's fiduciary duty. The 5th Circuit stated that "[t]he rights adjudicated by the arbitrator were thus not LMRDA rights, but a type of contractual rights provided for union officers in an agreement between the union and its members, the constitution of the APFA.  A union's violation of its own constitution is not per se a violation of the LMRDA, and a federal court has no jurisdiction to enforce union constitutions and by-laws as such." *Adams-Lundy II,* 792 F.2d  at 1373; *Martin v. Loc. 556, Transp. Workers Union of Am.,* 206 F.Supp.3d 1227 (N.D. Tex. 2016).

There are no damages suffered due to a breach of fiduciary duty by Plaintiffs.  Hal O'Neil conducts annual audits of all expenditures made with APFA funds. (Doc. 239-4, PAGEID 6965: 286-92; Doc. 239-8, PAGEID 7064: 286-96).

The final audit report is submitted to the four National Officers, who submit it to the APFA BOD for a final review and approval.  This annual audit is used to draft the LM-2 Report.  (Doc. 239-4, PAGEID 6965: 286-92; Doc. 239-8, PAGEID 7064: 286-96).

. The U.S Department of Labor requires the LM-2 Financial Report to indicate any loss of union assets or funds each year and to date no such report has been made.  (App. pp. 198-506).  The LM-2 Financial

---

[4] In particular, credit card charges and receipts were asserted as Martin's credit card charges.   After verifying the majority of the charges were not, in fact the result of Ms. Martin's charges, but that the charging party believed they were belonged to Martin because her name was written on the receipt, Martin filed a Summary Dismissal.  The Arbitrator dismissed the charges based on a lack of evidence.

Report is signed under penalty of perjury by Hedrick and Harris.

Hal O'Neil's declaration in support Defendants' Motion for Summary Judgment testifies to his intent in drafting the concealed Confidential Memo, which accompanied his "accounting review." (Doc. 236-4, PAGEID 6492-6506). O'Neil's justifies the contradiction—and liability—between his accounting review and attached Confidential Memo by stating that he did not *mean* what he *said* when he wrote:

> "Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick, and accrued an unused vacation time. This agreement doesn't specify that the payments be made in accordance with the policy manual guidelines. Consequently, these payments appear appropriate and in compliance with the transition agreement."

O'Neil testifies that his statement ". . . these payments appear appropriate and in compliance with the transition agreement" *actually meant* that the payments to Ross were incorrect. (Doc. 236-4, PAGEID 6492-93).  There are several holes in this argument.

First, Harris asked O'Neil for a cover letter, allegedly on behalf of the BOD, prior to ever presenting the "accounting reviews" to the BOD on October 28, 2020.  (App. pp. 27-33).  Secondly, O'Neil wrote the letter to the BOD and EC who were not privy to any conversations between O'Neil and Harris.  (Doc. 236-4, PAGEID 6492-93). Therefore, O'Neil's explanation wholly fails to explain why he communicated that Ross was paid *properly*, when he *actually* meant that Ross had been *overpaid*. (Doc. 236-4, PAGEID 6492-6506). This is nonsensical. Third, O'Neil emailed the Confidential Memo to Harris stating to "Please get back to me if this memo looks OK."  (App. pp. 71-94; at 92). There is no evidence anywhere that Harris, or any one of the National Officers, responded to O'Neil's email addressing this discrepancy between O'Neil's Confidential Memo and what the National Officers represented to the union, the Arbitrator, and the Plaintiffs. Rather, the four National Officers, the General Counsel for APFA, and the Outside newly-hired Counsel, William Osborne all failed to object to the language in this letter.  Fourth, and most obviously, the Confidential Memo states the exact opposite of what this alleged newly developed "understanding" was between the two parties.  If O'Neil *meant* that he determined Ross was overpaid, why did he not say this in his Confidential Memo?  If

`

this is what Harris understood the Confidential Memo to say, why did Harris not ask him to rephrase the letter to reflect this?  Additionally, why was the letter not presented to the BOD, EC, Arbitrator Armendariz, Ross or Vargas? Why, instead, was it concealed from all these people?

O'Neil conducts the annual accounting audits used to create the LM-2's submitted to the U.S. Department of Labor. (App. pp. 198-506).  If O'Neil determined Ross *was* overpaid as he contends, then it should be reflected on the LM-2's in accordance with O'Neil's professional audit opinions submitted to APFA that year—and yet it is not.  (App. pp. 198-506).  The LM-2's from 2020-2022 do not list any loss suffered by the union. (App. pp. 198-506). The LM-2s are signed under oath by Hedrick and Harris as true and correct assessment of APFA's financial records, and Woods, Stephens and O'Neil are cited as conducting an audit for the purposes of drafting the LM-2s.  (App. pp. 198-506). Finally, it seems O'Neil's testimony would suggest that this lawsuit is the result of a mere misunderstanding between the parties. Yet O'Neil waits for four years after the date of the Confidential Memo—more than two years after the initial filing of this lawsuit—to set the record straight with testimony that directly conflicts an audit he conducted and sworn testimony submitted by Defendants to the U.S. Department of Labor—based on O'Neil's financial audits.  It is our contention that there are substantial credibility issues with both Harris' and O'Neil's testimony.

### C. Defendants fail to prove the equitable doctrine of laches applies to their breach of fiduciary duty claims.

Defendant's counterclaim under LMRDA § 501 for breach of fiduciary duty counterclaims is legal in nature and therefore governed by the Tex. Civ. Prac. & Rem.Code § 16.004, which applies a four-year statute of limitations to bring claims after the action occurred. *(Stewart v. Int'l Ass'n of Machinists & Aerospace Workers*, 16 F.Supp.3d 783 (S.D. Tex. 2014)).  Defendant has asserted the doctrine of laches as a defense. The U.S. Supreme Court held that proving the doctrine of laches requires "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." (*Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961)). Defendant cannot prevail on its breach

of fiduciary duty as it is unable to present evidence that will establish a doctrine of laches defense.  The claim is time-barred. In assessing the pleadings, the court decided that the doctrine of laches governed whether the claim might be time-barred in its Order Partially Granting Motion to Dismiss Counterclaims.  (Doc. 72). On the pleadings, the court could not reach the conclusion that laches time-barred the claim. Based on the evidence presented with this motion, the court should now determine that the claim is barred by the doctrine of laches as there is no evidence to support this assertion.

Therefore, judgment against Defendant's counterclaim for breach of fiduciary duty is proper as Defendant has no evidence to support the defense of laches.

## V.     ROSS HAS A VALID CLAIM FOR BREACH OF CONTRACT AGAINST APFA.

APFA breached Ross's TA based on the conduct of the National Officers.  Under Texas State Law, the elements of a breach of contract cause of action include (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the Defendant's breach of the contract; and (4) damages from the breach. *(Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex. App. – Beaumont 2003, no pet.)).

### A.  The plain language within the four corners of the Transition Agreement does not incorporate the APFA Constitution and Policy.

The crux of the argument between the Parties stems out of relationships created between the parties from *two* separate and distinct contracts: (1) the APFA Constitution and Policy which governs the relationship between APFA, as a labor union, and its members, and (2) the Ross TA, a resignation agreement negotiated and signed between the APFA governing BOD and Plaintiff, Bob Ross.  Applying the terms from one contract to another without a clear basis or justification can violate the canons of contract interpretation both under federal law and state law. To read the APFA Constitution and Policy into the Ross TA without clear language within the four corners of that document as of the date the Parties entered into the Ross TA is improper under standard canons of contract interpretation. *Danciger Oil & Ref. Co. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941).  When the parties reduced the terms of their agreement to a written instrument, the Texas Courts—

`

and the Federal Courts—give deference to the plain meaning of the parties' intent to those terms contained within the four corners of the document. *Id.* Texas Courts should not, and do not, read additional provisions into the instrument unless this is necessary to effectuate the intent of the parties. *Id.*

A binding arbitration clause effectuates a waiver of one's right to exercise their judicial remedies under a contract. *See also In re Bank of America, N.A.,* 278 S.W.3d 342, 346 (Tex.2009). cannot require Ross to waive his right to a jury trial and enforce an arbitration clause under the law. Additionally, 29 U.S.C. § 411(a)(4) states that "[n]o labor organization shall limit the right of any member thereof to institute an action in any court. . . ." (29 U.S.C.§411(a)(4)). Furthermore 29 U.S.C. §411(b) states that "[a]ny provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect." (29 U.S.C. §411(b)). Therefore, unions cannot force members to waive their right to trial in lieu of a mandatory contractual arbitration clause—whether in the TA or within APFA's Constitution—the arbitration is voluntary. (29 U.S.C. §411(a)(4)). The Union argues that confidentiality and non-disparagement would infringe on union member's rights to free speech under LMRDA §101(a)(2) and LMRDA § 431, however APFA is not allowed to credit report and pass resolutions claiming Ross defrauded the membership—this is not protected by LMRDA 101(a)(2). The members have the right to free speech, not leadership and certainly not APFA. (*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D, slip op. at 21 (N.D. Tex. May 19, 2016). Additionally, the clause voiding the arbitration term for illegality would be severed as the TA contains a term preserving the remaining provisions despite invalidation of a singular term in the contract.

Robert "Bob" Ross (hereinafter referred to as "Ross") and APFA entered the TA on March 1, 2018. (Doc. 239, PAGEID 6679 7-10). Per Texas law a contract for employment does not accrue a cause of action until the final payment is made "[i]f the parties' agreement contemplates a continuing contract for performance, the limitations period does not usually commence until the contract is fully performed.'..." *IDA Eng'g, Inc. v. PBK Architects, Inc.*, No. 05-15-01418-CV (Tex. App. Oct 04, 2016). Final payment was made to Ross in December, 2019 (App. pp. 507). *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988) (citation omitted). *See*

*also Booker v. Real Homes, Inc.*, 103 S.W.3d 487, 492 (Tex.App. — San Antonio 2003, pet. denied) ("[A]ll that is required to commence the running of the limitations period is the discovery of an injury and its general cause, not the exact cause in fact and the specific parties responsible.").  Therefore, Ross brought his claims in a timely manner.  Furthermore, Fed. R. Civ. Proc. §8(c) requires the affirmative defense of statute of limitations to be asserted in Defendants' responsive pleading, which Defendants failed to assert this defense.

ACCRUED AND UNUSED SICK AND VACATION DAYS: Under the terms of the Ross TA, Ross should have received all of his accrued and unused sick and vacation time, from April 1, 2016 through July 31, 2018 and "agreed that Ross will continue to receive from APFA his current full salary and benefits, including full insurance coverage, through July 31, 2018." (Doc. 239-8, PAGEID 7064:386-96; 433-448).  O'Neil states that he determined that Ross was paid the correct number of days under the TA, however according to his calculation Ross was only paid for twelve days of sick leave in 2016 and twelve days of sick leave in 2017. (App. pp. 34-35).  Ross accrued eighteen days of sick leave in 2016 and another eighteen days in 2017 according to documentation produced by Hal O'Neil. (App. pp. 34-35).  Therefore, this statement is inaccurate.

END-OF-TERM PAYOUT PER APFA POLICY: If Ross had been paid with full APFA policy benefits he would have been entitled to (1) an additional payment of five sick days for his end-of-term sick bank pay—payment made to National Officers for the transition period to assist new National Officers into office—and (2) his 2018 Cash Incentive benefit of $1,328.93. (App. pp. 5-26).  O'Neil's accounting review does not demonstrate that Ross received payment for this amount in 2018.  (App. pp. 5-26).

CONFIDENTIALITY AND NON-DISPARAGEMENT CLAUSES: The TA mandates complete confidentiality of the contract terms and prohibits any disparagement of the parties involved, including Ross. (Doc 239, PAGEID 6685-88; App. pp. 6; 577-595).  APFA admits it disclosed the TA to APFA members Melissa Chinery-Burns and Sandra Lee.  (Doc 239-5, PAGEID 6933-40; App. pp. 541-576; 577-595).  APFA claims that the LMRDA requires disclosure of the TA because LMRDA 431(b) and (c) require disclosure of officer's compensation, and its terms to its membership.  However, what Ross was paid under the TA was disclosed

`

in the LM-2s.  The terms of Ross TA did not require disclosure under LMRDA 431(b) and (c) in a separate, only officers' compensation. (*Mallick v. International Broth. of Elec. Workers*, 749 F.2d 771 (D.C. Cir. 1984)) ("[P]olitical opposition to union officials, unaccompanied by any specific concern with transactions summarized on the LM-2 report, does not constitute just cause for rummaging through all the union records"). Another APFA Article VII Arbitration was held on issues of the Ross TA and whether it could be confidential and was valid. (App. pp. App. pp. 541-576; 577-595). The Arbitrator determined that the Ross TA and its confidentiality and non-disparagement provisions of were valid under the APFA Constitution. (App. pp. 541-576; 577-595). APFA Counsel sought review of the Confidential provisions within the TA from the U.S. Department of Labor, and no requirement was imposed to disclose the Ross TA to members.   (App. pp. 541-576; 577-595). Furthermore, deference to a union's internal governing decision as to the internal interpretation and application of its own rules.  *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953); *Carr v. ALPA*, 866 F. 3d 597, 603 (5th Cir. 2017) (the union's interpretation of its constitution is entitled to judicial deference "unless it is patently unreasonable."); *O'Neil v. ALPA*, 939 F. 2d 1199, 1206 (5th Cir. 1991); *Newell v. IBEW*, 789 F.2d 1186, 1189 (5th Cir. 1986).

Rank-and-file union member, Melissa Chinery-Burns, who is married to Joe Burns (General Counsel for AFA and currently "on loan" to APFA as a negotiating attorney), posted the details and a hand-written altered copy of the TA on social media, which is a breach of the TA's confidentiality clause. (App. pp. **508-521**). She then filed Disciplinary Charges against Ross and Vargas based on this TA, and disparaged both Plaintiffs in a savage attack of their characters that bears thousands of pages of public statements, emails, and complaints claiming embezzlement and fraud. (Doc 239, PAGEID  6679-84; Doc 239-1, PAGEID 6720-70;. Doc 239-8, PAGEID 7064-74; App. pp. 55-58; 97-100; 145-147). These attacks continue to this day, causing devastating effects on Ross, who has since been diagnosed with depression and anxiety, and sought help for concerns of self-harm. Regrettably, these facts are not in dispute.

**VI.       PLAINTIFFS BREACH OF UNION CONSTITUTION CLAIMS SUBSTANTIATE VIOLATIONS OF**

**THEIR DUE PROCESS RIGHTS UNDER THE LMRDA.**

The APFA is an independent labor organization representing flight attendants employed by American Airlines under the Railway Labor Act.  Defendants corrected the record from their previous position that Plaintiffs' claim for Breach of a Union Constitution, as a collective bargaining agreement, falls within the scope of 301a of the LMRA as a breach of a contract between labor organizations and the officers are exempt thereunder per 29 LMRA § 185 in Footnote 25 of their Motion. (Doc. 235). APFA's previous position led this Court to enter an order in error finding that the APFA Constitution is a contract between two labor organizations—a factual inaccuracy. (Doc. 235; PAGEID 5926-27).[5]  APFA's Constitution is a contract between the union and its membership, and this is one of the facts Defendants counsel corrects on record from prior counsel's misrepresentations by conceding that state law applies to a breach of APFA's Constitution.  (Doc. 236, PAGEID 5893).  Defendants' breach of APFA's Constitution forms the basis for Plaintiffs' violations of the LMRDA as the LMRDA requires unions to follow their own rules. Plaintiffs does not assert a 301a claim, and federally protected rights to exemption for a union officer's conduct under 29 LMRA § 185 does not apply to APFA union officers under the Railway Labor Act—*this* is the reason Plaintiffs did not assert the affirmative defense—it was neither honest nor accurate and a violation of the Texas R. of Ethics 3.03.

Defendants argue Plaintiffs have not exhausted their internal remedies on the one hand and maintain that their disciplinary award is "final and binding."  Plaintiffs argue the disciplinary award is based on egregious violations of the APFA Constitution and Policy and thereby a violation of the LMRDA.  Either Defendants can

---

[5] "Section 301(a) states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in the Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). . . . The § 301 issue is stated as follows by both petitioner and respondents: 'Does section 301 of the Labor-Management Relations Act create a federal cause of action under which a union member may sue his union for a violation of the union constitution?' As the text makes clear, the answer to that question is in the affirmative but only if it is charged that the breach alleged violates a contract between two labor organizations." *Wooddell v. International Brotherhood of Electrical Workers, Local 71*, 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991).

`

assert that their Disciplinary Arbitration is "final and binding" and there is no means to appeal, which means Plaintiffs exhausted their internal remedies—or they can provide Plaintiffs a remedy for such an overt manipulation of the APFA Constitution.  Plaintiffs pursued their claims precisely because they had exhausted their internal remedies.   Plaintiffs offered to re-arbitrate these issues at the Settlement Conference— Defendants filed a Settlement Conference update stating that federal law requires Plaintiffs to pursue these claims.  (22—00430; Vargas v. APFA, Doc. 81).

## VII.   PLAINTIFFS ASSERT VALID CLAIMS UNDER LMRDA §§ 411(A)(2), 411(A)(5), AND 529 AGAINST APFA.

The LMRDA protects union member's right to §§411(a)(2) free speech and assembly; 411(a)(5) due process and notice; and 529 against improper disciplinary actions and retaliation. (29 U.S.C. §§ 411(a)(2), (a)(5); and 529).   A member may pursue a violation of either the individual rights or any wrongful discipline upon exercising those rights protected by the Act.  (29 U.S.C. § 529).

### A.   29 U.S.C. § 529 Retaliation or Otherwise Disciplined:

§529 and §412 both provide a claim to a member based on an unlawful restriction on their membership rights, however §529 is the proper claim to bring when the punishment is imposed in retaliation for exercising a protected right. (*Martin v. Loc. 556,* 3:14-CV-0500-D, (N.D. Tex. Sep. 3, 2014)). Additionally, the *Martin* Case held that this Court will ". . . assume that a ban against running for union office is a form of discipline that is actionable under § 411(a)(5). (*Id.)* (citing *Adams-Lundy I v. APFA*, 731 F.2d 1154, 1156).

Plaintiffs were fined, removed from office, and banned from holding union elected positions for life by APFA. (App. pp. 95-96; 97-100).  As stated in *Martin*, a complete ban on a member's right to run for elected positions within the union falls within the scope of §529 discipline requiring the union to comport with due process requirements under §101(a)(5).

The APFA Constitution Art. VII, Sec. 2B states:

The National Secretary shall cause a copy of the charges to be served upon the accused and the accuser within

seven (7) days following receipt of the charges. Such notification shall be by registered mail, return receipt requested
to their last known addresses, and shall furnish the accused and the accuser a description of all relevant procedures.
(Def. MSJ App. pp. 30-31).

APFA admits that it removed Ross from his elected position on the BOD.  APFA also admits that

Plaintiffs have been banned from ever running for office.  APFA failed to give Plaintiffs' proper notice of the

original charges filed against them as provided under APFA's Constitution as seen in the summary judgment

evidence filed and attached to Defendants' Motion marked as Tab 1 the Black Affidavit:

- Exhibit C – Original Ross Charges filed on November 18, 2020;
- Exhibit D – Original Vargas Charges filed on November 20, 2020;
- Exhibit E – Notice of the Original Ross charges dated November 19, 2020 without any attachments included;
- Exhibit F – "Amended" Ross Charges filed on November 24, 2020;
- Exhibit G – "Amended" Vargas Charges filed on November 24, 2020;
- Exhibit H – Notice of "Amended" Ross Charges filed on November 24, 2020;
- Exhibit I – Notice of "Amended" Vargas Charges filed on November 24, 2020;
- Exhibit J – Executive Committee Votes on Original Ross Charges filed on November 18, 2020 as valid, specific, and timely.
- Exhibit K - Executive Committee Votes on Original Vargas filed on November 20, 2020 as valid, specific, and timely.  (Doc.236-1; PAGEID 5948-55).

In Plaintiffs' Motion for Summary Judgment, Ross included a copy of the notice of charges he received

for the November 18, 2020, and he only received the first page of charges filed against him.  (239-2 PAGEID

6775-6776, App. pp. 97-98)

### B.  LMRDA: Due Process Violation and Breach of Union Constitution:

The LMRDA "is not meant as a vehicle for judicial oversight of union activity, but only as a means of

addressing unreasonable and arbitrary actions by union officials. The federal courts do not sit as a `super-

review' board of internal union grievances *unless there is evidence of impropriety in the proceedings.*"

(emphasis added) (*Hoffman v. Kramer*, 362 F.3d 308, 316 (5th Cir. 2004) (quoting *United Food & Com.*

*Workers Int'l Union Loc. 911 v. United Food $ Com. Workers Int'l*, 301 F.3d 468, 475 (6th Cir.2002)).

"Not all of the due process protections available in the federal courts apply to union disciplinary

proceedings. . . . [a] violation of a procedural provision of a union's constitution is actionable only if the violation

deprived the party of a full and fair hearing under the LMRDA." *Martin v.  Loc. 556, Transp. Workers Union of*

*Am.*, No. 3:14-CV-0500-D (N.D. Tex. May 19, 2016) (quoting *Int'l Bhd of Teamsters*, 247 F.3d at 385, 387).

`

Additionally, "[t]he LMRDA [§ 411 (a)(5)] gives plaintiffs *the right to present evidence and to cross-examine*

*witnesses*. . . .'" (emphasis added) *Martin v.  Loc. 556, Transp. Workers Union of Am*., No. 3:14-CV-0500-D

(N.D. Tex. Sep. 3, 2014 (quoting *Frye v. United Steelworkers,* 767 F.2d 1216, 1224 (7th Cir. 1985).  Therefore,

a claim under §411(a)(5), Plaintiffs must show that APFA's conduct either (1) violated the APFA Constitution

or Policy which resulted in Plaintiffs' loss of a full and fair hearing; or (2) infringed on Plaintiffs' right to present

evidence or cross-examine witnesses.

    1)   <u>APFA CONSTITUTION AND POLICY: ARTICLE VII DISCIPLINARY ARBITRATION</u>
<u>PROVISIONS HAVE BEEN VIOLATED.</u>

Article II of the APFA Constitution grants members a Bill of Rights.  The applicable section states:

**Section 3. BILL OF RIGHTS OF MEMBERS:**

A.       All members of the APFA shall have the right of free speech, freedom of assembly and freedom to
dissent.

**B.**       **All members of the APFA shall have access to all administrative and financial reports and
records except as provided in Section 5.B(1) of this Article II [inactive members].**

C.       All members of the APFA shall have the right to individual privacy.

D.       All members of the APFA shall have the right to due process and equal representation.  (APFA Const.
Art. II, Sec. 3 *et. seq.*). (Doc. 236-1, PAGEID 5961)

All APFA union members are entitled to financial reports and records if you are an active member of

the union.  Article VII of the APFA Constitution provides for disciplinary proceedings to be taken if a member

commits a defined stipulated violation of the APFA Constitution and Policy or violates the law.  Not turning

over the Confidential Memo violated APFA Constitution, Art. II, Section 3(B).

APFA Policy Manual, Section 17 entitled "Article VII Administrative Policies and Procedures" more

particularly defines the Article VII Disciplinary Hearing proceedings and provides that:

K.       **ORDER OF PROCEEDINGS**
    2.       The Arbitrator shall afford each party a full opportunity for the presentation of relevant proof.
           (APFA Policy, Sec. 17K).
N.       **EVIDENCE**
    1.       The parties may offer such evidence as they desire and shall produce such additional
           evidence as the Arbitrator may deem necessary to an understanding and determination of the
           dispute.  (APFA Policy, Sec. 17N). (Doc. 236-1, PAGEID 6011-6012).

Plaintiffs' rights to due process under LMRDA § 101(a)(5) were violated because they were deprived

of their rights to receive, request, or inspect all relevant documents and financial reports and records as

required by APFA's Constitution. "[T]he fundamental due process rights guaranteed under the LMRDA include: (1) the existence of "some evidence" to support the charges made, (2) an impartial tribunal, (3) an opportunity to confront pertinent witnesses, and (4) an opportunity to present evidence. . . ." (*International Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 246, 91 S.Ct. 609, 617, 28 L.E d.2d 10 (1971). Plaintiffs were denied the right to present the evidence they desired under APFA Policy Section 17 (N) (1).

2) <u>DEFENDANTS ALTERED EVIDENCE BY WITHHOLDING PARTS OF AN ACCOUNTING DOCUMENT THAT REFUTED DEFENDANT'S DISCIPLINARY ACCUSATIONS.</u>

To be subject to a disciplinary proceeding, there must be "some evidence" to support charges that would subject a person to discipline and satisfy the due process requirements under LMRDA § 411(a)(5). Court review of the disciplinary arbitration is appropriate here because "***there is evidence of impropriety in the proceedings.***" (*Martin v. Loc. 556,* No. 3:14-CV-0500-D (N.D. Tex. Sep. 3, 2014). Plaintiffs do not ask the court to act as a "'super-review' board of internal union disciplinary hearings." (*Ibid.*).

In the present case, documents were sought out and presented citing that they were from a state-licensed CPA. But those documents were tainted because they were not accompanied by the Confidential Memo, which disavowed the assertion. The Confidential Memo was never presented to the APFA BOD or the APFA Executive Committee, or the APFA Article VII Arbitrator, or initial to McGaughey Reber & Associates, Inc. d/b/a Diversified Credit Systems ("Diversified Credit") (Doc. 239, PAGEID 6820-23; Doc. 239-3, PAGEID 6863-6891; Doc. 239-5; PAGEID 6895--6903). Removing the Confidential Memo from the original document delivered by the CPA and citing his credentials as a CPA constitutes to fraudulent misrepresentation made to the governing bodies of the union charged with review and oversight of the union's disciplinary proceedings. (Doc. 239-5; PAGEID 6895--6903). Only valid, timely, and specific disciplinary charges should proceed to arbitration hearings. However, the concealment of the Confidential Memo compromised the due process of the Executive Committee's review and vote on whether the disciplinary charges met APFA Constitutional standards. Furthermore, the submission of fraudulent misrepresentations during the discovery process and

`

hearing deprived the Plaintiffs, including Mr. Ross, of their right to inspect the documents, question witnesses, and properly mount a defense based on the evidence.   It is a clear violation of the APFA Constitutional provision Art. II, Sec. 3B which grants all active members the right to all financial reports and records.

Referencing the "accounting review" while concealing the Confidential Memo is an attempt to mislead the audience in order to make them believe it is an audit—the Arbitrator had notice of this accounting audit from the evidence submitted before him as well.  (Doc. 239, PAGEID 6793-6816). There is also evidence that the National Officers referred to the accounting review as an "audit" rather than an "accounting review" which would constitute a material misrepresentation of the nature of the documents and the underline determinations by Hal O'Neil. (App. pp.71-94). Presenting the miscalculations to the union's governing body, while withholding the Confidential Memo which explains the distinction from the licensed and certified public accountant who issued the calculations and opinion is misleading. (App. pp. 71-94; Doc. 239-5; PAGEID 6895--6903). The union argues it was not a party to the Disciplinary hearing, however it conducted the disciplinary proceedings. The evidence was controlled by, presented by, testified to, and delivered by the APFA National Officers.  The National Officers produced a substantial number of documents the day before Vargas's Disciplinary hearing, and the day of the Ross hearing in violation of APFA's Policy requiring documents to be submitted 30 days prior to the date for the hearing and that "The exchange of documents and witness lists shall be coordinated through the Office of the National Secretary." (Doc. 236-1; PAGEID 6011; 236-1; PAGEID 6013). App. pp. 156-197) The APFA National Officers requested the accounting review, concealed the Confidential Memo, presented the accounting review as an "audit" at the October 2020 BOD meeting, and voted in favor of sending Plaintiffs to Article VII hearings at the December 1, 2020 Executive Committee meeting. (App. pp. 1-33; 71-94; 103-116; 117-122;). In light of these facts, it is easy to see how APFA influenced the Article VII Arbitration process to achieve this skewed Arbitration Award. APFA was not a neutral party to this proceeding.

### 3)   PLAINTIFFS WERE DEPRIVED OF PROPORTIONATE TIME.
Ross received only 2 hours and 51 minutes to present his evidence and witnesses, whereas the

charging party received 9 hours and 23 minutes.  (Doc. 239-2, PAGEID 6779-97). The disparity is clear. Mr. Ross was not given an adequate opportunity to present evidence or properly cross-examine witnesses. (Doc. 239-2, PAGEID 6779-97).

    4)  <u>PLAINTIFFS WERE PREVENTED FROM PRESENTING EVIDENCE AND FROM CROSS-EXAMINING WITNESSES.</u>

Ross was only able to admit eleven exhibits into evidence during his Arbitration whereas Chinery-Burns was able to enter forty-eight exhibits into record, all over Ross's objection to hearsay.  Vargas was unable to present evidence from witnesses that were intimidated and harassed by the union.  Both Plaintiffs were denied the opportunity to properly present their case as the Arbitrator rushed both Ross and Vargas through the presentation of their evidence, examination of their witness, to a conclusion so he could make a flight he had scheduled.  (App. pp. 529-531; ).  Additionally, since relevant documents were withheld, Plaintiffs were not able to properly cross-examine their witnesses. (Doc. 239, PAGEID 6933-6970; 7064-7074; App. 529-531; 600-602). Harris testified that Ross owed the overpayment under the TA without disclosing anything about the Confidential Memo from the O'Neil accounting firm he and the National Officers received over a year before testifying in both Vargas's and Ross's hearings.  (Doc. 239, PAGEID 6933-6970; 7064-7074; App. 529-531; 600-602).

Most importantly, neither Mr. Ross nor Mr. Vargas could introduce evidence related to Mr. Ross's TA. (Doc. 239, PAGEID 6933-6970; 7064-7074; App.  529-531; 600-602). This is strange considering the only charge that met the timeliness standard under APFA's Const. Art. VII Sec. 2D was an alleged overpayment made by Vargas to Ross based on the terms of Ross's TA. (Doc. 239, PAGEID 6933-6970; 7064-7074; App. 529-531; 600-602).

Mr. Vargas was also not allowed to present evidence regarding Mr. Ross's TA. (Doc. 239, PAGEID 6933-6970; 7064-7074; App.  529-531; 600-602). This seems counterintuitive considering the only timely charges brought against Vargas and Ross were the improper calculation of the per diem for payment to Ross

`

under the TA.[6]  Discussion relating to the TA contract was strictly prohibited from his Arbitration, or anything

related to Ross's overpayment.   The overpayment allegedly owed under the TA formed the only charge that

was filed timely per APFA Const. Art. VII, Sec. 2 D (1) ". . .within sixty (60) days after the accuser becomes

aware, or reasonably should have become aware, of the alleged offense." (Doc. 236-1, PAGEID 5978).

Finally, Mr. Ross was found guilty regarding the overpayment of these wages, and his refusal to pay

it as indicated in the Arbitration Award. (Doc. 239, PAGEID 6933-6970; 7064-7074; App.  529-531; 600-602).

Vargas was found guilty of paying Ross under his TA. (Doc. 239, PAGEID 6933-6970; 7064-7074; App.  529-

531; 600-602).. Whereas a cover letter from the APFA accounting firm was concealed, which absolved Ross

and Vargas of making overpayments under the Ross TA.  ("Confidential Memo"). The Confidential Memo was

intended for APFA leadership to review.  ((Doc. 239, PAGEID 6933-6970; 7064-7074; App.  529-531; 600-

602). Additionally, Ross was not provided any opportunity to introduce or discuss his TA at his Arbitration

hearing whatsoever, and yet the Arbitration Award rendered him guilty on those issues related to the Ross

TA. (Doc. 239, PAGEID 6933-6970; 7064-7074; App.  529-531; 600-602).

Evidence and testimony indicate that the union's records are not properly maintained. (Doc. 239-6,

PAGEID 6948; 239-8, PAGEID 7063; App. pp. 156-197). Harris admitted to the loss of an entire box of relevant

documents and receipts from 2017 that misplaced by the union. (Doc. 239-8, PAGEID 7063 App. pp. 156-

197). However, the majority of the documents admitted into record and taken under review to render the

Arbitration Award were from these same business records, which could potentially be considered unreliable

hearsay documents. (Doc. 239-6, PAGEID 6948; 239-8, PAGEID 7063; App. pp. 156-197).  In both Ross's

and Vargas's Arbitrations, the union deprived the charged parties, the arbitrator, the BOD and the EC the

---

[6] The Court should note the important dates: **Aug. 3, 2020**: Email from Hedrick to Ross: disclosure of Transition Agreement to members; **Sept. 24, 2020:** deadline for the O'Neil Accounting Review; **Sept. 24, 2020:** Chinery and Lee visited and viewed the O'Neil Accounting Review; **Oct. 28, 2020**: the Annual BOD meeting - Resolutions 11, 12, 13, 15 were discussed but postponed for a vote – proposed changes for National Officers moving expenses, credit card policies, rental cars, mileage, furniture, apartment leases – those items Chinery charges Ross for violations; **Nov. 10, 2020 and Nov.24, 2020**: APFA demand for repayment from Ross; **Nov. 18, 2020 and Nov. 20, 2020:** Chinery files Article VII charges on Ross and Vargas respectively; **Dec. 1, 2020:** EC Annual Meeting – vote to send Chinery v. Ross and Chinery v. Vargas to Arbitration.

proper opportunity to access and to review those documents. (Doc. 239, PAGEID 6820-6824; 6863-6891; 6895-6909). The four National Officers received the Confidential Memo on October 22, 2020, which states that the payments made under the Ross TA appear proper and in compliance with its terms. (Doc. 239, PAGEID 6820-6824; 6863-6891; 6895-6909). However, the four National Officers were present at the BOD meeting and presented documents about Ross's alleged overpayment owed to APFA and at the December 1, 2020 EC meeting and voted on whether the charges met APFA Constitutional requirements. (Doc. 239, PAGEID 6820-6824; 6863-6891; 6895-6909).  The National Officers were subpoenaed in both Ross' and Vargas' Arbitration hearings, produced all of the documents submitted at the hearing, were the only party allowed to communicate with the Arbitrator, verified all of the documents, Harris testified at both, Black testified at the Vargas' hearing, APFA's counsel submitted amicus briefs against all three of the Ross Administration's Arbitration Hearings. (Doc. 239, PAGEID 6820-6824; 6863-6891; 6895-6909).

Finally, there were multiple witnesses both Plaintiffs served with a subpoena to testify at their respective Arbitration hearings, not limited to but including Julie Hedrick and Josh Black, who simply never attended, and thus the Plaintiffs were not afforded an opportunity to question these witnesses. (Doc. 239, PAGEID 6820-6824; 6863-6891; 6895-6909). This potentially infringes on Plaintiff's right to present oral testimony, may violate the APFA constitution, and could conflict with the rule this court established in the *Martin v. TWU* case.  (*Martin v. Loc. 556, Transp. Workers Union of Am.*, No. 3:14-CV-0500-D, slip op. at 21 (N.D. Tex. May 19, 2016).

### C.  Plaintiffs' Rights Under the LMRDA of Free Speech were Violated.

"Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions. . . ."  (29 U.S.C. § 411(a)(2)).  "The primary difference between § 529 and § 412 is that § 529 protects against retaliation for the exercise of any right secured under the LMRDA, whereas § 412 only protects rights secured under §§ 411-15."  (*Martin v. Loc. 556, Transp. Workers Union of Am., AFL-CIO*, Dist. Court, (ND Texas 2016  May 19 2016)) (quoting *United*

`

*Steel Workers Loc. 12-369 v. United Steel Workers Int'l,* 728 F.3d 1107, 1115 (9th Cir. 2013)).

In *Martin v. TWU,*

> "If a plaintiff can show that the removal from [union] office 'was part of a scheme to subvert the union's basic democratic structure or otherwise directly implicated rights of members,' the plaintiff can prevail on a claim for relief as an officer under § 412. (*Martin v. Loc. 556, Transp. Workers Union of Am.,* No. 3:14-CV-0500-D, slip op. at 13 (N.D. Tex. Sep. 3, 2016)). (quoting *Adams-Lundy v. Ass'n of Prof'l Flight Attendants,* 731 F.2d 1154, 1156 (5th Cir. 1984)).

If the court decides Plaintiffs plead sufficient facts to reasonably infer that APFA disciplined Plaintiffs for exercising his rights to free speech as members rather than as officers, or that Ross's dismissal from the APFA BOD was part of a pattern of intimidation and stifled dissent, then Plaintiffs shall prevail.

The Ross Administration expressed opposition to an affiliation or merger with AFA upon taking office. (Doc. 239-6, PAGEID 6964 pp. 286-292; 293; 386-96; 409; 412-423). Since, leaving office, Ross has openly and vocally opposed an APFA/AFA merger while in office as National President, Vargas and Martin both supported Ross's position on this matter. (Doc. 239-6, PAGEID 6964 pp. 286-292; 293; 386-96; 409; 412-423). Ross maintains a membership on a social media group page called "AFA No Way, We Are APFA!" where he regularly comments against actions of APFA leadership that seek a merger of the two unions. (Doc. (Doc. 239-6, PAGEID 6964 pp. 286-292; 293; 386-96; 409; 412-423). The evidence illustrates the Ross Administration opposed any possible AFA/APFA merger. (Doc. 239-6, PAGEID 6964 pp. 286-292; 293; 386-96; 409; 412-423). Ross regularly speaks of his opposition to the LUS political faction, both on and off the BOD seat. Doc. 239-8, PAGEID 7064 pp. 386-96; 409; 412-423).  He often opposed LUS candidates for office due to their support of a merger between the two unions. Doc. 239-8, PAGEID 7064 pp. 386-96; 409; 412-423).  A pattern of intimidation and harassment from APFA leadership continues to stifle free speech and free association of the APFA membership.

Defendants' argue that the "but-for" test should apply, however this jurisdiction has not adopted this rule, and it disregards retaliation claims for free speech and association, and removal of officers from office based on free speech and association rights.  This test should not apply to the application of LMRDA

§411(a)(2).

29 U.S.C. § 411(a)(2) protects a union member's right to free speech and association.  Defendant, APFA, violated LMRDA § 411(a)(2) by seeking disciplinary charges, achieving an award that sought his removal from the APFA BOD, ban him for life from holding union office, and levying fines. There is a pattern of intimidation and stifled dissent within the union.

### 5)   FACTS SHOWING DEFENDANTS STIFLED FREE SPEECH

The facts evidencing these issues are laid out specifically in Plaintiff's Motion for Summary Judgment and detailed therein. (Doc. 239, PAGEID 6964-6897; 7064-7102; App. pp. 522-528).The details include a barrage of email demands from Chinery to APFA leaders to pursue the Ross Administration for embezzlement and theft (App. pp. 140-147; 117-122; 577-595); release of financial records by APFA for various supporters of the Ross Administration (App. pp. 140-147; 117-122; 577-595); release of people's private social security numbers and private financial information (App. pp. 537-540); APFA passed Resolutions that claim Ross "defrauded" APFA members (App. pp. 97-100; 140-147; 117-122; 577-595); and prohibit participation in a lawsuit filed against the union in violation of the LMRDA § 411(a)(4) (App. pp. 123-124); Cease and Desist letters sent to members that speak out against Joe Burns, General Counsel for AFA (App. pp. 125-139), threats of lawsuit and social media attacks by various unknown APFA members (App. pp. 577-595), anonymous complaints submitted to AA human resources (Doc. 239, PAGEID 7064-7073; App. pp. . 97-100; 140-147; 117-122; 577-595).

The pattern of abuse, harassment, intimidation, and continued threats are undeniable.  It is an atmosphere of chaos and fear designed to create distrust and internal conflict by those who vocalize opposition to the current leadership. The purpose, and more importantly, the effect on the APFA members is a culture of suppression to achieve the silent obedience by LAA flight attendants that would otherwise dissent to the LUS platform.  APFA members that speak out publicly become the victim of anonymous reports made against them to AA human resources, receive threats of legal action, disciplinary charges from their union,

`

or financial audits of their past union-related expenses.  This conduct is not exhaustive, but evidentiary of a growing pattern of behavior by the union intended to silence its opposition and control the rhetoric within the union.   The looming threat hangs in the air—whoever speaks out next may become the next "Bob Ross."

**VIII.        PLAINTIFFS CAN SUBSTANTIATE CLAIMS FOR COMMON LAW FRAUD AND DEFAMATION**

                1)   <u>VARGAS IS ENTITLED TO RECOVER FOR COMMON LAW FRAUD FROM APFA, JULIE HEDRICK, AND ERIK HARRIS ARE JOINTLY AND SEVERALLY.</u>

"Under Texas law, a plaintiff must establish six elements to prove actionable common law fraud: (1) the making of a material representation; (2) that was false; (3) that, when the speaker made it, the speaker knew was false or made it recklessly without knowledge of its truth and as a positive assertion; (4) that the speaker made it with the intent that it should be acted on by the other party; (5) that the other party acted in reliance on it; and, (6) that the other party suffered injury thereby."  (*Boggan v. Data Systems Network Corp.*, 969 F.2d 149-153 (5th Cir. 1992) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983)).

"Under **Texas** law, an agent is someone authorized by a person or entity to transact business or manage some affair for that person or entity." *Tex. Soil Recycling, Inc. v. Intercargo Ins. Co.*, 273 F. 3d 644, 650 (5th Cir. 2001).

        Vargas asserted the elements of fraud in his original petition filed against APFA, Hedrick and Harris. APFA, Harris and Hedrick acting as authorized agents on behalf of APFA, materially misrepresented the facts surrounding Ross's TA. (Doc, 239, PAGEID 6679-6700; App. p. 1-33). Harris and Hedrick alleged Vargas overpaid Ross because Vargas' admitted that he approved miscalculations from APFA Senior Accountant, Rene Berthelot, for the end-of-term payouts. (App. pp. 101-102). Misrepresentations were made by the National 01-Officers are outlined in a letter from Erik Harris dated November 24, 2020 to Ross in which Harris states:

        I am sending this letter to follow-up on our telephone conversation on November 10, 2020.  During our call, we discussed the finding of the APFA Board of Directors that you were overpaid in the amount of $5,436.47 in 2018.  The Board's finding was based on the results of a review from an independent accounting firm which determined that the formula used to determine the daily rate for your sick and vacation payout was incorrect.. (Doc. 239, PAGEID 6689).

This letter confirms statements made to the APFA BOD, the APFA EC, to the Plaintiffs, to the Article VII Arbitrator, and to Diversified by the APFA National Treasurer Erik Harris and APFA National President Julie Hedrick on behalf of the union and individually. (App. pp. 103-116). The October 28, 2020 BOD meeting minutes confirm this fact as it highlights the reliable on an "audit" by an independent auditor.  (App. pp. 71-94; 103-116;).  Furthermore, Martin attached an email in which the APFA General Counsel drafts a proposed email to Chinery confirming that the APFA BOD held no "finding" at the October 28, 2020 meeting—in direct contradiction to the November 24, 2020 letter.  (App. pp. 117-122.  This misrepresentation was echoed in the Verification of Debt letter from Diversified Credit—proving that these statements were made to Diversified Credit.  (Doc. 239, PAGEID 6679 ). This misrepresentation is even reflected in the Ross Arbitration Decision showing this misrepresentation was made to the Arbitrator Armendariz—who rendered decisions on Ross and Vargas's Arbitration Awards. (Doc 239-2, PAGEID 6793); (Doc 239-7, PAGEID 6989 Vargas decision Ross decision). Despite Hal O'Neil's rather confusing testimony in Defendants' Summary Judgment Motion—the misrepresentation that the "overpayment" was made and owed under the TA, was the result of an audit, and that the APFA BOD held a "finding" are substantially clear.  There is no resolution on record, no reflection of a quorum having been met, per APFA Constitution and Policy, no clear record or meeting minutes showing the BOD ever made this decision that Ross owed this money, as compared to the BOD Resolution from 2019. (App. pp. 101-102, 117-122).

The Confidential Memo proves that APFA, Harris and Hedrick acting as its authorized agents on its behalf, had notice on October 22, 2020 that the overpayment debt was not valid. (App. pp.101-116). The Confidential Memo states that the payments to Ross appear proper and in compliance with his Transition Agreement.  Furthermore, Harris represented the "accounting review" as an audit, claimed the BOD had a "finding" that Ross owed the overpayment to APFA, and concealed the Confidential Memo despite Ross's request to review the documents from the independent auditor.  (Doc 239, PAGEID 117-122;  Ross Aff emails to Erik; App. pp. 117-122).

`

The Confidential Memo specifically defines the review as not expressing any form of an opinion about the per diem calculation, and that the payments made to Ross "***appear appropriate and in compliance with the transition agreement.***" (App. pp. 103-116). Therefore, Harris, Hedrick, and APFA misrepresented the accounting firm's conclusions that Ross was overpaid.  Harris stated that the BOD had a "finding," whereas the APFA BOD never held any formal finding nor had any formal vote.  (App. pp. 117-122).  Misrepresentations were made to the APFA BOD on October 28, 2020 Doc. 239-5, PAGEID 6895-903 pp. 217-25)), to Ross in a telephone conversation on November 10, 2020 (App. pp. 103-116), then to Ross in writing on November 24, 2020 (App. pp. 103-116), again to the APFA BOD in an email on November 25, 2020(Doc. 239-5, PAGEID 6895-903), and to the APFA EC to vote on the Article VII disciplinary charges against Ross and Vargas on December 1, 2020, by Harris and Hedrick to Ross via telephone calls during January of 2021 (App. pp. 103-116) and at the Article VII hearings against Ross and Vargas. (App. pp. 103-116).

Harris, Hedrick, all APFA National Officers, and APFA's Counsel were in receipt of the Confidential Memo on October 22, 2020. (App. pp. 103-116).  When Nena Martin subpoenaed a copy of all emails disseminating th Confidential Memo, Harris re-sent the original email from O'Neil to the National Officers and in-house counsel on April 20, 2022 to create an email that displayed a different date in which the National Officers had notice of the Confidential Memo. (App. 103-116).  This illustrates Harris's attempt to conceal evidence that the National Officers had notice of the Confidential Memo prior to these misrepresentations being made.

When Vargas was told that APFA's outside accountant, Hal O'Neil, determined Ross was overpaid under the TA, he believed this misrepresentation to his detriment. (App. pp. 1-33; 103-116). Hal O'Neil is a licensed independent accountant. Vargas worked with him as the prior National Treasurer—he was a trusted accountant to their union.  In 2019, Vargas met at O'Neil's office, along with Martin and Dunaway, to review an audit of their 2018 exit payments.  (App. pp. 1-33; 103-116). At this meeting, O'Neil could not adequately explain the calculation for the overpayments, but told Vargas, Martin and Dunaway to repay the overpayment

to APFA. Thereafter, APFA counsel met with Vargas and the Board of Directors in 2019.  The APFA BOD threatened to sue Vargas for overpayment unless he repaid the overpayment to APFA, however if he agreed to repay the monies owed, APFA agreed to release Vargas from liability for his actions. Vargas acquiesced to stop the continued harassment.

When Vargas was informed that an independent accounting firm had determined Ross was overpaid, he reasonably believed this assertion, given his previous experience in 2019 with Hal O'Neil's firm and the APFA Board of Director's demand for repayment from him, Martin and Dunaway (App. pp. 1-33; 103-116)). Vargas believed the misrepresentation and did not seek to verify the matter with the accountant, or the APFA BOD. This was because APFA had previously pursued the three other Ross Administration officers, thus it seemed plausible that the accountant could determine that an incorrect formula was used to pay Ross. Vargas accepted this misrepresentation. Consequently, Vargas did not seek additional evidence of overpayment, nor introduce evidence to contradict the calculations used in his disciplinary hearing.  He accepted the assertion that Ross owed an overpayment under the Transition Agreement.

This was precisely the reason that APFA, Harris, and Hedrick used the 2019 formula change to pursue Ross for disciplinary charges. (App. pp. 1-33; 103-116).  The misrepresentation was put forth precisely because Vargas admitted that he approved the payments Berthelot miscalculated using a change in the per diem from base pay to taxable income. Therefore, it was an easy misrepresentation to pursue to induce conformity with the Article VII Arbitration process, so that APFA and the National Officers could discipline Vargas first for changing the formula and Ross for not paying the debt back—the plan was to ban Ross for life because he posed the greatest risk if he ran for National President—he won by over 70% in 2016.  They got Vargas to get to Ross.

1)      ROSS IS ENTITLED TO RECOVER FOR DEFAMATION AGAINST APFA, JULIE HEDRICK, AND ERIK HARRIS, JOINTLY AND SEVERALLY.

"The elements of a defamation claim under Texas law for a private figure are 'that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting negligently with regard

`

to the truth of the statement.'" *Shaunfield v. MB Fin. Bank, N.A.*, Civil Action No. 3:15-CV-0856-L, 8 (N.D. Tex.

Feb 17, 2016) (quoting *Nasti v. CIBA Specialty Chems. Corp.,* 492 F.3d 589, 596 (5th Cir. 2007).   "A

defamatory statement is one in which the words tend to damage a person's reputation, exposing him or her to

public hatred, contempt, ridicule, or financial injury." *Id*. at 8 (quoting *Encompass Office Solutions, Inc. v.

Ingenix, Inc.*, 775 F. Supp. 2d 938, 958 (E.D. Tex. 2011). When defamation is asserted in the context of

furnishing information to a credit report, i.e. defamation of credit, typically malice or willful intent will overcome

any defense of preemption asserted. *Morris v. Equifax Info. Servs., LLC, 457 F.3d 460, 470-71* (5th Cir. 2006)

(citing 15 U.S.C. § 1681h(e)).

Harris published misrepresentations claiming that Ross owed APFA due to an overpayment under

the TA.  In particular, the overpayment debt was assigned to Diversified Credit who published it to his credit

report. (App. pp. 1-33; 103-116). Harris and Hedrick misrepresented the nature of O'Neil's accounting review

as an "audit" and despite the Confidential Memo which clearly states the opposite.  In particular, Defendants

called and spoked with Ross multiple times regarding the debt he was being forced to repay.  (App. pp. 48-

58).   APFA's meeting minutes from the October 28, 2020 BOD meeting drafted by APFA National Secretary

state:

> "The agenda item - Former National Officer Payout - pertains to the payout to a former National Officer, the
> documentation and calculations done by APFA, **and results of an audit by an outside auditor**." (App. pp.
> 346).

"Diversified admitted in its original petition filed with the Tarrant County Justice Court that it was the

assignee or servicer of the account owed to APFA, that Ross was overpaid and attached the Confidential

Memo and the calculations of the overpayments under the TA. (Doc. 239-9, PAGEID 7111-7129). As seen

above, the defamatory statement Harris made was that Ross owed a debt to APFA of $5,436.47 based on an

overpayment made under the TA. Doc. 239-10, PAGEID 7111-7129). Harris published this statement, as the

APFA National Treasurer, verbally from Harris to the APFA BOD on October 28, 2020, from Harris to Ross

via telephone on November 10, 2020, from Harris to Ross via the Overpayment-of-Wages Letter on November

24, 2020, from Harris to the APFA BOD via forwarding the Overpayment of Wages Letter on November 25, 2020, from Harris to the Article VII Arbitrator through sworn testimony in the Ross and Vargas Arbitrations, and finally from Harris to Diversified Credit which was published to Ross's credit report to the American Airlines Federal Credit Union. (App. pp. 62-70). Diversified Credit admits it published this statement to Ross's credit report at the direction of and based on the statements made by Harris, Hedrick, and APFA and even left voicemails for Ross to collect the debt. (Doc. 23, PAGEID 168; App. pp. 36-42; 62-70; 97-100; 103-116)). Attached hereto are transcriptions for recorded voicemails left to Ross regarding these statements to collect the alleged overpayment debt by the Defendants.(App. pp. 36-42).The Court should note that these statements were made after both Harris and Hedrick had received notice of the Confidential Memo. (App. pp. 62-70; 97-100; 103-116).  Harris and Hedrick both sent Ross's account to collections as seen in the voicemails left for Ross (App. pp. 36-42). Furthermore, APFA authorized this conduct in a resolution at the APFA BOD meeting in March of 2021.  When Ross applied for credit with the American Airlines Federal Credit Union in June of 2021. (App. pp. 62-70).  Harris, Hedrick and APFA's defamatory statement were published to a third party via Ross's credit report, when he applied for credit. (App. pp. 62-70; 97-100; 103-116).  The pinnacle of the attack on Ross and Vargas by Defendants is in the APFA Resolutions and APFA Presidential Hotline released to the entire APFA Membership. (Doc. 239-6, PAGEID 6975-6986; App. pp. 97-100). In particular, the APFA BOD stated in the Resolution #2  Chinery-Lee v. Ross Arbitration Remedy passed on March 24, 2022:

> "**BE IT FINALLY RESOLVED**, the APFA Leadership hereby condemns the actions Bob Ross took to **defraud** the members of APFA during his term as APFA National President." (App. pp. 97-100).

The Arbitration Decision never claimed that Ross committed fraud. (Doc. 239, PAGEID 6679-6986; App. pp. 97-100). The statement that Ross owes the debt, which is reported on his credit report, is false and defamatory, as it implies negative credit reporting of a non-existent debt. (App. pp. 62-70; 97-100; 103-116). Finally, Harris was not only negligent regarding his statements as to the truth, but rather Harris also acted with a willful intent to cause financial harm when he transmitted this statement to Diversified Credit intending it to

`

be published to Ross's credit report.  (App. pp. 43-47; 48-62; 62-70; 97-100; 103-116). Harris gave Diversified Ross's old Texas address with no telephone number when he transferred the account in January of 2021. (App. pp. 43-47; 59-61).  However, Harris had Ross's correct California address as of November of 2020 as shown on the Overpayment of Wages Letter. Harris knowingly provided Diversified Credit the wrong address so that Ross would not receive the initial communication letter Diversified sends out 30 days prior to publishing information to a debtor's credit report per 15 U.S.C 1692g giving the debtor the opportunity to dispute the validity of the debt prior to taking any collection activity.  (App. pp. 36-42). He additionally warned Diversified Credit of Ross by saying "Just a heads up, he is pretty aggressive in his tone and he tends to fabricate. I'm sure you will hear many variants of the story." (App. pp. 48-54; 55-58; 59-61). Diversified reflected this statement on their call notes to warn any representatives that spoke to Ross. (App. pp. 59-61).

## IX.    CONCLUSION AND PRAYER

As demonstrated herein, the summary judgment evidence in this case, supports Plaintiffs' position that Defendants are not entitled to Summary Judgment, therefore Plaintiffs pray the Court denies Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,
KD PHILLIPS LAW FIRM, PLLC

By:  /s/ Kerri Phillips
Kerri Phillips
Texas Bar No. 24065906
Phone: (972) 327-5800
Email: kerri@KDphillipslaw.com
6010 W. Spring Creek Parkway
Plano, Texas 75024
Fax: (940) 400-0089
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on May 24, 2024 a true and correct copy of the foregoing instrument was served upon Defendants' attorney via the e-file manager and email to the following

/s/   Kerri Phillips
Kerri Phillips

Jeffrey Bartos
Guerrieri, Bartos, & Roma, P.C.
1900 M Street, NW, Suite 700
Washington, DC 20036
Tel: (202) 624-7400
Fax: (202) 624-7420
Email: jbartos@geclaw.com

Charlette Matts
In-House Counsel for APFA
1004 West Euless Blvd
Euless, TX 76040
Tel: (682) 301-8454
Cmatts@apfa.org

James Sanford
4803 Gaston Avenue
Dallas, TX 75249-1020
Tel: (214) 800-5111
Fax: (214) 838-0001
Email jim@gillespiesanford.com
Email: joe@gillespiesanford.com

Michael Rake
PO Box 1556
Lake Dallas, TX 75065-1556
Tel: (940) 498-2103
Fax: (940) 498-2103
Email: mrake1@mrakeattorney.com