Exhibit B

the Board that my resignation shall be effective at the end of the day on October 9, 2015."

4. The Board shall issue the following statement today:

"Laura Glading has informed the APFA Board of Directors that she has changed the effective date of her resignation to the end of the day on October 9, 2015. The Board recognizes Laura's dedication and contributions to APFA and the membership. With our thanks, we wish her the very best for the future."

5. The statements described in paragraphs 3 and 4, above, shall be the only statements Laura or any member of the Board, in either their official or personal capacities, shall make relating to Laura's resignation, except that if asked, Laura and the Board may say that Laura did not receive anything more than what any member in her position would receive.

6. Neither Laura nor any member of the Board, in their official or personal capacities, shall state or imply, either publicly or privately, that in exchange for advancing her resignation date Laura sought and/or was given any payment or other financial benefit to which she would not have been entitled had her resignation been effective December 2, 2015.

7. The following items from the October 5-6, 2015 Fall Board of Directors Meeting Tentative Agenda shall be removed:

    a. CIRT (Bedwell)
    b. Membership Outcry (Bedwell)
    c. APFA Headquarters Building/Land (Bedwell)
    d. Membership Representation (Adair)
    e. Article III, Section 3.B(3)(b) Constitution and Bylaws (Kaswinkel)
    f. CUN (Bedwell) – I/D
    g. PR Firm (Nikides) – I/D/A

8. The only items that shall be added to the Tentative Agenda for that meeting shall be:

    a. Payloss (Trautman) – I/D/A
    b. Article IX, Section 8.B (Kaswinkel) – I/D
    c. LUS Reserve Representative (Britton) – I/D/A
    d. Boarding Times (Bedwell) – I/D

**App. 551**

APFA I. - 000053

-3-

# Exhibit B

9. The current members of the Joint Implementation Resolution Committee ("JIRC) and Joint Scheduling Implementation Committee ("JSIC") shall continue to be the members of those Committees until they resign or the committees end, except that Mike Flores shall be replaced by Alin Boswell on the JSIC effective as soon as possible.

10. Except as may be necessary to enforce this Agreement, the existence of this Agreement and its terms shall remain strictly confidential, and shall not be shared in writing or verbally with any person or entity other than the current Base Presidents and the current National Officers.

11. This Agreement constitutes the entire understanding and agreement between the parties and supersedes all prior agreements between them. No other promises or agreements have been made to cause Laura or the Board to sign this Agreement.

12. This Agreement is non-precedential.

13. This Agreement shall be deemed jointly drafted and shall not be construed against either Laura or the Board based on authorship.

14. This Agreement may not be modified in any manner except by written agreement signed by Laura and every member of the Board.

Signed and dated October 5, 2015:

Laura Glading, National President

Jeff Pharr, National Secretary

Cathy Bossi, CLT President

Dianne Britton, DCA-LUS President

John Nikides, LAX President

Marcus Gluth, National Vice President

Amy Milenkovic, BOS President

Robert Valenta, DC-AA President

Ted Bedwell, DFW President

Ellen Eherts, LGA President

**App. 552**

APFA I. - 000054

**Exhibit B**

Randy Trautman, MIA President

Kim Kaswinkel, PHL President

Fiona MacPherson, RDUI President

Nena Martin, STL President

Susan Wroble, ORD President

Joseph Seelye, PHX President

David Adair, SFO president

*App. 553*

APFA I. - 000055

Exhibit B

# **ATTACHMENT C**

APFA I. - 000056

Exhibit B

In accordance with Article VII.2.A. of the APFA Constitution, please consider this document the formal filing of Article VII charges and other Policy Manual violations against current and former BOD Members:  Amy Milenkovic, BOS; Wanda Samacki, CLT; Robert Valenta, DCA-AA; John Pennel, DCA-US; Maureen Walsh-Martin, DFW; John Nikides, LAX; Raymond Lewis, LGA; Randy Trautman, MIA; Susan Wroble, ORD; Kim Kaswinkle, PHL; Michele Babi, PHX; Louise Sullivan, RDUI;  Jennifer Welpott, SFO; and Matt Faust, STL.   These charges stem from an alleged "buyout" or "exit package" of former APFA President Bob Ross.  However, to execute this action, the BOD violated multiple fundamental principles of the APFA Constitution[1] and the APFA Policy Manual[2].   These abusive actions will be shown to go well beyond the scope of the authority of the Board of Directors and that they acted in an ultra vires manner. I will go through the timeline and the violations below.   The first violation is:

- Article VII Section 1. Grounds for Charges:
  F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the BOD or the EC.

I was made aware of an "exit package" created for previous APFA National President, Bob Ross via the official minutes of the Special BOD meeting that took place on November 29, 2019. Resolution #12[3] put forward by President Bassani and seconded by Treasurer Gunter. This resolution stated that the BOD met behind closed doors and allegedly acted on their own behalf to coerce sitting Presidents out of office by allegedly offering "exit packages".  The resolution asked for an independent investigation and that the BOD repays this money to the APFA. Although the resolution failed, the BOD voted on it, which indicates that action took place and this exit package does exist.  If it didn't exist, the BOD would have objected to the content and had it withdrawn.

- Article V Section 3.   Other compensation:
  The rate or method of other compensation, if any, and/or the policy regarding pay continuance for other APFA representatives shall be established by the BOD and set forth in the APFA Policy Manual.

Although other compensation can be established by the BOD, it also shall be set forth in the policy manual.  There is no reference to an "exit package" or an ability to pay two Presidents simultaneously.  There is, however, a provision that stipulates that for payless purposes, there is a minimum requirement of days worked for that compensation.  Bob Ross "resigned" as President on March 2, 2018, but did not resume flying duties until September, 2018. There was

---

[1] See attached.
[2] See attached.
[3] See attached resolution 12.

*App. 555*

APFA I. - 000057

# Exhibit B

no record of work of any kind by him to earn compensation from APFA during that period.  His "exit package" is alleged to have been approximately $76,000.

APFA has had a lot of revisions to the Policy Manual regarding pay, concerning both Officers and Representatives.  These changes are debated, resolutions are written and voted on and the changed policy is published in the Policy Manual.  If that format was not followed, as seems to have been the case, the BOD has not followed the Constitution and they have reached beyond the scope of their authority as outlined below:

- Article III Section 2.  Governing Bodies and Policies:
  - A.  The governmental powers of the APFA shall be vested in the Board of Directors, and the officers and representatives of the APFA <u>in accordance with the provisions of this Constitution</u>. **The final control of the APFA shall be vested in the membership.**[4]

Once I became aware of resolution #12, I looked up the official minutes on the APFA website for the Annual Convention of 2018.  There I found the five sentence reference in the minutes to two Members who spent more than a year gathering signatures for a recall petition. It showed a four minute presentation with no ensuing questions from the BOD. Section 4.A. was not followed as outlined.  The Members notified the Secretary in advance they would be attending and bringing the required signed petitions to the meeting and ask for the recall process to start. They were not added to the agenda, and although a BOD member yielded time to them, there was no information from the Secretary on the process of submitting a resolution.

- Policy Manual Section 4.A.:
  - 5. Debate/Discussion by the Assembly:
    - (2) At the time a member of the assembly adds an action item to the agenda at the meeting, he or she shall describe what the resolution will be about and what action will be requested.

The BOD recessed for the remainder of the day and the meeting reconvened the next day with no mention of the recall petition for the rest of the convention.  The minutes do not reflect the action asked by the Members or reference any resolution or action taken in the off the record discussion.  They do not reference what was discussed and why the meeting was taken off the record.  Parliamentary Law, as required by the Constitution was not followed by this BOD in the actions taken at the Convention and those are reflected in the minutes of the meeting.

---

[4] Underline and bold inserted.

*App. 556*

APFA I. - 000058



- Article 1 Section 6: Parliamentary Law:

  All questions on parliamentary law and rules of order shall be decided according to the principles set forth in the most current published edition of Robert's Rules of Order, revised, except for those which are expressly modified by this Constitution.

  Robert's Rules of Order specify that:

  "Accurate minutes are of vital importance as they constitute the permanent records of proposals, decisions, and reports of the members and the executive board.  Minutes are the *legal* record of the meetings of an organization and may be subpoenaed. Minutes should be written as concisely as possible."

There is no reference to any off the record discussions that took place, which is a violation of parliamentary procedure.  Even in off the record discussions, the subject of this discussion is required to be referenced and reasons why the meeting was taken off the record. The above violates Policy Manual Section 4.A. 7. Minutes/Records/Reports: as referenced earlier.

- 7. Minutes/Records/Reports

  (2) The official minutes of any convention or meeting, including teleconference meeting, of the BOD or EC will consist of the following:

  (a) The original agenda as sent to the assembly;

  (b)  The revised agenda as approved by the assembly;

  (c)  The complete text and tally or outcome of votes (if taken)

  For any resolution or motion (read into the record even if subsequently postponed or tabled) as well as the names of the maker and second, and the date and time of the vote, and

  (d) Brief statements regarding the topics discussed, if necessary, to document verbal reports or to clarify the nature of business that was conducted.

The last day of the annual convention, March 2, 2018, Bob Ross announced his resignation and according to the official minutes, stated "his decisions have been made by himself and he was not influenced by social media or the red wagon."[5] The red wagon was a reference to the mode

---

[5] BOD Meeting minutes from  2/27-3/2/2018 attached

*App. 557*

APFA I. - 000059

# Exhibit B

of transportation used to bring the signed petitions for his recall into the BOD meeting days before.

- This BOD denied the Constitutional rights of due process to these Members, as is specified in: Article II Section 3. Bill of Rights of Members:
  > D. All members of the APFA shall have the right to due process and equal representation.

This article allows these Members the right to the formal proceeding carried out in accordance with the established rules and principles.

- Article VIII Section 1. Removal of National Officers:
  > The National President.....may be removed from office by action of the membership.
  > > A.   A removal balloting shall be caused to be taken:
  > > > (2) By a petition(s) carrying signatures numbering thirty percent (30%) or more of active members in good standing.  The office of the National Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting of the membership to begin no later than thirty (30) days following such certification.

After acknowledging in the official minutes of the meeting that these flight attendants had enough signatures to trigger the balloting, the BOD recessed for off the record discussions that resulted in the "resignation" of President Bob Ross. As stated above, Mr. Ross denied that his resignation had anything to do with the properly filed recall petition.  This failure to acknowledge and follow the Constitutional steps of a recall of a National Officer was a violation of both due process and a failure to acknowledge outlined Constitutional path. If in fact, there was an off the record action of a payout, that is an egregious violation to the efforts of Members to follow the Constitution.

There was also a recent payment of approximately $6000.00 for moving expenses paid out to Mr. Ross despite the fact that the time limit on repayment of moving expenses is within six months of the end of the Officers' term of office. This is a violation of Policy Manual Section 5.H.2 (a) below.

*App. 558*

APFA I. - 000060

# Exhibit B

- Section 5. H. Relocation
    2. If on the date of his/her election, a National Officer does not reside in the DFW area, s/he shall be reimbursed for actual moving expenses for relocation....to a maximum of $10,000 per round-trip move.
        a. The provisions of H.2. Above must be exercised within six (6) months following the end of the last term of office of the National Officer and must be substantiated by invoice or bill.

When it was questioned by the present National Officers, it was said to have been approved by the BOD. Without an investigation, we also do not know if the $10,000.00 was exceeded. If $6000.00 was submitted recently for a one way portion, it would seem logical that this was another violation, and by what means was it approved by the BOD. There is no record of a resolution that approved a late, and possibly over-budget moving expense submitted by Bob Ross that would justify paying this expense. The past practice would put any late or over budget requests for payment in front of the Executive Committee and there was no record of that happening.

There was also a Department of Labor election complaint filed by another presidential candidate in the election of 2016, in which Bob Ross became President. That complaint was found to have merit, and the DOL had already announced at the time of the annual convention that another election for the four (4) National officer positions would have to take place. APFA held that election in the spring of 2018, with the new officers taking office July 2, 2018.

In researching this issue, I learned of many attempts to ask the APFA Treasurer about the existence of an "exit package". These individuals have been ignored, not given access to the documents requested, as well as referred to APFA legal over a period of approximately six months. Those requests for financial statements have been denied to the Members who have asked. A reason for this denial, in all probability, is the requirement that all individuals who had specific knowledge of this "exit package" had to sign a Non Disclosure Agreement. These are clear violations of Article II Section 3 of the Bill of Rights:

- Article II Section 3. Bill of Rights of Members:
    B.  All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B (1) of this Article II.

    This also violates Section 7.G.1 of the Policy Manual:
- Section 7:  Budget and financial policies
    Policy statement:  in furtherance of the objectives of the APFA the Board of Directors hereby adopts the following policies and procedures as a means of

5

**App. 559**

APFA I. - 000061

Exhibit B

protecting the assets of the APFA by ensuring the use of sound budgetary practices

G.1. Financial records may be accessed for viewing by members through their Base President or through the Office of the National Treasurer. These records are not for publication or distribution and are deemed confidential. No copies of financial statements or audits, other than those sent to the BOD, EC, and National Chairs shall be distributed.

There are no parameters set in either the Policy Manual or the Constitution that there has to be just cause to view the financial documents, as it is required in the Labor Management Reporting and Disclosure Act of 1959. It simply requires that the Member has to be in good standing with the APFA.

The remainder of the Articles referenced above specifically speaks to the objectives of the APFA, the protection of its members, and although the BOD governs the entity, *"the final control of the APFA shall be vested in the membership."* I am quite sure, as a dues paying Member of this Union that others would be as outraged as I am to find that my $41.00 a month has been fraudulently paid to someone who didn't earn it. That is well beyond the scope of the BOD's authority and is reminiscent of the corrupt days of unionism that I previously denied had ever besmirched the APFA. In light of what I have found here, I have to reconsider my views.

- Article 1 Section 2.B:
  To protect the individual rights of the members of the APFA and to promote their professional interest and image.
- Article 1 Section 2.K:
  To do any and all other acts consistent with and in furtherance of the objectives and purposes herein.

A buyout of a National Officer and the subsequent covering up of that substantial financial action from the membership is a violation of the LMRDA, which requires disclosure of financial decisions of the governance of the Union to protect its members from unlawful actions. Under Title II-Report of Labor Organizations (29 U.S.C. 415) Section 201: Reports must be filed that accurately disclose:

(3) Salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization.....

6

*App. 560*

APFA I. - 000062

Exhibit B

(6) C:  Every labor organization required to submit a report under this title shall make available the information required to be contained in such report to all of its members....

Denying these Members access to these referenced financial records causes the APFA to violate its legal obligation to comply with State and Federal law, which is also a violation of Article VII G. of the APFA Constitution

- Article VII Section 1. Grounds for Charges:
    - G. Willfully acting in a manner that causes the Association to violate its legal obligations.

The evidence throughout these charges shows that the BOD acted outside a frightening number of Constitutional and Policy Manual restraints. These documents are well written, with well thought out parameters. However, it is clear that they have been ignored, possibly because the BOD feels that as the Governing Body, they have supreme authority to act in any manner without repercussions.  This is not true, however.  They are committing ultra vires offenses and they must be accountable for these breaches in governance on both an internal and, if found to have violated Federal Law, external level.  Their actions, if proven, have put the autonomy of the APFA at risk.

Finally, Arbitrator Charles Morris opined in the matter of the Stu Adams Lundy case dated January 3, 1985,

> The importance of that Constitutional requirement is underscored by #25 of Robert's Rules of Order concerning suspension of rules:  "Rules contained in the bylaws (or Constitution) cannot be suspended—no matter how large the vote in favor of doing so or how inconvenient the rule in question may be. ..." [6]

The relief sought is removal from their present positions of the above named BOD Members and prohibit them from representing American Airlines Flight Attendants for a period of 15 years.  These BOD members should also be required to pay restitution to the APFA based on the amount authorized by their financial malfeasance.  If any awards were bestowed upon these individuals, they should be removed from the records and any special acknowledgements should be revoked. Any BOD going forward should have training on financial responsibilities of Labor Unions and the Federal Laws that oversee them.  This award must be published to the Membership as well as a statement explaining what has happened and why. I also ask for any and all other relief deemed necessary.

Julie Moyer, 152632, APFA Member                    cc:  Michelle Hussar@dol.gov

---

[6] AAA case No. 71 199 0311 84 attached

*App. 561*

APFA I. - 000063

Exhibit B

# ATTACHMENT D

APFA I. - 000064

Exhibit B

**From:** Mark Richard <mrichard@phillipsrichard.com>
**Sent:** Thursday, June 11, 2020 2:00 PM
**To:** Bill Osborne <BOsborne@osbornelaw.com>
**Subject:** CONFIDENTIAL - Attorney/Client Privileged Communication


Dear Mr. Osborne:


Attached please find the confidential Transition Agreement dated March 1, 2018.  I was directed to forward this document to you by the APFA Officers.  Please call with any questions.  Thank you.


Mark

*App. 563*

APFA I. - 000065

Exhibit B

# ATTACHMENT E

APFA I. - 000066

Exhibit B

**Bill Osborne**

| | |
|---|---|
| **From:** | Bill Osborne |
| **Sent:** | Tuesday, July 14, 2020 3:32 PM |
| **To:** | Sandie.Janna@dol.gov |
| **Subject:** | FW: CONFIDENTIAL - Attorney/Client Privileged Communication |
| **Attachments:** | Confidential Transition Agreement 3-1-18.pdf |

**From:** Bill Osborne <BOsborne@osbornelaw.com>
**Sent:** Tuesday, July 14, 2020 3:30 PM
**To:** Sandie.Jana@diol.gov
**Cc:** Julie Hedrick <jhedrick@apfa.org>; Joshua Black <jblack@apfa.org>; Bill Osborne <BOsborne@osbornelaw.com>
**Subject:** FW: CONFIDENTIAL - Attorney/Client Privileged Communication

Ms. Sandie --

In response to your request, APFA hereby forwards a copy of the March 1, 2018 Transition Agreement between APFA and former President Robert Ross (enclosed). Contrary to the practice of the previous APFA administration, it is our view that access to the Agreement should not have been denied APFA members regardless of the nondisclosure provision in para. 7 of the Agreement. Article II, Section 3B of the APFA Constitution provides that "all members of the APFA shall have access to all administrative and financial reports and records except [inactive members]." *See also* LMRDA Section 201(c) ("… information required to be contained in such [LM-2] report…")

We are making arrangements to provide members with access to the Agreement. If you have further questions, please direct them to our attention.

Bill Osborne

OSBORNE LAW OFFICES, P.C.
1130 Connecticut Avenue, NW
Suite 950
Washington, DC 20036
(202) 243-3200

**From:** Bill Osborne <BOsborne@osbornelaw.com>
**Sent:** Monday, July 13, 2020 9:45 AM
**To:** Bill Osborne <BOsborne@osbornelaw.com>
**Subject:** FW: CONFIDENTIAL - Attorney/Client Privileged Communication

1

*App. 565*

APFA I. - 000067

Exhibit B

# ATTACHMENT F

APFA I. - 000068

# Osborne Law Offices

PROFESSIONAL CORPORATION

# Exhibit B

October 2, 2020

Howell L. Lankford, Arbitrator
Arbitration Services, Inc.
P.O. Box 2231
Portland, OR 97269-0331

Re:     Article VII Charges (*Moyer v. Former Board*)

Dear Arbitrator Lankford:

This submission is offered on behalf of the Association of Professional Flight Attendants ("APFA" or "the Union") and is *not* made on behalf of any of the parties to the above-referenced Article VII proceeding.

To follow up on our September 17 correspondence, we recently contacted the Department of Labor for an update and have been advised that the Department has completed its inquiry and that the Department does not intend to take any further action in this matter. The Department does not intend to issue a public report as it is not their practice to do so in this context.

Please let us know if you have any questions or concerns or need further information.

Respectfully submitted,

William W. Osborne, Jr.

cc:     Margot Nikitas, General Counsel

Attach.

*App. 567*

APFA I. - 000069

Exhibit B

# ATTACHMENT G

APFA I. - 000070

# APFA
## ANNUAL BOARD OF DIRECTORS CONVENTION



# Exhibit B

## March 8-10, 2021
*Westin Irving Convention Center at Las Colinas*

| Resolution Information | | | |
|---|---|---|---|
| **Resolution #:** | 14 | | |
| **Resolution Name:** | Resignation or Recall of a National Officer | | |
| **Status:** | Pass | | |
| **Maker:** | Hedrick | | |
| **Second:** | Norvell | | |
| **Date:** | March 9, 2021 | | |
| **Time:** | 11:15 a.m. | | |
| **Affects PM:** | ☒ Sec. 6.E | | |
| **Comments:** | | | |

| | BOS Milenkovic | CLT Hazlewood | DCA Pennel | DFW De Roxtra | LAX Nikides | LGA Norvell | MIA Trautman | ORD Wroble | PHL Kaswinkel | PHX Agee | SFO Schwartz | Pres Hedrick |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **YES** | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☒ | ☐ |
| **NO** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **ABS** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **N/A** | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Yes: 11  No: 0  Abstain:  0  Absent: 0  Show of Hands:** ☐

**WHEREAS**, Article III, Sections 3.L.(1) and (2) of the APFA Constitution authorizes the Board of Directors to set policy for the APFA and to review, and if necessary, modify the APFA Policy Manual; and

**WHEREAS**, Article III, Section 3.A of the APFA Constitution authorizes and empowers the Board of Directors to take any and all lawful action consistent with the Constitution to safeguard and protect the APFA and the rights, privileges, duties, and responsibilities of the officers, representatives, and members of the APFA; and

**WHEREAS**, Article II, Section 3.A of the APFA Constitution further authorizes the Board of Directors to interpret the APFA Constitution and to establish, prescribe, and adopt such other policies which may be consistent with the APFA Constitution as required for the direction and management of the affairs of the APFA; and

**WHEREAS**, in the past, the APFA Board of Directors have lawfully authorized resignation agreements with Officers of the Association in order to safeguard the Association, its representatives, and its members; and

**WHEREAS**, a resignation agreement was lawfully authorized in 2015 between the Board of Directors and the National President; and

**WHEREAS**, the most recent resignation agreement was lawfully authorized in 2018 between the Board of Directors and the National President; and

**WHEREAS**, in 2017-2018 a very substantial number of APFA members lobbied for the removal of the APFA National President, and the Board of Directors respected their wishes; and

## App. 569

APFA I. - 000071

**APFA**
BOARD OF DIRECTORS MEETING

# Exhibit B

**WHEREAS**, APFA's outside legal counsel at the time recommended to the Board a lawfully authorized resignation agreement in order to safeguard the Association, its representatives, and its members; and

**WHEREAS**, outside legal counsel at the time negotiated the resignation agreement between the Board of Directors and the National President; and

**WHEREAS**, in retrospect, APFA's outside legal counsel negotiated an agreement that was more favorable to the departing National President than to the interest of the entire organization and its members and the written terms of the agreement were overly general as to its terms; and

**WHEREAS**, the agreement negotiated a nondisclosure clause into the resignation agreement; and

**WHEREAS**, the APFA leadership have since revoked and negated the non-disclosure agreement; and

**WHEREAS**, the resignation agreement negotiated by APFA's outside legal counsel has resulted in significant harm to the Association, including the entity's reputation as well as substantial financial losses by way of audits, legal fees, and flight pay loss.

**BE IT THEREFORE RESOLVED**, APFA adopts the following policy for Resignations and Recalls of National Officers:

*Add new APFA Policy Manual Section 6.E*

<center>**&lt;new&gt;**</center>

**E.  Resignation or Recall of a National Officer**

1.  A National Officer who leaves office prior to the end of his/her term, such as resignation, or is recalled by the procedures prescribed in Article VIII of the APFA Constitution shall be provided the following:
    a.  Salary – Thirty (30) days of pay from the effective date of separation.
    b.  Unused Vacation – Paid out per APFA Policy Manual Section 6.B.1.c, prorated based on the months completed in the current fiscal year. In no case will the Officer be paid more than 14 days.
    c.  Retirement Contributions & Insurance Premiums – Paid until the end of the month of the effective date of resignation or recall.
    d.  Unused Sick – paid out per APFA Policy Manual Section 6.B.3.d, prorated based on the months completed in the current fiscal year. In no case will the Officer be paid more than 12 days.
    e.  Profit-Sharing – paid out per APFA Policy Manual Section 6.B.5, prorated based on the months completed in the current fiscal year.
    f.  Transition – will be provided one month transition period in accordance with APFA Policy Manual Section 6.B.6.b.
    g.  Relocation – if the National Officer relocated to DFW in accordance with Section 5.H, that National Officer will be entitled to relocation expenses in accordance with Section 5.H. The decision to relocate must take place within thirty (30) days from the effective date of separation.
2.  In no case shall an outgoing National Officer receive benefits in excess of those specified within this Section 6 of the APFA Policy Manual.
3.  Any and all agreements covered by this section shall not contain any limitation on disclosure to APFA members.

<center>*App. 570*</center>

APFA I. - 000072

Exhibit B

# **ATTACHMENT H**

APFA I. - 000073



# LABOR UNION LAW AND REGULATION

## Second Edition

### William W. Osborne, Jr.
*Editor-in-Chief*

ABA
Section of
Labor and
Employment
Law

### d. Authorization and Personal Benefit

As Justice Frankfurter observed, "[T]o say that a man is a fiduciary only begins the analysis; it gives direction to further inquiry . . ." including "what obligations does he owe as a fiduciary" and by what standards are his actions to be judged.[294] The statute explicitly recognizes the "special problems and functions of a labor organization" that counsel against the mechanical application of corporate trust principles to unions.[295] The courts in all circuits profess to evaluate the propriety of an officer's actions based upon the proposition that an agent (union officer) cannot be held liable for misuse of the principal's (labor union's) property when the principal has authorized the agent's action.[296] In the absence of such authorization, a breach occurs, even if the union ultimately derives a benefit from the expenditure.[297]

However, authorization is not a complete defense to an allegation that the fiduciary duty has been violated. Some courts have held that union members cannot authorize expenditures beyond the powers of the union as derived from the constitution or to achieve objectives that are inconsistent with those set forth in the constitution or statute.[298] However, it could be argued that the legislative debate supports the contrary conclusion, that Congress could not have intended to subject officers to liability under Section 501 where

---

[294] SEC v. Chenery Corp., 318 U.S. 80, 85–86 (1943).

[295] Ray v. Young, 753 F.2d 386, 389 (5th Cir. 1985).

[296] Gabauer v. Woodcock, 594 F.2d 662, 100 LRRM 2808 (8th Cir.), *cert. denied*, 444 U.S. 841 (1979); McNamara v. Johnston, 522 F.2d 1157, 1165, 90 LRRM 2401 (7th Cir. 1975), *cert. denied*, 425 U.S. 911 (1976).

[297] Ironworkers Local 92 v. Norris, 383 F.2d 735, 739–40, 66 LRRM 2297 (5th Cir. 1967) (unauthorized salary increases to officers); Farrington v. Benjamin, 468 F. Supp. 343, 350–51, 101 LRRM 2487 (E.D. Mich. 1979).

[298] Highway Truck Drivers & Helpers v. Cohen, 182 F. Supp. 608, 621–22, 45 LRRM 3050 (E.D. Pa.), *aff'd*, 284 F.2d 162, 47 LRRM 2040 (3d Cir. 1960), *cert. denied*, 365 U.S. 833 (1961) (union members cannot authorize the payment of attorney's fees for officers accused of breaching their fiduciary obligations); United States v. Boyle, 482 F.2d 755, 764–65, 83 LRRM 2835 (D.C. Cir.), *cert. denied*, 414 U.S. 1076 (1973) (use of union funds for illegal political contribution breaches fiduciary duty even if expenditure was authorized and union derives a benefit therefrom); Anderson v. Vestal, No. 5250, 1971 BL 110, 79 LRRM 2755, 2758 (M.D. Tenn. Sept. 20, 1971) (authorized assignment of union staff to senatorial candidate's campaign breached duty because salary payments were not utilized "solely for the benefit of the organization and its members"). *But see* McNamara v. Johnston, 522 F.2d at 1165; Gabauer v. Woodcock, 594 F.2d at 670 (union officers do not breach duty by making political contribution authorized by the membership even though contributions may violate Corrupt Practices Act).

the officers acted to achieve the objectives of the organization, as directed by the membership.[299]

Courts that have reviewed union expenditures that inure to the personal benefit of the union's officers have rejected authorization as a complete defense to alleged fiduciary breaches. Even where an expenditure has been authorized, these courts have subjected such use of union funds to a heightened degree of scrutiny, mindful of the legislative admonition that the greatest danger to the union exists with respect to transactions from which the officers personally benefit.[300] These cases fall within several categories. Where the court's initial review discloses that the expenditure was authorized, that there was a benefit to the union, and that the benefit to the officer was incidental, the inquiry generally ends without heightened scrutiny.[301] But where the court determines that personal benefit is significant, further evaluation is undertaken to ascertain whether the expenditure is "so manifestly unreasonable as to evidence a breach of fiduciary duty."[302]

---

[299] DOL Leg. Hist., *supra* note 3, at 1065. "Nor is it our intention that the courts . . . shall second guess union officers and employees on the question of whether a particular investment or expenditure is included within the 'special problems and functions of a labor organization. . . .' [T]he officer or employee is not required at his peril to determine whether or not the constitution, bylaws or resolution goes beyond the legitimate purposes and objectives of the organization. To do this would place them in an impossible position and would paralyze the legitimate operations of unions. . . . The intent of this section is simply that union officers and employees must act as the agents of the membership. They must conform their actions to the will of the membership, and they will be held strictly accountable for any loss to the organization or gain to themselves when they do not do so."

[300] AFSCME Council 49 v. Reach, 843 F.2d 1343, 1347, 128 LRRM 2303 (11th Cir. 1988); Ray v. Young, 753 F.2d 386; Brink v. DaLesio, 496 F. Supp. 1350, 105 LRRM 2233 (D. Md. 1980), *rev'd in part on other grounds*, 667 F.2d 420, 108 LRRM 2975 (4th Cir. 1982); Morrissey v. Curran, 650 F.2d 1267, 107 LRRM 2233 (2d Cir. 1981).

[301] Erkins v. Bryan, 785 F.2d 1538, 1544, 122 LRRM 2618 (11th Cir. 1986) (payment of expenses in addition to strike benefits was reasonable); Brink v. DaLesio, 496 F. Supp. at 1357. Payment of salary and benefits to officers falls within a hybrid class that involves self-dealing but that also provides a benefit.

[302] Moore v. Electrical Workers (IBEW) Local 569, 989 F.2d 1534, 143 LRRM 2016 (9th Cir. 1993), *cert. denied*, 510 U.S. 1117 (1994); Morrissey v. Curran, 650 F.2d at 1274; Puma v. Brandenburg, 324 F. Supp. 536, 534, 76 LRRM 2890 (S.D.N.Y. 1971) ("Merely because an Executive Board has the power to set officers' salaries (including pensions), does not mean that it has unlimited power to do so. Section 501 of the LMRDA imposes on labor representatives a fiduciary duty to the labor union and its members. . . . Consequently, the terms of the instant Officers' Pension Plan must be inspected in the light of this fiduciary duty to determine whether the Plan was essentially fair or whether it was so over-generous or otherwise improper

Exhibit B

# ATTACHMENT I

APFA I. - 000077

# Exhibit B

(c)    state the date on which the subpoena is issued;

(d)    identify the person to whom the subpoena is directed;

(e)    state the time, place, and nature of the action required by the person to whom the subpoena is directed, as provided in Rule 176.2;

(f)    identify the party at whose instance the subpoena is issued, and the party's attorney of record, if any;

(g)    state the text of Rule 176.8(a); and

(h) be signed by the person issuing the subpoena.

## 176.2   Required Actions.

A subpoena must command the person to whom it is directed to do either or both of the following:

(a)    attend and give testimony at a deposition, hearing, or trial;

(b)    produce and permit inspection and copying of designated documents or tangible things in the possession, custody, or control of that person.

## 176.3   Limitations.

(a)    **Range.**  A person may not be required by subpoena to appear or produce documents or other things in a county that is more than 150 miles from where the person resides or is served. However, a person whose appearance or production at a deposition may be compelled by notice alone under Rules 199.3 or 200.2 may be required to appear and produce documents or other things at any location permitted under Rules 199.2(b)(2).

(b)    **Use for discovery.**  A subpoena may not be used for discovery to an extent, in a manner, or at a time other than as provided by the rules governing discovery.

## 176.4   Who May Issue.

A subpoena may be issued by:

(a)    the clerk of the appropriate district, county, or justice court, who must provide the party requesting the subpoena with an original and a copy for each witness to be completed by the party;

(b)    an attorney authorized to practice in the State of Texas, as an officer of the court; or

(c)    an officer authorized to take depositions in this State, who must issue the subpoena immediately on a request accompanied by a notice to take a deposition under Rules 199 or 200, or a notice under Rule 205.3, and who may also serve the notice with the subpoena.

## 176.5   Service.

*App. 576*

APFA I. - 000078

**BEFORE THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS**

| | |
|---|---|
| In the Matter of the Arbitration<br><br>between<br><br>**Julie Moyer,**<br>             **Charging Party**<br>and<br><br>**Board of Directors (2018),**<br>             **Charged Parties[1]** | **ARTICLE VII CHARGES:**<br><br>**Violations of Constitution and Policy Manual**<br><br><br>**BEFORE:**<br>Edward B. Valverde, Esq. – Article VII Arbitrator |

APPEARANCES:

      For the Charging Party:   Julie Moyer and Cindy Dunfee

      For the Charged Parties: Marcus Gluth, and Heidi Morgan

| | |
|---|---|
| Place of Hearing: | Las Colinas, TX. |
| Dates of Hearing: | June 1-3, 2021 |
| Date Hearing Closed: | July 26, 2021[2] |
| Date of Award: | September 21, 2021 |
| | |
| Award: | Grievance denied. |

**Award Summary**

      Charging Party did not establish by preponderant evidence that the Charged Parties violated Article VII by entering into a Transition Agreement (TA) with then President Bob Ross.

---

[1] Charged Parties include Amy Milenkovic, Wanda Samacki, Robert Valenta, John Pennel, Maureen Walsh-Martin, John Nikides, Raymond Lewis, Randy Trautman, Susan Wroble, Kim Kaswinkel, Michele Babi, Louise Sullivan, Jennifer Welpott and Matthew Faust.

[2] The record was closed on upon arbitrator's receipt of the Charging Party and Charged Parties' briefs. References to the exhibits will be identified by party and exhibit number e.g., (Moyer Exhibits as (M. Ex. __); BoD Exhibits as (BoD Ex.__) and Joint Exhibits as (Ex. J_) and to the Transcript as (Tr. _) The parties allowed the arbitrator an extension until September 25, 2021, to issue this award for which the arbitrator is thankful.

Case: Julie Moyer v. Board of Directors (2018))

Edward B. Valverde, Esq.-Arbitrator

<center>ISSUE(s)[3]</center>

1)  Was the Ross Exist Agreement permissible under the APFA Constitution? If not, what is the appropriate remedy? And if not;

2)  Did the Charged Parties purported reliance on advice of Counsel exculpate them from liability for secretly executing the Ross Agreement? If not, what is the appropriate remedy?

**Organizational Structure**

The Association of Professional Flight Attendants (APFA or Association) is a labor organization within the meaning of the Railroad Labor Act that is the exclusive collective bargaining representative of flight attendants of American Airlines.  For purposes of self-governance, APFA established a constitution that sets forth, *inter alia*, its organizational structure. The organization is two-tiered, consisting of base presidents that are elected locally by members at each base and national officers that are elected by the entire membership.  There are four national officers elected by the membership: National President, National Vice President, National Secretary and National Treasurer.  Each base elects a president and vice president, thus there are fourteen (14) base presidents.  The Board of Directors (BoD) is the governing body of the organization.  The BoD membership consists of the National President who is a non-voting member of the BoD and presidents from each base (in the organization) who are voting members of the BoD.  Thus, these base officers also serve as members of the BoD.

---

[3] The issues identified herein are as alleged by the Charging Party in brief.

*App. 578*

Case: Julie Moyer v. Board of Directors (2018))

## RELEVANT CONSTITUTIONAL PROVISIONS

### ARTICLE I – GENERAL

  ****

### Section 6.  Parliamentary Law:

All questions on parliamentary law and rules of order shall be decided according to the principles set forth in the most current published edition of Robert's Rules of Order, revised, except for those which are expressly modified by this Constitution.

### ARTICLE II - MEMBERSHIP

A.    All members of the APFA shall have the right of free speech, freedom of assembly and freedom to dissent.

B.    All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5.B(1) of this Article II.

C.    All members of the APFA shall have the right to individual privacy.

****

### ARTICLE III – GOVERNMENT OF THE APFA

****

Section 2. Governing Bodies and Policies

A.  The governmental powers of the APFA shall be vested in the Board of Directors, and the officers and representatives of the APFA in accordance with the provisions of this Constitution. The final control of the APFA shall be vested in the membership.

B. The APFA shall establish an Executive Committee. This Constitution shall confer and vest in the Executive Committee the rights, privileges, duties and responsibilities to act as agent for the Board of Directors in accordance with the provisions of this Constitution.

****

Section 3. Board of Directors:

A.   The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret the Constitution and to establish, prescribe and adopt such other polices which may be consistent with the Constitution as required for the direction and management of the affairs of the APFA.

B. Organization

    (1) The Board of Directors shall consist of the National President, National Vice President, National Secretary, National Treasurer, and each Base President.

    (2) The Voting Board of Directors shall consist of each Base President.

        a. The National President, National Vice President, National Secretary and National Treasurer shall have a voice but no vote at a Board of Directors meeting, except that:

3

***App. 579***

Case: Julie Moyer v. Board of Directors (2018))

> b. when all voting members are present, and when a vote on an issue
> by the voting members results in a tie, with no abstentions, the
> National President must cast the deciding vote.
> ****

 G. Agenda: There shall be no restrictions on business conducted at any convention or meeting of the Board of Directors provided however, that no business shall be acted upon without:

> (1) ten (10) days notice of the agenda in writing to the total Board of Directors prior to such meetings, or
> (2) Approval by a majority of the voting Board of Directors who are present at the meeting.

****

Section 4. Executive Committee:

A. The Executive Committee shall act as the agent for and on behalf of the Voting Board of Directors and must interpret this Constitution, subject to the approval of the Board of Directors.

B. Organization: The Executive Committee shall consist of the National President, National Vice President, National Secretary, National Treasurer and five (5) Ad Hoc Members.

****

Section 6. Officers:

A. Definitions: The National Officers shall be the National President, National Vice President, National Secretary and National Treasurer.

B.  Duties of the National President shall include but not be limited to the following:

(1) The National President shall be the chief executive officer of the APFA, and shall conduct the affairs of the APFA in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors and/or the executive Committee.

****

 (10) The National President shall have the authority to hire, retain or employ general counsel and/or other legal counsel for the APFA, subject to the approval of the Executive Committee.

****

 D. Duties of the National Secretary shall include but not be limited to the following:

(1) The National Secretary shall be responsible for all administrative records of the Association.

****

(4) The National Secretary shall cause to be kept a record of all proceedings at any convention or meeting of the Board of Directors, or at any meeting of the Executive Committee…

****

Section 7. Base Councils/Base Representatives:

A. Organization: The Base Council shall consist of the Base President, vice President, and Base Council Representatives (BCRs)…

B. Base Representatives shall hold such positions only at the base where they are stationed.

C. The Base President and Vice President shall be elected by the membership of the base at large.

****

*App. 580*

Case: Julie Moyer v. Board of Directors (2018))

## ARTICLE V EXPENSES AND SALARIES
  ****

Section 2.  Compensation for National Officers

The rate or method of compensation for the National Officers of the APFA shall be established by the Board of Directors and set forth in the APFA Policy Manual, and may be subject to membership ratification.
****

## ARTICLE VI NOMINATIONS AND ELECTIONS
****

SECTION 2. WILLINGNESS TO SERVE

A.  The National Secretary shall direct the National Ballot Committee (NBC) to mail to each member and/or to post on the APFA website Willingness-to-Serve notifications:

  (1) At least one hundred and thirty-five (135) days prior to the end of the term for National Officers…
****

## ARTICLE VII – HEARING AND DISCIPLINARY PROCEDURES
 Section 1. Grounds for Charges:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:
****

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee.

G. Willfully acting in a manner that causes the Association to violate its legal obligations; or

H. Willfully bringing charges without reasonable basis against another member, officer or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.
****

Section 6. Jurisdiction and Authority of the Article VII Arbitrator

A. The Article VII Arbitrator shall have power to resolve all charges referred to him/her during his/her tenure.
****

G. No ex-parte communication may be had with the Article VII Arbitrator either by the accused, the accuser or by the APFA, or any member of the APFA except with respect to scheduling, location and like administrative matters.
****

## ARTICLE VIII REMOVAL OF OFFICERS[,] BASE REPRESENTATIVES AND ELECTED NEGOTIATING COMMITTEE MEMBERS

Section 1. Removal of National Officers:

The National President…may be removed from office by action of the membership.

A. A removal balloting shall be caused to be taken:

   (1) Within thirty (30) days following a two-thirds (2/3) majority vote of the Voting Board of Directors, or

5

*App. 581*

    (2) By a petition(s) carrying signatures numbering thirty percent (30%) or more of active members in good standing. The office of the National Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names on the petition(s) are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting o the membership to begin no later than thirty (30) days following such certification.

B.  The time limit for the return of the ballots (the balloting date) shall be thirty (30) days after the sending of the ballots.

        ****

D.  In any removal balloting, an affirmative two-thirds (2/3) majority vote by those active members in good standing who return valid ballots shall be required to remove a National Officer.

****

Section 4. Removal Petition:

    A.  The removal petition must clearly state the name of the officer…to be removed at the top of each page of the petition. The words "THIS IS A PETITION TO REMOVE (NAME OF OFFCIER…) FROM OFFFICE" must be made clearly visible by the use of capital letters at the top and bottom of each page.

    B.  Each member signing a petition must include the date of signature, and his/her printed name, base, and employee number.

        ****

## RELEVANT POLICY MANUAL PROVISIONS

Section 1. General

POLICY STATEMENT: In furtherance of the objectives of the APFA, the Board of Directors hereby adopts the following definitions and statements of general practice as part of this Policy Manual.

****

  E. Confidentiality

   1. The National Officers, voting Board of Directors…are required to maintain     confidentiality in connection with conducting the business of the Union. Every person   holding one (1) or more of these positions shall sign a Code of Confidentiality.

## FACTUAL SUMMARY[4]

    In 2016 Bob Ross was elected as National President by about 70 percent of the membership. A losing candidate filed a complaint with the Department of Labor (DOL) challenging the way the

---

[4] The core facts are essentially undisputed. Where the record contains disputed testimony, the facts contained in this summary include only those the arbitrator has determined are the most credible.

*App. 582*

election was conducted (electronic balloting) and another election was ordered. The DOL action effectively cut Ross' term of office in half. By the time of the annual convention, he notified the organization of his intent not to seek reelection.[5] Thus, in February 2018, he had about four months remaining in his term of office.  In addition to the DOL-ordered rerun election, there was member dissention with his term in office and a recall petition seeking his removal was being circulated by members of the Association.[6] Their intent was to publicly present the petition at the annual convention using a red wagon to wheel in hundreds of signed petitions. Members of the BoD were also frustrated with his leadership and were prepared to curtail his authority for the remainder of his tenure in office.[7] If the recall petition was recognized, the organization would be required to spend thousands of dollars verifying the petitions and conducting the recall election in the face of the DOL ordered rerun election.[8]

Once the officers were at the convention, the Union's counsel informed the BoD that Ross was willing to resign but wanted to leave "with dignity". In the past, the BoD had approved a "transition agreement" (TA) allowing an incumbent national president to resign during his/her term with a financial package that was negotiated and agreed to by the BoD and incumbent. The terms of the TA were kept confidential from the general membership by the signatories to the agreement through inclusion of non-disclosure language in the agreement. Union counsels had advised the BoD that such agreements were typical and legal.  With knowledge of this prior experience and guidance from counsel, Ross, and the BoD, through a designated representative, began negotiations on a TA for Ross. Purportedly, while Ross was prepared to resign at the end of the convention, he wanted to be compensated for what he would have received had he remained in office for the duration of his term. Negotiations were conducted over a two-day period amid the national convention. Once negotiations were complete, counsel drafted the TA that was subsequently signed by all fourteen (14) members of the BoD and Ross. At the end of the 2018 annual convention, Ross read a prepared statement agreed to by the parties and submitted his resignation. His resignation eliminated the need for

---

[5] Under the provisions of the APFA Constitution, anyone intending to run for national office must submit a "Willingness-to-Serve Notification".  Ross did not submit such notification thus, informing the Association he was not a candidate for National President.

[6] Emails from members complaining about Ross' leadership was so voluminous that the Union's mail system was shut down on at least one occasion.

[7] There were allegations that Ross was circumventing the processes of the Union on contractual implementation of the JCBA and acting without BoD participation or authorization.

[8] The recall petition appears to have involved his position only; the rerun election involved all national officer positions.

*App. 583*

acknowledging/processing the recall petition and the costs related thereto; neutralized the opposition to his continued leadership and allowed the BoD to focus working with new leadership at the helm.

Only Ross received a financial benefit from the TA.

**Subsequent Events**

On November 29, 2019, President Lori Bassani, at a Special BoD meeting presented "Resolution 12" which sought an investigation of the Board's use of TAs. That resolution was rejected by the BoD. However, once the minutes of the BoD meeting were published it revealed to the membership the BoD's use of TAs. Because of the nondisclosure language, the few members that had seen the TAs felt constrained to comply with that provision, thus limiting exposure of TAs to the general membership. It was this exposure that resulted in these charges being filed by the Charging Party that were received by the Association on January 23, 2020.[9]

The charges were reviewed by the Executive Committee (EC) on February 6-7, 2020. The EC determined the charges were timely, specific but not valid. (Ex. J-6) Pursuant to Article VII rules, the Charging Party appealed that action to the Article VII arbitrator, Howell L. Lankford.  Arbitrator Lankford reviewed the appeal and supporting documents. He determined there were sufficient issues that a full record needed to be developed to decide the merits of the charges stating: [10]

> "As I understand it, ex-National President Ross was the subject of a substantial recall effort in the   period before the 2018 Annual Convention. A recall petition was submitted at that convention but was not formally addressed in any detail. Instead of the petitioned recall, the BOG, in executive session, worked out an agreement with President Ross under which he resigned "voluntarily." That resignation was encouraged by certain payments to President Ross. Ms. Moyer now charges that the BOG agreement to that arrangement, and to those payments, violated Article 3, Section 3 and other provisions of the Constitution; that the procedure leading up to that arrangement violated   other provisions of the Constitution; and that the treatment of those payments in the financial records of the APFA – including the Treasurer's reluctance to disclose those records – violated still other provisions.
>
> The Executive Committee found that those charges are not "valid" as that term is  used in Article VII, i.e., that they do not state a proper cause of complaint or that they allege only arguments for that conclusion. But Ms. Moyer's charges, on their face, appear to have plausible support in the cited provisions of the Constitution, and it is simply impossible to

---

[9] On this date National Secretary acknowledged receipt of the charges filed by Moyer alleging several violations of the Constitution and Policy Manual. Those charges also revealed that Moyer served a copy to DOL.

[10] Arbitrator Lankford served his decision to the parties by letter dated April 11, 2020 through the National Secretary. (Ex. J-7)

**_App. 584_**

conclude that they do not present issues justifying the development of a formal record. I therefore grant Ms. Moyer's appeal of the EC's rejection of her charges as "invalid," and I will work with the National Secretary to set this matter for hearing."

By letter dated September 11, 2020, new legal counsel for the Association, William W. Osborne, Jr. notified arbitrator Lankford that the Moyer charges had also generated an investigation of these matters by DOL and that DOL had requested a copy of the Ross TA. Osborne noted that, "Non-disclosure of the Ross [TA] is one of the issues before" arbitrator Lankford. He advised, *"[W]e determined that the Agreement should have been disclosed to [Moyer] at her earlier request, notwithstanding a non-disclosure paragraph and contrary to the position of the prior administration, and the Union has now done so."* (Ex. J-8) On September 13, 2020, arbitrator Lankford suspended resolution of the Moyer charges as a result of the DOL inquiry. On September 17, 2020, Osborne issued arbitrator Lankford another letter stating, "the newly-elected APFA officers have already acknowledged and remedied Ms. Moyer's charges, in part, by reversing prior policy and authorizing her access to a copy of the Ross Transition agreement pursuant to Section 7G of the APFA Policy Manual (enclosed)." [11] (Ex. J-9)

As preparations were made to schedule this matter for hearing the Association created alternate arbitrator positions; and this arbitrator was selected to hear the matter. Thereafter, the matter was scheduled for hearing by this arbitrator.

Osborne issued one additional correspondence on behalf of the Association to this arbitrator on May 12, 2021. The purpose thereof was to provide a summary of what the Association believed were undisputed facts. In summary they stated:

a. That the Ross TA was duly authorized and executed by the 2018 BoD.

b. That none of the members of the 2018 BD benefited directly or indirectly from the TA.

c. That under Article III, Section 3A of the Constitution[12], the BoD has broad authority to "take any and all lawful action consistent with this Constitution."

---

[11] 7G. Financial Statements – "1. Financial records may be accessed for viewing by members through their base President or through the Office of the National Treasurer. These records are not for publication or distribution and are deemed confidential. No copies of financial statements or audits, other than those sent to the Board of Directors, Executive Committee and National Chairs, shall be distributed…"

[12] All references to "Constitution" are to the AFPA Constitution.

*App. 585*

d.  That the Ross TA was entered into on advice of then Union counsel, who came from a prominent Union-side labor law firm, that contained a strict nondisclosure provision based on counsel's advice.

e.  That there was a past practice of TAs with nondisclosure clauses (e.g., the 2015 TA between then President Laura Glading and 2015 BoDs); and that the 2018 BoDs had no basis for questioning the validity of the legality of legal advice in 2015 and 2018.

f.  That the Moyer charges were filed against the 2018 BoDs who authorized the Ross TA, which she forwarded to the DOL and became an administrative inquiry by DOL.

g.  That the essence of those charges was that the Ross TA was entered "off the record" between the parties; the DoD violated a number of procedural requirements of the Constitution of the Association and Policy Manual; that the nondisclosure provision violated the disclosure requirements of both the Constitution and federal law; and that the Constitution and Policy Manual prohibited the BoD from entering into an "exit package" with Ross.

h.  That current officers of the Association elected last year obtained a copy of the Ross and Glading Agreements by requesting a copy from former Union legal counsel and then forwarded a copy of the Ross agreement to DOL.

i.  That the newly elected officers of the Association were advised and concluded that the nondisclosure provision was contrary to both the Constitution and Section 201 of the Landrum-Griffin Act; and the Union remedied the Moyer charges, in part, by formally revoking and negating the nondisclosure clause in the Ross TA and provided access to the agreement to the parties to this proceeding in accord with the Constitution and Policy Manual.

j.  That Union counsel (Osborne) contacted DOL re the Moyer charges and was advised that DOL had completed its investigation of this matter and determined not to take any action but would not issue a written report of its inquiry.

k.  That at the March 2021 Convention, the Association enacted a new provision in its Policy Manual specifically addressing the issue of resignation or recall of Union Officers and thereby remedied the Moyer charges in that respect.

In addition to this summary, the Osborne letter contained legal principles it believed would be helpful in deciding this matter that included the following: (a) that a duly authorized decision by the governing officers of a union is lawful and cannot be the basis of charges under the union constitution, citing legal authority; (b) that the Ross TA with its nondisclosure clause were authorized by the 2018 BoD in reliance upon the advice of union legal counsel and was consistent with past practice; (c) that

**App. 586**

Article VII of the Constitution requires that any actionable disciplinary charges must be based on "willful" misconduct by the charged parties, and that "willful" is a term of art under the law and is a synonym for voluntary conduct undertaken with the intention to do something forbidden by law and that under Fifth Circuit precedent, a willful violation requires affirmative proof that the charged members of the 2018 BoD "knew or showed reckless disregard for the matter" of the propriety of the Ross TA and the nondisclosure clause; (d) while current legal counsel has determined the Ross TA and nondisclosure clause  are contrary to the Constitution and applicable law and therefore invalid (as alleged by Moyer), the 2018 BoD relied upon the contrary legal advice and existing past practice at the time; and (e)  that the Association is unaware of any facts indicating any of the 2018 BoD members committed an intentional (willful) act of knowing misconduct or intended to violate the Constitution for their decision was based on reliance of legal counsel and past practice – thus was not "willful" as required by Article VII of the Constitution.[13] In conclusion, the letter reiterated its intent to simplify and clarify the issues, but not to take a side or to assist any party.[14]

<div align="center">ARGUMENTS[15]</div>

**Charging Party**

Charging Party argues the BoD intentionally disregarded the Constitution's mandate when it made the Ross Transition Agreement (TA).  It contends the constitution prescribes the methods that can be used to remove a national officer, i.e., by a recall petition endorsed by at least 30 % of active members in good standing or through an Article VII charge. If an Article VII charge is filed against a national officer, that officer can be suspended by a 2/3s vote of the BoD; and if the charge is sustained by an Arbitrator, the officer can be removed by that same body. The BoD has no other ability to remove a national officer. A secret financial inducement designed to entice National President Ross to resign was a complete subversion of the "express provisions" of the APFA Constitution.

Charging Party also asserts that the BoD's reliance on advice of counsel does not exculpate the Charged Parties from liability. First, the statements Charged Party witnesses attributed to legal counsel are hearsay.  They failed to present Richard as a witness nor presented any evidence of his inability to

---

[13] Osborne cited authority regarding the limited use of subpoenas under Texas law not relevant to the award.

[14] (Ex. J-10)

[15] Any arguments by either party that are not specifically referenced or cited herein have been considered and found without merit by the arbitrator.

11

<div align="center">*App. 587*</div>

testify in this case. The only evidence of Richard's involvement in the Ross TA is unreliable hearsay. Further, there is no reliable evidence that Richard endorsed the Ross TA, e.g., it does not contain his signature.

Regarding the Ross TA itself, Charging Party contends it cannot be considered a legitimate document for it cannot be viewed as valid either under the Constitution or Policy Manual. Both documents contain provisions for officer salaries and expenses, as well as other compensation, yet the Ross TA does not comply with either of them. Further, it is contrary to the fiduciary responsibilities that union officers have under the LMRDA Title V.

Charing Party contends that further evidence of malfeasance on the part of the BoD are the Osborne letters and APFA Resolution #14. Regarding the July 14, 2020, letter by current union counsel Bill Osborne to the Department of Labor, he states "…access to the (Ross) Agreement should not have been denied APFA members regardless of the nondisclosure provision in para. 7 of the Agreement" citing Constitution Article II, Section 3B and LMRDA Section 301(c) (…information required to be contained in such LM-2 report…"). Likewise, in the March 9, 2021, Resolution #14 the current BoD stipulated that the Ross exit agreement was "more favorable to the departing National President than to the interest of the entire organization and its members…and the resignation agreement has resulted in significant harm to the Association including the entity's reputation as well as substantial financial losses by way of audits, legal fees, and flight pay loss." (JX Ex.10)

Finally, Charging Party contends the "precedents" relied upon by the Charged Parties are not precedents. Specifically, the previous Glading Transition Agreement contained a non-disclosure clause and a non-precedence clause, precluding its use as precedence. The conditions under which the "CLA" (shortened time for voting and permitting a member to change their vote) and the "RLA" (negotiating with another management team with all outcomes contingent on the team becoming the new leadership of American Airlines) were made with complete transparency; and were emergency situations.

As a remedy, the Charging Party seeks restitution, removal from office of those members currently serving in officer positions, placing the Charged Parties in bad standing, publication of the award and the APFA should be precluded from charging any of the fees and costs of arbitration to the Charging Party as otherwise permitted by the Article VII Section 7.B of Constitution; and jurisdiction should be retained by the arbitrator to assure compliance with the award.

*App. 588*

**Charged Parties**

Charged Parties contend they did nothing wrong for Article III, Section 3.A of the Constitution provides the BoD with broad authority, i.e., it has the authority to "take any and all lawful action consistent with this Constitution." There is no provision in the Constitution or APFA Policy Manual that prohibits transition agreements, including the Ross TA. They argue that they received guidance from legal counsel that entering the Ross TA was within their legal authority under the constitution and the law; and that they relied on the fact that previous BoD's had also executed an "exit agreement" like the Ross TA involving a previous National President (Laura Glading) and a previous union counsel (Mady Gilson). Thus, there was no basis for questioning the validity of doing so in this instance.

Charged Parties also argue that their action of entering the Ross TA was well within duty of fair representation standards set forth by the courts. Here, the BoD was facing "dire circumstances" comparable to the situation in *Marcoux*[16] where the federal district court judge dismissed a suit against officers of the APFA. Additionally, for the charges to be sustained, the conduct of the BoD must be found "willful". Here, that word is a term of art under applicable law and is a synonym for voluntary conduct undertaken with the intention to do something forbidden by law, citing *Screws v. US.*, 325 U.S. 91, 101 (1945) Further, for conduct to be "willful" there must be affirmative proof that the officer's "knew or showed reckless disregard for the matter" of the propriety of the Ross TA and its nondisclosure clause. Compare, *Miller v. Raython*, 716 F. 3d 138, 145 (5th Cir. 2013) In this matter, the BoD entered the Ross TA believing it was within their authority to do so and with guidance of legal counsel. Thus, their conduct cannot be viewed as reckless or willful.

Finally, regarding allegations pertaining to record keeping, meeting minutes and other administrative duties, these allegations should be summarily dismissed for those activities are performed by other APFA officers and are not the responsibility of the Charged Parties.

---

[16] *Marcoux v. American Airlines, Inc.*, 645 F.Supp.2d 68 (E.D.N.Y., July 22, 2008)

**App. 589**

Case: Julie Moyer v. Board of Directors (2018))

## DISCUSSION

The party pursuing charges has the burden of proving by a preponderous of evidence, that the Charged Parties (2018 BoD) committed conduct that was in violation of the APFA Constitution.  Here, that responsibility belongs to the Charging Party who is contending the 2018 BoD violated provisions of the Constitution by entering the TA with then National President Ross. The arbitrator finds Charging Party has not met that burden and that the credible evidence establishes the 2018 BoD acted within the scope of their authority as permitted and authorized by the Constitution for the reasons discussed below.[17]

### Conduct was Permitted by the Constitution

Article III, Section 3.A of the APFA Constitution authorizes the BoD to "take any and all lawful action consistent with this Constitution." That provision has been used by various BoDs to take action that is not specifically authorized by the Constitution, but which the BoD determined was for the benefit of the APFA.  The record identified several instances that can reasonably be identified as crises where the BoD acted relying on that provision. Such was the case when the APFA BoD took actions to help American Airlines avoid bankruptcy as noted and discussed by the court in *Marcoux*. Here the conduct is question is the BoD creation of an exit agreement for National President Ross at a time where there was much opposition of his leadership of the Association within the membership and the BoD.

### Crisis Existed

The arbitrator finds the credible evidence establishes the APFA was in a crisis in February 2018. The Department of Labor (DOL) had ordered the APFA to conduct another election of national officers, National President Ross had notified the organization he would not seek re-election making him a lame duck at the time of the convention, base presidents had lost confidence in Ross and were considering limiting his authority during the lame duck period, there was significant dissention within the membership with his leadership and he was facing the prospects of a recall petition. Base presidents had received hundreds of calls, emails, etc. complaining about Ross and requesting his removal.  These officers clearly felt pressure from factions of the membership to take some action against Ross; and he and the BoD were aware of these tensions.  It was in the mist of this climate that the idea of an exit agreement came into fruition.

---

[17] The arbitrator leaves to the federal courts to make determinations on alleged violations of federal law.

*App. 590*

Was it Ross or attorney Mark Richard who initiated the discussions about an exit agreement or was it the BoD, or a faction thereof that raised the prospects of an exit agreement? The record is inconclusive as to the genesis of the idea. Regardless, the arbitrator finds that both sides to the exit agreement embraced the Ross TA as the method to quell the crisis.[18] Thus, the 2018 BoD, contending with a crisis, relied on Art. III, Sec. 3.A; and with guidance of counsel, entered the Ross TA to address the crisis in February 2018. Under these circumstances, their action was permissible under the Constitution.

**Confidentiality Allowed**

The arbitrator finds the BoD did not violate any fiduciary duty to the APFA by entering a confidentiality (nondisclosure) agreement with Ross. The record reveals that prior BoDs had previously created exit agreements for a National President (Glading) that allowed for departure from office before the end of the term. In that instance, the agreement was created under the auspices of legal counsel who provided opinion that these board actions were within applicable law. All exit agreements contained confidentiality clauses. Was this in recognition of a member's right to privacy (Art. II, Sec. 3 C) and/or to maintain a level of confidentiality permitted in the Policy Manual (Sec. 1.E.1); and as recognized by *Robert's Rules of Order Newly Revised* (12th Edition) (Sec. 9:24 – 9:28, Executive Sessions)?[19] Regardless, a level of privacy/confidentiality is allowed under this Constitution.

**No Fiduciary Breach**

The arbitrator finds there was no objective evidence the BoD was fiscally irresponsible when it entered the Ross TA. Although Charging Party alleged the BoD was overly generous to the outgoing president the only credible evidence was the testimony of John Nikides who testified the Ross TA was to provide Ross the compensation he would have received had he remained in office for the duration of his term. According to National Treasurer Erick Harris, the BoD was faced with the possible costs of a recall election (e.g., $75,000.00)[20] ; and additional expenditures related to responding to DOL oversight that potentially would

---

[18] Charging Party presented no evidence disputing Ross' resignation quenched the tensions surrounding his tenure or that there a smoother transition. Additionally, the issue of whether following legal counsel's advice shielded the BoD is moot based on the finding they acted within the authority provided by the Constitution.

[19] See, Art. 1, Sec. 6 of the Constitution and J-3 (Robert's Rules of Order).

[20] See, testimony of National Treasurer Erik Harris (Tr. 276-279) and Robert Valenta (Tr. 291, 298-301) (Recall election would be expensive.)

15

**App. 591**

have been incurred had Ross remained in office, including the compensation he would have received during if he remained in office.  Agreeing to compensate him for the remainder of his term without having to deal with the continued turmoil of his term of office and avoiding the expenses of a recall election was viewed as a worthwhile expense by the BoD. More importantly, it is undisputed that none of the Charged Parties received any pecuniary benefit from the Ross TA.[21]

**Subsequent Conduct Not Determinative, But Revealing**

Charging Party argues that the 2021 BoD's decision to modify the Policy Manual through adoption of Resolution #14 in March 8-10, 2021 (detailing the compensation of a national officer who resigns from office) is proof that the Charged Parties violated the Constitution.  This argument is rejected for the following reasons.

First, while hindsight is always "20-20", the events that occurred in February 2018 must be viewed in the context in which they occurred.  Could the crisis within the membership been handled in another manner? Conceivably. Could the BoD have negotiated a better deal for the Association? Possibly. However, the question before the arbitrator is whether the 2018 BoD's conduct was permissible under the Constitution based on the conditions present at that time – and that question has been answered in the affirmative.

Second, the Charging Party misreads the content of Resolution #14. Beginning with Paragraph **4**, the BoD notes that past BoDs have "lawfully authorized resignation agreements with officers of the Association 'in order to safeguard the Association…'" Paragraphs **5** and **6** acknowledge BoDs *lawfully* entered into resignation agreements with National Presidents in 2015 and 2018. In paragraph **7** it acknowledged that in 2017-18 a substantial number of members lobbied for the removal of the Nation President that was recognized by the BoD. Paragraph **8** acknowledged that outside legal counsel recommended to the BoD that it enter into a resignation agreement to safeguard the Association, its representatives, and members.  In paragraph **9** it acknowledged that outside legal counsel negotiated a resignation agreement between the BoD and National President. Paragraph **10** acknowledged that outside legal counsel negotiated an agreement that was more favorable to the departing National President than to the interest of the entire organization and its members and the written terms of the agreement were overly general as to its terms. Paragraph **11** acknowledged the agreement had a nondisclosure clause into the resignation agreement and Paragraph **12** acknowledged the nondisclosure

---

[21] Union officials breach their duty of fair representation where their fiscal determinations are for self-interest and to their own financial benefit. Such is not the case here.

clause was revoked and negated. Paragraph **13** acknowledged the negotiated resignation agreement had resulted in significant harm to the Association that included its reputation and substantial financial losses by way of audits, legal fees and flight pay loss. Finally, in Paragraph **14**, because of all the above events, the BoD resolved to address resignations and recalls of National Officers by modifying the Policy Manual, adding a new Section 6.E.  (J Ex. -10, Resolution 14)

A fair reading of Resolution 14 reinforces the arbitrator's conclusion that the conduct of the 2018 BoD was permitted by the Constitution. There is no suggestion that the February 2018 board conduct was unlawful. However, revelations of the use of TAs with nondisclosure provisions had caused concerns within the Association about issues of transparency regarding officer resignations and expenses related thereto (i.e., audits, legal fees and flight pay loss) during a period where the finances of the Association were under scrutiny for a variety of reasons.[22] Thus, the current BoD resolved to address these transparency issues by unanimously adopting Resolution 14 that addresses future resignations and recalls of national officers. Inclusion of these provisions in the Policy Manual should eliminate issues of transparency with the issues herein.

**Procedural Arguments Without Merit**

Charging Party's allegations of procedural Constitutional and/or Policy Manual violations is also mooted by the finding that Article III, Section 3.A permitted the BoD's action due to the crisis that was at hand.  Failure to take a procedural action, e.g., failing to place the TA on the agenda or failure to formally call for a vote on the TA, etc. - would not prevent entering a TA if the BoD's action of doing so was permitted by the Constitution. Especially here, where the National President and all voting members the BoD endorsed the action by their signatures. Their conduct was permissible under the provisions of Article III, Section 3.A. Accordingly, the Charging Party's arguments in this regard are rejected.[23]

---

[22] Some evidence of financial issues within the Association was presented at this hearing, but those matters are beyond the scope of this proceeding that is limited to review of the 2018 BoD conduct pertaining to the Ross TA. Still, the finances of AFPA appear to have been under scrutiny during this period.

[23] To the extent some of the Charging Party's charges relate to maintenance of board minutes or distribution of Association funds pursuant to the Ross TA, those duties are the responsibility of other officers (National Secretary and National Treasurer) who were not specifically charged. Thus, that evidence was not fully developed. Accordingly, those charges are dismissed.

*App. 593*

Case: Julie Moyer v. Board of Directors (2018))

## COMMENTARY

The National President of the APFA at the time of the events in this case was Bob Ross. Ross was not identified as a Charged Party for the Charging Party narrowly focused on the conduct of the voting members of the 2018 BoD.  However, the National President is a member of the BoD, albeit a non-voting member. He was a direct participant in the conduct the Charging Party alleged is unlawful and/or violative of the Constitution for he was an active participant and engaged in negotiations with the voting members of the BoD., albeit through counsel. He was signatory to the agreement. Further, Ross is the only member of the BoD that received any monetary benefit through the TA. Without his participation in negotiations and his signature on the document, there would be no TA or non-disclosure provision.

Charging Party requested that the Association be reimbursed for any loss of funds incurred by the Union if the charges were sustained. Since only Ross received monetary benefit for the alleged misconduct, it would be reasonable for the BoD to seek reimbursement from him for any funds that were "improperly" issued to him (if the charges were sustained).

Ross inextricably became part and parcel of this case when he freely testified in this proceeding, thus bringing his conduct at the time (and his credibility at hearing) within the scrutiny of this proceeding.[24] It was for all the above reasons that the arbitrator commented at the end of the hearing that Ross could potentially have some liability, depending on the outcome of this case.

Here, however, the arbitrator finds the conduct of the BoD was within the broad authority granted by Article III, Section 3.A of the Constitution. Thus, this finding has equal application to Ross's participation in the negotiations and acceptance of the benefits provided by the TA.[25]

Finally, that the arbitrator finds the charges are without merit does not mean the charges were not valid. Notwithstanding that TAs with nondisclosure provisions were permissible, their use by the BoD was problematic for it allowed questions of transparency to arise and would have continued but for the current BoD's recent modifications to the Policy Manual. Those

---

[24] Ross could have challenged the validity of the subpoena but did not. His appearance was voluntary.

[25] The only substantive evidence of the financial benefit Ross received from the TA was that it was to compensate him as if he remained National President for the duration of his term. (Tr. 292-293). As noted above, Ross was not formally a part of these charges and his financial benefit from the TA was not fully developed in this record.

18

**App. 594**

modifications will hopefully eliminate the issues that resulted in the charges in this case and prevent them from resurfacing.

## CONCLUSION

Historically, Article III Section 3.A of the Constitution has been used by the BoDs to address and contend with crises of one kind or another. Prior to recent changes, there were no specific provisions addressing the issue of resignation of national officers.  In 2018, the entire BoD decided to address the crisis before it by doing that which it had done before regarding the resignation of a national officer; and in both instances, relied on legal counsel to guide their actions. The arbitrator finds for the reasons stated above, the Charging Party's charges should be dismissed in their entirety.

## AWARD

The arbitrator finds the charges are without merit for the reasons stated above, and this matter is dismissed in its entirety.  Also, because the charges relate to internal union matters, the award is to remain confidential and used only as determined by the APFA (e.g., as precedent within the organization).


Date of Award:  September 21, 2021

Edward B. Valverde, Esq.-Arbitrator

19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| **ROBERT "BOB" ROSS AND EUGENIO VARGAS** | § § § § | **Civil Action No. 4:22-cv-343-Y** |
| **Plaintiffs/Counterclaim Defendants,** | § § | **Consolidated with** |
| | § | **Civil Action No. 4:22-cv-430-Y** |
| **v.** | § § | |
| | § | **Judge Terry R. Means** |
| **ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS**, *et al.*, | § § § | |
| **Defendants/Counterclaim Plaintiffs.** | § | |

---

**OBJECTIONS TO DOUBLE HEARSAY EVIDENCE: SPECIFIC STATEMENTS OF INADMISSIBLE DOUBLE HEARSAY EVIDENCE TO SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

The Court should note that to submit an exhaustive list of double hearsay objections would be unreasonable. All statements contained within the Defendant's Brief and any supporting documentation referencing APFA's financial records Plaintiffs hereby object to based on unreliable inadmissible hearsay evidence. Therefore, Plaintiffs' submit this list of sample statements made for which Defendants or contained in the evidence Defendants submit which fail to substantiate the underlying financial documents as admissible credible evidence that may form the basis of the underlying facts:

**Black Declaration -Exhibit O – Ross Post-Hearing Brief** - "Ironically, an investigation into the payout of the Sick and Vacation days paid, brought about by the Charging Party's allegations, it was discovered Ross was not properly paid 'All' of his accrued and unused Sick days from April 1, 2016 – July 31, 2018. Ross earned and did not use 18 Sick days in each of the fiscal years April 2016-March 2017 and April 2017-March 2018." Doc. 236-1, PAGEID 6167.

"refused to repay APFA for an inappropriate overpayment … of $5,436.47." Doc. 235, PAGEID 5908.

**Black Declaration -Exhibit R – Ross Arbitrator's Decision** -"Plaintiff argued in these allegations that Defendant Ross moved into the South Lake home during the week of August 11, 2016. Defendant Ross used the APFA credit card for his personal use and was not for any Union related business activities and abused his fiduciary duty to the APFA. He charged the renting of a moving truck on August 20, 2016 to move furniture after being reimbursed for moving his belongings from Sacramento. He has purchased tools, sheets, blankets, pillows, mattresses, furniture and even smaller items such as toilet paper and candy. None of the larger items were ever inventoried or returned to the APFA upon cessation of his term of office. Defendant Ross elected to relocate to the DFW area and was afforded a moving expense reimbursement, he was not entitled to buy any furnishings using APFA funds." Doc. 235, PAGEID 6178.

*App. 596*

"The Arbitrator also found that Mr. Ross "purchased $3,637 in furniture on the APFA's credit card … and had it delivered to his personal residence" in violation of APFA's governing policy and, in doing so, Ross "abused his fiduciary duty to the APFA."
 Doc. 236-1, PAGEID 5905.

**Black Declaration -Exhibit S – Cornwall Jackson Audit -** "The Remedy included in the Arbitration Decision and language of this procedure directed us to only conclude on whether APFA expended funds that should not have been claimed as relocation moving expenses, and the amount." Doc. 236-1, PAGEID 6197

**Black Declaration -Exhibit T – Supplemental Award** - "In the original Remedy, the undersigned arbitrator requested APFA to hire a forensic auditor to audit certain items of this case to identify all inappropriate charges listed in item 1., 1(a.), 1(b)., 1(c.), and 1(d.) concerning Defendant Ross.
In accordance with the original remedy, the APFA hired Cornwell Jackson, Certified Public Accountants to conduct the requested audits. On August 5, 2022, the Independent Accountant's Audit Report was completed and submitted to the APFA. This report was subsequently transmitted to this arbitrator to review and to issue a 'Supplemental Decision and Remedy Modification.' The arbitrator has reviewed the Independent Accountant's Audit Report and finds Defendant Ross has violated certain identified items."  Doc. 236-1 PAGEID 6230.

**Black Declaration -Exhibit U – Transcripts -** "The policy manual dictates the day to day operations of the Union. It's what you can do, what you can't do. The financial, what money you can have, what you can't have. Your service to the Union. It dictates -- if you have a question about what you can or can't do, you go to the policy manual."  (Doc. 236-1, PAGEID 6253. Testimony of Cathy Lukesmeyer).

**Black Declaration -Exhibit V – Vargas Post-Hearing Brief** - "Mr. Vargas takes full responsibility for his actions involving his oversight and payment of the Ross "Transition Agreement" after only viewing the economic portions, which encompassed covenants #3, #4 and #5 and has provided his full support in these charges, including the mathematical determination used for "**Full Salary**" vs "**Basic Salary**" for said payments. The Ross "Transition Agreement" has been deemed valid by Arbitrator, Edward B. Valverde, and the actions of the APFA Board of Directors were permissible under the provisions of the APFA Constitution and no evidence that the APFA Board of Directors was fiscally irresponsible when entering into the Ross 'Transition Agreement.'" (Doc. 236-1, PAGEID 6387).

**Black Declaration -Exhibit W - Vargas Arbitration Award -** "Truan testified that at a Board of Directors meeting, it was discovered that Mr. Vargas, Ms. Martin and Mrs. Dunaway received large payouts at the end of their term for unused vacation and sick leave and it wasn't calculated correctly. Two Special BOD meetings were held on August 26, 2019 and via resolution the BOD passed to have these former Officers pay back the money owed to the Union. Payout is supposed to be calculated per APFA policy and National Officers salary. The former Treasurer had calculated additional income into that calculation which is not part of the policy at APFA. Exhibit (CLX-18) is the Executive Meeting that transpired on December 5-7, 2019 and Resolution No. 2 was passed on August 29, 2019. In this resolution, if the payouts were not paid back no later than January 26, 2020, the APFA Attorney was directed to file a civil lawsuit to collect these funds. Truan stated that from August to December, the money had not been paid back. Exhibit (CLX-17) is the second meeting of the BOD." (Doc. 236-1 PAGEID 6098).

**Black Declaration -Exhibit X - Vargas Arbitrator's Clarification Remedy -** The arbitrator has considered APFA's Request for Clarification of the Remedy and submits the following: "Issue No. 1 *is remanded to the BOD or EC to hire an Independent Auditor to audit Vargas credit card charges during his term as National Treasurer."* (ECF No. 236-1, PAGEID 6429).

**Black Declaration -Exhibit Y - Vargas Cornwall Jackson Auditor's Expenses** - *Findings:* "We obtained a monthly list of Eugenio Vargas's credit card charges from April 11, 2016 to August 28, 2018, which was in the form of an excerpt from the APFA credit card statements and an internal allocation to the entity's general ledger expense accounts." (ECF No. 236-1, PAGEID 6432).

*App. 597*

**Black Declaration -Exhibit Z - Vargas Supplemental Award -** "The arbitrator has reviewed the Independent Accountant's Audit Report and finds Defendant Eugenio Vargas has violated certain identified items. Thus, the February 18, 2022 Original Remedy is hereby modified to reflect the Auditors identified items." (ECF No. 236-1, PAGEID 6452).

"This agreement was documented in a written Transition Agreement ("T A" herein), signed by Mr. Ross and the Board in March 2018. Appx. 533-536. This Agreement covered only Mr. Ross; the other three National Officers remained in office until the re-run election later in 2018, which they each lost." (Harris Decl.) ¶ 6. Doc 235, PAGEID 5898.

The TA provided, among other things, for Mr. Ross to "voluntarily and irrevocably resign[] from his position as the National President." Appx. 533. Doc 235, PAGEID 5898.

The APFA agreed that Ross would receive, among other things, "his current full salary and benefits … through July 31, 2018," and "all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016, through July 31, 2018." Appx. 533 ¶¶ 3-4. The TA also included a confidentiality provision2: a mutual non-disparagement clause3; and a mandatory arbitration clause Appx. 533. Doc 235, PAGEID 5898.

"After Mr. Ross left office, Mr. Vargas – as Treasurer – calculated the amounts due to Mr. Ross under the TA. Appx. 606-7; 610-11 (Vargas Dep. 9-10, 23-26). With respect to sick and vacation days, Mr. Vargas determined the dollar value of each such day by taking Ross' annual salary, adding in the dollar value of certain additional expense allowances (the "Meal Expense Allowance" or "MEA" and the "Special Assignment Fee" or "SAF"), and then dividing the total amount by 365 days." *see also* Appx. 523 (Harris Decl.) ¶ 7. Doc 235, PAGEID 5899.

After the 2018 re-run election, the APFA Board of Directors examined the payments to Mr. Vargas, Ms. Martin and Ms. Dunaway, and concluded that Mr. Vargas had used an incorrect formula to calculate the amounts paid to each of them for accrued and unused sick and vacation days. Appx. 523-24 (Harris Decl.) ¶¶ 6-8. The error came from adding MEA and SAF amounts to their annual salary in order to calculate the value of a sick or vacation day, when only annual salary should have been used. *Id.* The APFA advised Mr. Vargas, Ms. Martin, and Ms. Dunaway of the overpayments, and they each repaid the amounts owed. Appx. 523-24 (Harris Decl.) ¶ 8-9. For Mr. Vargas, the amount of overpayment was $4,142.57. *Id.*; Appx. 529-532. The Board at that time did not examine the payments to Mr. Ross. Appx. 523-525 (Harris Decl.) ¶¶ 6, 9, 11-13. Doc 235, PAGEID 5899-5900.

To address outstanding requests to review the TA from members who had also complained to the DOL, the Officers requested a copy from prior APFA counsel. The TA was provided to the APFA Board of Directors, who then requested a review of payments made to Mr. Ross. Appx. 525 (Harris Decl.) ¶ 12.

"The Arbitrator also found that the "APFA paid for Ross' family vacation to the Grand Canyon with [his] APFA credit card," including costs for hotels and meals which "should be borne by

[Mr.] Ross" and that this was a "per se violation of the Policy Manual." Appx. 232. This finding also had record support. Evidence showed that Mr. Ross used the Union credit card to pay for his family's five-day trip through the Southwest, including to the Grand Canyon, supposedly on their way to "relocate" to Texas. Appx. 170-172 (family went "to Flagstaff and then from Flagstaff, my wife took the kids who were riding with her, up to the Grand Canyon, back to Grand Canyon down through Albuquerque"). Mr. Ross was not present on this trip, and he testified that his family then "went back [to California]" to "finish" the swim season and for his wife's job." Appx. 175, 179-80. Doc. 235, PAGEID 5905-5906.

"Mr. Ross contended that the cost of his family's trip (including hotel and meals) was proper because he needed to relocate his personal car. The Policy Manual provides that APFA "will reimburse a National Officer/Chair for the cost of relocating one (1) personal automobile to/from the DFW area" and "[s]uch reimbursement will be either for actual shipping charges or the applicable mileage rate by the APFA Board of Directors." Appx. 52. Accordingly, he claims that it was acceptable that his family "hopped" and "skipped around" the country on the way to Texas and charged this excursion to the Union. Appx. 172 (Ross Arb.). Mr. Ross never attempted to explain, however, why the Union paid for his family's meals and lodging during this trip, when the policy expressly only allowed direct mileage reimbursement for personal car relocation. Moreover, as explained below, Mr. Ross later claimed that this car was his "wife's car," which is why he stated he also needed to rent a car -- also at the Union's expense -- to commute to and from work." Doc. 235, PAGEID 5906-07

"The Arbitrator found that "Ross admitted he did not have a vehicle to get to work so he used the rental car" paid for by Union funds in violation of the Policy Manual. Appx. 234 Doc. 235, PAGEID 5906-07.

"Ross received a rental car from March 2016 until October 16, 2016;" "the arbitrator finds Defendant Ross abused his Fiduciary duty to the membership of the APFA by renting cars for his personal use to commute to work."). "Doc. 235, PAGEID 5906-07

"The Policy Manual provides that a national officer's "residence" shall be the DFW-area. *See* Appx. 51. It also states that the Union will only pay for rental cars *outside* of the officer's residence. Appx.50. Accordingly, Mr. Ross was not entitled to have the Union pay for his rental cars commuting to and from work in the DFW area." Doc. 235, PAGEID 5906-07

"Mr. Ross testified that he needed to rent a car in DFW because his wife needed their personal car (which the Union paid to be relocated to Texas) to drive his children to school and so she could commute to work. Appx.167-68. The hearing evidence showed that the Union paid $6,200 for long-term car rentals for Mr. Ross' use in DFW – his city of residence – in violation of APFA policy. Appx. 150-151; *see also* Appx. 124-25 Doc. 235, PAGEID 5906-07.

*App. 599*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| **ROBERT "BOB" ROSS AND** | § | |
| **EUGENIO VARGAS** | § | **Civil Action No. 4:22-cv-343-Y** |
| | § | |
| **Plaintiffs/Counterclaim Defendants,** | § | **Consolidated with** |
| | § | **Civil Action No. 4:22-cv-430-Y** |
| **v.** | § | |
| | § | **Judge Terry R. Means** |
| **ASSOCIATION OF PROFESSIONAL** | § | |
| **FLIGHT ATTENDANTS, *et al.*,** | § | |
| | § | |
| **Defendants/Counterclaim** | | |
| **Plaintiffs.** | | |

**DECLARATION OF EUGENIO VARGAS**

1. I am over 18 years of age and reside in the State of Texas. I have never been convicted of any felony or other crime involving moral turpitude. I am fully competent to make this affidavit.

2. I have personal knowledge of the facts set forth in this affidavit and the facts are true and correct.

3. I have served in elected and appointed positions within APFA leadership intermittently from 2000 to 2018, I am familiar with the practices and procedures used by APFA since 2000.

4. I attended the arbitration hearing of Chinery-Lee v. Vargas for the entire duration of the hearings on September 14, 2021, September 15, 2021 and September 16, 2021.

5. I have attended or participated in five Arbitration Hearings. The Chinery v. Vargas Disciplinary Arbitration Hearing is the first arbitration hearing I have attended where an Arbitrator held several off-record discussions related to the charges, evidence, issues pertinent to the pending hearings, prevented cross-examination of key witnesses, denied admission of key evidence, allowed documents to be withheld, and permitted APFA to deliver a substantial number of documents twenty-four hours prior to the Arbitration Hearing.

6. Neither Josh Black, Erik Harris, Julie Hedrick nor Larry Salas attended the arbitration hearing of Chinery-Lee v. Vargas for the entire duration of the hearings on September 14, 2021, September 15, 2021 and September 16, 2021.

*App. 600*

DocuSign Envelope ID: F39FBBC2-21C9-40C5-B840-E394ED98B9C2

7. I was never notified, given the opportunity to witness, nor sought for questions during the Cornwall Jackson "accounting review." I never received copies of the documents submitted to Cornwall Jackson.   This audit occurred unbeknownst to myself and my representatives.

8. Throughout the Chinery v. Vargas Disciplinary Arbitration Hearing, Arbitrator Ruben Armendariz stopped the presentation of evidence, cross-examination of witnesses, and conducted off-record discussions regarding the pending charges and evidence on several occasions.  When I objected to this based on the inability to adequately present at the hearing our case, the Arbitrator stated that these arguments could be made in the closing briefs.

9. Throughout the Chinery v. Vargas Disciplinary Arbitration Hearing, Arbitrator Ruben Armendariz stated multiple times that the Disciplinary Hearing needed to conclude early so he could make his scheduled return flight back home to San Antonio, Texas.  This limited my time to present his evidence and my ability to cross-examine witnesses.

10. During the Chinery v. Vargas Disciplinary Arbitration Hearing, the Arbitrator ruled that I could not cross-examine Erik Harris on any issues related to the Ross Transition Agreement or the debt Ross allegedly owed.

11. During the Chinery v. Vargas Disciplinary Arbitration Hearing, the Arbitrator ruled that I could not present any evidence about witness tampering, evidence tampering, witness intimidation, or any relevant social media posts.

12. During the Chinery v. Vargas Disciplinary Arbitration Hearing, the Arbitrator ruled that I could not present evidence or question any witnesses relating to the Ross Transition Agreement.

13. APFA delivered an exorbitant number of documents I requested during the Arbitration document exchange the day before the Article VII Disciplinary Hearing.

14. The Arbitrator ruled that I could not present evidence of past National Administrations financial charges or expenses could be admitted which impacted my ability to present evidence and cross-examine witnesses.

15. The Arbitrator disregarded or excluded pertinent evidence and copies of the furniture inventory lists I presented and submitted.

16. All calculations for payments made under the Ross TA were performed by Rene Berthelot ("Berthelot"), APFA's Senior Accountant, and submitted to me in the attached spreadsheet.  Berthelot made calculations to pay Robert "Bob" Ross under the Ross Transition Agreement in March of 2018.  Attached hereto as Exhibit A is a true and correct copy of Berthelot's calculations, which he gave to me to approve the payments under the Ross Transition Agreement.  Berthelot was subpoenaed by me to appear and testify to these facts but did not comply with that subpoena.

*App. 601*

DocuSign Envelope ID: F39FBBC2-21C9-40C5-B840-E394ED98B9C2

17. In 2018, Berthelot submitted calculations for the end-of-term payouts to the National Officers including myself.  I approved the calculations and payments to the National Officers which included a miscalculation of the per diem calculation.  I did so under the belief that the calculations and determinations were correctly performed in compliance with APFA policy.  Upon learning of the miscalculation, I agreed to repay the overpayment if APFA agreed to not to sue me and have fully repaid APFA this amount.

18. While serving as National Treasurer, I always submitted receipts for expenses for approval per APFA Procedures at the time.  No expenses were ever submitted for alcohol expenses, personal meals, personal vacations, or any personal use.  All expenses submitted were approved according to procedures in place with APFA at the time.  All expenses and receipts incurred were itemized receipts listing the legitimate business purpose for the expense on the receipt.

I CERTIFY THAT THE INFORMATION ABOVE IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE UNDER PENALTY OF PERJURY.

**EXECUTED** on this the 24th day of May 2024.

DocuSigned by:

*Eugenio Vargas*

533EEBB2030A4F9...

Eugenio Vargas

**App. 602**