IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STACY K. MARTIN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:14-CV-0500-D |
| VS. | § | |
| | § | |
| LOCAL 556, TRANSPORTATION | § | |
| WORKERS UNION OF AMERICA, | § | |
| AFL-CIO, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this labor dispute arising from disciplinary actions taken against officers of a union local, the court must decide whether it has subject matter jurisdiction over one claim and whether plaintiffs have stated a claim on which relief can be granted. For the reasons that follow, the court grants defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(1), grants in part and denies in part defendant's motion to dismiss under Rule 12(b)(6), and grants plaintiffs leave to amend as to all claims that are curable by amendment.

I

This is an action by plaintiffs Stacy K. Martin ("Martin"), Chris Click ("Click"), and Jerry Lindemann ("Lindemann") against defendant Local 556, Transportation Workers Union of America, AFL-CIO ("TWU Local"), seeking relief under the Norris LaGuardia Act, 29 U.S.C. §§ 101-15 ("NLA"), the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-97 ("LMRA"), and the Labor-Management Reporting and Disclosure Act of 1959,

29 U.S.C. §§ 401-531 ("LMRDA").  Plaintiffs are flight attendants employed by Southwest

Airlines.  They are also members of TWU Local, the local of the labor union that represents

Southwest Airlines' flight attendants.[1]  Each plaintiff ran for and was elected to a union local

office in 2012.  Martin was elected President, Click First Vice President, and Lindemann

Treasurer.

Following the elections, the President of the international union ("TWU

International") requested that the TWU Local Executive Board grant leave to Thom

McDaniel ("McDaniel"), the Immediate Past President of the TWU Local, so that he could

accept a position with TWU International.  McDaniel allegedly opposed plaintiffs during the

2012 elections.    Plaintiffs contend that, as union President, Martin opposed TWU

International's request because TWU International did not follow proper protocol in

submitting it.  The Executive Board denied the request.  TWU International's President then

---

[1]In deciding TWU Local's Rule 12(b)(6) motion, the court construes the amended complaint in the light most favorable to plaintiffs, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

A Rule 12(b)(1) motion can mount either a facial or factual challenge.  *See Hunter v. Branch Banking & Trust Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)).  When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial.  *Id.*  The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true.  If the allegations are sufficient to allege jurisdiction, the court must deny the motion."  *Id.* (citation omitted) (citing *Paterson*, 644 F.2d at 523).

-

allegedly threatened to charge Martin with violations of union rules if he continued to oppose the request.  Ultimately, the dispute was submitted to arbitration, and the arbitrator ruled in McDaniel's favor.

In the spring of 2013, a member of the TWU Local Executive Board charged Click and Lindemann jointly with violations of union rules, and another member[2] separately charged Click with other union rules violations.  Click's individual trial was scheduled for May 14, 2013, and Click and Lindemann's joint trial was scheduled for May 15, 2013.  On May 13 the Executive Board attempted to delay the trial dates to May 22 and May 23, 2013, respectively, by insisting that Martin reschedule the trials.  Martin allegedly refused to assist the Executive Board in its attempt to delay the trials on the basis that doing so would constitute a violation of union rules.  Click and Lindemann attended their trials on May 14 and 15, 2013 and were acquitted of all charges.  On May 16, 2013 Lindemann went on formally approved, extended medical leave.  On the same day, the Executive Board notified Click and Lindemann that it was nullifying the results of the May 14 and 15 trials and scheduling their retrials for May 23 and 24, 2013, respectively.  On May 23 a retrial committee found Click guilty and removed him from office.  On May 24 a retrial committee found Click and Lindemann guilty, removed them from office, and banned them from holding union office for three years.  Plaintiffs allege that neither Click nor Lindemann was present for the retrials on May 23 and 24.  On May 16, 2013 the Executive Board also

---

[2]Plaintiffs' amended complaint does not specify whether this person was a member of the Executive Board or a member of the union.  *See* Am. Compl. ¶ 20.

charged Martin with violating union rules. The Executive Board conducted Martin's trial on May 29 and 30, found him guilty, removed him from office, and banned him from holding union office for three years.

Plaintiffs then brought the instant lawsuit against TWU Local, alleging that it had violated their rights under the LMRDA. TWU Local filed a motion to dismiss and an amended motion to dismiss. Plaintiffs then filed an amended complaint, and TWU Local filed the instant motion to dismiss the amended complaint. In its present motion, TWU Local incorporates by reference the arguments and authorities asserted in its first motion to dismiss.[3] TWU Local moves to dismiss count II of plaintiffs' amended complaint under Rule 12(b)(1) for failure to establish federal question jurisdiction, and to dismiss count I under Rule 12(b)(6) for failure to plead a plausible claim for relief under the LMRDA.

II

The court considers first TWU Local's Rule 12(b)(1) motion to dismiss.[4]

---

[3]TWU Local's first motion to dismiss predates plaintiffs' amended complaint. "The court may nevertheless treat defendant's motion as directed to the amended complaint because the defects in plaintiff[s'] complaint reappear in the amended complaint." *Moore v. Dall. Indep. Sch. Dist.*, 557 F.Supp.2d 755, 760 (N.D. Tex. 2008) (Fitzwater, C.J.) (internal quotation marks and brackets omitted), *aff'd*, 370 Fed. Appx. 455 (5th Cir. 2010). Because TWU Local asserts that the amended complaint is subject to dismissal on the same grounds as is the complaint, and the parties have fully briefed the sufficiency of the amended complaint, the court will consider TWU Local's arguments in its first motion to dismiss in assessing whether the amended complaint is subject to dismissal under Rules 12(b)(1) and 12(b)(6).

[4]*See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the

A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

B

Plaintiffs predicate subject matter jurisdiction over count II on the jurisdictional grant found in 29 U.S.C. § 185(a) of the LMRA,[5] which provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Section 185(a) imposes a jurisdictional requirement. *See, e.g., Tex. Indus., Inc. v. Radcliff*

merits.").

[5]Plaintiffs cite identical provisions of the NLA and LMRDA in counts I and II as the basis for their claims. *Compare* Am. Compl. ¶ 71, *with* ¶ 83 (citing 29 U.S.C. §§ 102, 401, 411, 412, 413, 431, 481, 482, 501, 529, and 530). The primary difference between each count is that, in count I, plaintiffs seek relief for "violation of the LM[RD]A," Am. Compl. at 10 (bold font and upper case text omitted), while in count II, they seek relief for "breach of the TWU [International] Constitution & violation of the LM[RD]A," *id.* (bold font and some upper case text omitted).

- 5 -

*Materials, Inc.*, 451 U.S. 630, 642-43 (1981) ("In this vein, this Court has read § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), . . . as granting jurisdiction over defined areas of labor law[.]"); *Hou. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indust. & Serv. Workers Int'l Union*, ___ F.3d ___, 2014 WL 4197057, at *3 (5th Cir. Aug. 25, 2014) ("We have in the past read section 301(a) as a jurisdictional requirement."). "[A]n allegation of a labor contract violation is both necessary *and* sufficient to support subject-matter jurisdiction under section 301(a).  If the court later finds the allegedly violated contract to be non-existent or invalid, it must dismiss for failure to state a claim, not for lack of jurisdiction." *Hou. Ref. L.P.*, 2014 WL 4197057, at *5 (footnote omitted); *see also id.* at *6 ("[T]he alleged violation of a labor contract is both necessary and sufficient to invoke federal subject-matter jurisdiction under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).").

The amended complaint does not allege that count II pertains to a violation of a contract between an employer and a labor organization or between labor organizations.  The only conceivable contract mentioned in count II is the TWU International Constitution.  *See* Am. Compl. ¶¶ 73-76.  But the amended complaint does not allege that the TWU International Constitution is a contract between an employer and a labor organization or between labor organizations.  Plaintiffs allege that the TWU International Constitution "is a contract between [TWU] Local and its members." *Id.* at ¶ 76.  They assert that the TWU Local Executive Board violated its duties and responsibilities under the TWU International Constitution.  *Id.* at ¶¶ 77-80.

- 6 -

Accordingly, because an allegation of a labor contract violation is necessary to support subject matter jurisdiction under § 301(a), 29 U.S.C. § 185(a), and plaintiffs have not alleged such a violation, the court grants TWU Local's motion to dismiss count II of the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction.

III

TWU Local moves under Rule 12(b)(6) to dismiss count I of plaintiffs' amended complaint.

A

In deciding defendant's Rule 12(b)(6) motion, the court evaluates the sufficiency of plaintiffs' amended complaint "by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted)). To survive defendant's motion to dismiss under Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a

- 7 -

right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678. Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "labels and conclusions."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[A] formulaic recitation of the elements of a cause of action will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

B

"The Labor-Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership."  *Finnegan v. Leu*, 456 U.S. 431, 435 (1982).  Although the LMRDA as originally enacted focused on disclosure requirements and regulating union elections, over time various amendments have shifted the focus toward "protection for members of unions paralleling certain rights guaranteed by the Federal Constitution[.]"  *Id.*  In count I of the amended complaint, plaintiffs allege violations of the LMRDA, citing sections that deal with a host of topics, including reporting and disclosure requirements, the bill of rights for members of labor organizations, and provisions governing criminal violations of the Act.  Plaintiffs request

- 8 -

relief under § 102 of the NLA and §§ 401, 411, 412, 413, 431, 481, 482, 501, 529, and 530 of the LMRDA.

IV

A

Count I must be dismissed to the extent based on § 102 of the NLA and §§ 401, 413, and 530 of the LMRDA because these provisions do not expressly authorize a private cause of action.  Section 102 is an introductory provision of the NLA that merely sets out the public policy underlying the Act.  29 U.S.C. § 102 ("It is necessary that [the individual unorganized worker] have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment").  Similarly, § 401 of the LMRDA declares the public policy that underlies the LMRDA.  29 U.S.C. § 401 (declaring that LRMDA is intended to protect members of labor unions from various "improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies" of the LMRA and the Railway Labor Act).

Section 413 of the LMRDA provides that nothing in §§ 411-15 should be interpreted to limit the rights and remedies that members of labor organizations have under other provisions of state or federal law, or under the constitution and bylaws of their respective labor organizations.  *See* 29 U.S.C. § 413.  It does not create a private right of action.

Section 530 is a statute that imposes criminal penalties on labor organizations that use "force or violence, or threat of the use of force or violence, to restrain, coerce, or

- 9 -

intimidate . . . any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled" under the LMRDA. 29 U.S.C. § 530. Section 530 does not create a private cause of action. The Supreme Court "rarely implie[s] a private right of action under a criminal statute[,]" and where the Court has, "'there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) (quoting *Cort v. Ash*, 422 U.S. 66, 79 (1975)). Section 530 does not contain any language suggesting that Congress intended to authorize a private cause of action. Thus plaintiffs do not plausibly state a claim for relief under § 530.

B

Count I must be dismissed to the extent based on §§ 431 and 501 of the LMRDA because, although these sections do confer a private cause of action, plaintiffs have not pleaded *any* factual allegations to state a claim for relief under either section. Section 431 pertains to certain disclosure and reporting requirements. *See* 29 U.S.C. § 431. For example, it provides that every labor organization must submit to the Secretary of Labor certain reports about the organization and annual reports that detail the organization's use of funds. *See id.* (a)-(b). Section 431 also requires that labor organizations make the information in these reports available to its members. *See id.* § 431(c). But plaintiffs have neither pleaded any factual allegations that mention the reports covered by § 431 nor alleged any failure by TWU Local to fulfill its duties related to these reports.

Section 501 imposes fiduciary obligations primarily of a pecuniary nature on the

Appendix 612

representatives of labor organizations.  *See* 29 U.S.C. § 501; *see also Hoffman v. Kramer*, 362 F.3d 308, 316 n.3 (5th Cir. 2004) ("[T]he fiduciary obligations imposed are primarily pecuniary in nature—that is, having to do with the custody, control, and use of a union's money and its financial interests or property[.]").  Section 501(b) authorizes union members to bring a derivative suit on the union's behalf for a representative's violation of the duties prescribed by § 501.  *See id.* § 501(b).  But plaintiffs fail to plead *any* factual allegations relating to the fiduciary duties imposed in § 501, and they have therefore failed to state a plausible claim for relief on this basis.

C

Sections 481 and 482 of the LMRDA provide the exclusive remedy for challenging a union election that has already been conducted.  *See* 29 U.S.C. § 483 ("The remedy provided by this subchapter for challenging an election already conducted shall be exclusive.").  Section 481 provides, in relevant part:

> [i]f the Secretary [of Labor], upon application of any member of a local labor organization, finds after [a] hearing . . . that the constitution and bylaws of such labor organization do not provide an adequate procedure for the removal of an elected officer guilty of serious misconduct, such officer may be removed, for cause shown and after notice and hearing, by the members in good standing voting in a secret ballot.

Under § 482, except in two instances, only the Secretary of Labor can bring an action for a violation of § 481.  *See* 29 U.S.C. § 482(a)-(b); *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964) (noting that Congress "decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of [§ 481]").  A union member can bring a civil action

- 11 -

in the following circumstances: (1) against the Secretary of Labor to review the Secretary's decision not to file an action under § 482, *see Dunlop v. Bachowski*, 421 U.S. 560, 574-75 (1975), *overruled on other grounds*, 467 U.S. 526 (1984); and (2) to enforce "a candidate's right to distribution of campaign literature and equal access to membership lists." *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 540 n.15 (1984). Plaintiffs have not pleaded any factual allegations that enable the court to draw the reasonable inference that they are seeking relief under either of these exceptions. Accordingly, plaintiffs have failed to state a claim on which relief can be granted under §§ 481 and 482.

V

Plaintiffs also allege that TWU Local violated §§ 411, 412, and 529 of the LMRDA.

A

Section 411 of the LMRDA sets out the core of the guarantees afforded to members of labor organizations by the LMRDA. It constitutes a "bill of rights," and it is "designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline." *Local No. 82*, 467 U.S. at 536-37. The LMRDA provides two provisions that enable a union member to enforce the member's rights under this "bill of rights:" §§ 412 and 529.

Section 412 grants union members a private cause of action for a union's infringement of the rights secured by §§ 411-15. To state a claim under § 412, plaintiffs must show (1) that they are members of a labor organization and (2) that the organization infringed a

- 12 -

right secured by § 411, 412, 413, 414, or 415.  *See Martinez v. Am. Fed'n of Gov't Emps.*, 980 F.2d 1039, 1041-42 (5th Cir. 1993).  "Union leaders, *per se*, are not themselves a protected class under [the LMRDA], except that they, too, may not be deprived of the basic rights attending on union membership." *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 731 F.2d 1154, 1156 (5th Cir. 1984) ("*Adams-Lundy I*").  Thus it is generally insufficient for a plaintiff to plead a plausible claim under § 412 if the plaintiff only alleges the infringement of a right that he or she only has in the capacity of a union officer.  *See id.*

There is an exception to this general rule.  If plaintiffs can show that their removal from office "was part of a scheme to subvert the union's basic democratic structure or otherwise directly implicated rights of members," they can state a claim for relief as officers under § 412.  *See Adams-Lundy I*, 731 F.2d at 1159.  To state a claim under this exception, plaintiffs must show "that the defendants are attempting to dismantle the union's electoral system, . . . or that members opposing that faction are . . . suppressed or threatened with reprisals."  *Id.*  Allegations that merely suggest that an internal union struggle is "anti-democratic" are insufficient to plausibly allege the existence of a pattern of intimidation and stifled dissent.  *Id.*

Section 529 provides members a private cause of action when their union fines, suspends, expels, "or otherwise discipline[s]" them for exercising any right to which they are entitled under the LMRDA.  "The primary difference between § [529] and § [412] is that § [529] protects against retaliation for the exercise of any right secured under the LMRDA, whereas § [412] only protects rights secured under [§§ 411-15]." *United Steel Workers Local*

- 13 -

*12-369 v. United Steel Workers Int'l*, 728 F.3d 1107, 1115 (9th Cir. 2013) (citing *Finnegan*, 456 U.S. at 439 n.10).  Depending on the right the member seeks to protect, §§ 412 and 529 can be entirely duplicative.  *See id.* at 1115 n.4 (citing *Finnegan*, 456 U.S. at 439 n.10).  To state a claim under § 529, plaintiffs must show that (1) they are members of a labor organization; (2) the organization fined, suspended, expelled, or otherwise disciplined them; and (3) the organization imposed the punishment in retaliation for their exercise of a right protected by the LMRDA.  *See* 29 U.S.C. § 529.  As under § 412, to state a claim under § 529, plaintiffs must allege that any punishment or restriction imposed by TWU Local was a limitation or restriction on their membership rights.  Removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529.  *See Finnegan*, 456 U.S. at 438 n.9 (dictum) (explaining that discipline referred to in §§ 411(a)(5) and 529 means limitations on membership rights, not removal from union office); *Adams-Lundy I*, 731 F.2d at 1157 (dictum) (citing *Finnegan* for proposition that "§ [411(a)(5)] and § [529] protect only the rights of membership per se, and that a union officer who is removed from office but not deprived of membership in the union has suffered no loss cognizable as 'discipline' proscribed by these sections of the Act").

B

The court considers first plaintiffs' allegations under § 411.  They assert that TWU Local violated the LMRDA by infringing on their right to free speech.

- 14 -

Appendix 616

Section 411(a)(2) of the LMRDA provides, in pertinent part:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings[.]

"Where the injury allegedly suffered by union officers is done to them in their status as officers, not as individual members, there can be no cause of action under section[] 411[.]" *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 792 F.2d 1368, 1372 (5th Cir. 1986) ("*Adams-Lundy II*"). The court must therefore decide whether plaintiffs have pleaded sufficient facts to permit the court to draw the reasonable inference that TWU Local disciplined plaintiffs for exercising their rights to free speech *as members* rather than *as officers*, or that plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent.

The amended complaint does not plead factual content that would permit the court to draw the reasonable inference that TWU Local disciplined plaintiffs for exercising their rights to free speech *as members* rather than *as officers*. Plaintiffs allege that the charges leveled against Click and Lindemann were based on their "actions regarding information they provided the Local 556 membership at membership meetings in 2013[.]" Am. Compl. ¶ 19. Plaintiffs assert that the charges leveled against Martin were based on "various conduct including making presentations to the members on issues surrounding Local 556, allegedly making false representations to the membership, and for standing in opposition to the Local 556 Executive Board." *Id.* ¶ 37. The only reasonable inference the court can draw from

- 15 -

Appendix 617

these allegations is that plaintiffs engaged in this conduct in their capacities as officers.  With respect to the additional, internal charges leveled against Click that are "related to a rally that occurred [in March 2013] to protest the TSA's knives on planes decision[,]" *id.* ¶ 20, plaintiffs have failed to allege facts from which the court can reasonably infer that the charges were based on Click's speech as opposed to his conduct.

The amended complaint also fails to plead factual content that permits the court to draw the reasonable inference that plaintiffs' dismissal was part of a pattern of intimidation and stifled dissent.  Plaintiffs allege that their opponents "infiltrated" the Executive Board and "usurped" their offices.  Am. Compl. ¶¶ 47 & 62.  These allegations clearly express plaintiffs' concern that the Executive Board's actions were undemocratic, but that alone is insufficient.  *See Adams-Lundy I*, 731 F.2d at 1159 (holding that plaintiffs' allegations that defendants' conduct was anti-democratic were insufficient to show infringement of basic rights of membership).  Plaintiffs have not plausibly alleged that TWU Local is "attempting to dismantle the union's electoral system," or "that members opposing [plaintiffs' opponents] are in any fashion suppressed or threatened with reprisals."  *Id.*  Absent any further aggravating allegations, plaintiffs' allegations are insufficient to state a claim for relief under § 411(a)(2).

## C

Plaintiffs also allege that TWU Local violated the LMRDA by giving Click only a week to prepare for the second trials against him.  Section 411(a)(5)(B) provides that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise

- 16 -

Appendix 618

disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been . . . (B) given a reasonable time to prepare his defense[.]" "[D]iscipline," as used in § 411(a)(5), refers to "punitive actions diminishing membership rights." *Finnegan*, 456 U.S. at 438.  Plaintiffs allege that TWU Local disciplined them both by removing them from union office and banning them from holding any union office for three years.  Removal from an elected office is not a form of "discipline" actionable under § 411(a)(5).  *See Adams-Lundy I*, 731 F.2d at 1156-57 (holding that an elected union officer's removal from office does not constitute "infringement" of the rights secured by § 411). Although the Fifth Circuit has not specifically held that being banned from holding union office is a form of discipline, it has stated in *dicta* that the right to run for office is a membership right.  *See id.* at 1156.  The court will therefore assume that a ban against running for union office is a form of discipline that is actionable under § 411(a)(5).  It will consider whether plaintiffs have plausibly alleged that TWU Local violated Click's rights under § 411(a)(5)(B) by banning him from running for union office without providing him a reasonable time to prepare his defense.

Section 411(a)(5)(B) does not specify the amount of time that is necessary to comply with the "adequate time" requirement.  Courts generally decide whether a requirement such as this has been satisfied "with due regard to the practicalities and peculiarities of the case." *See, e.g., Air Lines Stewards & Stewardesses Ass'n, Local 550 v. Am. Airlines, Inc.* 455 F.2d 101, 108 (7th Cir. 1972) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313-14 (1950)).  The LMRDA gives plaintiffs the right to present evidence and to cross-

examine witnesses, *see, e.g., Holschen v. Int'l Union of Painters*, 598 F.3d 454, 463-64 (8th Cir. 2010), but it does not guarantee "the specific protections associated with judicial proceedings, including the right to be represented by counsel and the technical rules of pleading, procedure, and evidence." *Frye v. United Steelworkers*, 767 F.2d 1216, 1224 (7th Cir. 1985); *see also Conway v. Int'l Ass'n of Heat & Frost Insulators*, 209 F.Supp.2d 731, 751 (N.D. Ohio 2002) (holding that LMRDA did not guarantee discovery), *aff'd*, 93 Fed. Appx. 780 (6th Cir. 2004).

The amended complaint does not plead sufficient facts to enable the court to draw the reasonable inference that TWU Local failed to give Click a reasonable time to prepare his defense. Plaintiffs aver that Click was notified of at least some of the charges against him in March 2013, that Click's trial dates were set in April 2013, and that his initial trials were conducted on May 14 and 15, 2013. Plaintiffs maintain that the Executive Board notified Click on May 16 that it was nullifying the results of the initial trials and scheduling retrial for May 24.[6] Plaintiffs do not plead any factual allegations suggesting that the May 14 and 15 trials differed substantially from the May 23 and 24 retrials. Assuming that Click did not learn about all of the charges against him until the trial dates were set in April 2013, Click had 14 and 15 days, respectively, to prepare for his first trials, and six and seven days more,

---

[6]Without explanation, plaintiffs later aver that the retrial committee conducted an individual hearing against Click on May 23. Plaintiffs do not contend that the Executive Board failed to notify Click of the May 23 retrial. Thus there is no basis for the court to reasonably draw any inference other than that the Executive Board notified Click of the May 23 proceeding at least several days before the hearing was conducted.

Appendix 620

respectively, to hone his defense in light of what he learned about TWU Local's case at his first trials. This is well within the range that courts have considered reasonable under § 411(a)(5)(B). *See Wellman v. Int'l Union of Operating Eng'rs*, 812 F.2d 1204, 1206 (9th Cir. 1987) (28 days); *Falcone v. Dantinne*, 288 F. Supp. 719, 727 (E.D. Pa. 1968) (23 days), *rev'd on other grounds*, 420 F.2d 1157 (3d Cir. 1969); *Vars v. Int'l Bhd. of Boilermakers*, 215 F. Supp. 943, 947 (D. Conn. 1963) (14 days), *aff'd*, 320 F.2d 576 (2d Cir. 1963). Thus plaintiffs have failed to state a plausible claim for relief under § 411(a)(5)(B).

D

Plaintiffs allege that TWU Local violated the LMRDA by infringing their rights to a full and fair hearing. They assert that TWU Local deprived them of a full and fair hearing when (1) Click and Lindemann were tried twice for the same offense; (2) Lindemann was retried *in absentia* while on authorized medical leave; (3) Martin was tried before a panel of his accusers; (4) Martin was denied the right to have the assistance of counsel; and (5) Martin was convicted on insufficient evidence.

1

Section 411(a)(5)(C) of the LMRDA protects members of labor organizations from being disciplined without first being afforded a full and fair hearing. *See* 29 U.S.C. § 411(a)(5)(C). "The full and fair hearing clause does not require unions to provide the 'full panoply of procedural safeguards found in criminal proceedings,' but only to comply with the 'fundamental and traditional concepts of due process.'" *Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188, 1193 (D.C. Cir. 1996) (quoting *Ritz v. O'Donnell*, 566 F.2d 731,

- 19 -

735 (D.C. Cir. 1977)); *see United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 385 (2d Cir. 2001) (same) ("*Teamsters*"); *Bell v. Int'l Bhd. of Teamsters*, 108 F.3d 1376, 1997 WL 103320, at *5 (6th Cir. 1997) (unpublished table decision) (same).  "Not all of the due process protections available in the federal courts apply to union disciplinary proceedings." *Teamsters*, 247 F.3d at 385.  "A violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA." *Id.* at 387.

2

Plaintiffs have failed to state a plausible claim that TWU Local violated the LMRDA by trying Click and Lindemann twice for the same offense.  As a general proposition, the Supreme Court has declined to interpret the Due Process Clause as extending double jeopardy protection beyond the context of criminal prosecution.  *See Dowling v. United States*, 493 U.S. 342, 354 (1990).  Although courts have found a violation of § 411(a)(5)(C) where a union member was retried by individuals who had previously heard the charges and found the member guilty, *see, e.g., Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1243 (2d Cir. 1979), this is not what plaintiffs allege.  Plaintiffs fail to plead any factual allegations that explain why the Executive Board nullified Click and Lindemann's May 14 and 15 trials and ordered retrials, or that there were any other circumstances of unfairness surrounding the retrials that would enable the court to draw the reasonable inference that plaintiffs' rights to a full and fair hearing were violated.  Merely alleging that a union ordered a new trial, without more, does not state a plausible claim that

- 20 -

the union failed to afford a member a full and fair hearing.  *See Frye*, 767 F.2d at 1224 (stating that plaintiff's "contention that a trial *de novo* by the International's Commission was improper as a matter of law is not supported by reason or authority").

3

Plaintiffs have also failed to state a plausible claim that TWU Local violated § 411(a)(5)(C) when it tried Lindemann *in absentia* during his absence from work on approved medical leave.  "Fundamental due process . . . gives a party the right to be *present* during proceedings brought against him . . ., subject to limited exceptions."  *Holschen*, 598 F.3d at 464 n.4.  This right is infringed when the circumstances of the case suggest that the accused did not have a "fair opportunity" to attend the relevant hearing.  *Moody v. Miller*, 864 F.2d 1178, 1181 (5th Cir. 1989) (per curiam).  Plaintiffs allege that TWU Local violated Lindemann's rights by conducting the retrial when they knew that he was out on formally approved extended medical leave.  But merely alleging that Lindemann was ill and unable to attend the hearing does not enable the court to draw the reasonable inference that TWU Local failed to afford Lindemann a full and fair hearing.  If, through no fault of TWU Local, a member "[was] unable or refuse[d] to attend a disciplinary hearing, due process requires no more than that the hearing be held in accordance with all of the other requirements of due process that are called for under the circumstances."  *Id.*; *see also Rosario*, 605 F.2d at 1244 (finding no due process violation where parties were entitled to be present at second trial but chose to boycott proceeding instead).  This conclusion is strengthened by plaintiffs' failure to allege that Lindemann notified TWU Local that he was too ill to attend the May 24 retrial

- 21 -

or to request a continuance.  *See Parker v. Ellis*, 258 F.2d 937, 940 (5th Cir. 1958) (dismissing due process claim where defendant failed to raise health issue or seek continuance during trial).  Thus plaintiffs' allegations regarding Lindemann's trial *in absentia* do not state a plausible claim on which relief can be granted.

4

Plaintiffs allege that TWU Local violated Martin's rights to a full and fair hearing under the LMRDA when he was tried by the Executive Board, which included the person or people who filed the charges against him initially.  Essentially, plaintiffs' complain that the combination of investigative, prosecutorial, and adjudicatory functions in the Executive Board violated Martin's right to due process under § 411(a)(5)(C).

"The basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer."  *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) (citing *Gibson v. Berryhill*, 411 U.S. 564, 569 (1973)).  "In an effort to prevent 'even the probability of unfairness,' courts have identified situations in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty., Tex.*, 57 F.3d 436, 444 (1995) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).  A union's "combination of investigative, prosecutorial, and adjudicatory functions in [a single body] does not, by itself, violate the LMRDA." *Wildberger*, 86 F.3d at 1195.  But when this combination occurs, courts "should be alert to the possibilities of bias that may lurk in the way particular procedures actually

- 22 -

Appendix 624

work in practice." *Withrow v. Larkin*, 421 U.S. 35, 54 (1975).  It is therefore insufficient for plaintiffs merely to allege that the tribunal that filed charges against them also adjudicates the charges.  *See id.* at 58 (holding that "[t]he fact that the same agency makes [the initial decision to charge and the ultimate adjudicative decision] in tandem . . . relat[ing] to the same issues does not result in a procedural due process violation").  Plaintiffs "must overcome a presumption of honesty and integrity in those serving as adjudicators; and [they] must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment" to constitute a denial of the right to a full and fair hearing.  *Id.* at 47.

The court holds that plaintiffs have plausibly pleaded that Martin was denied a full and fair hearing when he was tried by a panel that included his accusers.  Plaintiffs' allegations regarding the "running controversy" between Martin and the faction associated with McDaniel enable the court to draw the plausible inference that there was "the possibility of bias."  *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994) (applying *Withrow* and holding that plaintiff had adduced sufficient evidence at summary judgment stage to overcome presumption of impartiality); *see also Valley*, 118 F.3d at 1053 & n.4 (quoting *Bakalis* with approval for proposition that "appellate jurisprudence has favored recusing board members who display a bias or prejudice that would result in an unconstitutional decision").  In support of their claim that the Executive Board prejudged Martin's guilt, plaintiffs allege that they all ran together on a slate of candidates opposed by past-president

McDaniel. They aver that, when Martin refused to assist the Executive Board in rescheduling Click and Lindemann's trials, the Executive Board suspended Martin from the office of union president in retaliation. Plaintiffs allege that the Executive Board did not explain its decision to suspend Martin until May 16, when it charged him with violating the union constitution. Based on these allegations, and taking a realistic appraisal of psychological tendencies and human weaknesses, the court holds that plaintiffs' allegation that the Executive Board acted in a prosecutorial and adjudicative role during the same hearing plausibly suggests a risk of actual bias or prejudgment. *Cf. Stein v. Mutuel Clerks' Guild of Mass., Inc.*, 560 F.2d 486, 491 (1st Cir. 1977) (upholding trial court's conclusion that plaintiff did not get full and fair hearing where union president, who was also member of executive committee, made comments to committee revealing he had prejudged case).

5

Plaintiffs allege that TWU Local violated Martin's right to a full and fair hearing when Martin was denied assistance of counsel. Plaintiffs assert that this right is guaranteed by TWU Local's constitution.

As noted above, the LMRDA's guarantee of a right to a full and fair hearing does not include the right to be represented by counsel. *See Frye*, 267 F.2d at 1224. Although the TWU Local constitution may guarantee a union member the right to assistance of counsel, "[a] union's violation of its own constitution is not *per se* a violation of the LMRDA." *Adams-Lundy II*, 792 F.2d at 1373. Rights guaranteed solely by a local union's constitution are contractual rights—not LMRDA rights—and "a federal court has no jurisdiction to

- 24 -

enforce union constitutions and by-laws as such." *Id.* (citing *McGovern v. New Orleans Clerks & Checkers, Local 1497 ILA*, 343 F. Supp. 351, 352 (E.D. La. 1972), *aff'd per curiam*, 463 F.2d 423 (5th Cir. 1972)). Thus plaintiffs' bare allegations that Martin was not afforded the right to counsel, in violation of TWU Local's constitution, are insufficient of themselves to state a plausible claim for relief.

6

Plaintiffs assert that the Executive Board convicted Martin on insufficient evidence presented to support the charges against him. Section 411(a)(5)(C) "requires the charging party to provide some evidence at the disciplinary hearing to support the charges made." *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 246 (1971) (noting that the Supreme Court has "repeatedly held that conviction on charges unsupported by any evidence is a denial of due process," and that § 411(a)(5)(C) "import[s] a similar requirement into union disciplinary proceedings"). This standard respects "the apparent congressional intent to allow unions to govern their own affairs." *Id.* Nevertheless, although § 411(a)(5)(C) requires "some evidence," plaintiffs' conclusory allegation that the evidence presented at Martin's trial was insufficient does not enable the court to draw the reasonable inference that TWU Local violated Martin's right to a full and fair hearing. *Cf. Rosario*, 605 F.2d at 1243 (noting that "union disciplinary proceedings . . . except in extreme cases, are not reviewed in the federal courts for the sufficiency of the evidence").

E

The court finally considers whether plaintiffs have stated a plausible claim for relief under § 529, which protects a union member from retaliation for exercising his or her rights under the LMRDA.

Plaintiffs allege that Martin's suspension from office occurred in retaliation for his refusal to reschedule Click's and Lindemann's trials. But removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529. *See Finnegan*, 456 U.S. at 439 n.9 (dictum). Nowhere in the amended complaint do plaintiffs allege that the Executive Board's decision to ban plaintiffs from running for office was taken in retaliation for the exercise of plaintiffs' rights. Accordingly, the court holds that the amended complaint does not plausibly allege a right to relief under § 529.

VI

Although the court is dismissing some of plaintiffs' claims, it will permit them to replead. *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567–68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." (citation and internal quotation marks omitted)). The defects with respect to § 102 of the NLA and §§ 401, 413, and 530 of the LMRDA are incurable, and the court therefore declines to permit plaintiffs to attempt to plead a claim under any of these provisions. But because plaintiffs have not stated that they cannot, or are unwilling to, cure

- 26 -

Appendix 628

the other defects that the court has identified, it grants them 28 days from the date this memorandum opinion and order is filed to file a second amended complaint.

*   *   *

The court grants TWU Local's motion to dismiss count II under Rule 12(b)(1), and it grants in part and denies in part TWU Local's Rule 12(b)(6) motion as to plaintiffs' claims in count I.

**SO ORDERED**.

September 3, 2014.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE

Appendix 629

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

STACY K. MARTIN, et al.,                        §
                                                §
                              Plaintiffs,       §
                                                §  Civil Action No. 3:14-CV-0500-D
VS.                                             §
                                                §
LOCAL 556, TRANSPORTATION                       §
WORKERS UNION OF AMERICA,                       §
AFL-CIO,                                        §
                                                §
                              Defendant.        §

MEMORANDUM OPINION
AND ORDER

In this labor dispute arising from disciplinary actions against officers of a union local,

the union local moves for summary judgment as to all of plaintiffs' claims.  The court must

decide whether plaintiffs have created genuine issues of material fact that warrant a trial of

their claims under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.

§§ 401-531 ("LMRDA").  For the reasons that follow, the court grants the union local's

summary judgment motion in part and denies it in part.

I

This case is the subject of two prior opinions of the court: *Martin v. Local 556,*

*Transportation Workers Union of America, AFL-CIO*, 2014 WL 4358480 (N.D. Tex. Sept.

3, 2014) (Fitzwater, C.J.) ("*Martin I*") and *Martin v. Local 556, Transportation Workers*

*Union of America, AFL-CIO*, 2015 WL 569045 (N.D. Tex. Feb. 11, 2015) (Fitzwater, J.)

("*Martin II*").  The court will therefore recount only the background facts and procedural

history that are pertinent to this memorandum opinion and order.

Plaintiffs Stacy K. Martin ("Martin"), Chris Click ("Click"), and Jerry Lindemann ("Lindemann") sue defendant Local 556, Transportation Workers Union of America, AFL-CIO ("TWU Local") seeking relief under the LMRDA.  Plaintiffs are flight attendants employed by Southwest Airlines. They are also members of TWU Local, the local of the labor union that represents Southwest Airlines' flight attendants.[1]  In 2011 the top officers of the TWU Local Executive Board ("Executive Board") were Thom McDaniel, President; Michael Massoni, 1st Vice President; Martin, 2nd Vice President; Cuyler Thompson ("Thompson"), Secretary; and John Parrott ("Parrott"), Treasurer.  In October 2011, during four separate membership meetings, Click voiced his opposition to an amendment ("Amendment")[2] proposed by then-Secretary Thompson.  TWU Local membership ultimately voted against the Amendment, in large part because of Click's opposition. Allegedly in retaliation for Click's opposition to and speech against the Amendment, and as a preemptive attempt to undermine Click's chances of being elected 1st Vice President during the 2012 elections, Thompson made charges that Click violated membership rights

---

[1]In deciding this motion, the court views the evidence in the light most favorable to plaintiffs as the summary judgment nonmovants and draws all reasonable inferences in their favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

[2]The Amendment, called "Project Redesign," would have replaced TWU Local membership meetings with delegate-style meetings during which members could neither vote nor speak but could only view union decisions.

by telling members how to vote on the Amendment.  Click was found not guilty of the charges.[3]  Allegedly in further retaliation and attempt to prevent Click from running for election, however, Thompson and the then-board posted the results of Click's hearing on the union's website.  This was the first time that hearing results had been posted on TWU Local's website, and plaintiffs allege it was clearly done in an attempt to "besmirch . . . Click's name" before the 2012 elections.  P. Resp. 3 (quoting 2d Am. Compl. ¶ 12).

In March 2012 two groups ran for the top officer positions in TWU Local.  The first group—the "Lauck Group"—consisted of Allyson Parker Lauck ("Lauck"), running for President; Audrey Stone ("Stone"), running for 1st Vice President; Brett Nevarez ("Nevarez"), running for 2nd Vice President; Thompson, running for reelection to the position of Secretary; and Parrott, running for reelection to the position of Treasurer.  The second group—the "Martin Group"—consisted of Martin, running for President; Click, running for 1st Vice President; Dawn Wann ("Wann"), running for 2nd Vice President; Jannah Dalak ("Dalak"), running for Secretary; and Lindemann, running for Treasurer.  The Martin Group won the March 2012 election with 65% of the vote.

Plaintiffs allege that, almost immediately after they took office in May 2012, members of the Lauck Group and TWU Local members who supported the Lauck Group embarked

---

[3]Although Click was found not guilty of the charges, the trial committee stated that Click had inadvertently disclosed confidential information, but that this disclosure occurred mainly as a result of the way TWU Local voted on the Amendment, which consisted of a show of hands.  The trial committee suggested that TWU Local adopt changes to prevent this from recurring.

on a systematic dismantling of the union's electoral system and democratic structure by filing a barrage of unfounded charges against the newly-elected officers, simply as a means of harassing and disrupting the union's infrastructure and business.[4]

In November 2012 a required audit of the union financials revealed that several of the board members had been paid excessive amounts of money for work that was unverified. During the December 2012 Executive Board meeting, Martin outlined and proposed immediate changes that would modify future payouts to reduce expenses. Members of the Lauck Group, however, submitted allegedly false accusations and charges that plaintiffs were maliciously spreading false information, although plaintiffs contend the audit had clearly verified the information put forth in the December meeting, and, in any event, the information being revealed was not confidential and was public information available to all TWU Local members. Ultimately, Click and Lindemann were suspended, and charges were accepted against them for the accusations stemming from the December 2012 meeting. Their Article XIX[5] trials were set for May 15, 2013.

---

[4]Plaintiffs contend that Don Shipman sent out a mass email encouraging other members to undermine the newly-elected officers and disrupt union affairs; members and supporters of the Lauck Group made it well known that they were going to do everything they could to get the Martin Group removed from office; Thompson submitted unfounded charges no fewer than five times simply to harass the Martin Group officers in an attempt to undermine the electoral system and disrupt the basic democratic structure by doing everything he could to remove them from office and have himself reinstated; and Lauck submitted charges against the Martin Group officers no fewer than four times simply to harass and undermine the electoral system and disrupt the union democratic infrastructure.

[5]Under the TWU of America Constitution, Article XIX sets out the process for considering one member's claim against another member.

- 4 -

In March 2013 Click attended a rally in Washington, D.C. to protest a Transportation Security Administration ("TSA") change that would allow knives to pass through security checkpoints and on commercial aircraft.  During the rally, Click carried a sign that read, "Ain't nobody got time for dat."  Another member of TWU Local, who allegedly supported the Lauck Group, saw the sign and reported it to TWU Local.  Charges of racial discrimination were then submitted against Click based on the allegation that the sign was offensive, and Click's Article XIX trial was set for May 14, 2013.

Union rules and bylaws dictate that, when an officer is suspended or resigns, the officer's position can be filled by the member who finished second for the position at the prior election, if that member opts to accept the position.  Consequently, when Click and Lindemann were suspended, their positions were filled by Stone and Parrott, members of the rival Lauck Group.  And before the hearings set for May 14 and 15, Wann and Dalak resigned their positions, allegedly under pressure from the Lauck Group, and they were replaced by Nevarez and Thompson, from the Lauck Group.

On May 13, 2013—the day before Click's individual Article XIX trial and two days before Click's and Lindemann's joint Article XIX trial—the Executive Board attempted to delay the trial dates by insisting that Martin reschedule them for one week later.  Martin refused on the basis that doing so violated union rules.  Click and Lindemann attended their trials on May 14 and 15, but the members who filed the charges against Click and Lindemann, having been advised that their trials were rescheduled, did not appear.  The trial committee acquitted Click and Lindemann of all charges, but the Executive Board did not

- 5 -

accept the trial committee's decision, and nullified it.

Click's and Lindemann's Article XIX trials were rescheduled for May 23 and 24, 2013.  Plaintiffs allege that Click requested a continuance on the basis that it was impossible for his witnesses to return for the new hearing on short notice and that his counsel was unavailable for a retrial, but the request was denied.  Lindemann also sought a continuance based on the fact that he went on approved medical leave after his first trial, and, due to his medical leave, he would be physically unable to attend the rescheduled trial.  This request was also denied.  The second trials were conducted in the absence of Click and Lindemann, and this time the trial committee found them both guilty.  The trial committee recommended to the Executive Board that Click and Lindemann be removed from their positions and banned from holding union office for three years.  The Executive Board accepted the recommendation of the trial committee.

Thereafter, Click's Article XXI[6] trial was held before Executive Board members.[7] After the trial, the Executive Board voted to remove Click from office and ban him from holding union office for three years, duplicating the recommendation of the trial committee

---

[6]Under the TWU of America Constitution, Article XXI details the procedures required for suspending and removing local officers.

[7]Plaintiffs allege that Lindemann also had an Article XXI trial, but they do not respond to TWU Local's assertion that only Click and Martin had Article XXI trials, and they present no evidence that this trial took place.  Because plaintiffs have failed to raise a fact issue on whether Lindemann had an Article XXI trial, the court grants TWU Local's motion for summary judgment to the extent that any of plaintiffs' claims involve Lindemann's alleged Article XXI trial.

in Click's Article XIX trials.

On May 14 the Executive Board suspended Martin from his position as President because of his refusal to reschedule the Click and Lindemann trials.  On May 16, at an Executive Board meeting, the Executive Board charged Martin with violating union rules by, *inter alia*, making presentations to the members on issues surrounding TWU Local, making false representations to the membership, and standing in opposition to the Executive Board. On May 29 and 30 Martin's Article XXI trial was held before Executive Board members, which then consisted of the Lauck Group members, who had replaced all of the Martin Group members on the Executive Board.  The Executive Board found Martin guilty of all charges, and it voted to remove him from office and declare him ineligible for union office for a period of three years.

Martin, Click, and Lindemann brought this lawsuit against TWU Local, alleging that it violated their rights under the Norris LaGuardia Act, 29 U.S.C. §§ 101-15, the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-97, and the LMRDA, and that TWU Local breached the TWU International Constitution.  In *Martin I* the court dismissed all of plaintiffs' claims except their claims that TWU Local violated 29 U.S.C. §§ 411, 412, and 529 by infringing on Martin's rights to a full and fair hearing, in violation of 29 U.S.C. § 411(a)(5)(C), when he was tried by a panel that included his accusers.  *Martin I*, 2014 WL 4358480, at *3-12.  The court granted plaintiffs leave to amend as to all claims that were curable by amendment, and they later filed their second amended complaint.  *Id.* at *12.

In *Martin II* the court dismissed plaintiffs' claims that TWU Local violated 29 U.S.C.

- 7 -

Appendix 636

§§ 411, 412, and 529 by wrongfully suspending them and removing them from office. *Martin II*, 2015 WL 569045, at *8. The court declined, however, to dismiss plaintiffs' claims that TWU Local violated 29 U.S.C. §§ 411, 412, and 529 by infringing on Click's right to free speech, and by violating plaintiffs' rights to a full and fair hearing. *See id.* at *6-7.

TWU Local now moves for summary judgment on plaintiffs' remaining two claims—that TWU Local violated 29 U.S.C. §§ 411, 412, and 529 by disciplining Click for exercising his right to free speech and by infringing on all plaintiffs' rights to a full and fair hearing.[8] Plaintiffs oppose the motion.[9]

II

When a summary judgment movant will not have the burden of proof on a claim at trial, it can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovants' claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once it does so, the nonmovants must go beyond their pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is

---

[8]TWU Local filed, without leave of court, an appendix in support of its summary judgment reply. Because TWU Local did not first obtain leave of court to file the appendix, the court has not considered it in deciding the summary judgment motion. *See Dethrow v. Parkland Health Hosp. Sys.*, 204 F.R.D. 102, 104 (N.D. Tex. 2001) (Fitzwater, J.) (holding that party may not file summary judgment reply appendix without first obtaining leave of court).

[9]Plaintiffs move the court for leave to file a surreply. Because plaintiffs' surreply does not affect the court's decision, the court grants the motion.

- 8 -

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovants' failure to produce proof as to any essential element renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmovants fail to meet this burden. *Little*, 37 F.3d at 1076.

III

Plaintiffs allege that TWU Local violated §§ 411, 412, and 529 of the LMRDA.

A

Section 411 sets out the core of the guarantees afforded to members of labor organizations by the LMRDA. It is a "[b]ill of [r]ights" that is "designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline." *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 536-37 (1984). The LMRDA contains two provisions that enable union members to enforce their rights under this "bill of rights": §§ 412 and 529.

Section 412 confers a private cause of action on union members for a union's infringement of the rights secured by §§ 411-15. To state a claim under § 412, plaintiffs must show (1) that they are members of a labor organization and (2) that the organization infringed a right secured by § 411, 412, 413, 414, or 415. *See Martinez v. Am. Fed'n of Gov't Emps.*, 980 F.2d 1039, 1041-42 (5th Cir. 1993). "Union leaders, *per se*, are not

- 9 -

themselves a protected class under [the LMRDA], except that they, too, may not be deprived of the basic rights attending on union membership." *Adams-Lundy v. Ass'n of Prof'l Flight Attendants*, 731 F.2d 1154, 1156 (5th Cir. 1984). Thus it is generally insufficient for a plaintiff to plead a plausible claim under § 412 based only on the alleged infringement of a right held in the capacity of a union officer. *See id.*

There is an exception, however, to this general rule.  If a plaintiff can show that the removal from office "was part of a scheme to subvert the union's basic democratic structure or otherwise directly implicated rights of members," the plaintiff can prevail on a claim for relief as an officer under § 412. *Id.* at 1159.  To recover under this exception, a plaintiff must show "that the defendants are attempting to dismantle the union's electoral system, [or] that members opposing that faction are . . . suppressed or threatened with reprisals." *Id*. Allegations that merely suggest that an internal union struggle is "anti-democratic" are insufficient to plausibly allege the existence of a pattern of intimidation and stifled dissent. *Id*.

Section 529 provides members a private cause of action when their union fines, suspends, expels, "or otherwise discipline[s]" them for exercising any right to which they are entitled under the LMRDA.  "The primary difference between § [529] and § [412] is that § [529] protects against retaliation for the exercise of any right secured under the LMRDA, whereas § [412] only protects rights secured under [§§ 411-15]." *United Steel Workers Local 12–369 v. United Steel Workers Int'l*, 728 F.3d 1107, 1115 (9th Cir. 2013) (citing *Finnegan v. Leu*, 456 U.S. 431, 439 n.10 (1982)).  Depending on the right the member seeks to protect,

- 10 -

§§ 412 and 529 can be entirely duplicative. *See id.* at 1115 n.4 (citing *Finnegan*, 456 U.S. at 439 n.10). To prevail under § 529, plaintiffs must prove that (1) they are members of a labor organization; (2) the organization fined, suspended, expelled, or otherwise disciplined them; and (3) the organization imposed the punishment in retaliation for their exercise of a right protected by the LMRDA. *See* 29 U.S.C. § 529.

As under § 412, to prevail under § 529, plaintiffs must prove that any punishment or restriction imposed by TWU Local was a limitation or restriction on their membership rights. Removal from elected union office does not qualify as a suspension, expulsion, or other discipline under § 529. *See Finnegan*, 456 U.S. at 438 n.9, 439 (explaining that discipline referred to in §§ 411(a)(5) and 529 means limitations on membership rights, not removal from union office); *Adams-Lundy*, 731 F.2d at 1157 (citing *Finnegan* for proposition that "§ [411(a)(5)] and § [529] protect only the rights of membership *per se*, and that a union officer who is removed from office but not deprived of membership in the union has suffered no loss cognizable as 'discipline' proscribed by these sections of the Act").

## B

TWU Local moves for summary judgment on plaintiffs' claim that it violated the LMRDA by disciplining Click for exercising his right to free speech protected by 29 U.S.C. § 411(a)(2).

- 11 -

Appendix 640

1

Section 411(a)(2) provides, in pertinent part:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings[.]

29 U.S.C. § 411(a)(2).  "[T]here is absolutely no indication that Congress intended the scope of § [411(a)(2)] to be identical to the scope of the First Amendment." *United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 111 (1982).  "Rather, Congress' decision to include a proviso covering 'reasonable' rules refutes that proposition." *Id.*  "Union rules . . . are valid under § [411(a)(2)] so long as they are reasonable; they need not pass the stringent tests applied in the First Amendment context." *Id.*

2

In their second amended complaint, plaintiffs allege that, on two occasions, Click exercised rights secured by § 411(a)(2) in his capacity as a member of TWU Local.  First, in October 2011, Click attended four separate membership meetings and voiced his opposition to Thompson's proposed Amendment.  Plaintiffs allege that Thompson retaliated against Click by submitting unfounded charges that Click violated membership rights by telling members how to vote on the Amendment, and, when Click was found not guilty of the charges, by posting the results of the hearing on TWU Local's website.  Second, plaintiffs allege that Click attended a rally in Washington, D.C. in March 2013 to protest the TSA

- 12 -

Appendix 641

change of allowing knives to pass through security checkpoints and allowing knives on commercial aircraft, and that Click carried a sign that stated: "Ain't nobody got time for dat." Plaintiffs contend that charges of racial discrimination were submitted against Click based on the sign's being allegedly offensive.

TWU Local challenges only that its rules prohibiting racial harassment and malicious publication of misleading and false financial information are "reasonable" under § 411(a)(2), and thus exempt from the free speech protection of the LMRDA. Regarding the racial discrimination allegations, plaintiffs do not contend that TWU Local's rules prohibiting racial discrimination are unreasonable. Rather, they merely contend that Click "vehemently denie[s]" TWU Local's "attempts to paint the charges as racial discrimination." Ps. Resp. 10. And they cite Click's declaration in support. But Click's declaration does not mention the Washington, D.C. protest or the racial discrimination charges. Without any evidence to support their allegations, plaintiffs have failed to raise a fact issue on whether TWU Local's policy against racial harassment is reasonable or whether Click was disciplined for engaging in racial discrimination. Accordingly, the court grants TWU Local's motion for summary judgement on this claim to the extent that Click was charged with engaging in racial discrimination.

TWU Local does not, however, make any allegations with respect to the incident in which Click was charged with violating membership rights by telling members how to vote on the Amendment. Because TWU Local does not challenge plaintiffs' § 411(a)(2) claim on any basis other than that its rules prohibiting racial discrimination and malicious

- 13 -

Appendix 642

publication of misleading and false financial information are "reasonable," the court denies

TWU Local's motion for summary judgment on this claim with respect to the incident in

which Click was charged with violating membership rights.[10]

C

TWU Local moves for summary judgment on plaintiffs' claims that TWU violated

their rights to a full and fair hearing under the LMRDA, contending that plaintiffs received

full and fair hearings.  Plaintiffs assert that TWU Local deprived them of a full and fair

hearing when (1) Click's and Lindemann's May 14 and 15 trials were nullified without

authority or justification; (2) the rescheduled trials one week later did not afford Click and

Lindemann a fair opportunity to attend; (3) the Article XIX retrials of Click and Lindemann

were not fair and impartial because the Lauck Group members ensured that a guilty verdict

would be rendered and plaintiffs' guilt was prejudged; (4) and Martin and Click were tried

in their Article XXI trials by the Lauck Group members.[11]

1

Section 411(a)(5)(C) provides that "[n]o member of any labor organization may be

fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such

---

[10]Because TWU Local does not challenge plaintiffs' § 411(a)(2) claims on any basis other than that its rules prohibiting racial discrimination and malicious publication of misleading and false financial information are "reasonable," the court does not consider whether plaintiffs' § 412 or § 529 claims based on TWU Local's alleged violation of Click's § 411(a)(2) rights are subject to dismissal on any other basis.

[11]Plaintiffs also allege that Lindemann was tried in his Article XXI trial by Lauck Group members.  But Lindemann did not have an Article XXI trial; he only had an XIX trial.

- 14 -

organization or by any officer thereof unless such member has been . . . afforded a full and fair hearing."  29 U.S.C. § 411(a)(5)(C).  "The full and fair hearing clause does not require unions to provide the 'full panoply of procedural safeguards found in criminal proceedings,' but only to comply with the 'fundamental and traditional concepts of due process.'" *Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188, 1193 (D.C. Cir. 1996) (quoting *Ritz v. O'Donnell*, 566 F.2d 731, 735 (D.C. Cir. 1977)); *see United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 385 (2d Cir. 2001) ("*Teamsters*") (same); *Bell v. Int'l Bhd. of Teamsters*, 108 F.3d 1376, 1997 WL 103320, at *5 (6th Cir. March 6, 1997) (unpublished table decision) (same).  "Not all of the due process protections available in the federal courts apply to union disciplinary proceedings." *Teamsters*, 247 F.3d at 385.  "A violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA." *Id.* at 387.

2

Plaintiffs allege that TWU Local violated § 411(a)(5)(C) by denying them access to an unbiased tribunal.  They maintain that Martin was tried in his Article XXI trial by the Executive Board, which included the person or persons who filed the charges against him initially; Click was tried in his Article XXI trial before Lauck Group board members; and Lauck Group members ensured that guilty verdicts would be rendered in Click's and Lindemann's Article XIX retrials.  In other words, plaintiffs complain that the combination of investigative, prosecutorial, and adjudicatory functions in the Executive Board violated their rights to due process under § 411(a)(5)(C).

- 15 -

a

"The basic requirement of constitutional due process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) (citing *Gibson v. Berryhill*, 411 U.S. 564, 569 (1973)). "In an effort to prevent 'even the probability of unfairness,' courts have identified situations in which the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Baran v. Port of Beaumont Navigation Dist.*, 57 F.3d 436, 444 (1995) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). A union's "combination of investigative, prosecutorial, and adjudicatory functions in [a single body] does not, by itself, violate the LMRDA." *Wildberger*, 86 F.3d at 1195. But when this combination occurs, courts "should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice." *Withrow v. Larkin*, 421 U.S. 35, 54 (1975). It is therefore insufficient for plaintiffs merely to allege that the tribunal that filed charges against them also adjudicated the charges. *See id.* at 58 (holding that "[t]he fact that the same agency makes [the initial decision to charge and the ultimate adjudicative decision] in tandem . . . relat[ing] to the same issues does not result in a procedural due process violation"). Plaintiffs "must overcome a presumption of honesty and integrity in those serving as adjudicators; and [they] must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment" to constitute a denial of the right to a full and fair hearing. *Id.* at 47.

- 16 -

b

In support of their allegations, plaintiffs rely solely on their declarations, which state that Thompson and Lauck submitted charges against plaintiffs several times; that the Executive Board selected the members of the trial committee who heard Click's and Lindemann's May 14 and 15 trials; and that, after the trial committee found Click and Lindemann not guilty of all charged offenses in their May 14 and 15 trials, the Executive Board, including Stone, Thompson, Nevarez, and Parrott, did not accept, and nullified, the trial committee's decision without providing any reason for doing so.  Click and Martin also state that their Article XXI trials, which resulted in guilty verdicts, removal from their positions, and suspension from running for election for three years, were heard before the "Executive Board consisting of the Lauck Group Members who now had all replaced the Martin Group members," and were conducted and chaired by Nevarez and assisted by Stone, Parrott, and Thompson.  Martin Decl. 2; Click Decl. 3.[12]  TWU Local responds that only two

---

[12]Plaintiffs also aver in their declarations that the "Lauck Group made it well known that they were going to do everything they could to get [plaintiffs] removed from office," and Stone and Parrott "made it openly and knowingly clear that they wanted [plaintiffs] removed from office."  Ps. Decls. 1-2.  TWU Local objects to these statements as hearsay.  In their surreply, plaintiffs maintain that "[t]he statements made by the Lauck Group are not hearsay as they were done by the Lauck Group in their capacity as members of the Executive Board and open political opponents."  Ps. Surreply 3.  Plaintiffs therefore maintain that the statements qualify as party admissions under Fed. R. Evid. 801(d)(2) because "a Defendant who is an organization can only act through its representatives and agents."  *Id.*  Although plaintiffs do not specify the subpart of Rule 801(d)(2) that they maintain applies to these statements, it is reasonable to infer that they are relying on Rule 801(d)(2)(A) or (D).  Rule 801(d)(2) provides, in pertinent part, that a statement is not hearsay if it "is offered against an opposing party" and (A) "was made by the party in an individual or representative capacity" or (D) "was made by the party's agent or employee on a matter within the scope

- 17 -

of that relationship and while it existed."

Plaintiffs have failed to establish that the statements qualify as party admissions. The Lauck Group members are not parties to this suit. And plaintiffs do not provide any evidence that these statements were made *after* Lauck Group members, including Stone and Parrott, took office, or that Lauck Group members, in their capacity as union members and before they were elected to office, had sufficient authority to speak in representative capacities for TWU Local or were agents or employees of TWU Local speaking within the scope of that relationship and while it existed. *See, e.g., Ramirez v. Gonzales*, 225 Fed. Appx. 203, 210 (5th Cir. 2007) (per curiam) (holding that Rule 801(d)(2)(D) did not apply to statements made by legal secretary to union president about how she had problem with plaintiff's being part of union because "they concerned matters outside the scope of her employment, since [she] was not involved in the decision to terminate [plaintiff]"); *Bensen v. Am. Ultramar Ltd.*, 1996 WL 422262, at *12 (S.D.N.Y. July 29, 1996) (holding that Rule 801(d)(2)(A) applied to declarant's statement "confirm[ing] that Ultramar Group's 1990 Annual Report inaccurately suggested that the 1990 pension payment was made upon Bensen's retirement from executive duties" because "[a]t the time of this confirmation, [declarant] was an Ultramar Group executive and member of Ultramar PLC's Board of Directors," and "[s]uch positions of authority are sufficient to allow him to speak in a representative capacity for the corporation"); *see also Slaughter v. Atkins*, 396 Fed. Appx. 984, 988 (5th Cir. 2010) (per curiam) (holding that district court did not abuse its discretion when it sustained objections to statements on the ground that party had not established either agency or conspiracy relationship necessary to invoke exclusions under Rule 801(d)(2)(D) and (E)); *Zimmerman v. Gruma Corp.*, 2013 WL 3154118, at *11 (N.D. Tex. June 21, 2013) (Lindsay, J.). Accordingly, the court holds that these statements are inadmissible.

Plaintiffs also aver in their declarations that, after the Martin Group won the March 2012 election, members of the Lauck Group and their supporters "embarked on a systematic dismantling of the union's electoral system and democratic structure by filing a barrage of unfounded charges against [plaintiffs]," and that the charges submitted by Thompson and Lauck against plaintiffs "were unfounded and done solely to harass and undermine the electoral system and disrupt the union democratic infrastructure." Ps. Decls. 1-2. And plaintiffs allege that their trials were "false and pretextual." *Id.* at 3. Plaintiffs also contend that the "[Executive Board's] decision to nullify the not guilty verdicts [in Click's and Lindemann's May 14 and 15 trials] was based solely on the fact they did not like the outcome." *Id.* at 2. Additionally, Martin maintains that, two days after his suspension, "the Executive Board created a pretext for [his] previous suspension by hatching up seven unfounded and frivolous bases for the suspension." Martin Decl. 3.

TWU Local objects to these statements, contending that they are speculation. The court agrees. These speculative and conclusory allegations do not create a genuine issue of material fact. *See, e.g., Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting

- 18 -

Appendix 647

of the Executive Board members who served on Martin's and Click's Article XXI trials were members of the Lauck Group. Eleven Executive Board members served on Martin's Article XXI trial, and nine Executive Board members served on Click's Article XXI trial. TWU Local has also adduced evidence that Stone and Parrott did not participate in the Article XXI trials.[13] And it contends that these two Lauck Group members could not have seriously impacted the Executive Board's vote because a majority vote is required to remove and bar members. But TWU Local fails to cite any summary judgment evidence showing that a majority vote is required.

Regarding Click's and Lindemann's Article XIX trials, TWU Local makes no allegations regarding the May 14 and 15 trials; rather, it contends that the rescheduled trials were heard by a trial committee composed of three union members who were not Lauck Group members. TWU Local also contends that the decision of the trial committee is a recommendation to the Executive Board, which included only two Lauck Group members. TWU Local, however, does not dispute plaintiffs' assertion that the Executive Board selects the members of the trial committee, and TWU Local fails to cite any evidence showing the

_____

*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)) ("'[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment.").

[13]The remaining nine members of the Executive Board who served on Martin's Article XXI trial were Tina Coffee, Karen Amos, Jimmy West, Stacey Vavakas, Chris Sullivan, Rob Riddell, Donna Keith, Valerie Boy, and John DiPippa. The remaining seven members of the Executive Board who served on Click's Article XXI trial were Tina Coffee, Karen Amos, Stacey Vavakas, Rob Riddell, Valerie Boy, John DiPippa, and Matt Hettich.

- 19 -

Appendix 648

identity of the Executive Board members who voted to accept the trial committee's decision.

c

Based on the allegations in plaintiffs' declarations, and drawing all reasonable inferences in plaintiffs' favor as the summary judgment nonmovants, the court holds that plaintiffs have raised a genuine fact issue regarding a risk of actual bias or prejudgment stemming from the presence on the Executive Board of members who acted in prosecutorial and adjudicative roles during the same hearing and who were political opponents of plaintiffs in their elections. For example, Thompson, a member of the Lauck group who replaced a member of the Martin Group and who was a political opponent of plaintiffs, submitted charges against plaintiffs several times, served on Martin's and Click's Article XXI trials that resulted in guilty verdicts, nullified the trial committee's decision of not guilty in Click's and Lindemann's first Article XIX trials, and voted to accept the trial committee's decision of guilty in Click's and Lindemann's second Article XIX trials. *See Wildberger*, 86 F.3d at 1195-97 (quoting *Tincher v. Piasecki*, 520 F.2d 851, 855 (7th Cir. 1975)) (holding that procedures used in Wildberger's hearing "presented a 'significant danger of bias'" because union president, who served prosecutorial and adjudicatory functions, "was repeatedly the focus of Wildberger's criticism" and "Wildberger was at one time [president's] political opponent"); *Stein v. Mutuel Clerks' Guild of Mass., Inc.*, 560 F.2d 486, 491 (1st Cir. 1977) (upholding district court's conclusion that plaintiff did not get full and fair hearing where union president, who was also member of executive committee, made comments to committee revealing he had prejudged case). The court therefore holds that a reasonably jury

- 20 -

could find in this case that there was "the possibility of bias." *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994) (applying *Withrow* and holding that plaintiff had adduced sufficient evidence at summary judgment stage to overcome presumption of impartiality); *see also Valley*, 118 F.3d at 1053 & n.4 (quoting *Bakalis* with approval for proposition that "appellate jurisprudence has favored recusing board members who display a bias or prejudice that would result in an unconstitutional decision").

Accordingly, the court denies TWU Local's motion for summary judgment on these claims.

3

Plaintiffs allege that TWU Local violated § 411(a)(5)(C) when Click's and Lindemann's May 14 and 15 trials were nullified without authority or justification, and when their trials were rescheduled for one week later, which did not afford them a fair opportunity to attend. "Fundamental due process . . . gives a party the right to be *present* during proceedings brought against him . . . , subject to limited exceptions." *Holschen v. Int'l Union of Painters & Allied Trades/Painters Dist. Council #2*, 598 F.3d 454, 464 n.4 (8th Cir. 2010). This right is infringed when the circumstances of the case suggest that the accused did not have a "fair opportunity" to attend the relevant hearing. *Moody v. Miller*, 864 F.2d 1178, 1181 (5th Cir. 1989) (per curiam). But it does not require that TWU Local "must see to it that each person takes advantage of these opportunities." *Id.*

Plaintiffs allege that TWU Local violated Click's rights by continuing his trials, but they do not provide sufficient evidence to enable a reasonable jury to find that Click was not

- 21 -

afforded a fair opportunity to attend his rescheduled trials.  In fact, plaintiffs do not even allege that Click could not attend the rescheduled trials.  The mere fact that TWU Local rescheduled Click's trials would not enable a reasonable jury to find that TWU Local violated Click's rights.  *See, e.g., Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1244 (2d Cir. 1979) (holding that there was no due process violation where parties were entitled to be present at second trial but chose to boycott proceeding).

Plaintiffs also allege that TWU Local violated Lindemann's rights by continuing his trial when he objected to the retrial date based on the fact that he "was on approved medical leave and would not be physically able to attend."  Lindemann Decl. 2.  And they maintain that Lindemann's "request for a continuance was denied."  *Id.*  But if, through no fault of TWU Local, a member "is unable or refuses to attend a disciplinary hearing, due process requires no more than that the hearing be held in accordance with all of the other requirements of due process that are called for under the circumstances."  *Moody*, 864 F.2d at 1181.  And TWU Local "should not be required to delay the enforcement of . . . disciplinary rules because the affected [member], through no fault of [TWU Local], happens to be unavailable."  *Id.*

Plaintiffs also allege that TWU Local violated Click's and Lindemann's rights by nullifying their May 14 and 15 trials without any authority or justification.  But Click and Lindemann attended their May 14 and 15 trials, and they do not provide any evidence showing how the Executive Board's nullification of the trial committee's decision infringed

- 22 -

Appendix 651

their rights to a full and fair hearing. And plaintiffs do not provide any case law that holds that nullification of a trial committee's decision, without providing a reason for the nullification, in a trial that plaintiffs attended is without more a violation of plaintiffs' rights. The court therefore concludes that a reasonable jury could not find that TWU Local violated Click's and Lindemann's rights by rescheduling their trials for one week later or by nullifying the trial committee's decision in their May 14 and 15 trials.

Accordingly, the court grants TWU Local's motion for summary judgment on plaintiffs' claims that TWU Local violated § 411(a)(5)(C) when Click's and Lindemann's May 14 and 15 trials were nullified and rescheduled.

\* \* \*

For the reasons explained, TWU Local's motion for summary judgment is granted in part and denied in part.

**SO ORDERED**.

May 19, 2016.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 23 -

Appendix 652

**JOHN SHAUNFIELD, JR., Plaintiff,**
**v.**
**MB FINANCIAL BANK, N.A., et al.,**
**Defendants.**

**Civil Action No. 3:15-CV-0856-L**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**February 17, 2016**

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant MB Financial Bank, N.A's ("Defendant") Motion to Dismiss Amended Complaint (Doc. 18), filed May 21, 2015. After careful consideration of the motion, pleadings, and applicable law, the court **grants in part** and **denies in part** Defendant's Motion to Dismiss Amended Complaint.

**I. Factual and Procedural Background**

Plaintiff John Shaunfield, Jr. ("Plaintiff" or "Shaunfield") brought this action against Defendants Ally Financial, Inc.; Cole Taylor Mortgage, LLC ("Cole"); MB Financial Bank, N.A. ("MBFNA"); Experian Information Solutions, Inc. ("Experian"); Equifax, Inc. ("Equifax"); and Transunion, LLC ("Transunion") on March 17, 2015, asserting claims for violations of the Fair Credit Reporting Act ("FRCA") and libel. On April 20, 2015, Defendant filed its original Motion to Dismiss. Plaintiff filed his Amended Complaint on May 7, 2015. Plaintiff previously stipulated to the dismissal of Ally Financial, Inc., Experian, Equifax, and Transunion from this action. Only MBFNA and Cole remain as Defendants. MBFNA is the successor of Cole Taylor Bank.

Plaintiff's Amended Complaint alleges that Defendant reported false and inaccurate information to his credit report. Plaintiff alleges that on or about August 24, 2014, he was informed

Page 2

of adverse items on his credit report after receiving a letter from American Express in which it lowered his credit limit. Plaintiff reviewed his Experian Credit Report on or about August 31, 2014, and discovered inaccurate adverse or negative items on the report. Plaintiff further alleges that he disputed a reported late payment to Cole, now MBFNA, with the credit reporting agencies, Experian, Equifax, and Transunion. The agencies completed investigations and continued to report the late payment.

The reported late payment originates from a mortgage payment transaction. On July 15, 2014, Plaintiff made a payment to Cole for his July 2014 mortgage payment. He asserts that he received an e-mail the same day that confirmed his payment, and a letter in the mail dated July 15, 2014, also confirming the payment. On August 4, 2014, Plaintiff received a letter dated July 21, 2014, that stated "the check was returned due to 'Reversed ACH Correction.'" Am. Comp. ¶ 3.7. The letter states in relevant part:

> Your check for $1914.66 has been returned to us unpaid by your bank because of REVERSED-ACH CORRECTION.
> We are required to inform you late payments, missed payments, or other defaults on your account may be reflected in your credit report.

Def.'s Mot. Dismiss Ex. 4. Plaintiff alleges that there "is obviously an error in the Cole system" that led to the returned payment. Am. Comp. ¶ 3.7 He further alleges that he was not timely notified of the returned payment prior to August 1, 2014, to avoid the "30-day late date." *Id.* Plaintiff also alleges that Cole, now MBNFA, did not sufficiently investigate the information after being notified of the dispute from the reporting agencies. Plaintiff was notified of the results of Defendant's investigation in a letter dated December 10, 2014. In relevant part, the letter states:

> On December 4, 2014, [MBNFA] received your request via telephone



to dispute credit reporting for the above-referenced loan. We completed our review and the following was found. Our records reflect that the July 2014 payment in the amount of $1,914.66 was received and posted on

Page 3

July 15, 2014. However, it was then reversed on July 21, 2014 due to an invalid account number. On the same day, we mailed you a letter outlining the reason for the reversal. We have enclosed a copy of this letter, for your reference. We attempted to contact you via telephone on seven occasions after the payment was returned, but were unsuccessful in reaching you until August 3, 2014, when a payment was made in the amount of $1,914,66.
We regret to advise you that we cannot amend the credit reporting for July 2014 payment on your account. We are required by the [FRCA] to report payments as they are received. On August 3, 2014, we received the July 2014 payment. As this payment was received over 30 past the due date of the first of the month, we must report it as of the date it was received. For your convenience, we have enclosed a copy of the account history as well.

Def.'s Mot. Dismiss Ex. 5.

Defendant moves for dismissal of Plaintiff's Amended Complaint pursuant to Federal rule of Civil Procedure 12(b)(6). Defendant contends that Plaintiff fails to state a plausible claim for relief and that he has no claim against Cole Taylor Mortgage, LLC.

## II. Legal Standard for Rule 12(b)(6) - Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants*, *Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). The

Page 4

"[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean*



*Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

Page 5

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293

(5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

## III. Defendant's Motion to Dismiss

### A. Plaintiff's FCRA Claim

Defendant moves to dismiss Plaintiff's FCRA claim because Plaintiff bases his claim on the conclusion that Defendant "did not do a reasonable investigation and continues to provide inaccurate information of his credit report." Am. Compl. ¶ 3.7. Plaintiff alleges that Defendant has

Page 6

violated 18 U.S.C. § 1681s-2(b). Section 1681s-2(b) sets forth the "Duties of furnishers of information upon notice of dispute" and provides in pertinent part:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall-
>
> > (A) conduct an investigation with respect to the disputed information;
> > (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
> > (C) report the results of the investigation to



the consumer reporting agency;

15 U.S.C. § 1681s-2(b)(1). To establish a violation of section 1681s-2(b), a consumer must show that he notified a consumer reporting agency of the dispute in accordance with the procedure set forth in section 1681i(a)(2), and "that a consumer reporting agency . . . notified [the furnisher] pursuant to 1681i(a)(2)" of the consumer's dispute "within five business days from the time the consumer notifies the consumer reporting agency of the dispute." *Young v. Equifax Credit Info. Servs.*, 294 F.3d 631, 639 (5th Cir. 2002). "Such notice [by a credit reporting agency] is necessary to trigger the furnisher's duties under Section 1681s-2(b)." *Id.* A consumer must also establish "that a consumer reporting agency . . . notified [the furnisher] pursuant to 1681i(a)(2)" of the consumer's dispute "within five business days from the time the consumer notifies the consumer reporting agency of the dispute." *Young*, 294 F.3d at 639. Thus, the Fifth Circuit held in *Young* that any private right of action a consumer may have under section 1681s-2(b) requires a showing that a consumer reporting agency notified the furnisher of information pursuant to section 1681i(a)(2). *Id.*[1]

Page 7

The FCRA does not indicate the amount of investigation that is required under section 1681s-2(b)(1). At least one district court in this circuit concluded that a furnisher's requirement "to conduct a reasonable investigation to determine whether disputed information in a consumer credit report can be verified is widely recognized." *Robertson v. J.C. Penney Co., Inc.*, No. 2:06-CV-3KS-MTP, 2008 WL 623397, at *8 (S.D. Miss. Mar. 4, 2008) (collecting circuit and district court cases from the Third, Fourth, and Seventh Circuits and concluding that "a reasonable investigation 'clearly requires some degree of careful inquiry by creditors' and more than just a 'superficial inquiry.'"). The same court further concluded that section 1681s-2(b)(1)'s investigation requirement for furnishers "is analogous to the requirement imposed upon

credit reporting agencies under section 1681i(a) to reinvestigate a consumer's dispute regarding information contained in his credit report and, therefore, furnishers of credit are required to conduct a reasonable investigation." *Id.* (internal quotation marks omitted) (quoting *Bruce v. First U.S.A. Bank, Nat'l Assoc.*, 103 F. Supp. 2d 1135, 1143 (E.D. Mo. 2000)). The reasonableness of an investigation under the FCRA is generally a question of fact for the jury. *See Cousin v. Trans Union Corp.*, 246 F.3d 359, 368-69 (5th Cir. 2001) (stating that the issue of reasonableness was properly before the jury).

Plaintiff alleges that Defendant's investigation was not reasonable because it reported false or inaccurate information after being notified of a dispute. Defendant contends that it fully and fairly responded to Plaintiff's dispute and reported its findings to Plaintiff in its December 10, 2014 letter. Defendant further contends that Plaintiff concludes the investigation was unreasonable but fails to make any factual allegations to support that conclusion. Plaintiff responds that Defendant failed to do a sufficient investigation because the adverse information was not removed from his credit report, and the investigation did not reveal the source of the error. Viewing

Page 8

Plaintiff's Amended Complaint in a light most favorable to him, the court determines that he has stated a plausible claim for which relief can be granted. Accordingly, Defendant's Motion to Dismiss as to Plaintiff's FCRA claim will be denied.

### B. Plaintiff's Libel-Defamation Claim

Defendant also moves for dismissal of Plaintiff's claim for libel-defamation of character because he fails to make factual allegations to support his conclusions and, in the alternative, on the grounds that the claim is preempted by the FCRA.



*Shaunfield v. MB Fin. Bank, N.A., Civil Action No. 057-CV-0856-L (N.D. Tex. Feb. 17, 2014)*

The elements of a defamation claim under Texas law for a private figure are "that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting negligently with regard to the truth of the statement." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 596 (5th Cir. 2007) (internal citations omitted). A defamatory statement is one in which the words tend to damage a person's reputation, exposing him or her to public hatred, contempt, ridicule, or financial injury. *Encompass Office Solutions, Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 958 (E.D. Tex. 2011). "Section 15 U.S.C. § 1681h(e) [of the FCRA] bars a consumer from bringing any claim 'in the nature of defamation . . . with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer.'" *Morris v. Equifax Info. Servs., LLC*, 457 F.3d 460, 470-71 (5th Cir. 2006) (citing 15 U.S.C. § 1681h(e)).

Plaintiff alleges that Defendant caused inaccurate and false information to be published to his credit report. Plaintiff contends that as a result, "[he] has had his credits lowered, been forced to pay higher interest for the credit he could secure and it has had a negative influence on his ability to secure insurance and employment." Am. Compl. ¶ 4.10. He further alleges that the false

Page 9

information continues to be published every time his credit report is acquired by an entity that uses credit information. Plaintiff fails to sufficiently state the substance of the allegedly false and defamatory statements, and, therefore, his defamation claim should be dismissed. *See Shaunfield v. Bank of America*, No. 3:12-CV-3859-B, 2013 WL 1846885, at *3 (N.D. Tex. Apr. 24, 2011) (dismissing defamation claim when plaintiff failed to make sufficient allegations as to the substance of the allegedly defamatory statements).

Claims for defamation are preempted by the FCRA "unless the plaintiff consumer proves malice or willful intent to injure him." *Young*, 294 F.3d at 638 (internal quotations and citations omitted). Plaintiff alleges that Defendant's actions were incompetent, negligent and malfeasant, but he does not allege Defendant acted with malice or willful intent to injure him. Plaintiff first asserts that he believes Defendant acted with malice and willful intent to harm him in his response to the motion to dismiss; however, he did not assert any factual allegations to support his conclusory statement. His allegations fail to lead to a reasonable inference that Defendant acted with malice or willful intent to injure him when it reported information to any credit bureaus. *See Visconti v. Bank of America*, No. 4:10-CV-532, 2012 WL 3779083, at *3 (E.D. Tex. Aug. 31, 2012) (finding that the plaintiff's defamation claim was preempted by the Fair Credit Reporting Act when he failed to allege any facts that the defendant acted with malice or willful intent to injure him when they reported to various credit agencies). Accordingly, Plaintiff's defamation claim is preempted by the FCRA and will be dismissed.

### C. Cole Taylor Mortgage, LLC

Defendant MB Financial Bank N.A. is the successor to Cole Taylor Bank. Defendant asserts that Defendant wrongfully sued Cole Taylor Bank as Cole Taylor Mortgage, LLC. Defendant contends that Plaintiff's mortgage was serviced by Cole Taylor Mortgage, a division of Cole

Page 10

Taylor Bank. It further contends that Cole Taylor Mortgage, LLC has never serviced or been involved with Plaintiff's mortgage, and that all claims against Cole Taylor Mortgage, LLC should be dismissed. Plaintiff does not respond to Defendant's contention.[2] Neither party provides the court with adequate allegations or information to make a determination regarding the status of Cole Taylor Mortgage, LLC. Accordingly, Defendant's Motion to Dismiss as to all claims against Cole Taylor Mortgage, LLC is will be denied.



### D. Attorney's Fees

Defendant also seeks dismissal of Plaintiff's request for attorney's fees because he is a *pro se* litigant. Plaintiff seeks reasonable and necessary attorney's fees, generally, and in connection with his claims and any appeal. Because he is proceeding *pro se*, Plaintiff may not recover attorney's fees. *See Danial v. Daniels*, 162 F. App'x 288, 291 (5th Cir. 2006) ("Attorney's fees are not available to a non-attorney *pro se* litigant.") (citing *McLean v. Int'l Harvester Co.*, 902 F.2d 372, 373 (5th Cir. 1990)); *Vaksman v. C.I.R.*, 54 F. App'x 592 (5th Cir. 2002) ("As a pro se litigant, [the petitioner] is not entitled to attorney['s] fees because, quite simply, he did not actually 'pay' or 'incur' attorney['s] fees."). Accordingly, the portion of Defendant's motion to dismiss regarding Plaintiff's request for attorney's fees will be granted.

### E. Amendment of Pleadings

In response to Defendant's motion to dismiss, Plaintiff did not request to amend his pleadings in the event the court determined that he failed to state a claim. The provision of Rule 15(a)(2) of the Federal Rules of Civil Procedure that states "[t]he court should freely give leave

Page 11

when justice so requires" is not without limitation. The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) (citation omitted). In determining whether to allow an amendment of the pleadings, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted).

Plaintiff has not requested an opportunity to amend his pleadings as to his defamation claim. In any event, based on the pleadings, Plaintiff has asserted no allegations from which the court can reasonably infer that Defendant acted with malice or willful intent to injure him when it reported information to the credit bureaus. Although Plaintiff is proceeding *pro se*, he filed an action in Judge Jane Boyle's court in 2012 (Civil Action No. 3:12-CV-3859-B) in which his defamation claim was dismissed when he failed to set forth sufficient allegations as to the substance of the defamatory statements. He is, thus, aware that conclusory statements are insufficient to state a claim upon which relief can be granted. Accordingly, even if the court liberally construes his response as a pleading, it fails for being too conclusory, and the court is unable to make a reasonable inference that Defendant is liable for the allegedly wrongful conduct. Accordingly, the court determines that allowing further amendment would unduly delay the resolution of this case and would be futile.

## IV. Conclusion

For the reasons stated herein, the court **grants in part** and **denies in part** Defendant MB Financial Bank, N.A.'s, individually and as successor to Cole Taylor Bank, Motion to Dismiss

Page 12

Amended Complaint. The court **dismisses with prejudice** Plaintiff's claim for defamation and his claim for attorney's fees. Plaintiff's Fair Credit Reporting Act claim against MB Financial Bank, N.A and Cole Taylor Mortgage, LLC remains.

**It is so ordered** this 17th day of February, 2016.

/s/_____
Sam                 A.                 Lindsay
United States District Judge

--------

Footnotes:



[1] Courts disagree whether Section 1681s-2(b) provides a private right of action, and the Fifth Circuit has not decided this question. *See Young v. Equifax Credit Info. Servs.*, 294 F.3d 631, 639 (5th Cir. 2002).

[2] Plaintiff submitted a surreply in which he addressed Defendant's contention; however, he did not seek leave of the court to file the surreply. The court, therefore, **strikes** the surreply, and does not consider it regarding the pending motion.

--------



Appendix 659

**IDA ENGINEERING, INC., Appellant**
**v.**
**PBK ARCHITECTS, INC., Appellee**

**No. 05-15-01418-CV**

**Court of Appeals Fifth District of Texas at Dallas**

**October 4, 2016**

**On Appeal from the 160th Judicial District Court Dallas County, Texas Trial Court Cause No. DC-14-07539**

**MEMORANDUM OPINION**

Before Justices Myers, Evans, and Schenck Opinion by Justice Myers

This case concerns the statute of limitations in a suit for breach of contract. IDA Engineering, Inc. appeals the trial court's judgment granting PBK Architects, Inc.'s motion for summary judgment that asserted the affirmative defense of the statute of limitations. IDA brings four arguments[1] on appeal contending (1) suit was filed on July 3, 2014 and not July 16, 2014 when it was file-stamped by the district clerk; (2) the cause of action accrued no earlier than December 15, 2009; (3) the parties' course of performance altered the date for payment of IDA's invoices; and (4) limitations was tolled by equitable estoppel. We affirm the trial court's judgment.

Page 2

### BACKGROUND

In 2008, PBK and IDA entered into two contracts for IDA to perform engineering-design and construction-administration services on a building for the Waco Independent School District. The contracts were in the form of letter agreements on IDA's letterhead addressed to PBK. The contracts set forth the total fee that would be charged for the services ($840,000 on one contract and $197,500 for the other). The contracts contained the following terms

concerning billing and payment: "Invoices will be issued monthly, per percentage of completion or per phase and will be due upon issuance date. Late payments will incur a late charge of (1½%) per month from original date of invoice."

On September 29, 2009, IDA issued two invoices for "Completion of 50% of CA Phase." One invoice was for $42,000 and the other was for $9,875. IDA issued a second pair of invoices on December 8, 2009 for "Final Completion of 50% to 90% CA Phase" in the amounts of $33,600 and $7,900.

On December 15, 2009, PBK terminated the contracts due to IDA's deficient services and told IDA it would be "hiring alternate MEP engineering representation." PBK also stated, "We will not release retained funds until we have confirmed our cost exposures due to: a) the requirement to hire a new engineer, and b) until we have mitigated any exposure with our client due to IDA's incorrect or incomplete plans and specifications."

On November 12, 2013, the parties entered into a tolling agreement providing that the statute of limitations "shall be tolled and suspended and shall not run during the Tolling Period," which was November 12, 2013 through May 31, 2014.

IDA electronically filed its original petition on July 3, 2014, which was exactly four years after December 15, 2009, including the agreed tolling period. PBK moved for summary judgment on the ground that IDA's suit was barred by the four-year statute of limitations. The

Page 3

trial court granted the motion for summary judgment and ordered that IDA take nothing on its claims.

### STANDARD OF REVIEW

The standard for reviewing a traditional summary judgment is well established. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49



(Tex. 1985); *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 825 (Tex. App.—Dallas 2010, no pet.). The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon*, 690 S.W.2d at 549; *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

### STATUTE OF LIMITATIONS

Section 16.004 of the Civil Practice & Remedies Code provides, "A person must bring suit on the following actions not later than four years after the day the cause of action accrues: . . . (3) debt . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(3) (West 2002). The issues in this case concern when the cause of action accrued.[2]

IDA argues its breach of contract cause of action accrued, at the earliest, when PBK terminated the contracts on December 15, 2009. If the cause of action accrued before December 15, 2009, then IDA's suit was filed outside the statute of limitations.

Page 4

Generally, a cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279 (Tex. 2004). The date a cause of action accrues is normally a question of law. *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam). A breach-of-contract claim accrues when the

contract is breached. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006) (per curiam). Generally, a party breaches a contract when it fails to pay an invoice on or before the date payment is due. *See Oro-Castillo v. Nat'l Specialty Servs.*, No. 05-01-01319-CV, 2002 WL 971913, at *3 (Tex. App.—Dallas, May 13, 2002, no pet.) (not designated for publication) (party breached contract by not paying invoice by its due date; limitations ran from due date of invoice).

In this case, the contracts are clear that payment on the invoices was due the day they were issued. The contracts state, "Invoices . . . will be due upon issuance date." The contracts provide for late fees in the form of interest dating back to the date of the invoice. According to the plain language of the contracts, when PBK failed to pay the invoices on the dates they were issued, it breached the contracts, and IDA was authorized to bring suit for breach of contract.

IDA argues these contracts were continuing contracts for performance, so the limitations period did not commence until the contract was fully performed or terminated. IDA cites two cases in support of this argument, *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied), and *Intermedics Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). In *Lyle*, the operator of an oil well had a continuing obligation to pay royalties monthly to the royalty owners. The court of appeals stated,

> However, "[i]f the parties' agreement contemplates a continuing contract for performance, the limitations period does not usually commence until the contract is fully performed." Furthermore, "if the terms of an agreement call for periodic

Page 5

> payments during the course of the contract, a cause of action for such



payments may arise at the end of each period, before the contract is completed."

*Lyle*, 365 S.W.3d at 355 (citations omitted) (quoting *Davis-Apparel v. Gale-Sobel, a Div. of Angelica Corp.*, 117 S.W.3d 15, 18 (Tex. App.—Eastland 2003, no pet.); *Intermedics*, 683 S.W.2d at 845). The court determined that the four-year statute of limitations did not bar the royalty owners' claim for unpaid royalties and that they could bring suit for royalty payments accruing during the four years before the filing of the suit. *Id. Lyle* does not assist IDA; as in *Lyle*, the facts in this case called for PBK to make periodic payments (i.e., pay the invoices on issuance during the term of the contract), and the failure to pay each invoice when due gave rise to a cause of action which had to be sued on within four years.

*Intermedics* concerned an employee's suit for promised stock in a company as compensation. The employment agreement did not state when the stock was to be transferred to the employee, and the jury found the stock should have been transferred within one year of the agreement. Three years after the agreement took effect, the employee made a demand for the stock; instead of receiving the stock, the employer terminated him. The employee brought suit within two years after demanding the stock. *Intermedics*, 683 S.W.2d at 844. The court determined that because the employment contract was a continuing contract, the statute of limitations began to run when demand was made for the stock as long as the demand was made within a reasonable time. The court concluded the demand was within a reasonable time and that the employee's suit was filed within the limitations period after the demand. *Id.* at 845-47. In this case, IDA's demands for payment occurred on the dates the invoices were issued. *Intermedics* does not support IDA's position that limitations did not run from the date of the invoices.

IDA also argues that the parties' course of performance altered the due date for the payments because PBK always waited several months before paying the invoices. The only

Page 6

authority IDA cites in support of this position is section 1.303 of the Texas Business and Commerce Code, which is part of Texas's enactment of the Uniform Commercial Code (UCC). *See* TEX. BUS. & COM. CODE ANN. § 1.303 (West 2009). Chapter 1 of the UCC "applies to a transaction to the extent that it is governed by another chapter of this title." *Id.* § 1.102. The UCC does not apply to contracts involving only the rendition of services. *See Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 355 (Tex. App.—Corpus Christi 2002, pet. denied). Because IDA cites no authority that supports its argument, we conclude IDA has not shown the trial court erred by rejecting its argument that the parties' course of conduct altered the due date of the invoices.

IDA also argues the requirement that the invoices be based on the percentage of the project completed meant that its invoices were estimates of that amount. IDA asserts that until the project was completed or the contracts terminated, it was impossible to determine exactly what percentage of the project had been completed because that percentage was dependent upon the amount of services IDA would be called upon to perform in the future on the project, which could be estimated but not exactly determined. IDA stated, "At the end of the Projects, the parties were to re-evaluate invoices based on actual work performed/required and make whatever adjustments might be necessary." However, nothing in the contracts called for re-evaluation of the invoices at the end of the project "based on actual work performed/required." Instead, the contracts are for a flat fee to be paid in installments based upon IDA's estimation of the percentage of the contract has been completed at that point. Even if the invoices might be subject to dispute based on their accuracy, that dispute would not bar IDA from bringing suit. Instead, it would raise a fact issue to be resolved in the litigation. It would not prevent the accrual of the cause of action. *See Howard v. Fiesta Tex. Show Park, Inc.*, 980 S.W.2d 716, 721 (Tex. App.—San Antonio 1998, pet. denied) ("The issue whether all of the damages or the full



Page 7

extent or seriousness of the injury resulting from the act is yet known is immaterial to the accrual of the cause of action.").

We conclude PBK conclusively established that IDA's cause of action accrued on the dates of the invoices and not on December 15, 2009, and that the cause of action accrued more than four years before IDA brought suit.[3]

IDA also argues that PBK is equitably estopped from asserting the cause of action accrued before December 15, 2009. The elements of equitable estoppel are: (1) a false representation or concealment of a material fact; (2) made with knowledge of the facts; (3) to a party without knowledge or the means of knowledge of the real facts; (4) with the intention that it should have been acted upon; and (5) the party to whom it was made must have relied upon or acted upon it to his prejudice. *Gulbenkian v. Penn*, 252 S.W.2d 929, 932 (Tex. 1952). IDA had the burden of providing sufficient summary judgment evidence to raise a fact question on each element of equitable estoppel. *Fiengo v. Gen. Motors Corp.*, 225 S.W.3d 858, 861 (Tex. App.—Dallas 2007, no pet.). IDA asserts the following statement by PBK to IDA raises equitable estoppel:

> We are hiring alternate MEP engineering representation. We will not release retained funds until we have confirmed our cost exposures due to: a) the requirement to hire a new engineer, and b) until we have mitigated any exposure with our client due to IDA's incorrect or incomplete plans and specifications.

IDA argues, "This statement suggests that after PBK Architects completed the projects, and negotiated a settlement with Waco Independent School District, PBK Architects would release all or a portion of the invoice amounts to IDA Engineering. IDA Engineering clearly relied upon this statement in postponing the filing of this

suit." Despite IDA's assertion that it "clearly relied upon this statement in postponing the filing of this suit," it presented no summary judgment

Page 8

evidence of its reliance. Likewise, IDA presented no evidence that the statement was false, that IDA lacked knowledge or the means of knowledge of the real facts, or that PBK intended for IDA to forbear filing suit based on the statement. We conclude IDA failed to meet its burden of raising a fact question on each element of equitable estoppel.

**CONCLUSION**

We conclude the trial court did not err by granting PBK's motion for summary judgment. We affirm the trial court's judgment.

/Lana                                     Myers/
LANA                                      MYERS
JUSTICE

151418F.P05

Page 9

**JUDGMENT**

On Appeal from the 160th Judicial District Court, Dallas                County,                Texas Trial     Court     Cause     No.     DC-14-07539. Opinion delivered by Justice Myers. Justices Evans and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED.**

It is **ORDERED** that appellee PBK ARCHITECTS, INC. recover its costs of this appeal from appellant IDA ENGINEERING, INC.

Judgment entered this 4th day of October, 2016.

--------

Footnotes:



[1.] IDA's brief did not include a statement of the issues presented as required by Rule of Appellate Procedure 38.1(f). IDA's arguments are apparent from its brief.

[2.] IDA also argues that it filed suit on July 3, 2014, and not on July 16, 2014 when its original petition was file-stamped. Because we conclude limitations expired before July 3, 2014, the issue of whether IDA filed suit on July 3 or July 16 is not necessary to the disposition of this appeal. Accordingly, we do not address it. *See* TEX. R. APP. P. 47.1.

[3.] For the September 29, 2009 invoices, limitations expired on September 29, 2013. For the December 8, 2009 invoices, December 8, 2009 to November 12, 2013 when the agreed tolling period began was three years, 339 days, leaving twenty-six days of limitations left when tolling ceased on May 31, 2014, which meant limitations expired on June 26, 2014, one week before IDA filed suit on July 3, 2014.

--------



Kessinger v. National Association of Letter Carriers, No. 08-20311 (5th Cir 12/31/2008)
Case 4:22-cv-00343-Y   Document 247-13   Filed 05/24/24   Page 63 of 72   PageID 8479
No. 08-20311. (5th Cir. Dec 31, 2008)

Page 1

**MARK S. KESSINGER, Plaintiff-Appellant**
v.
**NATIONAL ASSOCIATION OF LETTER CARRIERS, LOCAL 283, Defendant-Appellee**
**No. 08-20311.**
**United States Court of Appeals, Fifth Circuit.**
**Filed December 31, 2008.**

Appeal from the United States District Court for the Southern District of Texas, USDC No. 06-CV-1473.

Before: HIGGINBOTHAM, BARKSDALE, and ELROD, Circuit Judges.

PER CURIAM.[*]

Mark Kessinger is a United States Postal Service employee and a member of the Local 283 branch of the National Association of Letter Carriers. The local by-laws of Branch 283 provide for elected shop stewards. For many years, Kessinger was elected, and by virtue of obtaining the most votes, served as chief

Page 2

shop steward. One of Kessinger's responsibilities as chief shop steward was processing member's grievances.[1]

In 2002, Kessinger ran for branch president, but was beaten by Patsy Grace. As branch president, Grace stripped Kessinger of the title of chief shop steward and appointed a different shop steward to handle grievance processing. Grace justified her action by pointing out the 300-grievance backlog that Kessinger had amassed, many of which were not meritorious. After his demotion, Kessinger remained in his elected shop steward position, maintaining his other shop steward responsibilities.

Kessinger brought suit against Branch 283 and the National Association of Letter Carriers

alleging that they violated his free speech and due process rights under the Labor Management Reporting and Disclosures Act.[2] Specifically, Kessinger alleges that Grace retaliated against his free-speech exercise of running for president by stripping him of his grievance processing responsibilities and that the deprivation was without the due process required under the LMRDA. After Kessinger presented his case to a jury, Defendants made a Rule 50 motion for judgment as a matter of law, which the district court granted. Kessinger now appeals.

Kessinger contends essentially two points of error. First that he put forward sufficient evidence to present a question to the jury on whether Grace retaliated against him for exercising his free speech rights protected by the LMRDA; and second, that he put forth sufficient evidence to present a question to the jury on whether his due process rights were violated when he was

Page 3

"otherwise disciplined" without written notice, time to prepare a defense, and a hearing.[3] We review the grant of a Rule 50 motion de novo and only affirm the grant if "a party has been fully heard on [the] issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[4]

We AFFIRM because Kessinger's claims are legally deficient. In Finnegan v. Leu,[5] the Supreme Court held that discharge of a union's appointed business agent by the union president does not violate the LMRDA. In interpreting the statute, the Court drew a distinction between union members and a union's appointed employees, wherein only the former are protected from arbitrary action by the union or its officers, who thereby retain the ability to "choose a staff whose views are compatible with [their] own."[6] This case is indistinguishable from Finnegan. As in Finnegan, Branch 283's by-laws give Grace, as branch president, the responsibility for and authority to delegate the chief steward title and grievance process responsibilities. Accordingly, Kessinger's LMRDA claim hinges on the loss of an



Appendix 665

appointed position; because Finnegan teaches that the LMRDA is "not concerned with perpetuating

Page 4

appointed union employees in office at the expense of an elected president's freedom to choose his own staff,"[7] his claims fail, both in regards to their merits and the process due.[8] AFFIRMED.

---------------

Notes:

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1. A shop steward's role in grievance processing includes receiving complaints from letter carriers, determining if a grievance exists, conducing an investigation to develop a record, and presenting the grievance to management.

2. 29 U.S.C. § 401 et seq. Section 411 is the Bill of Rights of Members of Labor Organizations and protects the free speech, (a)(2), and due process, (a)(5), rights of members.

3. See 29 U.S.C. § 411(a)(5).

4. Hagan v. Echostar Satellite, LLC, 529 F.3d 617, 622 (5th Cir. 2008) (quoting Fitzgerald v. Weasler Engineering, Inc., 258 F.3d 326, 337 (5th Cir.2001)).

5. 456 U.S. 431, 438-42 (1982).

6. Id. at 441.

7. Id. at 442.

8. In Sheet Metal Workers' International Assoc. v. Lynn, 488 U.S.347 (1989), the Supreme Court distinguished a union's elected business agents, who are protected under the LMRDA, from appointed business agents, who are not protected

under the Finnegan holding. Finnegan, and not Lynn, controls in this case because under Branch 283's by-laws, Kessinger's chief shop steward title and grievance responsibilities were appointed; he maintained his elected shop steward position.

---------------



Appendix 666

Fulton Lodge No. 2 of Int. Ass&#2032;n of Mach. &amp; Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)

Case 4:22-cv-00343-Y   Document 247-13   Filed 05/24/24   Page 65 of 72   PageID 8481

**415 F.2d 212 (1969)**

**FULTON LODGE NO. 2 OF the INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Appellants,**
**v.**
**Franklin NIX, Appellee.**

**No. 24571.**

**United States Court of Appeals Fifth Circuit.**

**July 28, 1969.**

[415 F.2d 213]

J. R. Goldthwaite, Jr., Atlanta, Ga., James L. Highsaw, Jr., Edward J. Hickey, Jr., William J. Hickey, Washington, D. C., Adair, Goldthwaite, Stanford, Daniel & Horn, Atlanta, Ga., Plato E. Papps, Chief Counsel, Int. Ass'n of Machinists and Aerospace Workers, AFL-CIO, Washington, D. C., Mulholland, Hickey & Lyman, Washington, D. C., of counsel, for appellants.

William G. McRae, Atlanta, Ga., for appellee.

Before JOHN R. BROWN, Chief Judge, and AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This is an internal union free speech case governed by the Labor-Management Reporting and Disclosure Act of 1959.[1] The district court found that Appellee Nix was expelled from membership for the exercise of protected speech and ordered Fulton Lodge No. 2 and its international body, to reinstate Nix to full membership in the union and to refrain from further interference with his free speech rights. Nix v. Fulton Lodge No. 2, IAM, N.D.Ga.1967, 262 F.Supp. 1000.

We affirm in part and vacate in part.

The underlying facts are straightforward and undisputed. Nix was employed by the Grand Lodge of IAM as a press representative for the international union. He became a member of IAM, although membership was not a condition of employment, and affiliated with Fulton Lodge No. 2. His position with IAM was categorized as "staff employee." The staff employees were the only unit of IAM not organized and represented by an independent bargaining agent. Nix initiated an organizational campaign to form the IAM Representatives Association, an independent bargaining representative for the staff employees. The campaign extended for a year or more, with heat and passion not diminished by the fact that the employer was itself a union. Nix and IAM President Siemiller circulated mailings to the staff employees and to each other. Without

[415 F.2d 214]

attempting to catalog all the vigorous remarks and charges made and the industrial warfare that took place, they included charges by Siemiller that Nix was making threats against him and the Executive Council of the union and was subjecting the union to constant harassment and propaganda in the press and elsewhere. Siemiller charged that "Nix had made many false statements in the material that he has sent you while conducting his organizing campaign." Nix made a written charge that per diem was being paid by the union to employees in violation of the constitution, and demanded of Siemiller that he proceed to recover from Siemiller himself, other officers and members of the Executive Council, and the sureties on their bonds, union funds said to have been improperly paid out. Nix brought a § 8(a) (5) charge against IAM, then withdrew it. He made a series of charges of fraud and misconduct against a member of the Executive Council, and an investigating committee considered the charges and rejected them. Siemiller wrote Nix, implying that he might be discharged, stating that he and his "Associates on the Executive Council" were not justified in continuing Nix's employment if in their judgment he was not needed. Nix carried on a running argument with Siemiller about vacation, automobile mileage, exclusion of Nix from meetings, isolation of Nix from other employees, and a variety of other matters.



A representation case was brought before the National Labor Relations Board. The Board certified the Representatives Association as the appropriate bargaining unit and ordered an election.

After the Board order but before the election Nix wrote and disseminated to staff employees a letter stating *inter alia* that "Bob Quick, general chairman of United Airlines (then Capital) didn't hesitate to picket Grand Lodge when he thought Hayes former IAM President ordered him to trample on the rights of his members. You know what happened? They broke their necks getting down to settle things with Bob and get him off that sidewalk. Would Bob do it again? Ask him?" A second letter, responding to Quick's denial that he ever picketed the international, admitted that the information was derived from hearsay sources, but noted that, on confrontation by Nix, Quick did not deny the incident. These letters were only two of more than twenty mailings that Nix sent out in his organizational efforts.

The election was held and the Representatives Association won. Approximately a month later Siemiller notified Nix that he was fired. A few days later, September 6, 1966, Nix filed unfair practice charges against the union. The next day Bob Quick, a member of and president of an IAM local in California, invoked provisions of the IAM constitution (1966),[2] and charged Nix with misconduct in making the statements concerning Quick in the two letters described above. The alleged misconduct is that described by Art. L, § 3, which subjects a member to possible reprimand, fine, suspension and/or expulsion from membership after notice and hearing for, *inter alia:*

> Circulating or causing in any manner to be circulated any false or malicious statement reflecting upon the private or public conduct, or falsely or maliciously attacking the character, impugning the motives, or questioning the integrity of any member or officer.[3]

[415 F.2d 215]

The charges brought by Quick alleged misconduct in terms tracking the above language almost verbatim except for the insertion of the dates of the two Nix letters.

A hearing was conducted before a trial committee[4] which knew of the pendency of the charges made by Nix to the NLRB. The committee found that Nix "did circulate or cause to be circulated a false and/or malicious statement reflecting upon Quick's private or public conduct, which statement falsely and/or maliciously attacked his character and integrity as a Union member." The committee recommended that Nix be expelled from membership. By overwhelming votes the Fulton Lodge membership sustained both the report and the recommended expulsion.

The trial committee noted in its report to the Fulton Lodge membership that it excluded from evidence in the misconduct proceedings "statements and/or documents which Nix tried to have admitted pertaining to his discharge from the Staff and his organizing campaign, which in our opinion as a Trial Committee, had nothing to do with this case." See Part III, *infra*.

After the trial committee hearing and before the local membership vote, Nix filed his complaint in district court without attempting to exhaust his appellate remedies under the IAM constitution.[5]

In the district court Fulton Lodge filed a three-pronged motion to dismiss: (1) district court jurisdiction was preempted by the unfair practice charge pending before the Board; (2) Nix waived his right to judicial review by his failure to exhaust his internal appellate remedies; (3) and Nix's statements, made in the context of an organizational campaign, were "extraunion" and consequently unprotected by the free speech provisions of the LMRDA. The motion was denied. On appeal Fulton Lodge raises the identical issues on specification of error, to which is added a fourth: (4) the district court erred in



Fulton Lodge No. 2 of Int. Ass'n of Machinists & Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)

Case 4:22-cv-00343-Y   Document 247-13   Filed 05/24/24   Page 67 of 72   PageID 8483

making its order applicable to the IAM Grand Lodge, i. e., to the international union as a whole.

The unfair practice proceedings were still pending when the district court entered its judgment below. Subsequently, but before submission of this appeal, the Board decision was rendered, finding that the discharges of Nix and others were not discriminatorily motivated but that after the Representatives Association was certified as bargaining agent IAM, by refusing to furnish it with requested information, breached its duty to bargain. *IAM and Nix* et al., 172 NLRB 239.

## I. Preemption

Congress expressly provided two broad anti-preemption provisions in the LMRDA[6] in response to objections initially raised by then Sen. John F. Kennedy (D-Mass.).[7] This court has held

[415 F.2d 216]

that rights guaranteed under the LMRDA are not subject to preemption by the National Labor Relations Board. International Bhd. of Boilermakers, etc. v. Braswell, 5 Cir. 1968, 388 F.2d 193, 195-196.[8]

## II. Exhaustion of remedies

We have no difficulty in concluding that the district court did not err in holding that the facts of Nix's case were such as not to require him to exhaust intra-union remedies under § 101(4) of LMRDA, 29 U.S.C. § 411(a) (4).[9] Detroy v. American Guild of Variety Artists, 2 Cir. 1961, 286 F.2d 75, 79. The subsection does not establish a jurisdictional bar or absolute waiver to judicial review, but preserves the discretionary exhaustion doctrine which allowed pre-LMRDA courts to determine whether pursuit of internal remedies should be required in a given case. Simmons v. Avisco, Local 713, Textile Workers, 9 Cir. 1965, 350 F.2d 1012; Detroy, *supra*; cf. NLRB v. Industrial Union of Marine & Shipbuilding Workers, 1968, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706. The first review authority to whom

Nix would have been required to apply was IAM President Siemiller, and the next review authority was the Executive Council. The continuing difficulties between Nix on the one hand and Siemiller and the Executive Council on the other fully justified the district court's conclusion that Nix was not required to attempt to exhaust his intra-union appellate remedies before seeking judicial relief. See Calagaz v. Calhoon, 5 Cir. 1962, 309 F.2d 248, 259-260. Cf. Glover v. St. Louis-San Francisco Ry. Co., 1969, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (U.S. Jan. 14, 1969) (under Railway Labor Act). The union is the victim of its own appellate review structure.[10]

[415 F.2d 217]

## III. The offensive statements: protected or not?

Fulton Lodge presses the theory that statements made in the context of an intra-union organizational campaign are "extra-union" comments and not protected. The fallacy in this argument lies in the facts. Nix was expelled from membership, according to the trial committee report, solely for the effect of the remarks upon Quick's personal character and union reputation, not on the basis of any organizational activity. As we have noted above, the committee excluded from evidence statements and documents proffered by Nix pertaining to the organizing campaign and to his discharge, on the ground they had nothing to do with the case.

The union-employee and union-officer cases relied on by the union miss the mark.[11] This is a "union-member" case. *See* 262 F.Supp. at 1004.

The Bill of Rights (Title I) of the LMRDA did not enjoy an orderly genesis.[12] Consequently the statutory language and the legislative history are a source of confusion as well as enlightenment.[13] The courts, therefore, have substantially shaped the Bill of Rights into a guarantee of union democracy, with the right of free speech enjoying a particularly favored position. The landmark decision interpreting LMRDA § 101(a) (2) is Saltzhandler v. Caputo, 2 Cir. 1963, 316 F.2d 445,



Fulton Lodge No. 2 of Int. Ass'n of Mach. &amp; Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)

Case 4:22-cv-00343-Y    Document 247-13    Filed 05/24/24    Page 68 of 72    PageID 8484

in which the Second Circuit held that a union may not subject to retributive disciplinary action a member accused of libeling or slandering a union officer. The *Saltzhandler* rationale has been subsequently extended by the courts to protect from disciplinary retribution numerous types of communication.[14]

[415 F.2d 218]

From this judicial evolution of the scope of the LMRDA free speech protection, a general rule is perceivable: a union member has the statutory right "to express any views, arguments, or opinions" inside or outside of a union meeting,[15] subject to only three general limitations: (1) reasonable union rules relating to the conduct of union meetings; (2) reasonable rules relating to individual responsibility to the union as an institution; and (3) reasonable rules requiring members to refrain from conduct which would interfere with the union's performance of its legal or contractual obligations. The first limitation is immaterial to the case at bar. The "reasonableness" standard of the latter two limitations is a legacy of legislative compromise which leaves the balancing of the institutional interests and individual rights to the trial judge.[16] The district court correctly held that the union did not show Nix's statements to fall within the ambit of either of these provisos. He cannot be disciplined for the substance and effect of his comments about Quick. *See* Saltzhandler v. Caputo, *supra,* 316 F.2d at 450 n. 8. As the Second Circuit held in *Saltzhandler:*

"The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain."

[415 F.2d 219]

316 F.2d at 448-449. The statements of Nix here involved were protected speech.[17]

### IV. Scope of relief

The injunctive relief granted by the district court purported to bind the international organization as well as the local lodge. The international body was not named in the Nix complaint as a party, was not served with process, did not appear as a party, and no express relief was sought against it.[18] Nix moved for leave to join the international as a party, but rather than specifically ruling on the motion the district court treated the action as one against the union as a whole and not against individuals or a branch of the union, considering that the union had no legal existence as an entity separate from its members and that the international was in active concert with the subordinate local by and through the constitution and by-laws. The court concluded that the action was in the nature of a class action. Also it held Fulton Lodge No. 2 was merely an agent of the international.[19]

Unquestionably Fulton Lodge is a creature of the international organization, created and controlled by the IAM constitution and by-laws.[20] The charges filed with the local organization were dictated by both substantive and procedural directives contained in the IAM constitution. *See* notes 2 through 5, *supra,* with accompanying text. Prosecution of charges against an IAM member cannot, under the circumstances, be considered the independent action of an autonomous local organization. Furthermore, membership, though initiated by and through the local organization according to the constitution,[21] is in the *international* union.[22] And the international organization, to a large extent, is responsible for the actions of its subordinate bodies. *See generally* Evans, The Law of Agency and the National Union, 49 Ky.L.J. 295 (1961). Cf. 1 CCH Lab.Law Rep. ¶ 1695.70 (pointing out that

Case 4:22-cv-00343-Y   Document 247-13   Filed 05/24/24   Page 69 of 72   PageID 8485

Fulton Lodge No. 2 of Int. Ass&#203; of Mach. &amp; Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)

the NLRA § 2(13), 29 U.S.C. § 152(13), perpetuates the common law rules of agency to govern international-subordinate responsibility). In addition, it would be difficult to effectuate the

[415 F.2d 220]

purposes of the LMRDA free speech provision in a case such as is before us, where membership is in the international, if the international cannot be subjected to a remedial order.

But the existence of the substantive elements of a cause of action did not vest the district court with jurisdiction over the international. LMRDA § 102, 29 U.S.C. § 412 permits the district court to grant "such relief (including injunctions) as may be appropriate," but this does not expand in personam jurisdiction beyond that arising from proper designation of a party as defendant and proper service of process upon the party. See Fed.R.Civ.P. 19(a) and 4(d) (3). Calazaz v. Calhoon, 309 F.2d 248 (5th Cir. 1962) is not to the contrary. That case was brought as a class action against all members of a union and against individuals who were representatives of the class. The plaintiff denied any intent of making the union itself a party defendant. Service of process was had on an officer of the union who gave actual notice to the membership who comprised the class. Nix did not name or seek process or relief against the international union to the extent it can be sued as though a jural entity, nor did he bring a class action against members of the international association with process on a member of the class. Nix sued the local lodge and its president. This is not enough to bind the international.

However, Nix was entitled to amend to seek relief against the international. On remand he should be given that right if he still desires it.

### V. Damages

The district court reserved for future determination the question of compensatory damages to Nix.[23]

We affirm in part, vacate in part and remand for further proceedings not inconsistent with this opinion.

--------

Notes:

[1] Jurisdiction in the district court is based upon LMRDA § 102, 29 U.S.C. § 412. Free speech within the union is guaranteed by the "Bill of Rights" provisions of LMRDA (Title I) under § 101(a) (2), 29 U.S.C. § 411(a) (2):

*"Freedom of speech and assembly.* — Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

[2] All references to the union constitution are to that of 1966.

This particular provision is Art. L, § 7, which governs the procedure for preferring charges against a member for a violation other than of his duties as an officer or representative of the Local Lodge or District Lodge.

[3] Provisions such as this, limiting criticism of union members and officers, are not unique to IAM. See the remarks of Senator Goldwater (R-Ariz.) on the Senate floor that, as of 1959, the constitutions of "74 unions limit member criticism of officers and fellow members and 15

Fulton Lodge No. 2 of Int. Ass&#039;n of Mach. &amp; Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)

Case 4:22-cv-00343-Y    Document 247-13    Filed 05/24/24    Page 70 of 72    PageID 8486

unions prohibit the issuance of any literature emanating from members unless the consent of the national officers is received." 2 Legis.Hist. of the LMRDA 1235 (NLRB ed. 1959) (hereinafter "2 LMRDA * * *").

[4] Art. L, § 8 of the IAM constitution requires that a five man hearing committee be appointed by the local union president to conduct the disciplinary proceedings, file a report to the membership, and make recommendations of punishment.

[5] The intra-IAM appellate review procedure calls for a member disciplined by a local lodge to petition successively the IAM President, the Executive Council, and finally the Grand Lodge Convention. Each petition must be made within 30 days of the decision in the previous disposition. Art. L, §§ 14-16.

[6] LMRDA §§ 103 and 603, 29 U.S.C. §§ 413 and 523. The former is expressly applicable to Title I; the latter is a "catchall" for the entire Act. *See* Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 176 (1960); *see also* Summers, Preemption and the Labor Reform Act — Dual Rights and Remedies, 22 Ohio St.L.J. 119, 123-128 (1961).

[7] 2 LMRDA 1108-1112, 1221, 1233-1235. The House substitute for S. 1555 retained the Bill of Rights provisions from the Senate bill, including Section 103. 2 LMRDA 1520. On the day the Landrum-Griffin Bill was signed into law Senator Goldwater remarked on the Senate floor:

"Section 103 preserves any other rights and remedies which a union member may have under any other State or Federal law, before any other court or agency, or under any union constitution or bylaws. It thus guards against the application of the preemption problem in connection with the newly granted bill of rights, and preserves any broader safeguards for union members which may be contained in some union constitutions or bylaws."

[8] In *Braswell* the plaintiff sought damages only, not reinstatement. Nix seeks both damages

and reinstatement. As discussed below, the district court reserved the question of damages.

[9] "*Protection of the right to sue.* — No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency; irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding; or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition."

[10] *But compare* Note, Public Review Boards: A Check on Union Disciplinary Power, 11 Stan.L.Rev. 497 (1959) (examines impartial review boards established in 1954 and 1957 by the Upholsterers and the United Auto Workers Unions). IAM's self-regulation argument, *see* Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 615 (1959), would be more efficacious if the union's constitution or by-laws provided for impartial review. *See* Lipset, The Law and Trade Union Democracy, 47 Va. L.Rev. 1, 47-49 (1961). One critic has noted: "appeals to international presidents and councils, though generally permitted, cannot be expected to cure political infections in trials below, as international officers are no more immune to factional politics than those of locals." Note, Free Speech, Fair Trials, and Factionalism in Union Discipline, 73 Yale L.J. 472, 483-484 (1964).

[11] *See, e. g.,* Strauss v. International Bhd. of Teamsters, E.D.Pa.1959, 179 F.Supp. 297, 300. Accord: Thompson v. New York Cent. R. R. Co., 2



Fulton Lodge No. 2 of Int. Ass&#039;n of Mach. &amp; Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)

Case 4:22-cv-00343-Y   Document 247-13   Filed 05/24/24   Page 71 of 72   PageID 8487

Cir. 1966, 361 F.2d 137, 145; Airline Stewards & Stewardesses Assn. Local 550, TWU, AFL-CIO v. Transport Workers Union, 7 Cir. 1964, 334 F.2d 805, 808; Hill v. ARO Corp., N.D.Ohio 1967, 275 F.Supp. 482, 489. The gist of the above cases is that the LMRDA protects membership rights only, not rights to continued employment or office.

[12] For comprehensive analyses of the legislative travail surrounding the formulation of the Bill of Rights, *see* Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 851 (1960); Cox, Internal Affairs of Labor Unions under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819 (1960); Hickey, The Bill of Rights of Union Members, 48 Geo.L.J. 226 (1959); Rothman, Legislative History of the "Bill of Rights" for Union Members, 45 Minn. L.Rev. 199; Sherman, The Individual Member and the Union: The Bill of Rights Title in the LMRDA of 1959, 54 N.W.L.Rev. 803 (1960); Smith, The LMRDA of 1959, 46 Va.L.Rev. 195 (1960). The provisions of Title I were born amidst stormy debate on the Senate floor. *See* 2 LMRDA 1102-1119, 1220-1239 (debates and votes on the McClellan and Kuchel amendments).

[13] Since the Bill of Rights was an amendment introduced from the floor, it never received "the careful technical review and clarification which comes from scrutiny by a congressional committee and its legislative staff." Cox, *supra* note 12 at 831-833. One commentator has complained that "resort to LMRDA legislative history will at best be difficult, and may serve more to obscure than to illuminate intent." Smith, *supra* note 12, at 198. Yet another has observed:

"Turning to the statute for assistance is similarly frustrating. Since Title I was presented from the floor, it contains purposeful ambiguities and technical compromises thought necessary to insure passage. Moreover, it the Kuchel substitute amendment was hastily drawn to modify what had become an inevitable individual rights section of the act."

Atleson, A Union Member's Right of Free Speech and Assembly: Institutional Interests and Individual Rights, 51 Minn. L.Rev. 403, 409. Archibald Cox, labor law professor and former Solicitor General, suggests that "courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words." Cox, *supra* note 12, at 852.

[14] *See e. g.,* Giordani v. Upholsterers International, 2 Cir. 1968, 403 F.2d 85 (accusations of union fund misappropriation); International Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers v. Rafferty, 9 Cir. 1965, 348 F.2d 307 (circulation outside the union of handbills proposing by-law revisions); Cole v. Hall, 2 Cir. 1965, 339 F.2d 881 (malicious vilification of union officers); Farowitz v. Associated Musicians, 2 Cir. 1964, 330 F.2d 999 (exhortation to fellow members not to pay dues believed to be illegally excessive); Kelsey v. Philadelphia Local 8, International Alliance of Theatrical Stage Employees, E.D.Pa.1968, 294 F.Supp. 1368 (job assignment complaints); Archibald v. Local 57, Operating Engineers, D.R.I. 1967, 276 F.Supp. 326 (publication and distribution of material libelous of union officers and business agent); Deacon v. Operating Engineers, Local No. 12, C.D. Calif.1967, 273 F.Supp. 169 (authorship of newspaper article stating personal opinions and containing accusations against union officers); Leonard v. M.I.T. Employees Union, D.Mass.1964, 225 F.Supp. 937 (circulation of defamatory material); Graham v. Soloner, E.D. Pa.1963, 220 F.Supp. 711 (picketing); Gartner v. Soloner, E.D.Pa.1963, 220 F. Supp. 115 (picketing); Stark v. Twin City Carpenters District Council, D. Minn.1963, 219 F.Supp. 528 (slander of union business agent during meeting). See also, Note, Bill of Rights of Members of Labor Organizations, 1959-1964, 40 Notre Dame Law. 86, 94-95 (1964).

[15] As a result of Senator McClellan's insertion of a semicolon after the word "opinions" in the Kuchel text, the guarantee was expressly extended beyond mere union hall comments to cover any statement concerning union affairs, including those made in public. *See* 2 LMRDA 1230; *see also* 2 LMRDA 1236, 1270, 1280. *See generally*

Case 4:22-cv-00343-Y    Document 247-13    Filed 05/24/24    Page 72 of 72    PageID 8488

*Fulton Lodge No. 2 of Int. Ass&#39;n of Mach. &amp; Aero. Wkrs. v. Nix, 415 F.2d 212 (5th Cir. 1969)*

Atleson, *supra* note 13, at 431, 441; Sherman, *supra* note 12, 818.

[16] *See* Aaron, *supra* note 12, at 865-866:

"Almost all unions claim the right to discipline individual members or groups of members who openly challenge the authority of their leaders, especially when such conduct carries overtones of rival unionism or alliances with employers. No one can reasonably object to giving a legitimate organization the right to protect its institutional interests; yet it is undeniable that unions, like other voluntary associations, in time succumb to the `iron law of oligarchy.' Democracy cannot thrive in an environment hostile to dissent and opposition; therefore a line must somehow be drawn between legitimate resistance and illegal subversion."

*See also* Cox, *supra,* note 12, at 834-835; "Dissent in a union, like treason in a nation, must be suppressed if the purpose is to destroy the union, encourage a rival, or bring about the violation of legal or contractual obligations."

[17] The protection provided by LMRDA § 101(a) (2), 29 U.S.C. § 411(a) (2), is not absolute. A union or its officers simply may not use their disciplinary powers and processes to suppress statements made by a member so long as such comments do not fall within the ambit of the general limitations of the statute designed to provide institutional security. A union member or official who considers himself defamed by the statements of another member, is not preempted by the LMRDA from recourse to a civil action for defamation. See Saltzhandler v. Caputo, *supra,* 316 F.2d at 451. Cf. Linn v. United Plant Guard Workers, 1966, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (under Labor-Management Relations Act); Pettway v. American Cast Iron Pipe Co., 5 Cir. 1969, 411 F.2d 998 May 22, 1969, slip opinion at p. 18, n. 22.

[18] The complaint sought a declaration that the statements concerning Quick did not "afford a basis for disciplinary action against plaintiff *by Fulton Lodge No. 2"* and that "the prosecution of plaintiff on such charges *by such lodge"* violated

the rights secured to him by 29 U.S.C. § 411 (a) (2).

[19] We are required to note lack of jurisdiction apparent on the face of the record, so we are not concerned with whether the local, named as a party, can raise on appeal the validity of extending the injunction to include the entire union, not named as a party.

[20] Art. I, § 3, Art. VI, § 5, and Art. D, §§ 1-12, describe the governmental organizational structure of the IAM, its supervisory power over subordinate bodies, and the regulations controlling government of the local lodges. The provisions leave no doubt that the ultimate power within the institution is not in the local lodges.

[21] Art. I, §§ 1 and 2 (eligibility criteria and procedure governing local lodge investigation and election to membership).

[22] Art. I, § 13 (affiliation with a local or district lodge is transferable throughout the IAM).

[23] The court struck Nix's claim for punitive damages. This was correct. International Brotherhood of Boilermakers etc. v. Braswell, 5 Cir. 1968, 388 F.2d 193.

--------