UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ROBERT "BOB" ROSS AND | § | |
| EUGENIO VARGAS, | § | |
| | § | |
| *Plaintiffs/Counterclaim Defendants*, | § | |
| | § | |
| v. | § | No. 4:22-CV-343-Y |
| | § | |
| ASSOCIATION OF PROFESSIONAL | § | Consolidated with |
| FLIGHT ATTENDANTS, MCGAUGHEY, | § | No. 4:22-CV-430-Y |
| REBER AND ASSOCIATES, INC., | § | |
| JULIE HEDRICK, and ERIK HARRIS, | § | |
| | § | |
| *Defendants/Counterclaim Plaintiffs*. | § | |

**PLAINTIFFS' AMENDED BRIEF IN SUPPORT OF AMENDED RESPONSE
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**BROWN FOX PLLC**

Cortney C. Thomas
  Texas Bar No. 24075153
  cort@brownfoxlaw.com
C. Alan Carrillo
  Texas Bar No. 24109693
  alan@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000
Facsimile: (214) 327-5001

*Attorneys for Plaintiffs Robert "Bob"
Ross and Eugenio Vargas*

## <u>TABLE OF CONTENTS</u>

I.    IDENTIFICATION OF LIVE PLEADINGS ................................................ 1

II.   INTRODUCTION ............................................................................... 1

III.  STATEMENT OF FACTS .................................................................... 3

IV.   LEGAL STANDARD........................................................................ 10

V.    ARGUMENT................................................................................... 12

    A.    The Defendants Are Not Entitled to Judgment on Plaintiffs' Claims as a Matter of Law. ................................................................................... 12

        1.    The APFA Violated Mr. Ross and Mr. Vargas' Free-Speech and Due Process Rights Under the LMRDA .................................... 12

            a)    Legal Standard for LMRDA Claims............................. 12

            b)    Section 411(a)(5)(C): Mr. Ross and Mr. Vargas Did Not Receive a Full and Fair Hearing. ................................... 15

            c)    Section 411(a)(2) and Section 529: Mr. Ross and Mr. Vargas Were Arbitrarily Punished for Their Free Speech and Their Lifetime Leadership Ban Violates Their Rights.......... 18

        2.    The APFA Breached Mr. Ross's Transition Agreement. ........................ 23

        3.    The APFA Defamed Mr. Ross................................................. 25

    B.    The Defendants Are Not Entitled to Judgment on Their Counterclaims as a Matter of Law. ................................................................................... 27

        1.    The Court Should Hold that Section 501 Does Not Confer a Federal Breach of Fiduciary Duty Claim to Unions and Dismiss the Section 501 Counterclaims. ................................................... 28

            a)    The Court May *Sua Sponte* Dismiss the Section 501 Counterclaims for Lack of Subject-Matter Jurisdiction or for Failure to State a Claim.......................................... 29

            b)    Section 501's Plain Text Does Not Prescribe Unions with a Federal Right of Action. ............................................. 30

            c)    Section 501 Does Not Afford Unions an Implied Federal Right of Action. ....................................................... 32

            d)    There is No "Law of the Case," "Law of the Circuit," or "Law of the District" Establishing That Section 501 Provides the APFA With a Federal Right of Action.................... 37

2.     If the Court Does Not Dismiss the Section 501 Counterclaims, the Court Should Deny Summary Judgment Because of Genuine Disputes of Material Fact. ........................................................................ 41

a)     The Court Cannot Simply Defer to the Ross Award and Vargas Award to Decide the Section 501 Counterclaims— the Trier of Fact Must Resolve Genuine Disputes of Material Facts. ............................................................................ 41

b)     The Section 501 Counterclaims are Barred by Laches. ................ 45

c)     The APFA Is Not Entitled to Attorneys' Fees as a Matter of Law. ........................................................................................... 47

VI.    CONCLUSION ............................................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*Adams-Lundy Ass'n of Prof'l Flight Attendants* (*Adams-Lundy III*),
  844 F.2d 245 (5th Cir. 1988) ................................................................. 38

*Adams-Lundy v. Ass'n of Prof'l Flight Attendants* (*Adams-Lundy II*),
  792 F.2d 1368 (5th Cir. 1986) .............................................................. 41

*Adams–Lundy v. Ass'n of Prof'l Flight Attendants* (*Adams-Lundy I*),
  731 F.2d 1154 (5th Cir. 1984) ......................................................... 14, 42

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)................................................................. 34, 35, 39

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986)..................................................................... 11, 27

*Archer v. Tregellas*, 566 S.W.3d 281 (Tex. 2018)...................................... 24

*Ass'n of Pro. Flight Attendants v. Gibbs*, No. 4-82-593-E, 1984 WL 49097 (N.D. Tex.
  Mar. 8, 1984) (Mahon, J.), *rev'd on other grounds*, 804 F.2d 318 (5th Cir. 1986)............ 39, 41

*Benavidez v. Irving Indep. Sch. Dist., Tex.*,
  690 F. Supp. 2d 451 (N.D. Tex. 2010) .................................................. 40

*Building Material and Dump Truck Drivers, Local 420 v. Traweek*,
  867 F.2d 500 (9th Cir. 1989) .......................................................... 34, 35

*Carolina Cas. Ins. Co. v. Sowell*,
  603 F. Supp. 2d 914 (N.D. Tex. 2009) .................................................. 11

*Carroll v. Fort James Corp.*,
  470 F.3d 1171 (5th Cir. 2006) ........................................................... 29

*Carver v. Atwood*,
  18 F.4th 494 (5th Cir. 2021) ......................................................... 29, 30

*Celotex Corp. v. Catrett*
  477 U.S. 318 (1986)...................................................................... 11

*Coim USA Inc. v. Sjobrand Inc.*,
  663 F. Supp. 3d 684 (N.D. Tex. 2023) .................................................. 23

*Davoodi v. Austin Indep. Sch. Dist.*,
   755 F.3d 307 (5th Cir. 2014) ........................................................................ 29

*Encompass Off. Sols., Inc, Inc. v. Ingenix, Inc.*,
   775 F. Supp. 2d 938 (E.D. Tex. 2011) ............................................................ 25

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
   541 U.S. 246 (2004) ........................................................................................ 31

*Farrell v. Hellen*,
   367 F. Supp. 2d 491 (S.D.N.Y. 2005) ....................................................... 19, 20

*Finnegan v. Leu*,
   456 U.S. 431 (1982) .................................................................................. 12, 13

*Fontenot v. Upjohn Co.*
   780 F.2d 1190 (5th Cir. 1986) ........................................................................ 11

*Guidry v. Sheet Metal Workers Nat. Pension Fund*,
   493 U.S. 365 (1990) ........................................................................................ 32

*Guthrie v. Tifco Indus.*,
   941 F.2d 374 (5th Cir. 1991) .......................................................................... 30

*Guzman v. Allstate Assurance Co.*,
   18 F.4th 157 (5th Cir. 2021) ..................................................................... 11, 27

*Hughes Aircraft v. Jacobson*,
   525 U.S. 432 (1999) ........................................................................................ 31

*Illinois State Bd. of Elections v. Socialist Workers Party*,
   440 U.S. 173 (1979) ........................................................................................ 38

*Int'l Bhd. of Boilermakers v. Hardeman*,
   401 U.S. 233 (1971) ........................................................................................ 15

*Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Freeman*,
   683 F. Supp. 1190 (N.D. Ill. 1988) ................................................................. 36

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
   939 F.2d 1257 (5th Cir. 1991) ................................................................... 11, 27

*Int'l Union, Sec., Police & Fire Pros. of Am. v. Faye*,
   828 F.3d 969 (D.C. Cir. 2016) .................................................... 33, 34, 37, 49

*International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers, AFL–CIO v. Statham*,
    97 F.3d 1416 (11th Cir. 1996) .......................................................................... 34

*International Union of Operating Engineers, Local 150 v. Ward*,
    563 F.3d 276 (7th Cir. 2009) ...................................................................... 28, 34

*Loc. 15 of Int'l Bhd. of Elec. Workers v. O'Reilly*,
    No. 02 C 6464, 2003 WL 29896 (N.D. Ill. Jan. 2, 2003) ....................................... 36

*Loc. 443, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Pisano*,
    753 F. Supp. 434 (D. Conn. 1991) ..................................................................... 36

*Loc. 624, Int'l Union of Operating Engineers v. Byrd*,
    659 F. Supp. 274 (S.D. Miss. 1986) ................................................................... 36

*Loc. 815, Int'l Longshoreman's Ass'n, AFL-CIO v. Brazil*,
    12 F. Supp. 2d 918 (E.D. Wis. 1998) ............................................................ 48, 49

*Loc. No. 92, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO v. Norris*,
    383 F.2d 735 (5th Cir. 1967) ............................................................................ 49

*Local No. 82, Furniture & Piano Moving v. Crowley*,
    467 U.S. 526 (1984) ........................................................................................ 13

*Lozano v. Ocwen Fed. Bank, FSB*,
    489 F.3d 636 (5th Cir. 2007) ............................................................................ 30

*Lucas v. United States*,
    807 F.2d 414 (5th Cir. 1986) ............................................................................ 24

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
    243 F.3d 787 (4th Cir. 2001) ............................................................................ 46

*Mandaglio v. United Broth. of Carpenters and Joiners of America (Gen. Ex. Board)*,
    575 F. Supp. 646 (E.D.N.Y. 1983) .................................................................... 19

*Martin v. Alamo Cmty. Coll. Dist.*
    353 F.3d 409 (5th Cir. 2003) ............................................................................ 11

*Martin v. Local 556, Transp. Workers Union of Am. AFL–CIO*,
    No. 3:14–CV–0500–D, 2014 WL 4358480 (N.D. Tex. Sept. 3, 2014) ............................ passim

*Martin v. Transp. Workers Union of Am., Loc. 556*,
    206 F. Supp. 3d 1227 (N.D. Tex. 2016) (Kinkeade, J.), *aff'd sub nom. Martin v. Loc. 556, Transp. Workers Union of Am.*, 708 F. App'x 171 (5th Cir. 2017) .......................... 11, 13

*Martinez v. Am. Fed'n of Gov't Emps.*,
    980 F.2d 1039 (5th Cir. 1993) ................................................................ 13, 14

*Mercantile Nat. Bank at Dallas v. Bradford Tr. Co.*,
    850 F.2d 215 (5th Cir. 1988) ........................................................................ 47

*Mid-Am. Carpenters Reg'l Council v. Bond*,
    No. 4:22-CV-00291-SEP, 2023 WL 2734209 (E.D. Mo. Mar. 31, 2023) ................................ 35

*Morrissey v. Curran*,
    650 F.2d 1267 (2d Cir. 1981) .................................................................... 48, 49

*N.L.R.B. v. Int'l Ass'n of Bridge Structural & Ornamental Iron Workers*,
    864 F.2d 1225 (5th Cir. 1989) ...................................................................... 21

*N.L.R.B. v. Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO*,
    581 F.2d 473 (5th Cir. 1978) ....................................................................... 21

*Nasti v. CIBA Specialty Chems. Corp.*,
    492 F.3d 589 (5th Cir. 2007) ....................................................................... 25

*Noble v. Sombrotto*,
    260 F. Supp. 2d 132 (D.D.C. 2003) ........................................................... 43, 44, 45

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985) ................................................................................ 31

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*,
    574 S.W.3d 882 (Tex. 2019) ......................................................................... 23

*Plumbers & Steamfitters Union Loc. No. 10 v. Waters*,
    451 F. Supp. 3d 543 (E.D. Va. 2020) ........................................................... 46, 47

*Ray v. Young*,
    753 F.2d 386 (5th Cir. 1985) ..................................................................... 42, 43

*Runyan v. United Broth. of Carpenters*,
    566 F. Supp. 600 (D. Colo. 1983) ................................................................... 23

*Serafini v. Sw. Airlines Co.*,
    485 F. Supp. 3d 697 (N.D. Tex. 2020) ............................................................... 31

*Shaunfield v. MB Fin. Bank, N.A.*,
    No. 3:15-CV-0856-L, 2016 WL 631928 (N.D. Tex. Feb. 17, 2016) ..................................... 25

*Sheet Pile, L.L.C. v. Plymouth Tube Co., USA*, 98 F.4th 161 (5th Cir. 2024) ............................. 24

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ............................................................................... 34

*Stewart v. Int'l Ass'n of Machinists & Aerospace Workers*,
  16 F. Supp. 3d 783 (S.D. Tex. 2014) .................................................... 39

*Taylor v. Trevino*,
  569 F. Supp. 3d 414 (N.D. Tex. 2021) ...................................... 11, 42, 43

*Threadgill v. Armstrong World Indus., Inc.*,
  928 F.2d 1366 (3d Cir. 1991) ................................................................ 40

*Transport Workers Union of Am. v. Fudge*,
  No. 3:14-CV-3639-L, 2015 WL 5664429 (N.D. Tex. March 24, 2015) (Horan, M.J.),
  *report and recommendation adopted in part*, No. 3:14-CV-3639-L, 2015 WL 5682393
  (N.D. Tex. Sept. 25, 2015) (Lindsay, J.) .................................. 37, 38, 39, 40

*United Bhd. of Carpenters & Joiners of Am. v. Shapiro*,
  No. 2:22-CV-01099-JHC, 2023 WL 2161701 (W.D. Wash. Feb. 22, 2023), *appeal
  dismissed*, No. 23-35183, 2023 WL 6236875 (9th Cir. July 7, 2023) ...................................... 35

*United Steel Workers Local 12-369 v. United Steel Workers Int'l*,
  728 F.3d 1107 (9th Cir. 2013) ................................................................ 14

*United Transp. Union v. Bottalico*,
  120 F. Supp. 2d 407 (S.D.N.Y. 2000) .................................................... 36

*Van Houten v. City of Fort Worth*,
  No. 4:12-CV-826-Y, 2015 WL 13651282 (N.D. Tex. Apr. 7, 2015) (Means, J.), *aff'd*,
  827 F.3d 530 (5th Cir. 2016) ................................................................. 31

*Webster v. Fall*,
  266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ................................. 38

*Westfall v. Luna*
  903 F.3d 534 (5th Cir. 2018) ................................................................. 11

*Yager v. Carey*,
  910 F. Supp. 704 (D.D.C. 1995), *aff'd*, 159 F.3d 638 (D.C. Cir. 1998) ................................. 15

**Other Authorities**

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL
  TEXTS  (2012) .......................................................................................... 33

Brett M. Kavanaugh, *Fixing Statutory Interpretation*,
  129 Harv. L. Rev. 2118 (2016) .............................................................. 31

**Rules**

FED. R. CIV. P. 12(h)(3) ................................................................................................ 29

FED. R. CIV. P. 56(a) ................................................................................................... 10

FED. R. CIV. P. 56(c)(1) ............................................................................................... 11

Fed. R. Civ. P. 8(c) ..................................................................................................... 24

**Statutes**

29 U.S.C. § 411 ............................................................................................................ 13

29 U.S.C. § 412 ............................................................................................................ 13

29 U.S.C. § 501(a) .................................................................................................. 31, 39

29 U.S.C. § 501(b) ....................................................................................................... 48

29 U.S.C. § 529 ............................................................................................................ 14

TEX. CIV. PRAC. & REM. CODE § 16.051 ...................................................................... 24

TEX. CIV. PRAC. & REM. CODE § 38.001 ...................................................................... 25

Plaintiffs Robert "Bob" Ross and Eugenio Vargas file this amended brief ("MSJ Response Brief") in support of their amended response in opposition ("MSJ Response") to the *Defendants' Motion for Summary Judgment on All Claims and Counterclaims* ("Motion") [Doc. 234], *Memorandum in Support* of the Motion [Doc. 235], and *Appendix in Support* of the Motion ("MSJ Appendix") [Doc. 236].[1] Plaintiffs respectfully show the Court as follows.[2]

## I.    IDENTIFICATION OF LIVE PLEADINGS

The Plaintiffs agree with the Defendants' identification of the live pleadings.[3]

## II.    INTRODUCTION

Former APFA National President Bob Ross and former APFA National Treasurer Mr. Vargas filed their cases[4] against the Defendants to remedy violations of their free-speech and

---

[1] Mr. Ross and Mr. Vargas file their amended MSJ Response, MSJ Response Brief, and *Appendix to Plaintiffs' Brief in Support of Response in Opposition to Defendants' Motion for Summary Judgment* ("MSJ Response Appendix") in accordance with the Court's *Order Striking Response and Setting Deadline for Amendment* [Doc. 251] ("Order Striking Response") and *Order Granting Motion for Withdrawal of Counsel and Motion to Extend Deadline to File Amended Response* [Doc. 255]. Mr. Ross and Mr. Vargas' recently engaged substitute counsel prepared the amended MSJ Response, MSJ Response Brief, and MSJ Response Appendix to, as the Court ordered, "correct the noted problems with these documents[.]" Order Striking Response at 4.

Mr. Ross and Mr. Vargas do not read the Order Striking Response as disallowing them from drafting new or revised arguments in opposition to the Motion. Indeed, the Order Striking Response indicates that such material revisions may be necessary. *See id.* at 3–4 (cautioning that "briefs are subject to the requirements of Federal Rule of Civil Procedure 11"). Out of respect to the Court and to the Defendants, Mr. Ross and Mr. Vargas note that they believe that the only material additions to the MSJ Response Brief are their arguments in opposition to the Defendants' request for summary judgment on Defendant Association of Professional Flight Attendants' ("APFA") counterclaims based on 29 U.S.C. § 501 ("Section 501 Counterclaims"). These arguments largely stem from Mr. Ross and Mr. Vargas' new request for the Court to *sua sponte* dismiss the Section 501 Counterclaims for lack of subject-matter jurisdiction or, alternatively, for failure to state a claim upon which relief may be granted. After reviewing the Court's docket, the undersigned counsel reasonably believe that these new issues identified in the MSJ Response Brief have neither been argued by the Parties nor decided by the Court yet. As officers of the Court and fiduciaries of our clients, the undersigned counsel make these new arguments in good faith, especially considering that the issue of subject-matter jurisdiction may be raised at any point (including on appeal) and the Order Striking Response provides that "Defendants may, if they so desire, file an amended reply brief in accordance with Local Civil Rule 7.1(f)." *Id.* at 5.

[2] In accordance with Local Rule 56.6 and Judge-Specific Requirement II.B–C, all exhibits cited herein are in Plaintiffs' concurrently filed MSJ Response Appendix or in the Defendants' MSJ Appendix [Doc. 236].

[3] Judge-Specific Requirement II.A.1.

[4] Any citations to this Case's docket prior to the Court's *Order of Consolidation* [Doc. 204] will note whether the referenced document was filed in *Robert (Bob) Ross v. Association of Professional Flight Attendants, et al.*, No. 4:22-cv-343-Y (N.D. Tex.), through the use of "Ross Doc.," or in *Eugenio Vargas v. Association of Professional Flight Attendants, et al.*, No. 4:22-cv-430-Y (N.D. Tex.), through the use of "Vargas Doc."

due-process rights under the Labor-Management Reporting and Disclosure Act ("LMRDA") and their membership rights under the APFA Constitution. In retaliation for Mr. Ross's adamant public opposition to a union merger, a disgruntled union member and her allies, committed to removing Mr. Ross from office, fomented political resistance to the Ross Administration. They initiated financial investigations and pursued internal charges against Mr. Ross and Mr. Vargas, who were subjected to disciplinary proceedings rife with procedural and evidentiary injustices. Although Mr. Ross and Mr. Vargas remain APFA members in good standing nominally, both of their disciplinary proceedings resulted in unprecedented lifetime bans on holding elected office in the APFA—an undeniable violation of the rights afforded to them by the plain text of the APFA Constitution and a brazen perpetual violation of their free-speech and due-process rights under the LMRDA.

By its own arguments, citations, and evidence, the Motion demonstrates that summary judgment is improper. The Defendants ask the Court to grant them summary judgment as a matter of law while relying on self-serving declarations that require the Court to weigh evidence and determine witnesses' credibility. The APFA asks for summary judgment on its Section 501 Counterclaims, which it does not possess by statute expressly or impliedly and which the Court should dismiss. The APFA represents that the Court may simply grant judgment on its Section 501 Counterclaims because an arbitrator entered awards against Mr. Ross and Mr. Vargas in disciplinary proceedings, while acknowledging that Mr. Ross and Mr. Vargas were not entitled to—and did not receive—due process protections in those disciplinary proceedings that they would have otherwise receive in a court of law. Moreover, the APFA demands attorneys' fees from Mr. Ross and Mr. Vargas without providing a legal basis for such recovery.

The Defendants are not entitled to any of their requests in the Motion. The Court should deny it and set Mr. Ross and Mr. Vargas' claims for trial. It should also summarily dismiss the

Section 501 Counterclaims. And it should hold that the APFA is not entitled to attorneys' fees under any circumstance.

## III.    STATEMENT OF FACTS

1.    Robert "Bob" Ross has been employed as a flight attendant working with American Airlines, Inc. since 1983.[5] He is a member of the APFA in good standing.[6] Prior to the Ross Award (defined below), Mr. Ross had never been subjected to any discipline from American Airlines.[7]

2.    Eugenio Vargas is a fellow longtime employee of American Airlines who served in elected and appointed positions within APFA leadership intermittently from 2000 to 2018.[8] It is undisputed that Mr. Vargas is also a member of the APFA in good standing.

3.    On April 1, 2016, Mr. Ross was elected as the APFA National President and took office.[9] Mr. Vargas was elected as APFA National Treasurer and took office.[10]

4.    Since 2016, Mr. Ross has publicly opposed any actions to initiate a merger between the Association of Flight Attendants-CWA's ("AFA") and the APFA.[11] As one example, on July 4, 2017, Mr. Ross sent a letter to AFA International President Sara Nelson opposing the AFA's "raid" of the APFA.[12]

5.    On April 2, 2016—the day after Mr. Ross assumed the office of APFA National President—APFA member Melissa Chinery-Burns, who had purportedly supported Mr. Ross's

---

[5] *See* Declaration of Robert "Bob" Ross ¶ 3 ("Ross Declaration") (MSJ Resp. Appx. at 164). Mr. Ross executed the Ross Declaration on November 11, 2024, in support of this amended MSJ Response. Although reformatted, it is consistent with, and is not intended to expand, his affidavit submitted in support of Plaintiff's now-stricken *Brief in Support of Plaintiff's Motion for Summary Judgment* [Doc. 238].

[6] *See id.* (MSJ Resp. Appx. at 164).

[7] *See* Ross Deposition Transcript at 13:19–21 (MSJ Resp. Appx. at 291).

[8] *See* Vargas Deposition Transcript at 6:14–23 (MSJ Resp. Appx. at 305); Declaration of Eugenio Vargas ¶ 3 ("Vargas Declaration") (MSJ Resp. Appx. at 187).

[9] *See* Ross Decl. ¶ 5 (MSJ Resp. Appx. at 165).

[10] *See* Vargas Decl. ¶ 3 (MSJ Resp. Appx. at 187); Ross Decl. ¶¶ 5 (MSJ Resp. Appx. at 165).

[11] *See* Ross Decl. ¶¶ 6–8 (MSJ Resp. Appx. at 165).

[12] *See id.* ¶ 7 (MSJ Resp. Appx. at 165); 7/4/17 Ross Letter to Nelson (MSJ Resp. Appx. at 173).

campaign but developed a personal animus to him based on his opposition to a union merger, told Mr. Ross: "I will work tirelessly to make sure you are out of office."[13] She engaged in a multi-year campaign of political opposition to Mr. Ross and his administration.[14]

6.      On March 1, 2018, Mr. Ross resigned as APFA National President under a negotiated "Transition Agreement."[15] The Transition Agreement provided that Mr. Ross would resign from his position as APFA National President and, in exchange, the APFA would pay Mr. Ross "his current salary and benefits, including full insurance coverage, through July 31, 2018," "all of his accrued and unused sick and accrued and unused vacation time, from April 1, 2016 through July 31, 2018, and "a one-time lump sum in the total amount of ten thousand dollars ($10,000.00), which represents Ross's moving expenses."[16] Additionally, the Transition Agreement bound "the APFA's Board of Directors, and its officers, employees, and agents" who were aware of the Transition Agreement to not make "orally or in writing, any statements disparaging [Mr. Ross] or his immediate family, whether or not such statements legally constitute libel or slander[.]"[17]

7.      On August 3, 2020, Mr. Ross received an email from APFA National President Julie Hedrick ("Hedrik") in which she informed Mr. Ross that the APFA was disclosing Mr. Ross's confidential Transition Agreement to APFA members. Mr. Ross never consented to disclosure of his Transition Agreement by the APFA nor did he disclose it to any other APFA members.[18]

8.      On November 10, 2020, Mr. Ross received a telephone call from APFA National

---

[13] *See* Ross Decl. ¶ 6 (MSJ Resp. Appx. at 165); Chinery-Burns' Social Media Posts (MSJ Resp. Appx. at 170–71).
[14] *See* Ross Hr'g Tr. at 40:24–41:7 (MSJ Resp. Appx. at 316–17).
[15] *See* Affidavit of Robert Ross in Support of Plaintiff's Original Petition and Motion to Vacate ¶ 1(a) ("Ross Affidavit") (MSJ Resp. Appx. at 2); Ross Decl. ¶ 9 (MSJ Resp. Appx. at 165).
[16] Transition Agreement at 1–2 (MSJ Resp. Appx. at 9–10).
[17] *Id.* at 2 (MSJ Resp. Appx. at 10).
[18] *See* Ross Decl. ¶ 10 (MSJ Resp. Appx. at 166); 8/3/20 Hedrick Email to Ross (MSJ Resp. Appx. at 175).

Treasurer Erik Harris ("Harris") wherein Harris informed Mr. Ross that the APFA Board of Directors found that Mr. Ross owed $5,436.47 for an overpayment.[19] On November 24, 2020, Harris contacted Mr. Ross again, emailing Mr. Ross to inform him that the alleged overpayment amount was based on an accounting review that determined that the per diem calculation used was improper.[20]

9.    Following the receipt of Harris's letter, Mr. Ross had multiple conversations with Harris and Hedrick and requested the information for the accounting firm and its calculations for their findings. Mr. Ross was never provided information regarding the firm or calculations other than the schedules included in the Harris letter.[21]

10.    Ms. Chinery-Burns and another union member, Sandra Lee, filed Article VII Disciplinary charges against Mr. Ross.[22] On December 1, 2020, those charges were presented to the APFA Executive Committee, which voted that the charges were valid, timely, and specific.[23]

11.    On June 16, November 17, and November 18, 2021, the *Chinery v. Ross* disciplinary proceeding was held and which Mr. Ross attended. Mr. Ross informed the arbitrator that "a deeper political agenda is what's facilitating all these Article VII charges and its disturbing,"[24] and referenced the "thousands of FaceBook posts derogatory against me by the accusers,"[25] but the arbitrator would not allow Mr. Ross to share evidence about Ms. Chinery-Burns' multi-year public campaign against him.[26] Yet current APFA national treasurer Erik Harris

---

[19] *See* Ross Decl. ¶ 11 (MSJ Resp. Appx. at 166); 11/24/20 Harris Letter to Ross (MSJ Resp. Appx. at 177–81).

[20] *See* Ross Decl. ¶ 12 (MSJ Resp. Appx. at 166).

[21] *See* Ross Aff. ¶ 1(e) (MSJ Resp. Appx. at 3–4).

[22] *See* 11/19/20 Black Letter to Ross (MSJ Resp. Appx. at 106–07).

[23] *See* Ross Decl. ¶ 13 (MSJ Resp. Appx. at 166); Ross Aff. ¶ 1(k) (MSJ Resp. Appx. at 5–6).

[24] Ross Hr'g Tr. at 41:17–24 (MSJ Resp. Appx. at 317).

[25] *Id.* at 47:3–17 (MSJ Resp. Appx. at 323).

[26] *Id.* at 220:12–18 (MSJ Appx. at 126) [Doc. 236].

testified that Ms. Chinery-Burns and Ms. Sandra Lee sought financial records *only* of the Ross Administration, revealing the true nature of the targeted political attack.[27] Later, in Mr. Vargas' disciplinary proceeding, Ms. Chinery-Burns confirmed that she "was focused on Bob Ross, that's just me. But it was Bob Ross, Nena Martin, it was all four of them. Bob Ross, Nena Martin, Eugenio Vargas, and Marcy Dunaway."[28]

12.    Throughout the hearing, Mr. Ross was unable to properly cross-examine Harris, and other witnesses for the prosecution, and denied the full opportunity to call all of Mr. Ross's witnesses.[29] The arbitrator also directed Mr. Ross to not introduce evidence related to his Transition Agreement or about Mr. Vargas and his role in the Ross Administration.[30]

13.    Mr. Ross subpoenaed all four APFA National Officers to testify and only Harris appeared to testify as to the documents that were submitted at the hearing. Mr. Ross also objected multiple times on and off the record that the evidence was not reliable, and Mr. Ross could not verify whether it was true and accurate. Mr. Ross told the arbitrator that he objected to admitting all the APFA's documents, but the arbitrator told Mr. Ross that the documents would not be considered reliable evidence of the truth (only evidence of compliance with a subpoena) and effectively coerced Mr. Ross into waiving his objections.[31]

14.    At the disciplinary proceeding, Mr. Ross was denied the opportunity to testify, question witnesses, and submit evidence relating to the overpayment debt that Mr. Ross allegedly owed to the APFA. Mr. Ross was denied the opportunity to question Harris about the calculation and payment of his sick and vacation days paid under the Transition Agreement. Mr. Ross was

---

[27] *See id.* at 132:20–133:20 (MSJ Resp. Appx. at 336–37).

[28] Vargas Hr'g Tr. at 440:4–17 (MSJ Resp. Appx. at 378).

[29] *See* Ross Decl. ¶ 14 (MSJ Resp. Appx. at 166–67).

[30] *See* Ross Aff. ¶ 1(m) (MSJ Resp. Appx. at 6).

[31] *See* Ross Decl. ¶ 15 (MSJ Resp. Appx. at 167); Ross Hr'g Tr. at 106:22–107:21 (MSJ Resp. Appx. at 334–35).

denied the opportunity to submit evidence of the number of accumulated and unpaid sick and vacation days for 2016, 2017, and 2018.[32]

15.     The charging parties also challenged the propriety of several expenditures. One of those related to Mr. Ross's purchase of certain furniture and reimbursement of the APFA for that purchase.[33] Mr. Ross testified that, although he was unable to locate the furniture, he instructed Mr. Vargas to pay the APFA back through payroll deduction.[34] Ms. Chinery-Burns testified that it was "the most disturbing thing I found,"[35] but she knew prior to Mr. Ross's hearing that he had paid the APFA back.[36] Ms. Lee testified that she was also aware, through Mr. Vargas, that Mr. Ross paid the APFA back for the furniture by payroll deduction.[37] Through the witnesses' testimony, the arbitrator was aware as well.[38] Moreover, multiple witnesses testified that policies governing furniture expenditures did not exist at the time anyways.[39]

16.     While serving as APFA National Treasurer, Mr. Vargas always submitted receipts for expenses for approval per APFA Procedures at the time. No expenses were ever submitted for alcohol expenses, personal meals, personal vacations, or any personal use. All expenses submitted were approved according to procedures in place with APFA at the time.[40]

17.     The APFA made Mr. Vargas aware of certain overpayments, which Mr. Vargas repaid through a promissory note on the condition that the APFA agreed to release all of its claims

---

[32] *See* Ross Decl. ¶ 16 (MSJ Resp. Appx. at 167).

[33] *See* Ashley Homestore Invoices and APFA Records (MSJ Resp. Appx. at 278–82).

[34] *See* Ross Hr'g Tr. at 462:13–463:22 (MSJ Resp. Appx. at 356–57).

[35] *Id.* at 350:23–351:2 (MSJ Resp. Appx. at 354–55).

[36] *See* Facebook Post, April 26, 2021 (MSJ Resp. Appx at 285).

[37] *See* Ross Hr'g Tr. at 294:14–295:3 (MSJ Resp. Appx. at 338–39).

[38] *See id.* at 300:13–301:12 (MSJ Resp. Appx. at 344–45); Vargas Hr'g Tr. at 181:20–17 (MSJ Resp. Appx. at 370–71).

[39] *See* Vargas Hr'g Tr. at 358:3–16, 608:7–13 (MSJ Resp. Appx. at 377, 384).

[40] *See* Vargas Decl. ¶ 18 (MSJ Resp. Appx. at 189).

against Mr. Vargas on account of those overpayments.[41]

18.     But Mr. Vargas was still charged by Ms. Chinery-Burns and Ms. Lee. On September 14, 15, and 16, 2021, the *Chinery-Lee v. Vargas* disciplinary proceeding was held and Mr. Vargas attended.[42] Mr. Vargas was unable to present certain evidence or cross-examine Harris.[43] Mr. Vargas' representative, Ms. Heidi J. Morgan, argued that the charges were a targed political attack on the Ross Administration.[44]

19.     During Mr. Ross and Mr. Vargas' disciplinary proceedings, Mr. Ross and Mr. Vargas learned for the first time of the "Confidential Memorandum," which had been prepared by CPA firm Wood, Stephens & O'Neil, L.L.P. and sent to the APFA Board of Directors and the Executive Committee on October 22, 2020.[45] The Confidential Memorandum states that Mr. Ross's "accrued and unused sick, and accrued and unused vacation time" payments appeared "appropriate and in compliance" with the Transition Agreement, and that Mr. Ross's "moving expense reimbursement payments did not exceed" the amount of $10,000 provided by the Transition Agreement.[46] It is undisputed that the Mr. Ross and Mr. Vargas were not provided a copy of the Confidential Memorandum prior to their disciplinary proceedings and that they were unable to cross-examine any witnesses about the Confidential Memorandum.

20.     The arbitrator issued his initial award against Mr. Ross on March 19, 2022 ("Initial Ross Award") and his Supplemental Decision and Remedy Modification on August 24, 2022

---

[41] *See* Vargas Decl. ¶ 17 (MSJ Resp. Appx. at 189); Affidavit of Craig Gunter ¶ 1(b) (MSJ Resp. Appx. at 196); Vargas Depo. Tr. at 35:4–15 (MSJ Resp. Appx. at 305).

[42] *See* Vargas Decl. ¶ 4 (MSJ Resp. Appx. at 187).

[43] *See id.* ¶¶ 5–15 (MSJ Resp. Appx. at 187–88).

[44] *See* Vargas Hr'g Tr. at 22:17 –23:4 (MSJ Resp. Appx. 367–68).

[45] Confidential Memorandum (MSJ Appx. at 547) [Doc. 236].

[46] *Id.* (MSJ Appx. at 547).

("Supplemental Ross Award," together with the Initial Ross Award, the "Ross Award").[47] In addition to several other punishments, the Ross Award imposed a lifetime ban on Mr. Ross serving in APFA leadership:

> Ross is prohibited from serving in any official position within the APFA organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. If Ross currently holds any official position presently, he is to resign said position. This is to bar Ross from any official position for life other than that of member.[48]

Notably, despite the evidence demonstrating that Mr. Ross already repaid the APFA for the furniture he purchased, the Ross Award ordered him "to repay $3,737.00 to the APFA for all the furniture he had purchased[.]"**[49]**

21.    The arbitrator issued his initial award against Mr. Vargas on February 18, 2022 ("Initial Vargas Award") and his Supplemental Decision Over APFA's Request for Clarification of the Remedy ("Supplemental Vargas Award," together with the Initial Vargas Award, the "Vargas Award") on March 10, 2022.[50] The Vargas Award also imposed a lifetime ban on Mr. Vargas serving in APFA leadership: "Vargas is prohibited from serving any official position within the organization that is set forth and included in the APFA Constitution and Policy Manual that is covered or identified. This is to bar Vargas from any official position for life other than that of member."[51]

22.    After the Ross Award and Vargas Award were entered, the APFA board published a "Hotline" to its members announcing the awards to APFA membership.[52] The APFA Board also

---

[47] *See generally* Initial Ross Award (MSJ Appx. at 219–42) [Doc. 236]; Supplemental Ross Award (MSJ Appx at 282–84).

[48] Initial Ross Award (MSJ Appx. at 242); Supplemental Ross Award at 3 (MSJ Appx. at 284).

[49] Initial Ross Award (MSJ Appx. at 242); Supplemental Ross Award at 2 (MSJ Appx. at 283).

[50] *See generally* Initial Vargas Award (MSJ Appx. at 442–480); Supplemental Vargas Award (MSJ Appx. at 481–82).

[51] Initial Vargas Award at 39 (MSJ Appx. at 480); Supplemental Vargas Award at 2 (MSJ Appx. at 482).

[52] *See* 3/24/22 Hotline (MSJ Appx. at 512).

9

passed Resolution #2 entitled "Chinery-Lee v Ross Arbitration Remedy," put forth by Hedrick, on March 24, 2022 ("Resolution"). The Resolution, published to the APFA's membership, falsely states that "the APFA Leadership condemns the actions Bob Ross took to defraud the members of APFA during his term as APFA National President."[53]

23.    To Mr. Ross' personal knowledge, the APFA has never banned an APFA member from holding office for life until they were so banned in accordance with the Ross Award and Vargas Award.[54] The APFA has also never publicly announced an Article VII Award in a Presidential Hotline Email to the APFA membership, until Mr. Ross and Mr. Vargas received the Ross Award and Vargas Award.[55]

24.    The Ross Award and Vargas Award, and the release of hotlines to the APFA membership, have intimidated Mr. Ross and stifled his dissent. They, along with the Resolution, have also defamed him and have created a hostile work environment for him.[56] Mr. Ross feels as though he has become an example for others to prevent dissent against a possible merger between AFA and APFA. Mr. Ross fears that he will suffer more retaliation by the APFA and his employer for his political position against a merger between the AFA and the APFA.[57]

## IV.    <u>LEGAL STANDARD</u>

The Court may grant summary judgment if the Defendants demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial burden of identifying the evidence "which it believes demonstrate[s] the absence of a genuine [dispute] of

---

[53] 3/24/22 APFA Board Resolution at 4 (MSJ Resp. Appx. at 274).
[54] *See* Ross Decl. ¶ 16 (MSJ Resp. Appx. at 167).
[55] *See id.* ¶ 17 (MSJ Resp. Appx. at 167); Ross. Depo. Tr. at 111:15–112:4 (MSJ Resp. Appx. at 292–93).
[56] Ross Depo. Tr. at 115:4–8, 115:22–116:5 (MSJ Resp. Appx. at 294–95).
[57] *See* Ross Decl. ¶ 18 (MSJ Resp. Appx. at 167); Ross Hr'g Tr. at 40:20–23, 47:3–17 (MSJ Resp. Appx. at 316, 323).

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 318, 323 (1986); *see also* FED. R. CIV. P. 56(c)(1). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson*, 477 U.S. at 242).

"The Court must view all evidence and reasonable inferences in the light most favorable to the nonmovant and determine whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Martin v. Transp. Workers Union of Am., Loc. 556*, 206 F. Supp. 3d 1227, 1231 (N.D. Tex. 2016) (Kinkeade, J.), *aff'd sub nom. Martin v. Loc. 556, Transp. Workers Union of Am.*, 708 F. App'x 171 (5th Cir. 2017). Importantly, courts may not "evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–55 (1986)). "How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021) (citing *Int'l Shortstop, Inc.*, 939 F.2d at 1263).

To obtain summary judgment on a counterclaim, a defendant "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Taylor v. Trevino*, 569 F. Supp. 3d 414, 423 (N.D. Tex. 2021) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). The "beyond peradventure" standard is "heavy." *Id.* (quoting *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923–24 (N.D. Tex. 2009). Satisfying this requirement means the movants "must demonstrate that there are no genuine and material fact disputes and that they are entitled to summary judgment as a matter of law." *Id.* (citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## V.    ARGUMENT

**A.    The Defendants Are Not Entitled to Judgment on Plaintiffs' Claims as a Matter of Law.**[58]

### 1.    The APFA Violated Mr. Ross and Mr. Vargas' Free-Speech and Due Process Rights Under the LMRDA

Mr. Ross and Mr. Vargas assert LMRDA claims based on Section 411(a)(2) and Section 411(a)(5), which they seek to enforce through Section 412, and based on Section 529.

#### a)    Legal Standard for LMRDA Claims

"The Labor–Management Reporting and Disclosure Act of 1959 was the product of congressional concern with widespread abuses of power by union leadership." *Martin v. Local 556, Transp. Workers Union of Am. AFL–CIO,* No. 3:14–CV–0500–D, 2014 WL 4358480, at *6 (N.D. Tex. Sept. 3, 2014) (Fitzwater, C.J.) (quoting *Finnegan v. Leu,* 456 U.S. 431, 435 (1982)). "Although the LMRDA as originally enacted focused on disclosure requirements and regulating union elections, over time various amendments have shifted the focus toward 'protection for members of unions paralleling certain rights guaranteed by the Federal Constitution[.]'" *Id.* (quoting *Finnegan,* 456 U.S. at 435).

"Section 411 of the LMRDA sets out the core of the guarantees afforded to members of labor organizations by the LMRDA." *Id.* "It constitutes a 'bill of rights,' and it is 'designed to guarantee every union member equal rights to vote and otherwise participate in union decisions,

---

[58] Mr. Ross's remaining live claims, asserted in his *First Amended Complaint* [Ross Doc. 75] are: Count I against the APFA (LMRDA claims under Sections 411(a)(2) and 411(a)(5), enforced through Section 412, and under Section 529); Count IV against the APFA (breach of contract for breaching the Transition Agreement); and Count V against the APFA, Hedrick, and Harris (defamation). Mr. Vargas' remaining live claim, asserted in his *Amended Complaint* [Vargas Doc. 133] is Count I against the APFA (LMRDA claims under Sections 411(a)(2) and 411(a)(5), enforced through Section 412, and under Section 529).

As indicated by Plaintiffs' original and stricken *Brief in Support of Plaintiffs' Response and Objections to Defendants' Motion for Summary Judgment* [Doc. 246], Mr. Ross has withdrawn the following claims: Count II (breach of union constitution); Count III (violations of Fair Credit Reporting Act); Count V (tortious interference with contract); and Count VI (breach of fiduciary duty). Likewise, Mr. Vargas has withdrawn the following claims: Count II (breach of union constitution); and Count III (breach of fiduciary duty). Additionally, in connection with this amended MSJ Response, Mr. Vargas withdraws Count IV (fraud).

freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline.'" *Id.* (quoting *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 540 n.15 (1984)). Mr. Ross and Mr. Vargas each assert claims under Section 411(a)(2), which states, in part, that "every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions[.]" 29 U.S.C. § 411(a)(2). They also each assert claims under Section 411(a)(5), which prescribes:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5). "The LMRDA provides two provisions that enable a union member to enforce the member's rights under this 'bill of rights,'" which includes subsection (a)(5): sections 412 and 529. *Id.* at *6.

"Section 412 of the LMRDA grants union members a private cause of action for a union's infringement of the rights secured by §§ 411–15." *Martin v. Transp. Workers Union of Am., Loc. 556*, 206 F. Supp. 3d 1227, 1232 (N.D. Tex. 2016) (citing *Martin*, 2014 WL 4358480, at *6). Section 412 says:

> Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

29 U.S.C. § 412. To establish a claim under section 412, Mr. Ross and Mr. Vargus "must show (1) that they are members of a labor organization and (2) that the organization infringed a right secured by § 411, 412, 413, 414, or 415." *Martin*, 2014 WL 4358480, at *6 (citing *Martinez v. Am. Fed'n of Gov't Emps.*, 980 F.2d 1039, 1041–42 (5th Cir. 1993)). Union officers can successfully

assert a claim under section 412 if they "can show that their removal from office 'was part of a scheme to subvert the union's basic democratic structure or otherwise directly implicated rights of members[.]" *Id.* (quoting *Adams–Lundy v. Ass'n of Prof'l Flight Attendants* ("*Adams-Lundy I*"), 731 F.2d 1154, 1159 (5th Cir. 1984)). Specifically, former union officers must establish "that the defendants are attempting to dismantle the union's electoral system, . . . or that members opposing that faction are . . . suppressed or threatened with reprisals." *Id.* (quoting *Adams-Lundy I*, 731 F.2d at 1159).

> Section 529 also provides union members a private right of action. It states:

> It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

29 U.S.C. § 529. To establish a claim under section 529, Mr. Ross and Mr. Vargas "must show that (1) they are members of a labor organization; (2) the organization fined, suspended, expelled, or otherwise disciplined them; and (3) the organization imposed the punishment in retaliation for their exercise of a right protected by the LMRDA." *Martin*, 2014 WL 4358480, at \*6 (citing 29 U.S.C. § 529).

> This Court has noted that "the primary difference" between sections 529 and 412 is that section 529 "protects against retaliation for the exercise of any right secured under the LMRDA," whereas section 412 "only protects rights secured under" sections 411 through 415. *Id.* (quoting *United Steel Workers Local 12-369 v. United Steel Workers Int'l*, 728 F.3d 1107, 1115 (9th Cir. 2013)). "Depending on the right the member seeks to protect, §§ 412 and 529 can be entirely duplicative." *Id.* (citing *United Steel Workers Local 12-369*, 728 F.3d at 1115 n. 4).

**b)    Section 411(a)(5)(C): Mr. Ross and Mr. Vargas Did Not Receive a Full and Fair Hearing.**

The evidence shows that Mr. Ross and Mr. Vargas' disciplinary proceedings, the arbitrator did not allow them to: admit key evidence; omit inadmissible evidence; compel key witnesses to attend and testify; or cross-examine key witnesses.[59] Mr. Ross and Mr. Vargas contend that these procedural and evidentiary errors impaired their "ability to establish the facts and circumstances surrounding the charges." *Yager v. Carey*, 910 F. Supp. 704, 714 (D.D.C. 1995), *aff'd,* 159 F.3d 638 (D.C. Cir. 1998). That open question is a genuine dispute of material facts that should preclude summary judgment on Mr. Ross and Mr. Vargas' Section 411(a)(5)(C) claim.

The Defendants ague that Section 411(a)(5)(C) only "requires the charging party to provide some evidence at the disciplinary hearing to support the charges made." *Martin,* 2014 WL 4358480, at *12 (quoting *Int'l Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 246 (1971)). That is true, but irrelevant. Mr. Ross and Mr. Vargas contend that for some of their charges, *no evidence* was presented. And, as the Supreme Court of the United States has "repeatedly held," under the LMRDA, "charges unsupported by any evidence is a denial of due process." *Hardeman*, 401 U.S. at 246.

On this point, it is undisputed that the APFA failed to provide Mr. Ross and Mr. Vargas a copy of the Confidential Memorandum prior to their disciplinary proceedings and so it was never considered by the arbitrator live—with testimony and cross-examination—during the hearings. There is a genuine dispute of material fact regarding whether the APFA was obligated to provide the Confidential Memorandum to Mr. Ross, Mr. Vargas, and the arbitrator, and whether the APFA's failure to do so materially, detrimentally affected Mr. Ross and Mr. Vargas' defenses in their disciplinary proceedings. The Defendants' reliance on O'Neil and Harris's self-serving,

---

[59] *See generally* Statement of Facts ¶¶ 11–15, 18–19.

unsworn declarations regarding the Confidential Memorandum do not eliminate the Parties' dispute of this material fact—they magnify it.

The Ross Award concludes: "An independent accounting firm determined the formula used to determine the daily rate assessed for sick and vacation payout was incorrect."[60] But that is not what the firm determined. By its own terms, the Confidential Memorandum says:

> Please note the Bob Ross confidential transition agreement states that he will be paid all of his accrued and unused sick, and accrued and unused vacation time. This agreement doesn't specify that the payments be made in accordance with the policy manual guidelines. Consequently, these payments appear appropriate and in compliance with the transition agreement. This agreement also specifies reimbursement payments to him of up to $10,000 in actual moving expenses. His moving expense reimbursement payments did not exceed this amount.[61]

Instead of standing by the ordinary meaning of the Confidential Memorandum's plain text, O'Neil has offered the Court a self-serving, unsworn declaration to interpret the Confidential Memorandum and his purported intentions when he wrote it. O'Neil now testifies:

> I understand that the Plaintiffs in this lawsuit contend that this quoted language means that I found Mr. Ross had been paid the appropriate total amount and had not been overpaid. That is incorrect and is not what I wrote nor what I meant. The area of contention, as communicated to me by Mr. Harris, was whether the hours Mr. Ross was paid were in compliance with the Transition Agreement rather than the APFA policy manual. I intended by that sentence to communicate only my finding, as reflected in the schedules, that Mr. Ross had been paid for the correct number of days provided for in the Transition Agreement. I did not intend to communicate that Mr. Ross had been paid the correct daily rate.[62]

The Confidential Memorandum directly contradicts O'Neil's new testimony. It does not say what O'Neil says that he "meant." This alone creates a genuine dispute of material fact that disallows summary judgment. And even if this Court were to admit O'Neil's testimony on the Confidential Memorandum, his testimony is directly contravened by other evidence in the record.

---

[60] Initial Ross Award (MSJ Appx. at 241) [Doc. 236]; Supplemental Ross Award at 2 (MSJ Appx. at 283).
[61] Confidential Memorandum (MSJ Appx. at 547).
[62] Declaration of Hal O'Neil, CPA ¶ 8 (MSJ Appx. at 545).

For example, in his deposition, Mr. Ross testified why he believes the APFA is incorrect regarding Mr. Ross's alleged overpayments: "The Union is wrong on several fronts. I've never been given, specifically, in those charts and graphs, how they came up with the exact $5,400. The charts and graphs state an overpayment yet the memo from Hal O'Neil states I was paid correctly."[63] O'Neil's declaration does not proffer undisputed facts—it creates disputed facts.

Additionally, Harris now testifies in a self-serving, unsworn declaration as to his interpretation of the Confidential Memorandum and his understanding of O'Neil's alleged intentions:

> Based on my discussions with Mr. O'Neil and the context of the preparation of his analysis, I understood the above quoted sections of the Memorandum, taken together with the Overpayment Schedule, to mean that Mr. O'Neil believed the number of days of accrued and unused sick and vacation which had been paid to Mr. Ross was consistent with the Transition Agreement read without regard to the APFA Policy Manual, but that the daily rate applied to each such day was in excess of that which was allowed, and therefore was an overpayment as reflected on Schedule C.[64]

Notably, O'Neil did not attend or testify at Mr. Ross or Mr. Vargas's disciplinary proceedings, Mr. Ross and Mr. Vargas were unable to cross-examine him.[65] And because the Confidential Memorandum was also not produced to Mr. Ross, Mr. Vargas, or the arbitrator before the proceedings, neither the arbitrator nor Mr. Ross and Mr. Vargas could question O'Neil regarding his purported intentions in drafting the Confidential Memorandum or Harris regarding his purported understanding of the Confidential Memorandum and O'Neil's purported intentions for it. The absence of O'Neil and the Confidential Memorandum is inexplicable, because Harris "knew that this Confidential Memo existed yet refused to talk to me about it," Mr. Ross has

---

[63] Ross Depo. Tr. at 203:15–24 (MSJ Appx. at 592) [Doc. 236].

[64] Declaration of Erik Harris ¶ 17 ("Harris Declaration") (MSJ Appx. at 526).

[65] *See* Initial Ross Award (MSJ Appx. at 219) (not including Mr. O'Neil on witness list); Initial Vargas Award at 2 (MSJ Appx. at 443) (same).

testified. There were "so many opportunities that APFA had to settle this and to discuss this with me, that they purposely chose not to go down that avenue[.]"[66]

O'Neil and Harris's self-serving testimony on the Confidential Memorandum has been offered for the first time at summary judgment before this Court. The effect of its omission from Mr. Ross and Mr. Vargas' disciplinary proceedings is an unresolved question of material fact. Defendants may argue that the "Arbitrator ruled that the issue had already been fully explained before rejecting it in the decision,"[67] but the Arbitrator's conclusory dismissal of Mr. Ross and Mr. Vargas' request to reopen their disciplinary proceedings offers no explanation for how the "issue was raised and argued at hearing."[68] The Motion does not attempt to explain this unsupported representation either. It only argues that the Confidential Memorandum's omission from the disciplinary hearings was inconsequential.[69] But the question of what detriment, if any, was caused by the Defendants withholding of the Confidential Memorandum prior to Mr. Ross and Mr. Vargas' disciplinary hearings is not for the Defendants to decide unilaterally or for the Court to determine at summary judgment; it is precisely the type of open fact question that prohibits summary judgment.

      **c)**      **Section 411(a)(2) and Section 529: Mr. Ross and Mr. Vargas Were Arbitrarily Punished for Their Free Speech and Their Lifetime Leadership Ban Violates Their Rights.**

The APFA's disciplinary proceedings against Mr. Ross and Mr. Vargas were "a subterfuge for their real motive of silencing plaintiffs' opposition to corruption and to prevent them from seeking office[.]" *Mandaglio v. United Broth. of Carpenters and Joiners of America (Gen. Ex.*

---

[66] Ross Depo. Tr. at 113:18–22 (MSJ Appx. at 582) [Doc. 236].
[67] Motion at 39.
[68] 2/28/22 Arbitrator Email to Black (MSJ Appx. at 217).
[69] Motion at 39.

*Board*), 575 F. Supp. 646, 654 (E.D.N.Y. 1983). This is because, "even if a union member faces legitimate, non-speech-related charges, he may not be disciplined if those charges are intertwined with charges that violate his free speech rights." *Farrell v. Hellen*, 367 F. Supp. 2d 491, 500 (S.D.N.Y. 2005).

The evidence supports Mr. Ross and Mr. Vargas' free speech and retaliation claims. Mr. Ross is a longtime, public opponent to the merger between the APFA and Association of Flight Attendants-CWA ("AFA"), and his opposition fueled his pursuit to lead the APFA.[70] Ms. Chinery-Burns, who filed the charges against Mr. Ross and Mr. Vargas and vehemently disagreed with Mr. Ross's stance on a APFA/AFA merger, informed Mr. Ross the day after he won the APFA presidency that she was committed to removing Mr. Ross from office.[71] Additionally, in the Initial Vargas Award, the arbitrator noted that Chinery-Burns testified that she supported Mr. Ross and Mr. Vargas when they ran for APFA elected office but "could no longer support Ross" because he "opposed the APFA's merger between Legacy U.S. Air and Legacy America" and she initiated a yearlong recall process for Mr. Ross and Mr. Vargas.[72]

Likely mindful that motives matter for purposes of Section 529, now Hedrick and Harris offer self-serving testimony to challenge Mr. Ross and Mr. Vargas' free speech and retaliation claims. Hedrick says the following in her declaration:

> I understand that Mr. Ross and Mr. Vargas both alleged that I have in some way been motivated in my actions regarding the overpayment to Mr. Ross, the Article VII proceedings, and the publication of the above referenced Hotlines, by a desire to penalize or retaliate against them for their supposed opposition to a merger between APFA and another labor organization. This allegation is false. I did not take any steps with regard to Mr. Ross or Mr. Vargas based on either my view or their view regarding a union merger. My actions described above have been in my capacity as National President of APFA and were all taken in furtherance of what

---

[70] *See* Ross Decl. ¶¶ 6–8 (MSJ Resp. Appx. at 165); 7/4/17 Ross Letter to Nelson (MSJ Resp. Appx. at 173).

[71] *See* Ross Decl. ¶ 6 (MSJ Resp. Appx. at 165); Chinery-Burns' Social Media Posts (MSJ Resp. Appx. at 170–71).

[72] Initial Vargas Award at 15 (MSJ Appx. at 457) [Doc. 236].

I view as my fiduciary duty to the organization and its membership. Moreover, since I came into office in 2020, there have been no steps taken toward any such merger on behalf of the APFA, not by myself or any other officer or representative of APFA of which I am aware.[73]

Harris testifies similarly:

I played no role in the preparation of the charges, nor the decision by Ms. Chinery and Ms. Lee to file charges. . . . I understand that Mr. Ross and Mr. Vargas both allege that I have in some way been motivated in my actions regarding the overpayment to Mr. Ross and the Article VII proceedings, by a desire to penalize or retaliate against them for their supposed opposition to a merger between APFA and another labor organization. This allegation is false. I did not take any steps with regard to Mr. Ross or Mr. Vargas based on either my view or their review regarding a union merger. My actions described above have been in my capacity as National Treasurer of APFA and were all taken in furtherance of what I view as my fiduciary duty to the organization and its membership, as well as the directions given to me by the APFA Board of Directors. Moreover, since I came into office in 2020, there have been no steps taken toward any such merger on behalf of APFA, not by myself or any other officer or representative of APFA of which I am aware.[74]

Hedrick and Harris's self-serving declarations regarding their views and motivations contradict Mr. Ross and Mr. Vargas' evidence and create triable issues of material fact that prevent summary judgment on Mr. Ross and Mr. Vargas' free-speech, due-process, and retaliation claims. The Court should be "reluctant to grant summary judgment" on these claims, because "the motives of the acts are relevant" to a Section 529 claim. *E.g., Farrell*, 367 F. Supp. 2d at 500 (denying summary judgment on claim based on Section 529 "to prevent the possibility that plaintiffs were expelled for protected dissent").

Even if the Court were to conclude that Mr. Ross and Mr. Vargas lack a claim that they were disciplined for exercising their free-speech rights, it can—and must—still conclude that Mr. Ross and Mr. Vargas' lifetime leadership ban impermissibly violates their LMRDA rights and APFA membership rights in perpetuity. As this Court has noted: "Although the Fifth Circuit has

---

[73] Declaration of Julie Hedrick ¶ 14 (MSJ Appx. at 511) [Doc. 236].
[74] Harris Decl. ¶¶ 22–23 (MSJ Appx. at 527–28).

not specifically held that being banned from holding union office is a form of discipline, it has stated in *dicta* that the right to run for office is a membership right. The court will therefore assume that a ban against running for union office is a form of discipline that is actionable under § 411(a)(5)."[75] *Martin*, 2014 WL 4358480, at *8; *see N.L.R.B. v. Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL-CIO*, 581 F.2d 473, 477 (5th Cir. 1978) ("The law of this circuit distinguishes between discharge from office, which is permissible . . . and sanctions affecting membership status, which are not[.]") (internal citations omitted); *see also N.L.R.B. v. Int'l Ass'n of Bridge Structural & Ornamental Iron Workers*, 864 F.2d 1225, 1235 (5th Cir. 1989) (noting that the Fifth Circuit *Boilermakers* decision "distinguishes between removal from office and sanctions affecting membership rights. The former may be permissible, while the latter almost never would be. At least three of our sister courts of appeals have recognized the right to run for office as a fundamental attribute of union membership that may not be restricted") (collecting cases).

The APFA Constitution guarantees "all members" certain rights, including "the right of free speech, freedom of assembly and freedom to dissent"[76] and "the right to due process and equal representation."[77] It also holds: "The rights and privileges of a member in good standing shall include, but not be limited to … running for an elected position, or holding an elected or appointed position with the APFA."[78] Additionally, "any active member in good standing may self-nominate

---

[75] This Court cited then-Chief Judge Fitzwater's *Martin* opinion to conclude that it possessed subject-matter jurisdiction over Mr. Ross and Mr. Vargas' LMRDA claims. *See Order Granting Motion to Amend and Denying Motions to Vacate and for Leave to File Sur-Reply* at 1 [Ross Doc. 74; Vargas Doc. 72].

[76] APFA Constitution art. II, § 3(A) (MSJ Resp. Appx. at 214).

[77] *Id.* at art. II, § 3(D) (MSJ Resp. Appx. at 214).

[78] *Id.* at art. II, § 4(B)(1)(d) (MSJ Resp. Appx. at 215). The APFA Constitution prescribes only two classifications for active members: "good standing" or "bad standing." *See generally id.* at art. II, § 4 (MSJ Resp. Appx at 215). An APFA member is in "bad standing," without the "rights, privileges, duties and responsibilities of good standing membership status," if—and only if—the member's dues are in arrears for more than sixty days or a "member's status has been changed to bad standing" through "a final and binding determination by the Article VII Arbitration pursuant

for any office or elected position with the APFA"[79] and "may be nominated by another member in good standing for any office or elected position with the APFA."[80]

Both Mr. Ross and Mr. Vargas have been impermissibly banned from holding—and, in effect, even running for—APFA office. It is undisputed that they are both members in good standing; therefore, the Ross Award and Vargas Award constitute a violation of Mr. Ross and Mr. Vargas' rights under the LMRDA and the APFA Constitution.

In Mr. Ross's disciplinary proceedings, "Plaintiff argued that Defendant Ross should be expelled from membership."[81] Although the arbitrator declined to strip Mr. Ross of his APFA membership, the Ross Award imposed a lifetime ban on APFA leadership on Mr. Ross.[82] Likewise, the Vargas Award also imposed a lifetime ban on APFA leadership on Mr. Vargas.[83] Based on Mr. Ross and Mr. Vargas' personal knowledge, the APFA has *never* banned other members from ever holding office. And it has been enforced. As recently as December 2023, the APFA has denied members' attempts to nominate Mr. Ross as a candidate for a national officer position with the APFA.

The simple fact that Mr. Ross and Mr. Vargas are suffering lifetime leadership bans, in contravention of their LMRDA and APFA membership rights, is sufficient for the Court to deny the Motion as to Mr. Ross and Mr. Vargas' Section 411(a)(2) and Section 529 claims. Courts have denied motions for summary judgment simply because "defendants dispute plaintiff's contentions that he was excluded from exercising his membership rights in the union," because such

---

to the procedures" of the APFA Constitution. *Id.* at art. II, § 4(C) (MSJ Resp. Appx. at 216). Otherwise, the member is in good standing.

[79] *Id.* at art. VI, § 1(A) (MSJ Resp. Appx. at 241).

[80] *Id.* at art. VI, § 1(C) (MSJ Resp. Appx. at 241).

[81] Initial Ross Award (MSJ Appx. at 241) [Doc. 236].

[82] *See* Initial Ross Award (MSJ Appx. at 242); Supplemental Ross Award at 3 (MSJ Appx. at 284).

[83] *See* Initial Vargas Award at 39 (MSJ Appx. at 480); Supplemental Vargas Award at 2 (MSJ Appx. at 482).

"disputations give rise to a genuine issue of material fact that precludes the entry of summary judgment." *E.g., Runyan v. United Broth. of Carpenters*, 566 F. Supp. 600, 604 (D. Colo. 1983) (denying defendants' motion for summary judgment on claims, including a Section 529 claim, because those "issues must await consideration by the trier of fact").

### 2.    The APFA Breached Mr. Ross's Transition Agreement.

The APFA is not entitled to summary judgment on Mr. Ross's breach of contract claim. Under Texas law, the elements for a breach of contract are: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Coim USA Inc. v. Sjobrand Inc.*, 663 F. Supp. 3d 684, 688–89 (N.D. Tex. 2023) (citing *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019)).

The evidence shows that every element of Mr. Ross's breach of contract claim has been satisfied and that there are no genuine disputes of material fact as to each element. It is undisputed that Mr. Ross and the APFA were parties to the Transition Agreement, which is a valid contract. Mr. Ross performed under the Transition Agreement. But the APFA did not, and Mr. Ross has suffered damages.[84]

First, the APFA breached the Transition Agreement by underpaying Mr. Ross. In December 2019, the APFA made its "final payment" under the Transition Agreement, but that "final payment" resulted in Mr. Ross being underpaid in accordance with the terms of the Transition Agreement.[85]

---

[84] Notably, the APFA withdrew its argument that the Transition Agreement's arbitration provision mandates dismissal of Mr. Ross's breach of contract claim. *See Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment* at 30, n. 23 [Doc. 242] ("Defendant's Response to Plaintiffs' Partial MSJ").

[85] 12/13/19 Gunter Email to Early Regarding Ross Pay (MSJ Resp. Appx. at 276).

In the Defendants' Response to Plaintiffs' Partial MSJ, the Defendants raised—for the first time—a statute of limitations defense to Mr. Ross's breach of contract claim.[86] But is undisputed that the APFA failed to assert in its answer—and has thus waived—limitations as an affirmative defense to Mr. Ross's breach of contract claim. *See Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986) (Fed. R. Civ. P. 8(c) requires that an affirmative defense be set forth in a defendant's responsive pleading. Failure to comply with this rule, usually results in a waiver."). Mr. Ross would be prejudiced if the APFA may assert that affirmative defense over two years after Mr. Ross commenced this case and the discovery window has long since passed.

Even if the Court permits the Defendants to raise a limitations defense now, the claim is not barred. "Under Texas law, a breach-of-contract claim is subject to a four-year statute of limitations." *Sheet Pile, L.L.C. v. Plymouth Tube Co., USA*, 98 F.4th 161, 166 (5th Cir. 2024) (citing Tex. Civ. Prac. & Rem. Code § 16.051). A cause of action normally accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Id.* (quoting *Archer v. Tregellas*, 566 S.W.3d 281, 288 (Tex. 2018)). "Accordingly, 'a cause of action for breach of contract accrues at the moment the contract is breached.'" *Id.* (quoting *Archer*, 566 S.W.3d at 288). It is undisputed that the Transition Agreement does not include a date of performance, and so Mr. Ross's cause of action for breach of contract began to accrue no earlier than when the APFA ceased paying under the Transition Agreement in December 2019, while the APFA's obligations remained.

Second, the APFA, through Hedrick, Harris, and the rest of the board, breached the Transition Agreement by violating its non-disparagement clause. As shown below, the APFA defamed Mr. Ross through the publication of its Hotline and the APFA Board's Resolution.

---

[86] *See* Defendants' Response to Plaintiffs' Partial MSJ at 28.

Accordingly, the APFA is not entitled to summary judgment on Mr. Ross's breach of contract claim. To the contrary, Mr. Ross has established his breach of contract claim against the APFA and he is entitled to his attorneys' fees under Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 38.001.

### 3.    The APFA Defamed Mr. Ross.

Summary judgment is not warranted on Mr. Ross's defamation claim because the evidence creates a genuine dispute of material facts. "The elements of a defamation claim under Texas law for a private figure are 'that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting negligently with regard to the truth of the statement.'" *Shaunfield v. MB Fin. Bank, N.A.*, No. 3:15-CV-0856-L, 2016 WL 631928, at \*4 (N.D. Tex. Feb. 17, 2016) (quoting *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 596 (5th Cir. 2007)). "A defamatory statement is one in which the words tend to damage a person's reputation, exposing him or her to public hatred, contempt, ridicule, or financial injury." *Id.* (citing *Encompass Off. Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 958 (E.D. Tex. 2011)).

The Motion incorrectly contends that Mr. Ross cannot identify any false statements, and, even if he can, that the Defendants did not intend to make any false statements. It claims that Mr. Ross's defamation cause of action "fails for want of evidence" simply because Mr. Ross objected to the Defendants' interrogatories.[87] Aside from the fact that the Defendants did not file a motion to compel, this is an overstatement; on the next page of the Motion, the Defendants even acknowledge Mr. Ross's deposition testimony, which states that he considers the "Hotline" that the APFA published on March 24, 2022 regarding the Ross Award to be a defamatory statement.[88]

---

[87] Motion at 48.

[88] *See id.* at 49.

In his deposition, Mr. Ross has testified that the Defendants "put a hotline out from an arbitration award that they knew was false,"[89] explaining as follows:

> Well, as a long-standing Union rep with knowledge of prior arbitrations, prior litigations, it has always been the long-standing practice that we don't name names, that you don't single out a person, that you redact names when you're talking about things like dues forgiveness.
>
> My name wasn't redacted. It was a full-page spread out there of what the arbitration award was, and there were numbers given to the membership that they know were incorrect. And at no time was I ever conferred with to correct those. And it was done specifically to mar my reputation, as a dues-paying member in good standing, to my co-workers, of which I have had to live with harassment and volatility ever since.[90]

The Hotline and the Resolution, which asserts that Mr. Ross took his actions to "defraud the members of APFA,"[91] constitutes a defamatory statement. Nowhere in the Ross Award was Mr. Ross found to have defrauded APFA members. The Defendants cannot deny the falsity of the Resolution and Hotline through wordsmithing—equivocating the arbitrator's findings on alleged breaches of fiduciary duties with an unmade determination on actual fraud. As Mr. Ross testified, "They have caused my co-workers to think I'm a thief and an embezzler. And I was never charged with that."[92] The Resolution and Hotline, taken together, are an intentional false statement that has damaged Mr. Ross's reputation.

To avoid liability, Hedrick now offers an unsworn declaration to establish her mental state when the APFA published the Hotline and Resolution. She says: "I firmly believed, and continue to believe, that it was our obligation as National officers to provide this information to APFA members…. I believed at the time of publication of both Hotlines, and believe today, that all of

---

[89] Ross Dep. Tr. at 115:4–8 (MSJ Resp. Appx. at 294).

[90] *Id.* at 111:15–112:4 (MSJ Resp. Appx. at 292–93).

[91] 3/24/22 APFA Board Resolution at 4 (MSJ Resp. Appx. at 274).

[92] Ross Dep. Tr. at 115:22–116:5 (MSJ Resp. Appx. at 294–95).

the factual statements therein are true."[93] But Hedrick's self-serving declaration does not eliminate the Parties' genuine dispute of material facts regarding Mr. Ross's defamation claim—it emphasizes it. Specifically, Hedrick attempts to testify as to her mental state—her purported beliefs and intentions—to try to nullify an essential element of Mr. Ross's defamation claim.

Hedrick's testimony necessitates the denial of the Defendants' motion for summary judgment as to Mr. Ross's defamation claim. At this summary-judgment stage, the Court may not evaluate Hedrick's credibility, weigh the Parties' evidence, or resolve factual disputes. *See Int'l Shortstop, Inc.*, 939 F.2d at 1263 (citing *Anderson*, 477 U.S. at 253–55). Further, Mr. Ross is entitled to cross-examine Hedrick, before a trier of fact, regarding her mental state when the Hotline and Resolution were published. Because a genuine dispute of material fact regarding Mr. Ross's defamation claim remains, the Court should deny the Defendants' motion for summary judgment as to that claim. *See Guzman*, 18 F.4th at 161 (citing *Int'l Shortstop, Inc.*, 939 F.2d at 1263) ("How much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage.").

## B.    The Defendants Are Not Entitled to Judgment on Their Counterclaims as a Matter of Law.

The Court should deny the APFA's request for summary judgment on its two Section 501 Counterclaims against Mr. Ross and Mr. Vargas, because the APFA is not entitled to judgment on either counterclaim as a matter of law. [94]

---

[93] Hedrick Decl. ¶ 12 (MSJ Appx. at 510–11) [Doc. 236].

[94] The APFA originally asserted breach of fiduciary duty claims under both Section 501 and under Texas common law [Ross Doc. 8, Vargas Doc. 11]. The Court entered its MTD Orders, in which the Court concluded that "the APFA's counterclaim for breach of fiduciary duty under Texas common law is time barred" as Mr. Ross, and "largely time barred" as to Mr. Vargas and "any payments allegedly received prior to June 13, 2018." MTD Orders at 1–2. It is apparent, based on the Motion, that the APFA has abandoned its state-law fiduciary duty claim against Mr. Vargas.

First, even if there are no genuine disputes of material facts, Section 501 does not confer the APFA—or any other labor organization—with a federal breach of fiduciary duty claim against its representatives. Therefore, the Court must deny the Motion and should *sua sponte* dismiss the Section 501 Counterclaims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(h)(3) without prejudice or, alternatively, for failure to state a claim upon which relief may be granted under Rule 12(b)(6) with prejudice.

Second, even if the APFA may assert federal breach of fiduciary duty claims against Mr. Ross and Mr. Vargas, those counterclaims are subject to genuine disputes of material facts that a trier of fact must resolve.

Third, even if there is a federal right of action available to unions under Section 501 (there is not), there are no genuine issues material facts (there are), and the Court grants summary judgment for the APFA (it should not), the APFA nevertheless cannot recover attorneys' fees under Section 501 as a matter of law.

Accordingly, the Court should deny summary judgment, dismissing the Section 501 Counterclaims or allowing a trier of fact to resolve the open material fact questions, and hold that the APFA is not entitled to attorneys' fees under Section 501.

### 1. The Court Should Hold that Section 501 Does Not Confer a Federal Breach of Fiduciary Duty Claim to Unions and Dismiss the Section 501 Counterclaims.

The Motion represents that Section 501 gives unions a federal cause of action to enforce the federal fiduciary duty created by the statute.[95] In purported support, the Motion cites a single holding from a different federal circuit's court of appeals. The Motion does not otherwise explain how Section 501's plain text prescribes a federal breach of fiduciary duty claim to the APFA. It

---

[95] *See* Motion at 50 ("Violations of this duty are enforceable in federal court: a union 'may sue an unfaithful officer in federal court for an accounting of ill-gotten gains.' *Ward*, 563 F.3d at 287.").

also does not acknowledge that the Fifth Circuit is silent on this issue. On top of that, it does not note that there is a circuit split on whether Section 501 provides for an *implied* right of action for unions—a question which the Supreme Court of the United States has yet to resolve (and which at least one current Associate Justice of the Supreme Court of the United States has previously indicated should be answered by holding that a union does *not* possess, expressly or impliedly, any claim under Section 501).

In the absence of binding precedent, this Court should analyze the statutory text independently and rigorously. For reasons below, a straightforward interpretation of the original meaning of the statute's plain text forecloses the Section 501 Counterclaims. Under the Federal Rules of Civil Procedure and the Fifth Circuit's binding precedent, this Court should deny the Motion and *sua sponte* dismiss the Section 501 Counterclaims for lack of subject-matter jurisdiction, or, alternatively, for failure to state a claim upon which relief may be granted.

a)    **The Court May *Sua Sponte* Dismiss the Section 501 Counterclaims for Lack of Subject-Matter Jurisdiction or for Failure to State a Claim.**

The Fifth Circuit affirms that district courts "may, for appropriate reasons, dismiss cases *sua sponte*." *Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021). "The broad rule is that 'a district court may dismiss a claim on its own motion as long as the procedure employed is fair.'" *Id.* at 498 (quoting *Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 310 (5th Cir. 2014)). "More specifically, 'fairness in this context requires both notice of the court's intention and an opportunity to respond' before dismissing *sua sponte* with prejudice." *Id.* (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006)).

Regarding subject-matter jurisdiction, the Federal Rules of Civil Procedure mandate that "the court must dismiss the action" if "the court determines at any time that it lacks subject-matter jurisdiction[.]" FED. R. CIV. P. 12(h)(3). Interpreting Rule 12(h)(3), the Fifth Circuit has expressly

29

said that "*sua sponte* dismissal is mandatory when a court discovers that it lacks subject-matter jurisdiction." *Carver*, 18 F.4th at 497. However, the Fifth Circuit has clarified that its "precedents also make clear that a jurisdictional dismissal must be *without* prejudice to refiling in a forum of competent jurisdiction." *Id.* (internal citations omitted). Accordingly, for the reasons provided below, the Court may *sua sponte* dismiss the Section 501 Counterclaims without prejudice for lack of subject-matter jurisdiction.

Alternatively, if the Court determines that it has subject-matter jurisdiction over the Section 501 Counterclaims, the Court may also *sua sponte* dismiss them for the APFA's failure to state a claim upon which the Court may grant relief. *See id.* at 497 (noting that *sua sponte* dismissal is "also appropriate when a complaint fails to state a claim"); *see also Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 642 (5th Cir. 2007) ("We have held that a district court is 'authorized to consider the sufficiency of the complaint on its own initiative.'") (quoting *Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir. 1991)). The Court may do so if, prior to or in connection with denying the Motion, the Court first notifies the APFA of the court's "intention" to dismiss the Section 501 Counterclaims with prejudice and provides the APFA with "an opportunity to respond." *See Carver*, 18 F.4th at 496.

### b)    Section 501's Plain Text Does Not Prescribe Unions with a Federal Right of Action.

When interpreting and analyzing a statute, a court begins with the statute's plain text. As another judge on this Court has suggested, "this Court begins with the ordinary meaning of the controlling statute's plain text. If the text is unambiguous, the Court's inquiry ends. If the text's meaning is ambiguous, the Court may consider the text's context. And if the context provides no clarity, the Court may use appropriate canons of interpretation." *Serafini v. Sw. Airlines Co.*, 485

F. Supp. 3d 697, 701 (N.D. Tex. 2020) (Starr, J.) (citing Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2144 (2016)).

"Congress's legislative purpose is assumed to be accurately expressed by the statutory language's ordinary meaning." *Id.* (internal citation omitted); *see Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252, 124 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194 (1985)); *cf. Van Houten v. City of Fort Worth,* No. 4:12-CV-826-Y, 2015 WL 13651282, at *5 (N.D. Tex. Apr. 7, 2015) (Means, J.), *aff'd,* 827 F.3d 530 (5th Cir. 2016) (similarly noting that, when interpreting the state constitution, "courts are directed to rely heavily on its literal text, giving effect to its plain language," and when interpreting local ordinances, "courts look first to the ordinance's plain language and give words their ordinary meaning"). This is why "the Supreme Court has often repeated a critical principle: when the text of the statute is clear, the court does not resort to legislative history." Kavanaugh, *supra* at 2134–35 (citing *Hughes Aircraft v. Jacobson*, 525 U.S. 432, 438 (1999)).

As the Motion acknowledges, Section 501 creates a federal fiduciary duty for union representatives to "hold [the union's] money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder[.]" 29 U.S.C. § 501(a). Section 501 also creates a federal right of action for union members to sue union representatives "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization" when any union representative "is alleged to have violated the duties declared in subsection (a) and the labor organization or its governing board or officers refuse or fail to sue or

31

recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization[.]" 29 U.S.C. § 501(b).

Courts acknowledge, virtually universally, that the plain text of Section 501 does not prescribe a federal right of action for unions to sue its representatives for alleged breaches of their federal fiduciary duty. Even the Supreme Court of the United States has acknowledged this fact. *See, e.g., Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 375 n. 16 (1990) (Section 501(b) "by its terms, does not establish a private right of action for a union itself…. That language certainly contemplates that a union may bring suit against its officers in some forum, but it does not expressly provide an independent basis for federal jurisdiction. Courts have reached inconsistent positions on the question whether a union may bring suit under § 501") (collecting cases).

Despite this, many courts then immediately consider whether the absence of a union's express right of action under Section 501 means that there is an implied right of action. But Mr. Ross and Mr. Vargas respectfully suggest that Section 501's plain text is clear; therefore, the Court need not—and it should not—consider whether Section 501 provides an implied right of action at all.

       c)      **Section 501 Does Not Afford Unions an Implied Federal Right of Action.**

If the Court is unconvinced that the ordinary meaning of Section 501's plain text is clear, then the Court should employ relevant canons of interpretation to still conclude that Section 501 does not provide unions with an implied right of action. U.S. Supreme Court Justice Kavanaugh recommends the following statutory-interpretation approach:

> …statutory interpretation could proceed in a two-step process. First, courts could determine the best reading of the text of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying any other appropriate semantic canons of construction. Second, once judges have arrived at

the best reading of the text, they can apply — openly and honestly — any substantive canons (such as plain statement rules or the absurdity doctrine) that may justify departure from the text.

Kavanaugh, *supra* at 2144. A couple canon options follow.

An important private-right canon to guide this Court's analysis is the presumption against implied right of action: "A statute's mere prohibition of a certain act does not imply creation of a private right of action for its violation. The creation of such a right must be either express or clearly implied from the text of the statute." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 313 (2012). "Courts should not look at large for 'congressional intent,'" but "they should look for the fair import of the statute." *Id.* at 316. Put differently, "a private right of action cannot be found to be 'implied' unless the implication both is clear and is based on the text of the statute—not exclusively on its purpose." *Id.* at 317.

The court should also consider employing the negative-implication semantic canon: "The expression of one thing implies the exclusion of others (*expression unius est exclusion alterius*)." *Id.* at 107. "But the United States Supreme Court's rejection of implied rights of action is based not on a negative implication from an express private right of action but instead on the principle that federal courts do not possess the lawmaking power of common-law courts. If Congress does not create a private right of action for violating one of its laws, the courts have no power to create one." *Id.* at 109.

Then-D.C. Circuit Judge Kavanaugh's dissenting opinion in *International Union, Security, Police & Fire Professionals of America v. Faye* is an excellent example of how courts may apply these substantive canons and similarly conclude that Section 501, "by its terms, does not give a *union*—as opposed to union members—a cause of action." *Int'l Union, Sec., Police & Fire Pros. of Am. v. Faye*, 828 F.3d 969, 985 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) (emphasis in original).

To begin his dissenting opinion, then-Judge Kavanaugh acknowledged that the "statutory silence has precipitated a circuit split." *Id.* On one hand, the "Seventh and Eleventh Circuits have held that unions have an implied cause of action under Section 501." *Id.* (citing *International Union of Operating Engineers, Local 150 v. Ward*, 563 F.3d 276 (7th Cir. 2009); *International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers, AFL–CIO v. Statham*, 97 F.3d 1416 (11th Cir. 1996)).[96] On the other hand, the "Ninth Circuit, by contrast, has held that unions do not have an implied cause of action under Section 501." *Id.* (citing *Building Material and Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500 (9th Cir. 1989)).

Then-Judge Kavanaugh noted the presumption against implied rights of action: "private rights of action to enforce federal law must be created by Congress,' not the Judicial Branch." *Id.* (quoting *Alexander v. Sandoval,* 532 U.S. 275, 276 (2001)). For this reason, courts should "be 'reluctant' to 'provide a private cause of action where the statute does not supply one expressly.'" *Id.* (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)). And the Supreme Court of the United States has determined that courts "may find an implied cause of action only if they determine that the statute 'displays an intent to create not just a private right but also a private remedy.'" *Id.* (quoting *Sandoval*, 532 U.S. at 286). "Applying the Supreme Court's precedents regarding implied causes of action," then-Judge Kavanaugh wrote, "I would conclude that Section 501 does not create an implied cause of action for unions." *Id.*

Unsurprisingly, then-Judge Kavanaugh began his substantive analysis of Section 501 with the statute's unambiguous text: "To begin with, the text is clear. Subsection (b) of Section 501 creates a cause of action for union *members*. It does not create a cause of action for *unions*." *Id.*

---

[96] With its majority opinion in *Faye*, which held that Section 501 provides unions with an implied federal cause of action and reversed the district court's dismissal of the union plaintiff's suit without prejudice for lack of subject-matter jurisdiction, the D.C. Circuit joined the Seventh Circuit and the Eleventh Circuit in the circuit split, which does not yet include the Fifth Circuit and which the Supreme Court of the United States has yet to resolve.

(emphasis in original). "Indeed, the text of Section 501 strongly suggests that Congress did *not* want unions to have a federal cause of action." *Id.* (emphasis in original). And even if courts concluded that the text of Section 501 is unclear, "the legislative history supplies *zero* indication that Congress wanted to create a federal cause of action for unions." *Id.* (emphasis in original). This is because Congress knew that, when it enacted Section 501, "unions, unlike union members, already could bring suit against union officers under state law." *Id.* at 986. "And so Congress did not need to—and did not—create a new federal cause of action for unions." *Id.*

The Court should similarly analyze Section 501's plain text, apply any relevant canons if necessary, and conclude also that "unions do not possess a federal cause of action to sue their officers for breaches of fiduciary duties." *Id.* at 983. This Court should then summarily deny the Motion as to the Section 501 Counterclaims, dismissing them for lack of subject-matter jurisdiction without prejudice or for failure to state a claim with prejudice.

This Court would not be alone if it did so. *See, e.g., Traweek*, 867 F.2d at 507 (reversing district court's judgment to the extent it was predicated on the union's Section 501 claim "because the union could not initiate the suit as a sole party plaintiff and therefore the district court lacked subject matter jurisdiction to consider the claim"); *Mid-Am. Carpenters Reg'l Council v. Bond*, No. 4:22-CV-00291-SEP, 2023 WL 2734209, at *4 (E.D. Mo. Mar. 31, 2023) (noting the Eighth Circuit's silence on the issue, citing then-Judge Kavanaugh's *Faye* dissenting opinion, and granting a motion to dismiss a union's Section 501 claim for failure to state a claim because "Section 501 does not create an implied cause of action for unions"); *United Bhd. of Carpenters & Joiners of Am. v. Shapiro*, No. 2:22-CV-01099-JHC, 2023 WL 2161701, at *2 (W.D. Wash. Feb. 22, 2023), *appeal dismissed*, No. 23-35183, 2023 WL 6236875 (9th Cir. July 7, 2023)

(granting motion to dismiss union's Section 501 claim for lack of subject-matter jurisdiction because the court concluded Section 501 "does not provide unions a right of action" and it declined to interpret the terms of Section 501(b) "to imply a right of action" under Section 501(a)); *Loc. 15 of Int'l Bhd. of Elec. Workers v. O'Reilly*, No. 02 C 6464, 2003 WL 29896, at *3 (N.D. Ill. Jan. 2, 2003) (dismissing union's Section 501 for failure to state a claim because "Section 501(a) does not provide a cause of action for unions to sue in federal court"); *United Transp. Union v. Bottalico*, 120 F. Supp. 2d 407, 410–11 (S.D.N.Y. 2000) (dismissing union's Section 501 claim because Section 501 "applies only to union members"); *Loc. 443, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Pisano*, 753 F. Supp. 434, 436 (D. Conn. 1991) (dismissing union's claim for lack of subject-matter jurisdiction because Section 501 "does not permit a *union* to sue its officials in federal court") (emphasis in original); *Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO v. Freeman*, 683 F. Supp. 1190, 1192 (N.D. Ill. 1988) (granting motion to dismiss union's Section 501 claim for lack of subject-matter jurisdiction because it "does not authorize a labor organization to sue"); *Loc. 624, Int'l Union of Operating Engineers v. Byrd*, 659 F. Supp. 274, 276 (S.D. Miss. 1986) (finding that the union did not have standing to sue under Section 501 and finding "that the better reasoned judicial position is that which declines to imply such standing to unions").

Along with several other district courts in various federal circuits, the Court would find itself on reasonable and predictable statutory-interpretation ground if dismisses the Section 501 Counterclaims because the law does not empower unions—expressly or impliedly—to assert federal breach of fiduciary duty claims. "Notably, as far as anyone is aware, the Supreme Court has never found an implied cause of action for one party to sue under a particular statute when Congress expressly created a cause of action for another party to do so," then-Judge Kavanaugh

wrote in his *Faye* dissent. "We should not start now." *Faye*, 823 F.3d at 986. This Court should not either.

      **d)**      **There is No "Law of the Case," "Law of the Circuit," or "Law of the District" Establishing That Section 501 Provides the APFA With a Federal Right of Action.**

The APFA will likely oppose Mr. Ross and Mr. Vargas' request to independently interpret Section 501 and dismiss the Section 501 Counterclaims for at least three reasons. The Court should overrule these potential concerns.

First, the Court should reject any argument premised on the mistaken belief that the Court has already ruled that Section 501 provides unions with a federal breach of fiduciary duty cause of action. The Court has not even considered that question in this case. Mr. Ross and Mr. Vargas' motions to dismiss only argued that the APFA failed to state a claim under Section 501(a) because the APFA did not first meet Section 501(b)'s "good cause" requirement.[97] At the time, Mr. Ross and Mr. Vargas did not argue that Section 501 does not prescribe unions a federal right to enforce its officers' fiduciary duties that arise under federal law.[98] And so, when the Court denied Mr. Ross and Mr. Vargas' motions to dismiss as to the Section 501 Counterclaims, the Court assumed that— but it did not decide that, because it was not argued whether—Section 501 affords the APFA with such a claim.[99] As the Supreme Court of the United States has said, "Questions which 'merely lurk

---

[97] See Plaintiff's Motion to Dismiss Defendant's Counterclaims and Brief in Support at 11–12 [Ross Doc. 59]; see Plaintiff's Motion to Dismiss Defendant's Counterclaims and Brief in Support at 11–12 [Vargas Doc. 58].

[98] Like the Motion, the APFA's responses to Mr. Ross and Mr. Vargas' motions to dismiss did not analyze the text of Section 501. They merely assumed, without any reasoning, that unions have standing to sue under Section 501. *See Response and Brief in Opposition to Plaintiffs' Motions to Dismiss APFA's Counterclaims* at 2 n. 5 ("The LMRDA Section 501(a) arguments by Ross and Vargas are erroneous. Contrary to their contentions, labor organizations have standing to sue under Section 501(a).") (citing *Fudge*, 2015 WL 56644229, at *7–8) [Ross Doc. 60]; *see Response and Brief in Opposition to Plaintiffs' Motions to Dismiss APFA's Counterclaims* at 2 n. 5 (same) [Vargas Doc. 59].

[99] *See Order Partially Granting Motion to Dismiss Counterclaim* at 3–4 ("Furthermore, given that the counterclaim was filed by the APFA, rather than a member acting after the APFA's refusal to file suit, the good-cause requirement of LMRDA section 501(b) is inapplicable to the APFA's claim under section 501(a).") (citing *Transport Workers Union of Am. v. Fudge*, No. 3:14-CV-3639-L, 2015 WL 56644229, at *7–8 (N.D. Tex. March 24, 2015) (Horan, M.J.), *report and recommendation adopted in part*, No. 3:14-CV-3639-L, 2015 WL 5682393 (N.D. Tex. Sept. 25, 2015)

in the record,' *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925), are not resolved, and no resolution of them may be inferred." *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 182 (1979). Therefore, the Court is free to—and should—determine, as a matter of first impression in this case, that Section 501 does not afford the APFA the right to assert the Section 501 Counterclaims.

Second, the Court should overrule any argument that the Fifth Circuit has held that Section 501 affords a union an express or implied right of action. The Motion cites the Fifth Circuit's opinion in *Adams-Lundy v. Ass'n of Prof'l Flight Attendants* ("*Adams-Lundy III*"), 844 F.2d 245 (5th Cir. 1988) in purported support of the Section 501 Counterclaims, but *Adams-Lundy III* is inapposite. In that case, the Fifth Circuit merely found that individual union members satisfied the statutory conditions precedent to assert a Section 501 claim. *See Adams-Lundy III*, 844 F.2d at 250. *Adams-Lundy III* stands for the unremarkable proposition that Section 501 is a federal right of action available to union members. As explained above, that holding is irrelevant to this case, in which *the union* is attempting to assert a federal cause of action that it does not possess expressly or impliedly. However, in the words of the *Adams-Lundy III* court, Section 501(b) "must be strictly construed because it extends the jurisdiction of federal courts." *Id.* at 249. The Fifth Circuit is otherwise silent on the issue before the Court today.

Third, the Court should also deny any incorrect assertion that, in the absence of binding Fifth Circuit precedent, the Court is bound by its own precedent on this issue. Mr. Ross and Mr. Vargas are aware of only two instances in which this Court has considered whether Section 501 creates a federal fiduciary duty claim for unions, and the Court is not bound by either of them.

---

(Linsday, J.)) [Ross Doc. 72]; *see Order Partially Granting Motion to Dismiss Counterclaim* at 3–4 (same) [Vargas Doc. 70] (collectively, "MTD Orders").

In 1984, this Court held that Section 501 allows a union to assert claims based on the statute. *See Ass'n of Pro. Flight Attendants v. Gibbs*, No. 4-82-593-E, 1984 WL 49097, at *1 (N.D. Tex. Mar. 8, 1984) (Mahon, J.), *rev'd on other grounds*, 804 F.2d 318 (5th Cir. 1986) (holding that Section 501 provides unions with a federal right of action because it "is clear that the labor organization has the first opportunity to sue its officers for violation of their fiduciary duties" and the "right of a union member to sue is premised upon the union's failure to sue"). The *Gibbs* court did not explain how the "words are the statute are clear," *id.*, and no court has ever cited to or relied on the *Gibbs* court's holding.

In 2015, this Court again determined that Section 501 affords a union a federal fiduciary duty claim. *See Transport Workers Union of Am. v. Fudge*, No. 3:14-CV-3639-L, 2015 WL 5664429, at *7 (N.D. Tex. March 24, 2015) (Horan, M.J.), *report and recommendation adopted in part*, No. 3:14-CV-3639-L, 2015 WL 5682393 (N.D. Tex. Sept. 25, 2015) ("Lindsay, J.") (Linsday, J.)) ("The undersigned concludes that Plaintiffs have standing to sue under Section 501(a) of the LMRDA, 29 U.S.C. § 501(a), and recommends that the Court deny Defendants' motion to dismiss on this ground."). The *Fudge* court effectively adopted the Southern District of Texas's analysis and conclusions—it did not conduct an independent analysis of Section 501's plain text. *See id.* ("Like the district court in *Stewart,* the undersigned 'finds the reasoning of the Seventh and Eleventh Circuits to be persuasive' and consistent with the Supreme Court's guidance on implied causes of action in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), 'and concludes that unions have an implied federal cause of action under Section 501(a) to sue for violations of the fiduciary duties imposed by the statute.'") (quoting *Stewart v. Int'l Ass'n of Machinists & Aerospace Workers*, 16 F. Supp. 3d 783, 793 (S.D. Tex. 2014)).

This Court is bound by the law, not its precedent. In each case, this Court has the ability and the duty to analyze and apply the law independently. *See, e.g., Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 462 (N.D. Tex. 2010) (Fitzwater, C.J.) (holding that the Court's contrary decision in a prior case with similar facts—*City of Irving*—did "not preclude the court from reaching a different result in this case" because "there is no such thing as the 'law of the district'" and that the "doctrine of *stare decisis* does not compel one district judge to follow the decision of another") (quoting *Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 (3d Cir. 1991)).[100] As the *Benavidez* court implied, this principle that there is no "law of the district" has extra weight when a district court's precedent predates intervening case law. *See id.* (noting that the Court's prior decision predated an opinion from the Fifth Circuit on the issue). The Court also may offer less deference to its precedent when the referenced case is unreviewable by the Fifth Circuit. *See id.* at 464 n. 19 ("Moreover, the parties in *City of Irving* have reached a settlement, meaning that Judge Solis's ruling will not be reviewed by the Fifth Circuit. The court therefore cannot say that *City of Irving* would stand undisturbed if reviewed under *Reyes* and other decisions of the Supreme Court and the Fifth Circuit.").

And so, the Court need not assume, without deciding, that *Gibbs* and *Fudge* are correct. Notably, *Fudge* resulted in a stipulated dismissal, and the Fifth Circuit did not review the *Fudge* court's holding.[101] And because the Fifth Circuit reversed the *Gibbs* decision on other grounds, it did not address the *Gibbs* court's holding regarding Section 501. *See generally Ass'n of Prof'l.*

---

[100] As then-Chief Judge Fitzwater acknowledged in *Benavidez*, although Mr. Ross and Mr. Vargas request the Court to conduct an independent analysis of Section 501, Mr. Ross and Mr. Vargas have the utmost respect for this Court, including Judge Mahon (*Gibbs*) and Judge Lindsay and Judge Horan (*Fudge*). *See Benavidez*, 690 F. Supp. 2d at 462 n. 17 ("The undersigned, of course, has the utmost respect for Judge Solis, who is an esteemed and able colleague.").

[101] *See Stipulation of Dismissal of Local 541's Claims Against Defendants* in *Fudge*, No. 3:14-cv-03639-L (N.D. Tex. Mar. 23, 2016) [Doc. 34]; *Stipulation of Dismissal* in *Fudge*, No. 3:14-cv-03639-L (N.D. Tex. Mar. 28, 2016) [Doc. 36].

*Flight Attendants v. Gibbs*, 804 F.2d 318 (5th Cir. 1986). Additionally, since the *Gibbs* and *Fudge* decisions, courts nationwide have analyzed Section 501 further and have reached opposite conclusions than this Court did in *Gibbs* and *Fudge*. Accordingly, as discussed above, the Court should look beyond its limited, unreviewed precedent and consider other persuasive case law to inform its requisite independent textual analysis here.

> **2.    If the Court Does Not Dismiss the Section 501 Counterclaims, the Court Should Deny Summary Judgment Because of Genuine Disputes of Material Fact.**

If Court does not dismiss the Section 501 Counterclaims, it may not simply defer to the Ross Award and Vargas Award and grant summary judgment on the Section 501 Counterclaims. There are genuine disputes of material fact that prohibit summary judgment on them. And, whether the Court considers or disposes of the Section 501 Counterclaims, the Court should hold that the APFA is not entitled to attorneys' fees under Section 501 as a matter of law.

> **a)    The Court Cannot Simply Defer to the Ross Award and Vargas Award to Decide the Section 501 Counterclaims—the Trier of Fact Must Resolve Genuine Disputes of Material Facts.**

To prove its Section 501 Counterclaims (assuming it can even assert them in the first place), the APFA may not simply hang its hat on the Ross Award and Vargas Award and call it a day. It must still prove its Section 501 Counterclaims, with evidence, before the trier of fact.

Earlier in this case, this Court identified an open issue that has yet to be resolved and which the Motion attempted to preempt: whether the APFA's Section 501 Counterclaims are effectively improper requests for this Court to enforce arbitration awards in contravention of the Fifth Circuit's holding in *Adams-Lundy v. Association of Professional Flight Attendants* (*Adams-Lundy II*), 792 F.2d 1368 (5th Cir. 1986).[102] In *Adams-Lundy II*, the Fifth Circuit held that "a federal court

---

[102] In its MTD Orders, the Court acknowledged that "the Court may be required to address the Fifth Circuit's decision in *Adams-Lundy* at some point in this lawsuit[.]" MTD Orders at 3 n. 2.

is without jurisdiction to enforce an arbitration award that adjudicates rights granted to union officers by an internal union document." *Id.* at 1373.[103] Cognizant of the *Adams-Lundy II* holding, the Motion purports to not seek "to enforce the Arbitration Awards in and of themselves, but instead seeks to enforce the federal fiduciary duty."[104] But the Motion reveals that, at the summary-judgment stage, this is a distinction without a legal difference. In the same paragraph, the Motion represents that the arbitrator has "conclusively determined" that Mr. Ross and Mr. Vargas violated the APFA's Constitution and Policy Manual and requests.[105] The Motion then adds that the arbitrator's "findings are unassailable on summary judgment."[106] In other words, the APFA says there are no genuine disputes of material fact because *the arbitrator* already resolved them—it effectively asks the Court, contrary to Fifth Circuit precedent, to bypass the finder of fact in *this Court* and simply enforce the Ross Award and Vargas Award. This is impermissible.

What the Fifth Circuit *has* held regarding the evidentiary burden to prove a Section 501 claim is this: the APFA must first establish that Mr. Ross and Mr. Vargas "benefited personally from an expenditure." *Ray v. Young*, 753 F.2d 386, 389 (5th Cir. 1985). This is because "absent a showing of personal benefit to the union officer, there is typically little reason to scrutinize his actions." *Id.* at 390. At the summary-judgment stage, the APFA must establish its claims "beyond peradventure." *Taylor*, 569 F. Supp. 3d at 423.

If the APFA meets its evidentiary burden, then Mr. Ross and Mr. Vargas have the opportunity, regardless of the Ross Award and Vargas Award, to demonstrate that "the funds or property were obtained with the valid authorization of the union after adequate disclosure and,

---

[103] As explained above, the Motion overstates the relevance and import of the Fifth Circuit's judgment in *Adams-Lundy III* as it relates to the Section 501 Counterclaims.

[104] Motion at 50.

[105] *Id.*

[106] *Id.* at 52.

second, that the expenditure was not manifestly unreasonable." *Ray,* 753 F.2d at 389. This is because "as long as the disbursement has been validly authorized in compliance with the union's constitution, bylaws, and resolutions, a court will typically not have cause to review the reasonableness of the disposition of property or funds." *Id.* at 390. Because there is a genuine dispute of material facts regarding their authorization, the APFA is not "entitled to summary judgment as a matter of law" on its Section 501 Counterclaims (assuming the Court does not dismiss them first). *Taylor*, 569 F. Supp.3d at 423.

The Fifth Circuit's framework reveals that there are genuine disputes of material facts in this case that prevent summary judgment. For example, the U.S. District Court for the District of Columbia, relying in part on the Fifth Circuit's holding in *Ray*, denied a motion for summary judgment by a union-member plaintiff alleging that union officers "violated their fiduciary duties" by "making unauthorized payments to themselves from union funds." *Noble v. Sombrotto*, 260 F. Supp. 2d 132, 133 (D.D.C. 2003).[107] The parties agreed that certain payments were made, but they disagreed about whether they were made in accordance with the union's constitution and whether they had been concealed. *See id.* at 134.

The *Noble* court's thorough opinion demonstrates how fact-intensive a Court's review of a Section 501 claim or counterclaim should be. The *Noble* court determined that, at the summary-judgment stage, it must answer three questions for each payment challenged under Section 501: (1) "whether the challenged practices violate the [union's] constitution on its face"; (2) if "ambiguities exist in the language of the [union's] constitution which preclude such a

---

[107] Notably, the plaintiff in *Noble* initiated his Section 501 lawsuit to seek relief after the union did not bring charges against the officers. *See Noble*, 260 F. Supp. 2d at 135 ("After delegates at the Special Meeting voted to reject the charges, plaintiff brough this suite under the LMRDA."). Here, the APFA has already pursued and received relief through disciplinary proceedings, and the APFA has not explained what justifies its attempt to seek additional and separate relief against Mr. Ross and Mr. Vargas after already securing the Ross Award and Vargas Award.

determination," then "whether the union's interpretation of the relevant constitution provisions was 'reasonable and made in good faith'; and (3) whether "the payments 'are manifestly unreasonable'" even if "the Court finds the payments were made in accordance with either the plain text of the constitution or defendants' reasonable interpretation thereof." *Id.* at 138 (adding that "in order to determine whether the individual defendants' actions are entitled to deference, the three-step analysis outline above must be conducted with respect to each of the challenged payments, and the appropriate level of scrutiny applied to defendants' conduct under Section 501). The *Noble* court emphasized that "as a general rule, such determinations have been made following a bench trial, at which testimony was offered and evaluated regarding facts relevant to the factors which should guide the courts' application of the relevant standards." *Id.* In fact, the *Noble* court referenced the Fifth Circuit's decision in *Ray*, the Second Circuit's decision in *Morrisey*, and the Fourth Circuit's decision in *Brink*—all cited by the APFA in the Motion—as examples of judgments only being entered on Section 501 claims following bench trials, which the APFA seeks to avoid here. *See id.*

The *Noble* court's opinion also reveals how the Motion's evidence and analysis for the Section 501 Counterclaims falls woefully short of this Court's "beyond peradventure" standard for summary judgment. Instead of engaging in a rigorous analysis to demonstrate that each alleged payment was a breach of fiduciary duty, the APFA asks the Court to blindly endorse the Ross Award and Vargas Award in contravention of *Adams-Lundy II*. But, as the evidence shows, there are genuine disputes of fact regarding Mr. Ross and Mr. Vargas' expenditures.

For example, consider the allegation that Mr. Ross improperly purchased furniture. The APFA cannot assert that Mr. Ross's purchase was a violation of his fiduciary duties, because it is

undisputed that he paid the APFA back and ultimately did not benefit from the purchase.[108] But even if the APFA could show that Mr. Ross benefited personally, it cannot show that this purchase violated the APFA Constitution on its face, because it is undisputed that policies governing furniture expenditures did not exist at the time.[109] The APFA's interpretation now is not made in good faith because the undisputed evidence shows that the charging parties, Ms. Chinery-Burns and Ms. Lee, knew that Mr. Ross had paid the APFA back.[110] The APFA also cannot show that furniture purchases were manifestly unreasonable, because the APFA cannot show Mr. Ross intended to breach his duties.

Critically, Mr. Ross and Mr. Vargas' "motivations are central to a determination of whether their conduct is 'manifestly unreasonable[.]'" *Id.* at 144. Hence, it would be appropriate for the Court to deny summary judgment on the Section 501 Counterclaims, permitting the fact finder to resolve factual disputes and evaluate and make determinations based on the parties' contradicting evidence.

### b)   The Section 501 Counterclaims are Barred by Laches.

Even if the Court were to determine that the APFA may assert the Section 501 Counterclaims, and even if the Court were to determine that there are no genuine issues of material fact, the Motion must be denied under the doctrine of laches. When the Court dismissed the APFA's state-law breach of fiduciary duty claims against Mr. Ross and Mr. Vargas, it determined that the "claim under LMRDA section 501 appears to be governed by the federal doctrine of laches,

---

[108] *See* Ashley Homestore Invoices and APFA Records (MSJ Resp. Appx. at 278–82); Ross Hr'g Tr. at 462:13–463:22 (MSJ Resp. Appx. at 356–57).

[109] *See* Vargas Hr'g Tr. at 358:3–16, 608:7–13 (MSJ Resp. Appx. at 377, 384).

[110] *See* Facebook Post, April 26, 2021 (MSJ Resp. Appx at 285); Ross Hr'g Tr. at 294:14–295:3 (MSJ Resp. Appx. at 338–39).

rather than the state statute of limitations[.]"[111] Assuming that to be the case, then the Section 501 Counterclaims are barred by laches as a matter of law.

In one of the opinions that the Court cited in its MTD Orders, the U.S. District Court for the Eastern District of Virginia considered the same affirmative defense in a Section 501 action brought by a union. *See generally Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543 (E.D. Va. 2020). The *Waters* court noted that "courts have not universally determined whether a cause of action brough pursuant to § 501(a) constituted an equitable claim," but added that was inconsequential—the "Court need not make a conclusive determination whether Plaintiff's claim constitutes an equitable claim, because Plaintiff's Complaint proves time-barred under either framework." *Waters*, 451 F. Supp. 3d at 551 ("Under a strict application of the analogous two-year statute of limitations, Plaintiff's Complaint falls outside the statute of limitations and must be dismissed. Similarly, an application of the doctrine of laches also renders Plaintiff's Complaint untimely.").

This Court has already determined that the APFA's state-law breach of fiduciary duty claim against Mr. Ross is barred, and the state-law claim against Mr. Vargas is effectively barred, by Texas's four-year statute of limitations as of July 13, 2018.[112] This determination is critical, because "[c]ourts 'presume that if an equitable claim is brought within the limitations period, it will not be barred by laches.'" *Waters*, 451 F. Supp. 3d at 552 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 787, 799 (4th Cir. 2001)). But "[w]hen, as here, claims are brought outside the analogous statute of limitations, laches typically prevents the cause of action from continuing, barring extraordinary circumstances." *Waters*, 451 F. Supp. 3d at 552.

---

[111] MTD Orders at 2.

[112] *Id.*

Because the APFA brought its Section 501 Counterclaims outside of the four-year statute of limitations for its corresponding state-law fiduciary duty claims, which the Court has already barred, the Section 501 Counterclaims are barred by laches. *See id.* at 552–53 ("Defendant has properly demonstrated Plaintiff's lack of diligence in filing by establishing that the action was not commenced within the period provided by the analogous statute of limitations and Plaintiff has failed to demonstrate why the Court should not bar its claim as untimely."). The APFA is not able to "explain any facts or circumstances that might otherwise excuse its delay in filing" its Section 501 Counterclaims; indeed, in light of the fact that Congress expressly did not provide unions with Section 501 claims because unions possess state-law fiduciary duty claims, it is apparent that the Section 501 Counterclaims are nothing more than an attempted end-around the state's statute of limitations. Therefore, the Section 501 Counterclaims are barred by laches as a matter of law.

### c)    The APFA Is Not Entitled to Attorneys' Fees as a Matter of Law.

Under no circumstance is the APFA entitled to attorneys' fees. The Fifth Circuit holds that the "recovery of attorney's fees is confined to two situations: (i) where, under the restrictive American rule attorney's fees are allowed; and (ii) where controlling substantive law permits recovery." *Mercantile Nat. Bank at Dallas v. Bradford Tr. Co.*, 850 F.2d 215, 216 (5th Cir. 1988). The APFA has not shown—and it cannot show—why the Court should deviate from the American rule. And there is no statutory basis to fulfil the APFA's demand.

The Motion briefly hints that Section 501 makes attorneys' fees available to the APFA, but the statute does not do so. Here is what the LMRDA provides:

> The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation.

29 U.S.C. § 501(b). By its plain text, Section 501(b) merely allows the Court, in its discretion, to designate a portion of an individual plaintiff's recovery to pay the plaintiff's attorneys' fees. This statutory provision makes sense: a union member is entitled to attorneys' fees out of the recovery he or she secures for the union because the union member litigates his or her Section 501 claim on behalf of the union. *See Loc. 815, Int'l Longshoreman's Ass'n, AFL-CIO v. Brazil*, 12 F. Supp. 2d 918, 919–20 (E.D. Wis. 1998) ("The section regarding attorney's fees therefore shifts the fees to the union as a whole, since it is the union that recovers any damages and receives any other benefit from the litigation.").

Section 501 does not require defendants to pay union members' attorneys' fees—it allows the Court to allot that reimbursement out of the amount that the union recovers the defendants. *See id.* at 920 ("Furthermore, the statute does not provide for attorney's fees above and beyond the award. It instead allows for the union to reimburse the individual plaintiff from its recovery."). In an opinion that the APFA cites in the Motion, the Second Circuit puts it this way:

> Section 501(b) specifically permits a court to award attorneys' fees *out of the union's recovery* in the underlying action. *There is no directive permitting it to charge the fees against individual officers.* Congress adopted a theory of beneficial recovery in § 501(b), that the individual union member who brings the action on his union's behalf confers a benefit on the union through his successful litigation. He is entitled to recover his costs *from the union* because, under the normal presumption against costs, the union would have had to pay those fees if it, and not the member, had undertaken the lawsuit.

*Morrissey v. Curran*, 650 F.2d 1267, 1281 (2d Cir 1981) (emphasis added). Importantly, the Fifth Circuit has also spoken on the issue of Section 501 attorneys' fees. It has also gone so far as to hold that, based on the words of Section 501(b), it is "apparent" that the liability to pay a Section 501 plaintiff's attorneys' fees belongs to the union:

> …the statutory liability *of the [union]* for attorney's fees attaches regardless of whether the monetary judgment against [the defendant union officers] is satisfied. So long as the Union realized some substantial benefit as the result of the litigation *it stands liable for the fees due the specified persons who secured these benefits*….

> We find therefore that there is no merit to the [union's] contention that satisfaction of the judgment is a prerequisite to *its liability* or that the [union] may not be required to pay out of *its treasury* substantial sums in excess of the net recovery (even if paid).

*Loc. No. 92, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO v. Norris*, 383 F.2d 735, 743–44 (5th Cir. 1967) (emphasis added). The Motion's own cited case law makes this abundantly clear: if the APFA can even bring a Section 501 claim at all, the APFA is liable for its own attorneys' fees.

The most straightforward interpretation of Section 501 is that it "does not provide for the payment of attorney's fees to the plaintiff when the plaintiff is the union itself and not an individual officer suing on behalf of the union." *Loc. 815, Int'l Longshoreman's Ass'n, AFL-CIO*, 12 F. Supp. 2d at 919; *see Morrissey*, 650 F.2d at 1281 ("Although no other court appears to have considered assessing fees against individual defendants, fees in § 501(b) litigation have been consistently charged solely against the unions and not the individual defendants, even where there was no monetary recovery by the union[.]"); *see also Faye*, 828 F.3d at 980–81 (Millett, J., concurring) ("On top of that, it seems textually impossible to shoehorn union-plaintiffs into the statute as Congress wrote it. Section 501(b) repeatedly refers to the authorized plaintiff as a 'member' of the labor organization in describing who may sue and how, as well as who can obtain attorneys' fees and costs. Needless to say, a union is not a member of itself.") (internal citation omitted).

For these reasons, even if the Court finds that the APFA has an implied right of action under Section 501, the Court should hold that it "has no authority to award" the APFA attorneys' fees and deny the APFA's attempt to recover any attorneys' fees from Mr. Ross and Mr. Vargas as a matter of law. *See Loc. 815, Int'l Longshoreman's Ass'n, AFL-CIO*, 12 F. Supp. 2d at 920; *see, e.g., Morrissey*, 650 F.2d at 1281 (concluding "that the District Court could not order

Morrissey's counsel fees to be paid by the individual defendants and that these fees can only be recovered from the Union").

## VI.    CONCLUSION

Plaintiffs Robert "Bob" Ross and Eugenio Vargas respectfully request that the Court: deny the Motion; dismiss Defendant Association of Professional Flight Attendants' Section 501 Counterclaims for lack of subject-matter jurisdiction, or, alternatively, for failure to state a claim upon which relief may be granted; hold that Defendant Association of Professional Flight Attendants is not entitled to attorneys' fees for its Section 501 Counterclaims as a matter of law; enter judgment against the Defendants; and grant such other and further relief to which the Plaintiffs are justly entitled at law or in equity.

Respectfully submitted,

By: /s/ Cortney C. Thomas

**BROWN FOX PLLC**

Cortney C. Thomas
  Texas Bar No. 24075153
  cort@brownfoxlaw.com
C. Alan Carrillo
  Texas Bar No. 24109693
  alan@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000
Facsimile: (214) 327-5001

*Attorneys for Plaintiffs Robert "Bob" Ross and Eugenio Vargas*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.